# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**USAMA JAMIL HAMAMA,**
**ATHEER FAWOZI ALI,**
**ALI AL-DILAMI,**
**HABIL NISSAN,**
**JIHAN ASKER,**
**MOAYAD JALAL BARASH,**
**SAMI ISMAEL AL-ISSAWI**,
**ABDULKUDER HASHEM AL-SHIMMARY,**
**QASSIM HASHEM AL-SAEDY,** and
**ABBAS ODA MANSHAD AL-SOKAINI,** on behalf of themselves and all those similarly situated,

       Petitioners and Plaintiffs,

 v.

**REBECCA ADDUCCI**, Director of the Detroit District of Immigration and Customs Enforcement,
**THOMAS HOMAN**, Acting Director of U.S. Immigration and Customs Enforcement, and
**JOHN KELLY,** Secretary of the U.S. Department of Homeland Security, in their official capacities,

       Respondents and Defendants.

Case No. 2:17-cv-11910

Hon. Mark A. Goldsmith

Mag. David R. Grand

Class Action

## FIRST AMENDED HABEAS CORPUS CLASS ACTION PETITION AND CLASS ACTION COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND MANDAMUS RELIEF

## INTRODUCTION

1.    This class action habeas petition and complaint for declaratory, injunctive, and mandamus relief is brought on behalf of Plaintiffs/Petitioners, who are Iraqi nationals who have resided in the United States, in many cases for decades.  They now face imminent removal to Iraq, and the very real probability of persecution, torture or death.

2.    Although most were ordered removed to Iraq years ago (some for overstaying visas, others based on criminal convictions for which they long ago completed any sentences), the government released them, often under orders of supervision.  Thus, until recently, Plaintiffs/Petitioners were living peaceably in the community, reporting regularly to U.S. Immigration and Customs Enforcement ("ICE"), and complying with their other conditions of release.

3.    This changed suddenly, when, with no warning, ICE began arresting and detaining Plaintiffs/Petitioners, in preparation for their imminent removal, because, the government says, Iraq has now agreed to take them back.

4.    According to government officials, there are more than 1,400 Iraqi nationals with final orders of removal.  These individuals, many of whom have lived in the United States for decades and have U.S. citizen spouses and children, now face deportation as a result of ICE's sudden decision to remove them based on removal orders, which may be decades old.  *See* Associated Press, "Detroit Judge

1

Halts Deportation of Iraqi Christians," The New York Times (June 22, 2017), https://www.nytimes.com/aponline/2017/06/22/us/ap-us-immigration-arrests-michigan.html.

5.      In Michigan, ICE arrested approximately 114 Iraqi nationals, mostly Chaldean Christians, on June 11, 2017.  Around the same time, at least 12 Iraqi nationals, mostly Kurds, were arrested by ICE in Nashville, Tennessee. Iraqi nationals have also recently been arrested by ICE in New Mexico and, according to news reports, in San Diego, California. ICE has been conducting operations around the country to arrest and deport Iraqi nationals.

6.      According to ICE officials, as of June 14, 2017, at least 85 Iraqi nationals had been arrested around the country, in addition to 114 Iraqi nationals arrested in the Detroit area.  It is unknown how many Iraqi nationals have been arrested since June 14, 2017.

7.      Upon information and belief, ICE has attempted to arrest, detain and remove many additional Iraqi nationals around the country, but has yet to locate them.  Upon information and belief, ICE intends to continue arresting, detaining and deporting Iraqi nationals around the country who have final orders of removal, which could result in the deportation of more than 1,400 people to Iraq, a country where they face a grave risk of persecution, torture or death.

8.      Iraqi nationals subject to ICE's sudden change in policy have been or

2

are currently detained in immigration detention facilities scattered throughout the United States, including but not limited to St. Clair County, Michigan; Calhoun County, Michigan; Youngstown, Ohio; Nashville, Tennessee; El Paso, Texas; Dallas, Texas; Jena, Louisiana; Alexandria, Louisiana; Florence, Arizona; and Fort Payne, Alabama.

9.     ICE has repeatedly transferred detainees from location to location, moving them far from their families and retained counsel, and making it exceptionally difficult for attorneys to either accomplish their role of representing them in immigration proceedings and filing appropriate motions and applications, or to file habeas petitions in federal court.

10.     Approximately 200 Iraqi nationals, or perhaps more, are now detained in various immigration detention facilities around the country.   They face imminent removal to Iraq, a country which they left years ago and which is listed on the U.S. State Department's Travel Advisory as a country which U.S. citizens should avoid because it is too dangerous.   *See Iraq Travel Warning*, U.S. Dep't of State        (last        updated        June        14,        2017), https://travel.state.gov/content/passports/en/alertswarnings/iraq-travel-warning.html.

11.     Upon information and belief, eight Iraqi nationals have already been deported as a result of ICE's sudden change in policy.   *See* Associated Press,

3

"Detroit Judge Halts Deportation of Iraqi Christians," The New York Times (June 22, 2017), https://www.nytimes.com/aponline/2017/06/22/us/ap-us-immigration-arrests-michigan.html.

12.    U.S. law prohibits the removal of individuals to countries where they would face a likelihood of persecution or torture.  Yet despite the clear danger that many of these individuals face in Iraq, ICE is attempting to deport them based on outstanding removal orders that do not take account of intervening changed circumstances which should entitle them to protection.  For example, many of the Plaintiffs/Petitioners are Chaldean Christians or Iraqi Kurds, both groups who are widely recognized as targets of brutal persecution in Iraq.  Indeed, the persecution is so extreme that over the last few years, attorneys representing ICE in Michigan immigration courts have consented to the grant of protection to Chaldeans.  Nonetheless, Chaldeans whose orders of removal were entered years ago are now facing removal to Iraq as if nothing has changed, and without any inquiry into the dangers they would currently face.  Likewise, Iraqi Kurds and other Iraqis face increased likelihood of persecution or torture due to changed conditions in Iraq.

13.    Plaintiffs/Petitioners—regardless of their religious belief—cannot lawfully be removed to Iraq without being afforded a process to determine whether, based on current conditions and circumstances, the danger they would face entitles them to protection from removal.  Specifically, Plaintiffs/Petitioners

4

ask this Court to issue an order preventing their removal to Iraq—and the removal of those similarly situated—until they are provided with some process to determine if they are entitled to protection in light of changed country conditions.

14.    In addition, Plaintiffs/Petitioners, on behalf of themselves and those similarly situated, challenge ICE's policy of transferring them from their home states to detention facilities in other parts of the country—a practice that is interfering with existing counsel relationships and making it difficult for those Plaintiffs/Petitioners without existing counsel to take advantage of efforts to mobilize pro bono counsel in their home states.

15.    Finally, Plaintiffs/Petitioners, on behalf of themselves and those similarly situated, challenge their detention, which bears no reasonable relationship to any legitimate purpose.  Because they cannot lawfully be removed until they have had an opportunity to renew their requests for protection, their detention is not necessary to effectuate their imminent removal.  Nor is their detention justified on the grounds of danger.  Prior to their arrest by ICE, all Plaintiffs/Petitioners had been peaceably living in the community and complying with their orders of supervision.  Plaintiffs/Petitioners ask this Court to order their immediate release, absent an individualized determination that they pose a danger or flight risk that requires their detention.

5

## JURISDICTION

16.     This case arises under the United States Constitution; the Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1101 *et seq.*; the regulations implementing the INA's asylum provisions; the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"), Dec. 10, 1984, S. Treaty Doc. No. 100-20 (1988), 1465 U.N.T.S. 85.; the Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), 8 U.S.C. § 1231 note; and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq.*

17.     This Court has habeas corpus jurisdiction pursuant to 28 U.S.C. §§ 2241 *et seq.*, and Art. I § 9, cl. 2 of the United States Constitution (Suspension Clause).   This Court may also exercise jurisdiction pursuant to 28 U.S.C. § 1331; 28 U.S.C. § 1361 (mandamus statute); 5 U.S.C. §§ 701 *et seq.* (Administrative Procedures Act); Art. III of the United States Constitution; Amendment V to the United States Constitution; and the common law.   This Court may grant relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq.*, and the All Writs Act, 28 U.S.C. § 1651, and has the ability to enjoin federal officials pursuant to *Ex Parte Young*, 209 U.S. 123 (1908).   *See Philadelphia Co. v. Stimson*, 223 U.S. 605, 619–21 (1912) (applying *Ex Parte Young* to federal official); *Goltra v. Weeks*, 271 U.S. 536, 545 (1926) (same). The Court also has jurisdiction to determine its own jurisdiction.   *United States v. United Mine Workers of Am.*, 330

U.S. 258, 290 (1947); *Derminer v. Kramer*, 386 F. Supp. 2d 905, 906 (E.D. Mich. 2005).

## VENUE

18.     Venue for the complaint for injunctive, declaratory and mandamus relief is proper under 28 U.S.C. § 1391(e), as Defendants are officers or employees of the United States acting in their official capacity.   Venue for the habeas action is proper under 28 U.S.C. §§ 2241 *et seq.*, as Respondents exercise control over Petitioners' custody. *Roman v. Ashcroft*, 340 F.3d 314, 319 (6th Cir. 2003) (recognizing that the ICE Field Office Director is the immediate custodian, and that higher level ICE official may be proper respondent in exceptional circumstances); *Vasquez v. Reno*, 233 F.3d 688, 696 (1st Cir. 2000).

## PARTIES

19.     Plaintiff/Petitioner **Usama Jamil "Sam" Hamama** is an Iraqi national who lawfully entered the United States in 1974 as a refugee. He and his family reside in West Bloomfield, Michigan.   Petitioner Hamama is married and has four U.S. citizen children, ages 11, 15, 17, and 19.   Although he has been subject to an order of removal to Iraq since 1994, he was released to the community under an order of supervision, with which he has fully complied.   On June 11, 2017, without warning, ICE came to his home and arrested him in front of his wife and children.   ICE then transferred him to the St. Clair County Jail where

he awaits imminent removal to Iraq.  Twenty-eight years ago, Mr. Hamama was convicted of felonious assault, possession of felony firearm, and carrying a pistol in a motor vehicle, for which he served a two-year sentence. He has had no convictions since that time.  Mr. Hamama fears removal to Iraq, especially because his status as a Chaldean makes him a target for violence and persecution. He wishes to continue his ongoing efforts to seek relief from removal.

20.    Plaintiff/Petitioner **Jihan Asker** is a 41-year-old Iraqi national who has lived in the United States since the age of five, most of this time near Warren, Michigan.  She has three children ages 23, 22, and 15, all of whom are U.S. citizens.  Although she has been subject to a final order of removal to Iraq since 1986, she was released on an order of supervision and has been living in the community complying with this order.  On approximately June 11, 2017, without warning, ICE arrested her, and transferred her to a detention center in Calhoun County, Michigan, where she awaits imminent removal to Iraq.  Ms. Asker is a beneficiary of an approved I-130 Petition filed by her United States citizen daughter.  As a result, she is eligible to seek lawful permanent residency in the US. In 2003, Ms. Asker was convicted of a misdemeanor fraud charge and sentenced to six months' probation. She has not reoffended since.  Ms. Asker fears removal to Iraq, especially because her status as a Chaldean makes her a target for violence and persecution. She wishes to continue her ongoing efforts to seek relief from

removal.

21.    Plaintiff/Petitioner **Moayad Jalal Barash** is a 47-year-old Iraqi national who has lived in the United States since at least 1979, most of this time near Warren, Michigan. He has four U.S. citizen children, ages 21, 20, 18, and 7. His seven-year-old daughter has a disability.  On information and belief Mr. Barash has been subject to a final removal order to Iraq for close to twenty years, and was living in the community pursuant to an order of supervision, with which he was complying.  On June 11, 2017, without warning, ICE arrested him, and transferred him to a detention center in Youngstown, Ohio, where he faces imminent removal to Iraq.  While still a teenager, he was convicted and served time for a drug charge and for possession of a weapon.  Since serving his sentences, he has been involved in the church and the sole breadwinner and source of support for his family.  Mr. Barash fears removal to Iraq, especially since his status as a Christian makes him a target for violence and persecution.  He wishes to continue his ongoing efforts to seek relief from removal.

22.    Plaintiff/Petitioner **Atheer Ali** is a 40-year-old Iraqi national who has lived in the United States since 1992.  He has a 12-year-old daughter who is in the seventh grade.  His family left Iraq for the United States when he was a child and he has lived in Michigan since.  Mr. Ali is a Christian and has a tattoo of a cross on his shoulder.  On information and belief, Mr. Ali has been subject to an order of

9

removal to Iraq since 2004, but was living in the community pursuant to an order of supervision, with which he was complying.  On June 11, 2017, without warning, Mr. Ali was arrested by ICE and transferred to a detention center in Youngstown, Ohio, to await removal to Iraq.  Mr. Ali's criminal history includes a felony conviction for breaking and entering a vehicle and receipt or concealment of stolen property in 1996 and convictions for drug possession more recently.  He was never sentenced to prison.  Mr. Ali fears removal to Iraq, especially because his visible status as a Christian will make him a target for violence and persecution.  In addition, he shares the same name as his father, a former General in the Iraqi Army, and fears targeting as a member of his father's family.  He wishes to continue his ongoing efforts to seek relief from removal.

23.    Plaintiff/Petitioner **Habil Nissan** is a 36-year-old Iraqi national who lawfully entered the United States in 1997 as a refugee at the age of 16 years old. Mr. Nissan resides in Sterling Heights, Michigan with his girlfriend and two U.S. citizen daughters, ages 9 and 10. Mr. Nissan pled guilty to misdemeanor destruction of property and two misdemeanor and assault charges in 2005, and was sentenced to twelve months of probation. Although Mr. Nissan has been subject to an order of removal to Iraq since 2007, he was released to the community under an order of supervision, with which he was complying.  On or about June 11, 2017, without warning, he was arrested by ICE and immediately transferred to the

detention center in Youngstown, Ohio where he awaits imminent removal to Iraq. He fears removal to Iraq, especially because his status as a Catholic makes him a target for violence and persecution.  He wishes to continue his ongoing efforts to seek relief from removal.

24.    Plaintiff/Petitioner **Sami Ismael Al-Issawi** is an Iraqi national.  He currently resides in Michigan with his wife and three children, all of whom are U.S. citizens.  Although he has been subject to an order of removal to Iraq since September 2013, shortly thereafter ICE released him to the community with an order of supervision, with which he has fully complied.  On June 11, 2017, without warning, ICE came to Mr. Al-Issawi's home and arrested him.   ICE then transferred him to a detention center in Youngstown, Ohio where he awaits imminent removal to Iraq. In January 1998, Mr. Al-Issawi was convicted of aggravated assault and sentenced to a term of imprisonment of over one year. With the assistance of counsel, this sentence was later reduced to 360 days.  Mr. Al-Issawi has not reoffended since that time.  Mr. Al-Issawi fears removal to Iraq, especially because his status as a Shiite Muslim makes him a target for violence and persecution.  He wishes to continue his ongoing efforts to seek relief from removal.

25.    Plaintiff/Petitioner **Ali Al-Dilaimi** is a 38-year old Iraqi national who entered the United States in 1998 as a refugee when he was nineteen years old. He

11

resides with his wife, U.S. citizen child, and U.S. citizen step child in Conneaut, Ohio. Although he has been subject to an order of removal to Iraq since 2004, ICE released him to the community under an order of supervision, with which he has fully complied for the past thirteen years. On June 11, 2017, without warning, ICE came to his home and arrested him. Thereafter he was transferred to a detention center in Youngstown, Ohio where he awaits imminent removal to Iraq. Seventeen years ago Mr. Al-Dilaimi was convicted for assault and sentenced to one year, of which he served five months. Upon information and belief, the conviction was later expunged. Mr. Al-Dilaimi fears removal to Iraq, especially because his status as a Shite Muslim makes him a target for violence and persecution. He wishes to continue his ongoing efforts to seek relief from removal.

26.     Plaintiff/Petitioner **Abdulkuder Hashem Al-Shimmary** is an Iraqi Kurd who first entered the United States as a refugee on September 22, 1994, when he was 30 years old. He resides in Nashville Tennessee, and is the father of three U.S. citizen children, ages 8, 10, and 11. Although he has been the subject of a final order of removal to Iraq since 2003, he was released to the community under an order of supervision, with which he has fully complied. On June 12, 2017, ICE arrested Mr. Al-Shimmary. ICE first held him in Nashville, Tennessee, and then transferred him to Jena, Louisiana, where he awaits imminent removal to Iraq. Over twenty years ago, Mr. Al-Shimmary was convicted for statutory rape of a

seventeen-year-old and possession of marijuana. He was sentenced to 45 days in jail with one year supervised probation.  As a result of the U.S. Supreme Court's May 30, 2017 decision in Supreme Court's decision in *Equivel-Quintana v. Sessions*, 137 S. Ct. 1562 (2017), Mr. Al-Shimmary is no longer removable from the United States.  Mr. Al-Shimmary fears he will face torture if returned to Iraq. He wishes to continue his ongoing efforts to seek relief from removal.

27.    Plaintiff/Petitioner **Qassim Hashem Al-Saedy** is a 47-year-old Iraqi national who has lived in the United States since entering as a refugee in 1996.  He lives in Nashville, Tennessee, is the father a 16-year-old U.S. citizen son, and the longtime partner and former spouse of a U.S. citizen.  Although he has been subject to a final order of removal to Iraq since September 23, 2003, he was released to the community pursuant to an order of supervision, with which he was complying. On June 12, 2017, without warning, ICE arrested and detained him. ICE first held Mr. Al-Saedy in Nashville, Tennessee, and then transferred him to detention center in Ft. Payne Alabama and then to a third detention center in Jena, Louisiana, where he faces imminent removal to Iraq. Mr. Al-Saedy was convicted of domestic assault in 2002. Mr. Al-Saedy fears removal to Iraq, especially because his longtime U.S. residence, his status as an apostate, and his work as a trainer for U.S. Armed Forces who fought there will make him a target for persecution and torture. He wishes to continue his ongoing efforts to seek relief

13

from removal.

28.     Plaintiff/Petitioner **Abbas Oda Manshad Al-Sokaini** is an Iraqi national who has lived in the United States since 1996, in Albuquerque, New Mexico. His wife is a U.S. citizen and he has three stepchildren, eleven grandchildren, and five great-grandchildren, all of whom are U.S. citizens.   On information and belief, Mr. Al-Sokaini has been subject to a final removal order since October 21, 2003, and until recently was living in the community pursuant to an order of supervision, with which he was complying.   On June 20, 2017, without warning, ICE arrested him, and transferred him to a detention center in El Paso, Texas, where he faces imminent removal to Iraq.   His transfer to Texas, away from his family in New Mexico, has made it difficult for his family to communicate with him and retain counsel for him.   On information and belief, when he was a young man, he was charged with a drug crime and was placed on supervision, but he was never sentenced to any period of incarceration.   Mr. Al-Sokaini fears removal to Iraq, especially since, although he still identifies as a Muslim based on upbringing, he has been involved with a Baptist Congregation in Albuquerque, which could make him a special target for persecution or torture.   He is particularly fearful because his family members in Iraq know that he is involved with the Baptist congregation and he believes that others in Iraq know as well. He wishes to continue his ongoing efforts to seek relief from removal.

14

29.     Respondent **Rebecca Adducci** is the Director of ICE's Detroit Field Office and is sued in her official capacity.  The Detroit Field Office Director has responsibility for and authority over the detention and removal of noncitizens in Michigan and Ohio, and is their immediate custodian, for purposes of habeas corpus.  *See Roman v. Ashcroft*, 340 F.3d 314, 319-321 (6th Cir. 2003). Defendant/Respondent Adducci has the power or ability to produce petitioners arrested or detained in Michigan or Ohio if directed to do so by this court.  *Id.* at 323.  To the extent that—after the filing of the original Petition in this matter—ICE has moved petitioners from Michigan or Ohio to other states outside of the area of responsibility of the Detroit District Field Office, Respondent Adducci remains the appropriate respondent for those petitioners. *See Rumsfeld v. Padilla*, 542 U.S. 426, 441 (2004); *White v. Lamanna*, 42 F. App'x 670, 671 (6th Cir. 2002).

30.     Defendant/Respondent **Thomas Homan** is the Acting Director of ICE and is sued in his official capacity. The Acting Director of ICE has responsibility for and authority over the detention and removal of noncitizens throughout the United States.  Mr. Homan also qualifies as the appropriate habeas respondent for all petitioners and class members, other than those originally arrested in Michigan, for purposes of habeas corpus, in the extraordinary circumstances present here, where, in order to preserve the petitioners' access to habeas corpus relief, it is necessary to file this action on behalf of a nationwide class and thereby depart

15

from the general rule that the immediate custodian is the local ICE Field Office Director. *Roman*, 340 F.3d at 322-27. The circumstances here include:

(a) Petitioners and class members who are not within the area of responsibility of the ICE Detroit Field Office may be deported from the United States as soon as Tuesday, June 27, 2017, and are located in various locations around the United States making it difficult or impossible to seek the emergency relief requested in every location in which they are located.

(b) ICE has repeatedly and rapidly transferred Petitioners and class members from location to location and away from their counsel and local community, so that their "immediate custodian" changes so rapidly that it is extremely difficult for Petitioners and class members to file habeas petitions in a given jurisdiction prior to transfer to another jurisdiction.  ICE has declined to stop such transfers.

In light of these circumstances, in order to protect Iraqis outside the jurisdiction of the Detroit ICE Field Office from imminent removal, habeas relief must be sought on behalf of a nationwide class.  *See Ali v. Ashcroft*, 346 F.3d 873, 889-91 (9th Cir 2003) (holding that the district court did not exceed its habeas jurisdiction in certifying a nationwide habeas class), *withdrawn and amended on other grounds on reh'g, Ali v. Gonzales,* 421 F.3d 795 (9th Cir. 2005).

16

31.   Defendant/Respondent Homan has the power or ability to produce petitioners located anywhere in the United States if directed to do so by this court, and this court has personal jurisdiction over him. *See Straight v. Laird*, 406 U.S. 341, 345 n.2 (1972) (commanding officer is present in a jurisdiction "through the officers in the hierarchy of the command," and such presence suffices for personal jurisdiction); *Braden v. 30th Judicial Circuit Court of Kentucky,* 410 U.S. 484, 495 (1973) ("So long as the custodian can be reached by service of process, the court can issue a writ 'within its jurisdiction' requiring that the prisoner be brought before the court for a hearing on his claim, or requiring that he be released outright from custody, even if the prisoner himself is confined outside the court's territorial jurisdiction.").

32.   Defendant John Kelly is the Secretary of Homeland Security and is sued in his official capacity.  Mr. Homan reports to Secretary Kelly, who therefore has supervisory responsibility for and authority over the detention and removal of noncitizens throughout the United States.

17

## LEGAL FRAMEWORK

33.     Consistent with U.S. obligations under the Refugee Act and the Convention Against Torture ("CAT"), the immigration statute (the Immigration and Nationality Act, or the "INA") prohibits the U.S. government from removing a noncitizen to a country where he or she is more likely than not to face persecution or torture.

34.     Specifically, 8 U.S.C. § 1231(b)(3), "Restriction on removal to a country where alien's life or freedom would be threatened," codifies the non-refoulement obligation of the Refugee Act.   The provision is a *mandatory* prohibition on removing noncitizens to a country where their life or freedom would be threatened on the grounds of race, religion, nationality, membership in a particular social group or political opinion.   Apart from certain specified exceptions, any individual who can demonstrate that it is more likely than not that he or she will be persecuted on one of the five protected grounds, is entitled to this statutorily mandated protection.  *See INS v. Stevic*, 467 U.S. 407 (1984) (holding that alien is entitled to relief from deportation if he is more likely than not to face persecution on one of the specified grounds following his deportation).

35.     The other prohibition on removal tracks the Convention Against Torture's prohibition on removal of noncitizens to countries where they would face torture.  *See* 8 C.F.R. §§ 208.16–.18 (implementing the Convention Against

18

Torture's provisions with regard to withholding of removal); Foreign Affairs Reform and Restructuring Act ("FARRA"), Pub. L. No. 105-277, Div. G., Title XXII, § 2242, 112 Stat. 2681-822 (Oct. 21, 1998) (codified as Note to 8 U.S.C. § 1231); U.N. Convention Against Torture and Other Forms of Cruel, Inhuman or Degrading Treatment or Punishment, art. 1, ¶ 1, opened for signature Dec. 10, 1984, S. Treaty Doc. No. 100-20 (1988), 1465 U.N.T.S. 85.

36.     Under the CAT, an individual may not be removed if "it is more likely than not that [the individual] would be tortured if removed to the proposed country of removal." 8 C.F.R. § 208.16(c)(2).  Torture is defined in part "as any act by which severe pain or suffering, whether physical or mental, . . . is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity."  8 C.F.R. § 208.18(a)(1).  The regulations provide for both withholding of removal under CAT and "deferral of removal." Whereas withholding of removal is subject to the same exceptions as apply to 8 U.S.C. § 1231(b)(3), deferral of removal contains no exceptions for people with "particularly serious crimes."  *Compare* 8 C.F.R. § 208.16(d)(3) *with* 8 C.F.R. § 208.17.

37.     Plaintiffs/Petitioners are also potentially eligible for asylum.  *See* 8 U.S.C. § 1158.  Asylum is a discretionary form of relief from persecution that is available to noncitizens who can demonstrate that they have a "well-founded fear

of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42). To prevail on an asylum claim, the applicant must establish that there is at least a 10% chance that he or she will be persecuted on account of one of these enumerated grounds. *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 439-40 (1987).

38.     Noncitizens who have been ordered removed have the statutory right to file motions to reopen their cases, which are governed by certain time and numerical requirements. *See* 8 U.S.C. § 1229a(c)(7). But the statute grants special solicitude for noncitizens who are seeking relief from persecution. If the noncitizen is seeking asylum, withholding, or protection under CAT based "on changed country conditions arising in the . . . country to which removal has been ordered," the statute permits the noncitizen to file a motion to reopen at any time. *Id.*, § 1229a(c)(7)(C)(ii); see also 8 C.F.R. § 1003.2(c)(3)(ii) (Board of Immigration Appeals); 8 C.F.R. § 1003.23(b)(4)(i) (Immigration Court).

39.     The exception to the numerical and time limits provides a critical safety valve for bona fide refugees who would otherwise be deported from the United States in violation of U.S. international treaty obligations of non-refoulement. *See Salim v. Lynch*, 831 F.3d 1133, 1137 (9th Cir. 2016) ("Judicial review of a motion to reopen serves as a 'safety valve' in the asylum process. . . . Such oversight 'ensure[s] that the BIA lives by its rules and at least considers new

20

information' bearing on applicants' need for and right to relief." (citing *Pilica v. Ashcroft*, 388 F.3d 941, 948 (6th Cir. 2004)).

40.    In addition, the Due Process Clause and the INA grant Plaintiffs/Petitioners the right to counsel to challenge their removal, and to a fair proceeding before they are removed from the country.  8 U.S.C. § 1362; *Leslie v. Attorney General*, 611 F.3d 171, 181 (3d Cir. 2010) (holding that the Fifth Amendment and immigration statute affords a noncitizen right to counsel of her own choice); *Amadou v. INS*, 226 F.3d 724, 726-27 (6th Cir. 2000) (noting that noncitizens have "due process right to a full and fair hearing").

41.    Both ICE's due process obligations and the INA constrain the government's discretion to transfer detainees, if transfer interferes with detainees' access to counsel.  *See Orantes-Hernandez v. Thornburgh*, 919 F.2d 549, 565-66 (9th Cir. 1990) (affirming injunction enjoining INS from transferring detainees in manner that interfered with existing attorney-client relationships).  Such transfers are unlawful when they interfere with detainees' constitutional, statutory, and regulatory rights to seek relief from persecution and obtain counsel of their choosing.  *See Louis v. Meissner*, 530 F. Supp. 924, 927 (S.D. Fla. 1981) (finding INS had thwarted detainees' statutory and regulatory rights to representation in exclusion proceedings by transferring them to remote areas lacking counsel and interpreters); *see also Rios-Berrios v. INS*, 776 F.3d 859, 863 (9th Cir. 1985)

21

(holding that noncitizen's transfer, combined with "unexplained haste in beginning deportation proceedings," his incarceration, inability to speak English, and lack of friends, deprived him of due process).

## FACTS

### ICE Abruptly Changes Its Policy with Respect to Release of Iraqis with Final Removal Orders, Without Notice to Those Affected.

42.     On information and belief, for many years, even when ICE has obtained final orders of removal against Iraqi nationals, ICE has only extraordinarily rarely actually carried out removals.  Instead, ICE has had a policy and practice of releasing Iraqi nationals with final removal orders under orders of supervision.  This approach had at least two rationales: First, Iraq generally declined to issue travel documents allowing repatriation.  Second, in at least some instances, ICE acknowledged that humanitarian considerations weighed against removal, given the danger posed by removal to Iraq.

43.     As a result of the deal that the current administration made with Iraq to remove it from the list of countries that were subject to a travel ban, Iraq recently agreed to issue travel documents for a large number of U.S. deportees.

44.     On or about June 11, 2017, ICE began arresting Iraqi nationals in Michigan who had previously been released on orders of supervision.  Around the same time, ICE arrested at least 12 Iraqi nationals in Nashville, Tennessee, several Iraqi nationals in New Mexico, and additional Iraqi nationals around the country.

22

45.    ICE's change in policy came as a shock to the communities where these Iraqi nationals lived, in many cases for decades.  Until then, Iraqis with final orders had been living at large, sometimes for decades, with few restrictions apart from regular reporting requirements.  Law-abiding individuals who have been fully compliant with their conditions of supervision suddenly found themselves arrested and transferred far from their families and counsel, with many being repeatedly transferred.

46.    Over the course of just a few days, approximately 200 Iraqi nationals were arrested and detained nationwide, for the purpose of effectuating their removal back to Iraq.  *See* Ben Klayman, "Iraqis Detained in Detention Sweep," U.S. News & World Report (June 14, 2017, 6:31PM), https://www.usnews.com/news/us/articles/2017-06-14/us-arrests-nearly-200-iraqis-in-deportation-sweep.

47.    Many of the Iraqis from Michigan now scheduled for deportation are from the country's Chaldean ethno-religious Christian minority, whose persecution in Iraq has been well documented.  For example, in 2015 the Sixth Circuit held, on the basis of country-conditions evidence, that "status as a Christian alone entitles [a non-immigrant alien] to withholding of removal, given that there is 'a clear probability' that he would be subject to future persecution if returned to contemporary Iraq."  *Yousif v. Lynch*, 796 F.3d 622, 628 (6th Cir. 2015).  And

23

conditions for Christians have gotten even worse in the subsequent two years.

48.    Yet despite the clear danger they face if removed to Iraq, ICE has defended its decision to remove them, and other Iraqi nationals, by trying to paint them as dangers to the community.  Asked for comment about the arrests, ICE described these arrests as "part of ICE's efforts to process the backlog of these individuals, the agency recently arrested a number of Iraqi nationals, all of whom had criminal convictions for crimes." Kyung Lah et al*., ICE Arrests In Metro Detroit Terrify Iraqi Christians,* CNN (June 12, 2017), http://www.cnn.com/2017/06/12/politics/detroit-ice-iraqi-christians/index.html.  In fact, many of the Iraqis who have been detained and are threatened with imminent removal were convicted of relatively minor crimes.  And many of their crimes were from years ago.  Abigail Hauslohner, *Dozens of Iraqi Nationals Swept Up In Immigration Raids In Michigan, Tennessee*, Wash. Post (June 12, 2017), https://www.washingtonpost.com/national/dozens-of-iraqi-nationals-swept-up-in-immigration-raids-in-michigan-tennessee/2017/06/12/58e0524a-4f97-11e7-be25-3a519335381c_story.html?.

**Individuals With Old Removal Orders Have Multiple Bases for Reopening Their Cases, Including Changed Country Conditions in Iraq That Put Them at Risk of Persecution or Torture if Removed.**

49.    Plaintiffs/Petitioners have multiple bases for reopening their removal cases, ranging from changed country conditions in Iraq, to changes in the law that

affect the classification of their convictions so that they no longer render the individual statutorily ineligible for protection.  With respect to changed country conditions, the Plaintiffs'/Petitioners' removal orders mostly predate the significant deterioration in Iraq following the government's destabilization and the rise of the so-called Islamic State.  This is true for detainees who are Chaldean and non-Chaldean, Christian, Muslim, and Yazidi.  Members of the Chaldean Christian ethno-religious minority, who form a large percentage of the Iraqis targeted in the recent raids, are particularly vulnerable to religious persecution in light of recent ethno-political violence.

50.    The change in country conditions with respect to Chaldeans is starkly reflected in the change in how their applications for protection have fared in the immigration court.  Until recently, these applications were routinely denied.  Now they are almost invariably granted.  The Detroit Office of Chief Counsel for ICE concedes that Iraqi Chaldeans have a greater than 50% chance of being persecuted in Iraq, and the grant rate in the Detroit Immigration Court for Chaldeans is at or very near 100%, for applicants not statutorily barred from relief.

51.    Other grounds for reopening removal orders to seek protection from removal include intervening appellate and Supreme Court decisions which shift what crimes are considered disqualifying aggravated felonies.  For example, when the Supreme Court decided *Moncrieff v. Holder*, 133 S.Ct. 1678 (2013),

25

convictions for sharing small quantities of marijuana were no longer aggravated felonies. Thus, individuals who were previously improperly classified by immigration judges could file motions to reopen to apply for asylum based on the intervening authority.

### Obstacles to Access to Counsel Created by ICE's Transfer of Plaintiffs/Petitioners to Detention Facilities in Other Parts of Country

52. The vast majority of the Iraqi detainees were transferred to detention facilities outside of the states where they reside and were arrested. For example, most of the Iraqis nationals arrested in Michigan were initially transferred over 230 miles from Detroit to Youngstown, Ohio. Upon information and belief, some have been transferred to detention centers in Jena, Louisiana and Florence, Arizona. Iraqi detainees arrested in Tennessee have been detained, often in rapid succession, in Alexandria and Jena, Louisiana; Dallas, Texas; Fort Payne, Alabama; and Florence, Arizona.

53. These transfers have effectively disrupted detainees' ability to access pre-existing counsel, while also making it difficult to access pro bono resources that have been mobilized by their local communities.

54. For example, for Iraqis arrested in Michigan and detained in Ohio (not to mention those detained in Louisiana or Arizona), the distance has made it difficult for Detroit-based attorneys with pre-existing attorney-client relationships to communicate, consult with, or aid their clients.

26

55.     And for those detainees who lack pre-existing counsel, the transfer to out of state facilities has severely impeded their ability to access counsel by physically removing the detainees from the network of local attorneys in their home community who have volunteered to provide pro bono representation.

56.     For many detainees, the situation has been made even more problematic, and due process even more elusive, by one or more subsequent transfers to even more distant locations.  For example, on information and belief, there are many detainees from Michigan who were first transferred to Youngstown, Ohio, then to Jena, Louisiana, and then to Florence, Arizona. Detainees arrested in Nashville, Tennessee, have been transferred in rapid succession to Alabama, Louisiana, and Arizona, although not necessarily in that order.

57.     Detainees' distant and repeat transfers away from their homes, families, and previously retained attorneys also hinder their ability to file motions to reopen by imposing additional burdens on their ability to obtain documents in support of such motions, and limiting locally-based attorneys' access to detainees. Filing motions to reopen requires substantial time and resources, and will be extremely difficult for detainees who lack assistance of counsel.  Those who have retained counsel still face additional hurdles in filing motions to reopen, because attorneys need to visit and interview clients to draft pleadings, all of which is

27

hindered due to their clients' transfer far away, and repeat moves.

58.   ICE's repeated transfer of detainees from jurisdiction to jurisdiction has also made it extremely difficult for counsel to file habeas petitions. Habeas petitions must normally be filed in a court with jurisdiction over the detainee's immediate custodian, who is typically the ICE Field Director. *See Roman*, 340 F.3d at 319-321. By rapidly transferring detainees from location to location, ICE has effectively prevented detainees' counsel from filing habeas petitions. Even if counsel can determine the detainee's location and prepare a petition for filing before the detainee is moved again, counsel generally are not barred in multiple states and therefore, in jurisdictions where they are not licensed, it is difficult for them to file rapidly enough to prevent deportation.

## CLASS ALLEGATIONS

59.   Plaintiffs/Petitioners incorporate by reference the foregoing paragraphs as if fully alleged herein.

60.   Plaintiffs/Petitioners bring this action on behalf of themselves and all other similarly situated persons pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2), and as a representative habeas class action for similarly situated persons pursuant to a procedure analogous to Rules 23(a) and 23(b)(2). *See Ali v. Ashcroft*, 346 F.3d 873, 889-91 (9th Cir 2003) (holding that the district court did not exceed its habeas jurisdiction in certifying a nationwide habeas

28

class), *withdrawn and amended on other grounds on reh'g, Ali v. Gonzales,* 421 F.3d 795 (9th Cir. 2005). *See also Geraghty v. U.S. Parole Commission*, 429 F. Supp. 737, 740 (M.D. Pa. 1977) (noting that "procedures analogous to a class action have been fashioned in habeas corpus actions where necessary and appropriate").

61.    There are numerous other Iraqi nationals nationwide who, like the named Plaintiffs/Petitioners, face imminent removal to Iraq, and the very real probability of persecution, torture or death.   Each of these similarly situated individuals is entitled to bring a complaint for declaratory and injunctive relief, a petition for a writ of mandamus, and a petition for a writ of habeas corpus, to prohibit his or her removal to Iraq.

62.    Plaintiffs Hamama, Ali, Al-Dilaimi, Nissan, Asker, Barash, Al-Issawi, Al-Shimmary, Al-Saedy, and Al-Sokaini bring this declaratory, injunctive and mandamus class action on behalf of themselves and all others similarly situated for the purpose of asserting claims alleged in this action on a common basis.   They seek to represent a class defined as: all Iraqi nationals in the United States with final orders of removal, who have been, or will be, arrested and detained by ICE as a result of Iraq's recent decision to issue travel documents to facilitate U.S. removal.   Plaintiffs, and the class they seek to represent, assert their declaratory, injunctive and mandamus claims against all Defendants.

29

63.     Petitioners Hamama, Ali, Al-Dilaimi, Nissan, Asker, Barash and Al-Issawi bring this habeas class action on behalf of themselves and all others similarly situated ("Michigan habeas sub-class") for the purpose of asserting claims alleged in this Petition on a common basis.  They seek to represent a sub-class defined as all Iraqi nationals within the jurisdiction of the Detroit ICE field office with final orders of removal, who have been, or will be, arrested and detained as a result of Iraq's recent decision to issue travel documents to facilitate U.S. removal, including those detained in Michigan and transferred outside of Michigan to other detention locations.  These petitioners, and the sub-class they seek to represent, bring their habeas petition against their immediate custodian, respondent Rebecca Adducci.

64.     Petitioners Al-Shimmary, Al-Saedy, and Al-Sokaini bring this habeas class action on behalf of themselves and all others similarly situated ("national habeas sub-class") for the purpose of asserting claims alleged in this Petition on a common basis. They seek to represent a class defined as: all Iraqi nationals with final orders of removal, who have been, or will be, arrested and detained by ICE as a result of Iraq's recent decision to issue travel documents to facilitate U.S. removal, other than members of the "Michigan habeas sub-class."  These Petitioners, and the class they seek to represent, bring their habeas petition against their immediate custodian, Thomas Homan.

30

65.     There are more than 1,400 Iraqi nationals with final orders of removal who could become members of the class.  Upon information and belief, there are more than 100 members of the Michigan habeas sub-class who have already been arrested and/or detained in Michigan and Ohio (the area covered by the Detroit ICE Field Office), and approximately 85 members of the national habeas sub-class who have been arrested and detained in other locations.  The total number of class members is such that joinder of the claims of all class members would be impracticable.

66.     Plaintiffs'/Petitioners' claims are typical of the claims of the proposed class and proposed sub-classes, and Plaintiffs/Petitioners will fairly and adequately protect the interests of the proposed class and sub-classes.  Plaintiffs/Petitioners have no relevant conflicts of interest with other members of the proposed class or sub-classes and have retained competent counsel experienced in class action and immigration law.

67.     There are multiple questions of law and fact common to the members of the proposed class and sub-classes.  These common questions include, but are not limited to, the following:

a. Whether Plaintiffs/Petitioners and the proposed class and sub-class members can be removed without providing them an opportunity to demonstrate their qualifications for relief from persecution or torture

31

based on changed country conditions in Iraq;

b. Whether 8 U.S.C. § 1158, 8 U.S.C. § 1231(b)(3), and the Convention Against Torture impose a mandatory obligation to consider Plaintiffs'/Petitioners' individualized requests for relief from persecution or torture;

c. Whether Defendants/Respondents are violating Plaintiffs'/Petitioners' constitutional, statutory, and regulatory right to counsel of their own choosing by transferring them far from their existing counsel, sometimes multiple times in a short period of time, which impedes their counsel's effective representation and, for those without counsel, prevents them from securing counsel; and

d. Whether Defendants/Respondents are violating Plaintiffs'/Petitioners' constitutional, statutory, and regulatory right to a fair removal hearing by preventing them from seeking reopening based on changed country conditions in Iraq by providing insufficient time and opportunity for such a filing.

## CAUSES OF ACTION

### COUNT ONE
### PROHIBITION ON REMOVAL TO COUNTRY WHERE INDIVIDUAL WOULD FACE PERSECUTION OR TORTURE

68.     Plaintiffs/Petitioners reallege the foregoing paragraphs as if set forth

32

fully herein.

69.    Pursuant to the INA, and to ensure compliance with international treaties for which it is a signatory, the U.S. government is prohibited from removing noncitizens to countries where they are more likely than not to face persecution or torture.

70.    The prohibition on removal is mandatory for anyone who satisfies the eligibility criteria set forth in the statute and regulations.   In addition, where country conditions change after an individual has been ordered removed, the INA specifically provides for motions to reopen a removal order in order to renew one's claims for protection in light of new facts.

71.    Plaintiffs/Petitioners, who are facing removal to Iraq based on old removal orders, face persecution and/or torture if removed to that country in light of changed circumstances since their cases were first considered.

72.    Defendants/Respondents have a mandatory duty under the INA and under the international treaties to which the U.S. is a signatory to determine for each Plaintiff/Petitioner and members of the class whether the individual will face persecution, torture, or death if deported to Iraq.

## COUNT TWO
## PROHIBITION ON REMOVAL TO COUNTRY WHERE INDIVIDUAL WOULD FACE PERSECUTION OR TORTURE WITHOUT DUE PROCESS GUARANTEED BY CONSTITUTION

73.    Plaintiffs/Petitioners reallege the foregoing paragraphs as if set forth

33

fully herein.

74.   As persons who are protected by the Due Process Clause, Plaintiffs/Petitioners have a right to a fair proceeding before they are removed from the country.

75.   Because the danger to Plaintiffs/Petitioners in Iraq is based on changed country circumstances, they have not received their core procedural entitlement:  They have not had an opportunity to have their claims heard at a meaningful time and in a meaningful manner, that is, with respect to current conditions, rather than the conditions that existed at the time their removal order was first issued.  Removing the Plaintiffs/Petitioners without giving them this opportunity violates the Fifth Amendment's Due Process Clause.

76.   Defendants/Respondents have a mandatory duty under the Due Process Clause to determine for each Plaintiff/Petitioner and members of the class whether the individual will face persecution, torture, or death if deported to Iraq.

**COUNT THREE**
**PROHIBITION ON TRANSFER OF IMMIGRATION DETAINEES AWAY**
**FROM COUNSEL**

77.   Plaintiffs/Petitioners reallege the foregoing paragraphs as if set forth fully herein.

78.   In addition to their Due Process Clause rights, pursuant to statute, Plaintiffs/Petitioners have a right to counsel, at no expense to the government, to

34

challenge their removal from the county. 8 U.S.C. § 1362.

79.     ICE's decision to transfer Plaintiffs/Petitioners who reside in one state to detention centers that are hundreds of miles away, and sometimes far further, is interfering with their statutory right to counsel and their due process right to a fair hearing.

## COUNT FOUR
## UNLAWFUL DETENTION

80.     Plaintiffs/Petitioners reallege the foregoing paragraphs as if set forth fully herein.

81.     Petitioners' detention violates due process unless it bears a reasonable relationship to the government's purposes—effectuating removal and protecting against danger.  *See Zadvydas v. Davis*, 533 U.S. 678 (2001); *Rosales-Garcia v. Holland,* 322 F.3d 386 (6th Cir. 2003).

82.     The government's detention of Plaintiffs/Petitioners bears no reasonable relationship to either purpose.  At a minimum, Plaintiffs/Petitioners must be afforded individualized determinations to assess whether their continued detention is justified.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs/Petitioners respectfully request that the Court grant the following relief:

A       Assume jurisdiction over this matter;

B.  Issue a temporary stay of Plaintiffs'/Petitioners' removal to Iraq until this action is decided;

C.  Certify:

1.  a class defined as all Iraqi nationals with final orders of removal, who have been, or will be, arrested and detained by ICE as a result of Iraq's recent decision to issue travel documents to facilitate U.S. removal ("the class");

2.  for purposes of habeas relief, a sub-class defined as all Iraqi nationals within the jurisdiction of the Detroit ICE field office with final orders of removal, who have been, or will be, arrested and detained as a result of Iraq's recent decision to issue travel documents to facilitate U.S. removal, including those detained in Michigan and transferred outside of Michigan to other detention locations ("Michigan habeas sub-class"); and

3.  for purposes of habeas relief, a sub-class defined as all Iraqi nationals with final orders of removal, who have been, or will be, arrested and detained by ICE as a result of Iraq's recent decision to issue travel documents to facilitate U.S. removal, other than members of the "Michigan habeas sub-class" ("national habeas sub-class');

D   Name Plaintiffs/Petitioners as representatives of the class and sub-classes, and appoint Plaintiffs/Petitioners' counsel as class counsel;

E   Declare that defendants have violated the rights of the  class;

F   Order the government to provide Plaintiffs/Petitioners' counsel with a list of all class members and copies of their  A files (immigration files);

G.  Enter a writ of mandamus and/or enjoin the government from removing Plaintiffs/Petitioners to Iraq without first providing them with an opportunity to establish that, in light of current conditions and the likelihood that they would suffer persecution or torture if removed to Iraq, they are entitled to protection against such removal;

H.  At a minimum, enjoin the government from removing Plaintiffs/Petitioners to Iraq until they have been given sufficient time

36

and access to attorneys to enable them to file motions to reopen their removal orders and seek stays of removal from the immigration court;

I.    Enjoin the government from transferring Plaintiffs/Petitioners to detention centers far from where they are apprehended, and that it order the government to transfer all detainees back to their home states where they were apprehended;

J.    Order the government to release all Plaintiffs/Petitioners from detention absent an individualized determination by an impartial adjudicator that their detention is justified based on danger or flight risk, which cannot be sufficiently addressed by alternative conditions of release and/or supervision;

K.    Award reasonable attorneys' fees and costs to Plaintiffs/Petitioners; and

L.    Grant such other further relief as is just and equitable.

Date:  June 24, 2017

Respectfully submitted,

/s/Michael J. Steinberg
Michael J. Steinberg (P43085)
Kary L. Moss (P49759)
Bonsitu A. Kitaba (P78822)
Miriam J. Aukerman (P63165)
AMERICAN CIVIL LIBERTIES
   UNION FUND OF MICHIGAN
2966 Woodward Avenue
Detroit, Michigan 48201
(313) 578-6814
msteinberg@aclumich.org

/s/Wendolyn Wrosch Richards
Kimberly L. Scott (P69706)
Wendolyn Wrosch Richards (P67776)
Cooperating Attorneys, ACLU Fund
   of Michigan
MILLER, CANFIELD, PADDOCK
   & STONE, PLC
101 N. Main St., 7th Floor
Ann Arbor, MI  48104
(734) 668-7696
scott@millercanfield.com

/s/Susan E. Reed
Susan E. Reed (P66950)
MICHIGAN IMMIGRANT RIGHTS
   CENTER
3030 S. 9th St. Suite 1B
Kalamazoo, MI 49009
 (269) 492-7196, ext. 535
susanree@michiganimmigrant.org

/s/Judy Rabinovitz
Judy Rabinovitz* (NY Bar JR-1214)
Lee Gelernt (NY Bar NY-8511)
Anand Balakrishnan* (Conn. Bar 430329)
ACLU FOUNDATION
   IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2618
jrabinovitz@aclu.org

/s/ Margo Schlanger
Margo Schlanger (N.Y. Bar #2704443)
Samuel R. Bagenstos (P73971)
Cooperating Attorneys, ACLU Fund
   of Michigan
625 South State Street
Ann Arbor, Michigan 48109
734-615-2618
margo.schlanger@gmail.com

/s/Nora Youkhana
Nora Youkhana (P80067)
Nadine Yousif (P80421)
Cooperating Attorneys, ACLU Fund
   of Michigan
CODE LEGAL AID INC.
 27321 Hampden St.
Madison Heights, MI 48071
(248) 894-6197
norayoukhana@gmail.com

*Attorneys for All Petitioners and Plaintiffs*

38

/s/Lara Finkbeiner
Lara Finkbeiner* (NY Bar 5197165)
Mark Doss* (NY Bar 5277462)
Mark Wasef* (NY Bar 4813887)
INTERNATIONAL REFUGEE
ASSISTANCE PROJECT
Urban Justice Center
40 Rector St., 9th Floor
New York, NY 10006
(646) 602-5600
lfinkbeiner@refugeerights.org

*Attorneys for All Petitioners
and Plaintiffs*

/s/William W. Swor
William W. Swor (P21215)
WILLIAM W. SWOR
   & ASSOCIATES
1120 Ford Building
615 Griswold Street
Detroit, MI 48226
wwswor@sworlaw.com

*Attorney for Plaintiff/Petitioner Usama
Hamama*

* Application for admission forthcoming.

29404507.1\066667-00598

/s/Elisabeth V. Bechtold
Elisabeth V. Bechtold* (CA Bar
233169)
María Martínez Sánchez* (NM
Bar 126375)
Kristin Greer Love* (CA Bar
274779)
AMERICAN CIVIL LIBERTIES
UNION OF NEW MEXICO
1410 Coal Ave. SW
Albuquerque, NM 87102
ebechtold@aclu-nm.org

*Attorneys for Plaintiff/Petitioner
Abbas Oda Manshad Al-Sokaina*

39