```
 1                   UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF MICHIGAN
 2                        SOUTHERN DIVISION

 3

 4   USAMA J. HAMAMA, et al,

 5        Petitioners and Plaintiffs,

 6   -v-                                    Case No. 17-cv-11910

 7   REBECCA ADDUCCI, et al,

 8        Respondents and Defendants.
     _____/
 9

10   PETITIONERS/PLAINTIFFS' MOTION FOR EXPEDITED BRIEFING SCHEDULE
      FOR PLAINTIFFS/PETITIONERS' MOTION FOR PRELIMINARY INJUNCTION
11              AND TO EXTEND ORDER STAYING REMOVAL

12
                  BEFORE THE HONORABLE MARK A. GOLDSMITH
13
             Detroit, Michigan, Wednesday, July 5th, 2017.
14

15
     APPEARANCES:
16
     FOR THE PETITIONERS:      MARGO SCHLANGER
17                             ACLU FUND OF MICHIGAN
                               625 South State Street
18                             Suite LR910
                               Ann Arbor, MI 48109
19

20   FOR THE PETITIONERS:      LEE GELERNT
                               ACLU FOUNDATION, IMMIGRANTS' RIGHTS
21                             125 Broad Street
                               18th Floor
22                             New York, NY 10004

23
     FOR THE PETITIONERS:      MICHAEL J. STEINBERG
24                             ACLU FUND OF MICHIGAN
                               2966 Woodward Avenue
25                             Detroit, MI  48201
```

```
 1    (Appearances, continued):

 2    FOR THE PETITIONERS:      KIMBERLY L. SCOTT
                                MILLER, CANFIELD
 3                              101 North Main Street
                                7th Floor
 4                              Ann Arbor, MI  48104

 5
      FOR THE PETITIONERS:      WILLIAM W. SWOR
 6                              615 Griswold Street
                                Suite 1120
 7                              Detroit, MI  48226

 8
      FOR THE RESPONDENTS:      AUGUST E. FLENTJE
 9                              U.S. DEPARTMENT OF JUSTICE
                                Special Counsel, Civil Division
10                              950 Pennsylvania Avenue
                                Room 3613
11                              Washington, DC  20530

12
      FOR THE RESPONDENTS:      WILLIAM C. SILVIS
13                              U.S. DEPARTMENT OF JUSTICE
                                Civil Division
14                              P.O. Box 868
                                Ben Franklin Station
15                              Washington, DC  20044

16
      FOR THE RESPONDENTS:      JENNIFER L. NEWBY
17                              U.S. ATTORNEY'S OFFICE
                                211 West Fort Street
18                              Suite 2001
                                Detroit, MI  48226
19

20    FOR THE PETITIONERS:      CATHERINE PINCHECK
                                I.C.E. OPLA DETROIT
21                              333 Mount Elliott
                                Detroit, MI  48207
22

23

24    David B. Yarbrough, CSR, RMR, FCRR
      Official Court Reporter
25    (313) 234-2619
```

TABLE OF CONTENTS

PAGE

WITNESSES:

EXHIBITS

NONE

```
 1            Detroit, Michigan.

 2            Wednesday, July 5th, 2017.

 3            At or about 11:43 a.m.

 4                     --    ---    --

 5       THE CLERK OF THE COURT:  Please rise.  The United

 6  States District Court for the Eastern District of Michigan is

 7  now in session, the Honorable Mark Goldsmith presiding.  You

 8  may be seated.

 9            The Court calls case number 17-11910, Hamama versus

10  Adducci.  Counsel, please state your appearances for the

11  record.

12            MS. SCHLANGER:  Good morning, your Honor.  I'm Margo

13  Schlanger here for the petitioners and plaintiffs.

14            MR. GELERNT:  Good morning, your Honor.  Lee Gelernt

15  from the ACLU for petitioners/plaintiffs.

16            MR. STEINBERG:  Michael J. Steinberg on behalf of the

17  petitioners and the plaintiffs.

18            MS. SCOTT:  Kimberly Scott from Miller Canfield on

19  behalf of the plaintiffs/petitioners.

20            MR. SWOR:  William Swor on behalf of the

21  plaintiffs/petitioners.

22            MR. FLENTJE:  August Flentje on behalf of the

23  respondent.

24            MR. SILVIS:  William Silvis on behalf of the

25  respondent.
```

1          MS. PINCHECK:  Catherine Pincheck on behalf of the

2     respondent, your Honor.

3          MS. NEWBY:  Jennifer Newby on behalf of the

4     respondent.

5          THE COURT:  All right.  Good morning, everybody.  I

6     hope everyone had a glorious July the 4th.  I suppose some of

7     you were working on that day.  I know we were.  I do want to

8     take a moment and thank one my law clerks, Daniel Ping, for

9     taking time away from his holiday to help us get ready for

10    today's hearing and another clerk who's not in the courtroom,

11    Josh Zeman, also was helping out as well from a remote

12    location.  I thank them all as I thank all my staff for always

13    coming forward and offering to work beyond the regular business

14    hours.  Mr. Yarbrough has done that on numerous occasions.  I

15    thank him as well.

16         All right.  We're going to get started with the

17    motions that the plaintiffs filed.  They want expedited

18    briefing on a forthcoming motion for a preliminary injunction,

19    want to extend the stay as well and also want some discovery,

20    so we'll start with the plaintiffs.  Ms. Schlanger, you going

21    to lead off?

22         MS. SCHLANGER:  Thank you, your Honor.  As you said,

23    these are motions to extend the stay, the existing stay of

24    removal until there's time for this Court to adjudicate a

25    preliminary injunction motion that we intend to file very

1   shortly and to expedite some discovery prior to that and prior

2   to the Rule 26F conference.

3        On the extension on the stay of removal, you have

4   ample authority do this under the rules governing TROs.  The

5   standard is good cause and the case law tells us that good

6   cause means that the existence of the emergency that caused the

7   original grant still remains and absolutely that does remain.

8   The danger in Iraq hasn't lessened.  The class members continue

9   to face very significant hurdles in getting counsel and getting

10   their motions to reopen filed and heard although we continue to

11   work diligently on making that happen.  Umm --

12        THE COURT:  Let me interrupt four a second because I

13   want to understand the forthcoming motion for a preliminary

14   injunction that you want to file.  Is it going to introduce any

15   issues that we haven't already addressed?

16        MS. SCHLANGER:  Well, it will be fuller briefing on

17   the merits your Honor and if you needed fuller briefing, we're

18   happy to do a sort of more methodical and fuller briefing on

19   jurisdiction and my colleague, Lee Gelernt, is here to talk

20   about that today as well if that's what you want to do with

21   this hearing.

22        THE COURT:  Well, when you say the merits, tell me

23   what you plan on addressing in the preliminary injunction

24   motion on the merits.

25        MS. SCHLANGER:  We'll address the, umm, we've

1    asserted a claim for a stay of removal under CAT, the INA and

2    the due process clause and so I mean those three claims.

3    Mostly CAT and the due process clause to be frank.

4         THE COURT:  All right.  Are you going to get into why

5    those sources of law require that removal not take place under

6    these circumstances?

7         MS. SCHLANGER:  Yes, exactly.  So not, not in any

8    individual --

9         THE COURT:  In a general matter because you're not

10   going to apply it to obviously every member of the class.

11        MS. SCHLANGER:  That's right.  So as a general matter

12   we're going to brief the argument that this hurry to

13   deportation in light of the very obvious dangers in Iraq and in

14   light of the staleness of the existing findings that underlay

15   orders of removal, that that wouild be illegal under both CAT

16   and the due process clause and so we're going brief that issue

17   under both of those.

18        THE COURT:  Okay.

19        MS. SCHLANGER:  We'll also be planning to file, you

20   know, just very shortly thereafter because I think you'll need

21   it, a motion for class certification since this is a class --

22   since we've asserted class allegations so we need to get all of

23   that briefed and in front of you and the need for a stay

24   preserving the status quo remains an emergency situation.  We

25   have been continuing to work to get counsel lined up with the

1   class members and that is, umm, that is made more difficult by

2   their detention, by their transfers and by the communications

3   obstacles that come with detention and transfers.  For example,

4   we just found out yesterday -- no, I think it was the day

5   before, I think it was the day before the holiday that we found

6   out that for four or five days, there has been no phone access

7   for a large number of the class members.  They haven't been

8   able to call their families and so we knew we were having

9   trouble finding things out, but we just found out that their

10  phone service had been cut off in a particular detention

11  facility where they are.  The point is not so much the details

12  of that, is that there are real obstacles to making this all

13  happen.  We're working diligently through them to try to get

14  people lawyers, to try to get the motions to reopen filed, but

15  in the meantime there is this emergency need for more time,

16  that remains true and so --

17           THE COURT:  Well, let me ask you.  If I were to agree

18  with you that more time should be put on a clock, the

19  government's view of this is that if I do find I don't have

20  jurisdiction, that's the end of the ball game on the counts

21  that have to do with the removal orders.  I assume you still

22  have other claims that might need to be dealt with like the

23  detention issue, but let me talk about that with you later.

24  The government's point is if I agree with the government on

25  jurisdiction, that's it as far as the removal goes.  If I

1    agreed with you on jurisdiction, the government says I could at

2    that point entertain entry of proper orders which I assume

3    might include allowing for enough time for class members to get

4    lawyers or to be contacted to determine if they need lawyers,

5    so why wouldn't that be a workable solution, extending the stay

6    for whatever period I might deem reasonable until I can make my

7    ruling on jurisdiction and if I did side with you, then an

8    order could be crafted to deal with many of the issues that

9    you're raising now in these two motions, for example, the class

10   information you're seeking.  Couldn't I at that point enter an

11   order for discovery regarding class information so that

12   detainees or potential arrestees would be able to get in

13   contact with class counsel or class counsel could get in

14   contact with them to arrange for motions for reopening?

15          MS. SCHLANGER:  Yes, your Honor.  I think if you say

16   that you have jurisdiction, at some point that becomes an

17   appealable order and you'll have to talk to the government

18   about whether they would intend to appeal it.  If there was a

19   way for us to work out a stay pending that kind of resolution

20   and communication and so on, we would be very happy with that.

21          THE COURT:  Explain a little bit more what you mean

22   by that.

23          MS. SCHLANGER:  Well, umm, I think if, if you grant a

24   stay on a finding that you have jurisdiction which of course is

25   what we think you should do, while that is in a TRO posture,

1    that's not an appealable order, but when it becomes a more

2    permanent kind of an injunction, I imagine that the government

3    would seek to appeal it and we would then need a stay of

4    removal pending that appeal while we worked out the rest of

5    this stuff.  I mean, the thing that we care about is not having

6    our class members deported to Iraq where they'll be in harm's

7    way prior to adjudication.  That's the thing that we're after,

8    but we're open to many different ways to arrange that, but the

9    one that you just sketched out would be fine with us so long as

10    there was a stay on their removal pending whatever appeal the

11    government might plan to do of whatever order existed.

12          THE COURT:  Well, that's getting us a little further

13    down the road, but if whatever order I entered became

14    appealable, I suppose in the first instance I would be asked I

15    suppose to keep whatever order I had previously entered in

16    place.  I'm trying to work the decision tree here both ways,

17    but I assume someone's going to ask me to keep the stay in

18    place no matter what I do on jurisdiction, right?

19          MS. SCHLANGER:  Yes, sir.

20          THE COURT:  And then I assume if somebody's unhappy,

21    wants to go to the Court of Appeals, the Court of Appeals might

22    be asked to either dissolve any stay I had granted or enter a

23    stay if I had refused to enter a stay, right?

24          MS. SCHLANGER:  Yes, I imagine that's right.

25          THE COURT:  All right.

1          MS. SCHLANGER:  So what we're proposing at this point

2     is that you extend the TRO for there to be time for that fuller

3     briefing and we think you have ample authority to do that.

4          As you mentioned, we're also asking for expedited

5     discovery than expedited discovery which is really very limited

6     is before the Rule 26F conference obviously, but it's in a

7     preliminary injunction posture which means that it's under the,

8     the advisory committee explained that that's pretty routine and

9     it's in your discretion for good cause shown and we know that

10    the government when they come in and you ask them questions,

11    they answer the questions about various things that we don't

12    know because we haven't been able to get the discovery yet and

13    so, you know, they'll, perhaps they'll tell you today how many

14    people there are in various places and what their situations

15    are and how many of them have motions to reopen.  I don't know

16    what they'll tell you, but we don't know the answer to those

17    questions and those would be very useful as we're trying to put

18    you in a position to adjudicate this fairly and as we're trying

19    to make out our claim.

20          THE COURT:  Well, that's what I'm trying to

21    understand, what purpose right now would this information

22    serve.  In terms of the class dimension to the case, you're

23    seeking to represent a class based on Federal Rules of Civil

24    Procedure 23 (b)(2), right?

25          MS. SCHLANGER:  Correct.

1   THE COURT:  So all you need to show is that the

2   government's generally acting in a uniform way against class

3   members.  I'm not prejudging this issue, but you have at least

4   in theory laid out that argument already, that the government

5   has a policy of enforcing these orders against class members,

6   many of whom you say and perhaps all of whom you say could

7   assert these arguments under CAT or persecution provisions of

8   INA.  Why would you need any more information along the lines

9   you're asking for to establish the prerequisites for a class

10  certification?

11  MS. SCHLANGER:  Right, so one of the things that we

12  would like to know is when was their last adjudication, when

13  was their final order entered so that we have some sense of,

14  umm, we already have an educated sense, but we don't have a

15  full sense of how stale those orders are so that we can, umm,

16  we think explain to you more persuasively how the changed

17  country condition issues might work.

18  The other thing is that we also have been alleging

19  that their detention is getting in the way of, umm, of

20  obtaining representation and actually acting without

21  representation to file motions to reopen and knowing that we've

22  asked for their transfer history so that we can make that part

23  out, too, so we're really not asking for very much.  We've

24  asked for their date of their final order, criminal history, if

25  they have a lawyer, whether a motion to reopen has been filed,

1    where they are now and the detention locations where they've

2    been.  I mean, it's not a lot of information -- oh, and, and,

3    umm, contact information for families so that we can try to

4    flush out the circumstances a little bit more, so it's not a

5    lot of information that we're asking for, but it's directed at

6    those parts of the, umm, of the briefing that we hope to do for

7    you where we can tell you with a little bit more definitiveness

8    exactly what these obstacles have been and tell you that it's

9    not just a few that are stale, that it's the bulk of the class

10   we think, maybe it's all of the class.  We don't, we don't

11   know.  We haven't gotten that discovery yet.  I guess I'd just

12   want to point out again these are the kinds of questions that

13   you've been asking the government and we think appropriately so

14   and we would just like to be able to answer them as well.  We'd

15   like to know the answers, too, and it has to do as you say with

16   the class, umm, part of the case.  So I think that's what I

17   have for starters and unless there are other questions and of

18   course there may be more later.

19            THE COURT:  Well, I do have a question regarding the

20   date you expect to be able to file a motion for preliminary

21   injunction.  I think you said July 14?

22            MS. SCHLANGER:  Yes.

23            THE COURT:  Is that still a good date?

24            MS. SCHLANGER:  Yes, it is.

25            THE COURT:  All right, but you would need the

1      government's information pretty quickly then to put that in a

2      motion.

3           MS. SCHLANGER:  We've asked for it by the 10th.  I

4      think this is all information that's very readily available to

5      them, that they don't have to go digging around in any files to

6      get it, but yes, we've asked for it by the 10th and then we

7      would incorporate it very quickly.

8           THE COURT:  Well, does the detention issue that

9      you've raised in your initial habeas petition and your amended

10     petition Complaint impact at all on what we're deciding now or

11     is that a matter that you envisioned being entirely

12     independent?  How do you envision that being processed in this

13     case?

14          MS. SCHLANGER:  You mean the request for release from

15     detention that's in the Complaint?

16          THE COURT:  Yes.  You have a detention claim, right?

17          MS. SCHLANGER:  So in the preliminary injunction, we

18     are likely to come back to you and ask you for a transfer order

19     to get ICE to transfer detainees back to where they can most

20     effectively communicate with their counsel and the like.  That

21     was also in the initial Complaint.

22          On the release from detention, the argument -- if it

23     becomes the case that there is not an impending removal for

24     these detainees, then it becomes the case that under existing

25     case law they should be released from detention on an

1    individualized kind of a hearing that, umm, where they can

2    demonstrate that they're not a danger to the community and the

3    like, but --

4           THE COURT:  You mean by impending removal, you'd want

5    the government to announce that even though they haven't

6    arrested somebody, they're planning on moving against Mr. A or

7    Ms. B?

8           MS. SCHLANGER:  Oh, no.  I meant the people in

9    detention, your Honor.

10          THE COURT:  In detention.

11          MS. SCHLANGER:  In detention, yes.

12          THE COURT:  Okay, all right.

13          MS. SCHLANGER:  So it's not really ripe yet until

14   these other matters kind of mature a little bit.

15          THE COURT:  So that's something we can put to the

16   side in terms of the issues we're considering now?

17          MS. SCHLANGER:  Yes, your Honor.

18          THE COURT:  Okay.  All right, to circle back then to

19   the issue I raised before, if my opinion then is to agree with

20   you on jurisdiction, is the form of the order you're thinking I

21   should be entering something along the lines of a TRO extending

22   the stay finding jurisdiction and setting a date for a

23   preliminary injunction to be filed and some discovery to take

24   place before that?

25          MS. SCHLANGER:  That's one option.  A different

1    option I suppose is that you could enter it in a -- you could

2    enter a stay of removal that's longer lasting without PI

3    briefing and then I think that would be, umm, if it extended a

4    fairly long way into the future, you know, a matter of months,

5    it would be an appealable order and I suppose we could then go

6    up to the Sixth Circuit if the government wanted to on

7    jurisdiction only, but while the case remains in the district

8    court, yes, it's our intention to file that PI and that would

9    be the kind of order that we would ask for, but we're not

10   averse to litigating jurisdiction in the Sixth Circuit, but our

11   preference is to be able to, umm, you extend it, we brief it

12   more fully, we do a preliminary injunction hearing.

13        THE COURT:  Okay.  All right.  We'll hear from the

14   government then.

15        MR. FLENTJE:  Thank you, your Honor.  August Flentje

16   with the Department of Justice.  I guess I'll talk about the

17   extension of the TRO motion first if that's okay?  Our position

18   is that Rule 65 allows one 14-day extension of a TRO for good

19   cause, so the request to extend if it's considered should not

20   go beyond the additional 14 days.

21        We also think the Court should address its

22   jurisdiction before extending the motion -- excuse me, before

23   extending the TRO and I think I'd like to point the Court out

24   to Munaf v. Geren, the Supreme Court decision from about a

25   decade ago that said that at least with respect to a PI and our

```
1    view is if the TRO extends beyond an additional 14 days, it
2    would be the equivalent of a PI, especially if it extends
3    without an end date which is what plaintiffs have proposed.
4    The Court said there that it's an abuse of discretion to grant
5    a PI on the view that jurisdictional issues are difficult.  So
6    I think the Supreme Court's spoken pretty clearly that the
7    Court will need to address jurisdiction before it gets, it
8    enters an order that would be the equivalent of a PI.
9            The plaintiffs cited several cases about, you know,
10   courts entering TROs or in these kinds of circumstances, but
11   most of those courts were pretty quickly dissolving them
12   because they realized they lacked jurisdiction and Kumar is one
13   of those cases where the Court dissolved the TRO in four days
14   concluding it lacked jurisdiction and there are some others
15   where they were in place longer, but it's not clear when,
16   whether the parties were fighting about the extension of the
17   order in that, in those circumstances.
18           As far as an expedited briefing schedule, we were
19   happy to discuss with plaintiffs an expedited PI briefing
20   schedule.  I'm not sure I have an exact date that I can sign
21   off on at this moment, but I could probably get something today
22   if, if the Court wants to talk about expedited briefing.
23           Talking briefly about the discovery, our position on
24   the discovery is that again, you know, jurisdiction ought to be
25   sorted out before we get into discovery.  Plaintiffs haven't
```

1    said that the discovery is necessary to resolve jurisdiction

2    and it isn't.  Plaintiffs haven't provided a lot of explanation

3    as to how discovery's going to help them with their PI motion.

4    My sense is the PI -- the -- what they're asking for is sort of

5    time so that they can use the appropriate process and I really

6    think the plaintiffs, you know, fundamentally agree that the

7    right process is the BIA, the immigration court process with

8    review in the Court of Appeals.  They've said that if there's,

9    there's an adequate ability to use the, utilize that process,

10   that likely provides the due process that's necessary and the

11   Sixth Circuit in the, I think it's Moonah -- Muka case, said

12   that that was an adequate process in a suspension-clause-type

13   challenge.  So, you know, we, we think that's the right process

14   to use.

15           I think, you know, many of the petitioners, the

16   original class members have filed motions to reopen.  The

17   latest numbers that I have are that 93 have filed them out of

18   of around 220 who are detained.  A lot of them have sought

19   stays; some of them have gotten stays.  Obviously this Court's

20   order has released the pressure a little on that, but we think

21   the proper place to seek a stay or to seek a relief is in that

22   process and as this Court is thinking about extending its TRO,

23   I think it's important that there's got to be good cause to

24   extend it even another 14 days and with, with some portions of

25   the potential class, there is not that good cause.  Plaintiffs

```
 1    had said the whole purpose of this suit is to give these
 2    petitioners a chance to seek relief in the immigration courts
 3    so this shouldn't -- the Court shouldn't enter a TRO for
 4    petitioners who have already been able to utilize that process.
 5    Someone who has filed a motion to reopen is in the proper place
 6    to seek a stay and to seek relief on the merits.  That is the
 7    court that is most familiar with the facts, that can look at
 8    the individual circumstances presented both on issues with
 9    regarding harm or stay and with potential relief on the merits
10    either under CAT or under other remove -- other relief from a
11    removal provision, so we strong -- our strong view is that if
12    this Court extends the TRO, it should not apply the TRO to
13    people who have been able to file motions to reopen.
14             We also think that sort of the kernel of their claim
15    is that counsel can't get to these folks fast enough.  They've
16    talked about a few detainees being moved to different
17    facilities.  I don't know if that's a lot.  I do know that the
18    folks that are at Youngstown, they're still there is my
19    understanding so they haven't been moved around and so our
20    other point on extending the TRO is that there is not good
21    cause to extend the TRO for people who have counsel.  If they
22    have their own counsel, that counsel is fully capable of
23    utilizing the appropriate procedures to seek a stay.  You know,
24    there's the immigration courts which are kind of the gold
25    standard in addressing these kinds of issues, CAT claims,
```

1    asylum, withholding of removal.  That is what they do every

2    day.  You have the backstop of the Courts of Appeals which is

3    there to correct errors, which is also there potentially

4    available if the Board is not moving quickly enough, but they

5    have not made any -- they have no claim in this -- they've made

6    no claim here that once an alien has counsel and has access to

7    a motion to reopen, there is any reason for this Court to

8    impose itself on that process and Congress was quite clear in

9    1252(b)(9) as to the merits of a removal order and 1252(g) as

10   to execution of a removal order that the federal district

11   courts and habeas courts are not the proper place for that kind

12   of review and they have talked about CAT claims a fair amount

13   and Congress further made clear that in 1252(a)(4) that the

14   rights under the CAT arise only in the immigration proceedings;

15   in other words, the proceedings before the Board of immigration

16   appeals or the immigration judges.

17           I think we made some arguments in our papers as to

18   why the injunction should be -- the TRO should be more narrow.

19   I'm not going to go over these again here, but, you know, we

20   stand by those arguments with respect to extending the TRO.

21           I'd like to cite one case from the Third Circuit.

22   It's called -- excuse me, Kaan (phonetic) and that's an example

23   of where the court, and I have the actual cite, I'm sorry.

24   There, that's a -- if you read that case, that's an example of

25   where the Board and the Third Circuit acted very quickly in

1    exigent circumstances so, you know, that would reaffirm our

2    point that if this Court is going to extend the TRO, it

3    certainly shouldn't apply it to folks who have filed motions to

4    reopen or who have counsel.

5           THE COURT:  Is it your view I can extend it for 14

6    days from July 10th?

7           MR. FLENTJE:  Yes.  I mean, technically the narrower

8    TRO would have expired tomorrow and, but we're -- we think that

9    for cause, extending the TRO from the 10th.  Now we oppose

10   that, obviously after explaining --

11          THE COURT:  No, I understand.  I just wanted to

12   understand the government's position though because you said I

13   could extend it for on 14-day period.  I just want to know how

14   you're calculating that.  The expanded class, I think everyone

15   agrees, there the time based on the second order I entered

16   would be July 14 and in that order I included everybody, the

17   initial class and then the expanded class.  It's the

18   government's view I could extend the stay order 14 days beyond

19   July 10?

20          MR. FLENTJE:  I mean, we're not going to get in a big

21   fight over the difference between Thursday which is 14 days for

22   the original and Monday which is 14 days for the expanded group

23   so I think it would just make more sense to treat the Monday,

24   you could certainly expand it to that group on Monday for the

25   TRO.  I mean, that, you know, I'm not sure I would like the

1    Court to say we consent to that, but I think, you know, using

2    the Monday date as the end of the 14 days makes sense.

3            THE COURT:  Okay.

4            MR. FLENTJE:  I mean, the only other thing I would

5    want to mention is some of the access to counsel issues and,

6    you know, these are important issues, but I do want the Court

7    to understand and just to explain a few things.  Obviously the

8    potential class members here have had removal orders often for

9    some time, although I do have some stats on that if the Court's

10   interested.  They've been able to challenge those orders

11   throughout, so, you know, a lot of their evidence is about

12   conditions worsening in 2014.  They've had an ability to

13   challenge those removal orders or raise a CAT-type claim or a

14   withholding-type claim since that time and, you know, that's,

15   so that's, they've had a significant time to address some of

16   the changed circumstances in Iraq and of course, you know,

17   since January, the president issued some executive orders

18   saying that he's going to try to work hard on getting countries

19   who aren't cooperating on taking people back to agree to take

20   them back.  Iraq is one of those countries where it's been hard

21   and obviously said the criminal aliens were a removal priority,

22   so there have been certainly warning signs that it's time to

23   sort of take action to re -- if petitioners want to reconsider

24   the removal orders, that they should do so and so I don't think

25   we should think of sort of the moment that ICE began the

1   detention as the sort of first chance they had to think about

2   these issues and to consider whether, you know, having this

3   pending removal order is something that they need to work on

4   and try and address if they're concerned about conditions in

5   Iraq.

6           I'd also say that, you know, the -- they've cited

7   some cases about moving detainees around.  These are cases from

8   awhile ago and ICE has vastly changed -- I mean, a generation

9   ago.  ICE has vastly improved their detention standards since

10  those days.  I'll give you an example.  There's telephone

11  access almost all day at the Youngstown facility.  There is

12  definitely opportunity to reach out to counsel.  There are pro

13  bono providers lists available and so the -- I don't think it's

14  fair to sort of look at those cases from a generation ago and

15  think that provides much guidance on the counsel issues today

16  and I'll also say that, you know, facility issues require

17  moving people from time to time and that sort of movement

18  shouldn't be viewed as a violation of the right to counsel.

19          The other, the last two things I'd say and this sort

20  of relates to discovery is the staleness of removal orders.

21  Nationwide we got some data and it looked like around 20

22  removal orders, these are for the folks that are detained,

23  around 20 are from prior to 2000 and around 196 are from after

24  2000 and so some of their named plaintiffs, named petitioners

25  do have old removal orders, but they're not all old in that

1    sense and around 84 of them are from around 2010 to the present

2    so, you know, during the period where there would have been

3    definitely an opportunity to raise questions about, you know,

4    the conditions in Iraq at the time they were entered.

5         I'd also note that I've got information that since

6    2014, 163 people have been removed to Iraq so this is not

7    something that has never happened.  Recently, you know, we've

8    gotten more cooperation recently, but there are removals to

9    Iraq ongoing in every year, recently a toll of 325 since 2010.

10        I'd like to address one more thing on the discovery

11   and that's the scope of discovery.  If this Court is going to

12   order discovery, we think it should be limited.  We oppose --

13   obviously we don't think discovery is necessary now and we

14   don't think plaintiffs have provided good cause why they need

15   it for their PI motion, but if the Court were to order

16   discovery, we really think it needs to be limited to the

17   detained population which is a round 220 people.  Those are the

18   folks presenting kind of the emergent situation that plaintiffs

19   have identified.

20        We also think that it should be limited to sort of

21   identification information.  Issues about representation or

22   about filings that they've made is something that should come

23   from the individuals themselves, not from the government and in

24   addition, you know, some of the information they have listed is

25   actually a significant burden to gather.  Some of it is only

1    available in paper files.  So if this Court's inclined to order

2    discovery, we'd hope there'd be a little flexibility and that

3    we would work with plaintiffs to talk about exactly what

4    information is really critical in a short period of time.

5         THE COURT:  What's your best estimate as to how long

6    it would take the government to assemble all the information

7    that plaintiffs are asking for?

8         MR. FLENTJE:  All of the information?

9         THE COURT:  Yes.

10        MR. FLENTJE:  I think I'd have to get an answer from

11   ICE.  I think they could -- as I've narrowed it, I think they

12   could get it pretty quickly because it's available on

13   databases.  If you're talking about paper files for 1,500

14   people, that will take a significantly longer period of time

15   and some of the information they've requested is information

16   that we'd have to go to I think the immigration courts to

17   obtain rather than ICE having ready access to it.

18        THE COURT:  That's whether they've filed motions

19   already?

20        MR. FLENTJE:  Like whether they've made certain

21   filings and whether someone's filed a representation for them

22   in the immigration courts.  That's all -- I mean, ICE may have

23   some of it, but I'm not sure that I can say it's as reliable in

24   ICE's possession as it would be with the immigration courts and

25   the fact, the one thing on here, criminal history, that is,

```
1    umm, I'm not sure that data's collected in a manner.  I mean,
2    there will be sort of if it's a criminal grounds for removal,
3    that would be identified in the removal order, but as far as
4    criminal history without further definition, that could mean a
5    lot of things and ICE wouldn't have that information
6    necessarily.  It may have for some, but it certainly does not
7    collect all criminal history and that's not their role.  So
8    things like the name, date of birth, alien number and location
9    are things that could be quickly obtained for the detained
10   population.  I'm happy to answer questions, but I think those
11   are the main points I wanted to make on the motions.
12            THE COURT:  One question, I just want to understand
13   your view of the time table.  Obviously if I agree with the
14   government's position on jurisdiction, that would be the end of
15   the current stay, I would terminate it.  If I agree with the
16   plaintiff's view on jurisdiction, their next step in the
17   process is a preliminary injunction and understanding the
18   government's preference, the government would prefer not to
19   turn over anything until the Court rules on jurisdiction so
20   that ends up elongating our process somewhat.  Is it your view
21   that a temporary restraining order couldn't go beyond July 24th
22   unless it was replaced by a preliminary injunction at that
23   point?  In other words, would we have to finish discovery phase
24   and the preliminary injunction briefing and the hearing and my
25   ruling?  That doesn't sound the way that -- I know that's not
```

1    the way that we do it in other cases.  Once a TRO is entered,
2    we often have a period of discovery which sometimes lasts
3    months and then we have a preliminary injunction hearing that
4    may also take awhile to get set up following briefing, but I
5    want to understand what the government's view of that is.
6           MR. FLENTJE:  And our view is under Rule 65, it says
7    a TRO is for 14 days and for good cause it can be extended
8    another 14 days.  An order that extends past that, whatever
9    it's called, would operate as a preliminary injunction and
10   would be subject to appeal.  I mean, that doesn't mean there's
11   going to be an appeal, but, you know, that, I mean, if you
12   think about it, the whole point of allowing an appeal -- I
13   mean, that's what -- it's only important to the appeal issue
14   and the point of allowing an appeal of a preliminary injunction
15   is you're going to have an order limiting conduct of the
16   government or whoever is the defendant, that's a significant
17   imposition and if that's going to go on beyond 28 days, the
18   rules make it quite clear that that is something that is
19   subject to appeal.  So I'm not surprised that there have been
20   arrangements either by agreement to like let things go out a
21   little longer or, you know, the defendant has just decided this
22   is not the best time to appeal, there's, you know, let's build
23   the case a little bit, the harm is not that great.  I mean, the
24   appeal standard is, you know, showing irreparable harm, so I
25   would guess a lot of factors play into the fact that sometimes

1   it lasts longer than 28 days, but, you know, by the rules, you

2   know, there's an appeal available in our view on day 29.

3            THE COURT:  I understand, okay.

4            MR. FLENTJE:  Thanks.

5            THE COURT:  Thank you.  Reply?

6            MS. SCHLANGER:  Thank you, your Honor.  Umm, I don't

7   think -- we don't agree that Rule 65 is nearly as clear as the

8   government just said.  The rule by its terms talks about

9   temporary restraining orders issued without notice so it

10  doesn't by its terms exactly apply.  There -- it's certainly

11  the case that if you extended a TRO indefinitely for example it

12  would become an appealable PI.  We're not asking you to do that

13  and we don't think on day 29 it becomes appealable.  We've

14  cited you to, for example, a case that Judge Edmunds issued

15  about a year ago, United Naturals v. LXR Biotech.  That's in

16  docket 50, Exhibit C and what she did there was she held an

17  expeditious PI hearing and things extended a few days past the

18  28 days, so we think you have ample authority to do that and

19  for it to remain a TRO while you do that and perhaps we could

20  all work out a briefing schedule and if you extent TRO, we're

21  willing to agree on a kind of orderly way to do this, but in

22  any event we think you have authority to do that.

23            In addition, if you wanted to issue just a clean

24  jurisdictional order and that order became appealable, well,

25  you know, and then we, we put a PI kind of into the future and

1    we ask you for a stay pending that appeal, you know, those are

2    things, I mean, as you said the decision tree gets pretty

3    complexed, but we could figure something out along these

4    lines.

5            On the merits, I think much of what Mr. Flentje was

6    just presenting to you was merits arguments that could used to

7    be entertained more fully in a PI, so he told you that 93 of

8    the 220 detainees have filed motions to reopen.  He told you

9    about how many were before 2000 and how many were after.  He

10   didn't tell us how many were before 2014 which is kind of the

11   trigger date for these, for a lot of these changed conditions,

12   but there are some issues that we could try to develop if we

13   get the discovery that we're asking for and obviously people

14   who have counsel, but their counsel haven't been able to talk

15   to them, that's not -- they're not in a very good position yet

16   to file an MTR.  We are as until the declaration on the earlier

17   papers demonstrated really working hard to get people counsel,

18   to get all of this up and running and we think that that, that

19   they need the protection of the stay of removal while that

20   process works.

21           THE COURT:  Well, what about the carve-outs the

22   government was talking about, anyone who has an attorney or

23   anyone who's filed a motion for reopening?  Should those people

24   be excluded from the class?

25           MS. SCHLANGER:  No, we don't think so.  There's a

1    little bit of a chicken and egg problem I want to admit it

2    because the immigration courts won't grant stays while this

3    Court's stay is in effect and so we don't really know whether

4    the immigration courts would grant a stay in some of those

5    cases, but the fact is that if they don't have a stay, then

6    their motion to reopen isn't going to get heard and they don't,

7    they don't have stays and so it doesn't do them any good to

8    have filed a motion to reopen if the status quo doesn't get

9    protected while that motion gets adjudicated.  That doesn't

10   take very long, but it hasn't happened yet.  Certainly the

11   people who have counsel, but counsel haven't yet been able to

12   file a motion to reopen, that's a matter of a very short time,

13   but they are not yet able to, umm, to get this process up and

14   running.

15           One final issue about discovery which is that the

16   people facing removal file a form with ICE about representation

17   and that, so we're not actually asking if they are represented

18   in immigration court, we're asking for that information which

19   is entirely in ICE's possession.  We're asking for the

20   information on counsel that ICE knows about.  I think that's

21   all I have, your Honor.

22           THE COURT:  Well, you're saying the immigration

23   courts won't act on a motion for stay while this Court's stay

24   is in effect.

25           MS. SCHLANGER:  Right.

```
 1              THE COURT:  So aren't we going to have this gap
 2   problem if I agreed with you, your theory is these class
 3   members need to have an opportunity to file a motion to reopen
 4   which they can't do unless they file a motion for a stay?  Is
 5   is that right?
 6              MS. SCHLANGER:  No, no.  They can file a motion to
 7   reopen without a stay.
 8              THE COURT:  All right.  They just can't file a motion
 9   for a stay while my stay pending.
10              MS. SCHLANGER:  They can file it, but it won't get
11   adjudicated.
12              THE COURT:  It won't get adjudicated, all right.
13              MS. SCHLANGER:  They can and have filed it just to be
14   clear.  A lot of them have filed motions to stay, but
15   currently most of the immigration courts are not acting -- it
16   appears, right?  I mean, we can't really tell, but it appears
17   that most of the immigration courts are not acting on those
18   stay requests because they only act on them when deportation is
19   imminent and they say well it's not imminent enough because
20   there's this district court's stay.
21              THE COURT:  Well, then why don't you fine tune for me
22   when you think my stay should expire as to any particular class
23   member.  We've talked in kind of general terms that your
24   position is they should have a reasonable opportunity to file a
25   motion for reopening I suppose and a motion for a stay in the
```

1    immigration court, right?

2            MS. SCHLANGER:  Yes.

3            THE COURT:  Both of those.  So what does that mean as

4    a practical matter?

5            MS. SCHLANGER:  Right.  So this, too, is something

6    that we were hoping to develop further in the preliminary

7    injunction papers, but at the very least they should be able to

8    get their motion to reopen adjudicated.  That's a matter of,

9    it's, so I mean when we file for a PI, we were going to ask you

10   for an amount of time that was enough to do that and that's

11   typically six weeks or two months.

12           THE COURT:  So for the entire class you're saying you

13   would be asking me to set an outside limit the stay would

14   expire two months after issuance, something like that?

15           MS. SCHLANGER:  I confess it's making my nervous to

16   commit this when I was hoping to brief it in the PI and have --

17           THE COURT:  All right.  Well, I won't hold you to it.

18   I'm just trying to explore this because I'm hearing from the

19   government about how they want to carve out certain things,

20   you're coming back and telling me you're not agreeable to those

21   carve-outs.  So now I need to know a little bit more about what

22   exactly is the stay that you're asking for.  If you're just

23   saying on the one hand you don't want me to enter anything

24   that's indefinite and at the same time you're saying you want

25   to elaborate on this in your motion for preliminary injunction,

1   then I'm not sure what it is you're asking me to do at this

2   point.

3          MS. SCHLANGER:  For right now we're asking you to

4   preserve the status quo pending the adjudication of the PI and

5   we think that can be done in the matter if not absolutely dead

6   set fully adjudicated by the 24th, in a very expeditious matter

7   after that once we set a briefing schedule which the government

8   has said they're, you know, kind of willing to talk to us about

9   and so on so we're not talk about a very long period of time.

10  When we come back to you with the PI, we'll have a full ask

11  about these people.

12          The reason I'm so hesitant and the reason I'm not, in

13  ordinary circumstances that kind of time would be enough.  If

14  people are, for example, in a detention facility which has

15  taken away their phone access which is the fact for a number of

16  the class members right now.  Now I don't know if that a phone

17  access is going to come back, but right now we have to talk to

18  them only in person in Arizona.  If that continues to be the

19  case and their lawyers can only talk to them in person in

20  Arizona, things get stretched out and it's just very hard for

21  me to tell you right now, like I know what this usually looks

22  like, but it's hard for me to tell you right now oh, give us X

23  number of days and we're good because it depends on those kinds

24  of facts on the ground whether or not they actually have access

25  to a meaningful hearing in a meaningful time and that's

1    standard under the due process clause, but I'm not trying to be

2    evasive.  We're going to, umm, we're going to come back to you

3    with something much more definite, but for today what we're

4    asking for is a stay not for an indefinite amount of time, but

5    just until you have time to adjudicate that PI which is a

6    matter of if not and today's the 5th, if not only until the

7    24th, very expeditiously right after that and in agreeable

8    schedule.

9         THE COURT:  Okay.  All right, anything else?  Does

10   the government have anything else?

11        MS. SCHLANGER:  Thank you, your Honor.

12        MR. FLENTJE:  I don't think I have anything else.  I

13   do want to say that we're not sure that this counsel form that

14   ICE has is readily available or easily available and I'm not

15   sure it's going to provide the best information on whether

16   there's actually representation.  I understand the Board is

17   still acting on stays although I don't know what that

18   information comes from.

19        You know, I point out they said they needed six weeks

20   to two months at the first hearing and it's now been, umm, I

21   think a while since then so I hope you consider that in

22   deciding how much time to give them although it sounds like

23   that's coming later.

24        If there is an order, you know, there are some people

25   who actually prepared to go home to Iraq and I don't know how

1    to handle those, but we've, we have one letter that we got from

2    someone who wants out of the class so that they can travel so

3    they can go home.  You know, not everyone presents the same

4    circumstances as some of the plaintiffs or excuse me, the named

5    petitioners and as I'd said, there have been removals for Iraq,

6    to Iraq ongoing every year for a while.

7            I don't know anything about this phone access issue,

8    but I do stress that the detention standards provide for phone

9    access.  It is readily available and, you know, I'll reiterate

10   this is not kind of similar to what was going on in the

11   mid-'80s when courts intervened on counsel access issues.

12   That's it.

13           THE COURT:  All right.  I know that these issues have

14   been coming up at a pretty quick pace and I take it there may

15   not have been full discussion between both sides here.  Would

16   it be helpful for you to sit down right now to talk to each

17   other about any of these issues regarding discovery or access

18   to information or anything like that?  Would any of that be

19   helpful?

20           MR. FLENTJE:  I mean, we can.  My, I mean, the

21   government has a lot of players and it's, you know, it's very

22   hard for me to have sort of answers or be able to make

23   decisions on some of these issues without consulting with

24   clients and a lot of players who are very interested in this

25   litigation, so, umm, I mean, I'm happy to talk, but that's --

1      it's probably a talk that will result in me taking ideas back

2      to Washington.

3              THE COURT:  All right.  Well, let me ask plaintiffs.

4      Would there be any value to sitting down and seeing if any of

5      these logistical issues could be worked out?

6              MS. SCHLANGER:  Yeah, we would be very happy to do

7      that, your Honor.

8              THE COURT:  All right.  I can make my jury room

9      available to you if you want to sit down and see if any of that

10     would be something that could be addressed.  I understand you

11     may not be able to reach any final decision about anything, but

12     sometimes talking through issues does actually produce results.

13     Happens all the time in this courthouse, so if you'd like to do

14     that, my clerk, Mr. Ping, will escort you to the jury room if

15     that's where you'd like to meet or you're free to meet anywhere

16     else you might want to meet.  Anything else for the record at

17     this point?

18             MS. SCHLANGER:  No.  Thank you, your Honor.

19             MR. FLENTJE:  No, your Honor.  Thank you.

20             THE COURT:  Okay, thank you.  All right.  One

21     housekeeping matter before we sign off, the Court had sent out

22     an order regarding public access giving a time frame for any

23     objections.  Nothing's been submitted on the docket.  Just want

24     to make sure everyone is in agreement with that or has

25     something that's been submitted not on the docket?

```
 1              MS. SCHLANGER:  We have shared with the clerk's

 2    office, right?

 3              MS. SCOTT:   Your Honor, we had submitted a letter to

 4    your chambers with proposed redactions and categories of

 5    redactions we would like if the file is made publicly

 6    available.  If you would like me to file that, I can do that as

 7    well.

 8              THE COURT:  Well, I think you should unless, is there

 9    something that's confidential in the letter itself?

10              MS. SCOTT:   Umm, I don't believe so.

11              THE COURT:  All right.  Now you said it went to

12    chambers?

13              MS. SCOTT:   It did.

14              THE COURT:  When was that?

15              MS. SCOTT:   We delivered a copy, it was close to

16    4:30 on the day that it was due.  I can send another copy to

17    your chambers if you'd like.

18              THE COURT:  Okay, would you?

19              MS. SCOTT:   Yes.

20              THE COURT:  I will check on that, but is that only

21    questions regarding redaction as opposed to access?

22              MS. SCOTT:   It's only redactions.  We don't object

23    to access as long as we have the ability to redact some

24    personal information.

25              THE COURT:  Sure, okay.
```

1          MS. SCHLANGER:  And we would ask also there's a

2     couple of items that the government has filed that we would ask

3     that they would redact correspondingly that have some personal

4     information about our clients.

5          THE COURT:  Okay.  Well, we can deal with the

6     redactions, but as far as the government's concerned, opening

7     up to public access like other files, is there any objection to

8     that?

9          MR. FLENTJE:  No, no objections as long as we can do

10    the redactions.

11         THE COURT:  Okay.  Anything else?  Then we are

12    adjourned.  Thank you.

13         (Hearing concluded at 12:39 p.m.)

14                    --    ---    --

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

4

5

6

7           I, David B. Yarbrough, Official Court

8  Reporter, do hereby certify that the foregoing pages

9  comprise a true and accurate transcript of the

10 proceedings taken by me in this matter on Wednesday,

11 July 5th, 2017.

12

13

14

15

16 7/6/2017                    /s/ David B. Yarbrough

17 Date                        David B. Yarbrough,
                               (CSR, RPR, FCRR, RMR)
18                             231 W. Lafayette Blvd.
                               Detroit, MI  48226
19

20

21

22

23

24

25