UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

USAMA J. HAMAMA, et al.,

            Petitioners,                        Case No. 17-cv-11910

vs.                                          HON. MARK A. GOLDSMITH

REBECCA ADDUCCI,

            Respondent.

_____/

## OPINION & ORDER REGARDING JURISDICTION

       This case pits the power of Congress to control the jurisdiction of the federal courts against the Constitution's command that the writ of habeas corpus must be preserved. Both sides in this clash are right, in part. The Government is correct that Congress meant to strip federal district courts of jurisdiction to entertain the kind of habeas claims that Petitioners assert here challenging their repatriation to Iraq. But Petitioners are correct that extraordinary circumstances exist that will likely render their habeas claims meaningless, unless this Court intervenes to stay their deportation while review of their removal orders proceeds before the immigration courts and the courts of appeals.

       This Court concludes that to enforce the Congressional mandate that district courts lack jurisdiction — despite the compelling context of this case — would expose Petitioners to the substantiated risk of death, torture, or other grave persecution before their legal claims can be tested in a court. That would effectively suspend the writ of habeas corpus, which the Constitution prohibits.

       The Supreme Court has instructed, "It must never be forgotten that the writ of habeas corpus is the precious safeguard of personal liberty and there is no higher duty than to maintain it

1

unimpaired." Bowen v. Johnston, 306 U.S. 19, 26 (1939). And under the law, the federal district courts are generally the "first responders" when rights guaranteed by the Constitution require protection. In fulfillment of that mission, this Court concludes that it has jurisdiction in this case to preserve the fundamental right of habeas corpus and the duty to do so.

## I. BACKGROUND

### A. Procedural History

On June 11, 2017, agents from United States Immigration and Customs Enforcement ("ICE") began arresting Iraqi nationals as part of ICE's efforts to execute longstanding orders of removal. Am. Hab. Pet. ¶¶ 2, 5 (Dkt. 35). The vast majority of arrests that have taken place so far have occurred within metropolitan Detroit; this includes approximately 114 Detroit-based Iraqi nationals who have been arrested and transferred to federal facilities in Michigan, Ohio, Louisiana, and Arizona, where they await removal to Iraq. Id. ¶¶ 5, 8. Outside of Detroit, approximately 85 Iraqi nationals have been arrested and detained, including individuals from Tennessee, New Mexico, and California. Id. ¶¶ 5, 6. Those individuals have since been transferred to facilities in Alabama, Louisiana, Tennessee, and Texas. Id. ¶ 8. According to Petitioners, there are more than 1,400 Iraqi nationals across the country subject to final orders of removal whom the Government seeks to remove. Id. ¶ 7.

Most of the Iraqi nationals facing removal have been subject to final orders of removal for many years, resulting from criminal convictions and overstaying visas. Id. ¶ 2. However, the Government was unable to execute these removal orders due to Iraq's longstanding policy not to issue the requisite travel documents for repatriation. Id. ¶ 42. It was not until the United States agreed to remove Iraq from the list of countries set forth in Executive Order 13780, issued March 6, 2017, that Iraq agreed to issue travel documents. Id. ¶ 43.

2

The current operative pleading of Petitioners, filed on June 24, 2017, is their amended habeas corpus class petition and class action complaint for declaratory, injunctive, and mandamus relief.[1]  In their pleading, Petitioners state that they are eligible for relief from removal under both the Immigration and Nationality Act ("INA") and the Convention Against Torture ("CAT") because of their status as persecuted religious minorities and their affiliation with the United States. Id. ¶¶ 34-39, 68-72 (citing 8 U.S.C. § 1158(b)(1)(A) (providing asylum for refugees); 8 U.S.C. § 1231(b)(3) (restricting removal to country where alien's life or freedom would be threatened; 8 C.F.R. § 208.16(c)(2) (implementing regulation for the CAT)).

Petitioners Hamama, Asker, Barash, Ali, and Nissan fear removal to Iraq because their respective faiths — Chaldean, Christian, and Catholic — make them targets for persecution.  See id. ¶¶ 19-23.  Petitioners Al-Issawi and Al-Dilaimi fear similar persecution due to their status as Shiite Muslims.  Id. ¶¶ 24-25.  Petitioner Al-Saedy fears persecution due to his status as an apostate.  Id. ¶ 27.  Petitioner Al-Sokaini fears persecution because, although he identifies as a Muslim, he has been involved with a Baptist congregation in New Mexico.  Id. ¶ 28.

Petitioners also assert that their removal prior to a hearing on the changed country conditions in Iraq violates their rights under the Fifth Amendment's Due Process Clause.  Id. ¶¶ 73-76.  They also allege that the Government's decision to transfer them to multiple facilities across the country has interfered with their statutory right to counsel under the INA and their right to a fair hearing under the Due Process Clause.  Id. ¶¶ 77-79 (citing 8 U.S.C. § 1362).  Petitioners bring a separate Due Process claim based on their detention, arguing that they are being unlawfully

---

[1] Petitioners' original pleading, filed on June 15, 2017, was a habeas corpus class action petition (Dkt. 1).  The petition was substantially the same as the amended pleading, with the principal change being that the new pleading expanded the class from Iraqi nationals within the jurisdiction of the Detroit ICE Field Office to all Iraqi nationals subject to the jurisdiction of any ICE office throughout the nation.

detained, because their detention bears no reasonable relationship to effectuating their removal or protecting against danger.  Id. ¶¶ 80-82.

Petitioners seek a variety of relief, with the following requests pertinent for present purposes:

> G.  Enter a writ of mandamus and/or enjoin the government from removing Plaintiffs/Petitioners to Iraq without first providing them with an opportunity to establish that, in light of current conditions and the likelihood that they would suffer persecution or torture if removed to Iraq, they are entitled to protection against such removal;

> H.  At a minimum, enjoin the government from removing Plaintiffs/Petitioners to Iraq until they have been given sufficient time and access to attorneys to enable them to file motions to reopen their removal orders and seek stays of removal from the immigration court;

Id. at 36-37 (Prayer for Relief).

Petitioners filed a motion for a temporary restraining order and/or stay (Dkt. 11), to prevent their removal "until an appropriate process has determined whether, in light of current conditions and circumstances, they are entitled to mandatory protection from removal."  Id. at 2.  After the Government opposed the motion on jurisdictional grounds, which the Court found not susceptible to immediate resolution, the Court issued a stay of removal, pending resolution of the jurisdictional issue, which stay was made applicable to the class as then defined, i.e., all Iraqi nationals subject to removal orders within the jurisdiction of the Detroit ICE Field Office.  See 6/22/2017 Op. & Order (Dkt. 32).  After Petitioners filed their amended habeas corpus class action petition and class action complaint, along with a motion to expand the stay (Dkt. 36), the Court entered an order expanding the stay to a nationwide class of Iraqi nationals subject to final orders of removal.  See

6/26/2017 Op. & Order (Dkt. 43).[2]  The stay was subsequently extended until July 24, 2017.  See 7/6/2017 Op. & Order (Dkt. 61).

It is to the jurisdictional issue that the Court now turns.

**B. Conditions in Iraq**

Petitioners contend that conditions in Iraq have changed dramatically since their orders of removal were issued.  Specifically, Petitioners allege that the removal orders at issue "mostly predate the significant deterioration in Iraq following the government's destabilization and the rise of [ISIS]."  Am. Compl. ¶ 49.  This Court's investigation of the record bears out this claim.

Since the U.S.-led invasion of Iraq in March 2003, that country has essentially been in a continued state of unrest.  See Heller Decl., Ex. D. to Pet. Reply, ¶ 8 (Dkt. 30-5).[3]  Instability traceable to the invasion caused about two-thirds of Iraq's Christian community to leave the country prior to June 2014.  See "No Way Home: Iraq's Minorities on the Verge of Disappearance," (hereinafter, "No Way Home Report") at 10.[4]  According to the United Nations High Commissioner for Refugees, an estimated one million Iraqi citizens remain internally displaced due to sectarian violence dating from about 2006 until ISIS became heavily active in roughly 2014.  See Iraq, Internat'l Religious Freedom Report, U.S. State Dep't at 3 (2015),

---

[2] The members of the putative class are encompassed within the term "Petitioners," unless otherwise indicated.

[3] Rebecca Heller is the director and co-founder of the International Refugee Assistance Project ("IRAP"), a project of the Urban Justice Center, Inc.  Heller Decl. ¶ 1.  IRAP provides free legal services to refugees, including those who seek escape from persecution.  Id. ¶ 4.  The organization has extensive experience providing assistance to Iraqi refugees.  Id. ¶ 5.

[4] No Way Home Report was published in July 2016 and is available at http://minorityrights.org/wp-content/uploads/2016/07/MRG_CFRep_Iraq_Aug16_UPD-2.pdf. The report was jointly authored by several human rights organizations, with financial assistance from the European Union.

available at https://www.state.gov/documents/organization/256479.pdf.  The conflict with ISIS, however, caused a rate of displacement that vastly and rapidly outpaced the previous one, displacing an additional 3.4 million people in less than two years, from 2014 to July 2015.  Id.

Religious minorities have fled the country for good reason.  The declaration of Mark Lattimer indicates that religious minorities in Iraq face significant persecution at the hands of ISIS.  See Lattimer Decl., Ex. I to Pet. Mot., ¶¶ 8, 10 (Dkt. 11-10); see also id. ¶ 17 ("[R]eligious minorities are at risk of extinction in Iraq . . . .").[5]  ISIS forces in Iraq have directed Christians, in particular, to "pay a protection tax, convert to Islam, or be killed."  Id. ¶ 9.  Christians have also been abducted and subjected to sexual slavery, rape, and other atrocities.  Id. ¶ 10.

Sectarian violence in Iraq is by no means limited to Christian minorities.  The U.S. State Department's website paints a bleak picture of the country, noting that "[t]he murder rate remains high due to . . . religious/sectarian tensions."  The current International Religious Freedom Report, also published by the State Department, notes that "Yezidi, Christian, and Sunni leaders continued to report harassment and abuses" by certain regional governments.  See Internat'l Religious Freedom Report at 7.

Further, two of the Petitioners, Al-Issawi and Al-Dilaimi, identify as Shiite Muslims, a religious sect that has been targeted by ISIS.  See Am. Compl. ¶¶ 24-25; see also Internat'l Religious Freedom Report at 15 ("Coordinated [ISIS] bomb attacks continued to target Shia markets, mosques, and funeral processions. . . .); id. at 18 ("[ISIS] continued to publish open threats via leaflets, social media, and press outlets of its intent to kill Shia 'wherever they were found' on the basis of being 'infidels.'").

―――――――――――――――

[5] Lattimer, currently the executive director of Minority Rights Group International, has been extensively involved in various organizations dedicated to monitoring human rights abuses in Iraq.  Lattimer Decl. ¶ 1.

There is also evidence that Petitioners' association with Westerners will heighten their risk of persecution.  In the wake of the U.S.-led invasion of Iraq in 2003, Christian community leaders "were targeted for their religious differences <u>as well as their perceived ties to the West</u>, resulting in a large exodus of Christians from the country as refugees." <u>No Way Home</u> Report at 10 (emphasis added).  And the State Department's Iraq Travel Warning notes that "[a]nti-U.S. sectarian militias may also threaten U.S. citizens and western companies throughout Iraq." <u>See</u> Iraq Travel Warning, U.S. Dep't of State (June 14, 2017), available at https://travel.state.gov/content/passports/en/alertswarnings/iraq-travel-warning.html.

### C. Barriers to Asserting Claims

Petitioners assert that they have been unable to raise these changed conditions in immigration courts since their detainment, noting that many of them have been detained in facilities far from their homes. Petitioners detained in Michigan have been transferred to Ohio, Louisiana, and Arizona; Petitioners detained in Tennessee have been transferred to Louisiana, Texas, Alabama, and Arizona. <u>See</u> Am. Hab. Pet. ¶ 52.  Some petitioners were transferred multiple times.  <u>Id.</u> ¶ 56.  Legal help has been "mobilized by their local communities," <u>id.</u> ¶ 53, and relocating Petitioners away from counsel and the communities who help provide such legal assistance — sometimes in rapid succession — allegedly has deleterious effects, both for retaining and communicating with new counsel or communicating with retained counsel, <u>id.</u> ¶ 54-55.

Even without the pressure of an immediate removal without advance notice, preparing a motion to reopen proceedings before the immigration courts — the recognized route for presenting Petitioners' arguments based on changed circumstances — is no easy task.  Attorney Russell Abrutyn describes the process that was involved in filing a motion to reopen for one of his clients: it involved "several months" of obtaining files and affidavits, preparing applications for relief, and

"gathering hundreds of pages of supporting evidence."  Abrutyn Decl., Ex. A to Pet. Mot., ¶¶ 11, 13 (Dkt. 11-2).  Abrutyn personally spoke with family members of various Petitioners, who related that they are unable to even begin to prepare similar motions because they lack copies of relevant documents and, because of detention, the Petitioners cannot obtain representation by counsel.  Id. ¶ 12, 13; see also Barash Decl., Ex. H to Pet. Mot., ¶¶ 7-9 (daughter of Petitioner stating that Petitioner's detention prevents her from locating immigration documents and putting him in touch with counsel) (Dkt. 11-9).  Some of the relevant documents may take weeks to obtain, even in the normal course.  See Youkhana Decl., Ex. B to Pet. Mot., ¶ 16 (Dkt. 11-3).  Even those petitioners who have counsel cannot communicate with counsel or otherwise develop their motions.  See Id. ¶¶ 9-12 (describing the difficulties of retained and volunteer counsel in meeting with Petitioners due to relocation in order to file motions to reopen); Jajonie-Daman Decl., Ex. F to Pet. Mot., ¶¶ 7-8 (stating it is "nearly impossible" for her to meet with her Petitioner-clients "because they were all transferred to Youngstown, Ohio approximately 4 hours away . . . .") (Dkt. 11-7).

Preparing motions to reopen and motions to stay removal is also costly.  It requires "a high level of immigration law knowledge and experience," which costs clients somewhere between $5,000 and $10,000.  See Reed Decl., Ex. B. to Pet. Reply, ¶¶ 7, 10 (Dkt. 30-3).  This amount does not include fees of $10,000 to $30,000 that arise if the motion is granted and the case proceeds to a merits hearing on the underlying form of relief sought.  Id. ¶ 10.  In a case of this nature, costs can reach up to $80,000.  Id.

### III. ANALYSIS

Although Petitioners' request for injunctive relief, as set out in the amended petition, may be broad-based and in need of greater definition, they appear to be asking currently that this Court enjoin their removal until their claims can be adjudicated by the immigration courts and, if

8

necessary, the courts of appeals.  6/21/2017 Hr'g Tr. at 14 (Dkt. 31).  It is that request that must be examined under a jurisdictional lens.

Jurisdiction is a threshold issue, because it is the source of a court's legitimate power; without it, a court is off the constitutionally sanctioned power grid.  "Without jurisdiction the court cannot proceed at all in any cause.  Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause."  Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94 (1998) (quoting Ex parte McCardle, 7 Wall. 506, 514 (1868)).

Petitioners invoke both general and specific grants of jurisdiction to federal district courts, including 28 U.S.C. § 2241 (habeas); 28 U.S.C. § 1331 (federal question); 28 U.S.C. § 1361 (mandamus).  However, the Government contends that the REAL ID Act, codified at 8 U.S.C. § 1252, divests this Court of jurisdiction.  Petitioners argue that the act is inapplicable, but in the event the Court disagrees, they contend that the act violates the Constitution's Suspension Clause as applied, because it suspends their right to habeas corpus without providing an adequate and effective alternative.  The Court holds that Petitioners' claims regarding removal are excluded from this Court's jurisdiction by the REAL ID Act.  But the Court further holds that the act is unconstitutional as applied to Petitioners in the extraordinary circumstances of this case.

## A. REAL ID Act

To put the present jurisdictional question in proper perspective, a review of the history of court involvement with deportation proceedings is required, starting with the 1996 enactment of the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"), 110 Stat. 3009-546.  That act significantly restricted judicial review of deportation proceedings via 8 U.S.C.

§ 1252(g), whose language remains similar in important respects to the present language of the statute.  As enacted, it read:

> Except as provided in this section and notwithstanding any other provision of law, no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this Act.

That provision could be read as a broad jurisdiction-stripping enactment, depriving courts of judicial review powers in all deportation matters, unless § 1252 otherwise provides for such review.  But this "zipper" clause approach was rejected in the seminal case of Reno v. American-Arab Anti-Discrimination Committee, 525 U.S. 471 (1999), where the Supreme Court held that the provision's reach is "much narrower."  Id. at 482.  The limitations on judicial review of an Attorney General's decision or action to "commence proceedings, adjudicate cases, or execute removal orders" only barred district courts from reviewing those three categories; the statute did not protect all deportation decisions from district-court review.  Id.  As support for its reading that the language was not intended to cover the waterfront of all deportation decisions, the Court claimed that there was good reason for Congress to focus on these three areas: "At each stage, the Executive has discretion to abandon the endeavor, and at the time IIRIRA was enacted the INS had been engaging in a regular practice (which had come to be known as 'deferred action') of exercising that discretion for humanitarian reasons or simply for its own convenience."  Id. at 484.  Because litigation had proliferated against the Attorney General, Congress stepped in, via § 1252(g), "to give some measure of protection to 'no deferred action' decisions and similar discretionary determinations[.]"  Id. at 485.

In 2005, the REAL ID Act was signed into law.  The act, among other things, amended 8 U.S.C. § 1252, by adding language that expressly stated that habeas jurisdiction was withdrawn

for any claims excluded by § 1252(g).  The amended language — which is the current language at

issue in our case — states:

> Except as provided in this section and notwithstanding any other
> provision of law (statutory or nonstatutory), including section 2241
> of Title 28, or any other habeas corpus provision, and sections 1361
> and 1651 of such title, no court shall have jurisdiction to hear any
> cause or claim by or on behalf of any alien arising from the decision
> or action by the Attorney General to commence proceedings,
> adjudicate cases, or execute removal orders against any alien under
> this chapter.

8 U.S.C. § 1252(g) (amendment emphasized).  The act also clarified that the "sole and exclusive

means for judicial review of an order of removal" shall be a petition for review filed in the court

of appeals.  8 U.S.C. § 1252(a)(5); see also Elgharib v. Napolitano, 600 F.3d 597, 600 (6th Cir.

2010) ("In the REAL ID Act, Congress sought to channel judicial review of an alien's claims

related to his or her final order of removal through a petition for review at the court of appeals.").

Based on the current language of the statute, the Government argues that Petitioners'

claims are beyond the jurisdiction of this district court.  It asserts that what Petitioners seek — a

restraint on enforcement of removal orders — is  captured by the exclusion of any "claim by . . .

any alien arising from the decision or action by the Attorney General to . . . execute removal orders

against any alien[.]"  Petitioners' sole recourse, according to the Government, is for Petitioners to

seek relief in the form of a motion to reopen proceedings with the immigration courts and judicial

review in the appropriate court of appeals.  Gov. Resp. at 1 (Dkt. 17).

Petitioners respond by arguing that § 1252(g) does not preclude judicial review of all

actions by the Attorney General coming within the three headings of commencing proceedings,

adjudicating cases, or enforcing removal orders.  Rather, only discretionary decisions within those

types of matters are excluded from a district court's jurisdiction.  They argue that because the

Attorney General has no discretion to remove them in violation of the CAT and the INA, his

11

decision to do so is reviewable by this Court. In support of this argument, Petitioners rely on <u>Reno</u> and its many references to the fact that § 1252(g) was designed to protect discretionary decisions of the Attorney General. <u>See, e.g.</u>, <u>Reno</u>, 525 U.S. at 485 n.9 (Section 1252(g) "was directed against a particular evil: attempts to impose judicial constraints upon prosecutorial discretion.").

The problems with Petitioners' theory are manifold, starting with <u>Reno</u>. It is true that <u>Reno</u> notes that § 1252(g) was designed to protect certain discretionary decisions. But the opinion did not say that <u>only</u> discretionary decisions were protected. In fact, the allegation in <u>Reno</u> was that the Attorney General had violated the First Amendment by supposedly seeking to deport the petitioner because he was a member of a politically unpopular organization. That raised a non-discretionary issue — a claimed constitutional violation — much like the CAT and the INA violations Petitioners allege in the instant case. Nonetheless, the Supreme Court held that the district court lacked jurisdiction to consider the claim because the challenge was to the Attorney General's decision to "commence proceedings" — a challenge that "falls squarely within [§] 1252(g) — indeed . . . the language seems to have been crafted with such a challenge precisely in mind[.]" <u>Id.</u> at 487.

Other courts have rejected the view that <u>Reno</u> viewed § 1252(g) as excluding jurisdiction for claims only when they are based on discretionary decisions. In <u>Foster v. Townsley</u>, 243 F.3d 210 (5th Cir. 2001), the court affirmed dismissal for lack of jurisdiction where the plaintiff claimed his deportation would violate non-discretionary regulations requiring that his deportation be stayed. In rejecting the argument that <u>Reno</u> interpreted § 1252(g) to exclude jurisdiction only for claims based on discretionary decisions, the court held that neither the <u>Reno</u> opinion nor the statutory language would support such a distinction:

> Foster asserts that [<u>Reno</u>'s] interpretation of the statute requires that
> judicial review be precluded only when the Attorney General makes

> discretionary decisions. We disagree. Although the Court emphasized the importance of preserving the Attorney General's discretionary functions in the three enumerated categories, it did not explicitly state that the provision applies <u>only</u> to review of discretionary decisions by the Attorney General in these areas and not to review of non-discretionary decisions . . . . The Court does not . . . state that the provision exclusively governs review of <u>discretionary</u> actions. Indeed, there is no discussion of review over non-discretionary actions. The provision itself does not distinguish between discretionary and non-discretionary decisions. Rather, the statute refers to "any cause or claim" that "arises from the decision or action by the Attorney General" in the three areas. 8 U.S.C. § 1252(g). Therefore, while it may be true that the officials executed the order despite the regulation's requirement of an automatic stay of his deportation, this distinction is not critical because a plain reading of the statute demonstrates that Congress did not exclude non-discretionary decisions from this provision limiting judicial review.

<u>Id.</u> at 214 (emphasis in original); <u>see also</u> <u>Lopez Silva v. United States</u>, 2016 WL 953233, No. 14-5084 (D. Minn. 2016) (dismissing for lack of jurisdiction claims based on deportation in violation of mandatory, rather than discretionary, stay of removal order, because "<u>Reno</u> is silent with regard to an explicit substantive or procedural distinction between mandatory and discretionary decisions").

Petitioners' discretion-only theory fares no better under the Sixth Circuit authority they invoke. In <u>Mustata v. U.S. Department of Justice</u>, 179 F.3d 1017 (6th Cir. 1999), the court affirmed jurisdiction to hear a habeas petition because the petitioner's attorney in the immigration court had been entirely ineffective by failing to investigate grounds for asylum and failing to present any evidence during a hearing. The court noted <u>Reno</u>'s point that § 1252(g) was directed toward limiting judicial constraints on executive discretion, and that the petitioners were not claiming that the Attorney General should grant them discretionary, deferred-action type relief. But the court's statements on discretion were dicta: the nub of the decision is that the facts relevant to their claim took place well before any decision by the Attorney General, and the Attorney

General's decision was "immaterial to the substance of this claim." Id. at 1023. In fact, the habeas claim had nothing to do with any action by the Attorney General, because it was based entirely on the inadequate performance by the petitioner's attorney. As such, Mustata is a vastly different case from ours, in which Petitioners' claims are premised on the Attorney General's decision to proceed with enforcement of removal orders, based on his legal conclusions about the application of the CAT and INA provisions.

Petitioners' discretion-only theory — and their reading of Mustata – is contradicted by recent Sixth Circuit authority. In Elgharib, the petitioner filed an action in a district court, seeking to challenge her removal order, which she claimed had been entered without notice to her, in violation of the Due Process Clause. The court concluded that § 1252(g) deprived the district court of jurisdiction over the constitutional claim. Elgharib, 600 F.3d at 605 ("Congress acted within its constitutional powers to limit judicial review of constitutional questions under Section 1252, and we conclude that Section 1252(a)(5) & (g) both preclude district-court jurisdiction over constitutional challenges to final orders of removal."). Importantly, the court made no mention of discretion as part of its analysis (although it did note, in passing, that discretion was referenced in Reno); nor did it even mention Mustata, suggesting that it did not view that case as an arguably analogous one that needed to be distinguished. Elgharib's dismissal of constitutional claims is a sobering rebuke of Petitioners' theory, given that constitutional claims are, by their nature, non-discretionary claims. If the Sixth Circuit had adopted Petitioners' discretion-only theory, it would

have entertained the constitutional claims.[6] Elgharib's sweeping conclusion that §1252(g) bars jurisdiction for constitutional claims dooms Petitioners' theory.[7]

Petitioners' alternative approach is that their claim is not based on a decision of the Attorney General to enforce a removal order. This argument is premised on the notion that the grounds giving rise to their CAT or INA arguments did not manifest until long after the removal orders issued. Pet. Reply at 2 (Dkt. 30).

However, if Petitioners are not challenging enforcement of a removal order, it is difficult to understand what they are challenging. To be sure, they ground their challenge upon circumstances that have transpired following issuance of the removal orders. But that does not change the fact that what they challenge is the Attorney General's current decision to enforce orders to remove them, and his rejection of their arguments based on new circumstances. Regardless of whether they could have asserted these grounds before the orders were issued, they assert them now to challenge the Attorney General's decision and foreclose enforcement of the

---

[6] Other courts have recognized that § 1252(g) prohibits constitutional challenges to orders of removal in district court. See, e.g., Ajlani v. Chertoff, 545 F.3d 229, 235 (2d Cir. 2008) (holding that district court did not have jurisdiction to review constitutional challenge to order of removal).

[7] Petitioners' theory has support in other circuits. See, e.g., Jama v. INS, 329 F.3d 630, 632 (8th Cir. 2003) (holding that § 1252(g) did not deprive district court of jurisdiction, because court was not required to "second-guess the Attorney General's exercise of his discretion; it is to address a purely legal question of statutory construction."); Madu v. U.S. Atty. Gen., 470 F.3d 1362, 1368 (11th Cir. 2006) ("While [§ 1252(g)] bars courts from reviewing certain exercises of discretion by the attorney general, it does not proscribe substantive review of the underlying legal bases for those discretionary decisions and actions."); Chmakov v. Blackman, 266 F.3d 210, 215 (3d Cir. 2001) ("[Section 1252(g)] limits the power of federal courts to review the discretionary decisions of the Attorney General to commence proceedings, adjudicate cases, or execute removal orders."). Unfortunately for Petitioners, the Sixth Circuit in Elgharib indicated its rejection of the discretion-only approach.

orders.  It is simply not reasonable to characterize Petitioners' claim as not being one "arising from the decision or action by the Attorney General to execute removal orders."[8]

Any attempt to characterize Petitioners' efforts to avoid enforcement of an order as something other than a challenge to enforcement of an order not only runs counter to a natural reading of § 1252(g), but also to the Sixth Circuit's straightforward view expressed in Elgharib. There, the court made clear that § 1252(g) divested the district court of subject-matter jurisdiction, despite the petitioner's attempts to characterize her Due Process claim as being unrelated to her order of removal.  Elgharib, 600 F.3d at 605.  The court held that the petitioner's claim "directly target[ed]" her order of removal because she explicitly requested that the Government be prohibited from removing her so that she could seek relief in an immigration court.  Id.  That is precisely the posture of the present case.

Courts in this District have similarly held that they are without jurisdiction to hear claims related to decisions to execute removal orders, regardless of whether the challenges might be deemed "direct" or "indirect" challenges to the Attorney General's decision to remove, and even if they are brought only to stay removal until the immigration courts can act.  See Benitez v.

_____

[8] The cases cited by Petitioners are not instructive here.  In Singh v. Gonzales, 499 F.3d 969 (9th Cir. 2007), the court was addressing ineffective assistance committed after the removal order had been issued, when counsel failed to file a timely petition for review with the court of appeals.  The court held that § 1252 did not strip the district court of jurisdiction, because the district court proceeding would not be based on a substantive challenge to the order of removal; rather it would focus on whether counsel had been ineffective – akin to the challenge in Mustata.  Here, by contrast, there is no challenge to counsel's performance or anyone else's decision or action, other than the Attorney General's decision to remove them, allegedly in violation of the CAT and the INA.

The ruling in Ilyabaev v. Kane, 847 F. Supp. 2d 1168 (D. Ariz. 2012) is distinguishable, as well, because there the petitioners were challenging the revocation of the petitioners' I-140 petition for a skilled worker visa, not an order of removal.  Section 1252(g) simply does not address revocation of a petition, id. at 1174, but it does address orders of removals – the orders at issue here.

16

Dedvukaj, 656 F. Supp. 2d 725, 728 (E.D. Mich. 2009) (dismissing case and dissolving temporary stay, because "Plaintiff cannot circumvent the REAL ID Act's review provisions and express limitation of district court jurisdiction by claiming that he is pursuing in this court a due process claim that is somehow distinct from his removal order"); Ba v. Holder, No. 09-14645, 2009 WL 5171793, at *2 (E.D. Mich. Dec. 24, 2009) (dismissing case and vacating temporary stay, because Due Process claim was not distinct from direct challenge to the execution of the petitioner's removal order).

Because Petitioners are bringing claims that arise out of the Attorney General's decision to execute final orders of removal, 8 U.S.C. § 1252(g) applies to divest this Court of subject-matter jurisdiction, unless to do so would violate the Constitution.

**B. Suspension Clause**

Petitioners contend that if their claims are barred by the REAL ID Act, the act violates the Constitution's Suspension Clause as applied. 6/21/2017 Hr'g Tr. at 15. Petitioners argue that because the changed conditions in Iraq arose subsequent to the issuance of their final orders of removal, they will be deprived of judicial review unless some court hears their claims. In response, the Government notes that Petitioners have the option to file motions to reopen in the immigration courts; in the event the motions are denied, they may seek review in the courts of appeals. The Government argues that, to the extent Petitioners are now impeded in their ability to file motions to reopen in light of their imminent removal, Petitioners are to blame for not filing earlier.

"The Framers viewed freedom from unlawful restraint as a fundamental precept of liberty, and they understood the writ of habeas corpus as a vital instrument to secure that freedom." Boumediene v. Bush, 553 U.S. 723, 739 (2008). However, "the common-law writ all too often had been insufficient to guard against the abuse of monarchial power. That history counseled the

necessity for specific language in the Constitution to secure the writ and ensure its place in our legal system." Id. at 739-740. The Suspension Clause was ultimately drafted in order to protect against attempts to withhold habeas relief. The Clause guarantees that "the Judiciary will have a time-tested device, the writ, to maintain the 'delicate balance of governance' that is itself the surest safeguard of liberty." Id. at 745 (quoting Hamdi v. Rumsfeld, 542 U.S. 507, 536 (2004)).

The Suspension Clause states that "[t]he Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it." U.S. Const. art. I, § 9, cl. 2. "[T]he Supreme Court has noted that this Clause requires 'some judicial intervention in deportation cases.'" Muka v. Baker, 559 F.3d 480, 483 (6th Cir. 2009) (quoting I.N.S. v. St. Cyr, 533 U.S. 289, 300 (2001)). "However, the writ of habeas corpus is not suspended in violation of this Clause if, when the right to habeas is eliminated, there is 'the substitution of a new collateral remedy which is both adequate and effective' in allowing an individual to challenge the legality of his or her detention." Id. (quoting Swain v. Pressley, 430 U.S. 372, 381 (1977)).

The court in Muka directly addressed this issue in the context of the REAL ID Act, holding that, "[b]ecause there is a remedy available, a petition for review filed with the court of appeals, the REAL ID Act does not violate the Suspension Clause so long as a petition for review provides an 'adequate and effective' mechanism for relief." Id. at 484. The court further noted that "every circuit to confront this issue has agreed that, facially, the petition for review filed in the court of appeals provides an adequate and effective process to review final orders of removal, and thus the elimination of habeas relief does not violate the Suspension Clause." Id. at 484-485.

After ruling that the REAL ID Act was not subject to a facial challenge, the court in Muka addressed whether the petitioner had made out an as-applied challenge. The petitioners argued

18

that a holding that the district court was without subject-matter jurisdiction would leave them without a judicial forum in which to seek a status adjustment under 8 U.S.C. § 1255(i). In rejecting this claim, the court noted that the petitioners "did have an avenue to argue their § 1255(i) claim — their original removal proceedings and their petition for review." Id. at 485. The court held that "[s]imply because the [petitioners] failed to make a known argument during their prior proceedings does not mean that we must grant them a second bite at the apple to satisfy the Suspension Clause's requirements." Id. at 486. Regarding future as-applied challenges, the court stated, "[w]e do not say that there will never be an alien claiming protection under § 1255(i) who could make a successful as-applied challenge to the REAL ID Act. However, we leave this inquiry to future panels presented with different cases and do not foreclose other distinct as-applied challenges." Id. (emphasis added).

The instant case is an as-applied challenge markedly different than the one found wanting in Muka. The most obvious difference is that the petitioners in Muka had failed to assert an argument that was available to them before their orders of removal were entered. Petitioners here did not fail to raise a claim in their prior administrative proceedings. Indeed, their CAT and INA claims did not ripen until fairly recently, sometime in or after 2014, when the persecution of religious minorities in Iraq became far more threatening. See Heller Decl., Ex. D to Pet. Reply, ¶ 30 (Dkt. 30-5).

Further, unlike in Muka, the alternative to standard habeas relief for Petitioners is plainly inadequate and ineffective. The mechanism provided by the REAL ID Act for judicial review of removal orders — filing motions to reopen proceedings in immigration courts and subsequent review in the courts of appeals — does not take into account the compelling confluence of grave,

real-world circumstances present in our case. This makes relegation to the immigration courts, without a stay from this court in place, an alternative that is neither adequate nor effective.

Without a stay in place, deportations will begin immediately, which may mean a death sentence for some deportees. Petitioners have presented significant evidence — not contested by the Government — that many will face death. Beginning in August 2014, ISIS began carrying out large-scale killings. Lattimer Decl. ¶ 10. Religious minorities were particularly vulnerable to these atrocities, with Christians being given the horrific choice to "pay a protection tax, convert to Islam, or be killed." Id. ¶ 9. Obviously, deportees who are murdered will never have the opportunity to present their arguments that their removal orders are prohibited by the CAT or the INA.

While death is certainly the most egregious outcome deportees face, other persecution would also compromise their ability to pursue their removal challenges from foreign shores. Petitioners have presented evidence — not contested by the Government — that they may well face torture and severe discrimination. ISIS routinely commits arbitrary executions, torture, and sexual enslavement against religious minorities and those affiliated with the United States. Heller Decl. ¶¶ 11, 46, 55.

Deportees who must undertake evasive action to avoid these grave challenges — changing residences, leaving jobs — will be deprived of the stability that is often necessary to properly pursue legal challenges. Maintenance of legal paperwork and communication with lawyers and potential witnesses would likely become extraordinarily problematic, if not impossible.[9]

---

[9] The Government responds that "concerns about the ability to adjudicate requests for relief before removal do not equate to a denial of relief." Gov't Resp. to Mot. to Expand Stay at 11 (Dkt. 38) (quoting Roman v. Ashcroft, 340 F.3d 314, 327 (6th Cir. 2003) ("[W]e do not believe that the possibility of an alien's removal prior to the adjudication of his habeas corpus petition amounts to an effective denial of the petitioner's opportunity to seek meaningful habeas corpus relief.")).

What compounds Petitioners' difficulties is the great number of individuals suddenly at risk.  In an unanticipated decision to enforce removal orders, the Government has, without notice, put some 1,444 persons at risk for deportation.  This abrupt action taxes the immigration bar's ability to promptly service all in need of legal protection.  See Reed Decl., Ex. B. to Pet. Reply, ¶ 12 (Dkt. 30-3) (noting the "relatively small size of Michigan's immigration bar willing to handle removal cases, and the years to decades-long nature of most removal cases.").  It also taxes the resources of the immigration courts to provide prompt and appropriate decisions to all affected. See, e.g., Mendoza-Mazariegos v. Mukasey, 509 F.3d 1074, 1084 (9th Cir. 2007) (vacating departure order where petitioner was denied continuance to obtain counsel and "in effect, punished for the crowded docket of the immigration courts"); Cui v. Mukasey, 538 F.3d 1289, 1295 (9th Cir. 2008) (continuance improperly denied because of "crowded docket of the immigration courts").

The Government's decision to move arrestees to different locations within the country only exacerbates this problem, as it disrupts attorney-client communications and preparation of necessary court papers.  Preparing motions to stay and motions to reopen requires original signatures from the detained clients, thus necessitating in-person visits that are often impractical in light of Petitioners' ever-changing locations.  See Reed Decl. ¶ 12; see also Youkhana Decl. ¶¶ 10, 12 (describing difficulties faced by Michigan-based attorneys in communicating with clients who have been transferred to Ohio); Jajonie-Daman Decl. ¶¶ 7-8 (stating that it is "nearly impossible" to meet with her Petitioner-clients detained in Ohio).

---

Crucially, Roman involved a petitioner whose ability to seek readmission to the U.S. was not meaningfully affected by his removal.  See Roman, 340 F.3d at 327 ("[Petitioner] will not be deprived of his opportunity to seek habeas corpus relief even if he is removed prior to a court's resolution of his petition.").  Here, the deprivation of a meaningful opportunity to pursue a habeas claim is virtually assured.

It is reasonable to assume that delays in preparing motions to reopen and stay and processing them in the immigration courts — and further delays in processing petitions for review in the courts of appeals — will mean that many Petitioners will not have their arguments heard before they are repatriated. This, in turn, means many may face the grave consequences of deportation — death, torture, or other persecution — before their legal rights can be properly adjudicated.

The Government's response that these difficulties are the result of Petitioners' dereliction unfairly ignores salient history. Although Petitioners theoretically could have filed motions to reopen and stay before the Government's recent decision to enforce orders, such action would have served no immediately useful purpose. For many years, Iraq has refused repatriation of its nationals. The record is unclear regarding when exactly this refusal to accept deportees began, but it appears that repatriation had been unavailable since as long ago as 1986, the year in which one of the named Petitioners, Jihan Asker, was issued a final order of removal yet was not removed. See Am. Pet. ¶ 20. Prior to the recent agreement with Iraq announced in March 2017, filing a motion to challenge enforcement of removal orders that stood no reasonable chance of being enforced in the foreseeable future would have been a purely academic exercise. See also Reed Decl. ¶ 14 ("Stays of Removal are not typically sought until removal is imminent because they are rarely granted when removal is not imminent.").

And it would have been a costly exercise, at that. Petitioners have presented evidence — uncontested by the Government — of the steep legal cost to prepare such motions. The cost of simply preparing a motion to reopen or a motion to stay is between $5,000 and $10,000. Id. ¶ 10. If the motion is granted, the case will then proceed to a hearing on the merits, which can cost a client an additional $30,000. Id. When it is all said and done, a case of this nature can cost up to

$80,000.  Id.  Spending such large sums to avoid a removal that seemed impossible until March of this year would have been unreasonable.

The totality of these facts leads to the conclusion that casting Petitioners out of this court without a stay — in the extraordinary context of this case — would ignore the reality that the process for judicial review provided for in the Real ID Act would not be adequate or effective in protecting their habeas rights.  The destructive impact would critically compromise their ability to file and prosecute motions to reopen — a legal right that the Supreme Court has characterized as "an 'important safeguard' intended 'to ensure a proper and lawful disposition' of immigration proceedings." Kucana v. Holder, 558 U.S. 233, 242 (2010) (quoting Dada v. Mukasey, 554 U.S. 1, 18 (2008)).  To enforce § 1252(g) in these circumstances would amount to a suspension of the right to habeas corpus.  The Constitution prohibits that outcome.

Because Section 1252(g) may not be enforced, the Court is not stripped of jurisdictional grants found in other sources of the law, including 28 U.S.C. § 2241 (habeas); 28 U.S.C. § 1331 (federal question); 28 U.S.C. § 1361 (mandamus).

### III. CONCLUSION

The Court concludes that it has jurisdiction to grant Petitioners the limited relief they request, i.e., an injunction against enforcement of the orders of removal so that their habeas rights can be meaningfully asserted and addressed before other courts.

The next steps in this litigation remain to be determined.  As will be detailed in a separate order to be issued, the Court will convene a status conference with counsel on July 13, 2017 at 1:30 p.m. to discuss those steps.

23

In the interim, the Court's July 6, 2017 Order staying the removal orders of all class members remains in effect in accordance with its terms until July 24, 2017, unless otherwise ordered by the Court.

SO ORDERED.


Dated:  July 11, 2017                              s/Mark A. Goldsmith
        Detroit, Michigan                          MARK A. GOLDSMITH
                                                   United States District Judge



**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on July 11, 2017.

                                    s/Karri Sandusky
                                    Case Manager