# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

**USAMA JAMIL HAMAMA,** *et al.*,

        Petitioners/Plaintiffs,

v.

**REBECCA ADDUCCI**, *et al.*,

        Respondents/Defendants.

Case No. 2:17-cv-11910-MAG-DRG

Hon. Mark A. Goldsmith
Mag. David R. Grand

Class Action

---

# PETITIONERS/PLAINTIFFS' MOTION FOR A PRELIMINARY STAY OF REMOVAL AND/OR PRELIMINARY INJUNCTION

Michael J. Steinberg (P43085)
Kary L. Moss (P49759)
Bonsitu A. Kitaba (P78822)
Miriam J. Aukerman (P63165)
AMERICAN CIVIL LIBERTIES
   UNION FUND OF MICHIGAN
2966 Woodward Avenue
Detroit, Michigan 48201
(313) 578-6814
msteinberg@aclumich.org


Kimberly L. Scott (P69706)
Wendolyn Wrosch Richards (P67776)
Cooperating Attorneys, ACLU Fund
   of Michigan
MILLER, CANFIELD, PADDOCK
   & STONE, PLC
101 N. Main St., 7th Floor
Ann Arbor, MI  48104
(734) 668-7696
richards@millercanfield.com


Nora Youkhana (P80067)
Nadine Yousif (P80421)
Cooperating Attorneys, ACLU Fund
   of Michigan
CODE LEGAL AID INC.
 27321 Hampden St.
Madison Heights, MI 48071
(248) 894-6197
norayoukhana@gmail.com


Judy Rabinovitz* (NY Bar JR-1214)
Lee Gelernt (NY Bar NY-8511)
Anand Balakrishnan* (Conn. Bar 430329)
ACLU FOUNDATION
   IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2618
jrabinovitz@aclu.org


Margo Schlanger (N.Y. Bar #2704443)
Samuel R. Bagenstos (P73971)
Cooperating Attorneys, ACLU Fund
   of Michigan
625 South State Street
Ann Arbor, Michigan 48109
734-615-2618
margo.schlanger@gmail.com


Susan E. Reed (P66950)
MICHIGAN IMMIGRANT RIGHTS
   CENTER
3030 S. 9th St. Suite 1B
Kalamazoo, MI 49009
 (269) 492-7196, ext. 535
susanree@michiganimmigrant.org


Lara Finkbeiner (NY Bar 5197165)
Mark Doss* (NY Bar 5277462)
Mark Wasef* (NY Bar 4813887)
INTERNATIONAL REFUGEE
   ASSISTANCE PROJECT
Urban Justice Center
40 Rector St., 9th Floor
New York, NY 10006
(646) 602-5600
lfinkbeiner@refugeerights.org

*Attorneys for All Petitioners and Plaintiffs*

William W. Swor (P21215)
WILLIAM W. SWOR
  & ASSOCIATES
1120 Ford Building
615 Griswold Street
Detroit, MI 48226
wwswor@sworlaw.com

*Attorney for Plaintiff/Petitioner*
*Usama Hamama*

Elisabeth V. Bechtold* (CA Bar 233169)
María Martínez Sánchez* (NM Bar 126375)
Kristin Greer Love* (CA Bar 274779)
AMERICAN CIVIL LIBERTIES
  UNION OF NEW MEXICO
1410 Coal Ave. SW
Albuquerque, NM 87102
ebechtold@aclu-nm.org

*Attorneys for Plaintiff/Petitioner Abbas Oda*
*Manshad Al-Sokaina*

Dated: July 17, 2017

* Application for admission forthcoming.

**ORAL ARGUMENT REQUESTED**

Local Rule 7.1(a)(1) requires Petitioners/Plaintiffs (hereinafter Petitioners) to ascertain whether this motion is opposed. On July 14, 2017, Petitioners' counsel Margo Schlanger communicated personally via email with William Silvis, Assistant Director, District Court Section Office of Immigration Litigation, U.S. Department of Justice, Defendants/Respondents' counsel, explaining the nature of the relief sought and seeking concurrence. Mr. Silvis denied concurrence.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

1.      U.S. and international law prohibits removing individuals to countries where they will face torture, persecution, or death. Petitioners are Iraqi nationals currently subject to final orders of removal whom the government suddenly decided to remove to Iraq despite the grave threats they face there.

2.      Most of the Petitioners came to the United States years ago. As of the first of July, 2017, U.S. Immigration and Customs Enforcement (ICE) had arrested and was detaining 234 Iraqis, with the intention of immediately removing them to Iraq. Over a thousand other Iraqi nationals with final orders of removal are subject to arrest and detention at any time. Many of those currently detained are members of religious or ethnic minority groups, including Chaldean Christian, Kurds, and Sunni Muslims, who have suffered brutal repression in Iraq. Many of the removal orders are years, even decades old. The Petitioners have been residing in the

community, in many cases living with their U.S. citizen spouses and children, under orders of supervision.

3. Political negotiation by the Trump administration led to Iraq's agreement to accept repatriation of Iraqi nationals, and so Petitioners were arrested in June. Only this Court's emergency intervention has stood between them and removal to Iraq. The government's continued detention of the hundreds of Petitioners evidences its continued intention to remove them as soon as possible. If removed to Iraq, under current conditions, Petitioners face a grave danger of persecution, torture, and death.

4.     Pursuant to Fed. R. Civ. P. 65, Petitioners seek a Preliminary Stay of Removal/Preliminary Injunction that preserves the status quo while they pursue their central claim in this case.[1] That claim is that ICE cannot lawfully remove them to Iraq until an appropriate process has determined whether, in light of current conditions and circumstances, they are entitled to mandatory protection against removal. In particular, in this motion Petitioners seek a stay of removal until they have had a reasonable period of time to locate immigration counsel, file

---

[1] As set forth in Counts I and II of the First Amended Petition/Complaint, ECF 35, Pg.ID# 541-43, Petitioners have both a statutory and constitutional right not to be removed to Iraq without a meaningful process for establishing that they face a probability of persecution, torture or death if deported, and are thus entitled to mandatory protection against removal. Given the exigency of the removal claims, this motion seeks immediate, emergency relief only on Counts I and II. Petitioners may, in future, seek further relief on Count III (prohibition of transfer away from counsel) or Count IV (unlawful detention), or further relief on Counts I and II.

a motion to reopen in the appropriate administrative immigration forum, and have that motion adjudicated to completion in the administrative system, with time to file a petition for review and request a stay of removal in a federal court of appeals.

5.      In its June 22, 2017 order in this case, granting the first stay of removal, the Court found that the Petitioners face irreparable harm given the "significant chance of loss of life and lesser forms of persecution." Opinion and Order, ECF 32, Pg.ID# 501. "Such harm," the Court concluded, "far outweighs any conceivable interest the Government might have in the immediate enforcement of the removal orders." *Id.* This remains true. *See also* Opinion and Order Regarding Jurisdiction, ECF 64, Pg.ID# 1225 (describing the "substantiated risk of death, torture, or other grave persecution" that faces Petitioners if deported).

6. This Court has found that Petitioners face significant obstacles to filing motions to reopen and accessing the immigration court system. Opinion and Order Regarding Jurisdiction, ECF 64, Pg.ID# 1231-32. Moreover, as explained in more detail in the accompanying brief, Petitioners need to obtain their A-files (the comprehensive file of a person's immigration history) and the Record of Proceedings (the immigration court file containing records of proceedings before the immigration courts and Board of Immigration Appeals), which are in the government's hands, in order to properly frame both factual and legal arguments for reopening.

3

WHEREFORE, for the reasons set forth in the accompanying brief, Petitioners respectfully request this Court to grant a Preliminary Stay of Removal/Preliminary Injunction barring the removal of petitioner class members until they have had a meaningful opportunity to obtain immigration counsel, file a motion to reopen in the appropriate administrative immigration forum, and have that motion adjudicated to completion in the administrative system, with time to file a petition for review if necessary, along with a request for a stay of removal in a federal court of appeals.

Specifically, each member of the petitioner class should be given three months to file their motions to reopen, starting when the government provides a copy of the individual's A-file and the Record of Proceedings to the Petitioner's immigration counsel (i.e., counsel who has filed a G-28 form or equivalent) or, if the Petitioner does not have counsel, to the Petitioner.

Although the amount of time Petitioners have to file a motion to reopen after receiving the relevant records is uniform, the actual length of the stay thereafter will vary. For a Petitioner who *does not* file a motion to reopen, the stay will expire. A Petitioner who *does* file a motion to reopen will be protected by the stay until such time as the immigration court and the Board of Immigration Appeals ("BIA") adjudicate the motion, and the Petitioner has had the opportunity to file a petition for review and seek a stay with the Court of Appeals.

4

The stay will also expire for any class member who, having had the opportunity to seek protection from removal and having consulted with immigration counsel, has notified the court through counsel that s/he does not wish to pursue such protection further.

The Court should require the parties to report back periodically on how Petitioners' immigration cases are progressing, since at this stage it is unclear if obstacles might arise. To enable both the Court and the parties to assess the progress being made, Respondents should be required to provide updated information to the Petitioners every two weeks.[2] Specifically, Respondents should update the following information:

- Whether a motion to reopen has been filed and/or a stay has been granted, and the court(s) and date(s) of any such motion and/or stay;

- Readily available information on whether an attorney or representative has filed an appearance on behalf of the individual, and if so the name and contact information of that attorney or representative and the date on which he or she filed an appearance if that information is available;

- Whether the A-file has been provided to the individual and/or individual's attorney, and the date provided;

- Whether the Record of Proceedings has been provided to the individual and/or the individual's attorney, and the date provided;

---

[2] In their Motion for Expedited Discovery of Class Member Information, ECF 51, Pg.ID# 746, Petitioners requested weekly updates. While regular updating is critical since the information at issue is changing constantly, to reduce the burden on the Respondents, Petitioners are willing to make do with reporting every two weeks.

5

- For detained individuals only:  current detention location; and

- For individuals who have been detained at any time since March 6, 2017: all detention locations in which the class member has been held on or since March 6, 2017, the dates the class member was detained in those locations, and whether the class member has been released from detention.

Finally, the Court's order should provide that if the relief requested above proves unworkable or somehow insufficient, either Petitioners or Respondents can return to the Court to request modification.

Respectfully submitted,

/s/Michael J. Steinberg
Michael J. Steinberg (P43085)
Kary L. Moss (P49759)
Bonsitu A. Kitaba (P78822)
Miriam J. Aukerman (P63165)


/s/Kimberly L. Scott
Kimberly L. Scott (P69706)
Wendolyn Wrosch Richards (P67776)


/s/Susan E. Reed
Susan E. Reed (P66950)

/s/Judy Rabinovitz
Judy Rabinovitz* (NY Bar JR-1214)
Lee Gelernt (NY Bar NY-8511)
Anand Balakrishnan* (Conn. Bar 430329)


/s/ Margo Schlanger
Margo Schlanger (N.Y. Bar #2704443)
Samuel R. Bagenstos (P73971)

*Attorneys for All Petitioners and Plaintiffs*

* Application for admission forthcoming.


Dated: July 17, 2017

6

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

**USAMA JAMIL HAMAMA,** *et al.*,

    Petitioners/Plaintiffs,

v.

**REBECCA ADDUCCI**, *et al.*,

    Respondents/Defendants.

Case No. 2:17-cv-11910-MAG-DRG

Hon. Mark A. Goldsmith
Mag. David R. Grand

Class Action

**PETITIONERS/PLAINTIFFS' MEMORANDUM OF LAW IN
SUPPORT OF PETITIONERS' MOTION FOR A PRELIMINARY STAY
OF REMOVAL AND/OR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

**Page**

STATEMENT OF ISSUES PRESENTED .............................................................. iii

CONTROLLING OR MOST APPROPRIATE AUTHORITY .............................iv

INTRODUCTION .........................................................................................1

FACTS .........................................................................................................3

      A.    Conditions in Iraq have seriously deteriorated, giving rise to pervasive persecution and torture of people like Petitioners...............................................................................4

      B.    ICE abruptly detains hundreds of Iraqis and seeks to remove them..........................................................................6

      C.    The process for seeking review in immigration court is time-consuming, and the inherent difficulties are compounded by the age and complexity of Petitioner's immigration cases, ICE's repeated transfers of petitioners far from their homes, and the large number of individuals arrested. ................................................................................7

      D.    Petitioners' ability to access the immigration court system depends on a stay from this Court. ...........................13

LEGAL STANDARD...................................................................................14

SUMMARY OF ARGUMENT .....................................................................15

ARGUMENT .............................................................................................17

    I.    Petitioners are likely to succeed in their claims that removal would be unlawful absent a prior opportunity for adjudication of a motion to reopen...............................................................17

      A.    The INA and CAT/FARRA prohibit the removal of Petitioners until their motions to reopen are filed and reach a final administrative resolution....................................18

      B.    Due process forbids removal without an opportunity to be heard in the face of probable persecution and torture.........21

      C.    Absent a stay from this Court, the administrative process is inadequate to protect the statutory and constitutional rights at stake. ........................................................................24

i

D.  The Court has broad equitable power to fashion preliminary relief that will protect the statutory and constitutional rights at stake, and to preserve the status quo.................................................................25

II.   Irreparable Harm; Balance of the Equities; Public Interest. ..............27

III.  Classwide relief is necessary............................................................28

CONCLUSION ......................................................................................30

## STATEMENT OF ISSUES PRESENTED

Whether, given that Petitioners face grave danger of persecution, torture or death if removed to Iraq, the Court should preliminarily stay their removal until they have had a reasonable opportunity to obtain counsel, file motions to reopen, and have those motions adjudicated through the administrative immigration court system?

**Petitioners' Answer: Yes.**

## CONTROLLING OR MOST APPROPRIATE AUTHORITY

*Petitioners are entitled to a preliminary stay of removal/preliminary injunction to preserve the status quo.*

*Univ. of Texas v. Camenisch*, 451 U.S. 390 (1981)

*Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535 (6th Cir. 2007)

*Removal is unlawful where country conditions create a probability of persecution or torture*

INA § 240(c)(7), 8 U.S.C. § 1229a(c)(7)

INA § 241(b)(3), 8 U.S.C. § 1231(b)(3)

Foreign Affairs Reform and Restructuring Act of 1998 (FARRA) at § 2242(a), Pub. L. No. 105-277, 112 Stat. 2681, 2681-82 (1998), codified at 8 U.S.C. § 1231, (1998)

8 C.F.R. §§ 208.16, 18

*The Due Process Clause requires an opportunity for a meaningful hearing at a meaningful time.*

*Armstrong v. Manzo*, 380 U.S. 545 (1965)

iv

# INTRODUCTION

Federal law prohibits the removal of non-citizens to countries where they would face a likelihood of persecution, torture or death. Petitioners are Iraqi nationals subject to final orders of removal, whom the government now suddenly seeks to remove to Iraq despite the strong likelihood that they will face persecution, torture or death there. Most Petitioners came to the United States many years ago, some as children; many now have U.S. citizen spouses and U.S. citizen children of their own. Respondents' disclosures report that 234 were, as of July 1, 2017, detained by U.S. Immigration and Customs Enforcement (ICE). Kitaba-Gaviglio Decl., Ex. S, ¶ 5.[3] Over 1,400 Iraqis have final orders of removal, all of whom may face deportation under ICE's sudden change of policy.[4] Many are members of threatened ethnic and religious minorities in Iraq—they are Chaldean Christian, Kurdish, or Sunni Muslim. Many speak little or no Arabic. Nearly all are highly Americanized—which itself puts them in danger if they are deported.

Most Petitioners have removal orders that are years, even decades old; they have been living in the community under orders of supervision because Iraq would

---

[3] Petitioners have redacted declarations pursuant to the Court's Order Directing Clerk's Office to Unseal Case (ECF 62, Pg.ID# 1198). For the Court's reference, the Index of Exhibits lists ECF docket numbers for the original unredacted exhibits that remain under seal.

[4] *See* Associated Press, "Detroit Judge Halts Deportation of Iraqi Christians," U.S. News & World Report (June 22, 2017), https://www.usnews.com/news/world/articles/2017-06-22/detroit-judge-halts-deportation-of-iraqi-christians.

not accept their repatriation. Recent political negotiation by the Trump administration led to Iraq's agreement to accept a large number of U.S. deportees, and so the government began arresting nearly all of the currently detained Petitioners in June. If removed to Iraq under current conditions, Petitioners face a significant risk of persecution and torture. Yet the government has failed to provide them an opportunity to demonstrate their entitlement to protection from removal in light of the changed circumstances since their removal orders issued. Indeed, ICE's actions have, in effect if not intent, obstructed strenuous efforts over the past month to facilitate counsel for the detainees and to get their cases appropriately filed and briefed before the administrative immigration courts, run by the U.S. Department of Justice's Executive Office for Immigration Review (EOIR). The government's sudden haste in seeking to remove Petitioners without affording them the opportunity for a meaningful hearing at a meaningful time deprives them of due process and violates U.S. law, which prohibits the removal of individuals to countries where they would face a likelihood of persecution or torture.

Only this Court's emergency relief has stood between Petitioners and removal to Iraq. Even for the minority of the Petitioner class that has been able to file motions to reopen, those motions have not yet been fully adjudicated. Accordingly, there remains an urgent need for a continued stay of removal until such Petitioners have received a meaningful hearing on their motions—namely

adjudication of these motions through the administrative immigration court system and an opportunity to seek judicial review. At this point, prior to trial in this Court on the merits, such a stay of removal preserves the status quo.

The Court has already found that "extraordinary circumstances exist" that would render Petitioners' claims meaningless "unless this Court intervenes to stay their deportation while review of their removal orders proceeds before the immigration courts and the courts of appeals." Opinion and Order, ECF 64, Pg.ID# 1225. The Court has also found that Petitioners face irreparable harm given the "significant chance of loss of life and lesser forms of persecution" which "far outweighs any conceivable interest the Government might have in the immediate enforcement of the removal orders." Opinion and Order, ECF 32, Pg.ID# 501. This remains true, and compels the grant of Petitioners' requested preliminary relief. *See also* Opinion and Order Regarding Jurisdiction, ECF 64, Pg.ID# 1225 (describing the "substantiated risk of death, torture, or other grave persecution").

## FACTS[5]

ICE's new and too-quick march towards deportation threatens the Petitioners' lives, and violates U.S. law. U.S. statutory law forbids removal to probable persecution and torture. And both statutory law and due process require that Petitioners receive an opportunity to have their claims to protection considered

---

[5] Given space constraints and the Court's familiarity with this case, Petitioners set out the facts in brief, but incorporate by reference all prior pleadings and exhibits.

in light of current conditions, not the conditions that existed at the time their removal orders were first issued. This Court's stay of removal is imperative to preserve the status quo pending further adjudication in this Court, and to allow Petitioners to present their claims in the administrative immigration courts.

### A. Conditions in Iraq have seriously deteriorated, giving rise to pervasive persecution and torture of people like Petitioners.

As the Court itself has described, *see* Opinion & Order Regarding Jurisdiction, ECF 64, Pg.ID# 1229-31, the dangers posed by removals to Iraq have increased dramatically in recent years. In 2014, a Sunni insurgency created the Islamic State of Iraq and Syria (ISIS) (sometimes called the Islamic State of Iraq and the Levant, or ISIL, or Da'esh). ISIS took over Iraq's second largest city, Mosul, in June 2014, committing large-scale slaughter and atrocities, and forced the flight or forcible conversion of thousands of Christians and other residents.[6] The Iraqi government responded by "creat[ing] and mobiliz[ing] the Popular Mobilization Forces (PMF) to battle against" ISIS. The PMF include government-affiliated Shi'ite armed forces with an egregious human rights record. Heller Decl.,

---

[6] Lattimer Decl., Ex. I, ¶ 9; Moni Basu, *In Biblical Lands of Iraq, Christianity in Peril after ISIS*, CNN (Nov. 21, 2016), http://www.cnn.com/2016/11/20/middleeast/iraq-christianity-peril/index.html. Although Iraqi forces recently retook Mosul, other areas of Iraq remain under the control of ISIS, which thus plays the role of the government there. *See* Heller Decl. M, ¶ 9; Tim Arango, Iraq Celebrates Victory Over ISIS in Mosul, but Risks Remain, N.Y. Times (July 10, 2017), https://www.nytimes.com/2017/07/10/world/middleeast/iraq-mosul-celebration.html.

Ex. M, ¶¶ 16-18. Over three million Iraqis, many from minority groups, have become "internally displaced persons." *See* Lattimer Decl., Ex. I, ¶¶ 10-14.

The U.S. House of Representatives unanimously passed H.Con.Res.75, 114th Congress (Mar. 15, 2016) to "[e]xpress[] the sense of Congress that the atrocities perpetrated by ISIL against religious and ethnic minorities in Iraq and Syria include war crimes, crimes against humanity, and genocide." And the U.S. Department of State likewise announced on March 17, 2016, that "Da'esh is responsible for genocide against groups in areas under its control, including Yezidis, Christians, and Shia Muslims," and "Da'esh is also responsible for crimes against humanity and ethnic cleansing directed at these same groups and in some cases against Sunni Muslims and Kurds and other minorities." *See* U.S. Dep't of State, *Atrocities Prevention Report* (March 17, 2016), https://www.state.gov/j/drl/rls/254807.htm.

In areas recaptured from ISIS, militias—which are often government affiliated—"have carried out a systematic pattern of violations, including enforced disappearance, extrajudicial executions and other unlawful killings and torture of Sunni Arab men and boys." Heller Decl., Ex. M, ¶ 20. Sectarian and ethnic divisions are increasing and pose risks of persecution and torture for minorities and for internally displaced persons. *Id.* at 29; Lattimer Decl., Ex. I, ¶¶ 7-18. Anti-American sentiment has grown, and now renders Petitioners especially likely to be

targets, as well.  Lattimer Decl., Ex. L, ¶ 11.

The Iraqi government itself bears significant responsibility for each of these sets of dangers. In 2016, the U.S. State Department sharply criticized the Iraqi government not just for government officials' own widespread abuses of minority Iraqis and internally displaced persons but for the "impunity" the government effectively grants other human rights abusers.[7]

**B. ICE abruptly detains hundreds of Iraqis and seeks to remove them.**

Notwithstanding this exceedingly—and increasingly—threatening environment, last month ICE abruptly abandoned its long-standing practice of permitting nearly all Iraqis with final orders of removal to remain in the United States under orders of supervision.[8] Hundreds of Iraqi nationals who have been fully compliant with their supervision conditions suddenly found themselves detained and facing imminent removal. Almost all were moved far from their homes and their lawyers, and many were transferred multiple times, making it nearly impossible for them to interact with counsel for a number of days. Opinion and Order Regarding Jurisdiction, ECF 64, Pg.ID# 1231. As this Court emphasized, the changed country conditions in Iraq mean that ICE's sudden haste

---

[7] *See* U.S. Dep't of State, *Iraq 2016 Human Rights Report*, p. 2 (Mar. 29, 2017), https://www.state.gov/documents/ organization/265710.pdf.

[8] *See, e.g.*, Mica Rosenberg, *U.S. Targets Iraqis for Deportation in Wake of Travel Ban Deal*, REUTERS (June 12, 2017), https://www.reuters.com/article/us-usa-immigration-iraq-idUSKBN19326Z.

6

could produce unlawful—and deadly—removals. *Id.* at Pg.ID# 1246.

**C. The process for seeking review in immigration court is time-consuming, and the inherent difficulties are compounded by the age and complexity of Petitioners' immigration cases, ICE's repeated transfers of Petitioners far from their homes, and the large number of individuals arrested.**

A motion to reopen is the most common method to adjudicate the claim of a person who has a final order of removal but who has a viable claim that his or her removal is unlawful. Realmuto Decl., Ex. Y, ¶ 5. Such motions are filed either with the immigration court or the Board of Immigration Appeals (BIA), depending on the procedural history of the case. *Id.* at ¶ 5; 8 C.F.R. §§ 1003.2, 1003.23. If an immigration judge denies a motion to reopen, it can be appealed to the BIA. 8 C.F.R. § 1003.1(b). An individual whose motion to reopen is denied by the BIA can file a petition for review in the federal court of appeals, which must be filed within 30 days. 8 U.S.C. §§ 1252(b)(1)-(2).

The motion to reopen must be supported by affidavits or other evidentiary materials, and "must be accompanied by the appropriate application for relief and all supporting documentation." 8 C.F.R. § 1003.2(c)(1). *See also* 8 C.F.R. 103.5(a)(2). The applicant must show that the evidence: (1) is material; (2) was unavailable at the time of the original hearing; and (c) could not have been discovered or presented at the original hearing. 8 C.F.R. § 1003.2(c)(1). The motion must contain English translations for all documents. 8 C.F.R. § 1003.2(g)(1). Although

7

numerical and time limits apply to most motions to reopen, those bars do not apply to motions related to asylum, withholding of removal or CAT claims "based on changed circumstances arising in the country of nationality" where material evidence could not have been discovered or presented in the prior proceedings. 8 U.S.C. § 1229a(c)(7)(C)(ii); 8 C.F.R. §§ 1003.2(c)(3)(ii), 1003.23(b)(4)(i).

In order to competently prepare a motion to reopen, an immigration attorney must first obtain the relevant records. Realmuto Decl., Ex. Y, ¶¶ 8-10; Abrutyn Decl., Ex. AA, ¶¶ 3-4, 6-12. The attorney must obtain both the A-file (a comprehensive file kept by the Department of Homeland Security which documents each non-citizen's immigration history) and the Record of Proceedings (the immigration court file kept by the Executive Office for Immigration Review (EOIR), which includes trial and appeal records). Realmuto Decl., Ex. Y, ¶¶ 8-10. The A-file is obtained through a Freedom of Information Act request to a Department of Homeland Security (DHS) component, U.S. Citizenship and Immigration Services (USCIS) and the Record of Proceedings through a FOIA to EOIR. If the person facing deportation did not previously file a BIA appeal, there will be no transcript of prior immigration court proceedings; counsel instead must obtain and listen to an audio tape. *Id.* ¶ 9.

"Review of both the A-file and the complete Record of Proceedings is absolutely critical" to filing a motion to reopen. Realmuto Decl., Ex. Y, ¶ 10. But

the backlog of some 35,000 FOIA requests at USCIS means that it generally takes several months to obtain an A-file. Abrutyn Decl., Ex. AA, ¶ 7.[9] It similarly can take weeks or months to obtain the EOIR Record of Proceedings. Older records – required for many of the classmembers' cases – can take even longer. Realmuto Decl., Ex. Y, ¶ 9. *See also* Samona Decl., Ex. V, ¶¶ 5-8 (reporting inability to obtain files for detained Iraqis). These delays are entirely up to the government, which is responsible for prioritizing and responding to FOIA requests.

Once records are obtained, an attorney must consult with the client and perform additional research and investigation. Because the required predicate for a motion to reopen is new evidence, 8 U.S.C. § 1229a(c)(7)(B); 8 C.F.R. § 1003.2(c)(1), the immigration attorney must assemble that evidence, which can take significant time and effort both by the attorney and by the noncitizen or noncitizen's family. Realmuto Decl., Ex. Y, ¶¶ 8, 11. In addition, because the availability of different forms of immigration protection and relief depend on criminal history, attorneys filing motions to reopen will need, in many cases, to obtain and review criminal history information in light of significant changes in the case law. Scholten Decl., Ex. Z, ¶ 8. For example, some detainees can now file motions to reopen to apply for asylum based on intervening legal authority since

---

[9] The USCIS website shows that the processing time is 113 business days, or about 22 weeks. *See id.*; USCIS, Check Status of FOIA Request, https://www.uscis.gov/about-us/freedom-information-and-privacy-act-foia/foia-request-status-check-average-processing-times/check-status-foia-request.

the date of their final order of removal. *See* Abrutyn Decl., Ex. A, ¶ 10. It appears that over 50% of the detainees received final orders of removal over a decade ago, in 2006 or earlier, and over 83% of them received final orders of removal in 2012 or earlier. Kitaba-Gaviglio Decl., Ex. S, ¶ 8.

As this Court noted, "[e]ven without the pressure of immediate removal without advance notice, preparing a motion to reopen proceedings before the immigration courts – the recognized route for presenting Petitioners' arguments based on changed circumstances – is no easy task." Opinion & Order Regarding Jurisdiction, ECF 64, Pg.ID# 1231. Trina Realmuto, litigation director for the National Immigration Project of the National Lawyers Guild, estimates that after the A-file and Record of Proceedings are obtained, a lawyer with an active removal docket will reasonably need 6 to 12 weeks to research, write, and file the motion. Additional time may be necessary for counsel with a higher volume of cases or if it is difficult for the attorney and client to communicate. Realmuto Decl., Ex. Y, ¶ 12. Hillary Scholten, former attorney advisor at the BIA and now an attorney at the Michigan Immigrant Rights Center, recommends, given the complexity of the cases here, that six months is a reasonable amount of time in which to file a motion to reopen, after obtaining the individual's records. Scholten Decl., Ex. Z, ¶ 13.

As this Court has already found, the difficulties of filing motions to reopen have been compounded here by Respondents' decision to move Petitioners, often

repeatedly, away from counsel and the communities that can provide legal assistance, Opinion & Order Regarding Jurisdiction, ECF 64, Pg.ID# 1231, and by the "great number of individuals suddenly at risk . . . [which] taxes the immigration bar's ability to promptly service all in need of legal protection . . . [and] also taxes the resources of immigration courts to provide prompt and appropriate decisions to all affected." *Id.* at Pg.ID# 1245. Initial discovery disclosures provided by the government show that, as of July 1, 2017, 234 class members were detained in 31 different facilities located in eighteen different states. Kitaba-Gaviglio Decl., Ex. S, ¶ 5. Approximately 79% of the current detainees are being detained in a different state than the immigration court that issued their final order. *Id.* at ¶ 9.

The transfer of detainees and the barriers that ICE detention facilities impose for attorney access have made it even more difficult to file motions to reopen. For example, attorney Ruby Kaur, who represents Iraqis detained in Youngstown, Ohio, has been unable to file motions because she was denied access to her clients after driving four hours to meet with them – despite confirming a meeting time in advance with the facility – and was again denied access the next day after staying overnight in Youngstown in reliance on the facility's assurance that she could meet with her clients. Kaur Decl., Ex. U. *See also* Samona Decl., Ex. V, ¶¶ 9-12 (describing difficulty of making routine 10-hour trips to Ohio to visit clients, and of being limited to 10-minute phone conversations); Peard Decl., Ex. T, ¶¶ 15-24

11

(describing obstacles to representation for detainees in the Florence, Arizona detention center, who need counsel in home state, where relevant records and immigration courts are located, but also need counsel in Arizona to conduct interviews and obtain signatures); Markos Decl., Ex. X, ¶¶ 20-22, 24 (describing problems with phone access).

Notwithstanding these difficulties, incredible effort has produced substantial progress towards matching detainees with counsel. CODE Legal Aid, a small legal services non-profit that focuses on the Detroit-area Chaldean and immigrant community, has managed to match many of the Michigan detainees with counsel. Yousif Decl., Ex. J, ¶ 11. A consortium of advocacy groups, immigration lawyers, law students, and volunteer lawyers has now taken on the task of recruiting counsel for the detained Iraqis nationwide. Because many lawyers able to appear in the appropriate immigration courts are unable to travel to far-flung detention facilities, the group has facilitated partnerships between those lawyers and others who *can* go on site to detention facilities. Valenzuela Decl., Ex. W, ¶ 10.

As a result of these efforts, many of the detainee class members' lawyers *have* been able to file motions to reopen—though some of these, produced under the exigencies of ICE's threat of rapid deportation, have had to be filed without adequate records review and documentation. As one practitioner explains, his inability to review an A-file has rendered it "nearly impossible to ascertain"

whether the individual was lawfully ordered removed, much less to argue a client's case effectively. Samona Decl., Ex. V, ¶ 8. *See also* Valenzuela Decl., Ex. W, ¶ 17 (given urgency of filing, attorneys may be "filing[] at much quicker rates than is otherwise advisable given the complexity of the cases"). Many other counsel for class members have, despite diligent efforts to visit their clients, interview them, gather documents, and draft pleadings, been unable to file motions to reopen at all. And of course many detainees remain unrepresented.

### D. Petitioners' ability to access the immigration court system depends on a stay from this Court.

The administrative immigration court system has a stay-of-removal process, but that process cannot substitute for this Court's continuation of the existing judicial relief. As a threshold matter, neither a motion to reopen nor the appeal of a denial of such a motion automatically stays removal. 8 C.F.R. §§ 1003.2(f); 1003.6(b). Thus, a motion for an administrative stay is necessary. However, the immigration court will not consider a stay motion if a Petitioner does not also file the motion to reopen. Realmuto Decl., Ex. Y ¶ 13. Administrative stays are thus entirely unavailable for individuals who have not yet been able to prepare motions to reopen. Moreover, even once motions have been filed, the system for obtaining emergency stays of removal from immigration judges or the BIA "is not reliable and does not ensure the meritorious stay motions will be heard and adjudicated while a motion to reopen is pending." *Id.* ¶ 4.

13

Neither the BIA nor the immigration courts has promulgated any standard for granting a stay of removal, by precedential opinion, practice manual, or other method. *Id.* at ¶ 15. In addition, experienced practitioners report widespread problems getting stay applications assessed simply because of glitches in the system. *See* Samona Decl., Ex. V, ¶¶ 14-24; Realmuto Decl., Ex. Y, ¶¶ 14-25. For example, immigration judges and the BIA will grant a stay only if removal is imminent—but neither the detainee nor immigration counsel have a reliable way of getting speedy and timely information on the removal schedule, much less of finding out if a deportation date has been changed. In the words of one of these experienced immigration practitioners, "it can easily happen that a detainee's removal is effectuated without the BIA ever considering a pending motion to stay, because the BIA never finds out that the removal is imminent." Samona Decl., Ex V, ¶ 22. Another practitioner, who advises immigration lawyers on stay practice nationally, describes as "widespread" the problem of ICE executing removal orders before the BIA or immigration court has an opportunity to review the stay motion, and provides a concrete example where, because ICE changed a deportation date without informing the BIA, an individual was removed before the BIA considered—and granted—the stay request. Realmuto Decl., Ex. Y, ¶¶ 21-22.

## LEGAL STANDARD

The purpose of preliminary relief is "to preserve the relative positions of the

14

parties until a trial on the merits can be held." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981); *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007) (same). Motions for stays of removal and preliminary injunctions are both governed by a four-factor test: Courts consider whether movants have shown: (1) a likelihood of success on the merits, (2) that they are likely to suffer irreparable harm in the absence of such relief, (3) that the balance of equities tips in their favor, and (4) that an injunction is in the public interest. *Compare Nken v. Holder*, 556 U.S. 418, 435 (2009) (stays of removal); *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008) (preliminary injunction). These factors "are interrelated considerations that must be balanced together."' *Ne. Ohio Coal. for Homeless & Serv. Employees Int'l Union, Local 1199 v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006) (quotation and cite omitted). "For example, the probability of success that must be demonstrated is inversely proportional to the amount of irreparable injury the movants will suffer absent the stay." *Id*.

## SUMMARY OF ARGUMENT

The government is affirmatively forbidden from sending Petitioners to probable torture or death in Iraq. Motions to reopen provide an administrative avenue for Petitioners to establish their entitlement to protection from removal. However, this process is meaningless if Petitioners are removed before they can access it or before the process reaches a final decision point. This result – removal

before adjudication of Petitioners' claims for protection – violates both applicable statutory law, which includes the mandatory prohibitions in the Immigration and Nationality Act ("INA") and Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA") on deporting people to their death and torture, and the Due Process Clause.

Petitioners are in an extraordinary position as a result of the dangerous conditions in Iraq, the age of their final orders, and the government's sudden rush to remove them. The situation in Iraq is dire—and it has gotten worse in recent years. Petitioners' orders of removal became final before the change in conditions in Iraq, giving them a basis to file a changed country conditions motion to reopen. Moreover, Petitioners have acted in reasonable reliance on the government's own, often long-standing, actions in allowing them to remain in the country. Before the rapid change in the government's policies, Petitioners had no reason to seek relief from removal to Iraq. Because of the government's rush to remove them, their ability to do so is now hampered. Absent intervention by the Court, the procedures provided to address this situation within the immigration system are inadequate.

The relief that Petitioners are requesting is the following: a stay of removal until class members have had a meaningful opportunity to obtain immigration counsel, file a motion to reopen in the appropriate administrative immigration forum, and have that motion adjudicated to completion in the administrative

16

system, with time to file a petition for review, along with a request for a stay of removal in a federal court of appeals, if necessary. Specifically, each member of the Petitioner class should be given three months to file a motion to reopen, starting when the government provides a copy of the individual's A-file and Record of Proceedings to the Petitioner's immigration counsel (i.e., counsel who has filed a G-28 form or equivalent) or, if the Petitioner does not have counsel, to the Petitioner. Although the amount of time Petitioners have to file a motion to reopen after receiving the relevant records is uniform, the actual length of the stay thereafter will vary. For a Petitioner who does not file a motion to reopen, the stay will expire. A Petitioner who does file a motion to reopen will be protected by the stay until the immigration court and the BIA adjudicate the motion, and the Petitioner has had the opportunity to seek review and a stay in the Court of Appeals. The stay will also expire for any class member who, having had the opportunity to seek protection from removal and having consulted with immigration counsel, has notified the Court through counsel that s/he does not wish to pursue such protection further.

## ARGUMENT

## I. PETITIONERS ARE LIKELY TO SUCCEED IN THEIR CLAIMS THAT REMOVAL WOULD BE UNLAWFUL ABSENT A PRIOR OPPORTUNITY FOR ADJUDICATION OF A MOTION TO REOPEN.

Petitioners' claims on the merits are highly likely to succeed. But given the

17

probability and seriousness of the injury without preliminary relief, all that need be shown now are "serious questions going to the merits." *Jones v. Caruso,* 569 F.3d 258, 277 (6th Cir. 2009) (stating this test for preliminary relief, where the movant's "irreparable harm . . . decidedly outweighs any potential harm to the defendant if the injunction is issued."). *See also In re DeLorean Motor Co.,* 755 F.2d 1223, 1229-30 (6th Cir. 1985).

### A. The INA and CAT/FARRA prohibit the removal of Petitioners until their motions to reopen are filed and reach a final administrative resolution.

The INA and CAT/FARRA forbid removal of foreign nationals into circumstances that pose a probability of persecution or torture. Many of the Petitioners face such a probability and all therefore need a chance to demonstrate their qualifications for individualized protection from removal.

Two statutory provisions place a mandatory duty on the government not to remove Petitioners to persecution or torture. First, 8 U.S.C. § 1231(b)(3), "Restriction on removal to a country where alien's life or freedom would be threatened," implements "the 'non-refoulement obligation' reflected in Article 33 of the Refugee Convention." *Yousif v. Lynch*, 796 F.3d 622, 632 (6th Cir. 2015) (citations omitted). It prohibits removing noncitizens to a country where their life or freedom would be threatened on the grounds of race, religion, nationality, membership in a particular social group or political opinion. It contains exceptions

18

for, inter alia, individuals who have been convicted of a "particularly serious crime . . . [that renders them] a danger to the community." 8 U.S.C. § 1231(b)(3)(B). Apart from these exceptions, any individual who can demonstrate that it is more likely than not that he or she will be persecuted on one of the five protected grounds is statutorily entitled to protection. "[T]he viability of a withholding claim [under this provision] ordinarily depends upon its merits rather than . . . the government's good graces." *Yousif*, 796 F.3d at 632.

The second relevant statutory constraint on removal executes the prohibition under the Convention Against Torture ("CAT") on removal of noncitizens to countries where they would face torture.[10] *See* FARRA, Pub. L. No. 105-277, 112 Stat. 2681, 2681-82 (1998), codified at 8 U.S.C. § 1231 note: "It shall be the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture . . . ." An individual may not be removed if "it is more likely than not that [the individual] would be tortured if removed to the proposed country of removal." 8 C.F.R.

---

[10] Torture may be "inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." 8 C.F.R. § 208.18(a)(1). The standard is met where the government itself tortures, or where the government is aware of but unwilling or incapable of preventing torture. *See Amir v. Gonzales*, 467 F.3d 921, 927 (6th Cir. 2006); *Pieschacon-Villegas v. Attorney General*, 671 F.3d 303, 312 (3d Cir. 2011) (CAT standard may be met even where government opposes the torturing entity).

§ 208.16(c)(2).

The CAT regulations provide for withholding of removal, subject to the same exceptions as apply in the INA (8 U.S.C. § 1231(b)(3)), and for deferral of removal, which contains no exceptions even for people with "particularly serious crimes." *See* 8 C.F.R. § 1208.17. The prohibitions on removal are mandatory for anyone who satisfies the eligibility criteria set forth in the statute and regulations. All Petitioners, regardless of criminal history, are potentially eligible for deferral of removal under CAT. Some Petitioners, depending on their individual circum-stances, will also be eligible for withholding of removal under CAT, non-refoulement, or asylum. Because they are all subject to final orders of removal, each individual will need to file a motion to reopen before proceeding to the merits of her/his individual claims.

The government has conceded that it cannot remove people to a country where they face persecution, torture or death.  Ex. BB, July 13, 2017 Hearing Trans., at 24. The government, however, opposes Petitioners' request for a meaningful opportunity to have their motions to reopen considered, arguing that Petitioners should have filed such motions sooner. The Court has already rejected that argument:

> Although Petitioners theoretically could have filed motions to reopen
> and stay before the Government's recent decision to enforce orders,
> such action would have served no immediately useful purpose . . .
> And it would have been a costly exercise, at that . . . When it is all

20

said and done, a case of this nature can cost up to $80,000. []
Spending such large sums to avoid a removal that seemed impossible
until March of this year would have been unreasonable.

Opinion & Order Regarding Jurisdiction, ECF 64, Pg.ID#1246-47.

The statutory entitlement is clear: "[t]here is *no time limit* on the filing of a
[covered] motion to reopen." 8 U.S.C. § 1229a(c)(7)(C)(ii) (emphasis added). The
only timing-related requirement is that the evidence "was not available and would
not have been discovered or presented *at the previous proceeding*." *Id.* (emphasis
added). Numerous decisions of the BIA and the Courts of Appeals have
implemented precisely this understanding of reopenings for changed country
conditions.[11]

In short, statutory immigration law, having granted individuals with final
orders of removal a mandatory right to protection from persecution and torture,
also grants them the right to file motions to reopen based on changed country
conditions and to have these motions adjudicated prior to removal.

### B. Due process forbids removal without an opportunity to be heard in the face of probable persecution and torture.

The Due Process Clause guarantees fair procedures prior to deprivations of

---

[11] *See, e.g.*, *Zhang v. Holder*, 702 F.3d 878, 879 (6th Cir. 2012) (directing the BIA
to consider evidence relating to the decade prior to a motion to reopen); *Matter of
S-Y-G*, 24 I. & N. Dec. 247, 253 (BIA 2007) ("In determining whether evidence
accompanying a motion to reopen demonstrates a material change in country
conditions that would justify reopening, we compare the evidence of country
conditions submitted with the motion to those that existed at the time of the merits
hearing below [before the Immigration Court].").

liberty or property—including removal. *See Reno v. Flores*, 507 U.S. 292, 306 (1993) ("It is well established that the Fifth Amendment entitles aliens to due process of law in deportation proceedings."). And due process, of course, requires an opportunity to be heard "at a meaningful time and in a meaningful manner." *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965). The government's recent actions, and evident plan to remove the Petitioners as soon as possible, are denying Petitioners the opportunity to be heard at a meaningful time—now—about current country conditions. Removing the Petitioners without giving them this opportunity violates the Fifth Amendment's Due Process Clause.

Although Petitioners have each had a past opportunity to be heard on their immigration cases, those prior proceedings—some of which occurred decades ago—did not and could not afford them the process that is due now. The extraordinary danger Petitioners face under current country conditions presents a new set of facts that entitles them to a fair process for resolution. Given the changed country conditions and ensuing grave danger, the due process violation arises from a combination of factors: the speed of the proposed deportation dates; the government's insistence on removal before Petitioners can file motions to reopen and before those motions have been adjudicated; and the obstacles posed by detention far from home to obtaining and communicating with counsel.

The Due Process Clause is not satisfied by allowing a *request* for a

22

meaningful hearing at a meaningful time; it requires that there *be* a meaningful hearing at a meaningful time. As the Sixth Circuit has held, "[a] violation of due process occurs when 'the [immigration] proceeding was so fundamentally unfair that the alien was prevented from reasonably presenting his case.'" *Hassan v. Gonzales*, 403 F.3d 429, 436 (6th Cir. 2005) (quoting *Ladha v. INS*, 215 F.3d 889, 904 (9th Cir. 2000) (internal quotation omitted)). This requirement extends to motions to reopen, which, the Supreme Court has emphasized, are a crucial part of what makes the immigration system procedurally fair. *Kucana v. Holder*, 558 U.S. 233, 242 (2010). Indeed, the Sixth Circuit has several times entertained due process claims relating to BIA processing of motions to reopen. The Court of Appeals decided in these cases that there was no due process violation when such motions were considered and reasonably rejected on their merits. *See Modarresi v. Gonzales*, 168 F. App'x 80, 86 (6th Cir. 2006); *Ablahad v. Gonzales*, 217 F. App'x 470, 475 (6th Cir. 2007). But a necessary premise of these decisions is that an immigration judge's or the BIA's failure even to consider a motion to reopen *would* violate the Due Process Clause.

For the Petitioner class members, removal while their motions to reopen are pending would entirely deny them the opportunity to receive effective consideration of those motions. And removal would be incredibly dangerous, putting them directly in harm's way in Iraq. *Cf. Mathews v. Eldridge*, 424 U.S.

23

319, 341 (1976) ("the degree of potential deprivation that may be created by a particular decision is a factor to be considered in assessing the validity [under the Due Process Clause] of any administrative decisionmaking process").

### C. Absent a stay from this Court, the administrative process is inadequate to protect the statutory and constitutional rights at stake.

As explained above, the nominal availability of immigration court stays – which are not even available until a motion to reopen has been filed – does not provide the Petitioners the relief they need. The administrative processes simply do not adequately ensure that individuals will not be removed while they prepare their motions to reopen, or even once those motions are filed and are being adjudicated.

Petitioners do not contend that a federal district court stay is required any time an individual files a motion to reopen. Rather, it is because of the rare combination of circumstances in this case – circumstances that this Court has already found to be extraordinary – that a judicial stay of removal is appropriate here. Those extraordinary circumstances are: (1) The staleness of class members' removal orders and the fact that class members have been living in the community, with no inkling that they would be removed, in some cases for decades; (2) the significant and indisputably changed country conditions in Iraq; (3) the extraordinary danger facing class members if they are removed; and (4) the mandatory prohibition on the government removing individuals to torture or death.

**D. The Court has broad equitable power to fashion preliminary relief that will protect the statutory and constitutional rights at stake, and to preserve the status quo.**

In order to insure that Petitioners have a meaningful opportunity to seek protection from removal, this Court should issue preliminary relief staying removal to preserve the status quo pending fuller adjudication of this matter, and to allow class members a reasonable period of time to find counsel, file motions to reopen, and have those motions adjudicated administratively. Responsive to the Court's concerns about setting an objectively-ascertainable date for any stay, Petitioners propose that the stay of removal give each Petitioner three months to file a motion to reopen, starting that clock when Petitioner's counsel (or for uncounseled Petitioners, Petitioners themselves) receive the key files, i.e., the A-file and the Record of Proceedings. When that occurs is within the government's control.

Those records are essential to competent and effective representation. Yet it is entirely up to the government when Petitioners' FOIA requests will be met, or, indeed, whether a FOIA request is even necessary: the government could, after all, simply provide the necessary records. *See Dent v. Holder*, 627 F.3d 365, 374 (9th Cir. 2010) (requiring routine production of A-files in removal proceedings without a FOIA request, "because FOIA requests often take a very long time, continuances in removal hearings are discretionary, and aliens in removal hearings might not get responses to their FOIA requests before they were removed").

25

Once the necessary documents are obtained, significant further work is required. Although the time needed will vary among class members, Petitioners recognize that the Court prefers to set a uniform time frame for all class members and accordingly propose three months as the shortest reasonable span for this work to take place. Indeed, that is the very timeframe allowed by the INA for time-limited motions to reopen more generally, *see* 8 U.S.C. § 1229a(c)(7)(C)(i), which are typically filed by counsel who already have the A-file and immigration court records for the subject proceeding. The point is that the Court's relief should protect the right to a meaningful hearing at a meaningful time. Given the cases' complexity, the age of the final removal orders, and the government's decision to detain Petitioners far from counsel and the immigration courts in which their cases were initially heard, three months after receipt of A-file and immigration court records is a minimum projected timeframe for experienced counsel to file a motion to reopen in a typical class member's case. *See* Realmuto Decl., Ex. Y, ¶ 12.

Some practitioners believe, given the complexity of class members' claims and the obstacles to representation, that a six month period is required, at least for some class members. *See* Scholten Decl., Ex. Z, ¶ 13. Petitioners hope to do it more quickly, both for the sake of class members, who are suffering in detention and for the sake of judicial efficiency. A nationwide consortium of advocacy organizations has come forward to assist class members in finding counsel, and to

assist those counsel in addressing the cases competently notwithstanding the tight time frame. *See* Valenzuela Decl., Ex. W. Moreover, Petitioners have every reason to work hard both to retain counsel and file their motions to reopen as soon as possible, because they are incarcerated.

In order to ensure that the Court can address any unforeseen issues, the Court should require the parties to report back periodically on how Petitioners' cases are progressing. If the requested relief proves unworkable or somehow insufficient, the Court can modify it. So that both the Court and the parties can assess the progress being made, Respondents should be required to provide updated information every two weeks regarding attorney representation, filing and adjudication of motions to reopen and/or stays, provision of A-files and Records of Proceedings; and detention locations, transfers and releases from detention.

## II. IRREPARABLE HARM; BALANCE OF THE EQUITIES; PUBLIC INTEREST.

This Court, in granting the first, emergency, stay of removal, explained:

> Irreparable harm is made out by the significant chance of loss of life and lesser forms of persecution that Petitioners have substantiated. Such harm far outweighs any conceivable interest the Government might have in the immediate enforcement of the removal orders. . . .The public interest is also better served by an orderly court process that assures that Petitioners' invocation of federal court relief is considered before the removal process continues.

Opinion and Order, ECF 32, Pg.ID# 501-02. These sound conclusions continue to control this case. As the Court has already found, the harm from Petitioners'

27

removal is likely grievous, and irreparable. *See* Opinion and Order Regarding Jurisdiction, ECF 64, Pg.ID# 1225 (describing the "substantiated risk of death, torture, or other grave persecution before [Petitioners'] legal claims can be tested in a court"). The equities—the balance of harms and the public interest—also heavily favor Petitioners, who seek only to preserve the status quo. In contrast, little harm will accrue to the government from a pause while Petitioners pursue available avenues of relief. Finally, the public interest also strongly favors a stay, because the public benefits from a fair immigration system, which means an immigration system that does not send people to their potential death without giving them a chance to explain the danger they face.

## III.  CLASSWIDE RELIEF IS NECESSARY.

Immigration law is complex, and each of Petitioners has a different immigration and criminal history. Variation in those histories will mean varied outcomes to their claims for protection against removal. But each and every one is entitled to a meaningful chance to raise those claims and have them heard. *Barry v. Lyon*, 834 F.3d 706, 722 (6th Cir. 2016) (classwide relief appropriate for due process claims even though some class members might be found ineligible for any substantive benefit once due process was provided). And for each Petitioner, imminent removal to Iraq would eliminate that opportunity to be heard.

Petitioners propose that the Court (pending adjudication of the merits) grant

a preliminary stay that gives them three months from receipt of their A-files and Records of Proceedings to file a motion to reopen. For any Petitioner who does not file such a motion, the stay will then expire. A Petitioner who *does* file the motion will be protected by the stay until the immigration court and the BIA adjudicate the motion, and the Petitioner has had the opportunity to file a petition for review and seek a stay with the Court of Appeals. This Court's stay will end both for those who obtain immigration relief or protection (because the threat of removal will be gone) and for those who fail to obtain relief, once they have made their way through the administrative system and had an opportunity to seek judicial review.

Some class members may choose not to fully utilize the opportunity the requested stay provides. For example, a recently-arrived, non-minority Iraqi, after consultation with counsel, might conclude that she is unlikely to obtain any immigration relief and might rationally prefer removal to long-term detention. Some class members may terminate their efforts after an unsuccessful adjudication in the administrative system without filing a petition for review in the Court of Appeals. The Court should permit class members who have consulted with immigration counsel, who believe they have received adequate time and opportunity to present their claims, and who do not wish to seek further relief, to notify the Court through counsel of those facts. For them, the stay will also expire.

Petitioners will soon file for class certification, and the Court can consider

29

that motion in due course. Given the Court's desire to rule on the instant motion by July 24, the Court can and should rule on classwide preliminary relief prior to certifying the class. *See* Newberg on Class Actions § 4:30 & fn. 8.50 (5th ed. and June 2017 update) (court may issue a preliminary injunction prior to ruling on class certification); *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994) (holding in case brought by federal inmates that "the district court did not err in granting wide-ranging injunctive relief prior to certifying a nationwide class of plaintiffs"); *Gooch v. Life Investors Ins. Co. of America*, 672 F.3d 402, 433 (6th Cir. 2012).

## CONCLUSION

The Court should grant the motion for a Preliminary Stay of Removal and/or Preliminary Injunction.

Respectfully submitted,

/s/Michael J. Steinberg
Michael J. Steinberg (P43085)
Kary L. Moss (P49759)
Bonsitu A. Kitaba (P78822)
Miriam J. Aukerman (P63165)


/s/Kimberly L. Scott
Kimberly L. Scott (P69706)
Wendolyn Wrosch Richards (P67776)


/s/Susan E. Reed
Susan E. Reed (P66950)


Dated: July 17, 2017

/s/Judy Rabinovitz
Judy Rabinovitz* (NY Bar JR-1214)
Lee Gelernt (NY Bar NY-8511)
Anand Balakrishnan* (Conn. Bar 430329)

/s/ Margo Schlanger
Margo Schlanger (N.Y. Bar #2704443)
Samuel R. Bagenstos (P73971)


* Application for admission forthcoming.

*Attorneys for All Petitioners and Plaintiffs*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on July 17, 2017, I electronically filed the foregoing papers with the Clerk of the Court using the ECF system which will send notification of such filing to all ECF filers of record.

By: <u>/s/Kimberly L. Scott</u>
Kimberly L. Scott (P69706)
Cooperating Attorney, ACLU Fund of Michigan
MILLER, CANFIELD, PADDOCK & STONE, PLC
101 N. Main St., 7th Floor
Ann Arbor, MI 48104
(734) 668-7696
scott@millercanfield.com

31