# EXHIBIT Y

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

**USAMA JAMIL HAMAMA,** et al.,

      Petitioners and Plaintiffs,

v.

**REBECCA ADDUCCI**, et al.,

      Respondents and Defendants.

Case No. 2:17-cv-11910

Hon. Mark A. Goldsmith
Mag. David R. Grand

Class Action

## DECLARATION OF TRINA A. REALMUTO

## DECLARATION OF TRINA A. REALMUTO

I, Trina A. Realmuto, declare under penalty of perjury as follows:

1.      I am an attorney licensed to practice law before the courts of the States of New York and California, the United States District Courts for the Southern and Eastern Districts of New York and the Northern, Southern, Eastern and Central Districts of California, the District of Vermont, the District of Connecticut, as well as the United States Courts of Appeals for the First, Second, Third, Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, Tenth, and Eleventh Circuits and the U.S. Supreme Court.

2.      I was admitted to the New York and California bars in 1998 and 1999, respectively.  I have practiced immigration law since that time, first as an associate attorney at the law firm of Van Der Hout & Brigagliano (now Van Der Hout, Brigagliano & Nightingale LLP), later as an attorney consultant to the American Immigration Law Foundation (now the American Immigration Council) and, since 2009, as a Staff Attorney and now Litigation Director for the National Immigration Project of the National Lawyers Guild (NIPNLG).

3.      NIPNLG is a national non-profit membership organization that provides legal and technical support to attorneys, immigrant communities, and other advocates seeking to advance the rights of noncitizens.  As part of my responsibilities with NIPNLG and the American Immigration Council, I routinely mentor attorneys on immigration issues.  With respect to stay-related issues, I estimate that I have consulted with, and provided advice to at least 120 attorneys. I am also a co-author of a practice advisory entitled, *Seeking a Judicial Stay of Removal in the Court of Appeals*, which is available on the NIPNLG and other websites.

4.      I make this declaration in support of the Petitioners in *Hamama v. Adducci*, the above captioned case, to explain the work that is required for a competent and ethical motion to reopen an immigration case and to explain why the system available for seeking and obtaining an emergency stays of removal from an immigration judge (IJ) or the Board of Immigration Appeals (BIA or Board) is not reliable and does not ensure that meritorious stay motions will be heard and adjudicated while a motion to reopen is pending.  There are many ways in which immigration court and BIA stay practice can and does go wrong.

### *Difficulties with Expeditiously Preparing Motions to Reopen*

5.      When someone is the subject of a final removal order but has a viable claim that their removal order is unlawful or that they are now eligible for immigration relief or protection, the most common method for adjudication of that claim is to file a motion to reopen with either the immigration court or the BIA, depending on the procedural history of the case.  The motion must include "the appropriate application for relief and all supporting documentation." 8 C.F.R. § 1003.2(c)(1).

6.      Investigating the viability of a claim for reopening can be a complicated endeavor. An immigration attorney who did not represent the noncitizen in the removal proceeding has an ethical obligation to ensure that any motion filed is not frivolous. Compliance with this obligation generally is contingent upon obtaining the complete record of proceedings and new

and previously unavailable evidence, both of which are necessary to permit a full review of a claim.

7.      Attorneys have an ethical obligation to fully and competently assess the merits of a claim before seeking reopening on behalf of existing clients. Model Rule 1.1 entitled "Competence" mandates "competent representation" which "requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation." Model Rules of Prof'l Conduct R. 1.1 (2015).  Comment 5 to that rule elaborates on this requirement, stating:

> Competent handling of a particular matter includes inquiry into and analysis of the factual and legal elements of the problem, and use of methods and procedures meeting the standards of competent practitioners. It also includes adequate preparation. The required attention and preparation are determined in part by what is at stake; major litigation and complex transactions ordinarily require more extensive treatment than matters of lesser complexity and consequence. . . .

Model Rules of Prof'l Conduct R. 1.1 cmt. 5 (2015).  In immigration cases, "what is at stake" is the person's ability to vacate a removal order and reopen proceedings, which often is the difference between permanent exile from the United States and living in the country with family and friends.  In this case, the stakes are even higher; Iraqi nationals risk grievous harm, including death, if they are removed.

8.      The process for an attorney to comply with ethical and regulatory obligations in preparing motions to reopen is time-consuming for at least two reasons.  First, where counsel did not represent the person previously, counsel needs to obtain the complete record of proceedings to understand what transpired in the removal proceeding and to assess the viability of a claim for reopening.  Second, by statute and regulations, motions to reopen require substantial new evidence, which takes time to gather and assemble. *See generally* 8 U.S.C. § 1229a(c)(7)(B); 8 C.F.R. § 1003.2(c)(1).

9.      New counsel will need to obtain both written and audio files concerning the individual's case.  This includes at a minimum both the A-File (the comprehensive file of a person's immigration history kept by the Department of Homeland Security) and the Record of Proceedings (the immigration court file kept by the Executive Office for Immigration Review, which consists of the immigration courts and the BIA).  The A-File is accessed by a Freedom of Information Act (FOIA), 5 U.S.C. § 552, request to the U.S. Citizenship and Immigration Service (USCIS).  However, if a person has had any interaction with U.S. Customs and Border Protection, it is advisable to also file a FOIA request with CBP to obtain records from that agency's file.  The Record of Proceedings is accessed by a FOIA request to EOIR.  If the person previously filed an appeal to the BIA, the Record of Proceedings should contain the transcript of the prior proceedings.  However, if the person did not previously appeal to the BIA, an audio tape may be available or the attorney can try to arrange to listen to the audio tape of the prior proceeding at the immigration court that heard the case.  Even if the person had counsel, incompetent or predatory prior counsel often will not or cannot provide the appropriate information.  It is the individual agency processing the FOIA request that controls how long it will take to produce the requested records.  At present, USCIS has a backlog of over 35,000

FOIA requests and generally takes several months to produce an A-file. In my experience, EOIR requests can take several weeks to months as well. Records that are older can take longer than others.

10.     The A-file and the Record of Proceedings serve a different purpose. The A-file contains the paperwork documenting the individual's immigration history. For example, it can contain the paperwork related to a person's first entry on a visa, previously filed asylum applications, and previous statements to immigration officers. It is imperative to review the A-file to fully understand the person's immigration status, to adequately assess relief options, and to find support for potential factual or legal errors in the proceeding. The Record of Proceedings consists of the trial court and appeal records. Without the Record of Proceedings, it is impossible to know whether: (1) a client was properly informed of his or her rights, including the rights to counsel, to contest the charges of alienage and removability, to present and cross-examine evidence, to seek relief or protection from removal, and the right to appeal; (2) the removal hearing was conducted in a fair and impartial manner by the immigration judge; (3) prior counsel was effective (or not); (4) any previously submitted evidence was improperly overlooked or discounted; (5) the client knowingly, intelligently, and voluntarily waived any of his or her rights; and (6) the factual and legal bases underlying the client's removal order and/or denial of relief or protection were correct. Review of both the A-file and complete Record of Proceedings is absolutely critical to ascertaining whether there is a viable basis for a motion to reopen. After receiving the FOIA results, counsel must carefully review these records. She must then consult with her client and often perform additional research and investigation, particular in cases involving changed country conditions.

11.     In addition, researching and collecting substantial new evidence to support a motion to reopen, particularly evidence to support a motion based on changed country conditions, can take significant time and effort both by the attorney and by the noncitizen and/or his or her family. The reopening statute requires that motions "shall be supported by affidavits or other evidentiary material." 8 U.S.C. § 1229a(c)(7)(B). The implementing regulations further mandate that the evidence is "material and was not available and could not have been discovered or presented at the former hearing," as well as either evidence that the immigration judge did not "fully explain[]" the opportunity to apply for relief at the prior hearing or evidence that relief is now available due to "circumstances that have arisen subsequent to the hearing." 8 C.F.R. § 1003.2(c)(1).

12.     Every case is different, but it would not be unreasonable for obtaining and reviewing a client's record to require between 10-20 hours of work, even before research and writing can begin. For example, in one of my cases, the A-file was 1,000 pages and the Record of Proceedings was over 600 pages and included an audio file. In my opinion, it is reasonable to estimate that after the A-file and Record of Proceedings is obtained, a lawyer with an active removal docket may take somewhere between 6 - 12 weeks to adequately prepare and file a motion to reopen, including preparation of the underlying application for relief. Counsel who are handling a higher volume of cases may require more time. Additional time also would be needed in circumstances where it is difficult for the attorney and client to communicate, for example, if the client is detained far from the attorney, or is not proficient in English.

*Difficulties Related to Emergency Stay Motions*

13.     If a person with a final order of removal faces the prospect of imminent removal, and has a viable basis for a motion to reopen or motion to reconsider, the necessary motion may be accompanied by an emergency stay motion. Significantly, as set forth in the Board of Immigration Appeals Practice Manual, the BIA will not consider a motion for a discretionary and/or emergency stay unless it is accompanied by an appeal, a motion to reopen, or a motion to reconsider. In my experience, most adjudicators are more inclined to grant a stay if there is a possibility that the appeal or motion ultimately will succeed. Thus, I routinely advise attorneys to file substantive motions in conjunction with stay requests, which, as discussed above, is extremely hard to do when either removal is imminent or the attorney never represented the person before and does not have any of the records.

14.     Filing an emergency stay motion does not obligate ICE to halt a deportation. Rather, either an IJ or the BIA actually must grant the stay motion before ICE has a legal obligation to halt a deportation. In addition, according to the Board of Immigration Appeals Practice Manual, an emergency stay motion may be submitted only when an individual is in physical custody and is facing imminent removal. As such, an individual who is not in ICE's custody must surrender to ICE's custody before the BIA will consider an emergency stay motion.

15.     Notably, neither the Board of Immigration Appeals nor the immigration court has promulgated any standard for granting a stay of removal, by precedential opinion, practice manual, or other method. The lack of any such standard has caused great confusion among the immigration bar, leaving attorneys to guess what factors may warrant granting a stay.

16.     A case I handled as counsel for a man fearing persecution and torture in his country of origin well illustrates some of the practical obstacles faced by attorneys seeking emergency stays of removal in conjunction with the filing of a motion to reopen before the BIA. After filing a motion to reopen and emergency stay request, I called the Emergency Stay Coordinator at the BIA, who first informed me that I would have to wait 24-48 hours for the BIA to docket the stay motion and instructed me to call the BIA back with the deportation officer's name and telephone number once the motion had been docketed. After the overnight courier company confirmed that the BIA had received the motion, I called the BIA back. I learned that the stay motion was not yet docketed and that it could take a while for the motion to reopen and stay request to make its way from the BIA mailroom to the office where it would be docketed. Nevertheless, I provided the BIA staff person with the deportation officer's information. The following week, I called the BIA again and was told that:

        (a) the BIA did not have the deportation officer's contact information and that the BIA staff would not have been allowed to take such information before the motion was docketed (contrary to what the same unit told me the week before);

        (b) BIA staff would call the deportation officer to find out if DHS has travel documents and if removal is imminent;

        (c) if the BIA did not reach the deportation officer and/or he did not call them back (after how much time she did not say), the then the "stay unit" would assume removal is imminent and

would ask a Board member to rule;

(d) if the deportation officer informs the BIA that ICE does not have travel documents, the BIA staff will *ask* the deportation officer to inform the BIA when they get them and to share the expected deportation date; and

(e) if ICE does not have travel documents, the BIA stay unit will not ask a Board member to rule on the emergency stay motion because "the Board only rules if deportation is imminent."

17.     After hearing this, I asked the woman from the BIA stay unit whether deportation officers were under any obligation to advise the BIA when ICE obtains travel documents or has scheduled a deportation. Her answer was that every deportation officer is different. I explained that none of this information about the need to provide officer contact information or the BIA's adjudication process is in the Board of Immigration Appeals Practice Manual and it would be helpful for attorneys to have this information. The response I received was again that every deportation is different and that the best way to get information is by calling the BIA. Nearly one month after I filed the emergency stay request and motion to reopen and after several follow up calls to the BIA stay unit, the BIA finally granted the emergency stay motion.

18.     My experience with seeking a stay from the BIA in the aforementioned case is consistent with the experiences of many of the attorneys with whom I have consulted and advised on stay-related issues. Practitioners are overwhelmingly concerned that their clients may be deported before the BIA, or an IJ, has had an opportunity to review the merits of a stay request, much less the underlying motion to reopen. Much of this concern stems from the fact that whether the BIA will adjudicate a stay motion prior to deportation relies entirely on the deportation officer's discretionary act of communicating to the BIA the actual date and time of deportation (and any change to the date and time of deportation).

19.     To make matters worse, ICE officers routinely refuse, purportedly for security reasons, to provide attorneys with any details regarding the date and time of even imminent deportations. Thus, while the IJ/BIA and ICE all are privy to this critical information, the noncitizen at risk of deportation and his/her attorney are left in the dark. Even if a pro se detainee were somehow able to prepare a motion to reopen and emergency motion for a stay, he or she would have no way to know when the IJ or BIA would adjudicate the stay motion.

20.     Sometimes, ICE officers will tell an attorney that the deportation date is "imminent" or "soon" without giving any further information. In this situation, the attorney frequently has only a few days—or even a few hours—to file an emergency stay motion (in conjunction with a pending or yet-to-be filed motion to reopen) *and* try to ensure that BIA staff succeed in obtaining confirmation of the deportation date so that the BIA will actually adjudicate the motion before ICE executes the deportation.

21.     I am aware of the details of at least two cases where ICE affirmatively informed the BIA of particular deportation dates but subsequently—unbeknownst to the BIA, and without providing the BIA any notice—moved up the dates of deportation and carried out the removal. In those cases, ICE either affirmatively misrepresented the deportation dates or neglected to

inform the BIA of the new deportation date. In at least one of the cases, the BIA adjudicated, and granted, the person's stay request too late; the deportation already had taken place. These cases illustrate that there is no formal mechanism by which ICE is required to notify the BIA of a change in deportation date and, therefore, no way to ensure that the BIA has a meaningful opportunity to adjudicate the stay motion before deportation.

22.     I believe the problem just identified is widespread. As far as I am aware, ICE has no legal obligation to provide and/or update the BIA or an IJ with notice of the date and time of a deportation to ensure that a stay motion is timely adjudicated. This lack of any obligation combined with ICE's refusal to provide noncitizens or their attorneys with a deportation date has contributed to, and I believe will continue to contribute to, the execution of removal orders before the BIA or an IJ has had an opportunity to review and adjudicate the stay motion.

23.     Based on my communications with other attorneys, I believe that attorneys seeking emergency stays of removal from immigration judges face some of the same procedural obstacles as those faced by attorneys seeking emergency stays before the BIA. These include delays in receipt of the stay motion and reluctance to rule on a stay motion until the IJ is satisfied that deportation is imminent. In addition, where a person seeks an emergency stay from an immigration court in conjunction with a motion, the timing for adjudication of the stay motion is entirely dependent on the schedule of that particular immigration judge (as opposed to any number of BIA judges who might adjudicate the stay motion). For example, if a stay motion is filed at 9:00am and deportation is scheduled for 10:00am, the immigration judge may be conducting a hearing in court and, therefore, unaware, unable, or perhaps unwilling to timely adjudicate the emergency stay motion prior to the deportation.

24.     Securing an emergency stay is challenging and time-consuming even for experienced immigration attorneys. Securing an emergency stay without counsel is even more difficult. The vast majority of noncitizens in removal proceedings are unfamiliar with the intricacies of immigration law or even basic legal process. Without competent counsel to advise of the possibility of filing an emergency stay motion in conjunction with a motion to reopen, most pro se noncitizens will be unaware of this procedure. Even if they were aware, they must articulate legal arguments and produce new and compelling evidence. These individuals may have little or no formal education and/or face a language barrier that makes this task even more daunting. Noncitizens who are detained face additional obstacles attendant to their detention.

25.     In short, neither the immigration courts nor the BIA have reliable or sufficient procedures to ensure individualized assessment of the appropriateness of an emergency stay that would provide an opportunity for reasoned decision-making about whether individuals who have filed motions to reopen should or should not face removal while those motions are pending. Whether a person is able to obtain a stay of removal pending a motion to reopen is at least in part a function of luck.

//

//

//

6

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 14th day of July, 2017, at Boston, Massachusetts.

Trina A. Realmuto
Declarant