UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

USAMA J. HAMAMA, et al.,

               Petitioners,                         Case No. 17-cv-11910

vs.                                          HON. MARK A. GOLDSMITH

REBECCA ADDUCCI,

               Respondent.

_____/

## OPINION & ORDER
## GRANTING PETITIONERS' MOTION FOR PRELIMINARY INJUNCTION (Dkt. 77)

In their motion for a preliminary injunction, Petitioners ask this Court to halt temporarily their deportation to Iraq, until they can make their case in the immigration courts that their removal is legally prohibited. The grounds that they will urge in those courts and, if necessary, in the federal courts of appeals will be that returning them to the lawlessness and senseless religious hatred that engulfs much of Iraq would subject them to persecution, torture, and possible death. The Government opposes the motion, principally on the grounds that this Court has no jurisdiction to provide any relief — even temporary relief — and that Petitioners' only recourse is to seek a stay of removal before the immigration courts. As this Court explained in its earlier opinion on jurisdiction, and as it will explain again below, the Government's view is inconsistent with the Constitution's command that the writ of habeas corpus — the fundamental guarantor of liberty — must not be suspended, except in the rare case of foreign invasion or domestic rebellion.

The Government's view ignores the compelling confluence of extraordinary circumstances presented here. Without warning, over 1,400 Iraqi nationals discovered that their removal orders — many of which had lain dormant for several years — were now to be immediately enforced, following an agreement reached between the United States and Iraq to facilitate removal. This

abrupt change triggered a feverish search for legal assistance to assert rights against the removal of persons confronting the grisly fate Petitioners face if deported to Iraq. That legal effort has, in turn, been significantly impeded by the Government's successive transfers of many detainees across the country, separating them from their lawyers and the families and communities who can assist in those legal efforts.

In these singular circumstances, a federal district court is armed with jurisdiction to act as a first responder to protect the writ of habeas corpus and the allied right to due process, by allowing an orderly filing for relief with the immigration courts before deportation, thereby assuring that those who might be subjected to grave harm and possible death are not cast out of this country before having their day in court.

For the reasons explained fully below, the Court grants Petitioners' motion for a preliminary injunction (Dkt. 77).

## I. BACKGROUND

### A. Procedural History

On June 11, 2017, agents from United States Immigration and Customs Enforcement ("ICE") began arresting Detroit-based Iraqi nationals subject to final orders of removal. Am. Hab. Pet. ¶¶ 2, 5 (Dkt. 68). ICE's operation ultimately resulted in the arrest of 114 Iraqi nationals who have since been transferred to federal facilities in Michigan, Ohio, Louisiana, and Arizona, where they await removal to Iraq. Id. ¶¶ 5, 8. This operation was part of a nationwide effort to remove Iraqi nationals who have been subject to longstanding final orders of removal, resulting from criminal convictions or overstaying visas. Id. ¶¶ 2, 7. Outside of Detroit, approximately eighty-five Iraqi nationals from Tennessee, New Mexico, and California have been arrested and detained. Id. ¶¶ 5-6. Those individuals have since been transferred to facilities in Alabama, Louisiana, Tennessee, and Texas. Id. ¶ 52. In total, 234 Iraqi nationals subject to final orders of removal

have been arrested and are currently detained in 31 facilities across the country.  See Kitaba-Gaviglio Decl., Ex. S to Pet'rs Mot., ¶ 5 (Dkt. 77-20).  The Government seeks to remove 1,210 additional Iraqi nationals subject to final orders of removal who have yet to be arrested.  Am. Hab. Pet. ¶ 7.

Over eighty-three percent of those detained have been subject to final orders of removal for at least five years, with more than fifty percent being subject to the orders for a decade or more.  See Kitaba-Gaviglio Decl. ¶ 8.  However, prior to March 2017, the Government had difficulty executing removal orders for Iraqi nationals due to Iraq's longstanding policy of not issuing the requisite travel documents for repatriation.  Am. Hab. Pet. ¶ 42.  It was not until the United States agreed to remove Iraq from the list of countries set forth in Executive Order 13780, issued March 6, 2017, that Iraq agreed to issue travel documents.  Id. ¶ 43 (citing 82 F.R. 13209).  Prior to this agreement, the Government was only able to repatriate Iraqi nationals with unexpired passports.  Schultz Decl., Ex. C to Gov't Resp., ¶ 6 (Dkt. 81-4).  Since 2007, just over 400 such individuals were removed by the Government or voluntarily agreed to return to Iraq.  Id. ¶ 4.  Iraq's recent willingness to issue travel documents has allowed for removal on a much more aggressive scale.

On June 15, 2017, Petitioners filed both a habeas corpus class action petition (Dkt. 63) and a motion for a temporary restraining order and/or stay (Dkt. 66).  The motion sought to prevent their removal "until an appropriate process has determined whether, in light of current conditions and circumstances, they are entitled to mandatory protection from removal."  Pet'rs Mot. for TRO at 2.  After the Government opposed the motion on jurisdictional grounds,  the Court issued a stay of removal, pending resolution of the jurisdictional issue, which stay was made applicable to the class as then defined, i.e., all Iraqi nationals subject to removal orders within the jurisdiction of the

Detroit ICE Field Office.  See Hamama v. Adducci, No. 17-CV-11910, 2017 WL 2684477 (E.D. Mich. June 22, 2017).

After Petitioners filed an amended habeas corpus class action petition and class action complaint, along with a motion to expand the stay (Dkt. 69), the Court entered an order expanding the stay to a nationwide class of Iraqi nationals subject to final orders of removal.  See Hamama v. Adducci, No. 17-CV-11910, 2017 WL 2806144 (E.D. Mich. June 26, 2017).[1]  The stay was subsequently extended until July 24, 2017 to allow further consideration of the jurisdiction issue. See 7/6/2017 Op. & Order (Dkt. 61).  Since that time, the Court has ruled that it has jurisdiction in this matter.  See Hamama v. Adducci, No. 17-CV-11910, 2017 WL 2953050, ___ F. Supp. 3d ___ (E.D. Mich. July 11, 2017).

In their motion for a preliminary injunction, Petitioners argue that it is unlawful to remove them prior to an adjudication of their motions to reopen by the immigration courts and the filing of a petition for review with the courts of appeals, if necessary.  Motions to reopen allow those who are already subject to final orders of removal to argue that the order is now unlawful, or that they are now eligible for immigration relief or protection based on changed country conditions. See Realmuto Decl., Ex. Y to Pet'rs Mot., ¶ 5 (Dkt. 77-26).  Petitioners, many of whom are religious minorities, including Chaldean Christians, Kurds, and Sunni and Shiite Muslims, argue that they are eligible for mandatory relief under provisions of the Immigration and Nationality Act ("INA"), the Foreign Affairs Reform and Restructuring Act ("FARRA"), and the Convention Against Torture ("CAT").  Pet'rs Mot. at 18 (citing 8 U.S.C. § 1231(b)(3) (restricting removal to country where alien's life or freedom would be threatened); 8 U.S.C. § 1231 note (stating policy

---

[1] The members of the expanded putative class are encompassed within the term "Petitioners," unless otherwise indicated.

4

of the United States not to remove individual to a country where there are substantial grounds to believe the individual will be tortured in that country); 8 C.F.R. § 208.16(c)(2) (implementing regulation for the CAT, which forbids removal if more likely than not individual will be tortured upon removal). Petitioners argue that these laws prohibit their removal until motions to reopen have been filed and adjudicated. They also argue that the Fifth Amendment's Due Process Clause forbids removal prior to the opportunity to be heard regarding the risk of torture, persecution, or death.

Petitioners contend that the harm they will face if removed to Iraq far outweighs the harm to the Government that will result if removal is delayed pending the completion of administrative proceedings and the opportunity to seek a stay in the courts of appeals. They also maintain that the public interest weighs in their favor because the public has an interest in fair immigration proceedings.

To ensure their claims are heard, Petitioners request that their removal be enjoined for three months in order to file motions to reopen, beginning from the time the Government provides them with their Alien Files ("A-Files") and their Record of Proceedings ("ROP") from the immigration courts and/or the Board of Immigration Appeals ("BIA"). For those who file a motion to reopen within that three-month period, Petitioners request that the enjoinment of their removal continue through the adjudication of the administrative proceedings and, if necessary, until they have submitted both petitions for review and motions to stay in the appropriate courts of appeals.

In response, the Government reasserts its claim that the REAL ID Act, 8 U.S.C. § 1252, divests this Court of jurisdiction. It argues that there is no Suspension Clause violation under these circumstances, because the administrative motion to reopen process is adequate. The Government also raises, for the first time, the argument that there cannot be a Suspension Clause violation

because habeas relief is inappropriate where the detainee is challenging a transfer from custody, as distinct from a challenge to detention itself.  Finally, the Government argues that even if this Court has jurisdiction, Petitioners' motion for preliminary injunction should be denied because their claims are meritless and the balance of equities weighs in the Government's favor.

Prior to addressing these arguments, the Court turns to the pertinent facts.

### B. Conditions in Iraq

As noted in the Court's opinion regarding jurisdiction, Petitioners' removal orders largely predate the deteriorating conditions in Iraq.  See Hamama, 2017 WL 2953050 at *3; see also Heller Decl., Ex. D. to Pet'rs Mot., ¶ 8 (Dkt. 77-10)[2]; Kitaba-Gaviglio Decl. ¶ 7 (noting that over fifty percent of Petitioners have been subject to orders of removal since 2007).  The country's instability traces back to the 2003 United States-led invasion of Iraq, which brought in its wake the persecution of religious minorities, including Christians, Yezidis, and others.  See Lattimer Decl. I, Ex. I to Pet'rs Mot., ¶¶ 8, 10 (Dkt. 11-10).[3]  However, it was not until 2014 that conditions became especially dire for religious minorities.  In June of that year, the Islamic State in Iraq and Syria ("ISIS") took control of Mosul, Iraq's second largest city, causing an immediate exodus of some 500,000 civilians.  Id. at 9.[4]

---

[2] Rebecca Heller is the director and co-founder of the International Refugee Assistance Project ("IRAP"), a project of the Urban Justice Center, Inc.  Heller Decl. ¶ 1.  IRAP provides free legal services to refugees, including those who seek escape from persecution. Id. ¶ 4.  The organization has extensive experience providing assistance to Iraqi refugees. Id. ¶ 5.

[3] Mark Lattimer, currently the executive director of Minority Rights Group International, has been extensively involved in various organizations dedicated to monitoring human rights abuses in Iraq. Lattimer Decl. ¶ 1.

[4] Destabilization flowing from the 2003 invasion caused about two-thirds of Iraq's Christian community to leave the country prior to June 2014.  See "No Way Home: Iraq's Minorities on the Verge of Disappearance," (hereinafter, "No Way Home Report"), at 10, available at http://minorityrights.org/wp-content/uploads/2016/07/MRG_CFRep_Iraq_Aug16_UPD-2.pdf. According to the United Nations High Commissioner for Refugees, an estimated one million Iraqi

Religious minorities in Iraq face significant persecution at the hands of ISIS.  See Lattimer Decl. I ¶¶ 8, 10.  see also id. ¶ 17 ("[R]eligious minorities are at risk of extinction in Iraq . . . .").  In addition to desecrating numerous places of worship, ISIS has carried out large-scale killings and abductions of those who have been unable to flee.  Id. ¶ 10.  ISIS forces in Iraq have directed Christians, in particular, to "pay a protection tax, convert to Islam, or be killed."  Id. ¶ 9.  Christians have also been subject to rape and other atrocities.  Id. ¶ 10.  Five of the named Petitioners identify as Christian.  See Am. Hab. Pet. ¶¶ 19-23.

Sectarian violence in Iraq is by no means limited to Christian minorities.  Shiite Muslims and Yezidis have been subject to sexual slavery, abductions, and death at the hands of ISIS.  Heller Decl. ¶¶ 32, 38.  ISIS has gone as far as to target these groups for genocide.  Id. ¶ 32.[5]  Two of the named Petitioners identify as Shiite Muslims.  See Am. Hab. Pet. ¶¶ 24-25.

ISIS is not the only group targeting religious minorities.  The record indicates that Sunni Muslims have been singled out by militias associated with the Iraqi government.  Following the rise of ISIS, the Iraqi government empowered the Popular Mobilization Forces ("PMF") to reclaim territory.  Heller Decl. ¶ 16.  PMF consists of mostly Shiite organizations that are trained by the

---

citizens remain internally displaced due to sectarian violence dating from about 2006 until ISIS became heavily active in roughly 2014.  See Iraq, Int'l Religious Freedom Report, U.S. State Dep't at 3 (2015), available at https://www.state.gov/documents/organization/256479.pdf.  The conflict with ISIS, however, caused a rate of displacement that vastly and rapidly outpaced the previous one, displacing an additional 3.4 million people in less than two years, from 2014 to July 2015.  Id.

[5] The current International Religious Freedom Report, published by the State Department, also notes that "Yezidi, Christian, and Sunni leaders continued to report harassment and abuses" by certain regional governments.  See Int'l Religious Freedom Report at 7; see also id. at 15 ("Coordinated [ISIS] bomb attacks continued to target Shia markets, mosques, and funeral processions. . . .); id. at 18 ("[ISIS] continued to publish open threats via leaflets, social media, and press outlets of its intent to kill Shia 'wherever they were found' on the basis of being 'infidels.'").

Iranian government and has engaged in a campaign of abductions and extrajudicial killings against Sunni Muslims. Id. ¶¶ 16, 20.

There is also evidence that Petitioners' association with Westerners will heighten their risk of persecution. In addition to targeting U.S. citizens, ISIS and other sectarian militias have targeted Iraqis who they perceive to be associated with "western interests." Lattimer Decl. II, Ex. K to Pet'rs Mot., ¶ 2 (Dkt. 77-13). There is a high likelihood that if they are removed to Iraq, Petitioners will be immediately detained and interrogated by the country's internal security forces. Smith Decl., Ex. E to Pet'rs Reply, ¶ 1 (Dkt. 84-6). Petitioners face a heightened risk of interrogation due to media coverage of their criminal records, as well as Iraq's fear of American espionage. Id. ¶ 5. Many of the interrogation techniques used by Iraq's internal security forces would qualify as torture. Id. ¶ 2. Any Iraqi who lived or spent a considerable amount of time in the United States would almost certainly be unable to conceal this fact upon return to Iraq. Lattimer II Decl. ¶ 11.[6]

### C. Barriers to Asserting Claims

Petitioners assert that they have been significantly impeded in raising these changed conditions in immigration courts since their detention. According to Petitioners, even without the pressure of immediate removal without advance notice, preparing a motion to reopen proceedings before the immigration courts is a difficult task. They note that it requires compiling files, affidavits, "hundreds of pages of supporting evidence," and preparing the application for relief. Abrutyn Decl. I, Ex. A to Pet'rs Mot., ¶¶ 11, 13 (Dkt. 77-2); see also Realmuto Decl., Ex. Y to Pet'rs Mot., ¶ 8 (Dkt. 77-26) (noting that time is necessary to gather "substantial new evidence"

---

[6] The State Department's recent Iraq Travel Warning notes that "[a]nti-U.S. sectarian militias may also threaten U.S. citizens and western companies throughout Iraq." See Iraq Travel Warning, U.S. Dep't of State (June 14, 2017), available at https://travel.state.gov/content/passports/en/alertswarnings/iraq-travel-warning.html.

in support of a motion to reopen); Scholten Decl., Ex. Z to Pet'rs Mot., ¶ 8 (Dkt. 77-27); 8 C.F.R.

§ 1003.2(c)(1) (noting that an alien's criminal history will often need to be retrieved and reviewed,

and  that a motion to reopen "must be accompanied by the appropriate application for relief and

all supporting documentation").

The two most important documents, the A-File (the file documenting the alien's

immigration history) and the ROP (a court file that contains a history of the alien's past

proceedings before the immigrations courts and BIA), are generally only attainable through a

Freedom of Information Act ("FOIA") request.  See Realmuto Decl, ¶¶ 8-9.  Responses to these

FOIA requests can often take over five months.  See Abrutyn Decl. II, Ex. AA to Pet'rs Mot., ¶¶

6, 7 (Dkt. 77-28).

Preparing a motion to reopen is also an expensive proposition.  Preparing the motion

requires "a high level of immigration law knowledge and experience," which costs clients

somewhere between $5,000 and $10,000.  See Reed Decl., Ex. K to Pet'rs Mot., ¶¶ 7, 10 (Dkt. 77-

12).  This amount does not include fees of $10,000 to $30,000 that arise if the motion is granted

and the case proceeds to a merits hearing on the underlying form of relief sought.  Id. ¶ 10.  In a

case of this nature, costs can reach up to $80,000.  Id.

 The difficulty of preparing a motion to reopen has been compounded by Petitioners'

detention in facilities far from their homes.  Petitioners detained in Michigan have been transferred

to Ohio, Louisiana, and Arizona; Petitioners detained in Tennessee have been transferred to

Louisiana, Texas, Alabama, and Arizona.  See Am. Hab. Pet. ¶ 52.  It is estimated that

approximately seventy-nine percent of Petitioners are being detained in facilities outside of the

state in which the immigration court issued their final orders of removal.  Kitaba-Gaviglio Decl. ¶

9. Further, many Petitioners have been transferred multiple times.  Am. Hab. Pet. ¶ 56.  One

Petitioner, Constantin Jalal Markos, has been transferred to facilities in Michigan, Ohio, Louisiana, and Arizona, with a layover in Texas, since his detainment in May 2017.  See Markos Decl., Ex. X to Pet'rs Mot., ¶¶ 17-19 (Dkt. 77-25).

Relocation of Petitioners impedes retaining and communicating with counsel.  Am. Hab. Pet. ¶ 55. And it impedes local community efforts to find and maintain counsel for Petitioners when they are shuttled around the country.  Id. ¶ 53.

Attorneys have also described "extremely limited access to the phone" at detention facilities, thus making it difficult to compile the necessary information for a motion to reopen.  See Kaur Decl., Ex. U to Pet'rs Mot., ¶ 4 (Dkt. 77-22); see also Markos Decl. ¶¶ 20-21 (stating that phone calls at the Arizona detention facility can last no longer than fifteen minutes at twenty-five cents per minute).  Attempts to visit clients in person have also been impeded.  Ruby Kaur, an attorney representing two Petitioners detained in Ohio, stated that after making the four-hour drive from Michigan to Ohio, she was twice denied the opportunity to visit her clients despite receiving prior assurances.  See Kaur Decl. ¶¶ 7-9; see also Jajonie-Daman Decl., Ex. F to Pet'rs Mot., ¶¶ 7-8 (Dkt. 77-7) (stating it is "nearly impossible" for her to meet with her Petitioner-clients "because they were all transferred to Youngstown, Ohio approximately 4 hours away . . . ."); Samona Decl, Ex. V to Pet'rs Mot., ¶¶ 9-10 (Dkt. 77-23) (stating that it is impractical for him to drive over four hours to visit his clients in the Ohio facility).

In response to this detailed statement of evidence, the Government provides a generalized rebuttal.  The Government first argues that "[t]he requirements for the motion [to reopen] are not elaborate."  Gov't Resp. at 8 (Dkt. 81).  It notes that a motion need only state the new facts that will be proven and provide evidence relating to those facts.  Id. (citing 8 U.S.C. § 1229a(c)(7)(B)).  Further, when considering motions to reopen and motions to stay removal, the immigration courts

taken into account "the possibility that the motions may have been prepared and submitted without the alien (or his or her attorney) having time to obtain all appropriate evidence in support of the motion." McNulty Decl., Ex. B to Gov't Resp., ¶ 20 (Dkt. 81-3).

Regarding the transfer of most of the Detroit-based Iraqi nationals to Ohio, the Government states that this was done due to the lack of available space at local county jails. See Lowe Decl., Ex. D to Gov't Resp. ¶¶ 5-6 (Dkt. 81-5). Successive transfers to facilities in other states have been done for the purpose of staging for removal from the United States to Iraq. Id. ¶ 12.

The Government also states that it provides daily phone access to its detainees, and notes that at its Arizona facility, phone calls made to pro bono counsel, the immigrations courts, the BIA, the American Civil Liberties Union ("ACLU"), and other institutions are free of charge. See McGregor Decl., Ex. F to Gov't Resp., ¶ 3 (Dkt. 81-7). Detainees are also provided a handbook informing them of this right. Id.

Petitioners have presented specific facts contradicting the Government's generalized treatment of the facts. Detainees at the Arizona facility have stated that the list of legal service providers that they may call for free only consists of three organizations, only two of which can provide services, and such providers are limited by their resources to assisting only a small number of detainees. Peard Decl., Ex. F to Pet'rs Reply, ¶ 9 (Dkt. 84-7). Detainees contest that they are permitted to call the ACLU free of charge, and state that they must pay for calls to private immigration attorneys who have offered their services pro bono. Id. ¶ 10. Significantly, there is evidence that those in the Arizona facility are not permitted to call legal service providers in Michigan free of charge, despite the fact that the immigration court in which they received their final order of removal is in that state. Id. Further, there is evidence that detainees at the Ohio

11

facility have been limited to just ten minutes of time when making phone calls to counsel.  Samona Decl. ¶ 12.

## II. STANDARD OF DECISION

To determine whether to grant a preliminary injunction, a district court must consider: (i) the plaintiff's likelihood of success on the merits; (ii) whether the plaintiff may suffer irreparable harm absent the injunction; (iii) whether granting the injunction will cause substantial harm to others; and (iv) the impact of its decision on the public interest.  Yolton v. El Paso Tenn. Pipeline Co., 435 F.3d 571, 578 (6th Cir. 2006).  These four factors "are factors to be balanced, not prerequisites that must be met."  Hamad v. Woodcrest Condo. Ass'n, 328 F.3d 224, 230 (6th Cir. 2003).

## III. ANALYSIS

### A. Jurisdiction

Prior to addressing whether issuance of a preliminary injunction is appropriate, the Court must again address the Government's jurisdictional challenge.  "Without jurisdiction the court cannot proceed at all in any cause.  Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause."  Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94 (1998) (quoting Ex parte McCardle, 7 Wall. 506, 514 (1868)).

In its most recent opinion, the Court held that the REAL ID Act did not apply to divest the Court of subject-matter jurisdiction because the Act violated the Constitution's Suspension Clause, as applied.  See 7/11/2017 Op. & Order at 23.  The Government now argues that there can be no Suspension Clause violation where, as here, there is no entitlement to habeas relief.  It also reasserts its argument that there is no violation because the REAL ID Act created an adequate and effective alternative through the administrative motion-to-reopen process.

12

In support of its argument that a habeas claim is improper under the circumstances, the Government relies on the Supreme Court's ruling in <u>Munaf v. Geren</u>, 553 U.S. 674 (2008). In <u>Munaf</u>, the petitioners were two American citizens, who traveled to Iraq where they were arrested by the Multinational Force-Iraq ("MNF-I") in connection with charges of kidnapping and providing aid to terrorist groups. <u>Id.</u> at 681, 683. The petitioners subsequently filed a petition for habeas corpus, seeking to prohibit their transfer from MNF-I custody to the custody of the Iraqi government for prosecution. <u>Id.</u> at 682, 684. The Court held, as an initial matter, that the federal courts <u>had</u> habeas jurisdiction in such circumstances. <u>Id.</u> at 688. It went on to say, however, that the habeas power should not be exercised in the context of that case, because "habeas is not a means of compelling the United States to harbor fugitives from the criminal justice system of a sovereign with undoubted authority to prosecute them." <u>Id.</u> at 697. The Court also rejected the petitioners' claim that they might be tortured if turned over to Iraqi authorities, explaining that the petitioners alleged "only the possibility of mistreatment in a prison facility." <u>Id.</u> at 702. Notably, regarding the petitioners' claim that their transfer was barred under FARRA, the Court stated that their pleadings did not plead any FARRA-based claim, and stressed that it was expressing no opinion "on whether [the petitioners] may be permitted to amend their respective pleadings to raise [a FARRA claim] on remand." <u>Id.</u> at 703 n.6.

The Government also relies on <u>Kiyemba v. Obama</u>, 561 F.3d 509 (D.C. Cir. 2009), which addressed a habeas claim by Guantanamo Bay detainees who sought to prevent transfer to countries where they might face torture. The court held that the petitioners had properly asserted that the federal courts had habeas jurisdiction, even though the petitioners sought to prevent transfer, rather than seek release from detention. <u>Id.</u> at 513 ("[I]it is clear they allege a proper claim for habeas relief, specifically an order barring their transfer to or from a place of

incarceration."). However, the court concluded that the habeas power should not be exercised, because the Government had submitted a declaration expressly stating that it would not transfer any of the detainees to a country where a detainee was likely to be tortured. Id. at 514. The court also rejected a claim under FARRA, because the petitioners were not challenging a removal order.

Our case is far different from both Munaf and Kiyemba. Unlike the petitioners in Munaf, Petitioners here are not the subject of extradition requests by a foreign power, so there is no issue of interference with comity in regards to foreign nations, the expressed concern of the Supreme Court. And unlike the Munaf petitioners, Petitioners here have not made a speculative claim that they may be mistreated; they have produced substantial evidence that such mistreatment is highly probable. And unlike the Munaf petitioners, Petitioners here have specifically invoked the CAT.

Kiyemba is also distinguishable, because unlike the petitioners there, who were enemy combatants, Petitioners here are participants in the immigration process, who wish to raise CAT/FARRA arguments to challenge the present enforcement of their removal orders. See Hamama, 2017 WL 2953050 at *9 (stating that, if constitutional, 8 U.S.C. § 1252(g) would apply because Petitioners' claims arise out of the Attorney General's decision to execute their final orders of removal).

The Government's argument that habeas is not appropriate — on the theory that Petitioners are not challenging the fact of their detention — thus has no support in Munaf or Kiyemba. In fact, in none of the many cases cited by the parties and by the Court regarding habeas jurisdiction in immigration cases has a court refused to consider a petitioner's argument on the grounds that the challenge to the removal order was not cognizable for failure to challenge detention. See, e.g., Elgharib v. Napolitano, 600 F.3d 597 (6th Cir. 2010); Benitez v. Dedvukaj, 656 F. Supp. 2d 725

14

(E.D. Mich. 2009); Ba v. Holder, No. 09-14645, 2009 WL 5171793, at *2 (E.D. Mich. Dec. 24, 2009).  As a result, the Court finds that Petitioners have raised a cognizable habeas claim.

The Government also reasserts its claim that there is no Suspension Clause violation because the alternative to habeas relief created by the REAL ID Act — claims brought by motions to reopen adjudicated at the administrative level followed by petitions for review in the courts of appeals — is adequate and effective.  In support of this argument, the Government submits declarations from officials charged with overseeing the Detroit immigration court and the BIA. Sheila McNulty, the assistant chief immigration judge in charge of overseeing the Detroit immigration court, states that her office prioritizes the timely adjudication of emergency motions to stay removal.  McNulty Decl., Ex. B to Gov't Resp., ¶ 11 (Dkt. 81-3).  She states that there are multiple avenues to seek a stay pending the adjudication of a motion to reopen: (i) the initial motion for stay in immigration court; (ii) filing a motion to stay with the BIA pending appeal and; (iii) requesting a stay from the immigration court while an alien's appeal before the BIA is pending. Id. ¶ 13; see also Gearin Decl., Ex. A to Gov't Resp. (Dkt. 81-3) (describing the BIA's Emergency Stay Unit, a division dedicated to timely adjudicating emergency motions to stay).

The Court agrees with the Government that the administrative level is the proper venue to adjudicate Petitioners' motions to reopen and, ordinarily, motions to stay.  However, as noted in the Court's prior opinion, the confluence of events in this case would effectively foreclose this route for many Petitioners without intervention by the Court.  As detailed below, the impediments to prosecuting their motions to reopen are formidable.  The administrative process to file motions to reopen and stay can only be adequate and effective if individuals are given a fair chance to access the process.

15

The Government contends that Petitioners have been given such a chance, as evidenced by the fact that seventy-nine of the Detroit-based Petitioners have already received rulings on their motions to reopen and stay since the commencement of this case. See Gov't Resp. at 10 (citing McNulty Decl. ¶ 23). Unfortunately for the Government, this statistic does not prove much. For seventy-one of these cases, the Government does not state whether the motions to reopen and stay were filed before or after this Court's stay was entered. Thus, this Court's stay may well have given sufficient "breathing room" for certain Petitioners to invoke the administrative process. If the Court had not intervened, it seriously doubts that a meaningful number of Petitioners would have been able to file necessary motions and receive an adjudication from the immigration courts or the BIA prior to the time they might otherwise have been removed. It has taken a herculean effort by members of the bar and several nonprofit organizations just to get those seventy-nine motions filed. The record indicates that, under normal circumstances, preparing a motion to reopen can take anywhere from three to six months. Realmuto Decl. ¶ 12; Scholten Decl. ¶ 5. And the Government's focus on the seventy-nine motions says nothing of the hundreds of others in the class who have not yet been able to file motions or even retain counsel.

What the Court said in its earlier opinion on jurisdiction remains true and bears repeating. Under ordinary circumstances, the REAL ID Act would apply to divest this Court of jurisdiction. The act states that, other than a petition for review in the courts of appeals following administrative adjudication, "no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter." 8 U.S.C. § 1252(g).

But to enforce the REAL ID Act in the present circumstances violates the Constitution's Suspension Clause.  The Suspension Clause states that "[t]he Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it."   U.S. Const. art. I, § 9, cl. 2.   "[T]he Supreme Court has noted that this Clause requires 'some judicial intervention in deportation cases.'"  Muka v. Baker, 559 F.3d 480, 483 (6th Cir. 2009) (quoting I.N.S. v. St. Cyr, 533 U.S. 289, 300 (2001)).  However, suspension will not be made out if there is a "new collateral remedy which is both adequate and effective" to challenge the alleged illegality.  Id. (quoting Swain v. Pressley, 430 U.S. 372, 381 (1977)).

The Sixth Circuit in Muka held "facially, the petition for review filed in the court of appeals provides an adequate and effective process to review final orders of removal."  Id.  at 484-485. The court also rejected the petitioners' as-applied challenge, noting that the petitioners' failure to make a known argument during the administrative proceedings did not mean that the court "must grant them a second bite at the apple to satisfy the Suspension Clause's requirements."  Id. at 486. However, the court allowed for the possibility of successful as-applied challenges in the future.[7] Id.

---

[7] The Government notes that "the motion to reopen process has been upheld under the Suspension Clause by multiple courts of appeal."  Gov't Resp. at 7-8 (citing Iasu v. Smith, 511 F.3d 881 (9th Cir. 2007); Alexandre v. U.S. Atty. Gen., 452 F.3d 1204 (11th Cir. 2006); Luna v. Holder, 637 F.3d 85 (2d Cir. 2011)).  But two of the cases — Iasu and Alexandre — dealt with petitioners who, like the petitioners in Muka, had failed to raise a claim or submit evidence of which they had knowledge at the time of the initial removal proceeding.  By contrast, Petitioners here seek to raise claims that became available to them only after their removal orders were entered.  Luna is inapposite, because it held that the Suspension Clause was not violated where the petitioner's counsel failed to timely file a petition for review, noting that the petitioner was able to challenge his final order of removal by way of a motion to reopen.  Unlike the petitioner in Luna, Petitioners do not have an effective opportunity to file a motion to reopen absent this Court's prevention of their removal.

This case presents such a challenge. Unlike in <u>Muka</u>, Petitioners did not fail to raise a claim in their prior administrative proceedings; their CAT/FARRA and INA claims did not ripen until at least 2014, when the persecution of religious minorities and those affiliated with the United States became far more apparent. <u>See</u> Lattimer Decl. I. ¶ 9. More important, the REAL ID's alternative to habeas relief — filing motions to reopen followed by petitions for review in the courts of appeals — does not take into account the compelling confluence of grave, real-world circumstances present in this case that stand in the way of Petitioners' ability to access the administrative system.

The sudden decision to detain Petitioners in facilities far from home and with limited phone access has greatly hindered their ability to file motions to reopen. While the Government provides an overview of its efforts to provide detainees with access to counsel, it does not rebut the declarations of counsel and Petitioners who state they have been greatly impeded in their efforts to avail themselves of the administrative process. <u>See</u> Kaur Decl. ¶¶ 7-9 (noting that she was twice denied the opportunity to see her clients after driving four hours to Ohio); <u>see also</u> Markos Decl. ¶¶ 20-21 (phone calls at Arizona facility limited to fifteen minutes per day at twenty-five center per minute); Peard Decl. ¶ 9 (Arizona facility only allows free phone calls to two legal service providers that can only accommodate a small number of detainees); Reed Decl. ¶ 12 (stating that preparing motions to stay and motions to reopen requires original signatures from the detained clients, thus necessitating in-person visits that are often impractical in light of Petitioners' ever-changing locations). The shortcomings of these facilities, along with ICE's successive transferring to different facilities in order to facilitate removal, has either prevented Petitioners from filings motions altogether, or caused them to sacrifice the quality of their filings in light of the pace at which the Government is moving. Valenzuela Decl., Ex. W to Pet'rs Mot., ¶ 17 (Dkt. 77-24).

Petitioners have also submitted compelling evidence that if they are removed prior to their filing and adjudication of motions to reopen, their ability to seek judicial review in the courts of appeals will be effectively foreclosed. Their status as religious minorities places them at grave risk of torture and other forms of persecution at the hands of ISIS, other Sunni insurgencies, and the various Shi'a militias within the PMF. Heller Decl. ¶¶ 16, 20. Since ISIS's capture of Mosul in June 2014, the group has targeted Christian and Yezidi Iraqis, subjecting them to religious desecration, abductions, sexual slavery, and large scale killings. Lattimer Decl. I ¶¶ 9-10. Iraq responded to ISIS's rise by empowering the PMF, a group consisting of several Shi'a militias trained in Iran, a designated state sponsor of terror. Heller Decl. ¶ 16. In addition to combating ISIS, these militias have engaged in widespread persecution of the Sunni community as a form of retaliation. Id. ¶ 20. The militias have "carried out a systematic pattern of violations" against the Sunni community, including enforced disappearance and extrajudicial executions. Id.

The risk to Petitioners is compounded by their affiliation with the United States, an affiliation that will likely expose them to mistreatment by Iraq's internal security forces, as well as targeted killings by both Sunni and Shi'a groups. Immediately upon arriving in Iraq, Petitioners will be subject to interrogation that will likely cross the line into torture due to Iraq's fear of American espionage. Smith Decl. ¶¶ 1-2. Assuming they are released, Petitioners will be at risk from various groups. The record indicates that both Sunni and Shi'a militias continually target those associated with "western interests." Lattimer Decl. II ¶ 9.

Petitioners who face this severe mistreatment will obviously be unable to vindicate their habeas rights. Deportees who must undertake evasive action to avoid persecution, torture, or death — such as changing residences or leaving jobs — will be deprived of the stability that is often necessary to properly pursue legal challenges. Maintenance of legal paperwork and

communication with lawyers and potential witnesses would likely become extraordinarily problematic, if not impossible.

The Government's attempt to characterize Petitioners as having slept on their rights prior to detainment is unpersuasive. The earliest Iraq's changed conditions became apparent to Petitioners was 2014, with conditions threatening to some Petitioners not arising until much later. Heller Decl. ¶ 35 (members of the Sabaean-Mandaean community reported robberies and death threats beginning in 2015); id. ¶ 20 (2016 State Department report noted the extent to which members of the PMF were retaliating against Sunni civilians); Smith Decl. ¶ 36 (stating that upcoming Kurdish independence referendum could pose threat to Christians and Yezidis). By 2014, Iraq's refusal generally to accommodate removals led Petitioners — most of whom had been living peaceably under removal orders for over a decade — to reasonably conclude that filing a motion to reopen was an academic exercise. And given that lack of utility, it was reasonable not to incur the prohibitive cost of filing a motion to reopen, which can reach up to $80,000 in a case of this nature. Reed Decl. ¶ 10.

The Government points out that removals to Iraq have never fully ceased, noting that over 400 have been repatriated since 2007 alone. Schultz Decl. ¶ 4. However, this number includes those who have voluntarily returned and those with unexpired passports, a condition that had been imposed by Iraq for repatriation. Iraq also refused to accommodate charter flights for a number of years, another condition that prevented removal on a larger scale. Given the very limited nature of removals to Iraq prior to their detainment, Petitioners justifiably assumed that a motion to reopen was not necessary until given notice otherwise.

These circumstances once again lead the Court to hold that the REAL ID Act violates the Suspension Clause, as applied. Because the Act may not be enforced, the Court is not stripped of

20

jurisdictional grants found in other sources of the law, including 28 U.S.C. § 2241 (habeas); 28 U.S.C. § 1331 (federal question); 28 U.S.C. § 1361 (mandamus).

### B. Preliminary Injunction

The Court next turns to Petitioners' motion for preliminary injunction. A proper balancing of the four factors counsels granting the motion.

### 1. Likelihood of Success on the Merits

Before deciding whether Petitioners are likely to succeed on the merits, it is important to clarify what it is they are claiming. At the commencement of this action, Petitioners argued that they were entitled to relief under the INA and CAT/FARRA, and that this Court would be an appropriate forum to adjudicate their claims. Petitioners have since narrowed their claim, arguing that (i) they are statutorily and constitutionally entitled to adjudication of their claims via motions to reopen before the immigration courts and review by the courts of appeals, and (ii) this Court's role should be to make that process meaningful by staying enforcement of their removal orders until the immigration courts have acted and the courts of appeals have reviewed any motion for a stay. Regarding their statutory right to adjudication prior to removal, Petitioners contend that the INA and CAT/FARRA guarantee them the right to be heard prior to removal. Further, Petitioners contend that the Fifth Amendment's Due Process Clause forbids their removal without an opportunity to be heard in the face of probable persecution and torture.

The merits analysis must be conducted consistent with the Court's jurisdiction analysis. Having concluded that the Court's jurisdiction is limited to preserving a meaningful opportunity for access to the process that Congress intended be followed, this Court does not evaluate whether any class member will likely succeed on the substance of INA and CAT/FARRA arguments before the immigration courts and the courts of appeals. Rather, the Court's role now is to evaluate

whether the sources of law put forward by Petitioners support their claim of a right to adjudication of their motions to reopen prior to removal.

The standard regarding the merits that a court must evaluate is whether the moving party "has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation." Six Clinics Holding Corp., II v. Cafcomp Sys., Inc., 119 F.3d 393, 402 (6th Cir. 1997). Petitioners' showing meets that standard.

### a. INA and CAT/FARRA

The first statutory ground identified by Petitioners is 8 U.S.C. § 1231(b)(3)(A), a subsection of the INA, which "implements the 'non-refoulement obligation' reflected in Article 33 of the Refugee Convention." Yousif v. Lynch, 796 F.3d 622, 632 (6th Cir. 2015). The principle of non-refoulement, codified in the 1951 United Nations Convention Relating to the Status of Refugees ("Refugee Convention"), restricts the ability of countries to send individuals fleeing persecution to countries where they would be further threatened. See Almuhtaseb v. Gonzales, 453 F.3d 743, 749 (6th Cir. 2006). The INA provision implementing the Refugee Convention states that "the Attorney General may not remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A).[8]

---

[8] Title 8 U.S.C. § 1231(b)(3)(A) does not apply if (i) the applicant participated in persecution; (ii) the applicant is viewed as a danger to the community because he committed a serious crime; (iii) there is a reason to believe the applicant committed a serious nonpolitical crime outside the United States prior to arrival; or (iv) if there are reasonable grounds to believe that the applicant is a danger to the security of the United States. See 8 U.S.C. § 1231(b)(3)(B).

Petitioners state that they are also entitled to adjudication of their claims prior to removal based on statutory and regulatory provisions implementing the CAT. The statutory provision is the FARRA, which states that "[i]t shall be the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture." Pub. L. No. 105-277, 112 Stat. 2681-822 (codified at 8 U.S.C. § 1231 note). The CAT's implementing regulation provides that removal is to be withheld if the applicant establishes that "it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 208.16(c)(2). Petitioners argue that "statutory immigration law, having granted individuals with final orders of removal a mandatory right to protection from persecution and torture, also grants them the right to file motions to reopen based on changed country conditions and to have these motions adjudicated prior to removal." Pet'rs Mot. at 21.

However, the plain language of these statutes — which is the principal guidepost for statutory interpretation, Chapman v. Higbee Co., 319 F.3d 825, 829 (6th Cir. 2003) — does not support this conclusion. Neither the INA nor CAT/FARRA contains an express procedural guarantee that a motion to reopen on the basis of INA or CAT/FARRA is to be adjudicated prior to removal.[9]

Petitioners instead rely on 8 U.S.C. § 1229a(c)(7), the subsection governing motions to reopen. That subsection states that:

---

[9] Amici argue that "[t]he [United Nations] Committee against Torture has made clear that the principles of non-refoulement set forth in Article 3 of the Convention Against Torture includes both a substantive obligation as well as a procedural obligation." Am. Br. at 14 (Dkt. 80). They state that the Committee Against Torture has taken the position that adjudication "must occur before removal is effectuated." Id. at 15. While amici cite to decisions by various U.N. bodies requiring adjudication prior to removal, neither they, nor Petitioners, have cited any American case law holding that CAT/FARRA contains a procedural obligation.

23

> There is no time limit on the filing of a motion to reopen if the basis
> of the motion is to apply for relief under sections 1158 or 1231(b)(3)
> of this title and is based on changed country conditions arising in the
> country of nationality or the country to which removal has been
> ordered, if such evidence is material and was not available and
> would not have been discovered or presented at the previous
> proceeding.

8 U.S.C. § 1229a(c)(7)(C)(ii); see also 8 C.F.R. § 1003.23(b)(4) ("time and numerical limitations"

do not apply to motions to reopen based on 8 U.S.C. 1231(b)(3) or the CAT claiming changed

country conditions).

According to Petitioners, the "statutory entitlement" to adjudication prior to removal is

"clear" from the text of 8 U.S.C. § 1229a.  The Court disagrees.  The statute states that there is no

time limit to file a motion to reopen; it does not state that removal is to be automatically stayed

pending adjudication.  To the contrary, the regulations governing motions to reopen indicate that

removal is generally not stayed pending adjudication of the motion.   Title 8 C.F.R. §

1003.23(b)(1)(v) states that "[e]xcept in cases involving in absentia orders, the filing of a motion

to reopen or a motion to reconsider shall not stay the execution of any decision made in the case."

Further, 8 C.F.R. § 1003.6, the regulation addressing stays pending a decision by the BIA,

states that removal will not be automatically stayed pending the appeal of an immigration judge's

denial of a motion to reopen, unless the motion was filed based on an order of removal entered in

absentia.  See 8 C.F.R. §1003.6(b); see also Jusufi v. Chertoff, No. 07-15450, 2007 WL 4591760,

at *3 (E.D. Mich. Dec. 28, 2007) ("Petitioner's assertion that Congress could not have intended to

allow an alien to be removed before all of his administrative remedies are exhausted is belied by

the fact that Congress selectively imposed an automatic stay of removal orders under some

circumstances but declined to do so in others."); id. at *4 ("grant of discretionary authority with

respect to certain actions suggests that Congress, contemplated situations just such as this one but elected not to provide protection against deportation in all instances").

The above leads the Court to conclude that there is no statutory right to adjudication of motions to reopen prior to removal.

### b. Procedural Due Process

Petitioners also contend that they have a constitutional right not to be removed prior to adjudication of their motions to reopen. Specifically, Petitioners argue that the Fifth Amendment's Due Process Clause prohibits their removal prior to adjudication under the circumstances present here. In support of their claim, Petitioners list several factors at play: "the speed of the proposed deportation dates; the government's insistence on removal before Petitioners can file motions to reopen and before those motions have been adjudicated; and the obstacles posed by detention far from home to obtaining and communicating with counsel." Pet'rs Mot. at 22. The Government argues that there is no due process violation because Petitioners could have filed motions to reopen at any time prior to their arrest if they believed conditions had changed in Iraq. Gov't Resp. at 22. It notes that some Petitioners did in fact file motions to reopen as early as 2011. Finally, the Government argues that the circumstances are not emergent in light of the procedural protections afforded by the administrative process.

"Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." Mathews v. Eldridge, 424 U.S. 319, 332 (1976). "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" Id. at 333 (quoting Armstrong v. Manzo, 380 U.S. 545, 552 (1965)).

25

"Fifth Amendment guarantees of due process extend to aliens in [removal] proceedings." Vasha v. Gonzales, 410 F.3d 863, 872 (6th Cir. 2005) (quoting Huicochea-Gomez v. INS, 237 F.3d 696, 699 (6th Cir. 2001)). "A violation of due process occurs when 'the proceeding was so fundamentally unfair that the alien was prevented from reasonably presenting his case.'" Hassan v. Gonzales, 403 F.3d 429, 436 (6th Cir. 2005) (quoting Ladha v. INS, 215 F.3d 889, 904 (9th Cir.2000)).

The Court agrees with the Government that the administrative process is equipped to adjudicate the substance of Petitioners' motions to reopen. But the process Congress erected can only adjudicate claims that are actually before them. As noted above, Petitioners' efforts to prepare and file motions have been stymied by their successive transfers to out-of-state facilities, as well as by the reduced access to counsel those facilities afford Petitioners. The Court takes the Government at its word that these transfers have been conducted only for operational purposes and not with the intent to interfere with the right to counsel. Nevertheless, the effect of these transfers has been to severely disrupt this right.

The record contains numerous examples of the difficulties Petitioners and their attorneys have had preparing motions to reopen and stay removal since their detainment. Susan Reed, the managing attorney at the Michigan Immigrant Rights Center, states that Petitioners' original signatures are required on motions to reopen and stay removal, a requirement made more difficult by counsel's limited access to the detention facilities. Reed Decl. ¶ 12. Kaur described how, after making the four-hour drive from Detroit to the Youngstown, Ohio facility, she was twice denied an opportunity to meet with her clients. Kaur Decl. ¶¶ 7-9. Markos has described a fifteen-minute limit on phone calls in the Arizona detention facility, with costs often reaching up to twenty cents per minute. Markos Decl. ¶¶ 20-21. Markos' account is corroborated by William Peard, an ACLU

26

attorney, who notes that detainees at the Arizona facility are only afforded free phone access to two local legal service providers who are not equipped to handle the large number of Petitioners in need.  Peard Decl. ¶ 9.  Importantly, detainees are not given free phone access to private attorneys offering pro bono services, nor are they given free access to attorneys who are located in the states in which their final orders of removal were issued.  Id. ¶ 10.

These difficulties have prevented Petitioners from availing themselves of the administrative system's procedural protections.[10]  For those who have been able to file motions, their ability to further litigate these motions will almost assuredly be extinguished upon their removal to Iraq.  Those who are tortured or killed will obviously not be able to argue their motions; even those who are able to evade this treatment will likely be focused on their safety, rather than devoting the requisite attention to their legal proceeding.

To the extent the Government argues that Petitioners should have filed motions to reopen prior to their detainment, the Court has already noted that such a filing would have been academic. See Hamama, 2017 WL 2953050 at *12.  It was not until 2014 that the changed conditions in Iraq started to become apparent.  The threat of ISIS to religious minorities and others was not recognized by the much of the international community until June 2014.  Lattimer Decl. I ¶ 9. Further, threats posed by other groups to certain members of the class did not become apparent until well after.  See, e.g., Heller Decl. ¶ 20 (2016 State Department report noted the extent to which members of the PMF were retaliating against Sunni civilians).

Even when the threat was realized, Iraq's continued resistance to repatriation, combined with the prohibitive cost of preparing motions to reopen, made filing motions impractical.  The

---

[10] While the Government has submitted declarations describing generally the efforts the detention facilities undertake to provide phone access, none of the declarations rebuts the specific instances of interference alleged by Petitioners and the counsel of individual class members.

Government's declarations indicate that, prior to the March 2017 agreement, Iraq would only accept repatriation for those individuals with unexpired passports.  Schultz Decl. ¶ 6.  The country was unwilling to issue travel documents or accept charter flights, two measures that made carrying out removals exceedingly difficult for the Government.  <u>Id.</u>  This difficulty was well known to Petitioners, the majority of whom had been living in their communities subject to final orders of removal for a decade or more with little expectation that they would be removed in light of Iraq's refusal to accommodate repatriation.  <u>See</u> Kitaba-Gaviglio Decl. ¶ 8.  One of the named Petitioners, Jihan Asker, had been living in her community subject to a final order of removal since 1986.  Am. Hab. Pet. ¶ 20.  Until notified otherwise, Petitioners had little reason to suspect that the effort and cost of preparing a motion to reopen — up to $80,000 in a case of this nature — was necessary, given that they had been living peaceably for long periods of time under limited supervision.  <u>See</u> Reed Decl. ¶ 10.

The Government notes that two of the Petitioners, Barash and Al-Dilaimi, filed motions to reopen prior to detainment, in 2011 and 2012, respectively.  <u>See</u> Sidhu Decl., Ex. F. to Gov't Resp., ¶ 10 (Dkt. 73-7); Crowley Decl., Ex. C to Gov't Resp., ¶ 8 (73-4).  These two exceptions prove the rule: hundreds of others reasonably assumed that such an undertaking was not required until they were informed of Iraq's change in policy.  Now that Petitioners are on notice that filing motions is necessary, due process concerns would require that they be given a fair opportunity to present their cases.

The Government argues that even if there has been a due process violation, this Court cannot assess the prejudice inflicted upon each Petitioner, given the individualized nature of their claims.  <u>See</u> <u>Graham v. Mukasey</u>, 519 F.3d 546, 549-550 (6th Cir. 2008) ("[T]o establish the

requisite prejudice, [the alien] must show that the due process violations led to a substantially different outcome from that which would have occurred in the absence of those violations.").

But what the Government ignores is that the record contains compelling evidence that many Petitioners would be significantly impeded from filing motions to reopen. This is supported by abundant evidence concerning (i) the large number of Iraqis simultaneously affected by this sudden change in policy; (ii) the intense time and logistic pressures placed on the immigration bar in preparing necessary filings; (iii) the interference with attorney-client communications as detainees are shuttled around the country; (iv) the significant cost of the legal work and; (v) the difficulty that Petitioners would face trying to present their claims from foreign soil if they were removed prior to adjudication.

Therefore, this record, as a whole, demonstrates significant prejudice. The due process violation at issue here — impeded access to the administrative system — is far different than due process challenge brought by way of a run-of-the-mill petition for review in the courts of appeals. The typical due process challenge is whether a decision by the immigration court rendered the proceeding fundamentally unfair. See, e.g. Vasha, 410 F.3d at 872. In such a case, the concept of prejudice is of a specific and individualized nature. Here, Petitioners are arguing that their due process rights will be violated by extraordinary circumstances impacting their ability to get into a system of adjudication at a meaningful time for the protection of their rights. Prejudice is the denial or impeded access itself, rather than the loss of a particular outcome. As a result, Petitioners need not make a more specific showing of prejudice from a particular ruling that impacted the substantive outcome of their case.

Given the compelling evidence that Petitioners have presented regarding the probable deprivation of a meaningful opportunity to present their INA and CAT/FARRA claims to the

immigration courts and courts of appeals, they have shown a likelihood of success on their due process claim.

### c. Habeas

The same concerns that inform traditional notions of due process support the view, previously expressed by the Court, that the right of habeas corpus would be significantly compromised without according pre-removal adjudication. And what the Court has said regarding habeas rights in its earlier pronouncements on jurisdiction is applicable in the context of the merits.

In finding a Suspension Clause violation here, the Court has held that the extraordinary circumstances of this case — the longstanding unenforced removal orders, the detention far from home followed by successive transfers, and limited access to counsel — undermined the alternative to habeas set forth in the REAL ID Act. Because an injunction pending adjudication of the motions and the filing of petitions for review in the courts of appeals would allow for the requisite judicial review, its issuance is necessary to vindicate Petitioners' habeas rights.[11]

### 2. Irreparable Harm, Potential Injuries to Others, and the Public Interest

The "irreparable injury" factor requires that any harm to the plaintiff be "actual and imminent." Abney v. Amgen, Inc., 443 F.3d 540, 552 (6th Cir. 2006). As stated above, Petitioners have provided the Court with ample evidence of the risk of persecution, torture, and death they face if removed to Iraq. Such grievous harm unquestionably establishes irreparable harm. See

---

[11] The Government's contention that the difficulties faced by Petitioners are common to all litigants is without merit. Contrary to the Government's unsubstantiated assertion, everyday litigants are not forced to prepare motions while being transferred to successive detention facilities with limited access to counsel and their families. Further, litigants are not normally faced with the compressed time frame involved here. Nor are typical litigants forced to conduct their legal battle from foreign shores, on the run from hostile forces seeking to kill, torture, or otherwise persecute them.

Hadix v. Caruso, 492 F. Supp. 2d 743, 753 (W.D. Mich. 2007) ("The Injunction in question is necessary to prevent irreparable harm, including bodily injury and death.").

While the Government notes that the Court cannot individually assess the risk of return for each Petitioner, there are several threats that apply to the entire class. For instance, the record is clear that all Petitioners will be targeted for torture or death based solely on their association with America. Lattimer II Decl. ¶¶ 2, 9 (noting that Petitioners will be targeted simply because of their association with "western interests"). Further, the perpetrators will not be limited to just ISIS, whose fortunes and influence may wax and wane with time. The record demonstrates that other Sunni groups, Shi'a militias backed by Iran, as well as Iraq's own internal security forces, harbor prejudice towards those affiliated with America, which will manifest itself in the form of torture and extrajudicial killings. Id. ¶ 9; Smith Decl. ¶¶ 1-2.

All Petitioners are also at risk due to the media coverage of their criminal records. Smith Decl. ¶ 5. And it appears that most Petitioners are religious minorities who will face persecution at the hands of ISIS, other sectarian militias, or Iraq's own forces. This harm is also imminent, as the Government's own declaration indicates that a charter flight was scheduled to depart prior to this Court's stay of removal. Schultz Decl. ¶ 8.

The Government also argues that Petitioners cannot establish irreparable harm because they will not be removed to ISIS-controlled territory. This assurance likely provides little solace to Petitioners. As an initial matter, the Government does not establish how it can ensure that each Petitioner will avoid ISIS territory once removed to Iraq. While it states that Petitioners will be flown into Baghdad, a city not controlled by ISIS, it does not discuss where Petitioners are supposed to go from there. See Id. ¶ 6. Further, the uncertainty created by the ever-shifting fortunes of war means that areas that are not currently under ISIS control could very well be

31

captured by that group after Petitioners are removed. Finally, as stated above, the threat to Petitioners is not limited to ISIS. Their status as members of religious minorities and affiliation with America puts them at risk from a variety of Sunni and Shi'a militias. See Lattimer II Decl. ¶ 9.

This grievous harm must be weighed against the harm to the Government and the public interest. See Nken v. Holder, 556 U.S. 418, 435 (2009) ("Once an applicant satisfies the first two factors, the traditional stay inquiry calls for assessing the harm to the opposing party and weighing the public interest. These factors merge when the Government is the opposing party."). The Government argues that its interest in the prompt, efficient removal outweighs Petitioners' "speculative, non-yet-substantiated" claims of irreparable harm. Gov't Resp. at 30. The Court disagrees.

Petitioners' claims are far from speculative. Each Petitioner faces the risk of torture or death on the basis of residence in America and publicized criminal records; many will also face persecution as a result of a particular religious affiliation. While cost and efficiency in administering the immigration system are not illegitimate governmental concerns, such interests pale to the point of evaporation when weighed against the potential lethal harm Petitioners may suffer. A relatively brief delay in the removal process to assure that Petitioners have a meaningful opportunity to invoke the process Congress established is a small price to pay in service to the public interest in fundamental fairness.[12]

---

[12] Regarding its ability to conduct efficient removals, the Government expresses concern that an injunction "has the potential to create duplicative review paths in thousands of cases." Gov't Resp. at 29. This concern is puzzling given that this Court's ruling is meant to foster review exclusively in the immigration courts and the courts of appeals. Only those courts will conduct a substantive review of Petitioners' INA and CAT/FARRA claims. To the extent the Government is concerned that a flood of future litigants will seek habeas relief in light of this Court's ruling, the Court notes that the REAL ID Act will serve to quickly divest courts of subject-matter jurisdiction, unless, like

The above factors mandate issuance of a preliminary injunction.[13]

## IV. CONCLUSION

For the foregoing reasons, the Court grants Petitioners' motion for a preliminary injunction (Dkt. 77). The Court orders as follows:

1. Respondents Adducci, Homan, Kelly, and any other federal officials and personnel involved in the removal process, as well as all acting in concert with them, are preliminarily enjoined from enforcing final orders of removal directed to any and all Iraqi nationals in the United States who had final orders of removal on June 24, 2017, and who have been, or will be, detained for removal by ICE, except as provided below.

2. This preliminary injunction shall be terminated as to a particular class member upon entry by the Court of a stipulated order to that effect in connection with any of the following events:

> a. a class member's failure to file a motion to reopen with the appropriate immigration court, or, if appropriate, the BIA not later than ninety days following Respondents' transmittal to the class member of the A-file and ROP pertaining to that class member;

> b. a class member's failure to timely appeal to the BIA a final adverse ruling from an immigration judge;

---

here, the court is presented with extraordinary facts giving rise to a successful as-applied Suspension Clause challenge.

[13] The Court notes that its issuance of a preliminary injunction comes prior to a decision on class certification. However, the Sixth Circuit has held that "there is nothing improper about a preliminary injunction preceding a ruling on class certification." Gooch v. Life Inv'rs Ins. Co. of Am., 672 F.3d 402, 433 (6th Cir. 2012); see also Rodriguez v. Providence Cmty. Corr., Inc., 155 F. Supp. 3d 758, 767 (M.D. Tenn. 2015) ("[A] district court may, in its discretion, award appropriate classwide injunctive relief prior to a formal ruling on the class certification issue based upon either a conditional certification of the class or its general equity powers."); Newberg on Class Actions § 4:30 (5th ed.) (court is permitted to issue a preliminary injunction prior to ruling on class certification). Given the grave issues at stake, and the uniform nature of the challenged Government conduct, the Court believes it equitable to issue a preliminary injunction prior to class certification. Further the Government is correct that the award of class-wide relief in habeas proceedings is a subject of debate. See Harris v. Nelson, 394 U.S. 286, 294 n.5 (1969) ("The applicability to habeas corpus of the rules concerning . . . class actions has engendered considerable debate."). However, the Government has not cited any Supreme Court or Sixth Circuit decision prohibiting preliminary relief to a putative class in a habeas proceeding.

c. a class member's failure to timely file a petition for review with the appropriate United States Court of Appeals of a final adverse ruling from the Board of Immigration Appeals together with a motion for a stay;

d. the denial of a motion for a stay by the United States Court of Appeals;

e. a class member's consent that this preliminary injunction be terminated as to that class member.

If the parties dispute whether any of the foregoing events has transpired, the matter will be resolved by the Court by motion. Termination of this preliminary injunction as to that class member shall abide the Court's ruling.

3. As soon as practicable, Respondents shall transmit to each class member that class member's A-file and ROP, unless that class member advises Respondents that he or she will seek to terminate this preliminary injunction as to that class member.

4. Commencing on August 7, 2017, and continuing every other Monday thereafter, Respondents shall report to class counsel the following information: attorney representation of individual class members; transmittal of A-files and ROPs; status of filing and adjudication of motions to reopen, stay, and petitions for review; detention locations, transfers, releases from detention. The parties may negotiate additional information that should be supplied; agreement shall be memorialized in a stipulated order.

5. The Court will conduct a status conference with counsel on August 31, 2017 at 2:00 p.m. to assess what modifications, if any, are required to this Order, and to discuss further proceedings in this case.[14]

6. This preliminary injunction shall remain in effect unless modified by the Court.

SO ORDERED.

Dated: July 24, 2017                              s/Mark A. Goldsmith
       Detroit, Michigan                          MARK A. GOLDSMITH
                                                  United States District Judge

---

[14] Some of the specific provisions of the preliminary injunction are based on Petitioners' contentions in the briefing and at argument. Specifically, the Court has adopted a modified definition of the class to avoid any ambiguity in Petitioners' earlier definitions, which had defined the class as including those who had been or would be arrested "as a result of Iraq's recent decision to issue travel documents to facilitate U.S. removal." The Court agrees that the phrase is unnecessary. In addition, reporting requirements are appropriate to monitor the progress of class members in preparing and filing motions to reopen and to stay.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on July 24, 2017.

s/Karri Sandusky
Case Manager