## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**USAMA JAMIL HAMAMA,** et al.,

      Petitioners and Plaintiffs,

v.

**REBECCA ADDUCCI**, et al.,

      Respondents and Defendants.

Case No. 2:17-cv-11910

Hon. Mark A. Goldsmith
Mag. David R. Grand

Class Action

## JOINT STATUS REPORT

      The Petitioners/Plaintiffs ("Petitioners") and Respondents/Defendants ("Respondents") submit the following Joint Status Report in advance of the Court's status conference scheduled for September 19, 2017.

      Given the length of this report, a Table of Contents is included for the Court's convenience.

## Table of Contents

I.  Procedure for Determining Whether a Class Member's Desire to Return to Iraq is Knowing and Voluntary ......................................................3

II.  Transmittal of A-Files and Records of Proceedings (ROPs) to Class Members ........................................................................................15

III.  Notice to Putative Class........................................................................28

IV.  Definition of Putative Class..................................................................32

V.  Communications by ICE with Class Members Regarding This Litigation................................................................................................41

VI.  Information on Hunger Strikers............................................................43

VII.  Revision of Protective Order to Address Amicus and Case Coordination Issues ...........................................................................46

VIII.  Method For Getting Up-to-Date Detainee Location Information ...............49

IX.  Briefing Schedule and Sequencing of Next Steps in Litigation...................51

## I.      Procedure for Determining Whether a Class Member's Desire to Return to Iraq is Knowing and Voluntary

This Court's Preliminary Injunction Order, ECF 87, Pg.ID# 2355-56,

provides:

> 2. This preliminary injunction shall be terminated as to a particular class member upon entry by the Court of a stipulated order to that effect in connection with any of the following events:
>       . . .
> e. a class member's consent that this preliminary injunction be terminated as to that class member.
>
> If the parties dispute whether any of the foregoing events has transpired, the matter will be resolved by the Court by motion. Termination of this preliminary injunction as to that class member shall abide the Court's ruling.

The parties have been discussing a process for identifying individuals who

voluntarily consent to removal to Iraq, but have been unable to agree on that

process.

### Petitioners' Statement

Petitioners have no objection to Respondents' desire to affirmatively solicit

the entire group of Iraqi detainees to find out which, if any, may wish to terminate

the protection from removal afforded by this Court's Preliminary Injunction Order.

However, ICE detention is an environment rife with misinformation and the

potential for coercion, where the threat of prolonged or indefinite incarceration can

lead people who are unaware of their rights to forego them in order to be released

from detention. The declarations attached to Petitioners' last status report detail the

specific ways in which ICE employees and/or contractors are subjecting the detainees to harassment, factual distortion, and pressure to abandon their rights. *See* Elias Decl., ECF 94-4, Pg.ID# 2448 *et seq.*; Mallak Decl., ECF 94-5, Pg.ID# 2454 *et seq.*; Alkadi Decl., ECF 94-6, Pg.ID# 2461 *et seq.*; Peard Decl., ECF 94-7, Pg.ID# 2466 *et seq.*; Free Decl., ECF 94-8, Pg.ID# 2470 *et seq.*; Peard Decl. ECF 94-10, Pg.ID# 2493 *et seq.*; Hernandez Decl., ECF 94-11, Pg.ID# 2499 *et seq.*; Free Letter, ECF 94-13, Pg.ID# 2506 *et seq*.

Given the grave consequences of removal, which could result in persecution, torture, or even death, it is critical that detainees who elect to forego the protections of the preliminary injunction do so knowingly and voluntarily. Petitioners therefore believe that it is essential to individually evaluate any class member's expressed desire to be returned to Iraq. In Petitioners' view, a waiver form—signed by a detainee under unknown circumstances in the face of unknown pressures and potentially in a language they do not speak or read well—cannot provide sufficient assurance of knowledge and voluntariness.

Since the last status conference, Petitioners have refined their proposal for the process by which detainees who may wish to forego the protections of the Preliminary Injunction Order identify themselves to ICE and Petitioners' counsel. On September 4, 2017, Petitioners provided Respondents with their revised proposal, which was drafted to address ICE's concerns about documenting an

4

individual's desire for removal. An updated version of this proposal is attached as Exhibit 1, and is summarized below.

Petitioners propose that ICE distribute a "Detainee Request for Prompt Removal to Iraq" form to all detainees, along with Know Your Rights information provided by class counsel. The proposed form, attached as Exhibit 1.A, instructs detainees who have an immigration attorney to have that attorney contact both Petitioners' and Respondents' counsel. Petitioners and Respondents agree that assurances from a detainee's counsel about knowledge and voluntariness can provide sufficient confidence to move forward. In such cases, the detainee's counsel, putative class counsel, and Respondents' counsel can stipulate to removal. Indeed, that has already been done for one individual.

For detainees who do *not* have immigration counsel, Petitioners' proposed form allows detainees to indicate that they wish to be removed to Iraq. The form explains that Petitioners' counsel will then try to find an attorney to meet with the detainee and advise the detainee on this decision; it also states clearly that the detainee is not required to meet with the attorney. The form does not waive any rights.

Upon receipt of a detainee's form indicating a possible interest in removal, Petitioners' counsel will ask the advocates already working to locate immigration counsel for class members to identify a pro bono lawyer to visit the detainee's

5

detention location. The pro bono attorney would (a) advise the detainee about available options, (b) confirm that no pressure is being exerted, and (c) ensure that any decision to forego the protections of this Court's stay is knowing and voluntary. The pro bono lawyer can also be alert to the possibility of any indicia of incompetency. Some detainees may wish to acquiesce to their own removal; in that case, the interview will provide Petitioners' counsel the necessary information on which to base a stipulation, following the Court's previously established process. The plan is that these lawyers will be independent—not Petitioners' class counsel—to avoid any possible conflict of interest.

If, after the detainee meets with the volunteer attorney, the detainee still wishes to be removed, the detainee would sign a "Detainee Stipulation to Prompt Removal to Iraq", attached as Exhibit 1.B. This second form could be provided to the detainee by the pro bono lawyer. In addition, the attorney who met with the detainee would write a declaration attesting that advice was given and that, in the attorney's opinion, the detainee's waiver of rights is knowing and voluntary. A sample declaration is attached as Exhibit 1.C.

On the basis of the Detainee Stipulation to Prompt Removal to Iraq and the attorney declaration, the Petitioners and Respondents would file a stipulation and proposed order with the Court providing that the detainee is no longer covered by the preliminary injunction. A sample declaration is attached as Exhibit 1.D. This

6

process is designed to ensure that the Court has sufficient assurance, when entering orders that could result in removal (and potentially great harm) to individual detainees, that those individuals have made knowing and voluntary choices to be removed.

To address ICE's request that there be an end date for this process, Petitioners propose a goal of conducting attorney interviews within three weeks of notification that a detainee seeks removal. Whether this is feasible will depend on several factors, including how many detainees seek removal, how far-flung their detention locations are, whether they are repeatedly transferred, what steps ICE is willing to take to facilitate communications between counsel and detainees in remote locations, and whether ICE provides information about removal requests as they occur or all at once.

To address ICE's request that detainees not be required to meet with an attorney, Petitioners have drafted the form to clearly state that no such meeting is required. While detainees cannot be required to meet with counsel, Petitioners are concerned that the same coercion, pressure and misinformation that could affect detainees' choices about removal could also undermine the reliability of a written waiver of their opportunity to meet with counsel. Accordingly, detainees who decline to meet with counsel should do so in person when the attorney seeks to meet with them, rather than simply by signing a form.

If a detainee declines to meet with a pro bono attorney, it is Petitioners' view that the record will contain insufficient evidence to support a stipulated agreement to the detainee's waiver of rights. The government may choose to move for removal, but it will then be the government's burden to demonstrate to the satisfaction of the Court that the waiver of rights was knowing and voluntary.

Petitioners note that the government's recent motion relating to the removal of one detainee, ECF 104, has raised questions about how the parties and Court should handle cases where competency is at issue. *See Matter of M-A-M-*, 25 I & N Dec. 474, 479-81 (BIA 2011) (holding that when indicia of incompetency are present, an immigration judge must determine whether a respondent is sufficiently competent to proceed without safeguards and must state on the record the basis for his/her determination of a respondent's competency). The stipulation process should either note that there are no indicia of incompetency, or describe the safeguards used to allow fair proceeding notwithstanding such indicia. The parties will need to address situations where there are indicia of incompetency on a case-by-case basis.

*Petitioners' Objections to ICE's Proposal*

Respondents have not responded in writing to Petitioners' proposal. Rather, during the parties' recent discussions, Respondents' counsel has referred back to a waiver form that ICE drafted prior to the last status conference. *See* ECF 96-2,

8

Pg.ID# 2593 (waiver form refiled as Exh. 2). ICE proposes that class members would use that form to waive their rights. Although the form requires individuals requesting removal to state that they "do not wish to further consult with an attorney," ICE has also suggested that once Petitioners' counsel have those forms, they (or volunteer counsel) could nonetheless attempt to meet with the detainees during a short window (perhaps a week) before ICE would file motions with the Court asking the Court to allow removal based on the forms.

Petitioners do not believe detainees can make knowing and voluntary choices under these circumstances. As outlined in the previously-filed declarations, class members are subject not just to the inherently coercive atmosphere of detention, but also to misinformation and pressure to acquiesce to removal or face prolonged detention. Moreover, although ICE has agreed in principle to provide Know Your Rights information about the *Hamama* litigation, such information, by definition, is only about this case. Information about the *Hamama* litigation is not the same as individualized legal advice about that detainee's specific immigration situation, the likelihood of immigration relief, the likelihood of release from detention, and other issues that are critical for detainees' ability to make knowing and voluntary decisions about possible removal. In other words, a detainee's signature on that form establishes neither voluntariness nor knowledge.

ICE's proposal also promises to be extraordinarily burdensome for the Court since virtually every removal form that is signed will result in a contested motion. Petitioners' counsel cannot know, based on a signed form mailed to ICE, whether the detainee made a knowing and voluntary choice, whether the detainee is competent, or even whether it was actually the named detainee who signed the form. Petitioners' counsel cannot ethically stipulate to removal on that basis, meaning that instead of entering stipulations based on an orderly process, the parties will need to brief and this Court will need to decide motion after motion about whether specific detainees made voluntary and knowing choices to give up their rights.

Petitioners' concerns about ICE's proposed process are exacerbated by the fact that ICE has thus far been unwilling to allow attorneys to meet with detainees who allegedly desire to be removed. For weeks, Petitioners have been requesting the names of any class members whom ICE believes want to be removed to Iraq. Respondents claim that there are approximately a dozen individuals who wish to be removed, but have refused to provide their names to Petitioners' counsel, making it impossible for Petitioners to verify those claims or begin the process of determining whether those individuals actually want to give up their rights.

If those detainees truly desire removal, then ICE's refusal to share their names is prolonging their detention and preventing the prompt removal that ICE

claims is its goal. If the detainees are being coerced or if they are simply misinformed about their rights or immigration options, meetings with attorneys would shed light on those issues. In any case, it takes time and effort to identify pro bono counsel who can meet with these detainees (particularly if they are in remote locations). ICE has expressed concern that attorney meetings would introduce delay, but has refused to provide information to allow a reasonable process to begin. Unless ICE's actual objective is to prevent pro bono attorneys from meeting with the detainees, there is no reason to delay starting that process for those detainees who have already allegedly expressed a desire for removal. If Petitioners' counsel can ascertain that detainees are making voluntary and knowing choices to be removed, a prompt stipulation will follow.

### **Respondents' Position**

The parties agree that this is an urgent issue that must be addressed immediately but, despite numerous attempts, have been unable to agree on a process for doing so. The fundamental differences between the parties comes down to two things: (1) should the form that detainees return to ICE if they do not want to be part of this case and want to be removed to Iraq, and are unrepresented by counsel, include any indicia that the detainees actually understood the form and waived their rights under the PI Order; and (2) whether every unrepresented

detainee must first meet with an attorney before he or she can consent to the termination of the Court's PI Order as to the individual.

Respondents' proposal is that ICE would deliver two forms to detainees: (1) The ACLU's Know Your Rights information sheet which explains the proceedings in this case; and (2) a form that allows unrepresented detainees to express their desire to be removed to Iraq without further delay (Detainee Request for Prompt Removal to Iraq). *See* Exhibit 2, ECF No. 96-2. The Detainee Request for Prompt Removal to Iraq form includes several built-in safeguards. First, the form makes clear in several parts that it is only to be returned by individuals who do not have attorneys. Second, the form directs individuals who do not have an attorney, but wish to consult with one, to the ACLU's information sheet for guidance on how to do so. Third, the individual has to check a box indicating that he or she was able to read and understand the form, or that the form was read to the person in language understood by the individual. Fourth, an individual who wants to return this form must tear off the bottom portion to demonstrate his or her understanding of the instructions contained therein. Finally, the individual has to sign and date the form and mail it to ICE via the legal mail available at facilities.

Once Respondents receive a valid Detainee Request for Prompt Removal to Iraqvia the Legal Mail for ICE, Respondents would the share the form with Petitioners and allow them one week to visit the detention facility to meet the

individual. Following that one-week period, if the individual, an attorney, or Petitioners provided sufficient information indicating that the individual no longer wanted to be promptly removed, Respondents would not seek termination of the PI Order as to that individual. Otherwise, Respondents would proceed with either a stipulation, or a contested motion, before the Court as set forth in the PI Order. Should Respondents have any concerns with the intent expressed by the individual in the Detainee Request for Prompt Removal to Iraq form, they have the opportunity to express their concern not only during that one-week period, but also in opposition to a contested motion. This process provides a fair and full opportunity to allow unrepresented individuals to opt-out of the PI Order while at the same time providing multiple safeguards, including a potential contested motion before this Court, to ensure that the individual really wants to be excluded from the relief provided in the PI Order.

Petitioners have proposed their own process, but it is untenable in two ways. First, Petitioners' process requires that two separate forms be delivered to detainees. The first form would identify the individuals who want to be removed promptly, but would not include any indicia that the individual understood the forms. The second form would be delivered to the detainee at some time after Petitioners attempted—either successfully or unsuccessfully—to have an attorney visit the individual. Regardless of the seemingly open-ended nature of this process,

which is entirely in Petitioners' control, there are genuine concerns that this process requires individuals who previously clearly expressed their desire to be removed without meeting first with a lawyer, to now meet with Petitioners' attorneys. Second, it raises concerns about the criteria that will be used by attorneys, who presumably have no prior relationship with the individual, and who have not been retained by the individual, to assess whether the waiver was knowing and voluntary.

Respondents are currently aware only of individuals who have affirmatively approached them regarding potential removal. Respondents also have refrained from providing names of individuals who are seeking removal because, where the alien is represented, he or she needs to consult with his or her individual counsel, not putative class counsel. Respondents' position is that any unrepresented individuals seeking to be excluded from the class should be able to identify themselves and seek class exclusion through a uniform process agreed upon by both parties.  As a class has not yet been certified, opposing counsel currently has no relationship with these individuals and, as discussed in more detail below, Respondents' ability to disclose information to third parties is limited.

## II.    Transmittal of A-Files and Records of Proceedings (ROPs) to Class Members

This Court ordered on July 24, 2017 ordered that a 90-day period for filing motions to reopen commences upon "Respondents' transmittal to the class member of the A-File and ROP pertaining to that class member." Preliminary Injunction Order, ECF 87, Pg.ID# 2355. The Court further ordered that:

> As soon as practicable, Respondents shall transmit to each class member that class member's A-file and ROP, unless that class member advises Respondents that he or she will seek to terminate this preliminary injunction as to that class member.

*Id.* at Pg.ID# 2356.

The parties disagree on two issues: (1) timeline; and (2) process for producing records.

### Petitioners' Position

*Timeline for Production of the A-Files and ROPs*

To date, Respondents have not transmitted any A-Files or ROPs to class members. By the time of the status conference, 58 days—almost two months—will have passed since the Preliminary Injunction Order. A normal (non-expedited) discovery deadline is 30 days. Fed. R. Civ. Proc. 34(b)(2)(A). The U.S. Citizenship and Immigration Services website shows the current average processing time for FOIA requests for individuals scheduled for hearings before an immigration judge

as 43 days,[1] while the Executive Office of Immigration Review typically takes one to three months to respond to FOIA requests. *See* Abrutyn Decl. ¶ 6, ECF 77-28, Pg.ID# 1901.

Not only has the government not produced any A-Files or ROPs, Respondents have refused to commit to a specific date for production. Indeed, despite repeated requests, the government has been unwilling to provide an estimate for when these files will be ready—or even an estimate of when an estimate might be available. This is simply unreasonable.

Respondent's failure to provide A-Files and ROPs is prejudicing class members' claims for relief from removal and needlessly prolonging their detention. For class members who have not yet filed motions, prompt production of the files is critical to prevent unnecessary and prolonged incarceration. For individuals who already filed emergency motions to reopen, the practical result of Respondents' delay is that they lack the information for effective presentation of their cases and

---

[1] *See* https://www.uscis.gov/about-us/freedom-information-and-privacy-act-foia/foia-request-status-check-average-processing-times/check-status-foia-request. USCIS processes FOIA requests by individuals with a final order of removal under a slower track, with an average processing time of 109 days. *Id.*, *see also* Abrutyn Decl. ¶ 7, ECF 77-28, Pg.ID# 1901. But the point here is that more than 43 days— the normal time for processing A-Files in pending immigration cases—has elapsed.

could end up removed to a country where they face persecution, torture, and death if their motions to reopen are denied before they receive A-Files and ROPs.[2]

For example, in one case, a class member filed emergency motions to reopen and for a stay of removal in the Immigration Court in Eloy, Arizona on July 24. On August 23, the class member moved to defer adjudication of the motion to reopen, on the basis that it had been filed without benefit of the A-File or Record of Proceedings; that ICE had not fulfilled its obligation under the *Hamama* Preliminary Injunction to provide the records; and that without those records, "Respondent cannot competently and thoroughly litigate his Motion to Reopen." *See* Motion to Defer Adjudication of Respondent's Motion to Reopen in Matter of R.A., Exh. 5. ICE opposed the request for deferral of adjudication because "the respondent is currently being detained at government expense" and because "respondent gives no indication as to how long it will take to obtain these materials." *See* Department of Homeland Security Opposition to Defer Adjudication in Matter of R.A., Exh. 6. ICE objected to an "open-ended pause on the adjudication of his motion to reopen," demanding a "hard date"—a demand

---

[2] As the Court knows, these kinds of bare bones motions have a much-reduced likelihood of their success. As of September 4, 2017, Petitioners' best information is that 187 Iraqis with final orders—133 of them detained—had so far sought to reopen their cases, nearly all filing prior to this Court's preliminary injunction order. It is highly likely that most of these rushed motions were filed without access to the A-Files and Records of Proceedings.

that is rich given ICE's current refusal to even estimate when it will produce the ordered files. *Id.* The Immigration Court denied both the motion to reopen and the motion to defer adjudication. *See* Order in Matter of R.A., Exh. 7. Should there be additional grounds to reopen presented in the A-File and ROP (at whatever indefinite point in the future the government produces them), the class member will have to attempt to supplement the record, move to reconsider, or file and litigate a new motion to reopen—all while detained, and potentially no longer subject to this court's stay.

Petitioners will further address the appropriate remedy for class members in this position in the next status report. In the interim, Petitioners request that the Court set a reasonable deadline for production of the A-Files and ROPs. Petitioners propose staged production:

- For all cases where motions to reopen have already been filed (whether granted, pending, or denied), the deadline should be 9/26/2017, one week after the date of the status conference, and 64 days after this Court's production order.

- Where no motion to reopen has been filed, but counsel for the class member has, since March 2017, appeared or been active, the deadline should be two weeks later, 10/10/2017.

18

- For unrepresented class members, for whom the process described in the next section will need to be completed prior to production, the deadline should be 10/17/2017.

*Process for Production of A-Files and ROPs*

Petitioners and Respondents have discussed the process for producing A-Files and ROPs. The Court's Preliminary Injunction Order states that the A-File and ROP should be "transmit[ted] to each class member." ECF 87, Pg.ID# 2356. While Respondents read this literally to mean that the file should be provided to class members in detention, Petitioners are concerned about the practicalities of such a literal implementation of the Court's order. It is not clear, for example, whether or how detainees would be able to keep, copy, or mail these files, which can number hundreds of pages. Under all three applicable versions of ICE's detention standards, facilities are permitted to impose sharp limits on the accessibility of personal legal files to detainees and are not required to facilitate mailing such materials to counsel or family members.[3] Copying and mailing would be both difficult and expensive, if available at all.

---

[3] ICE detention facilities are each governed by one of three sets of detention standards: the Performance Based National Detention Standards 2011 (PBNDS 2011); the Performance Based National Detention Standards 2008 (PBNDS 2008), and National Detention Standards, which were promulgated in 2000 (NDS 2000). Which set of standards applies is governed by the applicable detention contract.

*Continued on next page.*

Petitioners' proposal (modified since the last Status Conference to address the government's Privacy Act concerns, and provided to the government on September 4) is as follows:

First, if an attorney has filed a representation form (a G-28, EOIR-27, or EOIR-28) in January 2017 or later, the detainee's A-File and ROP should be transmitted to that attorney unless the detainee directs otherwise. The government proposes to send the files only to attorneys who have filed G-28s, DHS's attorney representation form. But many attorneys have filed appearances in the immigration courts using the DOJ forms, the EOIR-27 or EOIR-28, rather than the G-28. ICE has access to EOIR-27 and EOIR-28 data for each class member (indeed, it is part of the currently required disclosures) and given that the purpose of these files is to facilitate filings in Immigration Court, it makes sense for those appearances to suffice, rather than requiring each lawyer to file an additional DHS form.

---

*Continued from previous page.*

The rules governing legal documents and legal mail vary between the three. For PBNDS 2011, *see* § 5.1 (correspondence and other mail), https://www.ice.gov/doclib/ detention-standards/2011/5-1.pdf, and § 6.3 (law libraries and legal materials), at https://www.ice.gov/doclib/detention-standards/2011/6-3.pdf. For PBNDS 2008, *see* § 26 (correspondence and other mail), http://www.ice.gov/doclib/dro/detention-standards/pdf/correspondence _and_other_mail.pdf; § 36 (law libraries and legal material), http://www.ice.gov/doclib/dro/detention-standards/pdf/law_libraries_and_ legal_material.pdf. For NDS, *see* Access to Legal Material, https://www.ice.gov/doclib/dro/detention-standards/pdf/legal.pdf; Correspondence and Other Mail, https://www.ice.gov/doclib/dro/detention-standards/pdf/ corresp.pdf.

Second, ICE should provide a form to all class member detainees allowing them to select to whom the A-File and ROP will be sent: the detainee's attorney (who may not yet have an appearance on file), the detainee, or another person such as a family member (provided the detainee grants appropriate authorization under the Privacy Act). A copy of that proposed form, the "Detainee Designation of Representatives to Receive A-File and Record of Proceedings," is attached as Exhibit 3.A. Petitioners believe the proposed process is consistent with the language of the Court's Preliminary Injunction Order, which should be read to require production to the class member's counsel, if represented, and to the class member or his/her designee if the class member is unrepresented. Alternately, Petitioners request modification of the Order to allow for the process proposed.

In response to DHS's concerns that allowing class members to have their files sent to third parties (such as a family member who is seeking to retain counsel) would raise Privacy Act issues, the "Detainee Designation of Representatives to Receive A-File and Record of Proceedings" would include the standard DHS Privacy Act forms (DHS 60-001). *See* Exh. 3.B.

Third, Respondents should also provide Petitioners' counsel with a copy of the A-Files and ROPs, in PDF format. These documents are clearly relevant to Petitioners' claims, and Petitioners intend to ask for them in discovery. As a practical matter, it will be more efficient for Respondents to provide these

documents to class counsel at the same time as they are provided to class members and/or class members' individual counsel.

Again, to address the government's Privacy Act concerns, Petitioners have agreed that they will receive A-Files and ROPs only where the class members designate the *Hamama* class counsel as recipients of those files and complete a Privacy Act waiver. *See* Exh. 3.C. In addition, Respondents have expressed concern that different types of redactions may be necessary for class counsel compared to family members or immigration counsel. To address this concern, the Privacy Act waiver forms (DHS 60-001) will be pre-filled to ensure that the government need only redact each file one time with a consistent set of redactions across recipients. *See* Exhs. 3.A and 3.B.   (In other words, class members will be allowed to send their entire file or no file to class counsel and family members, rather than choosing to send certain parts of their file to class counsel and certain parts to family members.)

Finally, as discussed above, the delay in production of A-Files and ROPs is highly prejudicial to the class members, undermining their ability to file effective motions and prolonging their incarceration. Petitioners propose that the form allowing unrepresented class members to select the recipient of these documents be sent out as soon as possible, along with the class notice (discussed below), so that

22

Respondents can meet the deadlines proposed above. Respondents object to sending out the form at this time.

### **Respondents' Position**

Petitioners presume that providing A-files and ROPs is a simple matter of printing copies. This presumption is incorrect, both legally and practically. Petitioners' allegations that Respondents have failed to act on the Court's order are also incorrect. Respondents are still primarily a paper-based agency – compliance with this request includes locating all A-files, some of which are in storage with USCIS, the custodial agency for A-files; scanning all of the files, many of which are hundreds of pages; and uploading each of them into internal data systems for review and redaction in coordination with several other government agencies whose documents are in the files. The files are currently located in a number of jurisdictions nationwide. Respondents have begun the process of locating and scanning files for the review and redaction process. Respondents anticipate files will be produced on a rolling basis. Further, the government has a finite amount of time and resources for handling this production order. Respondents have had to reassign personnel to handle this project in addition to their regular duties. Respondents' efforts in this case must be undertaken in conjunction with other cases with discovery deadlines, FOIA actions requiring review and production of large numbers of documents, and other litigation obligations. Respondents are

working to scan files as quickly as possible and have made regular progress since the Court's order, but anticipate that it will be several more weeks before any A-files will be ready for production, as files must be reviewed, redacted, finalized, and then sent to the appropriate field office for service.  Respondents are using their best efforts to comply with the order as quickly as possible, but the number of variables, particularly the required coordination with and input from other government agencies, the difference in redactions that would be necessary under Petitioners' proposal and the issues Respondents require the Court to address to obtain clarity on those points, prevents Respondents from providing an exact date for production at this time.

Respondents have informed Petitioners that Respondents are subject to a number of privacy and disclosure laws with respect to A-file production. Petitioners' position and the Court's order make no exception for classified documents, confidential information, or information subject to protection and privileges, including attorney work product protection, and attorney-client, deliberative process, and the law enforcement privileges.

The current order, which does not recognize any of the above mentioned exceptions, demonstrates why ordering the production of an entire A-file is improper without accounting for whether the documents are *considered* to be confidential. *See Dent v. Holder*, 672 F.3d 365, 374 (9th Cir. 2010) (quoting section

240(c)(2) of the Immigration and Nationality Act for the proposition that release of documents is limited to "those not considered by the Attorney General to be confidential").

A-files commonly include confidential information along with information over which Respondents would assert an executive privilege or which would be covered by common law privileges to include attorney work product, attorney-client privilege, and the law enforcement privilege. For example, A-files almost always include government attorneys' notes taken in preparation for litigation and during hearings before the Department of Justice's Executive Office for Immigration Review (EOIR). Respondents would assert the attorney work product protection over these notes. Further, A-files often contain documents or information that Respondents would withhold pursuant to the law enforcement privilege, including information regarding law enforcement procedures and techniques that are not commonly known to the public.

In addition, A-files also commonly include documents that may contain confidential third-party information subject to independent protections that expressly prohibit disclosure. For example, certain information in A-files is governed by the Privacy Act, 5 U.S.C. § 552a. Additionally, other legal restrictions on release will also apply in certain cases. These restrictions on release include, but are not limited to, the personally identifying information of a third

party;[4] information relating to asylum or refugee applications;[5] applications under the Violence Against Women Act (VAWA);[6] information relating to Special Agricultural Worker (SAW) or Legalization claims;[7] information relating to an individual's Temporary Protected Status (TPS);[8] and information relating to nonimmigrant S visas[9] and nonimmigrant T or U visas.[10] Importantly, the Privacy Act and certain restrictions of the INA carry criminal and/or civil penalties for disclosure violations. *See*, *e.g.*, *Cooper v. FAA*, 596 F.3d 538 (9th Cir. 2010),

---

[4] *See*, *e.g.*, 5 U.S.C. § 552a(b); *see also generally DePlance v. Califano*, 549 F. Supp. 685 (W.D. Mich. 1982) (holding that the Privacy Act prevented the Social Security Administration from disclosing address information regarding a man's children contained in his file and organized and retrievable under his Social Security number because it was neither about the requestor nor did it pertain to him).

[5] *See* 8 C.F.R. §§ 208.6, 1208.6.

[6] *See* 8 U.S.C. § 1367. A-files may contain copies of protection orders, police reports, and other documents relating to crimes of domestic violence, stalking, child abuse, and violations of protection orders. *See* INA § 237(a)(2)(E). Those documents will often contain personally identifying information of the victims. *Cf. Pennsylvania v. Ritchie*, 480 U.S. 39, 60 (1987) (reversing lower court ruling "that defense counsel must be allowed to examine all of the confidential information" because, *inter alia*, "[t]o allow full disclosure to defense counsel in this type of case would sacrifice unnecessarily the Commonwealth's compelling interest in protecting its child-abuse information").

[7] *See* INA §§ 210(b)(6), 245a(c)(5).

[8] *See* 8 C.F.R. §§ 244.16, 1244.16.

[9] *See generally* 28 U.S.C. § 16.26(b)(4)–(5) (prohibiting disclosures that would reveal a confidential source or information or records relating to law enforcement investigations).

[10] *See* 8 U.S.C. § 1367.

*amended by and reh'g denied* 622 F.3d 1016 (9th Cir. 2010) (addressing damages under Privacy Act).

The law recognizes the documents and information discussed above as confidential and privileged and therefore not subject to automatic disclosure, whether during the course of litigation or in response to a FOIA request. Further, the Respondents routinely deem the documents and information discussed above as confidential and privileged and consistently withhold such information from public disclosure whether during the course of litigation or in response to a FOIA request.

Thus, before any A-files can be produced, Respondents must conduct the appropriate review and redactions. The amount and type of information to be redacted depends on the party to whom the information is to be disclosed. For example, asylum information can be produced directly to an alien or counsel of record without redaction. For production to *any* other party, including putative class counsel, this information must be redacted unless the individual waives in writing the confidentiality provisions of the asylum regulations. Respondents have a privacy waiver form that respondents can complete, ECF No. 96-3, but appropriate boxes for disclosures of any applicable information must be checked before information can be released. Such a process would also necessitate individualized review, with potentially a different set of redactions needed for every individual file. Respondents would also be unable to begin review and redaction of an individual's file until the

27

waiver form was returned.  This Court's order clearly requires production to class members and Respondents are willing, where practicable, to provide the documents to immigration counsel of record, meaning a current and accurate Form G-28 is on file, instead of service upon the alien.  For production to any other parties, including putative class counsel, putative class members must specifically waive privacy rights and any other applicable confidentiality provisions, or Respondents will need to conduct different, and more substantial, redactions.  Petitioners' proposed procedure adds substantial amounts of time to what Respondents already anticipate will be a somewhat lengthy process.  With respect to detainees, applicable detention standards permit detainees to retain legal documents at the facility and to mail legal documents; Respondents can address any issues with respect to directly serving detainees, such as if the detainee wishes to mail the file elsewhere after service, if and when they arise.

With respect to Immigration Court ROPs, Respondents do not have custody or control over those files.  EOIR is the custodian of those files, and Respondents are in communication with EOIR about this Court's order, but can make no representations regarding production other than to state that Respondents currently expect that they will be produced somewhat contemporaneously with the A-files.

### III.    Notice to Putative Class

Rule 23(d)(1) provides:

*In General.* In conducting an action under this rule, the court may issue orders that:
. . .
(B) require—to protect class members and fairly conduct the action—giving appropriate notice to some or all class members of:

(i) any step in the action . . .

To date, no formal notice has been provided to putative class members regarding this action. On July 18 and 19, Petitioners' counsel mailed an informational letter describing this Court's temporary stay order to 234 class members, who were all the class members known at that time. The letter described the contents of this Court's order extending the temporary stay until July 24 (ECF 61). A significant number of those letters were returned by the Post Office, in part due to detainee transfers from facility to facility. The returned letters were remailed, but Petitioners have no way to know whether the letters were delivered as hoped. Petitioners' counsel and other organizations have also conducted know your rights presentations at the detention facilities in Youngstown, Ohio and Florence, Arizona.

The parties have been discussing distribution by ICE of a Know Your Rights fact sheet, prepared by Petitioners' counsel, accompanied by one or more relevant forms. The parties have been unable to come to agreement, however, with the major stumbling blocks being the process and forms to be used for individuals who may wish to return to Iraq, and the A-File/ROP production process.

29

**Petitioners' Position**

Communications with class members and their immigration counsel have revealed that many detainees do not understand this Court's Preliminary Injunction Order or their rights more generally within the immigration system. There is widespread confusion and rumors spread rapidly. Petitioners believe it is imperative that all class members be fully informed about their rights and have an opportunity to consult with an immigration lawyer, so they can make voluntary and knowing choices about whether/how to proceed in their individual immigration cases. *See* Elias Decl., ECF 94-4, Pg.ID# 2448 *et seq.*; Mallak Decl., ECF 94-5, Pg.ID# 2454 *et seq.*; Alkadi Decl., ECF 94-6, Pg.ID# 2461 *et seq.*; Peard Decl., ECF 94-7, Pg.ID# 2466 *et seq.*; Free Decl., ECF 94-8, Pg.ID# 2470 *et seq.*; Peard Decl. ECF 94-10, Pg.ID# 2493 *et seq.*; Hernandez Decl., ECF 94-11, Pg.ID# 2499 *et seq.*; Free Letter, ECF 94-13, Pg.ID# 2506 *et seq.*

The parties have been discussing distribution by ICE of a Know Your Rights fact sheet, prepared by Petitioners' counsel, accompanied by one or more relevant forms. Petitioners have drafted a Know Your Rights document, which will need some revision once the Court decides on various issues raised in this status report. The primary reason that this notice has not gone out is that the parties have not been able to come to agreement on the process and forms for transmittal of A-

Files/ROPs and for individuals who may wish to return to Iraq. In addition, Respondents have not agreed to handle all of these issues in one set of materials.

Petitioners believe the Court should order notice that meets the following criteria:

- The notice should reach all class members. Due to repeated transfers of detainees and more general problems with mail delivery at ICE facilities, mailings by Petitioners' counsel are unlikely to reach all detainees. In addition, ICE continues to arrest and detain additional Iraqi nationals, and any notice procedure should ensure that newly-detained class members are informed of their rights. The Court should set a firm date by which ICE provides this notice to all currently-detained class members. Petitioners propose that this date be set as seven days from the date of the Court's resolution of the A-File/ROP and request-for-removal issues raised in this report.

- The notice should explain this Court's Preliminary Injunction Order, as well as how class members can request legal assistance in their individual cases.

- The notice should facilitate the process Petitioners propose in Section I by which detainees can self-identify their potential interest in terminating their own protection under the Preliminary Injunction Order.

- The notice should cover the A-File/ROP issues discussed in Section II.

31

**Respondents' Position**

Respondents do not object to providing notice to detained putative class members, and first approached Petitioners about including information with a form for individuals to opt-out of the class. Respondents object to any process that *requires* individuals to meet with an attorney before being allowed to be excluded from the class and to any forms that Petitioners have drafted regarding A-file or ROP production.

## IV.    Definition of Putative Class

The Court has defined the putative class as "all Iraqi nationals in the United States who had final orders of removal on June 24, 2017, and who have been, or will be, detained for removal by ICE." *Id.* at Pg.ID# 2354. The class definition used in the Preliminary Injunction Order was adopted at Petitioners' request; this modification was intended to avoid confusion about exactly who is member of the class. This is the group covered by three requirements of the Preliminary Injunction: the bar on removal; the A-File and ROP production requirements; and the court-ordered bi-weekly disclosure requirements.

**Petitioners' Position**

Respondents have raised concerns about the class definition with respect to both individuals with reopened cases and non-detained individuals. In Petitioners'

view, for both groups, the issues are most usefully addressed by separating the three aspects of the Preliminary Injunction.

*The Stay of Removal.* As far as the Preliminary Injunction's stay of removal, that stay does not actually affect either of the groups Respondents seek to exclude from the class definition. As far as Petitioners understand, ICE always detains individuals prior to removal, and therefore the stay of removal ordered by this Court is irrelevant unless someone is detained. Thus, non-detained people are not facing imminent removal. In addition, individuals who have successfully reopened their cases are statutorily protected by an automatic stay of removal. *See* 8 C.F.R. § 1003.6(a).

*A-File and ROP production.* With respect to A-File and ROP production, individuals whose motions to reopen have been granted need those files more urgently than anyone. As discussed above, their ability to proceed effectively in immigration court is severely impaired without access to the necessary documents. Accordingly, Petitioners believe production of the files should be prioritized, not eliminated, for these individuals.

With respect to non-detained individuals, Petitioners appreciate that providing A-Files and ROPs to all the non-detained individuals would be a burden for the government. At the same time, for individuals who are *currently* not detained but who will enter the class when they are detained in the future, it is

33

unreasonable to require them to reach out to request their records in anticipation of enforcement action that may never occur. Moreover, an individual who is detained tomorrow, but who has not yet obtained her/his A-File and ROP, has just as much need of those documents as an individual who was detained yesterday. Accordingly, Petitioners propose that the A-File/ROP production obligation cover any detained class member, whether detained now or in the future (including individuals who were detained and are subsequently released). Petitioners would not be required to produce A-Files/ROPS for individuals who have not been detained. The obligation to produce the files would be triggered once the person is detained. (The government's proposal, by contrast, seeks to limit the protections available to individuals who are currently not detained, which would require actual notice to those individuals.)

*Bi-Weekly Disclosures*. Petitioners are using the existing bi-weekly disclosures to monitor, understand, and help to coordinate what is happening to the pending Motions to Reopen in the Immigration Court and Board of Immigration Appeal cases. If those disclosures were limited to detained individuals, this kind of monitoring would be impossible. For example, Petitioners' counsel are currently working to facilitate consolidated expert testimony in Immigration Court, and amicus briefing in the Board of Immigration Appeals. That kind of aid to the administrative courts' timely and informed resolution of these hundreds of similar

cases would be impossible if the government is excused from the already-ordered disclosures for (a) anyone who succeeds in getting a motion to reopen granted, and (b) anyone who is not detained.

In fact, Petitioners request that the Court clarify that both the A-File/ROP and bi-weekly disclosure requirements cover Iraqi nationals who had a final order removal that was inoperative on June 24, 2017 as a result of a previously granted motion to reopen. The due process claims of someone whose motion to reopen was granted on June 23 are no different than those of someone whose motion to reopen was granted on June 25. And the coordination required is precisely the same, as well. Accordingly, Petitioners suggest that the bi-weekly disclosure requirement be amended to cover "all Iraqi nationals in the United States who have been, or will be, detained for removal by ICE; and who had final orders of removal on June 24, 2017, or whose removal proceedings were, as of that date, pending due to a granted Motion to Reopen." Petitioners believe that this modification would add a handful of additional individuals to the disclosure list, as there are a few individuals whose Motions to Reopen were granted before June 24 and hence did not have a then-final order on that date.

### Respondents' Position

The Court defined the putative class as "all Iraqi nationals in the United States who had final orders of removal on June 24, 2017, and who have been, or

will be, detained for removal by ICE." Prelim. Inj., ECF No. 87 at 33. Petitioners concede that this is the exact definition that they requested from the Court. Pet. Status Report at 11, ECF No. 95. It is also the exact same definition Petitioners use in their motion for class certification. Mot. Class Cert. at 1, ECF No. 83 ("All Iraqi nationals in the United States who had final orders of removal on June 24, 2017, and who have been, or will be, detained for removal by U.S. Immigration and Customs Enforcement (ICE)"). Petitioners now want to expand the definition to include individuals "whose removal proceedings were, as of [June 24, 2017], pending due to a granted Motion to Reopen." Pet. Status Report at 13, ECF No. 95. Respondents, however, believe that all individuals whose motions to reopen have been granted should be excluded from the relief granted under the Preliminary Injunction Order ("PI Order"). Further, Respondents ask the Court to clarify that the PI Order only applies to detained individuals, such that Respondents are not required to (1) provide A-Files or Records of Proceedings (ROPs) to non-detained individuals, and (2) include non-detained individuals in the reporting order under paragraph 4 of the PI Order. The reasons for the requested modifications and clarifications are set forth below.

First, Petitioners' proposal to include individuals whose proceedings have been reopened is not only contrary to the plain language of this Court's order, but is impractical. Respondents do not have a mechanism to determine which of the

36

Iraqi nationals no longer subject to a final order of removal had their proceedings reopened and on what date that occurred without conducting a manual case-by-case review.  Respondents are capable only of providing "snapshots" of data on a specific date, such as individuals who currently have final orders and the dates on which those orders were received.  In reporting to date, for individuals who had final orders on June 24, 2017, and have since had their proceedings reopened, Respondents have had to manually track those cases to ensure they remain included on the biweekly reporting list.  Further, as this Court correctly recognized, without a date certain to define the putative class, it is impossible to determine which individuals should be class members and which should not. Accordingly, the Court should not modify the PI Order to include individuals whose motions to reopen were granted before June 24, 2017.

Additionally, an individual whose motion to reopen was granted after June 24, 2017, no longer has a final order of removal and therefore should also be excluded from the relief under the PI Order. Petitioners have maintained throughout this litigation that their "primary goal has been to secure time for class members to access the administrative immigration court system," ECF No. 95 at 31, that class members' alleged injury was insufficient time to file a motion to reopen, and that the relief sought before this Court was the time needed to prepare and file a motion to reopen in order to pursue their administrative remedies. When

an Immigration Judge ("IJ") or the Board of Immigration Appeals ("BIA"), as appropriate, has granted a motion to reopen, the individual has received all of the relief that he or she sought before this Court. Not only has the individual had his or her opportunity to seek reopening, the individual's motion was granted. The alien will now have the opportunity to appropriately seek protection from removal before the Immigration Judge. There is simply nothing further for this Court to address with respect to aliens who have had their proceedings reopened.[11] Further, there was no evidence presented in the record of the preliminary injunction proceeding that suggests, much less proves, that the administrative proceedings available to individuals in reopened proceedings are constitutionally inadequate. Accordingly, the Court should modify the PI Order so that individuals whose

---

[11] As Petitioners note, there is little practical difference between aliens who have had their motions to reopen granted and any other alien in removal proceedings. Under the court's preliminary injunction, an alien who files a petition for review cannot be removed until a federal circuit court denies a stay request. In other cases, an alien with a pending petition for review and pending stay motion, except in the Ninth and Second Circuits, may be removed unless a stay is actually granted. Leaving aliens in the class once proceedings have been reopened actually provides them *more* than standard administrative processes and procedures and exceeds what this Court has found is its limited jurisdiction to be – i.e., to provide Petitioners the opportunity to pursue the normal administrative process through the filing of a motion to reopen, and not to supplement the administrative review and petition for review process with additional protections not otherwise available. *See* PI Order at 21 (acknowledging that the court's jurisdiction "is limited to preserving a meaningful opportunity for *access to the process that Congress intended to be followed*." (emphasis added)).

immigration proceedings are reopened are excluded from the relief provided in the PI Order.

Respondents' position does not, as Petitioners allege, "fail to recognize that the due process claims of someone whose motion to reopen was granted on June 23 are no different than those of someone whose motion to reopen was granted on June 25." Pet. Am. Status Rpt at 13, ECF No. 95. In fact, such aliens have received all of the relief sought before this Court and are in exactly the same position as any other alien in removal proceedings. Once a motion to reopen is granted, an alien is no longer subject to a final order of removal and, thus, said order cannot be executed. At that point, an alien will have all procedural protections in place to pursue available relief from removal through immigration proceedings.[12] An alien is not again subject to removal unless the alien is once again ordered removed, all applications for protection are denied, and the order subsequently becomes administratively final, which is after any appeal period (if not waived) has expired or, if the case is appealed, after the BIA issues a decision. 8 C.F.R. § 1241.1.

---

[12] Because withholding of removal under the Immigration and Nationality Act and withholding or deferral of removal under the regulations implementing Article III of the Convention Against Torture are forms of protection that withhold or defer removal, an alien granted such protection will nevertheless be ordered removed by the immigration court.

Respondents also request that this Court clarify that individuals who are not currently detained are not entitled to receive their A Files or ROPs under the PI Order, and the reporting requirements do not apply with regard to these individuals.[13] Non-detained individuals are not subject to any of the allegations Petitioners make regarding the difficulties of filing a motion to reopen from a detained setting and are fully capable of seeking their own counsel and pursuing their own FOIA requests for A-files. Nor is their removal imminent. Should Respondents detain an individual up until a specific date set by this Court,[14] who is subject to a final order of removal that was in effect on June 24, 2017, and has remained in effect since that date, Respondents will treat the individual as part of the group entitled to relief under the PI Order.

Therefore, Respondents request that this Court's order be modified to clarify that it applies to Iraqi individuals who are detained and remain subject to a final order of removal that was in effect on June 24, 2017, and to make clear that both

---

[13] In an abundance of caution, Respondents have been providing the information required in paragraph 4 of the PI Order for detained and non-detained individuals. Going forward, Respondents request clarification from the Court that reporting is only required for detained individuals.

[14] Defendants propose December 31, 2017 as a reasonable date, as it would be roughly 6 months from the date that this action was filed and, accordingly, has permitted more than sufficient time for non-detained individuals to file a motion to reopen.

individuals whose motions to reopen are granted, and individuals who are not detained, are excluded from the relief under the PI Order.

## V.    Communications by ICE with Class Members Regarding This Litigation

### Petitioners' Position

As set out in the declarations that accompanied the last status report, Petitioners' counsel have received numerous reports regarding abuse, coercion, and misinformation directed at *Hamama* class members. *See* Elias Decl., ECF 94-4, Pg.ID# 2448 *et seq.*; Mallak Decl., ECF 94-5, Pg.ID# 2454 *et seq.*; Alkadi Decl., ECF 94-6, Pg.ID# 2461 *et seq.*; Peard Decl., ECF 94-7, Pg.ID# 2466 *et seq.*; Free Decl., ECF 94-8, Pg.ID# 2470 *et seq.*; Peard Decl. ECF 94-10, Pg.ID# 2493 *et seq.*; Hernandez Decl., ECF 94-11, Pg.ID# 2499 *et seq.*; Free Letter, ECF 94-13, Pg.ID# 2506 *et seq*. Beyond the ordinary coercive effects of detention, the situation is exacerbated here by the fact that ICE employees, contractors, and agents—who unlike class counsel have direct, ongoing access to the detainees—seem to be misrepresenting this litigation and the detainees' rights. Class members who are abused or harassed, or who are told that they will suffer in prolonged detention if they get a lawyer, cannot make voluntary and knowing choices about how to proceed with their immigration cases.

In an effort to resolve this issue without Court intervention, Petitioners proposed that ICE send a written directive to all employees, agents, and contractors

informing them that they may not discuss the *Hamama* litigation with detainees, and may not provide legal advice. Petitioners requested that a copy of that directive be posted in all housing areas for Iraqi detainees, along with an address for Petitioners' counsel, to which detainees can mail any complaint of a violation of that directive. Respondents did not agree to this proposal, although they have informed Petitioners that they intend to issue (or perhaps have already issued) some kind of directive to some employees. Respondents did not share the timing, content, or audience of that directive.  As of the morning of September 15, 2017 when this report was being finalized, Petitioners had not seen it.

Petitioners request the Court to prohibit ICE employees, agents, or contractors from discussing this litigation in any way with class members, and require ICE to inform all employees, agents, or contractors who have or could have contact with class members of this order. The Court should further require ICE to post notice about this order in detainee housing areas, along with Petitioners' counsel's address, so that detainees can mail complaints of any violations. The order should specify that all communications by ICE with class members regarding this litigation should be in writing, and must be reviewed in advance by Petitioners' counsel. The order would not bar ICE employees, agents or contractors from communicating with detainees on custody-related matters.

### Respondents' Position

ICE has disseminated a broadcast message instructing ERO officers, if asked about the case, to inform the alien that further information may be available at a later time and to direct the alien to their attorney or, if the alien is unrepresented, inform the alien that he or she may seek counsel and provide the list of pro bono legal service providers upon request.  Exhibit 4, ICE Broadcast. The notice further instructs officers not to answer any additional questions or offer further information.  *Id.*  This broadcast message strikes a balance between addressing opposing counsel's concern and Respondents' operational needs and requirements regarding detainee communication.   For example, some communication is necessary for daily operations and, under applicable detention standards, ICE is required under to respond to detainee requests and inquiries.   *See, e.g.,* Performance-Based National Detention Standards 2011, Section 2.13 "Staff-Detainee Communication," *available at* https://www.ice.gov/doclib/detention-standards/2011/2-13.pdf.

### VI.    Information on Hunger Strikers

### Petitioners' Position

On September 13, 2017, Petitioners' counsel learned from family members of the detainees that a number of class members—believed to be about forty to fifty individuals—detained at the Northeast Ohio Correctional Center in

Youngstown have been on hunger strike since approximately September 11, 2017. Family members reported that their loved ones say that they would rather die here in America so that their families can bury them, instead of dying or being persecuted in Iraq. The families also report that the detainees participating in the hunger strike are being held in lock-down, and their phone use is restricted.

Petitioners' counsel have asked Respondents' counsel how many detainees are on hunger strike, how long they have been on hunger strike, the names of the detainees on strike, and the demands of the detainees on strike. Respondents have declined to provide this information, describing the request as seeking "medical information," and referring to privacy rules governing ICE's "system of . . . medical, mental health, and dental records that document the medical screening, examination, diagnosis, and treatment of aliens." *See* 80 Fed. Reg. 239, https://www.gpo.gov/fdsys/pkg/FR-2015-01-05/html/2014-30854.htm.          But Petitioners did not seek any such medical records. Hunger strikes are an activity; they may raise medical issues, but participation and demands are not "medical screening, examination, diagnosis, or treatment." *Id.*

The government has already provided the Court and Petitioners' counsel with information about another individual, currently being held in El Paso, Texas, who started a hunger strike on approximately August 20. (Petitioners have asked the government, but have not been told, whether that individual is still on hunger

strike.) The government informed Petitioners' counsel about that hunger strike on September 7, because the government was seeking Petitioners' consent for that detainee's removal to Iraq.

These hunger strikes reflect the desperation of the class members, who are being held in detention without justification, and who are risking their own lives as a way to try to reunite with their families. Petitioners do not know if other detainees in other facilities are also on hunger strike. Petitioners' counsel are extremely concerned about the safety and treatment of the detainees who are on hunger strike, and request that the Court order Respondents to provide information about them, which Petitioners' counsel can use to negotiate with the government on class members' behalf and to seek further court intervention if necessary. In particular, the Court should order Respondents to provide a daily update with the following information: names and detention locations of each class member on a hunger strike; when each individual's strike started; any demands class members are making; and any planned attempt to forcefeed any hunger striker. In addition, the Court should forbid the isolation or lockdown of such individuals without a doctor's order declaring isolation to be "medically advisable."[15] And finally, the

---

[15] See, e.g., ICE PBNDS 2011 § 4.2, https://www.ice.gov/doclib/detention-standards/2011/4-2.pdf ("When medically advisable, a detainee on a hunger strike shall be isolated for close supervision, observation and monitoring.").

Court should direct Respondents to allow Petitioners' counsel or their designees to meet confidentially with any hunger-striking class member detainee. To the extent any of this information is deemed "medical," its disclosure by court order, with a protective order, would exempt it from statutory or regulatory privacy restrictions. Cf. 45 C.F.R. § 164.512 (HIPAA regulation).

### Respondents' Position

As discussed above, Respondents are subject to a number of laws restricting the release of information about detainees; the exact law applicable is dependent upon the facts and circumstances of an individual case and the information requested.   Health information is sensitive and highly personal and not relevant to the underlying claim of this litigation – an opportunity to file a motion to reopen. Petitioners' request is outside the scope and intention of the Court's order.

## VII.  Revision of Protective Order to Address Amicus and Case Coordination Issues

The Amended Protective Order, entered by the Court on agreement of the parties, provides in pertinent part:

> X. All documents, information and discovery responses designated as CONFIDENTIAL subject to this Order shall be used solely and exclusively for purposes of this action in accordance with the provisions of this Order. No documents, information and discovery response shall be used in or for other cases, proceedings, or disputes, or for any commercial, business, competitive, or other purpose whatsoever, without further order of this Court.

Petitioners wish to use certain information disclosed by the Respondents in order to facilitate case coordination and amicus briefing in the immigration court process—in Immigration Court, before the Board of Immigration Appeals, and in the Courts of Appeals. In particular, Petitioners wish to use the names of individuals facing removal, their A-Numbers, and the disclosed information on the procedural posture of their cases.

### Petitioners' Position

With the assistance of pro bono counsel not involved in this district court litigation, Petitioners' counsel plan to seek leave to participate as amicus curiae in a large number of Board of Immigration Appeals cases involving class members. (The amicus curiae briefs would be filed on behalf on organizations representing the *Hamama* Petitioners.) In order to do so, Petitioners need to share with pro-bono counsel the list of individuals with pending BIA cases, their A-numbers (which are used essentially as docket numbers), and the names of their immigration lawyers.

Petitioners believe that the immigration court matters are most reasonably classified as part of "this action," as that phrase is used in the Protective Order. Correspondingly, counsel working with Petitioners' counsel in the coordination efforts relating to Immigration Court, the BIA, and the Courts of Appeals (and, if such cases arise, habeas matters in the federal district courts) should be able to

make appropriate use of the disclosed information to, for example, call class members' lawyers or to file briefs.

Because Respondents read the Protective Order differently, and have objected to Petitioners sharing information for the purposes of coordination in the immigration courts, Petitioners propose amending the Protective Order to make it clear that this kind of use of confidential information is authorized. In particular, Petitioners propose amending Paragraphs H and X to read (additions in bold):

> H. For confidential information relating to proposed members of the class or members of the class if the class is certified, the institutions and individuals, to be designated by Counsel of Record from the American Civil Liberties Union Fund of Michigan, who will coordinate access for the proposed or actual class members to independent legal representation **or facilitate coordinated litigation strategy or amicus support related to immigration/habeas cases involving class members**, but only after such persons have completed the certification contained in Exhibit A, Acknowledgment Regarding the Order;

> X. All documents, information and discovery responses designated as CONFIDENTIAL subject to this Order shall be used solely and exclusively for purposes of this action, **or for immigration/habeas cases involving class members,** in accordance with the provisions of this Order.

**<u>Respondents' Position.</u>**

Respondents oppose amending the protective order to allow access to protected information by individuals not engaged in this litigation. The protective order makes clear that "X. All documents, information and discovery responses designated as CONFIDENTIAL subject to this Order shall be used solely and

exclusively for purposes of this action in accordance with the provisions of this Order. No documents, information and discovery response shall be used in or for other cases, proceedings, or disputes, or for any commercial, business, competitive, or other purpose whatsoever, without further order of this Court." Protective Order at 9, ECF No. 71. Because immigration proceedings are not part of this litigation, it is not appropriate to amend the protective order to cover such use. Once an alien engages an attorney for purposes of filing a motion to reopen and any related immigration proceedings, it would be their choice as to what personal information they wish to share with that attorney from their A-file, once provided.

## VIII. Method For Getting Up-to-Date Detainee Location Information

### Petitioners' Position

While the pace of detainee transfers appears to have slowed, ICE continues to transfer class members from one detention facility to another. In addition, it was only yesterday that respondents apparently solved a problem Petitioners had alerted them to: ICE's Online Detainee Locator System did not include information about at least a handful of facilities in which class members have been housed in recent weeks. It is unclear whether or not this fix to the online locator will prove durable.

Even if the online system does not omit any facilities, it inevitably falls a little bit behind the facts. Yet it is crucial for Petitioners' counsel, and the lawyers

who are working to match detainees to immigration counsel, to be able to get up-to-date information on where a detainee is located. Otherwise lawyers who want to visit the detainee to discuss their cases cannot be sure that the detainee will be at a given facility, and may well waste many hours of driving. The government has declined to facilitate this simple information.

Petitioners have no preference about the method to meet this need: counsel could call or email the Department of Justice with the relevant (usually short) lists of names, or could call or email ICE Field Offices. The response should be provided within 24 hours.

### **Respondents' Position**

Respondents have been providing biweekly reports as ordered. When Petitioners have made Respondents aware of issues with the detainee locator involving specific detainees or facilities, Respondents have moved to promptly address those issues. On September 11, 2017, Petitioners raised issues involving specific individuals and detention facilities. Respondents promptly provided detention locations for the individuals and immediately began working to resolve the issues regarding the facilities. Respondents believe the issues Petitioners' have identified regarding the detainee locator have been resolved as of September 14, 2017. Respondents will continue to promptly address any additional issues if and when they arise.

## IX.    Briefing Schedule and Sequencing of Next Steps in Litigation

**<u>Petitioners' Position</u>**

The current case calendar requires numerous briefs and conferences with the

Court over the next six weeks:

- September 19, 2017:  Status conference.

- September 25, 2017: Respondents' requested date for response to the motion for class certification.

- September 25, 2017: Respondents' motion to dismiss.

- September 26, 2017: Second joint status report to be submitted to Court.

- September 28, 2017: Status conference with the Court.

- October 2, 2017: Parties' settlement statements to be submitted to Court.

- October 4, 2017 or another date that week: Settlement conference with Magistrate Judge Grand.

- October 9, 2017: Petitioners' reply in support of their motion for class certification (if Respondents' response is set for September 25).

- October 16, 2017: Petitioners' response to the motion to dismiss.

- October 30, 2017: Respondents' reply in support of their motion to dismiss.

This schedule excludes briefing on any potential appeal, and on any additional

issues that may emerge, such as detention or emergency situations related to the

hunger strike.

51

The next six weeks will require Herculean efforts by all parties to meet the current deadlines, and will impose a significant burden on the Court. Petitioners agree with the Court's suggestion to address the Respondents' motion to dismiss before completing the briefing on the class certification. Petitioners propose the following schedule:

- Three weeks after the settlement conference (or, if continued, after the date on which settlement discussions conclude), Respondents would file their motion to dismiss.  (The settlement conference is currently scheduled for October 4, but that date may change.)   Subsequent briefing would follow the ordinary briefing calendar.

- Three weeks after the Court issues its opinion on Respondents' motion to dismiss, Respondents would file their response to the motion for class certification. Subsequent briefing would follow the ordinary briefing calendar.

## Respondents' Position

The Court has indicated that its preference would be to entertain the motion to dismiss first, following by the class certification briefing. Additionally, the Court indicated that Petitioners' response period for the motion to dismiss would be stayed until after the settlement conference. Accordingly, Respondents propose that they would file the motion to dismiss within two business days following the

settlement conference. Four weeks later, Respondents would file their opposition to class certification. The remaining deadlines would be calculated under the Local Rules, and would allow for staggered briefing of both motions in the order that Respondents understood to be the Court's preference. This would also allow the parties to engage in the Court-ordered settlement conference while at the same time allowing the briefing to proceed promptly after the conference concludes.

Respectfully Submitted,

*Attorneys for All Petitioners
and Plaintiffs*

Michael J. Steinberg (P43085)
Kary L. Moss (P49759)
Bonsitu A. Kitaba (P78822)
Miriam J. Aukerman (P63165)
American Civil Liberties Union Fund Of
  Michigan
2966 Woodward Avenue
Detroit, Michigan 48201
(313) 578-6814
msteinberg@aclumich.org

Judy Rabinovitz (NY Bar JR-1214)
Lee Gelernt (NY Bar NY-8511)
Anand Balakrishnan* (Conn. Bar 430329)
ACLU Foundation
  Immigrants' Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2618
jrabinovitz@aclu.org

Margo Schlanger (N.Y. Bar #2704443)
Samuel R. Bagenstos (P73971)
Cooperating Attorneys, ACLU Fund
  of Michigan
625 South State Street
Ann Arbor, Michigan 48109
734-615-2618
margo.schlanger@gmail.com

*Counsel for Respondents*

Chad A. Readler
Acting Assistant Attorney General

August Flentje
Special Counsel

William C. Peachey
Director

Vinita B. Andrapalliyal
Michael A. Celone
Joseph A. Darrow
Trial Attorneys

*/s/ William C. Silvis*
William C. Silvis
Assistant Director
United States Department of Justice
Office of Immigration Litigation
District Court Section
PO Box 868 Ben Franklin Station
Washington, DC 20044
Tel: (202) 307-4693
Fax: (202) 305-7000

54

*/s/ Kimberly L. Scott*

Kimberly L. Scott (P69706)
Wendolyn Wrosch Richards (P67776)
Cooperating Attorneys, ACLU Fund
 of Michigan
Miller, Canfield, Paddock
 & Stone, PLC
101 N. Main St., 7th Floor
Ann Arbor, MI 48104
(734) 668-7696
scott@millercanfield.com

Nora Youkhana (P80067)
Nadine Yousif (P80421)
Cooperating Attorneys, ACLU Fund
 of Michigan
Code Legal Aid Inc.
 27321 Hampden St.
Madison Heights, MI 48071
(248) 894-6197
norayoukhana@gmail.com

Susan E. Reed (P66950)
Michigan Immigrant Rights
 Center
3030 S. 9th St. Suite 1B
Kalamazoo, MI 49009
 (269) 492-7196, ext. 535
susanree@michiganimmigrant.org

Lara Finkbeiner (NY Bar 5197165)
Mark Doss (NY Bar 5277462)
Mark Wasef (NY Bar 4813887)
International Refugee
  Assistance Project
Urban Justice Center
40 Rector St., 9th Floor
New York, NY 10006
(646) 602-5600
lfinkbeiner@refugeerights.org

*Attorney for Petitioner/Plaintiff Usama Hamama*

William W. Swor (P21215)
William W. Swor & Associates
1120 Ford Building
615 Griswold Street
Detroit, MI 48226
wwswor@sworlaw.com

*Attorneys for Petitioner/Plaintiff Abbas Oda Manshad Al-Sokaina*

María Martínez Sánchez (NM Bar 126375)
American Civil Liberties Union
  Of New Mexico
1410 Coal Ave. SW
Albuquerque, NM 87102
msanchez@aclu-nm.org

* Application for admission forthcoming.

Dated: September 15, 2017

## **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on September 15, 2017, I electronically filed the foregoing

document with the Clerk of the Court using the electronic filing system, which will

send notification of such filing to all counsel of record.

By: /s/ Kimberly L. Scott

_____