# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| **USAMA JAMIL HAMAMA, ALI AL-DILAMI, SAMI ISMAEL AL-ISSAWI, QASSIM HASHEM AL-SAEDY, ABBAS ODA MANSHAD AL-SOKAINI, ATHEER FAWOZI ALI, JIHAN ASKER, MOAYAD JALAL BARASH, JAMI DERYWOSH, ANWAR HAMAD, JONY JARJISS, MUKHLIS MURAD, HABIL NISSAN, ADEL SHABA,** and **KAMIRAN TAYMOUR**, on behalf of themselves and all those similarly situated,<br><br>    Petitioners and Plaintiffs,<br><br>v.<br><br>**REBECCA ADDUCCI**, Director of the Detroit District of Immigration and Customs Enforcement, **THOMAS HOMAN**, Acting Director of U.S. Immigration and Customs Enforcement, **ELAINE C. DUKE,** Acting Secretary, U.S. Department of Homeland Security, and **JEFFERSON B. SESSIONS III,** Attorney General of the United States, in their official capacities,<br><br>    Respondents and Defendants. | Case No. 2:17-cv-11910<br><br>Hon. Mark A. Goldsmith<br><br>Mag. David R. Grand<br><br>Class Action |

## SECOND AMENDED HABEAS CORPUS CLASS ACTION PETITION AND CLASS ACTION COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND MANDAMUS RELIEF

**INTRODUCTION**

1.      This class action habeas petition and complaint for declaratory, injunctive, and mandamus relief is brought on behalf of Petitioners/Plaintiffs (hereinafter "Petitioners"), who are Iraqi nationals who have resided in the United States, in many cases for decades. Absent this Court's injunctive relief, issued in response to the First Amended Petition and Complaint, Petitioners would be under imminent threat of removal to Iraq, where they face the very real probability of persecution, torture, or death.  Petitioners also face unwarranted and potentially prolonged detention, lasting months or possibly years, while they litigate their challenges to removal.

2.      Although all Petitioners were subject to final orders of removal to Iraq—many dating back more than twenty years—nearly all were subsequently released by the government, typically under orders of supervision, because Iraq would not accept their repatriation. In addition, although most were ordered removed based on criminal convictions, all have completed serving their sentences, many long ago, and until recently most were living peaceably in the community, reporting regularly to U.S. Immigration and Customs Enforcement ("ICE"), and otherwise complying with their conditions of release.

3.      This changed suddenly in June 2017, when, pursuant to a national policy, ICE began arresting and detaining Petitioners because, the government

1

said, Iraq had now agreed to take them back.

4.      There are more than 1,400 Iraqi nationals who had final orders of removal when this case was filed. These individuals, many of whom have lived in the United States for decades and have U.S. citizen spouses and children, now face an active threat of deportation as a result of ICE's sudden decision to remove them based on removal orders that may be decades old. They also face unwarranted, often prolonged detention, as Respondents/Defendants (hereinafter "Respondents") insist on incarcerating them while they fight their immigration cases, despite the fact that most had for many years been living in the community, complying with any ICE orders of supervision.

5.      ICE has detained approximately 300 Iraqi nationals with final orders of removal since June 2017. In Michigan, in mid-June 2017, ICE arrested approximately 114 Iraqi nationals, mostly Chaldean Christians, and arrested at least 85 more Iraqi nationals around the country at about the same time. Additional Iraqi nationals with final orders have been arrested since then.

6.      Although the U.S. government continues to assert that Iraq will accept Petitioners' repatriations, Iraq continues to deny Iraqi nationals travel papers, and little is known about whether Iraq truly intends to accept the repatriation of each and every one of the hundreds of Americanized Iraqis previously deemed non-repatriatable who are detained.

2

7.     Iraqi nationals subject to ICE's sudden change in policy have been and are currently detained in dozens of immigration detention facilities scattered throughout the United States. Approximately 285 Iraqi nationals are now detained while they seek to challenge the government's efforts to remove them to Iraq, a country which they left years ago and which is listed on the U.S. State Department's Travel Advisory as a country which U.S. citizens should avoid because it is too dangerous. *See Iraq Travel Warning*, U.S. Dep't of State (last updated June 14, 2017), https://travel.state.gov/content/passports/en/alertswarnings/iraq-travel-warning.html.

8.     Upon information and belief, ICE intends to continue arresting, detaining, and trying to deport Iraqi nationals who have outstanding final orders of removal, which could result in the detention and potential deportation of more than 1,400 people to Iraq, where they face a grave risk of persecution, torture, or death.

9.     U.S. law and the Constitution prohibit the removal of individuals to countries where they would face a likelihood of persecution or torture. Yet despite the clear danger that many of these individuals face in Iraq, ICE is attempting to deport them based on old removal orders that do not take account of intervening changed circumstances that should entitle them to protection. For example, many of the class members are Chaldean Christians or Iraqi Kurds, both groups widely recognized as targets of brutal persecution in Iraq. Indeed, the persecution is so

3

extreme that prior to the events described in this complaint, attorneys representing ICE in Michigan immigration courts over the last few years frequently consented to the grant of immigration protection to Chaldeans. Nonetheless, Chaldeans whose orders of removal were entered years ago are now facing removal to Iraq as if nothing has changed, and—were it not for this Court's stay—without any inquiry into the dangers they would currently face in Iraq. Likewise, Iraqi Kurds and other Iraqis face increased likelihood of persecution or torture due to changed conditions in Iraq.

10.    Petitioners—regardless of their religious beliefs—cannot lawfully be removed to Iraq without being afforded a process to determine whether, based on current conditions and circumstances, the danger they would face entitles them to protection from removal.

11.    Petitioners seek an order preventing their removal to Iraq—and the removal of those similarly situated—until they have had the opportunity to access the immigration court system for a determination that they are entitled to reopen their cases in light of changed country conditions. This Court, recognizing Petitioners' right to such a process, granted that request nearly three months ago.

12.    ICE has repeatedly transferred detainees from location to location, moving them far from their families, retained or potential counsel, and immigration courts, making it exceptionally difficult for attorneys to either accomplish their

role of representing them in immigration proceedings and filing appropriate motions and applications, or to file habeas petitions in federal court.

13.     On behalf of themselves and those similarly situated, Petitioners continue to challenge ICE's policy of transferring them from their home states to detention facilities in other parts of the country—a practice that continues to interfere with existing counsel relationships and makes it difficult for those Petitioners without existing counsel to take advantage of efforts to mobilize pro bono counsel in their home states.

14.     U.S. law and the Constitution also prohibit immigration detention unless it is reasonably related to the government's legitimate purposes, which are to prevent danger to the community or the risk of flight. The immigration statute that authorizes detention of individuals with final orders of removal authorizes such detention only for a reasonable period of time to effectuate removal. If removal is not significantly likely in the reasonably foreseeable future, detention is not authorized. And even if removal is reasonably foreseeable, detention must be reasonably related to the purpose of preventing danger or flight.

15.     Petitioners have already been incarcerated, most for more than four months, even though they cannot lawfully be removed until they have had an opportunity to litigate their challenges to removal. Although immigration court proceedings are likely to take many additional months, even years, Respondents

5

refuse to release them. Moreover, Respondents have failed to provide Petitioners with any individualized determination that they pose either a danger or flight risk that would justify such a prolonged deprivation of liberty.

16.     Prior to their arrest by ICE, nearly all Petitioners had been peaceably living in the community and complying with their orders of supervision. Yet the government waited more than 90 days before conducting any kind of custody review. When it did conduct purely administrative custody reviews, they were wholly inadequate to satisfy due process, failed to comply with the government's own regulations, and resulted in boilerplate decisions rubberstamping Petitioners' continued detention.

17.     The Petitioners who no longer have final orders of removal because their motions to reopen have been granted are entitled by law to bond hearings, but based on Respondents' misapplication of the relevant statute are, in many cases, being subjected to mandatory detention and thus denied such hearings.

18.     Whether they are detained while they litigate motions to reopen, or after having had such a motion granted, Petitioners' detention in the absence of an individualized showing of danger or flight risk is unlawful, especially as it becomes more prolonged. Likewise, for Petitioners previously deemed unable to be repatriated, detention without an individualized and specific showing that Iraq actually intends to allow their repatriation—either by issuing them a travel

6

document or allowing their repatriation without one—is unlawful.

## JURISDICTION AND VENUE

19.     This case arises under the United States Constitution; the Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1101 *et seq.*; the regulations implementing the INA's asylum provisions; the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"), Dec. 10, 1984, S. Treaty Doc. No. 100-20 (1988), 1465 U.N.T.S. 85; the Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), 8 U.S.C. § 1231 note; and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq.*

20.     This Court has habeas corpus jurisdiction pursuant to 28 U.S.C. §§ 2241 *et seq.*, and Art. I § 9, cl. 2 of the United States Constitution (Suspension Clause). This Court may also exercise jurisdiction pursuant to 28 U.S.C. § 1331; 28 U.S.C. § 1361 (mandamus statute); 5 U.S.C. §§ 701 *et seq.* (Administrative Procedures Act); Art. III of the United States Constitution; Amendment V to the United States Constitution; and the common law. This Court may grant relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq.*, and the All Writs Act, 28 U.S.C. § 1651, and has the ability to enjoin federal officials pursuant to *Ex Parte Young*, 209 U.S. 123 (1908). *See Philadelphia Co. v. Stimson*, 223 U.S. 605, 619–21 (1912) (applying *Ex Parte Young* to federal official); *Goltra v. Weeks*, 271 U.S. 536, 545 (1926) (same). The Court also has jurisdiction to determine its

7

own jurisdiction. *See United States v. United Mine Workers of Am.*, 330 U.S. 258, 290 (1947); *Derminer v. Kramer*, 386 F. Supp. 2d 905, 906 (E.D. Mich. 2005).

21.     Venue is proper under 28 U.S.C. § 1391(e), as Defendants are officers or employees of the United States acting in their official capacity. Venue is also proper under 28 U.S.C. §§ 2241 *et seq.*, as Respondents exercise control over Petitioners' custody. *Roman v. Ashcroft*, 340 F.3d 314, 319 (6th Cir. 2003) (recognizing that while ICE Field Office Director is generally the proper respondent for immigration habeas petitioners, higher level ICE officials may be proper respondents in extraordinary circumstances); *Vasquez v. Reno*, 233 F.3d 688, 696 (1st Cir. 2000). *See also Armentero v. INS*, 340 F.3d 1058, 1069-70 (9th Cir. 2003), *withdrawn on reh'g*, 382 F.3d 1153 (9th Cir. 2004) (explaining why "practicality, efficiency, and the interests of justice" demand relaxation of immediate custodian rule in habeas challenges to immigration detention).

## PARTIES

### Petitioners/Plaintiffs

22.     Petitioner/Plaintiff **Usama Jamil "Sam" Hamama** is an Iraqi national who lawfully entered the United States in 1974. He and his family reside in West Bloomfield, Michigan. Mr. Hamama is married to a U.S. citizen and has four U.S. citizen children. Although he has been subject to an order of removal to Iraq since 1994, he was subsequently released to the community and been subject

to an order of supervision, with which he was complying. On information and belief, ICE's decision not to detain him was based on the government's determination that Iraq would not accept him for repatriation and on his medical condition. In 1988, Mr. Hamama was convicted of felonious assault and possession of a firearm and a misdemeanor related to the possession of a firearm in a vehicle. For this, he served a two-year sentence, about half in custody and about half on electronic monitoring with regular reporting. He has had no convictions since that time, and has fully complied with his immigration conditions of supervision. Nonetheless, on June 11, 2017, without warning, ICE came to his home and arrested him in front of his wife and children, detaining him since in the St. Clair County Jail preparatory to imminent removal to Iraq. Mr. Hamama has submitted a motion to reopen to the Board of Immigration Appeals on the grounds that due to changed country conditions in Iraq, and his status as a Chaldean Christian, he would be a target for torture, persecution, and death if he were sent to Iraq. He did not have the benefit of either his A-File or Record of Proceedings before submitting his motion to reopen. That motion remains pending. Since his redetention by ICE, he has not received any determination that he poses a danger to the community or a flight risk. On September 6, 2017, ICE informed him his detention would continue on the following grounds: "You have a final order of removal from the United States and ICE is actively pursuing your removal to Iraq."

Mr. Hamama's detention cannot be justified based on flight risk or danger to the community. Although when he was arrested he faced the threat of imminent removal, currently his removal is not significantly likely in the reasonably foreseeable future: because of this Court's stay of removal, he cannot be removed while he pursues his meritorious challenges to removal, a process that will take months if not years. In addition, ICE has made no individualized showing that Iraq will agree to his repatriation.

23.     Petitioner/Plaintiff **Ali Al-Dilaimi** is a 38-year old Iraqi national who entered the United States in 1998 as a refugee when he was nineteen years old. Before June 11, 2017, he lived with his wife, U.S. citizen child, and U.S. citizen stepchild in Conneaut, Ohio. Although he has been subject to an order of removal to Iraq since 2004, ICE released him to the community under an order of supervision, with which he was complying. On information and belief, ICE's decision to put him on an order of supervision was based on the government's determination that Iraq would not accept him for repatriation. On June 11, 2017, without warning, ICE came to his home and arrested him. Seventeen years ago Mr. Al-Dilaimi was convicted for assault and received a one-year sentence, of which he served five months. Upon information and belief, the conviction was later expunged. Mr. Al-Dilaimi fears removal to Iraq, especially because his status as a Shiite Muslim makes him a target for torture, persecution, and death. He has filed a

10

motion to reopen, a final decision on which is pending, but did not have the benefit of either his A-file or Record of Proceeding before submitting that motion. He is currently detained in the Geauga County Jail in Ohio. On September 7, 2017, ICE informed him his detention would continue on the following grounds: "You have a final order of removal from the United States and ICE is actively pursuing your removal to Iraq." Since his redetention by ICE, he has never received any determination that he poses a danger or flight risk. Mr. Al-Dilaimi's detention cannot be justified based on flight risk or danger to the community. Although when he was arrested he faced the threat of imminent removal, currently his removal is not significantly likely in the reasonably foreseeable future: because of this Court's stay of removal, he cannot be removed while he pursues his meritorious challenges to removal, a process that will take months if not years. In addition, ICE has made no individualized showing that Iraq will agree to his repatriation.

24.     Petitioner/Plaintiff **Sami Ismael Al-Issawi** is a 49-year-old Iraqi national. He came to the United States as a refugee in 1994 and adjusted his status to Lawful Permanent Resident. He currently resides in Michigan with his wife and three children, all of whom are U.S. citizens. Although he has been subject to an order of removal to Iraq since September 2013, shortly thereafter ICE released him to the community under an order of supervision, with which he was complying. On information and belief, ICE's decision to put him on an order of supervision was

11

based on the government's determination that Iraq would not accept him for repatriation. On June 11, 2017, without warning, ICE came to Mr. Al-Issawi's home and arrested him. ICE then transferred him to a detention center in Youngstown, Ohio preparatory to removal to Iraq. In January 1998, Mr. Al-Issawi was convicted of aggravated assault and sentenced to a term of imprisonment of over one year. With the assistance of counsel, this sentence was later reduced to 360 days. Mr. Al-Issawi has not reoffended since that time. Mr. Al-Issawi fears removal to Iraq, especially because his status as a Shiite Muslim makes him a target for torture, persecution, and death. He filed a motion to reopen on that basis, which was initially denied by the immigration judge. Subsequently, the immigration judge reconsidered the ruling in light of additional evidence, and granted his motion to reopen. Although the government has appealed that decision to the Board of Immigration Appeals, on October 3, 2017 an immigration judge ordered his release on bond, demonstrating that an independent adjudicator found that his detention could not be justified based on flight risk or danger to the community.

25.     Petitioner/Plaintiff **Qassim Hashem Al-Saedy** is a 48-year-old Iraqi national who has lived in the United States since entering as a refugee in 1996. He adjusted his status to Lawful Permanent Resident in 1998, and lives in Nashville, Tennessee. He is the father of a teenage U.S. citizen son, and the longtime partner

and former spouse of a U.S. citizen. Although he has been subject to a final order of removal to Iraq since September 23, 2003, he was released to the community pursuant to an order of supervision, with which he was complying. On information and belief, ICE's decision to put him on an order of supervision was based on the government's determination that Iraq would not accept him for repatriation. On June 12, 2017, without warning, ICE arrested and detained him. ICE first held Mr. Al-Saedy in Nashville, Tennessee, and then transferred him to a detention center in Ft. Payne, Alabama and then to a third detention center in Jena, Louisiana, where he remains detained. Mr. Al-Saedy was convicted of domestic assault in 2002. Mr. Al-Saedy fears removal to Iraq, especially because his longtime U.S. residence, his religious views, and aspects of his employment history will make him a target for persecution and torture. Without the benefit of his A-File, he filed a motion to reopen, a final decision on which is currently pending. On September 27, 2017, ICE informed him his detention would continue on the following grounds: "You have a final order of removal from the United States and ICE is actively pursuing your removal." Since his redetention by ICE, he has never received any determination that he poses a danger or flight risk. Mr. Al-Saedy's detention cannot be justified based on flight risk or danger to the community. Although when he was arrested he was threatened with imminent removal, currently his removal is not significantly likely in the reasonably foreseeable future: because of this Court's

13

stay of removal, he cannot be removed while he pursues his meritorious challenges to removal, a process that will take months if not years. In addition, ICE has made no individualized showing that Iraq will agree to his repatriation.

26.    Petitioner/Plaintiff **Abbas Oda Manshad Al-Sokaini** is an Iraqi national who has lived in the United States since 1996, and is a resident of Albuquerque, New Mexico. His wife is a U.S. citizen and he has three stepchildren, eleven grandchildren, and five great-grandchildren, all of whom are U.S. citizens. On information and belief, Mr. Al-Sokaini has been subject to a final removal order since October 2003; until recently he was living in the community pursuant to an order of supervision, with which he was complying. On information and belief, ICE's decision to allow him to live in the community subject to an order of supervision was based on the government's determination that Iraq would not accept him for repatriation. On June 20, 2017, without warning, ICE arrested him, and transferred him to a detention center in El Paso, Texas, where he remains detained. His transfer to Texas, away from his family in New Mexico, made it difficult for his family to communicate with him and retain counsel. When Mr. Al-Sokaini was a young man, he was convicted of two drug charges and was placed on supervision, but he was never sentenced to any period of incarceration. Mr. Al-Sokaini fears removal to Iraq, as he is a practicing Christian. Although he was raised a Muslim, he has been involved with a Baptist Congregation in

14

Albuquerque, which could make him a special target for persecution or torture. He is particularly fearful because his family members in Iraq know that he is involved with the Baptist congregation and he believes that others in Iraq know as well. He is currently represented in his immigration proceedings and wishes to continue his ongoing efforts to seek protection from removal, but is waiting on receipt of his A-File and Record of Proceedings to file a motion to reopen. He has been told a decision on detention is being made in Washington, D.C. Since his redetention by ICE, he has never received any determination that he poses a danger or flight risk. Under Respondents' declared—but erroneous—interpretation of 8 U.S.C. § 1226(c), they will subject Mr. Al-Sokaini to mandatory detention if he wins his motion to reopen. Mr. Al-Sokaini's detention cannot be justified based on flight risk or danger to the community. Although when he was arrested he faced the threat of imminent removal, currently his removal is not significantly likely in the reasonably foreseeable future: because of this Court's stay of removal, he cannot be removed while he pursues his meritorious challenges to removal, a process that will take months if not years. In addition, ICE has made no individualized showing that Iraq will agree to his repatriation.

27. Petitioner/Plaintiff **Atheer Ali** is a 41-year-old Iraqi national who has lived in the United States since 1992. His family left Iraq for the United States when he was a child. He resides in Michigan and has a 12-year-old daughter who

is a U.S. citizen. Mr. Ali is a Christian and has a tattoo of a cross on his shoulder. Mr. Ali has been subject to an order of removal to Iraq since 2004, but was living in the community pursuant to an order of supervision, with which he was complying. On information and belief, ICE's decision to allow him to live in the community under an order of supervision was based on the government's determination that Iraq would not accept him for repatriation. On June 11, 2017, without warning, Mr. Ali was arrested by ICE and transferred to a detention center in Youngstown, Ohio, where he remains detained. Mr. Ali's criminal history includes a felony conviction for breaking and entering a vehicle and receipt or concealment of stolen property in 1996, and convictions for drug possession more recently. Apart from a month in a "bootcamp," he was never sentenced to any term of incarceration. Mr. Ali fears removal to Iraq, especially because his visible status as a Christian will make him a target for torture, persecution, and death. In addition, he fears targeting based on particular aspects of his family's history. He has filed a motion to reopen with the Board of Immigration Appeals, which is pending. On September 11, 2017, ICE issued him a Decision to Continue Detention which denied release on the following basis: "You have a final order of removal from the United States and ICE is actively pursuing your removal." Since his redetention by ICE, he has never received any determination that he poses a danger or flight risk. Under Repondents' declared—but erroneous—interpretation

16

of 8 U.S.C. § 1226(c), they will subject Mr. Ali to mandatory detention if he wins his motion to reopen. Mr. Ali's detention cannot be justified based on flight risk or danger to the community. Although when he was arrested he faced the threat of imminent removal, currently his removal is not significantly likely in the reasonably foreseeable future: because of this Court's stay of removal, he cannot be removed while he pursues his meritorious challenges to removal, a process that will take months if not years. In addition, ICE has made no individualized showing that Iraq will agree to his repatriation.

28.    Petitioner/Plaintiff **Jihan Asker** is a 42-year-old Iraqi national who has lived in the United States since the age of five, mostly near Warren, Michigan. She has three children, all of whom are U.S. citizens. Although she has been subject to a final order of removal to Iraq since 1986, she was released on an order of supervision and has been living in the community complying with this order. On information and belief, ICE's decision to put her on an order of supervision was based on the government's determination that Iraq would not accept her for repatriation. On approximately June 11, 2017, without warning, ICE arrested her, and transferred her to a detention center in Calhoun County, Michigan. In 2003, Ms. Asker was convicted of a misdemeanor fraud charge and sentenced to six months' probation. She has not reoffended since. Ms. Asker is a beneficiary of an approved I-130 Petition filed by her United States citizen daughter. As a result, she

17

is eligible to seek lawful permanent residency in the United States. Ms. Asker fears removal to Iraq, especially because her status as a Chaldean makes her a target for torture, persecution, and death. She filed a motion to reopen, which was granted on August 17, 2017. She was released from detention on August 22, 2017 on bond, demonstrating that her detention could not be justified based on flight risk or danger to the community.

29.    Petitioner/Plaintiff **Moayad Jalal Barash** is a 47-year-old Iraqi national who has lived in the United States since at least 1979, mostly near Warren, Michigan. He has four U.S. citizen children. His seven-year-old daughter has a disability. On information and belief Mr. Barash has been subject to a final removal order to Iraq for about twenty years, and was living in the community pursuant to an order of supervision, with which he was complying.  On information and belief, ICE's decision to release him from detention pursuant to an order of supervision was based on the determination that Iraq would not accept him for repatriation. On June 11, 2017, without warning, ICE arrested him, and transferred him to a detention center in Youngstown, Ohio, where he remains detained. While still a teenager, Mr. Barash was convicted and served time for a drug charge and for possession of a weapon. Since serving his sentences, he has been involved in the church and the sole breadwinner and source of support for his family. Mr. Barash fears removal to Iraq, especially since his status as a Christian makes him a

target for torture, persecution, and death. He has filed a motion to reopen, which is currently pending; he filed without the benefit of his A-file or Record of Proceedings. On September 11, 2017, ICE issued him a Decision to Continue Detention which denied release on the following basis: "You have a final order of removal from the United States and ICE is actively pursuing your removal." Since his redetention by ICE, he has never received any determination that he poses a danger or flight risk. Under Respondents' declared—but erroneous—interpretation of 8 U.S.C. § 1226(c), they will subject Mr. Barash to mandatory detention if he wins his motion to reopen. Mr. Barash's detention cannot be justified based on flight risk or danger to the community. Although when he was arrested he faced the threat of imminent removal, currently his removal is not significantly likely in the reasonably foreseeable future: because of this Court's stay of removal, he cannot be removed while he pursues his meritorious challenges to removal, a process that will take months if not years. In addition, ICE has made no individualized showing that Iraq will agree to his repatriation.

30.     Petitioner/Plaintiff **Jami Derywosh** is an Iraqi national who lawfully entered the United States in 1983 as a refugee at the age of six; he adjusted his status to lawful permanent resident two years later. He has resided in the United States for over thirty-four years. He is a longtime resident of the Chicago area and a successful businessman who owns three businesses employing between twenty to

19

thirty people. He supports his elderly father and his fiancée is pregnant with the couple's first child, due in just two months. Mr. Derywosh belongs to an ethnic and religious minority group in Iraq: Assyrian Christians. In late 1994, at the age of 16, Mr. Derywosh was arrested for arson. He subsequently pled guilty and was sentenced to seven years in prison, of which he served roughly half. Apart from a 2009 municipal code violation, for which he paid a fine, this is his only offense. Although Mr. Derywosh was ordered removed in 1997, and spent 13 months in post-final-order immigration detention, the government released him under an order of supervision in August 1999, with which he has been complying. On information and belief, ICE's decision to put him on an order of supervision was based on the government's determination that Iraq would not accept him for repatriation. Nonetheless, on July 20, 2017, while reporting to ICE-ERO for his annual check-in, Mr. Derywosh was taken into custody and placed in detention at the Kenosha County Detention Center, where he remains today. Mr. Derywosh knew there was a significant likelihood that he would be detained at his check-in because of the June arrests in Michigan, but he appeared for his check-in anyway. Both before and after Mr. Derywosh's arrest and detention, his attorney asked the Chicago Field Office whether it would abide by this Court's order temporarily staying removals to Iraq. The Chicago Field Office refused to provide this assurance, stating erroneously that the order only applied in Michigan and that it

20

was following directives from Headquarters. Therefore, without the benefit of Mr. Derywosh's A-file or Record of Proceeding, on August 15, 2017, Mr. Derywosh's attorney filed an emergency motion to reopen along with an emergency motion for stay of removal on his behalf. The motion to reopen, which remains pending, was based on changed country conditions in Iraq that make it likely Mr. Derywosh would be a target for torture and persecution because he is an Assyrian Christian. Since his redetention by ICE, he has never received any custody determination nor any determination that he poses a danger or flight risk. Mr. Derywosh's detention cannot be justified based on flight risk or danger to the community. Although when he was arrested he faced the threat of imminent removal, currently his removal is not significantly likely in the reasonably foreseeable future: because of this Court's stay of removal, he cannot be removed while he pursues his meritorious challenges to removal, a process that will take months if not years. In addition, ICE has made no individualized showing that Iraq will agree to his repatriation..

31.     Petitioner/Plaintiff **Anwar Hamad** is 30 years old and entered the United States lawfully as a refugee in 2000; he adjusted status to lawful permanent resident in 2005. He was born in Kuwait, but the U.S. government considers him Iraqi. He was convicted of one misdemeanor and one felony drug crime in 2013 and 2014, respectively. He has been subject to an order of removal since 2014. He has a young U.S. citizen daughter. On June 11, 2017, ICE arrested him and

subsequently transferred him to a detention facility in Chippewa County, Michigan. He filed an emergency motion to reopen which was granted on August 6, 2017. He fears removal to Iraq because he is Shia Muslim, is unable to speak Arabic, and because he worked for the U.S. Army in 2006 helping train U.S. soldiers to fight in Iraq. Under Respondents' declared—but erroneous—interpretation of 8 U.S.C. § 1226(c), they are subjecting Mr. Hamad to mandatory detention; he is being held without the opportunity to seek bond. Since his redetention by ICE, he has never received any determination that he poses a danger or flight risk. Mr. Hamad's detention cannot be justified based on flight risk or danger to the community. Although when he was arrested he faced the threat of imminent removal, currently his removal is not significantly likely in the reasonably foreseeable future: because of this Court's stay of removal, he cannot be removed while he pursues his meritorious challenges to removal, a process that will take months if not years. In addition, ICE has made no individualized showing that Iraq will agree to his repatriation.

32.     Petitioner/Plaintiff **Jony Jarjiss** is a 57-year-old Iraqi national who lawfully entered the United States in 1993. He has never been convicted of a crime. He has been subject to an order of removal to Iraq for about twenty years. He has been living in the community for more than a decade under an order of supervision, with which he was complying. On information and belief, ICE's

decision to allow him to live in the community subject to an order of supervision was based on the government's determination that Iraq would not accept him for repatriation. He has requested travel documents from the Iraq consulate more than once, but Iraq has declined to issue him a passport or other travel documents. Both his daughter and grandchild are U.S. citizens. On June 11, 2017, he learned of the large number of arrests of Iraqi nationals in Michigan. Nevertheless, he reported to his scheduled supervision appointment at the Detroit Field Office two days later, on June 13, 2017, even though he knew there was a high likelihood that he would be detained. At that meeting, he was indeed detained. Before his detention, he lived in Saginaw, Michigan. He is currently detained in Youngstown, Ohio. He fears removal to Iraq, especially because his status as a Chaldean Christian makes him a target for torture, persecution, and death. He is currently represented; he has filed a motion to reopen without the benefit of his A-File or Record of Proceeding; that motion is pending. ICE denied his 90-day post order custody review, issuing him a Decision to Continue Detention which denied release on the following basis: "You have a final order of removal from the United States and ICE is actively pursuing your removal." Since his redetention by ICE, he has never received any determination that he poses a danger or flight risk. Mr. Jarjiss's detention cannot be justified based on flight risk or danger to the community. Although when he was arrested he faced the threat of imminent removal, currently his removal is not

23

significantly likely in the reasonably foreseeable future: because of this Court's stay of removal, he cannot be removed while he pursues his meritorious challenges to removal, a process that will take months if not years. In addition, ICE has made no individualized showing that Iraq will agree to his repatriation.

33.    Petitioner/Plaintiff **Mukhlis Murad** is a 59-year-old Iraqi national. He lawfully entered the United States in 1977, and later adjusted status to lawful permanent resident. Over two decades ago, he was convicted of drug possession with intent to deliver. In 1997, he was shot when his place of work was robbed, and as a result he continues to suffer from mental and physical sequelae for which he needs treatment. Mr. Murad requires a cane to walk, and while in ICE detention has been confined to a wheelchair. He has been subject to an order of removal since 2004, but was released to the community on an order of supervision, with which he was complying. On information and belief, ICE's decision to allow him to live in the community subject to an order of supervision was based on the government's determination that Iraq would not accept him for repatriation. He lived in Farmington Hills, Michigan. In July 2017, he received a letter from ICE demanding that he report for what he understood as a check-in. He reported to ICE as ordered on July 27, 2017, even though he was aware that a large number of Iraqis had been detained in June and knew that there was a significant likelihood that he himself would be detained. He was indeed detained at his check-in, and is

24

currently being held in Calhoun County, Michigan. He is represented in his immigration proceedings, and intends to file a motion to reopen because he fears, that as a Catholic, he would be a target for torture, persecution, and death if removed to Iraq. He has not yet received his A-File and Record of Proceedings. Since his redetention by ICE, he has never received any determination that he poses a danger or flight risk. Under Respondents' declared—but erroneous—interpretation of 8 U.S.C. § 1226(c), they will subject Mr. Murad to mandatory detention if he wins his motion to reopen. Mr. Murad's detention cannot be justified based on flight risk or danger to the community. Currently his removal is not significantly likely in the reasonably foreseeable future: because of this Court's stay of removal, he cannot be removed while he pursues his meritorious challenges to removal, a process that will take months if not years. In addition, ICE has made no individualized showing that Iraq will agree to his repatriation.

34.     Petitioner/Plaintiff **Habil Nissan** is a 36-year-old Iraqi national who lawfully entered the United States in or around 1996, was granted asylum in 1997, and adjusted his status to Lawful Permanent Resident a few years later. Mr. Nissan resides in Sterling Heights, Michigan and has two U.S. citizen daughters. Mr. Nissan pled guilty to misdemeanor destruction of property and two misdemeanor and assault charges in 2005, and served a sentence of twelve months of probation. Although Mr. Nissan has been subject to an order of removal to Iraq since 2007, he

was released to the community under an order of supervision, with which he was complying. On information and belief, ICE's decision to put him on an order of supervision was based on the government's determination that Iraq would not accept him for repatriation. On or about June 11, 2017, without warning, he was arrested by ICE and transferred to the detention center in Youngstown, Ohio. He fears removal to Iraq, especially because his status as a Catholic makes him a target for torture, persecution, and death. On August 9, 2017 an immigration judge granted his motion to reopen. He remains detained in Chippewa County, Michigan. He had a hearing in immigration court scheduled for October 10, 2017, which the Executive Office of Immigration Review cancelled and re-calendared for November 21, 2017. Mr. Nissan's detention cannot be justified based on flight risk or danger to the community. Although when he was arrested he faced the threat of imminent removal, currently his removal is not significantly likely in the reasonably foreseeable future: because of this Court's stay of removal, he cannot be removed while he pursues his meritorious challenges to removal, a process that will take months if not years. In addition, ICE has made no individualized showing that Iraq will agree to his repatriation.

35.     Petitioner/Plaintiff **Adel Shaba** is a 67-year-old Iraqi national who has lived in the United States since approximately 1979 and adjusted status to lawful permanent resident in 1982. He is married to a lawful permanent resident

26

and is father to five U.S. citizen children and a grandfather to six U.S. citizen grandchildren. On or about December 10, 1987, he was convicted of delivery and manufacture of less than 50 grams of a controlled substance. He was ordered removed in 1992. He has lived for more than a decade under an order of supervision, with which he was complying. On information and belief, ICE's decision to put him on an order of supervision was based on the government's determination that Iraq would not accept him for repatriation. He was arrested by ICE on June 11, 2017, and has remained detained since. He is currently being held in the St. Clair County Jail. He fears removal to Iraq, especially because his status as a Chaldean Christian makes him a target for torture, persecution, and death. On or about June 23, 2017, he filed a motion to reopen without the benefit of his A-file or Record of Proceeding. The motion is pending with the Board of Immigration Appeals. On September 7, 2017, ICE issued him a Decision to Continue Detention which denied release on the following basis: "You have a final order of removal from the United States and ICE is actively pursuing your removal." Under Respondents' declared—but erroneous—interpretation of 8 U.S.C. § 1226(c), they may subject Mr. Shaba to mandatory detention if he wins his motion to reopen. Since his redetention by ICE, he has never received any determination that he poses a danger or flight risk. Mr. Shaba's detention cannot be justified based on flight risk or danger to the community. Although when he was arrested he faced

27

the threat of imminent removal, currently his removal is not significantly likely in the reasonably foreseeable future: because of this Court's stay of removal, he cannot be removed while he pursues his meritorious challenges to removal, a process that will take months if not years. In addition, ICE has made no individualized showing that Iraq will agree to his repatriation.

36.    Petitioner/Plaintiff **Kamiran Taymour** is a 41-year-old Iraqi national who lawfully entered the United States in 1993 as a refugee; he was 17, and adjusted his status to lawful permanent residence the following year. He converted to Christianity in 2007 after marrying his wife, who is a Christian. Mr. Taymour is a resident of Ann Arbor, Michigan, with his wife and three children who are all U.S. citizens. He has been convicted of three marijuana-related offenses, in 1998, 2006, and 2011. Mr. Taymour has not been convicted of any crime since 2011, although he is currently contesting a misdemeanor charge of marijuana possession. He has been subject to an order of removal to Iraq since December 2011, but was released to the community under an order of supervision. On information and belief, ICE's decision to put him on an order of supervision was based on the government's determination that Iraq would not accept him for repatriation. Notwithstanding his compliance with that order, he was arrested by ICE officers on June 11, 2017 and detained in the detention center in Youngstown, Ohio; he was later transferred to the detention center in Calhoun County, Michigan, where he is

currently being held. Mr. Taymour fears removal to Iraq because his status as a Christian convert makes him a target for torture, persecution, and death. Particular aspects of his family history also render him likely to be target for torture and persecution. Mr. Taymour submitted a motion to reopen to the Detroit Immigration Court on June 13, 2017; that motion was granted on August 28, 2017.  Under ICE's declared—but erroneous—interpretation of 8 U.S.C. § 1226(c), Mr. Taymour is being subjected to mandatory detention and being held without bond. Since his redetention by ICE, he has never received any determination that he poses a danger or flight risk.  Mr. Taymour's detention cannot be justified based on flight risk or danger to the community. Although when he was arrested he faced the threat of imminent removal, currently his removal is not significantly likely in the reasonably foreseeable future: because of this Court's stay of removal, he cannot be removed while he pursues his meritorious challenges to removal, a process that will take months if not years. In addition, ICE has made no individualized showing that Iraq will agree to his repatriation.

### Respondent/Defendants

37.    Respondent/Defendant **Rebecca Adducci** is the Director of ICE's Detroit Field Office and is sued in her official capacity. The Detroit Field Office Director has responsibility for and authority over the detention and removal of noncitizens in Michigan and Ohio, and is their immediate custodian, for purposes

29

of habeas corpus. *See Roman v. Ashcroft*, 340 F.3d 314, 319-321 (6th Cir. 2003). Respondent Adducci has the power or ability to produce petitioners arrested or detained in Michigan or Ohio if directed to do so by this Court. *Id.* at 323. To the extent that—after the filing of the original Petition in this matter—ICE has moved petitioners from Michigan or Ohio to other states outside of the area of responsibility of the Detroit District Field Office, Respondent Adducci remains an appropriate respondent in a habeas petition for those petitioners. *See Rumsfeld v. Padilla*, 542 U.S. 426, 441 (2004); *Ex parte Endo,* 323 U.S. 283 (1994); *White v. Lamanna*, 42 F. App'x 670, 671 (6th Cir. 2002).  ICE has agreed not to contest personal jurisdiction on this basis.

38.    Respondent/Defendant **Thomas Homan** is the Acting Director of ICE and is sued in his official capacity. The Acting Director of ICE has responsibility for and authority over the detention and removal of noncitizens throughout the United States and as such is a proper defendant and respondent in this matter. Director Homan also qualifies as an appropriate respondent for named Petitioners' and class members' habeas action based on the extraordinary circumstances present here, where, in order to preserve access to habeas corpus relief, it was necessary to file this action on behalf of a nationwide class and thereby depart from the general rule that the proper respondent in a habeas action is the local ICE Field Office Director. *See* Opinion & Order Granting Petitioners'/Plaintiffs'

Motion to Expand Order Staying Removal to Protect Nationwide Class, dated June 26, 2017, ECF # 43, Pg.ID# 671-676 (finding habeas jurisdiction over nationwide class based on extraordinary circumstances warranting departure from "immediate custodian" rule).

The circumstances here include:

(a) At the time the First Amended Petition was filed, named Petitioners and class members who were not within the area of responsibility of the ICE Detroit Field Office were to be deported from the United States as soon as Tuesday, June 27, 2017, and were located in various locations around the United States making it difficult or impossible to seek the emergency relief that was necessary to prevent their removal to possible death; that they could continue to pursue their habeas petitions from abroad would be meaningless in light of the extraordinarily grave consequences they faced.

(b) ICE has and continues to repeatedly and rapidly transfer named Petitioners and class members from location to location interfering with their ability both to obtain and communicate with counsel who they need to file papers on their behalf. ICE has declined to stop such transfers.

31

(c) Upon information and belief, decisions regarding the continued detention of named Petitioners and class members are being made at ICE headquarters, rather than being delegated to the local level.

In light of these circumstances, in order to protect Iraqis outside the jurisdiction of the Detroit ICE Field Office, habeas relief must be sought on behalf of a nationwide class. *See Ali v. Ashcroft*, 346 F.3d 873, 889-91 (9th Cir 2003) (holding that the district court did not exceed its habeas jurisdiction in certifying a nationwide habeas class), *withdrawn and amended on other grounds on reh'g, Ali v. Gonzales,* 421 F.3d 795 (9th Cir. 2005).

Director Homan has the power and ability to produce Petitioners located anywhere in the United States if directed to do so by this Court, and this Court has personal jurisdiction over him. *See Straight v. Laird*, 406 U.S. 341, 345 n.2 (1972) (commanding officer is present in a jurisdiction "through the officers in the hierarchy of the command," and such presence suffices for personal jurisdiction); *Braden v. 30th Judicial Circuit Court of Kentucky,* 410 U.S. 484, 495 (1973) ("So long as the custodian can be reached by service of process, the court can issue a writ 'within its jurisdiction' requiring that the prisoner be brought before the court for a hearing on his claim, or requiring that he be released outright from custody, even if the prisoner himself is confined outside the court's territorial jurisdiction.").

39.    Respondent/Defendant **Elaine C. Duke** is the Acting Secretary of

Homeland Security and is sued in her official capacity. Director Homan reports to Acting Secretary Duke, who therefore has supervisory responsibility for and authority over the detention and removal of noncitizens throughout the United States.

40.     Respondent/Defendant **Jefferson B. Sessions III** is the Attorney General of the United States, responsible for the interpretation and enforcement of the nation's immigration laws. He supervises the Executive Office of Immigration Review. He is sued in his official capacity.

## LEGAL FRAMEWORK

## Protection from Removal

41.     Consistent with U.S. obligations under the Refugee Act and the Convention Against Torture ("CAT"), the Immigration and Nationality Act (the "immigration statute" or the "INA") prohibits the U.S. government from removing a noncitizen to a country where he or she is more likely than not to face persecution or torture.

42.     Specifically, 8 U.S.C. § 1231(b)(3), "Restriction on removal to a country where alien's life or freedom would be threatened," codifies the non-refoulement obligation of the Refugee Act. The provision is a *mandatory* prohibition on removing noncitizens to a country where their life or freedom would be threatened on the grounds of race, religion, nationality, membership in a

particular social group, or political opinion. Apart from certain specified exceptions, any individual who can demonstrate that it is more likely than not that he or she will be persecuted on one of the five protected grounds, is entitled to this statutorily mandated protection. *See INS v. Stevic*, 467 U.S. 407 (1984) (holding that alien is entitled to relief from deportation if he is more likely than not to face persecution on one of the specified grounds following his deportation).

43. The other prohibition on removal tracks the Convention Against Torture's prohibition on removal of noncitizens to countries where they would face torture. *See* 8 C.F.R. §§ 208.16–.18 (implementing the Convention Against Torture's provisions with regard to withholding of removal); Foreign Affairs Reform and Restructuring Act ("FARRA"), Pub. L. No. 105-277, Div. G., Title XXII, § 2242, 112 Stat. 2681-822 (Oct. 21, 1998) (codified as Note to 8 U.S.C. § 1231); U.N. Convention Against Torture and Other Forms of Cruel, Inhuman or Degrading Treatment or Punishment, art. 1, ¶ 1, opened for signature Dec. 10, 1984, S. Treaty Doc. No. 100-20 (1988), 1465 U.N.T.S. 85.

44. Under the CAT, an individual may not be removed if "it is more likely than not that [the individual] would be tortured if removed to the proposed country of removal." 8 C.F.R. § 208.16(c)(2). Torture is defined in part "as any act by which severe pain or suffering, whether physical or mental, . . . is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other

person acting in an official capacity." 8 C.F.R. § 208.18(a)(1). The regulations provide for both withholding of removal under CAT and "deferral of removal." Whereas withholding of removal is subject to the same exceptions as apply to 8 U.S.C. § 1231(b)(3), deferral of removal contains no exceptions for people with "particularly serious crimes." *Compare* 8 C.F.R. § 208.16(d)(3) *with* 8 C.F.R. § 208.17.

45.     Petitioners are also potentially eligible for asylum. *See* 8 U.S.C. § 1158. Asylum is a discretionary form of relief from persecution that is available to noncitizens who can demonstrate that they have a "well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42). To prevail on an asylum claim, the applicant must establish that there is at least a 10% chance that he or she will be persecuted on account of one of these enumerated grounds. *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 439-40 (1987).

46.     Noncitizens who have been ordered removed have the statutory right to file motions to reopen their cases, which are governed by certain time and numerical requirements. *See* 8 U.S.C. § 1229a(c)(7). But the statute grants special solicitude for noncitizens who are seeking relief from persecution. If the noncitizen is seeking asylum, withholding, or protection under CAT based "on changed country conditions arising in the . . . country to which removal has been ordered,"

35

the statute permits the noncitizen to file a motion to reopen at any time. *Id.*, § 1229a(c)(7)(C)(ii); *see also* 8 C.F.R. § 1003.2(c)(3)(ii) (Board of Immigration Appeals); 8 C.F.R. § 1003.23(b)(4)(i) (immigration court).

47.   The exception to the numerical and time limits provides a critical safety valve for bona fide refugees who would otherwise be deported from the United States in violation of U.S. international treaty obligations of non-refoulement. *See Salim v. Lynch*, 831 F.3d 1133, 1137 (9th Cir. 2016) ("Judicial review of a motion to reopen serves as a 'safety valve' in the asylum process. . . . Such oversight 'ensure[s] that the BIA lives by its rules and at least considers new information' bearing on applicants' need for and right to relief." (citing *Pilica v. Ashcroft*, 388 F.3d 941, 948 (6th Cir. 2004)).

48.   In addition, the Due Process Clause and the INA grant Petitioners the right to counsel to challenge their removal, and to a fair proceeding before they are removed from the country. 8 U.S.C. § 1362; *Leslie v. Attorney General*, 611 F.3d 171, 181 (3d Cir. 2010) (holding that the Fifth Amendment and immigration statute affords a noncitizen right to counsel of her own choice); *Amadou v. INS*, 226 F.3d 724, 726-27 (6th Cir. 2000) (noting that noncitizens have "due process right to a full and fair hearing").

49.   Both ICE's due process obligations and the INA constrain the government's discretion to transfer detainees, if transfer interferes with detainees'

access to counsel. *See Orantes-Hernandez v. Thornburgh*, 919 F.2d 549, 565-66 (9th Cir. 1990) (affirming injunction enjoining INS from transferring detainees in manner that interfered with existing attorney-client relationships). Such transfers are unlawful when they interfere with detainees' constitutional, statutory, and regulatory rights to seek relief from persecution and obtain counsel of their choosing. *See Louis v. Meissner*, 530 F. Supp. 924, 927 (S.D. Fla. 1981) (finding INS had thwarted detainees' statutory and regulatory rights to representation in exclusion proceedings by transferring them to remote areas lacking counsel and interpreters); *see also Rios-Berrios v. INS*, 776 F.3d 859, 863 (9th Cir. 1985) (holding that noncitizen's transfer, combined with "unexplained haste in beginning deportation proceedings," his incarceration, inability to speak English, and lack of friends, deprived him of due process).

### Detention

50.     The INA governs the use of immigration detention both pre- and post-final order. Post-final-order immigration detention is governed by 8 U.S.C § 1231(a); pre-final-order detention by 8 U.S.C. § 1226.

#### Post-final-order detention

51.     8 U.S.C. § 1231(a)(2) authorizes a 90-day period of mandatory post-final-order detention during which time ICE is supposed to effectuate removal. Also known as "the removal period," § 1231(a)(1)(A), the 90 days generally

commences as soon as the BIA issues a final order of removal. § 1231(a)(1)(B).[1]

52.     Individuals whom the government is unable to remove during the 90-day removal period should be released under conditions of supervision. § 1231(a)(3) ("If the alien . . . is not removed within the removal period, the alien, pending removal, *shall* be subject to supervision.") (emphasis added). These conditions include periodic reporting and other "reasonable written restrictions on the alien's conduct." *Id.* However, the government "*may*" continue to detain certain individuals "beyond the removal period," including individuals who have been ordered removed on criminal grounds, and other individuals who are determined to pose a danger or flight risk. § 1231(a)(6). In *Zadvydas v. Davis,* the Supreme Court held that 8 U.S.C. § 1231(a)(6) authorizes continued detention only insofar as removal is "reasonably foreseeable." 533 U.S. 678, 699 (2001). That is because, to satisfy due process, detention must "bear a reasonable relation to the

---

[1] The only exceptions are: (1) where the removal order has been judicially stayed pending a petition for review with the court of appeals (in which case the removal period does not commence until review is completed and the stay lifted), 8 U.S.C. § 1231(a)(1)(B)(i), or (2) where an individual is subject to non-immigration detention or confinement (in which case the removal period commences upon the individual's release from such confinement). 8 U.S.C. § 1231(a)(1)(B)(iii). In addition, the 90-day removal period will be "tolled"—and effectively extended—if the individual "conspires or acts to prevent [their] removal." 8 U.S.C. § 1231(a)(1)(C). However, the removal period continues to run even where an individual has been released from detention. *See, e.g., Ulysse v. Dep't of Homeland Sec.*, 291 F. Supp. 2d 1318, 1326 (M.D. Fla. 2003); *Farez-Espinoza v. Chertoff*, 600 F. Supp. 2d 488, 500 (S.D.N.Y. 2009).

purpose for which the individual [was] committed." *Id*. at 690 (citations omitted). Because the principal purpose of the post-final-order detention statute is to effectuate removal, if removal cannot be effectuated, detention bears no reasonable relation to its purpose. *Id.* at 697. Thus, in order to avoid the serious constitutional problem that would be created if the statute authorized detention in such circumstances, the Court construed Section 1231(a)(6) as authorizing post-final-order detention only for a "period reasonably necessary to secure removal," a period that the Court determined to be presumptively six months. *Id.* at 699-701. After this six month period, if a detainee provides "good reason" to believe that his or her removal is not significantly likely in the reasonably foreseeable future, "the Government must respond with evidence sufficient to rebut that showing" *Id*. at 701. If the government cannot do so, the individual must be released. However, detainees are entitled to release even before six months of detention, as long as removal is not reasonably foreseeable. *See* 8 C.F.R. § 241.13(b)(1) (authorizing release after 90 days where removal not reasonably foreseeable). Moreover, as the period of post-final-order detention grows, what is considered "reasonably foreseeable" must shrink. *Id*.

53.    Even where detention meets the *Zadvydas* standard for reasonable forseeability, detention violates the Due Process Clause unless it is "reasonably related" to the government's purpose, which is to prevent danger or flight risk. *See*

39

*Zadvydas,* 533 U.S. at 700 ("[I]f removal is reasonably foreseeable, the habeas court should consider the risk of the alien's committing further crimes as a factor *potentially* justifying confinement within that reasonable removal period") (emphasis added); *id.* at 699 (purpose of detention is "assuring the alien's presence at the moment of removal"); *id.* at 690-91 (discussing twin justifications of detention as preventing flight and protecting the community).

54.    Thus, due process requires a meaningful determination that class members pose a danger or flight risk that warrant post-final-order detention, regardless of whether their removal can be effectuated within a reasonable period of time.

55.    The government's own regulations implement this requirement. They dictate that even after ICE determines that removal is reasonably foreseeable—and that detention therefore does not *per se* exceed statutory authority—the government must still determine whether continued detention is warranted based on flight risk or danger. *See* 8 C.F.R. § 241.13(g)(2) (providing that where removal is reasonably foreseeable, "detention will continue to be governed under the established standards" in 8 C.F.R. § 241.4).

56.    The regulations, at 8 C.F.R. § 241.4, set forth the custody review process that existed even before the Supreme Court's decision in *Zadvydas.* This mandated process, known as the post-order custody review (or "POCR"), requires

40

ICE to conduct "90-day custody reviews" prior to expiration of the 90-day removal period and to consider release of individuals who pose no danger or flight risk, 8 C.F.R. § 241.4(e)-(f). Among the factors to be considered in these custody reviews are "ties to the United States such as the number of close relatives residing here lawfully"; whether the noncitizen "is a significant flight risk"; and "any other information that is probative of whether" the noncitizen is likely to "adjust to life in a community," "engage in future acts of violence," "engage in future criminal activity," pose a danger to themselves or others, or "violate the conditions of his or her release from immigration custody pending removal from the United States." *Id.*

57.     Individuals with final orders who are released after a POCR are subject to orders of supervision.  8 C.F.R. § 241.4(j).

## Pre-final-order detention

58.     Detention of individuals whose removal proceedings are pending— including individuals whose motions to reopen have been granted and whose cases are remanded for a new round of proceedings in immigration court—is governed by 8 U.S.C. § 1226. This provision generally allows ICE or an immigration judge to release the individual on bond or parole, with the opportunity for a custody hearing before an immigration judge. 8 U.S.C. § 1226(a); 8 C.F.R. § 236.1.

59.     The principal exception to the opportunity to seek release under 8 U.S.C. § 1226 is for individuals subject to mandatory detention under 8 U.S.C.

41

§ 1226(c). Often referred to as "the mandatory detention statute," Section 1226(c) mandates detention pending removal proceedings of certain individuals charged with removal on criminal grounds "when the alien is released…." from criminal custody for an offense that triggers mandatory detention.

60.     The government has applied this provision to the Iraqi nationals it has detained without regard to how long a gap in time separates their release from criminal custody and their detention by ICE. *Cf. Matter of Rojas*, 23 I&N Dec. 117 (BIA 2001). Two Courts of Appeals, and numerous district courts inside and outside this Circuit, have held that the provision applies only to individuals who are detained by immigration immediately, or within a short period of time, of their release from criminal custody. *See Preap v. Johnson*, 831 F.3d 1193, 1206–07 (9th Cir. 2016) (detention is not mandatory where there is a gap between release from criminal custody and ICE apprehension), *petition for cert pending*; *Castañeda v. Souza*, 810 F.3d 15, 18–43 (1st Cir. 2015) (en banc) (same); *Rosciszewski v. Adducci*, 983 F. Supp. 2d 910, 916 (E.D. Mich. 2013) (same); *Khodr v. Adducci*, 697 F. Supp. 2d 774, 778–79 (E.D. Mich. 2010) (same); *Mudhallaa v. Bureau of Immigration & Customs Enf't*, No. 15-10972, 2015 WL 1954436, at *4 (E.D. Mich. Apr. 29, 2015) (same); *Rosario v. Prindle*, No. CIV. 11-217-WOB-CJS, 2011 WL 6942560, at *3 (E.D. Ky. Nov. 28, 2011) (Ex. 10), report and recommendation adopted, No. CIV.A. 2011-217 WOB, 2012 WL 12920 (E.D. Ky.

Jan. 4, 2012) (same).[2]

61.    In *Demore v. Kim*, the Supreme Court upheld mandatory detention for a "brief period" of time, for an individual who had no challenge to removability. 538 U.S. 510 (2003). Despite the Supreme Court's emphasis on the brevity of mandatory detention, the government takes the position that mandatory detention applies regardless of how long it takes for an individual's removal proceedings to be resolved. However, all of the Courts of Appeals to consider this issue, including the Sixth Circuit, have held that mandatory detention is authorized only for a "reasonable period of time."[3] And in two circuits, Courts of Appeals have held that mandatory detention beyond six months is unreasonable and requires a bond hearing. *Rodriguez v. Robbins*, 804 F.3d 1060 (9th Cir. 2015), *cert. granted sub nom. Jennings v. Rodriguez*, 138 S.Ct. 2489 (June 20, 2106); *Lora v. Shanahan*, 804 F.3d 601, 605 (2d Cir. 2015).

---

[2] *But see Olmos v. Holder*, 780 F.3d 1313 (10th Cir. 2015) (disagreeing with the First and Ninth Circuits to hold that "when released" does not require that noncitizen be placed in immigration detention immediately upon release from criminal sentence); *Lora v. Shanahan*, 804 F.3d 601 (2d Cir. 2015) (same); *Sylvain v. Attorney Gen. of U.S.*, 714 F.3d 150 (3d Cir. 2013) (same); *Hosh v. Lucero*, 680 F.3d 375 (4th Cir. 2012) (same).

[3] As the Sixth Circuit elaborated in *Ly v. Hansen*, 351 F.3d 263, 271-72 (6th Cir. 2004)*, factors for determining when detention becomes unreasonable include whether an individual has been subjected to immigration detention for a longer period of time than he was incarcerated for his criminal conviction, the likelihood that he will actually be ordered removed, and the government's inability to effectuate an order of removal if one ultimately issues. *Diop v. ICE*, 656 F.3d 221 (3d Cir. 2011); *Sopo v. U.S. Attorney General*, 825 F.3d 119 (11th Cir. 2016).

62.     Based on similar concerns, the Ninth Circuit has held that Section 1226(c)'s mandatory detention does not apply individuals in reopened removal proceedings. *Casas-Castrillon v. Dep't of Homeland Sec.,* 535 F. 3d 942, 947-48 (9th Cir. 2009). A noncitizen "whose case is being adjudicated before the agency for a second time—after having fought his case in this court and won, a process which often takes more than a year—has not received expeditious process." *Id.* at 948.

## FACTS

### ICE Abruptly Changes Its Policy with Respect to Release of Iraqis with Final Removal Orders, Without Notice to Those Affected.

63.     For many years, even when ICE has obtained final orders of removal against Iraqi nationals, ICE has only very rarely actually carried out removals. Instead, ICE had a policy and practice of releasing Iraqi nationals with final removal orders under orders of supervision, because Iraq so frequently declined to issue travel documents allowing repatriation.

64.     As a result of the deal that the current administration made with Iraq to remove it from the list of countries that were subject to an Executive Order barring entry into the United States for nationals of certain countries, Iraq reportedly agreed to relax its policy for allowing the repatriation of its nationals. Because the administration has not disclosed any information about the deal with Iraq, it is unknown how many individuals Iraq has agreed to repatriate, what

44

requirements it has imposed for repatriation, or how long the process of repatriation will take. It is clear, however, that Iraq has continued to deny travel papers for many Iraqi nationals with final orders of removal.

65.    On or about June 11, 2017, ICE began arresting Iraqi nationals in Michigan who had previously been released on orders of supervision. Around the same time, ICE arrested Iraqi nationals around the country, detaining approximately 200 Iraqi nationals over the course of just a few days for the purpose of effectuating their removal back to Iraq.[4] ICE has arrested additional individuals since; approximately 300 Iraqi nationals with final orders have been detained by ICE since June 2017.

66.    ICE's change in policy came as a shock to the communities where these Iraqi nationals lived. Until then, Iraqis with final orders had been living at large, sometimes for decades, with few restrictions apart from regular reporting requirements. Law-abiding individuals who were fully compliant with their conditions of supervision suddenly found themselves arrested and facing the threat of imminent deportation to a country where they face persecution, torture and death. The detainees were transferred far from their families and counsel, with many being repeatedly transferred.

---

[4] *See* Ben Klayman, "Iraqis Detained in Detention Sweep," U.S. News & World Report (June 14, 2017, 6:31PM), https://www.usnews.com/news/us/articles/2017-06-14/us-arrests-nearly-200-iraqis-in-deportation-sweep.

45

67.     Many of the Iraqis from Michigan arrested and detained as part of the roundup are from the country's Chaldean ethno-religious Christian minority, whose persecution in Iraq has been well documented. For example, in 2015 the Sixth Circuit held, on the basis of country-conditions evidence, that "status as a Christian alone entitles [a non-immigrant alien] to withholding of removal, given that there is 'a clear probability' that he would be subject to future persecution if returned to contemporary Iraq." *Yousif v. Lynch*, 796 F.3d 622, 628 (6th Cir. 2015). And conditions for Christians have gotten even worse in the subsequent two years.

68.     Yet despite the clear danger they face if removed to Iraq, ICE has defended its decision to remove them, and other Iraqi nationals, by trying to paint them as dangers to the community. Asked for comment about the arrests, ICE described these arrests as "part of ICE's efforts to process the backlog of these individuals, the agency recently arrested a number of Iraqi nationals, all of whom had criminal convictions for crimes."[5] In fact, many of the Iraqis who have been detained and are threatened with imminent removal were convicted of relatively minor crimes. And many of their crimes were from years ago.[6] Some of those

___

[5] Kyung Lah, et al*., ICE Arrests In Metro Detroit Terrify Iraqi Christians,* CNN (June 12, 2017), http://www.cnn.com/2017/06/12/politics/detroit-ice-iraqi-christians/index.html.

[6] Abigail Hauslohner, *Dozens of Iraqi Nationals Swept Up In Immigration Raids In Michigan, Tennessee*, Wash. Post (June 12, 2017), https://www.washingtonpost.com/national/dozens-of-iraqi-nationals-swept-up-in-

detained do not have criminal records at all.

### Individuals With Old Removal Orders Have Multiple New Bases for Immigration Protection or Relief, Including Changed Country Conditions in Iraq That Put Them at Risk of Persecution or Torture if Removed.

69.     Petitioners have multiple bases for immigration protection or relief, ranging from changed country conditions in Iraq, to changes in the law that affect the classification of their convictions so that they no longer render the individual statutorily ineligible for protection. With respect to changed country conditions, the Petitioners' removal orders mostly predate the significant deterioration in Iraq following the government's destabilization and the rise of the so-called Islamic State. This is true for detainees who are Chaldean and non-Chaldean, Christian, Muslim, and Yazidi. The Chaldeans who form a large portion of the now-detained Iraqis are particularly vulnerable to religious persecution in light of recent ethno-political violence.

70.     Prior to this past spring, the change in country conditions with respect to Chaldeans had been starkly reflected in the change in how their applications for protection fared in the immigration court. In previous years, these applications were routinely denied. But then came a period of time, in the past several years, in which they were almost invariably granted. Until the recent policy change, the Detroit Office of Chief Counsel for ICE conceded that Iraqi Chaldeans have a

immigration-raids-in-michigan-tennessee/2017/06/12/58e0524a-4f97-11e7-be25-3a519335381c_story.html?.

greater than 50% chance of being persecuted in Iraq, and the grant rate in the Detroit Immigration Court for Chaldeans was at or very near 100%, for applicants not statutorily barred from relief.

71.     Other new grounds for relief or protection from removal include intervening appellate and Supreme Court decisions which shift what crimes are considered disqualifying aggravated felonies. For example, when the Supreme Court decided *Moncrieff v. Holder*, 133 S.Ct. 1678 (2013), convictions for sharing small quantities of marijuana were no longer aggravated felonies. Thus, individuals who were previously improperly classified by immigration judges could file motions to reopen to apply for asylum based on the intervening authority.

### Obstacles to Access to Counsel Created by ICE's Transfer of Petitioners to Detention Facilities in Other Parts of Country

72.     The vast majority of the Iraqi detainees were transferred to detention facilities outside of the states where they reside and were arrested. For example, most of the Iraqis nationals arrested in Michigan were initially transferred over 230 miles from Detroit to Youngstown, Ohio. Some were then transferred to detention centers in Jena, Louisiana and Florence, Arizona. (Eventually, many but not all were transferred back to Youngstown.) Iraqi detainees arrested in Tennessee were detained, often in rapid succession, in Alexandria and Jena, Louisiana; Dallas, Texas; Fort Payne, Alabama; and Florence, Arizona.

73.     The Iraqi detainees are being held in facilities all over the country. As

48

of late September, those facilities include but are not limited to Youngstown, Ohio (86); Calhoun County, Michigan (29); Denver, Colorado (17); Etowah County, Alabama (17); Chippewa County, Michigan (16); Otey Mesa, California (10); Jena, Louisiana (8) and over 40 additional facilities. Because detainees have been and continue to be transferred from location to location, the number of detainees in any given facility can change rapidly.

74.    These transfers effectively disrupted detainees' ability to access pre-existing counsel, while also making it difficult to access pro bono resources that have been mobilized by their local communities. For example, for Iraqis arrested in Michigan and detained in Ohio (not to mention those detained in Louisiana or Arizona), the distance has made it difficult for Detroit-based attorneys with pre-existing attorney-client relationships to communicate, consult with, or aid their clients.

75.    And for those detainees who lack pre-existing counsel, the transfer to out-of-state facilities has severely impeded their ability to access counsel by physically removing the detainees from the network of local attorneys in their home community who have volunteered to provide pro bono representation. For many detainees, the situation has been made even more problematic, and due process even more elusive, by one or more subsequent transfers to even more distant locations.

49

76.    Detainees' distant and repeated transfers away from their homes, families, and previously retained attorneys also hinder their ability to file motions to reopen by imposing additional burdens on their ability to obtain documents in support of such motions, and limiting locally-based attorneys' access to detainees. Filing motions to reopen requires substantial time and resources, and is extremely difficult for detainees who lack assistance of counsel. Those who have retained counsel still face additional hurdles in filing motions to reopen, because attorneys need to visit and interview clients to draft pleadings, all of which is hindered due to their clients' transfer far away, and repeat moves.

77.    ICE's repeated transfers of detainees from jurisdiction to jurisdiction have also made it extremely difficult for counsel to file habeas petitions. Habeas petitions must normally be filed in a court with jurisdiction over the detainee's immediate custodian. By rapidly transferring detainees from location to location, ICE effectively prevents detainees' counsel from filing habeas petitions. Even if counsel can determine the detainee's location and prepare a petition for filing before the detainee is moved again, counsel generally are not admitted to practice in multiple states and therefore, in jurisdictions where they are not licensed, it is difficult for them to file rapidly. Without this Court's stay of removal, this would preclude habeas petitions needed to prevent unlawful deportation; even with this Court's stay of removal in effect, the result is difficult obstacles to habeas filings.

## This Court's Preliminary Injunction and
## Proceedings in Immigration Court

78.    On July 24, 2017, this Court issued a preliminary injunction staying removal of "any and all Iraqi nationals in the United States who had final orders of removal on June 24, 2017, and who have been, or will be, detained for removal by ICE." Opinion & Order Granting Petitioners' Motion for Preliminary Injunction, dated July 24, 2017, ECF # 87, Pg.ID# 2355. The stay gives class members three months to file a motion to reopen in the immigration court system, so that their cases can be decided there on an individual basis. The three months starts when the government provides class members with copies of their immigration files and records that are necessary to properly litigate relief in immigration court. The stay of removal continues while the individual's immigration case works its way through the immigration court system, including appeals.

79.    The stay is working: it has allowed many class members to pursue the relief to which they are entitled.  145 class members have filed motions to reopen since March 2017; about one-third in the Board of Immigration Appeals and the rest in immigration court. So far, Immigration Judges have granted reopening in 62 cases, and denied reopening in 43; a handful of cases are still pending in immigration court, and most of the denials are now pending on appeal before the Board. So far, the Board has denied reopening in 7 cases and granted it in 8; the rest of the cases are pending.

51

80.     Over 80% of these motions were filed prior to this Court's July 24, 2017 injunction that required production of files necessary to properly litigate relief in immigration court. Upon information and belief, most of these rushed motions were filed without access to the A-Files and Records of Proceedings.

81.     Once their cases were reopened, a number of class members have so far succeeded on the merits in immigration court. For example, an Immigration Judge has terminated the removal proceedings against Abdulkuder Hashem Al-Shimmary, who was a named Petitioner in the First Amended Complaint, on the basis that the U.S. Supreme Court's May 30, 2017 decision, *Esquivel-Quintana v. Session*, 137 S. Ct. 1562 (2017), made his twenty year old conviction no longer grounds for his removal.

82.     As of September 30, 2017, government disclosures do not reveal even one class member who has failed to obtain at least some success in his or her reopened case.

83.     Thus, the July 24, 2017 Preliminary Injunction Order has already begun to have its intended effect: enabling named Petitioners and class members to access the immigration court system and establish their eligibility for protection from removal or entitlement to other forms of immigration relief.

84.     At the same time, ICE has not yet provided the immigration files and records named Petitioners and class members need to meaningfully litigate their

cases in immigration court, despite this Court's order requiring the government to provide the necessary immigration files and records "[a]s soon as practicable." Opinion & Order Granting Petitioners' Motion for Preliminary Injunction, dated July 24, 2017, ECF # 87, Pg.ID# 2356.

85.    ICE's failure to provide A-Files and Records of Proceedings is prejudicing named Petitioners and class members' claims for relief from removal where those individuals filed emergency motions to reopen. The practical result of ICE's delay is that these individuals lack the information for effective presentation of their cases and could end up removed to a country where they face persecution, torture, and death if their motions to reopen or the underlying requested substantive relief are denied before they receive A-Files and Records of Proceedings.

### The Unjustified Detention of Petitioners and Class Members

86.    There are currently approximately 285 class members detained.  Most have been detained since mid-June. Many had also been detained in prior years, some for long periods of time, before the government released them because they could not be repatriated, either without any conditions or on orders of supervision.

87.    Since June 2017, fewer than 20 class members have been released from detention. Upon information and belief, the class members who have been released have either prevailed in immigration proceedings (winning not only a motion to reopen but the underlying substantive relief or protection from removal),

were released for medical reasons, or were granted bond pending reopened removal proceedings.

88.     Most of the class members currently in detention are being detained pursuant to 8 U.S.C. § 1231, which governs detention of individuals with final orders of removal. Approximately 160 class members have not yet filed motions to reopen, and about 80 more have not (yet) had such a motion granted.

89.     Some class members have been told by ICE employees that the ultimate release decision is being made in Washington, D.C. and not local offices. Some class members have been told by ICE employees that ICE has decided that no Iraqis with final orders will be released. Others have been told that the reason for this policy is this lawsuit, and have been encouraged to disassociate themselves with the lawsuit in order to improve their chance of post-order release from detention.

90.     Named Petitioners and class members who have final orders and are detained more than 90 days are entitled under ICE's regulations to a POCR. 8 C.F.R. § 241.4. Yet some class members who have been held more than 90 days have not received a POCR at all. And others have not received any POCR decisions.

91.     In any event, based on the data provided by the government, it appears that the POCR process has been pro forma, merely rubberstamping continued

detention. ICE has provided named Petitioners and class members with only boilerplate denials that address neither whether the individual is significantly likely to be removed in the reasonably foreseeable future nor whether the individual is a danger or flight risk.

92.     Although the named Petitioners and class members were threatened with immediate deportation at the time of their recent immigration arrests, currently neither named Petitioners nor most class members who have final orders of removal satisfy the requirement for detention that they be significantly likely to be removed in the reasonable foreseeable future. The overwhelming majority of class members were previously released under orders of supervision based on the government's determination that their removal to Iraq could not be effectuated. The government has made no individuated showing that this situation has changed for any particular individual.

93.     Typically individuals set to be deported must obtain travel documents—usually a passport—from their nation of citizenship. But when class members attempted to do that, some of them were denied the requisite documents by the Iraqi consulate. Other class members were designated as Iraqi by the U.S. government but either they or Iraq challenge the nationality designation because they were not born in Iraq. Upon information and belief, Iraq has still not provided travel documents to many detained Iraqis.

94.     Even where Iraq agrees to repatriation, the process of securing the necessary documents for individuals and coordinating the travel of these individuals is a time consuming, complicated, and costly process. Given the large number of Iraqis detained and the labor-intensive process involved in removing even those Iraq has agreed to accept, it could take many months for ICE to deport the almost 300 class members currently in detention, not to mention the 1100 other Iraqis with final orders of removal.

95.     Moreover, this Court's July 24, 2017 stay of removal means that deportation is delayed for another reason. For most named Petitioners and class members, proceedings in immigration court are likely to take many months or even years until a final resolution of their underlying immigration claims.

96.     The large majority of the currently pending motions to reopen were filed over three months ago; they could take months more to resolve. If those motions to reopen are granted, it will take many more months or even years for their cases to be decided on the merits. If those motions to reopen are denied, it will likely take many months for their appeals to wend their way through the immigration court system and up to the Court of Appeals.

97.     ICE has exacerbated these delays by failing to promptly produce the A-files and Records of Proceedings that this Court has already determined are necessary to competently litigate the named Petitioners' and class members' claims

56

in immigration proceedings.

98.    ICE's failure to provide A-Files and Records of Proceedings, coupled with ICE's insistence that class members remain in detention while those files are produced, are needlessly prolonging their detention. Already, almost three months have passed since this Court's July 24, 2017 order requiring production of the files. Not until November 27, 2017, will all the files be produced—at which point it will be four-and-a-half months from when the majority of the class members were detained in early June.

99.    Neither named Petitioners nor the overwhelming majority of class members present a danger or flight risk. Named Petitioners and class members could demonstrate that fact if given the opportunity for a meaningful individualized determination before an impartial adjudicator.

100.   The named Petitioners and the overwhelming majority of class members were previously living in the community, complying with their orders of supervision and reporting regularly to ICE, often for decades.

101.   Some named Petitioners, including Mr. Derywosh, Jarjiss, Murad, and some other class members reported to ICE as required under their orders of supervision even after the mass arrest of Iraqis in early June, knowing full well that they were likely to be taken into custody.

102.   Petitioners and the overwhelming majority of class members were not

transferred directly from criminal custody to ICE detention upon conclusion of any criminal sentence, and hence are not subject to mandatory detention under 8 U.S.C. § 1226(c).

103.   Nonetheless, ICE has detained Petitioners Hamad and Taymour and similarly situated class members who have won their motions to reopen without providing them the opportunity for a bond hearing, claiming that their detention is mandatory under 8 U.S.C. § 1226(c), regardless of whether they are a flight risk or danger.

104.   If Petitioners Al-Sokaini, Ali, Barash, Murad, and Shaba and similarly situated class members win their motions to reopen in the future, the Respondents will deprive them of the required bond hearings under the same erroneous reading of the mandatory detention statute.

## CLASS ALLEGATIONS

105.   Petitioners incorporate by reference the foregoing paragraphs as if fully alleged herein.

106.   Petitioners bring this action on behalf of themselves and all other similarly situated persons pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2), and as a representative habeas class action for similarly situated persons pursuant to a procedure analogous to Rules 23(a) and 23(b)(2). *See Ali v. Ashcroft*, 346 F.3d 873, 889-91 (9th Cir 2003) (holding that the district court did not exceed

its habeas jurisdiction in certifying a nationwide habeas class), *withdrawn and amended on other grounds on reh'g, Ali v. Gonzales,* 421 F.3d 795 (9th Cir. 2005). *See also Geraghty v. U.S. Parole Commission*, 429 F. Supp. 737, 740 (M.D. Pa. 1977) (noting that "procedures analogous to a class action have been fashioned in habeas corpus actions where necessary and appropriate").

107.   There are numerous other Iraqi nationals nationwide who, like the named Petitioners, are, have, or will be subject to arrest and the threat of removal to Iraq, a country where they face the very real probability of persecution, torture or death, and to unjustified and often prolonged incarceration while they challenge the government's efforts to remove them. Each of these similarly situated individuals is entitled to bring a complaint for declaratory and injunctive relief, a petition for a writ of mandamus, and a petition for a writ of habeas corpus, to prohibit his or her removal to Iraq and to obtain relief from unlawful transfers and detention.

108.   All the Petitioners—Hamama, Al-Dilaimi, Ali, Al-Issawi, Al-Saedy, Al-Sokaini, Asker, Barash, Derywosh, Hamad, Jarjiss, Murad, Nissan, Shaba, and Taymour—bring this action on behalf of themselves and all others similarly situated for the purpose of asserting claims alleged in this action on a common basis. They seek to represent a class defined as: All Iraqi nationals in the United States who had final orders of removal on March 1, 2017, who have been, or will

be, detained for removal by U.S. Immigration and Customs Enforcement (ICE).

109.   In addition, particular named Petitioners seek to represent one or both of two subclasses: the "Detained Final Order" subclass and the "Mandatory Detention" subclass. The class and subclasses include both individuals arrested and/or detained in ICE's Detroit Area of Responsibility (who are in the immediate custody of Respondent/Defendant Adducci) as well as individuals arrested and/or detained elsewhere.[7]

110.   Petitioners Hamama, Al-Dilaimi, Al-Saedy, Al-Sokaini, Ali, Barash, Derywosh, Jarjiss, Murad, and Shaba bring this class action on behalf of themselves and all others similarly situated for the purpose of asserting claims alleged in this action on a common basis. They seek to represent the Detained Final Order Subclass, defined as: All class members with final orders of removal, who are currently, or will be, detained in ICE custody.

111.   Petitioners Hamad and Taymour bring this class action on behalf of themselves and all others similarly situated for the purpose of asserting claims alleged in this action on a common basis. They seek to represent the Mandatory Detention subclass, defined as: All class members whose motions to reopen have been or will be granted, who are currently or will be detained in ICE custody under

---

[7] In the event this Court or the Court of Appeals deems it necessary for jurisdiction, the petitioners propose in the alternative the more limited class and subclasses of Detroit Area of Responsibility detainees.

the purported authority of the mandatory detention statute, 8 U.S.C. § 1226(c). If motions to reopen for Petitioners Al-Sokaini, Ali, Barash, Murad, and Shaba are granted, they will or may be members of this subclass as well, and would seek to represent the Mandatory Detention subclass.

112.   There are more than 1,400 Iraqi nationals with final orders of removal who could become members of the class. On information and belief, as of September 30, 2017, there were more than 285 members of the Class; 233 members of the Detained Final Order subclass; as many as 50 members of the Mandatory Detention subclass (the number of class members whose cases have been reopened but who remain in detention). The Mandatory Detention subclass in particular will likely grow over time, as class members' motions to reopen are granted and their orders of removal reconsidered.

113.   For the class as a whole and for each subclass, the total number of class members is such that joinder of the claims would be impracticable. Petitioners' claims are typical of the claims of the proposed class and proposed subclasses, and Petitioners will fairly and adequately protect the interests of the proposed class and subclasses. Petitioners have no relevant conflicts of interest with other members of the proposed class or subclasses and have retained competent counsel experienced in class action and immigration law.

114.   There are multiple questions of law and fact common to the members

61

of the proposed class and subclasses. These common questions include, but are not limited to, the following:

a. Whether Petitioners and the proposed class and subclass members can be removed without providing them a meaningful opportunity to demonstrate their qualifications for relief or protection from persecution or torture based on changed country conditions in Iraq;

b. Whether, absent the existing stay of removal, Respondents would violate Petitioners' constitutional, statutory, and regulatory right to a fair removal process by preventing them from seeking reopening based on changed country conditions in Iraq by providing insufficient time and opportunity for such a filing;

c. Whether 8 U.S.C. § 1158, 8 U.S.C. § 1231(b)(3), and the Convention Against Torture impose a mandatory obligation to consider Petitioners' individualized requests for relief and protection from persecution or torture;

d. Whether Respondents are violating Petitioners' constitutional, statutory, and regulatory right to counsel of their own choosing by transferring them far from their existing counsel and the immigration court in which their removal case was heard, sometimes multiple times in a short period of time, which impedes their counsel's effective representation and, for

those without counsel, prevents them from securing counsel;

e.  Whether the government has sufficiently demonstrated that class members previously released from detention based on a finding of non-repatriatability are now able to be repatriated, and thus their removal is significantly likely in the reasonably foreseeable future, such that their continued detention is lawful;

f.  Whether in determining foreseeability of removal under *Zadvydas v. Davis,* a habeas court must consider the length of time it will likely take for immigration proceedings to conclude and for a removal order to be enforceable;

g.  Whether the Due Process Clause requires that individuals subject to post-final-order detention under 8 U.S.C. § 1231(a)(6) be provided with a hearing before an impartial adjudicator on the issues of danger and flight risk;

h.  Whether the POCR procedures set out in applicable regulations were properly followed;

i.  Whether the POCR procedures satisfy due process on their face and as applied by ICE to class members;

j.  Whether the mandatory detention statute, 8 U.S.C. § 1226(c), applies to individuals in reopened removal proceedings, or to individuals taken into

63

immigration custody months or years after they were released from criminal custody for the offenses that could otherwise trigger their mandatory detention;

k. Whether the government's delay in providing class members with their A-Files and Records of Proceedings, as ordered by this Court, entitles class members who filed motions to reopen before receipt of these files to protection from removal until such time as they have been able to submit motions to supplement or reconsider their previously filed motions, and for the time it takes for these motions to be adjudicated.

## CAUSES OF ACTION

### COUNT ONE
**PROHIBITION ON REMOVAL TO COUNTRY WHERE INDIVIDUAL WOULD FACE PERSECUTION OR TORTURE**

115.    Petitioners reallege the foregoing paragraphs as if set forth fully herein.

116.    Pursuant to the INA, and to ensure compliance with the Convention Against Torture, enacted into statutory law by FARRA, the U.S. government is prohibited from removing noncitizens to countries where they are more likely than not to face persecution or torture.

117.    The prohibition on removal is mandatory for anyone who satisfies the eligibility criteria set forth in the statute and regulations. In addition, where country

conditions change after an individual has been ordered removed, the INA and the regulations implementing CAT specifically provide for motions to reopen a removal order in order to renew one's claims for protection in light of new facts.

118.   Petitioners, who are facing removal to Iraq based on old removal orders, face persecution and/or torture if removed to that country in light of changed circumstances since their cases were first considered.

119.   Respondents have a mandatory duty under the INA, CAT, and FARRA to determine for each Petitioner and members of the class whether the individual will face persecution, torture, or death if deported to Iraq.

## COUNT TWO
### PROHIBITION ON REMOVAL TO COUNTRY WHERE INDIVIDUAL WOULD FACE PERSECUTION OR TORTURE WITHOUT DUE PROCESS GUARANTEED BY CONSTITUTION

120.   Petitioners reallege the foregoing paragraphs as if set forth fully herein.

121.   As persons who are protected by the Due Process Clause, Petitioners have a right to a fair proceeding before they are removed from the country.

122.   Because the danger to Petitioners in Iraq is based on changed country conditions, they have not received their core procedural entitlement: They have not had an opportunity to have their claims heard at a meaningful time and in a meaningful manner, that is, with respect to current conditions, rather than the conditions that existed at the time their removal order was first issued. Removing

65

the Petitioners without giving them this opportunity violates the Fifth Amendment's Due Process Clause.

123.   Respondents have a mandatory duty under the Due Process Clause to determine for each Petitioner and members of the class whether the individual will face persecution, torture, or death if deported to Iraq.

## COUNT THREE
### PROHIBITION ON TRANSFER OF IMMIGRATION DETAINEES AWAY FROM COUNSEL

124.   Petitioners reallege the foregoing paragraphs as if set forth fully herein.

125.   In addition to their Due Process Clause rights, pursuant to statute, Petitioners have a right to counsel, at no expense to the government, to challenge their removal from the country. 8 U.S.C. § 1362.

126.   ICE's decision to transfer Petitioners who reside in one state to detention centers that are hundreds of miles away, and sometimes far further, is interfering with their statutory right to counsel and their due process right to a fair hearing.

## COUNT FOUR
### PROHIBITION ON IMMIGRATION DETENTION WHERE REMOVAL IS NOT SIGNIFICANTLY LIKELY IN THE REASONABLY FORESEEABLE FUTURE

127.   Petitioners reallege the foregoing paragraphs as if set forth fully herein.

128.   Due process requires that immigration detention bear a reasonable relation to its purpose. *See Zadvydas v. Davis*, 533 U.S. 678 (2001); *Rosales-Garcia v. Holland,* 322 F.3d 386 (6th Cir. 2003). The principal purpose of the statute that authorizes post-final-order detention, 8 U.S.C. § 1231, is to effectuate removal. Where removal cannot be effectuated, detention is not reasonably related to its purpose, would violate due process, and is not statutorily authorized.

129.   Petitioners who were previously released by the government, based on a determination that they could not be repatriated to Iraq, have met their burden of establishing good reason to believe that their removal is not reasonably foreseeable. Respondents have not rebutted this showing as they have provided no particularized evidence that Iraq is prepared to issue travel documents for, or otherwise accept the repatriation, of any particular class member. Absent such evidence, Petitioners' detention is not authorized by statute and they are entitled to immediate release under orders of supervision.

130.   In addition, Petitioners' removal is not significantly likely in the reasonably foreseeable future because of the prolonged amount of time it will take to adjudicate both their motions to reopen and their reopened proceedings.

131.   This Court's stay of removal prohibits the government from removing Petitioners from removal while they litigate their motions to reopen, a process that will take months or even years, and that has been further extended by the

67

government's failure to promptly provide Petitioners with the A-files and Records of Proceedings necessary for the filing of effective motions, as well as by its practice of routinely transferring detainees from one detention center to another, which has made it more difficult for them to obtain and communicate with counsel.

132.   In the absence of dilatory conduct, Petitioners should not be subjected to prolonged and indefinite detention "merely because [they] seek[] to explore avenues of relief that the law makes available to [them]." *Ly v. Hansen*, 351 F.3d at 272. Thus, Petitioners whose motions to reopen, or reopened removal proceedings, are unlikely to be adjudicated in the reasonably foreseeable future, are entitled to immediate release from detention under orders of supervision.

## COUNT FIVE
### PROHIBITION ON IMMIGRATION DETENTION WITHOUT AN INDIVIDUALIZED HEARING ON DANGER AND FLIGHT RISK

133.   Petitioners reallege the foregoing paragraphs as if set forth fully herein.

134.   Even where removal is "reasonably foreseeable," detention violates due process unless it bears a reasonable relationship to the government's purposes—protecting against danger and flight risk. *See Zadvydas v. Davis*, 533 U.S. 678 (2001); *Rosales-Garcia v. Holland,* 322 F.3d 386 (6th Cir. 2003).

135.   Moreover, due process requires a meaningful procedure for determining that the purposes of detention are actually being served.

136.   The government is subjecting Petitioners to detention for months, potentially years, without any individualized determination that they pose a danger or flight risk that would justify their detention.

137.   The only procedure it has provided—administrative post-order custody reviews—is inadequate on its face to satisfy the requirements of due process. Moreover, the government has violated its own regulations by issuing boilerplate custody review denials that merely rubberstamp continued detention without any mention of the factors that the regulations specify must be considered, including danger and flight risk.

138.   Due process requires that Petitioners be afforded individualized hearings before impartial adjudicators to assess whether their continued detention is justified based on danger or flight risk.

## COUNT SIX
## UNLAWFUL APPLICATION OF MANDATORY DETENTION TO CLASS MEMBERS WHOSE MOTIONS TO REOPEN HAVE BEEN GRANTED

139.   Petitioners reallege the foregoing paragraphs as if set forth fully herein.

140.   The mandatory detention statute applies only to individuals who were taken into ICE custody "when released" from incarceration for an offense that triggers mandatory detention.

141.   In addition, it authorizes only "brief" and "reasonable" periods of

69

detention. *Demore v. Kim,* 538 U.S. 510, 513 (2003)*; Ly v. Hansen,* 351 F.3d 263 (2003)*.*

142. And it does not apply to individuals who are facing a second round of removal proceedings after their motions to reopen have been granted.

143. The government is violating both the INA and the Due Process Clause by unlawfully applying mandatory detention to Petitioners whose motions to reopen have been granted, who were released long ago for the crimes that form the purported basis for their mandatory detention, and without any consideration of whether such detention meets the constitutional standard of reasonableness. Petitioners who are detained pending reopened proceedings are entitled to immediate bond redetermination hearings before an immigration judge under 8 U.S.C. § 1226(a).

## COUNT SEVEN
### RELIEF FOR CLASS MEMBERS WHO HAVE BEEN DEPRIVED OF TIMELY ACCESS TO THE FILES NEEDED TO FILE THEIR MOTIONS TO REOPEN

144. Petitioners reallege the foregoing paragraphs as if set forth fully herein.

145. For any individual in removal proceedings, access to individual A-Files and Records of Proceedings is critical to fair adjudication and due process. This Court ordered Respondents to provide the necessary immigration files and records "[a]s soon as practicable." Opinion & Order Granting Petitioners' Motion

70

for Preliminary Injunction, dated July 24, 2017, ECF # 87, Pg.ID# 2356. The Court was later forced to set dates certain of November 6, 2017 and November 27, 2017, due to Respondents' failure to provide the files. Opinion Regarding Further Proceedings, ECF #115, Pg.ID# 2943. Although Respondents have not yet produced the files, they have nonetheless continued to pursue removal for individuals who filed emergency motions to reopen prior to receiving the files.

146.   To the extent such individuals have therefore been forced to proceed with their immigration adjudication without the information needed for effective presentation of their cases that is within the control of the Respondents, and if as a result their motions to reopen are denied or if they are forced to proceed with reopened cases, that adjudication violates due process.

147.   Because adjudications under the foregoing circumstances provide an insufficient safeguard against removals that lead to persecution and torture, they also violate the INA and CAT.

## PRAYER FOR RELIEF

**WHEREFORE**, Petitioners respectfully request that the Court grant them the following relief:

A.   Assume jurisdiction over this matter;

B.   Continue the existing stay of Named Petitioners' and class members' removal to Iraq until this action is decided;

71

C.   Continue the existing orders regarding data disclosures and production of documents;

D.   Certify:

1.   A class defined as: All Iraqi nationals in the United States who had final orders of removal on March 1, 2017, who have been, or will be, detained for removal by U.S. Immigration and Customs Enforcement (ICE).

2.   The Detained Final Order subclass, defined as: All class members with final orders of removal, who are currently or will be detained in ICE custody.

3.   The Mandatory Detention subclass, defined as: All class members whose motions to reopen have been or will be granted, who are currently or will be detained in ICE custody under the purported authority of the mandatory detention statute, 8 U.S.C. § 1226(c).

E.   Name the individual named Petitioners as representatives of the class and subclasses, and appoint Petitioners' counsel as class counsel;

F.   Declare that Respondents have violated the rights of the class;

G.   Enter a writ of mandamus and/or enjoin the government from removing Petitioners to Iraq without first providing them with an

72

individualized opportunity to establish before an impartial adjudicator that, in light of current conditions and the likelihood that they would suffer persecution or torture if removed to Iraq, they are entitled to protection against such removal;

H.  Enjoin the government from transferring Petitioners to detention centers far from where they are apprehended, and order the government to transfer all detainees back to their home states where they were apprehended;

I.  Order the government to release Petitioners from detention, or in the alternative, order a prompt individualized hearing by an impartial adjudicator to determine for each one if there is a significant likelihood of removal in the reasonably foreseeable future, and if danger to the community or flight risk that cannot be mitigated by alternative conditions of release and/or supervision are sufficient to justify continuing prolonged detention.

J.  Clarify the Court's existing stay of removal so that Petitioners who filed their motions to reopen before receipt of their A-files and Records of Proceedings are protected from removal for three months after receipt of these files, in order to allow them to submit motions to supplement or reconsider their previously filed motions, and for the

time it takes for these motions to be adjudicated.

K.   Award reasonable attorneys' fees and costs; and

L.   Grant such other further relief as is just and equitable.

Date:  October 13, 2017

Respectfully submitted,

Michael J. Steinberg (P43085)
Kary L. Moss (P49759)
Bonsitu A. Kitaba (P78822)
Miriam J. Aukerman (P63165)
AMERICAN CIVIL LIBERTIES
  UNION FUND OF MICHIGAN
2966 Woodward Avenue
Detroit, Michigan 48201
(313) 578-6814
msteinberg@aclumich.org

Kimberly L. Scott (P69706)
Wendolyn Wrosch Richards (P67776)
Cooperating Attorneys, ACLU Fund
  of Michigan
MILLER, CANFIELD, PADDOCK
  & STONE, PLC
101 N. Main St., 7th Floor
Ann Arbor, MI 48104
(734) 668-7696
scott@millercanfield.com

Judy Rabinovitz (NY Bar JR-1214)
Lee Gelernt (NY Bar NY-8511)
Anand Balakrishnan* (Conn. Bar 430329)
ACLU FOUNDATION
  IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2618
jrabinovitz@aclu.org

Margo Schlanger (N.Y. Bar #2704443)
Samuel R. Bagenstos (P73971)
Cooperating Attorneys, ACLU Fund
  of Michigan
625 South State Street
Ann Arbor, Michigan 48109
734-615-2618
margo.schlanger@gmail.com

Susan E. Reed (P66950)
MICHIGAN IMMIGRANT RIGHTS
  CENTER
3030 S. 9th St. Suite 1B
Kalamazoo, MI 49009
 (269) 492-7196, ext. 535
susanree@michiganimmigrant.org

Nora Youkhana (P80067)
Nadine Yousif (P80421)
Cooperating Attorneys, ACLU Fund
  of Michigan
CODE LEGAL AID INC.
 27321 Hampden St.
Madison Heights, MI 48071
(248) 894-6197
norayoukhana@gmail.com

María Martínez Sánchez (NM Bar
126375)
AMERICAN CIVIL LIBERTIES
 UNION OF NEW MEXICO
1410 Coal Ave. SW
Albuquerque, NM 87102
msanchez@aclu-nm.org

Lara Finkbeiner (NY Bar 5197165)
Mark Doss (NY Bar 5277462)
Mark Wasef (NY Bar 4813887)
INTERNATIONAL REFUGEE
  ASSISTANCE PROJECT
Urban Justice Center
40 Rector St., 9th Floor
New York, NY 10006
(646) 602-5600
lfinkbeiner@refugeerights.org

*Attorneys for All Petitioners and Plaintiffs*

William W. Swor (P21215)
WILLIAM W. SWOR
 & ASSOCIATES
1120 Ford Building
615 Griswold Street
Detroit, MI 48226
wwswor@sworlaw.com

*Attorney for Petitioner/Plaintiff
Usama Hamama*

Dated: October 13, 2017

* Application for admission forthcoming

## **VERIFICATION**

Pursuant to 28 U.S.C. § 2242, the undersigned certifies under penalty of perjury:

I have reviewed the foregoing petition. The facts stated therein are true and accurate to the best of my knowledge.


Dated: October 13, 2017                    */s/Kimberly L. Scott*_____
                                            Kimberly L. Scott (P69706)

## **CERTIFICATE OF SERVICE**

I hereby certify that on October 13, 2017, I electronically filed the foregoing papers with the Clerk of the Court using the ECF system which will send notification of such filing to all ECF filers of record.

By: */s/Kimberly L. Scott*
Kimberly L. Scott (P69706)
  Cooperating Attorney, ACLU Fund of Michigan
MILLER, CANFIELD, PADDOCK & STONE, PLC
101 N. Main St., 7th Floor
Ann Arbor, MI 48104
(734) 668-7696
scott@millercanfield.com