# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**USAMA JAMIL HAMAMA**, et al.,

       Petitioners/Plaintiffs,

v.

**REBECCA ADDUCCI**, et al.,

       Respondents/Defendants.

Case No. 2:17-cv-11910
Hon. Mark A. Goldsmith
Mag. David R. Grand

Class Action

## PETITIONERS/PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION ON DETENTION ISSUES

### ORAL ARGUMENT REQUESTED

Local Rule 7.1(a)(1) requires Petitioners/Plaintiffs (hereinafter Petitioners) to ascertain whether this motion is opposed. On November 6, 2017, Petitioners' counsel, Margo Schlanger, communicated personally via email with Respondents/Defendants' counsel, William Silvis, Assistant Director, District Court Section, Office of Immigration Litigation, U.S. Department of Justice, explaining the nature of the relief sought and seeking concurrence. Mr. Silvis denied concurrence by email that same day.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

1.    The named Petitioners and the class members they seek to represent were all ordered removed to Iraq—in most cases many years or even decades

ago—but have been living in the community because Iraq would not accept them for repatriation. That changed suddenly when United States Immigration and Customs Enforcement (ICE) recently arrested and incarcerated them.

2.      On July 24, 2017, this Court stayed the deportation of Petitioners and the putative class. *See* Op. & Order Granting Pet'rs' Mot. for Prelim. Inj., ECF 87, Pg.ID# 2323. That stay has been extraordinarily effective: the named Petitioners and the class they seek to represent are receiving time to fight their immigration cases. And they are winning. Of the motions to reopen that have been fully adjudicated, 87% have been granted. Of the 10 cases that have so far been adjudicated on the merits in immigration court, in *every single one*, the noncitizen has won some kind of immigration relief or protection from deportation. Petitioners are winning their motions to reopen and merits cases because of their strong claims of the likelihood of persecution, torture, or death in Iraq.

3.      Yet almost all remain incarcerated. Although it will soon be five months since the June ICE raids, and although it is clear that Petitioners and class members face the prospect of many more months or years of detention as they fight their immigration cases, and although Petitioners and class members have demonstrated through past compliance with orders of supervision that they are not a danger or flight risk, Respondents insist on keeping them incarcerated.

4.      It is likely that most Petitioners will not, in the end, be removed

because they will win some kind of relief or protection from removal. Even if they lose, and even if Iraq agrees to accept them, it will take additional months, even years, for their motions to reopen and reopened proceedings to be finally adjudicated, during which time the government is prohibited from removing them.

5.      The Due Process Clause and the Immigration and National Act (INA) both constrain the government's ability to deprive non-citizens of their fundamental right to liberty, and prohibit prolonged detention except in narrow circumstances.

6.      Pursuant to these constitutional and statutory requirements, immigrants who are in removal proceedings or who have final orders of removal cannot be incarcerated unless their detention meets several criteria:

- *First*, their removal must be significantly likely in the reasonably foreseeable future,

- *Second,* even if their removal is reasonably foreseeable, their detention must be reasonably related to the government's purpose of protecting against danger or flight risk, *and*

- *Third,* when detention is prolonged, this determination of danger or flight risk must be made in an individualized hearing before an impartial adjudicator.

*See Zadvydas v. Davis*, 533 U.S. 678 (2001); *Rosales-Garcia v. Holland*, 322 F.3d

3

386 (6th Cir. 2003); *Ly v. Hansen*, 351 F.3d 263 (6th Cir. 2003); 8 U.S.C. § 1226; 8 U.S.C. § 1231; 8 C.F.R. §§ 241.4, 241.13.

7.      Two immigration statutes, both part of the INA, govern the Petitioners' detention. The first is 8 U.S.C. § 1226, which governs detention of persons who are in removal proceedings. The second is 8 U.S.C. § 1231, which governs detention of persons who have already received a final order of removal.

8.      Individuals litigating a motion to reopen have final removal orders and are subject to detention pursuant to § 1231. If they win, they are no longer subject to a final order, and the authority for their detention shifts to § 1226.

9.      Detention under either § 1231 or § 1226 is permissible only if removal is "reasonably foreseeable." *Zadvydas*, 533 U.S. at 699; *Ly*, 351 F.3d at 273. If a detainee provides good reason to believe that removal is not likely in the reasonably foreseeable future, the detainee must be released unless the government can rebut that showing. *Zadvydas*, 533 U.S. at 701.

10.     As detailed in the accompanying brief and supporting declarations and exhibits, there are two reasons why Petitioners are unlikely to be removed in the reasonably foreseeable future, even assuming that they will lose their immigration cases.

11.     First, it remains unclear if Iraq will actually allow their repatriation— whether by issuing travel documents or making other arrangements to accept their

4

removal—and if so, how long that process will take. Unless Iraq can and will promptly accept an individual for repatriation, that individual's detention is unlawful under *Zadvydas*.

12.     Second, for the overwhelming majority of Petitioners it will take additional months, if not years, for their motions to reopen and for reopened proceedings to be finally adjudicated, during which time the government is prohibited from removing them. Petitioners now face one of three scenarios: winning soon, winning a long time from now, or losing a long time from now. Under *Zadvydas*, none of those scenarios can justify continued detention.

13.     Accordingly, Petitioners ask that this Court order that they be returned to the community under orders of supervision unless the government can provide individualized evidence that they can be repatriated to Iraq *and* that it is significantly likely that their immigration proceedings will conclude within nine months of the date when they were first taken into custody. This is Petitioners' ***Zadvydas* Claim.**

14.     The ***Zadvydas* Claim** applies to all of the detained named Petitioners, Usama Hamama, Ali Al-Dilaimi, Qassim Al-Saedy, Abbas Al-Sokaini, Atheer Ali, Moayad Barash, Jami Derywosh, Anwar Hamad, Jony Jarjiss, Mukhlis Murad, Habil Nissan, Adel Shaba, and Kamiran Taymour.

15.     The ***Zadvydas* Claim** also applies to all detained members of the

Primary Class. As set out in the simultaneously filed Amended Motion for Class

Certification, the Primary Class is defined as:

> All Iraqi nationals in the United States who had final orders of
> removal on March 1, 2017, and who have been, or will be, detained
> for removal by U.S. Immigration and Customs Enforcement.

All detained Primary Class members, whether held under 8 U.S.C. § 1231 or 8

U.S.C. § 1226, seek relief from detention based on the ***Zadvydas* Claim.**

16.    Even if removal is reasonably foreseeable, detention must be

reasonably related to its purpose, which is to protect against danger or flight risk.

When detention is prolonged, this requires an individualized hearing before an

impartial adjudicator. This is Petitioners' **Prolonged Detention Claim,** and it is

grounded in the bedrock due process requirement that civilly detained persons are

entitled to meaningful procedures to insure that the purposes of detention are being

served. *Zadvydas,* 533 U.S. at 690–701. Because the purpose of immigration

detention is to protect against danger and flight risk, immigration detention

requires an individualized hearing on these issues.

17.    The **Prolonged Detention Claim** is brought on behalf of two sub-

classes, the Detained Final Order Subclass and the Mandatory Detention Subclass,

as well as for Named Petitioners who are putative class representatives for each

subclass. For the Detained Final Order Subclass the putative class representatives

are Usama Hamama, Ali Al-Dilaimi, Qassim Al-Saedy, Abbas Al-Sokaini,

Moayad Barash, Jami Derywosh, Jony Jarjiss, Mukhlis Murad, and Adel Shaba. For the Mandatory Detention Subclass the putative class representatives are Atheer Ali, Anwar Hamad, and Kamiran Taymour. Members of both subclasses are suffering prolonged detention without an individualized hearing before an impartial adjudicator on danger or flight risk.

18.     The Detained Final Order Subclass is defined as:

> All Class Members with final orders of removal, who are currently or will be detained in ICE custody.

Those individuals are detained under the post-final-order statute, 8 U.S.C. § 1231, which provides for a 90-day removal period that has now passed for virtually all class members.

19.     After 90 days, individuals detained under 8 U.S.C. § 1231 are entitled by law to a post-order custody review (POCR) to determine if ICE will continue to detain them beyond the removal period, or release them under an order of supervision. This custody review requires consideration of a number of factors, including danger or flight risk. 8 C.F.R. §§ 241.4(e)–(f).

20.     Members of the Detained Final Order Subclass are being subjected to prolonged detention without having received any meaningful custody determinations. Rather, it seems ICE has instituted an across-the-board policy: individuals who are subject to the *Hamama* injunction will not be released. Those Petitioners who have received POCRs have received boilerplate denials stating: "You have a

7

final order of removal from the United States and ICE is actively pursuing your removal." Other Petitioners have not received a POCR at all. Some Petitioners, class members and their attorneys have been told by ICE personnel that the *Hamama* litigation prevents release and relieves ICE from the obligation to conduct POCRs, and that the decision not to release was made at headquarters.

21.     The Prolonged Detention Claim is also brought by the Mandatory Detention Subclass, defined as:

> All Class Members whose motions to reopen have been or will be granted, and who are currently or will be detained in ICE custody under the purported authority of the mandatory detention statute, 8 U.S.C. § 1226(c).

22.     Individuals who have won their motions to reopen are detained under the pre-final-order detention statute, 8 U.S.C. § 1226. Respondents are subjecting the Mandatory Detention Subclass members to detention under 8 U.S.C. § 1226(c), which provides for the mandatory detention of persons with certain criminal convictions without the opportunity for a bond hearing. Such mandatory detention for a prolonged period of time raises serious constitutional problems. In light of these problems, all circuit courts to consider the issue, including the Sixth Circuit, have construed the mandatory detention statute as only authorizing such detention for a "reasonable" period of time. *Ly*, 351 F.3d at 273.

23.     Because both the Detained Final Order Subclass and the Mandatory Detention Subclass are unlawfully being subjected to prolonged detention without

8

an individualized determination of danger or flight risk, they seek to be returned to the community under orders of supervision (as they were before), unless Respondents (a) conduct individualized bond determinations in the administrative immigration court system, or (b) provide evidence to the Court that Subclass members pose a danger or flight risk that cannot be mitigated by alternative conditions of release and/or supervision, whereupon the Court shall set forth a process for individualized hearings for persons for whom such evidence is produced.

24.     Petitioners' third claim, the **Section 1226 Claim**, is brought by Petitioners Atheer Ali, Anwar Hamad, and Kamiran Taymour, and the Mandatory Detention Subclass. These individuals have won their motions to reopen but are nevertheless being subjected to mandatory detention under the purported authority of § 1226(c), despite the fact that (a) the mandatory detention statute does not apply where the person has succeeded in reopening his/her case, because such application would be unreasonable, *Casas-Castrillon v. Dep't of Homeland Sec.*, 535 F.3d 942, 947–48 (9th Cir. 2008), *see Ly*, 351 F.3d at 271; and (b) as a straightforward matter of textual interpretation, the statute authorizes mandatory detention only where an individual is placed in civil immigration detention "when . . . released" from their criminal sentence, and here Petitioners were released from their criminal sentences years before their current period of

detention.

25.    Because 8 U.S.C. § 1226(c) does not apply, the relevant detention authority is 8 U.S.C. § 1226(a), which authorizes discretionary release on bond, and pursuant to regulations, provides for immigration judge bond hearings in most circumstances. 8 U.S.C. § 1226(a); 8 C.F.R. § 1236.1(d). The Court should therefore order that Petitioners Atheer Ali, Anwar Hamad and Kamiran Taymour and members of the Mandatory Detention Subclass receive immediate individualized bond hearings pursuant to 8 U.S.C. § 1226(a), so that they can be released if that hearing demonstrates that they are neither a danger or a flight risk.

26.    Finally, Petitioners ask that this Court clarify the existing stay of removal to address prejudice to those Petitioners who filed motions to reopen their immigration proceedings prior to receiving their A-files and Records of Proceedings (the **A-File/ROP Claim**).

27.    As this Court has already held, for any individual in removal proceedings, access to individual A-Files and Records of Proceedings is critical to fair adjudication and due process. The Court ordered prompt production of the files to class members, and was later forced to set dates certain of November 6, 2017 and November 27, 2017, due to Respondents' failure to provide the files. *See* Op. & Order Granting Pet'rs' Mot. for Prelim. Inj., ECF 87, Pg.ID# 2323; Order Regarding Further Proceedings, ECF 115, Pg.ID# 2943. Although Respondents

have not yet produced the files, they have nonetheless continued to pursue removal for individuals who filed emergency motions to reopen prior to receiving the files.

28.   Petitioners ask that this Court clarify that the Preliminary Stay of Removal/Preliminary Injunction (ECF 87) also stays removal of Petitioners who filed their motions to reopen before receipt of their A-Files and Records of Proceedings until they have a reasonable opportunity to submit motions to supplement or reconsider their previously filed motions once they have received their A-Files and Records of Proceedings from Respondents, and for the time it takes for these motions to be adjudicated.

WHEREFORE, for the reasons set forth in the accompanying brief and pursuant to Fed. R. Civ. P. 65, Petitioners respectfully request this Court to enter preliminary relief as follows:

**The *Zadvydas* Claim**

1. DECLARE that: Detained Petitioners and detained members of the Primary Class have provided good reason to believe that their removal is not significantly likely in the reasonably foreseeable future. Respondents must therefore respond with evidence sufficient to rebut that showing.

2. And ORDER that: The detained Petitioners and detained members of the Primary Class shall be released under orders of supervision within 14 days unless Respondents by that date provide to the Court individualized evidence that:

    a) Either ICE has secured travel documents from Iraq for that individual detainee or Iraq has agreed to the repatriation of that detainee without travel documents, *and*

11

b) It is significantly likely that the individual detainee's immigration proceedings, including any appeals to the Board of Immigration Appeals and to the federal Courts of Appeal, will be concluded within nine months from the date on which the detainee was first taken into ICE custody.

## The Prolonged Detention Claim

3. DECLARE that: The Due Process Clause bars prolonged detention without a hearing by an impartial adjudicator on the issues of danger and flight risk; Respondents have failed to provide such a hearing to Petitioners Usama Hamama, Ali Al-Dilaimi, Qassim Al-Saedy, Abbas Al-Sokaini, Atheer Ali, Moayad Barash, Jami Derywosh, Anwar Hamad, Jony Jarjiss, Mukhlis Murad, Adel Shaba, and Kamiran Taymour, and to members of the Mandatory Detention and Detained Final Order Subclasses.

4. And ORDER that: Petitioners Usama Hamama, Ali Al-Dilaimi, Qassim Al-Saedy, Abbas Al-Sokaini, Atheer Ali, Moayad Barash, Jami Derywosh, Anwar Hamad, Jony Jarjiss, Mukhlis Murad, Adel Shaba, and Kamiran Taymour, and members of the Detained Final Order and Mandatory Detention Subclasses, if not released pursuant to paragraph 2 above, shall be released under orders of supervision within 14 days unless Respondents by that date either (a) conduct individualized bond determinations in the administrative immigration court system or (b) provide to the Court individualized evidence of danger or flight risk that cannot be mitigated by alternative conditions of release and/or supervision, whereupon the Court shall order a process for individualized hearings for persons for whom such evidence is produced.

## The Section 1226 Claim

5. DECLARE that: The mandatory detention statute, 8 U.S.C. § 1226(c), does not apply to individuals in reopened removal proceedings, or to individuals taken into immigration custody months or years after they were released from criminal custody. Petitioners Atheer Ali, Anwar Hamad, and Kamiran Taymour, and members of the Mandatory Detention Subclass are therefore detainable only under 8 U.S.C. § 1226(a) and are eligible for bond hearings in immigration court.

6. And ORDER that: Petitioners Atheer Ali, Anwar Hamad, and Kamiran Taymour, and members of the Mandatory Detention Subclass, if not released

12

pursuant to paragraphs 2 or 4 above, shall receive immediate individualized bond determinations pursuant to 8 U.S.C. § 1226(a).

**The A-File/ROP Claim**

7.  Clarify the Court's existing stay of removal so that Petitioners who filed motions to reopen their immigration cases prior to receiving their A-files and Records of Proceedings are protected from removal for three months after receipt of these files, in order to allow them to submit motions to supplement or reconsider their previously filed motions, and for the time it takes for those motions to be adjudicated.

**Miscellaneous**

8.  Schedule a status conference to be held promptly after the 14-day period for implementation of this Court's order, so that the Court and the parties can discuss appropriate procedures for reviewing the detention of any named Petitioners or class members who remain detained.

Date: November 7, 2017

Respectfully submitted,

Michael J. Steinberg (P43085)
Kary L. Moss (P49759)
Bonsitu A. Kitaba (P78822)
Miriam J. Aukerman (P63165)
AMERICAN CIVIL LIBERTIES
 UNION FUND OF MICHIGAN
2966 Woodward Avenue
Detroit, Michigan 48201
(313) 578-6814
msteinberg@aclumich.org

Kimberly L. Scott (P69706)
Wendolyn Wrosch Richards (P67776)
Cooperating Attorneys, ACLU Fund
 of Michigan
MILLER, CANFIELD, PADDOCK
 and STONE, PLC
101 N. Main St., 7th Floor

Judy Rabinovitz (NY Bar JR-1214)
Lee Gelernt (NY Bar NY-8511)
ACLU FOUNDATION
 IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2618
jrabinovitz@aclu.org

Margo Schlanger (N.Y. Bar 2704443)
Samuel R. Bagenstos (P73971)
Cooperating Attorneys, ACLU Fund
 of Michigan
625 South State Street
Ann Arbor, Michigan 48109
734-615-2618
margo.schlanger@gmail.com

13

Ann Arbor, MI 48104
(734) 668-7696
scott@millercanfield.com

Nora Youkhana (P80067)
Nadine Yousif (P80421)
Cooperating Attorneys, ACLU Fund
 of Michigan
CODE LEGAL AID INC.
 27321 Hampden St.
Madison Heights, MI 48071
(248) 894-6197
norayoukhana@gmail.com

María Martínez Sánchez (NM Bar
126375)
AMERICAN CIVIL LIBERTIES
 UNION OF NEW MEXICO
1410 Coal Ave. SW
Albuquerque, NM 87102
msanchez@aclu-nm.org

Susan E. Reed (P66950)
MICHIGAN IMMIGRANT RIGHTS
 CENTER
3030 S. 9th St. Suite 1B
Kalamazoo, MI 49009
 (269) 492-7196, ext. 535
Susanree@michiganimmigrant.org

Lara Finkbeiner (NY Bar 5197165)
Mark Doss (NY Bar 5277462)
Mark Wasef (NY Bar 4813887)
INTERNATIONAL REFUGEE
 ASSISTANCE PROJECT
Urban Justice Center
40 Rector St., 9th Floor
New York, NY 10006
(646) 602-5600
lfinkbeiner@refugeerights.org

*Attorneys for All Petitioners and Plaintiffs*

William W. Swor (P21215)
WILLIAM W. SWOR
 & ASSOCIATES
1120 Ford Building
615 Griswold Street
Detroit, MI 48226
wwswor@sworlaw.com

*Attorney for Petitioner/Plaintiff*
*Usama Hamama*

14

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

**USAMA JAMIL HAMAMA**, et al.,

      Petitioners/Plaintiffs,

v.

**REBECCA ADDUCCI**, et al.,

      Respondents/Defendants.

Case No. 2:17-cv-11910
Hon. Mark A. Goldsmith
Mag. David R. Grand

Class Action

---

**PETITIONERS/PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR A
PRELIMINARY INJUNCTION ON DETENTION ISSUES**

**ORAL ARGUMENT REQUESTED**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... iii

STATEMENT OF ISSUES PRESENTED.................................................vi

CONTROLLING OR MOST APPROPRIATE AUTHORITY ......................... viii

INTRODUCTION ........................................................................1

STATUTORY AND REGULATORY FRAMEWORK....................................2

FACTS ...........................................................................................3

    A. THE NAMED PETITIONERS ARE SUFFERING UNJUSTIFIED
    AND PROLONGED DETENTION .........................................................3

    B. PETITIONERS WERE LIVING IN THE COMMUNITY
    BECAUSE IRAQ WOULD NOT ACCEPT THEIR
    REPATRIATION ......................................................................7

    C. PETITIONERS HAVE NOT RECEIVED AN INDIVIDUALIZED
    DETERMINATION OF DANGER OR FLIGHT RISK .......................10

        1. Petitioners Whose MTRs Have Been Granted Are Being
        Subjected To Mandatory Detention. .............................................10

        2. Petitioners With Final Orders Have Not Received
        Individualized Determinations of Danger and Flight Risk. ...........10

    D. PETITIONERS' PROLONGED DETENTION COULD LAST
    YEARS ..............................................................................12

        1. Petitioners Have Been Successful in Immigration Court. .............12

        2. The Immigration Court System Will Take Many Months or
        Years to Resolve Petitioners' Immigration Cases..........................13

    E. PETITIONERS AND THEIR FAMILIES ARE SUFFERING
    SEVERE HARM AS A RESULT OF THEIR PROLONGED
    DETENTION..........................................................................15

LEGAL STANDARD.........................................................................17

ARGUMENT ...................................................................................17

    A. PETITIONERS HAVE A HIGH LIKELIHOOD OF SUCCESS...........19

i

1. The *Zadvydas* Claim: Petitioners Are Being Unlawfully Detained Because Their Removal Is Not Significantly Likely in the Reasonably Foreseeable Future............................................19

    a. Petitioners Cannot Be Detained If Iraq Will Not Repatriate Them ..................................................19

    b. Petitioners' Removal is Not Significantly Likely in the Reasonably Foreseeable Future. .........................................22

    c. Respondents Must Release Petitioners or Rebut Their Showing That Their Removal Is Not Likely in the Reasonably Foreseeable Future .........................................23

2. The Prolonged Detention Claim: Petitioners' Prolonged Detention Without Individualized and Impartial Adjudication is Unlawful. ..................................................24

3. The Section 1226 Claim: Members of the Mandatory Detention Subclass Are Entitled to Bond Hearings under Section 1226(a)..................................................28

    a. Section 1226(c) Does Not Apply To Detention Pending Reopened Removal Proceedings. .........................28

    b. Section 1226(c) Does Not Apply To Individuals Who Were Living in the Community Prior to Detention. ............30

4. The A-File Claim: Class Members Should Be Protected from Removal If Prejudiced By Lack Of Their A-Files/ROPs...............32

B. THE IRREPARABLE HARM, BALANCE OF THE EQUITIES, AND PUBLIC INTEREST FACTORS FAVOR PETITIONERS .........33

C. CLASSWIDE RELIEF IS NECESSARY ................................................35

CONCLUSION ..................................................35

ii

# TABLE OF AUTHORITIES

**Cases**

*Casas-Castrillon v. Dep't of Homeland Sec.*,
    535 F. 3d 942 (9th Cir. 2008).......................................................... 29, 30

*Castañeda v. Souza*,
    810 F.3d 15 (1st Cir. 2015)............................................................ 31, 32

*Chavez–Alvarez v. Warden York Cty. Prison*,
    783 F.3d 469 (3d Cir. 2015)..................................................................29

*Deluis-Morelos v. ICE Field Office Dir.*, No. 12-cv-1905-JLR,
    2013 WL 1914390 (W.D. Wash. May 8, 2013) ....................................31

*Demore v. Kim*,
    538 U.S. 510 (2003)..........................................................................25

*Diouf v. Napolitano*,
    634 F.3d 1081 (9th Cir. 2011) ...........................................................26

*Foucha v. Louisiana*,
    504 U.S. 71 (1992)............................................................................24

*Hosh v. Lucero*,
    680 F.3d 375 (4th Cir. 2012) .............................................................31

*In re DeLorean Motor Co.*,
    755 F.2d 1223 (6th Cir. 1985) ...........................................................17

*Jackson v Indiana*
    406 U.S. 715 (1972)..........................................................................25

*Kansas v. Hendricks*,
    521 U.S. 346 (1997)..........................................................................24

*Khodr v. Adducci*,
    697 F. Supp. 2d 774 (E.D. Mich. 2010)..............................................32

*Lora v. Shanahan*,
    804 F.3d 601 (2d Cir. 2015)......................................................... 29, 31

*Ly v. Hanson*,
    351 F.3d 263 (6th Cir. 2003) ..................................................... passim

*Mudhallaa v. Bureau of Immigration & Customs Enf't,* No. 15-10972,
    2015 WL 1954436 (E.D. Mich. Apr. 29, 2015) ..................................31

*Nadarajah v. Gonzales*,
    443 F.3d 1069 (9th Cir. 2006) ............................................................20

*Nken v. Holder*,
    556 U.S. 418 (2009).............................................................................14

*Olmos v. Holder*,
    780 F.3d 1313 (10th Cir. 2015) .........................................................31

*Preap v. Johnson*,
    831 F.3d 11937 (9th Cir. 2016) .........................................................31

*Reid v. Donelan*,
    819 F.3d 486 (1st Cir. 2016)...............................................................29

*Rodriguez v. Robbins*,
    804 F.3d 1060 (9th Cir. 2015) ...........................................................29

*Rosales-Garcia v. Holland*,
    322 F. 3d 386 (6th Cir. 2003) ............................................................21

*Rosciszewski v. Adducci*,
    983 F. Supp. 2d 910 (E.D. Mich. 2013)...........................................31

*Sopo v. Attorney General*,
    825 F.3d 1199 (11th Cir. 2016) .........................................................29

*Sylvain v. Attorney Gen. of U.S.*,
    714 F.3d 150 (3d Cir. 2013)...............................................................31

*United States v. Bogle*,
    855 F.2d 707 (11th Cir. 1998) ...........................................................34

*United States* v. *Salerno*,
    481 U.S. 739 (1987).............................................................................24

*United States v. Witkovich*,
    353 U/S/ 194 (1957)............................................................................27

*Winter v. Nat. Res. Def. Council*,
    555 U.S. 7 (2008).................................................................................17

*Zadvydas v. Davis*,
    533 U.S. 678 (2001) ..................................................................... passim

**Statutes**

8 U.S.C. § 1225(b) .......................................................................................20

8 U.S.C. § 1226 ................................................................................ passim

8 U.S.C. § 1226(a) ........................................................................... passim

8 U.S.C. § 1226(c) ........................................................................... passim

8 U.S.C. § 1231 ................................................................................ passim

8 U.S.C. §§ 1231(a) ....................................................... 2, 19, 20, 26, 27

### Regulations

8 C.F.R. § 241.4 ................................................................. 3, 11, 28

8 C.F.R. § 241.13 ............................................................................. passim

## STATEMENT OF ISSUES PRESENTED

1. Whether Petitioners have established a likelihood of success on the merits of their claims, including:

   a. Whether Petitioners have provided good reason to believe that their removal is not significantly likely in the reasonably foreseeable future such that release on an order of supervision is required unless the government rebuts that showing?

   **Petitioners' Answer: Yes**

   b. Whether due process and the Immigration and Nationality Act require that individuals subject to prolonged immigration detention be afforded a hearing before an impartial adjudicator on the issues of danger and flight risk?

   **Petitioners' Answer: Yes**

   c. Whether the mandatory detention statute, 8 U.S.C. § 1226(c), does not apply to individuals in reopened removal proceedings, or to individuals taken into immigration custody months or years after they were released from criminal custody for an offense that could trigger mandatory detention.

   **Petitioners' Answer: Yes**

2. Whether Petitioners' continued detention constitutes irreparable harm?

   **Petitioners' Answer: Yes**

vi

3.  Whether Petitioners' interest in freedom from detention that is not required to secure their possible removal outweighs any interests of Respondents in continuing that detention?

    **Petitioners' Answer: Yes**

4.  Whether the public interest supports Petitioners' claims to be free from detention while they contest their removal to Iraq?

    **Petitioners' Answer: Yes**

5.  Whether Class Members who filed motions to reopen before receipt of their A-Files and Records of Proceedings should receive protection from removal until such time as they are able to submit motions to supplement or reconsider their previously filed motions, and for the time it takes for these motions to be adjudicated.

    **Petitioners' Answer: Yes**

## CONTROLLING OR MOST APPROPRIATE AUTHORITY

**Standard for Issuing Preliminary Injunction:**

*Winter v. Nat. Res. Def. Council*, 555 U.S. 7 (2008)

*In re DeLorean Motor Co.*, 755 F.2d 1223 (6th Cir. 1985)


**Constitutional Limits on Civil Immigration Detention Authority:**

*Zadvydas v. Davis,* 533 U.S. 678 (2001)

*Demore* v. *Kim*, 538 U.S. 510 (2003)

*Rosales-Garcia v. Holland*, 322 F.3d 386 (6th Cir. 2003)

*Ly v. Hansen*, 351 F.3d 263 (6th Cir. 2003)

*Rodriguez v. Robbins*, 804 F.3d 1060 (9th Cir. 2015), *cert. granted sub. nom.*, *Jennings v. Rodriguez*, 136 S.Ct. 2489 (2016)

*Diouf v. Napolitano*, 634 F.3d 1081 (9th Cir. 2011)

*Casas-Castrillon v. Dep't of Homeland Sec.*, 535 F.3d 942 (9th Cir. 2008)


**Statutory Limits on Detention Pursuant to 8 U.S.C. § 1226(c):**

*Preap v. Johnson*, 831 F.3d 1193 (9th Cir. 2016), *cert. pet. filed*, *Duke v. Preap*, No. 16-1363 (U.S. May 11, 2017)

*Castañeda v. Souza*, 810 F.3d 15 (1st Cir. 2015)

## INTRODUCTION

This Court's July 24, 2017 stay of removal has been extraordinarily effective: 164 class members have filed Motions to Reopen (MTRs); 85 have been fully adjudicated, of which close to 90% have been granted. Just 10 cases have been adjudicated on the merits in immigration court, but *every single one* has resulted in grants of relief or protection.

Yet nearly all the named Petitioners and class members ("Petitioners") remain detained—some whose MTRs or reopened proceedings are pending, others who have yet to file MTRs as they await court-ordered production of their immigration records. 80% have already been held for four or more months, 20% for five or more, with the prospect of additional months and even years of detention as their cases wend their way through the administrative immigration court system.

For any particular class member, it is far from clear that Iraq will accept repatriation at all, much less in the reasonably foreseeable future. Moreover, Respondents have made no individualized determination that Petitioners—who have lived in the community for years, often decades—pose a danger or flight risk that would justify their detention.

Prolonged detention of individuals whose removal is not reasonably fore-seeable, or who pose no danger or flight risk, violates both the Constitution and the Immigration and Nationality Act (INA). The Petitioners, on behalf of a class with

1

two subclasses, therefore seek preliminary relief from such detention—either release under orders of supervision or individualized hearings before an impartial adjudicator on danger and flight risk.

## STATUTORY AND REGULATORY FRAMEWORK

Two general immigration detention statutes are involved here. The first, 8 U.S.C. § 1231, governs detention of persons with final orders of removal. It requires the government to effectuate removal within 90 days (the "removal period"), during which the person "shall . . . [be] detain[ed]." 8 U.S.C. §§ 1231(a)(1)(A), 1231(a)(2). Those ordered removed for certain reasons, including for specified criminal convictions or because they are determined to be a danger or flight risk, "may be detained beyond the removal period." *Id.* § 1231(a)(6).

The second statute, 8 U.S.C. § 1226, provides generally for *discretionary* detention for individuals in removal proceedings, *see* § 1226(a), but *mandates* detention of certain persons with criminal convictions who are in removal pro-ceedings, *see* § 1226(c). With some exceptions, an individual detained under § 1226(a) is entitled to an immigration judge bond hearing; an individual detained under § 1226(c) is not. Individuals litigating a motion to reopen have final removal orders and are subject to detention pursuant to § 1231. If they win, they are no longer subject to a final order, and the authority for their detention shifts to § 1226.

The regulations provide two avenues for release of individuals in post-final

2

order detention under § 1231. First, they may be released where there is "no significant likelihood of removal in the reasonably foreseeable future," 8 C.F.R. §§ 241.13(a), (c), (h)(1). Second, even if removal *is* reasonably foreseeable, ICE must conduct a 90-day Post-Order Custody Review ("POCR") to consider release of those who pose no danger or flight risk. *See id.* §§ 241.4(e)–(f), 241.13(b)(1). Persons released are placed on orders of supervision. *Id.* §§ 241.4(j), 241.14(h).

A person released because there is no significant likelihood of removal in the reasonably foreseeable future may be (re-)detained under two circumstances: first, if the person violates a condition of release, *id*. § 241.13(i)(1), and, second, if changed circumstances create a "significant likelihood that the alien may be removed in the reasonably foreseeable future," *id.* § 241.13(i)(2). In either case, ICE must provide notification of the reasons for revocation, conduct a prompt informal post-detention interview, and afford an opportunity to respond to the reasons for revocation. "The revocation custody review will include an evaluation of any contested facts relevant to the revocation and a determination whether the facts as determined warrant revocation and further denial of release." *Id.* § 241.13(i)(3).

## FACTS

### A. THE NAMED PETITIONERS ARE SUFFERING UNJUSTIFIED AND PROLONGED DETENTION

Nearly all of the named Petitioners and class members have already been detained for over four months, Ex. 1, Schlanger ¶ 32, despite the fact that it is unclear

3

whether, or when, they will be removed to Iraq, and even though they pose no danger or flight risk. The named Petitioners' stories are representative of the class members' experiences. Three of their cases are summarized here.

**Abbas Al-Sokaini** is a 52-year-old Iraqi national, a father and grandfather, who came to the U.S. more than 20 years ago as a refugee. At the time of his arrest he was living in Albuquerque, New Mexico working three jobs to support his family. On June 20, 2017, he was arrested without warning, based on a 2003 order of removal he received after pleading no contest to two drug charges sixteen years ago—convictions for which he was not incarcerated. ICE transferred him to a Texas detention center four hours away from his family, making it difficult to retain counsel. Mr. Al-Sokaini eventually managed to obtain counsel and is waiting on receipt of his A-File and Record of Proceedings to file a MTR. Once he does receive his records, it will take up to three months to file a MTR, and then anywhere from several months to over a year for that motion to be finally decided. If he wins his MTR, ICE will likely subject him to mandatory detention under § 1226(c), as it did for more than seven months in 2003-2004, when he was initially placed in removal proceedings. Adjudication of his reopened proceedings will take more months or years. No matter how his case resolves, he faces the real prospect of more than a year in detention—despite the fact that for more than a decade he complied with an order of supervision and despite abundant evidence that he

4

presents neither a flight risk nor danger. Moreover, even if he were to ultimately lose his challenge to removal, it is unclear that he can be removed to Iraq. He was recently told by ICE personnel that Iraq has not issued travel documents for him. For this reason, and because Mr. Al-Sokaini suffers from medical problems, his deportation officer recommended his release from detention. But on October 26, 2017, his attorney received a boilerplate POCR denial, stating: "You have a final order of removal from the United States and ICE is actively pursuing your removal." The deportation officer later told Mr. Al-Sokaini that the decision came from "Washington." Ex. 2, Al-Sokaini ¶¶ 5, 9–11, 14–16. There are approximately 141 detained class members who, like Mr. Al-Sokaini, have not yet filed MTRs. Ex. 1, Schlanger ¶ 20.

**Kamiran Taymour** arrived in the U.S. nearly 25 years ago as a refugee after his father was tortured and his mother and brother were both shot. Prior to his arrest, he lived in Ann Arbor, Michigan with his wife and three young children, all U.S. citizens. He was ordered removed in 2011 based on marijuana convictions, spent six months in immigration detention, and was then released on an order of supervision. On June 11, 2017, ICE arrested Mr. Taymour and revoked his order of supervision allegedly because he had failed to provide an Iraqi travel document, even though he had previously attempted to obtain such documents and was denied because he could not prove Iraqi citizenship. Mr. Taymour filed an MTR which

5

was granted in late August. Nonetheless, he remains incarcerated because ICE considers him subject to mandatory detention. Ex. 3, Taymour ¶¶ 13–17; Ex. 17, Abrutyn ¶¶ 9, 12. He could face months or years of detention while his merits case is decided. *See* Facts, Section D. Even if he wins, if the government appeals, he will be subject to mandatory detention during that appeal. Ex. 17, Abrutyn ¶ 12. Fifty-nine class members are similarly detained even though their MTRs have been granted, a number that is likely to grow; the vast majority are subjected to mandatory detention. Ex. 1, Schlanger ¶ 31.

**Adel Shaba**, a Michigan resident, father, and grandfather, came to the U.S. 37 years ago as a refugee. More than 28 years ago he was convicted of a drug offense and subsequently ordered removed. He has not reoffended and has been living in the community under an order of supervision for 14 years. ICE arrested him on June 11, 2017, and notified him that his supervised release was being revoked due to his "failure to provide Iraqi travel document." He has repeatedly but unsuccessfully attempted to obtain travel documents. On June 20, his daughter applied for travel documents for him again, but was again told that Iraq was unable to confirm his nationality. Mr. Shaba's attorney provided ICE with a detailed 203-page information packet showing that he poses neither flight risk nor danger; his doctor urged his release because Mr. Shaba, who is 67, has significant medical issues. Nevertheless, ICE issued him a boilerplate POCR denial on September 7, 2017,

6

stating: "You have a final order of removal from the United States and ICE is actively pursuing your removal." Mr. Shaba's wife has been struggling to pay the mortgage, heat their home, and even to buy food. Mr. Shaba's MTR, filed on June 23, 2017 without an A-file or Record of Proceedings, is pending in the BIA. Ex. 4, Shaba ¶¶ 3, 9, 12–14, 18–19, 24–28, 32–34. There is no way to know how long its adjudication will take. If he loses his MTR, he will likely be incarcerated for at least an additional six months and as much as two more years while he appeals to the Sixth Circuit. *See* Facts, Section D. There are approximately 79 class members who, like Mr. Shaba, have filed MTRs that remain pending. Ex. 1, Schlanger ¶¶ 18-20.

## B.   PETITIONERS WERE LIVING IN THE COMMUNITY BECAUSE IRAQ WOULD NOT ACCEPT THEIR REPATRIATION

The Department of Homeland Security does not have the capacity to detain everyone currently in immigration proceedings, and therefore uses a variety of alternatives to detention. Ex. 18, Brané ¶¶ 11, 15–18, 27; Ex. 19, Bajoka ¶¶ 4–9; Ex. 20, Maze ¶ 25. ICE normally uses orders of supervision for non-citizens who have final removal orders. *See* Ex. 17, Abrutyn ¶¶ 21, 34. They must comply with certain conditions such as regularly notifying ICE of address and employment information; not leaving the state without permission; and assisting ICE in obtaining travel documents. *Id.* ¶ 22. If removal becomes less likely, or if the noncitizen has proven her/himself trustworthy, ICE often relaxes reporting

7

requirements. *Id.* ¶ 25. If an individual has been under supervision for an extended period, it is very likely that the individual has complied, as otherwise the individual would have been taken back into custody. *Id.* ¶ 27.

Prior to their recent arrests, all of the named Petitioners and most of the class members had been living in the community under such orders, often for decades. Although some had been detained when their removal orders were first entered,[1] they were released back to the community because Iraq would not accept them for repatriation. After release, they raised children, built businesses, and contributed to public life. Most were required to report to ICE only once a year. *See* Petitioner Decls., Exs. 2–15; Ex. 19, Bajoka ¶¶ 3, 7–8.

When ICE decided to redetain them, most Petitioners were given no advance notice that—let alone why—their supervision orders were being revoked[2]; after the fact, many received boilerplate letters that revocation was due to their failure to obtain Iraqi travel documents.[3] In fact, however, Petitioners have tried to obtain

---

[1] Ex. 11, Derywosh ¶ 7 (13 months in 1999); Ex. 13, Jarjiss ¶ 6 (11 months in 2000); Ex. 6, Al-Dilaimi ¶ 8 (4 months in 2004); Ex. 8, Al-Saedy ¶ 9 (several months in 2004); Ex. 2, Al-Sokaini ¶ 11 (5 months in 2003–04); Ex. 12, Hamad ¶ 10 (3 months in 2014-15); Ex. 3, Taymour ¶ 10 (3 months in 2011).

[2] *See*, *e.g.*, Ex. 23, Abraham ¶ 5; Ex. 17, Abrutyn ¶ 32; Ex. 5, Hamama ¶¶ 8–14; Ex. 11, Derywosh ¶ 9; Ex. 15, Nissan Decl., ¶¶ 8–11.

[3] *See*, *e.g.*, Ex. 21, Andrade ¶ 11 (24 of 25 revocation notices obtained by Petitioners base revocation on "Failure to provide Iraqi travel document", and remainder do not specify a reason), Ex. C.

8

such documents, including very recently, but Iraq has denied those requests.[4] In revoking release, ICE presented no evidence that Iraq was willing to issue travel documents or otherwise accept any given Petitioner for repatriation. Such repatriations involve enormous logistical and political hurdles. Schultz Decl., ECF 81-4, Pg.ID# 2008. Thus, even if Petitioners are accepted for repatriation, the process will take many months.

ICE also neither presented evidence nor made any findings that revocation of Petitioners' supervision orders was needed to prevent flight or danger to the community pending removal. Not only have Petitioners been complying with their orders of supervision and living safely in the community for years, but many of them reported for supervision after the mass raids or affirmatively contacted ICE knowing that they were likely to be taken into custody.[5] Notably, ICE has not detained all of the roughly 1,400 Iraqis who have final orders. And attorneys who represent both recently detained class members and non-detained Iraqis report no

---

[4] *See* Ex. 6, Al-Dilaimi ¶¶ 11–12 (tried 4 times, and wife tried again after his June arrest); Ex. 2, Al-Sokaini ¶ 14 (deportation officer said in mid-September that U.S. government unable to get his travel documents); Ex. 19, Bajoka ¶ 13 (Iraq has never issued a travel document for any of his clients); Ex. 5, Hamama ¶ 12; Ex. 7, Al-Issawi ¶ 11; Ex. 9, Ali ¶ 19; Ex. 10, Barash ¶ 24; Ex. 12, Hamad ¶ 12; Ex. 13, Jarjiss ¶ 9; Ex. 14, Murad ¶ 13; Ex. 4, Shaba ¶¶ 12, 15; Ex. 3, Taymour ¶ 15.
[5] *See* Ex. 7, Al-Issawi ¶ 10; Ex. 9, Ali ¶ 15; Ex. 11, Derywosh ¶ 10; Ex. 13, Jarjiss ¶¶ 7-12, 20; Ex. 14, Murad ¶ 12; Ex. 23, Abraham ¶ 5.

discernable difference between the two groups.[6] Thus, if and when Petitioners lose their cases and if and when ICE is actually ready and able to deport Petitioners, they can be asked to report to ICE then, rather than be held for months and years before their removal can take place.[7]

## C.   PETITIONERS HAVE NOT RECEIVED AN INDIVIDUALIZED DETERMINATION OF DANGER OR FLIGHT RISK

### 1. Petitioners Whose MTRs Have Been Granted Are Being Subjected To Mandatory Detention.

Two named Petitioners won their MTRs, had bond hearings, and were released on bond.[8] However, three named Petitioners who won their MTRs remain detained because of ICE's overbroad application of § 1226(c), the mandatory detention statute; they have been denied any individualized consideration of danger or flight risk.[9] Class-wide, 59 of the 74 class members who have won MTRs remain detained. Ex. 1, Schlanger ¶ 32. It is likely that virtually all are held under § 226(c) without the opportunity for bond. *Id*.

### 2. Petitioners With Final Orders Have Not Received Individualized Determinations of Danger and Flight Risk.

---

[6] *See* Ex. 17, Abrutyn ¶ 30; Ex. 23, Abraham ¶¶ 5, 12 (Iraqi clients who reported in July were arrested but those who reported in October were not).
[7] Ex. 17, Abrutyn ¶¶ 33–34 (other clients complying with orders of supervision have remained in the community until scheduled departure date).
[8] They are Petitioners Asker and Al-Issawi.
[9] They are Petitioners Ali (*see* Ex. 9 ¶¶ 25–26), Hamad (*see* Ex. 12, ¶¶ 19, 23), and Taymour (*see* Ex. 3, ¶ 16–17). Petitioner Barash is likely to be deemed subject to § 1226(c) if he wins his MTR. *See* Ex. 10, ¶ 21.

None of the Petitioners who have final orders and are detained under § 1231 have received individualized determinations of danger or flight risk. They are legally entitled to a POCR to determine whether they can be detained beyond the 90-day removal period—a period that passed, for virtually all of them, years ago. 8 C.F.R. § 241.4(e)–(f). The regulations specify that POCRs must consider an individual's danger and flight risk, and that those who pose no danger or flight risk can be released even if removal is reasonably foreseeable. *Id.* §§ 241.4, 241.13(b)(1).

Although Respondents have provided some—but not all[10]—class members with POCRs, the process has been a sham. Petitioners who have received POCRs have all received boilerplate denials, most stating: "You have a final order of removal from the United States and ICE is actively pursuing your removal."[11] Finally, several Petitioners and attorneys have specifically been told by ICE personnel that the *Hamama* litigation prevents release and relieves ICE from the obligation to conduct POCRs, and that the decision not to release the *Hamama*

---

[10] *See* Ex. 2, Al-Sokaini ¶¶ 13-17; Ex. 14, Murad ¶ 15; Ex. 15, Nissan ¶¶ 17-20.

[11] *See* Ex. 13, Jarjiss ¶¶ 4, 21 (boilerplate denial despite no criminal history); Ex. 5, Hamama ¶ 31; Ex. 6, Al-Dilaimi ¶ 21; Ex. 8, Al-Saedy ¶ 16; Ex. 9, Ali ¶ 21; Ex. 10, Barash ¶ 23; Ex. 11, Derywosh ¶¶ 9-19; Ex. 4, Shaba ¶ 33; Ex. 17, Abrutyn ¶ 3; Ex. 22, Free ¶¶ 4-5. Petitioners have collected 53 POCR decisions from class members, of which 47 contain this boilerplate language; the remainder note the person's criminal history but contain no finding of dangerousness or flight risk. Ex. 21, Andrade Decl., ¶¶ 6-8, Exs. A-B.

detainees was made at ICE headquarters.[12]

## D.   PETITIONERS' PROLONGED DETENTION COULD LAST YEARS

### 1.  Petitioners Have Been Successful in Immigration Court.

164 (53%) of the class members have filed MTRs in either Immigration Court or the BIA. So far, 74 MTRs have been granted, and 79 are pending. Ex. 1, Schlanger ¶ 14. Just 11 MTRs have been finally denied within the immigration court system—that is, denied by the BIA, or denied by an IJ with no remaining time for appeal to the BIA. *Id*. ¶ 21. Thus the current administrative grant rate for MTRs is 87%. *Id*. Only 10 of the reopened cases have proceeded to completion on the merits in the immigration court; class members have obtained relief from the immigration court in every one of those. *Id*. ¶ 22. The 15 named Petitioners have procedural postures very like the class as a whole. Of the 15 named Petitioners, 6 have succeeded in reopening their cases, and 8 have MTRs pending in the BIA. Exhibit 26 summarizes named Petitioners' procedural status. Abdulkar Al-Shimmary, who was a named Petitioner in the 1st Amended Petition, is no longer in the case because he succeeded first on his MTR and then in winning termination of removal proceedings altogether. *See* Ex. 32, Al-Shimmary ¶¶ 6–8. He is omitted from the 2nd Amended Petition.

---

[12] *See* Ex. 24, Yacou ¶ 7 (told he did not receive a POCR because "the clock has stopped because of the pending litigation of the *Hamama* case"); Ex. 23, Abraham ¶¶ 6, 11–12, 16; Ex. 8, Al-Saedy ¶¶ 18–19; Ex. 2, Al-Sokaini ¶¶ 14–16; Ex. 25, Jahanaian ¶¶ 7–13; Ex. 22, Free ¶¶ 5, 8–9; Ex. 32, Al-Shimmary, ¶ 11.

### 2. The Immigration Court System Will Take Many Months or Years to Resolve Petitioners' Immigration Cases.

Petitioners have strong claims given the likelihood of persecution, torture or death in Iraq. This is why they are winning both reopening and their merits cases.[13] It is likely that most Petitioners will not, in the end, be removed because they will win some kind of relief or protection from removal. *See* Ex. 22, Free ¶ 14; Ex. 1, Schlanger ¶ 17; Ex. 19, Bajoka ¶ 19. However, because of the length of time it takes to adjudicate both MTRs and the underlying substantive relief, Petitioners face many months or years of incarceration before those decisions are made. Even if they ultimately lose, it will be months or years before the government can execute any removal order.[14]

Table A summarizes the time needed to litigate a MTR, including appeals, and, if the motion is granted, to litigate the merits case that follows.[15] A Petitioner who has not yet filed an MTR has three more weeks to wait (until November 27) for court-ordered production of the necessary immigration files, before the time frames on the table even begin, and then another three months to prepare the motion. Once begun, the MTR process can be expected to take many months or

---

[13] Ex. 20, Maze ¶ 10; Ex. 1, Schlanger ¶ 17.

[14] *See* Ex. 20, Maze ¶¶ 11–21; Ex. 17, Abrutyn ¶¶ 15–18; Ex. 27, Realmuto ¶¶ 12-23; Ex. 28, Scholten ¶¶ 23–27; Ex. 22, Free ¶¶ 16–18.

[15] Table A is based on the declarations of immigration practitioners and data on processing rates. *See* Ex. 17, Abrutyn ¶¶ 15–18; Ex. 20, Maze ¶¶ 11–20; Ex. 27, Realmuto ¶¶ 12–23; Ex. 28, Scholten ¶¶ 10–32; Ex. 1, Schlanger ¶¶ 25–27.

even years, as can the merits adjudication that follows reopening. Even a Petitioner whose MTR is already in the BIA—whether on appeal or because that is where the motion was filed—will have months or years of subsequent litigation. If the motion is denied in the BIA, litigation moves to the Court of Appeals,[16] where Petitions for Review (PFRs) typically take 6 months to two years to resolve. Ex. 1, Schlanger ¶ 27. If the motion is granted, litigation moves to immigration court for a merits decision which will take many more months or years.

### Table A: Motion to Reopen Adjudication Time

| A. Motion To Reopen (MTR) | | |
|---|---|---|
| Process | Time | Cumulative time, if the detainee loses at every stage |
| Prepare MTR | 3 months | 3 months |
| Immigration Court* | 1-3 months | 4 to 6 months |
| BIA | 3 months+ | 7-9 months+ |
| PFR | 6 months-2 years | 13 months to 2 years, 9 months + |
| * Because of the procedural history of their cases, some class members have or will file their Motions to Reopen directly in the BIA, and will therefore skip this step. | | |
| B. On Grant of Motion To Reopen at Any Stage: Decision on the Merits | | |
| Process | Time | *Additional* cumulative time, if the detainee wins above |
| Immigration Court | 1-2 months + | 1-2 months + |
| BIA | 6 months + | 7-8 months + |
| PFR | 6 months-2 years | 13 months to 2 years, 8 months + |

If a Petitioner wins, some of the steps in Table A may be omitted. Even so, the very shortest period of time to be expected for resolution—when the noncitizen

---

[16] The Courts of Appeal can be expected to grant stays of removal, given the grave harm of erroneous removals. *See Nken v. Holder*, 556 U.S. 418 (2009).

wins quickly, without any appeals at all—is at least 6 months from the date of production of the A-File and ROP: 3 months to prepare the MTR, 1-3 months for its adjudication by an IJ, and at least 2 months for merits adjudication by the IJ. For Petitioners in detention since June, who will receive their files on November 27, this adds up a year of detention at a minimum.

The actions of the government have extended the likelihood of prolonged detention. The decision to detain hundreds of Iraqi nationals at the same time created logistical hurdles to finding representation. *See* Reed Decl., ¶¶ 6, 15, ECF 77-12, Pg.ID# 1798, 1801. The government has delayed providing necessary immigration files and has taken unusual litigation steps—such as filing interlocutory appeals when immigration judges have granted MTRs—that can cause delays. The government has opposed a motion in the Detroit Immigration Court seeking a consolidated hearing on common fact issues, such as country conditions, a step that would clearly expedite hearings in light of the pressing volume of cases. And it has continued to detain individuals who obtain CAT deferral of removal, purportedly to look for other countries to accept the removal of these individuals, an unlikely prospect. *See* Ex. 23, Abraham ¶ 18; Ex. 20, Maze ¶ 17.

**E.   PETITIONERS AND THEIR FAMILIES ARE SUFFERING SEVERE HARM AS A RESULT OF THEIR PROLONGED DETENTION.**

Detention undermines the ability of detainees to obtain counsel and access immigration relief, as well as their physical and mental health and family unity.

15

Ex. 18, Brané ¶¶ 10–12. For example, Mr. Al-Dilaimi is suffering significant medical deterioration in detention, but ICE has not responded to his request for humanitarian release. Mr. Murad, who has limited mobility, has been confined to a wheelchair and suffered panic attacks. Mr. Al-Saedy, a diabetic, was assaulted and injured.[17]

The toll on Petitioners' families has likewise been severe, as children have struggled with the sudden loss of a parent, wives with the loss of a husband, and elderly parents with the loss of a care-giving son.[18] Many Petitioners were their family's primary source of income; now many of those families are struggling to survive, even losing their homes or being forced to close their businesses.[19]

Several named Petitioners and other class members are so desperate that they have gone on hunger strikes in the hope of drawing attention to their plight. *See*, *e.g.*, Ex. 10, Barash ¶ 19; Ex. 8, Al-Saedy ¶ 17; Ex. 22, Free ¶ 12. Other class members, faced with the prospect of seemingly indefinite detention, are considering giving up and agreeing to be removed to Iraq, despite the grave dangers they face. Ex. 20, Maze ¶¶ 21–22.

---

[17] Ex. 6, Al-Dilaimi ¶¶ 16, 20, 23; Murad ¶¶ 5–10; Ex. 8, Al-Saedy ¶¶ 19–22. *See also* Ex. 5, Hamama ¶¶ 27–30; Ex. 13, Jarjiss ¶ 23; Ex. 15, Nissan ¶¶ 13–15; Ex. 4, Shaba ¶¶ 24–26.

[18] *See*, *e.g.*, Ex. 6, Al-Dilaimi ¶ 25; Ex. 10, Barash ¶¶ 6, 7, 17–18 (unable to care and provide for his disabled child).

[19] Ex. 3, Taymour ¶¶ 6, 18–19; Ex. 5, Hamama ¶¶ 19–20, 25-26; Ex. 6, Al-Dilaimi ¶ 26; Ex. 9, Ali ¶ 24; Ex. 10, Barash ¶¶ 7, 16; Ex. 12, Hamad ¶ 22.

## LEGAL STANDARD

Preliminary injunctions are governed by a four-factor test that examines: (1) likelihood of success on the merits, (2) irreparable harm in the absence of relief, (3) the balance of equities, and (4) the public interest. *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008). These are "factors to be balanced, not prerequisites that must be met. Accordingly, the degree of likelihood of success required may depend on the strength of the other factors." *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985). A court may, for example, grant a preliminary injunction "where the plaintiff fails to show a strong or substantial probability of ultimate success on the merits of his claim, but where he at least shows serious questions going to the merits and irreparable harm which decidedly outweighs any potential harm to the defendant." *Id.* at 1229.

## ARGUMENT

Petitioners and class members seek preliminary relief on four claims. First is the ***Zadvydas* Claim**: for detained named Petitioners and the entire Primary Class, detention is unlawful under both the Fifth Amendment's Due Process Clause and the INA. Because their removal is not "significantly likely in the reasonably foreseeable future," they are being unlawfully subjected to indefinite detention—which is unauthorized by Congress and in violation of their constitutional rights.

Second is the **Prolonged Detention Claim**: for Petitioners who have not yet

17

succeeded in reopening their immigration cases (that is, the Detained Final Order Subclass, detained under 8 U.S.C. § 1231), *and* for those who have reopened their cases but are detained under the purported authority of the mandatory detention statute, 8 U.S.C. § 1226(c) (the Mandatory Detention Subclass), their prolonged detention without an individualized assessment of danger and flight risk, by an impartial adjudicator, also violates due process and is not authorized by statute.

Third is the **Section 1226 Claim**, asserted by the Mandatory Detention Subclass and the four named Petitioners who have won their MTRs but are detained under the purported authority of 8 U.S.C. § 1226(c). Section 1226(c), properly construed, does not apply here for two independent reasons. It does not apply to detention pending reopened proceedings. Moreover, it authorizes mandatory detention only where an individual is placed in immigration detention "when . . . released" from his or her criminal sentence. Mandatory Detention Subclass members are not encompassed by this language, because they were released from any criminal incarceration years before their current immigration detention. Because § 1226(c) does not apply, they are entitled to bond hearings under § 1226(a).

Fourth, with the **A-File/ROP Claim**, Petitioners seek clarification of this Court's July 24 Order, to ensure that class members are protected from removal until they have opportunity to use information in newly-disclosed immigration

18

records.

**A.     PETITIONERS HAVE A HIGH LIKELIHOOD OF SUCCESS**

> **1.** *The Zadvydas* **Claim: Petitioners Are Being Unlawfully Detained Because Their Removal Is Not Significantly Likely in the Reasonably Foreseeable Future.**

Immigration detention for the purpose of effectuating removal is authorized only where there is a "significant likelihood of removal in the reasonably foreseeable future." *Zadvydas v. Davis,* 533 U.S. 678, 701 (2001). Petitioners' detention fails under this standard for two reasons. First, it remains unclear whether Iraq will actually allow any particular individual's repatriation—whether by issuing travel documents or making other arrangements to accept removal—and if so, how long that process will take. Second, for most it will take additional months, if not years, for their MTRs and reopened proceedings to be finally adjudicated, during which time the government is prohibited from removing them.

> ### a. *Petitioners Cannot Be Detained If Iraq Will Not Repatriate Them.*

*Zadvydas* held that 8 U.S.C. § 1231(a)(6), the post-final-order detention statute, authorizes detention only insofar as removal is "reasonably foreseeable." 533 U.S. at 699. That is because, to satisfy due process, detention must "bear a reasonable relation to the purpose for which the individual [was] committed." *Id*. at 690 (citations omitted). Because the principal purpose of the post-final-order detention statute is to effectuate removal, if removal is not feasible, detention bears no reasonable relation to its purpose. *Id.* at 697. To avoid the serious constitutional

19

problem that would be created if the statute authorized indefinite detention, the Court construed § 1231(a)(6) to authorize detention only for a "period reasonably necessary to secure removal"—presumptively six months. *Id.* at 699–701. After this six-month period, if a detainee provides "good reason" to believe that his or her removal is not significantly likely in the reasonably foreseeable future, "the Government must respond with evidence sufficient to rebut that showing" *Id.* at 701. If the government fails to do so, the individual must be released under conditions of supervision. *Id.* at 700. Moreover, as post-final-order detention lengthens, what is considered "reasonably foreseeable" shrinks. *Id.* at 701. The due process principles animating *Zadvydas* apply with equal force to the pre-final-order detention statute, 8 U.S.C. § 1226. Because the principal purpose of such detention is to effect removal, if removal is not reasonably foreseeable, then detention is not reasonably related to its purpose.[20]

   *Zadvydas* requires release here. As Respondents acknowledge, the named Petitioners, and nearly all class members, were previously released by the government based on the determination that their removal to Iraq could not be effected. *See, e.g.,* Mot. to Dismiss 2d Am. Class Pet., ECF 135, Pg.ID# 3305–06, 3312–13.

_____

[20] *See, e.g., Ly v. Hansen,* 351 F.3d 263, 271–73 (6th Cir. 2003) (applying *Zadvydas* to construe pre-final-order mandatory detention statute as authorizing detention only for reasonable period); *Nadarajah v. Gonzales*, 443 F.3d 1069, 1076 (9th Cir. 2006) (*Zadvydas* limits pre-final-order detention under 8 U.S.C. § 1225(b)).

20

Many Petitioners were already subjected to post-final-order detention, some for prolonged periods. *See supra* n.1. Yet neither prior to the re-detention of the Petitioners (i.e., the "revocation" of their release) nor since has ICE provided any particularized evidence that their removal can be effected in the "reasonably foreseeable future." The only evidence the government has provided is a declaration stating that Iraq recently relaxed its repatriation requirements. *See* Schultz Decl., ¶ 6, ECF 81–4, Pg.ID# 2007. But this is insufficient, as it provided no individuated evidence that Iraq will accept repatriation of any particular detainee. *See Rosales-Garcia v. Holland*, 322 F.3d 386, 415 (6th Cir. 2003) (finding "no significant likelihood of removal in the reasonably foreseeable future" where "government presented evidence of our continuing negotiations with Cuba over the return of Cuban nationals excluded from the United States [but petitioners were not] currently on a list of persons to be returned.").

Notably, the regulations implementing *Zadvydas*, 8 C.F.R. § 241.13, make clear that in order to revoke the release of someone who was released based on a prior finding that release was not reasonably foreseeable, ICE must determine that "on account of changed circumstances . . . there is a significant likelihood that the alien may be removed in the reasonably foreseeable future." 8 C.F.R. § 241.13(i)(2). Moreover, ICE guidance for revocation of release under the regulations refers to "imminent" removal, suggesting that a more demanding

foreseeability standard is required to revoke the release of an individual who was previously released because removal was determined not to be foreseeable:

> Revocation of Release Due to Changed Circumstances. Upon the determination that a released alien can be removed, the alien's release may be revoked and the alien may be returned to custody. . . . If the circumstances under which an alien was taken back into custody no longer exist and *his/her removal is no longer imminent*, the alien is to be released.

ICE Field Office Manual, U.S. DEP'T OF HOMELAND SEC'Y, p. 104 (Rev. March 27, 2006).[21] The government's vague representations about Iraq's willingness to relax its policies for issuing travel documents and accepting repatriations do not meet this standard, particularly in light of Iraq's repeated refusal to provide travel documents to class members even after its alleged policy change.

Even if Iraq does agree to the repatriation of Iraqi nationals without travel documents, that repatriation will necessarily take many months. ICE has explained that each flight to Iraq requires "numerous diplomatic meetings with the governments of Iraq and other international partners," describing "[t]he intensive diplomatic coordination and resources that go into planning such removal missions." Schultz Decl., ¶ 5, ECF 81-4, Pg.ID# 2006. *See also id.* at ¶ 8, Pg.ID# 2008 (arranging flights will be "time consuming, complicated and costly.")

### b. Petitioners' Removal is Not Significantly Likely in the Reasonably Foreseeable Future.

This Court's stay of removal appropriately prohibits the government from

---

[21] *See* www.ice.gov/doclib/foia/dro_policy_memos/09684drofieldpolicymanual.pdf.

removing Petitioners while they litigate their MTRs, a process that will, as already explained, take additional months or even years. *See* Table A, *supra*. Those individuals who win their MTRs—which is likely to be most—will face additional months or years in detention. Their removal is, therefore, not significantly likely in the reasonably foreseeable future

As the Sixth Circuit held in *Ly,* absent dilatory conduct, individuals fighting removal should not be subjected to prolonged detention "merely because [they] seek[] to explore avenues of relief that the law makes available to [them]." 351 F.3d at 272. They are "not responsible for the amount of time that such determinations may take." *Id*. Here government delay—particularly the failure to promptly provide the necessary files—has contributed directly to Petitioners' prolonged detention. *See id.* at 272 ("The mere fact that an alien has sought relief from deportation does not authorize the INS to drag its heels indefinitely in making a decision."). Finally, it is unlikely for most Petitioners that removal proceedings will in fact result in removal. *See* Facts D.1, D.2; *Ly*, 351 F.3d at 271 ("actual removability" bears on the reasonableness of detention).

### c. *Respondents Must Release Petitioners or Rebut Their Showing That Their Removal Is Not Likely in the Reasonably Foreseeable Future.*

Petitioners have shown "good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future." *Zadvydas*, 533 U.S. at 680. Therefore they must be released unless the government "furnish[es] evidence

23

sufficient to rebut that showing" for each individual detainee. *Id.* Petitioners ask this Court to order that detained Petitioners and class members be released under Orders of Supervision within 14 days, unless Respondents provide to the Court individualized evidence that either ICE has secured that individual's travel documents or Iraq has otherwise agreed to his or her repatriation, *and* that it is significantly likely that the detainee's immigration proceedings, including any appeals, will be concluded within nine months from the detainee's entrance into ICE custody. The mechanics of any subsequent review process can wait until it is known for how many individuals Respondents are presenting evidence. What matters for this motion is that all detained Primary Class members are entitled to the same procedural protections: an individualized showing that their removal is significantly likely in the reasonably foreseeable future.

## 2. *The Prolonged Detention Claim:* **Petitioners' Prolonged Detention without Individualized and Impartial Adjudication is Unlawful.**

The bedrock due process requirement for civil detention is an individualized hearing before an impartial decision-maker to ensure that the purposes of detention are being served. *See Zadvydas*, 533 U.S. at 690 (citing, *inter alia, United States* v. *Salerno*, 481 U.S. 739 (1987), *Foucha* v. *Louisiana*, 504 U.S. 71 (1992), *Kansas* v. *Hendricks*, 521 U.S. 346 (1997)). Because the purpose of immigration detention is to protect against danger and flight risk, immigration detention requires an individualized hearing on these issues. *See Zadvydas,* 533 U.S. at 700 ("[I]f removal is

24

reasonably foreseeable, the habeas court should consider the risk of the alien's committing further crimes as a factor *potentially* justifying confinement within that reasonable removal period") (emphasis added); *id.* at 699 (purpose of detention is "assuring the alien's presence at the moment of removal"); *id.* at 690-91 (discussing twin justifications of preventing flight and protecting the community). Moreover, "duration of commitment" must bear a "reasonable relation to its purpose." *Jackson v. Indiana*, 406 U.S. 715, 738 (1972).

*Demore* v. *Kim*, 538 U.S. 510 (2003), which carved out a narrow exception to the individualized hearing due process requirement in upholding § 1226(c), is not to the contrary. *Demore* relied on the government's assertion that detention is typically "brief"—what the Court understood to be a typical duration of one-and-a-half months for cases without BIA appeals to five months for the small minority of cases that were appealed. *Id.* at 530. The Court held that this "limited" period of mandatory detention was statutorily authorized and satisfied due process because it was reasonably related to the government's purpose of preventing against danger and flight risk. *Id.* at 528-29. The detention of both the Detained Final Order Subclass and the Mandatory Detention Subclass will far exceed this brief period. *See* Facts D; Argument A.1. Thus, for both Subclasses, continued detention without an individualized determination of danger and flight risk by an impartial adjudicator violates their constitutional and statutory rights.

25

The post-final-order statute, 8 U.S.C. § 1231, was intended to effectuate the prompt removal of individuals ordered removed. The mandatory detention provisions of the pre-final-order statute, § 1226(c), were intended to prevent release after criminal incarceration of potentially deportable non-citizens who might flee or harm the public if released. Nothing in either statute or their legislative history indicates that Congress intended to authorize the prolonged detention—for months, even years—of individuals who were ordered removed years or decades ago, who pose no danger or flight risk, and whose removal orders are stayed while they pursue bona fide motions to reopen.[22] Thus, both the Due Process Clause, and the immigration statute construed in light of due process concerns, require that Petitioners be afforded individualized determinations by an impartial adjudicator that their continued detention is justified based on danger or flight risk.

The case for release of both the Mandatory Detention and Detained Final Order Subclasses, absent an impartial adjudicator's individualized determination of danger or flight risk, is supported by the fact that, prior to their re-detention, Petitioners were complying with their conditions of supervision. That most of them were subject to the least restrictive reporting conditions—annual reporting—is

---

[22] *See, e.g., Diouf v. Napolitano*, 634 F.3d 1081, 1086 (9th Cir. 2011) (holding "prolonged detention under § 1231(a)(6), without adequate procedural protections, would raise serious constitutional concerns" and construing statute to require bond hearings whenever detention exceeds or will inevitably exceed six months).

strong evidence that they were not considered a danger or flight risk, as is the fact that ICE's purported justification for revoking release was not based on a violation of supervision conditions, but rather on failure to obtain Iraqi travel documents that Petitioners could not in fact obtain.[23] The regulations authorize revocation of release on only two grounds: violation of conditions or that circumstances make removal now foreseeable. *See* 8 C.F.R. § 241.13(i). Moreover, the government must conduct a revocation review to evaluate any "contested facts" and determine "whether the facts as determined warrant" not only revocation, but also "further denial of release." *Id.* at § 241.13(i)(3). Respondents did not do so.

Moreover, for the Detained Final Order Subclass, § 1231(a)(6) does not mandate detention beyond the 90-day removal period. Both *Zadvydas* and the agency's own regulations contemplate release of individuals who pose no danger or flight risk. *Zadvydas*, 533 U.S. at 692. But the only process the government has provided—and not all class members have received even this—is purely administrative 90-day POCRs, which would be woefully inadequate to satisfy due process even if the government had complied with the minimal regulatory require-ments, which it has not. These custody reviews do not provide for an impartial adjudicator; they place the burden on the detainee to establish lack of danger and

---

[23] Violation of supervision conditions is essentially a proxy for danger or flight risk, because the government can impose only conditions related to those purposes. *See U.S. v. Witkovich*, 353 U.S. 194, 201–02 (1957) (construing post-final-order conditions of supervision narrowly in order to avoid constitutional problem).

flight risk; and they do not even require that individuals who meet this burden be released, merely authorizing their release in the discretion of the agency. *See* 8 C.F.R. § 241.4; *Zadvydas*, 533 U.S. at 692 (citing inadequacies of administrative review process as one factor warranting Court's limiting construction of the statute).

The relief Petitioners seek on this claim is that the Court order Respondents to release members of the Detained Final Order and Mandatory Detention Sub-classes under orders of supervision within 14 days, unless Respondents by that date conduct individualized bond determinations in the administrative immigration court system or provide individualized evidence of danger or flight risk that cannot be mitigated by alternative conditions of release and/or supervision.[24]

### 3. *The Section 1226 Claim:* **Members of the Mandatory Detention Subclass Are Entitled to Bond Hearings under Section 1226(a).**

Members of the Mandatory Detention Subclass have an additional statutory right to immigration court bond hearings, because, for two reasons, the purported authority for their detention, § 1226(c), does not apply.

### a. *Section 1226(c) Does Not Apply To Detention Pending Reopened*

---

[24] In *Ly*, the Sixth Circuit declined to order bond hearings, holding that the constitutional problems created by prolonged detention without a "strong special justification" could be resolved in habeas. 351 F.3d at 273. Petitioners' proposed relief is consistent with *Ly*, because this Court would not be ordering bond hearings but rather, as in *Ly*, ordering relief in the *absence* of a bond hearing (Particularly given the large number of cases to be decided here, *Ly* might not bar such an order in any event.)

### Removal Proceedings.

*Demore*'s heavy reliance on the brevity of mandatory detention to find § 1226(c) constitutional demonstrates the unlawful nature of the unjustified prolonged detention here. As the Sixth Circuit recognized in *Ly v. Hansen*—and as other circuits uniformly agree in post-*Demore* cases—when noncitizens are detained pending removal proceedings pursuant to the mandatory detention statute, without a bond hearing, due process concerns limit such detention to a "reasonable time," and 8 U.S.C. § 1226(c) must be construed accordingly. 351 F.3d at 270.[25]

The Ninth Circuit has held that the mandatory detention statute does not apply at all to individuals who are in reopened removal proceedings. *Casas-Castrillon v. Dep't of Homeland Sec.,* 535 F.3d 942, 948 (9th Cir. 2008) (A noncitizen "whose case is being adjudicated before the agency for a second time—after having fought his case in this court and won, a process which often takes more than a year—has not received expeditious process."). Because they are not properly subject to § 1226(c), their detention is instead governed by § 1226(a), which provides for bond hearings before an immigration judge. *Id.* at 950.

This Court should follow this approach, reading § 1226(c) not to reach re-

---

[25] *See also Reid v. Donelan*, 819 F.3d 486, 494 (1st Cir. 2016); *Sopo v. Attorney General*, 825 F.3d 1199, 1212–13 (11th Cir. 2016); *Lora v. Shanahan*, 804 F.3d 601, 606 (2d Cir. 2015) (6 months); *Chavez–Alvarez v. Warden York Cty. Prison*, 783 F.3d 469, 478 (3d Cir. 2015) (6 months to 1 year); *Rodriguez v. Robbins*, 804 F.3d 1060, 1074–79 (9th Cir. 2015) (6 months), *cert. granted sub. nom.*, *Jennings v. Rodriguez*, 136 S.Ct. 2489 (2016).

opened proceedings at all. While the Sixth Circuit has not addressed whether mandatory detention should apply to reopened proceedings, its decision in *Ly* recognized that the statute must be given a limiting construction in light of the due process concerns posed by unreasonably prolonged detention. 351 F.3d at 269–70. *Ly* therefore supports the argument here. *Ly* focused on several factors for determining whether mandatory detention without a bond hearing was unreasonable. These included "the length of detention to which the petitioner has already been subjected, the likelihood of deportation, the potential length of the detention into the future, the likelihood that release will frustrate the petitioner's actual deportation, and the danger to the community posed by the petitioner if released." *Id.* at 268. While *Ly* required the release of an individual unreasonably detained, these same factors—each of which favors the Mandatory Detention Subclass—also support a holding that § 1226(c) simply does not apply to these reopened cases. Members of the Mandatory Detention Subclass have already been subject to lengthy detention; have strong claims for relief; and show every indicia of not being flight risks or danger. Therefore, § 1226(c) is best read not to apply to reopened removal proceedings, generally, and not to apply to *these* reopened proceedings in particular.

### b. *Section 1226(c) Does Not Apply To Individuals Who Were Living in the Community Prior to Detention.*

Mandatory Detention Subclass members are entitled to an immediate bond

hearing before an immigration judge for another reason as well. They were not taken into ICE custody "when . . . released" from criminal incarceration—as required by the plain language of § 1226(c)—but rather *years* after they completed serving their criminal sentence and returned to their families and communities.

Two courts of appeals and numerous district courts inside and outside this Circuit have held that § 1226(c) "unambiguously imposes mandatory detention without bond only on those aliens taken by the [Secretary] into immigration custody 'when [they are] released' from criminal custody." *Preap v. Johnson*, 831 F.3d 1193, 1197 (9th Cir. 2016), *cert. pet. filed*, *Duke v. Preap*, No. 16-1363 (U.S. May 11, 2017); *accord Castañeda v. Souza*, 810 F.3d 15 (1st Cir. 2015) (affirming the judgments below by an evenly divided *en banc* court); *Mudhallaa v. Bureau of Immigration & Customs Enf't*, No. 15-10972, 2015 WL 1954436 (E.D. Mich. Apr. 29, 2015) (Ex. 29); *Rosciszewski v. Adducci*, 983 F. Supp. 2d 910 (E.D. Mich. 2013).[26] As such, § 1226(c) does not apply to class members who were detained by ICE after returning to their communities years after their criminal release.

"[P]ermitting ICE to detain an alien under 8 U.S.C. § 1226(c) anytime after the alien is released from custody would render the phrase 'when the alien is released' meaningless." *Deluis-Morelos v. ICE Field Office Dir.*, No. 12-cv-1905-

---

[26] *But see Olmos v. Holder*, 780 F.3d 1313 (10th Cir. 2015); *Lora v. Shanahan*, 804 F.3d 601 (2d Cir. 2015); *Sylvain v. Attorney Gen. of U.S.*, 714 F.3d 150 (3d Cir. 2013); *Hosh v. Lucero*, 680 F.3d 375 (4th Cir. 2012).

JLR, 2013 WL 1914390 at *6 (W.D. Wash. May 8, 2013) (Ex. 30); *see also*

*Castañeda*, 810 F.3d at 41. As one judge of this Court explained,

> To read the statute in a manner that allows the Attorney General to take a criminal alien into custody without regard to the timing of the alien's release from custody would render the 'when the alien is released' clause redundant and therefore null.

*Khodr v. Adducci*, 697 F. Supp. 2d 774, 779 (E.D. Mich. 2010) (citation omitted).

The "when . . . released" requirement of § 1226(c) also makes practical

sense. When an individual is taken into custody immediately upon release from

criminal custody, there will be little evidence available, making a hearing in which

the noncitizen must prove that she is not a flight risk or a danger unlikely to result

in release. Where, by contrast, an individual has been living in the community, it

was sensible for Congress to provide for an individualized hearing.

Because § 1226(c) does not apply to Petitioners in the Mandatory Detention

subclass, because they are being detained years after their release from criminal

custody and who have reopened their proceedings, those subclass members are

detained under § 1226(a)—and are therefore entitled to an immediate bond

hearing.

### 4. *The A-File Claim*: Class Members Should Be Protected from Removal If Prejudiced by Lack of Their A-Files/ROPs.

As this Court has already held, for individuals in removal proceedings,

access to A-Files and Records of Proceedings is critical to fair adjudication and

due process. *See* Injunction Order, ECF 87, Pg.ID# 2356. The Court ordered prompt production of the files, but was later forced to set dates certain of November 6 and 27, due to Respondents' failure to produce them. *See* Order Re Further Proceedings, ECF 115, Pg.ID# 2943.    Before providing the files, Respondents continued to pursue removal for individuals who filed emergency MTRs without them. Such individuals have therefore been forced to proceed without the information that is within Respondents' control and that is needed for effective presentation of their cases.[27]

If, as a result, class members' MTRs are denied, that adjudication violates due process. Because adjudications under the foregoing circumstances provide an insufficient safeguard against removals that lead to persecution and torture, they also violate the INA and CAT. It was for this precise reason that this Court ordered file production. The Court should clarify its existing stay of removal so that Petitioners who filed MTRs before receipt of their files are protected from removal until they have an opportunity to submit motions to supplement or reconsider their earlier motions, and for the time it takes for these motions to be adjudicated.

## B.    THE IRREPARABLE HARM, BALANCE OF THE EQUITIES, AND PUBLIC INTEREST FACTORS FAVOR PETITIONERS.

In this action the final three injunctive factors—irreparable harm, balance of

---

[27] *See* Ex. 19, Bajoka ¶ 12; Ex. 14, Murad ¶ 14; Ex. 27, Realmuto 2d ¶ 10; Ex. 31, Realmuto ¶ 10.

equities and public interest—overwhelmingly support Petitioners, who seek nothing more than a return to a pre-detention status quo. The harm caused by detention is obvious and ongoing: it harms their physical and mental health, financial stability, family relationships, and ability to fight their immigration cases. *See* Facts Section E. Simply put, to languish in jail, removed from a life built over years, is the very definition of irreparable harm.[28]

Nothing balances this loss on Respondents' side of the ledger. As Petitioners' evidence shows, they will act in compliance with government orders, absent detention, and the government has ample alternatives short of detention to ensure presence at removal, if and when it should become imminent. Economic efficiency too supports Petitioners. The government itself complains that unnecessary detention costs $1 million per month. Schultz Decl. ¶ 8, ECF 81-4, Pg.ID# 2004. The cost of non-detention supervision is between $0.17 to $44 per day, with an average cost of $4.50 per day. Ex. 18, Brané ¶ 13.

Together, the evidence suggests a punitive basis for Petitioners' detention. Respondents have refused to engage in good faith reviews under the POCR process and have characterized Petitioners' efforts to advance legal defenses to removal as "acts to impede governmental removal efforts." Mot. Dismiss Second Am. Class Pet., ECF 135, PgID# 3303–04. But opposing removal to a nation where torture

---

[28] *See United States v. Bogle*, 855 F.2d 707, 710–11 (11th Cir. 1998) ("unnecessary deprivation of liberty clearly constitutes irreparable harm").

34

and death awaits is not improper "obstruction." It is an effort to advance the laws of this nation. Absent any individual showing that Petitioners' detention is, in fact, required to protect the community or ensure presence at removal, the only "purpose" left is punishment for exercising legal rights.

Little needs be added regarding the public interest. Justice, not efficiency, is the primary goal of our judicial system. Persons with good faith defenses to removal should be free to advance those claims.

## C.    CLASSWIDE RELIEF IS NECESSARY

As with Petitioners' initial preliminary injunction motion, classwide relief is both appropriate and necessary because the claims brought and the relief sought are essentially procedural. While each Petitioner has a different immigration history and procedural posture, each has a right not to be incarcerated if his/her removal is not significantly likely in the reasonably foreseeable and, at a minimum, each has a right to an individualized determination of whether detention is justified based on flight risk or dangerousness.

## CONCLUSION

The Court should grant Petitioners' motion for the reasons stated above.

35

Date: November 7, 2017

Respectfully submitted,

Michael J. Steinberg (P43085)
Kary L. Moss (P49759)
Bonsitu A. Kitaba (P78822)
Miriam J. Aukerman (P63165)
AMERICAN CIVIL LIBERTIES
 UNION FUND OF MICHIGAN
2966 Woodward Avenue
Detroit, Michigan 48201
(313) 578-6814
msteinberg@aclumich.org

Kimberly L. Scott (P69706)
Wendolyn Wrosch Richards (P67776)
Cooperating Attorneys, ACLU Fund
 of Michigan
MILLER, CANFIELD, PADDOCK
 & STONE, PLC
101 N. Main St., 7th Floor
Ann Arbor, MI 48104
(734) 668-7696
scott@millercanfield.com

Nora Youkhana (P80067)
Nadine Yousif (P80421)
Cooperating Attorneys, ACLU Fund
 of Michigan
CODE LEGAL AID INC.
 27321 Hampden St.
Madison Heights, MI 48071
(248) 894-6197
norayoukhana@gmail.com

María Martínez Sánchez (NM Bar
126375)
AMERICAN CIVIL LIBERTIES
 UNION OF NEW MEXICO

Judy Rabinovitz (NY Bar JR-1214)
Lee Gelernt (NY Bar NY-8511)
ACLU FOUNDATION
 IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2618
jrabinovitz@aclu.org

Margo Schlanger (N.Y. Bar #2704443)
Samuel R. Bagenstos (P73971)
Cooperating Attorneys, ACLU Fund
 of Michigan
625 South State Street
Ann Arbor, Michigan 48109
734-615-2618
margo.schlanger@gmail.com

Susan E. Reed (P66950)
MICHIGAN IMMIGRANT RIGHTS
 CENTER
3030 S. 9th St. Suite 1B
Kalamazoo, MI 49009
 (269) 492-7196, ext. 535
Susanree@michiganimmigrant.org

Lara Finkbeiner (NY Bar 5197165)
Mark Doss (NY Bar 5277462)
Mark Wasef (NY Bar 4813887)
INTERNATIONAL REFUGEE
 ASSISTANCE PROJECT
Urban Justice Center
40 Rector St., 9th Floor
New York, NY 10006
(646) 602-5600
lfinkbeiner@refugeerights.org

36

1410 Coal Ave. SW
Albuquerque, NM 87102
msanchez@aclu-nm.org

*Attorneys for All Petitioners and Plaintiffs*

William W. Swor (P21215)
WILLIAM W. SWOR
 & ASSOCIATES
1120 Ford Building
615 Griswold Street
Detroit, MI 48226
wwswor@sworlaw.com

*Attorney for Petitioner/Plaintiff*
*Usama Hamama*

## CERTIFICATE OF SERVICE

I hereby certify that on November 7, 2017, I electronically filed the foregoing papers with the Clerk of the Court using the ECF system which will send notification of such filing to all ECF filers of record.

By:  /s/Kimberly L. Scott
Kimberly L. Scott (P69706)
Cooperating Attorneys, ACLU Fund
 of Michigan
MILLER, CANFIELD, PADDOCK
 & STONE, PLC
101 N. Main St., 7th Floor
Ann Arbor, MI 48104
(734) 668-7696
scott@millercanfield.com

37