# EXHIBIT 34

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**USAMA JAMIL HAMAMA**, et al.,

*Petitioners/Plaintiffs,*

v.

**REBECCA ADDUCCI**, et al.,

*Respondents/Defendants.*

Case No. 2:17-cv-11910
Hon. Mark A. Goldsmith
Mag. David R. Grand

Class Action

## SECOND DECLARATION OF MARGO SCHLANGER

I, Margo Schlanger, hereby declare:

1. I make this declaration based upon my own personal knowledge and if called to testify, I could and would do so competently as follows.

2. My qualifications and background are fully set out in my first declaration in this case, dated November 6, 2017, ECF 138-2, Pg.ID# 3402-3410. As it says, I am the Wade H. and Dores M. McCree Collegiate Professor of Law at the University of Michigan Law School, and counsel for all Petitioners/Plaintiffs and proposed counsel for the putative class in the above-captioned case.

3. That first declaration also describes in more detail the available sources of information on which I rely.

4. This declaration addresses six topics:

    a. the number of putative class members currently detained under the purported authority of the mandatory detention provisions of the Immigration and Nationality Act (INA), INA § 236(c), 8 U.S.C. § 1226(c).

    b. the number of putative class members who have been released pursuant to post-order custody reviews (POCRs);

    c. the number of class members whose most recent immigration hearings were held in 2015, 2016, and 2017;

    d. the countries of birth for all putative class members and potential class members, and issues non-Iraq births may cause for repatriation;

    e. the length of detention of putative class members;

    f. habeas petitions filed by individual putative class members; and

    g. issues relating to court-ordered A-File and Record of Proceedings (ROP) production.

**Mandatory Detention**

5. Mandatory detention is a statutory bar on bonded release for particular noncitizens in the midst of immigration proceedings, under INA § 236(c), 8 U.S.C. 1226(c). The number of putative class members whose current detention is under the purported authority of this mandatory detention statute changes daily. Some putative class members enter this status when their motions to reopen (MTRs) are granted; others exit when they either win or lose immigration protection or relief.

6. In my first declaration, I explained that as of the government's data disclosure dated October 28, 2017, there were 59 detainees with reopened immigration cases who remained in detention. I stated that "[t]he vast majority" of these class members were being subjected to mandatory detention based on the purported authority of 8 U.S.C. § 1226(c). ECF 138-2, ¶ 31, PgID 3409. This conclusion was based on my frequent contact with dozens of class members' immigration counsel for various purposes, and my conversations with them about their clients, as well as on the fact gathering the entire team did before filing this case's Second Amended Habeas Petition.

7. Based on additional inquiry, I can now estimate with more precision that approximately 90% of the class member detainees who remain in detention after their MTRs are granted but before resolution of their cases are being held under the purported authority of 8 U.S.C. § 1226(c).

8. I make this estimate based on the following: Because of Respondents' data disclosures, we are currently aware of 66 individuals who are currently or were until recently detained *after* getting an MTR

granted. This is the group of individuals who might currently be, or until recently have been, detained under the mandatory detention statute.

9. In the course of fact development for this case, we already had notes recording the mandatory detention status for a few of these specific individuals. By email, I asked the lawyers for each of the rest of the 66 current/former detainees about the basis of their clients' detention. I received many responses, and we now have information for well over half—40 of the 66. All but 3 of those 40—that is, over 90%—are or were (before their reopened immigration cases were recently successfully concluded) subjected to mandatory detention during the course of this litigation. The situations of those 3 vary: one individual has been granted bond, but lacks the necessary money; one has decided to focus on the merits of his case rather than seek bond; and one is held under a different INA provision.

10. Using this information, we now know the identities of at least 27 individuals currently being detained under the purported authority of 8 U.S.C. § 1226(c). We do not have individual information for the additional individuals whose immigration cases are open but who remain in detention. But the just-described inquiry robustly confirms the conclusion I stated in my first declaration—the vast majority of the class members who have open cases and are detained are being held under the purported authority of the mandatory detention statute.

11. There is no reason to think that the individuals for whom we do *not* have specific information differ systematically from those whom we do have information. Assuming that the unknown group are, like the known group, about 90% mandatory detention cases, that means there are currently 50-plus individuals in the putative Mandatory Detention Subclass.

12. In addition, the Mandatory Detention Subclass group is likely to grow over the next several months. As of the last data disclosed to Petitioners by the government, there were 85 MTRs pending in the immigration court or the BIA (some as appeals from the immigration court). Now that the government has produced A-Files and Records of Proceedings (ROPs) as required by this Court's orders, many more MTRs are likely to be filed in the next weeks and months. As the pending or new MTRs are granted, some detainees will bond out of detention, but many more will remain detained under the purported authority of the mandatory detention statute. For example, as set out in the Second Amended Habeas Petition, named

3

Petitioners Abbas Al-Sokaini and Moayad Barash, upon having their motions to reopen granted, are likely to be subjected to mandatory detention. While individuals will also exit the Mandatory Detention subclass as they win or lose their cases, that is almost certainly a smaller number than the number of detainees who will enter the subclass, because there are fewer currently reopened cases than cases likely to be reopened in the coming weeks and months.

**Releases after post-order custody reviews**

13. Since this litigation began, remarkably few putative class members whose cases have *not* been reopened—that is, who still have final orders—have been released. In Respondents' Opposition to Petitioners' Motion for a Preliminary Injunction on Detention Issues, Respondents offered the Declaration of ICE Deputy Assistant Director John A. Schultz Jr. (ECF 158-2). This Declaration, dated Nov. 30, 2017, stated "Since the filing of this litigation, nationwide ICE has released 13 Iraqis with final orders." *Id*., at ¶ 10, Pg.ID# 4131.

14. Government data provided to us by Court order is similar; it shows that 14 individuals with no noted MTR grant—that is with final orders of removal—were released from detention.

15. Neither the Schultz declaration nor the data produced by Respondents disclose the basis of these releases. But members of the plaintiffs' counsel team have attempted to find out this information. We were able to contact either the former detainee, family members, or counsel for 9 of the 14 individuals on our list. In the end, we have determined that 3 former immigration detainees were actually not released at all, but were transferred into criminal custody; and 1 was released because of medical issues and apparently without any POCR process. For at least 2, releases occurred after the noncitizen won immigration relief or protection. Only for 3 individuals does it seem possible—though by no means certain, based on the limited information we have—that POCR processes could have led to releases. We have no verified information that the POCR process was the reason for release in those cases. For the remaining 5 we have no information at all. In other words, at most 8, and almost certainly fewer, of the releases happened pursuant to post-order custody reviews.

16. Since this litigation began, there have been about 300 putative class members held in detention. Even if 13 of them were released pursuant to

4

post-order custody reviews, that's a POCR release rate of 4%. Given, as explained in the preceding paragraph, that many of the releases we have tracked down were *not* POCR releases, the true POCR release rate is almost certainly far lower.

**Recent final orders**

17. The government's disclosures in this case do not provide full information about the removal order dates for each putative class member. The disclosures include a variable labeled "Comp Date." For the most part, this is the most recent removal order date. There are, however, exceptions. For anyone whose motion to reopen has been granted and whose case is therefore pending without an extant removal order, "Comp Date" seems instead to be similar (though sometimes not identical) to the date the MTR was granted. For anyone whose MTR has been granted, therefore, the "Comp Date" does not provide the removal order date. I have had several conversations about this with Respondents' counsel, and it seems that "Comp Date" is the best that the government can do, in terms of disclosures of removal order dates.

18. Each of Respondents' data disclosures includes new "Comp Date" data. But we have kept the old data, too, so we are in most but not all cases aware of what the removal order date was prior to a recent reopening.

19. In addition, in mid-July we supplemented this information by calling the EOIR 1-800 number; that number includes a recording of the most recent immigration court merits decision and its date. As just explained, the "Comp Date" seems to be the removal order date—in the large majority of cases the "Comp Date" is the same as the decision date available on the EOIR recorded phone number. But the two dates are not always the same, and we do not entirely understand the differences.

20. Nonetheless, because the government has disclosed the "Comp Date" in response to a court order to disclose the date of the final removal order, Table A rests on that data. For the reasons explained in ¶ 17, Table A omits individuals if (a) the "Comp Date" data reflects a recent MTR (since March 2017) rather than the pre-MTR removal date and we do not have the pre-MTR date, or (b) the "Comp Date" data shows a removal date *after* June 24, 2017, because either that information is incorrect or the affected individual is not in the putative class (using either the definition in the Court's July 24, 2017 order or the definition Petitioners have more

5

recently proposed). In total, there are 10 individuals who have been detained during this lawsuit's pendency for whom we do not know a removal order date. For the remaining 10 individuals with listed "Comp Dates" in 2017, it seems plausible but not certain that their order date truly was in 2017. The information is summarized in Table A.

**Table A: Current Class Members' Removal Order Year**

| Removal Order Year | # | % |
| --- | --- | --- |
| < 2008 | 151 | 49.5% |
| 2008 – 2014 | 109 | 35.7% |
| 2015 | 12 | 3.9% |
| 2016 | 13 | 4.3% |
| 2017 | 10 | 3.3% |
| Unknown | 10 | 3.3% |
| TOTAL | 305 | 100% |

**Countries of Birth**

21. Pursuant to this Court's order, ICE has disclosed the country of birth of each individual the government considers an Iraqi national, if that individual had an order of removal on June 24, 2017.

22. Nationality is not simply a matter of country of birth—different countries have different rules about qualifying as a national of that country, both substantive and as a matter of evidentiary basis. An individual thought to be an Iraqi national because he was born in Iraq may have a difficult time proving that, because he lacks a birth record; I understand that many registries in Iraq that once contained such records have been destroyed in recent years.

23. The matter is particularly uncertain for individuals born to Iraqi or mixed parents outside of Iraq. My understanding is that as a technical matter, Iraqi citizenship for those born outside Iraq requires that the father be Iraqi, and that a person born outside Iraq to an Iraqi mother is not automatically considered Iraqi. Regardless of the technical requirements of the law, it may be particularly difficult for individuals born outside of Iraq to be repatriated. Both their country of birth and Iraq may well reject their repatriation.

24. In the course of this litigation, I have learned about individual situations

in which repatriation seems particularly unlikely for these kinds of reasons. For example, I learned just this week about one detained individual whom ICE considers to be an Iraqi and whom ICE has included in its disclosures as a putative class member, but whose removal order specifies removal to Greece. It seems very unlikely that Greece will grant this individual travel papers, and it is unclear whether he could be removed to Iraq, if ICE is able to persuade the immigration court to amend his removal order. His removal is not likely in the reasonably foreseeable future—if ever—and his ongoing detention is therefore serving no purpose.

25. Table B sets out the prevalence of each country of birth among the full set of such individuals ("potential class members"), and the subset on individuals who are currently putative class members—that is, who have been detained by ICE during the pendency of this litigation.

**Table B: Country of Birth, Potential and Current Class Members**.

| Country | Potential AND Current Class Members | Current Class Members |
|---|---:|---:|
| **Iraq** | **1,366** | **291** |
| **Not Iraq** | **58** | **14** |
| Kuwait | 16 | 3 |
| Greece | 8 | 4 |
| Saudi Arabia | 7 | 2 |
| Jordan | 6 | 1 |
| Afghanistan | 4 | 1 |
| Lebanon | 4 | 2 |
| Syria | 2 | 1 |
| United Arab Emirates | 2 | |
| United Kingdom | 2 | |
| Bulgaria | 1 | |
| Cuba | 1 | |
| Egypt | 1 | |
| El Salvador | 1 | |
| Iran | 1 | |
| Pakistan | 1 | |
| Turkey | 1 | |
| **Total** | **1,424** | **305** |

**Time in Detention**

26. Two-thirds of the individuals detained during the course of this litigation were arrested on or before (mostly on) June 11 and 12, 2017—precisely six months ago. Table C sets out those and subsequent detentions: column (a) sets out dates every two weeks since the June 12 mass arrests. Column (b) tallies all the detentions that occurred on or before the the stated date. Column (c) lists the number of individuals arrested on or before the stated date and *still* in detention. Column (d) pulls out the individuals who have succeeded in getting their cases reopened, but who are still in detention—for the reasons described in ¶¶ 13-16 above, we know that these are nearly all individuals in the Mandatory Detention Subclass. Column (e) indicates the minimum number of days in detention as of December 12, 2017.

**Table C: Time in Detention**

| (a) Newly detained on or before: | (b) All detained | (c) Still detained | (d) Reopened Case, Still Detained | (e) Minimum Days in Detention, as of 12/12/2017 |
|---|---|---|---|---|
| June 12, 2017 | 206 | 186 | 42 | 183 (6 mos.) |
| June 26, 2017 | 33 | 29 | 9 | 169 |
| July 10, 2017 | 16 | 11 | 1 | 155 |
| July 24, 2017 | 16 | 15 | 2 | 141 |
| Aug 7, 2017 | 4 | 4 | 3 | 127 |
| Aug. 21, 2017 | 13 | 12 | 2 | 113 |
| Sept. 4, 2017 | 5 | 5 | 1 | 99 |
| Sept. 18, 2017 | 0 | 0 | 0 | 85 |
| Oct. 2, 2017 | 0 | 0 | 0 | 71 |
| Oct. 16, 2017 | 7 | 7 | 1 | 57 |
| Oct. 30, 2017 | 3 | 3 | 1 | 43 |
| Nov. 13, 2017 | 0 | 0 | 0 | 29 |
| Nov. 27, 2017 | 2 | 2 | 0 | 15 |
| TOTAL | 305 | 274 | 61 | |

27. In Table C's columns (c) and (d), comparing the total number of detained (the last row) with those detained on or before June 12 (the first row), it is evident that as of today, two-thirds of the detainees have been in detention

8

for six months or more: this is true for detainees generally and for the individuals with reopened cases in particular.

**Habeas petitions**

28. As I described in my prior Declaration, we have systematically tracked current and potential class members' cases in the federal court system. In addition to looking for Court of Appeals Petitions for Review, we recently began tracking habeas petitions. Except where individuals have names too common to allow effective searches, these can be located online using their names, searching information from the U.S. District Court PACER system. I have trained several law and college student volunteers to conduct these name searches and set up alerts, so that we are notified electronically of any habeas matters filed by a class member or a potential class member. Once a search is set up, it runs automatically, once each day. We have set up such a search for each class member detainee and are in the process of setting them up for the non-detained individuals.

29. These habeas searches are not fail proof; names can be spelled differently, and name searches have many false positives, which can be challenging to sort through. Thus we cannot be certain that we are finding every habeas matter related to this litigation.

30. So far, we have located 9 habeas filings. All are pro se, except for the first one listed below, in which the District Court appointed counsel.

- N.D. Ala.

    o Maytham Al Bidairi, 4:17-cv-00824-RDP-JHE (filed May 19, 2017)

    o Hussain Al Kinani, 4:17-cv-01021 (filed June 19, 2017)

    o Hussain Al-Jabari, 4:17-cv-01972 (filed Nov. 22, 2017)

    o Mohammed Al Asady, 4:17-cv-01970 (filed Nov. 22, 2017)

- S. D. Fla.

    o George Phillip Arthur, 1:17-cv-23343 (filed Sept. 5, 2017)

9

- W.D. Mich.

    - Salman Saiyad, 1:17-cv-00995 (filed Nov. 13, 2017) (motion to transfer case to E.D. Mich. pending)

    - Abidoon Al Dilaimi, 1:17-cv-01037 (filed Nov. 27, 2017)

    - Bassil Yousif, 1:17-cv-01038 (filed Nov. 27, 2017)

- D. Minn.

    - Khalef Abdullah-Hussein, 17-cv-05214 (filed Nov. 27, 2017)

**A-File and ROP Production**

31. In its July 24 Order, this Court ordered Respondents to produce A-Files and Records of Proceedings to putative class members "as soon as practicable." ECF 87. By subsequent order—ECF 110 (Sept. 25, 2017), ECF 113 (Sept. 27, 2017), ECF 115 (Sept. 29. 2017), ECF 152 (Nov. 21, 2017)—deadlines were set. A-Files and ROPs were to be produced by November 6, 2017 for detained individuals who had already filed Motions to Reopen their immigration cases, by November 27 for the rest of the detained putative class members, and by December 11 for previously detained class members who had filed a motion to reopen. For those class members who have authorized disclosure of their files to class counsel, that production is scheduled to happen today, December 11, 2017. Respondents were also required to provide to class counsel a list of files produced and to whom and when they were produced.

32. The orders provide that for class members with immigration counsel, counsel should receive the files. Class members without counsel may designate who should receive their files. All class members are also allowed to authorize class counsel to receive their files.

33. ICE and the Executive Office of Immigration Review produced these files separately, and mailed them separately: ICE provided the A-Files and EOIR the ROPs.

34. Unfortunately, the productions have been marred by many problems. We have reported these, in detail, to the Respondents. Among the issues:

    a. For a large number of individuals, the A-File, the ROP, or both were

10

      sent to the wrong person—the wrong lawyer, or to the detainee rather than the lawyer. For quite a few of these, one of the files was directed correctly but the other was not.

    b. For at least one individual and maybe more, the files were sent to a detention facility that no longer housed the detainee—and were therefore refused and not delivered.

    c. For a number of individuals, no information is provided about one or both file productions. For several, the file is noted as "missing." For several others, the ROP is noted as "Sent to DHS for production," with no further information on actual delivery.

    d. Many of the lawyers reported a problem with decrypting the encrypted files. At Respondents' request, we have directed them to Detroit Office of Chief Counsel. But it is unclear whether all these problems have been solved.

    e. Some of the files the detainees designated to be produced to Petitioners' counsel have not been produced to us.

35. Until problems like these are solved, the affected class member does not in fact have access to his or her files. In addition, for anyone who has already filed a motion to reopen, the delay further prejudices the possibility of supplementation and access during ongoing proceedings.

Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury under the laws of the United States that the above statements are true and correct to the best of my knowledge, information, and belief.

Date: December 12, 2017

*Margo Schlanger*
Margo Schlanger

11