# EXHIBIT 35

# EXHIBIT 35

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

USAMA JAMIL HAMAMA, et al.,

    Petitioners and Plaintiffs,

v.

REBECCA ADDUCCI, et al.,

    Respondents and Defendants.

Case No. 2:17-cv-11910
Hon. Mark A. Goldsmith
Mag. David R. Grand
Class Action

## DECLARATION OF ARASH JAHANIAN

I, Arash Jahanian, make this statement under the penalties of perjury of the laws of the United States, and if called to testify I could and would do so competently based upon my personal knowledge as follows:

1. I am a lawyer admitted to practice in the state of Colorado. I am employed as a staff attorney at the ACLU of Colorado.

2. Since August 9, 2017, I have been in regular contact with an Iraqi national in ICE detention whom I will call Mr. A., to preserve his privacy, and with his immigration counsel. Mr. A is a class member in this matter.

3. ICE arrested and detained Mr. A. on June 23, 2017. Since then, Mr. A. has been detained at the Denver Contract Detention Facility operated by the GEO Group in Aurora, Colorado.

4. Throughout his detention, Mr. A. has been experiencing medical issues that he believes are related to his heart, and he has not received adequate medical care. The account that follows is based on what he has told me about his recent medical situation while in ICE custody.

5. Prior to his detention, Mr. A. had suffered three heart attacks and received two heart surgeries, most recently in May 2017.

6. When Mr. A. first contacted me on August 9, he had been suffering from swelling in his right foot and ankle. Thereafter, the swelling exacerbated at points to where Mr. A.'s skin turned black and he felt it was about to break.

7. For the vast majority of the time Mr. A. has been in detention, the only treatment the medical department has provided him is to give him a compression sock and a pillow so

that he could prop up his leg. The medical unit at the facility does regularly check his blood pressure.

8. After filing a number of grievances, Mr. A. saw Dr. Peterson, whom I understand to be the sole physician at the Denver Contract Detention Facility, for the first time on September 2 or 3, 2017. Dr. Peterson examined the ankle and ordered an MRI, which confirmed that Mr. A. had not suffered from any trauma to his foot or ankle. The technician who conducted the MRI said Mr. A. should get a scan to check for blockage, but Dr. Peterson did not order one.

9. The swelling in Mr. A.'s ankle remained a problem, even to the point where it would cause alarm for officers supervising Mr. A. in detention. For example, on September 14, 2017, an officer became concerned about Mr. A.'s ankle and took him down to the medical unit. The officer waited with Mr. A. for approximately three hours. Medical personnel told the officer they would not see Mr. A. and that the officer should not bring Mr. A. down to medical again.

10. On the night of Thursday, December 7, Mr. A. observed that his hands had become purple. He was seen by the medical unit and eventually transported to Denver Health hospital.

11. A doctor at Denver Health conducted tests and found blockage in an artery. He told Mr. A. that his heart was weak and he would perform surgery to insert a stent. However, Mr. A. was then told, without explanation, that he was being taken back to detention. No surgery was performed.

12. Mr. A. was transported back to the Denver Contract Detention Facility midday Friday, and he has been held in general population, where he remains. He is no longer even getting compression socks.

13. Since he was taken to the hospital, Mr. A. has experienced trouble breathing. Both his hands are swollen and purple, and both ankles are swollen. He has also suffered from some lightheadedness. On Saturday, December 9, he reported his worsening condition and asked to be taken to the emergency room, but the nurse at the facility took his vitals and told him she did not see a need to send him to the emergency room.

14. The detention facility has also failed to accommodate Mr. A.'s need for a no-salt diet, even after Dr. Peterson ordered it for him on September 11, 2017. At one point, a kitchen employee told him, "What do you think; we're going to make separate food for you? That's not going to happen." On approximately October 1, the food preparation staff gave Mr. A. a tray with just water in it. Mr. A. has been forced to eat food with salt, against medical orders. According to a form from the facility, Mr. A. is apparently getting a daily diet that contains 2,400-to-2,600 calories and less than 3,000 mg of sodium. Obviously, less than 3,000 mg of sodium per day does not equate to a no-salt diet, which is what Mr. A.'s medical condition requires.

15. Mr. A. has filed numerous grievances for medical treatment throughout his detention, and Dr. Peterson and one official at the facility have told him to stop filing grievances.

16. In addition, I have made numerous attempts to bring Mr. A.'s situation to the attention of officials in charge, both at the facility and with ICE in Washington, DC. These efforts include emails on September 25, November 21, and December 11. Mr. A.'s immigration attorney has also spoken to officials at the facility. We have never received any response beyond something to the effect of "we are looking into it." Mr. Alkadi continues to receive ineffective and substandard treatment.

17. Mr. A. is afraid that he is going to die in detention. I am not a doctor, but in his place, I would be afraid of the same thing. His situation has been bad for months, and has gotten observably worse in recent days. He needs an immediate health intervention or to be released so that he can manage his own health as he has done for years in the community prior to his detention.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge.

Executed this 12th day of December, 2017 in Denver, Colorado.

Signature _____