# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

**USAMA JAMIL HAMAMA,** et al.,

        Petitioners/Plaintiffs,

v.

**REBECCA ADDUCCI,** et al.,

        Respondents/Defendants.

Case No. 2:17-cv-11910

Hon. Mark A. Goldsmith
Mag. David R. Grand

Class Action

# BRIEF OF DETENTION WATCH NETWORK AS *AMICUS CURIAE* IN SUPPORT OF PETITIONERS' MOTION FOR A PRELIMINARY INJUNCTION ON THE DETENTION ISSUES

3949727

## ISSUES PRESENTED

1.      Does prolonged detention cause distinctive and irreparable physical, psychological, economic and legal harms to detainees?

*Amici* answer:  Yes.

2.      Does prolonged detention harm the families of detainees, including but not limited to U.S. citizen children?

*Amici* answer:  Yes.

3.      Does prolonged detention cause harm to society?

*Amici* answer:  Yes.

## **MOST CONTROLLING OR APPROPRIATE AUTHORITY**

The aim of this brief is to provide the court with social science research and data regarding the harms of prolonged detention. Thus, *Amicus* does not rely on controlling legal authorities for this brief; all authorities are provided in the Table of Authorities, *infra*.

# TABLE OF CONTENTS

STATEMENT OF INTEREST OF AMICUS CURIAE

INTRODUCTION

ARGUMENT

    I.    Prolonged Detention Causes Distinctive and Irreparable Harms to Detainees

        A. Physical Harms of Prolonged Detention

        B. Psychological Harms of Prolonged Detention

        C. Economic Harms of Prolonged Detention

        D. Legal Harms of Prolonged Detention

    II.    Prolonged Detention Harms the Families of Detainees, Including U.S.-Citizen Children

    III.    Prolonged Detention Harms Society

CONCLUSION

# TABLE OF AUTHORITIES

**Cases**

*Barker v. Wingo,*
    407 U.S. 514 (1972) ................................................................ 14, 16

*Davis v. Ayala,*
    135 S. Ct. 2187 (2015) ............................................................... 10

*Nat'l Ctr. for Immigrants Rights, Inc. v. INS,*
    743 F.2d 1365 (9th Cir. 1984) .................................................... 15

**Regulations**

Separate Representation for Custody and Bond Proceedings, 79 Fed.
    Reg. 55659-60, (proposed Sept. 17, 2014) (to be codified at 8 C.F.R.
    pt. 1003) ................................................................................ 16

Standards To Prevent, Detect, and Respond to Sexual Abuse and
    Assault in Confinement Facilities, 79 Fed. Reg. 13100, 13104 (Mar.
    7, 2014) (codified at 6 C.F.R. pt. 115) ........................................7

**Other Authorities**

ACLU, *Fatal Neglect: How ICE Ignores Deaths In Detention* 3 (2016)
    .......................................................................................................4

ACLU, *Shutting Down the Profiteers: Why and How the Department
    of Homeland Security Should Stop Using Private Prisons* 7-8 (Sept.
    2016) ....................................................................................... 22

Admin. On Children, Youth & Families, U.S. Dep't of Health &
    Human Servs., ACYF-CB-IM-15-02, *Case Planning and Service
    Delivery for Families with Parents and Legal Guardians who are
    Detained or Deported by Immigration Enforcement* (Feb. 20, 2015)
    .......................................................................................... 22

Ajay Chaudry et al., The Urban Inst., *Facing Our Future: Children in
    the Aftermath of Immigration Enf't* 27 (2010) ............................ 14

Alex Friedmann, *32 Deaths at CCA-operated Immigration Det. Facilities Include at Least 7 Suicides*, Prison Legal News (June 20, 2015), http://tinyurl.com/jfb8bde ....................................................................... 13

Allen Keller et al., *Mental Health of Detained Asylum Seekers*, 362 Lancet 1721, 1722 (2003) ............................................................................... 14

Am. Bar Ass'n, Comm'n on Immigration, *Reforming the Immigration System: Proposals to Promote Independence, Fairness, Efficiency, and Professionalism in the Adjudication of Removal Cases* 5-9 (2010) ........................................................................................................... 16

Caitlin Dickerson, *Trump Plan Would Curtail Protection for Detained Immigrants*, N.Y. Times (Apr. 13, 2017), https://www.nytimes.com/2017/04/13/us/detained-immigrants-may-face-harsher-conditions-under-trump.html................................................ 11

Caitlin Patler & Nicholas Branic, *Legal Status and Patterns of Family Visitation During Immigration Detention,* 3 Russell Sage Journal of the Social Sciences (2017)....................................................................... 20

Caitlin Patler & Tanya M. Golash-Boza, *The Fiscal and Human Costs of Immigrant Detention and Deportation in the United States*, 11 Sociology Compass, no. 11 at 1-9 (2017)........................................................... 15

Caitlin Patler, UCLA Inst. for Research on Labor and Emp't, *The Economic Impacts of Long-Term Immigration Detention in Southern California* (2015) ...................................................................... 15

Craig Haney, *Mental Health Issues in Long-Term Solitary and "Supermax" Confinement*, 49 Crime & Delinquency 124, 124-56 (2003) ...................................................................................................................9

Ctr. for Victims of Torture et al., *Tortured & Detained: Survivor Stories of U.S. Immigration Detention* 5 (2013) .............................................................. 14

David Kaiser & Lovisa Stannow, *Immigrant Detainees: The New Sex Abuse Crisis*, NYR Daily (Nov. 23, 2011) .............................................................5

Detention Watch Network, *Expose and Close: One Year Later: The Absence of Accountability in Immigration Detention* (2013)................................4

Dora Schriro, U.S. Immigration & Customs Enforcement, *Immigration Detention Overview and Recommendations* 25 (2009)..........................................3

Erika Eichelberger, *Watchdog: Feds Are Muzzling Us for Reporting Alleged Immigrant Detainee Sex Abuse*, Mother Jones (Mar. 19, 2014, 10:02 AM), http://www.motherjones.com/ politics/2014/03/ice-sexual-abuse-immigrant-detention-oversight.......................8

Geoffrey Heeren, *Pulling Teeth: The State of Mandatory Immigration Det.*, 45 Harv. C.R-C.L. L. Rev. 601, 602-03, 622 (2010) .............:.......................4

Heather Koball, et al., Migration Policy Inst. & Urban Inst., *Health and Social Service Needs of U.S.-Citizen Children with Detained or Deported Immigrant Parents* (2015), http://tinyurl.com/hxz7 ...........................19

Human Impact Partners, *Family Unity, Family Health: How Family-Focused Immigration Reform Will Mean Better Health for Children and Families* (2013) ........................................................................21

Human Rights First, *Jails and Jumpsuits: Transforming the U.S. Immigration Detention System – A Two-Year Review* 25 (2011)..............4, 16, 20

Human Rights Watch, *A Costly Move: Far and Frequent Transfers Impede Hearings for Immigrant Detainees in the United States* 1, 17 (2011) .......................................................................................18

Human Rights Watch, *Detained and At Risk: Sexual Abuse and Harassment in United States Immigration Detention* (Aug. 25, 2010)........................................................................................5

Human Rights Watch, *"Do You See How Much I'm Suffering Here?": Abuse Against Transgender Women In US Immigration Detention* (Mar. 23, 2016)........................................................................6

Human Rights Watch, *Jailing Refugees: Arbitrary Detention of Refugees in the US Who Fail to Adjust to Permanent Resident Status* 36 (2009) ..........................................................................14

Human Rights Watch, *Systemic Indifference: Dangerous & Substandard Medical Care in Immigration Detention* 52 (2017) ........................4

vi

Human Rights Watch, *US: Deaths in Immigration Detention* (July 7, 2016)............................................................................................ 4

Ian Urbina & Catherine Rentz, *Immigrants Held in Solitary Cells, Often for Weeks*, N.Y. Times, Mar. 24, 2013 ........................................8

Ingrid V. Eagly & Steven Shafer, *A National Study of Access to Counsel in Immigration Court*, 164 U. Pa. L. Rev., no. 1, at 8, 50 (2015)............... 16, 17

Jaya Ramji-Nogales et al., *Refugee Roulette: Disparities in Asylum Adjudication*, 60 Stan. L. Rev. 295, 340 (2007).................................... 17

John Hagan et al., *Collateral Consequences of Imprisonment for Children, Communities and Prisoners, in Prisons* 121-162 (Michael Tonry & Joan Petersilia, eds. 1999)................................................. 21

John Marshall Law School, *U.S. Immigration and Customs Enf'ts New Directive on Segregation: Why We Need Further Protections* 7 (2014) .................................................................................... 11

Joshua Breisblatt, *The President's FY 2016 Budget Department of Homeland Security*, Nat'l Immigration Forum (Feb. 6, 2015), http://tinyurl.com/h4lmo3w.................................................... 22

Juan E. Mendez (Special Rapporteur on Torture & Other Cruel, Inhuman or Degrading Treatment of Punishment), *Interim Rep. of the Special Rapporteur of the Human Rights Council on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment*, U.N. Doc. A/68/295 (Aug. 9, 2013)................................................. 9

Kalina Brabeck & Qingwen Xu, *The Impact of Det. and Deportation on Latino Immigrant Children and Families: A Quantitative Exploration*, 32 Hisp. J. of Behav. Sci. 341 (2010) .......................... 20

Kalina Brabeck et. al, *The Psychosocial Impact of Detention and Deportation on U.S. Migrant Children and Families*, 84 Am. J. of Orthopsychiatry 495, 498-99 (2013)................................... 21

Kyle Kim, *Immigrants Held in Remote ICE Facilities Struggle to Find Legal Aid Before They're Deported*, L.A. Times (Sept. 28, 2017), http://www.latimes.com/projects/la-na-access-to-counsel-deportation/ .......................................................................... 17

Leticia Miranda, *Dialing with Dollars: How County Jails Profit From Immigrant Detainees*, The Nation (May 15, 2014), https://www.thenation.com/article/dialing-dollars-how-county-jails-profit-immigrant-detainees/ ........................................................ 18

Letter from Cmty. Initiatives for Visiting Immigrants in Confinement to Thomas D. Homan, Director, U.S. Immigration & Customs Enf't et al. 3 (Apr. 11, 2017), http://www.endisolation.org/wp-content/uploads/2017/05/CIVIC_SexualAssault_Complaint.pdf ...................... 7

Lisa Christensen Gee et al., Inst. on Taxation and Econ. Policy, *Undocumented Immigrants' State and Local Tax Contributions* 2 (2017) ........................................................................................ 23

Manfred Nowak (Special Rapporteur on Torture & Other Cruel, Inhuman or Degrading Treatment of Punishment), *Interim Rep. of the Special Rapporteur of the Human Rights Council on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment*, U.N. Doc. A/63/175 (July 28, 2008) .................................................. 10

Marjorie S. Zatz & Nancy Rodriguez, *Dreams and Nightmares: Immigration Policy, Youth, and Families* 86 (2015) ............................................ 20

N.J. Advocates for Immigrant Detainees, *Isolated In Essex: Punishing Immigrants Through Solitary Confinement* 23-24 (June 2016) .......................... 9

N. Y. Lawyers for the Public Interest, *Detained and Denied: Healthcare Access in Immigration Detention* 2 (2017) .................................... 4, 5

Nat'l Immigrant Justice Ctr., *Isolated in Detention: Limited Access to Legal Counsel in Immigration Detention Facilities Jeopardizes a Fair Day in Court* 4 (2010) ......................................................... 18

Nat'l Immigrant Justice Ctr., *"What Kind of Miracle…"– the Systemic Violation of Immigrants' Right to Counsel at the Cibola County Correctional Center* 2 (2017) .................................................... 17

Nat'l Immigrant Justice Ctr. & Physicians for Human Rights, *Invisible in Isolation: The Use of Segregation and Solitary Confinement in Immigration Detention* 4 (2012) ................................................ 8, 10

Nat'l Immigration Forum, *Department of Homeland Security Fiscal Year (FY) 2017 Omnibus Appropriations* (May 9, 2017), https://tinyurl.com/y7vpdt9l ............................................................ 23

N.J. Advocates for Immigrant Detainees, *Isolated In Essex: Punishing Immigrants Through Solitary Confinement* 23-24 (June 2016) ............................ 9

Nat'l Prison Rape Elimination Comm'n, *National Prison Rape Elimination Comm'n Report* 177-81 (2009) ........................................................ 6

Nina Rabin, *Disappearing Parents: Immigration Enforcement and the Child Welfare System*, 44 Conn. L. Rev. 99, 140 (2011) ................................... 21

Nina Rabin, *Unseen Prisoners: Women in Immigration Detention Facilities in Arizona*, 23 Geo. Immigr. L.J. 695, 728 (2009) ............................ 19

Office of Det. Oversight, U.S. Dep't of Homeland Sec., Compliance Inspection of Adelanto Correctional Facility 2 (2012) ......................................... 5

Office of Inspector Gen., U.S. Dep't of Homeland Sec., *Mgmt. of Mental Health Cases in Immigration Det.* 1 (2011) ............................................ 13

Org. of Am. States, Inter-American Comm'n. on Human Rights, *Report on Immigration in the United States: Detention and Due Process* 117 (2010) ............................................................................................................... 19

Patrick G. Lee, *Immigrants in Detention Centers are Often Hundreds of Miles From Legal Help*, ProPublica (May 16, 2017), https://www.propublica.org/article/immigrants-in-detention-centers-are-often-hundreds-of-miles-from-legal-help ......................................... 18

Peter L. Markowitz et al., Steering Comm. of the N.Y. Immigrant Representation Study Report, *Accessing Justice: The Availability And Adequacy of Counsel In Removal Proceedings*, 33 Cardozo L. Rev. 357, 369 (2011) .................................................................................... 16

Physicians for Human Rights, *Punishment Before Justice: Indefinite Detention in the US* 11 (2011) ................................................................. 11

Physicians for Human Rights & Bellevue/NYU Program for Survivors of Torture, *From Persecution to Prison: The Health Consequences of Det. for Asylum Seekers* 10-14 (2003) ......................................................... 12

Press Release, Cmty. Initiatives for Visiting Immigrants in Confinement, Watchdog Organization Files Civil Rights Complaint Alleging Rising Sexual Abuse, Assault, and Harassment in U.S. Immigration Detention Facilities (Apr. 11, 2017), http://www.endisolation.org/sexual-assault ........................................................ 7

Press Release, U.S. Immigration & Customs Enf't, Houston-Area Detainee Passes Away At Local Hospital (Sept. 18, 2017) ................................. 6

Press Release, U.S. Immigration & Customs Enf't, Sec'y Napolitano & ICE Assistant Secr'y Morton Announce New Immigration Det. Reform Initiatives (Oct. 6, 2009) ................................................................. 4

Project South, *Imprisoned Justice: Inside Two Georgia Immigrant Detention Centers* 28-30, 42-43 (2017) ................................................. 17

Ruben Loyo & Carolyn Corrado, N.Y.U. Sch. of Law Immigrant Rights Clinic, *Locked Up But Not Forgotten: Opening Access to Family & Cmty. in the Immigration Det. Sys.* 23 (2010) ..................................... 18

S. Appropriations Comm., *FY2017 Additional Appropriations for the Department of Homeland Security,* https://tinyurl.com/ybm5cpq2 .................. 23

Sarah Rogerson, *Lack of Detained Parents' Access to the Family Justice System and the Unjust Severance of the Parent-Child Relationship*, 47 Family L.Q. 141-72 (2013) ....................................... 21

Seth F. Wessler, *Nearly 250K Deportations of Parents of U.S. Citizens in Just over Two Years*, Colorlines (Dec. 17, 2012, 9:45 AM), http://tinyurl.com/gnv7vye........................................................ 19

Seth Freed Wessler, Applied Research Ctr., *Shattered Families: The Perilous Intersection of Immigration Enforcement and the Child Welfare System* 5 (2011) ......................................................... 19

Southern Poverty Law Center et al, *Shadow Prisons: Immigration Detention in the South* 8 (Nov. 2016) ....................................... 9, 11 12

Spencer Woodman, *Exclusive: ICE put detained immigrants in solitary confinement for hunger striking*, The Verge (Feb. 27, 2017, 9:33 AM), https://www.theverge.com/2017/2/27/14728978/immigrant-deportation-hunger-strike-solitary-confinement-ice-trump26 ............................. 9

x

Spencer Woodman, *ICE Detainees are Asking to be Put in Solitary Confinement for Their Own Safety*, The Verge (March 10, 2017, 12:02 PM) https://www.theverge.com/2017/3/10/14873244/ice-immigrant-detention-solitary-trump-corecivic-geo ..............................8

*The Strange Death of Jose de Jesus*, National Public Radio Latino USA (July 15, 2006), http://tinyurl.com/zdqv8wr ..................... 10

Stuart Grassian, *Psychiatric Effects of Solitary Confinement*, 22 Wash. U. J.L. & Pol'y 325, 328 (2006)......................... 10

Susan S.Y. Li et al., *The Relationship Between Post-Migration Stress and Psychological Disorders in Refugees and Asylum Seekers*, 18 Current Psychiatry Reps, no. 82 (2016)............... 12

Tanya Golash-Boza, *Immigration Nation: Raids, Dets., and Deportations in Post-9/11 America*, 8 Soc'ys Without Borders 313 (2012)......................................4

Todd R. Clear, *Imprisoning Communities: How Mass Incarceration Makes Disadvantaged Neighborhoods Worse* 97 (2007) .................... 21

TRAC Immigration, *New Data on 637 Det. Facilities Used by ICE in FY2015* (Apr. 12, 2016), http://tinyurl.com/hdjzlgj ............................ 22

U.S. Dep't of Homeland Sec., *Budget-in-Brief: Fiscal Year 2016* 13 (2015), https://www.dhs.gov/publication/fy-2016-budget-brief....................... 22

U.S. Gov't Accountability Office, *GAO-07-875, Alien Det. Standards: Telephone Access Problems Were Pervasive at Detention Facilities; Other Deficiencies Did Not Show a Pattern of Noncompliance* 15-17 (2007)...................................... 18

U.S. Gov't Accountability Office, *GAO-14-38, Immigration Det.: Additional Actions Could Strengthen DHS Efforts to Address Sexual Abuse* 25 (2013)..........................................6

U.S. Gov't Accountability Office, *GAO-15-26, Alternatives to Detention: Improved Data Collection and Analyses Needed to Better Assess Program Effectiveness* 9-12 (Nov. 2014) ...................... 23

U.S. Gov't Accountability Office, *GAO-16-231, Report to the Ranking Member, Committee on Homeland Sec., House of Representatives: Immigration Det.: Additional Actions Needed to Strengthen Mgmt. and Oversight of Detainee Medical Care* (Feb. 2016) ........................................ 5

U.S. Immigration & Customs Enf't, *Facilitating Parental Interests in the Course of Civil Immigration Enforcement Activities Directive* (Aug. 23, 2013), http://tinyurl.com/j2p755s ........................................ 22

U.S. Immigration & Customs Enforcement, 11065.1, Review of the Use of Segregation for ICE Detainees (2013) .................................. 10

Vera Inst. of Justice, *Solitary Confinement:  Common Misconceptions and Emerging Safe Alternatives*, 17-18 (May 2015).......................... 10

Victoria Kline, Instituto para las Mujeres en la Migración, *Where Do We Go From Here? Challenges Facing Transnational Migrant Families Between the US and Mexico* 31-32 (2013)......................... 22

Wendy Cervantes & Yali Lincroft, *The Impact of Immigration Enforcement on Child Welfare* 6 (2010).............................................. 22

Women's Refugee Comm'n, *Politicized Neglect:   A Report from Etowah County Detention Center* 5 (2012)........................................ 12

Women's Refugee Comm'n, *Torn Apart by Immigration Enforcement: Parental Rights and Immigration Detention* 10 (2010)...................... 21

## STATEMENT OF INTEREST OF AMICUS CURIAE[1]

*Amicus curiae* is the Detention Watch Network ("DWN"), a national coalition of organizations and individuals concerned about the impact of immigration detention on individuals and communities in the United States. DWN has a substantial interest in the outcome of this litigation. Founded in 1997, DWN has worked for nearly two decades to fight abuses in detention, and to push for a drastic reduction in the reliance on detention as a tool for immigration enforcement. Since 2011, through its advocacy and organizing work, DWN has been advocating for the elimination of all laws mandating the detention of immigrants.

At issue in this case is whether the United States District Court for the Eastern District of Michigan should permit the government to continue to detain petitioners and similarly situated class members for prolonged time periods without any opportunity for meaningful, individualized custody review by an impartial adjudicator. *Amicus* intends to provide the Court with an empirically grounded understanding of the distinctive individual, familial, and societal harms that such prolonged detention poses. As a national network with decades-long expertise in the harms that mandatory immigrant detention poses, DWN is uniquely positioned to

---

[1] The parties have consented to the filing of this *amicus* brief. No counsel for a party authored the brief in whole or in part. No party, counsel for a party, or any person other than *amici* and their counsel made a monetary contribution intended to fund the preparation or submission of the brief.

address these issues.

## INTRODUCTION

While the legal framework at issue in each subclass's request for release or a custody review by an impartial adjudicator in this case may vary,[2] all the detained class members are profoundly impacted by their prolonged incarceration. We offer this amicus brief to provide the Court with data to illuminate the distinctive individual, familial, and societal harms associated with such prolonged detention.

This research overwhelmingly demonstrates that prolonged detention both exacerbates the physical, mental, societal, and economic harms of transitory detention, and presents unique harms and risks of its own. Immigrants held in prolonged detention suffer physically and psychologically from substandard medical and mental health care, isolation, and increased risk of physical and sexual assault. *See* Part I.A-B. Detainees' financial and legal interests are also harmed as a result of long-term detention. *See* Part I.C-D. Further, prolonged detention destabilizes families and communities, harming society, causing lasting harm to a generation of children impacted by their family members' prolonged detention, and costing taxpayers millions of dollars. *See* Parts II-III.

## ARGUMENT

## I. Prolonged Detention Causes Distinctive and Irreparable Harms to

---

[2] *See* Pet.'s Mot. for Prelim. Inj. on Detention Issues, ECF 138.

Detainees.

While detention for any length of time is detrimental, individuals subject to prolonged detention suffer four types of harms—physical, psychological, economic, and legal—that differ in degree and kind from those suffered by short-term detainees.

### A. Physical Harms of Prolonged Detention.

Extended detention exacerbates the health and safety risks facing immigrant detainees. Long-term detainees suffer from insufficient medical care, sexual assault, the excessive use of solitary confinement, and generally poor conditions that take an increasing toll the longer one remains in custody.

*Insufficient Medical Care.* Numerous studies and reports have documented insufficient medical care in immigration detention facilities. A 2009 government investigation led by Department of Homeland Security ("DHS") Special Advisor Dr. Dora Schriro identified, among other concerns, systematic failures to provide adequate medical care in immigration detention facilities, and a wide disparity in the availability and quality of care between facilities.[3] In response to the Schriro Report, the government in 2009 announced an initiative to improve accountability and safety

---

[3] Dora Schriro, U.S. Immigration & Customs Enf't, *Immigration Det. Overview and Recommendations* 25 (2009).

3

in detention facilities.[4]

In the eight years since this announcement, however, many of the problems highlighted by the Schriro Report continue.[5] From October 2003 through December 2017, ICE has acknowledged the death in custody of 176 detainees.[6] An independent medical records review of 18 of these cases concluded that "substandard medical care and violations of applicable detention standards . . . probably contributed to the deaths of 7 of the 18 detainees."[7] Other reports have found endemic deficiencies in

---

[4] *See* Press Release, U.S. Immigration & Customs Enf't, Sec'y Napolitano & ICE Assistant Sec'y Morton Announce New Immigration Det. Reform Initiatives (Oct. 6, 2009).

[5] *See, e.g.*, Human Rights Watch, *Systemic Indifference: Dangerous & Substandard Medical Care in Immigration Detention* 52 (2017) (comprehensively reporting on sub-standard medical care in immigration detention) [hereinafter *Systemic Indifference*]; N. Y. Lawyers for the Public Interest, *Detained and Denied: Healthcare Access in Immigration Detention* 2 (2017) (documenting deficiencies in medical care at New York and New Jersey detention centers) [hereinafter *Detained and Denied*]; Detention Watch Network, *Expose and Close: One Year Later: The Absence of Accountability in Immigration Detention* (2013); Human Rights First, *Jails and Jumpsuits: Transforming the U.S. Immigration Det. System—A Two-Year Review* (2011) [hereinafter *Jails and Jumpsuits*]. *See also* Tanya Golash-Boza, *Immigration Nation: Raids, Dets., and Deportations in Post-9/11 America*, 8 Soc'ys Without Borders 313 (2012); Geoffrey Heeren, *Pulling Teeth: The State of Mandatory Immigration Det.*, 45 Harv. C.R-C.L. L. Rev. 601, 602-03, 622 (2010).

[6] Fiscal year 2017 saw 12 deaths in ICE custody, an average of one person per month. Press Release, U.S. Immigration & Customs Enf't, Houston-Area Detainee Passes Away At Local Hospital (Sept. 18, 2017).

[7] Human Rights Watch, *US: Deaths in Immigration Det.* (July 7, 2016); *see also* ACLU, *Fatal Neglect: How ICE Ignores Deaths In Detention* 3 (2016) (concluding that "[i]n nearly half of the death reviews produced by ICE, the documentation suggests that failure to comply with ICE medical standards contributed to deaths"); Office of Det. Oversight, U.S. Dep't of Homeland Sec., Compliance Inspection of

4

the quality of care in immigrant detention, including underqualified medical providers, inappropriate denials, delays, and refusals of requests for critical medical care, and inadequate record-keeping.[8]

A February 2016 Government Accountability Office (GAO) audit of ICE's management and oversight of immigration detention facility standards concluded that ICE still lacks adequate processes for tracking and addressing complaints of inadequate medical treatment.[9]

***Increased Risk of Sexual Abuse and Assault.*** Prolonged detention also increases the risk of sexual abuse and assault. Incidents of sexual abuse in the detention system are well documented.[10] In 2009, the National Prison Rape Elimination Commission found that immigration detainees are especially vulnerable to sexual abuse due to several factors including isolation, inadequate investigative

---

Adelanto Correctional Facility 2 (2012) (finding "egregious errors" by medical staff led to one detainee's death).

[8] *Systemic Indifference*, *supra* note 5, at 52; *Detained and Denied*, *supra* note 5, at 2.

[9] U.S. Gov't Accountability Office, *GAO-16-231, Report to the Ranking Member, Committee on Homeland Sec., House of Representatives*: *Immigration Det.: Additional Actions Needed to Strengthen Management and Oversight of Detainee Medical Care* (Feb. 2016).

[10] *See, e.g.*, David Kaiser & Lovisa Stannow, *Immigrant Detainees: The New Sex Abuse Crisis*, NYR Daily (Nov. 23, 2011); Human Rights Watch, *Detained and At Risk: Sexual Abuse and Harassment in United States Immigration Detention* (Aug. 25, 2010).

procedures, and the fact that they are "confined by the same agency with the power to deport them" and as such often fear retaliatory deportation for reporting misconduct.[11] These risks are more acute for certain especially vulnerable subpopulations, including transgender detainees.[12]

In 2013, the GAO conducted a study on sexual abuse and assault in immigration detention facilities and found that ICE did not maintain complete records regarding sexual abuse and assault incidents,[13] and that up to 40% of sexual abuse and assault allegations were not reported to ICE headquarters as required by agency procedures.[14] The report substantiated 15 incidents of sexual assault in ICE facilities from October 2009 through March 2013[15]—almost certainly a gross understatement of actual incidents given the lack of documentation.

In another review of government data, DHS Office of the Inspector General ("OIG") records reveal that between January 2010 and July 2016, the OIG received

---

[11] Nat'l Prison Rape Elimination Comm'n, *National Prison Rape Elimination Comm'n Report* 177-81 (2009) (citations omitted).

[12] Human Rights Watch, *"Do You See How Much I'm Suffering Here?": Abuse Against Transgender Women in U.S. Immigration Detention* 14 (Mar. 23, 2016) ("[T]hree out of fifteen substantiated incidents of sexual assault in U.S. immigration detention facilities involved transgender women.").

[13] U.S. Gov't Accountability Office, *GAO-14-38, Immigration Det.: Additional Actions Could Strengthen DHS Efforts to Address Sexual Abuse* 25 (2013).

[14] *Id.* at 1, 19.

[15] *Id.* at 60-62.

"33,126 complaints of sexual and/or physical abuse against DHS component agencies."[16] Of the 14,693 complaints lodged against ICE specifically,[17] the OIG investigated just 173.[18]

In 2014, nearly a decade after passage of the Prison Rape Elimination Act (PREA), DHS issued regulations implementing the Act's protections against sexual abuse in custody.[19] However, the regulations will not be enforced at facilities operated by local sheriffs or private contractors—which together house the vast majority of ICE detainees—until the underlying detention contracts are renegotiated.[20] As a result, it may be years before long-term detainees will be fully covered by the PREA regulations. Informal barriers to preventing and reporting sexual abuse in DHS facilities—such as retaliatory loss of privileges—may also

---

[16] Letter from Cmty. Initiatives for Visiting Immigrants in Confinement to Thomas D. Homan, Director, U.S. Immigration & Customs Enf't et al. 3 (Apr. 11, 2017).

[17] *Id.* at 4.

[18] Press Release, Cmty. Initiatives for Visiting Immigrants in Confinement, Watchdog Organization Files Civil Rights Complaint Alleging Rising Sexual Abuse, Assault, and Harassment in U.S. Immigration Detention Facilities (Apr. 11, 2017).

[19] Standards To Prevent, Detect, and Respond to Sexual Abuse and Assault in Confinement Facilities, 79 Fed. Reg. 13100 (Mar. 7, 2014) (codified at 6 C.F.R. pt. 115).

[20] 79 Fed. Reg. at 13104 n.6.

allow abuse to continue to remain hidden.[21]

*Frequent Reliance on and Abusive Use of Solitary Confinement*.   Another serious risk to the health and safety of long-term detainees is the use of solitary confinement, which ICE typically refers to as "segregation." As of 2013, an average of 300 immigrants are held in solitary confinement at the 50 largest detention facilities on any given day.[22] While the Schriro Report raised concerns about the use of segregation "to detain special populations whose unique medical, mental health, and protective custody requirements cannot be accommodated in general population housing" in 2009,[23] recent reports reveal that ICE continues to misuse solitary as long-term treatment for suicidal or mentally ill detainees.[24]

Segregation is also overused for disciplinary purposes, often in ways that violate ICE's own policies. One report found that a detention facility in New Jersey

---

[21] Erika Eichelberger, *Watchdog: Feds Are Muzzling Us for Reporting Alleged Immigrant Detainee Sex Abuse*, Mother Jones (Mar. 19, 2014, 10:02 AM).

[22] Ian Urbina & Catherine Rentz, *Immigrants Held in Solitary Cells, Often for Weeks*, N.Y. Times, Mar. 24, 2013, at A1.

[23] *See* Schriro, *supra* note 3, at 21; Nat'l Immigrant Justice Ctr. & Physicians for Human Rights, *Invisible in Isolation: The Use of Segregation and Solitary Confinement in Immigration Detention* 4 (2012) (documenting similar findings on a national scale).

[24] *Systemic Indifference, supra* note 5, at 40. *See also* Spencer Woodman, *ICE Detainees are Asking to be Put in Solitary Confinement for Their Own Safety*, The Verge (March 10, 2017, 12:02 PM) (documenting the widespread use of solitary confinement in immigration detention centers).

overused solitary confinement by, among other things, "stacking" disciplinary charges (charging multiple offenses for a single incident) and imposing solitary confinement during prehearing detention before any finding of misconduct.[25] Solitary confinement has also been used in a retaliatory manner to punish detainees participating in hunger strikes in protest of detention center conditions, and for assisting other detainees to file grievances.[26] In some cases, detainees have been sent to solitary confinement due to lack of bed space in the general housing population.[27]

It is well established that this type of isolation exacerbates physical and mental health problems.[28] Research demonstrates that solitary confinement can lead to a combination of symptoms referred to as "prison psychosis," including hypersensitivity to external stimuli, hallucinations, panic attacks, obsessive

---

[25] N.J. Advocates for Immigrant Detainees, *Isolated In Essex: Punishing Immigrants Through Solitary Confinement* 23-24 (June 2016).

[26] Spencer Woodman, *Exclusive: ICE put detained immigrants in solitary confinement for hunger striking*, The Verge (Feb. 27, 2017, 9:33 AM). *See also* Southern Poverty Law Center et al, *Shadow Prisons: Immigration Detention in the South* 8 (Nov. 2016) [hereinafter *Shadow Prisons*] (a comprehensive review of six immigration detention facilities in the southern United States).

[27] *Shadow Prisons*, *supra* note 26, at 32.

[28] Juan E. Mendez (Special Rapporteur on Torture & Other Cruel, Inhuman or Degrading Treatment of Punishment), *Interim Rep. of the Special Rapporteur of the Human Rights Council on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment*, U.N. Doc. A/68/295 (Aug. 9, 2013); Craig Haney, *Mental Health Issues in Long-Term Solitary and "Supermax" Confinement*, 49 Crime & Delinquency 124, 124-56 (2003).

thoughts, paranoia, and lack of impulse control.[29] Solitary confinement can lead to severe symptoms, even among those with no prior history of mental illness.[30] Suicide and self-harm are also more common in solitary confinement than in general prison populations.[31] Because solitary confinement can exacerbate existing mental health conditions, the United Nations Special Rapporteur on Torture believes that solitary confinement constitutes cruel, inhuman or degrading treatment.[32]

In 2013, ICE acknowledged the problem, establishing procedures for reviewing detainees placed in segregation and outlining stricter requirements for disciplinary segregation.[33] However, the revised standards suffer from compliance

---

[29] *See Invisible in Isolation: The Use of Segregation and Solitary Confinement in Immigration Detention supra* note 23, at 12.

[30] Stuart Grassian, *Psychiatric Effects of Solitary Confinement*, 22 Wash. U. J.L. & Pol'y 325, 328 (2006).

[31] Vera Inst. of Justice, *Solitary Confinement: Common Misconceptions and Emerging Safe Alternatives*, 17-18 (May 2015) (reporting that 69% of suicides among incarcerated individuals in California in 2006 took place in segregated housing); *see also "The Strange Death of Jose de Jesus,"* National Public Radio Latino USA (July 15, 2006) (chronicling suicide of detainee in isolation who was taken off suicide watch 24 hours after prior suicide attempt); *Davis v. Ayala*, 135 S. Ct. 2187, 2210 (2015) (Kennedy, J., concurring) ("[R]esearch still confirms what this Court suggested over a century ago: Years on end of near-total isolation exact a terrible price.").

[32] Manfred Nowak (Special Rapporteur on Torture & Other Cruel, Inhuman or Degrading Treatment of Punishment), *Interim Rep. of the Special Rapporteur of the Human Rights Council on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment*, U.N. Doc. A/63/175 (July 28, 2008).

[33] U.S. Immigration & Customs Enf't, 11065.1, Review of the Use of Segregation for ICE Detainees (2013).

problems, including that not all facilities' contracts require compliance with the updated procedures.[34] ICE has resisted attempts to make those contracts and inspection reports publicly available,[35] and DHS recently disbanded the office responsible for implementing the segregation directive.[36]

## B. Psychological Harms of Prolonged Detention.

People in detention for prolonged periods suffer severe and lasting psychological harms. All detainees face uncertainty about when or whether they will be released, which frequently leads to high rates of anxiety, despair, and depression.[37] When detention is prolonged, these feelings become more pronounced and often manifest as diagnosable mental health conditions.[38] A longitudinal study of asylum seekers detained in the United States found that symptoms of depression, anxiety and Post-Traumatic Stress Disorder all improved in those released from detention, while symptoms deteriorated in those who remained detained, despite

---

[34] John Marshall Law School, *U.S. Immigration and Customs Enf'ts New Directive on Segregation: Why We Need Further Protections* 7 (2014).

[35] *Shadow Prisons*, *supra* note 26, at 9.

[36] Caitlin Dickerson, *Trump Plan Would Curtail Protection for Detained Immigrants*, N.Y. Times (Apr. 13, 2017).

[37] *See* Physicians for Human Rights, *Punishment Before Justice: Indefinite Detention in the U.S.* 11 (2011).

[38] *Id.* at 16.

there being no difference in symptom severity between the groups at baseline.[39] Another study concluded that detention without a definite endpoint—the characteristic of all prolonged detention for immigrant detainees including every class member in this case—results in "physical, social and emotional problems [that] continue to plague individuals long after their release . . . ."[40]

The mental toll of detention is exacerbated in facilities that have physical infrastructures and program offerings generally designed for inmates who are expected to remain in custody for a year or less.[41] Many detainees have described being detained for prolonged periods under these conditions as difficult to bear.[42] Detained immigrants have reported conditions that can lead to rapid mental and physical decline, including lack of outdoor recreation areas, activities and religious accommodations.[43] Other aspects of detention that may negatively impact mental

---

[39] Susan S.Y. Li et al., *The Relationship Between Post-Migration Stress and Psychological Disorders in Refugees and Asylum Seekers*, 18 Current Psychiatry Reps, no. 82, 2016, at 3.

[40] *See* Physicians for Human Rights, *supra* note 37, at 17.

[41] Physicians for Human Rights & Bellevue/NYU Program for Survivors of Torture, *From Persecution to Prison: The Health Consequences of Det. for Asylum Seekers* 10-14, 126 (2003) (immigrant detainees "reported feeling degraded and being treated like criminals" and described the negative impact this treatment had on their mental health).

[42] *Id.*; *see also* Women's Refugee Comm'n, *Politicized Neglect: A Report from Etowah County Detention Center* 5 (2012).

[43] *Shadow Prisons*, *supra* note 26, at 6.

health include the lack of access to legal services and representation, proximity to others experiencing high levels of distress, lack of agency, lack of control over case processing times, and ongoing separation from family.[44]

Nor are detention facilities equipped to provide quality mental health care to long-term detainees, and as described above, often use solitary confinement for individuals with mental health care needs rather than providing care. A 2011 DHS Inspector General report found that the ICE Health Service Corps, which provides direct care and arranges for outside health care services to detainees, staffed "only 18 of the nearly 250 detention centers nationwide and has limited oversight and monitoring for mental health cases across immigration detention centers."[45] This government report raised serious concerns about ICE's capacity to provide detainees with proper treatment.[46] The high rate of suicides among detainees underscores the urgent nature of these concerns.[47]

While all long-term detainees face the prospect of lasting psychological

---

[44] Li et al., *supra* note 39, at 3.

[45] Office of Inspector Gen., U.S. Dep't of Homeland Sec., *Mgmt. of Mental Health Cases in Immigration Det.* 1 (2011).

[46] *Id.* This concern is even greater for detainees with pre-existing mental illnesses who often either go untreated or receive "one size fits all" medication. *See id.* at 5 (noting that the Health Service Corps lacks a mechanism for screening and tracking mental health conditions of individual detainees).

[47] *See* Alex Friedmann, *32 Deaths at CCA-operated Immigration Det. Facilities Include at Least 7 Suicides*, Prison Legal News (June 20, 2015).

harm,[48] asylum-seekers and other torture and trauma survivors confront particularly severe mental health challenges. One study of detained asylum-seekers found that 77% showed clinically significant symptoms of anxiety, 86% exhibited symptoms of depression, and 50% suffered from symptoms of Post-Traumatic Stress Disorder ("PTSD").[49] Of these detainees, 26% reported thoughts of suicide while in detention, and just under 3% reported attempting suicide.[50]

### C. Economic Harms of Prolonged Detention.

"The time spent in jail awaiting trial . . . often means loss of a job; it disrupts family life; and it enforces idleness . . . . The time spent in jail is simply dead time . . . ." *Barker v. Wingo*, 407 U.S. 514, 532-33 (1972). The economic hardship imposed from being unable to work for long periods of time is clear.[51] Immigrants in extended

---

[48] *See, e.g.*, Golash-Boza, *supra* note 5, at 65 (recounting how substandard medical care during prolonged detention resulted in an immigrant suffering serious health problems); Heeren, *supra* note 5, at 601-03, 622 (same).

[49] Allen Keller et al., *Mental Health of Detained Asylum Seekers*, 362 Lancet 1721, 1722 (2003).

[50] *Id.* Conversely, detainees who exhibited symptoms of anxiety, depression, and PTSD while detained showed significant improvement after release from detention. *Id.*; *see also* Ctr. for Victims of Torture et al., *Tortured & Detained: Survivor Stories of U.S. Immigration Detention* 5 (2013) at 12.

[51] *See* Ajay Chaudry et al., The Urban Inst., *Facing Our Future: Children in the Aftermath of Immigration Enf't* 27 (2010) (noting families "generally lose[] a breadwinner" during immigration detention); Human Rights Watch, *Jailing Refugees: Arbitrary Detention of Refugees in the US Who Fail to Adjust to Permanent Resident Status* 36 (2009) (noting that the detention of refugees "results in loss of jobs").

detention almost invariably lose their jobs, and thus income for necessities, including food and shelter for their families. Some also lose their homes through foreclosure.[52] For those fortunate enough to be able to hire a lawyer, the concurrent inability to work and the assumption of legal expenses compounds the economic harm.[53]

A recent study surveyed 562 detained individuals in California who had been detained for six months or longer. Approximately 90% of the study participants were employed in the six months prior to their detention; based on their pre-detention earnings, the estimated lost wages for the sample due to detention was $43,357 per day.[54] As a consequence of lost wages, families of detained immigrants suffer substantial financial instability. The same study documented that 63% of family members had difficulty paying mortgage, rent, or utilities.[55] Over one-third of families had trouble paying for food.[56]

---

[52] *See* Heeren, *supra* note 5, at 622 (immigrant lost his home as a result of three-year long detention); *see also* Chaudry et al., *supra* note 51, at ix, 29-31.

[53] *See Nat'l Ctr. for Immigrants Rights, Inc. v. INS*, 743 F.2d 1365, 1369 (9th Cir. 1984) (noting that the "hardship from being unable to work . . . to pay for legal representation is beyond question").

[54] Caitlin Patler, UCLA Inst. for Research on Labor and Emp't, *The Economic Impacts of Long-Term Immigration Detention in Southern California* (2015). *See also* Caitlin Patler & Tanya M. Golash-Boza, *The Fiscal and Human Costs of Immigrant Detention and Deportation in the United States*, 11 Sociology Compass, no. 11, 2017, at 1-9.

[55] Patler, *The Economic Impacts of Long-Term Immigration Detention in Southern California*, *supra* note 54, at 4.

[56] *Id.* at 4.

Due to the stigma associated with detention, an individual's ability to work can also extend past their release. Employers may avoid hiring formerly detained immigrants because they are afraid of administrative complications with ICE.[57]

## D. Legal Harms of Prolonged Detention.

Prolonged detention inflicts substantial harm on an individual's access to and exercise of legal rights, including hindrance of the "ability to gather evidence, contact witnesses, or otherwise prepare his defense." *Barker*, 407 U.S. at 533. The vast majority of detainees—86% nationally—lack counsel in immigration proceedings.[58] Long-term detainees are at a distinct disadvantage as many are held in remote locations far from legal services and have limited ability to seek or pay for representation.[59]

---

[57] *See* Chaudry et al., *supra* note 51, at 28.

[58] *See* Ingrid V. Eagly & Steven Shafer, *A National Study of Access to Counsel in Immigration Court*, 164 U. Pa. L. Rev., no. 1, 2015, at 8. *See also* Separate Representation for Custody and Bond Proceedings, 79 Fed. Reg. 55659, 55659-60 (proposed Sept. 17, 2014) (to be codified at 8 C.F.R. pt. 1003) ("Of the 265,708 initial case completions for detained aliens from FY 2011 to FY 2013, 210,633 aliens, or 79 percent, were unrepresented.").

[59] *See Jails and Jumpsuits, supra* note 5, at 31 (almost 40% of ICE detention bed space is located more than 60 miles from an urban center); Peter L. Markowitz et al., Steering Comm. of the N.Y. Immigrant Representation Study Report, *Accessing Justice: The Availability And Adequacy of Counsel In Removal Proceedings*, 33 Cardozo L. Rev. 357, 369 (2011) (study of detainees in New York concluded that representation rates for detainees transferred out of state were "dismal"); Am. Bar Ass'n, Comm'n on Immigration, *Reforming the Immigration System: Proposals to Promote Independence, Fairness, Efficiency, and Professionalism in the Adjudication of Removal Cases* 5-9 (2010) [hereinafter *Reforming the Immigration*

16

A recent study documented the dramatic difference a lawyer makes: detained immigrants with counsel obtained a successful outcome in 21% of cases, ten-and-a-half times greater than the 2% rate for their *pro se* counterparts.[60] A nationwide study focused specifically on asylum concluded that whether an asylum seeker is represented is the single most important factor affecting the outcome of her case.[61]

Irrespective of whether a detainee has legal counsel, the circumstances of long-term detention render effective representation difficult, if not impossible.[62] One

---

*System*] (stating that "remote facilities . . . and the practice of transferring detainees from one facility to another   often more remote   location without notice stand in the way of retaining counsel for many detainees"); Kyle Kim, *Immigrants Held in Remote ICE Facilities Struggle to Find Legal Aid Before They're Deported*, L.A. Times (Sept. 28, 2017) ("About 30% of detained immigrants are held in facilities more than 100 miles from the nearest government-listed legal aid resource . . . . Of these, the median distance between the facilities and the nearest government-listed legal aid was 56 miles.").

[60] Eagly & Shafer, *supra* note 58, at 50 fig. 14; *see also* Markowitz et al., *supra* note 59, at 363 (from 2005 to 2011 non-detained immigrants with lawyers had successful outcomes 74% of the time, while detained immigrants without counsel prevailed 3% of the time); *Reforming the Immigration System*, *supra* note 59, at 5-8 ("[T]he disparity in outcomes of immigration proceedings depending on whether noncitizens are unrepresented or represented is striking.").

[61] Jaya Ramji-Nogales et al., *Refugee Roulette:   Disparities in Asylum Adjudication*, 60 Stan. L. Rev. 295, 340 (2007) ("Represented asylum seekers were granted asylum at a rate of 45.6%, almost three times as high as the 16.3% grant rate for those without legal counsel."); *see also Reforming the Immigration System*, *supra* note 59, at 5-8.

[62] *See, e.g.*, Project South, *Imprisoned Justice: Inside Two Georgia Immigrant Detention Centers* 28-30, 42-43 (2017) (describing severe restrictions on confidential attorney visitation, mail problems, and a lack of phone access in two facilities); Nat'l Immigrant Justice Ctr., "*What Kind of Miracle...*" – the *Systemic*

major obstacle is the limited access to telephones in most detention facilities.[63] Assuming a detainee is able to locate counsel, the detainee must often pay to make phone calls, a cost that many detainees find prohibitive.[64] A broad national survey of detention facilities found that many facilities prohibited private calls between lawyers and their detained clients, and in several cases, even leaving messages was impossible.[65] Mail communication is also slow, costly, and an unreliable means of communication for long-term detainees, who are frequently transferred from one facility to another: between 1998 and 2010, 52% of detainees were transferred at least once, and 46% were moved multiple times.[66] With no reliable mail forwarding,

---

*Violation of Immigrants' Right to Counsel at the Cibola County Correctional Center* 2 (2017).

[63] *See* Nat'l Immigrant Justice Ctr., *Isolated in Detention: Limited Access to Legal Counsel in Immigration Detention Facilities Jeopardizes a Fair Day in Court* 4 (2010) [hereinafter *Isolated in Detention*] (reporting widespread problems with phone access); *see also* U.S. Gov't Accountability Office, *GAO-07-875, Alien Det. Standards: Telephone Access Problems Were Pervasive at Detention Facilities; Other Deficiencies Did Not Show a Pattern of Noncompliance* 15-17 (2007) (discussing deficiencies with phone system).

[64] *See, e.g.*, Ruben Loyo & Carolyn Corrado, N.Y.U. Sch. of Law Immigrant Rights Clinic, *Locked Up But Not Forgotten: Opening Access to Family & Community in the Immigration Detention System* 23 (2010); Leticia Miranda, *Dialing with Dollars: How County Jails Profit From Immigrant Detainees*, The Nation (May 15, 2014).

[65] *Isolated in Detention, supra* note 63, at 9.

[66] *See* Human Rights Watch, *A Costly Move: Far and Frequent Transfers Impede Hearings for Immigrant Detainees in the United States* 1, 17 (2011). *See also* Patrick G. Lee, *Immigrants in Detention Centers are Often Hundreds of Miles From Legal Help*, ProPublica (May 16, 2017) (describing detainee transferred between five

mail intended for detainees is often returned or lost. Furthermore, despite standards requiring access to legal resources, those actually provided are often inadequate.[67] When detainees struggle to obtain the assistance necessary to mount an effective defense, the result is an overall increase in the total time spent in detention.

## II. Prolonged Detention Harms the Families of Detainees, Including U.S.-Citizen Children.

Prolonged detention adversely affects detainees' families, especially children, many of whom are U.S. citizens.[68] Between 1998 and 2010, detained immigrants were transported an average of 370 miles to a detention facility, making regular contact with their children and families virtually impossible.[69] A recent study of

---

detention facilities in four states before ICE held him in a facility four hours from his attorney's office, where access to legal phone calls was sometimes limited to 15 minutes per call due to high demand.

[67] *See* Schriro, *supra* note 3, at 23; Org. of Am. States, Inter-American Comm'n. on Human Rights, *Report on Immigration in the United States: Detention and Due Process* 117 (2010); Nina Rabin, *Unseen Prisoners: Women in Immigration Detention Facilities in Arizona*, 23 Geo. Immigr. L.J. 695, 728 (2009) (finding multiple Arizona detention facilities fail to comply with detention standards providing for access to legal resources like law libraries).

[68] One report estimated that between one-fifth and one-quarter of the 3.7 million people deported between 2003 and 2013 had U.S. citizen children. Heather Koball et al., Migration Policy Inst. & Urban Inst., *Health and Social Service Needs of U.S.-Citizen Children with Detained or Deported Immigrant Parents* (2015); *see also* Seth F. Wessler, *Nearly 250K Deportations of Parents of U.S. Citizens in Just over Two Years*, Colorlines (Dec. 17, 2012, 9:45 AM).

[69] Seth Freed Wessler, Applied Research Ctr., *Shattered Families: The Perilous Intersection of Immigration Enforcement and the Child Welfare System* 5 (2011); *see also* Loyo & Corrado, *supra* note 64, at 1, 9.

immigration detention visitation found that visits were less likely for detainees at privately-contracted facilities than public ones, suggesting that both restrictive visitation policies and geography undermine detainee access to family visits.[70]

Children suffer the most acute effects. Increased anxiety, stress, and depression have been documented in children with one or both parents detained.[71] An Urban Institute study found that children whose parents were held in immigration detention for long periods were more likely to exhibit adverse changes in sleeping habits and behavior, including increased anger and withdrawal, as compared with children who were reunited with their parents within a month of apprehension.[72] The harmful effects extend to children's well-being in other areas, including development and academic performance.[73] Recent research indicates that

---

[70] Caitlin Patler & Nicholas Branic, *Legal Status and Patterns of Family Visitation During Immigration Detention,* 3 Russell Sage J. of the Soc. Scis. (2017). *See also* Schriro, *supra* note 3, at 23-24; Loyo & Corrado, *supra* note 64, at 12 fig.1; *Jails and Jumpsuits, supra* note 5, at 9.

[71] Marjorie S. Zatz & Nancy Rodriguez, *Dreams and Nightmares: Immigration Policy, Youth, and Families* 86 (2015) (summarizing this research); *see also* Koball et al., *supra* note 68, at 5 (children with detained or deported parents "refused to eat, pulled out their hair, or had persistent stomachaches or headaches. Others turned to more self-destructive outlets such as cutting themselves or abusing substances.").

[72] Chaudry et al., *supra* note 51, at 43. Ten parents in the population tracked by the Urban Institute study were detained up to one month and 18 parents were detained longer than one month. *Id.* at 14.

[73] Kalina Brabeck & Qingwen Xu, *The Impact of Det. and Deportation on Latino Immigrant Children and Families: A Quantitative Exploration,* 32 Hisp. J. of Behav. Sci. 341 (2010). Studies in the context of children of incarcerated parents confirm the negative impacts of parental detention. Todd R. Clear, *Imprisoning*

immigration detention is one of multiple factors that combine to make impacted children more prone to behavioral and emotional problems throughout their lives.[74]

For some parents, prolonged detention has resulted in their children being removed from the family entirely and placed in foster care. In 2011, a national study estimated that at least 5,100 children whose parents had been either detained or deported were living in foster care.[75] In addition to being separated from their children, detained parents struggle to meet court mandates set by the child welfare system, including visits and parenting classes.[76] Due to state and federal timelines established to ensure permanent homes for children in government custody, detainees may lose their parental rights as a result of prolonged detention.[77] While

---

*Communities: How Mass Incarceration Makes Disadvantaged Neighborhoods Worse* 97 (2007) (citing John Hagan et al., *Collateral Consequences of Imprisonment for Children, Communities and Prisoners, in Prisons* 121-162 (Michael Tonry & Joan Petersilia, eds. 1999).

[74] Kalina Brabeck et. al, *The Psychosocial Impact of Detention and Deportation on U.S. Migrant Children and Families*, 84 Am. J. of Orthopsychiatry 495, 498-99 (2013) (summarizing this research); Human Impact Partners, *Family Unity, Family Health: How Family-Focused Immigration Reform Will Mean Better Health for Children and Families* (2013).

[75] Wessler, Applied Research Ctr., *supra* note 69, at 4.

[76] Nina Rabin, *Disappearing Parents: Immigration Enforcement and the Child Welfare System*, 44 Conn. L. Rev. 99, 140 (2011).

[77] *Id.*; *see also* Wessler, Applied Research Ctr., *supra* note 69, at 8; Sarah Rogerson, *Lack of Detained Parents' Access to the Family Justice System and the Unjust Severance of the Parent-Child Relationship*, 47 Family L.Q. 141, 141-72 (2013); Women's Refugee Comm'n, *Torn Apart by Immigration Enforcement:*

ICE has taken some steps to address these concerns,[78] the Department of Health & Human Services recently noted that child welfare agencies continue to regularly encounter children whose parents are subject to prolonged detention.[79]

## III. Prolonged Detention Harms Society.

The costs of prolonged detention are staggering. Between FY 1995 and FY 2016, the average daily immigration detention population grew from 7,475 to 32,985.[80] A total of 367,774 individuals were in ICE custody at some point during FY 2015.[81] To detain this extraordinary number of people, DHS requested $2.407 billion in its FY 2016 budget proposal.[82] This amounts to more than $6.5 million per

---

*Parental Rights and Immigration Detention 10* (2010); Wendy Cervantes & Yali Lincroft, *The Impact of Immigration Enforcement on Child Welfare* 6 (2010).

[78] U.S. Immigration & Customs Enf't, *Facilitating Parental Interests in the Course of Civil Immigration Enforcement Activities Directive* (Aug. 23, 2013).

[79] Admin. On Children, Youth & Families, U.S. Dep't of Health & Human Servs., ACYF-CB-IM-15-02, *Case Planning and Service Delivery for Families with Parents and Legal Guardians who are Detained or Deported by Immigration Enforcement* (Feb. 20, 2015); *see also* Victoria Kline, Instituto para las Mujeres en la Migración, *Where Do We Go From Here? Challenges Facing Transnational Migrant Families Between the US and Mexico* 31-32 (2013).

[80] ACLU, *Shutting Down the Profiteers: Why and How the Department of Homeland Security Should Stop Using Private Prisons* 7-8 (Sept. 2016) (noting that the population in June 2016 was closer to 37,000).

[81] TRAC Immigration, *New Data on 637 Detention Facilities Used by ICE in FY2015* (Apr. 12, 2016).

[82] U.S. Dep't of Homeland Sec., *Budget-in-Brief: Fiscal Year 2016* 13 (2015); Joshua Breisblatt, *The President's FY 2016 Budget Department of Homeland Security*, Nat'l Immigration Forum (Feb. 6, 2015).

day, at an estimated daily cost of $158 per detainee.[83] Funding—and detention space—increased in FY 2017, when ICE was appropriated over $2.5 billion[84] to detain 39,324 people on any given day.[85]

Detaining productive, contributing members of society also imposes opportunity costs. Immigrants regardless of status pay property and sales taxes, and many pay income taxes.[86] A 2017 study found that households headed by unauthorized immigrants—not even counting authorized immigrants—contributed approximately $11.74 billion in taxes to state and local governments.[87] Prolonged detention compromises these substantial revenues, which in Michigan alone amount to $86,692,000 each year.[88]

## CONCLUSION

As the research presented in this brief attests, prolonged detention enacts enormous harm on immigrant detainees, their family members, and society as a

---

[83] U.S. Gov't Accountability Office, *GAO-15-26, Alternatives to Detention: Improved Data Collection and Analyses Needed to Better Assess Program Effectiveness* 9-12, 19 (Nov. 2014).

[84] Nat'l Immigration Forum, *Department of Homeland Security Fiscal Year (FY) 2017 Omnibus Appropriations* (May 9, 2017).

[85] S. Appropriations Comm., *FY2017 Additional Appropriations for the Department of Homeland Security.*

[86] Lisa Christensen Gee et al., Inst. on Taxation and Econ. Policy, *Undocumented Immigrants' State and Local Tax Contributions* 2 (2017).

[87] *Id.* at 6 (considering personal income taxes, property taxes, and sales taxes).

[88] *Id.* at 3 table 1.

whole. Petitioners' motion for a preliminary injunction requiring individualized review of class members' detention should therefore be granted.

Dated: December 12, 2017

Respectfully Submitted,

*/s/ David W. Williams*
JAFFE RAITT HEUER & WEISS, P.C.
David W. Williams (P55611)
Justin A. Hanna (P80596)
27777 Franklin Road, Suite 2500
Southfield, MI 48034
(248) 351-3000
jhanna@jaffelaw.com
dwilliams@jaffelaw.com

Nina Rabin (AZ Bar #025246)
Laura Hendrickson (AZ Bar #030783)
Dorien Ediger-Seto
JAMES E. ROGERS
  COLLEGE OF LAW,
  UNIVERSITY OF ARIZONA
1145 N. Mountain Ave.
Tucson, AZ 85719
(520) 621-9206
rabin@email.arizona.edu

## CERTIFICATE OF SERVICE

I hereby certify that on December 14, 2017, I served a copy of the foregoing upon all counsel of record via the Court's electronic e-filing system.

Dated:  December 14, 2017

*/s/ Laura A. Hunt*
Laura A. Hunt

24