# <u>EXHIBIT A</u>

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

**USAMA JAMIL HAMAMA,** et al.,

     Petitioners/Plaintiffs,

v.

**REBECCA ADDUCCI**, et al.,

     Respondents/Defendants.

Case No. 2:17-cv-11910
Hon. Mark A. Goldsmith
Mag. David R. Grand
Class Action

## DECLARATION OF MICHAEL V. BERNACKE

I, Michael V. Bernacke, make the following declaration in accordance with 8 U.S.C. § 1746 with respect to the above-captioned matter.

1.  I am the Acting Deputy Assistant Director for the Removal Management Division - East which encompasses the Asia and Europe Removal and International Operations (RIO) unit as well as the Middle East/Eastern Africa unit within the U.S. Department of Homeland Security (DHS), U.S. Immigration and Customs Enforcement (ICE), Enforcement and Removal Operation's (ERO) Removal Management Division (RMD). The RMD is located at ICE Headquarters in Washington, D.C. RMD provides guidance and assistance to officers attempting to obtain travel documents for foreign nationals who are ordered removed. RMD

1

collaborates with embassies and consulates, as well as with interagency and international networks to facilitate the efficient removal of aliens from the United States. RMD provides nationwide Post-Order Custody Review (POCR) guidance, implements policy and procedures, and is responsible for providing case management support for aliens subject to a final order of removal.

2. I have been employed with DHS as an immigration officer since March 2006, and I have worked with ERO since February 2009. From October, 2017 to present, I have been employed as the Removal Management Division-East Unit Chief for the Middle East/Eastern Africa unit in a permanent capacity and have served as Deputy Assistant Director in a temporary, acting, capacity.

3. This declaration is based upon my professional knowledge, information obtained from other individuals employed by ICE, and information obtained from DHS records. I am aware of the facts and circumstances of this case and the efforts to arrange for the removal of Iraqi nationals that have been ordered removed from the United States.

4. As noted in the declaration submitted by my colleague John A. Schultz on July 20, 2017, in 2017, Iraq agreed to the timely return of its nationals subject to a final order of removal. The agreement between the United

States and the Iraqi Ministry of Foreign Affairs (MFA) is not memorialized in any written document or treaty. It is a product of ongoing diplomatic negotiations.

5. Based on this agreement, the United States planned to schedule the return of all Iraqi nationals with final orders of removal in the United States. The agreement does not contemplate any numeric limitation on the number of removals in total or on an annual basis.

6. The government of Iraq agreed to accept these removals via charter mission. As a charter mission, rather than a removal conducted via commercial airline flight, formal travel documents are not required. Instead, ICE submits a proposed manifest for the charter flight to Iraqi officials for approval. The manifest for the charter scheduled for June 2017 included approximately 60 individuals. A charter flight, depending on which aircraft is available, can hold as many as 150 individuals for removal.

7. After the successful completion of the June 2017 flight, the United States planned to send a second, larger charter flight following the same general procedure. The scheduling of charter flights to Iraq was to continue through the summer of 2017 until the detained individuals with final orders of removal were returned to Iraq.

3

8.  As a result of the injunction in the above-captioned case, ICE cancelled the June 2017 charter flight. Because only a small number of individuals are now eligible for removal under the injunction, ICE is scheduling removals via commercial flights.

9.  Removal by commercial flight requires a significantly more onerous process because travel documents must be individually obtained through direct engagement with the Iraqi government in Baghdad. This is a labor-intensive, expensive, and time-consuming process that requires the engagement of individuals in several different agencies located in multiple countries.

10. The United States would be significantly harmed if required to obtain travel documents simply to demonstrate that we will be able to get a travel document again at a later date. Such requests are likely to be substantially harmful to our diplomatic relationship with Iraq. In addition, they may undermine the government's ability to obtain a travel document at a later date for that individual. Overall, such a requirement has the potential to jeopardize the present agreement and our ability to effect future removals to Iraq.

11. ICE is actively seeking and receiving travel documents for individuals who have requested to be voluntarily removed from the class. In

December of 2017, ICE removed 2 putative class members who requested removal. There are 3 additional putative class members for whom ICE has recently received travel documents from Iraq. ICE is in the process of making travel arrangements for these 3 individuals to be removed in the near future. ICE has also submitted 10 additional travel document requests for putative class members who have voluntarily opted out and is awaiting approval of travel documents for these individuals. ICE expects to receive travel documents for all requested individuals in the very near future.

12. ICE believes that the central government of Iraq in Bagdad will permit the entry of detained Iraqi nationals subject to final orders of removal if the injunction is lifted. At that time, ICE will make arrangements to facilitate the use of charter flights for removals. This injunction is the only impediment to ICE to resuming charter flights to Iraq.

I declare under penalty of perjury and in accordance with 8 U.S.C. § 1746 that the foregoing is true and correct and made after reasonable inquiry and personal knowledge, information, and belief.

DATED:  December 22, 2017

_____
Michael Bernacke
Acting Deputy Assistant Director
Removal Management Division - East
Washington, D.C.