UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

USAMA J. HAMAMA, et al.,

                 Petitioners,                     Case No. 17-cv-11910

vs.                                            HON. MARK A. GOLDSMITH

REBECCA ADDUCCI, et al.,

                 Respondents.

_____/

**OPINION & ORDER**
**DENYING IN PART RESPONDENTS' MOTION TO DISMISS (Dkt. 135), GRANTING**
**IN PART PETITIONERS' MOTION FOR PRELIMINARY INJUNCTION (Dkt. 138),**
**AND GRANTING IN PART PETITIONERS' AMENDED MOTION TO CERTIFY**
**CLASS (Dkt. 139)**

       Last July, this Court put a halt to the deportation of hundreds of aliens whom the

Executive Branch of the Federal Government had sought to repatriate to their native Iraq. The

Court ruled that they must be given a hearing before immigration judges on their claims that they

would face persecution, torture, and possibly death if sent back. While that immigration court

process proceeds apace, the aliens who were arrested have now languished in detention facilities

— many for over six months — deprived of the intimacy of their families, the fellowship of their

communities, and the economic opportunity to provide for themselves and their loved ones.

Detention may stretch into years, as the immigration court proceedings and subsequent appeals

wind their way to a conclusion.

       They now ask this Court to be allowed to return to their productive lives by being placed

on bond, while the legal process continues, unless the Government can show that they are

unreasonable risks of flight or danger to the community.

What they seek is consistent with the demands of our Constitution — that no person should be restrained in his or her liberty beyond what is reasonably necessary to achieve a legitimate governmental objective.  Here, the Government may fairly insist that those whose right to remain in this country is yet to be determined must not undermine the administration of justice by fleeing before that determination is made, nor endanger the public while that process unfolds.  But those interests can be served by a bond hearing process before immigration judges, who can sort out those who endanger the efficacy of the immigration system and public safety from those who will not.

Our legal tradition rejects warehousing human beings while their legal rights are being determined, without an opportunity to persuade a judge that the norm of monitored freedom should be followed.  This principle is familiar to all in the context of the criminal law, where even a heinous criminal — whether a citizen or not — enjoys the right to seek pre-trial release.  In the civil context of our case, this principle applies with at least equal force.  In either context, the principle illustrates our Nation's historic commitment to individual human dignity — a core value that the Constitution protects by preserving liberty through the due process of law.

As explained below, the Court will grant relief by establishing a process of individual bond hearings for all detainees entitled to them.

## I. BACKGROUND

This matter is before the Court on the motion to dismiss (Dkt. 135) filed by Respondents ("the Government"), Petitioners' motion for preliminary injunction (Dkt. 138), and Petitioners' amended motion to certify class (Dkt. 139).  The issues have been fully briefed and a hearing was held on December 20, 2017.  For the reasons stated below, the Court denies in part the

Government's motion to dismiss, grants in part Petitioners' motion for preliminary injunction, and grants in part Petitioners' amended motion to certify class.

As recited in the Court's prior opinions, this case arises out of the arrest and detention of Iraqi nationals who are or were subject to long-standing final orders of removal. See, e.g., Hamama v. Adducci, 261 F. Supp. 3d 820 (E.D. Mich. 2017). In June 2017, agents from Immigration and Customs Enforcement ("ICE"), a division of the Department of Homeland Security ("DHS"), began arresting hundreds of these Iraqi nationals, the majority of whom are Chaldean Christians who would face persecution, torture, and possibly death if returned to Iraq. The initial round-up took place in Michigan, snaring approximately 114 individuals. Am. Compl. ¶ 5 (Dkt. 118). The number has since swelled to over 300, many of whom are still in Michigan detention facilities, with others scattered to various detention facilities throughout the country. Id. ¶¶ 5, 12.

The vast majority of these individuals were ordered removed to Iraq years ago (some decades ago), because of criminal offenses they committed while in the United States. There is only spotty information in the record regarding the nature of the detainees' offenses. The offenses of the named Petitioners range from relatively minor drug possession convictions to more serious matters, such as felonious assault and arson; one has no conviction at all. Id. ¶¶ 22-36.[1] Although the Government presumably knows the criminal history of all the putative class

---

[1] Below is information taken from the amended complaint regarding the convictions of the named Petitioners:

| Named Petitioner | Offense(s) | Year of Conviction | Sentence |
| --- | --- | --- | --- |

| Usama Hamama | Felonious assault; possession of a firearm; misdemeanor related to the possession of a firearm in a vehicle | 1988 | Two years' imprisonment; half served in custody, half supervised release |
|---|---|---|---|
| Ali Al-Dilaimi | Assault | 2000 | One year imprisonment; served five months |
| Sami Al-Issawi | Aggravated assault | 1998 | 360 days' imprisonment |
| Qassim Al-Saedy | Domestic assault | 2002 | Unknown |
| Abbas Al-Sokaini | Two drug offenses | Unknown | No incarceration, placed on supervision |
| Atheer Ali | Breaking and entering; receipt or concealment of stolen property; drug possession | 1996 (breaking and entering; receipt and concealment of stolen property)<br><br>Drug possession convictions entered "more recently" | No incarceration, spent a month in a bootcamp |
| Jihan Asker | Misdemeanor fraud | 2003 | Six months' probation |
| Moayad Barash | Drug charge and possession of a weapon | "While still a teenager" | Incarcerated, unclear for how long |
| Jami Derywosh | Arson | 1994 | Seven years' imprisonment; served approximately half |
| Anwar Hamad | Misdemeanor drug crime; felony drug crime | 2013 (misdemeanor) 2014 (felony) | Unknown |
| Jony Jarjiss | Never been convicted of a crime | N/A | N/A |
| Mukhlis Murad | Drug possession with intent to deliver | "Over two decades ago" | Unknown |
| Habil Nissan | Misdemeanor destruction of property; two misdemeanor assault charges | 2005 | Twelve months' probation |

members, it has not placed that information in the record.  What is known is that all detainees served their sentences and were released long ago, under orders of supervision because Iraq refused to accept repatriation.  According to Petitioners, they lived peaceably in their respective communities under the orders of supervision — a point the Government does not contest.

While the detainees were scheduled for imminent removal following their arrests, this Court enjoined their removal in a July 24, 2017 ruling.  See Hamama, 261 F. Supp. 3d at 841-842.  In its ruling, the Court held that while the REAL ID Act, 8 U.S.C. § 1252, prohibits habeas actions that arise out of the Attorney General's decision to execute orders of removal, the act was unconstitutional, as applied, because it suspended Petitioners' habeas rights.  While the REAL ID Act provides an alternative to habeas actions (an administrative challenge in immigration courts, followed by a petition for review in the courts of appeals), the Court held that the circumstances of this case effectively foreclosed access to this alternative prior to removal.

Having concluded that the Court had jurisdiction to rule on Petitioners' habeas claims, the Court determined that Petitioners were entitled to a preliminary injunction enjoining their removal until they had a meaningful opportunity to challenge the continued validity of their orders of removal — under the Convention Against Torture, as implemented by 8 C.F.R. § 208.18 and other authorities — in immigration courts and, if necessary, the courts of appeals.

Since this case began, 164 of the putative class members have filed motions to reopen. See Schlanger Decl., Ex. 1 to Pet. Mot., ¶ 14 (Dkt. 138-2).  Of these 164 motions, seventy-four

| Adel Shaba | Delivery and manufacture of less than fifty grams of a controlled substance | 1987 | Unknown |
| Kamiran Taymour | Three marijuana-related offenses | 1998; 2006; 2011 | Unknown |

have been granted, eleven have been finally denied, and seventy-nine are pending.  Id. ¶ 21. Approximately ten of the seventy-four grantees have had their cases adjudicated to the merits, with each one resulting in grants of relief or protection.  Id. ¶¶ 22-23.  Since the Court's preliminary injunction was entered, roughly ninety-one percent of the motions to reopen have been granted in the Detroit immigration court.  Id. ¶ 17.

While these motions are being adjudicated, most of those arrested are still incarcerated. The most recent estimates have the number of detainees at 274, with the vast majority having spent six months or more in custody.  Schlanger Decl. II, Ex. 34 to Pet. Reply, ¶ 26 (Dkt. 174-3). Some are held under 8 U.S.C. § 1231, which authorizes detention for those with orders of removal in place, and provides for release under certain circumstances.  Others are held under 8 U.S.C. § 1226(c), a statute that purports to mandate detention when there is no order of removal in place for certain detainees, including those with certain criminal histories.  The detainees held under this subsection previously had final orders of removal; these orders were vacated when their motions to reopen were granted.  A smaller subset, estimated to be six or seven individuals, are being held pursuant to 8 U.S.C. § 1226(a) (authorizing detention before entry of a removal order) or 8 U.S.C. § 1225(b) (authorizing detention for those interdicted at the border).  Id. ¶ 8.

Based on due process principles and the Immigration and Nationality Act, 8 U.S.C. § 1101, et seq., Petitioners now seek relief from detention under a number of theories, as set forth in their motion for preliminary injunction.

Petitioners first argue that they are entitled to release pursuant to Zadvydas v. Davis, 533 U.S. 678 (2001), a seminal decision requiring, except in extraordinary circumstances, release of detainees when there is no reasonable likelihood of removal in the reasonably foreseeable future.  Pet. Br. at 19.  Petitioners argue that there is no significant likelihood of removal in the

reasonably foreseeable future in our case, because there is no definitive agreement that Iraq will accept repatriation, and because there is no foreseeable end to their removal proceedings. Id. at 19, 22.

In response, the Government submits declarations from ICE officials stating that Iraq has agreed to cooperate in the removal of the putative class members. It also notes that it has removed a few of the individuals who have had their stays of removal consensually lifted. The Government also argues that, because removal proceedings have a definitive end-point, removal is reasonably foreseeable. Gov. Resp. at 10.

As explained below, the Court agrees that the end point of the legal process is reasonably foreseeable. But it holds that there is insufficient evidence in the record to determine whether Iraq is willing to accept class-wide repatriation. Without a reasonable expectation that removal would follow the termination of legal proceedings, the definitive "end-point" of the legal process does not solve the due process problem of indefinite detention. Because it is unclear whether repatriation is likely, the Court defers ruling on Petitioners' Zadvydas claim, pending further discovery.

 Petitioners' second theory is that, even if their removal is reasonably foreseeable, their detention has become unreasonably prolonged. They argue that this unreasonable detention entitles them to a bond hearing before an impartial adjudicator, such as an immigration judge, to determine whether they are a flight risk or danger to the community. Pet. Br. at 24. In response, the Government argues that Sixth Circuit precedent defeats Petitioners' claim based on an unreasonably prolonged detention and corresponding entitlement to a bond hearing. The Government contends that Petitioners are not eligible for a bond hearing, because their detention

has not been sufficiently lengthy, and because their actual removable is reasonably foreseeable. Gov. Resp. at 17.

The Court holds that those detainees who have been in custody for six months or more are entitled to bond hearings, unless the Government presents specific evidence to this Court demonstrating why a particular detainee should be denied that right, such as evidence that the detainee has engaged in bad-faith or frivolous motion practice in an effort to artificially prolong the removal process. Bond hearings will be conducted by immigration judges who will consider flight and safety risks.

Petitioners contend that the Zadvydas and prolonged detention claims are assertable by detainees, regardless of whether the Government purports to detain them under the mandatory provisions of § 1226(c). Therefore, Petitioners also ask that bond hearings be ordered for those detainees being held under that provision. Petitioners argue that § 1226(c) does not apply to those who have had their motions to reopen granted or who have been living in the community for a significant period, after completion of their criminal sentence, prior to their immigration detention. Rather, Petitioners say, such people should be considered held under 8 U.S.C. § 1226(a), a provision that has been interpreted as requiring bond hearings after prolonged detention. Pet. Br. at 28. The Government argues that those who have had their motions to reopen granted are not exempt from mandatory detention, and that courts have interpreted § 1226(c) to require mandatory detention for those who had been living in their community after completion of their criminal sentences. Gov. Resp. at 20.

The Court agrees with Petitioners and holds that § 1226(c) does not apply to those who have had their motions to reopen granted or who were previously living in their communities for years after the conclusion of their criminal sentences. Section 1226(c) contemplates an

expeditious removal proceeding, which is typically not possible when a motion to reopen is granted and certainly is not the case here. Further, the plain language of § 1226(c) requires the conclusion that mandatory detention is only permissible when an alien is placed into immigration custody immediately following the completion of his or her criminal sentence.[2]

Petitioners' motion for preliminary injunction intersects with issues raised by the Government's motion to dismiss. In its motion, the Government seeks dismissal of all of Petitioners' claims as pled in the amended complaint — those pertaining to detention, as well as those based on removal, transfer, and right to counsel — on the grounds that they are either jurisdictionally barred or fail as a matter of law. See generally Gov. Mot. to Dismiss. The Court will consider — and deny — the Government's motion in conjunction with the detention claims raised in the motion for preliminary injunction, and defers a ruling on the remaining issues raised in the Government's motion.

Finally, Petitioners have filed a motion to certify the putative primary class and three detention subclasses. Because the Court is limiting its decision to detention issues, it will only consider certification of the detention subclasses. Petitioners argue that certification is appropriate because the detainees are seeking relief as a result of Government action that applies uniformly to those in custody. Pet. Br. at 31. They argue that they are sufficiently numerous; present common questions of law and fact; assert claims that are typical of the putative subclass members; and will fairly and adequately represent them. In response, the Government argues that each detention claim requires a highly fact-intensive inquiry that makes class treatment

---

[2] Petitioners also seek clarification regarding the Government's obligation to produce Alien Files ("A-Files") and Records of Proceedings ("ROPs") in connection with the Court's earlier preliminary injunction order. These are materials class members need to file well-supported motions to reopen. Because this issue bears on the stay of removal, not detention, the Court will address this by separate order.

inappropriate.  Gov. Resp. at 6.  The Court holds that these individual differences are insufficient to defeat certification, and that Petitioners have made a sufficient showing for class certification of the subclasses.

## II. STANDARDS OF DECISION

To determine whether to grant a preliminary injunction, a district court must consider: (i) the plaintiff's likelihood of success on the merits; (ii) whether the plaintiff may suffer irreparable harm absent the injunction; (iii) whether granting the injunction will cause substantial harm to others; and (iv) the impact of its decision on the public interest.  Yolton v. El Paso Tennessee Pipeline Co., 435 F.3d 571, 578 (6th Cir. 2006).  These four factors "are factors to be balanced, not prerequisites that must be met."  Hamad v. Woodcrest Condo. Ass'n, 328 F.3d 224, 230 (6th Cir. 2003).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'  A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Id.

With regard to class certification, "Rule 23 does not set forth a mere pleading standard." Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350 (2011).  Rather, "[a] party seeking class certification must affirmatively demonstrate his compliance with the Rule . . . [S]ometimes it

may be necessary for the court to probe behind the pleadings before coming to rest on the certification question." Id. (quotation marks omitted).

### III. ANALYSIS

The Court begins by analyzing the issues raised in Petitioners' motion for preliminary injunction. Next, the motion to dismiss is considered, but only insofar as it bears on the detention issues; consideration of the balance of the issues, including the jurisdictional challenge raised as to the removal claims, will be deferred. The Court will then turn to Petitioners' motion to certify class, considering only whether certification is appropriate as to the detention subclasses.

**A. Motion for Preliminary Injunction**

**1. Likelihood of Success on the Merits**

**a. Zadvydas Claim**

Petitioners first argue that, pursuant to Zadvydas, they are being unlawfully detained because there is no significant likelihood of removal in the reasonably foreseeable future. Pet. Br. at 19. Zadvydas involved two petitioners, Kestutis Zadvydas and Kim Ho Ma. Zadvydas was taken into custody after the conclusion of his criminal sentence and ordered removed. Efforts by the Government to deport Zadvydas to Germany, Lithuania, and the Dominican Republic were all unsuccessful, and the district court ordered Zadvydas released after concluding that he would be permanently confined. The Fifth Circuit reversed, holding that Zadvydas's detention was constitutional because his removal was still possible in light of ongoing diplomatic negotiations. Ma was also taken into custody following completion of a criminal sentence. Both the district court and Ninth Circuit ruled that Ma was entitled to release because there was no

likelihood of removal in light of the lack of a repatriation agreement between the United States and Cambodia, Ma's native country.

The Supreme Court began by interpreting 8 U.S.C. § 1231, the section of the INA addressing the detention and removal of aliens ordered removed. The statute establishes that where an alien has been ordered removed, the Attorney General shall remove the alien within ninety days. 8 U.S.C. § 1231(a)(1)(A). However, the statute permits the Attorney General to continue detention beyond this ninety day period. It states, in pertinent part:

> An alien ordered removed [1] who is inadmissible . . . [2] [or] removable [as a result of violations of status requirements or entry conditions, violations of criminal law, or reasons of security or foreign policy] or [3] who has been determined by the Attorney General to be a risk to the community or unlikely to comply with the order of removal, may be detained beyond the removal period and, if released, shall be subject to [certain] terms of supervision.

Zadvydas, 533 U.S. at 678 (quoting 8 U.S.C. § 1231(a)(6)). The question before the Court was whether this subsection "authorizes the Attorney General to detain a removable alien indefinitely beyond the removal period or only for a period reasonably necessary to secure the alien's removal." Id. The Court held that "the statute, read in light of the Constitution's demands, limits an alien's post-removal-period detention to a period reasonably necessary to bring about that alien's removal from the United States. It does not permit indefinite detention." Id. The Court reasoned that indefinite detention would raise a significant constitutional question, specifically as it pertains to the Fifth Amendment's Due Process Clause. Id. at 690. The Court held that, in any event, it could not find "any clear indication of congressional intent to grant the Attorney General the power to hold indefinitely in confinement an alien ordered removed." Id. at 697.

The Court ultimately held that detention for six months is presumptively reasonable and then stated:

> After this 6–month period, once the alien provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the Government must respond with evidence sufficient to rebut that showing. And for detention to remain reasonable, as the period of prior postremoval confinement grows, what counts as the "reasonably foreseeable future" conversely would have to shrink.

Id. at 701.  The Court remanded both cases in light of its new standard. It noted in Zadvydas's case that the Fifth Circuit had concluded that continued detention was lawful because Zadvydas had not demonstrated that his removal was "impossible" — meaning that an alien had to show "the absence of any prospect of removal" — which the Supreme Court found to be an excessive standard.  Id. at 702 (emphasis in original).  Remand was ordered in Ma's case, because the Ninth Circuit may have based its conclusion of no likelihood of removal based solely on the absence of a repatriation agreement, without giving due weight to future negotiations over repatriation.

With detention having exceeded the six-month milestone for the initial June detainees — and with more detainees reaching that milestone with the passage of time — Petitioners first argue that there is no significant likelihood of their removal in the reasonably foreseeable future because it is unclear whether Iraq will actually accept repatriation.[3]  Petitioners argue that the Government has not provided any "particularized evidence" that removal can be effected in the reasonably foreseeable future.  Pet Br. at 21.  They note that the Government has only provided

---

[3] At the time the Government filed its response to Petitioners' motion for preliminary injunction, the six-month period set forth in Zadvydas had not passed.  As a result, the Government argued that the detention at issue was still presumptively reasonable.  Gov. Resp. at 11.  Circumstances have since changed.  The majority of detainees began their detention on June 11, 2017, i.e. more than six months ago.  Thus, the Government is no longer entitled to the presumption that continued detention is reasonable.

"vague representations" about its agreement with Iraq and that country's supposed willingness to relax its policies regarding issuance of travel documents. Petitioners state that since the alleged policy change was announced, several putative members have unsuccessfully attempted to receive their travel documents from the Iraqi government. Id. at 22. Petitioners cite the Sixth Circuit's ruling in Rosales-Garcia v. Holland, 322 F.3d 386 (6th Cir. 2003), where the court held that there was no significant likelihood of removal in the reasonably foreseeable future for two Cuban aliens. The court noted that "[a]lthough the government presented evidence of . . . continuing negotiations with Cuba over the return of Cuban nationals excluded from the United States, neither [petitioner] is currently on a list of persons to be returned." Id. at 415.

In response, the Government provides the declaration of John Schultz, the deputy assistant director for DHS's removal management division - east. Schultz Decl., Ex. A to Gov. Resp., ¶ 1 (Dkt. 158-2). Schultz states that the Government's negotiations have resulted in Iraq's agreement to cooperate in removal of Iraqi nationals from the United States. Id. ¶ 4. As evidence of this cooperation, Schultz notes that, prior to this Court's rulings enjoining removal, ICE had scheduled charter flights to depart in both June and July. Id. ¶ 6. While very few travel documents have actually been provided since this Court's injunction was issued, Schultz's declaration states that these documents are only being sought for those not subject to the stay of removal, to avoid having to make multiple requests to Iraq in the event travel documents expire during the pendency of the injunction. Id. ¶ 8.

The Government later submitted, following the hearing on these motions, a declaration by Michael Bernacke, the acting assistant deputy assistant director for DHS's removal management division - east. See Bernacke Decl., Ex. A to Gov. Supp. Br., ¶ 1 (Dkt. 184-2). In his declaration, Bernacke states that the agreement between the United States and Iraq is not

14

memorialized in writing, but is instead the product of ongoing negotiations.  Id. ¶ 4.  Bernacke also states that "the agreement does not contemplate any numeric limitation on the number of removals," and that if the injunction is lifted, large-scale removals can be arranged via charter flight, without the need for travel documents.  Id. ¶¶ 5-6.

Based on this record, the Court cannot make a determination regarding whether Iraq will accept repatriation of the class.  Schultz's declaration does not contain information regarding the framework of the Government's diplomatic agreement with Iraq.  When pressed at the hearing by the Court regarding details of the agreement, counsel for the Government was unsure whether there was any formal agreement that had been memorialized in writing.  Although the post-hearing Bernacke declaration fills in some of the blanks — it acknowledges that there is no written agreement — there is still not enough information regarding the scope of the agreement with Iraq.[4]  While a handful of Iraqi nationals have been removed to Iraq since April, it is unclear whether Iraq has agreed to repatriate all 1,400 putative class members at issue here, and if so, what conditions may have been attached that could impact on whether removal is likely.   Until the Court has a more complete picture from the Government regarding its communications with the Iraqi government, it cannot make a ruling on Iraq's willingness to accept repatriation of the class.

Petitioners also argue that, even if Iraq has agreed to accept repatriation of the class, their removal is still not significantly likely in the reasonably foreseeable future, because it could take years to litigate their motions to reopen.  Pet. Br. at 22.  Petitioners contend that if a detainee is

---

[4] Further, Bernacke did not make the declaration based on his personal knowledge, but something he called his "professional knowledge" – a term his declaration does not define and not something that appears to support supposedly factual statements in an affidavit or declaration.  See Ondo v. City of Cleveland, 795 F.3d 597, 605 (6th Cir. 2015) (affidavits and declarations in support of dispositive motions must be based on personal knowledge).

denied at every stage of the litigation, from the immigration judge to the court of appeals, the process can take nearly three years.  See Pet. Br., Table A.

In support, Petitioners rely on the Sixth Circuit's decision in Ly v. Hansen, 351 F.3d 263 (6th. Cir. 2003), which addressed whether Zadvydas extended to 8 U.S.C. § 1226(c), the mandatory pre-removal detention statute.  Id. at 267.[5]  The Government in that case argued that the alien was partially responsible for his lengthy detention, noting that he had filed applications to cancel his removal.  Petitioners rely on the court's statement that "appeals and petitions for relief are to be expected as a natural part of the process," and that "[a]n alien who would not normally be subject to indefinite detention cannot be so detained merely because he seeks to explore avenues of relief that the law makes available to him."  Id. at 272.  Petitioners argue that they too should not be subject to indefinite detention simply because they have availed themselves of the motion to reopen process.

In response, the Government cites to cases holding removal to be reasonably foreseeable where the end of a litigation will terminate detention.  See Soberanes v. Comfort, 388 F.3d 1305, 1311 (10th Cir. 2004) ("[H]is detention is clearly neither indefinite nor potentially permanent like the detention held improper in Zadvydas; it is, rather, directly associated with a judicial review process that has a definite and evidently impending termination point."); see also Prieto-Romero v. Clark, 534 F.3d 1053, 1065 (9th Cir. 2008); Flores v. Holder, 977 F. Supp. 2d 243, 249 (W.D.N.Y. 2013).  One of the cases relied on by Petitioners supports the Government's point; it held that an alien who had been in custody for seven years had a reasonably foreseeable

---

[5] Title 8 U.S.C. § 1226(c) states that "[t]he Attorney General shall take into custody any alien who [is inadmissible or deportable for having committed certain enumerated offenses] when the alien is released, without regard to whether the alien is released on parole, supervised release, or probation, and without regard to whether the alien may be arrested or imprisoned again for the same offense."

removal date because Colombia was willing to accept his repatriation "if he ultimately fails in fighting the government's charge of removability." Casas-Castrillon v. Dep't of Homeland Sec., 535 F.3d 942, 949 (9th Cir. 2008).[6]

This line of cases is much clearer than the language in Ly that Petitioners rely on. The court in Ly was merely noting which factors courts should consider when determining whether an alien has been subject to an unreasonable detention. It simply instructed courts to weigh whether prolonged detention was attributable to dilatory tactics by the alien. It does not reject the holdings by the Ninth and Tenth Circuits that there is a significant likelihood of removal in the reasonably foreseeable future where the only impediment to removal is the litigation process, which has a definite endpoint. The Court finds those rulings persuasive, and holds that removal is reasonably foreseeable where the only barrier to removal is ongoing immigration proceedings.[7]

Thus, the Government is correct that Petitioners would have no Zadvydas claim if removal were blocked solely because the legal proceedings had not terminated. But that is not necessarily our circumstance. It is still an open question whether Iraq has agreed to accept class-wide repatriation. As noted above, a more developed record is necessary to answer this question.

---

[6] As discussed infra, Casas supports Petitioners' prolonged detention claim, even though it undermines their alternative theory under Zadvydas that an unduly long period can amount to no significant likelihood of removal in the foreseeable future although there is no impediment to ultimate removal.

[7] While Ly does not support Petitioners' argument on the definitive end-point issue, it does bear on other arguments raised by the Government — that the stay of removal has prolonged removal and that detention hearings would provide a "corrupt incentive" to litigate frivolously in the immigration courts to artificially prolong detention. Gov. Resp. at 13. Ly points out that aliens cannot be faulted for filing appropriate motions; implicitly, this means that frivolous actions can be evaluated in determining whether a period of detention is unreasonable. There is thus no corrupt incentive for needlessly churning a file. And while a stay of removal has — as a matter of tautology — delayed removal, Ly is not critical of bona fide efforts to utilize the tools the law affords, which is precisely what Petitioners did in securing the initial preliminary injunction.

Thus, the Court defers ruling on the likelihood of success on the <u>Zadvydas</u> claim pending further discovery.[8]

### b. Prolonged Detention

Petitioners next argue that even if their removal is reasonably foreseeable, <u>Zadvydas</u> provides a basis for them to receive individualized hearings on the issue of release.  Pet. Br. at 24.  They note <u>Zadvydas</u>'s statement that "if removal is reasonably foreseeable, the habeas court should consider the risk of the alien's committing further crimes as a factor potentially justifying confinement within that reasonable removal period."  <u>Zadvydas</u>, 533 U.S. at 700.  Petitioners also note rulings by other circuits recognizing that those subject to prolonged detention are entitled to bond hearings, even where their removal is reasonably foreseeable.   For instance, the Ninth Circuit in <u>Diouf v. Napolitano</u>, 634 F.3d 1081 (9th Cir. 2011), held that § 1231(a)(6) requires "an individualized bond hearing, before an immigration judge, for aliens facing prolonged detention under that provision."  <u>Id.</u> at 1085.  The court held that § 1231(a)(6) aliens are to be released on bond unless the government can establish that they are a flight risk or a danger to the community.  <u>Id.</u>

<u>Diouf</u> extended an earlier ruling by the Ninth Circuit in <u>Casas</u>, in which the court, addressing a § 1226(a) detainee, held that "prolonged detention without adequate procedural protections would raise serious constitutional concerns," noting that "[e]ven where detention is permissible [under <u>Zadvydas</u>], due process requires 'adequate procedural protections' to ensure

---

[8] Petitioners also note language in an ICE field office manual that states "[i]f the circumstances under which an alien was taken back into custody no longer exist <u>and his/her removal is no longer imminent, the alien is to be released</u>."  Pet. Br. at 22 (citing ICE Field Office Manual, DHS p. 104 (Rev. March 27, 2006)) (emphasis added).  This language notwithstanding, <u>Zadvydas</u> does not require that removal be imminent in order for the Government to continue detention; there need only be a significant likelihood of removal in the reasonably foreseeable future.

that the government's asserted justification for physical confinement 'outweighs the individual's constitutionally protected interest in avoiding physical restraint.'"    Casas, 535 F.3d at 951 (quoting Zadvydas, 533 U.S. at 690).[9]  The Casas court held that "the prolonged detention of an alien without an individualized determination of his dangerousness or flight risk would be 'constitutionally doubtful.'"  Id. (quoting Tijani v. Willis, 430 F.3d 1241, 1242 (9th Cir. 2005)).

The Government does not address Diouf. Nor does it address that portion of the Casas decision that upheld a prolonged detention claim.  Instead, it argues that Ly defeats any claim Petitioners have to an individualized hearing on whether their release would pose a flight risk or danger to the community. The Government claims that Ly holds that detainees must establish both that removal proceedings have not been concluded within a reasonable time, and that actual removal is not reasonably foreseeable.  Gov. Resp. at 17.

---

[9] Title 8 U.S.C. § 1226(a) states that:

>  On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States. Except as provided in subsection (c) and pending such decision, the Attorney General--
>
>  (1) may continue to detain the arrested alien; and
>
>  (2) may release the alien on--
>
>>  (A) bond of at least $1,500 with security approved by, and containing conditions prescribed by, the Attorney General; or
>>
>>  (B) conditional parole; but
>
>  (3) may not provide the alien with work authorization (including an "employment authorized" endorsement or other appropriate work permit), unless the alien is lawfully admitted for permanent residence or otherwise would (without regard to removal proceedings) be provided such authorization.

However, <u>Ly</u> did not purport to address a detainee asserting a pure prolonged detention claim, i.e. a claim without any argument that removal was not foreseeable.  It addressed only a <u>Zadvydas</u> claim, and specifically whether <u>Zadvydas</u>, which involved a § 1231(a)(6) detainee, "extends to the mandatory <u>pre-removal</u> detention statute [§1226(c)]."  <u>Ly</u>, 351 F.3d at 267 (emphasis in original).  <u>Ly</u> involved an alien who was detained and ordered removed after committing crimes, but his native Vietnam had no repatriation agreement with the United States. The court engaged in a multi-factor analysis to determine whether a 500-day detention was unreasonable, noting that what made the detention "especially unreasonable" was the lack of a repatriation agreement, <u>id.</u> at 271-272, meaning no likelihood of removal.  While that factor contributed to the court's ultimate decision, nowhere in the opinion does the court state that that factor is necessary for granting a relief to a § 1226(c) detainee, or to a detainee under any other authority, whenever the detainee complains of excessive detention.  Thus, <u>Ly</u> does not mandate that Petitioners demonstrate no likelihood of removal for a prolonged detention claim.

Courts that have been presented with circumstances where detention was prolonged, but removal was reasonably foreseeable, have adopted Petitioners' position. That is the teaching of <u>Diouf</u> and <u>Casas</u>, which this Court chooses to follow.  The Government has presented no contrary authority analogous to our case.   All that Petitioners must demonstrate is the unreasonableness of their detention, an issue discussed <u>infra</u>.

### c. § 1226(c)

Petitioners next seek a ruling that those being detained under § 1226(c) should instead be considered § 1226(a) detainees, and as such entitled to bond hearings, pursuant to <u>Casas</u>.  <u>See</u> <u>Casas</u>, 535 F.3d at 951 (deeming an alien held purportedly under § 1226(c) as one being held under § 1226(a) and ordering a bond hearing, reasoning that "[b]ecause the prolonged detention

of an alien without an individualized determination of his dangerousness or flight risk would be 'constitutionally doubtful,' we hold that § 1226(a) must be construed as requiring the Attorney General to provide the alien with such a hearing") (quoting Tijani, 430 F.3d at 1242).  They argue that § 1226(c) does not apply for two reasons: (i) it does not apply to detention pending reopened removal proceedings; and (ii) it does not apply to individuals who were living in the community prior to detention, i.e. they were not taken into immigration custody immediately upon release from their criminal sentences.  Pet. Br. at 28.

In support of their contention that § 1226(c) does not apply to motion to reopen proceedings, Petitioners rely on the Ninth Circuit's ruling in Casas.  In that case, the alien had been in custody for seven years at the time the Ninth Circuit was reviewing his petition for review.  The court was tasked with determining whether the alien was being held under § 1226(c), which requires mandatory detention of criminal aliens, or § 1226(a), which entitles the alien to a bond hearing.  The court rejected the Government's argument that § 1226(c) applied, holding that the mandatory detention provision "applies only to 'expedited removal of criminal aliens.'"  Casas, 535 F.3d at 951 (quoting Tijani, 430 F.3d at 1242).  The court also noted the Supreme Court's ruling in Demore v. Kim, 538 U.S. 510 (2003), that § 1226(c) detention is meant to be brief, and DHS regulations that interpreted § 1226(c) to apply only "during removal proceedings," which it defined as concluding upon dismissal by the Board of Immigration Appeals ("BIA").  Id. at 948 (quoting 8 C.F.R. §§ 236.1(c)(1)(i), 1241.1(a)).  The court held that "[b]ecause neither § 1231(a) nor § 1226(c) governs the prolonged detention of aliens awaiting judicial review of their removal orders, we conclude that Casas' detention was authorized during this period under the Attorney General's general, discretionary detention authority under § 1226(a)."  Id.

21

The Government argues that <u>Casas</u> is inapposite, because it did not apply to motion to reopen proceedings; instead it addressed what statute governs an alien's detention during and following any remand from a petition for review proceeding in the court of appeals. Pet. Br. at 21. This difference is immaterial.

In <u>Casas</u>, the court rejected the Government's contention that even if the alien was not subject to § 1226(c) while his petition for review was pending, he became subject to such custody again after his petition was granted and the case was remanded to the BIA. The court reasoned that "[a]n alien whose case is being adjudicated before the agency for a second time - after having fought his case in this court and won, a process which often takes more than a year - has not received expeditious process." <u>Id.</u> at 948. The same principle applies here. Petitioners are adjudicating their cases for a second time, by way of a motion to reopen. For those who have prevailed on their motions, the merits proceeding will likely not conclude for several months or possibly years. <u>See</u> Pet. Br., Table A (noting that a decision on the merits of a motion to reopen can take anywhere from two months to nearly three years if an alien takes his case to the court of appeals). This is well beyond the "relatively brief" period of five months, which the Supreme Court found was acceptable and supported mandatory detention in <u>Demore</u>. <u>See</u> <u>Demore</u>, 538 U.S. at 529. On this basis alone, Petitioners have shown that mandatory detention under § 1226(c) should not be deemed applicable, and that persons purportedly held under that provision should be deemed held under § 1226(a).

However, Petitioners also argue that § 1226(c) is inapplicable because it does not apply to individuals who were living in the community prior to detention. Title 8 U.S.C. § 1226(c) states that "[t]he Attorney General shall take into custody any alien who [has committed enumerated offenses] <u>when the alien is released</u>." (emphasis added). Petitioners argue that this

language means an alien is only subject to § 1226(c) mandatory detention if he is released directly from criminal custody into the custody of the Attorney General.

Petitioners contend the subsection is inapplicable to those who were released years ago and had been living in their communities, citing rulings by the Ninth and First Circuits, as well as courts in the district.  See Preap v. Johnson, 831 F.3d 1193, 1197 (9th Cir. 2016) (holding that § 1226(c) "unambiguously imposes mandatory detention without bond only on those aliens taken by the AG 'when [they are]' released from criminal custody"); Castaneda v. Souza, 810 F.3d 15, 43 (1st Cir. 2015) (Three judges of equally divided en banc court ruled "the detention mandate requires that aliens who have committed certain offenses be taken into immigration custody in a timely manner following their release from criminal custody . . . These petitioners were released from criminal custody years before they were first placed in immigration custody.  For that reason, they clearly do not fall within 'this detention mandate.'"); Khodr v. Adducci, 697 F. Supp. 2d 774, 778–779 (E.D. Mich. 2010) ("If Congress wished to permit the Attorney General to take custody of criminal aliens at any time after being released from criminal confinement, it could have done so using the phrase 'at any time after the alien is released.'  But, by using the word 'when,' Congress demonstrated its intent that such aliens be taken into custody contemporaneous with their release or not at all (at least under section 1226(c)).").

In response, the Government notes cases by the Third and Fourth Circuits, as well as the BIA, holding that immediate detention upon release from criminal custody is not necessary to detain an alien under § 1226(c).  See Sylvain v. Att'y Gen. of U.S., 714 F.3d 150, 157 (3d Cir. 2013); Hosh v. Lucero, 680 F.3d 375, 384 (4th Cir. 2012); In Re Rojas, 23 I. & N. Dec. 117, 124 (BIA 2001.  However, the Government argues that addressing this circuit split is not necessary, because Petitioners, by reopening their immigration cases, have placed themselves within §

1226(c) by operation of law.  The Government notes that the mandatory detention subclass was originally detained pursuant to § 1231(a)(6), when their final orders were still live.  When their motions to reopen were granted, the Government argues, they automatically reverted to the pre-order detention subsection for those with a criminal history, i.e., § 1226(c).  It argues that this case does not implicate the concern courts have that § 1226(c) is being used to detain an alien for a reason other than the crime underlying his eligibility for mandatory detention and removal.

The case law is in conflict on this issue, but one point proves decisive — the plain language of the statute.  The terms of § 1226(c) plainly state that mandatory detention is only authorized for those who are taken into custody by DHS "when . . . released" from their criminal sentence.  This was not done here.  Petitioners were taken into custody years after their release from criminal sentences. See Khodr, 697 F. Supp. 2d at 778–779 ("[B]y using the word 'when,' Congress demonstrated its intent that such aliens be taken into custody contemporaneous with their release or not at all (at least under section 1226(c)).").

Because § 1226(c) does not apply to those who have their motions to reopen granted, or who were living in the community for years prior to their immigration detention, those purportedly  being held under § 1226(c) are deemed to be held pursuant to § 1226(a). This conclusion is consistent with the principle recognized in several decisions that the length of the detention — not the stage of the proceeding — drives the constitutional concern. See, e.g., Diouf, 634 F.3d at 1087 ("Regardless of the stage of the proceedings, the same important interest is at stake — freedom from prolonged detention.").

### d. Reasonable Time Limitation

Having determined that those subject to prolonged detention under § 1231(a)(6) and § 1226(a) may be entitled to bond hearings, the Court must determine whether Petitioners have made a sufficient showing that they have been held for an unreasonably prolonged period.

Courts have taken different approaches regarding the reasonableness of detention.  In the context of § 1226(c), the Sixth Circuit rejected the six-month bright-line limitation set forth in Zadvydas, instead holding that "courts must examine the facts of each case, to determine whether there has been unreasonable delay in concluding removal proceedings." Ly, 351 F.3d at 271. The court considered several factors, including the actual removability of a criminal alien, his length in detention as compared to the length of his criminal sentence, and whether the alien has engaged in dilatory tactics.  Id. at 271-272.  The First, Third, and Eleventh Circuits follow this case-by-case approach.  See Sopo v. U.S. Attorney Gen., 825 F.3d 1199, 1217–1218 (11th Cir. 2016); Reid v. Donelan, 819 F.3d 486, 502 (1st Cir. 2016); Diop v. ICE/Homeland Sec., 656 F.3d 221, 233 (3d Cir. 2011).

In contrast, the Second and Ninth Circuits have adopted the six-month, bright-line rule set forth in Zadvydas.  In Lora v. Shanahan, 804 F.3d 601, 615 (2d Cir. 2015), the Second Circuit stated that "Zadvydas and Demore, taken together, suggest that the preferred approach for avoiding due process concerns in this area is to establish a presumptively reasonable six-month period of detention."  The court noted that the case-by-case approach results in "random outcomes resulting from individual habeas litigation in which some detainees are represented by counsel and some are not, and some habeas petitions are adjudicated in months and others are not adjudicated for years."   Id.   The court ultimately held that "in order to avoid the constitutional concerns raised by indefinite detention, an immigrant detained pursuant to section

1226(c) must be afforded a bail hearing before an immigration judge within six months of his or her detention." Id. at 616.

This is consistent with the Ninth Circuit's ruling in Rodriguez v. Robbins, 715 F.3d 1127, 1133 (9th Cir. 2013), cert. granted sub. nom. Jennings v. Rodriguez, 136 S. Ct. 2489 (2016), which construed "the government's statutory mandatory detention authority under Section 1226(c) and Section 1225(b) as limited to a six-month period, subject to a finding of flight risk or dangerousness." This followed its previous ruling in Diouf that § 1231(a)(6) required a bond hearing after the six-month mark. See Diouf, 634 F.3d at 1091–1092. Further, the court in Rodriguez held that "[t]o the extent Diop and Ly reject a categorical time limit, their reasoning in that respect is inapplicable here . . . because this petition is a class action (and thus relief will perforce apply to all detainees)." Rodriguez, 715 F.3d at 1139.

This Court follows the Ly multi-factor approach, adapted for use in this class action context. The starting point is the six-month benchmark, whose pedigree can be traced to Zadvydas, and which was followed in Lora, Diouf, and Rodriguez. The Court follows Zadvydas in concluding that any presumption of reasonableness ends after six months. As the Supreme Court noted, there is "reason to believe that Congress . . . doubted the constitutionality of detention for more than six months." Zadvydas, 533 U.S. at 701. Further, as noted in Lora, a six-month benchmark will help protect against inconsistent outcomes that could otherwise result.[10]

_____

[10] The Government points out that certain cases granting relief from unreasonable detention have involved detentions in excess of six months. See, e.g., Sopo v. U.S. Attorney Gen., 825 F.3d 1199, 1220 (11th Cir. 2016) (over three years of detention); Reid v. Donelan, 819 F.3d 486, 501 (1st Cir. 2016) (fourteen months ); Chavez-Alvarez v. Warden York Cty. Prison, 783 F.3d 469, 478 (3d Cir. 2015) (twelve months); Ly, 351 F.3d at 271 (eighteen months). However, nothing in those cases suggests that those periods were viewed as minimum periods for establishing

This Court recognizes that in a small percentage of cases, detainees may engage in bad faith tactics that prolong what would otherwise be a relatively brief period of detention. To address this concern, the Government may present evidence that specific individuals have themselves significantly contributed to the unreasonable length of detention because of bad faith or frivolous tactics that delayed adjudication of their case. The Government may also present evidence of other factors as to a particular detainee that it claims should be considered as a basis for denial of a bond hearing as to a particular detainee.[11] If such evidence is presented as to a particular detainee, this Court will rule on whether the detainee will receive a bond hearing. Any bond hearing shall be conducted before an immigration judge at which the judge shall release the detainee under an appropriate order of supervision unless the Government establishes by clear and convincing evidence that the detainee is a flight or public safety risk. Rodriguez, 715 F.3d at 1131.[12]

---

unreasonable detention. To the contrary, the six-month period referenced in Zadvydas was acknowledged as a benchmark. See, e.g., Ly, 351 F.3d at 267.

[11] Beyond dilatory tactics, courts have considered the following factors when determining whether continued detention is reasonable: the alien's actual removability, whether the length of time in immigration detention has exceeded the alien's criminal sentence, and whether the immigration detention facility is "meaningfully different from a penal institution for criminal detention." Sopo, 825 F.3d at 1218; see also Reid, 819 F.3d at 502; Ly, 351 F.3d at 271-272. These factors do not appear to be appropriate in our case. Actual removability is contingent on the Zadvydas claim, for which there is insufficient evidence to make a ruling. As for comparing the criminal sentence to the period in immigration custody, such a comparison has little meaning when the sentence was served years before, even assuming that the comparison makes sense in some other context. And comparing detention facilities to prisons leads to the conclusion that both are very challenging environments, as the record amassed here of the hardship detention imposes on the economic, mental and medical health of detainees. See discussion infra. What purpose would be served by exploring the particular similarities and dissimilarities of the two environments is somewhat of a mystery. Nonetheless, the Government is free to present specific evidence as to a particular detainee if it concludes that consideration of such evidence should bear on whether a detainee is entitled to a bond hearing.

[12] Although the Government notes that detainees receive post-order custody reviews ("POCRs") by ICE, see 8 C.F.R. §§ 241.4, 241.13, the Government does not, and cannot, contend that they

The Government argues that granting habeas relief in the form of ordering bond hearings is somehow inconsistent with Ly. Gov. Resp. at 17. While upholding habeas relief for an alien asserting a Zadvydas claim, the Ly court noted that "we do not require the United States to hold bond hearings for every criminal alien detained under [§ 1226(c)]" because "in the majority of cases, where an order of removal is promptly entered and removal is effected within the time allotted under Zadvydas, bond hearings are not required." Ly, 351 F.3d at 270. The court's meaning is not clear. It may have meant that there generally is no need for a bond hearing, given that removal usually takes place promptly. It may have meant that no bond hearing was required in that particular case, because the petitioner had already been released from immigration custody. But what is clear is that Ly did not purport to issue a blanket rule that bond hearings may never be appropriate, especially when used as part of habeas relief, as is being done here, and in particular, as part of class-wide relief. Thus, this Court is not acting contrary to Ly.

In sum, Petitioners have demonstrated a probability of success both as to their statutory and constitutional arguments regarding their prolonged detention claim and their § 1226(c) claim. Relief is accorded to all asserting such claims, as defined below in the class action

---

are an adequate replacement for a bond hearing. The Supreme Court has suggested that "the Constitution may well preclude granting an administrative body the unreviewable authority to make determinations implicating fundamental rights." Zadvydas, 533 U.S. at 692. Further, the court in Casas held that a POCR "falls far short of the procedural protections afforded in ordinary bond hearings, where aliens may contest the necessity of their detention before an immigration judge and have an opportunity to appeal that determination to the BIA." Casas, 535 F.3d at 951–952. Moreover, there is strong evidence that the reviews in our case were not undertaken in a good faith effort to detain only those who were flight and safety risks. Virtually every detainee who had a POCR review was denied release, and given a terse written statement that the Government was still interested in removing the detainee; there is no indication that any legitimate bond issue was even considered. Pet. Mot. at 7. Those who have been released appear to have been released for medical reasons, or having won a bond hearing, not as a result of a POCR. See Schlanger Decl. ¶ 30.

discussion, provided they have been detained at least six months. Consideration of the <u>Zadvydas</u> claim is deferred pending further discovery.

### 2. Irreparable Harm; Balance of the Equities; Public Interest

Petitioners have unquestionably met their burden regarding irreparable harm. Detention has inflicted grave harm on numerous detainees for which there is no remedy at law. Some have lost businesses and jobs. <u>See</u> Ali Al-Dilaimi Decl., Ex. 6 to Pet. Mot., ¶ 26 (Dkt. 138-7) ("After June 11, 2017, my oil change business, which my wife used to help manage, had to close down."); Atheer Ali Decl., Ex. 9 to Pet. Mot., ¶ 23 (Dkt. 138-10) ("Recently, I was forced to close my auto shop business and now face a real possibility of losing it forever because I cannot continue running it while I am detained, and cannot afford to have someone else replace all of my duties."). Dreams of a college education for the children of detainees are now in doubt. <u>See</u> Usama Hamama Decl., Ex. 5 to Pet. Mot., ¶ 25 (Dkt. 138-6) ("Our son is scheduled to attend college next year but as of now, we cannot afford to even pay the minimum deposit for his tuition."). The medical needs of some detainees have gone unmet. <u>See</u> Adel Shaba Decl., Ex. 4 to Pet. Mot., ¶¶ 24-25 (Dkt. 138-5) ("The medical care I receive in detention is inadequate as they do not provide some of the medications that my doctor prescribed me."); Habil Nissan Decl., Ex. 15 to Pet. Mot., ¶ 15 (Dkt. 138-16) ("[I]t took two months for me to receive medical treatment after my transfer to Chippewa County, Michigan."). Other harms have also been documented. Qassim Hashem Al-Saedy Decl., Ex. 8 to Pet. Mot., ¶ 21 (Dkt. 138-9) (describing assault while in custody).

The balance of equities tips decidedly in favor of preliminary relief. Without some relief from detention, detainees will undoubtedly continue to experience these or similar harms. On

the other hand, the Government does not substantiate any claim that it will suffer any harm if enjoined.

Finally, the public interest requires preliminary relief. Our Nation has a long history of resisting unreasonable governmental restraints. In the present circumstances, allowing bond hearings for those who have been subjected to prolonged detention is in keeping with the core value of liberty our Constitution was designed to protect.

In balancing all of the factors, the Court concludes that Petitioners are entitled to preliminary relief.

**B. Motion to Dismiss**

The Government's motion to dismiss argues that the detention counts in Petitioners' amended complaint — counts four, five, and six — should be dismissed because they fail to state a claim. There is no jurisdictional challenge to the detention claims. The Court has already ruled that not only do Petitioners state a plausible claim for relief, but that they are likely to succeed on the merits. As a result, the Government's motion to dismiss is denied as to Petitioners' detention claims.

**C. Motion to Certify Class**

Petitioners also seek to certify their putative primary class, which they originally defined in their motion to certify class as "All Iraqi nationals in the United States who had final orders of removal on March 1, 2017, and who have been, or will be, detained for removal by U.S. Immigration and Customs Enforcement (ICE)." Petitioners have since filed a supplemental brief (Dkt. 176) in which they seek to amend the primary class definition to "All Iraqi nationals in the United States who had final orders of removal at any point between March 1, 2017 and June 24, 2017 and who have been, or will be, detained for removal by U.S. Immigration and Customs

Enforcement."  This was done so that those who did not have final orders of removal as of March 1, 2017 are protected by the stay of removal.

Petitioners also seek to certify three subclasses.  The first, referred to as the "<u>Zadvydas</u> subclass," is defined as "All Primary Class Members, who are currently or will be detained in ICE custody, and who do not have an open individual habeas petition seeking release from detention."  Petitioners seek to certify this subclass as to count four.  Count four alleges that the detainees are entitled to release because there is no significant likelihood that they will be removed in the reasonably foreseeable future.

Next, Petitioners seek certification for the "detained final order subclass," which they define as "All Primary Class Members with final orders of removal, who are currently or will be detained in ICE custody, and who do not have an open individual habeas petition seeking release from detention."  Certification is sought for this subclass as to count five, which alleges that due process requires that those held for a prolonged period receive an individualized hearing before an impartial adjudicator to determine whether they are a flight risk or danger to the community.

Finally, Petitioners request that the Court certify the "mandatory detention subclass," defined as "All Primary Class Members whose motions to reopen have been or will be granted, who are currently or will be detained in ICE custody under the authority of the mandatory detention statute, 8 U.S.C. § 1226(c), and who do not have an open individual habeas petition seeking release from detention."  Petitioners seek to certify this class as to counts five and six. Count six alleges that those who have had their motions to reopen granted or who had been living in their community prior to their immigration detention are being improperly held under § 1226(c).

To obtain class certification, Petitioners must first show the following four requirements:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig., 722 F.3d 838, 850 (6th Cir. 2013) (quoting Fed. R. Civ. P. 23(a)).

The Court determines that certification is appropriate for the three detention subclasses and defers a ruling on whether the primary class should be certified. Deferral is prudent because Petitioners only seek certification of the primary class as to the removal counts, claims that are not at issue in this Opinion. Moreover, those claims are the subject of an appeal pending in the Sixth Circuit. At this point, it does not appear that there is a need to rule on certification of the primary class until that court has ruled.

**1. Numerosity**

The Government does not contest that Petitioners have met the numerosity requirement for the Zadvydas subclass or the detained final order subclass. However, it argues that the requirement is not met for the mandatory detention subclass. Gov. Resp. at 23. It notes the assertion in the declaration of Petitioners' counsel that that there are fifty-nine detained putative class members who have had their motions to reopen granted, and that "it appears that the vast majority are being detained without bond under 8 U.S.C. § 1226(c)." Schlanger Decl. ¶ 31. The Government contends that this assertion is "directly contradicted" by Petitioners' motion, which notes that some primary class members "are not in either subclass because they are detained under a third statutory provision." The Government also argues that Petitioners are ignoring another group of individuals – those who are being held pursuant to 8 U.S.C. § 1225(b) as a result of being immediately detained at the border.

The Court does not see how Petitioners' counsel's assertion that a "vast majority" of the fifty-nine detainees who have had their motions to reopen granted are being held pursuant to § 1226(c) is contradicted by the acknowledgment that a small number (possibly six or seven) are being held pursuant to § 1226(a) or § 1225(b).  See Schlanger Decl. II ¶ 7.  Petitioners' calculation appears accurate, and sufficient to establish numerosity.  See Daffin v. Ford Motor Co., 458 F.3d 549, 552 (6th Cir. 2006) ("[W]hile there is no strict numerical test, 'substantial' numbers usually satisfy the numerosity requirement."); see also Turnage v. Norfolk S. Corp., 307 F. App'x 918, 921 (6th Cir. 2009) (broad geographic proximity weighs in favor of numerosity); Davidson v. Henkel Corp., 302 F.R.D. 427, 436 (E.D. Mich. 2014) ("[I]t generally is accepted that a class of 40 or more members is sufficient to satisfy the numerosity requirement.").  The Government provides no evidence to the contrary.

### 2. Commonality

The Court must next consider whether there are questions of law or fact common to the subclasses.  "To demonstrate commonality, plaintiffs must show that class members have suffered the same injury."  In re Whirlpool Corp., 722 F.3d at 852.  The plaintiffs' claims "must depend upon a common contention . . . of such a nature that it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each of the claims in one stroke."  Id.  Commonality depends on "the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers."  Wal-Mart, 564 U.S. at 350.  "Commonality under Rule 23(a)(2) is met where, notwithstanding some factual differences, the class action claims are based on a common course of conduct of misrepresentations, omissions, or other wrongdoing affecting all class

members in the same manner." Yadlosky v. Grant Thorton, L.L.P., 197 F.R.D. 292, 298 (E.D. Mich. 2000) (quotation marks omitted).

### a. Count Four: Zadvydas Claim

The Zadvydas subclass has multiple common questions of law and fact. As discussed at length above, Petitioners' Zadvydas claim rests on the factual issue of whether Iraq is actually willing to accept repatriation of all putative class members. Petitioners assert that Iraq will not, stating that certain putative class members have been denied travel documents. See Andrade Decl., Ex. 21 to Pet. Mot., ¶ 13 (Dkt. 138-22). The Government argues otherwise, stating that, after ongoing negotiations, Iraq has agreed to accept the putative class members. There are also common legal issues, such as whether Petitioners can demonstrate that there is no significant likelihood of removal in the reasonably foreseeable future where they are subject to prolonged immigration proceedings, and if so, whether their detention is unlawful and they must be released.

In its response, the Government lists several reasons why it believes the class should not be certified as to this claim, including that (i) the putative class includes a large number of aliens who have not been detained for the requisite time or at all; (ii) it includes those not detained under § 1231; (iii) it includes a number of aliens who will not file motions to reopen or will have the motions adjudicated quickly because they are in expedited proceedings; and (iv) Zadvydas requires an individualized inquiry into each alien's nationality and travel documents. Gov. Resp. at 13. None of these defeats commonality. As discussed above, whether Iraq will actually accept the detainees will likely be dispositive of the Zadvydas claim, regardless of the length of time each class member has been in custody or how quickly their motions to reopen will be adjudicated. The Government's argument that there is not commonality because the Zadvydas

framework only applies to § 1231 detainees ignores that courts have extended <u>Zadvydas</u> to § 1225(b), § 1226(a), and § 1226(c) detainees.  <u>See</u> <u>Casas</u>, 535 F.3d at 949 (extending to § 1226(a)); <u>Nadarajah v. Gonzales</u>, 443 F.3d 1069, 1076–1077 (9th Cir. 2006) (extending to § 1225(b)); <u>Ly</u>, 351 F.3d at 267 (extending to § 1226(c)).  Further, the Government's argument that <u>Zadvydas</u> requires an individualized inquiry into each travel document is belied by the Bernacke declaration, which states that Iraq has agreed to accept charter flights of the class members without travel documents, provided the injunction is lifted.  <u>See</u> Bernacke Decl. ¶ 6.  In sum, Petitioners have demonstrated commonality with regard to the <u>Zadvydas</u> subclass.

### b. Counts Five and Six: Prolonged Detention and § 1226(c) Claims

There are also common questions of law as it relates to both the detained final order subclass and the mandatory detention subclass.  With respect to the detained final order subclass, the Court must consider whether, as stated in <u>Diouf</u>, due process requires that those with final orders of removal are entitled to a bond hearing after being in detention for a prolonged period. The mandatory detention subclass presents multiple common questions of law.  As it relates to count six, the Court has to determine whether § 1226(c) even applies to those who are being detained while they litigate motions to reopen, and to those who had previously been living in their communities long after their criminal sentences ended.  The resolution of that issue bears on the next legal question, i.e., whether, as alleged in count five, the mandatory detention subclass is entitled to a bond hearing after being subject to prolonged detention.

The Government argues that there is no commonality because prolonged detention claims involve a highly individualized inquiry.  Gov. Resp. at 15.  The Ninth Circuit's ruling in <u>Rodriguez v. Hayes</u>, 591 F.3d 1105 (9th Cir. 2010), is directly on point and rejects the Government's position.  In <u>Hayes</u>, the petitioner sought certification of a class of aliens in the

Central District of California who had been or would be detained under any of the general immigration statutes for more than six months and had not been afforded a hearing to determine whether prolonged detention was justified. The Government argued that the propriety of each putative class member's detention "turns on divergent questions of statutory interpretation and consideration of different factual circumstances." Id. at 1122. The court held that this did not defeat commonality, stating that Rule 23(a)(1) does not require that members of a putative class "share every fact in common or completely identical legal issues." Id. The rule requires that courts "look only for some shared legal issue or a common core of facts." Id. The court concluded that there was a common legal issue of whether the Constitution allowed an individual to be detained for longer than six months where not authorized explicitly by statute. Id. at 1123. That same question is posed here, both for the detained final order subclass and the mandatory detention subclass.

As a result, the Court finds commonality as to the detained final order subclass and the mandatory detention subclass.

### 3. Typicality

To demonstrate typicality, Petitioners must demonstrate that "the class members' claims are fairly encompassed by the named plaintiffs' claims." In re Whirlpool, 722 F.3d at 852 (quotation marks omitted). The typicality requires ensures that "the representatives' interests are aligned with the interests of the represented class members so that, by pursuing their own interests, the class representatives also advocate the interests of the class members." Id. at 852-853. "[C]ommonality and typicality tend to merge in practice because both of them serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so

interrelated that the interests of the class members will be fairly and adequately protected in their absence." Id. at 853 (quotation marks omitted).

The claims of the named Petitioners are typical of the claims of members of the Zadvydas subclass, the detained final order subclass, and the mandatory detention subclass. With regard to the Zadvydas subclass, all but two of the named Petitioners are still being held in detention. They all allege that, pursuant to Zadvydas, they are entitled to be released because there is no significant likelihood of their removal in the reasonably foreseeable future. They are typical of all of the current or future detainees in the Zadvydas subclass who allege that their detention is unconstitutional because they are not likely to be released in the foreseeable future.

The named Petitioners are also typical of the prolonged detention subclasses. Nine of the named Petitioners — Usama Hamama, Ali Al-Dilaimi, Qassim Al-Saedy, Abbas Al-Sokaini, Moayad Barah, Jami Derywosh, Jony Jarjiss, Mukhlis Murad, and Adel Shaba — are typical of the detained final order subclass in light of their continued detention pursuant to § 1231(a)(6). Like the subclass, these named Petitioners contend that § 1231 mandates an individualized hearing before an impartial adjudicator on the issues of danger and flight risk. Further, two of the named Petitioners, Atheer Ali and Anwar Hamad, are being held in mandatory detention pursuant to § 1226(c).[13] Their claims encompass those of the mandatory detention subclass.

---

[13] A third named Petitioner, Kamiran Taymour, was previously held pursuant to § 1226(c); his removal proceedings were subsequently cancelled. See Taymour Order, Ex. A. to Gov. Resp. (Dkt. 159-2). The Government argues that this makes him an inadequate representative for the mandatory detention subclass. If, in fact, the Government is no longer proceeding at all against Taymour, he may no longer be in the class, but the Government has not clearly stated that. The Government also argues that Ali and Hamad are not typical or adequate representatives because they have had, or will have, merits hearings. It argues that because these Petitioners may succeed at their hearings, they will not be deported, and thus can no longer represent the putative subclass members. The Government's speculation regarding the potential success of these hearings is not sufficient to demonstrate their inadequacy as class representatives. Further, even if these individuals eventually are deemed inadequate because of their litigation success, others

Like the subclass, they argue that § 1226(c) does not apply to those in detention while litigating a motion to reopen, nor to those who were previously living in their communities after being released from criminal custody years prior. They also argue that they are entitled to release unless an impartial adjudicator determines that they are a flight risk or danger to the community. The named Petitioners are typical of the three detention subclasses.

### 4. Adequacy

The Court must next consider whether the named Petitioners' representation will fairly and adequately protect the interests of the class. The Sixth Circuit employs the following two-prong test to determine adequacy: (i) the class representatives must have common interests with the putative class members; and (ii) the representatives will "vigorously prosecute the interests of the class through qualified counsel." Vassalle v. Midland Funding LLC, 708 F.3d 747, 757 (6th Cir. 2013).

As discussed above, the concerns of the named representatives are common to each putative subclass. See In re Whirlpool, 722 F.3d at 853 ("[C]ommonality and typicality tend to merge with the requirement of adequate representation, although the latter factor also brings into play any concerns about the competency of class counsel and any conflicts of interest that may exist."). Further, class counsel have established throughout the course of this case that they are more than willing to zealously prosecute this case on behalf of all putative class members. The named Petitioners, through class counsel, are adequate representatives.

### 5. Rule 23(b)(2)

---

can be added as subclass representatives. The Government has offered no authority that potentially changing circumstances that may exclude a member from remaining a class representative must mean that the class action vehicle may not be used.

Finally, the Court must determine whether certification pursuant to Rule 23(b)(2) is proper.  The rule states that a class may be maintained if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).  "The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted — the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them."  Wal-Mart, 564 U.S. at 360 (quotation marks omitted).

The Government argues that a Rule 23(b)(2) class is inappropriate in light of the class members' "highly fact-intensive claims."  Gov. Resp. at vi.  This objection was addressed and rejected in Hayes.[14]  The court held that "[t]he rule does not require us to examine the viability or bases of class members' claims for declaratory and injunctive relief, but only to look at whether class members seek uniform relief from a practice applicable to all of them."  Hayes, 591 F.3d at 1125; see also Parsons v. Ryan, 754 F.3d 657, 688 (9th Cir. 2014) ("While each of the certified [Arizona Department of Corrections'] policies and practices may not affect every member of the proposed class and subclass in exactly the same way, they constitute shared grounds for all inmates in the proposed class and subclass.").

Petitioners are seeking uniform relief from a practice applicable to all three subclasses, i.e., the Government's uniform decision to detain each putative class member without granting release due to a lack of likelihood of removal, or without granting an individualized hearing on the issues of danger or flight risk.  The preliminary relief is also of a class-wide nature because

---

[14] The Government argues that Hayes is not good law because it was decided prior to Wal-Mart, which held that courts may consider the merits when deciding whether certification is appropriate.  As Petitioners note, the Government has not explained how consideration of the merits would have altered the court's decision on certification.

all affected detainees are being given the same habeas relief: the right to a bond hearing unless the Government can present some specific evidence why a particular detainee should not be entitled to that right. As the <u>Hayes</u> court noted, "[t]he fact that some class members may have suffered no injury or different injuries from the challenged practice does not prevent the class from meeting the requirements of Rule 23(b)(2)." <u>Id.</u>

Petitioners have met the requirements for certification under Rule 23(b)(2).

**6. Appointment of Class Counsel**

The Government also argues that class certification is inappropriate because class counsel cannot be appointed at this time. Rule 23(g)(1) states that "[u]nless a statute provides otherwise, a court that certifies a class must appoint class counsel." Courts must consider the counsel's identification or investigation of potential claims, counsel's relevant experience, knowledge of relevant law, and the resources counsel will commit to representation. Fed. R. Civ. P. 23(g)(1)(A).

The Government argues appointment is not appropriate at this time because counsel have not submitted affidavits in support of their motion, instead submitting their internet biographies. Gov. Resp. at 25. However, there is no requirement that an affidavit be submitted attesting to the biographies. The Court can accept the biographies as true, based on the attorneys' statements in the briefing to that effect.

Further, an examination of these biographies, in conjunction with the Court's awareness of the attorneys' past filings in this case, as well as their organizations' past work, all demonstrate that Petitioners' counsel satisfy the requirements of Rule 23(g)(1)(A). The attorneys have demonstrated that they have thoroughly investigated and researched each claim,

and are willing to devote considerable time and effort to their representation. Their biographies show that they have more than enough relevant experience.

The Government also argues that Petitioners have not justified the need for six organizations consisting of hundreds of attorneys and argues that there may be a conflict between class counsel and their colleagues who may have failed to timely file motions in past immigration proceedings. Id.

With regard to the number of organizations and attorneys, the Court believes that many laboring oars are required in a nationwide litigation such as this. The putative primary class numbers approximately 1,400, with some 274 detainees in facilities across the country. It is to be expected that a case of this size, moving at an expedited pace, would require a large number of attorneys. Regarding the allegation of potential conflicts of interest, the Government has not identified any particular conflicts between class counsel and past counsel for putative class members. If any such conflicts are presented, the Court will address them at that time.

At this time, the Court designates Margo Schlanger and Kimberly Scott of Miller Canfield as class counsel. To the extent additional attorneys should be appointed as class counsel or whether the participation of other counsel should be approved by the Court are matters that can be addressed at a forthcoming status conference.[15]

### 7. Nationwide Class

Finally, the Government argues that if the Court grants class certification, it should limit certification to those within the Eastern District of Michigan. Id. at 28. The Government

---

[15] Further, the Government argues that the Court should establish a framework regarding billing and should decline to issue a class notice at this time because Petitioners have not submitted a proposed order, and because notice is unnecessary for a Rule 23(b)(2) class. These issues, and others relating to certification, will be addressed at a forthcoming status conference with the parties.

contends that certifying a nationwide class would violate principles of inter-circuit comity and strip other courts of jurisdiction over claims pending before them. It argues that the Court should allow the other courts of appeals to decide the difficult questions posed by this case.

The Government's concerns that certification will strip other courts of jurisdiction over pending claims and harm inter-circuit comity is addressed by the Petitioners' amended subclass definitions. The definitions specifically exclude from the subclasses those who have filed individual habeas petitions. This Court's rulings will have no bearing on those petitions; to the extent those other courts disagree, the courts of appeals and the Supreme Court will receive the benefit of differing perspectives. See United States v. Mendoza, 464 U.S. 154, 160 (1984) ("Allowing only one final adjudication would deprive this Court of the benefit it receives from permitting several courts of appeals to explore a difficult question before this Court grants certiorari.").

As a result, nationwide certification of the three detention subclasses is appropriate.[16]

### IV. CONCLUSION

For the reasons set forth above, the Court awards the following relief.

1. Petitioners' motion for class certification (Dkt. 139) is granted in part.

    a. The Court certifies a subclass for the Zadvydas claim pleaded in count four. The subclass consists of "All Primary Class Members, who are currently or will be detained in ICE custody, and who do not have an open individual habeas petition seeking release from detention." The definition of the primary class to be used for purposes of defining the subclasses is "All Iraqi nationals in the United States

---

[16] The Government also argues that limiting the class to those in this District is appropriate because they share a common religion, and thus have more similar removal claims than a nationwide group of "all Iraqis." Because the Court is not addressing the removal claims at this time, it need not consider this argument.

who had final orders of removal at any point between March 1, 2017 and June 24, 2017, and who have been, or will be, detained for removal by ICE."  The primary class itself is not being certified at this time.

b.  The Court certifies a detained final order subclass for those pleading a prolonged detention claim pleaded in count five.  The subclass consists of "All Primary Class Members with final orders of removal, who are currently or will be detained in ICE custody, and who do not have an open individual habeas petition seeking release from detention."

c.  The Court certifies a mandatory detention subclass for those pleading a prolonged detention claim pleaded in count five and for those pleading a § 1226(c) claim pleaded in count six.  The subclass consists of "All Primary Class Members whose motions to reopen have been or will be granted, who are currently or will be detained in ICE custody under the authority of the mandatory detention statute, 8 U.S.C. § 1226(c), and who do not have an open individual habeas petition seeking release from detention."

d.  Attorneys Margo Schlanger and Kimberly Scott of Miller Canfield are appointed as class counsel.

e.  Any other relief requested in the motion for class certification is deferred.  Any issues pertaining to class action may be raised at the forthcoming conference or through future proceedings.

2.  Petitioners' motion for preliminary injunction (Dkt. 138) is granted in part.

a.  The Government shall be required to release, no later than February 2, 2018, any detained member of the detained final order subclass and any member of the

mandatory detention subclass who has been detained, as of January 2, 2018, for six months or more, unless a bond hearing for any such detainee is conducted on or before February 2, 2018 before an immigration judge; provided that neither release of a particular detainee nor a bond hearing for that detainee shall be required if the Government files with this Court a memorandum, by February 2, 2018, objecting to a bond hearing for any specific detainee and supplies evidence supporting the objection.  If such an objection is filed, the release of the detainee and the conducting of a bond hearing shall be deferred pending further order of the Court.

b.  Any subclass member whose detention first exceeds six months after January 2, 2018, shall be released  no more than 30 days after the six-month period of detention is completed, unless a bond hearing for any such detainee is conducted during that 30-day period before an immigration judge; provided that neither release of such detainee nor a bond hearing for such detainee shall be required if the Government files with this Court a memorandum, before the end of that 30-day period, objecting to a bond hearing for such detainee and supplies evidence supporting the objection. If such an objection is filed, the release of the detainee and the conducting of a bond hearing shall be deferred pending further order of the Court.

c.  At the bond hearing, the immigration judge shall release the detainee under an order of supervision unless the immigration judge finds, by clear and convincing evidence, that the detainee is either a flight risk or a public safety risk.

    d.   The parties may engage in discovery directed to the <u>Zadvydas</u> claim. Discovery shall encompass depositions of appropriate government personnel with knowledge of the Iraq repatriation agreement or program, and production of documents pertaining to that subject.  Counsel will confer regarding additional specific requests, and later depositions, by January 5, 2018.  Disagreements regarding the discovery, including scope and applicable privileges, will be addressed by the Court at the forthcoming conference.  The parties' respective positions on any disputes, including legal authorities, shall be set out in the Joint Statement of Issues referenced below.

    e.   Relief requested regarding A-Files and ROPs will be addressed in a separate order.

3.   The Government's motion to dismiss (Dkt. 135), as it pertains to counts four through six, is denied.  Consideration of the balance of the motion is deferred pending resolution of the appeal of this Court's earlier preliminary injunction before the United States Court of Appeals for the Sixth Circuit and/or pending other legal developments.

4.   The Court will convene an in-person conference to address any issue raised by this Opinion and Order on January 11, 2018 at 9:30 a.m.  By noon on January 9, 2018, the parties shall file a Joint Statement of Issues, setting forth their agreement and disagreement on any matter that they wish to raise at the conference.

    SO ORDERED.

Dated:  January 2, 2018                s/Mark A. Goldsmith
Detroit, Michigan                  MARK A. GOLDSMITH
                             United States District Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on January 2, 2018.

s/Karri Sandusky
Case Manager