# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

**USAMA JAMIL HAMAMA**, et al.,

      Petitioners and Plaintiffs,

v.

**REBECCA ADDUCCI**, et al.,

      Respondents and Defendants.

Case No. 2:17-cv-11910
Hon. Mark A. Goldsmith
Mag. David R. Grand

Class Action

## JOINT STATEMENT OF ISSUES

# TABLE OF CONTENTS

I.  PARTIES' OPENING STATEMENTS  ....................................................1

II. GENERAL DISPUTES REQUIRING COURT INTERVENTION ...........2

   A. No MTR filed within 90 days ...................................................2

   B. "Volunteers" for prompt removal ............................................7

   C. Wisam Ibrahim ......................................................................8

   D. Undisclosed Possible Class Members ....................................11

   E. A-File and ROP Transmittals ................................................16

   F. BIA Stay Disclosure ..............................................................19

III. DISCOVERY ...........................................................................20

   A. Amendments to Protective Order .........................................21

      1. Disclosure of Highly Confidential Information ...........................21

      2. Disclosure of Confidential Information to Class Members ...........22

      3. Documents Subject to FOIA Disclosure and Amending
         Process for Resolving Confidentiality Challenges .................24

      4. Filings Under Seal  .......................................................30

   B. Timing of Respondents' Document Production .........................30

   C. Respondents' Written Responses to the Requests for Production..........40

   D. Respondents' Redaction of Non-Responsive Information.....................41

   E. DHS's Failure to Make a Reasonable Inquiry to Respond to
      Interrogatories............................................................43

   F. Failure to Answer the Interrogatory as Written or to Answer Fully
      and Completely.........................................................47

   G. Respondents' Court Ordered Disclosures about their ESI Searches.......70

## I.    PARTIES' OPENING STATEMENTS

### Petitioners' Position

Petitioners' proposed Order Regarding Further Proceedings is attached as Exhibit 1, reflecting Petitioners' positions as set forth below in Sections II and III.

Petitioners oppose a stay of discovery and will brief the issue on the schedule the Court has set. Over 100 class members remain detained, and discovery to date lends credence to their *Zadvydas* claim—which was not part of either Sixth Circuit appeal. Moreover, Respondents have conceded that this Court has jurisdiction over that claim. There is, of course, no way to know how or when the Sixth Circuit will rule.  And even if the Sixth Circuit eventually decides some parts of the appeal adversely to Petitioners, the same discovery will be needed. There is no justification for staying discovery that will have to occur anyway.

### Respondents' Position

On May 11, 2018, the government filed a motion to stay discovery pending resolution of the two appeals pending before the United States Court of Appeals for the Sixth Circuit, 17-2171, and 18-1233. *See* ECF 284. As set forth more fully in that motion, the government submits that a stay is warranted given the impact that the Sixth Circuit's decision may have on the current discovery, the fact that a decision is likely to come soon, and the tremendous amount of judicial and party resources necessary to complete discovery.

II.    **GENERAL DISPUTES REQUIRING COURT INTERVENTION**

    A. **No MTR filed within 90 days**

**Petitioners' Position**

    The Government has provided Petitioners with a list of class members who have not yet filed Motions to Reopen (MTRs), or have had their MTRs denied and failed to file timely appeals. The Government now seeks an order lifting the Preliminary Injunction, ECF 87, as to these individuals.   An earlier list Respondents provided to Petitioners included over 30 class members; on looking into the relevant circumstances, Petitioners found that for many of them, the stay was not, in fact, terminable because they had actually filed MTRs.

    Respondents' current list includes 17 individuals:

    a)  For three, Petitioners have already stipulated to lift the stay of removal, and this Court has entered such an order (HS, XXX-XXX-975; MAR, XXX-XXX-314; SAZ, XXX-XXX-044).

    b)  For two, Petitioners agree to stipulate (JAE, XXX-XXX-483; HAJM, XXX-XXX-320).  For one more (AAS, XXX-XXX-907), Petitioners may be able to stipulate, as well, and have been seeking Respondents' assistance with facilitating a phone call with him to ascertain the circumstances; after failing to respond for several weeks, Respondents now advise Petitioners to attempt this call without government assistance. That effort is underway.

    c)  For three (who are out of detention), Petitioners several weeks ago requested contact information, to allow Petitioners to contact them and check on the situation. (Like many on the earlier list, perhaps they have in fact filed MTRs.)  Respondents have not provided the requested information (MZY, XXX-XXX-247; BS, XXX-XXX-438; NNA, XXX-XXX-838).

    d)  For two, Petitioners have reason to believe that mental disability may be rendering the individual's waivers of their right to file an MTR not knowing and voluntary, and have been attempting without success to work with

Respondents to develop a process for addressing this issue. (AK, XXX-XXX-012; HAHJ, XXX-XXX-327)

e)  For the remaining six, Petitioners have reason to believe that some have good cause for failing to file. (AMM, XXX-XXX-310; WKS, XXX-XXX-840; AKM, XXX-XXX-853; HAB, XXX-XXX-714; KAA, XXX-XXX-677; ARAA, XXX-XXX-031).  This may be true, as well, for one or more of the three individuals in category (c), above.

Petitioners respectfully suggest that the Court should allow extensions to the 90-day timeframe previously ordered, for good cause, where appropriate for any specific individual. Class members' immigration counsel have informed class counsel about a variety of circumstances that could or did prevent timely filing. For example, in one case Petitioners' counsel were informed that an attorney was in a car accident shortly before the MTR was due and in another the individual needed a document from Iraq in order to file, but the document had not yet arrived. In some cases, the immigration counsel still managed to file timely MTRs, but in others they did not. In one of the cases in group (e) above, the immigration attorney did not inform the class member that his MTR was denied; the class member therefore did not file a timely appeal, but has now secured new immigration counsel and is seeking relief based on ineffective assistance of counsel.

Petitioners' counsel do not know the reasons why an MTR or appeal was not filed in each of the cases above, but believe that in some there may have been good cause for late filing.  Contra Respondents' assertions, this Court has not previously

3

set out a process for termination of the stay of removal in situations in which Petitioners do not stipulate. So that in any such cases the class member can assert good cause and the Court can assess whether it exists, Petitioners propose the following process to address lifting the stay of removal for individuals in categories (c) to (e) (and potentially one individual in (b) if, after speaking with the class members, Petitioners cannot stipulate to lifting the stay:

a) For any non-detained individuals who do not have a lawyer with an EOIR appearance, order Respondents to provide Petitioners' counsel with contact information for the individual, including the most recent address and phone number known to Respondents.

b) Once contact information is provided, Petitioners' counsel will contact each of the individuals (via counsel if applicable), and ask if he or she would like to provide the Court a declaration that explains any good cause for delay that exists. Petitioners will then attach any declarations to a filing so that the Court can consider any explanations for late filing offered by these individuals or their immigration counsel. The use of declarations will facilitate getting the relevant circumstances before the Court without requiring counsel who are not members of the Court's bar to formally appear. Petitioners propose that this filing be due two weeks after Respondents provide the contact information.

c) In addition, with respect to individuals named by Petitioners who: (1) do

4

not have immigration counsel, and (2) have exhibited indicia of mental illness or developmental/intellectual disability, Petitioners request that the Court order Respondents to provide a mental health/disability evaluation or assessment to Petitioners and this Court, for further consideration of next steps. Such evaluations are routinely done in detention settings in order to provide appropriate care during detention, and existing evaluations may be sufficient at this stage for the parties and Court to determine appropriate next steps.

## Respondents' Position

Respondents object to Petitioners' proposals, *see* paragraphs a-c above. The Court's July 24, 2017 order granting Petitioners' motion for preliminary injunction holds, relevant here, that the preliminary injunction "[s]hall be terminated as to a particular class member upon entry by the Court of a stipulated order to that effect in connection with any of the following events: a class member's failure to file a motion to reopen with the appropriate immigration court, or, if appropriate, the BIA not later than ninety days following Respondents' transmittal to the class member of the A-file and ROP pertaining to that class member." ECF 87 at 33. The Court's order is clear: that the failure to file of a motion to reopen within 90 days of receiving the A-File and ROP shall terminate the preliminary injunction as to the individual class member. *Id.*

Here, Respondents have provided Petitioners with a list of 17 individual

class members who have received their A-files and ROPs and have not filed a motion to reopen within 90 days of receiving those files. Petitioners now seek to add additional processes into the procedure set forth by the Court—namely, a process for the individual class member who has missed the 90-day deadline for filing the motion to reopen to have a chance to come before this Court and demonstrate good cause for why the motion to reopen was not timely filed.

This is not the process established by the Court's order, and moreover, nothing prevents that class member from filing a motion to reopen and an administrative stay of removal outside the time period set by the Court—the government is simply no longer enjoined from enforcing the final order of removal against that individual. On March 15, 2018, Respondents provided Petitioners' counsel with a list of individuals who have received their A-files and ROPs and failed to file a motion to reopen within 90-days of receipt of those files and asked class counsel to join in a stipulation to the Court. Respondents' list inadvertently included individuals who had filed their motions to reopen on the last day of the 90–day period. Respondents culled their list and sent an updated version to Petitioners' counsel that included 17 individuals.

After the initial meet-and-confer on May 11, 2018, Petitioners agreed to stipulate that two of the class members had not timely filed their motions to reopen and that the injunction should be lifted as to those individuals. However, for six of

these individuals, Petitioners have not requested any follow up or noted any concerns about the individual, and yet have not agreed to join a stipulation to the Court. Indeed, Petitioners now propose a new process that individuals get a chance to demonstrate good cause for missing the deadline, Respondents object to Petitioners' proposal outlined above. Respondent's request that the court terminate the injunction for individuals who did not file a motion to reopen within 90 days.

### B. "Volunteers" for prompt removal

**Petitioners' Position**

Currently Respondents identified one individual they believe wishes to be promptly removed.  In Petitioners' view the Court's previously approved process for such individuals continues to be appropriate and there is no need for any court intervention at this time.  Details follow:

- AAS, AXXX-XXX-907.  Petitioners believe they were first notified of this formal request on May 4.  Petitioners requested Respondents' assistance with a phone call, which request was denied on May 14. Petitioners are now attempting to reach the individual without assistance. If Petitioners are able to reach this detainee and if this detainee is, in fact, seeking prompt removal, given that he has apparently not filed an MTR, Petitioners will stipulate to the lifting of the stay for him under the MTR-not-filed process, as described in Part I.A, above.

**Respondents' Position**

As an initial matter, it is unclear why Petitioners need Respondents to facilitate contact and phones calls with individuals in detention.  Respondents have previously informed class counsel that the visiting hours for each detention facility

7

are available online and each facility has a process for requesting phone calls. In addition, Respondents have also asked class counsel that if they are having problems contacting a specific individual to please provide Respondents with specific information about the issue, *i.e.*, dates, times, names of people (if known), and the nature of the problems encountered.

- AAS, AXXX-XXX-907: It is unclear why Petitioners need Respondents need to facilitate a phone call between class counsel and the detained individual. As explained, class counsel can request to make a legal consult telephone call with the detention facility. According to class counsel, this individual has informed his sister he wants to be removed. In addition, the individual has not filed a motion to reopen in the time period allotted by the Court's PI order. AAS's A-FILE was produced on 11.21.2017, and the ROP was produced on 11.27.2017. It is Respondents' position that the preliminary injunction should be lifted as to this individual.

### C. Wisam Ibrahim

**Petitioners' Position**

There has been substantial movement in Mr. Ibrahim's situation. On May 9, the Macomb County Probate Court entered a limited guardianship order, appointing Saeeb Mansy, Mr. Ibrahim's father, as his guardian for "immigration proceedings and legal matters only." Mr. Mansy has provided a declaration that explains that Mr. Ibrahim (via his guardian) no longer consents to any waiver of the stay of removal in this case. Petitioners therefore request that the Court strike the prior stipulated order (ECF 151) and reimpose the stay of removal as to Mr. Ibrahim, on that basis. Petitioners also request that Mr. Ibrahim should receive an

immediate bond hearing and that his A-File and ROP be shared with his counsel as soon as possible—Petitioners propose a deadline of May 29—so that he can file an appropriate motion to reopen, which should be due three months after such delivery. Respondents on May 15, 2018, have informed Petitioners that they believe Mr. Ibrahim's A-File and ROP were served upon him on November 22, 2017, and November 27, 2017, respectively. In December 2017, pursuant to Court order, Respondents produced to Petitioners a list of A-Files transmitted prior to that date; Mr. Ibrahim's name was not on that list—a fact brought to Respondents' attention by an email to counsel the very next day. Many briefs have now been filed with respect to Mr. Ibrahim's situation, and Petitioners have consistently requested transmittal of this file, to enable an MTR to be filed. It is awfully late in the day for Respondents to—after the asserted deadline has passed—claim that the file was transmitted months ago. (In addition, Mr. Ibrahim apparently threw away his ROP when he believed he was on his way to Iraq, so it is not available for use by his counsel.) More generally, Respondents are unwilling to respond to the request to produce Mr. Ibrahim's A-Files and ROP in this JSI, and instead wish Petitioners to file a motion. In order to move this along as speedily as possible, Petitioners filed such a motion today, with a request for expedited briefing, so that it can be included in the May 25 status conference. The parties have agreed that Respondents' response shall be due May 24 at noon.

9

Petitioners also note that it has been many weeks since the hearing on this matter, which concerned whether his purported waiver of the stay of removal was not knowing and voluntary. The Court at that hearing indicated its desire for the matter to be resolved promptly, and denied the opportunity for a bond hearing on that basis. However, because the Respondents have been unable to finalize their contract with an additional expert or schedule any additional examination, there have been weeks of delay. Given that Mr. Ibrahim's guardian is now withdrawing his waiver, there is no need for an additional expert or for this Court to determine Mr. Ibrahim's competency to agree to his removal. However, the government's long delays, even apart from the developments described in the first paragraph, above, justify (a) that Mr. Ibrahim's A-File and ROP be provided to his immigration counsel as soon as possible, and certainly by May 29, 2018, and (b) that he be afforded the opportunity for an immediate bond hearing.

## Respondents' Position

The process for retaining a third-party medical professional is laborious and requires multiple layers of review, within both the Office of Immigration Litigation division and the Department of Justice, Contracts and Procurement Branch. The process also requires more work than simply formalizing a contract. Internal memorandums and justifications must be prepared and require additional time for internal review. Respondents unfortunately had issues finding and securing a third-

party medical professional in March and April. ECF 267 at 2. However, Respondents are now in the process of finalizing the contract for a forensic psychologist. The internal processes at the Office of Immigration Litigation are complete. Once the documents are signed-off by the Contracts and Procurement Branch, Respondents will send the forensic psychologist to examine Mr. Ibrahim.

Petitioners informed Respondents on Friday, May 11, that a probate court had appointed Mr. Ibrahim's father as his limited guardian, for purposes of dealing with "immigration proceedings and legal matters only." Class counsel informed Respondents that Mr. Ibrahim's appointed guardian planned to withdraw Mr. Ibrahim's waiver of the stay of removal. Because a joint stipulation of dismissal was filed with this court, it is Respondents' position that Petitioners must file a motion with the Court, where Respondents have an opportunity to respond. Mr. Ibrahim was served with his A-file on November 22, 2017, and he was served with his Record of Proceeding on November 27, 2017. Respondents' position is that the 90-day time period for Mr. Ibrahim filing a motion to reopen has passed.

### D. Undisclosed Possible Class Members

**Petitioners' Position**

On March 13, this Court's Order Regarding Further Proceedings (the "Order"), ECF 254, included two provisions requiring notice to Petitioners of detainees at risk for removal to Iraq, as to whom it seems Respondents have taken

11

the position that such individuals are not covered by the Court's disclosure and stay of removal orders. The Court ordered:

> 5. In addition, Respondents shall report to Petitioners by March 23, 2018 the results of a diligent search for other detainees who are currently protected from removal under the Convention Against Torture, but whom ICE is actively seeking to remove to Iraq. ECF 254, Pg.ID# 6225.

> 16. By March 28, 2018, Respondents shall identify to Petitioners, by name and A-number, each individual—detained or not detained—who had a final order of removal at any point between March 1, 2017 and June 24, 2017, whom ICE is seeking to remove to Iraq (including individuals who are not Iraqi nationals) but whose identity has not already been disclosed to Petitioners. ECF 254, PgID#6228.

It seems to be Respondents' position that such individuals are not covered by this Court's stay of removal. With respect to this Court's order to provide information about these individuals, Respondents have stated, as to ¶ 5, that they have performed the required diligent search, but have not identified any such individual—but, as Petitioners understand it, may identify such an individual in the future. With respect to ¶ 16, Respondents have stated that they cannot search for individuals who did not have final orders on June 24, 2017, but may have had final orders on a date between March 1, 2017 and June 24, 2017. In addition, they have stated that they have no capability to run a search for aliens who are not Iraqi nationals who may have been ordered removed to Iraq in the alternative, but that ICE would become aware of an individual who is not an Iraqi national whom ICE

12

is seeking to remove to Iraq through taking the alien into custody and determining to pursue removal to Iraq.

In the absence of information about them, Petitioners are unable to investigate and develop a position about whether such individuals are or are not covered by the stay of removal, and have therefore requested Respondents to ensure that *no* individual who had a final removal order at any point between March 1 and June 24, 2017 is removed to Iraq without informing Petitioners' counsel, with adequate time to seek court intervention if appropriate. Respondents have not agreed, committing only to disclosing the names in the existing biweekly disclosure, when and if ICE becomes aware of an individual—that is, not necessarily in time for Petitioners to seek court intervention if need be.

Petitioners are not asking Respondents to conduct further searches to identify such individuals, but only for a process to ensure that such individuals – once identified – are not removed to Iraq before Petitioners can determine if they are covered by the stay. It is clear that removals to Iraq involve significant planning on the part of the agency, and therefore Respondents should be aware—or can easily become aware—of any such removals. Petitioners have requested that Respondents not merely provide them biweekly notice that such an individual has come to their attention, but that they either (a) agree, in writing, that all such individuals are covered by the existing stay of removal unless otherwise ordered by

13

the court, or (b) agree to not remove any such individual to Iraq until (1) notice has been provided and (2) Petitioners have had time to investigate whether the individual is a class member covered by the stay of removal and bring any disputes to this Court. Respondents have not agreed to either approach.

Petitioners therefore request a court order that bars removals to Iraq by any individual who had a final removal order on a date between March 1, 2017 and June 24, 2017, but as to whom Respondents take the position that the stay of removal is by its terms, inapplicable, unless Petitioners' counsel have been informed of the intended removal at least two weeks before such removal is scheduled to take place, and are provided the non-citizen's name, Alien number, counsel information, basis for removal, and description of the individual's connection to Iraq. Petitioners' counsel can then investigate whether the individual is or is not a class member covered by the stay of removal, and the parties can bring any disputes about class membership to the Court.

**Respondents' Position**

Pursuant to the Court's March 13, 2018 Order, Respondents conducted a manual search for any individual, by name and A-number, detained or not detained, of *any* nationality, who had a final order of removal at any point between March 1, 2017 and June 24, 2017, whom ICE is seeking to remove to Iraq but whose identity has not already been disclosed to Petitioners. Respondents were

14

likewise ordered to report to Petitioners by March 23, 2018 the results of a diligent search for other detainees who are currently protected from removal under the Convention Against Torture, but whom ICE is actively seeking to remove to Iraq. ECF 254 at 4. Respondents also conducted this manual search. If any the searches resulted in identifying new class members, those new class members were reported, as ordered, as part of the bi-weekly report.

Respondents have repeatedly informed Petitioners that they do not have the ability to electronically search for this information, nor is the information sought kept in a manner that is easily searchable. Respondents' system is designed to provide "snapshots" of data at any given time, and is not refreshed on a real-time basis. *See* ECF 96.

Thus, Respondents have explained that ICE will not know about the individual who falls into this category until the individual comes to the attention of ICE. This would usually occur when the individual comes into ICE custody and/or is brought into detention. Should this occur, ICE will disclose the individual to Petitioners on the bi-weekly report. Respondent ICE has been disclosing individuals as they have become aware of them.

Respondents object to Petitioners' request. Respondents do not agree to expand the definitions of individuals covered by the July 24, 2017 injunction.

Respondents do not agree to a stay of removal for individuals not subject to the stay of removal injunction.

### E. **A-File and ROP Transmittals**

**Petitioners' Position**

Under the Court's March 13 order, Respondents are to produce newly detained class members' A-Files and ROPs to the class member or his or her counsel within five weeks of the class member's detention by ICE, or provide notice and the reason for any delay for each class member to Petitioners' counsel on a biweekly basis. ECF 254, Pg.ID# 6223. (Previously, the Court had required production within three weeks, but that timing was relaxed at Respondents' request. ECF 254, Pg.ID# 6223.) Respondents nevertheless failed to provide most of this information until May 2, 2018, and even then have provided only partial information. Currently, many of the files are significantly late, as shown in the chart below.

| Class member | File due date | Issue, as of 5/14/2018 |
|---|---|---|
| JSJ, A-XXX-XXX-024 | 3/13/2018 | No information on ROP delivery to class member |
| AS, A-XXX-XXX-621 | 3/19/2018 | No ROP delivery to ACLU |
| SOK, A-XXX-XXX-489 | 4/2/2018 | ROP: "Being duplicated" |
| GT, A-XXX-XXX-285 | 4/8/2018 | A-File: Issue with getting A-File; ROP: "Being duplicated" |
| BAS, A-XXX-XXX-865 | 4/9/2018 | ROP: "Being duplicated" |
| FAK, A-XXX-XXX-711 | 4/9/2018 | A-File: "Relativity issues"; ROP: "In Process" |
| MM, A-XXX-XXX-207 | 4/11/2018 | A-File: "Relativity issues"; ROP: "In Process" |

| Class member | File due date | Issue, as of 5/14/2018 |
|---|---|---|
| AYD, A-XXX-XXX-388 | 4/11/2018 | ROP: "In Process" |
| AMAR, A-XXX-XXX-701 | 4/12/2018 | A-File: "Relativity issues"; ROP: "In Process" |
| HAJ, A-XXX-XXX-031 | 4/13/2018 | A-File: "Relativity issues"; ROP: "In Process" |
| RSM, A-XXX-XXX-199 | 4/17/2018 | A-File: no information ROP: "In Process" |
| JI, A-XXX-XXX-247 | 4/17/2018 | A-File: no information ROP: "In Process" |
| SNS, A-XXX-XXX-132 | 4/19/2018 | A-File: no information ROP: "In Process" |
| DO, A-XXX-XXX-561 | 5/1/2018 | A-File: no information ROP: "In Process" |

ICE has stated that the reason for nearly all its delay is that ICE's document platform, Relativity, has been performing poorly. But over three weeks ago, on April 20, 2018, Respondents filed a declaration in this Court that their prior "significant difficulties . . . with Relativity . . . have been largely resolved as of April 19, 2018, and the Relativity platform presently is available for document review." *See* Declaration of Scott Whitted, ECF 272-1, Pg.ID# 6601. Moreover, ICE's computer troubles should not have delayed EOIR's ROP disclosure. Yet, notwithstanding the court order requiring them to provide the reason for delays, EOIR has offered no other explanation.

Most recently, ICE stated that it expected to produce to class members at least some of the affected files by May 4, 2018—about a month late. Apparently this occurred for only three of the nine currently-late A-Files. EOIR has offered no

prediction of when it will produce the required files. The delays are seriously prejudicing the affected class members, who are unable to move forward with their immigration court filings until they receive the files.

Petitioners ask that both ICE and EOIR be required to produce all the currently overdue files by May 29. Given Respondents' history of failing to produce the files even weeks after their due date, the Court should consider whether, if Respondents continue to delay, a presumptive sanction per day per file would be appropriate. It is, of course, the Court's decision whether sanctions for Respondents' non-compliance are appropriate. Petitioners believe that, at this stage, a date certain for the already-late files, and a warning from the Court that it will consider such sanctions for other late files, is sufficient.

## Respondents' Position

The Court's order, ECF 254, requires that if Respondents cannot produce the A-Files and/or ROP's in the 5-week time period ordered by the Court, Respondents shall provide notice to Petitioners' counsel of the reason for delay. Respondents informed Petitioners of the problems ICE has experienced with their Relativity platform and the resulting delays in A-file production that resulted from the technological issues. Decl. of Kobie Crawl, ECF 266-1 at 7-10. ICE was unable to upload scanned files during that time. Since the resolution of the problems, ICE has uploaded, reviewed, and redacted A-files and is working to produce the rest.

18

In fact, ICE produced some files in two weeks – serving on May 7 and 8, 2018: AYD, A-XXX-XXX-388; BAS, A-XXX-XXX-865; SOK, A-XXX-XXX-489.

With regard to the Executive Office of Immigration Review (EOIR), the delay in processing the Records of Production was a result of multiple factors, including a change in the way that ICE notifies EOIR when it takes new class-members into custody and competing litigation priorities, including voluminous discovery production in another case, which taxed the small staff of EOIR's Office of the General Counsel and the resources that Respondents use to duplicate ROPs. At this time, all of the ROPs listed above have been ordered and are in the process of being duplicated.

### F. BIA Stay Disclosure

**Petitioners' Position**

On April 23, 2018, this Court ordered that previously entered discretionary stays of bond releases would "expire on May 7, unless by that date the Government files a renewed request for a discretionary stay and notice of that request is given to the detainee; in such event, the discretionary stay previously granted will expire on May 21, 2018, unless the BIA extends the stay by that date, based on a finding that the Government has made a strong showing that it is likely to succeed on the merits."

Petitioners request that the Court order Respondents to disclose the

19

following information about stays:

- Any individuals as to whom the BIA previously granted a stay, for whom that stay has now expired because DHS has not filed a renewed request for a discretionary stay.
- The outcome of any request for discretionary stays.

**<u>Respondents' Position</u>**

On May 8, 2018, Petitioners first contacted Respondents and requested information regarding individuals who the Board of Immigration Appeals had previously granted a stay of removal, but for whom ICE did not seek to extend the stay of removal. During the meet-and-confer process on May 11, Respondents informed Petitioners that they were making inquiries to obtain this information. That process is still ongoing; however, Respondents have not had sufficient time to gather the information requested.

## III. <u>DISCOVERY</u>

On January 2, 2018, the Court granted Petitioners' motion for class certification and a preliminary injunction on Petitioners' detention claims, and permitted the parties to engage in "discovery directed to the *Zadvydas* claims," including "depositions of appropriate government personnel with knowledge of the Iraq repatriation agreement or program, and production of documents pertaining to that subject." ECF 191 Pg.ID# 5362. Petitioners served amended discovery requests on January 14, 2018. The parties filed a Joint Statement of the Issues on February 1, 2018, ECF 217, and February 16, 2018, ECF 235, identifying disputes

20

related to Petitioners' discovery requests.  The Court held a status conference on March 7, 2018 and entered an Order Regarding Further Proceedings, ECF 254, on March 13, 2018 (the "Order") resolving several discovery disputes between the parties.

Copies of Respondents' interrogatory responses are attached as Exhibit 2 and 3.[1] Respondents were permitted to serve written responses to Petitioners' Requests for Production "no later than the last document production." ECF 254, Pg.ID# 6230.  A copy of the Requests for Production is attached as Exhibit 4.

### A. <u>Amendments to Protective Order</u>

### 1.  Disclosure of Highly Confidential Information

<u>Petitioners' Position</u>

The parties have negotiated additional categories of records and information that can be designated as "confidential" under the Protective Order (ECF 91).  *See* Exhibit 5, Proposed Second Amended Protective Order, ¶¶ II, III; Exhibit 6, Redlined Edits to Amended Protective Order (ECF 91), ¶¶ II, III. The parties have also negotiated a "highly confidential – attorneys' eyes only" tier to be used for highly sensitive documents and information, and records the Court determines should not be withheld under an assertion of a qualified privilege, such as the law enforcement privilege. *See id.* ¶ III. The parties have agreed to much of the

---

[1] All exhibits will be hand delivered to the Court.

21

language, and, where there is a disagreement, the parties have inserted their proposed language in Exhibit 5 for the Court's determination.

## 2.  Disclosure of Confidential Information to Class Members

**Petitioners' Position**

The Protective Order allows Petitioners to share confidential information with counsel who represent individual class members, if (and only if) that confidential information relates to their client. *See* ECF 91, Pg.ID# 2384 at § VI.I.[2] Petitioners seek to amend the Protective Order so that Petitioners can share with the class member the same information that can be shared with the class member's counsel, or, for unrepresented class members, that *could* be shared with counsel. *See* Exhibits 5 and 6, § XI.I. This will allow, for instance, Petitioners to share with individual class members that they were listed on the manifests for the June 2017 flights. *See* Exhibit 7. This proposal also serves Rule 1's purpose as it will lessen the number of times Petitioners' counsel seek a ruling to allow them to share information about individual class members with those individuals.

---

[2] Paragraph VI.I states, with Petitioners' proposed edits in bolded bracketed text: "For confidential information relating to proposed members of the class or members of the class if the class is certified, [**the individual class member and**] counsel who represent individual class members (or who will represent individual class members once a formal engagement is executed). [**The individual class member and**] Counsel shall only be provided information relating to the class member who is represented or is to be represented by such counsel."

Respondents' argument that information produced in this case has been for the purposes of this litigation only, not the class members' own immigration cases, lacks any basis.  In fact, the parties have repeatedly discussed and agreed to the sharing of information about the class members' situation with those individual's immigration counsel. This makes sense, because the government's asserted basis for confidentiality has been the privacy interests of the class member. The first time the government hinted at any other approach has been with respect to the manifests here at issue.  Discovery is broader than the Freedom of Information Act, 5 U.S.C. § 552, and use restrictions need more of a justification than simply pointing to an FOIA exemption.[3]

**Respondents' Position**

Respondents do not consent to this proposed amendment to the Protective Order. With the exception of individual A-files or the Record of Proceedings for

---

[3] The scope of discovery available under Rule 26 is much broader than that mandated by FOIA. *Friedman v. Bache Halsey Stuart Shields, Inc.*, 738 F.2d 1336, 1344 (D.C. Cir. 1984) ("If information in government documents is exempt from disclosure to the general public under FOIA, it does not automatically follow the information is privileged within the meaning of rule 26(b)(1) and thus not discoverable in civil litigation. The FOIA acts as a 'floor' when discovery of government documents is sought in the course of civil litigation. Though information available under the FOIA is likely to be available through discovery, information unavailable under the FOIA is not necessarily unavailable through discovery. . . . It is unsound to equate the FOIA exemptions and similar discovery privileges." (internal citation omitted)."; *see also Kamakana v. City & Cty. of Honolulu*, 447 F.3d 1172, 1185 (9th Cir. 2006); *Jones v. FBI*, 41 F.3d 238, 250 (6th Cir. 1994) ( "FOIA's scheme of exemptions does not curtail a plaintiff's right to discovery in related non-FOIA litigation.").

23

use in immigration court, Respondents production of information has been with the understanding that it would be provided to Petitioners' counsel for the purpose of this litigation only. Providing details of the removal process to individual aliens, particularly an alien's status within the removal process, greatly increases both the risk of flight and the risk of non-compliance. Non-compliance includes the incentive to forge documents or to provide false information in an attempt to avoid removal. Additionally, it is Respondents understanding that any information produced in this case as part of discovery into the *Zadvydas* issue is for use in this case only and is not being produced for the purpose of use in individual immigration proceedings. Respondents strongly disagree with Petitioners' example of individual aliens being provided information as to whether they were listed on the manifests for the June 2017 flights. Respondents' position is that this information is not to be provided to an individual alien. Even if the individual alien were to request this information through the FOIA process, this is information that would fall into one of the FOIA exemptions. Petitioners' counsel should not be allowed to circumvent those statutory protections under the veil of discovery.

### 3. Documents Subject to FOIA Disclosure and Amending Process for Resolving Confidentiality Challenges

<u>**Petitioners' Position**</u>

Petitioners seek to amend the Protective Order so that documents and information subject to disclosure under FOIA *cannot* be designated as

24

confidential—if the record or information is subject to public disclosure under FOIA, Respondents should not designate the record or information as "confidential" under the Protective Order. The Protective Order allows parties to designate records and information as confidential if the designating party reasonably believes the records and information are not in the public domain or that is personal information covered by the Privacy Act, 5 U.S.C. § 552a. ECF 91, Protective Order at § II. Respondents have interpreted the Protective Order in a way that allows them to designate records and information as confidential that may be publicly disclosed under FOIA.

Petitioners agreed to a proposal presented by Respondents that would lessen the Respondents' burden in identifying FOIA-able records, and, at the same time, Respondents have rejected Petitioners' proposal that would lessen the burden on Petitioners' when challenging the confidentiality designation of FOIA-able records. Respondents proposed that, for those records that contain mixed information—information that is disclosable to the public under FOIA and information that would be exempt from disclosure—Respondents would designate the records as "confidential." This will reduce the time it will take for Respondents to review and redact the records, allowing for a quicker production to Petitioners. Petitioners do not object to this proposal; however Petitioners would like to reduce their burden on challenging the confidentiality designation for those

25

materials that are subject to public disclosure under FOIA. Respondents opposed Petitioners' proposal.

Petitioners ask that the Court adopt this proposal:  (a) Petitioners would challenge the designation of the record or a portion of the record as set forth in the Protective Order (ECF 91) at ¶ XII.A in which Petitioners identify in writing the specific information or material being challenged and Respondents have 10 days to respond in writing (there would be no change to the current Protective Order); and (b) if Respondents oppose the challenge, Petitioners can ask the Court to hold a status conference to address the dispute following the parties' submission of a joint statement of issues. Petitioners' proposed edits to the Protective Order are shown at § XVIII of Exhibits 5 and 6.

As an example, Respondents designated Exhibit 8 as confidential because the government designated the records as "For Official Use Only" ("FOUO"). Respondents relied on the DHS Management Directive (attached as Exhibit 9) to support their confidentiality designation. That directive, however, says in two different paragraphs that information designated as FOUO is *not exempt* from FOIA disclosure. *See* ¶¶ 6.A.4, 6.C.1(a). The directive states that FOUO material "will be reviewed and processed in the same manner as any other FOIA request." ¶6.C.1(a). Petitioners submitted a written objection to Respondents, as required under § XII of the Protective Order, ECF 91. Respondents' response clarified that

26

the record's FOUO designation meant the document was designated as confidential "in the ordinary course" <u>not</u> "as a result of this litigation." They have not argued that FOIA's regulations prohibit public disclosure of the unredacted text. Petitioners request that the Court strike the confidentiality designation of Exhibit 8 (with redactions).

With respect to Respondents' proposed a process for future JSIs, Petitioners believe that turning JSIs into quasi-motions would undermine the most useful aspect of the JSI process—the meet and confer process that takes place during the drafting of the JSI and after its submission to the Court. In preparing their joint document, the parties have and will continue to resolve many issues without court intervention. This case is complex, and judicial economy is served by a less formal process for resolution of disputes. The JSI process, while it takes time, is much more efficient than motion practice. Many, if not all of the issues, raised in a JSI have been discussed extensively with the parties. For instance, Section I of this JSI involves issues that have been on the parties' Weekly Roundup List for several weeks, and which the parties have discussed for weeks without resolution. Another example is the confidentiality challenge of Exhibit 8, in which Respondents had 10 days to research and provide a written response. Given the time sensitivity of the issues and the fact that new issues regularly emerge by both parties, Respondents'

formalistic approach to JSI preparation would impede the parties' ability to resolve issues quickly and without court intervention.

**Respondents' Position**

Respondents do not consent to this proposal. Respondents object to the inclusion of this language: "information subject to disclosure under FOIA cannot be designated as confidential." Documents subject to disclosure under FOIA are still subject to partial redaction of any information meeting any of the FOIA exemptions. There are nine categories of documents that are exempt from disclosure under FOIA, 5 U.S.C. § 552(b).[4] Just because a document is subject to disclosure under FOIA does not mean that all of the information contained within the document is subject to public disclosure. Petitioners' assertion that "FOIA

---

[4] National defense or foreign policy information properly classified pursuant an Executive Order; 2) Documents "related solely to the internal personnel rules and practices of an agency"; 3) Documents "specifically exempted from disclosure by statute" other than FOIA, but only if the other statute's disclosure prohibition is absolute; 4) Documents which would reveal "[t]rade secrets and commercial or financial information obtained from a person and privileged or confidential" 5 U.S.C. § 552(b)(4); 5) Documents which are "inter-agency or intra-agency memorandum or letters" which would be privileged in civil litigation, 5 U.S.C. § 552(b)(5); 6) Documents which are "personnel and medical and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy"; 7) Documents which are "records or information compiled for law enforcement purposes," but only if one or more of six specified types of harm would result; 8) Documents which are related to specified reports prepared by, on behalf of, or for the use of agencies which regulate financial institutions; and 9) Documents which would reveal oil well data. 5 U.S.C. § 552(b)(1)-(b)(9).

doesn't apply to discovery" does not mean that discoverable information that would be subject to redaction and/or withholding under FOIA necessarily becomes public if ordered produced through discovery. Indeed, this is why Respondents approached Petitioners' counsel regarding amending the protective order—to provide an avenue of limited disclosure to Petitioners' counsel certain information that would not normally be disclosed.

Respondents do not agree with or consent to Petitioners' proposed amendments to the protective order in this case with regard to altering the process for challenging confidential or highly confidential designations. Respondents do not agree to a process outside what the Federal Rules of Civil Procedure and the protective order, ECF 91, provide to resolve these disputes. If, however, the Court were to adopt Petitioners' proposal that a party can raise a confidentiality challenge via a JSI and status conference (rather than solely by motion), Respondents ask that the process be given strict parameters. Petitioners must first raise the issue with Respondents, if the issue cannot be resolved, Petitioners then raise the issue via JSI (with a scheduled status conference). Once Petitioners send the JSI to Respondents for Respondents to add their positions to the document, Petitioners cannot add additional issues to that JSI during the meet-and-confer process. Respondents further request that they be given adequate time for responding to the issues raised in Petitioners' JSI; Respondents should be provided the same time

29

period for responding to the JSI, as they would be provided for responding to a motion under the protective order as it is currently written.

### 4. <u>Filings Under Seal</u>

Petitioners have previously sought leave to file certain documents under seal due to the sensitive nature of the information contained therein, specifically, information related to individual petitioners' health conditions or reasons for fearing return to Iraq (*see* ECF 60; ECF 236). Petitioners have also sought to file under seal information or documents that Respondents have designated as "confidential" subject to the Protective Order (ECF 91), which this Court has granted. (*See* ECF 279.) It is foreseeable that the parties may seek to include these same documents in support of future filings with this Court.  To alleviate the need for repeated motions to file the same documents under seal, the parties request that, as to those documents which the Court has already entered an order allowing such documents to be filed under seal, the parties may thereafter file those documents under seal in support of other pleadings without an additional motion.

### B. <u>Timing of Respondents' Document Production</u>

<u>Petitioners' Position</u>

The Order instructed Respondents to begin production of documents no later than March 30, 2018. ECF 254, Pg.ID #6230 at ¶ 22. On March 30, 2018, Respondents informed the Court that Respondent DHS had identified 50

potentially responsive documents, that DHS intended to start production on March 30, and that DHS anticipated completing production on April 27. ECF 266-1, Pg.ID# 6456. On the same day, ICE submitted a status report to the Court claiming it could not produce records due to technology issues with its Relativity database. *See* ECF 266-2.

On the same day, Respondents produced 3 documents totaling 4 pages—DHS produced a heavily redacted[5] one-page document from DHS showing that ███████████████████████████████████████████[6, 7] and ICE produced 2 documents (consisting of 3 pages) purporting to represent the April and June 2017 flight manifests of Iraqi nationals. No other documents were produced. Two of the three documents are not copies of original documents that existed in

---

[5] Respondents redacted the one page document on the basis that the redacted text is "[b]eyond the scope of discovery (not relevant to claims and defenses). *See* Exhibit 10, Redaction and Privilege Log for DHSHAMAMA000001. Such redactions are improper. *See* Section III.D below.

[6] The DHS memo makes clear that, ████████████████████ ████████████████████████████████████████████████████ █████████████████████████████ " *See id.* DHSHAMAMA000001. ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████ *Id.* To put these statements in context, the Court issued its first TRO on June 22, 2017, at 6:37 p.m. (ECF 32); it was set to expire 14 days later on July 6. On June 23, 2017, Petitioners filed their amended habeas petition and complaint to encompass a national class (filed at 2:45 p.m.) (ECF 35) and a motion to expand the TRO to a national class (filed at 3:12 p.m.) (ECF 36). The Court entered its second TRO on June 26, 2017 (ECF 43). Thus the ████████████████████████ while the first TRO was operative.

[7] An unredacted version of the JSI will be hand delivered to the Court.

31

Respondents' files but, rather, are records created by Respondents' counsel for this litigation that contain self-serving statements in support of Respondents' defenses. The records are a list of individuals' names and Alien numbers, with language at the top of the document which mirrors statements made by Respondents' counsel in this litigation: " ███████████████████████████████

████████████████████████████████████████

████████ (This statement is false. As the DHS document produced concurrently with this one makes clear, Iraq ████████████████ the Court's entry of the TRO. *See* footnote 4.) Respondents' counsel admitted that these were not copies of original documents, without any explanation at the time of their production that they were not. *See* Exhibit 11, email from N. Murley at p. 2. Respondents' counsel further stated on April 10 that Respondents would produce copies of the original manifests—which were used to create the documents—but to date Respondents have not done so. *See id.*

On April 6, 2018, ICE again reported that it "began its production on March 30" (even though it had only produced 2 documents), that it had identified 20,000 potentially responsive records, and that it anticipated it would take 4 months (until July 2018) to complete its production. Respondents' redactions of non-responsive materials from otherwise responsive documents, the redaction of the law enforcement sensitive materials despite Respondents' concession that an

32

amendment to the Protective Order will address most of (if not all) of those concerns, ICE's overbroad search terms (using terms like "Iraqi" and "Baghdad", *see* Exhibit 12, Decl. of John Schlutz, Jr. at ¶¶ 5, 6, 8, 10), and DHS's use of no search terms (*see* Exhibit 13, Decl. of David Palmer) are delaying what should be a fairly straight forward production of specific records:

- the Iraqi Agreement and its terms;
- the flight manifests and Iraq's responses to the flight manifests;
- Respondents' requests for travel documents and repatriation, and Iraq's responses;
- records relied on by Messrs. Schultz and Bernacke in their declarations stating an Iraqi agreement exists (although, as Respondents belatedly disclosed, it is an oral agreement and is purportedly part of ongoing discussions); and
- the records relied on by Respondents in answering the interrogatories that were served on March 30. *See* Exhibit 4.

On April 13, Respondents promised another status report, but missed that deadline without any explanation, and ignored inquiries from Petitioners' counsel as to when a report would be forthcoming.

On April 16, DHS produced 46 pages of non-responsive documents as a single PDF: letters sent in June 2017 from members of Congress, Michigan's House of Representatives, the United States Conference of Catholic Bishops, and the Evangelical Immigration Table to President Trump, DHS and John Kelly questioning DHS' detention and anticipated repatriation of Iraqi Nationals; and copies of the *exact same response* sent by Acting Director Homan on August 16,

33

2017 to each signatory of the letters explaining in general terms ICE's enforcement policies, immigration processes, and the arrests of class members. This PDF contains no information responsive to the Petitioners' document requests, which were limited to very specific documents.

On April 20—7 days after the promised April 13 status report which was never sent—Respondents filed another status report. ECF 272, Pg.ID #6596. ICE revised its estimate of potentially responsive documents downward to 15,000, and estimated that it would take 11 weeks to complete the production. Despite having 2 weeks to review records and despite a 5,000 record reduction in the review set, Respondents' estimated completion time was reduced by only 1 week from its April 6 estimate.

On April 27, DHS informed Petitioners that it had located 4,840 potentially responsive records (despite its previous disclosure that only 50 responsive documents were identified for production), and that it expected to complete its production by June 25, 2018—in other words, for each week over the 8 week period, Respondents will essentially review 500 documents per week. *See* Exhibit 14. DHS estimates it will take the *same amount of time* to review 4,840 records as ICE estimates it will take it to review 15,000 records.

Petitioners' requests for production were served on January 14, 2018—121 days ago. The Court ordered Respondents to begin producing documents on March

34

30. To date, ICE has produced 2 documents (3 pages). DHS has produced 1 responsive document (consisting of 1 page) and 46 non-responsive pages. Respondents' self-imposed production delays are unjustified. In light of Respondents' recent concession to the Sixth Circuit Court of Appeals that this Court has jurisdiction over Petitioners' *Zadvydas* and detention claims, *see* Exhibit 15, p. 4-5, the claims will exist no matter how the Sixth Circuit rules on the preliminary injunctions. Moreover, while Respondents have asked the Sixth Circuit to find that the detention claims cannot be addressed on a class-wide basis, even if the Sixth Circuit were to agree, discovery for the named Petitioners is proper. This issue will be briefed in Petitioners' response to Respondents' Motion to Stay Discovery, ECF 284.

Respondent's delays can be reduced by:

1. Ordering Respondents to produce in 1 week those records that, as of today, they reviewed and identified as responsive, and that Respondents must produce documents every week on a rolling basis, thereby preventing Respondents from withholding production until they have finished reviewing all documents (and make it clear that producing 1, 2 or a handful of documents—and non-responsive documents—each week will be construed as bad faith).

2. Ordering Respondents to require their custodians to identify the following specific records, and to produce those records in 2 weeks (these custodians have already identified records they believe are responsive to the requests, see Exhibit 13, Palmer Decl. at ¶ 9 and Exhibit 12, Decl. Schultz at ¶¶ 4-11, so the burden to those custodians and Respondents' counsel is minimal), and if Respondents do not possess the records, ordering that Respondents file a

35

declaration stating the efforts undertaken to locate the records and that no records exist:

    a. the Iraqi Agreement (Request No. 1);

    b. records containing the terms of the Iraqi Agreement (Request No. 1);

    c. requests from Respondents or other departments of the U.S. government for travel documents and repatriation for class members, and the responses from the Iraqi government (Request Nos. 2 and 3);

    d. the charter flight manifests and the responses from the Iraqi government (Request No. 4);

    e. documents relied on or cited by Respondents in answering the interrogatories, including the sample records used to answer Interrogatory No. 11 (Request No. 5);

    f. documents relied on by Messrs. Schultz and Bernacke in drafting or confirming the accuracy of the statements made in their declarations (Request Nos. 6 and 7); and

    g. documents memorializing agreements relating to the repatriation of Iraqi nationals that have arisen from the "ongoing diplomatic negotiations" referenced in Mr. Bernacke's declaration, including those "discussions" listed in in response to Interrogatory No. 12 (Request No. 8).

3. Ordering Respondents to produce to Petitioners for inspection the 15,000 responsive records that have been identified after removing those records identified by search terms (such as attorney names or the terms "classified") that may be subject to a privilege; such inspection is permitted under Rule 34. *See also Stambler v. Amazon.com, Inc.*, 2011 WL 10538668, at *9 (E.D. Tex. May 23, 2011) (Exhibit 16). The Court should order Respondents to produce to Petitioners the hard drive or thumb drive in 1 week with the Relativity load file specified in Exhibit A to Petitioners' Requests for Production (*see* Exhibit 4). The following terms should govern the inspection:

    a. Respondents may hold back from inspection by Petitioners any classified records, records designated "Sensitive Security Information" as defined in 49 C.F.R. Part 1520, and documents

that are subject to the attorney-client privilege and attorney work product doctrine, which can be easily identified with minimal effort through the use of search terms.

   b. Any privileged records that were inadvertently missed using privilege search terms (such as attorney names) will be clawed back in accordance with the Protective Order (ECF 91) and will not constitute a waiver of the privilege.

   c. During their inspection, Petitioners will treat the records as "highly confidential" under the amended protective order.

4. Within 3 weeks of receipt of the records for inspection, Petitioners will identify records to be produced. Respondents will then have 2 weeks to review the records designated by the Petitioners for privilege and produce the records and privilege log.

5. Ordering that Respondents are prohibited from redacting non-responsive material from otherwise responsive records. *See* Section III.D below.

6. Adopting the parties' proposed amended protective order which reduces the burden on Respondents for time-consuming redactions for FOIA exempt records and records designated by Respondents as being law enforcement sensitive, since Respondents have conceded that an amendment to the Protective Order will address many, if not all, of Respondents' concerns. *See* Exhibit 11, email from N. Murley at p. 2.

7. Ordering Respondents to complete their productions by June 29, 2018.

**<u>Respondents' Position</u>**

Petitioners' proposed revised timeline for completing the rolling production is simply not possible for Respondents to complete. And because Respondents need time to review all documents for both responsiveness and privilege, Petitioners' practically simultaneous request that information from Relativity be placed on a thumb drive, in 1 week, is improper.

As ordered, Respondents have provided Petitioners and the Court with the timelines anticipated to complete discovery. For example, ICE has identified over 15,000 potentially responsive documents. Decl. of Scott A. Whitted, ECF 272-1 at 4 ¶ 7. As explained, the document review process takes time, and Respondents will need to determine whether each document is responsive to Petitioners' requests for production. *Id.* at 5 ¶ 8. Additionally, time will be needed for Respondents to decide whether any document, or portion of any document, should be redacted based on a privilege, as well as placed into a privilege log. *Id.* With ten reviewers working eight hours a week, the review of 15,000 documents would take approximately 600 hours, not including time to train the reviewers or the time needed to complete a second-level review. *Id.* at 6 ¶ 12. In other words, ICE estimates that is will take eleven (11) weeks (or until early July 2018) to complete the document production. *Id*.

In addition, DHS has revised its timeline for being able to finalize production of responsive documents. As DHS has explained, DHS has been collecting and reviewing documents provided by custodians for production for the past several weeks. Several custodians did manual searches and DHS is in the process of reviewing for responsiveness to the discovery requests and privilege. In addition, DHS IT personnel conducted searches for 3 custodians who were not able for various reasons to conduct their own searches. In emails alone, that resulted in

4,840 individual emails (many of which contained multiple attachments) that required manual review.  Many were duplicates, but there is no technological ability to de-duplicate.  And, because the searches were done by IT, they were necessarily over-inclusive in terms of the relatively narrow discovery requests, so manual review was needed for responsiveness, in addition, of course, to review for privilege.  Those searches were not available for review until approximately April 17, 2018.

In addition to the email searches conducted by IT personnel, IT personnel also conducted searches of those same individuals' computer and/or network drives.  Some technological challenges have occurred and those documents are not currently accessible for review.  In addition, DHS has had to coordinate with U.S. government entities not parties to this litigation in order to determine whether they will assert privileges over certain documents and information.  The coordination is ongoing and not complete and those documents cannot be produced until that coordination has concluded. DHS's provided Petitioners counsel the revised date to complete production of currently known DHS documents by June 25, 2018.

Thus, Petitioners' proposed revised timeline for completing the rolling production is simply not possible for Respondents to complete.  And because Respondents need time to review all documents for both responsiveness and

privilege, Petitioners' request that information from Relativity be placed on a thumb drive, in 1 week, is improper.

### C. **Respondents' Written Responses to the Requests for Production**

**Petitioners' Position**

The Order allows Respondents to serve their written responses to the Petitioners' Requests for Production no later than the last document production. ECF 254, Pg.ID #6230 at ¶ 22. Given that Respondents will not complete their production until June or July and that, under Rule 34(b)(2), a responding party must serve written responses within 30 days of service of the requests for production, Petitioners ask the Court to order production of Respondents' written responses to the RFPs by May 29. Respondents have had sufficient time—over 121 days—to sufficiently investigate the scope of records responsive to the requests.

**Respondents' Position**

It is not feasible for Respondents to serve written responses to Petitioners' Requests for Production before the end of the document production. Any responses before Respondents have been able to complete its document review could not be certified as complete and would likely be incomplete and require supplemental responses. It would be a waste of government resources to require the government to serve written responses before they have completed the document review process.

40

### D. **Respondents' Redaction of Non-Responsive Information**

**Petitioners' Position**

Respondents have redacted non-responsive material from Exhibit 8 (filed under seal). Such redactions are improper. *Melchior v. Hilite Int'l, Inc.*, 2013 WL 2238754, at *3 (E.D. Mich. May 21, 2013) (holding that nonparty to document production subpoena "cannot unilaterally redact portions of documents based on relevancy grounds") (Exhibit 17).[8] The Proposed Second Amended Protective Order (Exhibit 5) sufficiently addresses any concerns Respondents may have to

---

[8] *See also Toyo Tire & Rubber Co. v. CIA Wheel Grp.*, 2016 WL 6246384, at *2 (C.D. Cal. Feb. 23, 2016) (ordering production of unredacted versions of documents and noting that "'a party should not take it upon him, her or itself to decide unilaterally what context is necessary for the non-redacted part disclosed, and what might be useless to the case. It should not come as a shock to those involved in litigation, that parties may see the outcome differently'") (internal quotation marks and citation omitted) (Exhibit 18); *Bonnell v. Carnival Corp.*, 2014 WL 10979823, at *4 (S.D. Fla. Jan. 31, 2014) (noting the "overarching purpose" of the Federal Rules in favor of "permitting broad discovery" and cautioning against "provid[ing] litigants with the carte blanche right to willy-nilly redact information from otherwise responsive documents in the absence of privilege, merely because the producing party concludes on its own that some words, phrases, or paragraphs are somehow not relevant") (Exhibit 19); *Burris v. Versa Prod., Inc.*, 2013 WL 608742, at *3 (D. Minn. Feb. 19, 2013) (disallowing redactions as finding "no explicit support" in the Federal Rules, counterproductive to "liberal discovery policies" of the federal judicial system, and "breed[ing] suspicion" among parties) (internal quotation marks omitted) (Exhibit 20); *Bartholomew v. Avalon Capital Grp., Inc.*, 278 F.R.D. 441, 451 (D. Minn. 2011) ("Redaction is an inappropriate tool for excluding alleged irrelevant information from documents that are otherwise responsive to a discovery request. It is a rare document that contains only relevant information. . . . [T]he Federal Rules of Civil Procedure do not grant parties the power to unilaterally redact information on the basis of relevance.").

41

producing non-responsive materials that may be sensitive or otherwise confidential. Petitioners request that the Court order Respondents to produce an unredacted version of Exhibit 8, and issue an order prohibiting redactions of non-responsive material from records to be produced by Respondents.

**Respondents' Position**

Respondents recognize that in the ordinary course of document production, the normal process does not provide for excluding alleged irrelevant information from documents that are otherwise responsive to a discovery request. However, Respondents note that the document in question is marked FOUO (For Official Use Only)—the document was designated FOUO in the ordinary course and not as a result of this litigation. According to the Department of Homeland Security's Management Directive FOUO information is defined as:

For Official Use Only (FOUO): The term used within DHS to identify unclassified information of a sensitive nature, not otherwise categorized by statute or regulation, the unauthorized disclosure of which could adversely impact a person's privacy or welfare, the conduct of Federal programs, or other programs or operations essential to the national interest. Information impacting the National Security of the United States and classified Confidential, Secret, or Top Secret under Executive Order 12958, "Classified National Security Information," as amended, or its predecessor or successor orders, is not to be considered FOUO.

FOUO is not to be considered classified information.

The Management Directive is available on the DHS website: Https://www.dhs.gov/sites/default/files/publications/mgmt_directive_110421_safe guarding_sensitive_but_unclassified_information.pdf

By its very definition, a DHS FOUO designation means the document is not in the public domain and the portions of the document not responsive to the discovery requests should not be disclosed here. This document contains very sensitive information regarding security and engagements with foreign countries.

Respondents request that the Court conduct an *in camera* review of the redacted portions of the document for responsiveness.

E. **DHS's Failure to Make a Reasonable Inquiry to Respond to Interrogatories**

**Petitioners' Position**

"[I]nterrogatories serve not only as a discovery device but as a means of producing admissible evidence; there is no better example of an admission of a party opponent, which is admissible because it is not hearsay, than an answer to an interrogatory." *Melius v. Nat'l Indian Gaming Comm'n*, 2000 WL 1174994, at *1 (D.D.C. July 21, 2000) (citations omitted) (Exhibit 21). DHS has gone to great lengths to avoid making any admissions about the Iraqi Agreement (or the lack thereof) or its ability to repatriate Iraqi nationals. Even after this Court instructed Respondents to respond to the interrogatories as written, ECF 254, Pg.ID# 6236, ¶

43

32, DHS responded with answers that are evasive and not responsive. DHS claims it "lacks information sufficient to respond" to Interrogatory Nos. 1, 2, 3, 4, 5, 9 and 10. For Interrogatory Nos. 6, 7, 8 and 11, DHS prefaced its answers with "upon information and belief." Absent from DHS' verification (and ICE's) is a statement that its disclosure is complete and correct *after conducting a reasonable inquiry*.

Each of DHS's responses, combined with the conspicuous absence of any assurance of a reasonable inquiry, violate Rule 33(b)'s requirement that a party answer the interrogatory with the information available to it. *See Washington v. City of Detroit*, 2007 WL 603379, at *2 (E.D. Mich. Feb. 22, 2007) (attorney was required to verify and sign any objections after a reasonable investigation) (Exhibit 22); *Braham v. Perelmuter*, 2016 WL 1305118, at *2-3 (D. Conn. April 1, 2016) ("If a party is unable to reply because it lacks knowledge or information, the party may not simply refuse to answer. Rather, the party must respond in a way that lets the requesting party know the information is unavailable. . . . Simply stating that a party does not know the answer to legitimate questions is unacceptable; a party has a duty to inquire or find the answer.") (Exhibit 23); *Sun River Energy, Inc. v. Nelson*, 800 F.3d 1219, 1229 (10th Cir. 2015) (stating that Rule 26(g)(1)'s "knowledge, information, and belief" requirement mandates a "careful inquiry by counsel" to "determine the existence of discoverable [information]"; *Smith v. Howe Military School*, 1998 WL 175875, at *2 (N.D. Ind. Feb. 27, 1998) (party

"must respond to interrogatory fully and completely, supplying all information within her knowledge, possession, or control, including information available through her attorneys, investigators, agents, or representatives") (Exhibit 24). *See also Small v. Ramsey*, 2011 WL 3627271, at *4 (N.D. W. Va. Aug. 17, 2011) ("No Gamesmanship: Parties must respond truthfully, fully and completely to discovery or explain truthfully, fully and completely why they cannot respond. Gamesmanship to evade answering as required is not allowed.") (Exhibit 25).

Petitioners request that the Court order DHS to fully and completely respond to the interrogatories within 1 week. DHS should include in its response the information available to and relied upon by ICE and DHS attorneys, who have made representations to this Court at various times about the Iraqi Agreement, the planned flights to Iraq, the process of repatriation, and Iraq's purported agreement to accept repatriation of the class members, among other things which are the subject of the interrogatories. *See Smith*, 1998 WL 175875, at *2 (a party "must respond" with "information available through her attorneys") (Exhibit 24). If DHS is unable to provide a responsive answer due to a lack of knowledge, DHS should detail its efforts to obtain the information requested in the interrogatory. *See id.; Braham*, 2016 WL 1305118, at *2-3 (Exhibit 23). Petitioners also request that the Court warn DHS that "Rule 26 imposes an obligation on parties to conduct a reasonable inquiry into the factual basis of their discovery responses," that a

45

responding party must "supplement or correct its disclosure or response in a timely manner," and that "the district court has discretion, when circumstances warrant, to exclude evidence not produced in compliance with a proper discovery request." *Woods v. DeAngelo Marine Exhaust, Inc.*, 692 F.3d 1272, 1279 (Fed. Cir. 2012); *see also Eastep v. Newman*, 2013 WL 12212557, at \*3 (M.D. Ga. Jan. 24, 2013) ("[F]ailure to disclose information in [the responding party's] possession or within reasonable accessibility may result in sanctions, including exclusion of the undisclosed information from motions, hearings and trial.") (Exhibit 26).

**<u>Respondents' Position</u>**

The interrogatories in question seek detailed information regarding the repatriation of Iraqi nationals. Immigration and Customs Enforcement (ICE) is the component agency within the Department of Homeland Security (DHS) with the responsibility for the enforcement of final orders of removal.  Although, as indicated by the response provided to Interrogatory No. 12, DHS Headquarters personnel were present for some of the meetings with Iraqi officials, DHS is not the Named Respondent with primary responsibility for direct engagement regarding requests relating to the removal of individual aliens, or for implementing the details of the repatriation and/or travel document issuance process.  Any detailed information on these topics that DHS HQ could provide in response to

these questions would necessarily be information it obtained from conversations with ICE personnel.  And those detailed answers are reflected in ICE's responses.

Petitioners' objections here have no merit.  They are claiming that DHS must respond based on the information available; DHS responded based on information available to them. To the extent, DHS is willing to revise some of its responses to Petitioners' interrogatories, those responses are provided below for Interrogatory Nos. 4 and 5.

### F.  <u>Failure to Answer the Interrogatory as Written or to Answer Fully and Completely</u>

**Interrogatory 1: Describe each term of the Iraqi Agreement pertaining to the repatriation of and process for repatriating Iraqi Nationals under the Iraqi Agreement.**

<u>**Petitioners' Position**</u>

1.  The interrogatory seeks a description of "each term of the Iraqi Agreement pertaining to the repatriation." Respondents ignored this portion of the interrogatory. The terms of the Iraqi Agreement – whether it is formal agreement or simply an "understanding" – are at the heart of this case. As this Court has noted, Respondents have produced nothing in the record to support their argument that Iraq will accept Iraqi nationals for repatriation:

> Based on this record, the Court cannot make a determination regarding whether Iraq will accept repatriation of the class. Schultz's declaration does not contain information regarding the framework of the Government's diplomatic agreement with Iraq. When presented at the hearing by the Court regarding details of the agreement, counsel for the Government was unsure whether there was any formal

47

agreement that had been memorialized in writing. Although the post-hearing Bernacke declaration fills in some of the blanks – it acknowledges that there is no written agreement – **there is still not enough information regarding the scope of the agreement with Iraq**. While a handful of Iraqi nationals have been removed to Iraq since April, **it is unclear whether Iraq has agreed to repatriate all 1,400 putative class members at issue here, and if so, what conditions may have been attached that could impact on whether removal is likely**. Until the Court has a more complete picture from the Government regarding its communications with the Iraqi government, it cannot make a ruling on Iraq's willingness to accept repatriation of the class. ECF 191, Pg.ID # 533 (emphasis added).

Respondents' answer—silence on the terms of the agreement—lead to the conclusion that no agreement (unwritten or otherwise) exists. If that is the case, Respondents should be required to say so, since that would be responsive to this interrogatory.

Petitioners ask the Court to order Respondents to respond to this portion of the interrogatory within 1 week. Respondents should confirm in a declaration that they have "give[n] the information available to [them], if any, through [their] attorney, investigators employed by [them] or on [their] behalf, or other agents or representatives, whether personally known to the answering party or not; if the answering party lacks necessary information to make a full, fair, and specific answer to the interrogatory, it should so state under oath and should set forth in detail efforts made to obtain the information." *Noble v. Gonzalez*, 2011 WL 2118746, at *6 (E.D. Cal. May 27, 2011) (Exhibit 27).

48

Petitioners also respectfully ask the Court to instruct Respondents that a failure to conduct a reasonable inquiry, to respond with information within their control or otherwise obtainable by them, and to fully and completely respond to the interrogatory may result in sanctions, including the exclusion of that information in motions, in hearings, and at trial. Fed. R. Civ. P. 37(d); *Woods*, 692 F.3d at 1279.

2. ICE asserts that "through discussions during this time, the governments of Iraq and the United States have reached an understanding of the process for repatriating Iraqi nationals." ICE does not identify the nature of those discussions, the individuals involved with the discussions, or the substance of those discussions, which makes its answer less than full and complete. The Court should order supplementation of the response with this information.

3. In describing the repatriation process, ICE answered that the Iraqi government "accept[s] a wide range of photocopied evidence from U.S. government information systems, including various documentation or secondary information (including relatives' identification documents) confirming citizenship located in Alien files." Respondents' answer is not full or complete—it lacks specificity as to the document types and the information systems referenced in the answer. Petitioners ask the Court to order Respondents to supplement their response.

49

4. When explaining the repatriation process, Respondents answered that the Iraqi government conducts interviews "either in person (including at designated points of embarkation) or via video." Petitioners seek a full and complete response regarding the process—what happens if, after an interview at a point of embarkation or at any point in the process, the Iraqi government determines the individual is not an Iraqi national, or will not be accepted for repatriation

5. When explaining the repatriation process, Respondents answered with "after an alien's identify has been verified," without explaining how an alien's identity has been verified, by whom, or based upon what criteria. Petitioners ask that the Court order Respondents to provide this information.

**Respondents' Position**

Plaintiffs' mischaracterize Respondents' responses to Interrogatory No. 1. Contrary to Petitioners' statements in their Section III.F.Rog.1.1 above, Respondents do in fact state in their response to interrogatory No. 1 that "[t]here has been no international agreement in force, nor any written arrangement in effect." ECF 269-2 at 3. The response to interrogatory No. 1 also provides ICE's understanding of the discussions between the Government of Iraq (GOI) and the U.S., to include the establishment of the Inter-ministerial Committee, the Committee's responsibilities, the types of documents that may be accepted, and the GOI requirement of interviews. *Id.* at 3-4. As instructed, Respondents have

50

answered the interrogatories as written and provided the most complete information available to them.

To the extent that Petitioners are now asking Respondents to provide additional or follow-up information to those interrogatory responses, Petitioners are essentially asking for additional discovery without actually propounding additional discovery requests. Respondents object to Petitioners request for additional follow-up information. This interrogatory asked Respondents to "[d]escribe each term of the Iraqi Agreement . . . and process for repatriating Iraqi Nationals under the Iraqi Agreement" and Respondents answered the interrogatory as written. Petitioners' complaints that respondents have not answered completely appear to be additional questions about the information provided and an attempt for additional discovery.

**Interrogatory 2: Describe each criterion an Iraqi National must meet before Iraq will accept an Iraqi National for repatriation, under the Iraqi Agreement or otherwise.**

<u>**Petitioners' Position**</u>

1. ICE's response included the following statements: (1) "through discussions in 2017, with the GOI [Government of Iraq], ICE's current understanding is that three criteria must be present before the GOI agrees to repatriate an Iraqi national"; and (2) "[i]t is Defendant's understanding that based on the relevance before it, the GOI assesses whether the individual is an Iraqi

national." Petitioners seek a supplementation of the interrogatory with the substance of ICE's "discussions" and the bases of its "understanding."

2. Petitioners seek supplementation of Respondents' knowledge of the criterion used during the consular interview to determine if repatriation will occur.

3. Respondents' answer regarding the type of records that show an indicia of citizenship is prefaced with "including but not limited to." *Jones-McNamara v. Holzer Health Sys.*, 2014 WL 3563406, at *1 (S.D. Ohio July 18, 2014) (Exhibit 28) ("[I]interrogatory answers must be responsive, full, complete and unevasive . . . . [and] when an interrogatory asks for 'all' of anything, the responding party may not respond with examples. The responding party must object to the interrogatory as overly burdensome or answer it in full."); *Boldstar Tech., LLC v. Home Depot USA, Inc.*, 2008 WL 11320011, at *2 (S.D. Fla. Mar. 10, 2008) (Exhibit 29). Respondents' answer suggests there are other documents which were not identified in their answer. Petitioners seek supplementation of the interrogatory with all records that have been or would be accepted by Iraq as showing an indicia of citizenship, including specificity as to the types of "documents from the Alien file" and "family documents."

4. Petitioners seek supplementation of the type of "statements made during the consular interview" that would show indicia of citizenship.

**<u>Respondents' Position</u>**

Respondents dispute Petitioners mischaracterization of Respondents response as incomplete. Interrogatory No. 2 asked Respondents to identify the criterion an Iraqi national must meet before Iraq will accept an Iraqi National for repatriation—ICE identified three main criterion. ECF 269-2 at 5. To the extent that Petitioners are now asking Respondents to provide additional or follow-up information to those interrogatory responses, Petitioners are essentially asking for additional discovery without actually propounding additional discovery requests. Respondents object to Petitioners' request for follow-up information because Petitioners are dissatisfied with the answer provided.  Again, what Petitioners phrase as a complaint due to an alleged incomplete response, appears to be a request for additional discovery.

Moreover, Respondents do not know the substance of an individual's interview with a foreign governments' consular interview.  As ICE explained, "[t]he GOI conducts a consular interview." *Id*. United States government officials cannot answer as to what GOI's internal decision-making process is.

**Interrogatory 3: Describe each criterion for denying repatriation to an Iraqi National under the Iraqi Agreement, or otherwise.**

<u>**Petitioners' Position**</u>

ICE responded with the following: "Defendant ICE is aware that direct requests sent by an individual to Iraqi Embassies have been denied if an individual does not provide, as part of the request, a representation that the individual wants

to return to Iraq." Petitioners seek a statement from Respondents if the same will occur or has occurred in situations other than when an individual has made a direct request to the Iraqi Embassies (for instance, if a class member represents during a consular interview that he or she does not want to return to Iraq).

**Respondents' Position**

Interrogatory No. 3 asked for criterion for denying repatriation to an Iraqi national, ICE answered that it was not aware of any specific criterion for denying repatriation of an Iraqi national. ICE indicated that it was aware that direct requests sent by an individual to Iraqi Embassies have been denied if an individual does not provide, as part of the request, a representation that the individual wants to return to Iraq. ECF 269-2 at 6. Petitioners now seek additional discovery regarding Respondents response.  Respondents object to this request. To the extent that Petitioners are now asking Respondents to provide additional or follow-up information to those interrogatory responses, Petitioners are essentially asking for additional discovery without actually propounding additional discovery requests. Respondents object to Petitioners request for follow-up information.

**Interrogatory 4: Identify any travel documents that Iraq requires or will accept before accepting an Iraqi National for repatriation under the Iraqi Agreement or otherwise, and the procedures for obtaining the travel documents.**

## Petitioners' Position

ICE responded with: "it is Defendant ICE's understanding that the [Iraqi government] issues" certain documents. Petitioners seek a full and complete response with specificity about to how ICE came to its "understanding" (who obtained this understanding, when, what information from Iraq led to the understanding, what other information lead to the understanding, and so forth).

DHS's revised response has the same issue as its initial response: DHS continues to preface its response with the impermissible "lacks sufficient information to respond." It also fails to respond to any unwritten agreements that may exist. To the extent DHS is revising its response, it should be ordered to verify the response.

## Respondents' Position

DHS provides the following revised response: DHS is not aware of any written agreement between the GOI and the United States regarding repatriation of Class Members. DHS lacks sufficient information to respond regarding "any travel documents that Iraq requires or will accept" prior to being accepted by the GOI for repatriation. ICE is the component agency of DHS with responsibility for repatriation of Iraqi Nationals. Therefore, DHS refers Petitioners to the ICE

55

response to Interrogatory No. 4. *See* ECF 269-2 at 7-8.

To the extent that Petitioners are now asking Respondents to provide additional or follow-up information to those interrogatory responses, Petitioners are essentially asking for additional discovery without actually propounding additional discovery requests. Respondents object to Petitioners request for additional follow-up information.

**Interrogatory 5: For the time period since March 1, 2017, identify the documentation or evidence other than travel documents that Iraq requires or will accept before approving an Iraqi National for repatriation under the Iraqi Agreement or otherwise.**

<u>**Petitioners' Position**</u>

1. Like Interrogatory No. 4, ICE should supplement with specificity as to its "understanding that there are no specific documents" that the Iraqi government "requires to issue a travel document."

2. ICE answered that the GOI considers "available indicia of citizenship, which varies from case to case and may include originals or photocopies of various identity documents, such as those noted in Interrogatory No. 2." The answer suggests there are additional documents, beyond those identified in Interrogatory No. 2. If so, Respondents should identify the documents.

3. DHS's revised response has the same issue as its initial response: DHS continues to preface its response with the impermissible "lacks sufficient

information to respond." It also fails to respond to any unwritten agreements that may exist. To the extent DHS is revising its response, it should be ordered to verify the response.

**Respondents' Position**

DHS provides the revised response: DHS is not aware of any written agreement or arrangement between the GOI and the United States regarding repatriation of Class Members. DHS lacks information sufficient to respond regarding "documentation or other evidence other than travel documents that Iraq requires or will accept" prior to being accepted by the Government of Iraq for repatriation.   ICE is the component agency of DHS with responsibility for repatriation of Iraqi Nationals.   Therefore, DHS refers Petitioners to the ICE response to Interrogatory No. 5 regarding the details of the repatriation process for Iraqi Nationals. *See* ECF 269-2 at 8-9.

With regard to ICE's response, it is not possible for ICE to identify every document that may potentially be used because, as explained, it varies case by case due to the fact specific circumstances of each individual case. To the extent that Petitioners are now asking Respondents to provide additional or follow-up information to those interrogatory responses, Petitioners are essentially asking for additional discovery without actually propounding additional discovery requests. Respondents object to Petitioners request for additional follow-up information.

**Interrogatory 6:** For each Class Member (identified by name and A-number) for whom ICE or another relevant department of the U.S. government has since March 1, 2017 requested travel documents from the Iraqi Ministry of Foreign Affairs (or another relevant department of the Iraqi government) for repatriation to Iraq, provide the following:

    a.    The date the request for the travel documents was made to the Iraqi government

    b.    The type of travel documents obtained, the department of the Iraqi government issuing the travel documents, and the date the documents were issued;

    c.    If the request for the travel documents was denied, the department of the Iraqi government issuing the denial, the date of the denial and the reason given for the denial; and

    d.    Whether Iraq denied or approved repatriation of the Class Member, and, if denied, the basis for such denial.

    e.    If repatriation occurred, when, by what travel method (commercial air, charter air, etc.), and to what location.

**Petitioners' Position**

ICE's response shows it ████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████ *See* Exhibit 30, p. 15.

Petitioners ask the Court to order bi-weekly supplementation of this information. *See* Fed. R. Civ. P. 26(e) (requiring supplementation of interrogatory responses "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect" or as otherwise ordered by the court.)

**Respondents' Position**

Respondents object to providing this information as a biweekly report. Respondents do not have the time or the resources to add additional information to

58

the biweekly report. The current biweekly report process already takes hours to prepare. The information requested is not electronically stored, and therefore, cannot be easily searched. Respondents had to manually compile the responses for Interrogatories Nos. 6 and 7.

**Interrogatory 7: For each Class Member (identified by name and A-number) for whom ICE or another relevant department of the U.S. government has since March 1, 2017 requested from the Iraqi Ministry of Foreign Affairs (or another relevant department of the Iraqi government) to be repatriated to Iraq, provide the following:**

    **a.**    **The date of the request;**

    **b.**    **The response from the Iraqi government, the date of the response, the department of the Iraqi government issuing the response, and, if repatriation was denied, the basis for the denial; and**

    **c.**    **If the request for repatriation was granted, any conditions placed on the repatriation of the Class Member.**

    **d.**    **If repatriation occurred, when, by what travel method (commercial air, charter air, etc.), and to what location.**

## Petitioners' Position

1. ICE produced a chart purporting to respond to this interrogatory, but it is incomplete. *See* Exhibit 30. Instead, ICE's chart intermingles travel documents (the topic of interrogatory No. 6) with repatriation (the topic of this interrogatory), making it unclear which interrogatory is being answered. As an example, the fourth column header is "TD [for travel documents] Request Date 6a, 7a." This purports to be the date travel documents were requested, yet "7a" is a reference to an interrogatory about the date repatriation was requested. The same issue exists

for column called, "If TD Denied, Department, Date, and Reason 6c, 6d, 7b." This consolidation of answers makes it impossible to extract requests for travel documents (and the denial or approval for the same) from the request for repatriation (and the denial or approval). Petitioners ask that Respondent ICE be required to separate its answers for Interrogatory No. 6 from its answers for Interrogatory No. 7.

2. The interrogatory seeks the response of the Iraqi government to requests for repatriation (No. 7b). ICE's response to the majority of the entries appears to be a self-serving statement to support its defenses in this case, rather than the actual response from GOI: "███████████████████████████████████████" Petitioners ask the Court to order Respondents to provide the actual response from the Iraqi government. For example, the chart shows that ICE ███████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████. Exhibits 7 and 30. Exhibit 8 shows that Iraq ███████████████████████████████ ███████████████████████████████████████████

3. Petitioners ask the Court to order bi-weekly supplementation of this interrogatory as it appears that Respondents ███████████████████ ███████████████████████████████████████████████████████ ████████████████████████

**Respondents' Position**

1. Respondents have said repeatedly that there is not a distinction between "request for repatriation" or "TD request date" in most cases – despite Petitioners' claims that these are not two separate requests –they are not.

2. As Respondents have explained, the GOI is aware of the injunction in this case.

3. Respondents object to providing this information as a biweekly report. Respondents do not have the time or the resources to add additional information to the biweekly report. The current biweekly report process already takes hours to prepare. The information requested is not electronically stored, and therefore, cannot be easily searched. Respondents had to manually compile the responses for Interrogatories Nos. 6 and 7.

**Interrogatory 8: For each Class Member (identified by name and A-number), state whether Iraq has agreed to the repatriation of that individual as of the following time:**

      **a.**    **On the date of the Class Member's arrest by ICE; and**
      **b.**    **On the date you answer this Interrogatory.**

**Petitioners' Response**

1. The interrogatory seeks confirmation that Iraq has agreed (or not) to repatriation as to *each individual class member*. ICE did not respond on an individual basis, but made a blanket statement that the "GOI had committed to

accept Iraqi nationals for repatriation." ICE did not respond to the interrogatory as written, and Petitioners ask the Court to (again) order them to do so.

2. Petitioners also seek more specificity about the answer that the "GOI had committed to accept Iraqi nationals for repatriation," such as the substance of the "commitment," how and when the commitment was communicated, and who communicated about the commitment. This information is also responsive to Interrogatory No. 1's request for the terms of the Iraqi Agreement.

## Respondents' Position

Respondents disagree as to what the response to Interrogatory No. 8 states. The response to Interrogatory No. 8 says that "[t]he GOI has committed to accept Iraqi nationals for repatriation, but at the time of any class member's arrest, a final approval would not have been issued because the GOI requires an interview, which cannot be scheduled until the individual is in ICE custody." ECF 269-2 at 12. For each individual class member in which a request was made, ICE referred to the spreadsheet provided in response to Interrogatory Nos. 6 and 7. *Id*.

To the extent that Petitioners are asking for additional discovery, for the reasons stated above Respondents so appear to a request for additional discovery, and therefore, Respondents object.

**Interrogatory 9: The declaration of John Schultz, ECF 81-4, Pg.ID# 2007, states that Iraq previously would accept only its nationals with unexpired passports, but that Iraq will now "authorize repatriation with other indicia of nationality." State what "other indicia of nationality" Iraq will accept for repatriation; the basis for the U.S. government's belief that the other indicia of nationality will be accepted, including the identification of the specific agreement(s) or document(s) stating this policy; and the criteria an individual must or can meet before Iraq will accept an Iraqi National for repatriation.**

<u>**Petitioners' Position**</u>

The interrogatory seeks "the basis for the U.S. government's belief that the other indicia of nationality will be accepted, including the identification of the specific agreement(s) or document(s) stating this policy; and the criteria an individual must or can meet before Iraq will accept an Iraqi National for repatriation." *See* ECF 81-4, Pg.ID# 2007. ICE answered that the "basis for [its] belief is the ongoing discussions with the GOI and the GOI's issuance of travel documents . . . in response to requests submitted using other indicia of nationality, such as photocopies of identity documents."

1. The Court should order Respondents to provide the substance of those discussions, understandings, GOI's indications, and GOI's commitments (including the date of the discussions, the participants, and specific statements made by the participants) referenced in Interrogatory Nos. 1, 2, 3, 4, 5, 8 and 12. The response should also include the substance of the ███████████████ ████████████████████████████████████████ that is referenced in Exhibit 8, DHSHAMAMA000001.

63

2. Respondents should also identify the specific types of documents used to show an "indicia of nationality," which Respondents have only identified in this response as "photocopies of identity documents."

## Respondents' Position

ICE answered the question as written and provided the information that it has in its records or recollections. *See* ECF 269-2 at 13.

DHS has no additional information as to Interrogatory No. 9. Moreover, the document referenced was not produced as responsive to this interrogatory and DHS referred to ICE for this one response.

**Interrogatory 11: For each Class Member (identified by name and A-number) who, prior to March 1, 2017, was living in the community, state whether ICE released that individual to the community because ICE determined that Iraq would not accept that individual for repatriation the reason ICE determined that Iraq would not accept the individual for repatriation, and whether the individual was subject to an order of supervision or other release conditions.**

## Petitioners' Position

To address Respondents' objections to this Interrogatory, Petitioners revised it as follows:

> **Interrogatory 11: For each Class Member (identified by name and A-number) who, prior to March 1, 2017, was living in the community, state whether ICE released that individual to the community because ICE determined that Iraq would not accept that individual for repatriation and the reason ICE determined that Iraq would not accept the individual for repatriation.**

1. ICE responded that its "review is ongoing." Petitioners seek supplementation of the interrogatory with information obtained from ICE's

ongoing review.

2.    By this Court's order, ECF 254, Pg.ID #6238, this interrogatory was narrowed to cover a random sample of 30 detainees, a list of which was provided by Petitioners to Respondents.    Respondents responded to the narrowed Interrogatory, but their responses are impossible to understand (Exhibit 31).

The response is in a tabular format.  One column is titled ███████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████    Yet the next column's responses are inconsistent with that.    For example:

- "███████████████████████████████████"
- "████████████████████████████████████████
████████████████████"
- "████████████████████████████████████████████
█████████████████████"
- "████████████████████████████████████████████████
███████████████████████████████████████"

Then for each of the ███████████████████████████████████

████████████████████████████████████████████████████"

Petitioners simply cannot make heads or tails of this.  How are Respondents differentiating between Iraq's ████████████████████████████

███████████████████████████████████████████

███████████████? It is a mystery.

Petitioners request that Respondents re-answer Interrogatory 11, but in plain English that explains how they are using the terms they choose.

3. Request for Production No. 5 seeks production of all records cited or relied on in responding to the interrogatories. Because Respondents have not provided a written response to the Requests for Production, Petitioners do not know if Respondents are objecting to producing the records reviewed to respond to this interrogatory. Petitioners seek confirmation that the records will be produced.

**Respondents' Position**

ICE stated in its initial interrogatory response that its review was ongoing because the Court ordered the response to this interrogatory to be provided at a later date. *See* ECF 269-2 at 17. The results of that review were provided at a later date, as Petitioners acknowledge in the very next paragraph. Section III.F.Rog.11.2.

With respect to Interrogatory No. 11, it was made clear to the Petitioners that the problem lies with the way they phrased because a determination that Iraq would not accept an individual for repatriation, is not the same as the SLRRFF determination that ERO makes in determining whether to release. *See id*. at 16. Or, stated differently, a release due to lack of significant likelihood in the

66

reasonably foreseeable future is not indicative that the foreign government has made a final determination that the individual would not be accepted for repatriation. Further, even if such a determination was made, that determination may change at a future point in time. Of the sample group, there were two "individuated declinations," as Petitioners describe it where Iraq affirmatively communicated to ICE that they would not accept the individual for a specified reason. To this end, Petitioners gave one example in the 2/16/18 JSI to clarify their request:

> Take the example of an individual who was not born in Iraq, but whom the U.S. government claims is an Iraqi national who is currently detained. If Iraq objected to accepting the individual for repatriation prior to the Iraqi Agreement on the basis that the individual was not born in Iraq and the Iraqi Agreement is silent on repatriation of individuals not born in Iraq, there is an argument under *Zadvydas* that it is not reasonably foreseeable that this individual will be repatriated.

ECF 235 at 47-48. Only the two individuated declinations were affirmatively responsive to the interrogatory and consistent with the clarification Petitioners offered, but Respondents understood that the Court's instruction was for Respondents to provide the reason for release for the sample group, even if not affirmatively responsive to the interrogatory as written. The rest of the individuals were undoubtedly released due to a lack of SLLRRFF and the reasons, where available, did not include an affirmative refusal to repatriate. These included individuals where Iraq declined to issue a TD upon request because a required

67

document or original document was missing from the request. It also included those individuals where Iraq did not respond to requests, as the GOI was not issuing at all at the time, or where the information was simply incomplete. ECF 269-2 at 17.

Respondents' position is that the request for written responses is premature. Respondents also highlight that discovery obligations are ongoing, and that production of documents is occurring on a rolling basis. Petitioners cannot imply that Respondents are failing to comply with discovery obligations when discovery is not yet due.

**Interrogatory 12: The name, title and department of the government (for both Iraq and the United States) of each individual negotiating the Iraqi Agreement, including the "ongoing diplomatic negotiations" referenced in the declaration of Michael V. Bernacke at paragraph 4 (ECF 184-2, Pg.ID# 5070-71), identification of the individuals authorized to enter into any agreement reached by the governments regarding the repatriation of Iraqi Nationals, and the date each individual engaged in the "ongoing diplomatic negotiations."**

<u>**Petitioners' Position**</u>

1. The interrogatory seeks the basis for a statement in Mr. Bernacke's declaration: "Iraq agreed to the timely return of its nationals subject to a final order of removal. The agreement between the United States and the Iraqi Ministry of Foreign Affairs (MFA) is not memorialized in any written document or treaty. It is a product of ongoing diplomatic negotiations." *See* ECF 184-2, Pg.ID # 5070, Decl. Bernacke at ¶ 4. ICE unilaterally narrowed the interrogatory to "diplomatic

negotiations identifying a *new process for the GOI to process removal cases*."
Exhibit 3, emphasis added. Negotiations about "a new process" are only one part
of what this interrogatory seeks. It also seeks negotiations about the "agreement"
(the term used by Mr. Bernacke) for the return of Iraqi nationals. Petitioners ask
this Court to order Respondents to supplement this response within 1 week, and,
like Interrogatory No. 1, warn Respondents that a failure to provide a full and
complete response may result in Respondents being prohibited from defending this
case by pointing to any agreement, understanding, discussions, Iraq's indications,
Iraq's commitments, or other communication from Iraq as evidence that Iraq will
accept repatriation of Iraqi nationals.

2. ICE's response acknowledges that the ███████████████████
led the discussions with ICE in attendance. ICE did not identify the ████
individuals who were part of the discussions. ICE also did not identify any DHS
attendees. Similarly, DHS's response indicates that individuals from outside DHS
and the Iraqi government participated in discussions, but DHS did not identify
those individuals. Petitioners ask that the Court order ICE and DHS to disclose *all*
individuals who attended the meetings. ICE and DHS should also be ordered to
identify any discussions or meetings that they may not have participated in or
attended, but are nonetheless aware took place.

**Respondents' Position**

This response is subject to privilege dispute that is currently before the Court. *See* ECFs Nos. 264, 269, 277.

### G. **Respondents' Court Ordered Disclosures about their ESI Searches**

**Petitioners' Position**

The Court ordered Respondents "to provide a declaration identifying the names and job titles of the custodians for whom Respondents have collected records and other information response to Petitioners' discovery requests describing how the custodians were identified, the methodologies used to identify responsive documents (including the instructions given to custodians, such as the instruction to search email by author or recipient), and any culling methods used by Respondents to narrow the records collected prior to or during their review for records responsive to the discovery requests." *See* ECF 254, Pg.ID# 6235-36 at ¶31.

Respondents did not comply with the Court's order.

ICE failed to comply with the Court's order in the following ways:

- It redacted the names of the custodians (Exhibit 12, Decl. Schultz, ¶¶4, 6-8, 10);[9]

- It redacted the search terms used to identify and/or cull the records

---

[9] Respondents did not assert that the redacted information was subject to any privileges until 10 days after the declarations were produced (and only after Petitioners' counsel challenged the redactions). *See* Exhibit 11, email from N. Murley at p. 2.

70

(*id.* ¶ 5);

- There is no information about how these individuals were selected, but instead ICE simply states they were selected "because they are/were the individuals involved with the subject matter of this litigation (*id.* ¶ 4);

- It fails to identify with any specificity the instructions given to the potential custodians about what records to collect, other than they were provided a copy of the discovery requests to review and "instructed to search their e-mail and files . . . for any information that could potentially be responsive" (*id.* ¶ 4); and

- It fails to identify the culling methods used by (or to be used by) Respondents to narrow the records collected prior to or during their review for records responsive to the discovery requests (it only provides this information for Mr. Schultz's emails, but no other custodian (*see id.* ¶ 5, "I understand that agency counsel plans to search my collected e-mails . . . . using the term "Iraq" (emphasis added)).

DHS also failed to comply with the Court's order in the following ways:

- It did not provide the names or titles of the custodians; rather, DHS provided only the department or unit that employed the custodian (Exhibit 13, Decl. Palmer, ¶9 ("Office of the Executive Secretariat", "Office of the General Counsel"; "Office of Policy (including Office for International Affairs; Office for Border, Immigration and Trade Policy; and Screening Coordination Office)");

- DHS's list of custodians was incomplete, promising to provide complete list of custodians on an unspecified date (*id.* ¶ 8 ("Agency counsel . . . cannot provide a comprehensive list of all custodians with responsive documents at this time. As documents are produced, the custodians will be identified.");

- It provided no information about the methodologies used to collect or cull the records (*id.* ¶¶ 7-8);

- There is no information about how these individuals were selected as custodians; Mr. Palmer notes that the Office of General Counsel identified custodians by identifying the "client subject matter experts on the particular issue that is the subject of the litigation" and looking

71

at the "subject matter, portfolio and area of work" for the custodians, yet there is no disclosure about the custodians' subject matter, portfolio or area of work included in the search (*id.* ¶ 6); and

- It fails to identify with any specificity the instructions given to the potential custodians, other than they were provided a copy of the discovery requests "and a general description of the litigation" and were asked to perform searches without any guidance from legal counsel other than to answer questions the custodians may have had (*id.* ¶ 7).

Petitioners ask the Court to, again, order Respondents to provide the information, and warn Respondents that failure to do so will be deemed a violation of the Order, ECF 254, and could result in sanctions.

## Respondents' Position

Respondents disagree that they failed to comply with the Court's order. Respondents provided the declarations and the information contained therein as required by the Court's order. Pursuant to the Court order, ECF 254, Respondents provided Petitioners with the discovery declarations that included the identified custodians in this case and the information Respondents had available to them at the time the declarations were due. Because the protective order in this case did not cover information, such as law enforcement sensitive (LES), Respondents explained that in order to produce that information unredacted to class counsel, an available option would be to amend the protective order.

72

Respectfully submitted,

*Attorneys for All Petitioners
and Plaintiffs*
Michael J. Steinberg (P43085)
Kary L. Moss (P49759)
Bonsitu A. Kitaba (P78822)
Miriam J. Aukerman (P63165)
ACLU Fund of Michigan
2966 Woodward Avenue
Detroit, Michigan 48201
(313) 578-6814
msteinberg@aclumich.org

Judy Rabinovitz (NY Bar JR-1214)
Lee Gelernt (NY Bar LG-8511)
ACLU FOUNDATION
  IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2618
jrabinovitz@aclu.org

Margo Schlanger (P82345)
Cooperating Attorneys, ACLU Fund
  of Michigan
625 South State Street
Ann Arbor, Michigan 48109
734-615-2618
margo.schlanger@gmail.com

*Counsel for Respondents and
Defendants*
Chad A. Readler
Acting Assistant Attorney General

William C. Peachey
Director

Michael A. Celone

Joseph A. Darrow

Trial Attorneys

*/s/ William C. Silvis*
William C. Silvis
Assistant Director
United States Department of Justice
Office of Immigration Litigation
District Court Section
PO Box 868 Ben Franklin Station
Washington, DC 20044
Tel: (202) 307-4693
Fax: (202) 305-7000

73

*/s/ Kimberly L. Scott*
Kimberly L. Scott (P69706)
Wendolyn W. Richards (P67776)
Cooperating Attorneys, ACLU Fund
  of Michigan
MILLER, CANFIELD, PADDOCK
  & STONE, PLC
101 N. Main St., 7th Floor
Ann Arbor, MI 48104
(734) 668-7696
scott@millercanfield.com

Nora Youkhana (P80067)
Nadine Yousif (P80421)
Cooperating Attorneys, ACLU Fund
  of Michigan
Code Legal Aid Inc.
 27321 Hampden St.
Madison Heights, MI 48071
(248) 894-6197
norayoukhana@gmail.com

Susan E. Reed (P66950)
MICHIGAN IMMIGRANT RIGHTS
  CENTER
3030 S. 9th St. Suite 1B
Kalamazoo, MI 49009
 (269) 492-7196, ext. 535
susanree@michiganimmigrant.org

María Martínez Sánchez (NM Bar 126375)
ACLU OF NEW MEXICO
1410 Coal Ave. SW
Albuquerque, NM 87102
msanchez@aclu-nm.org

Lara Finkbeiner (NY Bar 5197165)
Mark Doss (NY Bar 5277462)
INTERNATIONAL REFUGEE
  ASSISTANCE PROJECT
Urban Justice Center
40 Rector St., 9th Floor
New York, NY 10006
(646) 602-5600
lfinkbeiner@refugeerights.org

*Attorney for Petitioner/Plaintiff Usama Hamama*

William W. Swor (P21215)
WILLIAM W. SWOR
  & ASSOCIATES
1120 Ford Building
615 Griswold Street
Detroit, MI 48226
wwswor@sworlaw.com

Dated: May 15, 2018

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 15, 2018, I electronically filed the foregoing papers with the Clerk of the Court using the ECF system which will send notification of such filing to all ECF Filers of record.

By:  /s/ *Kimberly L. Scott*
Kimberly L. Scott (P69706)
Cooperating Attorney, ACLU Fund of Michigan
MILLER, CANFIELD, PADDOCK
 & STONE, P.L.C.
101 N. Main Street, 7th Floor
Ann Arbor, MI 48104
(734) 668-7696
scott@millercanfield.com