## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**USAMA JAMIL HAMAMA**, et al.,

      Petitioners and Plaintiffs,

v.

**REBECCA ADDUCCI**, et al.,

      Respondents and Defendants.

Case No. 2:17-cv-11910
Hon. Mark A. Goldsmith
Mag. David R. Grand
Class Action

## PETITIONERS/PLAINTIFFS' EMERGENCY MOTION REGARDING COERCION AND INTERFERENCE WITH CLASS MEMBERS

Local Rule 7.1(a)(1) requires Petitioners/Plaintiffs (hereinafter Petitioners) to ascertain whether this motion is opposed. Petitioners' counsel sent a letter to William Silvis and Nicole Murley, counsel for Respondents/Defendants (hereinafter Respondents), via email on June 6, 2018, explaining the nature of the relief sought. The same day, Respondents requested additional information. On the following morning, June 7, 2018, Petitioners provided such additional information as they had available and were able to share. Petitioners also indicated a willingness to narrow the relief they sought, prioritizing the ability to advise class members prior to consular interviews, and to better understand which individuals can be repatriated. Respondents did not respond. On June 9, 2018, Petitioners sent a follow up email requesting a response, but received no reply. On June 12, 2018, Petitioners formally sought concurrence, spelling out the precise relief requested. To date, no response has been received.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

1.    It is becoming increasingly clear that the Government of Iraq will

issue travel documents for class members only if the class members state in writing

that they desire to return to Iraq. In other words, the Government of Iraq will not accept individuals for repatriation if they are unwilling to be removed to Iraq.

2.  As set forth in the accompanying brief and its exhibits, class members have been subjected to threats, harassment, and coercion whose purpose is to elicit their statement, in writing, that they desire to return to Iraq, because, absent such a statement, they are not repatriatable.

3.  To prevent further coercion and to attempt to redress the coercion that has already occurred, Petitioners respectfully request, for the reasons set forth in the accompanying brief, that the Court enter two orders, one immediate and one after (expedited) briefing.

4.  The proposed immediate order is designed to prevent class members from being coerced, and to quickly identify class members who have been coerced so that Petitioners can take appropriate steps to address that coercion. The requested immediate emergency relief is narrow, and is set out in Paragraphs A-D, below.

5.  Petitioners ask that the Court hold an emergency telephone hearing and determine from Respondents whether any further consular interviews or mass transfers are imminent; if so the Court should direct the Respondents to respond in time to resolve the issue prior to those interviews/transfers.

6.     Respondents are well aware of the issues at the Stewart Detention Facility. After Respondents denied Petitioners timely access, which was first requested on May 24, 2018, Petitioners filed an emergency motion for access on June 4, 2018, ECF 297. The Court held two status conferences on June 4th and 5th to resolve the immediate issue. Once Petitioners' designees were able to meet with the detainees, Petitioners sent an urgent letter on June 6, 2018—now a week ago—outlining the issues of abuse and coercion, and requesting Respondents' agreement to ameliorative measures. Respondents have had plenty of time to investigate. The relief requested is extremely urgent to counter any further coercion of class members, to ensure that class members have accurate information to make informed choices in the days ahead, and to ensure that individuals who in fact wish to continue fighting removal are not deported.

7.     The remaining relief requested by Petitioners, set out in Paragraphs E-H, is designed to more fully remedy and address the problems with coercion and abuse. That relief, while still quite time-sensitive, can be handled through an expedited briefing schedule. Petitioners propose that Respondents receive until Wednesday, June 20, 2018, to file a response, and Petitioners then receive until Monday, June 25, 2018, to reply.

Therefore, Petitioners respectfully request that the Court enter an immediate order requiring Respondents to:

A. Provide notice to Class Counsel prior to Iraqi consular interviews so that Class Counsel can arrange for prompt class member meetings. Such notice can be designated as Highly Confidential under the Second Amended Protective Order. The Order should require Respondents to disclose the names of class members if those names are necessary for Class Counsel to arrange for client meetings. If consular interviews are being facilitated by detainee transfers, the notice should include the approximate number of detainees being transferred, the facility where consular interviews are being conducted, and the anticipated date(s) of arrival and of the consular interviews. Class Counsel will share the information only in order to make appropriate arrangements for client meetings under Paragraph B.

B. Permit Class Counsel or their designees to meet with detainees in either group or individual client meetings (at Class Counsel's discretion) prior to Iraqi consular interviews, so that detainees have accurate information and can make knowing and informed choices about what documents to sign.

C. Require Respondents, within 24 hours after entry of the Court's order, to produce to Petitioners a list of the names and A-numbers of all class members who have signed any document expressing a desire to be removed to Iraq, and copies of all such documents in Respondents' possession.

D. Facilitate confidential phone calls or video interviews, within 24 hours of Class Counsel's request, for any class members who—outside of the Court-ordered prompt removal process, *see* ECF 110, PgID.2815-16— have already signed or in the future sign any document expressing a desire to be removed to Iraq (other than class members for whom the Court has signed a stipulated order lifting the stay of removal), and facilitate Class Counsel's ability to obtain signatures on documents by these individuals, as requested.

Petitioners also request that the Court order expedited briefing, and after that briefing concludes, that the Court:

E. Prohibit Immigration and Customs Enforcement (ICE) and Department of Homeland Security (DHS) employees, agents, or contractors

(including all detention facility staff) from communicating about this litigation in any way with class members including: making any statement threatening prosecution, any statement projecting or suggesting how long an individual might remain in detention or their likelihood of removal to Iraq, and any statement suggesting that an individual will be returned to Iraq (unless Respondents have an order from this Court stating that the Court's stay of removal has been lifted).

F. Bar ICE, DHS, or the Department of Justice (DOJ) from penalizing or prosecuting any class member under 8 U.S.C. § 1253(a) or in any other way on the basis that the class member is unwilling to state that s/he desires to be removed to Iraq.[1]

G. Require ICE to post a notice, approved by Petitioners or by the Court, in all facilities housing *Hamama* class members in a location visible to class members, and to hand deliver that notice to each class member who met with Iraqi consular officials in the last two months. That notice shall inform class members that:

1. ICE officers are not allowed to communicate with them about their immigration cases, length of their detention, or prospect of removal to Iraq; and
2. While detainees with final orders must cooperate with obtaining passports or travel documents, they cannot be required to state that they wish to return to Iraq, and they will not be penalized under 8 U.S.C. § 1253(a) or otherwise if they refuse to state that they wish to be removed to Iraq.

H. Require Respondents, by June 27, 2018, to provide Petitioners with:

1. A list of ICE and DHS employees involved in facilitating consular interviews at the Stewart Detention Facility and/or present during those interviews, including their names and job titles.
2. A list of the names and A-numbers of all class members who— outside of the court-ordered prompt removal process, *see* ECF 110, PgID.2815-16—have to date been asked to sign any document expressing a desire to be removed to Iraq, and the following

---

[1] Class members can, pursuant to 8 U.S.C. § 1253(a)(1)(B), be required to cooperate in providing documents or other information necessary to obtain travel documents, but they cannot be penalized for being unwilling to state that they wish to return to Iraq.

information, and, going forward, providing such names, A-numbers, and information within 2 days of the document being presented to the detainee:

a. which individuals have signed the document and which have not;

b. copies of every such document that has been signed;

c. the names and titles of ICE or DHS employees, agents, or contractors present when the document was presented the document(s) to the individual or present during any interview of that individual by Iraqi government officials;

d. all statements made by the Iraqi government regarding whether Iraq will issue a travel document or otherwise accept the individual for removal; and

e. the estimated date removal will take place (which information may be designated as Highly Confidential under the Second Amended Protective Order).

Respectfully submitted,

Michael J. Steinberg (P43085)
Kary L. Moss (P49759)
Bonsitu A. Kitaba (P78822)
Miriam J. Aukerman (P63165)
ACLU FUND OF MICHIGAN
2966 Woodward Avenue
Detroit, Michigan 48201
(313) 578-6814
msteinberg@aclumich.org


/s/Kimberly L. Scott
Kimberly L. Scott (P69706)
Wendolyn W. Richards (P67776)
Cooperating Attorneys, ACLU Fund
 of Michigan
MILLER, CANFIELD, PADDOCK
 & STONE, PLC
101 N. Main St., 7th Floor
Ann Arbor, MI 48104
(734) 668-7696
scott@millercanfield.com

Judy Rabinovitz (NY Bar JR-1214)
Lee Gelernt (NY Bar LG-8511)
ACLU FOUNDATION
 IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2618
jrabinovitz@aclu.org


Margo Schlanger (P82345)
Cooperating Attorney, ACLU Fund
 of Michigan
625 South State Street
Ann Arbor, Michigan 48109
734-615-2618
margo.schlanger@gmail.com

Nora Youkhana (P80067)
Nadine Yousif (P80421)
Cooperating Attorneys, ACLU Fund
 of Michigan
CODE LEGAL AID INC.
 27321 Hampden St.
Madison Heights, MI 48071
(248) 894-6197
norayoukhana@gmail.com

María Martínez Sánchez (NM Bar 126375)
ACLU OF NEW MEXICO
1410 Coal Ave. SW
Albuquerque, NM 87102
msanchez@aclu-nm.org

Susan E. Reed (P66950)
MICHIGAN IMMIGRANT RIGHTS
 CENTER
3030 S. 9th St. Suite 1B
Kalamazoo, MI 49009
(269) 492-7196, Ext. 535
Susanree@michiganimmigrant.org

Lara Finkbeiner (NY Bar 5197165)
Mark Doss (NY Bar 5277462)
INTERNATIONAL REFUGEE
 ASSISTANCE PROJECT
Urban Justice Center
40 Rector St., 9th Floor
New York, NY 10006
(646) 602-5600
lfinkbeiner@refugeerights.org

*Attorneys for All Petitioners and Plaintiffs*

William W. Swor (P21215)
WILLIAM W. SWOR
 & ASSOCIATES
1120 Ford Building
615 Griswold Street
Detroit, MI 48226
wwswor@sworlaw.com

*Attorney for Petitioner/Plaintiff Usama Hamama*

Dated: June 13, 2018

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**USAMA JAMIL HAMAMA**, et al.,

      Petitioners and Plaintiffs,

v.

**REBECCA ADDUCCI**, et al.,

      Respondents and Defendants.

Case No. 2:17-cv-11910
Hon. Mark A. Goldsmith
Mag. David R. Grand
Class Action

## PETITIONERS/PLAINTIFFS' BRIEF IN SUPPORT OF EMERGENCY MOTION REGARDING COERCION AND INTERFERENCE WITH CLASS MEMBERS

# TABLE OF CONTENTS

**Page**

INDEX OF AUTHORITIES..................................................................... ii

QUESTIONS PRESENTED..................................................................... iv

CONTROLLING OR MOST APPROPRIATE AUTHORITIES.......................... v

INTRODUCTION ................................................................................1

FACTUAL BACKGROUND...................................................................2

    A.    Respondents Transfer Class Members to Stewart Detention Center and Deny Class Counsel Access to Them Until the Court Intervenes ................................................................2

    B.    Coercion and Threats Against Class Members at Stewart..................4

    C.    More Mass Consular Interviews Are Likely, Very Soon, So There Is a Need For Speedy Intervention. ........................................10

    D.    After Prior Abuses, the Court Had Already Put Respondents On Notice That Such Behavior Towards the Detainees Would Not Be Tolerated ...............................................................11

LEGAL STANDARD..........................................................................12

ARGUMENT ..................................................................................13

    A.    The Court Should Allow Class Counsel Access to Class Members Prior to Consular Interviews ..............................................13

    B.    The Court Should Regulate Government Contact with Class Members to Safeguard Against Future Coercion..............................18

        1.    The Court Has Broad Authority To Protect Class Members From Abuse and Coercion ......................................18

        2.    Class Members Cannot Be Penalized or Prosecuted for Refusing to Say They Do Not Wish To Return to Iraq ...........21

        3.    The Relief Requested is Necessary and Appropriate .............23

# INDEX OF AUTHORITIES

**Page(s)**

**Cases**

*Bah v. Cangemi,* 489 F. Supp. 2d 905 (D. Minn. 2007) ..........................................23

*Belt v. EmCare Inc.*, 299 F. Supp. 2d 664 (E.D. Tex. 2003) .............................19, 20

*Burns v. Martuscello*, 890 F.3d 77 (2d Cir. 2018) ...................................................23

*Cobell v. Norton*, 212 F.R.D. 14 (D.D.C. 2002) ..................................16, 19, 21, 24

*In re Currency Conversion Fee Antitrust Litig.,* 361 F. Supp. 2d 237 (S.D.N.Y. 2005), *as amended by* 2005 WL 1871012 (S.D.N.Y. Aug. 9, 2005) ......................................................................................18, 19, 24

*Georgine v. Amchem Prods., Inc.*, 160 F.R.D. 478 (E.D. Pa. 1995) ................16, 24

*Gulf Oil Co. v. Bernard*, 452 U.S. 89 (1981)........................................................ix, 13

*Jackler v. Byrne*, 658 F.3d 225 (2d Cir. 2011) ........................................................23

*Kleiner v. First Nat'l Bank of Atlanta*, 751 F.2d 1193 (11th Cir. 1985) .....17, 20, 24

*Rajigah v. Conway,* 268 F. Supp. 2d 159 (E.D.N.Y. 2003)....................................22

*Romano v. SLS Residential Inc.*, 253 F.R.D. 292 (S.D.N.Y. 2008) ............19, 20, 24

*In re Sch. Asbestos Litig.*, 842 F.2d 671 (3d Cir. 1988) ....................................21, 23

*Seretse-Khama v. Ashcroft*, 215 F. Supp. 2d 37 (D.D.C. 2002).............................22

*United States v. Ashraf*, 628 F.3d 813 (6th Cir. 2011) ...........................................22

*Zadvydas v. Davis,* 533 U.S. 678 (2001) ..........................................................*passim*

**Statutes**

8 U.S.C. §1253(a)(1)...............................................................................8, 22, 24, 25

**Rules**

Fed. R. Civ. P. 23(d) ...........................................................................................ix, 12

**Constitutional Provisions**

First Amendment.................................................................................................23

## QUESTIONS PRESENTED

1. Have class members been misled, coerced, threatened, or otherwise improperly induced to agree to repatriation to Iraq?

   **Petitioners' Answer: Yes.**

2. Should this Court issue an immediate, emergency order to ensure that (a) Class Counsel or their designees can promptly meet with and inform class member detainees of their rights prior to consular interviews, and (b) Class Counsel have the names of individuals who signed documents expressing a desire to be removed to Iraq, so that Counsel can investigate whether those individuals signed under duress and, if so, can take appropriate steps to address such coercion?

   **Petitioners' Answer: Yes.**

3. Should this Court bar Respondents from engaging in coercion or interference with class members, bar Respondents from penalizing or prosecuting any class member on the basis that the class member is unwilling to state that s/he desires to be removed to Iraq, require ICE to notify class members about these orders, and require Respondents to provide information to allow Petitioners to further investigate and attempt to redress the coercion that has occurred?

   **Petitioners' Answer: Yes.**

iv

## CONTROLLING OR MOST APPROPRIATE AUTHORITIES

Fed. R. Civ. P. 23(d)

*Gulf Oil Co. v. Bernard*, 452 U.S. 89 (1981)

*Zadvydas v. Davis,* 533 U.S. 678 (2001)

## INTRODUCTION

As this Court is well aware, there are significant questions about whether Iraq will agree to repatriation of its nationals who do not have passports and do not wish to return to Iraq. Information thus far obtained strongly suggests that Iraq will issue travel documents only for those who are willing to affirm their desire to return. *See* Pets' Resp. to Mot. to Stay, ECF 289, PgID.6855-60 (describing discovery evidence showing Iraq's position); Ex. 1 at Attachment A (Iraqi travel document application by which Iraqi nationals agree that they "desire to return voluntarily to Iraq"); Ex. 1, Gilbert Decl. at ¶¶ 8-11 (reporting on conversation with Iraqi official that Iraq is not accepting repatriation of Iraqis who are unwilling to be removed). Respondents, in an apparent effort to obtain such individual affirmations, recently transferred a significant number of detainees to the Stewart Detention Facility in Georgia for consular interviews. There, numerous misleading and abusive tactics were employed to obtain the detainees' signatures on documents expressing their "desire to return voluntarily to Iraq," even when the detainees do not actually so desire. ICE employees threatened detainees with criminal prosecution if they refused to sign—but in fact such a prosecution would be unlawful. ICE employees told detainees that there was no possible route out of detention except removal—but in fact there is. ICE employees told detainees that if they did not agree, they would spend years in detention—but in fact U.S. law

requires their release if there is no significant likelihood of removal in the reasonably foreseeable future. Iraqi consular officials also spoke with each detainee in Stewart, in many cases telling them, inaccurately, that their only route out of detention was to agree to repatriation. Only a few detainees successfully resisted this disinformation—and for them, ICE tried again, increasing the pressure, and may have extracted additional affirmations.

In other words, individuals who could not be repatriated if (informed about the true circumstances) they honestly expressed their own desires to remain in the United States—and who are therefore entitled to release under *Zadvydas v. Davis,* 533 U.S. 678 (2001), if, as appears highly likely, Iraq will not repatriate them involuntarily—are being induced, coercively and fraudulently, to sign documents that will likely result in their deportation to a country where they may well be tortured or killed. There is an urgent need both to prevent further subversion of other class members' wills and to redress the coercion that has already occurred. Additional consular interviews and mass transfers of detainees are apparently planned, and Respondents have not agreed to the steps necessary to end the coercion. Petitioners therefore bring this motion for emergency relief.

## FACTUAL BACKGROUND

### A. Respondents Transfer Class Members to Stewart Detention Center and Deny Class Counsel Access to Them Until the Court Intervenes

Around May 24, 2018, Petitioners' counsel learned that a significant number

of class members had been moved to Stewart Detention Center, in Lumpkin, Georgia (about 150 miles from Atlanta), and began hearing reports that detainees there were being harassed and coerced into agreeing to return to Iraq.[1] Pets' Emerg. Mot. for Access, ECF 297. Petitioners immediately requested that ICE allow their designee, attorney Marty Rosenbluth, to meet with class members in order to investigate and inform class members of their rights. *See* Email Correspondence, ECF 297-2. The Court had, in response to prior issues with ICE refusing to allow timely access to detainees, entered an order requiring that such visits be permitted within five days of request. *See* Order Re Further Proceedings, ECF 203 ¶ 10, PgID.5461. Mr. Rosenbluth repeatedly followed up with facility staff, who said that the matter was in ICE's hands. ECF 297, PgID.7164. Class Counsel raised the issue again with Respondents' counsel on June 1 and June 2, but no response was forthcoming. Petitioners filed an emergency motion for access to the Stewart Facility on Monday, June 4. ECF 289. (Shortly after that motion was filed, Stewart's detention center staff passed along ICE's email denying access to

---

[1] Notwithstanding ICE policy requiring that immigration counsel be notified of transfers of their clients, it appears that such notifications were omitted. Ex. 1, Gilbert Decl. ¶ 6. *See* U.S. Immigration and Customs Enforcement Policy 11022.1 (Detainee Transfers), at 5.3(2), https://www.ice.gov/doclib/detention-reform/pdf/hd-detainee-transfers.pdf ("If a detainee has an attorney of record (Form G-28 on file), the sending field office will: a) Notify the attorney that the detainee is being transferred and include the reason for the transfer and the name, location, and telephone number of the new facility as soon as practicable on the day of the transfer, but in no circumstances later than twenty four (24) hours after the transfer occurs.").

Mr. Rosenbluth. Ex. 3, Email to Rosenbluth). That same morning, June 4, Petitioners, who had heard detainees were about to be moved out of the Calhoun County, Michigan facility, were denied permission for a client meeting there within the court-ordered five-day window. Only after the Court instructed Respondents to make best efforts to provide Petitioners' counsel access to detainees in Stewart, and to try to work out access to Calhoun, did ICE grant access.

## B. Coercion and Threats Against Class Members at Stewart

On Tuesday, June 5, Mr. Rosenbluth and an additional designee, attorney Lauren Gilbert, met with detainees at Stewart. Ms. Gilbert returned to Stewart on Wednesday, June 6, for additional visits; her effort on June 7 to do a final round of visits in order to obtain class member signatures on various documents was largely unsuccessful because nearly all the class members had been transferred that morning.[2] *See* Ex. 1, Gilbert Decl. ¶ 20; Ex. 4, Rosenbluth Decl. ¶ 12.

Ms. Gilbert and Mr. Rosenbluth's investigation confirmed that class mem-

---

[2] As the Court is well aware, given Petitioners' longstanding reports of difficulty communicating with class members and more recent motion for emergency access to class members at Stewart, Class Counsel face tremendous challenges in reaching class members. Even when Class Counsel secure pro bono attorneys to travel to the locations where detainees are being held, those detainees can be transferred away before interviews are completed or declarations are signed—as happened here. *See* Ex. 1, Gilbert Decl. ¶ 20. Phone communications are extremely difficult; despite arduous efforts, Petitioners were unable to reach many of detainees for interviews or for final confirmation of the contents of their declarations. Ex. 5, Andrade Decl. ¶¶ 10-33. Petitioners may file supplemental declarations if those can be obtained from class members while this motion is pending.

bers were transferred to Stewart to meet with Iraqi consular officials, and that ICE was engaging in a campaign of coercion and misinformation to induce them to sign a letter addressed to the Iraqi Consul stating that they "desire to return voluntarily to Iraq." *See* Ex. 1, Gilbert Decl.; Ex. 4, Rosenbluth Decl.; Ex. 5, Andrade Decl.; Ex. 6, Kitaba-Gaviglio Decl.; Ex. 7, Arthur Decl.; Ex. 8, Kattoula Decl.; Ex. 9, Tayyeh Decl.; Ex. 10, Darmo Decl.; Ex. 11, Al-Atawna Decl.; Ex. 12, Al-Zubeidy Decl.; Ex. 13, Odish Decl.

For some class members, the misinformation and intimidation began when they heard they were being transferred. Hassan Al-Atawna and George Arthur both describe being awoken early in the morning and brought to an airport by ICE officers who told them they had been excluded from this lawsuit's stay of removal and were being deported to Iraq. Both fear torture if they are removed to Iraq—Mr. Arthur was tortured there before he left—and both were terrified. Consumed by fear, ████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████. It was not until they reached the airport that they were told they were actually being transferred to another detention facility. *See* Ex. 7, Arthur Decl. ¶¶ 5-7; Ex. 11, Al-Atawna Decl. ¶¶ 2-5. *See also* Ex. 8, Kattoula Decl. ¶ 3 (transported at 2 a.m. and not told where he was going; "started freaking out" because he thought he was being sent to Iraq).

5

Using ICE's on-line detainee locator, Petitioners were able to determine that approximately 31 class members were transferred to Stewart.[3] There they endured a course of conduct rife with coercion, intimidation, and misrepresentation, all designed to obtain class members' signatures on a letter to the Iraqi Consul, Ex. 1, Attachment A, that stated their willingness to be repatriated. The letter has both Arabic and English versions, and detainees reported being given both versions to sign. Ex. 1, Gilbert Decl. ¶ 16. The English version states in pertinent part:

> Dear Honorable Consul,
> Subject: Passport
>     I the Iraqi citizen (   ) would like to request the issue of a passport allowing me to enter Iraq due to my particular situation and **my desire to return voluntarily to Iraq.**
>     I would like to inform you that I have an old Iraqi passport that is not valid with the number (  ).
> With thanks and appreciation[4]

Ex. 1 at Attachment A, Letter to Iraqi Consul (emphasis added).

---

[3] The procedural posture of their immigration cases varies, with some still in the motion to reopen stage, some in the merits stage, some in appellate proceedings, and some having failed to file timely motions to reopen or appeals. While some have had the Court lift its stay of removal, for many the stay remains in effect.

[4] Petitioners obtained a certified translation of the Arabic letter, which differs in key respects from the English version provided to the detainees. The correct translation of the Arabic letter is:
> Dear Honorable Consul,
> Subject: Limited-Validity Passport
> I, an Iraqi citizen (                ), would like to request a limited-validity passport issued to me [to travel] to Iraq and this is for personal circumstances and my desire to return voluntarily to Iraq, with the knowledge that I don't hold a passport.
Ex. 2, Certified Translation of Letter to Iraqi Consul.

Class members report that they met with Iraqi consular staff, and that ICE or other American officials were present or standing nearby. *See* Ex. 7, Arthur Decl. ¶¶ 8-13 (both American officials, ICE officers, and Iraqi consular officials present); Ex. 11, Al-Atawna Decl. ¶¶ 11-12 (American official present during interview writing detailed notes); Ex. 9, Tayyeh Decl. ¶ 10 (fearful of what ICE would do because consular officials were telling ICE which detainees refused to sign). ICE pressured detainees to sign, and consular officials incorrectly told them that they would be detained indefinitely if they did not sign. Most of the detainees succumbed to these threats, and signed the letter. Others refused. Ex. 1, Gilbert Decl. ¶ 10 (told by Iraqi official that 39 detainees signed the form and only 6-7 refused). The next day, ICE employees berated detainees who refused to sign, again threatening or pressuring them. Ex. 10, Darmo Decl. ¶ 11; Ex. 8, Kattoula Decl. ¶ 22; Ex. 13, Odish Decl. ¶ 9; Ex. 6, Kitaba-Gaviglio Decl. ¶ 12.

The coercion of detainees to sign came from both ICE officers and Iraqi officials, and took several forms. First, detainees were threatened with prosecution if they did not sign. *See* Ex. 12, Al-Zubeidy Decl. ¶ 8 (told that if did not sign, he would be criminally prosecuted and spend the rest of his life in prison); Ex. 13, Odish Decl. ¶¶ 6-10 (when he refused to sign the consular letter, an ICE officer summoned him the next day, telling him that he had a "second opportunity to sign" the letter and that if he did not, he would be prosecuted for failure to comply with

7

orders); Ex. 5, Andrade Decl. ¶¶ 5-7 (A.A.O, XXX-XXX- 985 told by ICE officer that he would be criminally charged and serve time in prison if he did not sign). Other detainees heard about these threats second-hand, and found them both plausible and frightening. *See* Ex. 7, Arthur Decl. ¶ 9; Ex. 1, Gilbert Decl. ¶ 17 (because class members have been subject to orders of supervision, they are familiar with the general obligation to apply for travel papers and cooperate with removal procedures).

But the threat of prosecution is wrong: noncitizens with final removal orders must apply for travel papers, 8 U.S.C. § 1253(a)(1)(B), but it is not a crime for them to decline to tell a foreign government that they are willing to be repatriated. *See* Argument 2.b, below.

Second, both ICE officers and Iraqi consular staff told class members that they would be detained indefinitely, or for many years, unless they agree to sign. For example, class members Zaia Darmo and Ahmed Tayyeh each reported that an Iraqi official told him that if he did not sign, he "would be in jail for the rest of his life" (Darmo) and "would stay in jail forever" (Tayyeh); each—fearing indefinite detention—signed the form even though they do not desire to return to Iraq. Ex. 10, Darmo Decl. ¶¶ 12-15; Ex. 9, Tayyeh Decl. ¶¶ 6, 9. Class member Aziz Kattoula, who told consular officials, when asked, that he did not want to go to Iraq and did not want to sign, was called in by an American official who said he

was from Washington D.C. The official said the government would eventually de-port him, and that "I would be sitting in jail until they did." Ex. 8, Kattoula Decl. ¶ 22. Class member N.H., AXXX-XXX-451, reported that even prior to being transferred to the Stewart Detention Center, his detention officer gave him a letter that the officer claimed was an application for travel documents, and told him that if he did not sign, he would be detention for a very long time; N.H. signed the letter, which he believes that it was the same letter that he was given by Iraqi consular representatives in Georgia (although he was later told that he would still be denied travel documents). Ex. 6, Kitaba-Gaviglio Decl. ¶¶ 14-19. Other detainees were similarly threatened with years of detention unless they signed. *Id.* ¶¶ 10-11; Ex. 7, Arthur Decl. ¶¶ 9-10; Ex. 5, Andrade Decl. ¶ 7. The detainees "signed the form because ICE told them that if they did not, they could be prosecuted for failure to cooperate and sentenced to five years in prison, and because ICE told them if they did not sign, they would definitely be kept in detention until the U.S. government could send them back." *Id. See also* Ex. 6, Kitaba-Gaviglio Decl. ¶ 10 (class member K.P., AXXX-XXX-207, told that if he did not sign the form, he could be jailed for 5-10 years).

Again, this threat is incorrect. If ICE is unable to repatriate someone in the "reasonably foreseeable future," under *Zadvydas* ICE must release that individual from detention. There is no circumstance in which an immigrant detainee unable to

be repatriated faces permanent detention, and even a threat of "years" of detention exceeds what is permissible under *Zadvydas*.

Moreover, ICE officials interfered with class members' relationships with their immigration counsel, and with their ongoing immigration cases, by stating—falsely—that they had no hope of winning those cases. For example, an ICE officer told Aziz Kattoula that "eventually they were going to deport" him. Ex. 8, Kattoula Decl. ¶ 22. In fact, many class members have reopened their immigration cases and obtained relief/protection from removal. ECF 138-2, Schlanger Decl. ¶¶ 22-23, PgID.3406-07 (reporting high success rates for limited number of cases already decided on the merits).

Once Mr. Rosenbluth and Ms. Gilbert were able to provide accurate information to them about their rights and counter the misinformation, several detainees with whom Mr. Rosenbluth and Ms. Gilbert met indicated that they wish to revoke their prior statement that they want to go to Iraq. Ex. 1, Gilbert Decl. ¶ 18.  Each explained that he had been coerced and did not and does not want to return. *Id*. *See also* Ex. 12, Al-Zubeidy Decl. ¶ 13 (wishes to revoke signature on letter).

### C. More Mass Consular Interviews Are Likely, Very Soon, So There Is a Need For Speedy Intervention.

Petitioners have communicated at length with Respondents about the issues raised in this motion, sending a letter on June 6 setting out the facts and the relief requested. Respondents have so far declined to provide either information or any

remedy. The problem is prospective as well as retrospective—it seems likely that more transfers and consular visits are pending, and that pressure on detainees is not limited to the Stewart facility. The evidence for this is twofold:

- Iraqi Embassy official Wathiq Al Hammam told Ms. Gilbert that a plane to Iraq could leave as soon as mid-June—and that more consular interviews were likely to be conducted, perhaps in Pennsylvania. Ex. 1, Gilbert Decl. ¶ 11.
- The Respondents' answer to Interrogatories 6 and 7 noted ███████████████████████████████████████████ ███████████████████████████████████████████ ████████████████████ it seems likely that these individuals will have consular interviews soon. *See* Ex. 14, Response to Interrogatories.[5]

A speedy solution is required or more coercive interviews will prejudice more class members. *See also* Ex. 15, Jado Decl. ¶¶ 4-5 (Calhoun detainee told by ICE that he cannot be repatriated because neither Iraq nor Greece will take him, but unless he signs that he wants to be removed to Iraq and gets out of the *Hamama* case, he "will never get released until the case is over and that could take years").

### D. After Prior Abuses, the Court Had Already Put Respondents On Notice That Such Behavior Towards the Detainees Would Not Be Tolerated

The Court has previously confronted similar reports that ICE employees were abusing, coercing, and misinforming class members. *See* Petitioners' Status Report, ¶ G, ECF 94, PgID.2428-29; Elias Decl., ECF 94-4; Mallak Decl., ECF 94-

---

[5] Petitioners previously moved to file of this document under seal. *See* ECF 288. Pending a ruling on that motion, Petitioners have redacted that information here and will provide this exhibit directly to chambers.

5; Alkadi Decl., ECF 94-6; Peard Decls., ECF 94-7, 94-10; Free Decl., ECF 94-8;

Hernandez Decl., ECF 94-11; Free Letter, ECF 94-13. The Court found then:

> Petitioners have presented evidence that certain detainees have been subject
> to coercion and harassment as a result of this litigation. The Government has
> provided evidence that ICE has since instructed its personnel not to discuss
> the litigation with detainees, other than to instruct them to speak with their
> attorneys, or how to contact a pro bono attorney. Petitioners do not ask for
> further direction to ICE personnel, and the Court deems the current
> instruction sufficient. The Court agrees with Petitioners regarding notice to
> detainees, and orders that ICE shall post a notice in each facility, by
> September 28, 2017, instructing detainees on how to notify Petitioners'
> counsel regarding any future instances of coercion or harassment related to
> this litigation.

Order Regarding Further Proceedings, ¶ E, ECF 110, PgID.2818-19.

Petitioners have been unable to ascertain whether this notice is posted in

Stewart. Regardless, the prior instruction was insufficient to ensure that ICE em-

ployees refrain from providing misleading information to or coercing detainees.

## LEGAL STANDARD

In presiding over a class action, a district court has the power to

> [I]ssue orders that: . . . (B) require—to protect class members and
> fairly conduct the action—giving appropriate notice to some or all
> class members of: (i) any step in the action; . . . (iii) the members'
> opportunity to . . . present claims or defenses . . . (C) impose
> conditions on the representative parties or on intervenors; . . . or (E)
> deal with similar procedural matters.

Fed. R. Civ. P. 23(d). Because of the potential for abuse in a class action setting, "a

district court has both the duty and the broad authority to exercise control over a

class action and to enter appropriate orders governing the conduct of counsel and

12

parties," including the power to regulate communications between the class members and counsel and to fashion relief for improper conduct. *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 100 (1981).

## ARGUMENT

### A. The Court Should Allow Class Counsel Access to Class Members Prior to Consular Interviews

The most urgent relief Petitioners seek is simple and practical. Petitioners need information and access so that Class Counsel can 1) arrange for class member meetings prior to future consular interviews and provide class members accurate information to inform their decision-making at those interviews; and 2) identify all class members who may have been coerced into signing documents stating that they wish to be removed, and contact those class members to determine how to proceed. These emergency measures will help guard against further coercion and allow Class Counsel to investigate and address past coercion while the parties brief and the Court considers the remaining relief requested.

Specifically, Petitioners first ask for an order that Respondents shall provide notice to Class Counsel prior to Iraqi consular interviews, so that Class Counsel can arrange for prompt individual or group class member meetings (at Class Counsel's discretion), before those consular interviews occur. Given the logistics involved in scheduling consular meetings and transferring detainees, Respondents are aware well in advance of the locations for such meetings. Advance notice will

allow Class Counsel to identify and prepare designees who are able to visit which-ever of Respondents' many far-flung detention locations are the next sites for consular interviews or the sites from which interviewed detainees will be transferred. Because the process of identifying designees and coordinating with the facility can begin well in advance—even before or while detainees are in transit—this will allow for orderly planning of client meetings. If the interviews are being facilitated by detainee transfers, Petitioners request that the notice include the approximate number of detainees being transferred, the facility where consular interviews are being conducted, and the anticipated date(s) of arrival and of the consular interviews. (To ensure appropriate confidentiality, the notice can be designated as Highly Confidential under the Second Amended Protective Order, so that Class Counsel cannot share such information, other than with the designees who are to conduct the client meetings.) Notably, Class Counsel are not even seeking the names of class members who will be interviewed, unless those names are necessary for Class Counsel to arrange for client meetings (for example, if not all the Iraqis at an affected facility are heading to consular interviews). The meetings will ensure that detainees have accurate information and can make knowing and informed choices about what documents to sign.

While Respondents may contend—the evidence notwithstanding—that no abuse or coercion occurred, or that ICE was not responsible, Respondents can offer

no legitimate reason why class members should not have complete and accurate information before making decisions about whether to sign a document that could result in their removal.

Second, to enable Class Counsel to investigate and address the coercion and abuse that has already occurred, Petitioners ask the Court to order that Respondents, within 24 hours after the Court's order enters, produce to Petitioners a list of the names and A-numbers of all class members who have been asked to sign any document expressing a desire to be removed to Iraq, and copies of all such documents in Respondents' possession. Because of the time sensitivity of potential revocations of such documents, Respondents should further facilitate confidential phone calls or video interviews within 24 hours of Class Counsel's request for any class members who have already signed a letter to the Iraqi Consul stating that they desire to return to Iraq (other than class members for whom the court has signed a stipulated order lifting the stay of removal), and facilitate Class Counsel's ability to obtain signatures on documents by these individuals, as requested. The detainees and Petitioners' designees give varying estimates of the number of detainees who have signed the forms, but two things are clear: 1) dozens have signed, and 2) Petitioners have spoken to only a fraction of them, but many of those individuals signed under duress, do not want to be deported to Iraq, and wish to retract their statements assenting to removal. As this Court well knows, Class Counsel are

prepared to—and have—stipulated in many instances to lifting the stay of removal for individual class members. However, this system only works if Class Counsel have access to class members, can inform them of their rights, and can proceed with at least relatively high confidence that they are making voluntary choices, even if those choices are affected by the inherently coercive nature of prolonged detention. All Petitioners request at this emergency junction is the information and access necessary for Class Counsel to identify and then attempt to assist detainees who signed forms under duress, but do not in fact wish to be removed to Iraq.

The law is clear that courts should guard against situations—as happened here—that "pose a serious threat to the fairness of the litigation process, the adequacy of representation and the administration of justice generally." *Georgine v. Amchem Prods., Inc.*, 160 F.R.D. 478, 490 (E.D. Pa. 1995) (citation omitted). Respondents' actions clearly vitiated the "essential" decision of class members: whether to fight or give up "on the basis of independent analysis of their own self interest [sic]." *Id.*. As a result of Respondents' campaign of coercion, individual class members could no longer make a "free and unfettered decision" as to how to proceed in this litigation. *Id.* at 497. Rather, Respondents "fixed the system," *Cobell v. Norton*, 212 F.R.D. 14, 17 (D.D.C. 2002), in favor of one outcome: that class members will concede—lacking full and accurate information, subjected to blatant misrepresentations by the ICE agents controlling their situation, transferred

16

far from their attorneys and family members—to waive their rights. Under these circumstances, purportedly "voluntary" signatures are hopelessly infected by coercion and inequity. The stopgap remedy Petitioners request on an emergency basis is simply for access, so they can counter misinformation with accurate information.

The applicable principle is that class members should be able to make informed decisions. Class members are being presented with oral communications pressuring them to waive the protections offered by the class action and to agree to a highly adverse result—repatriation to an extremely dangerous country. *See Kleiner v. First Nat'l Bank of Atlanta*, 751 F.2d 1193, 1206 (11th Cir. 1985) (oral communications exacerbate the potential for abuse; "by their very nature, [they] are wont to produce distorted statements on the one hand and the coercion of susceptible individuals on the other"). The information class members are receiving grossly misrepresents the nature of this litigation, class members' rights and chances of success, and the consequences of failing to affirmatively express a desire to be removed to Iraq. Class Counsel, who were neither informed of the consular interviews nor allowed access to detainees at Stewart in a timely manner, had no opportunity to counteract the effect of Respondents' distortions. And the threatening and misleading communications were made to people who have already been held in custody for—in many cases—a year as of Monday: an audience stripped of resolve and easily coerced into believing that the government

17

can do as it pleases. As a result, class members compromised their position in this litigation and in their own immigration cases without a full and fair understanding of the circumstances.

### B. The Court Should Regulate Government Contact with Class Members to Safeguard Against Future Coercion

While the requested access and information can ameliorate the worst impacts of misinformation and coercion while the Court considers the issues, a deeper solution is necessary and appropriate to prevent further coercion and intimidation. After (expedited) briefing, the Court should 1) bar Respondents from engaging in further coercion or interference with class members; 2) prohibit Respondents from penalizing or prosecuting class members who refuse to express a desire to return to Iraq, and from threatening such penalty or prosecution; 3) require appropriate notice; and 4) order production of information necessary for Petitioners to investigate and monitor for coercion.

### 1. The Court Has Broad Authority To Protect Class Members From Abuse and Coercion

District courts possess broad authority to regulate and proscribe communications between defendants or their representatives and members of a class. *In re Currency Conversion Fee Antitrust Litig.,* 361 F. Supp. 2d 237, 252 (S.D.N.Y. 2005), *as amended by* 2005 WL 1871012 (S.D.N.Y. Aug. 9, 2005). A defendant may not initiate contact with class members, actual or putative, with the intent of

altering the plaintiff class members' rights in the pending litigation without judicial authorization. *See id.* at 253. Once a class has been certified, the members of that class stand in an attorney-client relationship with class counsel, and communications initiated by defendants are subject to more stringent restrictions as communications with represented parties. 3 Newberg on Class Actions § 9:9 (5th ed. June 2018 update).

Courts routinely intervene where unilateral communications from a defendant threaten to interfere with class proceedings. For example, courts regulate defendants' attempts to solicit opt outs from plaintiff class members, particularly where the defendants utilize false, misleading, or coercive tactics in their solicitations. *Romano v. SLS Residential Inc.*, 253 F.R.D. 292, 299 (S.D.N.Y. 2008) (communications seeking opt-outs were improper where defendants instilled "distress, misunderstandings, and fear among potential class members" by threatening to make class members' psychiatric records public and by misrepresenting the court's rulings); *Belt v. EmCare Inc.*, 299 F. Supp. 2d 664, 668-69 (E.D. Tex. 2003) (holding to be "misleading" and "coercive" a letter from defendants that "prey[ed] upon [class members'] fears and concerns" by misrepresenting the nature of the FLSA litigation and suggesting that their participation would imperil their economic livelihood); *see also Cobell*, 212 F.R.D.at 19 (finding improper defendant's otherwise ordinary business

communication with class members where language in letter would have effect of "extinguish[ing] the very rights that are at the heart of this class action litigation"). Efforts by defendants "to diminish the size of the class"—and therefore the scope of relief for which the defendants may be held responsible—reduce the effectiveness of the class action format "for no reason except to undermine the purposes of [Rule 23]." *Kleiner*, 751 F.2d at 1202, 1203 (scheme of unilateral communications dominated by defendants, is "rife with potential for coercion" and "sabotage[s] the goal of informed consent").

U.S. government employees, agents, and contractors should not be talking to class members—who are represented parties—about this litigation, including the prospects of their *Zadvydas* claim. *See* ECF 110, ¶ E PgID.2818-19. Yet here, government employees, who should not be communicating with *Hamama* class members about their immigration cases at all, have presented a one-sided view of the law and of Petitioners' chances of success that "prey[s] upon" class members' "distress, misunderstandings, and fear." *Romano*, 253 F.R.D. at 296; *Belt*, 299 F. Supp. 2d at 668-69. If, as the evidence increasingly shows, Iraq will issue travel documents only for individuals who state their willingness to be repatriated, then there is no "significant likelihood of removal in the reasonably foreseeable future," *Zadvydas*, 533 U.S. at 701, for a detainee who maintains his unwillingness to be repatriated. Respondents are attempting to foreclose class members' opportunity to

be heard on these claims by threatening them with indefinite and prolonged detention (itself an alternative ground for relief of Petitioners' detention). In other words, Respondents seek to "extinguish the very rights that are at the heart of this class action litigation." *Cobell*, 212 F.R.D. at 19.

Additionally, the court's power to regulate and proscribe contact extends to defendants' attempts to "undermine class plaintiffs' cooperation with or confidence in class counsel." *See In re Sch. Asbestos Litig.*, 842 F.2d 671, 682 (3d Cir. 1988). Respondents' representations to detained class members that this litigation will not benefit them are not only untrue but have the predictable effect of creating animosity toward class counsel and inducing class members to exclude themselves from this litigation based on misinformation and without an opportunity for Petitioners' counsel to rebut Respondents' assertions. Ex.1, Gilbert Decl. ¶ 15.

In light of the evidence here, the Court should limit communications between Respondents and class members Such an order would serve the underlying policy interests of Rule 23 and is appropriate because Respondents have sought, in effect, to "mislead or otherwise threaten to create confusion and to influence the [class members'] decision whether to" continue to seek the relief at issue in the case. *In re Sch. Asbestos Litig.*, 842 F.2d at 682–83.

## 2.  Class Members Cannot Be Penalized or Prosecuted for Refusing to Say They Do Not Wish To Return to Iraq

Threats to prosecute or punish class members for failing to express a desire

to return Iraq are legally unfounded. Detainees with final orders can be required to cooperate in obtaining travel documents, but they cannot be required to state that they *want* to go to Iraq. The threats in question seems to be premised on 8 U.S.C. §1253(a)(1), but would, in fact, be unlawful under that statute.

In pertinent part, the statute forbids noncitizens with final orders of removal to "(B) willfully fail[] or refuse[] to make timely application in good faith for travel or other documents necessary to the alien's departure," or to "(C) connive[] or conspire[], or take[] any other action, designed to prevent or hamper or with the purpose of preventing or hampering the alien's departure". 8 U.S.C. §1253(a)(1). As one court noted in dismissing a prosecution under the statute premised on truthful admissions to Liberian officials that the defendant did not want to return home because he had few ties to the country:

> Respondents cite no case law to support their view that petitioner's truthful (and somewhat self-evident) statement [about lack of desire to return] constitutes a lack of cooperation or failure to assist in his removal under 8 U.S.C. § 1231(a)(1)(C). The limited case law construing what constitutes an affirmative act that prevents one's return does not support the proposition that an alien's statement of a lack of desire to return to his country of origin, without more, amounts to a bad faith failure to cooperate.

*Seretse-Khama v. Ashcroft*, 215 F. Supp. 2d 37, 51 (D.D.C. 2002). *See also United States v. Ashraf*, 628 F.3d 813, 825 (6th Cir. 2011) ("Section 1253's proper-steps exception, in other words, prevents [the immigrant's] efforts to challenge his removal from being used as evidence of his failure to obtain his travel docu-

ments."); *Rajigah v. Conway,* 268 F. Supp. 2d 159, 166 (E.D.N.Y. 2003) (no bad faith where detainee's counsel truthfully advised Guyanese Ambassador that he intended to file a court action and the policy of the Guyanese government was to decline to issue travel documents while action was pending); *Bah v. Cangemi,* 489 F. Supp. 2d 905, 922 (D. Minn. 2007) (application by a noncitizen for legal relief from his removal does not constitute an action frustrating his removal, even if a foreign government therefore refuses to issue travel documents).

Moreover, each class member "has a First Amendment right to decide what to say and what not to say, and, accordingly, the right to reject governmental efforts to require him to make statements he believes are false." *Jackler v. Byrne,* 658 F.3d 225, 241 (2d Cir. 2011). *See also Burns v. Martuscello,* 890 F.3d 77, 86 (2d Cir. 2018) (right against compelled speech includes right not to be forced by government to say things one believes are not true). Respondents can require class members with final removal orders to participate in the process of obtaining travel documents, by, for example, filling out passport applications or providing copies of the identity documents. But Respondents cannot compel class members to lie.

## C.    The Relief Requested is Necessary and Appropriate

This Court has the power to fashion a remedy where Respondents' actions present a significant "likelihood" of abuse or confusion. *See In re Sch. Asbestos Litig.*, 842 F.2d at 683. Depending on the degree of harm and egregiousness of the

defendants' conduct, such remedies may include protective orders, corrective notices, provision of a second opportunity to opt out, invalidation of opt-outs, and other sanctions within the court's discretion. 3 Newberg on Class Actions § 9:9 (5th ed. June 2018 update); *see also Kleiner*, 751 F.2d at 1207 (affirming order barring defendants from soliciting opt outs from plaintiff class members); *Cobell*, 212 F.R.D. at 20 (prohibiting contact between defendants and class members "that discuss this litigation, or the claims that have arisen therein, without the prior authorization of this Court"); *Romano*, 253 F.R.D. at 299 (requiring corrective notice and invalidating opt outs obtained by deception and misrepresentation); *In re Currency Conversion Fee Antitrust Litig.*, 361 F. Supp. 2d at 254 (holding unenforceable arbitration agreements purporting to waive class action rights that defendants induced plaintiff class members to sign during pendency of litigation); *Georgine*, 160 F.R.D. at 498, 502 (creating second notice and opt-out period where communications "likely confused and misled class members, caused a high number of opt-outs and, therefore, had an adverse effect on the administration of justice").

In this case, four responses will prevent future abuses and begin to remedy the abuses that have occurred. First, the Court should limit Respondents' communications with class members to prevent further abuses. Second, the Court should prohibit Respondents from penalizing or prosecuting any class member under 8 U.S.C. § 1253(a) or in any other way on the basis that the class member is

unwilling to state that s/he desires to be removed to Iraq. Third, the Court should order ICE to both post a notice, and hand deliver it class members who met with Iraqi consular officials in the last two months, informing them that ICE officers are not allowed to communicate with them about their immigration cases, length of their detention, or prospect of removal to Iraq and that they will not be penalized under 8 U.S.C. § 1253(a) or otherwise if they refuse to state that they wish to be removed to Iraq. Finally, the Court should order Respondents to provide Petitioners with basic information necessary to fully investigate and address the past abuse and coercion, and to monitor for future abuse and coercion.

These four steps will reduce the likelihood of future coercion, help class members make informed decisions, counter the incorrect information that is subverting class members' ability to make voluntary and knowing decisions about their own repatriation, and provide information necessary for Class Counsel to attempt to assist detainees who signed forms under duress, but do not in fact wish to be removed to Iraq.

Respectfully submitted,

Michael J. Steinberg (P43085)
Kary L. Moss (P49759)
Bonsitu A. Kitaba (P78822)
Miriam J. Aukerman (P63165)
ACLU FUND OF MICHIGAN
2966 Woodward Avenue
Detroit, Michigan 48201
(313) 578-6814
msteinberg@aclumich.org

/s/Kimberly L. Scott
Kimberly L. Scott (P69706)
Wendolyn W. Richards (P67776)
Cooperating Attorneys, ACLU Fund
  of Michigan
MILLER, CANFIELD, PADDOCK
  & STONE, PLC
101 N. Main St., 7th Floor
Ann Arbor, MI 48104
(734) 668-7696
scott@millercanfield.com

Nora Youkhana (P80067)
Nadine Yousif (P80421)
Cooperating Attorneys, ACLU Fund
  of Michigan
CODE LEGAL AID INC.
 27321 Hampden St.
Madison Heights, MI 48071
(248) 894-6197
norayoukhana@gmail.com

Judy Rabinovitz (NY Bar JR-1214)
Lee Gelernt (NY Bar LG-8511)
ACLU FOUNDATION
  IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2618
jrabinovitz@aclu.org

Margo Schlanger (P82345)
Cooperating Attorney, ACLU Fund
  of Michigan
625 South State Street
Ann Arbor, Michigan 48109
734-615-2618
margo.schlanger@gmail.com

Susan E. Reed (P66950)
MICHIGAN IMMIGRANT RIGHTS
  CENTER
3030 S. 9th St. Suite 1B
Kalamazoo, MI 49009
(269) 492-7196, Ext. 535
Susanree@michiganimmigrant.org

Lara Finkbeiner (NY Bar 5197165)
Mark Doss (NY Bar 5277462)
INTERNATIONAL REFUGEE
  ASSISTANCE PROJECT
Urban Justice Center
40 Rector St., 9th Floor
New York, NY 10006
(646) 602-5600
lfinkbeiner@refugeerights.org

26

María Martínez Sánchez (NM Bar
126375)
ACLU OF NEW MEXICO
1410 Coal Ave. SW
Albuquerque, NM 87102
msanchez@aclu-nm.org

*Attorneys for All Petitioners and Plaintiffs*

William W. Swor (P21215)
WILLIAM W. SWOR
 & ASSOCIATES
1120 Ford Building
615 Griswold Street
Detroit, MI 48226
wwswor@sworlaw.com

*Attorney for Petitioner/Plaintiff Usama Hamama*

Dated: June 13, 2018

27

CERTIFICATE OF SERVICE

I hereby certify that on June 13, 2018, I electronically filed the foregoing papers with the Clerk of the Court using the ECF system which will send notification of such filing to all ECF filers of record.

> By: /s/*Kimberly L. Scott*
> Kimberly L. Scott (P69706)
> Cooperating Attorneys, ACLU Fund of Michigan
> MILLER, CANFIELD, PADDOCK
>   & STONE, PLC
> 101 N. Main St., 7th Floor
> Ann Arbor, MI 48104
> (734) 668-7696
> scott@millercanfield.com