# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

**USAMA JAMIL HAMAMA**, et al.,
    Petitioners and Plaintiffs,

v.

**REBECCA ADDUCCI**, et al.,
    Respondents and Defendants.

Case No. 2:17-cv-11910
Hon. Mark A. Goldsmith
Mag. David R. Grand

Class Action

## PETITIONERS/PLAINTIFFS' MOTION FOR SANCTIONS

Local Rule 7.1(a)(1) requires Petitioners/Plaintiffs (hereinafter Petitioners) to ascertain whether this motion is opposed. Petitioners' counsel Margo Schlanger communicated with William Silvis, counsel for Respondents/Defendants (hereinafter Respondents), via email on August 28, 2018 explaining the nature of the relief sought and seeking concurrence. Mr. Silvis responded that "Respondents deny that any false or misleading statements have been made to the Court, but without knowing which statements Petitioners are referencing Respondents are not in a position to provide the answer required under LR 7.1(2)(A)."

\* \* \*

On January 2, 2018, this Court deferred ruling on Petitioners' *Zadvydas* claim, based principally upon factual representations by Respondents regarding the likelihood that Iraq would accept Petitioners for repatriation. ECF 191, PgID5328-35. Relying on declarations from John Schultz, deputy assistant director for ICE's Asia and Europe Removal and International Operations Unit, and Michael Bernacke, ICE's acting deputy assistant director for that same unit, the Court found that it is "still an open question whether Iraq has agreed to accept class-wide

repatriation" and that "a more developed record is necessary to answer this question." *Id.* at PgID5334. The Court pointed specifically to statements that "the Government's negotiations have resulted in Iraq's agreement to cooperate in removal of Iraqi nationals from the United States;" that "ICE had scheduled charter flights to depart in both June and July;" that "there is no numeric limit on the number of removals;" that the reason "very few travel documents have actually been provided" was that "these documents are being sought only for those not subject to the stay of removal;" and that "if the injunction is lifted, large-scale removals can be arranged via charter flights, without the need for travel documents." *Id.* at PgID5331-32 (citing Schultz and Bernacke declarations).

Once the Court allowed discovery, Respondents – who had successfully prevented discovery during all of 2017 – sought to thwart it at every turn through delay and objection. When they did respond, they provided incomplete and misleading interrogatory responses designed to obscure, *inter alia*, the fact that Iraq has a long-standing and continuing policy against involuntary repatriations, and that Iraq has repeatedly refused repatriation of class members, absent their expressed desire to return. Discovery is still incomplete. Most recently, after Respondents sought yet another extension and the Court ordered that they respond to discovery requests, including production of documents by August 20, 2018, Respondents again failed to produce documents, meaning that only Respondents –

2

and not Petitioners nor the Court – have access to documents that post-date March 2018.

Critically, however, the documents that Petitioners have obtained in these hard-fought discovery battles show that the Respondents' sworn declarations contained both highly misleading and demonstrably false information – information that was the basis for this Court's January 2nd ruling. Moreover, the Respondents knew at the time they submitted those declarations that the statements were misleading or false. Documents obtained in discovery also show that Respondents knowingly withheld critical facts from the Court. At no point have Respondents made any efforts to rectify the situation by notifying the Court or class counsel that prior court filings and discovery responses contained false and misleading information, or that Respondents had failed in their court filings to mention facts central to resolution of the *Zadvydas* claim. The truth is:

- there is no agreement with Iraq for class-wide repatriation;
- ICE sought ███████████████████████████████████ ███████████████████████████;
- Iraq had and continues to have a longstanding policy of opposing forced repatriation and it is unclear whether or when Iraq will ever accept Iraqi nationals who do not wish to return;
- Iraq has long required potential deportees to express their desire to return to

Iraq, and has used a standard form to document that desire in writing;

- Iraq has ███████████████████████████████████
  ████████████ ;

- Iraq will not accept Iraqi nationals on charter flights without travel documents;

- ███████████████████████████████████████
  ███████████████████

- Iraq ███████████████████████████████ by the time when this Court's nationwide injunction issued; and

- by the time Respondents' opposed the first preliminary injunction in July 2017, ICE ████████████████████████████
  ███████████████████████████████████
  ███████████████████████████████████
  █████████████ .

Respondents not only failed in their duty to reveal those facts to the Court, but affirmatively misrepresented them.

WHEREFORE, pursuant to this Court's inherent powers and for the reasons set forth in the accompanying brief, Petitioners request that this Court, as sanctions and remedies for Respondents' misrepresentations, bad faith and misconduct:

1. ORDER that members of the *Zadvydas* Subclass who have been detained

longer than six months be released under orders of supervision within 14 days unless Respondents by that date provide to the Court individualized evidence that:

    a. ICE has valid travel documents for the detainee; or

    b. There is another strong special justification for the individual's detention, other than effectuating removal.

2. STRIKE from the declarations of John Schultz Jr. and Michael Bernacke language that is false or misleading and that is contained in the following paragraphs of those declarations, as highlighted in Exhibits A, B and C:

- Schultz Dec. 7/20/2017, ECF 81-4, ¶5;

- Schultz Dec. 11/30/2017, ECF 158-2, ¶¶4, 6, 7, 8 and 9;

- Bernacke Dec. Doc# 184-2, ¶¶4, 5, 6, 7, 8, 10, 11 and 12.

3. ORDER that in any individual immigration and habeas proceeding, whether in immigration court or federal court, in which the Schultz and Bernacke declarations have been offered as evidence, Respondents file a notice stating that this Court has stricken portions of those declarations, provide each presiding judge in such a proceeding with this Court's order and opinion explaining why credence is not due the declarations and what portions of the declarations have been stricken, and report to this Court on those filings.

4. ORDER Respondents to pay Petitioners' counsel their reasonable attorneys' fees and costs for conducting discovery related to Petitioners' *Zadvydas*

claim, for filing and litigating this Motion for Sanctions, and for filing and litigating Petitioners' Renewed Motion for Preliminary Injunction Under *Zadvydas*, ECF 376.

5. GRANT whatever other relief the Court deems appropriate to sanction and remedy the government's actions.

Respectfully submitted,

Michael J. Steinberg (P43085)
Bonsitu A. Kitaba (P78822)
Miriam J. Aukerman (P63165)
ACLU FUND OF MICHIGAN
2966 Woodward Avenue
Detroit, Michigan 48201
(313) 578-6814
msteinberg@aclumich.org

/s/Kimberly L. Scott
Kimberly L. Scott (P69706)
Wendolyn W. Richards (P67776)
Cooperating Attorneys, ACLU Fund
 of Michigan
MILLER, CANFIELD, PADDOCK
 & STONE, PLC
101 N. Main St., 7th Floor
Ann Arbor, MI 48104
(734) 668-7696
scott@millercanfield.com

Judy Rabinovitz (NY Bar JR-1214)
Lee Gelernt (NY Bar LG-8511)
ACLU FOUNDATION
 IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2618
jrabinovitz@aclu.org

Margo Schlanger (P82345)
Cooperating Attorneys, ACLU Fund
 of Michigan
625 South State Street
Ann Arbor, Michigan 48109
734-615-2618
margo.schlanger@gmail.com

Susan E. Reed (P66950)
MICHIGAN IMMIGRANT RIGHTS
CENTER
3030 S. 9th St. Suite 1B
Kalamazoo, MI 49009
(269) 492-7196, Ext. 535
Susanree@michiganimmigrant.org

Nora Youkhana (P80067)  
Nadine Yousif (P80421)  
Cooperating Attorneys, ACLU Fund  
 of Michigan  
CODE LEGAL AID INC.  
 27321 Hampden St.  
Madison Heights, MI 48071  
(248) 894-6197  
norayoukhana@gmail.com  

María Martínez Sánchez (NM Bar  
126375)  
ACLU OF NEW MEXICO  
1410 Coal Ave. SW  
Albuquerque, NM 87102  
msanchez@aclu-nm.org  

Lara Finkbeiner (NY Bar 5197165)  
Mark Doss (NY Bar 5277462)  
INTERNATIONAL REFUGEE  
 ASSISTANCE PROJECT  
Urban Justice Center  
40 Rector St., 9th Floor  
New York, NY 10006  
(646) 602-5600  
lfinkbeiner@refugeerights.org  

*Attorneys for All Petitioners and Plaintiffs*

William W. Swor (P21215)  
WILLIAM W. SWOR  
 & ASSOCIATES  
1120 Ford Building  
615 Griswold Street  
Detroit, MI 48226  
wwswor@sworlaw.com  

*Attorney for Petitioner/Plaintiff Usama Hamama*

Dated: August 31, 2018

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

**USAMA JAMIL HAMAMA**, et al.,
    Petitioners and Plaintiffs,

v.

**REBECCA ADDUCCI**, et al.,
    Respondents and Defendants.

Case No. 2:17-cv-11910
Hon. Mark A. Goldsmith
Mag. David R. Grand

Class Action

## PETITIONERS/PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR SANCTIONS

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................iv

STATEMENT OF ISSUES PRESENTED..................................................vi

CONTROLLING OR MOST APPROPRIATE AUTHORITY ........................... vii

INTRODUCTION ..........................................................................1

BACKGROUND AND FACTS .............................................................2

I.    RESPONDENTS KNOWINGLY PRESENTED FALSE AND MISLEADING INFORMATION ....................................................2

    A.    Respondents' Declarations Stated There Was an Agreement Under Which Iraq Would Accept Unlimited Repatriations Via Charter Flights...................................................................3

    B.    Respondents Knew The Declarations Were Untrue ...........................5

        1.    Respondents said Iraq agreed to the return of all Iraqi nationals with final orders of removal, knowing that was untrue............................................................................6

        2.    Respondents said ICE could secure travel documents, but has not attempted to do so because of the injunction, knowing that was untrue ...........................................8

        3.    Respondents said Iraq agreed to accept charter flights without formal travel documents, knowing that was untrue............................................................................9

        4.    ICE said that the June and July 2017 flights were cancelled as a result of this Court's injunction, knowing that was untrue ......................................................10

    C.    The Government Withheld Material Information .............................12

II.    THE GOVERNMENT'S CONDUCT THROUGHOUT THIS LITIGATION HAS BEEN DESIGNED TO HIDE THE TRUTH .......13

III.    RESPONDENTS' MISCONDUCT HAS CAUSED PETITIONERS SEVERE HARM.........................................................15

ARGUMENT ............................................................................16

IV.    THIS COURT HAS INHERENT AUTHORITY TO SANCTION
AND REMEDY THE GOVERNMENT'S LITIGATION
MISCONDUCT...................................................................................16

V.    THIS COURT HAS INHERENT AUTHORITY TO FASHION
APPROPRIATE REMEDIES TAILORED TO THE HARM
CAUSED BY THE GOVERNMENT'S MISCONDUCT ....................19

VI.    BECAUSE RESPONDENTS SECURED DEFERRAL OF
PETITIONERS' ZADVYDAS CLAIM THROUGH
MISCONDUCT, THE APPROPRIATE SANCTION IS
PETITIONERS' RELEASE.................................................................20

VII.    THE COURT SHOULD STRIKE FALSE AND MISLEADING
LANGUAGE FROM THE DECLARATIONS AND REQUIRE
RESPONDENTS TO INFORM OTHER TRIBUNALS WHERE
THE DECLARATIONS WERE USED OF THAT FACT....................23

VIII.    PETITIONERS SHOULD BE AWARDED ATTORNEYS' FEES
AND COSTS ...................................................................................24

CONCLUSION ....................................................................................................25

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*Ayoubi v. Dart*, 640 F. App'x 524 (7th Cir. 2016) ....................................................17

*Barnhill v. United States*, 11 F.3d 1360 (7th Cir. 1993).........................................20

*In re Bavelis*, 563 B.R. 672 (S.D. Ohio 2017).........................................................19

*Beard v. City of Southfield*, No. 14-13465, 2016 WL 6518490 (E.D. Mich. Nov. 3, 2016).................................................................................................20

*Chambers v. NASCO, Inc.,* 501 U.S. 32 (1991).................................................*passim*

*Demjanjuk v. Petrovsky*, 310 F.3d 338 (6th Cir. 1993) ....................................19, 22

*Enmon v. Prospect Capital Corp.*, 675 F.3d 138 (2d Cir. 2012) ......................1, 23

*First Bank of Marietta v. Hartford Underwriters Ins. Co.*, 307 F.3d 501 (6th Cir. 2002).........................................................................................*passim*

*Forsberg v. Pefanis*, 634 F. App'x 676 (11th Cir. 2015) ......................................17

*Fuery v. City of Chicago*, --- F.3d ----, 2018 WL 3853742 (7th Cir. Aug. 14, 2018) ...................................................................................................19, 22

*Grace v. Sessions*, No. 18-CV-1853 (EGS), 2018 WL 3812445 (D.D.C. Aug. 9, 2018) .....................................................................................25

*Graham v. Dallas Indep. Sch. Dist.*, No. 3:04-CV-2461-B, 2006 WL 507944 (N.D. Tex. Jan. 10, 2006) .....................................................................17

*Hutto v. Finney*, 437 U.S. 678 (1978)...............................................................1, 24

*Korematsu v. United States*, 323 U.S. 214 (1944)..................................................1

*Korematsu v. United States*, 584 F. Supp. 1406 (N.D. Cal. 1984).................*passim*

*Lamie v. Smith*, No. 1:12-cv-201, 2013 WL 12109526 (W.D. Mich. Feb. 14, 2013), *report and recommendation adopted by* 2013 WL 12109421 (W.D. Mich. Mar. 6, 2013) ................................................................20

*Laukus v. Rio Brands, Inc.*, 292 F.R.D. 485 (N.D. Ohio 2013) .............................19

*Metz v. Unizan Bank*, 655 F.3d 485 (6th Cir. 2011) ................................1, 16, 17, 24

*Monsanto Co. v. Ralph*, 382 F.3d 1374 (Fed. Cir. 2004) .......................................20

*Murray v. City of Columbus*, 534 F. App'x 479 (6th Cir. 2013) ............................16

*Oliver v. Gramley*, 200 F.3d 465 (7th Cir. 1999) ...................................................20

*Plastech Holding Corp. v. WM Greentech Auto. Corp.*, 257 F. Supp. 3d 867 (E.D. Mich. 2017) ..............................................................................1, 17

*Railway Express, Inc. v. Piper*, 447 U.S. 752 (1980) .............................................16

*Red Carpet Studios Div. of Source Advantage, Ltd. v. Sater*, 465 F.3d 642 (6th Cir. 2006) ...........................................................................................1, 24

*Robert Bosch LLC v. A.B.S. Power Brake, Inc.*, No. 09-14468, 2011 WL 1790221 (E.D. Mich. May 10, 2011) .........................................................20

*United States v. Van Engel*, 15 F.3d 623 (7th Cir. 1993) ......................................21

*Virzi v. Grand Trunk Warehouse & Cold Storage Co.*, 571 F. Supp. 507 (E.D. Mich. 1983) ...................................................................................1, 19

*Williamson v. Recovery Ltd. P'ship*, 826 F.3d 297 (6th Cir. 2017) .......................19

*Zadvydas v. Davis*, 533 U.S. 678 (2001) ...........................................................*passim*

**Rules**

Fed. R. Civ. P. 37(b) ................................................................................................14

E.D. Mich. L.R. 83.22(b) .........................................................................................18

Michigan Rule of Professional Conduct 3.3 .......................................................1, 18

Michigan Rule of Professional Conduct 4.1 .......................................................1, 18

## STATEMENT OF ISSUES PRESENTED

1. Should this Court enter relief granting Petitioners' claims for release under *Zadvydas v. Davis*, 533 U.S. 678 (2001), where this Court's earlier decision to defer ruling on that claim was secured by Respondents' misrepresentations and omissions of material facts?

Petitioners' Answer: Yes

2. Should this Court strike misleading or false portions of the declarations of John Schultz Jr. and Michael Bernacke, and require Respondents to inform immigration courts or federal courts where those misleading and false declarations have been used in individual proceedings of that fact?

Petitioners Answer: Yes.

3. Should this Court order Respondents to pay Petitioners' fees associated with (a) discovery conducted for their *Zadvydas* claim, (b) Petitioners' renewed motion for relief under *Zadvydas*, and (c) this motion for sanctions?

Petitioners' Answer: Yes

## CONTROLLING OR MOST APPROPRIATE AUTHORITY

Michigan Rule of Professional Conduct 3.3

Michigan Rule of Professional Conduct 4.1

*Chambers v. NASCO, Inc.,* 501 U.S. 32 (1991)

*Hutto v. Finney*, 437 U.S. 678 (1978)

*Zadvydas v. Davis*, 533 U.S. 678 (2001)

*Enmon v. Prospect Capital Corp.*, 675 F.3d 138 (2d Cir. 2012)

*First Bank of Marietta v. Hartford Underwriters Ins. Co.*, 307 F.3d 501 (6th Cir. 2002)

*Metz v. Unizan Bank*, 655 F.3d 485 (6th Cir. 2011)

*Red Carpet Studios Div. of Source Advantage, Ltd. v. Sater*, 465 F.3d 642 (6th Cir. 2006)

*Korematsu v. United States*, 584 F. Supp. 1406 (N.D. Cal. 1984)

*Plastech Holding Corp. v. WM Greentech Auto. Corp.n*, 257 F. Supp. 3d 867 (E.D. Mich. 2017)

*Virzi v. Grand Trunk Warehouse & Cold Storage Co.*, 571 F. Supp. 507 (E.D. Mich. 1983)

## INTRODUCTION

In *Korematsu v. United States*, 584 F. Supp. 1406 (N.D. Cal. 1984), the court vacated the conviction of Fred Korematsu, a conviction which four decades earlier led to the Supreme Court's decision upholding the internment of Japanese-Americans. *See Korematsu v. United States*, 323 U.S. 214 (1944). The district court in 1984 focused on the fact that the federal government had presented only information justifying detention of the Japanese, when "there was critical contradictory evidence known to the government and knowingly concealed from the courts." *Korematsu*, 584 F. Supp. at 1417.

> [T]he government deliberately omitted relevant information and provided misleading information in papers before the court. The information was critical to the court's determination, although it cannot now be said what result would have obtained had the information been disclosed. Because the information was of the kind peculiarly within the government's knowledge, the court was dependent upon the government to provide a full and accurate account. . . . The judicial process is seriously impaired when the government's law enforcement officers violate their ethical obligations to the court.

*Id.* at 1420. Regardless of "[w]hether a fuller, more accurate record would have prompted a different decision," relief was justified because "relevant evidence has been withheld." *Id.* at 1419. Had the government, and its attorneys, been honest with the court, this shameful chapter in our history might have been avoided.

More than 70 years have passed, but the government's obligation to be forthright with the court has not changed. Nor, unfortunately, has the government's

1

behavior which has, yet again, led to unjustified detention.

When this Court deferred ruling on Petitioners' *Zadvydas* claim, it did so based on Respondents' representation of facts only they then knew. Discovery has now shown both that those representations were false, and that the government knowingly concealed key information demonstrating the falsehoods. The cost of Respondents' misconduct here is measured in the pain it inflicted on Petitioners – in separated families, in months of human life spent unlawfully behind bars, and in the desperation of some 37 class members who, unable to stand the toll of detention, have given up and agreed to removal, despite the danger of persecution, torture, or even murder in Iraq. While that harm cannot be undone, Petitioners ask this Court to use its inherent authority to release the *Zadvydas* subclass members and rectify, to the extent possible, the consequences of Respondents' misconduct. Petitioners also ask the Court to strike the misleading and false portions of Respondents' declarations, to require Respondents to acknowledge error in other proceedings where those declarations were used, and to pay attorneys' fees.

## BACKGROUND AND FACTS

### I.   RESPONDENTS KNOWINGLY PRESENTED FALSE AND MISLEADING INFORMATION.

In January this Court deferred ruling on the *Zadvydas* claim, concluding that it could not "make a determination regarding whether Iraq will accept repatriations of the class." ECF 191, PgID5332. In ruling, the Court was forced to rely on the

government's one-sided rendition of the facts, because the government had vigorously opposed any discovery. Discovery has now shown that a) the government's sworn facts were misleading and false, b) the government knew they were false, and c) the government withheld material, critical information.

### A. Respondents' Declarations Stated There Was an Agreement Under Which Iraq Would Accept Unlimited Repatriations Via Charter Flights.

The government's first declaration related to the purported US-Iraq "agreement" was from John Schultz, ICE Deputy Assistant Director with primary responsibility for obtaining Iraqi cooperation with repatriations, dated July 20, 2017. ECF 81-4. The declaration stated "Iraq has agreed, using charter flights, to the timely return of its nationals that are subject to final orders of removal." *Id.* ¶5.

In their response to Petitioners' preliminary injunction motion on detention, ECF 158, Respondents relied on another declaration, dated November 30, 2017, from Mr. Schultz, ECF 158-2, which was based on his purported "professional knowledge," as well as "information obtained from other individuals employed by ICE, and information obtained from DHS records." [1] *Id.* ¶3.[2] He testified:

---

[1] The declaration was central to Respondents' argument. *See* Response, ECF 158, PgID4103-04 (declaration "establishes that, but for the stay in place in this case, ICE would obtain travel documents for the detained Petitioners"); 12/20/2017 Hrg. Trans., at 47, 115-16 (counsel stated that charter flights stopped by injunction and that ICE was in the process of obtaining travel documents for each person).

[2] The Court has appropriately questioned why Respondents' declarations are *Continued on next page.*

3

- "Recent negotiations between the governments of the United States and Iraq have resulted in increased cooperation in removal of Iraqi nationals." *Id.* ¶4.

- "ICE originally had a charter flight scheduled in June 2017 that was rescheduled for July 2017 in view of the court's original order; however, ICE was not able to effectuate that flight due to the Court's July 24th order." *Id.* ¶6.

- "ICE expects to receive travel documents for all individuals that ICE has requested to remove to Iraq." *Id.* ¶7.

- "To minimize the risk of having to ask a foreign government to re-issue or extend an expired travel document, ICE waits until there are no impediments to request a travel document. Thus, ICE currently does not have travel documents for all detained final order detainees. ICE believes that the central government of Iraq in Baghdad will issue travel documents should the court lift the injunction." *Id.* ¶8.

After the Court asked about the terms of the purported Iraqi agreement during the detention motion hearing, 12/20/2017 Transcript, at 47-48, 122-23, Respondents submitted a declaration from Michael Bernacke, ECF 184-2, that:

- vouched for earlier statements made by Mr. Schultz under oath (ECF 81-4) that there was an agreement with Iraq, though finally admitted that it was "not memorialized in any written document or treaty" (ECF 184-2, ¶4);

- asserted that the Iraqi Agreement "does not contemplate any numeric limitation on the number of removals in total or on an annual basis" (*id.* ¶5);

- asserted that Iraq had agreed to accept removals via charter flights and without the need for travel documents being issued by Iraq (*id.* ¶¶6-7);

- claimed that ICE cancelled the June 2017 flight "[a]s a result of the injunction in the above-captioned case." (*id.* ¶8); and

- attested that "ICE believes that the central government of Iraq in Baghdad will permit the entry of detained Iraqi nationals . . . if the injunction is lifted"

not based on personal knowledge, as required. ECF 191, PgID5332.

4

using charter flights and the "injunction is the only impediment to ICE to resuming charter flights to Iraq." (*Id.* ¶12).[3]

The Court relied on Schultz's and Bernacke's declarations in deferring adjudication of the *Zadvydas* claim, rather than ordering release, ECF 191, PgID5331-32:

> Schultz states that the Government's negotiations have resulted in Iraq's agreement to cooperate in removal of Iraqi nationals from the United States. [Schultz Decl.] ¶ 4. As evidence of this cooperation, Schultz notes that, prior to this Court's rulings enjoining removal, ICE had scheduled charter flights to depart in both June and July. *Id.* ¶6.
>
> *   *   *
>
> In his declaration, Bernacke states that the agreement between the United States and Iraq is not memorialized in writing, but is instead the product of ongoing negotiations. [Bernacke Decl.] ¶ 4. Bernacke also states that "the agreement does not contemplate any numeric limitation on the number of removals," and that if the injunction is lifted, large-scale removals can be arranged via charter flight, without the need for travel documents. *Id.* ¶¶5-6.

## B. Respondents Knew The Declarations Were Untrue.

Discovery has shown not only that Respondents' account was inaccurate, but also that they knew the true story at the time. Respondents' misrepresentations fall into four main categories: 1) statements that the U.S. reached an agreement with Iraq in 2017, and that Iraq was willing to accept the return of all Iraqi nationals

---

[3] The declarations did not attest to personal knowledge and were carefully hedged to allow the declarants to disclaim responsibility. In some instances where a declarant had personal knowledge of adverse facts, a different declarant was used to tell a false story. For example, Mr. Schultz who testified at his deposition that he had abandoned efforts to use manifests for the June charter flight, ECF 376-64, Schultz Dep. at 47, 123, does not discuss that in his declaration. Mr. Bernacke's declaration makes the exact opposite claim. ECF 184-2, Bernacke Dec. ¶6.

with final orders of removal without limitation; 2) claims that ICE could secure travel documents for all Iraqi nationals but did not attempt to do so because of the preliminary injunction; 3) statements that Iraq will accept charter flights using manifests rather than requiring travel documents; and 4) statements that the June and July 2017 flights were cancelled as a result of this Court's injunctions.

> **1.    Respondents said Iraq agreed to the return of all Iraqi nationals with final orders of removal, knowing that was untrue.**

The government has consistently and without qualification asserted that in 2017 the U.S. and Iraq reached an agreement for the return of all Iraqi nationals with final orders of removal. While Iraq agreed to accept a charter flight with eight deportees in April 2017, in return for its removal from the first travel ban,



ECF 376-2, ¶10.

*Id.* ¶20; ECF 376-62 ¶¶21-22, 30. Instead, Iraq

ECF 376-2, ¶20.h.

*Id.* ¶¶20-21, 23. By July 19,



*Id.* ¶24. On July 20, Mr. Schultz ███████████████████████████████

███████. *Id.* ¶24.b. That same day, Respondents opposed an injunction barring

removal of Iraqis (ECF 81), relying on Mr. Schultz' sworn declaration that "Iraq

has agreed… to the timely return of its nationals that are subject to final orders of

removal." ECF 81-4, ¶5.

     On July 26, 2017, Mr. Schultz' Deputy Chief of Staff ████████████



ECF 376-2, ¶24.d. ICE



*Id.* ¶24.f.

. *Id.* ¶¶25-28. Indeed,

[4] Nonetheless, Respondents submitted declarations stating that Iraq will accept "**all individuals** that ICE has requested to remove to Iraq", ECF 158-2, 11/30/2017 Schultz Decl. ¶7, "Iraq agreed to the timely return of its nationals subject to a final order of removal," and "the United States planned to schedule the return of **all** Iraqi nationals with final orders of removal." ECF 184-2, 12/22/2017 Bernacke Decl. ¶¶4-5 (emphasis added).

### 2. Respondents said ICE could secure travel documents, but has not attempted to do so because of the injunction, knowing that was untrue.

Respondents, having claimed that Iraq would accept deportees without limit-

---

[4] *See, e.g.*, ECF 376-2,



ation, had to explain why ICE nonetheless did not have travel papers. They said:

> To minimize the risk of having to ask a foreign government to re-issue or extend an expired travel document, ICE waits until there are no impediments to request a travel document. Thus, ICE currently does not have travel document for all detained final order Iraqis.

ECF 158-2, 11/30/2017 Schultz Decl. ¶8. ICE also said that requesting travel documents prematurely "has the potential to jeopardize the present agreement and our ability to effect future removals to Iraq." ECF 184-2, Bernacke Decl. ¶10. In fact, ICE ███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████ ECF 376-2, ¶20; ECF 376-62, ¶21. Significantly, ████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████ despite ICE's assertion that doing so would jeopardize the present agreement. *Id.* ¶33.

### 3.      Respondents said Iraq agreed to accept charter flights without formal travel documents, knowing that was untrue.

Respondents also highlighted the ease of return pursuant to the supposed "agreement" between the United States and Iraq, claiming that:

> The government of Iraq agreed to accept these removals via charter mission. As a charter mission, rather than a removal conducted via commercial airline flight, formal travel documents are not required. Instead, ICE submits a proposed manifest for the charter flight to Iraqi officials for approval.

9

ECF 184-2, Bernacke Decl. ¶6. In fact, as Mr. Schultz admitted in his deposition, the plan to use manifests "never came to fruition" and was not even used for the April flight. ECF 376-2, ¶17. Thereafter ICE abandoned any hope of using the simpler manifest procedure for later flights, ECF 376, Ex. 4 at 123:

> Q: At any time, did ICE try to effectuate the June 2017 flight by submitting a flight manifest versus obtaining travel documents?
> A: No. It was my intention to get travel documents for the individuals on the flight.

### 4. ICE said that the June and July 2017 flights were cancelled as a result of this Court's injunction, knowing that was untrue.

A memo drafted by Respondents



ECF 376-3. The longer version tells the same story, showing problems with the June flight from the start. A June 12

ECF 376-2, ¶20.k. ICE first learned on June 20 ██████████████████████ on June 21. *Id.* ¶20.q-20.r. The next day, June 22,

this Court entered the initial TRO. ECF 32. Because that TRO only covered Detroit-area deportees, and because there were plenty of non-Detroit-area deport-ees to fill a flight, on June 23 ███████████████████████████████

████████████████████████████████████████████████████████

████████████ ECF 376-2, ¶20.t. ████████████████████████

██████████████████████████████████████ *Id.* On June 26 ███

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████ *Id.* ¶20.u. In short, by the time this Court entered a nationwide injunction on June 26, ECF 43, the June flight had failed because ██████████████████. Respondents, however, provided sworn testimony blaming this Court's injunction for the failure. *See* ECF 158-2, 11/30/2017 Schultz Dec. ¶6; ECF 184-2, Bernacke Dec. ¶8.

ICE also represented that it rescheduled the June flight for July, and that the preliminary injunction thwarted the July flight. ECF 158-2, 11/30/2017 Schultz Dec. ¶6. ICE had requested a flight for ███████████████████████

████████████. ECF 376-2, ¶23.c. ██████████████████████

███████████████████ *Id.* ¶23.d-20.e. ███████████████████

████████████████████████████████████████████████ *Id.*

¶23.g. But ████████████████ on July 18, Iraqi officials █████████████

11



*Id.* ¶24.  As of July 24, when the injunction was

entered, Iraq ███████████████████████ *Id.* ¶24.c.

### C.    The Government Withheld Material Information.

The above affirmative misrepresentations, and the fact that neither Respond-

ents nor their counsel ever returned to the Court to correct them, are only part of

the story. As in *Korematsu*, "[b]ecause the information was of the kind peculiarly

within the government's knowledge, the court was dependent upon the government

to provide a full and accurate account." 584 F. Supp. at 1420. This Court naturally

believed that the government would act with candor. Indeed, when Petitioners

sought discovery in advance of their initial *Zadvydas* motion, the Court denied that

request, relying on the government's promise that "it would [] disclos[e] in its

response to Petitioners' motion . . . information that may be of utility to Petitioners

to meet the Government's response." ECF 153, PgID3936. *See id.* (suggesting

government promised disclosures may obviate need for discovery).

The government did not disclose the key material facts – facts then known

only to the government – that showed there was no significant likelihood of

removal in the reasonably foreseeable future. Those undisclosed facts included:

- As a result of ███████████████████████████████████████
  ██████████████████████████████████████████████████████
  ██████████████████████████████████████████████████████
  ██████████████████████████████████████████████████████
  ██████████████████████████████████████ ECF 376-2, ¶24.

- Iraq has a longstanding policy against accepting involuntary repatriations of
  its nationals, a position it ████████████████████████████████████████
  ████████████████████████████. *Id.* ¶¶36-37, 48-49, 53.

- Iraq ███████████████████████████████████████████████████████
  ████████████████████████████ and required potential
  deportees to execute a form attesting to their desire for repatriation (a form
  that has ████████████████████████████████████████████████████████
  ██████████████████████ *Id.* ¶¶3-6, 20.h, 33, 38-41.

## II.   THE GOVERNMENT'S CONDUCT THROUGHOUT THIS LITIGATION HAS BEEN DESIGNED TO HIDE THE TRUTH.

Respondents' conduct during the past 14 months – which at first appeared to

be garden variety obstruction and discovery abuse – can in hindsight be recognized

for what it was: an effort to prevent Petitioners and this Court from learning the

truth. Three themes emerge. First, the government's misrepresentations have

infected this entire case. Had Petitioners and the Court known the truth back in

July 2017 – when ICE was simultaneously ████████████████████████████████████

while opposing the first preliminary injunction with sworn testimony that there was

a U.S.-Iraq agreement for return of all Iraqi nationals – the course of this litigation

would have been utterly changed. Both the removal and detention issues would

13

have been litigated very differently, with the absence of a repatriation agreement becoming a central issue in the summer of 2017, rather than the summer of 2018.

Second, the government has only admitted to its misrepresentations when caught. It was not until after the Court questioned the government about the terms of the purported Iraqi agreement that Respondents admitted that there is no written agreement. 12/20/2017 Hrg. Trans., at 47-48, 122-23; ECF 184-2, Bernacke Decl. ¶4. It was not until Petitioners were forced to seek emergency relief when ICE coerced class members into signing Iraq's repatriation form, ECF 307, that Respondents admitted that a deportee's expressed desire to return is an essential step in the issuance of Iraqi travel documents.[5] ECF 311-3, Maddox Decl. ¶¶8, 11, 13, 14.

Third, Respondents have routinely ignored both the Federal Rules and this Court's orders to avoid discovery, to the point where the Court had to warn that "[f]ailure to comply with the Court's order may be cause for the Court to direct that the facts necessary to support Petitioners' *Zadvydas* claim are established, or prevent the Government from opposing the *Zadvydas* claim, or issue other appropriate relief. *See* Fed. R. Civ. P. 37(b)(2)(A)." ECF 320, PgID7608. The latest

---

[5] In response to an interrogatory asking for "each criterion an Iraqi National must meet before Iraq will accept an Iraqi National for repatriation", ICE notably omitted that Iraq's criteria include a desire to return. ECF 376-56, ICE's Response to Interrogatory No. 2; ECF 376-57, ICE Supplemental Response to Interrogatory No. 2. Nor did ICE mention the form, although ICE ████████████████████ ████████████████████████████ ECF 376-2, ¶¶4-5, 33.

14

violation – ignoring the August 20 document production deadline, ECF 366, PgID8323 – seems likely to be an effort to ensure that when Respondents oppose the *Zadvydas* motion with their version of the facts, Petitioners will not have any "critical contradictory evidence known to the government and knowingly concealed from the courts." *Korematsu*, 584 F. Supp. at 1417.

## III.   RESPONDENTS' MISCONDUCT HAS CAUSED PETITIONERS SEVERE HARM.

Over 100 class members are still suffering in detention. Had the government been honest about Iraq's refusal to accept involuntary repatriations, they should have been released during post-order-custody reviews. Had the government not created a false narrative of easy deportations impeded solely by this Court's orders, they would have been released in January when this Court ruled on the *Zadvydas* claim. Instead, they remain incarcerated in terrible conditions, subjected to pro-longed lock-downs, given inadequate medical care, and separated from their fami-lies. *See, e.g.* Op. on Coercion, ECF 370 (describing mistreatment in Calhoun jail). Their suffering, set out in more detail in Petitioners' renewed *Zadvydas* motion and supporting declarations, is directly attributable to the government's misconduct.

The government's use of Mr. Bernacke's and Mr. Schultz's declarations in class members' immigration bond hearings compounded the harm. ICE argued, based on the declarations, that removal was imminent, but for the *Hamama* stay, and that the detainees were therefore flight risks. ECF 376-70, Bajoka Decl., ¶¶3-7.

For example, after ICE introduced the declarations at the bond hearing of Salman Saiyad, a 63-year-old man who had been complying with an order of supervision for 20 years, the immigration judge set a $100,000 cash bond, which Mr. Saiyad is unable to pay. Mr. Saiyad remains detained. ECF 376-75, Kaplovitz Dec. ¶¶5-8.

## ARGUMENT

### IV.   THIS COURT HAS INHERENT AUTHORITY TO SANCTION AND REMEDY THE GOVERNMENT'S LITIGATION MISCONDUCT.

Courts are vested with power to "manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991). Courts have inherent power to sanction "acts which degrade the judicial system," *id.* at 32; where "fraud has been practiced upon [the court]", *id.* at 44; where a litigant is "misleading and lying to the court," *id.* at 42; or where a litigant engages in bad-faith conduct or conduct that is "tantamount to bad faith." *Metz v. Unizan Bank*, 655 F.3d 485, 489 (6th Cir. 2011). *See also Railway Express, Inc. v. Piper*, 447 U.S. 752, 767 (1980); *First Bank of Marietta v. Hartford Underwriters Ins. Co.*, 307 F.3d 501, 511-12 (6th Cir. 2002); *Murray v. City of Columbus*, 534 F. App'x 479, 484 (6th Cir. 2013). While courts should exercise their power with restraint and discretion, *Chambers*, 501 U.S. at 44, "[t]he exercise of inherent authority is particularly appropriate for impermissible conduct that adversely impacts the entire litigation." *Marietta*, 307 F.3d at 516.

In imposing sanctions the court determines whether there was bad faith con-

16

duct, or conduct that is tantamount to bad faith.[6] *Id.* at 517. "It goes without saying that lying to the court constitutes bad faith." *Graham v. Dallas Indep. Sch. Dist.*, 2006 WL 507944, at *4 (N.D. Tex. Jan. 10, 2006). "[N]o one needs to be warned not to lie to the judiciary." *Ayoubi v. Dart*, 640 F. App'x 524, 529 (7th Cir. 2016). "[T]hose 'who lie, evade and fail to tell the *whole* truth obviously enjoy an advantage over honest litigants. The victimized opponent winds up ... consuming substantial resources to respond to and 'undo' the victimizer's lies and distortions.'" *Forsberg v. Pefanis*, 634 F. App'x 676, 680 (11th Cir. 2015) (emphasis in original).

Misrepresentations constitute a fraud on the court. As this Court held in *Plastech Holding Corp. v. WM Greentech Automotive Corp.*, 257 F. Supp. 3d 867, 872 (E.D. Mich. 2017), where it dismissed a suit as a sanction for submitting fraudulent evidence, a party commits a fraud upon the court where it adopts tactics

> "...calculated to interfere with the judicial system's ability to adjudicate a matter by improperly influencing the trier or unfairly hampering the presentation of the opposing party's claim or defense." *Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, 1118 (1st Cir. 1989) (citing cases); *see also New York Credit & Fin. Mgmt. Grp. v. Parson Ctr. Pharmacy, Inc.*, 432 Fed. App'x. 25 (2d Cir. 2011) (same); *Almeciga v. Ctr. for Investigative Reporting, Inc.*, 185 F. Supp. 3d 401, 427 (S.D.N.Y. 2016) ("[T]he essence of fraud upon the Court is when a party lies to the court and his adversary intentionally, repeatedly, and about issues that are central to the truth-finding process.").

---

[6] While a party must receive "fair notice and an *opportunity* for a hearing on the record," an evidentiary hearing is not required. *Metz*, 655 F.3d at 491.

There are of course special ethics rules governing attorneys.[7] Under Michigan Rule of Professional Conduct 4.1, "a lawyer shall not knowingly make a false statement of material fact or law to a third person." Rule 3.3 imposes a duty of candor to the court and opposing counsel, bars attorneys from making false statements and requires them to correct any false statements previously made. An advocate "must not allow the tribunal to be misled by false statements of law or fact or evidence that the lawyer knows to be false." Comment, Rule 3.3. "If a lawyer has offered material evidence and comes to know of its falsity, the lawyer shall take reasonable remedial measures, including, if necessary, disclosure to the tribunal." Rule 3.3(a)(3). *See* Rule 3.3(e) (conflict between duties of candor and confidentiality).

"There are circumstances where failure to make a disclosure is the equivalent of an affirmative misrepresentation." Comment, Rule 3.3. In *First Bank of Marietta*, 307 F.3d at 525, the Sixth Circuit found bad faith where a plaintiff withheld a document knowing it undermined its cause of action. As this court has said:

> The handling of a lawsuit and its progress is not a game. There is an absolute duty of candor and fairness on the part of counsel to both the Court and opposing counsel. At the same time, counsel has a duty to zealously represent his client's interests. That zealous representation of interest, however, does not justify a withholding of essential information . . .

*Virzi v. Grand Trunk Warehouse & Cold Storage Co.*, 571 F. Supp. 507, 512 (E.D. Mich. 1983). *See also Williamson v. Recovery Ltd. P'ship*, 826 F.3d 297, 304 (6th

---

[7] This Court has adopted the Michigan Rules. E.D. Mich. L.R. 83.22(b).

Cir. 2017) (misrepresentations not innocent where party "willfully blind" to evidence); *In re Bavelis*, 563 B.R. 672, 687 (S.D. Ohio 2017) (misrepresentations intentional where party knew of key evidence); *Laukus v. Rio Brands, Inc.*, 292 F.R.D. 485, 489 (N.D. Ohio 2013) (dismissing complaint because plaintiff "knowingly offered (or allowed to be offered) arguments before this Court and on appeal that were not supported by-and contrary to-the record" and "failed to correct discovery responses they knew to be inaccurate, misleading or false").

## V. THIS COURT HAS INHERENT AUTHORITY TO FASHION APPROPRIATE REMEDIES TAILORED TO THE HARM CAUSED BY THE GOVERNMENT'S MISCONDUCT.

Once a court determines sanctions are warranted, it must decide what form of sanctions should be imposed. *Marietta*, 307 F.3d at 517. The Supreme Court has emphasized that a "primary aspect of [the court's] discretion is the ability to fashion an *appropriate* sanction for conduct which abuses the judicial process." *Chambers*, 501 U.S. at 44-45 (emphasis added). While "the less severe sanction of an assessment of attorney's fees" is most common, the court has discretion to impose "a particularly severe sanction" where that is the appropriate remedy. *Id.* at 45. Severe sanctions include "outright dismissal of a lawsuit," *id.*; vacating prior judgments, *Demjanjuk v. Petrovsky*, 310 F.3d 338 (6th Cir. 1993); setting aside a jury verdict, *Fuery v. City of Chicago*, --- F.3d ----, 2018 WL 3853742 (7th Cir. Aug. 14, 2018); barring witness testimony, *Beard v. City of Southfield*, 2016 WL 6518490 (E.D. Mich. Nov. 3, 2016); entering an injunction, *Lamie v. Smith*, 2013

19

WL 12109526 (W.D. Mich. Feb. 14, 2013), *report and rec adopted by* 2013 WL 12109421 (W.D. Mich. Mar. 6, 2013); or striking claims or defenses, *Robert Bosch LLC v. A.B.S. Power Brake, Inc.*, 2011 WL 1790221 (E.D. Mich. May 10, 2011)[8].

## VI. BECAUSE RESPONDENTS SECURED DEFERRAL OF PETITIONERS' *ZADVYDAS* CLAIM THROUGH MISCONDUCT, THE APPROPRIATE SANCTION IS PETITIONERS' RELEASE.

The government's false assertion that the preliminary injunction was the only thing standing between the Petitioners and return to Iraq was critical for this Court's ruling on the *Zadvydas* claim. Had the government honestly presented the facts, Petitioners would have met their burden to show a likelihood of success on the merits. Instead, the government dissembled. The supposed "agreement" to accept all Iraqis with final orders never existed. The June plane was cancelled because ███████████████ yet the government swore that it was the result of this Court's TRO. ICE never █████████████████████████ ███████████, yet it again blamed the litigation. Although ICE ███████ █████████████████████████████, it told this Court the opposite. And the government simply omitted key facts, including that 1) Iraq ███████ █████████████████; and 2) in July 2017 ███████████████

---

[8] *See also, e.g., Barnhill v. United States*, 11 F.3d 1360, 1367 (7th Cir. 1993) ("Moreover, pursuant to this power, a court may impose the severe sanction of dismissal with prejudice (or its equivalent, judgment) if the circumstances so warrant."); *Monsanto Co. v. Ralph*, 382 F.3d 1374, 1382 (Fed. Cir. 2004) (entering judgment); *Oliver v. Gramley*, 200 F.3d 465, 466 (7th Cir. 1999) (dismissal).

███████████████████████████████████████

No amount of wordsmithing – which one can expect in the government's response – can hide the fact that Respondents have not been remotely candid with this Court. Any post hoc rationalization leaves unanswered the question of why the government's original factual assertions—so unconditioned and unambiguous—are not supported by the contemporaneous record.

The duty of candor—which every party and attorney owes to a court—applies with particular force to the government:

> The Department of Justice wields enormous power over people's lives, much of it beyond effective judicial or political review. With power comes enormous responsibility, moral, if not legal, for its prudent and restrained exercise; and responsibility implies knowledge, experience, and sound judgment, not just good faith.

*United States v. Van Engel*, 15 F.3d 623, 629 (7th Cir. 1993), *abrogated on other grounds by United States v. Canoy*, 38 F.3d 893 (7th Cir. 1994). And it is even more apt here, as the government prevented Petitioners from securing any discovery before the hearing on the *Zadvydas* claim by promising to provide the relevant information in its responsive pleadings. Whatever duty to disclose that was not imposed as a matter of law was assumed by the government based on that promise; a promise this Court expressly relied upon in denying discovery at that time.

The real question for this Court is not whether there was misconduct – based on the record set out above there clearly was – but rather how the Court can here

21

"fashion an appropriate sanction for conduct which abuses the judicial process." *Chambers*, 501 U.S. at 44-45. While there is "no requirement that the district court find prejudice" when imposing sanctions, the Court should consider "the impact or effect that the [improper] conduct had on the course of the litigation" when fashioning an appropriate remedy." *Fuery*, 2018 WL 3853742 at *10.

There is no way for the Court to give the Petitioners what they were wrongfully deprived of: release back in January. What the Court can do, however, is prevent that wrong from continuing any longer by ordering release, at long last. The government's misconduct is both a supplemental reason to grant Petitioners' renewed *Zadvydas* motion, ECF 376, and an independent reason for the same relief.

This Court's earlier *Zadvydas* ruling was premised on false evidence. The Court has the inherent power to amend its earlier decision "upon proof that a fraud has been perpetrated upon the court."[9] *Chambers*, 501 U.S. at 44. That power "is necessary to the integrity of the courts, for 'tampering with the administration of

---

[9] In addressing misconduct, courts have expansive power to revise earlier decisions. For example, in *Demjanjuk*, 310 F.3d at 351-52, the Sixth Circuit vacated an earlier extradition order, concluding that acts and omissions by Department of Justice attorneys, particularly the failure to disclose evidence, constituted fraud on the court, and that the court had the inherent power to grant such relief to protect the integrity of the judicial process. Similarly, in *Fuery*, 2018 WL 3853742 at *10, the Seventh Circuit held that the district court had authority to set aside a jury verdict for the plaintiff as a sanction for the plaintiff's misconduct.

justice in [this] manner ... involves far more than an injury to a single litigant. It is a wrong against the institutions set up to protect and safeguard the public.'" *Id.*

## VII. THE COURT SHOULD STRIKE FALSE AND MISLEADING LANGUAGE FROM THE DECLARATIONS AND REQUIRE RESPONDENTS TO INFORM OTHER TRIBUNALS WHERE THE DECLARATIONS WERE USED OF THAT FACT.

The Court should strike the false and misleading language in the Schultz and Bernacke declarations (as set out in Exhibits A-C). The Court should also order Respondents to file a notice in any individual immigration and habeas proceedings, whether in immigration or federal court,[10] in which the declarations have been offered as evidence, and provide proof of those filings. *See Chambers*, 501 U.S. at 56-57 (court can sanction misconduct before other tribunals); *Enmon v. Prospect Capital Corp.*, 675 F.3d 138, 148 (2d Cir. 2012) (court could require sanctioned lawyers to submit its sanction order with any future *pro hac vice* applications).

The government is using the declarations in Petitioners' underlying immigration cases as proof of ICE's ability to remove them, which affects how bond is set and whether class members are released. *See* ECF 376-70, Bajoka Dec. ¶¶2-7, ECF 376-77; Kaplovitz Dec. ¶7 The government is also filing the declarations in individual habeas cases to argue, falsely, that removal is significantly likely in the

_____

[10] Federal court cases would include both habeas proceedings and petitions for review to the Court of Appeals in immigration cases.

reasonably foreseeable future.[11] The notice to the other tribunals should state that this Court has stricken portions of the declarations, and should provide each presiding judge with this Court's opinion. This will allow class members to take appropriate steps to remedy any decisions that relied on those declarations, and alert both the immigration courts other federal courts that the government is presenting false evidence.

## VIII.   PETITIONERS SHOULD BE AWARDED ATTORNEYS' FEES AND COSTS.

Attorneys' fees are an appropriate sanction for bad faith conduct. *Chambers*, 501 U.S. at 45-46; *Metz*, 655 F.3d at 489. The Court also has inherent authority to impose attorneys' fees where a litigant's "actions were taken, at the very least, in the face of an obvious risk that he was increasing the work on the other party without advancing the litigation." *Red Carpet Studios Div. of Source Advantage, Ltd. v. Sater*, 465 F.3d 642, 647 (6th Cir. 2006). Attorney's fees serve the dual purposes of "vindicat[ing] judicial authority" and "mak[ing] the prevailing party whole for

---

[11] While Petitioners do not know every case where the declarations have been filed, they include *Al Jabari v. U.S. Attorney General*, 4:17-cv-01972 (N.D. Ala.); *Al-Hallaf v. U.S. Attorney General*, 4:17-cv-02068 (N.D. Ala.); *Arthur v. Session*, 1:17-cv-23343 (S.D. Fla.); *Mirza v. Hassell*, 4:17-cv-02039 (N.D. Ala.); *Saiyad v. Adducci*, 1:17-cv-00995 (W.D. Mich.); *Yousif v. Adducci*, 1:17-cv-01038 (W.D. Mich.). In the *Al-Jabari* case, ICE submitted an additional declaration attesting to the likelihood of removal, even though Mr. Al-Jabari was ███████ ████████████████████████████████████████████████████. *Compare* ECF 376-77, North Decl. ¶¶53-54, *with* ECF 376-20, ████████ ██████████.

expenses" caused by his opponent. *Hutto v. Finney*, 437 U.S. 678, 689 n.14 (1978).

Here, Respondents' misrepresentations, their failure to provide information known exclusively to the government and promised in lieu of discovery, and their delays, concealment, and obstruction when discovery finally commenced forced Petitioners to engage in protracted discovery. The government's actions also necessitated both this motion and the renewed *Zadvydas* motion. None of this labor should have been necessary. All fees and expenses incurred as a result of the government's misconduct should be awarded to Petitioners.

## CONCLUSION

"[E]xtraordinary injustices require extraordinary relief." *Korematsu*, 584 F. Supp. at 1413. More than 100 human beings remain behind bars as a direct result of the government's misconduct. They should be released, the record cleansed of the government's falsehoods, and Petitioners reimbursed for the many months of work it has taken to uncover the truth. Respondents may believe that they can violate this Court's orders, disregard the Court Rules, and dissemble without consequence.[12] The Court should make clear that they cannot.

---

[12] ICE's disregard of this Court's order is not an isolated incident, but rather part of a pattern of misconduct. *See, e.g., Grace v. Sessions*, 2018 WL 3812445 (D.D.C. Aug. 9, 2018) (ordering ICE to return deported asylum seeker and her daughter, who had been removed despite ICE's representation to the court that no removal would occur before hearing, and warning of possible contempt sanctions against Attorney General Sessions, DHS Secretary Nielsen, and other Defendants).

Respectfully submitted,

Michael J. Steinberg (P43085)
Bonsitu A. Kitaba (P78822)
Miriam J. Aukerman (P63165)
ACLU FUND OF MICHIGAN
2966 Woodward Avenue
Detroit, Michigan 48201
(313) 578-6814
msteinberg@aclumich.org

*/s/Kimberly L. Scott*
Kimberly L. Scott (P69706)
Wendolyn W. Richards (P67776)
Cooperating Attorneys, ACLU Fund
 of Michigan
MILLER, CANFIELD, PADDOCK
 & STONE, PLC
101 N. Main St., 7th Floor
Ann Arbor, MI 48104
(734) 668-7696
scott@millercanfield.com

Nora Youkhana (P80067)
Nadine Yousif (P80421)
Cooperating Attorneys, ACLU Fund
 of Michigan
CODE LEGAL AID INC.
 27321 Hampden St.
Madison Heights, MI 48071
(248) 894-6197
norayoukhana@gmail.com

María Martínez Sánchez (NM Bar
126375)
ACLU OF NEW MEXICO
1410 Coal Ave. SW
Albuquerque, NM 87102
msanchez@aclu-nm.org

Judy Rabinovitz (NY Bar JR-1214)
Lee Gelernt (NY Bar LG-8511)
ACLU FOUNDATION
 IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2618
jrabinovitz@aclu.org

Margo Schlanger (P82345)
Cooperating Attorneys, ACLU Fund
 of Michigan
625 South State Street
Ann Arbor, Michigan 48109
734-615-2618
margo.schlanger@gmail.com

Susan E. Reed (P66950)
MICHIGAN IMMIGRANT RIGHTS
CENTER
3030 S. 9th St. Suite 1B
Kalamazoo, MI 49009
(269) 492-7196, Ext. 535
Susanree@michiganimmigrant.org

Lara Finkbeiner (NY Bar 5197165)
Mark Doss (NY Bar 5277462)
INTERNATIONAL REFUGEE
 ASSISTANCE PROJECT
Urban Justice Center
40 Rector St., 9th Floor
New York, NY 10006
(646) 602-5600
lfinkbeiner@refugeerights.org

*Attorneys for All Petitioners and Plaintiffs*

26

William W. Swor (P21215)
WILLIAM W. SWOR
 & ASSOCIATES
1120 Ford Building
615 Griswold Street
Detroit, MI 48226
wwswor@sworlaw.com

*Attorney for Petitioner/Plaintiff Usama Hamama*

Dated: August 31, 2018

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 31, 2018, I electronically filed the foregoing papers with the Clerk of the Court using the ECF system which will send notification of such filing to all ECF filers of record.


By: */s/Kimberly L. Scott*
Kimberly L. Scott (P69706)
Cooperating Attorneys, ACLU Fund of Michigan
MILLER, CANFIELD, PADDOCK
   & STONE, PLC
101 N. Main St., 7th Floor
Ann Arbor, MI 48104
(734) 668-7696
scott@millercanfield.com