# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

**USAMA J. HAMAMA**, et al.,
Petitioners and Plaintiffs,

Case No. 17-cv-11910

v.

Hon. Mark A. Goldsmith
Mag. David R. Grand

**REBECCA ADDUCCI**, et al.,
Respondents and Defendants.

Class Action

## PETITIONERS/PLAINTIFFS' RENEWED MOTION FOR A PRELIMINARY INJUNCTION UNDER *ZADVYDAS*

Local Rule 7.1(a)(1) requires Petitioners/Plaintiffs (hereinafter Petitioners) to ascertain whether this motion is opposed. Petitioners' counsel Margo Schlanger communicated with William Silvis, counsel for Respondents/Defendants (hereinafter Respondents), via email on August 28, 2018, explaining the nature of the relief sought and seeking concurrence. Mr. Silvis reported that Respondents do not concur.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

On January 2, 2018, this Court deferred ruling on Petitioners' *Zadvydas* claim, concluding that "a more developed record is necessary" to answer the "open question whether Iraq has agreed to accept classwide repatriation." Opinion, ECF 191, PgID5334-35. Discovery has established that Petitioners' removal is not significantly likely in the reasonably foreseeable future, and that their detention—which now for most extends well over a year—is unreasonable. *See Zadvydas v. Davis*, 533 U.S. 678 (2001); *Ly v. Hansen*, 351 F.3d 263 (6th Cir. 2003); *Rosales-Garcia v. Holland*, 322 F.3d 386, 415 (6th Cir. 2003). Release is required as a

matter of statutory construction and constitutional law.

Because *Zadvydas* requires immigration detention statutes to be construed, if plausible, to avoid the grave constitutional concerns presented when civil detention becomes divorced from its ostensible regulatory purpose, both 8 U.S.C. §1231 and §1226(a)—the two statutes under which virtually all detained class members are held—must be interpreted as requiring release where removal is not significantly likely in the reasonably foreseeable future. Those same constitutional concerns support a constitutional ruling that unless Respondents can establish a significant likelihood of removal in the reasonably foreseeable future, a timeframe which is now very short, or some other sufficiently strong special justification for detention, Petitioners must be released.

WHEREFORE, for the reasons set forth in the accompanying brief and pursuant to Fed. R. Civ. P. 65, Petitioners respectfully request this Court to enter preliminary relief as follows:

1. FIND, for members of the *Zadvydas* subclass who have been detained longer than six months, that:

   a. The duration of Petitioners' detention is no longer presumptively reasonable for the purpose of effectuating their removal.

   b. Given the length of Petitioners' detention to date, what counts as the "reasonably foreseeable future" under *Zadvydas v. Davis*, 533 U.S. 678, 688 (2001), and *Ly v. Hansen*, 351 F.3d 263 (6th Cir. 2003), is now very short.

   c. Petitioners have provided good reason to believe that removal is not significantly likely in the reasonably foreseeable future, and therefore

2

Petitioners must be released unless the government "responds with evidence sufficient to rebut that showing." *Zadvydas*, 533 U.S. at 701.

d. In order to establish a significant likelihood of removal in the reasonably foreseeable future that would allow a class member's detention to be even further prolonged, Respondents must present actual evidence that Iraq has agreed to repatriation of that specific class member, not just generic facts about diplomatic negotiations. *Rosales-Garcia v. Holland*, 322 F.3d 386, 415 (6th Cir. 2003).

e. Respondents cannot detain Petitioners unless Respondents establish that *either* the class member's removal is significantly likely because Iraq has issued travel documents *or* there is another "sufficiently strong special justification" for detention, other than Respondents' desire to effectuate removal. *Zadvydas*, 533 U.S. at 690.

2. ORDER that members of the *Zadvydas* subclass who have been detained longer than six months be released under orders of supervision within 14 days unless Respondents by that date provide to the Court individualized evidence that:

a. ICE has valid travel documents for the detainee; or

b. There is another strong special justification for the individual's detention other than effectuating removal.

Respectfully submitted,

| | |
|---|---|
| Michael J. Steinberg (P43085) | Judy Rabinovitz (NY Bar JR-1214) |
| Bonsitu A. Kitaba (P78822) | Lee Gelernt (NY Bar LG-8511) |
| Miriam J. Aukerman (P63165) | ACLU FOUNDATION |
| ACLU FUND OF MICHIGAN | IMMIGRANTS' RIGHTS PROJECT |
| 2966 Woodward Avenue | 125 Broad Street, 18th Floor |
| Detroit, Michigan 48201 | New York, NY 10004 |
| (313) 578-6814 | (212) 549-2618 |
| msteinberg@aclumich.org | jrabinovitz@aclu.org |

*/s/Kimberly L. Scott*
Kimberly L. Scott (P69706)
Wendolyn W. Richards (P67776)
Cooperating Attorneys, ACLU Fund
 of Michigan
MILLER, CANFIELD, PADDOCK
 & STONE, PLC
101 N. Main St., 7th Floor
Ann Arbor, MI 48104
(734) 668-7696
scott@millercanfield.com

Nora Youkhana (P80067)
Nadine Yousif (P80421)
Cooperating Attorneys, ACLU Fund
 of Michigan
CODE LEGAL AID INC.
 27321 Hampden St.
Madison Heights, MI 48071
(248) 894-6197
norayoukhana@gmail.com

María Martínez Sánchez (NM
Bar126375)
ACLU OF NEW MEXICO
1410 Coal Ave. SW
Albuquerque, NM 87102
msanchez@aclu-nm.org

Margo Schlanger (P82345)
Cooperating Attorney, ACLU Fund
 of Michigan
625 South State Street
Ann Arbor, Michigan 48109
734-615-2618
margo.schlanger@gmail.com

Susan E. Reed (P66950)
MICHIGAN IMMIGRANT RIGHTS
 CENTER
3030 S. 9th St. Suite 1B
Kalamazoo, MI 49009
(269) 492-7196, Ext. 535
Susanree@michiganimmigrant.org

Lara Finkbeiner (NY Bar 5197165)
Mark Doss (NY Bar 5277462)
INTERNATIONAL REFUGEE
 ASSISTANCE PROJECT
Urban Justice Center
40 Rector St., 9th Floor
New York, NY 10006
(646) 602-5600
lfinkbeiner@refugeerights.org

*Attorneys for All Petitioners and Plaintiffs*

William W. Swor (P21215)
WILLIAM W. SWOR
 & ASSOCIATES
1120 Ford Building
615 Griswold Street
Detroit, MI 48226
wwswor@sworlaw.com

*Attorney for Petitioner/Plaintiff Usama Hamama*

Dated: August 29, 2018

4

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

| | |
|---|---|
| **USAMA J. HAMAMA**, et al.,<br>Petitioners and Plaintiffs, | Case No. 17-cv-11910 |
| v. | Hon. Mark A. Goldsmith<br>Mag. David R. Grand |
| **REBECCA ADDUCCI**, et al.,<br>Respondents and Defendants. | Class Action |

# PETITIONERS/PLAINTIFFS' BRIEF IN SUPPORT OF RENEWED MOTION FOR A PRELIMINARY INJUNCTION UNDER *ZADVYDAS*

## QUESTION PRESENTED

Should members of the *Zadvydas* subclass be released because the presumptively reasonably period for their removal has passed, and their removal is not significantly likely in the reasonably foreseeable future?

**Petitioners' Answer: Yes.**

## CONTROLLING OR MOST APPROPRIATE AUTHORITIES

*Zadvydas v. Davis*, 533 U.S. 678 (2001)

*Demore v. Kim*, 538 U.S. 510 (2003)

*Jennings v. Rodriguez*, 138 S. Ct. 830 (2018)

*Rosales-Garcia v. Holland*, 322 F.3d 386 (6th Cir. 2003)

*Ly v. Hansen*, 351 F.3d 263 (6th Cir. 2003)

## TABLE OF CONTENTS

I.  INTRODUCTION .................................................................................................1

II. FACTS ...............................................................................................................1

A.  It Is Entirely Unclear Whether Iraq Will Ever Change Its
    Longstanding Opposition to Forced Repatriations, and Even If
    it Does, It Will Take Many Months or Years to Accomplish
    Any Involuntary Repatriations .............................................................1

B.  Petitioners Are Suffering Severe Harm in Detention.........................7

C.  Release Does Not Prevent ICE From Seeking Travel
    Documents, Nor From Proceeding With Removal If Travel
    Documents Issue.................................................................................11

III. LEGAL STANDARD .......................................................................................13

IV. LAW AND ARGUMENT..................................................................................13

A.  Petitioners Have a High Likelihood of Success ................................13

    1.  The Constitutional Framework for Petitioners' Zadvydas
        Claim ......................................................................................14

    2.  The Constitutional Standard: Immigration Detention Is
        Punitive, and Hence Unlawful, if Removal Is Not
        Significantly Likely In the Reasonably Foreseeable
        Future .....................................................................................17

    3.  The Statutory Standard: §1231 and §1226(a) Detainees
        Must Be Released Unless Removal Is Significantly
        Likely In the Reasonably Foreseeable Future.........................21

    4.  Petitioners' Detention Has Become Unreasonably
        Prolonged ...............................................................................26

    5.  Petitioners Have Established Good Reason to Believe,
        and Respondents Cannot Rebut, That Removal Is Not
        Significantly Likely in the Reasonably Foreseeable
        Future .....................................................................................29

iv

a.    Because Iraq Has a Long-Standing Policy of Refusing Involuntary Repatriations, There is Good Reason to Believe Removal is Not Significantly Likely in the Reasonably Foreseeable Future ...............29

b.    Respondents Cannot Rebut Petitioners' Showing By Suggesting Negotiations with Iraq Could Potentially Lead to Repatriation ....................................30

c.    The Length of Removal Proceedings, When Coupled With the Uncertainty of Removal, Requires Release........................................................36

6.    Respondents' Past Misrepresentations to the Court Further Undermine the Reasonableness of Detention ............40

B.    The Irreparable Harm, Balance of the Equities, and Public Interest Factors Favor Petitioners.......................................................41

C.    The Relief Requested ........................................................43

V.    CONCLUSION...............................................................................45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abdel-Muhti v. Ashcroft*, 314 F. Supp. 2d 418 (M.D. Pa. 2004) ............................35

*Abdulle v. Gonzales*, 422 F. Supp. 2d 774 (W.D. Tex. 2006) ...................28, 39, 40

*Addington v. Texas*, 441 U.S. 418 (1979).................................................................15

*Casas-Castrillon v. Dep't of Homeland Sec.*, 535 F.3d 942 (9th Cir. 2008) ........................................................................................................................21

*Chavez-Alvarez v. Warden York Cty. Prison*, 783 F.3d 469 (3d Cir. 2015) ........................................................................................................................42

*Clark v. Martinez*, 543 U.S. 371 (2005) .................................................................18

*In re DeLorean Motor Co.*, 755 F.2d 1223 (6th Cir. 1985)....................................13

*Demore v. Kim*, 538 U.S. 510 (2003) ....................................................20, 21, 27, 38

*Diop v. ICE/Homeland Sec.*, 656 F.3d 221 (3d Cir. 2011)......................................19

*Elashi v. Sabol*, 714 F. Supp. 2d 502 (M.D. Penn. 2010)........................................35

*Foucha v. Louisiana*, 504 U.S. 71 (1992)..............................................14, 15, 16, 17

*Hajbeh v. Loiselle*, 490 F. Supp. 2d 689 (E.D. Va. 2007).................................28, 35

*Hall v. Eichenlaub*, 559 F. Supp. 2d 777 (E.D. Mich. 2008) .................................25

*Howell v. Hodge*, 710 F.3d 381 (6th Cir. 2013) .....................................................15

*Jackson v. Indiana*, 406 U.S. 715 (1972).................................................................17

*Jama v. Immigration & Customs Enf't*, No. Civ. 01-1172(JRT/AJ), 2005 WL 1432280 (D. Minn. Apr. 7, 2005)................................................28, 35

*Jennings v. Rodriguez*, 138 S. Ct. 830 (2018) ...................................................*passim*

*Kennedy v. Mendoza-Martinez*, 372 U.S. 144 (1963) .............................................16

*Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015) ...........................................15, 16

*Koussan v. Department of Homeland Security*, No. 15-12827, 2015 WL 6108303 (E.D. Mich. Oct. 16, 2015) ...........................................40

*Ly v. Hansen*, 351 F.3d 263 (6th Cir. 2003) ......................................................*passim*

*Ma v. Ashcroft*, 257 F.3d 1095 (9th Cir. 2001)...................................................33, 34

*Nielsen v. Preap*, 138 S. Ct. 1279 (Mar. 19, 2018) .................................................26

*Oyedeji v. Ashcroft*, 332 F. Supp. 2d 747 (M.D. Pa. 2004) ....................................40

*Parlak v. Baker*, 374 F. Supp. 2d 551 (E.D. Mich. 2005), *vacated as moot, appeal dismissed sub nom., Parlak v. U.S. Immigration & Customs Enf't*, No. 05-2003, 2006 WL 3634385 (6th Cir. Apr. 27, 2006) ...........................................................................................................24

*Reno v. Flores*, 507 U.S. 292 (1993) .........................................................27, 37, 42

*Rosales-Garcia v. Holland*, 322 F.3d 386 (6th Cir. 2003) ...................15, 32, 33, 44

*Santobello v. New York*, 404 U.S. 257 (1971) .........................................................14

*Schall v. Martin*, 467 U.S. 253 (1984).........................................................16, 17, 42

*Seling v. Young*, 531 U.S. 250 (2001)........................................................................16

*Seretse-Khama v. Ashcroft*, 215 F. Supp. 2d 37 (D.D.C. 2002).......................28, 35

*Thai v. Ashcroft*, 366 F.3d 790 (9th Cir. 2004).........................................................34

*United States v. Salerno,* 481 U.S. 739 (1987)......................................14, 16, 17, 42

*Uritsky v. Ridge*, 286 F. Supp. 2d 842 (E.D. Mich. 2003)................................26, 36

*Winter v. Nat'l Res. Def. Council*, 555 U.S. 7 (2008) .............................................13

*Yang v. Chertoff,* No. 05-73098, 2005 WL 2177097 (E.D. Mich. Sept. 8, 2005) ..............................................................................................................24

*Younes v. Lynch*, No. 16-13556, 2016 WL 6679830 (E.D. Mich. Nov. 14, 2016) ........................................................................................................34, 35

*Youngberg v. Romeo*, 457 U.S. 307 (1982) ............................................................42

*Zadvydas v. Davis*, 533 U.S. 678 (2001) ...........................................................*passim*

**Statutes**

8 U.S.C §1225......................................................................13, 22, 25, 26

8 U.S.C. §1226.....................................................................................*passim*

8 U.S.C. §1231................................................................13, 18, 21, 22, 23

**Other Authorities**

8 C.F.R. §241.13 ..................................................................................4, 22

8 C.F.R. §241.14 ......................................................................................12

## I. __INTRODUCTION__

As this Court held more than seven months ago, "[o]ur legal tradition rejects warehousing human beings." Op., ECF 191, PgID5319. "[N]o person should be restrained in his or her liberty beyond what is reasonably necessary to achieve a legitimate governmental objective." *Id.* Today, some 120 class members remain detained, of whom 110 are members of the *Zadvydas* subclass. Ex. 2, Schlanger Decl. ¶10. By the time this motion is argued and decided, most will have been incarcerated almost a year and a half. It is highly uncertain that they can ever be removed, even assuming they lose their immigration cases, a process which could take years. Iraq has a longstanding policy against involuntary repatriations. Procuring travel documents for Iraqi nationals who do not wish to return is at best an arduous, unreliable process, contingent on intense diplomatic pressure. Petitioners' liberty interests far outweigh any conceivable governmental interest in incarcerating them for many more months or years so that—**if** they are ultimately found to be removable and **if** Iraq ultimately agrees to repatriation—they can then be removed.

## II. __FACTS__

### A. __It Is Entirely Unclear Whether Iraq Will Ever Change Its Longstanding Opposition to Forced Repatriations, and Even if It Does, It Will Take Many Months or Years to Accomplish Any Involuntary Repatriations.__

Iraq has long refused involuntary repatriations, reflecting humanitarian principles, the practical reality that forcible repatriations are extremely challenging

(particularly now that Iraq must also reintegrate nearly two million internally displaced persons), and political concern that forced returns from one country would set a precedent for other countries as well. Ex. 8, Smith Dec. ¶¶14-47. *See also* Ex. 1, Chronology ("Chron.") ¶¶1-7. Because Iraq refused Petitioners' repatriation, they spent years living in the community while ICE unsuccessfully tried to obtain travel documents. Now, however, ICE insists on incarcerating them while it continues to seek travel documents because, ICE says, Iraq has agreed to accept all Iraqi nationals with final removal orders, and only this Court's injunction prevents removal.[1] Discovery has shown this is untrue. The attached chronology (Ex. 1), drawn from dozens of documents, details ICE's repeated but failed efforts to force Iraq to change its policy on forced repatriations. Briefly, the facts are:

After President Trump, on January 27, 2017, issued Executive Order 13769, 82 Fed. Reg. 8977, barring admission of Iraqi nationals, Iraq agreed to increased information-sharing and to accept a charter flight of eight deportees (which departed in April 2017). Ex. 1, Chron. ¶¶8-18. In return, Iraq was deleted from the list of banned countries in Executive Order 13780, 82 Fed. Reg. 13209, on March 6, 2017. Ex. 1, Chron. ¶9. ICE, hopeful that Iraq's position had changed, *id.* ¶¶10-19, submitted travel document requests in May and June for 280 potential deportees, and scheduled a flight for June 28, 2017. *Id.* ¶20. But Iraq did *not* issue

---

[1] *See* ECF 184-2, PgID5072, Bernacke Decl. ¶8; ECF 158-2, PgID4130, Schultz Decl. ¶6; Ex. 17, North Decl. ¶53; Ex. 18, Pitman Decl. ¶31.

travel documents for those potential deportees, and, on June 7, 2017, specifically denied repatriation to some two dozen of them. *Id.* ¶¶20.h, 44, 45. Nevertheless, ICE proceeded to round up hundreds of Iraqi nationals in June. *Id.* ¶20.j.

On June 20, 2017, ICE learned that Iraq had refused to accept the charter flight. *Id.* ¶20.q. This Court's temporary restraining order was issued two days later, but at first covered only detainees who had been arrested/detained by ICE's Detroit field office—leaving ICE many possible deportees elsewhere. *Id.* ¶20.s. Despite high-level diplomatic pressure, Iraq stood firm, refusing the June flight and declining to agree to a rescheduled July flight ICE planned on the optimistic assumption that this Court's restraining order would not last long. *Id.* ¶¶20.q-20.v. By July, ICE had become so frustrated by its inability to convince Iraq to accept the *Hamama* class members that the ICE office responsible for obtaining detainee travel documents began pushing for visa sanctions. *Id.* ¶¶23-24. All the while, Respondents represented to this Court that Iraq would accept class-wide repatriation. *Compare id.* ¶¶20.q-20.s, 21-22, 23.b, 24 *with* ECF 81-4, PgID2006, 7/20/2017[2] Schultz Decl. ¶5 ("[D]ue to renewed discussions between the United States and Iraq in recent months, Iraq has agreed, using charter flights, to the timely return of its nationals that are subject to final orders of removal."); ECF 86, 7/21/2017 Hr'g Tr. at 31.

_____

[2] On July 20, the same day Schultz executed his declaration, Schultz received an email attaching a sanction package for Iraq. Ex. 1-35; *see also* Ex. 1-36.

3

In September and October 2017, most of the detainees hit the 90-day threshold for post order custody reviews (POCRs). ECF 138, PgID3344-45, 3365-66, 3371-72; ECF 191, PgID5344-45. Under the regulations, continued detention requires a significant likelihood of removal in the reasonably foreseeable future. 8 C.F.R. §241.13. By the time of these reviews, ICE's internal assessment was that: "Despite expending significant resources and exhausting other available means to obtain cooperation, ICE has been unsuccessful in securing cooperation from the Government of Iraq in the acceptance of its nationals subject to final orders of removal." Ex. 1-24, ICE-0297770. Yet, ICE issued boilerplate POCR denials, which stated simply: "You have a final order of removal from the United States and ICE is actively pursuing your removal." ECF 138, PgID3344-45, 3365-66, 3371-72; ECF 191, PgID5344-45. Indeed, ICE issued boilerplate POCR denials even to individuals whom Iraq had specifically refused to repatriate. *Compare* ECF 138-6, PgID3447-48, Hamama Decl. ¶31 (received boilerplate POCR denial), *with* Ex. 1-18, 6/7/2017 Iraqi Letter Denying Travel Documents (listing Sam Hamama among 24 Iraqis for whom travel documents were denied); *see also* Ex. 2, Schlanger Decl. ¶19 (none of the 24 individuals listed as non-repatriable in the 6/7/2017 Iraqi letter were released under the POCR process).

Diplomatic pressure on Iraq continued through the winter and into spring. Ex. 1, Chron. ¶¶25-35. Nevertheless, in March 2018, Iraq's Ministry of Foreign

Affairs distributed a "circular," attaching a letter from the Ministry of Migration and Displacement reaffirming that Iraq "refuse[s] the principle of forced return of Iraqis abroad or any other nationals, because it conflicts with humanitarian laws and principles." Ex. 1, ¶¶36-37; Ex. 1-46; Ex. 7, Lopez Decl. p. 5; Ex. 8, Smith Decl. ¶¶21-26. The Foreign Ministry circular instructed "all our political and consular missions abroad" to "[k]indly take notice and the necessary action to coordinate with those countries to reduce this serious phenomenon that affects Iraqis abroad." Ex. 1-46; Ex. 7, Lopez Decl. p. 5.

In May 2018, ICE transferred about 40 Iraqis to Georgia for consular interviews. Ex. 1, Chron. ¶38; ECF 311-3, PgID7478-80, Maddox Decl. ¶¶6-10. Iraqi consular officials presented each detainee an Iraqi form asking to affirm his "desire to return voluntarily to Iraq" (ECF 311-3, PgID7489-90, Ex. B; ECF 307-2, PgID7325-27, Gilbert Decl. ¶¶5-18), a form ICE had repeatedly requested Iraq not to use. Ex. 1, Chron. ¶¶30-31, 33. ICE and consular officials exerted considerable pressure on the detainees to sign the form, threatening them with prosecution or indefinite detention if they refused; that pressure underscores that an expressed desire to return is central to Iraq's repatriation process. *Id.* ¶¶39-40; ECF 307. Iraq then issued travel documents for those who signed, but not for those who refused. Ex. 1, Chron. ¶41. On July 13, 2018, after intense diplomatic pressure, Iraq issued travel documents for the six involuntary deportees, but made no commitment to

further involuntary repatriations. *Id.* ¶¶42-43. To date, the six involuntary deportees—including three without an extant stay of removal—have not been removed. *Id.* ¶44. Iraq has continued, during subsequent consular interviews, to confirm that each detainee is volunteering for repatriation. *Id.* ¶47; Ex. 1-51.

Whether Iraq will agree to future involuntary repatriations is entirely unclear. Ex. 1, Chron. ¶¶44-52. Avoiding forced repatriations is very important to many power centers in Iraq. *Id.* ¶¶48-49. For example, in May 2017, when the United Kingdom pushed for forced returns, the Iraqi Parliament passed a resolution telling the Ministry of Foreign Affairs not to accept them. Ex. 8, Smith Decl. ¶31. The Ministry of Migration and Displacement's website states that Iraq's policy is "refusal of forcible returns." *Id.* ¶30. The Ministry reasserted this in a July 29, 2018 letter to the Ministry of Foreign Affairs:

> We received information showing that some of the countries in which Iraqis are located intend to return them forcibly, particularly the United States and the European Union. This is against the policy of the state and international laws and norms. Please emphasize to all our embassies and consulates in the countries of the world where Iraqis are, to ensure that they are not deported and forced to return.

Ex. 1, Chron. ¶49. The Minister also instructed the Ministry of the Interior (which has jurisdiction over entry procedures at airports/borders) and the Ministry of Transport (which has jurisdiction over airlines) to "take the necessary actions to ensure forcibly returned nationals are not taken in." *Id.* Iraqi diplomats have continued in July and August to say Iraq opposes forced repatriations. Ex. 1, Chron. ¶¶47-49.

6

What *is* clear is that Iraqi repatriations—even voluntary ones—are extremely time consuming. ECF184-2, PgID5072, Bernacke Decl. ¶9; ECF 184, PgID5063; ECF 81-4, PgID2006, 2008, Schultz Decl. ¶¶5, 8; Ex. 5, Bernacke Dep. at 59-61. Some detainees, increasingly desperate about their ongoing detention, have agreed to removal, and this Court established a process for lifting the stay in such cases. ECF 110, PgID2815-16. Yet even for those volunteering to return, ICE has struggled to get documents. Of the 37 class members for whom the stay has lifted, ICE has yet to obtain travel documents for between 6 and 8. Only 17 have actually been removed, some more than 5 months after the stay was lifted. The others have sat in detention for as much as 8 months after the stay was lifted. Ex. 2, Schlanger Decl. ¶¶49-50. Even where Iraq has provided documents to willing returnees, ICE has struggled to complete removals. *See* Ex. 9, Gonzalez Decl. ¶5 (ICE unable to remove prompt removal detainee due to problem with flight clearances); Ex. 2, Schlanger Decl. ¶¶50-51. Thus, even for willing repatriates, it can take many months to obtain the travel documents, and many more months to actually accomplish removal if documents are in fact issued.

## B.    Petitioners Are Suffering Severe Harm in Detention

Nearly all of the 110 *Zadvydas* subclass members will have been detained for over six months by October 1, 2018, the earliest this motion will be fully briefed. Ex. 2, Schlanger Decl. ¶10. Depending on the procedural posture of their

immigration cases, they face many months or years of detention until their cases are resolved. *Id.* at ¶13; Ex. 12, Piecuch Decl. ¶15; Ex. 15, Kaplovitz Decl. ¶13; Ex. 14, Gandhi Decl. ¶13. The detainees include individuals who did not receive bond hearings under this Court's January 2nd Order, ECF 191, who could not afford bond, or who were denied bond. Ex. 12, Piecuch Decl. ¶10; Ex. 14, Gandhi Decl. ¶10; Ex. 15, Kaplovitz Decl. ¶¶5, 8; Ex. 16, VanderWoude Decl. ¶12; Ex. 13, Moore Decl. ¶8. Some of the detainees have already **won** in immigration court, but remain incarcerated while ICE appeals those grants of immigration relief. Ex. 10, Bajoka Decl. ¶¶12-16. In addition, if the Sixth Circuit were to reverse this Court's decision to grant bond hearings, absent the relief requested here, ICE could re-detain almost all of the class members who obtained release under the January 2nd Order and whose cases are open. Ex. 2, Schlanger Decl. ¶9.

As detailed in the prior amicus brief of Detention Watch Network, ECF 177, Pg. ID# 4980-5003, the declaration of Michelle Brané, ECF 138-19, and the above cited attorney declarations, detention has devastating effects on both detainees and their families, damaging their physical and mental health, undermining their immigration cases, and depleting their financial and emotional resources. Space permits only three representative cases to be summarized here.[3]

**Hassan Al-Atawna** came to the U.S. in 2013 at the age of 16, fleeing

---

[3] *See also* Ex. 10, Bajoka Decl. ¶17; Ex. 15, Kaplovitz Decl. ¶12; Ex. 16, Vanderwoude Decl. ¶¶10-11.

violence in Iraq. Because his father worked as an interpreter for the U.S. military, ISIS targeted the family: his sister was raped and he himself was close to being set on fire. Mr. Al-Atawna, who was overwhelmed and deeply depressed, got into trouble and was convicted of attempted assault. He received a suspended jail sentence, but was taken into ICE custody in January 2017. He received an immigration bond hearing in early 2018 pursuant to this Court's January 2, 2018 Order. The immigration judge found that he was neither a danger nor a flight risk, and granted him bond of $7,500, which he cannot afford. Mr. Al-Atawna has been detained 20 months, and has not seen his infant—now toddler—son, during that time. Mr. Al-Atawna is not receiving proper medical health services in detention and has experienced suicidal ideations. Iraq officials informed ICE in May 2018 that they believe Mr. Atawna is Palestinian, and that Iraq will not accept him. He faces an additional year of detention until his immigration case is resolved, and cannot be removed to Iraq if he loses. Ex. 14, Gandhi Decl. ¶¶2-11; ECF 311-3, PgID7480-81, Maddox Decl. ¶11.d.ii, ECF 311-3.

**Maytham Al Bidairi**, who came to the U.S. with his family as a refugee in 2009, has been in ICE detention since May 2016. For over two years he has not seen his wife and three daughters, aged 12, 13 and 14, because they cannot afford to travel from Louisville, Kentucky, to Jena, Louisiana, where he is detained. His wife is too frail to work. After his arrest, the family was evicted because they could

not afford rent. His wife and children lived for nearly a year in a mosque, surviving on the generosity of congregants until more suitable housing could be found. Mr. Al Bidairi himself has been hospitalized several times since being detained. He was denied bond at the immigration court bond hearing he received under this Court's order. Yet in 2016 the U.S. District Court for the Western District of Kentucky, where Mr. Al-Bidairi had pled guilty to making false statements for public benefits (based in part on the understanding that he could not be deported), had granted him pretrial release and subsequently sentenced him to probation, finding incarceration unwarranted. Mr. Al Bidairi faces at least another year of detention until his immigration case is resolved. Ex. 13, Moore Decl. ¶¶4-6, 11-16.

**Firas Nissan**, whose six-year-old son, nine-year-old daughter, elderly parents, and five siblings are all U.S. citizens, came to the U.S. seventeen years ago after being threatened and detained in Iraq. He missed an asylum hearing in 2004 due to illness and was ordered removed, but lived in the community and complied with an order of supervision for 13 years. ICE arrested him in June 2017. He has been detained fifteen months. He potentially faces another two years of detention until his immigration case concludes. Because of his specific immigration status, he did not receive a bond hearing under this Court's January 2nd Order. He is locked in solitary confinement 21 hours a day, is not receiving needed medical care, can rarely see his family, and has not been able to provide for them,

though he was previously the family's breadwinner. Ex. 12, Piecuch Decl. ¶¶3-14.

## C. Release Does Not Prevent ICE From Seeking Travel Documents, Nor From Proceeding With Removal If Travel Documents Issue.

ICE has pursued travel documents for non-detained Iraqi nationals in the past—including many class members in this case—and could do so here if Petitioners are released. ICE submitted over 200 requests to Iraq in May for non-detained Iraqis, before the June 11 raids. Ex. 1, Chron. ¶20.e. ICE Unit Chief Michael Bernacke testified that when noncitizens are released on orders of supervision, it is "typical" for ICE to continue seeking travel documents: "at times [individuals] are released as a result of our inability to obtain a travel document and we may receive one at a later date, and then we will rearrest that alien as they were generally arrested once before." Ex. 5, Bernacke Dep. at 49-50. *See also* Ex. 11, 4th Abrutyn Decl. ¶¶5-10; Ex. 10, Bajoka Decl. ¶19.

Respondents have previously asserted that Petitioners' detention should continue, even though Iraq has not issued travel documents, because (1) if the stay of removal is lifted, removals can be accomplished through charter flights without the need for travel documents; and (2) ICE cannot request travel documents for individuals who are not currently repatriatable for fear of damaging the repatriation "agreement" with Iraq. ECF 184-2, PgID5071-73, Bernacke Decl. ¶¶6-7, 10, 12. Those assertions are false. Iraq will not accept repatriated individuals who lack travel documents, whether by charter or by commercial flights. Ex. 1, Chron. ¶¶14,

11

16-17, 20, 32. Moreover, ICE has repeatedly asked Iraq for travel documents for individuals who, at the time of the request, are not repatriatable. *Id.* ¶¶20; Ex. 2, Schlanger Decl. ¶¶16-17.

If class members are released, ICE will still be able to remove them, *if and when* ICE obtains both travel documents and final orders. Should ICE be concerned about flight risk, it can use any one of a broad spectrum of alternatives to detention (ATDs)—ranging from release to a responsible family member, to periodic reporting, to electronic monitoring—that ICE has employed for over 20 years.[4] ECF 138-19, PgID3539, Brané Decl. ¶11. ATDs are much less expensive than detention (ATDs cost 17¢ to $44 per day while detention costs $133-$319, *id.* PgID3540, ¶13) and are "extremely effective at ensuring compliance." *Id.* PgID3540-41, ¶14 (95-99% compliance); Ex. 11, 4th Abrutyn Decl. ¶¶5-11 (explaining supervision while ICE obtains travel documents); Ex. 17, North Decl.

_____

[4] Purported public safety concerns cannot be used to prolong detention where removal is not reasonably foreseeable. *Zadvydas*, 533 U.S. at 690–91 (limits on preventive detention). Detainees who present a significant threat to national security or risk of terrorism, and for whom no conditions of release can reasonably be expected to avoid that threat or risk, can be further detained. 8 C.F.R. §241.14(d)(1). Unit Chief Bernacke testified that he did not recall any of the *Hamama* class members whose POCR decisions he reviewed as presenting such a "unique danger." Ex. 5, Bernacke Dep. at 83–85, 136. In any event, not only have the vast majority of class members been released on orders of supervision in the past, despite any criminal history, but as criminologist Kiminori Nakamura explains, for those who committed offenses years ago, the "risk of reoffending and engaging in criminal activity is extremely low." Ex. 19, Nakamura Decl. at 1-2; *see id.* at pp. 13-14 (based on age of convictions, for many Petitioners "the risk they pose is no greater than the risk posed by a member of the general public").

¶41 (ATD used for class member in September 2016).

## III.   <u>LEGAL STANDARD</u>

Preliminary injunctions are governed by the familiar four-factor test that examines: (1) likelihood of success on the merits, (2) irreparable harm in the absence of relief, (3) the balance of equities, and (4) the public interest. *Winter v. Nat'l Res. Def. Council*, 555 U.S. 7, 20 (2008). These are "factors to be balanced, not prerequisites that must be met. Accordingly, the degree of likelihood of success required may depend on the strength of the other factors." *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985). A court may, for example, grant a preliminary injunction "where the plaintiff fails to show a strong or substantial probability of ultimate success on the merits of his claim, but where he at least shows serious questions going to the merits and irreparable harm which decidedly outweighs any potential harm to the defendant if an injunction is issued." *Id.* at 1229.

## IV.   <u>LAW AND ARGUMENT</u>

### A.   **Petitioners Have a High Likelihood of Success**

The issue before the Court is whether class members who remain in detention are significantly likely to be removed in the reasonably foreseeable future. For those detained pursuant to 8 U.S.C. §1231 or §1226(a), this standard arises from construing those statutes to avoid constitutional doubt. For those detained pursuant to 8 U.S.C §1225 (or §1226(c), if the Court of Appeals reverses this Court's decision that §1226(a) is the applicable detention authority), it is simply constitutionally

13

required. Whichever source applies, the evidence on this common question is clear: the government *hopes* to deport class members, and would *prefer* deportation sooner rather than later—but those hopes and preferences are running into the reality that Petitioners' cases are stretching on, and that Iraq is unwilling to accept their return because of its longstanding policy against involuntary repatriation. Given the many months of detention already, only a short time horizon is appropriately considered the "reasonably foreseeable future." Because removal during that short time is not "significantly likely," Petitioners are likely to succeed on the merits.

### 1. The Constitutional Framework for Petitioners' *Zadvydas* Claim

"In our society, liberty is the norm," and detention is the "carefully limited exception." *United States v. Salerno,* 481 U.S. 739, 755 (1987). "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). Incarceration can be used to punish criminal acts, but may be imposed only after extensive procedural protections designed to ensure a person is not unjustly deprived of her liberty. *See Santobello v. New York*, 404 U.S. 257, 264 (1971) (Douglas, J., concurring) (describing fundamental right to jury trial, confront one's accusers, present witnesses in one's defense, remain silent, and be convicted by proof beyond all reasonable doubt).

Civil detainees, by contrast, "may not be punished." *Foucha v. Louisiana*,

504 U.S. 71, 80 (1992); *see also Kingsley v. Hendrickson*, 135 S.Ct. 2466, 2475 (2015). Accordingly, the constitutional constraints on civil detention are even higher than in the criminal context: "detention violates that [Due Process] Clause unless the detention is ordered in a *criminal* proceeding with adequate procedural protections, or, in certain special and narrow nonpunitive circumstances, where a special justification ... outweighs the individual's constitutionally protected interest in avoiding physical restraint." *Zadvydas*, 533 U.S. at 690. *See also Addington v. Texas*, 441 U.S. 418, 425 (1979) ("civil commitment for any purpose constitutes a significant deprivation of liberty"); *Rosales-Garcia v. Holland*, 322 F.3d 386, 414 (6th Cir. 2003). The Supreme Court has "always been careful not to 'minimize the importance and fundamental nature' of the individual's right to liberty," and has therefore insisted that civil detention be "narrowly focused on a particularly acute problem in which the government interests are overwhelming." *Foucha*, 504 U.S. at 80-81 (quoting *Salerno*, 481 U.S. at 749–50). "The bar for involuntarily removing someone from society against her will is high—quite understandably and quite legitimately so," and thus there is a "heavy presumption" against such "a massive curtailment of liberty." *Howell v. Hodge*, 710 F.3d 381, 385, 387 (6th Cir. 2013).

To ensure that civil detention does not become impermissible punishment, the Supreme Court has carefully limited its use, insisting on two core restrictions. First, not only must there be "special and narrow nonpunitive circumstances," *Zad-*

*vydas*, 533 U.S. at 690, but detention must "bear[] [a] reasonable relation to the purpose for which the individual [was] committed." *Id*. at 690 (quoting *Jackson v. Indiana,* 406 U.S. 715, 738 (1972)). *See also Foucha*, 504 U.S. at 79 ("[d]ue process requires that the nature of commitment bear some reasonable relation to the purpose for which the individual is committed"); *id.* at 88 (opinion of O'Connor, J.) (requiring a "necessary connection between the nature and purposes of confinement"); *Seling v. Young*, 531 U.S. 250, 265 (2001). Unless civil detention is closely linked to its purpose, the state's interests cannot "outweigh[] the individual's constitutionally protected interest in avoiding physical restraint." *Zadvydas*, 533 U.S. at 690.

Second, the "duration of confinement" must be both "strictly limited," *Foucha*, 504 U.S. at 82, and "linked to the stated purposes of the commitment." *Hendricks*, 521 U.S. at 363. Because the use and duration of detention may not be excessive in relation to the special, non-punitive reason that justifies civil detention, *Salerno*, 481 U.S. at 747, the longer confinement becomes, the more it tilts toward impermissible punishment rather than permissible civil detention. *See Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-69 (1963) (ostensibly civil restrictions constitute punishment if they are "excessive in relation to the alternative [non-punitive] purpose" used to justify them); *Schall v. Martin*, 467 U.S. 253, 269 (1984) (same); *Kingsley*, 135 S.Ct. at 2469 (same); *Zadvydas*, 533

16

U.S. at 701 (as detention increases in length, time until removal must shrink).

Accordingly, in evaluating the constitutionality of civil detention, the Supreme Court has regularly focused on detention length, exemplifying the common-sense notion that the longer a person remains behind bars, the more compelling the "civil" justification for such detention must be. *Salerno* upheld pretrial detention because its duration was restricted "by the stringent time limitations of the Speedy Trial Act," 481 U.S. at 747 (maximum of 70 days), whereas *Foucha* faulted the statute there for not imposing a comparable limitation. *Foucha*, 504 U.S. at 82. *See also Jackson*, 406 U.S. at 738 ("the nature and *duration* of commitment [must] bear some reasonable relation to the purpose for which the individual is committed") (emphasis added); *Schall*, 467 U.S. at 270 ("detention is strictly limited in time," to a maximum of 17 days); *Hendricks*, 521 U.S. at 364 (sex offender entitled to immediate release if adjudged safe; if confinement exceeds one year, "a court must once again determine beyond a reasonable doubt that the detainee satisfies the same standards as required for the initial confinement").

### 2. The Constitutional Standard: Immigration Detention Is Punitive, and Hence Unlawful, if Removal Is Not Significantly Likely in the Reasonably Foreseeable Future.

Immigration detention—like all civil detention—must be supported by a "sufficiently strong special justification." *Zadvydas*, 533 U.S. at 690. The justification is "effectuating an alien's removal." *Id.* at 697. To satisfy due process, de-

tention must "bear a reasonable relation" to that purpose, *id*. at 690, meaning that

> the habeas court must ask whether the detention in question exceeds a period reasonably necessary to secure removal. It should measure reasonableness primarily in terms of the statute's basic purpose, namely, assuring the alien's presence at the moment of removal.

*Id*. at 699.

Congress contemplated that removals will be completed within 90 days, and provided for detention during that period, 8 U.S.C. §§1231(a)(1)(A), 1231(a)(2). The Supreme Court gave immigration authorities additional leeway, setting six months as the presumptively reasonable detention period. *Zadvydas*, 533 U.S. at 701. In other words, for the first six months of detention, the government's interest in ensuring the non-citizen's presence for removal presumptively outweighs the individual's liberty interest. But thereafter, the balance shifts, with the government's burden ever increasing the longer that removal is delayed:

> After this 6-month period, once the alien provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the Government must respond with evidence sufficient to rebut that showing. And for detention to remain reasonable, as the period of prior postremoval confinement grows, what counts as the "reasonably foreseeable future" conversely would have to shrink.

*Id*. at 701. *See also Clark v. Martinez*, 543 U.S. 371, 377 (2005) (applying same 6-month presumption to "inadmissible aliens" and explaining that the government may "detain aliens ... only as long as 'reasonably necessary' to remove them").

The *Zadvydas* test thus incorporates the two core constitutional restrictions

18

on civil detention. First, removal must be "significantly likely," because otherwise detention becomes divorced from its purpose of ensuring the non-citizen's presence for removal. Second, to ensure that detention is not excessive in relation to that purpose, removal must occur "in the reasonably foreseeable future," a time period that shrinks the longer detention goes on.

As the Sixth Circuit explained in *Ly v. Hansen*, 351 F.3d 263 (6th Cir. 2003), the touchstone of immigration detention jurisprudence is reasonableness.[5] *Ly* held that noncitizens in pre-order detention may be detained only

> for a time reasonably required to complete removal proceedings in a timely manner. If the process takes an unreasonably long time, the detainee may seek relief in habeas proceedings.

*Id.* at 268. The Court saw the "reasonableness limitation on the period of incarceration" as critical, explaining that this limitation serves to balance the individual's liberty interest in freedom from detention against the state's interest in ensuring the non-citizen's availability for removal. *Id.* at 270.

Turning to what constitutes a reasonable time limit, the Sixth Circuit found "Ly had been imprisoned for a year and a half with no final decision as to removability," and that even if he were ultimately ordered removed, his removal to Vietnam was not "reasonably foreseeable." *Id.* at 271. Unless actual removal is reason-

---

[5] *See also Diop v. ICE/Homeland Sec.*, 656 F.3d 221, 234 (3d Cir. 2011) (reasonableness of immigration detention "is a function of whether it is necessary to fulfill the purpose of the statute").

ably foreseeable, noncitizens "may not be detained beyond a reasonable period required to conclude removability proceedings without a government showing of a 'strong special justification,' constituting more than a threat to the community, that overbalances the alien's liberty interest." *Id.* at 273. In Ly's case, the "period of time required to conclude the proceedings was unreasonable." *Id.* at 273.

Although *Zadvydas* concerned post-order detention, and *Ly* concerned pre-order detention, the same constitutional principles apply to both, since both have the same basic purpose: assuring that removable noncitizens are available for removal. *See Zadvydas*, 533 U.S. at 690 (purpose of post-order detention is "assuring the alien's presence at the moment of removal"); *Demore v. Kim*, 538 U.S. 510, 528 (2003) (purpose of pre-order detention is "preventing deportable criminal aliens from fleeing prior to or during their removal proceedings, thus increasing the chance that, if ordered removed, the aliens will be successfully removed"); *Ly*, 351 F.3d at 271 ("The goal of pre-removal incarceration must be to ensure the ability of the government to make a final deportation."). While public safety is also "a factor potentially justifying confinement," it is relevant only "within that reasonable removal period." *Zadvydas*, 533 U.S. at 700. Where removal is neither significantly likely nor reasonably foreseeable, concerns about possible dangerousness do not constitute "special and narrow nonpunitive circumstances where a special justification ... outweighs the individual's constitutionally

protected interest in avoiding physical restraint." *Id.* at 690. (Indeed, the *Zadvydas* petitioners themselves were "proven [] dangers to society." *Demore*, 538 U.S. at 562 (Souter, J., dissenting).)

In sum, if removal is not significantly likely to occur in the reasonably foreseeable future, then detention is both divorced from and excessive in relation to the "strong special justification" of ensuring availability at the time of removal.

### 3. The Statutory Standard: §1231 and §1226(a) Detainees Must Be Released Unless Removal Is Significantly Likely in the Reasonably Foreseeable Future.

The vast majority of subclass members are held under either 8 U.S.C. §1231 or §1226(a). Under Supreme Court precedent, both must be interpreted to require release if removal is not significantly likely in the reasonably foreseeable future.[6]

Post-order detainees (e.g., those who have not yet filed motions to reopen, or whose motions are pending), are held under §1231. In *Zadvydas*, the Supreme Court provided an authoritative interpretation of that statute, construing it to avoid indefinite detention, which—for the reasons addressed above—would be unconstitutional. The Court reaffirmed that holding earlier this year in *Jennings v. Rodriguez*, 138 S.Ct. 830 (2018), which ratified *Zadvydas*'s interpretation of the

---

[6] While the statistics fluctuate, as of August 22, 2018, 55 detainees were held post-order and 55 were held pre-order. Ex. 2, Schlanger Decl. ¶11. Class members move back and forth between pre- and post-order detention based on adjudication of their motions to reopen and merits cases. *See id.*, ¶12; *Casas-Castrillon v. Dep't of Homeland Sec.*, 535 F.3d 942, 945-46 (9th Cir. 2008) (describing shifting statutory detention authority as noncitizen goes through different phases of administrative and judicial review as a "moving target").

permissive language of §1231(a)(6). The Court explained that in *Zadvydas*, it had

> detected ambiguity in the statutory phrase "may be detained." "'[M]ay,'" the Court said, "suggests discretion" but not necessarily "unlimited discretion. In that respect the word 'may' is ambiguous."

*Jennings*, 138 S.Ct. at 843 (quoting *Zadvydas*). In light of this ambiguity, *Zadvydas*

> construed §1231(a)(6) to mean that an alien who has been ordered removed may not be detained beyond "a period reasonably necessary to secure removal," 533 U.S., at 699, and it further held that six months is a presumptively reasonable period, *id.*, at 701. After that, the Court concluded, if the alien "provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future," the Government must either rebut that showing or release the alien. *Ibid.*

*Jennings*, 138 S.Ct. at 843. Regulations implementing *Zadvydas* provide for release of post-order detainees after six months of detention where there is "no significant likelihood of removal in the reasonably foreseeable future." 8 C.F.R. §§241.13(a), (c), (h)(1). Thus for all detainees held pursuant to §1231, what is before this Court is a straightforward application of *Zadvydas*.

Pre-order detention, i.e., detention *during* removal proceedings, is governed by §1225 and §1226. Only a handful of class members, who for various reasons are deemed "applicants for admission," are held under §1225.[7] Nearly all class members who have succeeded in reopening their immigration cases are held under

---

[7] 8 U.S.C. §1225(b)(2) provides: "Subject to subparagraphs (B) and (C), in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title."

§1226, which provides generally for *discretionary* detention, *see* §1226(a), though detention of certain persons with criminal convictions is mandatory, *see* §1226(c). Respondents deemed some class members to be subject to §1226(a) and others to §1226(c) upon reopening. However, this Court held that "[b]ecause §1226(c) does not apply to those who have had their motions to reopen granted, or who were living in the community for years prior to their immigration detention, those purportedly being held under §1226(c) are deemed held pursuant to §1226(a)."[8] ECF 191, PgID5341. Therefore, the relevant detention authority for almost all detainees with reopened cases is §1226(a), which provides (emphasis added):

> (a) Arrest, detention, and release. On a warrant issued by the Attorney General, an alien *may be arrested and detained* pending a decision on whether the alien is to be removed from the United States. Except as provided in subsection (c) and pending such decision, the Attorney General—
> (1) *may continue to detain* the arrested alien; and
> (2) *may release* the alien on—
> (A) bond of at least $1,500 with security approved by, and containing conditions prescribed by, the Attorney General; or
> (B) conditional parole . . .

For §1226(a) detainees, *Zadvydas*'s reasoning dictates an interpretation analogous to that of §1231. Both use permissive language: §1231(a)(6) ("An alien ordered removed … *may* be detained beyond the removal period"); §1226(a): "an

---

[8] With some exceptions, an individual detained under §1226(a) is entitled to an immigration judge bond hearing; an individual detained under §1226(c) is not. This Court previously held that prolonged pre-order detention under these statutes, like prolonged post-order detention under §1231, is unlawful absent an individualized finding of danger or flight risk. ECF 191, PgID5335-46.

alien *may* be arrested and detained" and the government "*may* continue to detain the arrested alien" or "*may* release the alien") (emphases added). Therefore, both can and must be interpreted to avoid the same constitutional problem. As *Zadvydas* dictates, absent a clear "congressional intent to authorize indefinite, perhaps permanent, detention," 533 U.S. at 680, detention statutes must be construed "to avoid a serious constitutional threat," meaning that "once removal is no longer reasonably foreseeable, continued detention is no longer authorized by statute." *Id.* at 699.

*Jennings* reinforces this analysis because its outcome turned on the difference between the permissive statutory text analyzed in *Zadvydas*, and the mandatory language in the other statutory provisions at issue in *Jennings*. The *Jennings* Court held that because §1226(c) and §1225(b) contain language mandating detention, neither provision can plausibly be read to require bond hearings, even to avoid constitutional difficulty.[9] 138 S.Ct. at 844, 846 (focusing on the fact that

---

[9] In *Ly v. Hansen*, the Sixth Circuit held *Zadvydas*'s constitutional avoidance reading applied to §1226(c). That interpretation is now foreclosed by *Jennings*, but *Jennings* left untouched the Court of Appeals' discussion both on the constitutional issues at stake and on the need to interpret immigration detention statutes, where possible, to avoid constitutional concerns. *See Ly*, 351 F.3d at 270 (because the Supreme Court in *Zadvydas* "construed the post-removal detention statute to avoid the specter of permanent detention," it should "do the same[] by construing the pre-removal detention statute to include an implicit requirement that removal proceeding be concluded within a reasonable time"). *Ly* dealt with detention under §1226(c) but framed its holding generally. *See, e.g., Yang v. Chertoff*, 2005 WL 2177097 (E.D. Mich. Sept. 8, 2005) (applying *Ly* to §1226(a)); *Parlak v. Baker*, 374 F.Supp.2d 551, 560 (E.D. Mich. 2005) (same), *vacated as moot, appeal dismissed sub nom., Parlak v. U.S. Immigration & Customs Enf't*, 2006 WL

§1225(b) requires that noncitizens "shall" be detained, a word that "[u]nlike the word 'may,' which implies discretion … usually connotes a requirement," and on the fact that §1226(c) allows release "only if" the Attorney General decides certain conditions are met). Unlike §1226(**c**), and like §1231(a)(6), §1226(**a**)'s language is permissive, not mandatory.[10] *Zadvydas* thus mandates a statutory interpretation of §1231 and §1226(a) that requires those detainees be released absent a significant likelihood of removal in the reasonably foreseeable future.

To be clear, the Court will still need to undertake the constitutional analysis, because a handful of class members are detained under §1225, and *Jennings* does instruct that that provision cannot be interpreted in a way that resolves the const-

---

3634385 (6th Cir. Apr. 27, 2006). *Ly*'s statutory holding as to §1226(c) has been overruled by *Jennings*, but it remains the law for §1226(a). As Judge Roberts explained in *Hall v. Eichenlaub*, 559 F.Supp.2d 777, 781–82 (E.D. Mich. 2008):

> Absent a clear directive from the Supreme Court or a decision of the Court of Appeals sitting en banc, a panel of the Court of Appeals, or for that matter, a district court, is not at liberty to reverse the circuit's precedent. *See Brown v. Cassens Transport Co.*, 492 F.3d 640, 646 (6th Cir. 2007). In the absence of Supreme Court precedent directly on point, a district court should decline to "underrule" established circuit court precedent. *See Johnson v. City of Detroit*, 319 F.Supp.2d 756, 771, n. 8 (E.D. Mich. 2004).

*Ly*'s holding with respect to §1226(a) remains binding because it has not been overruled, including by *Jennings*.

[10] The *Jennings* Court did find that §1226(a)'s language could not support the procedural requirements that the Court of Appeals added to the initial bond hearing established in existing regulations. 138 S.Ct. at 847. But that finding does not bear at all on the issue here: the *Zadvydas*'s Court's interpretation of "*may be detained*" in §1231(a)(6) as not authorizing indefinite detention is necessarily likewise a "plausible" reading of the same language in §1226(a).

itutional issues presented by prolonged §1225 detention. *Jennings* similarly bars a constitutional avoidance reading of §1226(c). While there are currently no class members held under §1226(c), Respondents have appealed this Court's ruling that §1226(a) is the applicable detention authority,[11] ECF 191, PgID5325, and the Supreme Court will soon be deciding the import of §1226(c)'s "when released" language. *Nielsen v. Preap*, 138 S.Ct. 1279 (Mar. 19, 2018).

Here the statutory standard and the constitutional standard merge: both require release where removal is not significantly likely in the reasonably foreseeable future. The Court should address both.

### 4.    Petitioners' Detention Has Become Unreasonably Prolonged.

In authorizing immigration detention, Congress anticipated both that removal proceedings would be expeditiously resolved, *Ly*, 351 F.3d at 269 (citing 8 U.S.C. §1229(d)(1))[12], and that non-citizens with final orders would be removed within 90 days, 8 U.S.C. §1231(a)(1)(A). The Supreme Court has likewise empha-sized that immigration detention must be time-limited. Under *Zadvydas*, removal must not just be significantly likely, it must be significantly likely **in the reason-**

---

[11] If it were not for the Court's holding that reopened cases are covered by 8 U.S.C. §1226(a) rather than §1226(c), then most of the detainees with open cases would be detained under the latter statute. Ex. 2, Schlanger Decl. ¶9.

[12] *See also Uritsky*, 286 F.Supp.2d at 846-47 (granting habeas because 11-12 month pre-order detention "is well beyond the short period of detention pending a determination of removability that the Supreme Court assumed was typical when it decided *Kim*" and "also is far longer than the six month presumptively reasonable period of post-removal detention set forth by the Court in *Zadvydas*").

**ably foreseeable future**. The Court found six months to be a presumptively reasonable removal period. *Zadvydas*, 533 U.S. at 701. Similarly, *Demore* held mandatory pre-removal detention permissible based on the assumption that it usually "lasts for less than the 90 days we considered presumptively valid in *Zadvydas*." 538 U.S. at 529 (2003) (average time for removal proceedings in unappealed cases is 47 days; 4 month average in appealed cases). *See also Reno v. Flores*, 507 U.S. 292, 314 (1993) (noncitizen youth in custody an average of 30 days).

Here, the presumptively reasonable period passed long ago.[13] By October, when this motion is fully briefed, it will be 16 months since the June 2017 raids. Accordingly, Petitioners may be detained only if removal is nonetheless significantly likely in the reasonably foreseeable future. *Zadvydas*, 533 U.S. at 701.

 "[T]he reasonably foreseeable future" depends on how long detention has already stretched. "[F]or detention to remain reasonable, as the period of prior postremoval confinement grows, what counts as the 'reasonably foreseeable future' conversely would have to shrink.'" *Id.*; *see also id., on remand*, 285 F.3d 398 (5th Cir. 2002) (given how long Zadvydas had been detained, he had shown removal was not significantly likely in the reasonably foreseeable future).

---

[13] As of October 1, 2018, when this motion will be fully briefed, 96% of the *Zadvydas* subclass will have been in ICE detention for over six months, 81% for over a year and 35% for over 15 months. Ex. 2, Schlanger Decl. ¶10. Only 4 current subclass members will have been detained less than six months; they will be excluded from the requested relief until they pass the six month mark held presumptively reasonable in *Zadvydas*.

27

Here, given the length of Petitioners' detention to date, what counts as the "reasonably foreseeable future" is very short. *See, e.g.*, *Seretse-Khama v. Ashcroft*, 215 F.Supp.2d 37, 48, 50 (D.D.C. 2002) ("Under the sliding scale adopted in *Zadvydas*, the lengthy period of petitioner's post-removal confinement has certainly caused the 'reasonably foreseeable future' to shrink to the point that removal must be truly imminent . . . [W]hile the history of the Service's efforts to remove aliens to the country in question is one consideration to take into account in determining the likelihood of removal in the foreseeable future, this factor becomes increasingly less important the longer a country refused to provide travel documents for a particular removable alien."); *Abdulle v. Gonzales*, 422 F.Supp.2d 774, 778–79 (W.D. Tex. 2006) (because detention exceeded one year, "the amount of time considered the 'reasonably foreseeable future' has shrunk dramatically"); *Hajbeh v. Loiselle*, 490 F.Supp.2d 689, 693 (E.D. Va. 2007) (where petitioner had been confined nearly twenty-one months, "what counts as the 'reasonably foreseeable future' in this case is now exceedingly short"); *Jama v. Immigration & Customs Enf't*, 2005 WL 1432280, at *2, *3 (D. Minn. Apr. 7, 2005) (given length of detention to date, "the 'reasonably foreseeable future' is necessarily very short;" ICE has previously been unable to remove the petitioner, and "the government is not entitled to an unlimited number of chances to effect [his] deportation").

In sum, time matters. Petitioners have been detained far longer than any

presumptively reasonably period to conclude their removal proceedings and effectuate their removal. The "reasonably foreseeable" period by which to measure the likelihood of removal is therefore extremely short.

> ### 5. Petitioners Have Established Good Reason to Believe, and Respondents Cannot Rebut, That Removal Is Not Significantly Likely in the Reasonably Foreseeable Future.
>
> > a. Because Iraq Has a Long-Standing Policy of Refusing Involuntary Repatriations, There is Good Reason to Believe Removal is Not Significantly Likely in the Reasonably Foreseeable Future.

Petitioners have established good reason to believe their removal is not significantly likely in the reasonably foreseeable future because:

- The United States does not have a repatriation agreement with Iraq. Ex. 1, Chron. ¶¶24, 50-51; Ex. 1-44, No. 1; Ex. 1-54, No. 1; Ex. 1-55, No.1; Ex. 1-56, No. 1; ECF 184, PgID5062; ECF 184-2, PgID5070-71, Bernacke Decl. ¶4.
- Iraq has a long-standing policy against involuntary repatriations. Ex. 1, Chron. ¶¶2, 3, 4-7, 20.h, 30-31, 33, 36, 37, 48-51.
- Iraq's official position is that it "refuse[s] the principle of forced return of Iraqis abroad or any other nationals, because it conflicts with humanitarian laws and principles." *Id.* ¶¶36-37. It reaffirmed that policy as recently as July 29, 2018. *Id.* ¶49.
- Iraq refused to accept the scheduled June charter flight, and refused to schedule a July 2017 flight. *Id.* ¶¶20.q-20.v, 22-24.
- Iraq has repeatedly denied travel documents to class members on the basis that they do not wish to return. *Id.* ¶¶2, 3, 6-7, 20.h.
- Even for individuals who desire to be repatriated, the process of obtaining travel documents is arduous and time-consuming; some individuals have been waiting as long as eight months since this Court lifted the stay of removal, and have still not been repatriated. Ex. 2, Schlanger Decl. ¶¶45-50; Ex. 9, Gonzalez Decl. ¶¶3-5.

29

Petitioners have met their initial burden under *Zadvydas*.[14]

> b.    Respondents Cannot Rebut Petitioners' Showing By Suggesting Negotiations with Iraq Could Potentially Lead to Repatriation.

Any presumptively reasonable period of detention to effectuate removal has ended. And Petitioners have established good reason to believe their removal is not significantly likely in the reasonably foreseeable future. Respondents must rebut that showing. *Zadvydas*, 533 U.S. at 701. They cannot.

Respondents will likely argue that ongoing negotiations are finally bearing fruit, and Iraq will accept back however many Iraqi nationals ICE wants to deport. Respondents made that same claim in their earlier *Zadvydas* briefing in November 2017. ECF 158, PgID4096-97; ECF 158-2, PgID4130-31, Schultz Decl. ¶¶4, 7-9;

---

[14] Although this case is now in its 14th month and discovery began months ago, due to Respondents' stonewalling and delay tactics, discovery is still not complete. Given that each day the *Zadvydas* claim remains unresolved is a day that the detainees suffer behind bars, and given that the evidence already produced establishes the illegality of their detention, counsel can wait no longer to file this motion. However, Petitioners expressly reserve the right to supplement the record here or to return with a subsequent motion based on yet-to-be-completed discovery. Moreover, pursuant to this Court's order, ECF 366, PgID8323, Respondents had until August 20, to respond to Petitioners' second set of discovery requests. Instead of doing so, Respondents once again sought to delay discovery by refusing to answer all but one interrogatory, producing no documents despite the Court's order to do so, and claiming they will need more than three months to supplement their discovery with records dated March 2018 to the present. *See* Exs. 20-23, Respondents' August 20, 2018 discovery responses. Respondents should be barred from responding to this motion with any previously undisclosed evidence; should they do so, Petitioners will ask the Court for appropriate relief.

ECF 184, PgID5063-64; ECF 184-2, PgID5071-73, Bernacke Decl. ¶5, 11-12.[15] It was untrue then and it is untrue now. ICE has long been aware that a precondition for repatriation to Iraq is that the Iraqi national express a desire to return—a constraint conspicuously absent from Respondents' prior filings and interrogatory responses. Ex. 1, Chron. ¶¶1-7, 20.h, 30-31, 33-34, 36-42, 48-51. Indeed, precisely because ICE knew of this precondition, ICE has gone to extraordinary lengths to coerce class members into expressing such a desire to return, including threatening detainees who participated in consular interviews with prosecution or years of incarceration if they did not sign Iraqi forms. *See id.* ¶¶38-40. Petitioners' never-ending detention is itself a coercive act seeking to undermine their resolve and compel them to "agree" to return to Iraq. After Petitioners sought relief from coercion and highlighted that Iraq had not issued travel documents for six interviewees who withstood that coercion and refused to sign the forms, Respondents placed extraordinary pressure on Iraq to issue documents for those individuals. Ex. 1, Chron. ¶¶41-42. As a result of high-level intervention from the Ministry of Foreign Affairs, on July 13, 2018, Iraq finally agreed to issue

---

[15] ICE has told other federal courts the same thing, even in cases where Iraq has specifically refused repatriation. *Compare* Ex. 17, North Decl. ¶¶53-54 ("ICE will remove Petitioner [Hussain Al-Jabari] to Iraq in the reasonably foreseeable future once the Stay of Removal for Iraqi nationals is dismissed or the Plaintiff is removed from the class" and the "Government of Iraq has already demonstrated its willingness to accept back Iraqi nationals with final orders of removal from the United States.") *with* Ex. 1-18, 6/7/2017 Iraqi Letter Denying Travel Documents (listing Mr. Al-Jabari). *See also* Ex. 18, Pitman Decl. ¶¶31-32.

documents for those six. *Id.* ¶43. Critically, however, Iraq has made no commitment to issue travel documents for involuntary repatriations in the future. *Id.* ¶¶50-51. To the contrary, the Ministry of Migration and Displacement, on July 29, 2018 issued a new statement, reiterating that embassy staff should not facilitate involuntary repatriations. *Id.* ¶49.

Even if one accepts Respondents' claims about the negotiations as true—and the Court should be skeptical given the history here—the most Respondents can show is that the U.S. will continue to negotiate, and that Respondents hope that if the State Department exerts extraordinary diplomatic pressure, Iraq might at some point in the indeterminate future dole out a few more travel documents, notwithstanding Iraq's clear policy against involuntary repatriations. That does not constitute a significant likelihood of removal in the reasonably foreseeable future.

Under *Rosales-Garcia*, 322 F.3d at 415, a detainee's removal is neither significantly likely, nor reasonably foreseeable, absent a clear assurance that the receiving country is willing to accept that individual for repatriation. There the Sixth Circuit reversed the denial of habeas petitions for Cuban detainees held longer than six months, holding that the government failed to meet its burden because once a non-citizen has been incarcerated for the presumptively reasonable period, detention cannot be prolonged even further by pointing to ongoing diplomatic negotiations. "Although the government presented evidence of our

continuing negotiations with Cuba over the return of Cuban nationals excluded from the United States, neither [of the petitioners] is currently on a list of persons to be returned." *Id.* at 415. Thus, generalized avowals that the U.S. is negotiating with another country about repatriation are insufficient to establish a significant likelihood of removal. The receiving country must have indicated a willingness to accept the specific detainee. Here, ICE's promises that Iraq will issue travel documents do not meet this standard, particularly in light of Iraq's repeated refusals to provide travel documents even after it allegedly changed its policy in March 2017.

*Rosales-Garcia* harkens back to *Zadvydas* itself, which firmly rejected the Fifth Circuit's approach of allowing detention as long as good faith efforts to effectuate detention continue and removal is not impossible. As the Supreme Court said, the question is not whether there is "*any* prospect of removal," but whether it is significantly likely to occur in the relatively near future. *Zadvydas*, 533 U.S. at 702 (original emphasis). Indeed, the Ninth Circuit, finding habeas relief appropriate for the other *Zadvydas* petitioner on remand, explained:

> Our conclusion that there was no likelihood of Ma's removal in the reasonably foreseeable future was based, and is based, not only on the fact that there was no "extant or pending" repatriation agreement but also on the fact that there was an insufficient showing that future negotiations were likely to lead to a repatriation agreement within the reasonably foreseeable future.

*Ma v. Ashcroft*, 257 F.3d 1095, 1099 (9th Cir. 2001). The Court further noted that negotiations were in the "embryonic stage," that relevant discussions had been

going on for four or five years, and that Cambodia had still not announced a willingness to enter into a repatriation agreement. *Id.* at 1099, 1115. Given that "Ma's detention has already lasted well beyond the six-month 'presumptively reasonable' period established by the Supreme Court in *Zadvydas* … the INS may not detain Ma any longer." *Id.* at 1115. There, as here, the absence of a repatriation agreement, particularly where a country has a long history of resisting repatriation, weighed heavily towards release after the presumptively reasonable removal period elapses. *See also Thai v. Ashcroft*, 366 F.3d 790, 792 (9th Cir. 2004) (highlighting lack of repatriation agreement in foreseeability analysis).

This case is also very similar to *Younes v. Lynch*, 2016 WL 6679830 (E.D. Mich. Nov. 14, 2016), where this Court granted release to an immigrant detained for eight months because "no travel documents have yet been produced, and the Lebanese consulate has not suggested any date by which they will be produced," perhaps because of "the need for multiple domestic government agencies in Lebanon to sign off on her authorization to return." *Id.* at *2.

> [The government of Lebanon has not said "no," but likewise it has not said "yes," and no one can say when an answer will be forthcoming... Despite diligent efforts by the ICE deportation officer, the government has not been able to furnish any evidence that the government of Lebanon will issue travel documents in the discernable future. And although there is no hard evidence either way in the question when or if travel documents will issue, there is a suggestion in the record that bureaucratic complications in Lebanon will delay (or possibly pre-vent) issuance of the documents "in the reasonably foreseeable future".

*Id.* at *2, *3. Exactly the same thing is true here.

Other courts agree. In *Abdel-Muhti v. Ashcroft*, 314 F.Supp.2d 418, 426 (M.D. Pa. 2004), where the petitioner had been detained long past the presumptively reasonable period, the court held that ICE's evidence about diplomatic progress toward repatriation did not rebut petitioner's showing, particularly where the government did not know "whether removal will be available under the agreement in one month or in one year." Similarly, in *Elashi v. Sabol*, 714 F.Supp.2d 502, 506 (M.D. Penn. 2010), for five months, the Department of State had been pressuring the Palestinian Authority to accept the petitioner. The court granted habeas, rejecting the government's claim that "removal remains reasonably foreseeable because attempts to effect [] removal remain ongoing." *Id.* "[T]he Government is required to demonstrate the likelihood of not only the existence of untapped possibilities, but also a probability of success in such possibilities." *Id. See also Hajbeh*, 490 F.Supp.2d at 693 ("the government cannot continue to rely on claims of 'best efforts' and promises that removal is just around the corner"); *Seretse-Khama*, 215 F.Supp.2d at 49 (rejecting argument that detention should continue because Liberia had repatriated a few citizens in recent years and might repatriate the petitioner: "this Court must determine whether there is evidence of a significant likelihood of removal in the reasonably foreseeable future, not whether the INS efforts will be futile"); *Jama*, 2005 WL 1432280, at *2, *3 (ordering release of a Somali national

35

where ICE has previously "proposed elaborate, but ultimately unsuccessful, plans" for repatriation, and now had new plans for accomplishing repatriation).

The Supreme Court recognized that habeas courts may face "difficult judgments" in considering how long it is reasonable "to grant the Government appropriate leeway" to pursue repatriation. *Zadvydas*, 533 U.S. at 700. That is precisely why the Court established a presumptively reasonable six-month period where the government's interest in continued diplomatic negotiations outweighs the individual's liberty interest. *Id.* at 701. *See also Uritsky v. Ridge*, 286 F.Supp.2d 842, 845 (E.D. Mich. 2003) (*Zadvydas* established presumptive 6-month period as guide for determining when removal is no longer reasonably foreseeable). Since here that period has long since passed, since what counts as "reasonably foreseeable" is now exceedingly short, and since it is unlikely that—or at best highly uncertain whether or when—Iraq will accept Petitioners, they must be released absent individualized proof that Iraq has issued travel documents or there is some other special justification for their detention.

       c.    The Length of Removal Proceedings, When Coupled with the Uncertainty of Removal, Requires Release.

Not only have most *Zadvydas* subclass members already been incarcerated well over a year, but given the posture of their immigration cases, many could face years of further detention, even though they may well ultimately prevail on the merits. *See* Ex. 2, Schlanger Decl. ¶13. Indeed, even detainees who have won

36

immigration relief or protection are being detained while ICE appeals or seeks to deport them to countries other than Iraq. *See, e.g.*, Ex. 10, Bajoka Decl. ¶¶12-16 (detainee granted asylum in January, but detained until BIA dismissed government appeal in July); ECF 312-3, PgID7511-13, Vakili Decl. ¶¶6-10 (immigrant, who was found likely to be tortured but was detained for over a year *after* winning that relief, agreed to removal because he despaired of ever being released).

In January this Court decided (based on necessarily cursory briefing, given the number of issues before the Court) that the length of time it will take for immigration cases to conclude could not by itself form the basis of a *Zadvydas* claim "where the *only* barrier to removal is ongoing immigration proceedings." ECF 191, PgID5334 (emphasis added). Here, the length of those proceedings is coupled with great uncertainty about whether removal will ever be possible, implicating the core constitutional principles that the length of civil detention must be carefully limited to serve the purposes of that detention and the duration of detention must be reasonable. *See* Section IV.A.1. The Supreme Court noted in *Flores*, 507 U.S. at 314–15, that detention's duration for noncitizen youth "is inherently limited by the pending deportation hearing," but emphasized that these proceedings "must be concluded with 'reasonable dispatch' to avoid habeas corpus," which is the appropriate remedy where "alien juveniles are being held for undue periods" due to the length of immigration proceedings. *See also Jennings*, 138 S.Ct. at 868

(Breyer, J., dissenting) ("It is immaterial that the detention here is not literally indefinite, because while the [] removal proceedings must end eventually, they last an indeterminate period of at least six months and a year on average, thereby implicating the same constitutional right against prolonged arbitrary detention that we recognized in *Zadvydas*.").

The Sixth Circuit in *Ly* stressed that the "entire process . . . is subject to the constitutional requirement of reasonability." 351 F.3d at 272. It found that the length of proceedings was unreasonable where Ly "had been imprisoned for a year and a half with no final decision as to removability." *Id.* at 271. In *Ly* the question was not whether there is a definite end point to immigration proceedings—Ly's proceedings like all such proceedings had an endpoint (a month after the grant of habeas)—but whether the amount of time spent in detention until that end point was reached was reasonable, particularly given questions about whether Ly could be repatriated. The Court recognized that under *Demore*, brief detention during removal proceedings is permissible, but explained that *Demore* "is undergirded by reasoning relying on the fact that [§1226(c) detainees] normally have their proceedings completed within a short period of time and will actually be deported or will be released. That is not the case here." *Id.* at 271. The Court thus found habeas relief proper for Ly "[b]ecause there is no strong special justification in this case, because the period of time required to conclude the proceedings was

38

unreasonable, and because actual removal was not foreseeable." *Id.* at 273. The fact that Ly was not removable made "a year-and-a-half imprisonment awaiting removal proceedings [] *especially* unreasonable." *Id.* at 271-72 (emphasis added).

Exactly the same is true here. It is unreasonable to subject Petitioners—who will soon hit *Ly*'s 18-month mark—to years of further detention while their cases wend their way through the immigration courts, particularly given the utter uncertainty about whether Iraq will accept them for repatriation if they lose. Because their removal litigation has become prolonged, Petitioners' liberty interest in freedom from detention outweighs the government's interest in detaining them so that they will be available at some future date **if** they are found to be removable and **if** Iraq then agrees to repatriation. Given that Petitioners have been detained so long already that the "reasonably foreseeable future" is now very short, "the period of time required to conclude the proceedings [is] unreasonable." *Id.* at 273.

The present case is like *Abdulle v. Gonzales*, where a nationwide injunction prevented removal of Somalis, a fact the district court considered in finding that the petitioner was not likely to be removed in the reasonably foreseeable future. 422 F.Supp.2d at 779. The court rejected the government's argument that detention was lawful because it was attributable to the injunction: "Respondents' instant argument is remarkably similar to the contention that continued detention be lawful so long as good faith efforts to effectuate [removal] continue, a rationale the

*Zadvydas* Court expressly rejected." *Id.* Similarly, in *Koussan v. Department of Homeland Security*, 2015 WL 6108303 (E.D. Mich. Oct. 16, 2015), this Court found the indeterminate length of ongoing legal proceedings dispositive, regardless of the availability of travel documents. Noting that the detainee had a Sixth Circuit appeal pending, that "it is not known when it will be resolved" and that the case could be sent back to the BIA for further proceedings, the court rejected ICE's argument that removal was reasonably foreseeable because the government would—if the detainee lost—be able to remove him when proceedings concluded:

> Even though ICE has a travel document to remove Koussan, ICE cannot act on that document due to the stay of removal by the Sixth Circuit and Koussan's pending appeal. . . Under these circumstances, he faces detention for an unknown period of time. *Zadvydas* prohibits such continued detention.

*Id.* at *3. *See also Oyedeji v. Ashcroft,* 332 F.Supp.2d 747, 752–54 (M.D. Pa. 2004) (granting habeas relief because "[t]he price for securing a stay of removal should not be continuing incarceration"). Petitioners here should not be punished with years of detention simply because they are exercising their legal right to oppose removal to a nation where torture and death awaits.

### 6.    Respondents' Past Misrepresentations to the Court Further Undermine the Reasonableness of Detention.

Respondents have, throughout this litigation, repeatedly represented that Iraq is willing to accept repatriation of Iraqi nationals without limit, that it was this Court's injunction (rather than Iraq's refusal) that prevented the June 2017 flight,

and that large-scale removals can be accomplished through charter flights without the need for travel documents. Discovery has now revealed what the government sought to hide: clear evidence that, absent an Iraqi national's expressed desire to return to Iraq, it is extremely difficult, and perhaps impossible, for him to be repatriated. Discovery has also revealed that Respondents knew this all along, and misled the Court. Petitioners will shortly be filing a motion for sanctions.

As a result of the government's falsehoods, over 100 people have been incarcerated unlawfully since January, when this Court, relying on Respondents' declarations, concluded that it could not "make a determination regarding whether Iraq will accept repatriation of the class" without discovery. ECF 191, PgID5331-32. Even more appalling, virtually every week additional detainees give up their rights because of the toll of detention. The reasonableness of Petitioners' ongoing detention must be evaluated in light of the reasonableness of their past detention—detention that was based on Respondents' misrepresentations to the Court. Petitioners have languished in detention as winter became spring, then summer, and now soon fall, separated from their families and communities, increasingly desperate. That their past suffering has been predicated on falsehoods weighs heavily against the reasonableness of allowing their suffering to continue.

### B. The Irreparable Harm, Balance of the Equities, and Public Interest Factors Favor Petitioners.

This Court has already decided that the final three injunctive factors—

irreparable harm, balance of equities and public interest—overwhelmingly support Petitioners, who seek nothing more than a return to a pre-detention status quo. ECF 191, PgID5346-47. "Detention has inflicted grave harm … for which there is no remedy at law." *Id.* at PgID5346. "The balance of equities tips decidedly in favor of preliminary relief": absent relief, the detainees will continue to suffer that grave harm, while "the Government does not substantiate any claim that it will suffer any harm if enjoined." *Id.* at PgID5346-47. "Finally, the public interest requires preliminary relief" because "[o]ur Nation has a long history of resisting unreasonable governmental restraints." *Id.* at PgID5347.

In balancing the four injunction factors, it is critical to remember that civil detainees "are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Youngberg v. Romeo*, 457 U.S. 307, 322 (1982). *See also Flores*, 507 U.S. at 319 (O'Connor, J., concurring) (focusing on confinement conditions in assessing constitutionality of detaining noncitizen youth). Judicial acceptance of civil detention is premised on the notion that civil confinement conditions are less severe than criminal imprisonment. *See, e.g.*, *Salerno*, 481 U.S. at 747–48; *Hendricks*, 521 U.S. at 363; *Schall*, 467 U.S. at 271. In practice, however, Petitioners are being held in penal conditions; over half are held in jails, alongside pretrial and sentenced prisoners. Ex. 2, Schlanger Decl. ¶¶14-15; *Chavez-Alvarez v. Warden York Cty.*

*Prison*, 783 F.3d 469, 478 (3d Cir. 2015) ("[W]e cannot ignore the conditions of confinement. Chavez-Alvarez is being held in detention at the York County Prison with those serving terms of imprisonment as a penalty for their crimes. Among our concerns about deprivations to liberties brought about by [immigration detention] is the reality that merely calling a confinement 'civil detention' does not, of itself, meaningfully differentiate it from penal measures.").

Petitioners' detention has ceased to be reasonable; their powerful liberty interest in freedom from incarceration easily outweighs the government's interest in ongoing detention for an indeterminate time to procure travel documents that may never even issue. There is no reason Petitioners cannot resume their lives under orders of supervision (which many of them were on for decades), subject to any appropriate restrictions. ECF 138-19, Brané Decl. ¶¶10-11, 13-25. "The choice … is not between imprisonment and the alien living at large. It is between imprisonment and supervision under release conditions that may not be violated." *Zadvydas*, 533 U.S. at 696 (citation and quotation marks omitted). Monitored freedom is reasonable here, and that is all Petitioners seek. If and when Respondents succeed in obtaining travel documents, along with final orders, the government can take Petitioners back into custody.

### C.    The Relief Requested

As this Court found in its January 2nd certification order, there are "multiple

43

common questions of law and fact" related to Petitioners' *Zadvydas* claim, ECF 191, PgID5351, questions which they now ask this Court to answer. Specifically, Petitioners ask the Court to find that for members of the *Zadvydas* subclass who have been detained longer than six months (a) the duration of their detention is no longer presumptively reasonable for the purpose of effectuating their removal; (b) what counts as the "reasonably foreseeable future" under *Zadvydas* and *Ly* is now very short, given the length of Petitioners' detention to date; (c) Petitioners have provided good reason to believe that removal is not significantly likely in the reasonably foreseeable future, and therefore Petitioners must be released unless the government "responds with evidence sufficient to rebut that showing;" *Zadvydas*, 533 U.S. at 701; (d) under *Rosales-Garcia*, 322 F.3d at 415, Respondents cannot rebut Petitioners' showing by pointing to ongoing diplomatic negotiations, particularly given how short the "reasonably foreseeable future" now is, but must present actual evidence that Iraq has agreed to repatriation of a specific class member if that class member's detention is to be further prolonged; and (e) Respondents cannot continue to detain Petitioners unless Respondents establish that *either* the class member's removal is significantly likely because Iraq has issued travel documents*, or* there is another "sufficiently strong special justification" other than effectuating removal that justifies continued detention. *Zadvydas*, 533 U.S. at 690.

To operationalize this relief, the Court should order that members of the

44

*Zadvydas* subclass who have been detained longer than six months be released under orders of supervision within 14 days unless Respondents by that date provide individualized evidence that (i) ICE has valid travel documents for the detainee,[16] or (ii) there is another strong special justification for the individual's detention other than effectuating removal. The procedure will allow the Court, having answered the common legal and factual class-wide questions,[17] to address any individual facts that might justify continued detention in particular cases.

## V.   CONCLUSION

Given the length of time Petitioners have already spent behind bars and the great uncertainty whether Iraq will ever accept them, their ongoing detention is not reasonable in relation to the government's goal of effectuating removal. Their detention is unlawful, and they must be released absent individualized evidence that Iraq is willing to accept their repatriation.

---

[16] The one-way *laissez passer* travel documents Iraq issues are valid for six months. Ex. 1-58. If ICE obtains a travel document, but is unable to accomplish removal before the document expires, the class member would then be released.

[17] Should the Court believe that any of the common questions cannot be answered class-wide, the Court should allow for individualized decisions on those questions, either through the process proposed above or through individual habeas petitions—in which case the Court should make clear that its decision does not preclude class members from seeking relief in individual habeas petitions.

Respectfully submitted,

Michael J. Steinberg (P43085)
Bonsitu A. Kitaba (P78822)
Miriam J. Aukerman (P63165)
ACLU FUND OF MICHIGAN
2966 Woodward Avenue
Detroit, Michigan 48201
(313) 578-6814
msteinberg@aclumich.org


*/s/Kimberly L. Scott*
Kimberly L. Scott (P69706)
Wendolyn W. Richards (P67776)
Cooperating Attorneys, ACLU Fund
 of Michigan
MILLER, CANFIELD, PADDOCK
 & STONE, PLC
101 N. Main St., 7th Floor
Ann Arbor, MI 48104
(734) 668-7696
scott@millercanfield.com


Nora Youkhana (P80067)
Nadine Yousif (P80421)
Cooperating Attorneys, ACLU Fund
 of Michigan
CODE LEGAL AID INC.
 27321 Hampden St.
Madison Heights, MI 48071
(248) 894-6197
norayoukhana@gmail.com
María Martínez Sánchez (NM
Bar126375)
ACLU OF NEW MEXICO
1410 Coal Ave. SW
Albuquerque, NM 87102
msanchez@aclu-nm.org

Judy Rabinovitz (NY Bar JR-1214)
Lee Gelernt (NY Bar LG-8511)
ACLU FOUNDATION
 IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2618
jrabinovitz@aclu.org

Margo Schlanger (P82345)
Cooperating Attorney, ACLU Fund
 of Michigan
625 South State Street
Ann Arbor, Michigan 48109
734-615-2618
margo.schlanger@gmail.com

Susan E. Reed (P66950)
MICHIGAN IMMIGRANT RIGHTS
 CENTER
3030 S. 9th St. Suite 1B
Kalamazoo, MI 49009
(269) 492-7196, Ext. 535
Susanree@michiganimmigrant.org

Lara Finkbeiner (NY Bar 5197165)
Mark Doss (NY Bar 5277462)
INTERNATIONAL REFUGEE
 ASSISTANCE PROJECT
Urban Justice Center
40 Rector St., 9th Floor
New York, NY 10006
(646) 602-5600
lfinkbeiner@refugeerights.org


*Attorneys for All Petitioners and Plaintiffs*

William W. Swor (P21215)
WILLIAM W. SWOR
 & ASSOCIATES
1120 Ford Building
615 Griswold Street
Detroit, MI 48226
wwswor@sworlaw.com

*Attorney for Petitioner/Plaintiff Usama Hamama*

Dated: August 29, 2018

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 29, 2018, I electronically filed the foregoing papers with the Clerk of the Court using the ECF system which will send notification of such filing to all ECF filers of record.

By: *<u>/s/Kimberly L. Scott</u>*
Kimberly L. Scott (P69706)
Cooperating Attorneys, ACLU Fund of Michigan
MILLER, CANFIELD, PADDOCK
& STONE, PLC
101 N. Main St., 7th Floor
Ann Arbor, MI 48104
(734) 668-7696
scott@millercanfield.com