# EXHIBIT 1

# CHRONOLOGY

**BEFORE 2017**

1. For many years, Iraq had declined to accept repatriation of Iraqi nationals ordered removed from the United States. This declination was not uniform: a few dozen individuals were removed each year. Ex. 1-1, ICE-0270499.[1] Iraq would accept only its nationals who had unexpired passports issued in 2007 or later. Ex. 1-2, ICE-298502.

2. More generally, Iraq has had a strong policy against forced repatriations. As summarized in ICE briefing documents, "In November 2011, the GoI's [Government of Iraq's] Ministry of Foreign Affairs directed consular officials to not issue passports or TDs [travel documents] to Iraqi nationals who did not wish to return to Iraq. In August 2012, as a result of that mandate, 10 countries (Australia, Belgium, Canada, Denmark, France, The Netherlands, Sweden, Switzerland, the United Kingdom, and the United States) established the 'Brussels Group,' to discuss Iraqi repatriation concerns and to identify strategies to elicit better cooperation from the GoI." Ex. 1-2, ICE-298503.

3. At some point in 2016, the State Department prepared a summary of prior meetings with Iraq which led nowhere. The U.S. Embassy in Baghdad wrote:

   > Since February 2014, the Department of State and Immigration and Customs Enforcement have met an additional seven times with officials of the Iraqi government, both in Washington, DC and Baghdad, to follow-up on the issue (March 31, 2015; April 1, 2015; July 2015; January 10, 2016; January 29, 2016; May 12, 2016; and June 13, 2016, respectively). During the meeting of January 29, the Iraqi Ambassador in Washington, DC assured U.S. government officials that Iraqi Consulates would interview Iraqi detainees with criminal records to begin the process of issuing travel documents. Iraqi Consulates in Detroit and Washington, DC have begun these interviews. Unfortunately, the Consulate in Los Angeles has yet to allow a single interview due to lack of identity documents.

   Ex. 1-3, ICE-0269781-82. *See also* Ex. 1-4, ICE-0298714 (more on the January 29, 2016 meeting). Notwithstanding prior assurances of cooperation from the Ambassador, this document shows that only some of the consulates (Detroit and Washington) would meet with Iraqi nationals whose deportation ICE sought. Ex. 1-3, ICE-0269781-82. Another summary, this one prepared as a briefing memo for then-ICE Director Sara Saldaña and ICE Assistant Director Marlen Piñeiro, explains still more about the January 29, 2016 meeting: it states that there was "an agreement to accept criminal deportees' return to Iraq." Ex. 1-2, ICE-0298501. Yet as of October 2016, this purported agreement had not yielded any travel documents; Iraq continued to adhere to "the forced return and fear claim policy that hinders TD issuance." *Id.* "The Iraqi Embassy has stated during multiple meeting[s] that there is a policy of not issuing documents on subjects who do not want to return. Iraq has also mentioned refusing to issue a TD on anyone who claimed fear regardless of the fear claim being resolved and the subject

---

[1] In this and other exhibits, Petitioners' counsel have highlighted the referenced text in yellow.

being removable." *Id.* ICE-0298501-02. Over the years, the U.S. responded with "multiple demarches." *Id.* ICE-0298504. (A demarche is a formal diplomatic complaint.)

4. When Iraqi officials *did* conduct travel-document interviews of Iraqi nationals, Iraq used a form (the "GOI form") seeking the would-be-deportee's consent to removal. A version of the form known to be used in 2016 and 2017[2] is attached as Exhibit 1-5, ICE-0295793 and Exhibit 1-6, ICE-0267486. *See* Ex. 3, Attieh Decl., Exs. C-K. As an ICE officer explained in a declaration to this Court, "The GOI travel document application forms have been in use by the GOI for many years now. These forms have been a regular part of the travel document procurement process . . . ." ECF 311-3, PgID.7481-82, Maddox Decl. ¶14. The 2016 version is in Arabic. *Id.* at PgID.7490. Certified translations of the 2016-2017 versions of the form are attached at Exhibit 3, Exhibit C to K. It reads (emphasis added):

> Dear Honorable Consul,
> Subject: Limited-Validity Passport
> I, an Iraqi citizen ( ), would like to request a limited-validity passport issued to me [to travel] to Iraq and this is for personal circumstances and **my desire to return voluntarily to Iraq,** with the knowledge that I don't hold a passport to return to to [sic] the homeland.

5. The point of this form was evidently to ascertain whether an individual was or was not willing to be repatriated, in order to implement the Iraqi policy against involuntary repatriations.

6. In short, Iraq has long had an express policy against involuntary repatriations, and against repatriation of individuals who expressed fear for their safety in Iraq. Between 2011 and 2017, Iraq did not accept forced repatriation of its nationals. For a history of this policy against forced returns, and repeated, unavailing opposition to it by the U.S. government, see Ex. 1-2, ICE-298502-04.

7. This was the state of play as of December 2016. That very month, the Iraqi Consulate in Detroit declined to issue a travel document for one class member, stating:

> With reference to your letter dated on October 11, 2016 and in the light of the interview that [was] conducted by the Iraqi consulate with above mentioned individual on November 15, 2016, kindly be advised that the Consulate General of the Republic of Iraq in Detroit is unable to issue travel document for him due to lack of his proper Iraqi documents which are necessary and required to process his application, . . . also [he] stated that he is unwilling to voluntary repatriated to Iraq, therefore and according to our regulations we will not be able to start any application for him at this time. Ex. 1-8, ICE-0269762.

---

[2] As explained in Ex. 3, Attieh Decl. 5, signed copies of this form disclosed by ICE are dated between March 21, 2016 and November 4, 2017.

**JANUARY – APRIL 2017**

8. On January 27, 2017, President Trump issued Executive Order 13769 barring admission into the United States of nationals of seven countries, including Iraq. 82 Fed. Reg. 8977. A flurry of diplomatic contacts ensued, in Iraq rather than with Iraqi diplomats in the United States. As ICE described it in briefing materials prepared in July 2017, "Due to the lack of cooperation from the Iraq Embassy, Washington, D.C. on this issue, ERO and the Department of State developed a strategy to request approval for final order cases directly from Baghdad." Ex. 1-9, ICE-0269073. During those negotiations, the U.S. government told Iraqi officials in January 2017 "that accepting this flight would be an encouraging sign of progress on an issue that could help remove Iraq from sanctions in future Executive Orders." Ex. 1-10, ICE-0297786.

9. The above negotiations resulted in an agreement to accept a small charter plane with Iraqi deportees: "In February 2017, ERO received confirmation from the U.S. Embassy in Baghdad that Iraqi officials have approved the acceptance of a Special High Risk Charter flight containing eight Iraqi detainees." Ex. 1-1, ICE-0270496. The Trump Administration in turn quickly rewarded the concession by taking Iraq off the Travel Ban country list. The President signed the second version of that ban, Executive Order 13780, 82 Fed. Reg. 13209, on March 6, 2017. On a press call to announce the new Order, a "senior DHS official" stated "Iraq is no longer one of those countries [covered by the order] because we have received firm commitments from the government of Iraq over the last several weeks since the first executive order was issued about increased cooperation in terms of information sharing and other related activity. . . . Iraq has agreed to the timely return in [sic] repatriation of its nationals who are subject to final orders of removal." Ex. 1-11, ICE-0296207-08.

10. However, contemporaneous records show that in private, ICE was clear that "[a]t this point ERO [did] not have a repeatable process in place regarding the removal of Iraqi nationals with final orders." Ex. 1-12, ICE-0271069. So negotiations continued. A State Department cable dated March 12, 2017, described discussions conducted after Iraq agreed to accept the first charter plane (in February, *see* ¶9 supra), though before it actually took off (in April, *see* ¶17, *infra*). Ex. 1-13, ICE-0271130. The result was an "Iraq Inter-ministerial Committee on Deportations," composed of "representatives from the Prime Minister's Office, the Ministry of Foreign Affairs (MFA), the Ministry of Justice (MoJ), and the Ministry of the Interior (MoI)." *Id.*, ICE-0271131.

11. The March 12, 2017 cable also focused on identity documents. It stated, "In response to the DCG's [U.S. Deputy General Consul's] offer for the United States to provide where permissible evidence of Iraqi citizenship derived from U.S. information systems, [Foreign Affairs Minister Dr. Kadhim] Al-Rikabi said the GoI would accept such evidence in lieu of passports and national identification cards." *Id.*

12. The March 12, 2017 cable contained no discussion of involuntary repatriations. *Id.*, ICE-0271130-32. The cable stated that "the Committee was prepared to direct the Iraqi Embassy and Consulates to provide travel documents for each of the 1400 deportees," taking four steps: "consular access, Iraqi citizenship verification, deportation court order review, and travel document issuance." *Id.*, ICE-0271130-31.

13. This new development was described by senior ICE official John Schultz as a "possible huge breakthrough." *Id.*, ICE-0271129. He testified that he considered the cable a "Statement of Cooperation," that set the terms of subsequent dealings between ICE and Iraq. See Ex. 4, Schultz Dep. at 47, 79-80, 98-99, 116-117.

14. The March 12 cable stated that Iraq will issue travel documents for repatriations; it did not refer to repatriations without travel documents, using flight manifests or other methods. Ex. 1-13, ICE-0271130-32. *See also* Ex. 1-54, ICE's Response to Interrogatory Nos. 1-7; Ex. 1-55, ICE's Response to Interrogatory Nos. 1-5; Ex. 1-56, DHS's Response to Interrogatory Nos. 1-7.

15. In the meantime, planning proceeded for the first, small charter flight in April 2017. As described in March 2017 by the Baghdad-posted Deputy Consul General for the State Department, the process for the flight did not include ordinary travel documents:

> With regard to travel documents, the GoI agreed to have previously-reviewed plane manifests replace the need for travel documents for Iraqis for whom the USG can provide some evidence of Iraqi citizenship, i.e., valid or expired passports or national identification cards, or other Iraqi citizenship documentation. This was the 'Haiti model' we previously discussed with DHS. *Id.*, ICE-0271129.

16. A litigation declaration later portrayed this approach as typical of charter flights. ERO Unit Chief Michael Bernacke stated: "The government of Iraq agreed to accept these removals via charter mission. As a charter mission, rather than a removal conducted via commercial airline flight, formal travel documents are not required. Instead, ICE submits a proposed manifest for the charter flight to Iraqi officials for approval." ECF 184-2, PgID.5071, Bernacke Decl., ¶ 6. In fact, the no-travel-document approach was extremely unusual: Mr. Bernacke testified that of the 43 countries whose travel document acquisition process he supervises, not even one uses a manifest-only process. Ex. 5, Bernacke Dep. at 100.

17. In the end, the no-travel-document approach was not used. Ex. 4, Schultz Dep. at 46-48 ("that manifest idea . . . never came to fruition"). Instead, individuals on the April 2017 plane obtained one-way laissez-passers. Ex. 6, ICE's Response to Interrogatory Nos. 6 and 7 (see entry for H. A., AXXX-XXX-621).

18. When the April 2017 plane landed in Iraq, its passengers were interrogated by the Iraqi intelligence service. Ex. 1-10, ICE-0297786 (describing the April repatriations: "The Airport authority had been superseded by the Iraqi Intelligence Service (INIS) who would receive the deportees . . . ."). *See also* Ex. 1-14, ICE-0297798 (Iraqi ███████████████████████████████████ ███████████████████████████████████ ██████████████████████.").

## JUNE 2017: ARRESTS AND A FAILED FLIGHT

19. Because of the April charter flight and the meeting memorialized in the State Department's March 2017 cable, ICE reclassified Iraq from "uncooperative" to "at risk of noncompliance (ARON)" in May 2017. Ex. 1-15, ICE-0270938-40.

20. ICE scheduled its next flight for June 2017. From the beginning, however, its prospects were clouded by debate between Iraqi consular officials in the U.S. and foreign ministry officials in Baghdad. As Supervisory Detention and Deportation Officer Chris George described it, "We are essentially going over the Consulates and Embassy's heads and going right to the Ministry of Foreign Affairs in Baghdad and presenting our TD requests there, and they are forcing the Embassy/Consulate to accept them." Ex. 1-16, ICE-0271766.  In the end, Iraq declined to allow the flight to proceed. ICE's contemporaneous documents make the timeline clear:

a. May 15, 2017:    "[O]peration to begin removing non-detained Iraqi final order cases" begins with the first arrests of Iraqi nationals. Ex. 1-17, ICE-0269197.

b. May 16, 2017:    "64 non-detained cases submitted to the DOS [Department of State] for TD presentation" to the Iraqi inter-agency committee. *Id.*

c. May 17, 2017:    "List of 26 detained final order cases sent to DOS for presentation to the Iraqi MFA." *Id.*

d. May 22, 2017:    "149 additional non-detained cases submitted to the DOS for TD presentation." *Id.*

e. May 25, 2017:    "DOS submitted all 240 presentations to the Iraqi MFA along with a Dipnote [diplomatic note[3]] for the upcoming June charter." Ex. 1-9, ICE-0269074.

f. May 30, 2017:    "ICE established June 28, 2017, as the removal date for the charter." Ex. 1-17, ICE-0269197.

g. June 6, 2017:    "40 add-on cases submitted to DOS for the June charter." *Id.*

h. June 7, 2017:    The Iraqi embassy declines to approve forced repatriations. In response to a request for two dozen travel documents, each for a class member in this case (*see* Ex. 2, Schlanger Decl., ¶¶18-19), it writes to ICE: "With reference to your request for travel documents for the aliens whose names are listed in the attachment, kindly be advised the Embassy of the Republic of Iraq in Washington D.C. is unable to issue such travel documents . . . . The applicant . . . should express orally and in writing his willingness to return to Iraq voluntarily in order to be issued a travel document." Ex. 1-18, ICE-0298492 to 93. In response to this "blanket denial," ICE Deputy Assistant Director Schultz reaches out for a progress report on 33 additional travel document requests, *id.* at ICE-0298490, but none of these are granted either. *See* Ex. 6, ICE's Response to Interrogatory Nos. 6 and 7; Ex. 2, Schlanger Decl. ¶22.  (ICE later

---

[3] A diplomatic note, or dipnote, is a formal written communication between countries.

suggested that the meaning of the blanket-denial letter was—implicitly—to instruct ICE to submit these individuals' travel document presentations to the Foreign Ministry, rather than the Embassy, *see* Ex. 4, Schultz Dep. at 219-221, 232-234. But as ICE staff knew, ICE had *already* submitted the presentations to the Foreign Ministry, via the U.S. Department of State; each of the named individuals had been on the list of Department of State submissions made in prior weeks. Ex. 1-18, ICE-0298490 ("Also all these cases were sent to Brigid [at the U.S. embassy in Baghdad] as well."); Ex. 2, Schlanger Decl., at ¶¶20-21 (comparing names on June 7 letter to Ex. 6, ICE's Responses to Interrogatory Nos. 6 and 7.)

i.  June 9, 2017:     Intra-ICE communication: "At this point we have more aliens in custody than we have seats on the plane, only 75 can go, 15 alternates identified, total cases ready is at 90. 17 cases identified for the future July charter due to field arrests." Ex. 1-17, ICE-0269197.

j.  June 11-12, 2017: ICE arrests nearly about 100 Iraqi nationals, nationwide, bringing the total in detention to over 200. Of 230 Iraqi nationals arrested prior to June 22, 130 had been the subject of travel documents previously submitted to Iraq (via the U.S. Embassy in Baghdad); 68 had been  designated for the June 28 plane, and at least eight of them were on the June 7 "blanke[t] denial" list from the Iraqi embassy. Ex. 1-18, ICE-0298490; Ex. 2, Schlanger Decl. ¶25.

k.  June 12, 2017:    Iraq denies any agreement. ICE emails the Department of State:

[H]ave you heard anything regarding Iraq backing out of the charter missions? DAD [Deputy Assistant Director] Schultz is answering a message regarding the Ministry of Foreign Affairs allegedly stating that there is no agreement with the US Government.

Ex. 1-19, ICE-0269475. State Department confirms: "The MFA wrote yesterday and said that the flight 'decision' is with 'top Iraqi officials.' Our front office was briefed and we are engaging to push the issue." *Id.*

l.  June 13, 2017:    The State Department engages Iraq. The State Department informs ICE: "We talked to Brigid's [Brigid Weiler, the U.S. deputy consul general] primary POC in the Ministry of Foreign Affairs, reminding him of our dipnote [diplomatic note] of May which noted the June flight, and letting him know another note with more names was on its way. We reminded him that the Prime Minister had promised our Ambassador that deportations would resume. His response was that

with such a large number this time there were important identity and logistical issues to arrange, and the best he could offer was a meeting at MFA [Ministry of Foreign Affairs] next week with all the Iraqi players. He was very concerned that anyone deported is truly an Iraqi. He offered several times that delaying this flight would give them more room." Ex. 1-20, ICE-0269421.

m. June 15, 2017:    Petitioners—at this point, Iraqi nationals with final orders of removal arrested by ICE in the Detroit Area of Responsibility (that is, Michigan and Ohio)—file this lawsuit, and seek an emergency stay of removal.  ECF 1, 11.

n. June 18, 2017:    Higher-level negotiations do not resolve the issue. Iraqi Ambassador Yasseen expresses concerns about the appropriateness of the deportations, asking U.S. Ambassador to Iraq Douglas Silliman: "What happens to someone who may have committed a crime, fulfilled the sentence, been released and has since perhaps married and has Amcit [American citizen] children and/or spouse? Is there any allowance for this?" Ex. 1-20, ICE-0269418.

o. June 18, 2017:    U.S. diplomats recognize that Iraq has concerns about allowing the repatriation of individuals with old orders. Baghdad Consul General Scott Riedmann emails several ICE officials: "I think it better to keep the groups mixed to avoid someone in the GOI deciding entire flights should not be received because the passengers all received final orders more than 10 years ago, for example." Ex. 1-21, ICE-0269538.

p. June 19, 2017:    ICE officials meet with Iraqi Ambassador Yasseen, without evident progress. Ex. 1-22, Interrogatory 12, ICE Supplemental Response.

q. June 20, 2017:    ICE learns that the Iraqi Prime Minister is not going to approve the June charter flight. Ex. 1-23, DHSHamama0000100.  The same day there is a meeting between ICE and embassy staff.  Ex. 1-22, Interrogatory 12, ICE Supplemental Response.

r. June 21, 2017:    ICE receives direct notification that Iraq will not accept the June charter flight. Ex. 1-24, ICE-0297771.

s. June 22, 2017:    Efforts to pressure Iraq continue.  DHS Deputy Assistant Secretary Matt King notes at 2:53 pm that "ICE and Embassy have been going hard at it."  Ex. 1-23, DHSHamama000103.

At 6:37 pm, the Court grants a temporary restraining order staying the Detroit Field Office's removal of petitioners. ECF 32. ICE's ability to deport other Iraqi nationals is unconstrained by the court order.  The majority of the individuals intended for the June flight are *not* covered by the Court order. ICE disclosures of 76

noncitizens intended for the June flight, and their detention records, show that 52 of the 76 had no disclosed immigration detention history in Ohio or Michigan. Ex. 2, Schlanger Decl. ¶29; Ex. 6, ICE's Response to Interrogatory Nos. 6 and 7.

t. June 23, 2017:  Acting ICE Director Thomas Homan and DHS Deputy Assistant Secretary Matt King called Iraq Ambassador Yasseen and "pressed him to ensure that the flight land as scheduled." Ex. 1-25, DHSHamama000001. The Ambassador "expressed that this flight is problematic (almost impossible) as scheduled.  Additionally, the Ambassador noted that in Iraq, the multi-agency coordination to facilitate deportations takes longer than what the U.S. expects." Ex. 1-23, DHSHamama000097.  As summarized in subsequent DHS briefings, he "indicated he was limited in his ability to persuade Baghdad to allow the flight to land, highlighting Iraqi bureaucratic 'clumsiness' and the *eid al-fitr* holiday that fell during the time the flight was scheduled to land (celebrated in Iraq this year from June 25 to June 29)." Ex. 1-25, DHSHamama00001.

u. June 26, 2017:  At 12:10 pm following up on the June 23, 2017 phone call, Iraqi Ambassador Yasseen states conclusively in an email to ICE Director Homan and others, that the flight will not proceed:

> I forwarded the information to Baghdad and I heard from them this morning. . . . The US embassy had informed the Foreign Ministry that the batch of returnees would arrive on June 29. That date was determined by the US embassy and other US agencies without consultation with the Iraqi agencies involved. As things stand, we will not be able to receive the returnees on the date mentioned (time too short to guarantee receipt of PM's clearance or to arrange for the logistics required for such a large number of returnees). On this issue, our working group met in Baghdad with the U.S. Consul and his deputy or assistant and explained these issues, the Consul in turn promised to delay the trip until after receipt of the PM's clearances on a later date to be agreed to by both sides."

Ex. 1-26, DHSHamama0000115. The Ambassador specified, as well, that Iraq would not allow "enforced repatriations," writing that Iraq would only admit individuals convicted of a crime "different from illegal entry into the USA as these fall into the category of asylum seekers and their removal could be considered an enforced repatriation." *Id.*

At 8:57 pm, the Court expands the June 22 TRO to cover a nationwide class, scheduled to expire July 10, 2017.  ECF 43.

v. June 28, 2017:     In response to Iraq's refusal to allow the planned charter flight to proceed, ICE Assistant Director, Marlen Piñeiro (Mr. Schultz's boss) reports to DHS that ICE has "exhausted all [its] efforts at [its] level" and ICE has not "even been able to get a new tentative date for the flight." Ex. 1-27, DHSHamama0000116.

21. In short, the cancellation of the June 2017 charter flight occurred because Iraq declined to allow that flight to land.   Ex. 1-1, ICE-0270496; Ex. 1-9, ICE-0269074; Ex. 1-24, ICE0297771; Ex. 1-59, DHSHamama000059.

## SUMMER 2017: THE ABSENCE OF A "DURABLE SOLUTION" AND IRAQ REASSERTS ITS POLICY AGAINST FORCED REPATRIATIONS

22. The Court's nationwide order was, at the start, provisional. The June 26, 2017 TRO stated that it would last only for 14 days—that is, until July 10.  ECF 43. On July 6, the TRO was extended until July 24, ECF 61. On July 24, the Court granted the preliminary injunction that remains in effect. ECF 87.

23. Before the preliminary injunction issued, ICE continued to seek Iraq's acquiescence to a charter plane to replace the one that Iraq rejected in June. This did not succeed. Iraq continued to assert its concerns with forced repatriations and also about the safety of deportees. (*See* Ex. 1-28, ICE-0296142 (describing Iraqi "argument that Iraqi Chaldeans would necessarily face persecution upon return to Iraq").) Over the subsequent month, the United States was unable to obtain a firm commitment for a replacement flight. The timeline is:

a. July 5, 2017:     The Iraqi Ministry of Foreign Affairs informs the U.S. embassy in Baghdad that "the PMs [Prime Minister's] office gave them the go-ahead on deportations."  However, Consul General Scott Riedmann explained to ICE that the issue was far from resolved.  While he was "cautiously optimistic" about the prospects of a "durable solution," he wrote that "[t]he Iraqi Embassy in Washington is the next piece of the puzzle." Ex. 1-29, ICE-0268969.

b. July 6, 2018:     In the afternoon, Department of State Iraq Desk Director Peter Shea meets with Iraqi Ambassador Yasseen, "aim[ing] for a July 13 flight if the court injunction is removed." *Id.*, ICE-0268966. Yaseen "is awaiting new instructions from Baghdad, including to clarify if the embassy may issue travel docs to all removal cases, or only those who had been convicted of felonies and have served their sentences." *Id.*  Absent "new instructions," "right now he feels he can only issue docs to" "those with prior felonies." *Id.*, ICE-0268964. The Ambassador also pushes back on the date. *Id.*, ICE-0268966.

At 6:12 pm, the *Hamama* TRO is extended until July 24. ECF 61.

c. July 7, 2017:   ICE presses ahead, requesting internal authorization to conduct a "charter removal mission." Ex. 1-30, ICE-0268974.  The request is for a flight on July 25, 2017, the day after the TRO is set to expire. *Id.*, ICE-02689875; ECF 61.

d. July 11, 2017:   U.S. Ambassador to Iraq Douglas Silliman meets with ICE officials (including Deputy Assistant Director Schultz, who describes the meeting in an email), discussing the need for continued diplomatic pressure on Iraq to accept repatriations. Ex. 1-29, ICE-0268963.

e. July 13-17, 2017: Baghdad Consul General Scott Riedmann and other State Department officials in Baghdad conduct multiple meetings with Iraqi officials, who discuss the proposed charter passenger list. The Iraqi officials raise several issues. First, they express concern that individuals whose asylum claims were rejected in the U.S. "are at risk if returned to Iraq." Ex. 1-31, ICE-297638. They "explain[] that [they] are under pressure from Parliament about some deportees returning who claimed asylum and have other immigration violations." *Id.*, ICE-0297636. For this reason, Iraqi officials are reluctant to accept the return of individuals who have no criminal convictions. *Id.* ICE had included several such people on its list of intended deportees. *Id.*

"The Dep Foreign Minister . . . agreed again to instruct the Embassy to start issuing travel docs and to resume flights," *Id.*, but Consul General Riedmann emails ICE's John Schultz on July 18:  "Just be warned: the NS [national security—that is, non-criminal] cases might cause the Iraqis to balk and cancel last minute. I'd hate to see you lose another charter." *Id.*, ICE-297633; *see also* Ex. 1-32, ICE-297588.

f. July 17, 2017:   "While he has not received updated instructions, [Ambassador] Yaseen [sic] told [Iraq Desk Director Peter Shea] he is inclined to send his team to [the relevant ICE facility] anyway before July 24." Ex. 1-33, ICE-0271020.

g. July 18, 2017:   Iraqi consular officials conduct 80 interviews of Iraqi nationals at the ICE facility. An ICE officer, Chris George, was "present for every interview." At each one, consular officials asked "who said they didn't want to travel v. those who were willing." Mr. George noted "about 1/3 of detainees interviewed were telling us that they just wanted to go back, they didn't want to fight their case anymore, and were tired of being detained and said they wanted to go." That was in English, however: "when speaking to the Consulate in Arabic I can't be sure if they said something different." The

interviews were part of a travel document (not a manifest-only) process. Ex. 1-34, ICE-0271034-35.

24. Frustrated by its inability to accomplish removals, ICE begins the path towards visa sanctions against Iraq. The timeline is:

   a. July 19, 2017:   The background and proposed path forward is described at length in an internal memo titled "Removal Efforts and Challenges: Iraq." Ex. 1-24, ICE-0297770 to ICE-0297772. It states:

> U.S. Immigration and Customs Enforcement (ICE) considers Iraq to be among the most recalcitrant countries [with respect to repatriations]. Despite expending significant resources and exhausting other available means to obtain cooperation, ICE has been unsuccessful in securing cooperation from the Government of Iraq in the acceptance of its nationals subject to final orders of removal and has determined that implementing visa sanctions pursuant to section 243(d) of the Immigration and Nationality Act (INA) is the only remaining avenue available to secure cooperation. . . .

> ICE and the U.S. Department of State (State) have collaborated to engage Iraq and have pursued graduated measures . . . . These and other diplomatic efforts, as described below, have failed to yield substantive progress regarding the removal of Iraqi nationals.

> ICE believes that it has exhausted all means at its disposal to secure cooperation from the Government of Iraq, consistent with its international obligation to promptly facilitate the return of its nationals. A tool unavailable to ICE, but vested in the Secretary of Homeland Security, is visa sanctions under section 243(d) of the Immigration and Nationality Act. . . .

   b. July 20, 2017:   ICE officials responsible for obtaining travel documents initiate the visa sanction process, and send a "Section 243(d) package" up their chain of command.  Ex. 4, Schultz Dep. at 189-194; Ex. 1-35, ICE-0271028, Schultz Dep. Ex. 22; Ex. 1-36, ICE-296029-34. The package contains several memos in draft: a "formal letter S1 to S1

Invoke Visa Sanctions Iraq"[4]; a "Memo D1 to S1 Invoke Visa Sanctions";[5] a "Memo EAD to D1 Invoke Visa Sanctions Iraq"[6]; and a "White Paper Invoke Visa Sanctions Iraq."[7] Ex. 1-35, Schultz Dep. Ex. 22; Ex. 1-36, ICE-296029-34. This is the same day Respondents filed its opposition to a stay of removal. ECF 81.

c. July 24, 2017:    No travel documents have been issued as of this date. Ex. 6, ICE's Response to Interrogatory Nos. 6 and 7; Ex. 4, Schultz Dep. at 189. The Court grants a nationwide preliminary injunction staying class member removal to Iraq. ECF 87.

d. July 26, 2017:    In an email to Deputy Assistant Director Schultz, ICE's Deputy Director's Deputy Chief of Staff, describing a State Department and ICE meeting the day before—the day after the preliminary injunction issues—states, regarding Iraq's willingness to issue travel documents, "[t]here was no defined way forward as to Iraq and the current TD issuance problems we're facing." He also relays Iraq's concerns about persecution of returnees.   Ex. 1-28, ICE-0296142.

e. July 29, 2017:    Almanhal Alsafi, Iraq's Consul General in Detroit is quoted in the media rejecting the idea of forcible repatriations: "We will not accept any detainee going back involuntarily." Ex. 1-37.[8]

f. Aug. 4, 2017:     ICE staff continue to consider Iraq uncooperative, and to urge visa sanctions. Deputy Assistant Director John Schultz instructs his staff to finalize a sanctions package by August 16, 2017.  Ex. 1-38, ICE-0270929.

---

[4] S1 means "Secretary," so this indicates a draft Secretary of Homeland Security to Secretary of State letter.

[5] This indicates a memo from ICE's Director (D1) to the DHS Secretary (S1). See also Ex. 1-36, ICE-0296031.

[6] This indicates a draft memo from the Executive Associate Director—that is, the head of ICE's Enforcement and Removal Operations, the ICE branch responsible for deportations and detention—to D1, ICE's Director.  See Ex. 1-36, ICE-0296029.

[7] This white paper appears to be the quoted memo on "Removal Efforts and Challenges: Iraq" Ex.1-24, ICE-029770-74.

[8] Namo Abdulla, *Families in America still fear return to Iraq, despite a halt in deportation* (July 29, 2017), http://www.rudaw.net/english/world/290720171.

## SEPTEMBER TO DECEMBER, 2017: A HANDFUL OF VOLUNTEERS ARE REPATRIATED

25. The Court's stay of removal prevented most class member repatriations during this period.[9] But efforts to obtain travel documents continued. Various officials believed "we [are] approach[ing] the end of the court injunction for Iraqis." Ex. 1-39, ICE-0295965. Accordingly, the issue of travel document issuance was evidently live for Iraq, which nonetheless declined to issue any travel documents based on the prior submissions. Ex. 6, ICE's Response to Interrogatory Nos. 6 and 7. The impending opportunity created by the expected close of the preliminary injunction did not elicit any further progress from Iraq. On October 2, an ICE official explained, "The [Iraqi] consulate is awaiting authorization from the prime minister's office to issue the requested travel documents." Ex. 1-39, ICE-0295965.

26. The district court preliminary injunction/stay of removal did not apply to Iraqis with removal orders first entered after June 24, 2017, who are not included in the class definition. ECF 87. Nonetheless, ICE did not obtain travel documents for such non-class members. Rather, it appears that the only Iraqi travel documents obtained during this period were for class members who expressly volunteered for removal, informing the U.S. government that they were willing to be repatriated. Ex. 6, ICE's Response to Interrogatory Nos. 6 and 7; ECF 104, 114, 119; Ex. 2, Schlanger Decl. ¶¶43-44.

## DECEMBER AND JANUARY 2018: IRAQ HOLDS TO THE POLICY AGAINST FORCED REPATRIATIONS

27. A major U.S./Iraq meeting was held on December 5, 2017, "in which a variety of issues, including the repatriation of Iraqi Nationals, was discussed." Ex. 1-40, DHS Response to Interrogatory No. 12. Participants included a team of at least seven DHS officials, led by Assistant Secretary for International Affairs (and retired Ambassador) James Nealon; the State Department delegation included at least two individuals; and Iraq had six officials present, led by Deputy Foreign Minister Nazar Issa Abdulahadi Al-Khairullah, Ambassador Ahmed Kamal Hasan Al-Kamaly, and Ambassador Fareed Mustafa Kamil Yasseen. Ex. 1-40, DHS's Supplemental Response to Interrogatory No. 12.

28. A summary of that meeting sent to ICE Deputy Assistant Director Schultz, stated "it would be difficult for the Iraqi Government to accept individuals whose asylum claims have failed." Ex. 1-42, ICE-0296787. Mr. Schultz' response to this and several other points was: "Those bullet points are troubling." *Id.*, ICE-0296786.

29. Handwritten notes about the meeting by a DHS participant also noted Iraq's "difficult[y] accepting individuals where asylum claims failed." Ex. 1-41, DHSHamama-000051 (handwritten notes of Alexander Kisselburg).

---

[9] ICE kept most class members in detention, but did release a small number. For example, an ICE document explains of one class member that "[o]n 8/17/2017, subject was served an order of supervision due to the inability to remove to Iraq because of the injunction by the federal judge preventing the removal of Iraqi nationals." Ex. 1-57, ICE-0295998.

30. The Iraqi Deputy Foreign Minister suggested a follow-up meeting at the embassy, which was duly held January 9, 2018,[10] led by ICE Deputy Assistant Director John Schultz, with at least four other DHS and ICE officials, three State Department officials, and five Iraqi officials including, again, Deputy Foreign Minister Nazar Al-Khairullah. Ex. 1-40, DHS's Supplemental Response to Interrogatory No. 12; Ex. 1-22, Interrogatory 12, ICE Supplemental Response. An email a week earlier by Department of State Iraq Desk Political Unit Chief Derek Hoffmann relating to *Hamama* class members pursuing prompt removal similarly noted, "Iraqis are ready to move on the voluntary deportees now." Ex. 1-43, DHS Hamama000066. No agreement on involuntary deportees was noted. At that meeting, a difference of opinion on forced repatriations emerged among the Iraqi diplomats present. Contemporaneous notes by Alexendar Kisselburg, a State Department participant, evidence the Iraqi debate. Ex. 1-41, DHSHamama000052. While one Iraqi official—the Deputy Chief of Mission—expressed his view that the GOI form was not obligatory, and that Iraq "will issue travel documents [in] any case," his colleagues disagreed. At least one Iraqi attendee expresses a view that involuntary repatriations are legally barred—that there is no problem if detainees were "willing to go back" but there *is* a problem if this is not the case. Therefore, an Iraqi participant suggests development of an MOU (Memorandum of Understanding) between ICE and the Iraqi Ministry of Justice—demonstrating that the obstacle is seen as a legal rather than diplomatic one. *Id.*

31. The handwritten notes just referenced (Ex. 1-41, DHSHamama000052) read (emphasis added):

> *DCM [Deputy Chief of Mission]:*
> -   *clear instructions from Ministry to cooperate with DHS in removals*
> -   *Wants to expedite removals*
> -   *Wants to interview all returnees, at least through telephone*
> -   *Need history (crim. history) for removals; needs their {illegible}*
> *Ahmed (legal)*
> -   *no problem if finished sentence, willing to go back, have proof of citizenship*
> -   ***must sign self-declaration*** *. . .*
> *DCM*
> -   *form is not obligatory*
> -   *will issue travel document in any case . . .*
> *DCM*
> -   *need instructions from Baghdad regarding the 1300 (*[illegible]*) to issue travel documents*
> -   ***Embassy can only issue TDs for voluntary deportees***
> *Wathiq[11] suggests an **MOU b/w ICE and MOJ** [Ministry of Justice] re. removals*

---

[10] The handwritten notes on this meeting mistakenly date it January 9, 2017, but see Ex. 1-1, ICE 270495, for the correct year.

[11] Wathiq Ibrahim Mohammed Al Hammam was the First Secretary for the Embassy of Iraq in Washington, D.C. Ex. 1-40, DHS' Response to Interrogatory No. 12.

32. In its answer to Interrogatory 1, provided June 19, 2018, Ex. 1-44, 1-57, DHS's description of this meeting omitted the dissensus that was evident to its own personnel:

> As of January 9, 2018, DHS understood that the Government of Iraq: (1) would cooperate with DHS regarding removals and wanted to expedite removals; (2) needed criminal history for removal of criminal aliens; (3) needed proof of Iraqi citizenship; (4) would not require Iraqi Nationals to sign a form; and (5) that the Embassy can issue travel documents for voluntary removals, but Baghdad will approve travel documents required for other Iraqi Nationals.

## IRAQ PERSISTS IN SEEKING WRITTEN ACQUIESCENCE TO REMOVAL BY DETAINEES

33. ICE made it clear at the January 9 meeting that it disapproved of the GOI form seeking agreement from noncitizens to their own deportation.  As Unit Chief Bernacke stated, "We told [Iraq] that it was a violation of the International Civil Aviation Organization's Annex 9 protocols on travel document issuance, that an alien doesn't expressly have to submit themselves to deportation voluntarily; they could be deported by a foreign government, you know, even if it was against their will, and we expressed that sentiment to them."  Ex. 5, Bernacke Dep. at 85-86. But despite U.S. "consternation," *id.* at 116, later in January the embassy again provided ICE a "voluntary removal declaration" in Arabic for its nationals to sign. Ex. 1-48, ICE-0270850-53.  When ICE translated the document, it discovered that the form continued to seek non-citizen agreement to deportation. Accordingly ICE declined to give it to the interviewees.  *Id.*, Ex. 1-45, ICE-0270696; Ex. 5, Bernacke Dep. at 114-116.  That was a change by the U.S.: an ICE officer noted, "We already have documents posted with that language on our site," prompting ICE official Bernacke to instruct: "Also, the voluntary declaration stating the aliens voluntarily remit themselves to be removed needs to be pulled from the intranet." Ex. 1-48, ICE-0270852.  The form had been used for years.[12] ECF 311-3, PgID.7481-82, Maddox Decl. ¶14.

34. The result of the January 9 meeting was not agreement by Iraq to take involuntary deportees, but rather several scheduled consular interviews which occurred in late January. Ex. 1-45,

---

[12] The form itself, ECF 311-3, PgID.7489-90, has already been described (see ¶4, *supra*). At some point after 2016 the form was altered immaterially, to strike the Arabic for "to return to the homeland." Ex. 3, Attieh Decl. 11. In addition, at some point, an English version was included along with the Arabic version. The two differ in some key respects, but both clearly reference the signatory's "desire to return voluntarily to Iraq." The certified translation of the Arabic letter is set out above, see ¶4. The English version states, in full (with emphasis added):

> Dear Honorable Consul,
> Subject: Passport
> I the Iraqi citizen ( ) would like to request the issue of a passport allowing me to enter Iraq due to my particular situation and **my desire to return voluntarily to Iraq**.

I would like to inform you that I have an old Iraqi passport that is not valid with the number ().

ICE-0270693. Some but not all were of class members who had volunteered for prompt removal and had the district court stay of removal lifted. The result was a handful of travel documents and several denials. Four of the interviewees "notified the consulate that he does not want to return." *Id.*; *see also* Ex. 6, ICE's Response to Interrogatory Nos. 6 and 7. Iraq did not issue travel documents for these four nationals. Ex. 1-45, ICE-0270693. One of the interviewees who told the consulate he did not want to return—SAS, AXXX-XXX-637— was not a class member. Although this Court's stay precluded removal for class members, for Mr. AS, there was no such obstacle. Yet while the *Hamama* class members continued to be detained, the non-class member was released on the ground that there was no significant likelihood of his removal in the reasonably foreseeable future. Ex. 2, Schlanger Decl. ¶¶43-44.

35. Notwithstanding DHS's later-asserted "understanding" that "Baghdad will approve travel documents required for . . . Iraqi Nationals" whose repatriation was involuntary, Ex. 1-44, Response to Interrogatory No. 1, no travel documents were issued for those four detainees, nor are any follow-up requests to Baghdad noted in ICE's disclosures of all travel document requests for these four interviewees. Ex. 6, ICE's Response to Interrogatory Nos. 6 and 7.

## MARCH 2018: IRAQ FORMALLY RESTATES ITS POLICY AGAINST FORCED REPATRIATIONS

36. In March 2018, the Iraqi government official with jurisdiction over migration issues, the head of Iraq's Ministry of Migration and Displacement (MoMD), issued a formal letter to the Foreign Affairs Minister, stating:  the "policy of our ministry, since it was established," to "refuse the principle of forced return of Iraqis abroad or any other nationals, because it conflicts with humanitarian laws and principles." Ex. 1-46; Ex. 7, Lopez Decl.; Ex. 8, Smith Decl. ¶¶21-26. MoMD requested that all embassies be notified of this policy:  "Kindly inform all our missions to coordinate with those countries to reduce this serious phenomenon that affects Iraqis abroad."  *Id.*

37. Iraq's Ministry of Foreign Affairs duly distributed a "circular" attaching the MoMD letter, and restating its language, instructing "all our political and consular missions abroad" to "[k]indly take notice and the necessary action to coordinate with those countries to reduce this serious phenomenon that affects Iraqis abroad." Ex. 1-46; Ex. 7, Lopez Decl., p. 5.

## MAY 2018-JULY 2018: THE ALLEGED "BAGHDAD" SOLUTION

38. Throughout March and April 2018, ICE submitted travel document requests to the Iraqi embassy, without any progress being made. Ex. 4, Schultz Dep. at 58-60. To nudge Iraq into scheduling interviews, ICE officials had to ramp up political pressure and meet with more senior Iraqi staff—the Deputy Chief of Mission as well as consular staff.  Ex. 5, Bernacke Dep. at 69.  This led to a new round of consular interviews which was broader, and covered more class members. In late May 2018, ICE transferred about 40 Iraqi nationals—the large majority of them class members—to Stewart Detention Center, in Lumpkin, Georgia. Consular interviews were conducted on May 23, 2018.  ECF 311-3, PgID.7478, Maddox Decl. at ¶6. At those interviews, each detainee was presented the longstanding Iraqi form, in

Arabic and English, that asked him to affirm his "desire to return voluntarily to Iraq." *See* ECF 307-2, PgID.7325-27, Gilbert Decl. ¶¶5-18; ECF 311-3, PgID.7489-90

39. ICE and the consular officials exerted considerable pressure on the detainees to sign the GOI form. First, detainees were threatened with prosecution if they did not sign. *See* ECF 307-13, PgID.7382, Al-Zubeidy Decl. ¶8 (told that if did not sign, he would be criminally prosecuted and spend the rest of his life in prison); ECF 307-14, PgID.7386-87, Odish Decl. ¶¶6-10 (when he refused to sign the consular letter, an ICE officer summoned him the next day, telling him that he had a "second opportunity to sign" the letter and that if he did not, he would be prosecuted for failure to comply with orders); ECF 307-6, PgID.7345-6, Andrade Decl. ¶¶5-7 (A.A.O, XXX-XXX-985 told by ICE officer that he would be criminally charged and serve time in prison if he did not sign). Other detainees heard about these threats second-hand, and found them both plausible and frightening. *See* ECF 307-8, PgID.7357-58, Arthur Decl. ¶9-10 ("Many of my fellow Iraqis told me that they signed the form because ICE told them that if they did not, they could be prosecuted for failure to cooperate and sentenced to five years in prison . . ."; ECF 307-2, PgID.7327, Gilbert Decl. ¶17 (because class members have been subject to orders of supervision, they are familiar with the general obligation to apply for travel papers and cooperate with removal procedures). Before this Court, ICE later disavowed this threat of prosecution, acknowledging that individuals cannot be required under 8 U.S.C. §1253(a)(1)(B) to express a desire for repatriation; *see* ECF 307, PgID.7300; June 18, 2018 Hrg. Tran. at 58-59. But by that time, 33 individuals had signed the voluntary-return form. *See* ECF 311-3, PgID.7479-81, Maddox Decl. ¶¶8, 11.

40. Second, both ICE officers and Iraqi consular staff told class members that they would be detained indefinitely, or for many years, unless they agreed to sign. For example, class members Zaia Darmo and Ahmed Tayyeh each reported that an Iraqi official told him that if he did not sign, he "would be in jail for the rest of his life" (Darmo) and "would stay in jail forever" (Tayyeh); each—fearing indefinite detention—signed the form even though they do not desire to return to Iraq. ECF 307-11, PgID.7373, Darmo Decl. ¶¶12-15; ECF 307-10, PgID.7368-69, Tayyeh Decl. ¶¶6, 9. Class member Aziz Kattoula, who told consular officials, when asked, that he did not want to go to Iraq and did not want to sign, was later told by an American official who said he was from Washington D.C. that the government would eventually deport him, and that he "would be sitting in jail until they did." ECF 307-9, PgID.7364-65, Kattoula Decl. ¶22. Other detainees were similarly threatened with years of detention unless they signed. ECF 307-11, PgID.7373, Darmo Decl. ¶¶12-15; ECF 307-10, PgID.7368-69, Tayyeh Decl. ¶¶6, 9; ECF 307-9, PgID.7364, Kattoula Decl. ¶22; ECF 307-7, PgID.7353-54, Kitaba-Gaviglio Decl. ¶¶6, 14-19; ECF 307-6, PgID.7346, Andrade Decl. ¶7; ECF 307-18, PgID.7357-58, Arthur Decl. ¶¶9-10 ("Many of my fellow Iraqis told me that they signed the form . . . because ICE told them if they did not sign, they would definitely be kept in detention until the U.S. government could send them back."). *See also* ECF 307-7, PgID.7353, Kitaba-Gaviglio Decl. ¶10 (class member K.P., AXXX-XXX-207, told that if he did not sign the form, he could be jailed for 5-10 years).

41. On June 8, 2018, Iraq issued travel documents—one-way laissez-passers—for those detainees who signed the form. Ex. 1-58. At least six detainees refused to sign the GOI form, four of them class members. Ex. 2, Schlanger Decl. ¶39. According to the Detention Officer who managed the process at Stewart, "the GOI indicated that further approval from Baghdad

was required to issue those travel documents." ECF 311-3, PgID.7480, Maddox Decl. ¶11(b). As of June 15, 2018, ICE's declarant was not able to state that Iraq has committed to issuing the documents—he stated merely that the "requests . . . are pending" and that "ICE continues to engage with the GOI to have these additional travel documents issued." *Id.* PgID.7481, ¶13.

42. That same day, ICE staff met with embassy staff to press the argument that travel documents should issue for the six detainees who had refused to sign. ICE also "again request[ed] that the Consulate Section of the Embassy of Iraq no longer require Iraqi Nationals to sign the declaration form wherein they state their desire to return to Iraq." Ex. 1-47. For some weeks, there was no resolution; as of June 22, 2018, Deputy Assistant Director John Schultz planned a personal trip to Iraq, to attempt to obtain Iraqi cooperation. Ex. 4, Schultz Dep. at 35-37. When that trip fell apart, Mr. Schultz spoke on the phone numerous times with Iraq's Deputy Chief of Mission. *Id.* at 65. The U.S delivered a formal diplomatic note (a "dipnote") to Iraq urging issuance of travel documents. *Id.* at 92-95. And on July 2, 2018, Mr. Schultz, along with several other ICE and State Department officials, met with the Iraqi Ambassador and his staff to exert additional pressure—a meeting that Mr. Schultz testified the Department of State may have considered a "demarche" (a formal diplomatic complaint). *Id.* at 92-93. That meeting yielded a bit more refinement to the process: individuals who would not agree to sign the "volunteer" form would have their records sent to Baghdad, with some information about their removal proceedings and criminal history. *Id.* at 37-43. Officials in Baghdad will then "make the determination regarding the travel document." *Id.* at 43.

43. After all these diplomatic contacts, and after individuated review by Iraqi officials in Iraq, on July 13, 2018, Iraq issued travel documents for the six individuals who had declined to sign the Iraqi form. Ex. 5. Bernacke Dep. at 119-120.

## THE PRESENT: ICE IS UNLIKELY TO ACCOMPLISH INVOLUNTARY REPATRIATIONS IN THE REASONABLY FORESEEABLE FUTURE

44. None of these six detainees has yet been removed. Ex. 2, Schlanger Decl. ¶40. Even for individuals who have agreed to removal and for whom Iraq has issued travel documents, ICE's removal capabilities are limited. ICE has disclosed that Iraq has issued 47 travel documents to class members since the beginning of this case. Ex. 6; Ex. 2, Schlanger Decl. ¶¶31-41 (table D, column d; Table E, columns b & c). And (not counting one individual removed prior to entry of the preliminary injunction) there have been 37 repatriatable class members (class members for whom the Court has lifted the stay of removal). But as of August 23, there have been only 18 class member removals, one in violation of the Court's stay of removal. Ex. 2, Schlanger Decl. ¶8. That is, even for willing repatriates where there is no legal impediment to removal, it can take many months to obtain the travel documents, and many more months to actually accomplish the removal after travel documents are issued.

45. In December 2017, Mr. Bernacke submitted a declaration that stated that ICE had recently obtained three travel documents for class members who had waived the protection of the stay of removal, and expected to get travel documents for an additional ten similar individuals "in the very near future." ECF 184-2, PgID.5072-73, Bernacke Decl. ¶11. In the event, as of August, eight months later, only three additional travel documents had been obtained, and

only four of them have been removed so far—eight months after the declaration. Ex. 6, ICE's Response to Interrogatory Nos. 6 and 7; Ex. 2, Schlanger Decl. ¶¶45-46.

46. In addition, Iraq has refused to issue travel documents for individuals whose Iraqi citizenship Iraq questions. ECF 311-3, PgID.7480-81, Maddox Decl. ¶¶11, 12. ICE has continued those individuals in detention, despite Iraq's explicit refusal to accept them. Ex. 2, Schlanger Decl. ¶40 Mr. Bernacke testified that ICE takes many more steps prior to considering a non-citizen for release: conducting further investigation, and trying more times to persuade both Iraq and other countries: "Essentially, we take a second bite at the apple with any country that we think the alien may have some indicia of citizenship or connection to. We'll also seek third country removal options, as well." Ex. 5, Bernacke Dep. at 75-76; see *id.* at 73-76, 141-42.

47. The process for subsequent applications is ongoing. On June 28, consular interviews were conducted for an additional 11 class members, and on July 19, for another 6. Iraq continues to confirm whether each detainee is volunteering for repatriation. Of these 16 detainees, 7 informed the consular officials they were willing to be repatriated; 9 objected to removal. Ex. 1-51.

48. Avoiding forced repatriations is very important to many power centers in Iraq. Ex. 8, Smith Decl. ¶¶14-19, 30-32, 35-38. On July 10, 2018, Iraq's Ambassador to Finland explained that Iraq would, going forward, enforce its policy against forced repatriations. Ex. 1-49; Ex. 8, Smith Decl. ¶33.[13] He was quoted in media reports as stating, "We will accept those returning of their own free will and those guilty of crimes, but we oppose forced repatriations." *Id.* Similarly, on August 12, 2018, Iraq's ambassador to Sweden told the Swedish government's Coordinator of Migration and Refugees Affairs that the Iraqi government "refuses" forcible repatriations. Ex. 1-50.[14]

49. On July 31, 2018, the Minister of Migration and Displacement re-asserted MoMD's policy against forced removals, sending a letter to the Ministry of Foreign Affairs:

> We have received information indicating that some countries which host Iraqi nationals intend to forcibly return them, particularly, the EU [European Union] and the USA.
>
> Since this issue contravenes the policy of the State and international law and norms, please ensure that all our embassies and consulates in the countries that host Iraqi nationals are ensuring they are not subject to deportation or forced return.

---

[13]*See* Forced deportations of Iraqi asylum seekers on hold (July 10, 2018), https://yle.fi/uutiset/osasto/news/forced_deportations_of_iraqi_asylum_seekers_on_hold/10297477.

[14] *See* Iraqi Ministry of Foreign Affairs, Iraq's Ambassador to Sweden Discusses Voluntary Repatriation of Refugees with Immigration Coordinator (Aug. 12, 2018), http://www.mofa.gov.iq/en/news/28136/iraq-s-ambassador-to-sweden-discusses-voluntary-repatriation-of-refugees-with-immigration-coordinator.

Ex. 1-52, 1-53; Ex. 8, Smith Decl. ¶¶27-29.  The Minister also instructed the Iraqi Ministry of the Interior and the Iraqi Ministry of Transport to "take the necessary actions to ensure forcibly returned nationals are not taken in." Ex. 1-52, 1-53; Ex. 8, Smith Decl. ¶29.

50. Given several opportunities to explain the current state of Iraq's repatriations, Mr. Schultz testified that neither the Iraqi Ambassador nor any other Iraqi official has stated that Iraq has a policy of issuing travel documents for involuntary deportees.  Mr. Schultz was asked whether in repeated recent discussions with Iraq's Washington Deputy Chief of Mission: "Did he indicate to you Baghdad's position on whether or not travel documents would be issued for Iraqi nationals who have not indicated they desire to return to Iraq?"  He answered: "No." Ex. 4, Schultz Dep. at 66. He was asked again, more generally: "At any point since June 1, 2017, has Baghdad indicated what its policy is about accepting Iraqi nationals who desire not to return to Iraq?"  He answered: "Not that I recall." *Id.* And again, he was asked, "Did an Iraqi official state, 'We will issue travel documents for any individual that says they do not want to go back." He answered, "They did not make that statement." *Id.* at 239.

51. Likewise, Mr. Bernacke has testified that Iraqi officials have not told him "that they would no longer ask Iraqi nationals if they desired to go back to Iraq." Ex. 5, Bernacke Dep. at 79-81. Similarly, Iraqi officials have not told him "that if an individual expresses they don't want to go back to Iraq, they will still issue travel documents." *Id.* at 89-90. And no Iraqi official has explicitly stated—to him or anyone else to his knowledge—that Iraq "will permit the entry [into Iraq] of detained Iraqi nationals once  . . . the injunction in this litigation is lifted." *Id.* at 102-04.

52. Of the 16 class members whose consular interviews were conducted on June 28 and July 19—eight and six weeks ago, respectively—Iraq has not issued any travel documents. Ex. 2, Schlanger Decl. ¶41; Ex. 1-51; ECF 316 ¶H, PgID.7577-78 (ordering disclosure of travel documents within 24 hours of ICE's receipt of them).

53.  Iraq has a long-standing policy against involuntary repatriations. Ex. 8, Smith Decl. ¶¶14, 34, 39. Involuntary repatriations would cause significant controversy in the Iraqi govenrment. *Id.* ¶¶40-43. Currently, there is uncertainty if Iraq would reconsider its policy under the next administration, which is still in the process of being formed. *Id.* ¶¶ 44-47.