# EXHIBIT 1-54

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF
MICHIGAN SOUTHERN DIVISION

USAMA JAMIL HAMAMA, et al.,

    Petitioners and Plaintiffs,

v.

REBECCA ADDUCCI, et al.,

    Respondents and Defendants.

Case No. 2:17-cv-11910
Hon. Mark A. Goldsmith
Mag. David R. Grand
Class Action

### RESPONDENT/DEFENDANT ICE'S RESPONSE TO PLAINTIFF USAMA JAMIL HAMAMA'S FIRST SET OF INTERROGATORIES TO RESPONDENT KIRSTJEN NIELSEN

Pursuant to Federal Rule of Civil Procedure 33, Defendant ICE hereby objects and responds to Petitioners'/Plaintiffs' First Set of Interrogatories to All Respondents as follows:

### INTERROGATORIES

1. Describe each term of the Iraqi Agreement pertaining to the repatriation of and process for repatriating Iraqi Nationals under the Iraqi Agreement.

**RESPONSE**:

Subject to and without waiver of the foregoing objections, Defendant ICE responds

1

as follows:

> There has been no international agreement in force, nor any written arrangement in effect, between the governments of Iraq and the United States regarding the repatriation of Iraqi nationals. However, through discussions during this time, the governments of Iraq and the United States have reached an understanding of the process for repatriating Iraqi nationals.

As an initial matter, Iraq informed the United States that they had created an Inter-ministerial Committee of Deportation to commence the return of over 1,400 Iraqi nationals in the United States with final orders of removal. Defendant ICE understands that this committee is made up of representatives from the Prime Minister's Office, the Ministries of Justice, Foreign Affairs and Interior.

Defendant ICE understands that the Committee is intended to ensure that the appropriate Iraq ministries were reviewing deportation notices thoroughly and quickly and would be responsible for the following:

1. Consular access
2. Iraqi citizenship verification
3. Deportation court order review
4. Travel document issuance

As part of the removal process, the Government of Iraq (GOI) has indicated that it requires, after an alien's identity has been verified, that Iraqi embassy officials meet

with the individual. The interviews have been conducted either in person (including at designated points of embarkation) or via video with Iraqi nationals.

To establish citizenship, the GOI has decided to accept a wide range of photocopied evidence from U.S. government information systems, including various citizenship documentation or secondary information (including relatives' identification documents) confirming citizenship located in the Alien files. Previously, the Iraqi government had limited the type of identity documents that would be acceptable for issuance of a travel document, such as an original Iraq identification card or an original Iraq citizenship card.

2. **Describe each criterion an Iraqi National must meet before Iraq will accept an Iraqi National for repatriation, under the Iraqi Agreement or otherwise.**

**RESPONSE**:

It is ICE's understanding that there has been no international agreement in force, nor any written arrangement in effect, between the GOI and the United States regarding the criteria an Iraqi National must meet before the GOI will accept him or her for repatriation. However, through discussions in 2017, with the GOI, ICE's current understanding is that three criteria must be present before the GOI agrees to

3

repatriate an Iraqi national:

1. Indicia of Citizenship: The GOI requires some evidence that the person being repatriated is an Iraqi national. There is no litmus test or set of specific documents to establish Iraqi citizenship. The GOI may, depending on the facts of a specific case, consider a variety of evidence, including but not limited to: passports, national identification cards, documents from the Alien file, and family documents. If the GOI is not satisfied with the documentary evidence present in a specific case, the GOI will also consider statements made during the consular interview. It is Defendant's understanding that based on the evidence before it, the GOI assesses whether the individual is an Iraqi national.

2. Final Order: The United States will provide the GOI a copy of the Iraqi national's final order of removal.

3. Consular Interview: The GOI conducts a consular interview.

3. **Describe each criterion for denying repatriation to an Iraqi National under the Iraqi Agreement, or otherwise.**

**RESPONSE:**

It is ICE's understanding that there has been no international agreement in force, nor any written arrangement in effect, between the GOI and the United States regarding the criteria for the GOI denying repatriation of an Iraqi national. Defendant ICE is aware that direct requests sent by in individual to the Iraqi Embassies have been denied if an individual does not provide, as part of the request, a a representation that the individual wants to return to Iraq. Through discussions during 2017 and 2018, the governments of Iraq and the United States focused on what is required for the GOI to accept an Iraqi national, not on what is required to deny repatriation. ICE incorporates by reference the response to Interrogatory No. 2.

4. **Identify any travel documents that Iraq requires or will accept before accepting an Iraqi National for repatriation under the Iraqi Agreement or otherwise, and the procedures for obtaining the travel documents.**

**RESPONSE**:

Objections:

Defendant ICE objects to Petitioners defining the phrase "travel document" in a manner that is inconsistent with how the phrase is commonly used in the context of immigration proceedings. In the immigration context, travel documents are issued by the receiving state (in this case Iraq) and allow an individual to travel to that state. However, Defendant ICE understands that for the purposes of responding to Petitioners' discovery requests the parties are in agreement that "[t]he term 'travel documents' used in Petitioners' discovery requests should be read as follows: 'travel and identity documents.'" ECF No. 254. Defendant ICE further understands that the exceptions are Interrogatory Numbers 4 and 5; Number 4 seeks only travel documents and excludes identity documents, whereas Number 5 seeks only identity documents (and any other document) other than travel documents."

Subject to and without waiver of the foregoing objections, Defendant ICE responds as follows:

In the immigration context, travel documents are issued by the receiving state (in this case Iraq) to allow an individual to travel to that state. In this context, it is Defendant ICE's understanding that the GOI issues: a GOI-issued valid passport; a GOI-issued one-time use laissez-passer; or a GOI-approved manifest of a charter

6

flight that is returning Iraqi nationals to Iraq. *See* Interrogatory No. 1 and No. 2 for the description of the travel document process.

**5. For the time period since March 1, 2017, identify the documentation or evidence other than travel documents that Iraq requires or will accept before approving an Iraqi National for repatriation under the Iraqi Agreement or otherwise.**

**RESPONSE**:

Objections:

Defendant objects to Petitioners defining the phrase "travel document" in a manner that is inconsistent with how the phrase is commonly used in the context of immigration proceedings. In the immigration context, travel documents are issued by the receiving state (in this case Iraq) and allow an individual to travel to that state. However, Defendant ICE understands that for the purposes of responding to Petitioners' discovery requests "the parties are in agreement that the term "travel documents" in Petitioners' discovery requests should be read as follows: "travel and identity documents." ECF No. 254. Defendant ICE further understands that the exceptions are Interrogatory Numbers 4 and 5; Number 4 seeks only travel documents and excludes identity documents, whereas Number 5 seeks only identity

7

documents (and any other document) other than travel documents."

It is Defendant ICE's understanding that there are no specific documents that GOI requires to issue a travel document. GOI has indicated that it considers available indicia of citizenship, which varies from case to case and may include originals or photocopies of various identity documents, such as those noted in Interrogatory No. 2. ICE incorporates by reference the answers to Interrogatories No. 1 and No. 2 for a description of the process to obtain travel documents and a non-exhaustive list of the examples of documents Iraq will now accept.

**6. For each Class Member (identified by name and A-number) for whom ICE or another relevant department of the U.S. government has since March 1, 2017 requested travel documents from the Iraqi Ministry of Foreign Affairs (or another relevant department of the Iraqi government) for repatriation to Iraq, provide the following:**

    a. The date the request for the travel documents was made to the Iraqi government;

    b. The type of travel documents obtained, the department of the Iraqi government issuing the travel documents, and the date the documents were issued;

  c. If the request for the travel documents was denied, the department of the Iraqi government issuing the denial, the date of the denial and the reason given for the denial; and

  d. Whether Iraq denied or approved repatriation of the Class Member, and, if denied, the basis for such denial.

  e. If repatriation occurred, when, by what travel method (commercial air, charter air, etc.), and to what location.

  f.

**RESPONSE:**

Defendant objects to Petitioners defining the phrase "travel document" in a manner that is inconsistent with how the phrase is commonly used in the context of immigration proceedings. In the immigration context, travel documents are issued by the receiving state (in this case Iraq) and allow an individual to travel to that state. However, Defendant ICE understands that for the purposes of responding to Petitioners' discovery requests "the parties are in agreement that the term "travel documents" in Petitioners' discovery requests should be read as follows: "travel and identity documents." ECF No. 254. Consistent with this understanding, Defendant ICE responds as follows:

*See* attached spreadsheet.

9

7. **For each Class Member (identified by name and A-number) for whom ICE or another relevant department of the U.S. government has since March 1, 2017 requested from the Iraqi Ministry of Foreign Affairs (or another relevant department of the Iraqi government) to be repatriated to Iraq, provide the following:**

 a. The date of the request;

 b. The response from the Iraqi government, the date of the response, the department of the Iraqi government issuing the response, and, if repatriation was denied, the basis for the denial; and

 c. If the request for repatriation was granted, any conditions placed on the repatriation of the Class Member.

 d. If repatriation occurred, when, by what travel method (commercial air, charter air, etc.), and to what location.

**RESPONSE:**

*See* attached spreadsheet.

10

8. For each Class Member (identified by name and A-number), state whether Iraq has agreed to the repatriation of that individual as of the following time:

    a. On the date of the Class Member's arrest by ICE; and

    b. On the date you answer this Interrogatory.

**RESPONSE:**

a. The GOI had committed to accept Iraqi nationals for repatriation, but at the time of any class member's arrest, a final approval would not have been issued because the GOI requires an interview, which cannot be scheduled until the individual is in ICE custody.

b. *See* Interrogatories No. 6 and No. 7 for the individual status of any travel document requests.

9. The declaration of John Schultz, ECF 81-4, Pg.ID# 2007, states that Iraq previously would accept only its nationals with unexpired passports, but that Iraq will now "authorize repatriation with other indicia of nationality." State what "other indicia of nationality" Iraq will accept for repatriation; the basis for the U.S. government's belief that the other indicia of nationality will be accepted, including the identification of the specific agreement(s) or document(s) stating this policy; and the criteria an

11

individual must or can meet before Iraq will accept an Iraqi National for repatriation.

**RESPONSE:**

Defendant ICE incorporates by reference the responses to Interrogatories No. 1 No. 2 and No. 12 for the descriptions of the process, examples of documents accepted, and ongoing discussions regarding repatriations. ==There has been no international agreement in force, nor any written arrangement in effect, between the governments of Iraq and the United States regarding repatriations==, but Defendant ICE's basis for belief is the ongoing discussions with the GOI and the GOI's issuance of travel documents since March 2017 in responses to requests submitted using other indicia of nationality, such as photocopies of identity documents.

10. Explain each step (in sequence) that has since March 1, 2017 or will be taken by you or the government of Iraq to process an Iraqi National for removal if that Iraqi National does not have travel documents.

**RESPONSE:**

Objections:

Defendant ICE objects to Petitioners defining the phrase "travel document" in a manner that is inconsistent with how the phrase is commonly used in the context of immigration proceedings. In the immigration context, travel documents are

issued by the receiving state (in this case Iraq) and allow an individual to travel to that state. However, Defendant ICE understands that for the purposes of responding to Petitioners' discovery requests "the parties are in agreement that the term "travel documents" in Petitioners' discovery requests should be read as follows: "travel and identity documents." ECF No. 254. Consistent with this understanding, Defendant ICE responds as follows:

Defendant ICE objects to the phrase "will be taken" to the extent it requests information regarding "the government of Iraq." Specifically, ICE cannot answer regarding the future actions of a foreign government.

Subject to and without waiver of the foregoing objections, Defendant ICE responds as follows:

As a general rule, since March 1, 2017, the sequence for ICE requesting the repatriation of an Iraqi national who does not have a travel document is as follows:

1. ICE sends the GOI a request for a travel document. This includes providing a copy of any documents showing indicia of Iraqi nationality and the final order of removal.
2. If additional information is needed, the GOI will make a request for additional information to ICE and ICE responds.

13

3. Iraq makes a determination regarding whether the information is sufficient to establish that the individual is Iraqi. If the GOI has requested additional information, no final decision is made until the GOI receives a response to that request.
4. The GOI schedules an interview with the Iraqi national.
5. The GOI issues a travel document.
6. ICE makes arrangements to return the individual to Iraq.

**11. For each Class Member (identified by name and A-number) who, prior to March 1, 2017, was living in the community, state whether ICE released that individual to the community because ICE determined that Iraq would not accept that individual for repatriation the reason ICE determined that Iraq would not accept the individual for repatriation, and whether the individual was subject to an order of supervision or other release conditions.**

## RESPONSE:

To address Respondents' objections to this Interrogatory, Petitioners revised it as follows:

**Interrogatory 11: For each Class Member (identified by name and A-**

14

**number) who, prior to March 1, 2017, was living in the community, state whether ICE released that individual to the community because ICE determined that Iraq would not accept that individual for repatriation and the reason ICE determined that Iraq would not accept the individual for repatriation.**

Objections:

    a.    Despite Petitioners' rewording of this Interrogatory, ICE continues to object to this interrogatory on the ground that it is overbroad and burdensome to the extent it seeks to obtain information that is not tracked in a statistically reportable manner and/or would require a burdensome manual search to gather the data and pertains to a subject matter outside the scope of this litigation and that potentially predates the commencement of this action.

    b.    Despite Petitioners' rewording of this Interrogatory, ICE continues to object to the interrogatory as it has no relevance on significant likelihood of removal in the reasonably foreseeable future, which is the *Zadvydas* issue. ICE has already stated that Iraq's practices were different prior to March 1, 2017, thus this point is not dispute and discovery is unnecessary.

Defendant ICE does not determine whether a foreign government will accept an individual for repatriation – the foreign government makes such a determination. Once an alien is subject to a final order of removal, ICE requests travel documents

15

from that foreign government in order to effectuate removal. The denial of a travel document request does not equate to a country denying repatriation– many travel document requests may be denied due to insufficient information, or a foreign government's own policies, at the time that the request was made. Travel document requirements may change over time, as is the case with Iraq, which revised its practices in 2017. ICE will, in some cases, determine to release an alien from custody under the applicable legal standard, which is a determination that there is no significant likelihood of removal in the reasonably foreseeable future. This determination which is dependent upon the facts and circumstances in an individual case. A determination that there is no significant likelihood of removal in the reasonably foreseeable future is not an ICE determination that a country will never accept an individual for repatriation. In fact, in cases such as Iraq, ICE's determination that there is a significantly likelihood of removal in the reasonably foreseeable future may change upon receipt of new information.

Defendant ICE understands that the court has ordered a review of the 30 A-files, as identified by petitioners, and ICE is conducting that review in compliance with that order. However, as ICE does not make a final determination regarding repatriation, ICE is instead reviewing for whether ICE released based on a determination that there was no significant likelihood of removal in the reasonably foreseeable future at the time of release. ICE's review is ongoing.

16

In addition, in response to the Court's order, ECF. No. 254 ¶ 38, ICE has reviewed its records as ordered and has determined that there is no single working file or system containing the information requested in interrogatory number 11, nor is the information centrally or easily available or in the custody of a single individual or office. Obtaining the information requires a manual review of each case, which includes case-by-case review of paper and electronic records. The electronic records for a case, if they exist, are not necessarily fully complete, and not electronically searchable – manual review of an individual case entry is required and such a search still requires review of paper records to verify accuracy of any information in the electronic system. In some cases, there are no electronic records due to age. Paper records may be in the custody of any ICE field office, including Offices of Chief Counsel or an ERO office, nation-wide, depending on the alien's location. The records may also be in the custody of another DHS component, such as USCIS, or in offsite storage. There are no centrally located or easily available records to respond to a broad request for historical information; case-by-case manual review is required. ICE is currently manually reviewing the 30 cases on the list provided by opposing counsel.

12. The name, title and department of the government (for both Iraq and the United States) of each individual negotiating the Iraqi Agreement, including the "ongoing diplomatic negotiations" referenced in the declaration of Michael V. Bernacke at paragraph 4 (ECF 184-2, Pg.ID# 5070-71), identification of the individuals authorized to enter into any agreement reached by the governments regarding the repatriation of Iraqi Nationals, and the date each individual engaged in the "ongoing diplomatic negotiations."

**RESPONSE:**

Objections:

Defendant ICE has not been involved in any diplomatic negotiations identifying a new process for the GOI to process removal cases. Any diplomatic negotiations and discussions would have been led by the U.S. Department of State. ICE has attended meetings with GOI and Department of State personnel as operational experts on the repatriation process. ICE's direct engagement as operational experts with Iraq, and the Department of State, is regarding the logistical and operational implementation of the travel document request and repatriation process, which are the subjects of the responses in interrogatories 1 and 2. ICE has provided dates on which these operational meetings occurred in the attached list. ICE is not aware of any participants at these meetings who were "individuals

18

authorized to enter into any agreement reached by the governments regarding the repatriation of Iraqi Nationals."

## VERIFICATION

I, John A. Schultz, Jr. declare under penalty of perjury:

I am employed by U.S. Immigration and Customs Enforcement as the Deputy Assistant Director for the Removal Management Division (East).

I have read and know the contents of these responses. These responses on behalf of ICE were prepared after obtaining information available to ICE through its officers and employees and through its documents and records. These responses, subject to inadvertent and undiscovered errors, are based upon, and necessarily limited by, the records and information still in existence, able to be located, presently recollected, an thus far discovered in the course of preparing these responses. The responses regarding ICE are true and correct to the best of my knowledge, information, and belief.

Executed on March 23, 2018

*[signature]*

John A. Schultz, Jr.
Deputy Assistant Director
Removal Management Division- East
Enforcement and Removal Operations
Immigration and Customs Enforcement
U.S. Department of Homeland Security