# EXHIBIT 2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**USAMA JAMIL HAMAMA, et al.,**
    Petitioners/Plaintiffs,

**v.**

**REBECCA ADDUCCI, et al.,**
    Respondents/Defendants.

Case No. 2:17-cv-11910
Hon. Mark A. Goldsmith
Mag. David R. Grand

Class Action

## FIFTH DECLARATION OF MARGO SCHLANGER

I, Margo Schlanger, hereby make this declaration based upon my own personal knowledge; if called to testify, I could and would do so competently as follows:

**Qualifications and Sources of Information**

1. My qualifications and background are fully set out in my first declaration in this case, dated November 6, 2017, ECF 138-2, PgID3402 ¶¶2-4. As it says, I am the Wade H. and Dores M. McCree Collegiate Professor of Law at the University of Michigan Law School, and counsel for all Petitioners/Plaintiffs. I have since been designated class counsel, as well. ECF 191, PgID5360 ¶1(d).

2. This declaration is based primarily on: the Respondents' court-ordered disclosures; the Respondents' answers to Petitioners' discovery requests (both interrogatories and requests for production); the Department of Justice Executive Office for Immigration Review (EOIR) 1-800 immigration case hotline; and the U.S. Immigration and Customs Enforcement (ICE) online detainee lookup system. All sources are referenced where used. Responses to Petitioners' requests for production of documents are referred to by the Bates Stamp numbers assigned by Respondents. ICE's responses are denoted ICE-[number]; DHS's responses are denoted DHSHamama[number].

3.  By this Court's order, Respondents were required to respond to Petitioners' most recent discovery requests, "including production of documents," by August 20, 2018. ECF 366. On that date, however, Respondents did not produce any of the requested documents and declined to answer all but one interrogatory. They have not produced any additional documents in the days since. In addition, they have not updated the prior interrogatory responses since service of those responses on March 23, 2018.

4.  Under this Court's orders, Respondents disclose information on class member detention location and immigration case progress every two weeks. The most recent disclosure was due August 22, and was provided partially on August 22 and August 23. ICE detention location data was disclosed August 23, and covers individuals in detention as of August 20. EOIR case procedure information was disclosed August 22 and is as of that date. Any stipulations to lift the stay of removal for a class member that occurred on or after August 27 are not included in this declaration. There is one class member, TJ, AXXX-XXX-230, whose detention status is unclear. He is not listed in ICE's detention disclosure, and his information is not available using ICE's online detainee locator. Respondents' counsel reports that ICE will check, but believes he is, in fact, in detention. I have omitted him below because I am not sure if (or where) he is detained.

5.  Except when otherwise noted, this declaration is based on information about the (uncertified) primary class, which includes all Iraqi nationals in the United States who had final orders of removal at any point between March 1, 2017 and June 24, 2017 and who have been, or will be, detained for removal by U.S. Immigration and Customs Enforcement. ECF 191, PgID5347-48. When I refer to the *Zadvydas* subclass, I am using the definition certified by this Court: "All Primary Class Members, who are currently or will be detained in ICE custody, and who do not have an open individual habeas petition seeking release from detention." ECF 191, PgID5348. Based on monitoring of PACER entries using the names of class members, I am aware of nine detained members of the primary class who are not members of the subclass because they have open individual habeas petitions.

**Arrests, the Timing of Detention, and Time Remaining**

6.  Discovery in this case reveals that Respondents started planning for a mass removal of Iraqi nationals in spring 2017, after eight removals by charter plane in April 2017. The first arrests in anticipation of that mass removal were made May 15, 2017. Ex. 1-17, ICE-0269197. (Other Iraqis were apparently in detention at that time, as well.) In an internal document created in May 2017, ICE reported 29 Iraqi

nationals with final removal orders in detention. Ex.1-15, ICE-0270940. In the course of May and the first 10 days of June, at least 84 were arrested, and as of June 10, 2017, ICE had at least 107 Iraqi nationals with final removal orders in detention. (The number of arrests does not sum to the number in detention because a few people got out.)

7.  The weekend of June 11, 2017, ICE conducted mass arrests; about 100 class members entered detention that weekend, mostly arrested by ICE's Detroit field office. Over the next weeks, many more class members were detained, and by August 21, 2017, there were over 290 class members detained. New detentions then slowed; only about 40 class members have been newly detained since August 21.  All told, there are about 340 class members who have been detained in the course of this litigation.

8.  Since June 11, 2017, most of the class members have gotten out of detention. At least 152 have been released on bond, nearly all as a result of this Court's prolonged detention order dated January 2, ECF 191. At least 24 more have been released because they won their immigration cases. 17 were removed after individually waiving this Court's stay of removal.[1] One was removed in violation of this Court's order. ECF 371. At least 14 were released by ICE without immigration court involvement, 11 on orders of supervision or under formal alternatives to detention requirements. At least one of these was based on a finding that there was no significant likelihood of removal in the reasonably foreseeable future.  (The ICE document that lists this individual states: "On 8/17/2017, subject was served an order of supervision due to the inability to remove to Iraq because of the injunction by the federal judge preventing the removal of Iraqi nationals." Ex. 1-57, ICE-0295998.) One or two of the non-immigration court releases were for medical reasons. For another 6 releases, the reason and circumstances of release are unknown.

9.  If the Court of Appeals were to reverse this Court's January 2 preliminary injunction, many of the class members released on bond would be subject to re-detention under 8 U.S.C. § 1226(c). In a prior declaration, I set out the available information about how many class members with open immigration cases are considered by ICE to meet the criteria in §1226(c), and estimated that "approximately 90% of the class member detainees who remain in detention after their MTRs are granted but before resolution of their cases are being held under the

---

[1]  In addition, this Court approved one individual's waiver of the stay of removal, ECF 85, even before entering the July 24 preliminary injunction.

purported authority of 8 U.S.C. § 1226(c)." ECF 174-3, PgID4917. That estimate addressed the class members *then* in detention, including those who later got out on bond based on this Court's order.

10. There are 110 *Zadvydas* subclass members remaining in detention as of August 20. See Table A for their time in detention. Column a in Table A and also in Table B (below) includes all subclass members; column b is the subset who are currently not covered by this Court's stay of removal, because they have waived its protection.[2] (That is, the numbers in column a include all those in column b.) I picked October 1, 2018 as the cutoff date in Table A, row 4 because that is approximately when Petitioners' motion will be fully briefed, barring extensions. See L.R. 7.1(e). As the Table shows, by that date (assuming nobody is released or removed) there will be 106 *Zadvydas* subclass members whose detention has reached six months in duration. Only 4 subclass members will have been detained less than 6 months.

### Table A: Class Members' Detained Dates

|  | a. All *Zadvydas* subclass members | b. Prompt Removal Stipulation Entered |
|---|---|---|
| 1. Before June 11, 2017 | 38 | 6 |
| 2. June 11 to Aug. 30, 2017 (over 1 year in detention, as of **9/1/2018**) | 51 | 5 |
| 3. Sept. 1, 2017 to Feb. 28, 2018 (over 6 months in detention, as of **9/1/2018**) | 9 | 3 |
| 4. March 1, 2018 to March 31, 2018 (will hit 6 months or more by **10/1/2018**) | 8 | 0 |
| 5. 5/1/2018 to present | 4 | 0 |
| **TOTAL** | **110** | **14** |

## Detention Authority and Bond

11. The posture of the *Zadvydas* subclass members' cases varies. Table B sets out the data. The first set of rows, labeled 1 and 1.a through 1.d, sets out the bond results for the subclass members. The second and third sets of rows—labeled 2 and

---

[2] I omit subclass member Wisam Ibrahim from the stipulation tally, since his prior attempted waiver is contested. See ECF 356.

2.a through 2.d and 3 and 3.a through 3.d—divide the subclass by detention authority.[3]

### Table B: Class Member Procedural Posture

| | a. All *Zadvydas* subclass members | b. Prompt Removal Stipulation Entered |
|---|---|---|
| **1. TOTAL** | **110** | **14** |
| a.   Ineligible for *Hamama* bond hearing[4] | 8 | 6 |
| b.   No bond hearing/result yet | 16 | |
| c.   Bond denied | 79 | 8 |
| d.   Bond granted but still in detention[5] | 7 | |
| **2. Post-Order (§1231) Total** | **55** | **14** |
| a.   Still time to file an MTR under ECF 87, or MTR in adjudication | 17 | |
| b.   Time to file MTR has expired,[6] or lost MTR, or inapplicable due to stipulation | 22 | 10 |
| c.   Reopened, but then lost on the merits or | 17 | 4 |

---

[3] Note: whether 1231 or 1226 applies in particular procedural postures is a complex question and the frequent subject of dispute. The chart is based on my understanding of what ICE considers the applicable detention authority under Sixth Circuit law. The one exception to that is for cases that are fully adjudicated in the BIA. Under *Bejjani v. INS*, 271 F.3d 670, 689 (6th Cir. 2001), abrogated on other grounds by *Fernandez–Vargas v. Gonzales*, 548 U.S. 30 (2006), 8 U.S.C. §1226, not §1231, is the detention authority for individuals who have lost on the merits in the BIA, filed a petition for review (PFR) in the court of appeals, and obtained a stay of removal. PFR case documents are largely unavailable using PACER, so I do not have reliable information about them. Accordingly, just for purposes of this chart, I classify cases as "post-order" once the merits are fully adjudicated in the BIA, without regard to PFR litigation.

[4] One subclass member is ineligible for bond because he is classified by ICE as an "arriving alien" and is therefore not covered by the language of the Court's detention preliminary injunction, see ECF 265. The others have had stipulations entered lifting the stay of removal. See ECF 203, PgID5459. (Wisam Ibrahim is tallied in column a but *not* in column b because the stipulation he agreed to has prevented his bond hearing, but that stipulation is currently contested. ECF 356.)

[5] One of these individuals was redetained in circumstances not yet clear to me; the others were apparently unable to post bond.

[6] Some of these individuals may have good cause for delay in their motions to reopen; in any event, it remains available to them to file such a motion.

| | a. All *Zadvydas* subclass members | b. Prompt Removal Stipulation Entered |
|---|---|---|
| waived the merits challenge. | | |
| **3. Pre-Order (§1225 and §1226) Total** | **55** | **0** |
| a.  Won merits before IJ, pending appeal | 2 | |
| b.  Lost merits before IJ, pending BIA appeal | 23 | |
| c.  Merits pending before IJ | 30 | |

12. As Table B shows, the class members in detention are currently evenly split between pre-order and post-order postures. Nearly all of them began detention post-order, but then those who won their motions to reopen shifted to pre-order detention. Some of that group then shifted back to post-order detention when they gave up or lost their cases (row 2.c). Those who remain pre-order have either won or lost before the immigration judge (IJ) and appeal is pending, or their case is still pending before an IJ.  (Those who won final relief/protection in their cases are no longer in detention.)

13. Given the variation in posture, it's hard to know how long the open cases will take to resolve.  Different immigration courts are deciding these cases at different speeds. But based on the EOIR disclosures for the subclass, we do know that the Board of Immigration Appeals (BIA) has taken between two months and a year to decide motions to reopen for the current detainees (who, as detainees, are supposed to receive speedier BIA adjudication), with an average of about 6 months. The BIA has taken between 4 months and a year on appeals of IJ denials of MTRs. And the cases *pending* in the BIA on appeal from MTR denials have been there up to 8 months already. Merits cases can be expected to take longer—it takes time for the merits record to be transferred to the BIA, for example. A detainee who loses his IJ motion to reopen, wins a BIA appeal, loses his merits case on remand, and takes another BIA appeal, can expect that administrative adjudication to take well over a year *after* the immigration judge denies the motion. I set out more information on MTR adjudication time in my declaration dated November 6, filed in this case as ECF 138-2, ¶¶25-27, PgID3407-3408; and Petitioners summarized information on estimated time for adjudication in their motion for a preliminary injunction on detention issues, ECF 138, PgID3373-3375.

**Detention Locations and Conditions**

14. As of ICE's August 23, 2018 detention location disclosure, the 110 *Zadvydas* subclass members were incarcerated in 33 different detention facilities. Each detention facility that houses more than 2 subclass members is set out in its own row of Table C, and the others are summed in the last two rows.

6

**Table C: *Zadvydas* Subclass Detention Locations**

| Facility | Number |
|---|---|
| Calhoun Co* (Battle Creek, MI) | 29 |
| Northeast Oh. Correct. (Youngstown, OH) | 16 |
| Chippewa Co. Jail* (Sault Ste. Marie, MI) | 6 |
| Farmville Detention Center (Farmville, VA) | 5 |
| Lasalle ICE Processing Center (Jena, LA) | 5 |
| St. Clair Co. Jail* (Port Huron, MI) | 5 |
| Denver Contract Det. Fac. (Aurora, CO) | 4 |
| Pine Prairie ICE Processing Center (Pine Prairie, LA) | 4 |
| Houston Contract Detention Fac. (Houston, TX) | 3 |
| Otay Mesa Detention Center* (San Diego, CA) | 3 |
| York Co.* (York, PA) | 3 |
| Other—7 immigration detention facilities | 9 |
| Other—15 jails* | 18 |

\* Facility is a jail that also houses criminal defendants and/or convicts.

15. In Table C, an asterisk (*) marks the facilities that are jails, rather than specialized immigration detention centers. All told, most of the subclass member detainees—64 of the 110—are held in jails. The largest number are in the Calhoun County jail, where they are housed alongside pretrial criminal detainees and sentenced prisoners.

**May and early June 2017 Travel Documents Requests**

16. I have analyzed the data provided by Respondents relating to about 280 travel document presentations ICE submitted to Iraq in May and June, 2017. The data is from Ex. 6, ICE's response to Petitioner Hamama's Interrogatories 6 and 7 ("Interrogatory 6/7 Response") and includes the names and A-numbers of each of the individuals covered by this phase of ICE's deportation efforts, and the date(s) ICE sought travel documents for them. It lists 234 travel document presentations made on May 25, 2017, and another 40 on June 6, 2017, for a total of 274. ICE also produced other documents that state that there were either 239 or 240 in May, and 40 in June 6, for a total of 279 or 280:

- May 16, 2017: "64 non-detained cases submitted to the DOS [U.S. Department of State] for TD presentation" to the Iraqi inter-agency committee. Ex. 1-15, ICE-0269197.

- May 17, 2017:  "List of 26 detained final order cases sent to DOS for presentation to the Iraqi MFA." *Id.*

7

- May 22, 2017: "149 additional non-detained cases submitted to the DOS for TD presentation." *Id*. [Note: 64+26+149 = 239]

- May 25, 2017: "DOS submitted all 240 presentations to the Iraqi MFA [Ministry of Foreign Affairs] along with a Dipnote [diplomatic note] for the upcoming June charter." *Id*.

- June 6, 2017: "40 add-on cases submitted to DOS for the June charter." *Id*.

17. As the quotations above show, the May 16 and May 22 cases were non-detained cases—that is, that the individuals in question were not in detention at the time when ICE sought the travel documents for them. The May 17 cases and June 6 "add-on cases" were detained cases. The June 6 cases were apparently chosen based on the covered individuals' recent arrests. *Id.* ("As the field continued to make arrests of non-detained Iraqi nationals, RIO [Removal and International Operations] noticed a trend in which there were cases arrested that were not included on the original list of 240 cases submitted to the MFA [Iraq Ministry of Foreign Affairs] for approval. RIO asks DOS [Department of State] if we still can submit more cases . . . DOS agrees to allow RIO to submit more cases but needs them ASAP.").

18. Among ICE's other discovery disclosures are a letter from the Iraqi Embassy to ICE, dated June 7, 2017. The letter was contemporaneously described by an ICE officer as a "blanket denial" of the travel document requests for 24 individuals. Ex. 1-18, ICE-0298490. Accompanying the blanket denial, the Iraqi Embassy wrote ICE: "With reference to your request for travel documents for the aliens whose names are listed in the attachment, kindly be advised the Embassy of the Republic of Iraq in Washington D.C. is unable to issue such travel documents . . . . The applicant should express orally and in writing his willingness to return to Iraq voluntarily in order to be issued a travel document."*Id.* at ICE-0298493.

19. Three of these 24 individuals are named Petitioners in this lawsuit: Usama Hamama, Jihan Asker, and Sami Al-Issawi. I checked the names and A-numbers of the other individuals against ICE's biweekly disclosures, and confirmed that each of the 24 affected individuals was, indeed, a class member. Of the 24 listed, 11 have not (so far) been detained during the course of this litigation. One was actually in detention even before ICE received the June 7 denial, seven more were arrested on July 11 or 12, and another four over the next month (i.e., during late June or July 2017). (The remaining individual was arrested later.) Four are still detained. Those released were released on bond, nearly all after more than six months of detention and pursuant to this Court's detention preliminary injunction,

ECF 191. Notwithstanding Iraq's June 2017 refusal of travel documents, not one was released on the grounds that his or her removal was not significantly likely in the reasonably foreseeable future.

20. In July 2018, Petitioners deposed John Schultz, the ICE Deputy Assistant Director responsible for obtaining travel documents for Iraqis. He testified that this June 7, 2017 denial letter was not, in fact a denial—instead, he said, this letter was the Iraqi Embassy's implicit instruction to ICE to send the travel document requests to the Iraqi foreign ministry. Mr. Schultz speculated that for these 24 individuals, ICE had made travel document requests not to the foreign ministry, in Baghdad, but to Iraq's embassy, in Washington DC. He testified that he "can only surmise from this letter that Julius [the Unit Chief Mr. Schultz supervised] sent those cases to the Iraq Embassy in Washington, DC," but admitted, "I do not know for sure." He also admitted that it was possible that "what the embassy is saying here has been directed by Baghdad." Ex. 4, Schultz Dep. at 147-152.

21. ICE's response to Petitioners' interrogatories seeking information about travel document/repatriation requests (ICE Interrogatory 6/7 Response) states, "From March 2017 to November 2017, ICE sent travel document requests directly to the Department of State (DOS) in Baghdad. DOS submitted the requests to the Government of Iraq in Baghdad." My analysis of the ICE disclosures further demonstrates that in fact the travel document requests in question had indeed been submitted to the foreign ministry, via the Department of State. Prompted by Mr. Schultz's testimony, I compared the individuals named in the June 7, 2017 blanket denial letter, using their names and A-numbers, to the list of travel document presentations submitted via the Department of State to the Iraqi foreign ministry. Each of the 24 individuals named in the June 7, 2017 letter was listed in ICE's Interrogatory 6/7 Response as the subject of a travel document presentation on May 25, 2017—the travel document presentations described above as "submitted to the DOS [U.S. Department of State] for TD presentation" in Baghdad.

22. ICE's Interrogatory 6/7 Response also shows that ICE did not receive any travel documents from any of the approximately 280 requests made May 25 or June 6. Of these individuals, only 18 have since received travel documents, based on subsequent resubmissions, as of nearly 18 months after the initial requests.

**The Cancelled June and July Planes and the Possibility of Removals in June**

23. Documents disclosed in this case demonstrate that ICE hoped to deport a large number of individuals using a charter flight to Iraq in late June 2017. ICE officials designated individual Iraqi nationals for inclusion on that flight—creating

9

a list of approximately 75 proposed passengers, all class members. ICE has disclosed the names and A-numbers of these individuals. Using names and A-numbers, I compared the June flight list to the list of ICE's approximately 280 travel document presentations from May 25 and June 6, 2017; everyone on the June charter flight list was the subject of a travel document presentation, via the State Department, on May 25 or June 6.

24. My analysis, explained in paragraphs ¶¶25-29 shows that up until the night of June 26, 2017, there were many Iraqi nationals in ICE custody—including many for whom ICE had requested travel documents and many from the June charter list—who were not covered by this Court's first temporary restraining order, and hence could have been removed, had Iraq been willing to accept their return.

25. Early in this litigation, pursuant to Court order, see ECF 87, PgID2356, ICE disclosed the detention histories from March 6, 2017 to July 28, 2017 for class members still in detention as of July 28, 2017. (Respondents did not disclose a list of absolutely all the arrests made in June; the disclosure was limited to those still in detention as of July 28.)  There were 276 such individuals, of whom 230 were arrested before June 22, when the Court entered the first temporary restraining order. Of the 230 listed arrests before June 22, ICE had sought travel documents for 130 in the May 25 or June 6 travel document presentations, and had designated 68 of them for the June flight.

26. Petitioners filed this lawsuit on June 15, 2017, seeking to represent a class of "all Iraqi nationals within the jurisdiction of the Detroit ICE Field Office, with final orders of removal, who have been, or will be, arrested and detained by ICE as a result of Iraq's recent decision to issue travel documents to facilitate U.S. removals." ECF 1, PgID20.  On June 22, 2017, at 6:37 p.m., the Court agreed to the requested temporary restraining order blocking deportation of Iraqi nationals "within the jurisdiction of the Detroit ICE Field Office. . . , including those detained in Michigan and transferred outside of Michigan to other detention locations." ECF 32, PgID502. (I know the time of the order because it was electronically distributed to counsel.)

27. On June 26, 2017, at 8:57 p.m. (again, I know the time because of electronic distribution from the court), the Court expanded the temporary restraining order to cover a nationwide class: "all Iraqi nationals in the United States with final orders of removal, who have been, or will be, arrested and detained by ICE as a result of Iraq's recent decision to issue travel documents to facilitate U.S. removal." ECF 43, PgID676.

28. Thus up until the night of June 26, ICE's ability to deport Iraqis *not* "within the jurisdiction of the Detroit ICE Field Office" was unconstrained by this litigation. ICE's Detroit Field Office has jurisdiction over all of Michigan and Ohio; ICE refers to this area as the Detroit Area of Responsibility or AOR. See https://www.ice.gov/contact/ero. In order to see how many Iraqi nationals whom ICE had in custody at that time (and hence available to be removed) were outside the Detroit Field Office's jurisdiction, I cross-referenced the arrested individuals and their disclosed detention records. I flagged each individual who had been detained prior to June 26 for any period of time in either Ohio or Michigan. Individuals who were *not* detained in Ohio or Michigan were not covered by the first temporary restraining order, and remained amenable to deportation—if Iraq had provided travel documents and permission for ICE's hoped-for charter flight.

29. Of the 274 individuals listed as covered by the May 25 and June 6 travel document presentations, 194 had not, by July 24, been for any period of time in Michigan or Ohio.  Of the 230 individuals listed as arrested prior to June 22, 2017, 97 were not detained for any period of time in Michigan or Ohio. And of the 76 individuals listed as intended passengers of the hoped-for June charter flight, 52 were not detained for any period of time in Michigan or Ohio. ICE could have deported any or all of these individuals without violating the June 22, 2017 temporary restraining order. But as already stated, ICE's Interrogatory 6/7 Response shows that Iraq did not grant travel documents for any of these individuals in June 2017—or, for that matter, in July 2017.

30. According to ICE's Interrogatory 6/7 Response, on June 20, 2017, ICE resubmitted travel document requests for 89 class members, each previously the subject of a travel document presentation on May 25 or June 6. The Response notes that Iraq conducted 74 interviews of the listed individuals in July 2017, but that it did not grant any travel documents.

**Other Consular Interviews and Travel Document Grants and Denials**

31. After the three rounds of travel document presentations just described (May 25, June 6, and June 20)—none of which led to any issuance of travel documents—ICE has submitted travel document requests in several more clusters. These first few of these are spelled out in ICE's Interrogatory 6/7 Response, and are summarized in Table D.

32. As Table D shows, for 13 requests made December to February 2018, ICE notes that the Iraqi embassy responded on March 20, 2018 with a "Verbal Agreement from Iraq Embassy in U.S. to Issue TD for upcoming removal." Of

these 13 individuals, ten have been removed as of Respondents' most recent data disclosure on August 22, five months after that assurance is said to have been received. However, in May 2018, ICE also went back to the Iraqi embassy and obtained consular interviews for three of the 13 individuals (including one of the ten actually removed), so the "verbal agreement" was evidently not definitive.

33. All told, Table D shows ICE submitted 67 travel document presentations from September 2017 through March 2018 listed in its Interrogatory 6/7 Response; these were for 60 individual class members (there were several repeats).

34. As the table shows in the rows for requests made October 2017 and January 2018, in late January 2018 there were four consular interviews in which Iraq encountered detainees who were unwilling to acquiesce in their own removal. These were of SAS, AXXX-XXX-637 (who was not a class member, because of the date of his removal order); AK, AXXX-XXX-016 (also not a class member, although that became known only later, see ECF 212, 223, 232); GA, AXXX-XXX-821, and MAB, AXXX-XXX-307. ICE's Interrogatory 6/7 Response—which includes all travel document submissions, including many resubmissions—has no entry indicating that ICE or the embassy responded to those January 2018 denials by submitting the travel document presentations to the Iraqi Ministry of Foreign Affairs. Mr. AS, the non-class member, was released on a post-order custody review. See ¶44, *infra*. The other three, all class members or believed to be class members, remained—and to this day, remain—in detention.

**Table D: Travel Document Requests and Responses**

| a. Request date | b. # of requests | c. # Approved, NON-Volunteer (Date) | d. # Approved, Volunteer (Date) | e. # Declined: Reason (Date) | f. # Other: No outcome (Date) |
|---|---|---|---|---|---|
| Sept. 2017 | 1 | 0 | 1 (12/2017) | 0 | |
| Oct. 2017 | 5 | 0 | 2 (11/21, 11/28) | 2: withdrew request for removal (10/19/2018) 1: Embassy notified ICE that he did not want to return (1/25/2018) | |
| Nov. 2017 | 4 | 0 | 2 (1/3/2018) | 1: withdrew request for removal (11/14/2017) | 1: Embassy "stated that request will be processed") (3/20/2018) |
| Dec. 2017 | 6 | 0 | 2: Verbal agreement to issue (3/20/2018) | 3: withdrew request for removal (varied dates) | 1: Embassy "stated that request will be processed") (3/20/2018) |
| Jan. 2018 | 9 | 0 | 5: Verbal agreement from embassy to issue (3/20/2018) | 3: Embassy notified ICE that he did not want to return (1/24 & 1/25/2018) | 1: Interviewed (1/25/2018) |
| Feb. 2018 | 7 | 0 | 6: Verbal agreement from embassy to issue (3/20/2018) | 0 | 1: Embassy "stated request will be processed" (3/20/2018) |
| Mar. 2018 | 35 | 0 | 0 | 0 | 35: Embassy "stated request will be processed" (3/20/2018) |
| **TOTAL*** | **60** | **0** | **17** | **9** | **34** |

\* The total is not a sum of the rows because it eliminates multiple submissions for the same individuals.

13

35. After this court's entry on July 24, 2017 of the preliminary injunction staying removal, and prior to March 20, 2018, ICE's travel document presentations to Iraq were largely, though not exclusively, for detainees who had expressed some desire to waive the protection of this Court's stay of removal. In some of these cases, once these detainees discussed their situations with counsel, pursuant to this Court's order, ECF 110, it became clear that they had not understood the issues or they changed their mind. Therefore no "prompt removal" stipulation was submitted to the Court and the stay of removal remained in place.

36. Beginning with the large round of travel document presentations submitted March 20, 2018, ICE's Interrogatory 6/7 Response demonstrates that ICE's approach changed. (Under this Court's order, most class members' motions to reopen were due in February 2018.)  Of the 35 travel document requests submitted March 20, 2018, 22 of them were for class members who had either not submitted a motion to reopen by the deadline or not appealed an immigration judge's denial of their motion. However, for the other 13, ICE sought travel documents for individuals who were still fighting their immigration cases; while their removal orders were technically "final," they had live prospects for reviving those cases. Eleven had motions to reopen still pending. (Five of them have since won reopening, and several are still pending.) One additional class member had not yet hit his motion to reopen deadline under ECF 87; he did soon file a motion to reopen, which he won. And the final class member of this group of 13 actually had, a few days before, already won reopening, and so did not have an extant removal order at all.

37. As far as can be ascertained from ICE's disclosures, all the travel documents issued after April 2017 and prior to June 2018 seem to have been for individuals who both waived this Court's stay of removal *and* who informed Iraq's consular officials that they were willing to be removed to Iraq. Numerous times, Iraq denied travel documents after an interview in which a detainee declined to agree to his own removal.

38. Most recently, Iraqi officials have conducted three rounds of interviews; these are tallied in Table E. On May 23, 2018, Iraqi consular officials conducted 33 interviews of class members at the Stewart Detention Center in Lumpkin, Georgia. (According to a declaration by James Maddox, ECF 311-3, Iraqi officials conducted a total of 42 consular interviews. Some were of non-class members.) As with the March 20, 2018 travel document submissions, these most recent interviews included numerous individuals who were not amenable to deportation under this Court's stay of removal; five with pending motions to reopen, and seven whose motions to reopen were not yet due. Similarly, when ICE arranged for 10

14

consular interviews in Farmville, Virginia on June 28, 2018, and 6 more in York, Pennsylvania on July 19, 2018, of these 16 individuals two had pending motions to reopen, and six had not yet reached the deadline for filing such a motion.

**Table E: Consular Interviews Since May 2018**

| a.<br># of interviews<br>(Location, Date) | b.<br># Approved,<br>NON-"Volunteer"<br>(Date) | c.<br># Approved,<br>"Volunteer"*<br><br>(Date) | d.<br># Declined: Reason<br><br>(Date) | e.<br># Other: Outcome<br><br>(Date) |
|---|---|---|---|---|
| 33<br><br>Stewart, 5/23/2018 | 4<br><br>(7/10/2018) | 26<br><br>(6/8/2018) | 2: Embassy stated they are not Iraqi<br>(6/8/2018) | 1: More info. requested<br>(6/8/2018) |
| 10<br>Farmville, 6/28/2018 | | | | 10: No decision |
| 6<br>York, 7/19/2018 | | | | 6: No decision |
| **TOTAL** | **4** | **26** | **2** | **17** |

\* The word "volunteer" in this column means only that the individual in question signed Iraq's form that stated he was "return[ing] voluntarily" to Iraq. *See* Ex. 3 at Exhibits A-K for examples of the form. Petitioners have brought to the Court's attention numerous examples of coercion inducing detainees to sign although they do *not* wish to return to Iraq, ECF 307, and the Court responded by instituting some helpful safeguards. ECF 370.

39. For 23 of the total 49 individuals who have participated in the three sets of consular interviews from May to July 2018, ICE had previously requested travel documents, requests that are included in Table D columns e and f. According to an ICE declaration, on June 8, the Iraqi embassy issued one-way laissez-passers for 26 of them—all individuals interviewed on May 23, at Stewart, who signed the Iraqi form acquiescing to removal. The embassy denied two, requested more information for one, and sent six of the files—those for detainees who declined to sign the acquiescence form—to Iraq for consideration by the Ministry of Foreign Affairs. Maddox Dec., ECF 311-3, PgID7480. Of those six detainees, four are subclass members.

40. Respondents eventually disclosed that travel documents were issued on July 10 for the six detainees who had not signed the GOI form and whose files were sent to Baghdad. They are:

- Sabeeh Alsaad, AXXX-XXX-798
- AO, AXXX-XXX-985 (non class member)
- RAA, AXXX-XXX- 968 (non class member)

- AK, AXXX-XXX-689
- ODD, AXXX-XXX-561
- KP, AXXX-XXX-207

The first three listed individuals are unprotected by this Court's stay of removal, and are therefore available to be deported whenever ICE is able to do so.[7]  Yet as of August 27, 2018, ICE's online detainee locator shows all still in detention. Likewise, the three individuals whom Iraqi officials declined to accept for other reasons—because they were not Iraqi, or because more information was needed—are also still in detention.

41. ICE is required by ECF 316 to disclose any additional travel documents obtained for other class members. There have been no travel documents issued since July 10, although two months have passed since the 10 interviews in Farmville.

**Removal difficulties unrelated to this Court's stay of removal.**

42. There is a great deal of evidence that ICE faces tremendous obstacles to effectuating removals to Iraq, which cause long delays and often make removals impossible. These are wholly separate from this Court's stay of removal. As discussed above, ICE frequently cannot obtain travel documents. But even when it *does* obtain travel documents, the task of arranging flights is very challenging and may not, in the end, succeed. The succeeding paragraphs provide detail.

*Non-class members*

43. Respondents have not provided full information about Iraqi nationals who are not class members, and therefore not protected by this Court's stay of removal. But it is clear that ICE has been unable to remove at least some—and possibly all—such individuals who have not agreed to their own removal when interviewed by Iraqi officials.

44. The discovery in this case covers one such individual, SAS, AXXX-XXX-637.[8] In its response to Hamama Interrogatory 6 and 7, ICE provided the

---

[7] This court lifted the stay of removal for Mr. Alsaad under the prompt removal process. ECF 252.

[8] There is also a great deal of information about Mr. AS available from an article published in The Intercept. *See* Ryan Devereaux, An Iraqi Family Sought

information that it had requested a travel document for Mr. AS on Oct. 3, 2017, and that the Iraqi embassy conducted a consular interview on Jan. 25, 2018, but that the request was denied because, the Embassy informed ICE, "he did not want to return." Mr. AS had not been in any prior ICE disclosures. By calling EOIR's 1-800 number, I was able to confirm that based on his removal order date, he is not a class member. And by periodically checking ICE's online detainee locator, I determined that he was released from detention at some point in the spring. I was able to obtain a copy of his order of supervision, which lists his final removal order date as August 26, 2017, and states, "Because the agency has not effected your deportation or removal during the period prescribed by law, it is ordered that you be placed under supervision and permitted to be at large under the following conditions . . . ." It is dated February 20, 2018—so it was executed just two days before Mr. AS reached the 180th day of post-final-order detention. The order of supervision thus indicates that Mr. AS was released from immigration detention because Iraq declined to accept his repatriation—because he was unwilling to return. His release was the result of a 180-day Post-Order Custody Review.

### Class members who waive the protection of the stay of removal

45. Respondents have asserted in declarations that ICE can promptly effect removal where there is no judicial limitation (i.e. for those who have requested removal and for whom the court has then lifted the stay). For example, on December 22, 2017, ICE official Michael Bernacke wrote in a declaration "ICE has also submitted 10 additional travel document requests for putative class members who have voluntarily opted out and is awaiting approval of travel documents for these individuals. ICE expects to receive travel documents for all requested individuals in the very near future." ECF 184-2, PgID5073, ¶11.

46. My analysis of the length of time it takes for ICE to effectuate removal for class members who have waived the protection of the stay shows that they spend substantial time in detention even after the stay has lifted. ICE's response to Hamama Interrogatories 6/7 has ten entries that correspond to Mr. Bernacke's description in the declaration cited above—class members for whom ICE sought travel documents before December 22, 2018, but had not heard a response by that date. Of these, by three months later (when the interrogatory responses were

Asylum in the U.S., Thinking the Worst Was Over. Then Their American Nightmare Began, at https://theintercept.com/2018/03/18/safaa-al-shakarchi-asylum-detention-ice/ (Mar. 18, 2018).

produced), only two of the ten had actually received travel documents. Travel documents have since issued for one additional individual who was, indeed removed. And it is possible that for one additional individual, Iraq's March "verbal agreement," shown in Table D, column d above, can actually be relied upon as likely to result in travel documents. For the other six, ICE's disclosure states that one was denied (because the individual did not want to return to Iraq) and three withdrawn (for the same reason). For the final two, Iraqi officials had made no promises by March 20 that travel documents would in fact issue; they stated merely that "the request will be processed." Only four of these individuals have been removed.

47. This Court has ordered a process by which individuals can waive the protection of the stay of removal. As of August 26, 2018, the Court has approved such waivers for 33; for 4 others, Petitioners stipulated to the lifting of the stay because the individuals had agreed that they were not seeking to further litigate their immigration cases class members.[9] Only 17 of them have actually been removed. Based on ICE's court-ordered disclosures, we are able to determine when those removals took place within a week or two. For three, removal occurred a month or less after the Court lifted the stay of removal; for seven, removal took between one and three months after the stay was lifted; for three, removal took three to five months; and for three, removal took over five months after the stay was lifted.

48. Of the 37 class members who have had the stay of removal lifted for them (in many cases, foregoing challenge to their removal orders), 20 remain in detention. For many, travel documents have not yet issued. They have been waiting ever since the Court lifted the stay, some for as long as 8 months. Table F sets them out by name, with the date their stay was lifted, the docket number of the relevant order, and the days elapsed since then (as of August 26, 2018).

49. The very long length of time these individuals have waited, unable to get out of detention, cannot be attributed to the Court's stay of removal because Table F shows only time accrued after that stay was lifted.

---

[9] This tally omits Wisam Ibrahim, whose attempted waiver is contested. *See* ECF 356. It also omits Hussein Alrudaini, whose stipulated order, ECF 85, was entered prior to the July 24 preliminary injunction and prior to the Court's approval of the general process, and who I understand possessed an unexpired Iraqi passport.

50. As Table F shows, it can take months for ICE to obtain travel documents even for willing repatriates, even after the stay has lifted. In addition, Table F demonstrates that even *after* travel documents are issued, difficulties can arise that can add months to a class member's detention. See, e.g., Ex. 9, Declaration of Perla Gonzalez (describing clearance difficulties for class member Nouzat Hanna that are delaying his repatriation for at least two months); Ex. 4, Schultz Dep. at 46, 174-175 (describing commercial flight scheduling difficulties caused by "country clearances and then notification time periods and transiting issues").

### Table F: Class Members without A Stay of Removal

| Name | Stay Lifted Date | ECF # | Travel document obtained date | Days since stay lifted. |
|---|---|---|---|---|
| Dhahir Al Salman | 12/18/2017 | 181 | 6/8/2018 | 251 |
| Omar Al Talaqani | 12/18/2017 | 182 | 6/8/2018 | 251 |
| Safaa Abdulaziz Al Maliki | 2/16/2018 | 233 | 6/8/2018 | 191 |
| Aqil Al Muntafiji | 3/7/2018 | 253 | 6/8/2018 | 172 |
| Sabeeh Abed Jasim Alsaad | 3/7/2018 | 252 | 7/10/2018 | 172 |
| Muslem Al Rubaiai | 4/13/2018 | 271 | 6/8/2018 | 135 |
| Saed Al Zamely | 4/13/2018 | 270 | 6/8/2018 | 135 |
| Abdulrazaq Al Shimari | 5/10/2018 | 283 | Not issued | 108 |
| Aziz Al Darraji | 5/24/2018 | 291 | Not issued | 94 |
| Ahmad Mirza | 5/31/2018 | 294 | 6/8/2018 | 87 |
| Wamidh Al Idani | 6/6/2018 | 300 | Unknown | 81 |
| Hani Al Bazoni | 6/8/2018 | 303 | Not issued | 79 |
| Jomaa Al Essa | 6/14/2018 | 309 | Not issued | 73 |
| Sarkoun Ablahid | 6/19/2018 | 314 | Not issued | 68 |
| Salar Omar Karim | 7/10/2018 | 332 | 6/8/2018 | 47 |
| Mohammed Al Khafaji | 7/19/2018 | 346 | Unknown | 38 |
| Revan Shawkat Mansoor | 7/23/2018 | 349 | 6/8/2018 | 34 |
| Nouzat Hanna | 7/30/2018 | 352 | 6/8/2018 | 27 |
| Khalid Al-Asakir | 8/7/2018 | 361 | 6/8/2018 | 19 |
| Sarmad Israil | 8/22/2018 | 369 | Not issued | 4 |

Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury under the laws of the United States that the above statements are true and correct to the best of my knowledge, information, and belief.  Sworn in Washtenaw County, Michigan.

Date: August 28, 2018

Margo Schlanger