# EXHIBIT 4

# In the Matter Of:

## HAMAMA, ET AL. vs ADDUCCI, ET AL.

## JOHN AUGUSTIN SCHULTZ, JR.

July 12, 2018

*Prepared for you by*



**Bingham Farms/Southfield • Grand Rapids**

Ann Arbor • Detroit • Flint • Jackson • Lansing • Mt. Clemens • Saginaw • Troy

SCHULTZ, JR., JOHN AUGUSTIN
07/12/2018

Confidential
Pages 1–4

**Page 1**

```
 1        IN THE UNITED STATES DISTRICT COURT
 2        FOR THE EASTERN DISTRICT OF MICHIGAN
 3                 SOUTHERN DIVISION
 4     - - - - - - - - - - - - x
 5   USAMA JAMIL HAMAMA, et al.,    :
 6          PETITIONERS AND         :
 7          PLAINTIFFS,             :
 8      v.                          :   Case No.
 9   REBECCA ADDUCCI, et al.,       :   2:17-cv-11910
10          DEFENDANTS AND          :
11          RESPONDENTS.            :
12     - - - - - - - - - - - - x
13
14   Confidential deposition of JOHN AUGUSTIN SCHULTZ, JR.
15        Washington, District of Columbia
16             Thursday, July 12, 2018
17                  9:04 a.m.
18
19
20
21
22   Job No. 196902
23   Pages: 1 - 241
24   Reported By: Angela K. McCullough, RPR, Notary
25   Public in and for the District of Columbia
```

**Page 2**

```
 1        Deposition of JOHN AUGUSTIN SCHULTZ, JR.,
 2   held at the offices of:
 3
 4
 5        U.S. DEPARTMENT OF JUSTICE
 6        450 5th Street, Northwest
 7        Washington, DC  20001
 8        (202) 307-4693
 9
10
11
12
13        Pursuant to notice, before ANGELA K.
14   MCCULLOUGH, RPR, Notary Public in and for the
15   District of Columbia.
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1           A P P E A R A N C E S
 2   ON BEHALF OF THE PLAINTIFFS AND PETITIONERS:
 3        KIMBERLY L. SCOTT, ESQUIRE
 4        MILLER, CANFIELD, PADDOCK & STONE, PLC
 5        Cooperating Attorney, ACLU Fund of Michigan
 6        101 North Main Street, 7th Floor
 7        Ann Arbor, Michigan  48104
 8        (734) 668-7696
 9
10        MARGO SCHLANGER, ESQUIRE
11        Cooperating Attorney, ACLU Fund of Michigan
12        625 South State Street
13        Ann Arbor, Michigan  48109
14        (734) 615-2618
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1   A P P E A R A N C E S   C O N T I N U E D
 2        ON BEHALF OF THE RESPONDENTS:
 3        WILLIAM C. SILVIS, ESQUIRE
 4        U.S. DEPARTMENT OF JUSTICE
 5        950 Pennsylvania Avenue, NW
 6        Washington, DC 20530
 7        (202) 307-4693
 8
 9        ON BEHALF OF THE DEFENDANT ICE:
10        KATHLEEN THACKER, ESQUIRE
11        U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT
12        500 12th Street, Southwest
13        Washington, DC  20536
14        (202) 732-2427
15
16
17
18
19
20
21
22
23
24
25
```

**MIdeps@uslegalsupport.com**
**Ann Arbor | Detroit | Flint | Jackson**

**U. S. LEGAL SUPPORT**
**Bingham Farms/Southfield | Grand Rapids**

**Phone:  888.644.8080**
**Lansing | Mt. Clemens | Saginaw | Troy**

SCHULTZ, JR., JOHN AUGUSTIN
07/12/2018

---

Page 5

```
1              C O N T E N T S
2   EXAMINATION OF JOHN AUGUSTIN SCHULTZ, JR.    PAGE
```

3     By Ms. Scott                                7
4     By Mr. Silvis                             217
5     By Ms. Scott                              231

```
6
7
8              E X H I B I T S
9       (Exhibits attached to transcript)
10  EXHIBIT NO.                                 PAGE
```

11    Exhibit 1     6-12-18 declaration          10
12    Exhibit 2     11-30-17 declaration         32
13    Exhibit 3     Letter                       40
14    Exhibit 4     E-mail                       85
15    Exhibit 5     8-4-17 e-mail from Schultz  101
16    Exhibit 6     1-11-18 e-mail. Maldonado to
17                  Clinton                     104
18    Exhibit 7     1-17-18 e-mail from Ochoa   104
19    Exhibit 8     E-mail from Schultz         116
20    Exhibit 9     Unidentified               124
21    Exhibit 10    Unidentified               130
22    Exhibit 11    12-6-16 letter from
23                  Al-Sahafi                   144
24    Exhibit 12    Unidentified               146
25    Exhibit 13    6-7-17 letter              147

---

Page 6

```
1       E X H I B I T S   C O N T I N U E D
2   EXHIBIT NO.                                 PAGE
```

3     Exhibit 14    1-9-18 e-mail from Bernacke  155
4     Exhibit 15    E-mail                       158
5     Exhibit 16    DHSHAMAMA000052              163
6     Exhibit 17    Unidentified                171
7     Exhibit 18    Letter                      181
8     Exhibit 19    E-mail                      184
9     Exhibit 20    E-mail                      186
10    Exhibit 21    E-mail chain                188
11    Exhibit 22    E-mail, Farmer to Schultz   190
12    Exhibit 23    E-mail chain                207
13    Exhibit 24    10-27-17 e-mail,
14                  Bernacke to Schultz         215

```
15
16
17
18
19
20
21
22
23
24
25
```

---

Page 7

```
1              P R O C E E D I N G S
2        (The witness was sworn.)
3        MS. SCOTT:  So I am Kimberly Scott from
4   Miller Canfield on behalf of Petitioners.
5        MS. SCHLANGER:  I'm Margo Schlanger, also
6   on behalf of the Petitioners.
7        MS. SCOTT:  Could you -- could you put your
8   name on the record.
9        MR. SILVIS:  Do you want to --
10       Oh, William Silvis, part of Department of
11  Justice, for the respondents.
12       MS. SCOTT:  Could you put your name on the
13  record.
14       MS. THACKER:  I'm Kat Thacker,
15  Kathleen Thacker, agency counsel for Immigration
16  Customs Enforcement.
17  Whereupon,
18       JOHN AUGUSTIN SCHULTZ, JR.,
19  called as a witness by counsel for Plaintiffs and
20  Petitioners, and having been duly sworn by the
21  Notary Public, was examined and testified as
22  Follows:
23            EXAMINATION BY COUNSEL
24          FOR PLAINTIFFS AND PETITIONERS
25  BY MS. SCOTT:
```

---

Page 8

```
1        Q  So, Mr. Schultz, have you been deposed
2   before?
3        A  No.
4        Q  All right.  I'm going to assume that your
5   counsel has given you instructions about how the
6   deposition works.  We have scheduled, planned
7   breaks, but I'm happy to take an unscheduled break
8   if you feel that you need it.  I may need it.
9   Just let me know.
10       I am not familiar with the government or
11  your agency.  So I am going to ask you a lot of
12  questions today that may seem very basic.  And
13  it's because I'm just trying to understand how the
14  organization works.  So if I have misstated
15  something or used the wrong acronym, please
16  clarify for me.
17       A  Okay.
18       Q  Because I may not realize that I'm doing
19  that.
20       Similarly, if you don't understand one of
21  my questions, please let me know.  Otherwise, I
22  will assume it's a clear question.
23       And -- and unless you are told not to
24  answer a question, Mr. Silvis may object, but then
25  you can go ahead and answer after the objection.
```

---

SCHULTZ, JR., JOHN AUGUSTIN
07/12/2018

Page 33

1   which is your declaration that was executed on
2   November 30th, 2017.
3           Do you recognize this document?
4       A  Yeah.
5       Q  Okay.  If we go to paragraph 4, it says,
6   "Travel documents for many Iraqi nationals are now
7   being approved directly by Baghdad."
8           What do you mean by the use of "Baghdad"?
9       A  I just mean the government for Iraq.
10      Q  Is there a particular ministry or unit of
11  the Iraqi Government that you're referring to
12  here?
13      A  So the -- no.  There's an interministerial
14  ^ i found this inter-ministerial and inter
15  ministerial.  Was this in a document?  I want o
16  make sure i don't have it wrong committee
17  of different -- different ministries make it up.
18  And they work on the travel document or removal
19  issue.
20      Q  Okay.  So, in general, when there's
21  references to seeking approval from Baghdad,
22  you're -- the term "Baghdad" is referring to that
23  interministerial committee; is that correct?
24      A  Yeah.  To my knowledge, it's -- it's
25  correct.  When we're -- when I say that we're

Page 34

1   going to Baghdad, essentially, what -- what ICE is
2   doing is asking the Department of State at the US
3   Embassy in Baghdad to engage the government of
4   Iraq.
5           I personally don't know if they have one
6   point of contact in one single ministry who they
7   speak to who, then, discusses it amongst
8   themselves within the government of Iraq
9   bureaucracy.  But we do -- do all our dealings
10  through the US Embassy in Baghdad.
11      Q  So, if I understand you correctly, you
12  don't -- in general, you don't know who
13  specifically in the government of Iraq is being
14  asked to do the approvals in any given situation;
15  is that correct?
16      A  At the time that I signed this, I just
17  knew it was the -- someone within the Iraq
18  Government.  Recently, I've learned that there's
19  one point of contact who is the -- the main
20  conduit to getting the travel documents.  And he's
21  the person who really gets everything going.
22      Q  And who is that person?
23      A  It's Mr. Nizar within the Iraqi
24  Government.  He works within the Ministry of
25  Foreign Affairs.  And I think it's N-a-z-i-r.  And

Page 35

1   I forget his title.
2       Q  Okay.  N-a-z-i-r?
3       A  Yeah.
4       Q  Oh, Ms. Schlanger reminds me that
5   everybody has multiple names.
6           Do you know what his first name is, or the
7   other names that he uses?
8       A  Unfortunately, I don't recall.  But I can
9   tell you, if you Google it during the break,
10  Mr. Nizar, Iraq MFA, you'll be able to get his
11  information.
12      Q  Is it your understanding that he has a
13  fairly high-level position within the Ministry of
14  Foreign Affairs?
15      A  It's my understanding he has a high level.
16      Q  And the Ministry of Foreign Affairs is
17  often referred to as MFA; is that correct?
18      A  Mm-hmm.
19      Q  And going forward, we'll use "MFA."
20      A  Okay.
21      Q  At what point -- what is your
22  understanding of when Mr. Nizar became the main
23  contact for obtaining travel documents?
24      A  So it was just recent, within the last
25  three weeks or so, when I had made a determination

Page 36

1   to travel to Baghdad to discuss the travel
2   document procurement process.
3           I met with the deputy chief of mission at
4   the Iraq Embassy in Washington to determine whom I
5   should speak to.  And they gave me the name of the
6   individual.
7       Q  All right.  So I'm going to put it -- a
8   more specific date to that meeting.
9       A  Sure.
10      Q  Would it have been during the week of
11  June 25th?
12      A  If today is July 12th, it was most
13  likely -- yeah.  I actually have my passport.  I
14  can look at my --
15      Q  Can you take a look?
16      A  I can look at my visa and see when it was
17  issued.
18      Q  Thank you.
19      A  I can tell you exactly when.
20  BY MS. SCHLANGER:
21      Q  Oh, you actually have gone already?
22      A  No.  I didn't go to Iraq, but I did get
23  the visa.
24          (Witness complies.)
25          So this was issued -- so it was June 22nd.

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone:  888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

SCHULTZ, JR., JOHN AUGUSTIN
07/12/2018

---

Page 37

```
 1   BY MS. SCOTT:
 2        Q   Okay.  So you were scheduled to -- to meet
 3   with Dr. Nizar; is that correct?
 4        A   I was attempting to get a meeting
 5   scheduled, correct.
 6        Q   And were you successful?
 7        A   I was unsuccessful.
 8        Q   Did you meet with anybody else to discuss
 9   the travel procurement document -- to procure
10   travel documents?
11        A   I did not travel to Iraq.
12        Q   Did you meet with anybody in the US with
13   the Iraqi Government to discuss travel documents?
14        A   Subsequent to June 22nd?
15        Q   Yes.
16        A   Yes.
17        Q   And who did you meet with?
18        A   I met with the Ambassador -- oh, what's
19   his name -- Yaseen -- Ambassador Yasseen on
20   July 2nd.
21        Q   And where was that meeting at?
22        A   The Iraq Embassy in Washington, DC.
23        Q   Okay.  And what happened during that
24   meeting?
25        A   So myself, members from my team,
```

Page 38

```
 1   Department of State, the ambassador, the deputy
 2   chief of mission, and one other individual from
 3   the Iraq Government were there.  And we discussed
 4   a way forward regarding travel documents, as we
 5   had identified some inefficiencies.  And we made a
 6   determination on how we were going to proceed
 7   forward.
 8        Q   Okay.  So who on your team attended the
 9   meeting?
10        A   Myself, Michael Bernacke, James Maddox.
11        Q   Anybody else?
12        A   I don't believe so.
13        Q   And who from the Department of State
14   attended the meeting?
15        A   Valerie Chittenden and Peter -- something
16   with an H.  He's the desk officer for Iraq.
17        Q   And then you said there was one other
18   individual from Iraq.
19            Do you remember his name?
20        A   So there was the DCM, who is Mohammed --
21   his name is in one of these declarations.
22   Mohammed Tarek?  I don't know.  But the -- and
23   then Yarub something, he is the, like, third
24   secretary.  He's really Officer Maddox's conduit.
25   It's his counterpart.
```

Page 39

```
 1        Q   Any other officials from the Iraqi
 2   Government?
 3        A   No.
 4        Q   And did -- when you say that you discussed
 5   a way forward, was there any agreement on a way
 6   forward?
 7        A   Yes.  To expedite the travel document
 8   issuance process, we -- we agreed that we would
 9   provide a cover letter for each presentation
10   package, sort of, outlining the subject's criminal
11   history, that they completed their criminal
12   sentence, and that their -- their immigration case
13   has been completed.
14        Q   Would that cover letter include any
15   information about whether or not the Iraqi
16   national desires to return to Iraq?
17        A   No.
18        Q   Did you guys discuss, at this meeting,
19   whether or not Iraq will accept Iraqi nationals
20   who do not desire to return to Iraq?
21        A   At that meeting, what was determined was
22   if we have that cover letter, there's going to be
23   no question regarding whether or not someone wants
24   to return to Iraq.
25        Q   And who made that statement, that that
```

Page 40

```
 1   would be the policy?
 2        A   The ambassador.
 3        Q   Ambassador Yasseen?
 4        A   Yes, ma'am.
 5        Q   Did he put that in writing?
 6        A   No.  But, subsequent to the meeting, we
 7   submitted cover letters for individuals who had
 8   not voiced their desire to return.  And we have
 9   since been notified that the travel documents will
10   be issued this Friday.
11        Q   Okay.  So let's put your declaration off
12   to the side for a moment.
13            I'm going to hand you -- I'm going to hand
14   you a letter.  It says on the bottom, "Respondents
15   Exhibit No. 1."  It was used during the last
16   hearing with the Court.  So I did not mark this;
17   Nicole Murley did.  So it is -- what appears on
18   the document is it was handed to us.
19            MS. SCOTT:  But let's mark this as
20   Exhibit 3.
21            (Exhibit 3 was marked for identification.)
22            THE WITNESS:  Thank you.
23   BY MS. SCOTT:
24        Q   Have you seen this letter before?
25        A   I have not seen this letter before.
```

SCHULTZ, JR., JOHN AUGUSTIN
07/12/2018

Confidential
Pages 41–44

Page 41

1    Q   Okay.  You'll notice that it's signed by
2  Michael Bernacke, who reports to you, correct?
3    A   Mm-hmm.  Correct.
4    Q   You'll notice, on the back page, there are
5  the names of -- one, two, three, four, five --
6  six Iraqi nationals?
7    A   Right.
8    Q   Are these the six Iraqi nationals that you
9  recently submitted a cover letter to the Iraqi
10  Government seeking travel documents?
11    A   I -- I -- I don't know, to be honest with
12  you.
13    Q   Okay.  Do you know the names of the
14  individuals who you recently submitted the cover
15  letter to the Iraqi Government?
16    A   No.  So Michael signed that letter.  OPLA
17  reviewed the letter.  But I didn't look at the --
18  the names of the people on the -- on the letter.
19    Q   So do you know if those individuals that
20  are listed on the letter have signed any documents
21  indicating either that they do not desire to go
22  back to Iraq, or that they do desire to go back to
23  Iraq?
24    A   It's my understanding that the six people
25  in the cover letter did not sign any documents

Page 42

1  indicating that they wanted to return.
2    Q   Mm-hmm.  Did -- during your meeting on
3  July 2nd, did the Iraqi Government indicate what
4  type of travel documents would be issued for those
5  six individuals?
6    A   No.
7    Q   Did -- during the meeting, did the Iraqi
8  Government indicate whether they will, after these
9  initial six individuals, continue to issue travel
10  documents for individuals that desire not to go
11  back to Iraq?
12    A   Yes.
13    Q   And what was specifically said on that
14  front by the Iraqi Government?
15    A   The ambassador understood that they have
16  an obligation to take back their nationals.
17    Q   Mm-hmm.
18    A   He believes that they're doing good work,
19  so far.  And that, you know, with this cover
20  letter, they have that ability to ship that
21  information directly to Baghdad -- to their
22  counterparts in Baghdad who can make the
23  determination whether or not a travel document is
24  going to be issued.
25    And they can do that absent any

Page 43

1  volunteering of an individual indicating that they
2  want to return to Iraq.
3    Q   At the end of the day, though, Baghdad
4  still makes the decision of whether or not the
5  travel documents will be issued; is that correct?
6    A   At the end of the day, yes.  Absent an
7  individual saying -- going to the embassy and
8  saying they want to go back to Iraq, Baghdad makes
9  the determination regarding the travel document.
10    Q   Okay.  What else was discussed during the
11  July 2nd meeting?
12    A   So we discussed that letter.  The
13  ambassador requested that individuals with -- that
14  ICE focus on removal of individuals with
15  criminal -- criminal records.  I advised him that,
16  you know, ICE does prioritize individuals based on
17  criminality.
18    But, of course, during regular operations,
19  if an individual is encountered who has a final
20  order of removal, an individual still -- who
21  doesn't have a criminal history, that individual
22  is still a priority within our current framework.
23  So it would be likely that person would be
24  arrested and -- when we request the travel
25  documents.

Page 44

1    Q   What is your understanding of why the
2  Iraqi Government wants to prioritize those
3  individuals with criminal records?
4    A   I honestly don't know why they want to.
5  It's my belief that they feel as though people who
6  ICE is looking to remove who have criminal
7  histories were given an opportunity here in the
8  United States, and they didn't take advantage of
9  that opportunity.
10    And they understand that they're not only
11  immigration violators, but they're also criminal
12  violators.  And so that's why they don't -- they
13  shouldn't remain.
14    Q   Did -- was there any discussion about
15  repatriation of asylum seekers?
16    A   They mentioned asylum.  Oh, you know what,
17  we had someone from OPLA there, too,
18  Joan Lieberman.
19    Q   Okay.  Thank you.
20    A   Sorry.  You brought up asylum, and I
21  thought -- so they did bring up asylum.  And, of
22  course, I brought OPLA with me so she could
23  discuss, you know, how we can't divulge any asylum
24  information, which the ambassador understood.  He
25  already knew that.

SCHULTZ, JR., JOHN AUGUSTIN
07/12/2018

Page 45

1   And, you know, of course, you know, she
2   had indicated that, you know, during the
3   immigration process, the -- you know, they can
4   claim asylum but -- or even subsequent to having
5   asylum and LPR, you know, we don't -- we don't
6   remove people who are -- you know, have LPR cards
7   or asylum.  It's when the status is revoked.  And
8   it's spoke in very general terms.
9       Q  Was there any discussion about whether or
10  not the removal of Iraqi nationals will take place
11  by charter flight or by commercial flights?
12      A  During that meeting, I don't recall any
13  discussion on the mechanism of removal.
14      Q  And is there a current understanding about
15  whether or not charter flights or commercial
16  flights will be used for removal of Iraqi
17  nationals?
18      A  Not at this time, to my knowledge.  No.
19      Q  So there's no agreement with the Iraqi
20  Government to use a charter flight, currently?
21      A  Currently, ICE doesn't have a need for a
22  charter flight.
23      Q  Mm-hmm.
24      A  So we -- there's no need to -- to -- we
25  engage foreign governments regarding charter

Page 46

1   flights when there's a need.
2       Q  Mm-hmm.
3       A  So, you know, it's cost prohibitive.  ICE
4   is, you know, in a financial crunch.  So, right
5   now, we're just not looking to do a charter
6   flight.
7       Q  Okay.  Does that mean that Iraq won't
8   accept flight manifests in lieu of travel
9   documents for Iraqi nationals?
10      A  So that -- that is something that was in
11  place in -- where are we now?  So that was going
12  to be used in the April 2017 flight.  And that was
13  an idea that really started in November-December
14  2016, where we were cutting out the embassy,
15  engaging directly with Baghdad.
16          And since we were cutting out the embassy
17  and dealing directly with Baghdad via our conduit,
18  the Department of State --
19      Q  Mm-hmm.
20      A  -- we had discussed the use of a manifest,
21  which is, essentially, a name list.  You know,
22  John Schultz, date of birth, blah, blah, blah,
23  alien number, criminal history.
24      Q  Mm-hmm.
25      A  And that's what we were going to use to

Page 47

1   remove the individuals who were on the April
2   flight.
3           But subsequent to those actions, there was
4   the -- the Statement of Cooperation from the
5   Iraqis indicating that they would accept 1,400
6   individuals and that they would issue travel
7   documents.  So we've migrated from that manifest
8   idea that never came to fruition because the
9   consular officers from Washington ended up issuing
10  travel documents for the April flight.
11      Q  So, for clarification, flight manifests
12  were never implemented as -- okay.  Let me start
13  that over.
14          I had been under the impression that --
15  and, obviously, it's wrong now, but I want to
16  clarify that -- that, at one point, the Iraqi
17  Government would approve individuals for removal
18  based upon a flight manifest and didn't require
19  travel documents.
20          That understanding is incorrect?
21          MR. SILVIS:  Object to the form of the
22  question.
23  BY MS. SCOTT:
24      Q  You can go ahead and answer.
25      A  Okay.

Page 48

1           No.  That's correct.
2       Q  Mm-hmm.
3       A  At one point, Iraq was going to accept a
4   charter flight with a manifest.
5       Q  Without travel documents?
6       A  Without travel documents having been
7   issued.  But, ultimately, it didn't occur because
8   the embassy issued the travel documents for the
9   individuals who were going to be removed with only
10  the manifest.
11      Q  Okay.  And that was for the April 2017
12  flight, correct?
13      A  Correct.
14      Q  The individuals that were on the
15  April 2017 flight, did they indicate to the Iraqi
16  Government whether they desired to be removed to
17  Iraq?
18      A  I do not know.
19      Q  Do you know if they -- do you know if they
20  were interviewed by Iraq before their flights?
21      A  Yes, they were.
22      Q  Do you know if each of those individuals
23  on the April 2017 flight had current passports?
24      A  Valid passports?
25      Q  Current, valid passports, yes.

SCHULTZ, JR., JOHN AUGUSTIN
07/12/2018

Page 57

1    Q  Had Mr. Nizar or his staff indicated to
2  you that they would be willing to meet with you?
3    A  I didn't have any direct communication
4  with Mr. Nizar.
5    Excuse me.
6    Again, the Iraq Embassy here, in
7  Washington, supported the trip and was
8  communicating with Mr. Nizar's staff regarding my
9  travel.  There was no -- no clear sense that
10  Mr. Nizar was going to be available to meet.  But,
11  again, I was trying to get -- to meet -- if I
12  couldn't meet the decision-maker, meet someone,
13  you know, who worked immediately under him to
14  relay the message of the importance of the travel
15  documents being issued timely.
16    Q  Are you still trying to arrange a meeting
17  with Mr. Nizar to talk about travel documents?
18    A  So I intend to travel to Iraq in the
19  future to talk to Ministry officials regarding
20  travel document issues.
21    Q  Has a date between set for that meeting?
22    A  A date has not been set yet.
23    Q  Do you have -- do you know who you will be
24  meeting if -- once you do set the date?
25    A  So the intent would be that myself and

Page 58

1  Assistant Director Pineiro travel to Baghdad
2  and -- to meet with Mr. Nizar regarding the travel
3  document issuance process.
4    Q  Do you have a time frame within which that
5  meeting will take place?
6    A  Ideally, it would take place within the
7  next -- July 13th -- seven weeks.
8    Q  All right.  So what I'm going to do is
9  walk backwards from the July 2nd meeting to ask
10  you about other meetings you've had with officials
11  from Iraq about repatriation of Iraqi nationals.
12    So prior to the July 2nd, when did you
13  meet with Iraqi nationals?
14    Let me rephrase that.
15    So was there a meeting -- let me -- let's
16  do it this way:  Between March 18th and July 2nd,
17  was there a meeting -- did you have a meeting with
18  Iraqi Government officials about repatriating
19  Iraqi nationals?
20    A  Yes.  In May, we met with the Iraqis.  It
21  was myself, Agent Pineiro, Jim Maddox, met with
22  the Iraqis.  I think it was the first week of May.
23  I don't recall meeting with them in April.  But,
24  subsequent to the May meeting, we had the July
25  meeting, but I did have e-mail exchange and

Page 59

1  telephone exchange with the DCM.
2    And, additionally, I was there on
3  June 22nd.  And I saw Yarub when I got the visa.
4    Q  Okay.  So let me back up here.  All right.
5    Did you have any meetings with Iraqi
6  officials in March of 2018?
7    A  I'm sorry.  I don't recall.  I don't have
8  my calendar in front of me.  My portfolio covers
9  140 countries.  So unless there's something super
10  significant going on that stands out to me, it's
11  just another day in the office.  So --
12    Q  Okay.  So then in April 2018, did you have
13  a meeting with the Iraqi Government?
14    A  I -- I don't know.
15    Q  Do you remember any calls with Iraqi
16  Government officials in April 2018?
17    A  You know, I -- I met with them once.  Me,
18  Mike, and James went over there.  I don't recall
19  if it was March or April.  It -- it was me, Mike,
20  James, and Robert Tremont.  I can't recall if it
21  was March or April.  But we did go over, and we
22  met with them and handed them -- I think it was,
23  like, a stack of travel document presentations.
24  And they had indicated to us that they were going
25  to issue a number of travel documents for -- for

Page 60

1  individuals that had been previously presented.
2    Q  And did they issue the travel documents?
3    A  Mm-hmm.  Yeah.
4    Q  And how many did they issue?
5    A  You're challenging me.
6    I don't -- I don't recall the number, but
7  I know it was greater than 14.  We did -- we did a
8  small charter, eight-person charter, and then we
9  did commercial removals after that.
10    Q  When did you do the commercial charter?
11    A  It was --
12    Q  I mean -- hold on.
13    When did you do the commercial removals?
14    A  The commercial removals?
15    Q  Yeah.
16    A  I don't know.
17    Q  When did you do the charter flight?
18    A  Pretty certain I went in June of this
19  year, June 2018.
20    Q  And how many individuals were on that
21  flight?
22    A  It should've been eight.
23    Q  Eight.  Who is Robert Tremont?
24    A  There were seven people on the charter
25  because one person didn't get to the staging

SCHULTZ, JR., JOHN AUGUSTIN
07/12/2018

Confidential
Pages 65–68

Page 65

1  a lot of meetings with the foreign governments.
2       So, in June, like I said, I met with Yarub
3  in -- you know, June 22nd.  But that was really
4  only to get a visa.  Because it was a Friday.  I
5  was in jeans.  I had no intention of meeting with
6  them.
7       But, you know, other than that, it was --
8  like I mentioned, it was e-mail and phone
9  communication with the -- with the DCM.  He's
10  really my -- my equivalent at the embassy.
11       Q  And, for clarification, that's Mohammed?
12       A  Yes, Mohammed.  So he's -- he's typically
13  the person I, you know, contact when I need
14  something.
15       Q  How many calls did you have with Mohammed
16  during June 2018?
17       A  Maybe -- less than ten.
18       Q  Okay.
19       A  I wanted to say five.  But let's say less
20  than ten.
21       Q  During any of those calls, did you discuss
22  the issue of Iraq issuing travel documents for
23  nationals who indicated they did not desire to go
24  back to Iraq?
25       A  Yes.

Page 66

1       Q  And what did you discuss with him?
2       A  I indicated that willingness to return to
3  an individual's country has no bearing on their
4  removal.
5       Q  And what was his response back?
6       A  I don't know -- exactly recall, you know,
7  word for word, verbatim.  But, again, he indicated
8  that they don't have the authority to issue travel
9  documents for those who -- who haven't
10  volunteered, that it's got to go through Baghdad,
11  and that we have to, you know, continue to push
12  Baghdad to get the travel documents to be issued.
13       Q  Did he indicate to you Baghdad's position
14  on whether or not travel documents would be issued
15  for Iraqi nationals who have not indicated they
16  desire to return to Iraq?
17       A  No.
18       Q  At any point since June 1, 2017, has
19  Baghdad indicated what its policy is about
20  accepting Iraqi nationals who desire not to return
21  to Iraq?
22       A  Not that I recall.
23       Q  Is there any documents that you could look
24  at to refresh your memory?
25       Can you change that to "Are there any

Page 67

1  documents that you can look at?"
2       A  I don't have any documents here on hand.
3  You know, there's certainly a lot of communication
4  dealing with Iraq within the last, you know, two
5  years.  And I think the time frame you had
6  mentioned is the last year.  So I just didn't want
7  to misspeak.
8       It's always been my understanding in
9  dealing with the -- the Iraq Embassy here since --
10  since -- so it's been my understanding that they
11  won't deny individuals who don't want to return,
12  but they will not issue on; in that, they defer to
13  their headquarters, very similar to our field
14  office directors, who often won't release somebody
15  from custody and will refer the cases up to
16  headquarters for my unit to do so.
17       So it's my understanding and my belief
18  that the embassy often doesn't want to be seen as
19  assisting the US Government too much in the
20  removal aspect.
21       Q  Okay.  I'm going to be tenacious here.  So
22  I'm going to go back to the question about
23  Baghdad.  Okay?
24       Have you -- or do you know of any instance
25  in which Baghdad has affirmed that they will not

Page 68

1  accept Iraqi nationals who have not clearly
2  indicated that they desire to return to Iraq?
3       A  No.  As -- as a matter of fact, the six
4  individuals who didn't volunteer to return to Iraq
5  are going to be issued travel documents tomorrow
6  on orders from Baghdad.  So that's a clear
7  indication to me that irregardless of whether
8  someone wants to return to Iraq, the government of
9  Iraq is going to do their international obligation
10  and issue travel documents for individuals who
11  have been ordered removed from the United States.
12       Q  Okay.  Other than the anticipated
13  documents that you're expecting to receive
14  tomorrow, has Baghdad ever indicated that they
15  would accept Iraqi nationals who have indicated
16  they do not desire to return to Iraq?
17       A  I would have to go through all the cases
18  who have been issued travel documents to see who
19  didn't, you know, affirmatively state that they
20  want to go back to Iraq.
21       It's my impression and my understanding
22  that the individuals from the April charter
23  weren't necessarily the individuals who
24  volunteered to return.
25       Q  But -- but you don't know for certain if

SCHULTZ, JR., JOHN AUGUSTIN
07/12/2018

Confidential
Pages 77—80

---

Page 77

1 they're not state-owned enterprises. They're
2 for-profit businesses. They captain has got the
3 final say. So we can't just say, "We're the
4 Federal Government; we're putting him on."
5 So the -- that leaves us with -- the only
6 alternative is either try again -- and he'll
7 probably do the same thing -- or do a charter
8 flight.
9 Another -- another reason why we would do
10 a charter flight is if the numbers make sense. So
11 we have daily charters to Honduras and Guatemala
12 and El Salvador, and monthly charters to Ecuador,
13 Jamaica, Haiti, et cetera. So, if the numbers
14 make sense.
15 And then, every now and then, a country
16 just wants a charter. They say, "Hey, you know
17 what, it's easier for us to get everybody who is
18 involved in, you know, handling removals to the
19 airport at the same time. So let's have all the
20 aliens come on a charter flight."
21 So those are, really, the three reasons
22 why we do that.
23 So, you know, charter flights, they're
24 fully operational. Trust me. We got a number of
25 charter flights scheduled for the summer. But,

Page 78

1 you know, ideally, in the perfect world, it would
2 be much easier just to go commercial.
3 Q So it's possible, in the future, you could
4 be using charter flights to provide Iraqi national
5 removal?
6 A Yes.
7 Q Okay. So prior to -- to May 2018, what
8 was Iraq's status? You know, it's now
9 cooperative. Was it cooperative on May 2017?
10 A I'm pretty certain it was. I can look
11 during lunch and let you know. But I -- I don't
12 recall off the top of my head.
13 Q Okay. Okay. What is the fiscal year for
14 ICE?
15 A It's October 1 to September 30th.
16 Q All right. Let's go back to
17 Exhibit No. 2.
18 (Exhibit 2 was referenced.)
19 BY MS. SCOTT:
20 Q And let's look at paragraph 7.
21 And the third sentence says, "ICE expects
22 to receive travel documents for all individuals
23 that ICE has requested to remove to Iraq."
24 Why did you say "ICE expects" versus "I
25 expect"?

Page 79

1 A I guess it's either way, right? It -- you
2 know, ICE -- I was speaking for the collective
3 organization. You know, I expect. My unit chief
4 expects. My DDO expects.
5 For me, I don't see a difference between
6 "ICE expects" or "I expect." I mean, I'm signing
7 this. So when I say "ICE expects," me signing it
8 is the same thing as saying "I expect." Maybe
9 it's just a nuancing in words. I don't --
10 Q Okay. And this declaration was signed in
11 November of 2017.
12 What was the basis for the statement that
13 ICE expects to receive travel documents?
14 A So it was our understanding from the
15 Statement of Cooperation from the Iraqis, that
16 they would -- they would accept the return of the
17 final orders -- final orders -- they would accept
18 the return of the 1,400 Iraqi nationals who got
19 final orders of removal in the United States. And
20 subsequent to the litigation -- or absent the
21 litigation, the individuals would be removed.
22 So what I'm -- what I'm saying there is
23 that those who were excluding themselves from the
24 lawsuit, we fully expect that we're going to get
25 travel documents based on the Statement of

Page 80

1 Cooperation.
2 Q And what is the Statement of Cooperation
3 that you're referring to?
4 A So it's, essentially -- we had gotten
5 notification that -- in March 2017, that the
6 Iraqis had indicated that they were ready to put
7 in place this interministerial committee
8 deportation to issue travel documents to the -- to
9 issue travel documents or accept removal of? I
10 believe it's to issue travel documents of the
11 Iraqi nationals within 30 days of request. And it
12 was for the 1,400.
13 And so, from that, we had -- we had the
14 understanding, or the belief, that all was going
15 to -- that they were going to, you know, cooperate
16 and -- and do their international obligation.
17 Q Did the Statement of Cooperation address
18 those Iraqi nationals who would indicate that they
19 desired not to remove -- be removed to Iraq?
20 A I don't recall that as being one of the
21 pillars of the Statement of Cooperation.
22 Q It was -- was the Statement of Cooperation
23 silent on that front?
24 A Yeah, I think so.
25 Q All right. Okay. Okay. Going to

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

SCHULTZ, JR., JOHN AUGUSTIN
07/12/2018

Page 85

1    determination.
2        Q  Okay.  All right.  So you can put that one
3    off to the side.
4        Okay.  All right.
5        MS. SCOTT:  I'm going to mark this as
6    Exhibit 4.
7        (Exhibit 4 was marked for identification.)
8        THE WITNESS:  Thank you.
9    BY MS. SCOTT:
10       Q  Do you recognize this document?
11       A  Yes.
12       Q  And what is it?
13       A  It's an e-mail going out to the -- the
14   attaches -- the ICE personnel deployed overseas.
15       Q  And what is it pertaining to?
16       A  The latest Removal Cooperation Initiative
17   run.
18       Q  And this is -- this -- we were talking
19   earlier about a cooperative country.  This is the
20   analysis you were talking about?
21       A  Yeah.
22       Q  Okay.  Let's turn to the second page.
23   That's marked ICE0271048.  And, if you go down to
24   the paragraph that starts "Although," do you see
25   that?

Page 86

1        A  Yes.
2        Q  And it says, "Although the United States
3    can extend detention in certain cases, we cannot
4    detain aliens who have not been repatriated to the
5    country of nationality or citizenship because the
6    country will not accept their return."
7        Under what circumstances can detention be
8    extended?
9        A  So if the officer can -- officer -- if ICE
10   can articulate that they're SLRRFF, then detention
11   can be extended.  If someone is a mental health
12   threat, we can -- we can continue detention based
13   on a 241.13.  If -- if someone is deemed to be
14   a -- like, a terrorist, the Secretary, in
15   conjunction with the -- Secretary of Homeland
16   Security, in conjunction with the director of the
17   FBI -- well, in -- with advice from the director
18   of the FBI, can maintain custody of an individual.
19       Q  Any other situations?
20       A  Those are, like, the real three ones.
21       Q  All right.  Then it says, "Under the US
22   Supreme Court decision in Zadvydas v Davis" -- and
23   it gives the case number -- "when countries refuse
24   or delay the repatriation of their nationals, ICE,
25   generally, is required to release aliens into US

Page 87

1    communities after 180 days if there is no
2    significant likelihood of removal in the
3    reasonably foreseeable future."
4        Today, is the 180-day mark still the
5    benchmark for determining SLRFF?
6        A  Yes.
7        Q  Have there been any Iraqi nationals since
8    2017 that have hit their 180 days that have been
9    released because SLRRFF does not exist?
10       A  I'm sorry.  Since when?
11       Q  Since January 2017.
12       A  Since January 2017.  I would say yes.
13       Q  Do you know how many?
14       A  I do not.
15       Q  Do you know -- okay.  Can you give me a
16   roundabout figure?  And it's fine to say no.  But
17   I'm going to keep pushing, just to see if it
18   triggers your memory.
19       A  No.  No.  Unfortunately.  I wish I could
20   give you the answer.  I'm not trying to be
21   difficult.
22       I don't know.  January 2017 feels like an
23   eternity, long ago, right?  But I would say -- I
24   don't have a number for you.  But -- I don't.
25   Sorry.

Page 88

1        Q  Okay.  That's fine.  No.  That's fine.
2        So several of the Hamama class members have
3    been in detention longer than 180 days, correct?
4        A  Mm-hmm.
5        Q  Has there been a SLRRFF analysis for those
6    detainees?
7        A  So my officers have done -- I know they've
8    done case reviews on -- on the Hamama class.
9        And just so you know the mechanism of how
10   this works, I just want to back it up a little
11   bit.
12       Q  So answer my question first, and then I
13   will give you time to provide that --
14   that process.
15       A  Okay.  So, yes.  The answer is yes.
16       Q  Do you know how many?
17       A  How many --
18       Q  How many --
19       A  -- aliens have had their cases reviewed?
20       Q  Yes.
21       A  That, I do not.
22       Q  All right.  So go ahead and give us the
23   process that --
24       A  So I just want to lay the foundation of
25   why I can't answer you -- give you a granular

SCHULTZ, JR., JOHN AUGUSTIN
07/12/2018

Confidential
Pages 89–92

Page 89

1    answer, right?
2         So my -- the officers, the DDOs, detention
3    and deportation officers, do the review.  If the
4    review is to continue detention, it goes to the
5    unit chief.  The unit chief reviews it, gives it
6    back to the officer.
7         Q  Can I stop you right there?
8         A  Yes.
9         Q  And who would be the unit chief?
10        A  Michael Bernacke.  It never comes to my
11   desk.
12        And then on the flip side is, if an alien
13   is to be released, the detention and deportation
14   officer reviews the case.  It goes to
15   Michael Bernacke, the unit chief.  It comes to
16   John Schultz, the deputy assistant director, who
17   then writes an e-mail to the assistant director
18   saying, "Hey, I intend to release this guy because
19   of this."
20        And so I don't have -- I don't have
21   very -- I don't have visibility on people who are
22   in continued detention.
23        Q  Okay.  You have visibility into those that
24   you recommend to be released?
25        A  For release.

Page 90

1         Q  Do you have visibility into knowing if
2    those that you've recommended have been released?
3         A  Those who have been recommended for
4    release -- I don't go back and check the system.
5    I just assume the officers are doing their job and
6    notifying the field to release them from custody.
7         Q  Okay.  So let me be -- I'm not clear about
8    what you're saying.
9         So if you make the recommendation, that is
10   the decision to release; is that correct?
11        A  Well -- so the officer makes the
12   recommendation.  The unit chief concurs.  It comes
13   to me.  I, essentially, go to my ADD the same way
14   the unit comes to me, and I say, "This guy --
15   we -- we've got to release him.  You know, here
16   are the particulars in the case."
17        She'll say yes, concur, or she may say,
18   "Oh, wait a minute.  I think you missed something
19   here.  What about this"?
20        And then once we get the concur
21   notification -- concur on the release, I tell the
22   unit -- Mike, the unit chief, Bernacke, go ahead
23   and release.  And then -- and then the officer
24   cuts a release letter, notifies the field.
25        Q  All right.  So I think I might not have

Page 91

1    been listening very clearly the first time around.
2         A  I'm sorry.
3         Q  No.  Don't you apologize.  That was my
4    fault.
5         All right.  So let's go into the page that
6    refers to Iraq, which is Bates numbered 271055.
7         A  Mm-hmm.
8         Q  All right.  So then this is as of
9    February 2017.  It -- it discusses a démarche --
10   am I saying that correctly?
11        A  Yes.
12        Q  -- issued on July 27th, 2011, and
13   March 31st, 2015.
14        What is a démarche?
15        A  So a démarche is, like, an official
16   communication between one country and another.
17   So, according to the Department of State, a
18   démarche can be either verbal or written.
19        Q  Mm-hmm.
20        A  It's basically anytime you may admonish
21   them for something or request something, or
22   request something strongly, you know.  So, you
23   know, a démarche -- like, I don't know what it
24   said in March 2015 or July 2011.  But a typical
25   démarche today, they're all -- it's boilerplate.

Page 92

1    Or, you know, it discusses the importance of
2    removal; the -- you know, the EO, executive
3    order --
4         Q  Mm-hmm.
5         A  -- you know, what the current condition of
6    the country's cooperation is; you know, possibly
7    visa sanctions.
8         And then, like, what ICE has asked is, "We
9    ask that you immediately issue travel documents to
10   these ten people who are detained.  And, in
11   addition to that, identify a repeatable process
12   within the next 30 days to handle all the
13   non-detainees."
14        Something to that effect.
15        Q  Okay.  Has a démarche been issued to Iraq
16   since January of 2017?
17        A  So the -- the démarche definition is --
18   like I said, it's verbal.  It could be verbal, or
19   it could be written.
20        So State Department may consider the
21   July 2nd meeting a démarche.  I wouldn't have
22   considered it a démarche because I felt like it
23   was just more of a -- just engagement, right?
24        Q  Mm-hmm.
25        A  There -- I just -- we did a dip note.  We

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield/Grand Rapids

Phone:  888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

SCHULTZ, JR., JOHN AUGUSTIN
07/12/2018

Confidential
Pages 93–96

Page 93

1  did a dip note, which is different than a
2  démarche, which is also an official communication
3  between one country and another, you know, just
4  two weeks ago.
5      Q  Okay.  So let me -- let me slow you down
6  there a second.  Okay?
7          "Dip note" means diplomatic note?
8      A  Mm-hmm.
9      Q  Okay.  And compared to a démarche, is it
10 less of an admonishment?
11     A  For me, a non-State employee, I think
12 they're relatively the same.
13     Q  Okay.  Okay.  And what did the dip note
14 from two weeks ago say?
15     A  It was, essentially, asking for the
16 issuance of the travel documents for the six
17 individuals.
18     Q  Was the --
19     A  So the -- so the dip -- so --
20         I apologize.  Sorry.  I'm sorry.
21     Q  That's okay.
22         Was the dip note issued prior to the
23 July 2nd meeting?
24     A  Yes, ma'am.
25     Q  Did the July 2nd meeting result -- was the

Page 94

1  result of a dip note, do you believe?
2      A  No, I don't believe so.
3      Q  Was the July 2nd meeting scheduled before
4  the dip note went out?
5      A  No.
6      Q  Okay.  So what did the dip note say,
7  specifically?
8      A  The -- the dip note was, basically, in
9  lieu of my meeting.  So since I -- I didn't have
10 the opportunity to go over, we sent a --
11     Q  So let me slow you down a second.  I don't
12 mean to interrupt you.
13         So when you talk about the "meeting," that
14 was the meeting you were planning to have with
15 Mr. Nizar.
16     A  (No verbal response.)
17     Q  Okay.  Go ahead.
18     A  So -- so -- yeah.  So since I couldn't get
19 the -- that trip to Baghdad on June 25th to meet
20 with the Ministry of Foreign Affairs, I worked
21 with the Department of State Consular Affairs
22 Bureau here in Washington to draft a diplomatic
23 note; essentially, putting on paper what I -- you
24 know, what the intent of the meeting was.
25         And so that turned out to be a -- they

Page 95

1  cabled that over to -- to the Iraqis.  I forget on
2  which date.  But, essentially, it was asking for,
3  you know, the issuance of the travel documents for
4  the six individuals.
5      Q  Was there any discussion in that dip note
6  about sanctions or any warnings about sanctions?
7      A  Without seeing it now, I don't -- I don't
8  know.  Sorry.
9      Q  That's okay.
10         So I think I -- one of my earlier
11 questions was the diplomatic note was issued
12 because you didn't -- weren't able to have the
13 meeting with Mr. Nizar.
14     A  Yes.
15     Q  Correct?  I think I misstated the name
16 earlier.  But I think we all understood who I was
17 talking about, correct?
18     A  Yes.
19     Q  All right.
20         MS. SCOTT:  We only have another 45 minutes
21 before lunch.  So I'm getting exhausted, for the
22 record.
23         MS. SCHLANGER:  You had set lunch for
24 11:45.
25         MS. SCOTT:  Oh, so we only have a half an

Page 96

1  hour, almost.  So --
2          MS. SCHLANGER:  You should do what you
3  want.
4          MS. SCOTT:  Yeah.  Okay.
5  BY MS. SCOTT:
6      Q  All right.  So I had asked you if there
7  had been any diplomatic notes issued since
8  January 2017, and you responded, "There was one
9  two weeks ago."
10         Were there any others?
11     A  I think you asked me if there were any
12 other démarches, but --
13     Q  Okay.  So that -- fair enough.
14         Were there any other démarches since
15 January 2017?
16     A  I believe so.  We have a démarche tracker,
17 you know, at the office, you know, on SharePoint.
18 I don't track them in my head.  I -- I don't --
19     Q  You just don't recollect at this point?
20     A  Yeah.  But I'm pretty certain there was
21 one.
22     Q  So let me ask the question about
23 diplomatic notes.
24         Have there been any other diplomatic notes
25 issued since January of 2017?

SCHULTZ, JR., JOHN AUGUSTIN
07/12/2018

Confidential
Pages 97–100

Page 97

1  A  I would say the same.  I would say it's --
2  it's likely, but I am not 100 percent certain that
3  there has been.
4  Q  Is there a tracker of diplomatic notes
5  that were issued?
6  A  As I mentioned, sometimes there's a gray
7  area, at least in the non-State side, on dip notes
8  and démarches.  So they do sometimes filter into
9  the démarche tracker.
10  Q  Okay.  All right.  So let's go back to
11  this document.
12  A  Sure.
13  Q  So the -- Iraq is listed -- if you go back
14  to 271049, the header says, "Removal Cooperation
15  Initiative (RCI) Uncooperative Countries' Status
16  of Efforts as of February 15, 2017."
17      So as of that time, Iraq was identified as
18  an uncooperative country, correct?
19  A  Right.
20  Q  Today, it's identified as a cooperative
21  country?
22  A  Right.
23  Q  Are there any specific activities or
24  conduct or statements from Iraq that transferred
25  them from uncooperative to cooperative?

Page 98

1  A  So with that Statement of Cooperation in
2  March of 2017, where they said they would take
3  their individuals back, we also had that -- the
4  April charter.
5      And then, without seeing the data in front
6  of me -- you know, when -- so the -- just to
7  explain the RCI and the score a little bit -- so
8  the Iraqis said they would interview, right?  They
9  went.  They interviewed.  They issued documents
10  for all that they interviewed.
11      So there's four variables, as I mentioned
12  before.  So they'd get 100 percent on that one,
13  right?
14  Q  For clarification --
15  A  Yes, ma'am.
16  Q  -- are you talking about the eight from
17  April 2017?
18  A  Yes.
19  Q  Okay.
20  A  So they would get 100 percent there.
21      Like, so, on the next -- you know, so
22  we -- we do the RCI run twice a fiscal year.
23  Q  Mm-hmm.
24  A  So at the next run, the data set would be,
25  "Well, Iraq did interviews.  They issued all the

Page 99

1  documents.  Yes, they interview.  Yes, it meets
2  ICE's needs."
3      They get 100 percent on that variable.
4      Then charters.  "Well, they did the April
5  charter.  They took everybody."
6      Yes.  That's 100 percent.  Right there,
7  that's 50 points, right?
8  Q  Mm-hmm.
9  A  Then you get -- you get -- then you add in
10  the March Statement of Cooperation, where they
11  say, "We're going to take back everybody."
12      So then, you know, ICE is working to get
13  these individuals, you know, teed up for travel
14  documents and everything else.
15      So then since we have what we -- what we
16  interpret as SLRRFF, based on their -- their
17  statement that they're going to issue travel
18  documents on those 1,400, the -- your ratio of
19  releases to returns goes down, right?  And so,
20  then, that scores goes up.  So you've got already
21  two variables at 100, which gives you 50, you
22  know, because they're equally weighted.  This --
23  this -- the ratio goes down.  So that's going to
24  give you more points.
25      All you have to do is get above a 70, and

Page 100

1  you're cooperative.  So they're already almost
2  there.  And I don't know what that -- the final
3  order to removal time frame is.
4  Q  Mm-hmm.
5  A  But, you know, just depending on it, like,
6  you could've easily seen the -- the numbers
7  reduce.  And I -- without the data in front of me,
8  I can't say that's exactly what happened.  But
9  that's -- that's a possibility.
10  Q  Okay.  So -- I mean, I asked you earlier
11  about démarches, not realizing that this document
12  actually says that you had issued a démarche in
13  early -- at some point before February 2017.
14      Do you remember what that démarche was
15  about?
16  A  I don't.
17  Q  Okay.  And then the next bullet point
18  mentions that there's been 21 cases submitted to
19  Baghdad.
20      I'm assuming that means for travel
21  documents, correct?
22  A  That's correct.
23  Q  Did Baghdad issue travel documents for
24  those 21 cases?
25  A  Not to my knowledge.

SCHULTZ, JR., JOHN AUGUSTIN
07/12/2018

Confidential
Pages 113–116

---

Page 113

1   have the ability to look at a case almost like a
2   consular officer from that foreign country, and
3   say whether or not they really believe, you know,
4   a travel document is going to be issued.  And
5   they're the ones that have that personal knowledge
6   of the country.  They use their experience with
7   the information provided within the travel
8   document presentation to make -- to make that
9   SLRRFF determination.
10          You know, the consulate of Iraq in LA, the
11   field may have just submitted the request.
12   "Unknown," that means maybe they never called them
13   back.  Nothing ever happened, right?
14          For me, if -- if I'm the DDO, this line
15   here means absolutely nothing to me.
16      Q   Okay.  So are there certain specific
17   entries that are supposed to be put into this
18   field?
19      A   Helpful entries.
20      Q   So it's -- so it's a wide range?
21      A   Right.
22      Q   It's not a "Select this number" or "Select
23   this word"?
24      A   No.
25      Q   Okay.  So let's look at Exhibit 7.

---

Page 114

1          (Exhibit 7 was referenced.)
2   BY MS. SCOTT:
3      Q   We're going to look at the same line on
4   this one, which, again, is under -- has a header
5   "Date Consular/Embassy Person Contacted, Results
6   Regarding Likelihood of Issuance."
7          And it says, "No response."
8          So would that trigger a SLRRFF analysis?
9      A   That's on 269857?
10      Q   Yes.
11      A   So this is where the -- the DO in the
12   field e-mailed Julius Clinton, and Julius didn't
13   respond to the e-mail.
14      Q   Okay.  Thank you.  Okay.  That makes more
15   sense.  Okay.  Gotcha.
16      A   Okay.
17      Q   All right.  Let's push those off to the
18   side, then.
19          MR. SILVIS:  I just wanted to note the
20   time, too.  I don't know what your planning was.  I
21   think this was the prearranged break, but --
22          MS. SCOTT:  I -- let's go off the record.
23          (Whereupon, at 11:44 a.m., the deposition
24   in the above-entitled matter was recessed, to
25   reconvene at 12:49 p.m., this same day.)

---

Page 115

1                   AFTERNOON SESSION
2                           (12:49 p.m.)^ is
3   this how you want the time place, or centered or
4   something else lo
5              EXAMINATION BY COUNSEL
6              FOR PETITIONERS (RESUMED)
7   BY MS. SCOTT:
8      Q   All right.  Mr. Schultz, you've been
9   talking about a gentleman by the name of Nizar --
10   Nizar.  I believe that's his first name.
11          Do you now have his complete name?
12      A   Yes.  I believe the individual who I was
13   going to -- who I was attempting to meet with in
14   Iraq is Undersecretary of Bilateral Relations from
15   the Ministry of Foreign Affairs,
16   Nizar Issa Abdul-Hadi Al-Khairalla.
17      Q   All right.  And will you hand the court
18   reporter the -- the piece of paper that has the
19   name on it so she can have the spelling --
20      A   Yes.
21      Q   -- please.
22          Thank you.
23          So we were talking earlier about the RCI.
24   And we saw that there were documents that had put Iraq
25   in the ARON category.

---

Page 116

1   Has Iraq moved into the cooperating category?
2      A   During lunch, I had the opportunity to
3   review the -- the latest run to ensure that I had
4   provided you with the correct information.
5          Iraq is still currently within the ARON.
6   So that is where they currently stand.  So they're
7   currently ranked at risk of noncompliance.
8      Q   So when you were testifying earlier about
9   them being a cooperating country, you weren't
10   using the formal category that's used through the
11   RCI, correct?
12      A   Right.  They -- they hadn't been
13   classified -- and I may have just misspoke at the
14   time.  And I verified that they're currently an
15   ARON country.
16      Q   Okay.  We've also been talking about a
17   Statement of Cooperation.  And I want to see if we
18   can't nail that down a little better about what
19   that statement is.
20          MS. SCOTT:  Are we on Exhibit 8?
21          THE REPORTER:  Yes.
22          (Exhibit 8 was marked for identification.)
23          THE WITNESS:  Thank you.
24   BY MS. SCOTT:
25      Q   So I'm handing you an e-mail from you that

---

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

SCHULTZ, JR., JOHN AUGUSTIN
07/12/2018

Confidential
Pages 117–120

Page 117

1   attaches a cable that is dated March 12th, 2017.
2       Is the cable in this document what you're
3   calling the Statement of Cooperation?
4       A  It is.
5       Q  Are there any other Statements of
6   Cooperations or amendments to the Statement of
7   Cooperation?
8       A  No.
9       Q  So this is the -- what -- what's reflected
10  in Exhibit 8 is the full Statement of Cooperation,
11  correct?
12      A  This -- correct.  This is -- this is what
13  I've -- what I consider to be the Statement of
14  Cooperation.
15      Q  Okay.  Was the Statement of Cooperation
16  drafted by the Iraqi Government?
17      A  So this -- this cable was drafted by --
18  let's see.  It was drafted by Bridgette Wheeler of
19  the Department of State.
20      Q  Do you have any -- any documents from Iraq
21  which has set forth in writing the Statement of
22  Cooperation?  And when I say "you," I mean ICE or
23  any other department of the Government.
24      A  To my knowledge, there's no written
25  acknowledgement of a Statement of Cooperation or

Page 118

1   written agreement that codifies this information.
2       Q  Okay.  Do you know if any member of the
3   Iraqi Government was handed this cable and asked
4   to confirm the statements within it are accurate?
5       A  I do not know if anybody from Iraq
6   verified this cable.
7       Q  Do you know who would be able to confirm
8   if Iraq has received this cable and confirmed its
9   accuracy?
10      A  I -- I would -- I would guess that it
11  would either be Bridgette Wheeler or, perhaps,
12  Ambassador Silliman, whose signature is digitally
13  on this cable, regarding the -- the statement.
14          Typically, from my experience in past
15  meetings -- bilateral meetings, there is sort of
16  an agreement in notes of the -- what's transpired
17  during the meeting.  So this may have occurred in
18  this case.  So I'm sure, if needed, at some point,
19  somebody could figure that out.
20      Q  All right.  So let's walk through the
21  document.
22          So, according to this document, the deputy
23  consul general and the assistant legal attache met
24  with Dr. Kadim Al-Rikabi from the Ministry of
25  Foreign Affairs.

Page 119

1   That's at paragraph 1, correct?
2       A  That's correct.
3       Q  Who is the deputy consul general?
4       A  So the -- I don't know the -- the name of
5   the deputy consul general.  But -- so the
6   Department of State has different cones, and
7   that's how they break up their organization.  And
8   there's the consular cone.  And at the embassies,
9   you've got your consul general and then your
10  deputy.  So that would be second to the -- the
11  consul general.
12      Q  Okay.  So those are -- those are referring
13  to US Government officials, though, correct?
14      A  That's correct.  The assistant legal
15  attache would be an FBI agent.
16      Q  Okay.  And when we've been talking
17  about -- okay.
18          Going down further in that same paragraph,
19  it says, "Al-Rikabi said the committee had
20  identified four necessary steps for Iraq to
21  facility the deportations."
22          And one of those is consular access.
23          Do you have an understanding of why they
24  needed consular access?
25      A  So it's -- my understanding from meeting

Page 120

1   with the Iraq Embassy in Washington, is that the
2   consular access was just to meet with the
3   nationals who would be returned, sort of to ensure
4   that they had a place to go upon arrival within
5   Iraq.
6       Q  Was it your understanding that part of the
7   consular access was to confirm whether the Iraqi
8   national wanted to return to Iraq?
9       A  No.
10      Q  And then it says, "Al-Rikabi said the
11  deportations are a high priority for the Prime
12  Minister and Foreign Minister, and the committee
13  was prepared to finalize, within 30 days, the
14  removal of the first group of deportees."
15          What's the first group of deportees?
16      A  So, during this time, we were still
17  working on getting that April charter up.  I'm not
18  100 percent certain what -- or what the cable is
19  referencing that Al-Rikabi was indicating would be
20  the first group.  I can only guess that the first
21  group would be to finalize that charter that we
22  were working on, and, then go from there.
23      Q  Okay.  And do you know if -- if the --
24  if the finalization did take place within 30 days?
25      A  Of -- of the -- the April charter was out

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson
U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids
Phone:  888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

SCHULTZ, JR., JOHN AUGUSTIN
07/12/2018

Confidential
Pages 121–124

Page 121

1   37 days later, roughly.
2       Q   Okay.  Okay.  Let's go down to
3   paragraph 2.  So let's go down to paragraph 2.
4       The -- it says that an interministerial
5   committee on deportations was formed, and it
6   identifies various ministries that are part of the
7   interministerial economy.
8       Earlier, we were talking about references
9   to Baghdad, and getting travel documents approved
10  by Baghdad, and you mentioned a committee.
11      Is this the same committee you were
12  talking about?
13      A   Yes.
14      Q   Does this committee still exist?  Do you
15  know?
16      A   To --
17      Q   Today?
18      A   To my knowledge, yes.
19      Q   Have they -- have the members of this
20  committee changed at all since March 2017?
21      A   I do not know.
22      Q   Do you know who are -- who are the members
23  of the committee?  Individuals?
24      A   No.
25      Q   And then -- yes.  And then it talks about

Page 122

1   a Deputy Foreign Minister Khairalla.
2       Is that Mr. Nizar, that we've been talking
3   about today?
4       A   That falls in line with his name.  So I
5   would assume, yes.
6       Q   Okay.  Do you know what the -- the paren
7   "Rucktail" means?
8       A   I don't know off the top of my head.
9   Sorry.
10      Q   Okay.  Do you know when the April 2017 --
11  when an agreement to allow the April 2017 charter
12  to go forward was reached with Iraq?
13      A   I don't know.
14      Q   Okay.  All right.  And then down at four,
15  it says -- it says that Al-Rikabi said that "once
16  a deportation notification and accompanying
17  documents were received by the MFA, the Ministry
18  of Interior would review and verify the evidence
19  of citizenship provided by the United States."
20      Has there ever been a requirement on how
21  long the review and verification of evidence of
22  citizenship would take?
23      A   So it's Ice's typical stance that a travel
24  document be issued within 30 days of a request.
25  So that -- that's the standard that we hold all

Page 123

1   countries to.  And that's the response we would
2   like to get from Iraq.
3       Q   So, according to this cable, the Statement
4   of Cooperation anticipated that the government of
5   Iraq would issue travel documents rather than
6   approve a flight manifest, correct?
7       A   I don't think it says "rather than."  But
8   it does say "would streamline in the need for
9   travel documents."
10      Right.  They would issue travel documents.
11      Q   And for the April 2017 flight, travel
12  documents were issued; correct?
13      A   That is correct.
14      Q   And there was going to be a flight in June
15  2017; is that correct?
16      A   That's correct.
17      Q   And for that flight, ICE was attempting to
18  get travel documents for those Iraqi nationals,
19  correct?
20      A   That's correct.
21      Q   At any time, did ICE try to effectuate the
22  June 2017 flight by submitting a flight manifest
23  versus obtaining travel documents?
24      A   No.  It was my intention to get travel
25  documents for the individuals on the flight.

Page 124

1       Q   Okay.  All right.  Iraq will sometimes --
2   will sometimes issue a laissez-faire -- well,
3   sorry.  That's my economics background.  I
4   apologize.  I'm going to start over.
5       Okay.  The Iraqi Government will sometimes
6   issue a laissez-passer.
7       A   Mm-hmm.
8       Q   Am I pronouncing that correctly?
9       A   Laissez-passer.
10      Q   Okay.  Is that sufficient to allow an
11  Iraqi national to be deported on a commercial
12  plane?
13      A   Yes.
14      Q   I told you we're asking you some very
15  basic questions.
16      All right.  Now, we're going to get into
17  some numbers, which should make for some fun.
18      MS. SCOTT:  Okay.  This is going to be
19  Exhibit 9.
20      (Exhibit 9 was marked for identification.)
21      THE WITNESS:  Thank you.
22  BY MS. SCOTT:
23      Q   Do you recognize this document?
24      A   Yes.
25      Q   So let me -- let me ask you this question:

SCHULTZ, JR., JOHN AUGUSTIN
07/12/2018

Confidential
Pages 145–148

Page 145

1  this were to be dated July 2018, and then the
2  officer had recommended release, then I would've
3  certainly seen this.  Yes.
4      Q  Okay.  The second-to-last sentence --
5  actually, it's the very last part of the first
6  sentence of the document.  It starts with, "Also,
7  Mr. Shou stated that he is unwilling voluntary
8  repatriated to Iraq.  Therefore, and according to
9  our regulations, we will not be able to start any
10 application for him at this time."
11     Did I read that correctly?
12     A  You did.
13     Q  Okay.  Do you know what happened after
14 receiving this letter with regards to Mr. Shou's
15 detention?
16     A  I do not.
17     Q  Would that type of -- of statement from
18 the Iraqi Government trigger a SLRRFF analysis?
19     A  What I would have -- I -- I don't know
20 what happened in this particular case.
21     Q  Mm-hmm.
22     A  But what I would've liked to have had
23 happen is that the officer brought it to the
24 attention of his -- this went to the -- this went
25 to the -- the office in Detroit, not to my

Page 146

1  officer.  My officer should've, eventually, gotten
2  it, but I'm not certain if he did.  But I would've
3  liked my officer to -- to talk to his unit chief
4  to make contact with the embassy to discuss this
5  situation.  Because, again, volunteering to return
6  to your country is not part of the removal order.
7      Q  Okay.  I understand that.
8      But if Iraq is indicating that they will
9  not start any applications for travel documents
10 for an individual, that means you cannot
11 repatriate the individual to Iraq, correct?
12     A  So -- yes.  I -- if they indicate that
13 they're not going to start anything.  But this is
14 from the consul.  The embassy oversees the
15 consuls.  So we should engage the embassy.
16     Q  Okay.  Okay.  Now I understand most of
17 your answers.  Okay.  Thank you.  Okay.
18     MS. SCOTT:  So I'm going to mark the next
19 as Exhibit 12.
20     (Exhibit 12 was marked for
21     identification.)
22 BY MS. SCOTT:
23     Q  Okay.  Are you familiar with -- with
24 Exhibit 12?
25     A  I -- I don't necessarily recall this

Page 147

1  document.  But that's not to say I haven't seen
2  it.
3      Q  Okay.  So let me ask you this, then:  Are
4  you familiar with Iraq making statements to
5  various European Union countries and Canada
6  about -- let me start over.
7      In January 2017, were you aware that other
8  countries were being told by Iraq that they would not
9  accept and force repatriation of their nationals?
10     A  No.  I do know about the Brussels' working
11 group.  But it's a working group that the US group
12 doesn't have an active role in.  We only have an
13 observation role.  So, unfortunately, since we
14 didn't have much of a role in it, I wasn't very
15 engaged in what was going on.  So that's why I
16 said I don't know if I recall it.
17     Like, I may have seen this document.  But
18 if I did, I didn't pay much -- I didn't give them
19 much of my attention.  So I don't recall reading
20 this readout from this teleconference.
21     Q  Okay.  So let's leave it at that, then.
22     All right.  Okay.
23     MS. SCOTT:  Let's mark this next one as
24 Exhibit 13.
25     (Exhibit 13 was marked for

Page 148

1     identification.)
2  BY MS. SCOTT:
3      Q  So this document is a June 7th, 2017,
4  letter from the consul of Iraq in Washington, DC,
5  to the Department of Homeland Security,
6  Mr. Julius Clinton, who was somebody that worked
7  under you, correct?
8      A  That's correct.
9      Q  Have you seen this document before?
10     A  Yes.  It looks familiar.
11     Q  Okay.  And it says, "With reference to
12 your request for travel documents for the aliens
13 whose names are listed in the attachment, kindly
14 be advised the Embassy of the Republic of Iraq in
15 Washington, DC, is unable to issue such travel
16 documents for the lack of required official Iraqi
17 documents."
18     Did I read that correctly?
19     A  Yes.
20     Q  Okay.  And then the second-to-last
21 sentence starts -- it says, "The applicant must
22 submit with his request an original and valid
23 Iraqi personal identification card and Iraqi
24 citizenship certificate and should express orally
25 and in writing his willingness to return to Iraq

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

SCHULTZ, JR., JOHN AUGUSTIN
07/12/2018

Confidential
Pages 149–152

Page 149

1  voluntarily in order to be issued a travel
2  document."
3       Did I read that correctly?
4       A  Correct.
5       Q  And if you turn the page, there's a list
6  of 24 individuals.  The person at No. 9 is
7  Usama Hamama, which is the petitioner in the
8  Hamama litigation, correct?
9       A  I actually don't know his first name.
10       Q  Okay.  Well, let me represent that to you.
11       A  Okay.
12       Q  All right.  So upon receiving this letter,
13  was there a SLRRFF analysis conducted as to
14  whether or not Mr. Hamama could be removed to
15  Iraq?
16       MR. SILVIS:  Object to the foundation.
17       THE WITNESS:  So what -- what this letter
18  states is something that the embassy has stated
19  after the Statement of Cooperation had come out.
20       I had met with the ambassador.  And,
21  basically, this letter states the embassy will not
22  issue the documents.  You know, they wanted to have
23  Baghdad mandate that the embassy issue the
24  documents.  So this document -- this statement is
25  not saying that they're not going -- that they're

Page 150

1  not Iraqi.  This is just more of their way of
2  saying, "Go through your other channel.  Go through
3  Department of State as -- as you did with the
4  April 2017 charter, those individuals, to get
5  the travel -- to get the -- the authorization to
6  issue travel documents."
7       Have it come from Iraq versus the embassy.
8       Q  Okay.  Where in this letter does it say
9  that you should go to Iraq, or what we've been
10  calling Baghdad, to get the documents?
11       A  The letter doesn't explicitly say that.
12  But I know from my experience and my engagement
13  with the -- the Iraqi Embassy, especially after
14  the -- the e-mail on March 12th or March 13th
15  regarding the interministerial committee on
16  deportations.  I -- I met with the embassy, and
17  they -- they said -- they outlined, you know,
18  which cases they wanted to go to the -- to Iraq,
19  cases that they wanted to come to Washington.
20       And this is, essentially, stating that
21  these cases should go directly to Iraq without
22  explicitly saying that.
23       Q  Okay.  So the -- the travel documents --
24  we saw in an earlier document that the 280 travel
25  documents were submitted to Baghdad, correct?

Page 151

1       A  Mm-hmm.  That's correct.
2       Q  And did you -- did ICE submit travel
3  documents to the embassy in DC for these
4  individuals in -- in May or June 2017?
5       A  For the --
6       Q  For these individuals.
7       A  Oh, for those -- sorry.  For those
8  individuals, I can only surmise from this letter
9  that Julius sent those cases to the Iraq Embassy
10  in Washington, DC.
11       Q  But you don't know for sure?
12       A  I do not know for sure.
13       Q  So you don't know for sure if what the
14  embassy is saying here has been directed by
15  Baghdad to State, do you?
16       A  I do not know for sure.
17       Q  What did -- what happened after this
18  letter was received to obtain travel documents for
19  these individuals?
20       MR. SILVIS:  Object to the form.
21       THE WITNESS:  These cases were -- I don't
22  know for certain.  But these cases should've been
23  part of that 280 tranche that was sent to Baghdad
24  during the same time frame.
25       Q  And did you receive any statement from

Page 152

1  Baghdad on those 280 requests after this letter
2  was received by Julius Clinton?
3       A  I don't recall any written notification
4  from the embassy or from the -- or from Baghdad
5  regarding the 280 cases.
6       Q  Did Baghdad issue any travel documents
7  after June 7th, 2017, for these individuals
8  after -- after this letter was received?
9       MR. SILVIS:  Just a clarification.  What do
10  you mean, "these"?  Are you pointing to the --
11  you're pointing to the letter.
12       MS. SCOTT:  I'm pointing to the individuals
13  on the letter.
14       MR. SILVIS:  Okay.  So you're pointing to
15  the individuals in '17?
16       MS. SCOTT:  So let me -- let me clarify the
17  record.
18       MR. SILVIS:  Sure.
19  BY MS. SCOTT:
20       Q  After receiving this letter, and after
21  Baghdad having received the 280 travel documents,
22  did Baghdad issue travel documents?
23       MR. SILVIS:  Object to the form.
24       THE WITNESS:  I don't believe, from the
25  280 -- I don't have visibility on every single case

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

SCHULTZ, JR., JOHN AUGUSTIN
07/12/2018

Confidential
Pages 173–176

**Page 173**

1    may be the immigration enforcement EO.  I don't
2    know which one 13768 is.
3        Q    Okay.  What's an immigration EO?
4        A    So, upon entry into office,
5    President Trump signed a few EOs, I think, within
6    the first week.  And one of them was regarding,
7    essentially, interior enforcement -- interior
8    immigration enforcement.  And within that, there
9    was a bullet on foreign countries taking their
10   nationals back.
11       Q    And did that have anything to do with
12   Iraq?
13       A    No.  It was just foreign countries.
14       Q    Are you aware of any MOU between Iraq and
15   the State -- I'm sorry -- Iraq and State?  Is
16   "State" referring to Department of State?
17       A    That's correct.
18       Q    Okay.  Are you aware of any MOU between
19   Iraq and State?
20       A    I -- on removals?
21       Q    On repatriations and the return of Iraqi
22   nationals.
23       A    No.  I don't -- I'm not aware of any MOU
24   between the Department of State and Iraq on
25   removals or repatriation.

**Page 174**

1        Q    Okay.  Are you aware of any negotiations
2    between Iraq and the State on an MOU about
3    repatriations?
4        A    No.
5        Q    Have you been involved in any negotiations
6    between Iraq and the State on repatriations of
7    Iraqi nationals?
8        A    No.
9        Q    Are you aware of any -- anybody at DHS
10   that is working on an MOU between State and Iraq
11   on repatriation of Iraqi nationals?
12       A    No.
13       Q    Do you know of any MOU between DHS and
14   Iraq about repatriation?
15       A    No.
16       MS. SCHLANGER:  Seems like -- yeah.
17   BY MS. SCOTT:
18       Q    All right.  Let's push that off to the
19   side.
20            Why was the May 2018 flight a charter?
21            Let me rephrase that.
22            So in May 2018, some Iraqi nationals were
23   removed.
24            Why was a charter used?
25       A    So we had gotten the sense -- we had

**Page 175**

1    gotten a -- I forget the number, but we had gotten
2    a decent amount of travel documents, and we wanted
3    to get the individuals out as soon as possible.
4    We do have restrictions going commercially to some
5    countries.  I don't know exactly how long it takes
6    to get to Iraq.  Not -- obviously, in the air, it
7    doesn't take that long.  But there's country
8    clearances and then notification time periods and
9    transiting issues.
10           So the -- you know, we can get a small
11   flight bought and paid for and scheduled within
12   ten days, which is much quicker than getting the
13   field to schedule a commercial removal for an
14   individual.  So it was more -- it was mostly about
15   efficiencies, about getting, you know, at least
16   some of them out as soon as possible.
17       Q    So why did you want to get them out as
18   soon as possible?
19       A    Because they had already been in custody
20   for almost over a year, you know, from the --
21   prior to the inception of the litigation, and then
22   during the litigation until they were removed from
23   the class.  And then they got the final order.
24           I mean, at the end of the day, people
25   are -- in ICE custody are being -- you know, they

**Page 176**

1    don't have, you know, the civil liberties.
2    They're not -- they're not free to, you know, do
3    what they want to do.  I'm sure they want to get
4    out as soon as possible.
5            So -- and, you know, additionally, you
6    know, it costs ICE $133 a day to detain somebody.
7    So it makes sense, both on a humanitarian issue
8    and a fiscal issue, to remove them as soon as
9    possible.
10       Q    Does detention take a toll on a person?
11       MR. SILVIS:  Object to the form.
12       THE WITNESS:  I think it depends on the
13   person.
14   BY MS. SCOTT:
15       Q    In general, do you think a year of
16   detention is -- is tough on people?
17       MR. SILVIS:  Object to the form and
18   foundation.
19       THE WITNESS:  I would think -- to be honest
20   with you, some people, yes, have a hard time.  But
21   some people never want to leave.
22   BY MS. SCOTT:
23       Q    What do you mean by that?
24       A    That they get comfortable in detention.
25   They have their Nintendo, their warm meals, and

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

SCHULTZ, JR., JOHN AUGUSTIN
07/12/2018

Page 189

1  received an e-mail from folks at the US Embassy in
2  Baghdad regarding the meeting.
3      Q   Okay.  Did they give you any information
4  about what was discussed during the meeting, other
5  than the interviews starting?
6      A   Not that I recall.  No.
7      Q   So you weren't privy -- you weren't part
8  of the -- of the meeting between the Baghdad --
9  the US Embassy in -- US Embassy, Baghdad, and the
10  deputy foreign minister, correct?
11      A   That is correct.
12      Q   Did -- the e-mail references that there's
13  going to be interviews started, correct?
14      A   That's correct.
15      Q   Were interviews conducted in July 2017?
16      A   Yes.
17      Q   Do you know how many interviews were
18  conducted?
19      A   Roughly, 75 to 80-ish.
20      Q   And after conducting those 75 to 80-ish
21  interviews, were any travel documents issued by
22  Iraq?
23      A   No.
24      Q   Okay.
25          MS. SCOTT:  This is going to be Exhibit 22?

Page 190

1          THE REPORTER:  Yes.
2          (Exhibit 22 was marked for
3          identification.)
4          THE WITNESS:  Thank you.
5  BY MS. SCOTT:
6      Q   All right.  So this is an e-mail from
7  Floyd Farmer to you.  And I will let you know that
8  we did not receive the attachments in the
9  production.  But the subject line says, "FWD:
10  Sanctions Iraq," correct?
11      A   Mm-hmm.  That's correct.
12      Q   Okay.  And it's dated July 20th, 2017,
13  correct?
14      A   That's correct.
15      Q   Okay.  And the attachments are called
16  formal -- "Formal Letter S1 to S1, Invoke Visa
17  Sanctions Iraq.docx."
18          There's also a memo, "EAD to D1, Invoke
19  Visas Sanctions Iraq.doc."
20          And there's a memo, "D1 to S1, Invoke Visa
21  Sanctions (7-19-17) Iraq.doc."
22          And then a white paper, "Invoke visa
23  Sanctions Iraq.docx."
24          Was there any letter sent to the -- sent to
25  Iraq about sanctions?

Page 191

1      A   No.
2      Q   Are you aware of -- are these documents
3  recommendations to sanction Iraq?
4      A   Yes.
5      Q   And who did these documents go to,
6  eventually?
7      A   Well, eventually, they will go to the
8  Secretary of Homeland Security.
9      Q   And do you know if they were sent to the
10  Secretary of Homeland Security?
11      A   I don't believe that they were.
12      Q   Do you know why?
13      A   Because there was an exercise last summer
14  regarding 243(d) packages that never -- never
15  came -- never concluded.
16      Q   All right.  What are 243(b) packages?
17      A   243(d).
18      Q   243(d) packages.  Thank you.
19      A   243(d).  The package that I'm referencing
20  is the S1 to S1 letter to invoke visa sanctions.
21          EAD to D1, that's the executive associate
22  director of ERO to the director of ICE to invoke
23  sanctions, the recommendation letter.
24          Then the other letter is a director vice
25  to the Secretary of Homeland Security recommending

Page 192

1  sanctions.
2          And then the last document in this package
3  is a white paper, which sort of outlines all our
4  engagement with whatever countries that need to be
5  sanctioned.
6      Q   And the visa sanctions referenced here, is
7  that the same set of sanctions that we -- the
8  same -- let me rephrase.
9          Earlier this morning, we talked about what
10  types of sanctions could be imposed on Iraq if they
11  don't agree to repatriation.
12          Is that the same sort of visa sanctions that are
13  being referenced here?
14      A   Yes.
15      Q   Do you have an understanding of why the
16  sanctions weren't imposed?
17      A   Because, at the time, we didn't agree upon
18  going forward with the sanctions.
19      Q   Who did not agree with going forward with
20  the sanctions?
21          MR. SILVIS:  I think, at this point, we're
22  going into the deliberative process-type situation
23  if we're discussing different policy alternatives
24  and how to go forward.
25          So I think, at this point, I'll instruct

SCHULTZ, JR., JOHN AUGUSTIN
07/12/2018

Confidential
Pages 193–196

Page 193

1  him not to answer that.
2      MS. SCOTT:  All right.
3      MS. SCHLANGER:  Let's step outside for two
4  seconds.
5      MS. SCOTT:  Okay.
6      Let's go off the record.
7      (Recess.)
8  BY MS. SCOTT:
9      Q  Did -- were these memos sent to EAD?
10     A  I don't recall if they were sent to the
11  EAD.  Actually, they were created.
12     Q  I'm sorry.  They were created by?
13     A  If they're -- my unit created them.  I
14  don't know if they made it to the EAD.  I don't
15  know.
16     Q  Do you know if -- if they were sent to the
17  Secretary of DHS -- ck audio
18     Oh, the director of DHS?  Thank you.
19     MS. SCHLANGER:  No.  No.  No.
20  BY MS. SCOTT:
21     Q  Oh, did they make it to the director of
22  ICE?
23     A  I -- it -- I don't know if they made -- if
24  they didn't make it to the director of ERO -- or
25  EAD, they wouldn't have made it to the director of

Page 194

1  ICE.
2      Q  Okay.  All right.  So you just don't know
3  how far it got in the process.  Okay?
4      A  I -- that's correct.
5      Q  All right.
6      MS. SCHLANGER:  Do one more.  Trust me.
7  Just ask.
8      Q  Okay.
9  BY MS. SCOTT:
10     Q  Did it make it to S1?
11     A  No, it didn't make it to S1.
12     MS. SCOTT:  Let's take a break.
13     (Recess.)
14  BY MS. SCOTT:
15     Q  I want to go back to talking about visa
16  sanctions.
17     A  Mm-hmm.
18     Q  How many times in fiscal year 2017 were
19  visa sanctions issued?
20     A  For --
21     Q  And what countries received those
22  sanctions?
23     A  Cambodia, Eritrea, Sierra Leone, and
24  Guinea.
25     Q  And how long did the sanctions last for

Page 195

1  each of those countries?
2      A  They're still under sanction.
3      Q  How many times were visa sanctions issued
4  in fiscal year '18, besides those four countries
5  you just mentioned?
6      A  I may be off on my fiscal year.  Those
7  sanctions occurred in September.  I think they
8  were September 13th.  It may have been at the end
9  of 2016.
10     Q  So why don't we do it this way.  Let's do
11  it this way:  If it makes it easier, why don't we
12  walk through each of those four and say what month
13  the sanctions were issued.
14     A  Sure.  Sure.
15     So Guinea, Sierra Leone, Eritrea, and
16  Cambodia were all sanctioned -- pretty certain it
17  was September 13th, 2017, or August 13th, 2017.
18  All of those countries are currently under
19  sanctions -- remain under sanctions.
20     Q  Okay.  Were there any new countries
21  sanctioned in 2018?
22     A  Burma and Laos were just sanctioned
23  July 9th, 2018.
24     Q  Did you say Laos?
25     A  Laos.

Page 196

1      Q  And is that it for 2018?
2      A  I believe that's it.  Yes.
3      Q  Okay.  And how long do -- do visa
4  sanctions, typically, last?  Is there a specific
5  period, or is it until a specific conduct happens?
6      A  So the -- The Gambia was sanctioned
7  September 2016.  They were, essentially, on --
8  they were under sanctions for, roughly, a year.
9      But to answer your question, it's not a
10  timeline.  It's a performed-based evaluation.
11     Q  Okay.  All right.  And I just want to
12  confirm that in 2017, there were just those four
13  countries that were sanctioned.
14     A  Yes.  And -- but I just want to caveat,
15  I'm pretty certain it was August or
16  September 2017.  So it would be fiscal year 2016,
17  not fiscal year 2017.  And it was those four
18  countries.
19     Q  Okay.  In fiscal year 2016, how many
20  countries were sanctioned?
21     A  The Gambia was sanctioned in October 2016.
22     Q  And is that it for fiscal year 2016?
23     A  Well, if -- if the other four were
24  sanctioned in August and September, then they also
25  would be 2016 --

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone:  888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

SCHULTZ, JR., JOHN AUGUSTIN
07/12/2018

Confidential
Pages 217–220

Page 217

1    Is there a plane scheduled to return Iraqi
2  nationals to Iraq in July?
3    **A  There is currently not a charter scheduled**
4  **to remove Iraqi nationals in July.  All -- all**
5  **removals are currently scheduled -- all removals**
6  **are being scheduled commercially at this time.**
7    Q  And that's going to be in July, correct?
8    **A  In July -- right now, we don't have**
9  **anything on my desk, or anything cooking for any**
10 **time in the future.  Not -- not in -- not in, you**
11 **know, forever future, but the immediate -- you**
12 **know, July -- July is two weeks over -- it's over**
13 **in two weeks.  There's no Iraq charter that's**
14 **going to occur in July.**
15   Q  Okay.
16     MS. SCHLANGER:  All right.
17     MS. SCOTT:  Thank you very much for your
18 time.
19     MR. SILVIS:  I have a couple follow-ups
20 that I wanted to do.  Yeah.  So you might have some
21 after.  So if I could just have a few.
22     EXAMINATION BY COUNSEL FOR RESPONDENTS
23 BY MR. SILVIS:
24   Q  Let's see.  I'll ask you about a few
25 documents here.

Page 218

1      Let's see.  Would you grab Exhibit No. 4?
2      (Exhibit 4 was referenced.)
3      **THE WITNESS:  (Witness complies.)**
4      **Yes.  I have it.**
5  BY MR. SILVIS:
6    Q  And then, if you turn within Exhibit 4
7  to -- the bottom of the page is Bates marked
8  ICE0271055.
9    **A  Yes.**
10   Q  And it's where they're discussing Iraq --
11 where the document discusses Iraq.
12   **A  Yes.**
13   Q  Do you see where I'm talking about?
14   **A  Yes.**
15   Q  Okay.  In the -- one, two, three -- on the
16 fourth bullet point, it discusses the ERO having
17 submitted 21 cases to Baghdad.
18     Do you recall -- do you see that where
19 I'm --
20   **A  Yes.**
21   Q  -- identify that in the document?  Okay.
22     I think, earlier, if I heard you correctly,
23 you testified something about those 21 cases having
24 been submitted to Baghdad.
25     Do you remember being questioned about

Page 219

1  this?
2    **A  Yes.**
3    Q  And do you know -- of those 21 cases, do
4  you know if there have been travel documents
5  issued for any of them, or you do not know, one
6  way or the other?
7    **A  I don't know, one way or the other.**
8    Q  So it's possible that some of those 21s
9  that were submitted to Baghdad have actually
10 issued travel documents?
11     MS. SCOTT:  Objection; foundation.
12 BY MR. SILVIS:
13   Q  Is it possible that some have issued?
14   **A  It's possible that some have had travel**
15 **documents issued.**
16   Q  Okay.  Then, if you could, grab -- there's
17 a few that I wanted to ask you about.  It's a
18 document -- Exhibits 11 and 13.
19     (Exhibit 11 & 13 were referenced.)
20 BY MR. SILVIS:
21   Q  First, my question, before today, had you
22 seen Exhibit No. 11?
23   **A  I think I -- I think I actually have seen**
24 **11 before.  It looks somewhat familiar to me.**
25   Q  Okay.  And then same question with

Page 220

1  Exhibit 13.
2      Have you seen it before?
3    **A  Yes, I've seen 13 before.**
4    Q  Okay.  Now, when you received these
5  documents -- or if you had seen them before, could
6  you just, briefly, remind us what these are, 11
7  and 13?
8    **A  They're correspondence from**
9  **representatives of the government of Iraq to -- to**
10 **ICE officials.**
11   Q  Okay.  And what -- what information are
12 they conveying?
13   **A  So Exhibit 13 is indicating that the**
14 **embassy of Iraq cannot -- is unable to issue**
15 **documents for 23 -- 24 individuals because they**
16 **lack required Iraqi documents.**
17   Q  So does that mean -- I'll just ask for 13
18 first, then.
19     Does that mean that they will never be
20 issued travel documents?
21   **A  No.  For -- it's my understanding that --**
22 **in my experience, that we continue to work with**
23 **the government in Iraq in Baghdad to procure the**
24 **travel document for these individuals.**
25   Q  Okay.  So receiving a letter like No. 13

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone:  888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

SCHULTZ, JR., JOHN AUGUSTIN
07/12/2018

Confidential
Pages 221–224

Page 221

1 doesn't mean that the individuals will not receive
2 travel documents?
3      A  That's correct.  My interpretation on this
4 letter is that the embassy will not issue but has
5 not determined that the individual is not
6 Iraqi and -- and so that we should and will engage
7 with the Ministry of Foreign Affairs or Department
8 of State, who will then engage with the Iraqi
9 individuals.
10     Q  And same question with No. 11.
11        When you receive a letter like No. 11,
12 does that mean that you will not get travel
13 documents from Iraq?
14     A  No.  Again, this is -- this is very
15 similar to -- to the Washington document.  But,
16 you know, we -- we would try and leverage our
17 relationship with the -- the embassy in Washington
18 to get assistance while also sending the request
19 to the Department of State to have them engage the
20 government of Iraq in Baghdad.
21     Q  So it's possible that after receiving a
22 letter like 11, that -- Exhibit 11, that you will,
23 eventually, get travel documents for those
24 individuals?
25     A  That is correct.

Page 222

1      Q  I wanted to point you to Exhibit No. 18.
2         (Exhibit 18 was referenced.)
3      THE WITNESS:  Okay.
4 BY MR. SILVIS:
5      Q  Got 18?
6      A  Oh, sorry.  18?  No.  That's the date.
7 I'm going backwards.
8      Q  That's all right.  Take your time.
9      MS. SCOTT:  I think, if you pick up the
10 pile, it's on the bottom of the pile.
11     THE WITNESS:  Is it?  Oh, here it is.
12        (Witness complies.)
13     I found it.
14 BY MR. SILVIS:
15     Q  Before today, had you ever seen the
16 exhibit marked No. 18?
17     A  It doesn't look familiar to me.
18     Q  And can you turn it over, and look on the
19 other side.
20     A  Yes.
21     Q  Same -- same question.
22        Does that look like a document that you
23 received before?
24     A  It doesn't look familiar.
25     Q  All right.  Do you know, one way or the

Page 223

1 other, if this document is from the Iraqi
2 Government, for sure?
3      A  I -- for sure?  It looks like the one
4 would be likely to be -- I'm sorry.  On the front
5 side, the one that's titled "Ministry of Foreign
6 Affairs," it looks similar to the other ones.  The
7 backside, I can't tell.  I would say, I don't know
8 where it's from.
9      Q  So just by -- so I understand, then, do
10 you know -- you didn't receive Document 18?  It
11 wasn't sent to you?
12     A  Doesn't look familiar to me.  No.  I don't
13 know what it is.
14     Q  Can you say with any certainty it's from
15 the government of Iraq?
16     MS. SCOTT:  Objection; asked and answered.
17 BY MR. SILVIS:
18     Q  You can answer.
19     A  To be certain, no.  But I would say if I
20 were to have received this letter, I would think
21 it was from the government of Iraq.
22     Q  Okay.  Could you go to Document 21 --
23 Exhibit 21 and, actually, 23 as well.
24        (Exhibit 21 & 23 were referenced.)
25 BY MR. SILVIS:

Page 224

1      Q  And then you were just asked some
2 questions about Document 23.
3         Do you remember that?
4      A  Yes.
5      Q  Okay.  And I think it was a little earlier
6 in your deposition when you were questioned about
7 Exhibit 21.
8         Do you remember that?
9      A  Yes.
10     Q  Are -- are Exhibits 21 and 23 talking
11 about the same rounds of interviews?
12     A  Yes.
13     Q  Okay.  And just to remind me, how many
14 interviews were conducted at that time?
15     A  80.
16     Q  And you testified that travel documents
17 were not issued immediately after those
18 interviews?
19     A  That correct.
20     Q  And why is that?
21     A  It wasn't the intent of the government of
22 Iraq or the embassy of Iraq to issue travel
23 documents at the time of the interviews.
24 Ambassador Yasseen notified me that they would
25 like to take an exploratory trip to meet with the

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson
U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids
Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

Page 229

1  from ERO's law enforcement systems analysis unit,
2  the weekly removal and detention report that comes
3  out. And it has the final orders. And that would
4  be the number.
5      Q  Yeah. I guess my question is, to the
6  extent that you know, was the 1,400 number
7  something that Iraq set, or was that just the
8  total number of Iraqi nationals with removal
9  orders at that time?
10     A  That was the total number of -- of Iraqi
11  nationals with removal orders at that time.
12     Q  Okay. And, earlier, you testified that
13  the government of Iraq is ready to issue travel
14  documents to six people who they -- "they,"
15  meaning the government of Iraq, knows are not
16  returning to Iraq voluntarily.
17     MS. SCOTT:  Objection.
18  BY MR. SILVIS:
19     Q  Do you recall that?
20     A  Yes, I do recall it.
21     Q  Okay. And when do you expect those travel
22  documents to issue?
23     A  I expect the documents to be issued
24  tomorrow.
25     Q  Okay. And do you have any reason to

Page 230

1  believe that the government of Iraq will not do
2  that in the future for other people that also
3  they're aware that do not want to go back to Iraq?
4      A  No. I believe this is -- this is going to
5  be the way forward.
6      Q  Okay. Meaning what?
7      A  Meaning that this process will continue.
8  We've got the -- we've created the new cover
9  letter for all the travel document presentation
10  packages. And the Ambassador has said that, you
11  know, they'll send it over to Baghdad. Baghdad
12  understands the US Embassy has had communications
13  with the government of Iraq in Baghdad about
14  issuing the travel documents and keeping in the
15  spirit of the Statement of Cooperation.
16     So I think it's -- I think it's -- I
17  suspect it's going to continue. There's nothing
18  that would indicate that it wouldn't. I think if
19  it weren't going to continue, they wouldn't have
20  done it in the first place.
21     Q  Do you think it's, ultimately, irrelevant
22  whether an Iraqi national who has a removal order
23  wants to go back to Iraq, in terms of whether
24  they'll actually be removed?
25     A  I think it -- yeah. I think it's

Page 231

1  irrelevant.
2      Q  Okay.
3      MR. SILVIS:  They might have some redirect
4  for you.
5      EXAMINATION BY COUNSEL FOR PETITIONERS
6  BY MS. SCOTT:
7      Q  Yeah. I do have a couple of redirects.
8      With regards to the six Iraqis that you are
9  currently seeking travel documents for and you sent
10  the -- the presentations to Baghdad, if they are
11  put -- if they obtain the travel documents and they
12  are put on a flight to Iraq, is there any guarantee
13  that Iraq will not send those individuals back to
14  US; or, in other words, not accept the flight?
15     A  So if Iraq issues the travel documents for
16  the individuals, we would have every indication to
17  believe that, upon arrival in Iraq, they would be
18  accepted for admission.
19     Q  Have you heard that some Iraqi nationals
20  had been returned to Iraq under enforced
21  repatriation from other countries, and Iraq has
22  refused to accept them after the plane landed?
23     A  No.
24     Q  You have not heard of that?
25     A  No.

Page 232

1      Q  Let's take a look at Exhibit 11 and 13
2  again.
3      (Exhibit 11 & 13 were referenced.)
4  BY MS. SCOTT:
5      Q  And these are the letters received from
6  Iraqi Government officials -- one from
7  December 6th, 2016, and one from June 7th, 2017 --
8  in which they indicate that they will not accept
9  the individuals or issue travel documents because
10  the individuals have not expressed a willingness
11  to return to Iraq; is that correct?
12     A  That's correct.
13     Q  And you have testified that this is not an
14  indication that travel documents will not be
15  issued by Iraq because you could submit a travel
16  document presentation to Baghdad, correct?
17     A  That's correct. And that's based on my
18  conversations with the Iraqi officials from the
19  embassy after they -- the March 12th cable.
20     Q  Okay. So this one is -- one of these,
21  Exhibit 13, is June 7th, 2017, correct?
22     A  That's correct.
23     Q  And that's after what we've been calling
24  the Statement of Cooperation, or the cable, right?
25     A  That's correct.

SCHULTZ, JR., JOHN AUGUSTIN
07/12/2018

Confidential
Pages 233–236

Page 233

1    Q   Did ICE submit a TD presentation to
2  Baghdad for these individuals?
3    A   I presume we did.
4    Q   You do not know for certain --
5    A   I do not know for certain.
6    Q   Did you have a process in place in June of
7  2017, to issue presentations to Baghdad when
8  embassies denied travel documents?
9    A   It's my understanding that all the cases
10  went to Baghdad in June that -- I'm sorry.
11    Q   Go ahead.  Finish what you were going to
12  say.
13    A   It was within that -- that 280 cases that
14  were submitted from late May to the first week of
15  June, those all went to Baghdad.
16    Q   And Baghdad between -- and Baghdad, prior
17  to the temporary restraining order in this case,
18  did not issue travel documents, did they?
19    A   No.  They -- from middle May to third week
20  of June, they did not provide the Iraq Embassy
21  with notification they issued travel documents.
22    Q   Okay.  So, in effect, these individuals'
23  TD presentations were made to Baghdad, and Baghdad
24  did not issue travel documents, correct?
25    A   Prior to the litigation?

Page 234

1    Q   Yes.
2    A   That is correct.  I believe they were
3  submitted to Baghdad, and they were not issued
4  prior to the litigation.
5    Q   When we earlier discussed visa sanctions
6  for Iraq, and we looked at an e-mail that had
7  memos and write-ups proposing those sanctions, do
8  you remember that?
9    A   Yes.
10    Q   Was the proposal for sanctions made
11  pursuant to the MOU between State and DHS that you
12  just testified about?
13    A   Can you rephrase that a little bit?
14    Q   Sure.  Sure.  Let's take a look at the --
15  see if we can find the exhibit here.
16        So you testified -- Mr. Silvis asked you
17  about an MOU between the Department of State and the
18  DHS, correct?
19        MR. SILVIS:  I didn't ask him -- don't
20  think that's correct.  I didn't ask about an MOU.
21  I didn't ask any questions about an MOU.
22        BY MS. SCOTT:
23    Q   Okay.  So you testified about a document
24  between the Department of State and DHS discussing
25  sanctions?

Page 235

1    A   That's correct.
2    Q   Okay.  What kind of document is that?  Is
3  it an MOU?
4    A   It's an MOU.
5    Q   And when was that MOU executed?
6    A   Clearly, I'm the best with dates.
7        It was in the summer of 2017.  It was
8  signed by Elaine Duke, acting secretary, and
9  Secretary Tillerson.
10    Q   Okay.  So let's take a look at Exhibit 22.
11    A   Sure.
12        (Exhibit 22 was referenced.)
13  BY MS. SCOTT:
14    Q   And that exhibit was from Floyd Farmer to
15  you, attaching exhibits, one of them which is
16  called "Formal Letter S1 to S1 Invoke Visa
17  Sanctions Iraq," correct?
18    A   That's correct.
19    Q   Okay.  The analysis that was done to make
20  a recommendation for visa sanctions, was that
21  before or after the MOU between Department of
22  State and DHS?
23    A   This -- the MOU was signed after this.  It
24  was -- I believe it was August.  But the MOU
25  superceded an ICE-DOS MOU from 2011.  So that had,

Page 236

1  essentially, the same information.
2    Q   So what was the difference between the MOU
3  in 2011 and the MOU that was executed in 2017?
4    A   Nothing earth-shattering.  But,
5  essentially, it was signed at the secretary level.
6  And it was secretary-to-secretary versus DOS
7  consular affairs and DHS ICE.  That was the big --
8  that was the big change.
9    Q   And so the -- in Exhibit 22, when it's
10  talking about the visa sanctions, that was done
11  pursuant to the analysis of the 2011 MOU?
12    A   Yeah.
13    Q   Okay.  There are -- the April 2017 flight
14  had eight people, correct?
15    A   I believe it turned out to be seven.
16    Q   Seven.  Correct.  Because one was pulled
17  at the last minute.
18    A   (No verbal response.)
19    Q   And I believe, you testified earlier that
20  you are not -- you don't have knowledge of whether
21  or not those individuals indicated they were
22  willing to return to Iraq; is that correct?
23    A   That's correct.
24    Q   Okay.  Do you know of any instances in
25  which travel documents had been issued by Iraq

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone:  888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

SCHULTZ, JR., JOHN AUGUSTIN
07/12/2018

Confidential
Pages 237–240

Page 237

1  when an individual has indicated they do not want
2  to go back to Iraq?
3      A  I don't know specifically if they've
4  issued for people who -- who have verbalized that
5  they do not want to go back.
6      Q  Okay.  Is ICE actively planning removal of
7  individuals who received travel documents after
8  the May 2018 interviews?
9      A  Yes.
10     Q  What is your current estimate of the
11 timing of when those -- that flight will take
12 place?
13     A  It would be "flights" because it's
14 commercial.  They wouldn't all go on the same
15 commercial flight.  And I honestly don't know.
16         As I mentioned earlier, depending on
17 transiting routes, some countries, they want X
18 amount of days for -- for or -- for clearance to
19 allow the deportee to transit.  Other times,
20 there's airlines' restrictions where they'll only
21 allow three deportees worldwide on a certain
22 flight.  So with limited flights going into Iraq,
23 I -- I don't have -- I don't have your answer.
24     Q  Okay.  Have any government officials
25 affirmatively stated that after -- okay.  Let me

Page 238

1  start over.
2      Q  So, tomorrow, you're expecting the Iraqi
3  Government to issue travel documents for six
4  individuals who expressed that they did not want
5  to go back to Iraq, correct?
6      A  Correct.
7      Q  Have any Iraqi officials affirmatively
8  stated that after the travel documents are issued
9  for those six individuals, they will issue travel
10 documents for other individuals who expressed they
11 did not want to go back to Iraq?
12     A  From the July 2nd meeting, the
13 understanding was -- is that we wouldn't have
14 any -- the -- that declaration, Exhibit 10, is
15 nonmaterial.  And the question whether or not an
16 individual wants to go back won't effect their
17 travel document being issued.
18     Q  Okay.  Did an Iraqi official government
19 affirmatively make that statement?
20     A  An Iraqi Government official said that.
21     Q  And who was that official?
22     A  It came from the ambassador -- I believe
23 it was the ambassador, or the DCM.  But I'm
24 thinking it was the ambassador who was,
25 essentially, stating that we have this.  We'll

Page 239

1  send this to Iraq.  We no longer need the
2  declaration.  Yarub did chime in and say, Of
3  course, if they volunteer, it's much easier for
4  us.  That's -- that's sort of how that
5  conversation went on on July 2nd.
6      Q  Okay.  But did an Iraqi official state,
7  "We will issue travel documents for any individual
8  that says they do not want to go back"?
9      A  They did not make that statement.
10     Q  Okay.
11         MS. SCOTT:  I don't have any further
12 questions.
13         MR. SILVIS:  I think we're done.
14         (Whereupon, at 4:40 p.m., the taking of the
15 instant deposition ceased.)
16
17
18
19
20
21
22
23
24
25

Page 240

1          ACKNOWLEDGMENT OF DEPONENT
2      I, JOHN AUGUSTIN SCHULTZ, JR., do hereby
3  acknowledge that I have read and examined the
4  foregoing testimony and the same is a true,
5  correct, and complete transcription of the
6  testimony given by me and any corrections appear on
7  the attached errata sheet signed by me.
8
9  _____    _____
10   (SIGNATURE)                  (DATE)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone:  888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

SCHULTZ, JR., JOHN AUGUSTIN
07/12/2018

Confidential
Pages 241

```
                              Page 241
1              CERTIFICATE OF REPORTER
2      UNITED STATES OF AMERICA   ) ss:
3      DISTRICT OF COLUMBIA       )
4         I, ANGELA K. MCCULLOUGH, RPR, the officer
5    before whom the foregoing proceedings were taken,
6    do hereby certify that the foregoing transcript is
7    a true and correct record of the proceedings; that
8    said proceedings were taken by me stenographically
9    to the best of my ability and thereafter reduced to
10   typewriting under my supervision; and that I am
11   neither counsel for, related to, nor employed by any
12   parties to this case and have no interest, financial
13   or otherwise, in its outcome.
14
15
16           _____
17              Notary Public in and for
18              The District of Columbia
19
20      My commission expires:  01/31/2020
21
22
23
24
25
```

SCHULTZ, JR., JOHN AUGUSTIN
07/12/2018

Confidential
Page 240

```
 1              ACKNOWLEDGMENT OF DEPONENT

 2          I, JOHN AUGUSTIN SCHULTZ, JR., do hereby

 3    acknowledge that I have read and examined the

 4    foregoing testimony and the same is a true,

 5    correct, and complete transcription of the

 6    testimony given by me and any corrections appear on

 7    the attached errata sheet signed by me.

 8

 9                                        Aug 13 2018

10           (SIGNATURE)                  (DATE)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**ERRATA SHEET**

| Page | Line | Change |
|------|------|--------|
| 19 | 7 | Delete "Ch Audio" |
| 28 | 16 | Change CVP to CBP |
| 58 | 21 | Change "Agent" to "AO" |

```
 1              IN THE UNITED STATES DISTRICT COURT
 2            FOR THE EASTERN DISTRICT OF MICHIGAN
 3                      SOUTHERN DIVISION
 4        - - - - - - - - - - - - x
 5   USAMA JAMIL HAMAMA, et al.,       :
 6             PETITIONERS AND          :
 7             PLAINTIFFS,              :
 8        v.                            :   Case No.
 9   REBECCA ADDUCCI, et al.,           :   2:17-cv-11910
10             DEFENDANTS AND           :
11             RESPONDENTS.             :
12        - - - - - - - - - - - - - - x
     _____/
```

VERIFICATION OF DEPONENT

       I, having read the foregoing deposition consisting of my testimony at the aforementioned time and place, do hereby attest to the correctness and truthfulness of the transcript.

John Augustin Schultz, Jr.

Dated: Aug 13 2018

1