# EXHIBIT 5

# In the Matter Of:

## HAMAMA, ET AL. vs ADDUCCI, ET AL.

## MICHAEL  BERNACKE-CONFIDENTIAL

July 13, 2018

*Prepared for you by*



**Bingham Farms/Southfield • Grand Rapids**
Ann Arbor • Detroit • Flint • Jackson • Lansing • Mt. Clemens • Saginaw • Troy

BERNACKE-CONFIDENTIAL, MICHAEL
07/13/2018

Confidential
Pages 1–4

**Page 1**

```
1              IN THE UNITED STATES DISTRICT COURT

2           FOR THE EASTERN DISTRICT OF MICHIGAN

3                   SOUTHERN DIVISION

4    - - - - - - - - - - - - - -x

5    USAMA JAMIL HAMAMA,        :

6    et al.,                    :

7        Petitioners and    :   Case No. 1:17:cv-11910

8        Plaintiffs,            :

9        v.                     :

10   REBECCA ADDUCCI,           :

11   et al.,                    :

12       Respondents and    :

13       Defendants.            :

14   - - - - - - - - - - - - - -x

15                  Confidential

16

17         Deposition of MICHAEL BERNACKE

18              Washington, D.C.

19            Friday, July 13, 2018

20                 9:04 a.m.

21

22   Pages: 1 - 157

23   Reported By: Victoria Lynn Wilson, RMR, CRR

24

25
```

**Page 2**

```
1    Deposition of MICHAEL BERNACKE, held at the

2    offices of:

3

4         UNITED STATES DEPARTMENT OF JUSTICE

5              450 5th Street, NW

6            Washington, DC 20001

7

8

9

10

11

12       Pursuant to notice, before Victoria Lynn

13   Wilson, Registered Merit Reporter, Certified

14   Realtime Reporter, Notary Public in and for the

15   District of Columbia.

16

17

18

19

20

21

22

23

24

25
```

**Page 3**

```
1          A P P E A R A N C E S

2    ON BEHALF OF ALL PETITIONERS AND PLAINTIFFS:

3       KIMBERLY L. SCOTT, ESQUIRE

4       MILLER, CANFIELD, PADDOCK & STONE, PLC

5       101 North Main Street

6       Seventh Floor

7       Ann Arbor, MI 48104

8       (734) 668-7696

9

10      MARGO SCHLANGER, ESQUIRE

11      625 South State Street

12      Ann Arbor, MI 48109

13      (734) 615-2618

14

15

16

17

18

19

20

21

22

23

24

25
```

**Page 4**

```
1       A P P E A R A N C E S   C O N T I N U E D

2    ON BEHALF OF RESPONDENTS AND DEFENDANTS:

3       WILLIAM C. SILVIS, ESQUIRE

4       ASSISTANT DIRECTOR

5       NICOLE MURLEY, ESQUIRE

6       TRIAL ATTORNEY

7       UNITED STATES DEPARTMENT OF JUSTICE

8       OFFICE OF IMMIGRATION LITIGATION

9       DISTRICT COURT SECTION

10      950 Pennsylvania Ave,NW

11      Washington, DC 20530

12      (202) 307-4693

13

14      ON BEHALF OF U.S. IMMIGRATION AND CUSTOMS

15   ENFORCEMENT AND THE WITNESS:

16      SABRINA V. VASA, ESQUIRE

17      ASSOCIATE LEGAL ADVISOR

18      DISTRICT COURT LITIGATION DIVISION

19      U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT

20      500 12th Street, SW MS 5900

21      Washington, DC 20536

22      (202) 732-3358

23

24

25
```

**MIdeps@uslegalsupport.com**
**Ann Arbor | Detroit | Flint | Jackson**

**U. S. LEGAL SUPPORT**
**Bingham Farms/Southfield | Grand Rapids**

**Phone:  888.644.8080**
**Lansing | Mt. Clemens | Saginaw | Troy**

BERNACKE-CONFIDENTIAL, MICHAEL
07/13/2018

Confidential
Pages 5–8

Page 5

```
 1            C O N T E N T S
 2   EXAMINATION OF MICHAEL BERNACKE        PAGE
 3        By Ms. Scott                       8
 4        By Mr. Silvis                     153
 5            E X H I B I T S
 6        (Attached to transcript)
 7   J. SCHULTZ EXHIBITS                    PAGE
 8   Exhibit 1   Schultz Declaration         --
 9   Exhibit 2   Schultz Declaration         --
10   Exhibit 3   6/15/18 Letter from Bernacke to
11               Yasseen                      39
12   Exhibit 4   2/22/17 Email Chain from Lenox
13               to Pineiro, et al.
14   Exhibit 5   8/4/17 Email from Schultz to
15               Joseph, et al., with attachments  --
16   Exhibit 6   1/11/18 Email from Maldonado to
17               Clinton with attachment       --
18   Exhibit 7   1/17/18 Email from Ochoa to
19               Clinton with attachment       --
20   Exhibit 8   1/9/18 Email from Schultz to
21               Frankel, et al.               --
22   Exhibit 9   Meeting with Iraqi Embassy
23               Regarding Litigation Volunteers  93
24   Exhibit 10  Exhibit B                    12
25
```

Page 6

```
 1            E X H I B I T S   C O N T I N U E D
 2   J. SCHULTZ EXHIBITS                    PAGE
 3   Exhibit 11  12/6/16 Letter from Al Safi to
 4               DHS Re: Shao, Nahidh          --
 5   Exhibit 12  1/24/17 Brussels Working Group
 6               Teleconference                --
 7   Exhibit 13  6/7/17 Compliments document
 8               from Abdulrazzaq Ali to DHS    --
 9   Exhibit 14  1/9/18 Email from Bernacke to
10               Jawad, et al.                107
11   Exhibit 15  1/25/18 Email from Bernacke to
12               Clinton                      113
13   Exhibit 16  1/9/17 Handwritten Notes      --
14   Exhibit 17  12/5/17 Meeting with Al-Khairalla  --
15   Exhibit 18  Ministry of Foreign Affairs
16               document                      --
17   Exhibit 19  6/25/17 Email Chain from
18               Tenarodriguez to Weiller, et al.  --
19   Exhibit 20  6/28/18 Email Chain from
20               Stafford to Clinton          123
21   Exhibit 21  7/17/17 Email Chain from Schultz
22               to Lieberman                  --
23   Exhibit 22  7/20/17 Email Chain from Farmer
24               to Schultz                    --
25
```

Page 7

```
 1            E X H I B I T S   C O N T I N U E D
 2   J. SCHULTZ EXHIBITS                    PAGE
 3   Exhibit 23  7/20/17 Email Chain from Koontz
 4               to Schultz                    --
 5   Exhibit 24  10/27/17 Email from Bernacke to
 6               Schultz                       --
 7
 8   BERNACKE EXHIBITS                      PAGE
 9   Exhibit 25  Bernacke Declaration         8
10   Exhibit 26  1/10/18 Email from Bernacke to
11               Clinton                      126
12   Exhibit 27  Chart                       128
13   Exhibit 28  1/22/18 Document from Clinton
14               to All                       132
15   Exhibit 29  2/2/18 Email Chain from
16               Al-Anpaqi to Clinton         133
17
18
19
20
21
22
23
24
25
```

Page 8

```
 1            P R O C E E D I N G S
 2               MICHAEL BERNACKE,
 3   having been duly sworn, testified as follows:
 4   EXAMINATION BY COUNSEL ON BEHALF OF ALL
 5   PETITIONERS AND PLAINTIFFS
 6   BY MS. SCOTT:
 7        Q  Good morning, Mr. Bernacke.
 8        A  Good morning.
 9        Q  I am going to hand you Exhibit 25, which
10   is the declaration that you submitted on
11   December 22nd, 2017.
12           (Bernacke Exhibit 25 was marked for
13   identification and is attached to the transcript.)
14        Q  Do you recognize that document?
15        A  I do.
16        Q  Okay.  We're going to talk today about
17   many different processes within ICE relating to
18   obtaining travel documents and other documentation
19   for Iraqi nationals, and I think it would be
20   helpful if off that we come to an understanding of
21   the various terms that we're going to be using
22   today.
23        A  Uh-huh.
24        Q  All right?  If I use the term "GOI," do
25   you understand what that means?
```

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

BERNACKE-CONFIDENTIAL, MICHAEL
07/13/2018

Confidential
Pages 49–52

Page 49

```
1   procure travel documents.
2        Q  So, let me ask you the situation where an
3   individual is out on an order of supervision.  Do
4   you understand what that term "order of" --
5        A  Yes, I do.
6        Q  And what does it mean?
7        A  It's essentially a parole or probation
8   mechanism within the immigration context in which
9   we have aliens on supervised release reporting to
10  us on a regularized basis.
11       Q  And because they're reporting, do you
12  understand you have knowledge of where they're
13  residing; correct?
14       A  Generally speaking, yes.
15       Q  Okay.  And in the situations in which
16  there are individuals out on orders of
17  supervision, has ICE obtained or started to obtain
18  travel documents before they've arrested the
19  individual?
20       A  Can you restate that question.
21       Q  Sure.  Do you know of instances in which
22  somebody was out on order of supervision, ICE
23  submitted travel -- travel document presentations
24  or applications and then arrested the individual?
25       A  Yes.
```

Page 50

```
1        Q  Is that typical?
2        A  Yeah, it is.  Aliens on order of
3   supervisions have final orders of removal or else
4   they wouldn't have an order of supervision.
5   They -- at times, they are released as a result of
6   our inability to obtain a travel document and we
7   may receive one at a later date, and then we will
8   rearrest that alien as they were generally
9   arrested once before.
10       Q  And when you say that you may receive a
11  travel document at a later date, that's because
12  ICE has made efforts to obtain that travel
13  document; correct?
14       A  Correct.
15       Q  So, the concerns that you previously
16  testified about not knowing who the individual may
17  be or not knowing where they're located, all those
18  other concerns don't necessarily apply to those
19  that are out on orders of supervision.
20       A  It's a little bit different.  What I was
21  referring to previously was initial contact with
22  those individuals.
23       Q  All right.  So, do you know what the term
24  "fugitive operation" means?
25       A  I do.
```

Page 51

```
1        Q  And what does it mean?
2        A  It is a program that's managed within
3   enforcement removal operations that acquires
4   immigration fugitives, aliens that have absconded
5   after the issuance of a final order of removal.
6        Q  Is it always because somebody has
7   absconded?
8        A  No.  The program has been reframed in
9   recent years to focus on criminal aliens that are
10  at large or other enforcement priorities.
11       Q  Do you know the -- what the phrase
12  "operation cross-check" means?
13       A  I do.
14       Q  And what does it mean?
15       A  It is an organized targeted operation that
16  generally focuses on criminal aliens.
17       Q  When there is a fugitive operation, is it
18  typical that ICE will try to obtain or start the
19  process to obtain travel documents before the
20  individual is arrested?
21       A  As I mentioned before, many times with our
22  at-large operations, and that encompasses fugitive
23  operations, many times with our at-large
24  operations, we're operating off of actionable
25  intelligence that is time-sensitive, leads that
```

Page 52

```
1   are time-sensitive, and we may not always have
2   time to obtain a travel document prior to
3   acquisition of that alien.
4        Q  Would future operations on occasion
5   include those individuals that are out on orders
6   of supervision?
7        A  It could.  It could.
8        Q  And in those situations when there's a
9   future operation for individuals with orders of
10  supervision, is it possible that ICE would have
11  tried to obtain travel documents before the
12  arrest?
13       A  Usually when they -- during the alien's
14  initial detainment.
15       Q  You said, "usually"?
16       A  Yeah, generally speaking.
17       Q  What do you mean by "initial detainment"?
18       A  This kind of goes back to Zadvydas and
19  SLRRFF.  An alien is usually, generally, arrested
20  by ERO, HSI, Customs and Border Protection.  They
21  are detained with us.  We may -- we will request a
22  travel document in instances where we do need a
23  travel document and -- and in the event that we
24  are unable to obtain a travel document, that alien
25  may be released on an order of supervision.
```

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

BERNACKE-CONFIDENTIAL, MICHAEL
07/13/2018

Page 57

1   A   Okay.  We will identify, through our
2   detention inventories, to see how many Iraqi
3   nationals are available for a charter flight with
4   administratively final orders of removal and --
5   and contact our ICE air operations division to see
6   their availability for flights.  We use a contract
7   service provider, so we have to make sure that
8   their scheduling is deconflicted with us, and we
9   will notify them that we have a tranche of aliens
10  that are amenable to removal and can be flown out.
11      Q   So, then what happens next after you
12  notify them?
13      A   Usually, a date is agreed upon by my unit
14  and ICE air operations and we will coordinate
15  logistics, a staging location, how many aliens
16  will be on the plane.  What else?  And -- and,
17  also, you know, any travel documents that need to
18  be routed to -- to the staging location prior to
19  the flight occurring.  And that's essentially --
20  those are the iterative planning stages.
21      Q   At what stage do you inform Iraqi
22  Government that there's going to be a charter
23  flight?
24      A   We will usually seek authorization to do
25  one prior to the nascent stages of planning to see

Page 58

1   whether or not they would be amenable to accepting
2   a flight and what their availability is in terms
3   of potential accepting a flight.
4       Q   Do you -- does the Iraqi Government give a
5   written confirmation that that date is acceptable
6   to them?
7       A   Not that I have seen.  I think we've only
8   gotten verbal authorizations.  It may be different
9   for our personnel abroad dealing with the Iraqi
10  Government, but I have not seen any written
11  authorization that I can recall.
12      Q   Okay.  And who on the U.S. side receives
13  the verbal authorization from the Iraqi
14  Government?
15      A   Usually it will be either myself or, most
16  likely, my staff, James Maddox.
17      Q   And who would Mr. Maddox or yourself
18  receive that verbal agreement or authorization
19  from on the Iraqi side?
20      A   Usually from Mr. Al-Anpaqi.
21      Q   Was that the same process prior to you
22  becoming unit chief?
23      A   I couldn't speak to any particulars with
24  the process as to the details.
25      Q   So, do you know who received the

Page 59

1   authorization on behalf of the U.S. Government for
2   the June 2017 flight?
3       A   I don't.
4       Q   Do you know who from the Iraqi Government
5   gave the verbal agreement?
6       A   I don't.
7       Q   Do you know if the Iraqi Government gave a
8   verbal agreement to that date?
9       A   I do not.  I don't know the mechanism in
10  which that was communicated to us.
11      Q   All right.  We're slowly getting there.
12  Let's go to the next page.  So, on paragraph nine,
13  can you read that for me.  I mean as you're
14  reading, I'm going to stop and we're going to talk
15  about certain statements in here.  Okay?
16      A   Sure thing.  "Removal by commercial
17  flights requires a significantly more onerous
18  process because travel documents must be
19  individually obtained through direct engagement
20  with the Iraqi Government in Baghdad."
21      Q   Okay.  Let's stop there.  What do you mean
22  by "commercial flights are a more onerous
23  process"?
24      A   Usually, and at the time of the drafting
25  of this declaration and -- we will have to obtain

Page 60

1   travel documents individually from the Government
2   of Iraq.  Those aliens are scheduled for an
3   interview, and they're interviewed by the
4   government, and then the -- the authorization, as
5   I understand it, from the Iraqi side, is given in
6   Baghdad.  The embassy will issue -- the consulate
7   will issue the travel document and then we will
8   pay for it, receive it and then schedule a flight
9   resulting from that.
10      Q   Okay.  Is this process more onerous than a
11  process that's used for other countries?
12      A   For commercial flights --
13      Q   Yes.
14      A   -- you mean?
15          It's -- it's equivalent, but the process,
16  in general, is more onerous than a charter flight.
17      Q   Okay.  Can you read the next sentence,
18  please.
19      A   Sure thing.  "This is a labor intensive,
20  expensive and time-consuming process that requires
21  engagement of individuals in different agencies
22  located in multiple countries."
23      Q   And it says, "in several different
24  agencies located in multiple countries"; right?
25      A   Uh-huh.

BERNACKE-CONFIDENTIAL, MICHAEL
07/13/2018

Confidential
Pages 61–64

Page 61

1      Q  Okay.  What multiple countries are you --
2  well, what do you mean by "several different
3  agencies located in multiple countries"?
4      A  What I'm referring to is in any -- any
5  government agency that is utilized and contacted
6  by the Government of Iraq, also ICE and Department
7  of State.
8      MS. SCOTT:  Can you read that back to me.
9      (The reporter read the record as
10  requested.)
11      Q  Okay.  Do you know which agencies in Iraq
12  would be involved?
13      A  Generally, their Ministry of Foreign
14  Affairs, their Ministry of Immigration and also
15  the embassy.  I don't know the specific names for
16  their Ministry of Foreign Affairs or Ministry of
17  Immigration, I'm just referring to the entities
18  that have administrative controls over those
19  processes.
20      Q  All right.  So, you called the obtaining
21  of travel documents a labor-intensive process and
22  time-consuming process.
23      A  It is.  It is.
24      Q  So, we are now going to walk through that
25  process.  And so, can you -- and we're going to

Page 62

1  want the nitty-gritty.  Start from day one when
2  you identify that Iraqi national with the travel
3  document to when you get a decision from Iraq and
4  whether or not the travel document will be issued.
5      A  Okay.  As presently executed, what we do
6  is identify the detention inventory of Iraqi
7  nationals that are currently detained by ICE, and
8  we will either reach out to the field offices or
9  they will reach out to us with a travel document
10  requests.  Again, travel documents processes are
11  centralized at headquarters.
12      The travel document requests are manually
13  reviewed by Mr. Maddox to ensure data quality,
14  that they are complete, and submitted over to the
15  Government of Iraq.  We will -- to the embassy.
16      Q  Can I stop you right there.
17      A  Sure thing.
18      Q  And just for clarifications.  Is there --
19  when you say it's submitted to the Government of
20  Iraq and then you said to the embassy --
21      A  Uh-huh.
22      Q  -- which embassy are you talking about?
23      A  The embassy here in Washington, D.C.
24      Q  Okay.  Iraqi Embassy?
25      A  The Iraqi Embassy in Washington, D.C.

Page 63

1      Q  Has it always been the process to submit
2  the travel documents to the Iraqi Embassy in D.C.?
3      A  Since I encumbered this role, yes.
4      Q  And that's currently the same process now?
5      A  Yes.
6      Q  Okay.  Go ahead.
7      A  So, those travel documents requests are
8  submitted.  We will coordinate interviews with the
9  embassy, with the counselor staff and -- and agree
10  upon a date and location which these interviews
11  will occur.
12      The aliens are then -- we will contact the
13  field offices once we identify a location to house
14  the aliens for those interviews.  We will contact
15  the field offices to transfer the aliens to that
16  detention location, and I will send out Mr. Maddox
17  to accompany Mr. Al-Anpaqi to conduct those
18  interviews.
19      Q  Okay.  And then what's the next stage of
20  that process?
21      A  Mr. Maddox will escort -- he is the ERO
22  representative, of course, that Mr. Al-Anpaqi is
23  familiar with, so, we -- I will send a familiar
24  face to escort Mr. Al-Anpaqi to the detention
25  location that we will conduct the interviews at

Page 64

1  and -- and Mr. Al-Anpaqi will interview the
2  detainees to ascertain -- I have to assume
3  ascertaining identity and citizenship from those
4  aliens.
5      Q  Okay.  And what happens after the
6  interview?
7      A  He will -- as I understand it, he takes
8  the results of those interviews, submits them to
9  Iraq, as he's described in the past, and --
10      Q  Okay.  So, let me stop you there.
11      A  Sure.
12      Q  What do you mean by "as he's described in
13  the past"?
14      A  During meetings.  During meetings that
15  I've had with him in which he's gone over his end
16  of the process, Mr. Al-Anpaqi's end of the
17  process.
18      Q  So, what did he say -- who -- what was his
19  description of the process?
20      A  He will identify the aliens, ascertain
21  their citizenship, and he will report back on the
22  results to --
23      Q  We're talking past each other.  It's my
24  bad question.  Sorry.
25      A  Okay.  Okay.

BERNACKE-CONFIDENTIAL, MICHAEL
07/13/2018

Page 65

1    Q  So, who does he say he submits the
2  applications --
3    A  He just says he sends them back to
4  Baghdad.
5    Q  So, he doesn't identify
6  specific individual --
7    A  Or entity, no.
8    Q  Okay.  Go ahead.
9    A  So, he will submit those -- those results
10  of his interviews back to Baghdad, and they will,
11  as I understand it, give authorization to issue
12  the travel documents.
13    Q  When are the travel documents submitted to
14  Iraq?
15    A  What do you mean?
16    Q  So, here's the -- so, let me -- so, I
17  think we talked about the interview process.  I
18  want to go before the interview process.  So,
19  you've identified the Iraqi national.
20    A  Uh-huh.  Uh-huh.
21    Q  How do you notify -- so, when -- okay.
22  When do you pull together travel document
23  presentation?
24    A  The travel document presentation, by ICE
25  guidance, is required to be submitted to us within

Page 66

1  seven days of receipt of the alien in ICE
2  detention.
3    Q  And who provides that presentation?
4    A  Usually deportation officers in the field
5  will submit that to my unit.
6    Q  And, then, when is a travel document
7  presentation submitted to Iraq?
8    A  Immediately thereafter.  It's supposed to
9  be submitted as soon as possible.
10    Q  And what is the source of materials that
11  are used for the travel document presentation?
12    A  Usually documents from the alien's
13  administrative file.
14    MS. SCOTT:  All right.  Let's take a
15  break.
16    THE WITNESS:  Okay.
17    (A recess was taken.)
18  BY MS. SCOTT:
19    Q  So, Mr. Bernacke, we've been talking about
20  the process for obtaining travel documents, the
21  interview process, and then the process to
22  actually effectuate removal to Iraq.  And I think
23  it might be beneficial if we focus on a specific
24  instance that happened to try and walk through
25  what happened there, and I want to refer -- use

Page 67

1  the May 2018 interview --
2    A  Okay.
3    Q  -- and those individuals as our example.
4  Okay?  And I also think that we might have a
5  language difference about what we call the process
6  for obtaining travel documents.  I've been using
7  "travel document presentation."  Do you know what
8  that means?
9    A  Yes, I do.
10    Q  And what is that?
11    A  It's a packet of what I'm -- what I
12  believe I'm referring to as a travel document
13  request, it's a packet of documents that includes
14  identity documents, immigration documents and
15  potentially passport applications, anything that
16  an embassy would presumably need to issue a travel
17  document.
18    Q  And what's an identity document?
19    A  National ID card, birth certificate,
20  et cetera.
21    Q  Okay.  And then you've used the term
22  "travel document acquisition process."  What is
23  that?
24    A  The motions that we undertake to submit a
25  travel document request or a travel document

Page 68

1  presentation to an embassy, any liaison efforts
2  that result from that, and interview efforts on
3  the part of the embassy or consulate to -- to
4  identify that national and then issue a travel
5  document.
6    Q  Okay.  So, my questions before, when I
7  used "travel document presentation," "travel
8  document request," actually meant travel document
9  acquisition process.
10    A  Okay.  Okay.
11    Q  So, that's, I think, where some of our
12  disconnect was going.
13    A  Okay.
14    Q  So, let's start with the travel document
15  acquisition process for those individuals that
16  were interviewed in May 2018.
17    A  Okay.  So, those -- those aliens had a
18  number of travel document requests, the travel
19  document presentation packets, that were submitted
20  to the embassy, the Government of Iraq's Embassy
21  in Washington, D.C. throughout the month of --
22  months of March and April, and I believe that a
23  number of cases went to them during May of 2018, that had
24  accumulated for a period of time, you know, during
25  those months.  It was a numbering near 50 or so

Page 69

1   cases that had been presented to the embassy that
2   they had not -- that they had not interviewed yet.
3       Myself, Mr. Schultz and, I believe,
4   Mr. Maddox had an interview with the deputy chief
5   of mission and also counselor staff to prompt them
6   to interview those cases immediately thereafter
7   the following --
8       Q  I'm sorry.  So, again, I'm going to stop
9   you so we can --
10      A  Sure.
11      Q  When was the meeting with the counselor
12  staff?
13      A  I believe it was end of April, maybe May.
14      Q  Okay.
15      A  Yeah.
16      Q  All right.  Please proceed.
17      A  Sure.  We had that -- we had that meeting
18  and, shortly thereafter, within a week or two
19  weeks, the embassy agreed to conduct -- to conduct
20  interviews for all the cases that we had presented
21  during the months of March, April and May.
22      We coordinated with the Atlanta field
23  office to use some of their detention space to
24  hold the aliens for a limited amount of time to
25  conduct the interviews.

Page 70

1       I had Mr. Maddox fly out to -- to the
2   region and meet up with Mr. Al-Anpaqi to visit the
3   Stewart detention center where the aliens were
4   detained to interview those aliens.
5       Q  Okay.  And then what was the next step in
6   the process?
7       A  The aliens were interviewed and -- the
8   aliens were interviewed and, you know,
9   Mr. Al-Anpaqi reported the results back to
10  Baghdad.
11      Q  And then what happened after those results
12  were reported to Baghdad?
13      A  So, 42 cases were ultimately transferred
14  over to Stewart out of the 50 or so cases that had
15  been presented to them.  And during the time that
16  they had -- that they had been waiting -- awaiting
17  interview with the embassy, a number of cases had
18  submitted motions to reopen, I believe, untimely
19  appeals, and had actually been put back into
20  removal proceedings as a result of those actions.
21  So, they were no longer on the table.  So, only
22  42 cases were ultimately transferred over to
23  Stewart.
24      And all aliens were interviewed.  As I
25  recall it, 33 cases had travel documents issued

Page 71

1   within a week or two after the -- the conclusion
2   of those interviews.  Three aliens were -- their
3   citizenship status as Iraqi nationals was in
4   question, and six aliens had refused to sign the
5   GOI form.
6       Q  Who from the GOI conducted the interviews
7   in May 2018?
8       A  Yarub Al-Anpaqi.
9       Q  Was there anybody else?
10      A  Not to my awareness.  I don't believe
11  there was.
12      Q  And you would know if somebody else was
13  partaking in the interviews because you would have
14  had to obtain their security clearance to get into
15  the facility?
16      A  Correct.  Yeah.  It was just -- it was
17  just Mr. Al-Anpaqi.  Again, I was not personally
18  present for those interviews, it was Mr. Maddox,
19  but he did not report to me anybody else who
20  staffed those interviews.
21      Q  Do you know if at any time during those
22  interviews any other individuals were in the room
23  besides Mr. Al-Anpaqi and the Iraqi national?
24      A  Not that -- not that I'm aware of.  Not
25  that I'm aware of.  I -- perhaps some contractors,

Page 72

1   contract detention staff that needed to be there
2   by virtue of their safety and security, but to my
3   knowledge, it was only Mr. Al-Anpaqi and the
4   detainee.
5       Q  Do you know if ICE submitted 280 TD
6   presentations back in May through June 2017?
7       A  I'm not aware of that.
8       Q  So, you don't know for the individuals
9   that were interviewed in May 2018 if travel
10  document presentations were previously submitted
11  for these individuals?
12      A  I -- I'm not aware of that.
13      Q  Would their files reflect if travel
14  document presentations were submitted back in May
15  or June 2017?
16      A  Potentially, however, I did not personally
17  review every alien's file.
18      Q  When you were getting up to speed after
19  becoming unit chief, did Mr. Schultz or
20  Mr. Clinton inform you that 280 travel
21  presentations had been made for Iraqi nationals in
22  May and June 2017?
23      A  Not that I recall.  I just remember
24  conversations about the manifests.
25      Q  What types of travel documents were issued

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

BERNACKE-CONFIDENTIAL, MICHAEL
07/13/2018

Confidential
Pages 73—76

Page 73

1  for the individuals that were interviewed in
2  May 2018?
3      A  To my awareness, they were
4  laissez-passers.  They were onetime use travel
5  documents.
6      Q  And, typically, for the Iraqi Government,
7  how long does that -- what's the expiration date
8  for those types of documents?
9      A  I believe it's six months.
10      Q  Has there been instances in which the
11  document's expiration date exceeded six months?
12      A  Not that I'm aware of but, then again, I
13  have not reviewed every travel document personally
14  that has been issued.
15      Q  Okay.  You indicated that there were three
16  individuals in which there was a determination
17  that they may not be Iraqi citizens; is that
18  correct?
19      A  Correct.
20      Q  What's the next step for those three
21  Iraqis?
22      A  We --
23      Q  Sorry.  Let me rephrase that.  What's the
24  next step for those three individuals?
25      A  Well, the Iraqi Government, you know,

Page 74

1  Mr. Al-Anpaqi indicated that he believed that one
2  of the aliens was Syrian, one of the aliens was
3  Palestinian and the other was Kuwaiti, so, we are
4  seeking travel document requests from those
5  respective governments.
6      For one alien, and I can't recall if it
7  was the alien who was noted to potentially be
8  Palestinian or Syrian, we do believe that person
9  to actually be an Iraqi national; however, during
10  his arrest by the border patrol, I understand that
11  to have occurred on a beach and he had zero
12  iden -- identification documents, any documents to
13  his name, and is using an alias while in
14  detention.
15      And we are currently using our abroad
16  personnel in Europe to investigate various
17  locations that he resided in in Europe to see
18  whether or not he had documents that were
19  submitted to those governments during his presence
20  there.  So, we are acquiring travel documents
21  through other means.
22      Q  So, did you just discuss four individuals
23  there?
24      A  It was three individuals.
25      Q  Three.

Page 75

1      A  Yeah.
2      Q  What are the individuals' names?
3      A  I don't recall offhand.  The one alien
4  that I do remember his name is the one with the
5  alias and he is using the name of George Arthur.
6      Q  Is that the individual that was arrested
7  on the beach?
8      A  Yes.
9      Q  If the -- for these individuals, if, after
10  ICE submits travel document presentations to these
11  other countries and those countries come back
12  indicating that they're not their citizens, what
13  happens next?
14      A  Usually we will re-present the case to the
15  Iraqis or whichever government we are dealing
16  with, if we are speaking generally, and ask them
17  to take a second look at the case.  We will
18  usually garner the support of Department of State,
19  their assets abroad, to present the case to
20  Baghdad or any other government that we have some
21  sort of indicia of potential citizenship of and
22  seek travel documents through those means, as
23  well.
24      Essentially, we take a second bite at the
25  apple with any country that we think the alien may

Page 76

1  have some indicia of citizenship or connection to.
2  We'll also seek third county removal options, as
3  well.
4      Q  If both of those efforts are unsuccessful,
5  what happens next?
6      A  We'll take a look at the circumstances of
7  each case, the facts of each case, to include, you
8  know, criminal history, immigration history,
9  travel document acquisition efforts, and make a
10  custody determination based off of that.
11      Q  Is that a SLRRFF analysis?
12      A  Correct.
13      Q  All right.  Let's go back to the six
14  that refused to sign the GOI form.  And you're
15  referring to the form that's at Exhibit 10;
16  correct?
17      A  Correct.
18      Q  All right.  What's the next steps in the
19  efforts to remove those individuals?
20      A  The -- we ask the Iraqi Embassy what our
21  options were in terms of acquiring a travel
22  document without the GOI form being filled out and
23  submitted by the detainee.  They indicated that we
24  could write them a letter indicating limited
25  biographical information associated with the

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

BERNACKE-CONFIDENTIAL, MICHAEL
07/13/2018

Confidential
Pages 77—80

Page 77

1 alien, to include their alien registration number,
2 I also believe date of birth, the issuance of
3 their -- their final order of removal, any
4 criminal history that they may have in the United
5 States, and also indicate that their final
6 order -- in the body of the letter, that their
7 final order is, in fact, administratively final
8 and that it nullifies any potential legal status
9 that they may have had in the United States prior
10 to the issuance of that final order, and -- and
11 they would submit that to Baghdad and that would
12 circumvent the need for a GOI form being
13 completed.
14     Q  So, the letter that you're discussing, is
15 that at Exhibit 3?
16     A  That was the original iteration, the
17 document in Exhibit 3 that you're referring to,
18 that was the original iteration of the letter,
19 however, they reviewed it and they wanted -- the
20 Iraqi Embassy reviewed that letter.  They wanted
21 additional information relating to the facts that
22 I had just previously elaborated upon and that the
23 administratively final order of removal nullified
24 any legal status to the aliens, you know,
25 previously held legal status in the United States,

Page 78

1 and -- and elaborate that in the body of the
2 letter and submit it to their office.
3     Q  Okay.  And when was that submitted to the
4 office?
5     A  It was submitted at the beginning of this
6 month, I believe, on June -- or I'm sorry,
7 July 2nd.
8     Q  And when did Iraq indicate to you that the
9 June 15th, 2018 letter was not sufficient, the
10 letter in Exhibit 3?
11     A  Yeah, it -- yeah, let me just try to
12 refresh my memory.  Sorry.  I'm just sorting out
13 dates in my mind.  I believe it was -- I don't
14 remember the date offhand.  I believe it was at
15 the end of June -- either end of June or maybe the
16 first of July.
17     Q  And who indicated that to you?
18     A  That was the ambassador of Iraq to the
19 United States, the deputy chief of mission, and
20 also Mr. Al-Anpaqi who was present during that
21 meeting.
22     Q  So, did they communicate directly to you
23 or was it through others in the U.S. Government?
24     A  No, it was during a meeting that I
25 personally had with Mr. Schultz and Mr. Maddox

Page 79

1 with -- with those three in the room.
2     Q  What was the date of that meeting?
3     A  I -- I believe it was -- it was sometime
4 at the end of June or perhaps July 1st.  I can't
5 remember offhand.
6     Q  And what took place during that meeting?
7     A  We -- we discussed the body of -- I
8 believe it was Exhibit 3 at the time or another
9 iteration of that letter.  We discussed the
10 contents of that letter, what they were expecting
11 in the letter in terms of additional information
12 related to the alien's immigration history in the
13 United States.  That way we can provide them a --
14 what they felt would be a sound letter to
15 circumvent the need for the GOI form.
16     Q  And what else happened at that meeting?
17     A  They reviewed the letter.  They elaborated
18 upon what they needed from us, and we made
19 modifications accordingly based off of that, the
20 meeting that we had with them.
21     Q  Anything else happen at the meeting?
22     A  Not that I can recall.
23     Q  Did -- was there a discussion about the
24 GOI form?
25     A  We did indicate to them that the GOI form,

Page 80

1 you know, as we had previously indicated to them,
2 was not something that ICE felt was necessary
3 to -- to issue a travel document for each case and
4 that we did not want to use it going forward, in
5 which the Iraqis said that, you know, given the
6 contents of the modified and edited letter based
7 off of our discussion would circumvent the need
8 for the GOI form going forward.
9     Q  For those six individuals or for
10 everybody?
11     A  Everybody.
12     Q  Did the Iraqi officials indicate that they
13 would no longer ask Iraqi nationals if they
14 desired to go back to Iraq?
15     A  We did not -- we did not explicitly ask
16 them that question.  My perception of the meeting
17 is that the inference was there based off their
18 discontinuance of the use of the GOI form.
19     Q  But you did not ask that question;
20 correct?
21     A  No.
22     Q  And they did not give you a statement to
23 that effect; correct?
24     A  We did not explore that with them.
25     Q  They did not give you a statement to that

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson
U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids
Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

BERNACKE-CONFIDENTIAL, MICHAEL
07/13/2018

Confidential
Pages 81—84

Page 81

1  effect; correct?
2      A  Correct.
3      Q  When are you expecting a response from the
4  Iraqi Government relating to these six
5  individuals?
6      A  Today.
7      Q  Has it come in yet?
8      A  Well, let me back -- back up on that.  We
9  have already received a positive response relating
10  to the travel document issuance for these cases.
11      Q  What was that response?
12      A  That they would issue travel documents
13  based off of the fact that we've provided a
14  letter.  We're supposed to pick up those travel
15  documents today.
16      Q  What do you mean by "pick up today"?
17      A  Physically receive those travel documents
18  in hand by ICE personnel.
19      Q  Okay.  And who indicated to you that the
20  travel documents would be issued?
21      A  Mr. Al-Anpaqi and also, I believe, the
22  deputy -- the deputy chief of mission had a
23  conversation with Mr. Schultz that Mr. Schultz
24  communicated to me indicating that those cases
25  would -- those cases would be issued travel

Page 82

1  documents.
2      Q  Okay.  And what specifically did
3  Mr. Al-Anpaqi say to you?
4      A  That the travel documents would be ready
5  this Friday.
6      Q  And, so, what happens if the travel
7  documents are not ready today?
8      A  We will revisit that topic with them
9  continuously until they are.
10      Q  And at what point will you stop revisiting
11  that issue if you can't get them to issue the
12  travel documents?
13      A  I don't want to say that there's any
14  hardline date or hardline number of contacts that
15  we will have with them.  We will -- we will
16  revisit that topic with them continuously, and if
17  we have to explore other means in which to obtain
18  those travel documents, we will pursue that.
19      Q  And what other means are you referencing?
20      A  Any -- well, we'll confer with Department
21  of State but that could be any -- any sort of
22  punitive actions taken against them that
23  Department of State would recommend to us.
24      Q  At what point would you conduct the SLRRFF
25  analysis for these six individuals if you cannot

Page 83

1  get travel documents in the next, say -- let me
2  rephrase that.
3      If you don't get the travel documents
4  tomorrow, at what point are you going to conduct
5  the SLRRFF analysis of these individuals?
6      A  At the next point in which it is -- it is
7  required by regulation to conduct those --
8  those -- those -- that SLRRFF analysis.  That is
9  generally at the 90-day mark after the previous
10  analysis was conducted.
11      Q  Have you done a SLRRFF analysis for these
12  six individuals already?
13      A  I -- if they are detained after 180 days
14  in detention, then I most likely have.  I just
15  don't recall it -- their names offhand.  I sign a
16  lot of SLRRFF analysis, not just for Iraq but for
17  a number of other countries.
18      Q  I think you mentioned earlier that as part
19  of your SLRRFF analysis, you will take a look at
20  the criminal history; is that correct?
21      A  Correct.
22      Q  Why would you look at the criminal
23  history?
24      A  Under 8 CFR 241.14D, we can categorize
25  aliens as especially dangerous.  It's an avenue

Page 84

1  that we -- and it's for an indefinite detention
2  based off of criminal history, terrorist ties,
3  essentially anything that would make an alien a --
4  a unique danger to the public.  It's an authority
5  that ICE is -- uses very sparingly, but it is
6  something that we have to factor into our SLRRFF
7  analysis.
8      Q  For the Iraqi nationals that are currently
9  in detention and they've exceeded 180 days, you
10  believe you've done a SLRRFF analysis; is that
11  correct?
12      A  I do believe so.
13      Q  For those individuals, do you remember if
14  you evaluated their criminal history and
15  determined that they should not be released based
16  upon the criminal history?
17      A  For those aliens, I would have done a
18  SLRRFF analysis based on the viability of
19  obtaining a travel document.
20      Q  But not looking at the criminal history?
21      A  I would have looked at the criminal
22  history, as well.  I would have looked at the
23  totality of the case.  However, given that I
24  cannot recall any sort of unique instance that
25  sort of, you know, reared its head at me related

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

BERNACKE-CONFIDENTIAL, MICHAEL
07/13/2018

Page 85

1  to their criminal history or, you know, past
2  history that would make the alien a unique danger
3  to the public, I have to presume that my analysis
4  was based predominantly off of their -- the
5  viability of obtaining a travel document.
6      Q  On what date did Mr. Al --
7      A  Al-Anpaqi?
8      Q  Thank you.  On what date did Mr. Al-Anpaqi
9  indicate to you that travel documents for the six
10 individuals would be issued?
11     A  I believe it was Monday or Tuesday of this
12 week.  I'd have to check my email.  I'm not
13 entirely sure.
14     Q  So, when you were at the meeting in the
15 end of July -- end of June/early July, in which
16 you were talking with the Iraqi Government about
17 the GOI form --
18     A  Uh-huh.
19     Q  -- and they indicated that they were not
20 going to use the GOI form going forward --
21 correct?
22     A  Uh-huh.
23     Q  -- did you believe them?
24     A  Yes.
25     Q  Have they indicated to you before that

Page 86

1  they would -- they wouldn't use the GOI form?
2      A  They have -- they have not expressly
3  indicated that they would not use the GOI form.
4  They've always characterized it as a form that the
5  alien could voluntarily sign.
6      Q  Have you asked them in the past not to use
7  the GOI form?
8      A  We've expressed a -- lack of desire for
9  them to not use that form.
10     Q  And did they -- so, when you say you
11 expressed a lack of desire, was it also a request
12 not to use it?
13     A  We told them that it was a violation of
14 the International Civil Aviation Organization's
15 Annex 9 protocols on travel document issuance,
16 that an alien doesn't expressly have to submit
17 themselves to deportation voluntarily; they could
18 be deported by a foreign government, you know,
19 even if it was against their will, and we
20 expressed that sentiment to them.
21     Q  So, you wouldn't identify that as a
22 request not to use the form?
23     A  I would -- I would identify it as a -- as
24 a level of consternation associated with the use
25 of that form.

Page 87

1      Q  And what was their response to you?
2      A  That they felt that it was just something
3  that was voluntarily signed by them, that, you
4  know, it is something that they could -- that they
5  could -- that the aliens could sign on their own
6  volition, they weren't forcing them to sign it,
7  et cetera.
8      Q  And what did they indicate was the purpose
9  for offering the form to the Iraqi nationals to
10 sign?
11     A  They didn't -- and, again, this was a
12 meeting that we had in January, but I don't recall
13 them expressly indicating any -- any reason, any
14 hardline reason, why they wanted it.  It was just
15 something that was communicated to us as part of
16 their travel document issuance process.
17     Q  Did they indicate to you that they -- they
18 required that document in order to be able to
19 issue travel documents to an Iraqi national?
20     A  That's how they originally characterized
21 it to us.
22     Q  When did they originally characterize it
23 to you as that?
24     A  As I recall, it was in back in January
25 of 2018.

Page 88

1      Q  Okay.  And since then, they've changed
2  that characterization?
3      A  They have.  They -- they've told us that
4  they no longer need the form to be filled out as a
5  result of the -- the enhanced level of information
6  that we're giving them related to the -- the
7  alien's background via the letters that you have.
8      Q  Okay.  So, I don't understand what you
9  just said.
10     A  Uh-huh.
11     Q  Okay?  Because we were just talking about
12 requiring a form to issue travel documents.
13     A  Uh-huh.
14     Q  And I think that you were responding to
15 something different than --
16     A  Okay.
17     Q  -- the obtaining of travel documents.
18     A  Uh-huh.
19     Q  So -- and it may just be I don't
20 understand the language.
21     A  Okay.
22     Q  Okay?  So, has the Iraqi Government said
23 to you that if that form is not signed out, we
24 will still issue travel documents?
25     A  Yes, they have.

BERNACKE-CONFIDENTIAL, MICHAEL
07/13/2018

Page 89

1    Q   When did they say that to you?
2    A   The end of June/beginning of July.
3    Q   And who said that to you?
4    A   The ambassador, the deputy chief of
5    mission, and also Mr. Al-Anpaqi, the counselor
6    officer.
7    Q   Did they say to you, "If an Iraqi national
8    says they do not want to go back to Iraq, we will
9    still issue travel documents"?
10   A   Yes.
11   Q   And who said that to you?
12   A   That was the ambassador, the deputy chief
13   of mission, Mr. Al-Anpaqi.
14   Q   And what exactly did they say?
15   A   I don't remember exactly what they said
16   verbatim; however, I do recall them saying that it
17   would no longer be necessary as a result of the
18   letters that we would be providing them.
19   Q   What would no longer be necessary?
20   A   The GOI form.
21   Q   So, they didn't actually say to you that
22   if an individual expresses they don't want to go
23   back to Iraq, they will still issue travel
24   documents?
25   A   Again, that was something that we

Page 90

1    didn't -- we didn't explicitly ask them.  The
2    conversation centered around the GOI form.
3    Q   Did you say that there was a meeting in
4    May 2018 with the Iraqi Government?
5    A   Potentially.  That was a month that I
6    couldn't remember if we did have one.
7    Q   Okay.  Was there a meeting prior to --
8    MS. SCHLANGER:  It doesn't matter.
9    BY MS. SCOTT:
10   Q   Okay.  So, here's where I'm a little
11   confused.
12   A   Okay.
13   Q   I'm trying to go back to when we first
14   were talking about the May 2018 and the process
15   for travel document acquisition and review, and I
16   thought you might have mentioned that there was a
17   meeting prior to the -- that process starting.
18   Were you referring to the January 2018 meeting?
19   A   Correct.
20   Q   Okay.
21   A   Yeah.
22   Q   All right.  Okay.  I'm not trying to trick
23   you.
24   A   Uh-huh.
25   Q   I just want to be thorough.

Page 91

1    A   Yeah, yeah, yeah, definitely.
2    Q   Okay.  Is it possible that you testified
3    earlier that there was a meeting or a
4    communication made 2018 where they indicated there
5    were issued travel documents?
6    MR. SILVIS:  Object to the form.
7    Q   That's fine.  You can go ahead and answer.
8    A   Yeah.
9    MR. SILVIS:  Yeah, you can go ahead.
10   Q   He's just telling me my question is bad,
11   but I don't know how else to ask it.
12   MR. SILVIS:  I guess the concern I had is
13   you said, "Is it possible that you testified
14   earlier."
15   BY MS. SCOTT:
16   Q   All right.  So, that's fine.  Go ahead.
17   You can answer.
18   A   Okay.  So, I believe what I was referring
19   to in that instance is that we had discussions
20   with a -- the Iraqis in either the end of April or
21   in May of 2018.  I do recall having some sort of
22   meeting around that time frame -- I don't recall
23   whether or not it was in April or May of 2018 --
24   where we had indicated that there was a large
25   volume of cases that had accumulated with the

Page 92

1    Iraqi Embassies -- with the Iraqi Embassy and that
2    they needed to interview them as promptly as they
3    could.
4    Q   Okay.  Thank you.
5    A   Uh-huh.
6    Q   So, for clarification, so that I need to
7    get this into the record, you believe that there
8    was a meeting with the Iraqi Government in April
9    or May to talk about 50 individuals who had
10   outstanding travel document presentations --
11   A   Correct.
12   Q   -- correct?
13   A   There was a meeting.  I know that for a
14   fact.  You know, it's not something that I
15   believe.  We did have a meeting with them.  I just
16   don't know whether or not it was in April or May
17   offhand.
18   Q   And who attended that meeting?
19   A   It was myself, Mr. Maddox and Mr. Schultz.
20   Q   And who attended on behalf of the Iraqi
21   Government?
22   A   I believe it was the deputy chief of
23   mission and also Mr. Al-Anpaqi.
24   Q   Do you remember -- do you know the name of
25   the deputy chief?

BERNACKE-CONFIDENTIAL, MICHAEL
07/13/2018

Page 93

1    A  I do.  I did get that during our break.
2  Let me pull that up right now.  So, his name is
3  Al-Quraishi Mohamad Jawad.  And I can help you out
4  with spelling after -- during our break --or can I
5  help you out with spelling right now?  His first
6  name is A-l-q-u-r-a-i-s-h-y.  His middle name is
7  Mohamad, M-o-h-a-m-a-d.  And his last name is
8  Jawad.  That is J-a-w-a-d.
9    Q  Thank you.  Okay.  Is it possible that
10  Mohamad might be his first name?
11    A  Potentially.  I don't know.  I'll have to
12  take a look at his business card when I get back.
13  That's what Mr. Schultz emailed me.
14    Q  Okay.  So, let me show you this document.
15  So, I'm going to point you to Exhibit 9.  And it's
16  marked as 270499.
17       (J. Schultz Exhibit 9, previously marked,
18  is attached to the transcript.)
19    Q  You can take a look and see if the
20  individual that you just referenced is on that
21  page.
22    A  Yeah, that is him.
23    Q  Okay.  Can you say what that name is.
24    A  Mohamad Al-Quraishi.
25    Q  And then after his name, there's the

Page 94

1  initials --
2    A  DCM, deputy chief of mission.
3    Q  All right.  Thank you.  Okay.  And now she
4  would like you to respell it, please.
5    A  Sure thing.  His name is -- first name is
6  M-o-h-a-m-e-d.  And the last name as it's
7  presented in this document is Al-Quraishi.  That
8  is A-l-q-u-r-a-i-s-h-i.
9    Q  All right.  So, I did realize we have one
10  more question about the declaration, and then we
11  will push that to the side.
12    A  Sure.
13    Q  Are you ready?
14    A  Oh, yeah.  I'm ready.  Sorry.
15    Q  So, paragraph 12, your declaration states,
16  "ICE believes that the Central Government of Iraq
17  in Baghdad will permit the entry of detained Iraqi
18  nationals subject to final orders of removal if
19  the injunction is limited."
20       Do you believe at the time you wrote this
21  declaration that Baghdad would re- -- allow
22  repatriation of individuals once the injunction
23  was limited?
24    A  Yes, I did believe that at the time.
25    Q  And what did you base your belief upon?

Page 95

1    A  Based off the fact that we had already had
2  a number of -- of Iraqi nationals who requested
3  prompt removal from the United States and we were
4  making -- taking steps to get those interviews
5  established and, you know, travel documents be
6  issued as a result.
7    Q  At the time that you wrote this, had any
8  travel documents for those prompt removals been
9  issued?
10    A  No.  We were barely in the phase of
11  organizing and coordinating those interviews to
12  occur.
13    Q  At the time of this declaration, had any
14  prompt removals been returned to Iraq?
15    A  No.  Again, the -- the tranche of aliens
16  available characterized as a prompt removal was
17  rather limited, and we were taking steps to get
18  them interviewed.
19    Q  Okay.  Was there any other basis for the
20  belief that the Central Government in Iraq -- of
21  Iraq in Baghdad would accept removal of Iraqi
22  nationals?
23    A  They had expressed to, you know,
24  Mr. Schultz and Mr. Clinton in the past and during
25  the negotiation process that had preceded that,

Page 96

1  those prompt removals from being identified, as
2  accepting all of their final order cases, and I
3  had no other reason to believe otherwise.
4    Q  And we previously identified -- defined
5  what -- the term "prompt removal" in this
6  deposition.
7    A  Yes.
8    Q  Can you provide that definition again.
9    A  It's essentially any alien that had
10  voluntarily recused themselves from the -- from
11  the injunction.
12    Q  All right.  So, would a person who had
13  indicated that they wanted to be removed to Iraq
14  who was a class -- Hamama class member be deemed
15  to be a prompt removal?
16    A  Can you repeat that.
17    Q  Sure.  There is various phases in order to
18  have the stay lifted; correct?
19    A  Uh-huh.  Uh-huh.  Uh-huh.
20    Q  The Iraqi national, the class member --
21    A  Uh-huh.
22    Q  -- has to indicate that they want to --
23    A  Uh-huh.
24    Q  -- be removed.  And do you understand that
25  at that point, then there needs to be an order

BERNACKE-CONFIDENTIAL, MICHAEL
07/13/2018

Confidential
Pages 97–100

Page 97

1    from the Court to lift that removal --
2        A  I do.
3        Q  -- stay?
4        A  For each case and for each Iraqi case that
5    we identify as a prompt removal, we usually confer
6    with counsel beforehand to identify any potential
7    impediments to removal and -- and go forward with
8    the interviews accordingly.
9        Q  Okay.  So, at what point in that process
10   do -- does ICE start the -- well, travel document
11   acquisition process?
12       A  After an alien has been identified as a
13   prompt removal?
14       Q  Right.  So, when an alien -- let
15   me start -- when a Hamama class member indicates
16   that they want to be removed to Iraq --
17       A  Correct.
18       Q  -- does ICE start the travel document
19   acquisition process then?
20       A  No, we usually will wait until that alien
21   is -- is removed from the class.
22       Q  What do you mean, "removed from the
23   class"?
24       A  Is no longer part of the Hamama
25   litigation, part of the Hamama class, that they

Page 98

1    have taken the steps for, you know, a -- I believe
2    it's a district judge in this case who is making
3    these decisions, for that person -- to excuse that
4    person from the class based on their voluntary
5    willingness to be pulled out of -- pulled out of
6    the litigation.
7        Q  So, I am almost certain that you don't
8    know that the parties dispute the term "removed
9    from the class."
10       A  Okay.
11       Q  So, for this deposition --
12       A  Uh-huh.
13       Q  we're going to stick with the term
14   "prompt removal" --
15       A  Okay.
16       Q  because petitioners don't agree that a
17   prompt removal is the equivalent of being removed
18   from the class.
19       A  Okay.
20       Q  So, when a person indicates that they want
21   to be removed to Iraq --
22       A  Uh-huh.
23       Q  -- typically they will indicate that to a
24   field officer; correct?
25       A  Uh-huh.  Correct.

Page 99

1        Q  And then the field officer then reports
2    that back to ICE; is that correct?
3        A  They will report it, I believe, to their
4    local chief counsel.  And how the process sort of
5    plays out after that, I'm not entirely sure.  I do
6    know that our headquarters office gets involved,
7    and that's who we will confer with in order to
8    identify any impediments to removal, and that is
9    inclusive of this litigation, the Hamama
10   litigation, and anything else that we may not be
11   aware of, such as a motion to reopen or an
12   untimely appeal that's filed.
13       Q  Has it happened that for some of these
14   individuals, that the travel document acquisition
15   process may have started before the Court enters
16   an order approving the removal to Iraq?
17       A  Not that I'm aware of, no.  Not that I'm
18   aware of.
19       Q  And, so, just so that we're careful going
20   forward, when I talk about prompt removal, I talk
21   about those individuals that actually have an
22   order entered --
23       A  Uh-huh.
24       Q  -- approving or authorizing the removal.
25       A  Correct.

Page 100

1        Q  What other countries authorize the use of
2    manifests, flight manifests, rather than travel
3    documents?
4            MR. SILVIS:  Object to relevance.
5        Q  You can still answer.
6        A  So, I supervise the travel document
7    acquisition liaison efforts for 43 countries, you
8    know, all within the Middle East, Eastern Africa,
9    Southeast Asia.  None that are currently under my
10   purview facilitate removals in that manner.  I
11   cannot speak for the other REO units who handle
12   travel document liaison acquisition efforts.
13       Q  So, in paragraph 12 of Exhibit 25, you
14   write -- you state, "ICE believes that the
15   government will permit the entry of detained Iraqi
16   nationals."  Why didn't you write, "I believe"?
17       A  Which paragraph are you referring to?
18       Q  Paragraph 12.
19       A  Okay.  I mean, as a representative, as an
20   employee of ICE, I -- I include myself in that
21   statement.
22       Q  But did you -- did you confer with
23   Mr. Schultz's supervisor to confirm that they have
24   the same belief?
25       A  I conferred just with Mr. Schultz and my

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

BERNACKE-CONFIDENTIAL, MICHAEL
07/13/2018

---

Page 101

1   staff.  I did not confer, to my awareness, with
2   anyone else.
3        Q  Are you allowed to speak on behalf of ICE,
4   in general?
5        A  Can you clarify the question a bit.
6        Q  Sure.  Are you allowed to speak on behalf
7   of ICE in a public arena?
8        A  When authorized to do so.  I mean it
9   really depends on the forum.
10       Q  So, do you think it was sufficient to
11  speak solely to Mr. Schultz and Mr. Clinton and
12  then to translate that into what ICE's position or
13  belief is about what will happen with Iraqi
14  nationals?
15       A  I -- given that my unit handles travel
16  document acquisition efforts for Iraq and a number
17  of other countries, I believe it's appropriate for
18  me to do so.
19       Q  As of December 2017, had Iraq stated that
20  they would accept Iraqi nationals after the
21  injunction is lifted?
22       A  They had stated that they would accept all
23  final order nationals, so --
24       Q  And when did they state that?
25       A  They had stated it in -- in conversations

---

Page 102

1   that I had had with them subsequent to -- to
2   December.  That was a -- my initial contact with
3   them in January of 2018.  And they had
4   communicated to Mr. Schultz and Mr. Clinton prior
5   to that.
6        Q  And when did they communicate that
7   prior -- to Mr. Schultz and Mr. Clinton prior to
8   this declaration?
9        A  Can you restate that.
10       Q  Sure.  When did Iraq communicate to
11  Mr. Schultz and Mr. Clinton that they would accept
12  Iraqi nationals when the injunction was removed?
13       A  Summer -- when it was removed?  I don't
14  believe that they actually stated that.
15       Q  Okay.  Thank you.
16       A  Yeah.
17       Q  And have they actually stated that to you
18  since this declaration?
19       A  Let me reread paragraph 12, if you don't
20  mind.
21          MR. SILVIS:  Could you restate the
22  question, too, or could we have it read back.
23          (Pending question read.)
24          MR. SILVIS:  Do you understand the
25  question?

---

Page 103

1        A  Yeah, I do.  Can you just restate it,
2   though, just so it's fresh in my mind.
3        Q  Sure.  When did an official from the Iraqi
4   Government state to you that they will permit the
5   entry of detained Iraqi nationals once the
6   litigation -- or once the injunction in this
7   litigation is lifted?
8        A  They did not explicitly state that to me
9   or anyone else to my knowledge.  Again, you know,
10  if it was stated to Mr. Schultz in a separate
11  conversation or Mr. Clinton or anyone else maybe
12  above Mr. Schultz, I don't have knowledge of that.
13  However, given the actions that they took prior to
14  this declaration being authored and the injunction
15  being in place and also actions that have occurred
16  subsequent to the injunction being in place and --
17  and any actions that have occurred thereafter, we
18  have -- I believe, have had a good relationship
19  with them in terms of travel document issuance.
20          They have conducted interviews.  They have
21  issued travel documents.  They have done the
22  things that they need to do in order to -- to
23  stand up what we would consider a repeatable
24  process for a travel document issuance and -- and
25  based off of the actions and conversations that we

---

Page 104

1   have had with them, I have to believe that they
2   will accept a return of their nationals.
3        Q  So, my question to you is narrow.  All
4   right?  My question was when did an official from
5   the Iraqi Government state to you that they would
6   take back -- that they would -- let me go back.
7          When did an Iraqi Government official
8   state to you that they will permit the entry of
9   detained Iraqi nationals once the injunction in
10  this case is lifted?
11       A  They -- they did not state that; however,
12  based off their actions and their previous
13  conversations and conversations that we've had
14  with them throughout this process, we don't have
15  any indicia of noncompliance.
16       Q  Okay.  So, you're still -- so, the answer
17  is they have never made that statement to you or
18  anybody else at ICE that you're aware of.
19       A  They have not, but as my declaration
20  states, you know, we believe that the Central
21  Government of Iraq will permit the entry of these
22  detained nationals.
23       Q  How much value is your belief?
24          MR. SILVIS:  Object to the form.
25       Q  I mean would you -- would you write to

Page 113

1  Q  All right.  Let's take a look at
2  Exhibit 15.
3           (J. Schultz Exhibit 15, previously marked,
4  is attached to the transcript.)
5     Q  Can you tell me what Exhibit 15 is.
6     A  There's no attachment here, but I believe
7  this is the email in which I asked Mr. Clinton to
8  obtain translation services for the GOI form.
9     Q  Okay.  So, at the very end of this email
10  chain, there's an email from Hudhaifa Hassoon to
11  Yarub Al Anpaqi.
12     A  Uh-huh.
13     Q  Okay?  And it doesn't indicate that
14  there's an attachment here, does it, as far as we
15  can tell.
16     A  I think that -- and, again, this is just
17  me interpreting jargon on the first page, but
18  there's a number of -- there's language here
19  stating, you know, "P288571 Iraqi document project
20  details."  I have to assume that was information
21  that was included in the -- the application that
22  Mr. Clinton had to sign in order to obtain
23  translation services.
24     Q  All right.  So, what I'm trying to
25  establish is whether or not Al-Anpaqi sent you an

Page 114

1  attachment -- or sent Julius an attachment
2  during -- in the January 24th, 2018 email below.
3     A  It may be possible, and that's what
4  Mr. Clinton may have emailed me, and based off of
5  that attachment that was forwarded to me, I would
6  have asked him to get it translated.  But with the
7  information here, I can't really make a
8  100 percent certain determination that that was
9  the case.
10     Q  And that's the question I have is because
11  I can't either --
12     A  Okay.
13     Q  -- based upon the document.
14     A  Yeah.
15     Q  But Mr. Al-Anpaqi, in the January 24th,
16  2018 email, states, "As I wish to keep in touch, I
17  would like to update your data for a new travel
18  document form and application that would need all
19  the concerning cases fill and sign them."  Do you
20  see that?
21     A  Yeah.
22     Q  Okay.  So, that would suggest that there
23  was an attachment to his email?
24     A  Yeah, and that's what I'm basing my
25  presumption off of.  You know, during our routine

Page 115

1  liaison efforts, we will ask different embassies
2  to give us their latest travel document
3  applications.  That way, we can upload them to our
4  travel document intranet site.  And I have to
5  believe, based on the information presented to me,
6  that that was what we were doing in this instance
7  is just getting updated information from him.
8     Q  Okay.  At the January 9th, 2018 meeting,
9  did Iraqi Government officials hand you a copy of
10  the GOI form?
11     A  I don't recall being handed one, but I do
12  remember them holding a copy of it up.
13     Q  So, the question I have is, because
14  Mr. Al-Anpaqi uses the term "new travel document,"
15  do you have an idea if there was revisions to the
16  GOI form at this time?
17     A  Potentially.  I -- I don't recall whether
18  or not that was the case.  I mean I had asked
19  Mr. Clinton to remove it from our website.  So, it
20  was irrelevant.
21     Q  Were there efforts to have the Iraqi --
22  let me rephrase that.
23           Did ICE make request to the Iraqi
24  Government to amend the GOI form prior to
25  July 2018?

Page 116

1     A  To amend the GOI form?  What do you mean
2  by "amend" it?
3     Q  So, edit it, to change it.
4     A  No, we had expressed consternation with it
5  and we had discontinued use of it internally to
6  ICE.  We had removed it from -- its availability
7  from our website.
8     Q  Did the Iraqi Government submit to you any
9  changed versions to the GOI form?
10     A  I don't know.  Again, anything that
11  occurred after January of 2018, after the meeting
12  that we had with them, was irrelevant in terms of
13  edits to the form, as I had asked that we had --
14  that we remove it from our website.
15     Q  I just want to make sure I'm clear.
16  You're not aware of any changes to the GOI form
17  from January 2018 through July 2nd, 2018; correct?
18     A  I -- I'm not.  Again, there may have.
19  I'm -- I just don't recall but, again, it just
20  wasn't relevant, so I did not commit it to memory.
21     Q  Who would be the person that would know if
22  there was any edits proposed by the government of
23  Iraq to the GOI form?
24     A  I don't know.  I don't know.  I don't
25  believe we ever requested edits to that form.

BERNACKE-CONFIDENTIAL, MICHAEL
07/13/2018

Confidential
Pages 117–120

Page 117

1  Q  Who would know if the GOI made edits to
2  the GOI form and submitted that for review to ICE?
3  **A  I don't know.**
4      MS. SCOTT:  Okay.  All right.  So, why
5  don't we go ahead and take a lunch break.
6      MS. MURLEY:  Okay.  How long?
7      MS. SCOTT:  12:15?
8      MR. SILVIS:  Okay.
9      MS. MURLEY:  Okay.
10      (A recess was taken.)
11  BY MS. SCOTT:
12  Q  All right.  Good afternoon, Mr. Bernacke.
13  **A  Good afternoon.**
14  Q  I've got a quick -- few quick questions
15  and then we'll get back into the documents.
16      In those instances in which a
17  laissez-passer is issued --
18  **A  Uh-huh.**
19  Q  -- to an Iraqi national and they go into
20  Iraq on a charter commercial flight and that
21  commercial flight transits through another
22  country, are there any issues because the Iraqi
23  national has a laissez-passer?
24  **A  Generally not.  Usually we will have to,**
25  **you know -- and it is very subjective to each**

Page 118

1  **country that we would potentially be transiting**
2  **through.  Some locations will require transit**
3  **visa.  Some will not.  Some will have sort of a --**
4  **timelines in which a transit visa is necessary**
5  **depending on the layover time.  Some simply do**
6  **not.**
7      **So, it's very subjective and many -- in**
8  **most instances, we will receive those transit**
9  **visas.  It's usually not a problem because that is**
10  **not the final port of embarkation.**
11  Q  Okay.  Do you know of any removals to Iraq
12  of Iraqi nationals that had taken place in 2017
13  where the Iraqi nationals expressed that they do
14  not want to return to Iraq?
15  **A  In 2017?  Not -- not that I can recall,**
16  **no.**
17  Q  And so far in 2018, do you know of any
18  Iraqi nationals who have been removed to Iraq who
19  expressed that they desired not to return to Iraq?
20  **A  Yes, I do.**
21  Q  And who is that?
22  **A  I don't know their names offhand.  I do --**
23  **I am aware that there are six aliens that did not**
24  **sign a voluntary declaration in Stewart, Georgia**
25  **and an additional four that did not sign one in**

Page 119

1  **Farmville.**
2  Q  Have those Iraqi nationals been removed to
3  Iraq?
4  **A  The four and the six that I just referred**
5  **to?**
6  Q  Yes.
7  **A  They have not.  The six -- the six that**
8  **were interviewed in Stewart, Georgia did receive**
9  **travel documents about 40 minutes ago.**
10  Q  For all six individuals?
11  **A  For all six individuals.**
12  Q  And what type of travel documents were
13  issued to them?
14  **A  I don't know.  I haven't had a chance to**
15  **personally review them.  All I know is that my**
16  **staff reported to me that the six had travel**
17  **documents issued to them.**
18  Q  So, the -- so, let me make sure I
19  understand because my question is a little bit
20  different.
21  **A  Okay.**
22  Q  So, so far in 2018 --
23  **A  Uh-huh.**
24  Q  -- have any Iraqi nationals been removed
25  to Iraq who expressed that they had no desire to

Page 120

1  return to Iraq?
2  **A  No, not at this time.**
3  Q  Okay.  For the six individuals who
4  received travel documents today --
5  **A  Uh-huh.**
6  Q  -- have any conditions been put on their
7  return to Iraq by the Iraqi Government?
8  **A  I'm not aware of anything but, then again,**
9  **you know, my staff merely reported to me that they**
10  **received the travel documents.  I've not done**
11  **any -- any other more thorough analysis of -- of**
12  **the conditions or the types of documents.  I just**
13  **know that they have travel documents in hand.**
14  Q  Do you have an anticipated date in which
15  you will return those six -- six Iraqi nationals
16  we have just been discussing?
17  **A  I do not.  Again, we barely received the**
18  **travel documents and we will have to coordinate**
19  **their removal accordingly.**
20  Q  Do you have an anticipated date for the
21  return to Iraq of the Iraqi nationals who were
22  interviewed in May 2018 and who subsequently had
23  travel documents issued, what we call the 32 Iraqi
24  nationals?
25  **A  Sure.  For specific dates, I can't**

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone:  888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

BERNACKE-CONFIDENTIAL, MICHAEL
07/13/2018

Confidential
Pages 133–136

Page 133

1  released from detention?
2      A  I -- I don't know.  I don't recall.
3         MS. SCOTT:  We'll mark this as Exhibit 29,
4  please.
5         (Bernacke Exhibit 29 was marked for
6  identification and is attached to the transcript.)
7      Q  This is an e-mail that you're not on, but
8  I wanted to ask you about the Iraqi national
9  that's referenced here.
10     A  Okay.
11     Q  Okay.  So, Julius Clinton, who you
12 supervise, is communicating about Ahmed Tharis
13 Hacham.  Do you see that?
14     A  Is it at the bottom?
15     Q  It's at the very bottom.
16     A  Okay.  Okay.  I see that.
17     Q  Okay.  And there's an indication that he's
18 not a Hamama class member; correct?
19     A  Correct.
20     Q  Do you know if travel documents were
21 issued for this individual?
22     A  Not offhand, no.
23     Q  Is Julius Clinton the right person to ask
24 questions about individual Iraqi nationals?
25     A  He could be.  I mean the challenge is --

Page 134

1  is that we deal with a large volume of persons
2  cycling through.  You know, Iraq is -- wasn't the
3  only country that was assigned to him at the time,
4  nor is it the only country that is assigned to
5  Mr. Maddox at present.  So, he may or may not have
6  personal recollection of this particular case.
7      Q  So, if we wanted to find out which
8  individuals were released or which individuals --
9  strike that.
10        If we want to find out which individuals
11 were released, are there documents that would
12 provide that information?
13     A  Yes, there are.
14     Q  And what are those documents?
15     A  I'm sorry?
16     Q  What are those documents?
17     A  Those would be release notifications
18 coming from my unit.
19     Q  And are those in electronic format?
20     A  Yes, they are.
21     Q  If we wanted to find out which individuals
22 were released due to a SLRRFF analysis, what
23 documents would we look at?
24     A  I -- it's just a general Word document
25 that is a -- it's a -- we call it colloquially a

Page 135

1  "release letter."  It's something that we send out
2  to the field for -- I want to caveat that these
3  are only for cases that are above the 180-day
4  mark.  So, if a post-order custody review decision
5  resulted in a release prior to that 180-day line
6  in the sand, that would have been under the field
7  office's pursue and we wouldn't have had any
8  insight into that.
9      Q  Okay.  So, why don't we go ahead and
10 discuss more fully the SLRRFF process.
11     A  Okay.  Sure thing.
12     Q  Let's start with the 180-day POCR review.
13 And can you explain what that is.
14     A  Sure.  That, again, is a review of all the
15 individual facts of a particular individual case,
16 to include criminal history, immigration history
17 and travel document acquisition efforts.  It
18 also -- you know, it relies largely on the
19 viability of obtaining a travel document, and we
20 make a custody decision based off of that.
21     Q  What type of analysis -- under what
22 circumstances would a 100 -- when you're
23 conducting a 180-day custody review, what factors
24 do you look at to determine if an individual
25 should be released?

Page 136

1      A  All the factors that I just described.
2      Q  Can you list them again for me.
3      A  Criminal history, immigration history,
4  travel document acquisition efforts and viability
5  of obtaining a travel document.
6      Q  So, for each of those categories, what
7  factors do you look at to determine whether or not
8  someone should be released?
9      A  For criminal and immigration history, it
10 would be risk to U.S. public.  You know, again, as
11 I mentioned, with the 241.14D analysis, that would
12 have to be a very high threshold.  It's a very
13 unique instance in which we exercise that
14 authority.
15        In terms of travel document acquisition
16 efforts and viability of obtaining a travel
17 document, that would be -- you know, it could
18 be -- again, it's a -- it's very subjective, but
19 it would be obtaining the amount of times we have
20 approached a particular embassy or government or
21 consulate to issue a travel document.  It would be
22 the amount of liaison that has gone behind that
23 travel document request.
24     Q  Can I stop you there for a second.
25     A  Sure.

BERNACKE-CONFIDENTIAL, MICHAEL
07/13/2018

Confidential
Pages 137–140

Page 137

1    Q  What do you mean by the "amount of
2  liaison"?
3    A  Many times, for countries that have a more
4  matured repeatable travel document issuance
5  process, we will merely have to -- we, ICE, will
6  merely have to submit a travel -- a paper copy of
7  a travel document request.  You know, that
8  request, again, just includes immigration
9  documents, identity documents, that would support
10  an alien's identification and citizenship.
11        And in -- in instances, in some instances,
12  they will issue a travel document without having
13  to do an interview or, you know, do anything
14  largely outside of reviewing the paper documents
15  that we provide to their office.  Some require
16  interviews; some don't.
17        For more difficult cases or cases for
18  governments that don't necessarily have a very
19  mature travel document issuance process in place,
20  we will have to meet with the embassy counselor
21  staff to discuss the case, walk them through the
22  case particulars.  Anything that they necessarily
23  want to chat about regarding these different
24  cases, we will -- we will entertain them and
25  discuss those cases with them.

Page 138

1    Q  So, if there is greater liaison, does
2  that -- how does that factor into the SLRRFF
3  analysis?
4    A  It -- it -- in my perspective and, again,
5  you know, I can only speak for myself when it
6  comes to -- you know, the SLRRFF analysis and how I
7  conduct them, it demonstrates the amount of -- I
8  guess, the amount of vigor that goes behind a
9  travel document request and really walking through
10  the embassy staff, you know, the contents of the
11  documents, pushing for interviews, and really
12  doing a lot of hand holding when it comes to
13  coordinating any logistical aspect that they need
14  in terms of interviewing the alien, doing what
15  they need to get done in order to issue that
16  travel document.
17    Q  So, if there is greater liaison, is there
18  a less likelihood one would be released under
19  SLRRFF?
20    A  What do you mean by that?
21    Q  Okay.  Yeah.  So, I'm trying to figure out
22  how the amount of liaison factors into whether or
23  not SLRRFF exists.
24    A  So, generally speaking, for more
25  complicated cases, you know, our -- the desk

Page 139

1  officers, the detention deportation officers, will
2  meet with the embassies to discuss the case,
3  whatever case it may be.
4        And if a positive outcome is not yielded
5  in terms of a travel document potentially being
6  issued or assurances that one would be issued,
7  that could be elevated to greater, higher levels
8  of management within ERO.  And I will engage, John
9  Schultz will engage, and any -- anyone above him
10  could potentially engage in those cases, as well.
11        Generally speaking, that has resulted in
12  positive outcomes when we've done a greater level
13  of discussions, you know, at the desk officer
14  level, the detention deportation officer level,
15  or, you know, my level or higher levels, and --
16  and it has precluded us from having to release
17  aliens.
18    Q  If, after having those types of
19  interactions, ICE still does not receive travel
20  documents, does that factor into whether or not
21  SLRRFF exists?
22    A  It could.  It could.
23    Q  Okay.  So, I interrupted you, and I think
24  you had some other factors you were going to talk
25  about.

Page 140

1    A  Ooh, must have slipped my mind.
2    Q  So, we had criminal history -- we had the
3  four categories that you were looking at for
4  SLRRFF.
5    A  Uh-huh.
6    Q  We had the criminal history.  We were just
7  talking about -- can you --
8    A  Criminal immigration, the amount of times
9  a travel document has been requested and then the
10  amount of liaison.
11    Q  Which --
12    A  I think those were it, yeah.  Those are
13  the ones that I can think of offhand that I -- I
14  look for when I do my reviews.
15    Q  Does -- if you decide to decline release
16  from detention because you find SLRRFF exists, is
17  there anyone that reviews your decision?
18    A  For -- for a continued detention, no.  For
19  releases, yes.
20    Q  And who reviews your decision for
21  releases?
22    A  Our assistant director for removals.
23    Q  And who is that?
24    A  Marlen Pineiro.
25    Q  And does anybody review her decision?

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

BERNACKE-CONFIDENTIAL, MICHAEL
07/13/2018

Confidential
Pages 141–144

Page 141

1    A  Not that I'm aware of.
2    Q  So, Mr. Schultz yesterday said you guys
3  call him Dad Schultz; is that correct?
4    A  He's deputy assistant director, so there's
5  your acronym right there, but he is not my father.
6    Q  So, does DAD Schultz review --
7    A  Uh-huh.
8    Q  -- your determination when you decide that
9  someone should be released under SLRRFF?
10    A  Yes, he does.  Yes, it follows the chain
11  of command and he's -- he's Ms. Pineiro's deputy.
12    Q  When you decline release based on SLRRFF,
13  when is the next point that you make an assessment
14  if SLRRFF exists?
15    A  90 days thereafter or if we receive hard
16  declinations of a travel document and to our
17  interpretation, we do not see there being any
18  viable outcome for -- for an alien's potential
19  removal, then we will make a custody determination
20  at that point in time even if it is prior to the
21  90-day mark.
22       MS. SCOTT:  Can you read that answer back.
23       (The reporter read the record as
24  requested.)
25    Q  Okay.  So, what do you consider to be a

Page 142

1  hard declination?
2    A  In my opinion, that would be after we've
3  exhausted a number of resources to obtain a travel
4  document.  That includes continued liaison with a
5  number of embassies and consulates.  That would
6  include exhausting potential third-country
7  options, exhausting liaison efforts abroad with
8  our assistant attaches, usually in country or in
9  the region, Department of State engagement has not
10  resulted in any positive outcomes and we've really
11  tapped out all options -- in my perception, all
12  options to -- to obtain a travel document.
13    Q  If at this 90-day mark you determine that
14  SLRRFF continues to exist, does anybody evaluate
15  your decision?
16    A  No.
17    Q  Is there any point in the process that
18  somebody evaluates your decision when your
19  decision is to deny release?
20    A  Is there -- can you repeat that.
21    Q  Sure.  At any point when there is a SLRRFF
22  analysis --
23    A  Uh-huh.
24    Q  -- conducted, whether it's at the 180-day
25  point --

Page 143

1    A  Uh-huh.
2    Q  -- or a 90-day point --
3    A  Uh-huh.
4    Q  -- or thereafter, does anybody evaluate
5  your determination?
6    A  No.
7    Q  Do you, during that process, consult with
8  anybody regarding your determination?
9    A  Usually my staff, if I have any questions.
10  If there's any questions related to their
11  recommendation for continued detention that I may
12  have with a third party, for example, Department
13  of State, I may confer with them.
14    Q  Can you take a look -- let's take a look
15  at Exhibit 9.  What I want to draw your attention
16  to is the pages at 270499.
17    A  Okay.
18    Q  Okay.  If you look halfway down the page,
19  it says that Julius Clinton is responsible for the
20  briefing memo.  Do you see that?
21    A  I do.
22    Q  And Julius Clinton reports to you;
23  correct?
24    A  He did at the time.
25    Q  He did, yes.  Thank you for clarification.

Page 144

1    A  No worries.
2    Q  So, I want to talk to you about the
3  numbers here.  As you can see on the Zadvydas
4  releases, this printout cut off fiscal year 2017.
5    A  Uh-huh.
6    Q  Do you know how many Zadvydas releases
7  took place in 2017?
8    A  I don't.
9    Q  Have you -- do you calculate the releases-
10  to-removals ratio that's discussed on 204798?
11    A  I personally do not, no.
12    Q  So, if I was to tell you that if we
13  reverse engineered the reverse -- the release-to-
14  removal ratio that's here at that 0.15 --
15    A  Uh-huh.
16    Q  -- using the fiscal years 2017 removals of
17  58 --
18    A  Uh-huh.
19    Q  -- and resulted in 10 Zadvydas releases,
20  would you have any reason to dispute that?
21    A  I really couldn't speak intelligently to
22  it.
23    Q  You just don't know what numbers --
24    A  I just don't know.
25       MS. SCOTT:  Okay.  So, Will, we request a

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

BERNACKE-CONFIDENTIAL, MICHAEL
07/13/2018

Confidential
Pages 153–156

Page 153

1    A  All -- all Hamama class members are given
2 an individualized case review, post-order custody
3 review, and their custody determination is based
4 off of SLRRFF.
5         MS. SCHLANGER:  Sorry.  Just one second.
6         MS. SCOTT:  Okay.  I don't have anymore
7 questions.
8         MR. SILVIS:  I just have a couple, I
9 think.
10 EXAMINATION BY COUNSEL ON BEHALF OF THE
11 RESPONDENTS AND DEFENDANTS
12 BY MR. SILVIS:
13    Q  Take you back, earlier -- earlier you were
14 asked some questions about the -- the repatriation
15 efforts of the Hamama class if the stay is lifted.
16 Do you remember that?
17    A  I do.
18    Q  Okay.  Is it absent -- to your mind, is
19 the absence of an explicit statement from Iraq or
20 the Government of Iraq that they will accept for
21 repatriation all Iraqi nationals the final orders
22 of removal if the stay is lifted an indication
23 that they will not accept these individuals for
24 repatriation once the stay is lifted?
25    A  No.  It is -- it is my perception that

Page 154

1 they will accept the removal of their -- their
2 backlog of cases with final orders of removal.
3 Although it's taken a significant amount of
4 liaison thus far and engagement with the embassy
5 and their government, they, in my viewpoint, have
6 taken appropriate steps to institute a repeatable
7 process for travel document issuance.
8    Q  Okay.  So, do you have any reason to
9 believe that Iraq will not accept its nationals
10 with final orders of removal for repatriation if
11 the Hamama stay is lifted?
12    A  No, I do not.  I believe they will be
13 issued travel documents.
14        MR. SILVIS:  That's all I have.
15        MS. SCOTT:  We're finished.  Thank you.
16        THE WITNESS:  Thank you.
17        THE COURT REPORTER:  Ms. Scott, are you
18 ordering this to be transcribed?
19        MS. SCOTT:  So, my assistant will be in
20 touch with you.
21        THE COURT REPORTER:  Okay.  Fine.  Thank
22 you.
23        MR. SILVIS:  Actually, we're going to ask
24 to read and sign the declaration and also -- I'm
25 sorry -- the deposition transcript.  And, also, we

Page 155

1 will be requesting the 14 days under the
2 protective order to review and designate any parts
3 that we might think are protected.
4         MS. SCOTT:  And for those 14-day period,
5 you want to treat this as highly confidential;
6 correct?
7         MR. SILVIS:  Correct.
8         MS. SCOTT:  Okay.  Thank you.
9         (A discussion was held off the record.)
10        THE COURT REPORTER:  And how am I to
11 handle the exhibits?  Am I taking them?
12        MS. SCOTT:  Yes, please.  Take them all.
13        THE COURT REPORTER:  Okay.
14        (Off the record at 1:47 p.m.)
15
16
17
18
19
20
21
22
23
24
25

Page 156

1              ACKNOWLEDGEMENT OF DEPONENT
2        I, MICHAEL BERNACKE, do hereby acknowledge
3 that I have read and examined the foregoing
4 testimony, and the same is a true, correct and
5 complete transcription of the testimony given by
6 me, and any corrections appear on the attached
7 Errata sheet signed by me.
8
9 _____     _____
10    (DATE)                    (SIGNATURE)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

BERNACKE-CONFIDENTIAL, MICHAEL
07/13/2018

Confidential
Pages 157

Page 157

```
 1    CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC

 2         I, Victoria L. Wilson, the officer before

 3    whom the foregoing deposition was taken, do hereby

 4    certify that the foregoing transcript is a true

 5    and correct record of the testimony given; that

 6    said testimony was taken by me stenographically

 7    and thereafter reduced to typewriting under my

 8    direction; that reading and signing was requested;

 9    and that I am neither counsel for, related to, nor

10    employed by any of the parties to this case and

11    have no interest, financial or otherwise, in its

12    outcome.

13         IN WITNESS WHEREOF, I have hereunto set my

14    hand and affixed my notarial seal this 17th day of

15    July, 2018.

16    My commission expires January 31, 2019.

17

18

19    _____

20    VICTORIA L. WILSON

21    NOTARY PUBLIC IN AND FOR

22    THE DISTRICT OF COLUMBIA

23

24

25
```

**U**n**S L**EGAL
**S**UPPORT

The Power of Commitment™

July 18, 2018

U.S. Department of Justice
950 Pennsylvania Avenue NW
Northwest Building
Civil Rights Division
Washington, D.C. 20530

RE:   Usama Jamil Hamama, et al vs. Rebecca Adducci, et al
        Deposition of Michael Bernacke taken on July 13, 2018

Dear Mr. Silvis:

Enclosed is a copy of the above-referenced deposition and the Verification of Deponent page
from the original transcript.  Please have the witness review the deposition, sign the verification
page and send it to U.S. Legal Support, Attn:  Production Department for distribution to the
ordering parties listed below.
**Any changes are to be noted on the errata sheet in the following manner:**

Page 12, Line 6 – This should be That

This sheet is to be distributed to the attorneys and attached to the original and copies of the
transcript.

Thank you very much.

Debbie Stambersky
Production Department

Enclosure

cc:   Kimberly Scott
        Margo Schlanger

MICHAEL BERNACKE
July 13, 2018

Page 156

1              ACKNOWLEDGEMENT OF DEPONENT

2          I, MICHAEL BERNACKE, do hereby acknowledge

3     that I have read and examined the foregoing

4     testimony, and the same is a true, correct and

5     complete transcription of the testimony given by

6     me, and any corrections appear on the attached

7     Errata sheet signed by me.

8

9     ___08/02/2018___     _____

10         (DATE)                  (SIGNATURE)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



## ERRATA SHEET

| Page | Line | Change |
| --- | --- | --- |
| 100 | 11 | Change "REO" to "RIO". |
| 141 | 4 | Change "he's deputy assistant director" to "he's a deputy assistant director". |