# EXHIBIT 10

*Redacted per Court's Order ECF 338*

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

**USAMA JAMIL HAMAMA**, et al.,
  Plaintiffs/Petitioners,

v.

**REBECCA ADDUCCI**, et al.,
  Defendants/Respondents.

Case No. 2:17-cv-11910
Hon. Mark A. Goldsmith
Mag. David R. Grand

Class Action

## DECLARATION OF EDWARD AMIR BAJOKA

I, Edward Amir Bajoka, make this statement under the penalties of perjury of the laws of the United States and if called to testify I could and would do so competently based upon my personal knowledge as follows:

1.      I am an attorney in good standing licensed to practice in the State of Michigan. I have been practicing law for over ten years. My primary areas of practice are criminal defense and immigration, particularly removal defense. I would estimate that I have handled dozens of immigration cases, including dozens of immigration bond hearings, in my career to date.

2.      I currently represent multiple individuals who are members of the *Hamama* class. Many of those individuals are currently in DHS custody. I have represented sixteen of the *Hamama* class members at bond hearings that were conducted pursuant to this Court's Preliminary Injunction dated January 2, 2018.

3.      In most, if not all of these bond hearings, ICE Counsel has successfully introduced as exhibits the declaration of Michael V. Bernacke, and two declarations from John A. Schultz.

4.      The declaration of Michael Bernacke was used to make the point that Iraq is willing and able to issue travel documents to members of the class who are detained, and that the only impediment was the stay issued in the *Hamama* case.

5.      The declarations of John A. Schultz were used by ICE Counsel to point to the idea that there was an orderly, organized, simple process to go about getting a travel document from Iraq. The insinuation by ICE Counsel was that it would be an easy, simple process to obtain travel documents for my client once a removal Order was final.

1

6.      In most of the *Hamama* bond hearings I handled where cases had not yet been reopened, ICE attorneys argued, based on the declarations, that travel documents were ready to be issued for the individual, and that removal was imminent, but for the *Hamama* stay.

7.      In every single one of the *Hamama* bond hearings, regardless of the procedural posture of the individual case, ICE Counsel argued that my client was both a danger to the community and a flight risk. They argued danger in cases where the Respondent had not committed a crime in decades. They argued flight risk even in the case of a wheelchair bound man in his 60s. This was a successful argument in many cases, even those in which there was no finding of danger to the community. Many individuals that I am aware of were given bonds as high as $100,000.00, based on their perceived risk of flight. The declarations of Bernanke and Schultz were used to bolster the flight risk argument.

8.      One of my clients is Steve Salman. Mr. Salman first arrived in this country in 2002 as an asylee from Iraq. Steve was fourteen years old when he arrived in the U.S. with his family. He had lived the majority of his adolescence as a refugee. He and his family escaped violence and persecution in Iraq.

9. Steve has an ████████ daughter. She is a U.S. Citizen by birth. His mother and all his siblings are U.S. Citizens. His father is a lawful permanent resident.

10.      Mr. Salman was ordered removed in 2008 following a conviction for Possession with Intent to Deliver Marijuana. The total amount of marijuana, weighed with the packaging was 27 grams. The Board of Immigration Appeals has found that under 30 grams is an amount for personal use. Despite his order of removal, Steve was released from ICE custody pursuant to an order of supervision with which he complied for 9 years.

11.      Until July, 2017, Steve was gainfully employed at a restaurant in the San Diego, California area, a job he had held for around two years.

12.      Mr. Salman had an individual merits hearing on January 10, 2018. On January 30, 2018, the Judge ruled that his asylum status should be reinstated.

13.      ICE Counsel had not indicated whether or not they were waiving their right to appeal, and the Mr. Salman remained detained.

2

14. On February 5, 2018, a few days after receiving the news of the victory, Mr. Salman had his *Hamama* bond hearing. Despite his ruling in favor of Mr. Salman with regard to his asylum claim, the Judge found that he was not eligible for bond because he was a danger to the community based on drinking and driving charges in his past.

15. ICE Counsel waited until the final day of their 30 day appeal period to actually file their appeal of the restoration of his asylum status.

16. Ultimately, the matter was decided in Mr. Salman's favor by the Board of Immigration Appeals, which affirmed the immigration judge's decision that Mr. Salman's asylee status should be reinstated. Significantly, Mr. Salman had been detained for approximately one year before he was finally released. He was detained for greater than six months AFTER he had his asylum status reinstated by the Immigration Judge while he waited out the appeal process.

17. The period of detention was very hard on both Mr. Salman and his family. He missed milestones in his daughter's life. His family was uncertain whether the appeal would be successful or not, which wore on them heavily. Steve was placed in solitary confinement for a period of time after he allegedly called a guard a racist.

18. Steve was confined in the Calhoun County Jail. This is approximately a two and half hour drive from my offices in Metro Detroit. As such, a visit to the jail to gather necessary information and signatures takes up an entire work day. Steve was only allowed to use the phone at certain times. If I was unable to answer my phone during that time, we simply would not communicate. This was very frustrating for Steve and myself. It took a toll on our attorney-client relationship.

19. It is also standard practice that ICE re-detain an individual just prior to his or her removal, once travel documents are obtained. I have seen this happen in the case of many of my clients and other people. This is typical in cases where a travel document might be difficult to obtain for whatever reason. I am aware of no reason why ICE could not do the same thing here, releasing the *Hamama* class members on orders of supervision and re-detaining them if and when ICE is able to obtain travel documents from Iraq.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

3

Executed on August 22, 2018 in Warren, Michigan.

Edward Amir Bajoka