# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

| | |
|---|---|
| **USAMA JAMIL HAMAMA**, et al.,<br>    Petitioners and Plaintiffs,<br><br>v.<br><br>**REBECCA ADDUCCI**, et al.,<br>    Respondents and Defendants. | Case No. 2:17-cv-11910<br>Hon. Mark A. Goldsmith<br>Mag. David R. Grand<br><br>Class Action |

## PETITIONERS/PLAINTIFFS' MOTION FOR SANCTIONS

Local Rule 7.1(a)(1) requires Petitioners/Plaintiffs (hereinafter Petitioners) to ascertain whether this motion is opposed. Petitioners' counsel Margo Schlanger communicated with William Silvis, counsel for Respondents/Defendants (hereinafter Respondents), via email on August 28, 2018 explaining the nature of the relief sought and seeking concurrence. Mr. Silvis responded that "Respondents deny that any false or misleading statements have been made to the Court, but without knowing which statements Petitioners are referencing Respondents are not in a position to provide the answer required under LR 7.1(2)(A)."

\* \* \*

On January 2, 2018, this Court deferred ruling on Petitioners' *Zadvydas* claim, based principally upon factual representations by Respondents regarding the likelihood that Iraq would accept Petitioners for repatriation. ECF 191, PgID5328-35. Relying on declarations from John Schultz, deputy assistant director for ICE's Asia and Europe Removal and International Operations Unit, and Michael Bernacke, ICE's acting deputy assistant director for that same unit, the Court found that it is "still an open question whether Iraq has agreed to accept class-wide

repatriation" and that "a more developed record is necessary to answer this question." *Id.* at PgID5334. The Court pointed specifically to statements that "the Government's negotiations have resulted in Iraq's agreement to cooperate in removal of Iraqi nationals from the United States;" that "ICE had scheduled charter flights to depart in both June and July;" that "there is no numeric limit on the number of removals;" that the reason "very few travel documents have actually been provided" was that "these documents are being sought only for those not subject to the stay of removal;" and that "if the injunction is lifted, large-scale removals can be arranged via charter flights, without the need for travel documents." *Id.* at PgID5331-32 (citing Schultz and Bernacke declarations).

Once the Court allowed discovery, Respondents – who had successfully prevented discovery during all of 2017 – sought to thwart it at every turn through delay and objection. When they did respond, they provided incomplete and misleading interrogatory responses designed to obscure, *inter alia*, the fact that Iraq has a long-standing and continuing policy against involuntary repatriations, that the responsible ICE office was so frustrated by that policy that in July 2017 it was seeking visa sanctions, and that Iraq has repeatedly refused repatriation of class members, absent their expressed desire to return. Discovery is still incomplete. Most recently, after Respondents sought yet another extension and the Court ordered that they respond to discovery requests, including production of

2

documents by August 20, 2018, Respondents again failed to produce documents, meaning that only Respondents – and not Petitioners nor the Court – have access to documents that post-date March 2018.

Critically, however, the documents that Petitioners have obtained in these hard-fought discovery battles show that the Respondents' sworn declarations contained both highly misleading and demonstrably false information – information that was the basis for this Court's January 2nd ruling. Moreover, the Respondents knew at the time they submitted those declarations that the statements were misleading or false. Documents obtained in discovery also show that Respondents knowingly withheld critical facts from the Court. At no point have Respondents made any efforts to rectify the situation by notifying the Court or class counsel that prior court filings and discovery responses contained false and misleading information, or that Respondents had failed in their court filings to mention facts central to resolution of the *Zadvydas* claim. The truth is:

- there is no agreement with Iraq for class-wide repatriation;

- ICE sought travel documents in May and June 2017 for some 280 Iraqi nationals, which Iraq refused to provide;

- Iraq had and continues to have a longstanding policy of opposing forced repatriation and it is unclear whether or when Iraq will ever accept Iraqi nationals who do not wish to return;

- Iraq has long required potential deportees to express their desire to return to Iraq, and has used a standard form to document that desire in writing;

- Iraq has repeatedly refused to accept *Hamama* class members unless they desire to return;

- Iraq will not accept Iraqi nationals on charter flights without travel documents;

- the cancellation of the June 2017 flight was due to Iraq's refusal to accept it and not this Court's injunction;

- Iraq never agreed to accept a July 2017 charter and never issued a single travel document for any such flight by the time when this Court's nationwide injunction issued; and

- by the time Respondents' opposed the first preliminary injunction in July 2017, ICE had become so frustrated with Iraq's unwillingness to accept removals that it initiated the process for imposing visa sanctions against a country it deemed to be "among the most recalcitrant countries" with respect to repatriations.

Respondents not only failed in their duty to reveal those facts to the Court, but affirmatively misrepresented them.

WHEREFORE, pursuant to this Court's inherent powers and for the reasons set forth in the accompanying brief, Petitioners request that this Court, as sanctions

4

and remedies for Respondents' misrepresentations, bad faith and misconduct:

1. ORDER that members of the *Zadvydas* Subclass who have been detained longer than six months be released under orders of supervision within 14 days unless Respondents by that date provide to the Court individualized evidence that:

    a. ICE has valid travel documents for the detainee; or

    b. There is another strong special justification for the individual's detention, other than effectuating removal.

2. STRIKE from the declarations of John Schultz Jr. and Michael Bernacke language that is false or misleading and that is contained in the following paragraphs of those declarations, as highlighted in Exhibits A, B and C:

    - Schultz Dec. 7/20/2017, ECF 81-4, ¶5;

    - Schultz Dec. 11/30/2017, ECF 158-2, ¶¶4, 6, 7, 8 and 9;

    - Bernacke Dec., Doc# 184-2, ¶¶4, 5, 6, 7, 8, 10, 11 and 12.

3. ORDER that in any individual immigration and habeas proceeding, whether in immigration court or federal court, in which the Schultz and Bernacke declarations have been offered as evidence, Respondents file a notice stating that this Court has stricken portions of those declarations, provide each presiding judge in such a proceeding with this Court's order and opinion explaining why credence is not due the declarations and what portions of the declarations have been stricken, and report to this Court on those filings.

5

4. ORDER Respondents to pay Petitioners' counsel their reasonable attorneys' fees and costs for conducting discovery related to Petitioners' *Zadvydas* claim, for filing and litigating this Motion for Sanctions, and for filing and litigating Petitioners' Renewed Motion for Preliminary Injunction Under *Zadvydas*, ECF 457.

5. GRANT whatever other relief the Court deems appropriate to sanction and remedy the government's actions.

Respectfully submitted,

Michael J. Steinberg (P43085)
Bonsitu A. Kitaba (P78822)
Miriam J. Aukerman (P63165)
ACLU FUND OF MICHIGAN
2966 Woodward Avenue
Detroit, Michigan 48201
(313) 578-6814
msteinberg@aclumich.org

/s/Kimberly L. Scott
Kimberly L. Scott (P69706)
Wendolyn W. Richards (P67776)
Cooperating Attorneys, ACLU Fund
 of Michigan
MILLER, CANFIELD, PADDOCK
 & STONE, PLC
101 N. Main St., 7th Floor
Ann Arbor, MI 48104
(734) 668-7696
scott@millercanfield.com

Judy Rabinovitz (NY Bar JR-1214)
Lee Gelernt (NY Bar LG-8511)
ACLU FOUNDATION
 IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2618
jrabinovitz@aclu.org

Margo Schlanger (P82345)
Cooperating Attorneys, ACLU Fund
 of Michigan
625 South State Street
Ann Arbor, Michigan 48109
734-615-2618
margo.schlanger@gmail.com

6

Nora Youkhana (P80067)
Nadine Yousif (P80421)
Cooperating Attorneys, ACLU Fund
 of Michigan
CODE LEGAL AID INC.
 27321 Hampden St.
Madison Heights, MI 48071
(248) 894-6197
norayoukhana@gmail.com

María Martínez Sánchez (NM Bar
126375)
ACLU OF NEW MEXICO
1410 Coal Ave. SW
Albuquerque, NM 87102
msanchez@aclu-nm.org

Susan E. Reed (P66950)
MICHIGAN IMMIGRANT RIGHTS
CENTER
3030 S. 9th St. Suite 1B
Kalamazoo, MI 49009
(269) 492-7196, Ext. 535
Susanree@michiganimmigrant.org

Lara Finkbeiner (NY Bar 5197165)
Mark Doss (NY Bar 5277462)
INTERNATIONAL REFUGEE
 ASSISTANCE PROJECT
Urban Justice Center
40 Rector St., 9th Floor
New York, NY 10006
(646) 602-5600
lfinkbeiner@refugeerights.org

*Attorneys for All Petitioners and Plaintiffs*

William W. Swor (P21215)
WILLIAM W. SWOR
 & ASSOCIATES
1120 Ford Building
615 Griswold Street
Detroit, MI 48226
wwswor@sworlaw.com

*Attorney for Petitioner/Plaintiff Usama Hamama*

Dated: October 23, 2018

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

**USAMA JAMIL HAMAMA**, et al.,
    Petitioners and Plaintiffs,

v.

**REBECCA ADDUCCI**, et al.,
    Respondents and Defendants.

Case No. 2:17-cv-11910
Hon. Mark A. Goldsmith
Mag. David R. Grand

Class Action

# PETITIONERS/PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR SANCTIONS

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................iv

STATEMENT OF ISSUES PRESENTED.................................................vi

CONTROLLING OR MOST APPROPRIATE AUTHORITY .......................... vii

INTRODUCTION .........................................................................1

BACKGROUND AND FACTS ...........................................................2

I.    RESPONDENTS KNOWINGLY PRESENTED FALSE AND MISLEADING INFORMATION ....................................................2

    A.    Respondents' Declarations Stated There Was an Agreement Under Which Iraq Would Accept Unlimited Repatriations Via Charter Flights ................................................................3

    B.    Respondents Knew The Declarations Were Untrue ...........................5

        1.    Respondents said Iraq agreed to the return of all Iraqi nationals with final orders of removal, knowing that was untrue.............................................................6

        2.    Respondents said ICE could secure travel documents, but has not attempted to do so because of the injunction, knowing that was untrue ............................................8

        3.    Respondents said Iraq agreed to accept charter flights without formal travel documents, knowing that was untrue.............................................................9

        4.    ICE said that the June and July 2017 flights were cancelled as a result of this Court's injunction, knowing that was untrue .......................................................10

    C.    The Government Withheld Material Information .............................12

II.    THE GOVERNMENT'S CONDUCT THROUGHOUT THIS LITIGATION HAS BEEN DESIGNED TO HIDE THE TRUTH .......13

III.    RESPONDENTS' MISCONDUCT HAS CAUSED PETITIONERS SEVERE HARM........................................................15

ARGUMENT ............................................................................16

ii

IV. THIS COURT HAS INHERENT AUTHORITY TO SANCTION AND REMEDY THE GOVERNMENT'S LITIGATION MISCONDUCT ....................................................................................16

V. THIS COURT HAS INHERENT AUTHORITY TO FASHION APPROPRIATE REMEDIES TAILORED TO THE HARM CAUSED BY THE GOVERNMENT'S MISCONDUCT ....................19

VI. BECAUSE RESPONDENTS SECURED DEFERRAL OF PETITIONERS' ZADVYDAS CLAIM THROUGH MISCONDUCT, THE APPROPRIATE SANCTION IS PETITIONERS' RELEASE ..................................................................20

VII. THE COURT SHOULD STRIKE FALSE AND MISLEADING LANGUAGE FROM THE DECLARATIONS AND REQUIRE RESPONDENTS TO INFORM OTHER TRIBUNALS WHERE THE DECLARATIONS WERE USED OF THAT FACT ....................23

VIII. PETITIONERS SHOULD BE AWARDED ATTORNEYS' FEES AND COSTS ..............................................................................24

CONCLUSION .............................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ayoubi v. Dart*, 640 F. App'x 524 (7th Cir. 2016) ...................................................17

*Barnhill v. United States*, 11 F.3d 1360 (7th Cir. 1993).........................................20

*In re Bavelis*, 563 B.R. 672 (S.D. Ohio 2017)........................................................19

*Beard v. City of Southfield*, No. 14-13465, 2016 WL 6518490 (E.D. Mich. Nov. 3, 2016)...............................................................................................20

*Chambers v. NASCO, Inc.,* 501 U.S. 32 (1991).................................................*passim*

*Demjanjuk v. Petrovsky*, 310 F.3d 338 (6th Cir. 1993) ......................................19, 22

*Enmon v. Prospect Capital Corp.*, 675 F.3d 138 (2d Cir. 2012) ........................1, 23

*First Bank of Marietta v. Hartford Underwriters Ins. Co.*, 307 F.3d 501 (6th Cir. 2002)..................................................................................*passim*

*Forsberg v. Pefanis*, 634 F. App'x 676 (11th Cir. 2015) ........................................17

*Fuery v. City of Chicago*, --- F.3d ----, 2018 WL 3853742 (7th Cir. Aug. 14, 2018) .................................................................................................19, 22

*Grace v. Sessions*, No. 18-CV-1853 (EGS), 2018 WL 3812445 (D.D.C. Aug. 9, 2018) ......................................................................................25

*Graham v. Dallas Indep. Sch. Dist.*, No. 3:04-CV-2461-B, 2006 WL 507944 (N.D. Tex. Jan. 10, 2006) ....................................................................17

*Hutto v. Finney*, 437 U.S. 678 (1978)..................................................................1, 24

*Korematsu v. United States*, 323 U.S. 214 (1944)......................................................1

*Korematsu v. United States*, 584 F. Supp. 1406 (N.D. Cal. 1984)..................*passim*

*Lamie v. Smith*, No. 1:12-cv-201, 2013 WL 12109526 (W.D. Mich. Feb. 14, 2013), *report and recommendation adopted by* 2013 WL 12109421 (W.D. Mich. Mar. 6, 2013)..................................................................20

*Laukus v. Rio Brands, Inc.*, 292 F.R.D. 485 (N.D. Ohio 2013) .............................19

*Metz v. Unizan Bank*, 655 F.3d 485 (6th Cir. 2011)................................1, 16, 17, 24

*Monsanto Co. v. Ralph*, 382 F.3d 1374 (Fed. Cir. 2004) ........................................20

*Murray v. City of Columbus*, 534 F. App'x 479 (6th Cir. 2013)............................16

*Oliver v. Gramley*, 200 F.3d 465 (7th Cir. 1999) ...................................................20

*Plastech Holding Corp. v. WM Greentech Auto. Corp.*, 257 F. Supp. 3d 867 (E.D. Mich. 2017) ...............................................................................1, 17

*Railway Express, Inc. v. Piper*, 447 U.S. 752 (1980) .............................................16

*Red Carpet Studios Div. of Source Advantage, Ltd. v. Sater*, 465 F.3d 642 (6th Cir. 2006)...........................................................................................1, 24

*Robert Bosch LLC v. A.B.S. Power Brake, Inc.*, No. 09-14468, 2011 WL 1790221 (E.D. Mich. May 10, 2011) .........................................................20

*United States v. Van Engel*, 15 F.3d 623 (7th Cir. 1993) .......................................21

*Virzi v. Grand Trunk Warehouse & Cold Storage Co.*, 571 F. Supp. 507 (E.D. Mich. 1983) ...................................................................................1, 19

*Williamson v. Recovery Ltd. P'ship*, 826 F.3d 297 (6th Cir. 2017) .......................19

*Zadvydas v. Davis*, 533 U.S. 678 (2001) .........................................................*passim*

**Rules**

Fed. R. Civ. P. 37(b) ................................................................................................14

E.D. Mich. L.R. 83.22(b) .........................................................................................18

Michigan Rule of Professional Conduct 3.3.........................................................1, 18

Michigan Rule of Professional Conduct 4.1.........................................................1, 18

## STATEMENT OF ISSUES PRESENTED

1. Should this Court enter relief granting Petitioners' claims for release under *Zadvydas v. Davis*, 533 U.S. 678 (2001), where this Court's earlier decision to defer ruling on that claim was secured by Respondents' misrepresentations and omissions of material facts?

Petitioners' Answer: Yes

2. Should this Court strike misleading or false portions of the declarations of John Schultz Jr. and Michael Bernacke, and require Respondents to inform immigration courts or federal courts where those misleading and false declarations have been used in individual proceedings of that fact?

Petitioners Answer: Yes.

3. Should this Court order Respondents to pay Petitioners' fees associated with (a) discovery conducted for their *Zadvydas* claim, (b) Petitioners' renewed motion for relief under *Zadvydas*, and (c) this motion for sanctions?

Petitioners' Answer: Yes

## CONTROLLING OR MOST APPROPRIATE AUTHORITY

Michigan Rule of Professional Conduct 3.3

Michigan Rule of Professional Conduct 4.1

*Chambers v. NASCO, Inc.,* 501 U.S. 32 (1991)

*Hutto v. Finney*, 437 U.S. 678 (1978)

*Zadvydas v. Davis*, 533 U.S. 678 (2001)

*Enmon v. Prospect Capital Corp.*, 675 F.3d 138 (2d Cir. 2012)

*First Bank of Marietta v. Hartford Underwriters Ins. Co.*, 307 F.3d 501 (6th Cir. 2002)

*Metz v. Unizan Bank*, 655 F.3d 485 (6th Cir. 2011)

*Red Carpet Studios Div. of Source Advantage, Ltd. v. Sater*, 465 F.3d 642 (6th Cir. 2006)

*Korematsu v. United States*, 584 F. Supp. 1406 (N.D. Cal. 1984)

*Plastech Holding Corp. v. WM Greentech Auto. Corp.n*, 257 F. Supp. 3d 867 (E.D. Mich. 2017)

*Virzi v. Grand Trunk Warehouse & Cold Storage Co.*, 571 F. Supp. 507 (E.D. Mich. 1983)

## <u>INTRODUCTION</u>

In *Korematsu v. United States*, 584 F. Supp. 1406 (N.D. Cal. 1984), the court vacated the conviction of Fred Korematsu, a conviction which four decades earlier led to the Supreme Court's decision upholding the internment of Japanese-Americans. *See Korematsu v. United States*, 323 U.S. 214 (1944). The district court in 1984 focused on the fact that the federal government had presented only information justifying detention of the Japanese, when "there was critical contradictory evidence known to the government and knowingly concealed from the courts." *Korematsu*, 584 F. Supp. at 1417.

> [T]he government deliberately omitted relevant information and provided misleading information in papers before the court. The information was critical to the court's determination, although it cannot now be said what result would have obtained had the information been disclosed. Because the information was of the kind peculiarly within the government's knowledge, the court was dependent upon the government to provide a full and accurate account. . . . The judicial process is seriously impaired when the government's law enforcement officers violate their ethical obligations to the court.

*Id.* at 1420. Regardless of "[w]hether a fuller, more accurate record would have prompted a different decision," relief was justified because "relevant evidence has been withheld." *Id.* at 1419. Had the government, and its attorneys, been honest with the court, this shameful chapter in our history might have been avoided.

More than 70 years have passed, but the government's obligation to be forthright with the court has not changed. Nor, unfortunately, has the government's

1

behavior which has, yet again, led to unjustified detention.

When this Court deferred ruling on Petitioners' *Zadvydas* claim, it did so based on Respondents' representation of facts only they then knew. Discovery has now shown both that those representations were false, and that the government knowingly concealed key information demonstrating the falsehoods. The cost of Respondents' misconduct here is measured in the pain it inflicted on Petitioners – in separated families, in months of human life spent unlawfully behind bars, and in the desperation of some 37 class members who, unable to stand the toll of detention, have given up and agreed to removal, despite the danger of persecution, torture, or even murder in Iraq. While that harm cannot be undone, Petitioners ask this Court to use its inherent authority to release the *Zadvydas* subclass members and rectify, to the extent possible, the consequences of Respondents' misconduct. Petitioners also ask the Court to strike the misleading and false portions of Respondents' declarations, to require Respondents to acknowledge error in other proceedings where those declarations were used, and to pay attorneys' fees.

## BACKGROUND AND FACTS

### I.     RESPONDENTS KNOWINGLY PRESENTED FALSE AND MISLEADING INFORMATION.

In January this Court deferred ruling on the *Zadvydas* claim, concluding that it could not "make a determination regarding whether Iraq will accept repatriations of the class." ECF 191, PgID5332. In ruling, the Court was forced to rely on the

government's one-sided rendition of the facts, because the government had vigorously opposed any discovery. Discovery has now shown that a) the government's sworn facts were misleading and false, b) the government knew they were false, and c) the government withheld material, critical information.

**A.      Respondents' Declarations Stated There Was an Agreement Under Which Iraq Would Accept Unlimited Repatriations Via Charter Flights.**

The government's first declaration related to the purported US-Iraq "agreement" was from John Schultz, ICE Deputy Assistant Director with primary responsibility for obtaining Iraqi cooperation with repatriations, dated July 20, 2017. ECF 81-4. The declaration stated "Iraq has agreed, using charter flights, to the timely return of its nationals that are subject to final orders of removal." *Id.* ¶5.

In their response to Petitioners' preliminary injunction motion on detention, ECF 158, Respondents relied on another declaration, dated November 30, 2017, from Mr. Schultz, ECF 158-2, which was based on his purported "professional knowledge," as well as "information obtained from other individuals employed by ICE, and information obtained from DHS records." [1] *Id.* ¶3.[2] He testified:

---

[1] The declaration was central to Respondents' argument. *See* Response, ECF 158, PgID4103-04 (declaration "establishes that, but for the stay in place in this case, ICE would obtain travel documents for the detained Petitioners"); 12/20/2017 Hrg. Trans., at 47, 115-16 (counsel stated that charter flights stopped by injunction and that ICE was in the process of obtaining travel documents for each person).

[2] The Court has appropriately questioned why Respondents' declarations are *Continued on next page.*

- "Recent negotiations between the governments of the United States and Iraq have resulted in increased cooperation in removal of Iraqi nationals." *Id.* ¶4.

- "ICE originally had a charter flight scheduled in June 2017 that was rescheduled for July 2017 in view of the court's original order; however, ICE was not able to effectuate that flight due to the Court's July 24th order." *Id.* ¶6.

- "ICE expects to receive travel documents for all individuals that ICE has requested to remove to Iraq." *Id.* ¶7.

- "To minimize the risk of having to ask a foreign government to re-issue or extend an expired travel document, ICE waits until there are no impediments to request a travel document. Thus, ICE currently does not have travel documents for all detained final order detainees. ICE believes that the central government of Iraq in Baghdad will issue travel documents should the court lift the injunction." *Id.* ¶8.

After the Court asked about the terms of the purported Iraqi agreement during the detention motion hearing, 12/20/2017 Transcript, at 47-48, 122-23, Respondents submitted a declaration from Michael Bernacke, ECF 184-2, that:

- vouched for earlier statements made by Mr. Schultz under oath (ECF 81-4) that there was an agreement with Iraq, though finally admitted that it was "not memorialized in any written document or treaty" (ECF 184-2, ¶4);

- asserted that the Iraqi Agreement "does not contemplate any numeric limitation on the number of removals in total or on an annual basis" (*id.* ¶5);

- asserted that Iraq had agreed to accept removals via charter flights and without the need for travel documents being issued by Iraq (*id.* ¶¶6-7);

- claimed that ICE cancelled the June 2017 flight "[a]s a result of the injunction in the above-captioned case." (*id.* ¶8); and

- attested that "ICE believes that the central government of Iraq in Baghdad will permit the entry of detained Iraqi nationals . . . if the injunction is lifted"

not based on personal knowledge, as required. ECF 191, PgID5332.

using charter flights and the "injunction is the only impediment to ICE to resuming charter flights to Iraq." (*Id.* ¶12).[3]

The Court relied on Schultz's and Bernacke's declarations in deferring adjudication of the *Zadvydas* claim, rather than ordering release, ECF 191, PgID5331-32:

> Schultz states that the Government's negotiations have resulted in Iraq's agreement to cooperate in removal of Iraqi nationals from the United States. [Schultz Decl.] ¶ 4. As evidence of this cooperation, Schultz notes that, prior to this Court's rulings enjoining removal, ICE had scheduled charter flights to depart in both June and July. *Id.* ¶6.
>
> *       *       *
>
> In his declaration, Bernacke states that the agreement between the United States and Iraq is not memorialized in writing, but is instead the product of ongoing negotiations. [Bernacke Decl.] ¶ 4. Bernacke also states that "the agreement does not contemplate any numeric limitation on the number of removals," and that if the injunction is lifted, large-scale removals can be arranged via charter flight, without the need for travel documents. *Id.* ¶¶5-6.

### B.   Respondents Knew The Declarations Were Untrue.

Discovery has shown not only that Respondents' account was inaccurate, but also that they knew the true story at the time. Respondents' misrepresentations fall into four main categories: 1) statements that the U.S. reached an agreement with Iraq in 2017, and that Iraq was willing to accept the return of all Iraqi nationals

---

[3] The declarations did not attest to personal knowledge and were carefully hedged to allow the declarants to disclaim responsibility. In some instances where a declarant had personal knowledge of adverse facts, a different declarant was used to tell a false story. For example, Mr. Schultz who testified at his deposition that he had abandoned efforts to use manifests for the June charter flight, ECF 376-64, Schultz Dep. at 47, 123, does not discuss that in his declaration. Mr. Bernacke's declaration makes the exact opposite claim. ECF 184-2, Bernacke Dec. ¶6.

with final orders of removal without limitation; 2) claims that ICE could secure travel documents for all Iraqi nationals but did not attempt to do so because of the preliminary injunction; 3) statements that Iraq will accept charter flights using manifests rather than requiring travel documents; and 4) statements that the June and July 2017 flights were cancelled as a result of this Court's injunctions.

### 1.    Respondents said Iraq agreed to the return of all Iraqi nationals with final orders of removal, knowing that was untrue.

The government has consistently and without qualification asserted that in 2017 the U.S. and Iraq reached an agreement for the return of all Iraqi nationals with final orders of removal. While Iraq agreed to accept a charter flight with eight deportees in April 2017, in return for its removal from the first travel ban, ICE recognized that "[a]t this point ERO [Enforcement and Removal Operations] [did] not have a repeatable process in place regarding the removal of Iraqi nationals with final orders." ECF 457-2, ¶10. In May and June ICE submitted requests for travel documents for 280 Iraqis with final orders, but Iraq did not issue the documents. *Id.* ¶20; ECF 457-62 ¶¶21-22, 30. Instead, Iraq issued a blanket denial for 24, stating that "[t]he applicant should express orally and in writing his willingness to return to Iraq voluntarily in order to be issued a travel document." ECF 457-2, ¶20.h. Iraq refused the June charter flight, and never agreed to repatriations when ICE tried reschedule the July flight. *Id.* ¶¶20-21, 23. By July 19, ICE was so

6

frustrated by Iraq's refusals to cooperate that it initiated the process leading towards issuance of visa sanctions against Iraq:

> U.S. Immigration and Customs Enforcement (ICE) considers Iraq to be among the most recalcitrant countries [with respect to repatriations]. Despite expending significant resources and exhausting other available means to obtain cooperation, ICE has been unsuccessful in securing cooperation from the Government of Iraq in the acceptance of its nationals subject to final orders of removal and has determined that implementing visa sanctions pursuant to section 243(d) of the Immigration and Nationality Act (INA) is the only remaining avenue available to secure cooperation. . . .
>
> ***
>
> ICE believes that it has exhausted all means at its disposal to secure cooperation from the Government of Iraq, consistent with its international obligation to promptly facilitate the return of its nationals. A tool unavailable to ICE, but vested in the Secretary of Homeland Security, is visa sanctions under section 243(d) of the Immigration and Nationality Act. . . .

*Id.* ¶24. On July 20, Mr. Schultz received for his review a sanctions package against Iraq. *Id.* ¶24.b. That same day, Respondents opposed an injunction barring removal of Iraqis (ECF 81), relying on Mr. Schultz' sworn declaration that "Iraq has agreed… to the timely return of its nationals that are subject to final orders of removal." ECF 81-4, ¶5.

On July 26, 2017, Mr. Schultz' Deputy Chief of Staff emailed his boss to say "there was no defined way forward as to Iraq and the current TD [travel document] issuance problems we're facing." ECF 457-2, ¶24.d. ICE continued to consider sanctions until at least August, when Mr. Schultz instructed his staff to

finalize the documents. *Id.* ¶24.f. No progress on repatriations was made in the fall, and a summary of a high level U.S./Iraq meeting on December 5th noted Iraq's unwillingness to accept persons with failed asylum claims. *Id.* ¶¶25-28. Indeed, Iraq repeatedly emphasized its refusal to accept forced repatriation, expressing special concern for asylum seekers, those with non-criminal immigration violations, and Chaldeans.[4] Nonetheless, Respondents submitted declarations stating that Iraq will accept "**all individuals** that ICE has requested to remove to Iraq", ECF 158-2, 11/30/2017 Schultz Decl. ¶7, "Iraq agreed to the timely return of its nationals subject to a final order of removal," and "the United States planned to schedule the return of **all** Iraqi nationals with final orders of removal." ECF 184-2, 12/22/2017 Bernacke Decl. ¶¶4-5 (emphasis added).

> ## 2. Respondents said ICE could secure travel documents, but has not attempted to do so because of the injunction, knowing that was untrue.

Respondents, having claimed that Iraq would accept deportees without limit-

---

[4] *See, e.g.* ECF 376-2, ¶20.n (Iraqi ambassador expressing concern for those with past criminal history who now have U.S. citizen family); ¶20.o (U.S. diplomats worry that Iraq will cancel flights if deportees have old final orders); ¶20.u (Iraqi ambassador: Iraqi will not allow "enforced repatriations" or return of asylum seekers); ¶23 (describing Iraqi "argument that Iraqi Chaldeans would necessarily face persecution upon return to Iraq"); ¶23.e (Iraqi officials express concern about accepting rejected asylum seekers); ¶23.e (reporting Iraq's concern that rejected asylum seekers "are at risk if returned to Iraq," and noting that Iraqi officials were under pressure from parliament not to accept asylum seekers or those with immigration violations); ¶24.d. (relaying Iraq's concerns about persecution of returnees).

ation, had to explain why ICE nonetheless did not have travel papers. They said:

> To minimize the risk of having to ask a foreign government to re-issue or extend an expired travel document, ICE waits until there are no impediments to request a travel document. Thus, ICE currently does not have travel document for all detained final order Iraqis.

ECF 158-2, 11/30/2017 Schultz Decl. ¶8. ICE also said that requesting travel documents prematurely "has the potential to jeopardize the present agreement and our ability to effect future removals to Iraq." ECF 184-2, Bernacke Decl. ¶10. In fact, ICE tried to obtain travel documents, requesting them for 280 potential deportees during May and June 2017; Iraq did not issue travel documents, and, on June 7, 2017, specifically denied repatriation in two dozen cases. ECF 457-2, ¶20; ECF 457-62, ¶21. Significantly, ICE has continued to pursue travel documents for individuals covered by the stay, including arranging consular interviews for numerous individuals protected by this Court's stay, despite ICE's assertion that doing so would jeopardize the present agreement. *Id.* ¶33.

### 3. Respondents said Iraq agreed to accept charter flights without formal travel documents, knowing that was untrue.

Respondents also highlighted the ease of return pursuant to the supposed "agreement" between the United States and Iraq, claiming that:

> The government of Iraq agreed to accept these removals via charter mission. As a charter mission, rather than a removal conducted via commercial airline flight, formal travel documents are not required. Instead, ICE submits a proposed manifest for the charter flight to Iraqi officials for approval.

ECF 184-2, Bernacke Decl. ¶6. In fact, as Mr. Schultz admitted in his deposition, the plan to use manifests "never came to fruition" and was not even used for the April flight. ECF 457-2, ¶17. Thereafter ICE abandoned any hope of using the simpler manifest procedure for later flights, *id.* at 123:

> Q: At any time, did ICE try to effectuate the June 2017 flight by submitting a flight manifest versus obtaining travel documents?
> A: No. It was my intention to get travel documents for the individuals on the flight.

### 4.    ICE said that the June and July 2017 flights were cancelled as a result of this Court's injunction, knowing that was untrue.

A memo drafted by Respondents in preparation for the January 2018 U.S./Iraq meeting summarizes the relevant timeline for the June flight:

> ERO was notified on June 21, 2017, that Iraq would not accept the charter scheduled to arrive on June 29, 2017.
>
> On June 22, 2017 the U.S. District Court for the Eastern District of Michigan temporarily stayed the removal of 114 Iraqi nationals

ECF 457-3. The longer version tells the same story, showing problems with the June flight from the start. A June 12 ICE email asks the State Department:

> have you heard anything regarding Iraq backing out of the charter missions? DAD [Deputy Assistant Director] Schultz is answering a message regarding the Ministry of Foreign Affairs allegedly stating that there is no agreement with the US Government.

ECF 457-2, ¶20.k. ICE first learned on June 20 that Iraq would not approve the flight, and was officially notified on June 21. *Id.* ¶20.q-20.r. The next day, June 22,

this Court entered the initial TRO. ECF 32. Because that TRO only covered Detroit-area deportees, and because there were plenty of non-Detroit-area deportees to fill a flight, on June 23 Acting ICE Director Homan and Deputy Assistant Secretary King pressed the Iraqi ambassador "to ensure that the flight lands as scheduled." ECF 457-2, ¶20.t. "The Ambassador indicated he was limited in his ability to persuade Baghdad to allow the flight to land…." *Id.* On June 26 the Ambassador sent an email to Mr. Homan refusing the June 28 flight and noting that "[t]he date was determined by the US embassy and other US agencies without consultation with the Iraqi agencies involved." *Id.* ¶20.u. In short, by the time this Court entered a nationwide injunction on June 26, ECF 43, the June flight had failed because Iraq would not accept it. Respondents, however, provided sworn testimony blaming this Court's injunction for the failure. *See* ECF 158-2, 11/30/2017 Schultz Dec. ¶6; ECF 184-2, Bernacke Dec. ¶8.

ICE also represented that it rescheduled the June flight for July, and that the preliminary injunction thwarted the July flight. ECF 158-2, 11/30/2017 Schultz Dec. ¶6. ICE had requested a flight for July 25, the day after the TRO was set to expire on July 24. ECF 457-2, ¶23.c. The government pressured Iraq to accept the flight, but to no avail. *Id.* ¶23.d-20.e. After engaging in numerous diplomatic meetings, the government did persuade Iraq to conduct 80 consular interviews. *Id.* ¶23.g. But at those interviews on July 18, Iraqi officials asked each detainee about

his willingness to return. *Id.* An internal July 19 ICE memo states that "ICE has been unsuccessful in securing cooperation from the Government of Iraq … and has determined that implementing visa sanctions … is the only remaining avenue available to secure cooperation." *Id.* ¶24.  As of July 24, when the injunction was entered, Iraq had not issued *any* travel documents. *Id.* ¶24.c.

### C.  The Government Withheld Material Information.

The above affirmative misrepresentations, and the fact that neither Respondents nor their counsel ever returned to the Court to correct them, are only part of the story. As in *Korematsu*, "[b]ecause the information was of the kind peculiarly within the government's knowledge, the court was dependent upon the government to provide a full and accurate account." 584 F. Supp. at 1420. This Court naturally believed that the government would act with candor. Indeed, when Petitioners sought discovery in advance of their initial *Zadvydas* motion, the Court denied that request, relying on the government's promise that "it would [] disclos[e] in its response to Petitioners' motion . . . information that may be of utility to Petitioners to meet the Government's response." ECF 153, PgID3936. *See id.* (suggesting government promised disclosures may obviate need for discovery).

The government did not disclose the key material facts – facts then known only to the government – that showed there was no significant likelihood of removal in the reasonably foreseeable future. Those undisclosed facts included:

- As a result of Iraqi non-cooperation with ICE's removal efforts, in July 2017, ICE officials deemed Iraq to be "among the most recalcitrant countries" for repatriation. A senior ICE official explained to a DHS office that ICE had been "unsuccessful in securing cooperation" from Iraq, it had "exhausted all means at its disposal to secure cooperation" from Iraq, and there "was no defined way forward as to Iraq and the current [travel document] issuance problems we're facing." In July and August 2017, the ICE office responsible for obtaining travel documents initiated the process for visa sanctions against Iraq to force its acquiescence to removals. ECF 457-2, ¶24.

- Iraq has a longstanding policy against accepting involuntary repatriations of its nationals, a position it reaffirmed repeatedly during negotiations with the United States in 2017 and 2018. *Id.* ¶¶36-37, 48-49, 53.

- Iraq repeatedly refused ICE's requests to accept the repatriation of Iraqi nationals who were not returning voluntarily, and required potential deportees to execute a form attesting to their desire for repatriation (a form that has long been required by Iraq and which ICE submitted with its travel document presentations). *Id.* ¶¶3-6, 20.h, 33, 38-41.

## II.  THE GOVERNMENT'S CONDUCT THROUGHOUT THIS LITIGATION HAS BEEN DESIGNED TO HIDE THE TRUTH.

Respondents' conduct during the past 14 months – which at first appeared to be garden variety obstruction and discovery abuse – can in hindsight be recognized for what it was: an effort to prevent Petitioners and this Court from learning the truth. Three themes emerge. First, the government's misrepresentations have infected this entire case. Had Petitioners and the Court known the truth back in July 2017 – when ICE was simultaneously pursuing visa sanctions against Iraq while opposing the first preliminary injunction with sworn testimony that there was a U.S.-Iraq agreement for return of all Iraqi nationals – the course of this litigation would have been utterly changed. Both the removal and detention issues would

13

have been litigated very differently, with the absence of a repatriation agreement becoming a central issue in the summer of 2017, rather than the summer of 2018.

Second, the government has only admitted to its misrepresentations when caught. It was not until after the Court questioned the government about the terms of the purported Iraqi agreement that Respondents admitted that there is no written agreement. 12/20/2017 Hrg. Trans., at 47-48, 122-23; ECF 184-2, Bernacke Decl. ¶4. It was not until Petitioners were forced to seek emergency relief when ICE coerced class members into signing Iraq's repatriation form, ECF 307, that Respondents admitted that a deportee's expressed desire to return is an essential step in the issuance of Iraqi travel documents.[5] ECF 311-3, Maddox Decl. ¶¶8, 11, 13, 14.

Third, Respondents have routinely ignored both the Federal Rules and this Court's orders to avoid discovery, to the point where the Court had to warn that "[f]ailure to comply with the Court's order may be cause for the Court to direct that the facts necessary to support Petitioners' *Zadvydas* claim are established, or prevent the Government from opposing the *Zadvydas* claim, or issue other appropriate relief. *See* Fed. R. Civ. P. 37(b)(2)(A)." ECF 320, PgID7608. The latest

---

[5] In response to an interrogatory asking for "each criterion an Iraqi National must meet before Iraq will accept an Iraqi National for repatriation", ICE notably omitted that Iraq's criteria include a desire to return. ECF 376-56, ICE's Response to Interrogatory No. 2; ECF 376-57, ICE Supplemental Response to Interrogatory No. 2. Nor did ICE mention the form, although ICE has long included that form in travel document packages for Iraqis. ECF 376-2, ¶¶4-5, 33.

violation – ignoring the August 20 document production deadline, ECF 366, PgID8323 – seems likely to be an effort to ensure that when Respondents oppose the *Zadvydas* motion with their version of the facts, Petitioners will not have any "critical contradictory evidence known to the government and knowingly concealed from the courts." *Korematsu*, 584 F. Supp. at 1417.

## III.  RESPONDENTS' MISCONDUCT HAS CAUSED PETITIONERS SEVERE HARM.

Over 100 class members are still suffering in detention. Had the government been honest about Iraq's refusal to accept involuntary repatriations, they should have been released during post-order-custody reviews. Had the government not created a false narrative of easy deportations impeded solely by this Court's orders, they would have been released in January when this Court ruled on the *Zadvydas* claim. Instead, they remain incarcerated in terrible conditions, subjected to pro-longed lock-downs, given inadequate medical care, and separated from their families. *See, e.g.* Op. on Coercion, ECF 370 (describing mistreatment in Calhoun jail). Their suffering, set out in more detail in Petitioners' renewed *Zadvydas* motion and supporting declarations, is directly attributable to the government's misconduct.

The government's use of Mr. Bernacke's and Mr. Schultz's declarations in class members' immigration bond hearings compounded the harm. ICE argued, based on the declarations, that removal was imminent, but for the *Hamama* stay, and that the detainees were therefore flight risks. ECF 457-70, Bajoka Decl., ¶¶3-7.

For example, after ICE introduced the declarations at the bond hearing of Salman Saiyad, a 63-year-old man who had been complying with an order of supervision for 20 years, the immigration judge set a $100,000 cash bond, which Mr. Saiyad is unable to pay. Mr. Saiyad remains detained. ECF 457-75, Kaplovitz Dec. ¶¶5-8.

## ARGUMENT

### IV.   THIS COURT HAS INHERENT AUTHORITY TO SANCTION AND REMEDY THE GOVERNMENT'S LITIGATION MISCONDUCT.

Courts are vested with power to "manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Chambers v. NASCO, Inc.,* 501 U.S. 32, 43 (1991). Courts have inherent power to sanction "acts which degrade the judicial system," *id.* at 32; where "fraud has been practiced upon [the court]", *id.* at 44; where a litigant is "misleading and lying to the court," *id.* at 42; or where a litigant engages in bad-faith conduct or conduct that is "tantamount to bad faith." *Metz v. Unizan Bank*, 655 F.3d 485, 489 (6th Cir. 2011). *See also Railway Express, Inc. v. Piper*, 447 U.S. 752, 767 (1980); *First Bank of Marietta v. Hartford Underwriters Ins. Co.*, 307 F.3d 501, 511-12 (6th Cir. 2002); *Murray v. City of Columbus*, 534 F. App'x 479, 484 (6th Cir. 2013). While courts should exercise their power with restraint and discretion, *Chambers*, 501 U.S. at 44, "[t]he exercise of inherent authority is particularly appropriate for impermissible conduct that adversely impacts the entire litigation." *Marietta,* 307 F.3d at 516.

In imposing sanctions the court determines whether there was bad faith con-

16

duct, or conduct that is tantamount to bad faith.[6] *Id.* at 517. "It goes without saying that lying to the court constitutes bad faith." *Graham v. Dallas Indep. Sch. Dist.*, 2006 WL 507944, at *4 (N.D. Tex. Jan. 10, 2006). "[N]o one needs to be warned not to lie to the judiciary." *Ayoubi v. Dart*, 640 F. App'x 524, 529 (7th Cir. 2016). "[T]hose 'who lie, evade and fail to tell the ***whole*** truth obviously enjoy an advantage over honest litigants. The victimized opponent winds up ... consuming substantial resources to respond to and 'undo' the victimizer's lies and distortions.'" *Forsberg v. Pefanis*, 634 F. App'x 676, 680 (11th Cir. 2015) (emphasis in original).

Misrepresentations constitute a fraud on the court. As this Court held in *Plastech Holding Corp. v. WM Greentech Automotive Corp.*, 257 F. Supp. 3d 867, 872 (E.D. Mich. 2017), where it dismissed a suit as a sanction for submitting fraudulent evidence, a party commits a fraud upon the court where it adopts tactics

> "...calculated to interfere with the judicial system's ability to adjudicate a matter by improperly influencing the trier or unfairly hampering the presentation of the opposing party's claim or defense." *Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, 1118 (1st Cir. 1989) (citing cases); *see also New York Credit & Fin. Mgmt. Grp. v. Parson Ctr. Pharmacy, Inc.*, 432 Fed. App'x. 25 (2d Cir. 2011) (same); *Almeciga v. Ctr. for Investigative Reporting, Inc.*, 185 F. Supp. 3d 401, 427 (S.D.N.Y. 2016) ("[T]he essence of fraud upon the Court is when a party lies to the court and his adversary intentionally, repeatedly, and about issues that are central to the truth-finding process.").

---

[6] While a party must receive "fair notice and an *opportunity* for a hearing on the record," an evidentiary hearing is not required. *Metz*, 655 F.3d at 491.

There are of course special ethics rules governing attorneys.[7] Under Michigan Rule of Professional Conduct 4.1, "a lawyer shall not knowingly make a false statement of material fact or law to a third person." Rule 3.3 imposes a duty of candor to the court and opposing counsel, bars attorneys from making false statements and requires them to correct any false statements previously made. An advocate "must not allow the tribunal to be misled by false statements of law or fact or evidence that the lawyer knows to be false." Comment, Rule 3.3. "If a lawyer has offered material evidence and comes to know of its falsity, the lawyer shall take reasonable remedial measures, including, if necessary, disclosure to the tribunal." Rule 3.3(a)(3). *See* Rule 3.3(e) (conflict between duties of candor and confidentiality).

"There are circumstances where failure to make a disclosure is the equivalent of an affirmative misrepresentation." Comment, Rule 3.3. In *First Bank of Marietta*, 307 F.3d at 525, the Sixth Circuit found bad faith where a plaintiff withheld a document knowing it undermined its cause of action. As this court has said:

> The handling of a lawsuit and its progress is not a game. There is an absolute duty of candor and fairness on the part of counsel to both the Court and opposing counsel. At the same time, counsel has a duty to zealously represent his client's interests. That zealous representation of interest, however, does not justify a withholding of essential information . . .

*Virzi v. Grand Trunk Warehouse & Cold Storage Co.*, 571 F. Supp. 507, 512 (E.D. Mich. 1983). *See also Williamson v. Recovery Ltd. P'ship*, 826 F.3d 297, 304 (6th

---

[7] This Court has adopted the Michigan Rules. E.D. Mich. L.R. 83.22(b).

Cir. 2017) (misrepresentations not innocent where party "willfully blind" to evidence); *In re Bavelis*, 563 B.R. 672, 687 (S.D. Ohio 2017) (misrepresentations intentional where party knew of key evidence); *Laukus v. Rio Brands, Inc.*, 292 F.R.D. 485, 489 (N.D. Ohio 2013) (dismissing complaint because plaintiff "knowingly offered (or allowed to be offered) arguments before this Court and on appeal that were not supported by-and contrary to-the record" and "failed to correct discovery responses they knew to be inaccurate, misleading or false").

## V. THIS COURT HAS INHERENT AUTHORITY TO FASHION APPROPRIATE REMEDIES TAILORED TO THE HARM CAUSED BY THE GOVERNMENT'S MISCONDUCT.

Once a court determines sanctions are warranted, it must decide what form of sanctions should be imposed. *Marietta*, 307 F.3d at 517. The Supreme Court has emphasized that a "primary aspect of [the court's] discretion is the ability to fashion an *appropriate* sanction for conduct which abuses the judicial process." *Chambers*, 501 U.S. at 44-45 (emphasis added). While "the less severe sanction of an assessment of attorney's fees" is most common, the court has discretion to impose "a particularly severe sanction" where that is the appropriate remedy. *Id.* at 45. Severe sanctions include "outright dismissal of a lawsuit," *id.*; vacating prior judgments, *Demjanjuk v. Petrovsky*, 310 F.3d 338 (6th Cir. 1993); setting aside a jury verdict, *Fuery v. City of Chicago*, --- F.3d ----, 2018 WL 3853742 (7th Cir. Aug. 14, 2018); barring witness testimony, *Beard v. City of Southfield*, 2016 WL 6518490 (E.D. Mich. Nov. 3, 2016); entering an injunction, *Lamie v. Smith*, 2013

19

WL 12109526 (W.D. Mich. Feb. 14, 2013), *report and rec adopted by* 2013 WL

12109421 (W.D. Mich. Mar. 6, 2013); or striking claims or defenses, *Robert Bosch*

*LLC v. A.B.S. Power Brake, Inc.*, 2011 WL 1790221 (E.D. Mich. May 10, 2011)[8].

## VI. BECAUSE RESPONDENTS SECURED DEFERRAL OF PETITIONERS' *ZADVYDAS* CLAIM THROUGH MISCONDUCT, THE APPROPRIATE SANCTION IS PETITIONERS' RELEASE.

The government's false assertion that the preliminary injunction was the

only thing standing between the Petitioners and return to Iraq was critical for this

Court's ruling on the *Zadvydas* claim. Had the government honestly presented the

facts, Petitioners would have met their burden to show a likelihood of success on

the merits. Instead, the government dissembled. The supposed "agreement" to

accept all Iraqis with final orders never existed. The June plane was cancelled be-

cause Iraq refused to accept it, yet the government swore that it was the result of

this Court's TRO. ICE never cleared the first hurdle of securing travel documents

for a July flight, yet it again blamed the litigation. Although ICE abandoned any

hope of using charter manifests to expedite removal, it told this Court the opposite.

And the government simply omitted key facts, including that 1) Iraq consistently

refused involuntary repatriations; and 2) in July 2017 the responsible ICE office

---

[8] *See also, e.g., Barnhill v. United States*, 11 F.3d 1360, 1367 (7th Cir. 1993) ("Moreover, pursuant to this power, a court may impose the severe sanction of dismissal with prejudice (or its equivalent, judgment) if the circumstances so warrant."); *Monsanto Co. v. Ralph*, 382 F.3d 1374, 1382 (Fed. Cir. 2004) (entering judgment); *Oliver v. Gramley*, 200 F.3d 465, 466 (7th Cir. 1999) (dismissal).

initiated the process to issue visa sanctions against Iraq for its "recalcitrance".

No amount of wordsmithing – which one can expect in the government's response – can hide the fact that Respondents have not been remotely candid with this Court. Any post hoc rationalization leaves unanswered the question of why the government's original factual assertions—so unconditioned and unambiguous— are not supported by the contemporaneous record.

The duty of candor—which every party and attorney owes to a court— applies with particular force to the government:

> The Department of Justice wields enormous power over people's lives, much of it beyond effective judicial or political review. With power comes enormous responsibility, moral, if not legal, for its prudent and restrained exercise; and responsibility implies knowledge, experience, and sound judgment, not just good faith.

*United States v. Van Engel*, 15 F.3d 623, 629 (7th Cir. 1993), *abrogated on other grounds by United States v. Canoy*, 38 F.3d 893 (7th Cir. 1994). And it is even more apt here, as the government prevented Petitioners from securing any discovery before the hearing on the *Zadvydas* claim by promising to provide the relevant information in its responsive pleadings. Whatever duty to disclose that was not imposed as a matter of law was assumed by the government based on that promise; a promise this Court expressly relied upon in denying discovery at that time.

The real question for this Court is not whether there was misconduct – based on the record set out above there clearly was – but rather how the Court can here

21

"fashion an appropriate sanction for conduct which abuses the judicial process." *Chambers*, 501 U.S. at 44-45. While there is "no requirement that the district court find prejudice" when imposing sanctions, the Court should consider "the impact or effect that the [improper] conduct had on the course of the litigation" when fashioning an appropriate remedy." *Fuery*, 2018 WL 3853742 at *10.

There is no way for the Court to give the Petitioners what they were wrongfully deprived of: release back in January. What the Court can do, however, is prevent that wrong from continuing any longer by ordering release, at long last. The government's misconduct is both a supplemental reason to grant Petitioners' renewed *Zadvydas* motion, ECF 457, and an independent reason for the same relief.

This Court's earlier *Zadvydas* ruling was premised on false evidence. The Court has the inherent power to amend its earlier decision "upon proof that a fraud has been perpetrated upon the court."[9] *Chambers*, 501 U.S. at 44. That power "is necessary to the integrity of the courts, for 'tampering with the administration of

---

[9] In addressing misconduct, courts have expansive power to revise earlier decisions. For example, in *Demjanjuk*, 310 F.3d at 351-52, the Sixth Circuit vacated an earlier extradition order, concluding that acts and omissions by Department of Justice attorneys, particularly the failure to disclose evidence, constituted fraud on the court, and that the court had the inherent power to grant such relief to protect the integrity of the judicial process. Similarly, in *Fuery*, 2018 WL 3853742 at *10, the Seventh Circuit held that the district court had authority to set aside a jury verdict for the plaintiff as a sanction for the plaintiff's misconduct.

justice in [this] manner ... involves far more than an injury to a single litigant. It is a wrong against the institutions set up to protect and safeguard the public.'" *Id.*

## VII. THE COURT SHOULD STRIKE FALSE AND MISLEADING LANGUAGE FROM THE DECLARATIONS AND REQUIRE RESPONDENTS TO INFORM OTHER TRIBUNALS WHERE THE DECLARATIONS WERE USED OF THAT FACT.

The Court should strike the false and misleading language in the Schultz and Bernacke declarations (as set out in Exhibits A-C). The Court should also order Respondents to file a notice in any individual immigration and habeas proceedings, whether in immigration or federal court,[10] in which the declarations have been offered as evidence, and provide proof of those filings. *See Chambers*, 501 U.S. at 56-57 (court can sanction misconduct before other tribunals); *Enmon v. Prospect Capital Corp.*, 675 F.3d 138, 148 (2d Cir. 2012) (court could require sanctioned lawyers to submit its sanction order with any future *pro hac vice* applications).

The government is using the declarations in Petitioners' underlying immigration cases as proof of ICE's ability to remove them, which affects how bond is set and whether class members are released. *See* ECF 457-70, Bajoka Dec. ¶¶2-7, ECF 457-77; Kaplovitz Dec. ¶7 The government is also filing the declarations in individual habeas cases to argue, falsely, that removal is significantly likely in the

---

[10] Federal court cases would include both habeas proceedings and petitions for review to the Court of Appeals in immigration cases.

reasonably foreseeable future.[11] The notice to the other tribunals should state that this Court has stricken portions of the declarations, and should provide each presiding judge with this Court's opinion. This will allow class members to take appropriate steps to remedy any decisions that relied on those declarations, and alert both the immigration courts other federal courts that the government is presenting false evidence.

## VIII.   PETITIONERS SHOULD BE AWARDED ATTORNEYS' FEES AND COSTS.

Attorneys' fees are an appropriate sanction for bad faith conduct. *Chambers*, 501 U.S. at 45-46; *Metz*, 655 F.3d at 489. The Court also has inherent authority to impose attorneys' fees where a litigant's "actions were taken, at the very least, in the face of an obvious risk that he was increasing the work on the other party without advancing the litigation." *Red Carpet Studios Div. of Source Advantage, Ltd. v. Sater*, 465 F.3d 642, 647 (6th Cir. 2006). Attorney's fees serve the dual purposes of "vindicat[ing] judicial authority" and "mak[ing] the prevailing party whole for

---

[11] While Petitioners do not know every case where the declarations have been filed, they include *Al Jabari v. U.S. Attorney General*, 4:17-cv-01972 (N.D. Ala.); *Al-Hallaf v. U.S. Attorney General*, 4:17-cv-02068 (N.D. Ala.); *Arthur v. Session*, 1:17-cv-23343 (S.D. Fla.); *Mirza v. Hassell*, 4:17-cv-02039 (N.D. Ala.); *Saiyad v. Adducci*, 1:17-cv-00995 (W.D. Mich.); *Yousif v. Adducci*, 1:17-cv-01038 (W.D. Mich.). In the *Al-Jabari* case, ICE submitted an additional declaration attesting to the likelihood of removal, even though Mr. Al-Jabari was on the June 7, 2017 list of deportees that Iraq refused to accept. *Compare* ECF 376-77, North Decl. ¶¶53-54, *with* ECF 376-20, 6/7/2017 Iraqi Letter Denying Travel Documents.

expenses" caused by his opponent. *Hutto v. Finney*, 437 U.S. 678, 689 n.14 (1978).

Here, Respondents' misrepresentations, their failure to provide information known exclusively to the government and promised in lieu of discovery, and their delays, concealment, and obstruction when discovery finally commenced forced Petitioners to engage in protracted discovery. The government's actions also necessitated both this motion and the renewed *Zadvydas* motion. None of this labor should have been necessary. All fees and expenses incurred as a result of the government's misconduct should be awarded to Petitioners.

## CONCLUSION

"[E]xtraordinary injustices require extraordinary relief." *Korematsu*, 584 F. Supp. at 1413. More than 100 human beings remain behind bars as a direct result of the government's misconduct. They should be released, the record cleansed of the government's falsehoods, and Petitioners reimbursed for the many months of work it has taken to uncover the truth. Respondents may believe that they can violate this Court's orders, disregard the Court Rules, and dissemble without consequence.[12] The Court should make clear that they cannot.

---

[12] ICE's disregard of this Court's order is not an isolated incident, but rather part of a pattern of misconduct. *See, e.g., Grace v. Sessions*, 2018 WL 3812445 (D.D.C. Aug. 9, 2018) (ordering ICE to return deported asylum seeker and her daughter, who had been removed despite ICE's representation to the court that no removal would occur before hearing, and warning of possible contempt sanctions against Attorney General Sessions, DHS Secretary Nielsen, and other Defendants).

Respectfully submitted,

Michael J. Steinberg (P43085)
Bonsitu A. Kitaba (P78822)
Miriam J. Aukerman (P63165)
ACLU FUND OF MICHIGAN
2966 Woodward Avenue
Detroit, Michigan 48201
(313) 578-6814
msteinberg@aclumich.org

*/s/Kimberly L. Scott*
Kimberly L. Scott (P69706)
Wendolyn W. Richards (P67776)
Cooperating Attorneys, ACLU Fund
 of Michigan
MILLER, CANFIELD, PADDOCK
 & STONE, PLC
101 N. Main St., 7th Floor
Ann Arbor, MI 48104
(734) 668-7696
scott@millercanfield.com

Nora Youkhana (P80067)
Nadine Yousif (P80421)
Cooperating Attorneys, ACLU Fund
 of Michigan
CODE LEGAL AID INC.
 27321 Hampden St.
Madison Heights, MI 48071
(248) 894-6197
norayoukhana@gmail.com

María Martínez Sánchez (NM Bar
126375)
ACLU OF NEW MEXICO
1410 Coal Ave. SW
Albuquerque, NM 87102
msanchez@aclu-nm.org

Judy Rabinovitz (NY Bar JR-1214)
Lee Gelernt (NY Bar LG-8511)
ACLU FOUNDATION
 IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2618
jrabinovitz@aclu.org

Margo Schlanger (P82345)
Cooperating Attorneys, ACLU Fund
 of Michigan
625 South State Street
Ann Arbor, Michigan 48109
734-615-2618
margo.schlanger@gmail.com

Susan E. Reed (P66950)
MICHIGAN IMMIGRANT RIGHTS
CENTER
3030 S. 9th St. Suite 1B
Kalamazoo, MI 49009
(269) 492-7196, Ext. 535
Susanree@michiganimmigrant.org

Lara Finkbeiner (NY Bar 5197165)
Mark Doss (NY Bar 5277462)
INTERNATIONAL REFUGEE
 ASSISTANCE PROJECT
Urban Justice Center
40 Rector St., 9th Floor
New York, NY 10006
(646) 602-5600
lfinkbeiner@refugeerights.org

David B. Johnson (Ill. 6186478)
Cooperating Attonry, ACLU Fund of MI
573 Hawksnest Drive
South Haven, MI 49090
(616) 302-5226
Notworking2012@gmail.com

*Attorneys for All Petitioners and Plaintiffs*

William W. Swor (P21215)
WILLIAM W. SWOR
 & ASSOCIATES
1120 Ford Building
615 Griswold Street
Detroit, MI 48226
wwswor@sworlaw.com

*Attorney for Petitioner/Plaintiff Usama Hamama*

Dated: October 23, 2018

27

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 23, 2018, I electronically filed the foregoing papers with the Clerk of the Court using the ECF system which will send notification of such filing to all ECF filers of record.


By: *<u>/s/Kimberly L. Scott</u>*
Kimberly L. Scott (P69706)
Cooperating Attorneys, ACLU Fund of Michigan
MILLER, CANFIELD, PADDOCK
  & STONE, PLC
101 N. Main St., 7th Floor
Ann Arbor, MI 48104
(734) 668-7696
scott@millercanfield.com

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

| | |
|---|---|
| **USAMA J. HAMAMA**, et al.,<br>Petitioners and Plaintiffs, | Case No. 17-cv-11910 |
| v. | Hon. Mark A. Goldsmith<br>Mag. David R. Grand |
| **REBECCA ADDUCCI**, et al.,<br>Respondents and Defendants. | Class Action |

## INDEX OF EXHIBITS

Exhibit A       Highlighted Declaration of J. Schultz, Jr., ECF 81-4

Exhibit B       Highlighted Declaration of J. Schultz, Jr., ECF 158-2

Exhibit C       Highlighted Declaration of M. Bernacke, ECF 184-2

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

**USAMA JAMIL HAMAMA,** et al.,

     Petitioners and Plaintiffs,

  v.

**REBECCA ADDUCCI,** et al.,

     Respondents and Defendants.

Case No. 2:17-cv-11910
Hon. Mark A. Goldsmith
Mag. David R. Grand
Class Action

**DECLARATION OF JOHN A. SCHULTZ Jr.**

I, John A. Schultz Jr., hereby make the following declaration with respect to the above-captioned matter:

1. I am the Deputy Assistant Director for the Removal Management Division East which encompasses the Asia and Europe Removal and International Operations (RIO) unit as well as the Middle East/East Africa unit within the U.S. Department of Homeland Security (DHS), U.S. Immigration and Customs (ICE), Enforcement and Removal Operation's (ERO) Removal Management Division (RMD). The RMD is located at ICE Headquarters in Washington, D.C. RMD provides guidance and assistance to officers attempting to obtain travel documents for foreign nationals who are ordered removed. RMD collaborates with embassies and consulates, as well as with interagency and international networks to facilitate the efficient removal of aliens from the

United States. RMD provides nationwide Post-Order Custody Review (POCR) guidance, implements policy and procedures, and is responsible for providing case management support for aliens subject to a final order of removal.

2. I have been employed with ICE since April 2003, and I have worked with ERO since then. From July, 2016 to present, I have been employed as the Removal Management Division East Deputy Assistant Director in both an acting and permanent capacity.

3, This declaration is based upon my professional knowledge, information obtained from other individuals employed by ICE, and information obtained from DHS records. I am aware of the facts and circumstances of this case and the efforts to arrange for the removal of Iraqi nationals that have been ordered removed from the United States.

4. The history of removals to Iraq from fiscal year 2007 to the present, including both commercial and charter flights, is listed below. ICE data reveals continuous removals to Iraq have occurred over the past decade. These statistics include individuals who have returned to Iraq on their own volition, as well as formal removals:

> FY2007- 27
> FY2008- 40
> FY2009- 30 (18 removed via two separate charter flights)
> FY2010- 65 (nine removed via charter flight)
> FY2011- 33
> FY2012- 35

FY2013- 29
FY2014- 29
FY2015- 36
FY2016- 48
FY2017- 52 (eight removed via charter)

5. After the successful completion of charter flight operations to Iraq in May and December of 2009, and again in September of 2010, the government of Iraq became increasingly unwilling to facilitate the return of their nationals that have been ordered removed from the United States. However, due to renewed discussions between the United States and Iraq in recent months, Iraq has agreed, using charter flights, to the timely return of its nationals that are subject to final orders of removal. In order to facilitate charter flights to Iraq, the U.S. Department of State (DOS) and ICE have engaged in numerous diplomatic meetings with the governments of Iraq and other international partners to obtain the required landing permissions and approvals necessary for the various flights. Efforts to coordinate removals required participation from ICE and DOS both domestically and abroad and include the use of various commercial vendors to supply the aircraft, support staff and the necessary logistics. The intensive diplomatic coordination and resources that go into planning such removal missions mean there is the potential for severe harm to international relations if the United States government is unilaterally prevented from accomplishing its removal mission.

6. The newly established relationship between ICE, in coordination with DOS, and the Iraqi Ministry of Foreign Affairs (MFA), allows ICE to present travel document requests directly to the MFA to gain the approval to remove Iraqi nationals with final orders of removal. Once MFA agrees that the individuals are Iraqi, they will dispatch consular staff from the Iraqi Embassy to interview and issue travel documents for their return. Far the most recent June 2017 charter flight, ICE moved individuals to Arizona for required interviews and flight staging. Previously, the Iraqi government would only accept its nationals that had unexpired passports and only those traveling via commercial flights. Now, Iraq will authorize repatriation with other indicia of nationality. These charter flights fly into Baghdad, not ISIS controlled territory. In. Baghdad, the Iraqi nationals will be met by U.S. DOS officials and Iraqi officials from various government agencies.

7. In April of 2017, ICE conducted its first charter removal mission to Iraq since 2010, consisting of eight (8) Iraqi nationals. A second charter mission was scheduled for late June 2017. The manifest for the June flight included individuals who have criminal convictions for the following offenses: homicide, manslaughter, rape, sexual assault, sex offenses, aggravated assault, robbery, burglary, fraud and drug related offenses.

8. The burden on the U.S. government to return aliens back to Iraq is significant, as it is a time consuming, complicated and costly process. Unlike most removals, the process of removals to Iraq requires significant financial cost, the coordination of multiple U.S. government resources and the cooperation of at least two other foreign governments, all of which have to come together during a very limited window of time. ICE estimates that cancellation of a single flight, such as the originally-scheduled and now-cancelled June 2017 charter flight, which ICE attempted to reschedule for July, results in a total loss in excess of $500,000.00, to include an. estimated $450,000.00 in air carrier cancellation fees alone. This figure includes multiple variables, such as, contract security services, and ICE personnel's travel, lodging, and per diem costs. ICE's current cost of detention averages $125.56 per bed per day. The cost to detain 230 individuals during the court's temporary restraining order period of June 22, 2017 to July 24, 2017 is approximately $1 million. (230 x 33 days x $125.56= $953,000).   The estimated cost to further detain class members for an additional 90 days would be approximately $2.6 million dollars. (230 x 90 days x $125.56 = $2,599,092).

9. Iraqi nationals that ICE recently detained for removal on the agreed upon charter flights have been transferred among various detention facilities.   ICE utilizes its finite resources and bed space to locate aliens as close to their initial

point of apprehension as possible. Considering logistical, medical, and personnel concerns, ICE then identifies a staging location that is available to accommodate its removal mission needs. Detainee transfers are based purely on the operational aspects of ICE's removal processes, and are not made with any intent to limit Petitioners' access to counsel, the courts, or their communities. The detention staging location serves as a central point where detainees are consolidated in preparation for imminent removal. Detainees are then staged to a final transfer facility for a limited time prior to their departure from the United States.

Pursuant to 28 U.S.C. § 1746, I declare, under penalty of perjury, that the foregoing is true and correct based upon reasonable inquiry, knowledge, information, and belief.

Executed this 20th day of July, 2017.

John A. Schultz Jr.
Deputy Assistant Director
Removal Management Division
Washington, D.C.

# EXHIBIT B

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**USAMA JAMIL HAMAMA,** et al.,

      Petitioners and Plaintiffs,

v.

**REBECCA ADDUCCI,** et al.,

      Respondents and Defendants.

Case No. 2:17-cv-11910
Hon. Mark A. Goldsmith
Mag. David R. Grand
Class Action

### DECLARATION OF JOHN A. SCHULTZ Jr.

I, John A. Schultz Jr., hereby make the following declaration with respect to the above-captioned matter:

1. I am the Deputy Assistant Director for the Removal Management Division East which encompasses the Asia and Europe Removal and International Operations (RIO) unit as well as the Middle East/East Africa unit within the U.S. Department of Homeland Security (DHS), U.S. Immigration and Customs (ICE), Enforcement and Removal Operation's (ERO) Removal Management Division (RMD). The RMD is located at ICE Headquarters in Washington, D.C. RMD provides guidance and assistance to officers attempting to obtain travel documents for foreign nationals who are ordered removed. RMD collaborates with embassies and consulates, as well as with interagency and international networks to facilitate the efficient removal of aliens from the United States. RMD provides nationwide Post-Order Custody Review (POCR) guidance, implements policy and procedures, and is responsible for providing case management support for aliens subject to a final order of removal.

2. I have been employed with ICE since April 2003, and I have worked with ERO since then. From July, 2016 to present, I have been employed as the Removal Management

Division East Deputy Assistant Director in both an acting and permanent capacity.

3. This declaration is based upon my professional knowledge, information obtained from other individuals employed by ICE, and information obtained from DHS records. I am aware of the facts and circumstances of this case and the efforts to arrange for the removal of Iraqi nationals that have been ordered removed from the United States.

4. Recent negotiations between the governments of the United States and Iraq have resulted in increased cooperation in removal of Iraqi nationals ordered removed from the United States. Travel documents for many Iraqi nationals are now being approved directly by Baghdad and the travel documents are then subsequently issued by Iraq officials in the U.S.

5. Since April 2017, the Government of Iraq has issued twelve (12) travel documents. The first eight (8) individuals were removed on an ICE charter in April of 2017. The additional four (4) Iraqis received travel documents making them eligible for commercial travel. All but one of the individuals issued travel documents has been removed. The final individual is scheduled for removal in December 2017 via a commercial flight.

6. ICE originally had a charter flight scheduled in June 2017 that was rescheduled for July 2017 in view of the court's original order; however, ICE was not able to effectuate that flight due to the court's July 24th order. Thus, ICE must obtain individual travel documents on a case-by-case basis as aliens are excluded from the class.

7. So far in fiscal year 2018, ICE has received one travel document for the removal of an Iraqi national under a final order of removal. Several more travel documents requests are currently being processed for individuals who have recently been removed from the class at their request. ICE expects to receive travel documents for all individuals that ICE has requested to remove to Iraq. The Embassy of Iraq has facilitated interviews of Iraqi

nationals to gather information to ensure that those being removed can be resettled more easily. The interview process has not increased the time it takes for a travel document to be issued. However, due to the injunction, interviews of individuals with final orders have been held in abeyance pending an individual's removal from the class.

8. To minimize the risk of having to ask a foreign government to re-issue or extend an expired travel document, ICE waits until there are no impediments to removal to request a travel document. Thus, ICE currently does not have travel documents for all detained final order Iraqis. Of the detained Iraqi nationals subject to final orders of removal, ICE believes that the central government of Iraq in Bagdad will issue travel documents should the court lift the injunction that currently prevents removals to Iraq. The documentary evidence of these detainees' identity in each alien's official immigration file strongly supports their Iraqi nationality.

9. ICE believes the removal of these detainees is significantly likely in the reasonably foreseeable future. In the interim, ICE continues to conduct individualized custody reviews as required by law and regulation for aliens subject to administratively final orders of removal. A decision to continue detention for removal is communicated to the detainee in a Continued Detention letter; although these letters contain some common language, each detainee's individual circumstances are considered when conducting a custody review and in making a determination regarding whether the alien should continue to be detained.

10. Since the filing of this litigation, nationwide ICE has released 13 Iraqis with final orders.

Pursuant to 28 U.S.C. § 1746, I declare, under penalty of perjury, that the foregoing is true and correct based upon reasonable inquiry, knowledge, information, and belief.

Executed this 30 [th] day of November, 2017.

John A. Schultz Jr.
Deputy Assistant Director
Removal Management Division
Washington, D.C.

# EXHIBIT C

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

**USAMA JAMIL HAMAMA,** et al.,

     Petitioners/Plaintiffs,

v.

**REBECCA ADDUCCI**, et al.,

     Respondents/Defendants.

Case No. 2:17-cv-11910
Hon. Mark A. Goldsmith
Mag. David R. Grand
Class Action

## <u>DECLARATION OF MICHAEL V. BERNACKE</u>

I, Michael V. Bernacke, make the following declaration in accordance with 8 U.S.C. § 1746 with respect to the above-captioned matter.

1. I am the Acting Deputy Assistant Director for the Removal Management Division - East which encompasses the Asia and Europe Removal and International Operations (RIO) unit as well as the Middle East/Eastern Africa unit within the U.S. Department of Homeland Security (DHS), U.S. Immigration and Customs Enforcement (ICE), Enforcement and Removal Operation's (ERO) Removal Management Division (RMD). The RMD is located at ICE Headquarters in Washington, D.C. RMD provides guidance and assistance to officers attempting to obtain travel documents for foreign nationals who are ordered removed. RMD

1

collaborates with embassies and consulates, as well as with interagency and international networks to facilitate the efficient removal of aliens from the United States. RMD provides nationwide Post-Order Custody Review (POCR) guidance, implements policy and procedures, and is responsible for providing case management support for aliens subject to a final order of removal.

2. I have been employed with DHS as an immigration officer since March 2006, and I have worked with ERO since February 2009. From October, 2017 to present, I have been employed as the Removal Management Division-East Unit Chief for the Middle East/Eastern Africa unit in a permanent capacity and have served as Deputy Assistant Director in a temporary, acting, capacity.

3. This declaration is based upon my professional knowledge, information obtained from other individuals employed by ICE, and information obtained from DHS records. I am aware of the facts and circumstances of this case and the efforts to arrange for the removal of Iraqi nationals that have been ordered removed from the United States.

4. As noted in the declaration submitted by my colleague John A. Schultz on July 20, 2017, in 2017, Iraq agreed to the timely return of its nationals subject to a final order of removal. The agreement between the United

States and the Iraqi Ministry of Foreign Affairs (MFA) is not memorialized in any written document or treaty. It is a product of ongoing diplomatic negotiations.

5. Based on this agreement, the United States planned to schedule the return of all Iraqi nationals with final orders of removal in the United States. The agreement does not contemplate any numeric limitation on the number of removals in total or on an annual basis.

6. The government of Iraq agreed to accept these removals via charter mission. As a charter mission, rather than a removal conducted via commercial airline flight, formal travel documents are not required. Instead, ICE submits a proposed manifest for the charter flight to Iraqi officials for approval. The manifest for the charter scheduled for June 2017 included approximately 60 individuals. A charter flight, depending on which aircraft is available, can hold as many as 150 individuals for removal.

7. After the successful completion of the June 2017 flight, the United States planned to send a second, larger charter flight following the same general procedure. The scheduling of charter flights to Iraq was to continue through the summer of 2017 until the detained individuals with final orders of removal were returned to Iraq.

3

8. As a result of the injunction in the above-captioned case, ICE cancelled the June 2017 charter flight. Because only a small number of individuals are now eligible for removal under the injunction, ICE is scheduling removals via commercial flights.

9. Removal by commercial flight requires a significantly more onerous process because travel documents must be individually obtained through direct engagement with the Iraqi government in Baghdad. This is a labor-intensive, expensive, and time-consuming process that requires the engagement of individuals in several different agencies located in multiple countries.

10. The United States would be significantly harmed if required to obtain travel documents simply to demonstrate that we will be able to get a travel document again at a later date. Such requests are likely to be substantially harmful to our diplomatic relationship with Iraq. In addition, they may undermine the government's ability to obtain a travel document at a later date for that individual. Overall, such a requirement has the potential to jeopardize the present agreement and our ability to effect future removals to Iraq.

11. ICE is actively seeking and receiving travel documents for individuals who have requested to be voluntarily removed from the class. In

4

December of 2017, ICE removed 2 putative class members who requested removal.  There are 3 additional putative class members for whom ICE has recently received travel documents from Iraq.  ICE is in the process of making travel arrangements for these 3 individuals to be removed in the near future.   ICE has also submitted 10 additional travel document requests for putative class members who have voluntarily opted out and is awaiting approval of travel documents for these individuals.  ICE expects to receive travel documents for all requested individuals in the very near future.

12. ICE believes that the central government of Iraq in Bagdad will permit the entry of detained Iraqi nationals subject to final orders of removal if the injunction is lifted.  At that time, ICE will make arrangements to facilitate the use of charter flights for removals. This injunction is the only impediment to ICE to resuming charter flights to Iraq.

I declare under penalty of perjury and in accordance with 8 U.S.C. § 1746 that the foregoing is true and correct and made after reasonable inquiry and personal knowledge, information, and belief.

DATED:  December 22, 2017

_____
Michael Bernacke
Acting Deputy Assistant Director
Removal Management Division - East
Washington, D.C.