# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

USAMA JAMIL HAMAMA, et al.,

       Petitioners,

    v.

REBECCA ADDUCCI, Director, Detroit District
of Immigration and Customs Enforcement, et al.,

       Respondents.
_____

Civil No. 17-11910
Hon. Mark A. Goldsmith
Mag. Judge David R. Grand

## RESPONDENTS' OPPOSITION TO PETITIONERS' RENEWED MOTION FOR A PRELIMINARY INJUNCTION UNDER *ZADVYDAS*

Respondents oppose Petitioners' Renewed Motion for a Preliminary Injunction under *Zadvydas*, ECF No. 376. The grounds for this motion are set forth more fully in the attached supporting brief.

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General, Civil
Division

WILLIAM C. PEACHEY
Director

Dated:  September 28, 2018

WILLIAM C. SILVIS
Assistant Director

CARA E. ALSTERBERG
MICHAEL A. CELONE
JOSEPH A. DARROW
Trial Attorneys

*Counsel for Respondents*

## STATEMENT OF ISSUE PRESENTED

1. Whether Petitioners are entitled to release from immigration detention on the basis that such detention is no longer reasonable for the purpose of effectuating their removal to Iraq.

   **Respondents' Answer: No.**

## MOST CONTROLLING AUTHORITY

*Bennett v. Spear*, 520 U.S. 154, 167 (1997)

*Jennings v. Rodriguez*, 138 S. Ct. 830, 846 (2018)

*Zadvydas v. Davis*, 533 U.S. 678, 701 (2001)

# I.    INTRODUCTION

The Court should deny Petitioners' Renewed Motion for a Preliminary Injunction under *Zadvydas*, ECF No. 376. Petitioners seek immediate release from detention by the U.S. Department of Homeland Security ("DHS") while pending removal to Iraq. Petitioners are not likely to succeed on the merits, they have not established irreparable injury, and the public interest favors continuing the detention of aliens who are subject to final removal orders, particularly here where the Iraqi government is actively repatriating class members who are no longer subject to this Court's injunction.

Under the Court's preliminary injunction on removal, ECF No. 87, the government is currently only able to effectuate the removal of class members for whom the Court specifically lifts the stay of removal after they (a) volunteer to forgo the protections of this Court's preliminary injunction or (b) fail to file timely Motions to Reopen or fully exhaust their administrative remedies and do not timely appeal. The evidence demonstrates that, once the Court lifts its preliminary injunction as to individual class members, Respondents are able to procure travel documents from the Iraqi government and readily effectuate removal of *Hamama* class members. Moreover, contrary to Petitioners' assertions, Respondents are able to procure travel documents from Iraq even if class members are unwilling to state that they wish to return to Iraq voluntarily. Thus, to the extent the Court can enter an

order as to the *Zadvydas* class, writ large, its conclusion must be that there is a significant likelihood of removal in the reasonably foreseeable future ("SLRRFF").

Petitioners repeatedly argue that the class has "languished in detention" while this action is pending, *see* Pet'rs' Renewed Mot. for Prelim. Inj. Under *Zadvydas*, ECF 376, 41, but neglect to mention the widespread habeas relief that this Court has already ordered that covers the same class members who now seek a third preliminary injunction. Under the Court's January 2, 2018 order, the government was required to provide bond hearings to all members of the final order and mandatory detention (8 U.S.C. § 1226(c)) subclasses who had been detained for six months (unless they had open individual habeas cases), under a Petitioner-favorable "clear and convincing standard" that placed the burden on the government to establish that the detainee is a flight risk or public safety risk. *See* Op., ECF No. 191, 43 – 44.

The Court also certified the *Zadvydas* subclass, which includes *every* class member who is or may be detained, as long as they do not have an open individual habeas case. *Id*. Accordingly, the *Zadvydas* subclass includes the final order and mandatory detention subclasses, as well as class members detained under 8 U.S.C. §§ 1225, 1226(a) who do not have individual habeas cases, even though the Supreme Court's *Zadvydas* decision only applies to individuals with final orders of removal

2

who are detained under 8 U.S.C. § 1231.  In the Court's January 2, 2018 order, it deferred ruling on Petitioners' otion for a preliminary injunction on detention for the *Zadvydas* subclass, however, pending discovery on the scope of the repatriation agreement between the United States and Iraq.  *See* Op., ECF No. 191, 15

Accordingly, with the small exception of the individuals subject to detention under 8 U.S.C. § 1225, every *Zadvydas* subclass member is either receiving a bond hearing at six months under the favorable *Hamama* standard ordered in the court's January 2, 2018 order, or they are eligible to request a bond hearing even before six months of detention under the court's construction of  section 1226(a)'s detention authority. Thus, any *Zadvydas* subclass member who is still detained after six months either: (a) has not requested a bond hearing under 8 U.S.C. § 1226(a); (b) was denied bond; (c) was granted bond but did not post it; (d) is detained under 8 U.S.C. § 1225; and/or (e) has a pending habeas corpus petition. For (a)-(c), at least, these individuals lack standing for a preliminary injunction as their detention arises from their own inaction, specifically the decision of an immigration judge on bond – in which case the district court lacks jurisdiction to review such a decision – or from their own failure to adhere to the conditions of their supervised release.  *See* 8 U.S.C. § 1226(e). The appropriate recourse for such petitioners is to pursue relief through an appeal to the Board of Immigration Appeals ("BIA"), not through the

district court. *Id*. In other words, unlike a proper *Zadvydas* petition in which the length of detention can in some way be attributed to the government's inability to effectuate removal, the length of detention here (for all but a small subset of class members who are no longer subject to the injunction on removal) directly flows from their choice to remain subject to the court's stay of removal and thus the inability to secure release under the court's preliminary injunction order on detention, ECF No. 191.

Accordingly, Petitioners' motion should not be considered as one seeking a preliminary injunction; the relief Petitioners seek is the same relief they would hope to obtain on the merits of an individual habeas petition under *Zadvydas*—release from detention under an order of supervision. Petitioners' motion effectively asks this court to expedite consideration of the *Zadvydas* claim of each class member who has been detained for over six months, and order the release of that individual if the government cannot provide an individual travel document, *even if* such an individual still has pending removal proceedings (and thus does not possess a final order of removal) or, yet worse, Respondents cannot remove the class member solely due to this court's preliminary injunction on removal, ECF No. 87. However, *Zadvydas* does not require any specific method of proof to establish SLRRFF. As such, this court should conclude that Respondents should not be required to rebut the typical

factors required for a preliminary injunction. Instead, the court should consolidate any hearing on Petitioners' renewed motion into a hearing on the merits of Petitioners' *Zadvydas* claim.

In the event the court does consider Petitioners' motion as one properly seeking preliminary injunctive relief, such motion should be denied. *First*, Petitioners cannot succeed on the merits because their detention has not been unreasonably prolonged and because the law allows their continued detention. For Petitioners subject to final removal orders, detention is lawful because there is a significant likelihood of removal in the reasonably foreseeable future. *See Zadvydas v. Davis*, 533 U.S. 678, 701 (2001). Petitioners also receive post-order custody reviews to individually evaluate the need for continued detention. *See* 8 C.F.R. §§ 241.4, 241.13.  Iraq is, in fact, issuing travel documents to class members who are no longer subject to the preliminary injunction on removal (even to non-volunteers), and those previous class members are being successfully removed. Indeed, contrary to Petitioners' arguments, Respondents' assertions of SLRRFF do not rely on negotiations with Iraq, but on the fact that consular interviews are taking place, that travel documents are being issued, and that individuals are actively being removed to Iraq – all facts that Petitioners are well aware of, and have been for some time. *Second*, the public interest favors denying preliminary relief.  As the Supreme Court

5

noted in *Zadvydas*, the habeas court must ask whether the detention in question "exceeds a period reasonably necessary to secure removal." *Zadvydas*, 533 U.S. 678, 699. Specifically, the court "should measure reasonableness primarily in terms of the statute's basic purpose, namely, assuring the alien's presence at the moment of removal." *Id*. Congress's concern regarding the alien's presence at removal is heightened now that Iraq has indicated its willingness to accept a return of its citizens, and Petitioners' arguments based on the existence of orders of supervision prior to Iraq's changed approach are not persuasive. As *Zadvydas* notes, the basic purpose of the statutory scheme that Petitioners challenge supports public safety and reflects Congress's strong public interest in ensuring the effectuation of removal of those, like Petitioners here, who are subject to final orders of removal. These interests—reflected in Congress's detention framework—strongly cut against Petitioners immediate release.

For these reasons, Petitioners motion should be denied.

## II.    BACKGROUND

Petitioners' Request for Injunctive Relief.

On June 15, 2017, petitioners filed a putative class-action habeas petition and a motion for a temporary restraining order in the Eastern District of Michigan, asking the district court to halt their removal to Iraq based on allegedly changed conditions

in that country. *See* Habeas Petition, ECF No. 1, 1–26; TRO Motion, ECF No. 11. Petitioners alleged that ISIS had taken over Iraq's second-largest city in June 2014, committing slaughter and atrocities and forcing the flight or forcible conversion of thousands of Christians and other residents. Habeas Pet., ECF No. 1; TRO Mot., ECF No. 11.

After the district court entered a temporary stay of removal, *see* Order, ECF No. 32, petitioners filed an amended habeas petition, in which they sought to represent a putative class of "all Iraqi nationals in the United States with final orders of removal, who have been, or will be, arrested and detained by ICE as a result of Iraq's recent decision to issue travel documents to facilitate U.S. removal." First Am. Habeas Corpus Class Action Pet., ECF No. 35, 29. The amended petition made four claims challenging the government's efforts to remove petitioners to Iraq before the conclusion of adjudication on petitioners' claims that they cannot lawfully be removed from the country because of changed country conditions in Iraq. *See id.* at 32 – 34. Petitioners also moved for a preliminary injunction, asking the court to stay the removal of petitioners and putative class members so that they can file motions to reopen their immigration proceedings to pursue changed-country-conditions claims. Pet'rs' Mot. Prelim. Inj., ECF No. 77, 29.

On July 24, 2017, the district court issued an opinion and order granting petitioners a nationwide preliminary injunction preventing the government from enforcing final removal orders against Iraqi nationals and requiring the government to produce extensive discovery. *See* Removal Op., ECF No. 87, 33–34. By order, the stay of removal continues through the final disposition of the putative class members' motions to reopen, relief applications, and all timely appeals. *Id*.

While proceedings under the removal injunction have continued, the government has primarily detained affected Iraqi nationals under the authority provided in two statutes.  First, the government detained some nationals under the authority provided by 8 U.S.C. § 1231 to detain aliens who are subject to final removal orders.  Using that authority, the government has detained persons who have not prevailed on a motion to reopen immigration proceedings and who therefore remain subject to a final removal order.  Detention of such aliens is governed by 8 U.S.C. § 1231(a)(6). Second, the government has detained some Iraqi nationals under the authority provided by 8 U.S.C. § 1226(c) to detain certain aliens falling within a subsection of the INA specified in that statute. The Iraqi nationals detained under section 1226(c) have succeeded in having their removal orders reopened—and so are not subject to a final removal order and the detention authority of section

8

1231—but have criminal convictions or qualifying activities that render them subject to mandatory detention pending a decision on removal. *See* 8 U.S.C. § 1226(c)(1).

In October 2017, Petitioners filed a second amended habeas petition and class action complaint, adding claims challenging their detention while their removals were enjoined by the district court's first injunction. Second Am. Habeas Corpus Class Action Pet. and Complaint, ECF No. 118. Petitioners then moved for a preliminary injunction seeking relief on their detention-related claims. Pet'rs' Mot. Prelim. Inj. Detention Issues, ECF No. 138. For Count Four of the operative habeas petition (which petitioners called their "*Zadvydas* Claim"), petitioners contended – much as they do now – that they are subject to indefinite post removal-order detention, held unlawful by *Zadvydas*, because there is no SLRRFF. *Id*. at 19. Petitioners asked that they be ordered released unless the government provides "individualized evidence" showing that "[i]t is significantly likely" that an individual's proceedings "will be concluded within nine months from the detainee's entrance into ICE custody." *Id*. at 24. On Count Five (which Petitioners called their "Prolonged Detention Claim"), Petitioners contended that Iraqi nationals detained under section 1231 or under section 1226(c) have been subject to unreasonably prolonged immigration detention. *Id*. at 24-28. Petitioners asked that these nationals be released unless the government conducts individualized bond determinations or

9

provides "individualized evidence of danger or flight risk." *Id*. at 28. On Count Six (styled "the Section 1226/Mandatory Detention Claim"), Petitioners contended that, during reopened removal proceedings, they are subject to detention under 8 U.S.C. § 1226(a) (which allows for discretionary release on bond) rather than under the mandatory detention authority of section 1226(c), and seek a declaration to that effect. *Id*. at 28-32.

On January 2, 2018, this Court issued an opinion addressing Petitioners' preliminary-injunction motion, the government's motion to dismiss, and Petitioners' class-certification motion. *See* Op., ECF No. 191. The Court "defer[red] ruling" on whether to grant Petitioners injunctive relief on their claim (the *Zadvydas* claim in Count Four) that "they are being unlawfully detained because there is no significant likelihood of removal in the reasonably foreseeable future." *Id*. at 11–18.[1] First, the

---

[1] The Court found that the current record did not enable it to "determin[e] whether Iraq will accept repatriation of the class," Op., ECF No. 191, 15, so it deferred ruling on the *Zadvydas* claim "pending further discovery" on "whether Iraq will accept repatriation of the class," *id*. at 15, 18—and thus whether there is a "significant likelihood of removal in the reasonably foreseeable future," as necessary to resolve a *Zadvydas* claim. *Id*. at 11, 17–18. The Court denied the government's motion to dismiss as to the *Zadvydas* claim. *Id*. at 30. And it ruled that the Rule 23 requirements were satisfied for this claim, *see id*. at 30–35, 36–40, and certified a subclass relevant to that claim, consisting of "[a]ll Primary Class members, who are currently or will be detained in ICE custody, and who do not have an open individual habeas petition seeking release from detention." *Id*. at 42.

Court granted Petitioners preliminary injunctive relief on the detention claim for section 1231 detainees (Count Five)—the claim that, "even if their removal is reasonably foreseeable," they are nonetheless entitled "to receive individualized hearings on the issue of release." *Id.* at 18; *see id.* at 18–20, 29–30. The Court held that petitioners are likely to succeed on their claims that an alien subject to "prolonged detention" under the detention authority of 8 U.S.C. § 1231(a)(6)— which allows for detention after the 90-day removal period that ordinarily applies to an alien ordered removed—is entitled to an "individualized hearing[ ] on the issue of release" and is "to be released on bond unless the government can establish that" the alien is "a flight risk or a danger to the community." *Id.* at 18; *see id.* at 18–20, 44.

In reaching that holding, this court relied on *Zadvydas*'s statement that a "habeas court should consider the risk of the alien's committing further crimes as a factor potentially justifying confinement," 533 U.S. at 700, and on the Ninth Circuit's decisions in *Casas-Castrillon v. DHS*, 535 F.3d 942 (9th Cir. 2008), and *Diouf v. Napolitano*, 634 F.3d 1081 (9th Cir. 2011). *See* Op., ECF No. 191, 18–20. *Casas-Castrillon* held that "the prolonged detention of an alien" who was initially detained under the pre-removal-order detention authority of 8 U.S.C. § 1226(c) "would be constitutionally doubtful" after the "alien's administrative proceedings

are over." 535 F.3d at 951 (quoting *Zadvydas*, 533 U.S. at 690; some internal quotation marks omitted). *Diouf* extended *Casas-Castrillon*'s holding to post-removal-order detention under section 1231(a)(6), concluding that, as a matter of constitutional avoidance, the provision should be interpreted to require "an individualized bond hearing, before an immigration judge, for aliens facing prolonged detention under that provision." *Diouf*, 634 F.3d at 1085. Noting that those cases involved "circumstances where detention was prolonged, but removal was reasonably foreseeable," the district court here "ch[ose] to follow" those cases, concluding that petitioners needed only to "demonstrate the unreasonableness of their detention" to obtain release. Op., ECF No. 191, 20.

Second, this Court granted petitioners preliminary injunctive relief on their mandatory-detention claim for section 1226(c) detainees (Count Six)—that Petitioners purportedly detained under 8 U.S.C. § 1226(c) are entitled to bond hearings. *See* Op., ECF No. 191, 20–24, 29–30. The Court held that Petitioners detained under section 1226(c) (which does not provide for bond hearings) should be deemed detained under the authority of section 1226(a) (which does). *See id.* at 20–24.

Addressing both the prolonged detention claim and the mandatory detention claim, the Court concluded that the remaining injunctive factors supported relief.

*See* Op., ECF No. 191 at 29–30. Petitioners had "met their burden regarding irreparable harm" because "[d]etention has inflicted grave harm on numerous detainees for which there is no adequate remedy at law." *Id.* at 29. The Court believed that the "balance of equities" favored preliminary relief because without that relief, detainees would "continue to experience" the "harms" of detention. *Id.* And the Court concluded that the public interest in "the core value of liberty" supported preliminary relief too. *Id.* at 30. The Court also denied the government's motion to dismiss as to those detention claims, having ruled that they were likely to succeed on those claims. *Id.* at 30; *see also id.* at 45.

Third, the Court then partially granted Petitioners' class-certification motion and ordered injunctive relief in line with its certification decision. *See* Op., ECF No. 191 at 30–43. The Court further concluded that the "preliminary relief" sought was suitable for class treatment "because all affected detainees are being given the same habeas relief: the right to a bond hearing unless the Government can present some specific evidence why a particular detainee should not be entitled to that right." *Id.* at 40–41. This Court deferred ruling on Petitioners' "primary class"—defined as "[a]ll Iraqi nationals in the United States who had final orders of removal at any point between March 1, 2017 and June 24, 2017, and who have been, or will be, detained for removal by ICE"—but certified subclasses corresponding to the two

claims on which the court granted petitioners preliminary injunctive relief. *Id*. at 42 – 43. The Court certified a subclass corresponding to petitioners with section 1231 claims under Count Five (the court called this the Detained Final Order subclass) and a subclass corresponding to petitioners with section 1226(c) claims under Count 6 (the court called this the Mandatory Detention subclass). *See id.* at 42–43. (Those subclasses excluded those who "have an open individual habeas petition seeking release from detention." *Id*.).

For these subclasses, the Court ordered the government to release, no later than February 2, 2018, any detained member of the subclasses who had been detained, as of January 2, 2018, for six months or more, unless a bond hearing for any such detainee was conducted on or before February 2, 2018. *See* Op., ECF No. 191 at 43–44. The Court ordered that petitioners whose detention exceeds six months at some point after January 2, 2018, "shall be released no more than 30 days after the six-month period of detention is completed, unless a bond hearing" has been held. *Id*. at 44.

Ruling on "the reasonableness of detention" for the section 1231(a)(6) and section 1226(c) claims, *id*. at 25; *see id*. at 24 –29, the Court "conclud[ed] that any presumption of reasonableness ends after six months," *id*. at 26, and ordered that in bond hearings the immigration judge "shall release the detainee under an appropriate

order of supervision unless the Government establishes by clear and convincing evidence that the detainee is a flight or public safety risk." *Id*. at 26–27 (citing *Rodriguez v. Robbins*, 715 F.3d 1127, 1131 (9th Cir. 2013)). The court allowed the government to "present evidence that specific individuals have significantly contributed to the unreasonable length of detention" because of bad-faith tactics. *Id*. at 27.

ICE's Removal Preparations and Efforts.  Contrary to Petitioners' claims, the evidence in the record indicates that the removal of members of the *Zadvydas* subclass will be effectuated in the reasonably foreseeable future. Continued negotiations between the governments of the United States and Iraq have resulted in increased cooperation in removal of Iraqi nationals ordered removed from the United States.  *See* Respondents' Opp. to Pet'rs' Mot. for Sanctions, Decl. of John A. Schultz Jr. (Exh. A), ¶ 4.  Indeed, as a result of such negotiations, the Government of Iraq in 2017 "expressed their willingness to accept the return of all Iraqi nationals with final orders of removal without limitation." *Id*. These inter-governmental discussions yielded Iraq's statement of cooperation, which is memorialized in a March 12, 2017 U.S. Department of State Cable. *See id*. ¶ 6. That statement of cooperation "indicated that Iraq would accept 1,400 Iraqi nationals with final orders of removal, and did not place any limitations on that agreement." *Id*. After the

15

statement of cooperation was entered in March 2017, "the Iraqi Embassy indicated that it would issue [travel documents] for individuals being removed." *Id*. ¶ 40. Indeed, Iraq's actions of conducting interviews and issuing travel documents since that agreement indicate that there is now "a repeatable process for travel document issuance." Bernacke Dep. 103:20-24 (attached as Exhibit A). In fact, Respondents have "received approximately 72 travel documents" throughout fiscal year 2018. *See* Respondents' Opp. to Pet'rs' Mot. for Sanctions, Decl. of John A. Schultz Jr. (Exh. A), ¶ 42.

Additionally, Respondents understand that "Iraq will take back all Iraqi nationals with final orders of removal *regardless of whether they are volunteers*, asylum seekers or otherwise." *Id*. ¶ 6 (emphasis added). Indeed, the removal process understood to be "exactly the same for Iraqi nationals who declined to sign an Iraqi Government form stating that they were willing to return to Iraq[]." *Id*. ¶ 43. Beginning in June 2018, Respondents began "sending a letter with limited biographical information to the Iraq Embassy for all Iraqi nationals participating in consular interviews." *Id.* In September 2018, the Iraqi Government did not ask Iraqi nationals to sign "the voluntary form at consular interviews," and, instead, Respondents "sent the biographical information letter for all participants in the

16

interviews." *Id*.[2]  On July 13, 2018 and on September 5, 2018, the Iraqi Government issued 15 travel documents to Respondents "for Iraqi nationals who refused to sign the [Government of Iraq] voluntary return form at their consular interviews." *Id*. ¶ 46. Thus, it is Respondents' understanding that the process of obtaining travel documents or authorization for repatriation from the Iraqi Government "is not affected by an Iraqi national's expressed desire (written or verbal) to return or expressed desire (written or verbal) to not return to Iraq." *Id*. ¶ 47.

With the exception of those individual whom Iraq determines is not an Iraqi national, "ICE expects to receive [travel documents] for all individuals that ICE has requested to be removed to Iraq.  *Id*. ¶ 52 (referencing ECF 158-2 ¶ 7).

## III.   LAW AND ANALYSIS

A preliminary injunction is "an extraordinary and drastic remedy."  *Munaf v. Geren*, 553 U.S. 674, 689 (2008).   A party seeking such relief "must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and

---

[2] The biographical information letter Respondents send to the Iraqi government, "contains limited biographical information associated with the alien(s), such as alien registration number, date of birth, criminal history in the United States; confirmation of the issuance of a final order of removal; and a statement that the final order is administratively final." Respondents' Opp. to Pet'rs' Mot. for Sanctions, Schultz Decl. (Exh. A), ¶ 44.

that an injunction is in the public interest." *Winter v. NRDC*, 555 U.S. 7, 20 (2008).

"'The purpose of a preliminary injunction is always to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits.'" *United Food & Commercial Workers Union, Local 1099 v. Sw. Ohio Reg'l Transit Auth.*, 163 F.3d 341, 348 (6th Cir. 1998) (quoting *Stenberg v. Cheker Oil Co.*, 573 F.2d 921, 925 (6th Cir. 1978)).

The Court should deny Petitioners' request for this extraordinary relief.  On the merits, Petitioners fail to show that there is no significant likelihood of their removal to Iraq in the reasonably foreseeable future.  Moreover, Petitioners fail to show any cognizable irreparable injury arising from their immigration detention, or that the balance of interests favors their immediate release.

**A. Petitioners Fail to Show a Likelihood of Success on the Merits.**

Petitioners are not likely to succeed on the merits of any claim.  The Court should deny their preliminary-injunction motion on this ground alone.  *Jones v. Caruso,* 569 F.3d 258, 277 (6th Cir. 2009) (court need not consider other injunction factors when  "plaintiff has failed to show the likelihood of success on the merits").

> 1. Petitioners lack standing because their continued detention is not fairly traceable to DHS's actions, but rather the Court's stay of removal coupled with their inability to obtain release at the independent bond hearings they requested and received.

18

Under this Court's orders, all Petitioners, by virtue of their membership in either the section 1231 or 1226 subclasses, received bond hearings in front of neutral immigration judges.  To the extent that they are still detained, that continued detention is not fairly traceable to DHS's initial action in detaining them for removal, but rather the independent administrative determination of eligibility for release that they themselves requested.  Therefore, they lack standing to bring this request for preliminary injunctive relief.

To satisfy Article III's case or controversy requirement and establish the irreducible constitutional minimum of standing, a "plaintiff must have suffered or be imminently threatened with a concrete and particularized 'injury in fact' that is fairly traceable to the challenged action of the defendant and likely to be redressed by a favorable judicial decision." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125 (2014) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). The challenged action can "not [be] the result of the independent action of some third party not before the court." *Bennett v. Spear*, 520 U.S. 154, 167 (1997).

The Court has provided petitioners with bond hearings before a neutral arbiter on a heightened standard, as they previously requested.[3]  To the extent that they remain detained, their detention is caused by the immigration judge's determination that they cannot be released, or assessment of their bond at an amount the petitioner has declined to post. In other words, they remain detained as the result of the action of a third party, the independent immigration judges—acting on this Court's order and applying the standard this Court articulated—who are not before the Court. *Bennett*, 520 U.S. at 167.

Moreover, to the extent that Petitioners take issue with the IJ's determination in their bond hearing, they should be required to exhaust such a claim by appealing it within the administrative process before bringing it to federal court. The Supreme Court "long has acknowledged the general rule that parties exhaust prescribed administrative remedies before seeking relief from the federal courts." *McCarthy v. Madigan*, 503 U.S. 140, 144–45 (1992). Exhaustion "serves the twin purposes of protecting administrative agency authority and promoting judicial efficiency." *Id.* at

---

[3] The Court ordered that all persons in the section 1231(a) and 1226(c) subclasses receive bond hearings. Jan. 2, 2018 Order, ECF No. 191. This includes all persons in the main *Zadvydas* subclass, except for those who have opted out of the preliminary injunction and the "handful" detained under 8 U.S.C. § 1225(b), ECF No. 376 at 22 n.7, for whom immigration judges lack jurisdiction to hold bond hearings.  8 C.F.R. § 1003.19(h)(2)(i)(B).

145. Petitioners have failed to exhaust their administrative remedies because they have not appealed their bond decision to the Board of Immigration Appeals.  *See* 8 C.F.R. § 236.1(d)(3) (providing for filing appeals "relating to bond and custody determinations" with the BIA); *Osei v. Baker*, No. 2:07-CV-597, 2007 WL 4246140, at *2 (S.D. Ohio Nov. 29, 2007) (dismissing habeas petition for failure to exhausted administrative remedies by failing to appeal Immigration Court's denial of custody redetermination requesting release on bond to the BIA); *accord, e.g.*, *Leonardo v. Crawford*, 646 F.3d 1157, 1160 (9th Cir. 2011) (holding that alien "should have exhausted administrative remedies by appealing to the BIA before asking the federal district court to review the IJ's decision" regarding bond); *Kamrul-Islam v. Lowe*, No. 3:16-CV-02566, 2017 WL 2952820, at *3 (same), *R&R adopted*, 2017 WL 2906340 (M.D. Pa. July 7, 2017).[4]   Petitioners may challenge their bond determinations to the BIA, an administrative agency with expertise in handling these matters.   Instead, they seek to circumvent the Court-ordered decision of the immigration court regarding their release by coming back to this Court with a new

---

[4] Even if the deadline to appeal their IJ bond determinations to the BIA has passed, Petitioners still have an avenue to exhaust because they "still may seek a bond redetermination hearing from an Immigration Judge upon a showing of changed circumstances, *see* 8 C.F.R. § 1003.19; [and] then may appeal any adverse decision by the Immigration Judge to the Board of Immigration Appeals." *Osei*, 2007 WL 4246140, at *2.

21

theory allegedly entitling them to challenge their detention, rather than exhausting the process this Court set in place by appealing their bond-hearing determination to the BIA.

Thus, because Petitioners' continued detention is now fairly traceable to the actions of a third party—i.e., the outcome of the IJs' independent bond determinations—they lack standing to seek injunctive relief against Defendants on this issue. *See Bennett*, 520 U.S. at 167.  Alternatively, the Court should decline to address Petitioners' habeas claims because they have failed to exhaust their administrative remedies to challenge their continued detention post-bond hearing.

   2.   Petitioners Have Not Established No Significant Likelihood of Removal in the Reasonably Foreseeable Future, so Their *Zadvydas* Claim Is Likely to Fail.

Petitioners claim that their detention is unlawful because there is no significant likelihood of removal in the reasonably foreseeable future.  ECF No. 376 at 13-14.  Petitioners' *Zadvydas* arguments lack merit. For those aliens subject to post-order, section 1231 detention—and only those aliens; pre-order detention is subject to different considerations, *see generally Demore v. Kim*, 538 U.S. 510 (2003)—the Supreme Court has held that if the Government has not removed them after six months of post-order detention, "once the alien provides good reason to believe that there is no significant likelihood of removal in the reasonably

foreseeable future, the Government must respond with evidence sufficient to rebut that showing." *Zadvydas*, 533 U.S. at 701. Petitioners cannot meet their initial burden here because that six month period should not be deemed to and, even if it had, Petitioners fail to provide evidence showing removal is unlikely in the reasonably foreseeable future for the class as a whole. *See id.* Further, the Government has more than sufficiently rebutted their charge on the basis of evidence showing that Iraq is providing travel documents to and permitting the removal of Iraqis no longer subject to the Court's stay.

Petitioners fall into three categories: (a) Petitioners whose removal orders have been reopened; (b) Petitioners who are no longer covered by the stay of removal; and (c) Petitioners with final orders of removal but still subject to the stay – none of which can establish no significant likelihood of removal in the reasonably foreseeable future.

### a. Petitioners whose removal orders have been reopened.

Petitioners in this category are generally detained under 8 U.S.C. § 1226 as they no longer have final orders of removal.  The Supreme Court has indicated that the pre-order detention statute, 8 U.S.C. § 1226, governs the detention of aliens in removal proceedings and such detention "*must* continue 'pending a decision on whether the alien is to be removed from the United States.'" *Jennings v. Rodriguez*,

138 S. Ct. 830, 846 (2018) (quoting 8 U.S.C. § 1226(a)) (emphasis in original). *Zadvydas*'s finding of an implicit limitation on the duration of permissible detention of aliens already ordered removed, *see* 8 U.S.C. § 1231(a), does not apply to them.[5] "In *Demore* [538 U.S. at 529], we distinguished § 1226(c) from the statutory provision in *Zadvydas* by pointing out that detention under § 1226(c) has 'a definite termination point': the conclusion of removal proceedings." *Jennings*, 138 S. Ct. at 846. The Supreme Court has only read the foreseeability of removal as a limit on detention into section 1231(a), not the pre-order detention statutes. *See id.* at 843-44. Whether section 1226 Petitioners may be removed at all has yet to be determined by the immigration courts. To the extent this Court has held that these Petitioners are nevertheless eligible for bond hearings, the relevant considerations are public safety and flight risk. ECF No. 191 at 44; *see, e.g.*, *Jennings*, 138 S. Ct. at 836

---

[5] While, despite many Petitioners' eligibility for mandatory criminal detention under the terms of 8 U.S.C. § 1226(c), the Court held that they should be deemed as detained under section 1226(a), a permissive statute, that does not indicate that foreseeability of removal has any bearing on their detention either. *Jennings* made clear that the language of section 1226(a) also is not susceptible to reading any limitation, such as *Zadvydas*'s presumptive six-month period or foreseeability of removal, onto its length other than provided for in the statute's text. 138 S. Ct. at 848 ("Nor does § 1226(a)'s text even hint that the length of detention prior to a bond hearing must specifically be considered in determining whether the alien should be released.").

("Detention during those proceedings gives immigration officials time to determine an alien's status without running the risk of the alien's either absconding or engaging in criminal activity before a final decision can be made.") Indeed, the IJs have already assessed these factors in Petitioners' bond hearings, under a stringent burden of clear and convincing evidence imposed on the Government. *Id.* To the extent Petitioners remain detained, it is because they still could not obtain release under this favorable standard.[6]

The only basis Petitioners have for arguing that foreseeability of removal has any bearing on their detention is language in the Sixth Circuit case, *Ly v. Hansen*. However, the Supreme Court has now rejected both the constitutional-avoidance approach applied in *Ly* and its determination that there is an implicit temporal limitation on section 1226 detention. *Jennings*, 138 S. Ct. at 846-47. *Ly* held in part that "when actual removal is not reasonably foreseeable, criminal aliens may not be detained beyond a reasonable period required to conclude removability proceedings," 351 F.3d 263, 273 (6th Cir. 2003). The Sixth Circuit arrived at this

---

[6] This conclusion is the same for those Petitioners now in 8 U.S.C. § 1225(b) detention. *Jennings* makes clear that section 1225(b) is not susceptible to the same implicit limitation based on foreseeability of removal that *Zadvydas* read into section 1231(a). 138 S. Ct. at 843 ("*Zadvydas*, however, provides no such authority" to "graft a time limit onto the text of § 1225(b).").

conclusion regarding section 1226(c) detention "by constru[ing] the statute to include a reasonable time limitation in bringing a removal proceeding to conclusion" so as to avoid having to determine that "additional process would be required" as a constitutional matter.  *Ly*, 351 F.3d at 273.

The Supreme Court has subsequently rejected the use of the constitutional avoidance canon in this context, and has held that section 1226 contains no other limitations than those stated in the text.  As the Supreme Court has explained, the avoidance canon "permits a court to 'choos[e] between competing plausible interpretations of a statutory text'" when the text is ambiguous, but "does not give a court the authority to rewrite a statute as it pleases."  *Jennings*, 138 S. Ct. at 843 (quoting *Clark v. Martinez*, 543 U.S. 371, 381 (2005)).  Section 1226 contains no ambiguity on the length of permissible detention:  "it mandates detention 'pending a decision on whether the alien is to be removed from the United States,' *id.* at 846 (quoting 8 U.S.C. § 1226(a))." "[A]liens detained under its authority are not entitled to be released under any circumstances other than those expressly recognized by the statute." *Id.* Section 1226, however, contains no exceptions permitting release based on the foreseeability of removal.  *See generally* 8 U.S.C. § 1226.  Thus, under *Jennings*, the *Ly* Court erred in reading the statute to contain an additional limitation not contained in the text that "actual removal" be "reasonably foreseeable"—even

though it would be here for any Petitioners ordered removed, as explained below—and the Sixth Circuit has yet to address this issue as a constitutional matter.  As a result, current precedent indicates that there is no exception to the duration of section 1226 detention pending completion of removal proceedings based on the ultimate foreseeability of removal, a section 1231 consideration.  Accordingly, to the extent the Court has determined that Petitioners are eligible for bond hearings, the danger or flight considerations articulated by the Court set the standard governing the detention of Petitioners with reopened removal orders.

### b.  Petitioners who are no longer covered by the stay of removal.

The section 1231 detention of Petitioners who have opted out of the stay or have exhausted their appeals of denial of reopening is subject to the *Zadvydas* standard. However, such Petitioners cannot show a violation because members of this group have been, and continue to be, removed to Iraq. Because there is an agreement with Iraq to accept removals and class members have been removed to Iraq under this agreement, and because DHS continues to successfully obtain travel documents for Iraqis, Petitioners cannot establish as a classwide matter that their removal is significantly unlikely in the reasonably foreseeable future.

The fact that other Iraqis, and indeed *Hamama* class members, have recently been removed to Iraq establishes that the Court cannot hold there is no SLRRFF for the

class *per se*. Courts applying the *Zadvydas* standard generally require only a showing that there are no institutional barriers to repatriation to the country of removal, which is evinced by the fact that DHS has recently removed other aliens to that country, and that there is no clear impediment to *this individual* alien's similar removal. *See, e.g.*, *Beckford v. Lynch*, 168 F. Supp. 3d 533, 539 (W.D.N.Y. 2016) (holding *Zadvydas* satisfied where DHS provided evidence that it successfully recently repatriated several other Jamaicans and that "the request for a travel document for petitioner remains pending with the Consulate, and there is nothing in the record before the court to indicate that Jamaican authorities are inclined to deny the request"); *Joseph v. United States*, 127 F. App'x 79, 81-83 (3d Cir. 2005) (holding that alien failed to carry burden under *Zadvydas* where Antigua has provided travel documents in the past, *even though* the consulate had yet to issue any and "DHS has not explained or documented for this Court any recent steps that it has taken to procure Alva's papers, and it has not explained the delay following the Antiguan Consulate's representation that they would issue in April 2004"). *A fortiori*, courts finding a *Zadvydas* violation typically do so on the basis of some institutional impediment, most commonly the absence of a repatriation process with the target country, s*ee, e.g.*, *Clark v. Martinez*, 543 U.S. 371, 386 (2005) (finding no likelihood of foreseeable removal because U.S. was "no longer even involved in

repatriation negotiations with Cuba"); *Benitez v. Wallis*, 402 F.3d 1133, 1135 (11th Cir. 2005) (same),[7] or where the alien has attained relief from removal, *see Nadarajah v. Gonzales*, 443 F.3d 1069, 1081 (9th Cir. 2006) (holding "there is no significant likelihood of [alien's] removal" because he "has been awarded asylum twice, as well as protection under the Convention Against Torture once"), or where the country has specifically denied the government's request for travel documents and the government could show no progress in changing that determination, *see Shefqet v. Ashcroft*, No. 02 C 7737, 2003 WL 1964290, at *5 (N.D. Ill. Apr. 28, 2003). *See also Nma v. Ridge*, 286 F. Supp. 2d 469, 475 (E.D. Pa. 2003) (collecting cases).

Against this backdrop, Petitioners cannot establish a *Zadvydas* violation. Based on DHS's understanding of the United States' agreement with Iraq, memorialized in the March 12, 2017 U.S. Department of State Cable, "Iraq will take back all Iraqi nationals with final orders of removal regardless of whether they are volunteers,

---

[7] Indeed, *Zadvydas* itself indicated that even the absence of a current repatriation process does not *per se* mean removal is not reasonably foreseeable: it vacated the lower court's conclusion the alien was entitled to release because it "may have rested solely upon the 'absence' of an 'extant or pending' repatriation agreement without giving due weight to the likelihood of successful future negotiations." 533 U.S. at 702.

asylum seekers or otherwise." Respondents' Opp. to Pet'rs' Mot. for Sanctions, Schultz Decl. (Exh. A), ¶ 6. Iraq's actions of conducting interviews and issuing travel documents since that agreement indicate that there is now "a repeatable process for travel document issuance." Bernacke Dep. 103:20-24.[8] Under this agreement, ICE removed eight individuals to Iraq on April 18, 2017. *See* Respondents' Opp. to Pet'rs' Mot. for Sanctions, Schultz Decl. (Exh. A), ¶ 7. Prior to this Court's issuance of the preliminary injunction, ICE had obtained removal authorization from Iraq for another 60 Iraqis, which it eventually had to cancel when it became unclear if and when the TRO would lift. *Id.* ¶¶ 18-27. DHS and Iraq have held four rounds of consular interviews since May 2018 and Iraq has issued travel documents for all of those individuals that it has determined are Iraqi nationals. *Id.* ¶ 39. Iraq issued 33 travel documents for aliens interviewed in May 2018. *See* Bernacke Dep. 68:17-71:2. Further, Iraqi officials have indicated that Iraq "expects to issue [travel documents] for all individuals it determines to be Iraqi nationals, regardless of whether they state they wish to return to Iraq voluntarily" or not. Respondents' Opp. to Pet'rs' Mot. for Sanctions, Schultz Decl. (Exh. A), ¶¶ 43, 45. As of DHS's July 2, 2018 meeting with the Iraqi ambassador, so long as DHS

---

[8] Although there is no formal memorandum of understanding ("MOU"), the United States only has formal MOUs with a small percentage of the hundreds of countries it removes aliens to. *See* Schultz Dep. 166:17-21.

provides a cover letter with the alien's background information, including criminal history and indication of completion of immigration proceedings, Iraq will accept the alien's removal regardless of whether or not the alien wishes to go voluntarily. *See* Schultz Dep. 39:4-24. Indeed, Iraq issued fifteen travel documents to ICE on July 13, 2018 and on September 5, 2018 for Iraqis who refused to sign a voluntary return form at their consular interviews. Respondents' Opp. to Pet'rs' Mot. for Sanctions, Schultz Decl. (Exh. A), ¶ 44.

On the basis of this evidence, Petitioners cannot establish as a categorical matter that there is no likelihood of their removal to Iraq in the reasonably foreseeable future. There are active procedures in place for removing aliens to Iraq and DHS has been obtaining travel documents and conducting such removals of class members verified as nationals for whom the stay no longer applies. *See, e.g.*, *Beckford*, 168 F. Supp. 3d at 539. This is far more than sufficient to defeat a general claim of no SLRRFF, given the case law requiring either the absence of such a repatriation procedure, *see, e.g., Clark*, 543 U.S. at 386, or the foreign countries' official refusal to issue travel documents and the government's failure to show progress toward obtaining them, *see Shefqet*, 2003 WL 1964290, at *5.[9] Moreover,

---

[9] Individual Petitioners may have failed to obtain travel documents to the extent that such requests were made at the consulate, as DHS is obtaining travel documents for Iraqis directly through the embassy. *See* Schultz Dep. 146:13-15.

even a delay in the issuance of travel documents, which the evidence does not show, would not indicate a *Zadvydas* violation because DHS has been able to obtain Iraqi travel documents for significant numbers of aliens no longer under the stay and has demonstrated the steps it is taking to attempt to remove all class members with final removal orders once their removal is no longer stayed. *See Joseph*, 127 F. App'x at 81-83. To the extent that the process is delayed for any particular alien, such a claim could at most only bear on the likelihood of that alien's removal, not the class as a whole, given the evidence that DHS can and continues to remove class members.

Petitioners claim that *Rosales-Garcia v. Holland*, 322 F.3d 386 (6th Cir. 2003), supports their argument of no SLRRFF, but the circumstances in that case were very different.  In that case, Cuba "refused to repatriate most of the Mariel Cubans whom the United States has excluded, and the U.S. government does not contend in this appeal that a repatriation by Cuba of either [petitioner] is reasonably foreseeable." *Id.* at 391. The Court noted that the best evidence of SLRRFF was an ongoing negotiation between the United States and Cuba attempting to obtain Cuba's assent to accept some removals. *Id.* at 391 n.3. In contrast, here the Government is long past merely negotiating with Iraq, but has obtained a repatriation agreement under which Iraqis continue to be removed to Iraq. Unlike in *Rosales*, the Government here

therefore does not concede the absence of SLRRFF; rather, the evidence indicates that Petitioners will be removed to Iraq once they are no longer subject to the stay.

Given DHS's demonstrated ability to obtain travel documents for, and remove, Iraqi nationals, willing or not, once they are no longer under the stay of removal, the Court cannot hold that there is no significant likelihood of removal in the reasonably foreseeable future as a classwide matter.[10]

### c. Petitioners with final orders of removal but still subject to the stay.

Finally, Petitioners with final orders of removal, but still subject to the stay of removal (including, in addition to those still litigating their motions to reopen, those who have failed to file to such motions or did not timely appeal the denial of those motions, but have yet to be removed from the stay), also cannot establish a *Zadvydas*

---

[10] To the extent Petitioners maintain that the Court's *Zadvydas* determination must examine the evidence of SLRRFF for each petitioner individually, *see, e.g.*, ECF No. 376 at 2-3, Petitioners have selected an inappropriate vehicle by bringing this case as a class action seeking general injunctive relief. *See* Fed. R. Civ. P. 23(b)(2). "The key to the (b)(2) class is 'the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011). Therefore, "at a minimum, claims for individualized relief … do not satisfy the Rule." *Id.*  The fact that some class members have already been removed to Iraq on its own shows that the class's detention cannot be "declared unlawful … as to all of the class members" under *Zadvydas*, and therefore the Court must deny this motion. To the extent Petitioners think they could prevail individually, they may not do so within the confines of this action.

violation.  First of all, it makes no sense to count this period against the removal period because the Government cannot effect removal while the stay remains in place.  But even so, these class members cannot establish a lack of SLRRFF because the only impediment to removal is the Court's stay as other Iraqis have already been removed to Iraq and ICE has a process in place to remove these petitioners once the stay is lifted as to them, as explained above.

The purpose of detention under section 1231 is to provide the government an unobstructed period to execute a final removal order. "The purpose of the 90-day [removal] period is to afford the government a reasonable amount of time within which to make the travel, consular, and various other administrative arrangements that are necessary to secure removal." *Diouf v. Mukasey*, 542 F.3d 1222, 1231 (9th Cir. 2008). Thus, a legal obstacle to accomplishing removal, such as court-imposed stay, interrupts the running of the presumptively reasonable period of detention under section 1231. *See Akinwale v. Ashcroft*, 287 F.3d 1050, 1052 n.4 (11th Cir. 2002) ("Akinwale was taken into custody on November 17, 1999, and interrupted the running of time under *Zadvydas* by moving on December 3, 1999, for a stay of deportation in his prior appeal to this Court."); *cf. Hechavarria v. Sessions*, 891 F.3d 49, 55 (2d Cir. 2018), as amended (May 22, 2018) ("[T]he removal period is dependent upon the assumption that no substantive impediments remain to the

immigrant's removal."). Because the government has been prevented by the Court's stay of removal from executing Petitioners' removal from at the latest July 24, 2018 until the present, this period should not be counted toward the presumptively reasonable period that statute and *Zadvydas* provide for the detention of post-order aliens to ensure their removal. *See Akinwale*, 287 F.3d at 1052 n.4; *Abimbola v. Ridge*, 181 F. App'x 97, 99 (2d Cir. 2006) (explaining that alien's "self-inflicted wound" caused by "seeking and/or receiving numerous judicial stays and filing his numerous petitions for reconsideration and appeals" "should not establish grounds for [his] *Zadvydas* claim"). Accordingly, the *Zadvydas* claims by Petitioners in this group are premature.[11]

Even if the presumptively reasonable period had run, Petitioners cannot establish that there is no significant likelihood of removal in the reasonably foreseeable future, which they must do to warrant release under *Zadvydas*. 533 U.S. at 701. First, their removal has only been delayed due to the stay of removal this Court entered for the course of their proceedings to reopen their removal orders. As this Court has already held, "removal is reasonably foreseeable where the only barrier to removal is

---

[11] Petitioners' assertion that they have "languished in detention" while the stay is in place, ECF No. 376 at 41, ignores the fact that this Court has already afforded them bond hearings in which they could have obtained release if they could show, under the court's favorable standard, that they are not a danger or flight risk. ECF No. 191 at 44.

ongoing immigration proceedings." ECF No. 191 at 17; *see Prieto-Romero v. Clark*, 534 F.3d 1053, 1065 (9th Cir. 2008); *Soberanes v. Comfort*, 388 F.3d 1305, 1311 (10th Cir. 2004)).  Petitioners' section 1231 "detention is clearly neither indefinite nor potentially permanent like the detention held improper in *Zadvydas*; it is, rather, directly associated with a judicial review process that has a definite and evidently impending termination point"—the completion of their reopening, or reopened removal, proceedings. *Soberanes*, 388 F.3d at 1311.

And as explained, there is no evidence of other barriers on removal to Iraq such that the Court can find a classwide *Zadvydas* violation. The presence or absence of travel documents has little bearing on the likelihood of removal of these petitioners. DHS will not have applied for travel documents for many of these class members yet.[12]  DHS typically waits until a petitioner has been removed from the class, and therefore can be identified as "prompt removal," before seeking travel documents. Bernacke Dep. 97:12-13, 20-21. This is because obtaining travel documents is a

_____

[12] Petitioners claim that DHS has applied for travel documents "for individuals who, at the time of the request, are not repatriable."  ECF No. 376 at 12. The evidentiary basis they cite does not indicate what travel document requests were for aliens not repatriable, and what their basis is for claiming they are not repatriable. *See id.* (citing ECF No. 736, Ex. 1 ¶ 20; Ex. 2 ¶¶ 16-17).  Further, because the travel documents at issue in this case do not expire for six months, even if normal practice is to do otherwise, DHS could feasibly request travel documents for persons it anticipates will soon be removable without running a substantial risk of their expiration.  *See* Bernacke Dep. 73:6-9.

labor intensive process and documents, once obtained, are not valid indefinitely, but expire. *Id.* 61:21, 73:6-9. Nevertheless, there is no impediment to obtaining travel documents for these class members before the stay of removal is lifted, assuming only that they are verified to be Iraqi nationals. *See* Respondents' Opp. to Pet'rs' Mot. for Sanctions, Schultz Decl. (Exh. A), ¶¶ 43, 45; Schultz Dep. 39:4-24. Any persons determined not to be Iraqi nationals would no longer be affected by the stay.

However, as the Court explained, there is no *Zadvydas* violation where the only impediment to removal is ongoing immigration proceedings, so long as Iraq has agreed to accept repatriation at the classwide level. ECF No. 191 at 17. As explained above, Iraq has. Therefore, the *Zadvydas* claim of this final group of Petitioners must fail too.

## B. Petitioners Have Not Established Irreparable Harm, and the Public and Governmental Interest Weigh in Favor of Detention.

Petitioners claim that their immigration detention represents irreparable injury warranting immediate equitable relief. ECF No. 376 at 41-45. This is neither legally cognizable nor irreparable. Further, the balance of equities and public interest support the ongoing detention of Petitioners to ensure their presence at removal.

Harm that warrants the extraordinary remedy of preliminary injunctive relief must be legally cognizable harm. *See Stanton v. Hutchins*, No. 1:10-CV-74, 2010 WL 882822, at *6 (W.D. Mich. Mar. 8, 2010) (citing *Audi AG v. D'Amato*, 469 F.3d

534, 550 (6th Cir. 2006)); *Marchwinski v. Howard*, 113 F. Supp. 2d 1134, 1143 (E.D. Mich. 2000), *aff'd*, 60 F. App'x 601 (6th Cir. 2003); *Luxottica Grp. S.p.A. v. U.S. Shoe Corp.*, 919 F. Supp. 1085, 1091 (S.D. Ohio 1995).   A request for immediate release from lawfully instituted detention does not constitute a legally cognizable injury.   *See Barhoumi v. Obama*, 234 F. Supp. 3d 84, 86 (D.D.C. 2017). Detention of criminal aliens for at least a reasonable period during removal proceedings, or following issuance of a removal order when there is a significant likelihood that removal will occur, is a lawful and constitutional component of the immigration process.   *See Demore*, 538 U.S. at 523 ("[T]his Court has recognized detention during deportation proceedings as a constitutionally valid aspect of the deportation process."); *Zadvydas*, 533 U.S. at 701.

Additionally, the public interest favors denying Petitioners preliminary relief. Congress adopted mandatory detention for certain classes of aliens based on its understanding that "permitting discretionary release of aliens pending their removal hearings would lead to large numbers of deportable criminal aliens skipping their hearings and remaining at large in the United States unlawfully." *See Demore*, 538 U.S. at 528.   Petitioners' challenged detention is authorized by section 1231, which is expressly designed to support public safety and ensure that persons who have not established the safety or lawfulness of their presence not be permitted free reign

within the country.  *See, e.g.*, *Sylvain*, 714 F.3d at 159.  Further, while Petitioners argue that failure to abscond when they were previously released on orders of supervision indicates that they are not a flight risk, there was no need to flee the law when their removal orders could not be executed; now, however, as removal becomes imminent, the risk of absconding rises ever higher.  As the Supreme Court has observed, "by definition the first justification—preventing flight—is weak or nonexistent where removal seems a remote possibility at best." *Zadvydas*, 533 U.S. at 690.  The necessary corollary is that, as removal becomes more likely, the incentive to flee—and hence the public interest in preventing removable aliens' flight from the law—increases proportionately. Unless and until the Court determines that Petitioners' detention exceeds Congress's authority to require it, the interests of the public, as reflected in these statutes, oppose Petitioners' immediate release.

A final factor counseling against granting classwide preliminary relief here is that Petitioners' habeas inquiry will turn on the individual circumstances including the length of each Petitioner's detention, and the factors influencing the timing of her removal, etc., which render these determinations inappropriate on a generalized, classwide basis.  *See Ly*, 351 F.3d at 271 ("[C]ourts must examine the facts of each case, to determine whether there has been unreasonable delay in concluding removal

proceedings."). There is a serious question whether the reasonableness of continued detention can be commonly adjudicated as to the *Zadvydas* subclass as a whole in light of the varying strength of class members' interests, the government's interests, and the many reasons why immigration detention remain ongoing. Indeed, Petitioners tacitly recognize that individual determinations are essential for the habeas relief they seek. Instead, Petitioners attempt to have it both ways by asking this court to "allow for individualized decisions" on any common questions that cannot be answered class-wide. ECF No. 376 at 45 n.17. However, the alternative relief Petitioners seek to carve out, "individual habeas petitions", *id.*, is in fact the only relief that is appropriate here, which should have been pursued from the very beginning of this litigation.

Petitioners fail to show that any of the factors supporting preliminary injunctive relief weigh in their favor, and their motion should be denied.

## IV.   CONCLUSION

For the foregoing reasons, the Court should deny a preliminary injunction.

Dated:  September 28, 2018                    Respectfully submitted,

JOSEPH H. HUNT                                */s/ William C. Silvis*
Assistant Attorney General, Civil            WILLIAM C. SILVIS
Division                                     Assistant Director
                                             United States Department of Justice
                                             Office of Immigration Litigation
WILLIAM C. PEACHEY                            District Court Section
Director                                     PO Box 868 Ben Franklin Station
                                             Washington, DC 20044
CARA E. ALSTERBERG                            Tel: (202) 307-4693
MICHAEL A. CELONE                             Fax: (202) 305-7000
JOSEPH A. DARROW                              william.silvis@usdoj.gov
*Trial Attorneys*
                                             *Counsel for Respondents*

41

## CERTIFICATE OF SERVICE

I hereby certify that on this date, I caused a true and correct copy of the foregoing Defendants' Opposition To Petitioners' Renewed Motion for a Preliminary Injunction under *Zadvydas* to be served via CM/ECF upon all counsel of record.

Dated:  September 28, 2018                    Respectfully submitted,

                                                              */s/ William C. Silvis*
                                                              WILLIAM C. SILVIS

                                                              *Counsel for Respondents*

# Exhibit A

```
 1               IN THE UNITED STATES DISTRICT COURT

 2           FOR THE EASTERN DISTRICT OF MICHIGAN

 3                      SOUTHERN DIVISION

 4    - - - - - - - - - - - - - -x

 5   USAMA JAMIL HAMAMA,        :

 6   et al.,                    :

 7        Petitioners and       :   Case No. 1:17:cv-11910

 8        Plaintiffs,           :

 9      v.                      :

10   REBECCA ADDUCCI,           :

11   et al.,                    :

12        Respondents and       :

13        Defendants.           :

14    - - - - - - - - - - - - - -x

15                      Confidential

16

17           Deposition of MICHAEL BERNACKE

18                   Washington, D.C.

19                 Friday, July 13, 2018

20                        9:04 a.m.

21

22   Pages: 1 - 157

23   Reported By: Victoria Lynn Wilson, RMR, CRR

24

25
```

```
 1    Deposition of MICHAEL BERNACKE, held at the

 2    offices of:

 3

 4

 5          UNITED STATES DEPARTMENT OF JUSTICE

 6           450 5th Street, NW

 7           Washington, DC 20001

 8

 9

10

11

12        Pursuant to notice, before Victoria Lynn

13    Wilson, Registered Merit Reporter, Certified

14    Realtime Reporter, Notary Public in and for the

15    District of Columbia.

16

17

18

19

20

21

22

23

24

25
```

```
 1              A P P E A R A N C E S

 2    ON BEHALF OF ALL PETITIONERS AND PLAINTIFFS:

 3      KIMBERLY L. SCOTT, ESQUIRE

 4      MILLER, CANFIELD, PADDOCK & STONE, PLC

 5      101 North Main Street

 6      Seventh Floor

 7      Ann Arbor, MI 48104

 8      (734) 668-7696

 9

10       MARGO SCHLANGER, ESQUIRE

11       625 South State Street

12       Ann Arbor, MI 48109

13       (734) 615-2618

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1        A P P E A R A N C E S   C O N T I N U E D

 2        ON BEHALF OF RESPONDENTS AND DEFENDANTS:

 3          WILLIAM C. SILVIS, ESQUIRE

 4          ASSISTANT DIRECTOR

 5          NICOLE MURLEY, ESQUIRE

 6          TRIAL ATTORNEY

 7          UNITED STATES DEPARTMENT OF JUSTICE

 8          OFFICE OF IMMIGRATION LITIGATION

 9          DISTRICT COURT SECTION

10          950 Pennsylvania Ave,NW

11          Washington, DC 20530

12          (202) 307-4693

13

14        ON BEHALF OF U.S. IMMIGRATION AND CUSTOMS

15     ENFORCEMENT AND THE WITNESS:

16          SABRINA V. VASA, ESQUIRE

17          ASSOCIATE LEGAL ADVISOR

18          DISTRICT COURT LITIGATION DIVISION

19          U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT

20          500 12th Street, SW MS 5900

21          Washington, DC 20536

22          (202) 732-3358

23

24

25
```

BERNACKE-CONFIDENTIAL, MICHAEL                                Confidential
07/13/2018                                                   Page 61

1      Q   Okay.  What multiple countries are you --

2   well, what do you mean by "several different

3   agencies located in multiple countries"?

4      A   What I'm referring to is in any -- any

5   government agency that is utilized and contacted

6   by the Government of Iraq, also ICE and Department

7   of State.

8          MS. SCOTT:  Can you read that back to me.

9          (The reporter read the record as

10  requested.)

11     Q   Okay.  Do you know which agencies in Iraq

12  would be involved?

13     A   Generally, their Ministry of Foreign

14  Affairs, their Ministry of Immigration and also

15  the embassy.  I don't know the specific names for

16  their Ministry of Foreign Affairs or Ministry of

17  Immigration, I'm just referring to the entities

18  that have administrative controls over those

19  processes.

20     Q   All right.  So, you called the obtaining

21  of travel documents a labor-intensive process and

22  time-consuming process.

23     A   It is.  It is.

24     Q   So, we are now going to walk through that

25  process.  And so, can you -- and we're going to

BERNACKE-CONFIDENTIAL, MICHAEL
07/13/2018

Confidential
Page 68

1    presentation to an embassy, any liaison efforts
2    that result from that, and interview efforts on
3    the part of the embassy or consulate to -- to
4    identify that national and then issue a travel
5    document.
6        Q   Okay.  So, my questions before, when I
7    used "travel document presentation," "travel
8    document request," actually meant travel document
9    acquisition process.
10       A   Okay.  Okay.
11       Q   So, that's, I think, where some of our
12   disconnect was going.
13       A   Okay.
14       Q   So, let's start with the travel document
15   acquisition process for those individuals that
16   were interviewed in May 2018.
17       A   Okay.  So, those -- those aliens had a
18   number of travel document requests, the travel
19   document presentation packets, that were submitted
20   to the embassy, the Government of Iraq's Embassy
21   in Washington, D.C. throughout the month of --
22   months of March and April, and I believe a number
23   of cases went to them during May of 2018, that had
24   accumulated for a period of time, you know, during
25   those months.  It was a numbering near 50 or so

 1    for the individuals that were interviewed in

 2    May 2018?

 3        A  To my awareness, they were

 4    laissez-passers.  They were onetime use travel

 5    documents.

 6        Q  And, typically, for the Iraqi Government,

 7    how long does that -- what's the expiration date

 8    for those types of documents?

 9        A  I believe it's six months.

10        Q  Has there been instances in which the

11    document's expiration date exceeded six months?

12        A  Not that I'm aware of but, then again, I

13    have not reviewed every travel document personally

14    that has been issued.

15        Q  Okay.  You indicated that there were three

16    individuals in which there was a determination

17    that they may not be Iraqi citizens; is that

18    correct?

19        A  Correct.

20        Q  What's the next step for those three

21    Iraqis?

22        A  We --

23        Q  Sorry.  Let me rephrase that.  What's the

24    next step for those three individuals?

25        A  Well, the Iraqi Government, you know,

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

1    from the Court to lift that removal --

2        A  I do.

3        Q  -- stay?

4        A  For each case and for each Iraqi case that

5    we identify as a prompt removal, we usually confer

6    with counsel beforehand to identify any potential

7    impediments to removal and -- and go forward with

8    the interviews accordingly.

9        Q  Okay.  So, at what point in that process

10   do -- does ICE start the -- well, travel document

11   acquisition process?

12       A  After an alien has been identified as a

13   prompt removal?

14       Q  Right.  So, when an alien -- let

15   me start -- when a Hamama class member indicates

16   that they want to be removed to Iraq --

17       A  Correct.

18       Q  -- does ICE start the travel document

19   acquisition process then?

20       A  No, we usually will wait until that alien

21   is -- is removed from the class.

22       Q  What do you mean, "removed from the

23   class"?

24       A  Is no longer part of the Hamama

25   litigation, part of the Hamama class, that they

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

```
 1      A   Yeah, I do.  Can you just restate it,

 2   though, just so it's fresh in my mind.

 3      Q   Sure.  When did an official from the Iraqi

 4   Government state to you that they will permit the

 5   entry of detained Iraqi nationals once the

 6   litigation -- or once the injunction in this

 7   litigation is lifted?

 8      A   They did not explicitly state that to me

 9   or anyone else to my knowledge.  Again, you know,

10   if it was stated to Mr. Schultz in a separate

11   conversation or Mr. Clinton or anyone else maybe

12   above Mr. Schultz, I don't have knowledge of that.

13   However, given the actions that they took prior to

14   this declaration being authored and the injunction

15   being in place and also actions that have occurred

16   subsequent to the injunction being in place and --

17   and any actions that have occurred thereafter, we

18   have -- I believe, have had a good relationship

19   with them in terms of travel document issuance.

20          They have conducted interviews.  They have

21   issued travel documents.  They have done the

22   things that they need to do in order to -- to

23   stand up what we would consider a repeatable

24   process for a travel document issuance and -- and

25   based off of the actions and conversations that we
```

MICHAEL BERNACKE
July 13, 2018

Page 156

```
1                 ACKNOWLEDGEMENT OF DEPONENT

2            I, MICHAEL BERNACKE, do hereby acknowledge

3       that I have read and examined the foregoing

4       testimony, and the same is a true, correct and

5       complete transcription of the testimony given by

6       me, and any corrections appear on the attached

7       Errata sheet signed by me.

8

9       08/02/2018

10          (DATE)                    (SIGNATURE)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



USLEGAL
SUPPORT
The Power of Commitment™

# Exhibit B

```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE EASTERN DISTRICT OF MICHIGAN

 3                    SOUTHERN DIVISION

 4       - - - - - - - - - - - - x

 5     USAMA JAMIL HAMAMA, et al.,       :

 6            PETITIONERS AND            :

 7            PLAINTIFFS,                :

 8       v.                             :   Case No.

 9     REBECCA ADDUCCI, et al.,         :   2:17-cv-11910

10            DEFENDANTS AND             :

11            RESPONDENTS.               :

12       - - - - - - - - - - - - - - x

13

14   Confidential deposition of JOHN AUGUSTIN SCHULTZ, JR.

15            Washington, District of Columbia

16            Thursday, July 12, 2018

17                    9:04 a.m.

18

19

20

21

22   Job No. 196902

23   Pages: 1 - 241

24   Reported By: Angela K. McCullough, RPR, Notary

25   Public in and for the District of Columbia
```

```
 1              Deposition of JOHN AUGUSTIN SCHULTZ, JR.,

 2      held at the offices of:

 3

 4

 5              U.S. DEPARTMENT OF JUSTICE

 6              450 5th Street, Northwest

 7              Washington, DC  20001

 8              (202) 307-4693

 9

10

11

12

13              Pursuant to notice, before ANGELA K.

14      MCCULLOUGH, RPR, Notary Public in and for the

15      District of Columbia.

16

17

18

19

20

21

22

23

24

25
```

```
 1               A P P E A R A N C E S

 2    ON BEHALF OF THE PLAINTIFFS AND PETITIONERS:

 3         KIMBERLY L. SCOTT, ESQUIRE

 4         MILLER, CANFIELD, PADDOCK & STONE, PLC

 5         Cooperating Attorney, ACLU Fund of Michigan

 6         101 North Main Street, 7th Floor

 7         Ann Arbor, Michigan  48104

 8         (734) 668-7696

 9

10         MARGO SCHLANGER, ESQUIRE

11         Cooperating Attorney, ACLU Fund of Michigan

12         625 South State Street

13         Ann Arbor, Michigan  48109

14         (734) 615-2618

15

16

17

18

19

20

21

22

23

24

25
```

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone:  888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

```
 1   A P P E A R A N C E S   C O N T I N U E D

 2        ON BEHALF OF THE RESPONDENTS:

 3      WILLIAM C. SILVIS, ESQUIRE

 4      U.S. DEPARTMENT OF JUSTICE

 5      950 Pennsylvania Avenue, NW

 6      Washington, DC 20530

 7      (202) 307-4693

 8

 9       ON BEHALF OF THE DEFENDANT ICE:

10      KATHLEEN THACKER, ESQUIRE

11      U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT

12      500 12th Street, Southwest

13      Washington, DC  20536

14      (202) 732-2427

15

16

17

18

19

20

21

22

23

24

25
```

SCHULTZ, JR., JOHN AUGUSTIN
07/12/2018

Confidential
Page 39

```
 1      Q  Any other officials from the Iraqi

 2   Government?

 3      A  No.

 4      Q  And did -- when you say that you discussed

 5   a way forward, was there any agreement on a way

 6   forward?

 7      A  Yes.  To expedite the travel document

 8   issuance process, we -- we agreed that we would

 9   provide a cover letter for each presentation

10   package, sort of, outlining the subject's criminal

11   history, that they completed their criminal

12   sentence, and that their -- their immigration case

13   has been completed.

14      Q  Would that cover letter include any

15   information about whether or not the Iraqi

16   national desires to return to Iraq?

17      A  No.

18      Q  Did you guys discuss, at this meeting,

19   whether or not Iraq will accept Iraqi nationals

20   who do not desire to return to Iraq?

21      A  At that meeting, what was determined was

22   if we have that cover letter, there's going to be

23   no question regarding whether or not someone wants

24   to return to Iraq.

25      Q  And who made that statement, that that
```

1   officer.  My officer should've, eventually, gotten

2   it, but I'm not certain if he did.  But I would've

3   liked my officer to -- to talk to his unit chief

4   to make contact with the embassy to discuss this

5   situation.  Because, again, volunteering to return

6   to your country is not part of the removal order.

7       Q   Okay.  I understand that.

8           But if Iraq is indicating that they will

9   not start any applications for travel documents

10  for an individual, that means you cannot

11  repatriate the individual to Iraq, correct?

12      A   So -- yes.  I -- if they indicate that

13  they're not going to start anything.  But this is

14  from the consul.  The embassy oversees the

15  consuls.  So we should engage the embassy.

16      Q   Okay.  Okay.  Now I understand most of

17  your answers.  Okay.  Thank you.  Okay.

18          MS. SCOTT:  So I'm going to mark the next

19  as Exhibit 12.

20          (Exhibit 12 was marked for

21          identification.)

22  BY MS. SCOTT:

23      Q   Okay.  Are you familiar with -- with

24  Exhibit 12?

25      A   I -- I don't necessarily recall this

SCHULTZ, JR., JOHN AUGUSTIN
07/12/2018

Confidential
Page 166

```
 1      Q  At the very bottom of the second page, it
 2   starts off with "Watik."
 3         Do you see that?
 4      A  Yes.
 5      Q  "Suggests an MOU between ICE and MOJ."
 6         Do you see that?
 7      A  Yeah.  I guess I could see "MOU."
 8      Q  Do you recollect an MOU being discussed at
 9   this meeting?
10      A  No.  And, honestly, I -- maybe I don't
11   recall it because I didn't see a need for one.  It
12   didn't stand out as something I needed to pursue.
13   So I don't -- I still don't recall hearing about
14   that.
15      Q  Why did you think there wasn't a need for
16   an MOU?
17      A  So ICE, again, removes people to, like,
18   200 places.  We only have MOUs with, maybe, 10
19   countries.  And we're able to be successful in our
20   removal mission to the other 195 places that we
21   take people to.
22         MOUs, typically, are -- are items that
23   are -- take a good amount of time to negotiate and
24   agree upon.  And, at the end of the day, if we
25   have a system in place that's seemingly working,
```

SCHULTZ, JR., JOHN AUGUSTIN
07/12/2018

Confidential
Page 240

```
 1              ACKNOWLEDGMENT OF DEPONENT

 2          I, JOHN AUGUSTIN SCHULTZ, JR., do hereby

 3    acknowledge that I have read and examined the

 4    foregoing testimony and the same is a true,

 5    correct, and complete transcription of the

 6    testimony given by me and any corrections appear on

 7    the attached errata sheet signed by me.

 8

 9    _____        Aug 13 2018
                                 _____
10        (SIGNATURE)                (DATE)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```