# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**USAMA JAMIL HAMAMA**, et al.,

Petitioners and Plaintiffs,

v.

**REBECCA ADDUCCI**, et al.,

Respondents and Defendants.

Case No. 2:17-cv-11910
Hon. Mark A. Goldsmith
Mag. David R. Grand

Class Action

## RESPONDENTS/DEFENDANTS' OPPOSITION TO PETITIONERS/PLAINTIFFS' MOTION FOR SANCTIONS (ECF 381)

### Statement of Issue Presented

Have Petitioners established that Respondents' conduct in this litigation amounts to an "unconscionable scheme calculated to interfere with the judicial system's ability to adjudicate a matter" that would warrant this Court to exercise its inherent authority to enter sanctions?

Respondents' Answer:  No

### Controlling or Most Appropriate Authority

*Plastech Holding Corp. v. WM Greentech Auto. Corp,* 257 F. Supp. 3d 867 (E.D. Mich. 2017)

## I.      Introduction

Petitioners can no longer plausibly deny that Iraq is repatriating class members. As a result, Petitioners' *Zadvydas* claim fails as a matter of law. Moreover, despite Petitioners' arguments to the contrary, the evidence shows that Iraq is issuing travel documents for class members regardless of whether they are volunteering to return to Iraq. Facing these undeniable facts, Petitioners now attempt to redirect this Court's attention to prior statements and messages of officials from both the governments of the United States and Iraq, most of them taken out of context, in a futile attempt to show that Respondents somehow misled this Court—in January 2018—about Iraq's willingness to repatriate class members.  And, as a consequence, Petitioners argue that this Court should release all class members unless Respondents can procure a travel document within two weeks. However, once this Court takes into account all of the facts, including the context of when certain challenged statements were made, the impact of this litigation on the repatriation process, and that fact the agreement between the governments of the United States and Iraq was at an embryonic stage when this lawsuit started, and continues to evolve to this day, it will see that the sanctions motion lacks merit.

This Court should deny the motion for several reasons. First, and most important, is the fact that Respondents' statements were truthful when submitted to

the Court as evidence of Respondents' plans for the repatriation of Iraqi nationals. As addressed in more detail below, Respondents acknowledge that Deputy Assistant Director John Schultz's single line in his declaration made in November 2017, concerning the June 2017 charter flight was initially postponed to July 2017, does not provide every detail of the interplay between Respondents, the government of Iraq, and this Court's temporary restraining orders (TROs) and preliminary injunction. Respondents submitted the statement to the Court to provide background on what Respondents' plans had been to remove class members to Iraq before they have been prevented from doing so by the Court's TROs and, eventually, the preliminary injunction. Schultz's declaration filed in support of this response and attached hereto as Exhibit A, demonstrates why there was a good faith basis for doing so. Similarly, Respondents acknowledge that Schultz and Michael Bernacke provided conflicting statements on whether Respondents intended to procure travel documents from Iraq for the June 2017 charter flight, or whether the flight would have travel to Iraqi based on a manifest only. Bernacke's declaration, filed in support of this response and attached hereto as Exhibit B, explains that this conflict is immaterial because utilizing either method would have led to the exact same result— class members would have been removed to Iraq. Because these statements, and all of Respondents statements to this Court in the course of this intense,  docket-heavy litigation, have been made in good faith and not designed to mislead either the Court or Petitioners, the Court should deny this motion for sanctions.

Second, the Court should deny this motion because it is premised on the highly speculative notice that, but for the alleged false statements, the Court would have granted preliminary relief to the *Zadvydas* subclass. Petitioners' evidence that they were entitled to classwide *Zadvydas* rested solely on: (a) the fact that many class members had previously been released, mostly years ago, on orders of supervision because the United States could not remove them to Iraq; and (b) the 8 letters from the Iraqi Consul General in Detroit stating that there was insufficient evidence of Iraqi nationality to grant travel documents. The catalyst for this entire lawsuit, however, was undeniably the increased engagement between the governments of the United States and Iraq on the repatriation of Iraqi nationals which began in early 2017. *See, e.g.,* Pet'rs' TRO, ECF No. 11. Petitioners may dispute the significance of various aspects of that engagement, but they cannot plausibly argue that the situation with Iraq is the same as when they were released under orders of supervision years ago. Moreover, the 8 letters did not provide a sufficient basis for this Court to find that there was no significant likelihood of removal in the reasonably foreseeable future ("*SLRRFF*") for the nearly 300 Iraqi nationals who were detained at the time of the Court's January 2, 2018 order granting a preliminary injunction. Thus, because Petitioners had an inadequate record to demonstrate *SLRRFF* on behalf of the *Zadvydas* subclass, they were not harmed by having to engage in discovery or in filing their renewed *Zadvydas* preliminary injunction.

Third, the Court should deny Petitioners' motion because the *Zadvydas* subclass has not been harmed during the discovery period. On January 2, 2018, the Court granted widespread relief to virtually every class member who was not already eligible to request release on bond under the pertinent detention statues. The only members of the *Zadvydas* subclass not eligible for bond hearings under the January 2, 2018 order were a small number of individuals detained under 8 U.S.C. § 1225, who later filed individual habeas petitions. *See* ECF No. 265. Thus, to the extent that class members were unable to obtain release on bond or through habeas, their continued detention is the result of those proceedings, and not because Respondents are unable to demonstrate that there is *SLRRFF*.

Finally, the Court should deny Petitioners' motion because to the extent they identified statements that they believed to be false or misleading, they should have brought it to the attention of Respondents first, and provided Respondents an opportunity to correct the record if necessary. The allegedly false statements are in declarations filed 10-14 months ago (as attachments to an opposition to a preliminary injunction on which Petitioners actually secured broad relief). Petitioners received the underlying documents through discovery this summer, and deposed both Schultz and Bernacke in July 2017. The parties attended a hearing status conference on July 19, 2018, and had submitted a Joint Statement of the Issues on July 9, 2018 (ECF No. 331), and not once did Petitioners raise the issues of the allegedly false statements with Respondents. Again, on August 27, 2018, the parties submitted

4

another Joint Statement of Issues (ECF No. 373). It was not until Petitioners requested Respondents' LR 7.1 concurrence on the motion for sanctions that Respondents were aware of the allegations, yet even in seeking concurrence Petitioners did not disclose the nature of the allegations, only that the statements where "scattered through those three declarations." Ex. C. Tellingly, Petitioners filed this motion simultaneously with their renewed motion for relief on the *Zadvydas* claim. The Court should not exercise its inherent authority under these circumstances where the motion is clearly a litigation tactic designed to resurrect Petitioners' failing *Zavydas* claim.

## II.    Background

Petitioners/Plaintiffs' Motion for Sanctions (ECF No. 381) is premised on their argument that, but for the allegedly false and misleading statements in the declarations of two U.S. Immigration and Customs Enforcement employees—John Schultz and Michael Bernacke—this Court would have granted preliminary injunctive relief to the *Zadvydas* subclass. Pet'rs' Mot. Sanct. at 2-3. According to Petitioners, the discovery that followed this Court's January 2, 2018 Order (ECF No. 191), and Petitioners' Renewed Motion for a Preliminary Injunction under *Zadvydas* (ECF No. 376), would have been unnecessary but for these statements. *Id.* Accordingly, they seek not only the release of every *Zadvydas* subclass member who has been detained for six months or longer, but also their costs for conducting

discovery, drafting their renewed preliminary injunction motion, and for drafting their sanctions motion.

Petitioners/Plaintiffs' Motion for a Preliminary Injunction on Detention Issues (ECF No. 138)—Petitioners' first request for release under *Zadyvdas*—which Petitioners filed on November 11, 2017, was based on two arguments: (1) that it was "unclear whether Iraq will actually allow any particular individual's repatriation— whether by issuing travel documents or making other arrangements to accept removal—and if so, how long that process will take;" and (2) that for most class members it would "take additional months, if not years, for their MTRs and reopened proceedings to be finally adjudicated, during which time the government is prohibited from removing them." *Id.* Pg ID 3379. Addressing Petitioners' second argument, this Court agreed with Respondents that "the end point of the legal process is reasonably foreseeable," and thus did not provide a basis for relief under *Zadvydas*. Order, ECF No. 191, Pg ID 5324, 5334.

Addressing Petitioners' first argument, this Court held that "there [was] insufficient evidence in the record to determine whether Iraq is willing to accept class-wide repatriation," and accordingly deferred ruling on the *Zadvydas* claim pending further discovery. ECF No. 191, Pg ID 5324. The Court noted Petitioners' argument that Respondents had "not provided any "particularized evidence" that removal can be effected in the reasonably foreseeable future." *Id.* Pg ID 5330 (citing Pet'rs' Mot. Sanc., at 21). Specifically, it noted Petitioners' argument that

Respondents' had only provided "vague representations about its agreement with Iraq and that country's supposed willingness to relax its policies regarding issuance of travel documents." *Id.* Pg ID 5330-31. Additionally, the Court noted Petitioners' argument that "since the alleged policy change was announced, several putative members have unsuccessfully attempted to receive their travel documents from the Iraqi government." *Id.* (citing Pet'rs' Mot. Sanc., at 22). This evidence amounted to 8 letters from the Consulate General of the Republic of Iraq in Detroit, between April and October of 2017, declining to issue travel documents.  *See* ECF No. 138-22, Pg ID 3651-58.

In opposing the motion for a preliminary injunction on the *Zadvydas* claim, Respondents were forced with trying to demonstrate *SLRRFF* for all of the detained Iraqi nationals. The fact that the Court's two TROs (ECF No. 32, entered June 22, 2017, covering Iraqis within the jurisdiction of the Detroit Field Office, and ECF No. 43, entered June 26, 2017, expanding the June 22 TRO nationwide) and the Court's July 24, 2017 preliminary injunction (ECF No. 87), prevented Respondents from removing all but a few the class members made this especially challenging.

Accordingly, Respondents attempted to demonstrate *SLRRFF* through the declarations of Schultz and Bernacke, two employees with U.S. Immigration and Customs ("ICE"), Enforcement and Removal Operation's ("ERO") Removal Management Division ("RMD"), Removal and International Operations ("RIO") unit. *See* Schultz Decl., ECF No. 158-2; *see also* Bernacke Decl., ECF No 184-2.

7

Schultz's declaration addressed several points relevant to the *SLRRFF* analysis as of November 30, 2017, the day he executed his declaration. This Court's opinion cites three substantive paragraphs of Schultz's declaration:

- "Recent negotiations between the governments of the United States and Iraq have resulted in increased cooperation in removal of Iraqi nationals ordered removed from the United States. Travel documents for many Iraqi nationals are now being approved directly by Baghdad and the travel documents are then subsequently issued by Iraq officials in the U.S." Schultz Decl. ¶ 4, ECF No. 158-2.

- "ICE originally had a charter flight scheduled in June 2017 that was rescheduled for July 2017 in view of the court's original order; however, ICE was not able to effectuate that flight due to the Court's July 24th order. Thus, ICE must obtain individual travel documents on a case-by-case basis as aliens are excluded from the class." *Id.* ¶6.

- "To minimize the risk of having to ask a foreign government to re-issue or extend an expired travel document, ICE waits until there are no impediments to request a travel document. Thus, ICE currently does not have travel documents for all detained final order Iraqis. Of the detained Iraqi nationals subject to final orders of removal, ICE believes that the central government of Iraq in Baghdad will issue travel documents should the court lift the injunction that currently prevents removals to Iraq. The documentary evidence of these detainees' identity in each alien's official immigration file strongly supports their Iraqi nationality." *Id.* ¶8.

*See* Opinion, ECF No. 191, Pg ID 5331. Similarly, Bernacke's declaration addressed several points relevant to the *SLRRFF* analysis as of November 30, 2017, the day he executed his declaration. This Court's opinion cites three substantive paragraphs of his declaration:

- "The agreement between the United States and the Iraqi Ministry of Foreign Affairs (MFA) is not memorialized in any written agreement or treaty. It is a product of ongoing diplomatic negotiations." Bernacke Decl., ¶ 4, ECF No. 184-2.

- "Based on this agreement, the United States planned to schedule the return of all Iraqi nationals with final orders of removal in the United States. The agreement does not contemplate any numeric limitation on the number of removals in total or on an annual basis." *Id.* ¶ 5.

- "The government of Iraq agreed to accept these removals via charter mission. As a charter mission, rather than a removal conducted via commercial airline flight, formal travel documents are not required. Instead, ICE submits a proposed manifest for the charter flight to Iraqi officials for approval. The manifest for the charter scheduled for June 17 included approximately 60 individuals. A charter flight, depending on which aircraft is available, can hold as many as 150 individuals for removal." *Id.* ¶ 6.

*See* Opinion, ECF No. 191, Pg ID 5331-32. Based on these statements, and the thin evidence offered by Petitioners to argue that there was no *SLRRFF* for the entire *Zadvydas* subclass, this Court found that it could not "make a determination regarding whether Iraq will accept repatriation of the class." *Id.* Specifically, the Court noted that "it is unclear whether Iraq has agreed to repatriate all 1400 putative class members at issue here, and if so, what conditions may have been attached that could impact on whether removal is likely." *Id.*

## III.    Argument

### A.    Respondents' statements were truthful, not designed to mislead the Court or Petitioners, and are corroborated by other evidence, including Iraq's demonstrated practice of issuing travel documents to class members, regardless of their willingness to return to Iraq.

Petitioners' primary argument is that Respondents' statements about their plans to repatriate Iraqi nationals using charter flights were false or misleading, and caused this Court to defer ruling on the *Zadvydas* claim. Pet'rs' Mot. Sanc. at 3-4.

Petitioners divide these statements into four categories: "1) statements that the U.S. reached an agreement with Iraq in 2017, and that Iraq was willing to accept the return of all Iraqi nationals with final orders of removal without limitation; 2) claims that ICE could secure travel documents for all Iraqi nationals but did not attempt to do so because of the preliminary injunction; 3) statements that Iraq will accept charter flights using manifests rather than requiring travel documents; and 4) statements that the June and July 2017 flights were cancelled as a result of this Court's injunctions." *Id.* at 5-6. In so doing, Petitioners carefully select only the documents that support their allegations, seemingly pretend that context does not matter, and neglect to mention how Iraq's demonstrated willingness to issue travel documents to Iraqi nationals—*regardless of whether they are volunteers*—demonstrates the accuracy of Respondents' statements.[1]

**1. Iraq has in fact agreed to the return of 1400 Iraqi nationals with final orders of removal.**

---

[1] Petitioners also make an invidious claim that Respondents declarations were "carefully hedged to allow the declarants to disclaim responsibility. In some instances where a declarant had personal knowledge of adverse facts, a different declarant was used to tell as false story." Pet'rs' Mot. Sanc., at 5, n.3.  The sole example Petitioners provide is the discrepancy between Schultz and Bernacke's understandings of whether the June 2017 charter flight would have been conducted using a manifest or travel documents. *Id.* As discussed herein, the declarants had different understandings of what the plan would have been for charter flights that never actually went forward following the nationwide TRO and eventually the preliminary injunction, ECF No. 87. Moreover, the difference was immaterial in that the result is exactly the same: Iraqi nationals would have been repatriated to Iraq on the charter flights.

First, Petitioners argue that "Respondents said that Iraq agreed to the return of all Iraqi nationals with final orders of removal, knowing that it was untrue." Pet'rs' Mot. Sanc. at 6. In discovery, Respondents produced a cable from the United States Embassy in Baghdad dated March 12, 2017, which discusses the outcome of a meeting between American officials and the Iraqi Inter-ministerial Committee on Deportations which has been specifically set up to address the repatriation of Iraqi nationals form the United States to Iraq. *See* Schultz Dec. 9/28/2018, ¶ 6, Ex. 1. That e-mail specifically discusses the steps that will be taken "to commence the return of over 1400 Iraqj nationals ordered deported from the United States." *Id.*  Because the agreement did not place any limitations on the 1400 Iraqi nationals Iraq would accept, it forms the basis for Respondents' statements that Iraq will accept all Iraqi nationals with final orders of removal, regardless of whether they are volunteers or asylum seekers. *Id.* Despite having this document in their possession, and using it has an exhibit during the depositions, Petitioners do not even acknowledge this document in the pertinent section of their brief. *See* Pet'rs' Mot. Sanc. 6-8.

Petitioners also question the existence of the agreement based on 280 travel document requests that Respondents submitted in May and June of 2017, but never issued by Iraq. Pet'rs' Mot. Sanc. 6. These travel document requests were made as part of the large scale charter flights Respondents were planning for the summer of 2017. Schultz Dec. 9/28/2018, ¶ 8. After the Court entered the preliminary injunction on July 24, 2017, however, Respondents no longer pursued those requests. *Id.,* ¶¶ 4.

11

29. Similarly, the "blanket denial" of the 24 travel document requests cited in Petitioners' motion to undermine the basis of the agreement were unrelated to the 280 requests that Respondents made in May and June of 2017. *Id.*, ¶ 9. These appear to be requests that were made years earlier, before the agreement in March 2017. *Id.*

Petitioners also cite the postponement and eventual cancellation of the June 2017 charter flight as an example of the lack of an agreement with Iraq. Pet'rs' Mot. Sanct. 6. A contemporaneous e-mail relating a discussion with the Iraqi Ambassador to Iraq undermines that assertion: "Ambassador Yaseen has offered to provide the travel documents for the deportees from Washington, without waiting for the go ahead from Baghdad." Schultz Dec. 9/28/2018, ¶ 11, Ex. 7. The June 2017 flight was postponed and eventually cancelled, as discussed in more detail below, but the Iraqis continued to work with Respondents up until the July 24, 2017 preliminary injunction ultimately prevent the charter for going forward. Schultz Dec. 9/28/2018, ¶¶ 19, 24.  This included 80 interviews that the Iraqi Consulate completed in July 2017. *Id.,* ¶ 28.

Petitioners further cite to ████████████████████████████ as evidence that Respondents had misrepresented Iraq's willingness to cooperate with removals. Pet'rs' Mot. Sanct. 6-7. Petitioners are referring to a ██████████████████

████████████████████████████████████████████

Schultz Dec. 9/28/2018, ¶ 30. ████████████████████████████

████████████████████████████████████████. *Id.* █

████████████. *Id.* The e-mail from the "Deputy Chief of Staff" cited in Petitioners' motion was not involved in the travel document process, and after receiving it, Schultz did not believe there were about problems with the travel document process. *Id.* ¶ 31. Finally, Petitioners claim that Iraq will not accept forced repatriation of Iraqi nationals. Pet'rs' Mot. Sanct. 8. Iraq has already issued 15 travel documents for Iraqi nationals who refused to sign the volunteer form at issue in this lawsuit, and on July 2, 2018, several Iraqi officials communicated to Schultz that Iraq would issue travel documents to all individuals it determines are Iraqi nationals, regardless of whether they are returning voluntarily. Schultz Dec. 9/28/2018, ¶ 45.

## 2. Respondents believe they will secure travel documents for all Iraqi nationals with final removal orders.

Petitioners also challenge the statements in the declarations of Schultz and Bernacke declarations about why, in November and December 2017, Respondents did not have travel documents for all detained final order Iraqi class members. Pet'rs' Mot. Sanc., 9 (citing Schultz Decl. ¶ 8, ECF 158-2; Bernacke Decl. ¶10, ECF 184-2). Both declarations were offered in support of Respondents' opposition to the motion for a preliminary injunction on detention issues, to explain why Respondents were not pursing travel documents for the detained Iraqi nationals. At the time Schultz and Bernacke offered their declarations, Respondents were only seeking travel documents for individuals going through the voluntary removal process. Schultz Dec. 9/28/2018, ¶ 50; Bernacke Decl. 9/28/2018, ¶ 11. More recently,

Respondents have expanded this process and are now seeking travel documents for individuals whom Respondents believe may no longer be subject to the Court's preliminary injunction before the travel document expires. Schultz Dec. 9/28/2018, ¶ 51; Bernacke Decl. 9/28/2018, ¶ 12.

3. **Respondents believe that Iraq will issue travel documents for every Iraqi national with a final order of removal from the United States, making it unnecessary to coordinate flights based on "manifests" alone.**

Petitioners also argue that Respondents' statements about using charter flights based on manifest, instead of travel documents, was false. Pet'rs' Mot. Sanct. 9-10. Respondents had used the manifest procedure before the March 2017 agreement with Iraq due to the limited cooperation with the Iraqi Embassy in Washington, D.C. Schultz Dec. 9/28/2018, ¶ 37. After the agreement, however, Schultz understood that Iraqi would be issuing travel documents. *Id.* In fact, Schultz originally thought the April 2017 charter flight was going to be based on a manifest, but the night before the flight was scheduled to leave, Iraq produced travel documents for he individuals on the flight. *Id.*, ¶ 38. Schultz and Bernacke had different understandings of whether the planned charter flights would be utilized using manifests or travel documents, both agree that there is no function difference. Schultz Dec. 9/28/2018, ¶ 38; Bernacke Decl. 9/28/2018, ¶¶ 6-7. Moreover, because the consular interviews held since May 2018 have been successful in terms of procuring travel documents, there is no present need for Respondents to pursue the manifest option. Schultz Dec.

9/28/2018, ¶ 39. Finally, Iraq agreed in the past, and continues to agree to allow charter flights for the repatriation of Iraqi nationals. *Id.*, ¶ 41. There was a charter in May 2018, and another is scheduled later in 2018. *Id.*

**4. Respondents continued to utilize its full efforts to schedule charter flights in June and July of 2017, and maintains that the detained Iraqi nationals with final orders would have been removed via charter flights had it not been for the Court's injunctions.**

Petitioners also contend that "ICE said that the June and July 2017 flights were cancelled as the result of this Court's injunction, knowing that was untrue." Pet'rs' Mot. Sanc. 10. To provide much needed context, Schultz details not only the steps ICE had taken to schedule the flights prior to the first TRO, he also provides details of Iraq's cooperation up until this Court entered the preliminary injunction on July 24, 2017. Schultz Decl. 9/28/2018, ¶¶ 10-29. Specifically, an e-mail on June 16, 2017 states that, "Ambassador Yaseen has offered to provide the travel documents for the deportees from Washington, without waiting for go ahead from Baghdad.  He needs the information on who is to be deported, so they can research and confirm citizenship." *Id.* ¶ 11, Ex. 7. ICE was planning for a large charter flight to depart the United States on June 28, 2017. *Id.,* ¶ 12. To that end, ICE transported a number of Iraqi nationals to an ICE staging facility in Arizona to facilitate interview with Iraq officials. *Id*.

On June 22, 2017, the Court entered a TRO that prevented ICE from removing Iraqi nationals under the jurisdiction of the ICE's Detroit Field Office. There were

approximately 60 Iraqi nationals with final orders in ICE custody who could still be removed because they were not covered by the first TRO, ICE proceeded with plans to have Iraqi government officials interview detainees at the staging facility in Arizona on June 25, 2017. Schultz Decl. 9/28/2018, ¶ 12. The Iraqis postponed the interviews at the last minute, which may have been a result of the Eid Al-Fitr holiday. *Id*. ¶ 14. Because the interviews had not gone forward as scheduled, and because Respondents had not yet received approval to land in Iraq, on June 26, 2017, Respondents postponed the flight for additional time to work with the Iraqi Government on identifying an appropriate date to reschedule the June charter flight. *Id.* ¶¶ 4, 15. Later that evening, the Court extended the TRO to cover Iraqi nationals nationwide. ECF No. 43. The TRO for the expanded class was set to expire on June 10, 2017. *Id.*

ICE continued working to reschedule the charter flight, and on July 5, 2017, Schultz received an e-mail indicating that the Iraqi Prime Minister's Office had given the Iraqi Ministry of Foreign Affairs "the go-ahead on deportations." Schultz Decl. 9/28/2018, ¶ 19, Ex. 13. On July 5, 2017, this Court held a hearing on Petitioners' motion to extend the TRO and to expedite the briefing schedule. *See* Order, ECF No. 61. The following day, this Court entered an order extending the TRO to July 24, 2017, at 11:59 PM. *Id.*

Despite the extension of the TRO, ICE continued to work on scheduling a flight that could remove 60 Iraqi Nationals on July 25, 2017. Schultz Decl.

9/28/2018, ¶ 26. The flight that ICE had originally scheduled for June 2017, however, had to be cancelled on July 12, 2017, to avoid certain charges. *Id.* ¶ 27. By July 19, 2017, the Iraqi Consulate had interviewed 80 Iraqi nationals in preparation for a flight later that month. Schultz Dec. 9/28/2018, ¶ 28. On July 24, 2017, however, this Court entered a preliminary injunction. ECF No. 87. After the Court entered the preliminary injunction, ICE stopped pursuing the travel document requests that it had made in May and June, including the requests for the 80 individuals that the Iraqi Consulate had interview in July. Schultz Decl. 9/28/2018, ¶ 29.

## B. Respondents have not withheld material information.

Petitioners also allege that Respondents withheld material information because they: (1) objected to Petitioners' discovery requests that were served before the Court ruled on the preliminary injunction on detention issues; (2) did not disclose that Respondents ████████████████████████ for Iraq based on difficulties in obtaining travel documents; and (3) that Iraq had a long–standing policy against forced repatriation, and required Iraqi nationals to sign forms indicating their desire to return to Iraq before they would issue travel documents. Pet'rs' Mot. Sanc.,12-13. All three arguments are baseless.

First, Petitioners cannot plausibly deny that Respondents had the right to object to their discovery requests. The Court allowed Petitioners to serve discovery

requests before considering the preliminary injunction motion, and permitted Respondents to object. *See* Order, ECF No. 153. After considering the parties' positions, the Court decided that it was not prudent to proceed with Petitioners "extensive and far-reaching" discovery at that time. *Id.* To preserve Petitioners' opportunity to seek discovery should it have been necessary to respond to Respondents' response to the preliminary injunction on detention issues, however, the Court expressly granted Petitioners the opportunity to seek leave "to extend the time to file a reply brief and to take discovery after the Government's response is filed." *Id.* Pg ID 3936. Petitioners opted to forgo that procedure, and instead requested expedited discovery related to class certification issues. *See* ECF Nos. 160, 166.

Second, 

." Bernacke Decl. 9/28/2018, ¶ 8 (emphasis added). In fact, visa sanctions have only been implemented "upon eight countries in the past: Guyana in 2001; the Gambia in 2016; Cambodia, Eritrea, Guinea, and Sierra Leone in 2017; and Burma and Laos in 2018." Schultz Decl. 9/28/2018, ¶ 36.

On or around July 20, 2017, twenty-seven (27) draft

Schultz Decl. 9/28/2018, ¶ 30.

Schultz Decl. 9/28/2018, ¶

30. To be classified as recalcitrant, a country may be considered to be "uncooperative." Schultz Decl. 9/28/2018, ¶ 33. Factors that could lead to a country being classified as recalcitrant include: "hindering ICE's removal efforts by refusing to allow charter removal flights into the country, and denials or delays in issuing TDs, such as passports." Schultz Decl. 9/28/2018, ¶ 34. Since January of 2017, however, "DHS has removed Iraq from the list of recalcitrant countries maintained by ICE." Schultz Decl. 9/28/2018, ¶ 32.

Visa sanctions are issued against countries that deny or unreasonably delay acceptance of their nationals who have been ordered removed from the United States, but Iraq has been cooperating with the United States government at an acceptable level such that no visa sanctions would be necessary. Schultz Decl. 9/28/2018, ¶ 35. ████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████." Schultz Decl. 9/28/2018, ¶ 30.

████████████████████████████████████████████████████████

████████████████████ Schultz Decl. 9/28/2018, ¶ 30. Contrary to Petitioners assertions, ████████████████████████. Schultz Decl. 9/28/2018, ¶ 30. This is because Iraq *is* accepting back their nationals who have been ordered removed from the United States. ICE "would not recommend sanctions against Iraq" because Iraq has been cooperating in the repatriation of its nationals. Bernacke Decl. 9/28/2018, ¶ 8.

Third, Respondents are seeking and obtaining travel documents for Iraqi nationals regardless of whether they are volunteering to return to Iraq. The repatriation process is exactly the same for Iraqi nationals who declined to sign an Iraqi Government form stating that they were willing to return to Iraq as it is for Iraqi nationals who agreed to sign the GOI form, as well as for Iraqi nationals who are not presented with the form at all. Schultz Decl. 9/28/2018, ¶ 43. The evidence of this fact being that the Iraqi Government has thus far issued 15 TDs for Iraqi nationals who refused to sign the GOI voluntary return form at their consular interviews. Schultz Decl. 9/28/2018, ¶ 46. These TDs were then provided to ICE by the Iraqi Government on July 13, 2018 and on September 5, 2018. Schultz Decl. 9/28/2018, ¶ 46. In addition, at this time neither Schultz nor Bernacke are aware of any Iraqi national being denied a TD based upon their unwillingness to return to Iraq, and are instead only aware of individuals being denied TDs when the Iraqi Government determines that these individuals are not Iraqi nationals. Schultz Decl. 9/28/2018, ¶ 53; Bernacke Decl. 9/28/2018, ¶ 13, 18.

In May 2018, the Iraqi Government asked Iraqi nationals at consular interviews to sign the voluntary form. Schultz Decl. 9/28/2018, ¶ 43. For the six individuals that declined to sign the form, ICE sought additional approval directly through its DOS counterpart in Baghdad. Schultz Decl. 9/28/2018, ¶ 43. In June and July 2018, the Iraqi Government continued to request Iraqi nationals to sign the voluntary form at consular interviews, despite ICE's requests that they stop using

the form. Schultz Decl. 9/28/2018, ¶ 43. In June and July 2018, ICE began sending a letter with limited biographical information to the Iraq Embassy for all Iraqi nationals participating in consular interviews. Schultz Decl. 9/28/2018, ¶ 43. In September 2018, the Iraqi Government did not ask Iraqi Nationals to sign the voluntary form at consular interviews, and ICE sent the biographical information letter for all participants in the interviews. Schultz Decl. 9/28/2018, ¶ 43.

Again, on July 2, 2018, it was communicated to both Schultz and Bernacke by the Iraqi Ambassador, the Deputy Chief of Mission, and the First Secretary that the Iraqi Government expects to issue TDs for all individuals it determines to be Iraqi nationals, regardless of whether they state they wish to return to Iraq voluntarily. Schultz Decl. 9/28/2018, ¶ 45; Bernacke Decl. 9/28/2018, ¶ 17.

## C. Sanctions are not appropriate in this case.

Based on the foregoing, Petitioners have not established that ICE engaged in bad faith conduct that would warrant exercise of this Court's inherent authority to award the sanctions requested by Petitioners. In *Plastech Holding Corp. v. WM Greentech Auto. Corp,* 257 F. Supp. 3d 867 (E.D. Mich. 2017), this Court considered the circumstances under which litigation conduct could be sanctioned under the Court's inherent authority. The plaintiff in *Plastech* was a company involved in developing, importing, and distributing products for motor vehicles. *Id.* at 869. The company had entered into an exclusive agreement with a foreign automotive

21

company giving the plaintiff exclusive rights to distribute the company's automobiles in the United States. *Id.* at 869-70. Plaintiff later sued a third company, alleging that the company for tortious interference and other claims, based on a theory that the company had entered into an agreement with the same foreign automotive company despite knowing that plaintiff had exclusive rights to that business. *Id.* at 870. When plaintiff filed suit, it attached a copy of the purported exclusive agreement to its complaint, and it served as the basis for its legal claims. *Id.* As it turned out, the agreement was a fabrication, which plaintiff acknowledged. *Id.* at 871.

In considering whether the conduct amounted to fraud on the court, this Court noted a common definition, that it is conduct which "set[s] in motion some unconscionable scheme calculated to interfere with the judicial system's ability to adjudicate a matter by improperly influencing the trier or unfairly hampering the presentation of the opposing party's claim or defense." *Id.* at 874 (quoting *Aoude v. Mobile Oil Corp.*, 892 F.2d 1115, 1118 (1st Cir. 1989) (citing cases); *see also New York Credit & Fin. Mgmt. Grp. v. Parson Ctr. Pharmacy, Inc.*, 432 Fed.Appx. 25 (2d Cir. 2011) (same); *Almeciga v. Ctr. for Investigative Reporting, Inc.*, 185 F.Supp.3d 401, 427 (S.D.N.Y. 2016) ("[T]he essence of fraud upon the Court is when a party lies to the court and his adversary intentionally, repeatedly, and about issues that are central to the truth-finding process.")). This Court also noted that fabricating evidence and submitting it to the court to support one's claims has been

found to amount to fraud on the court. *Id.* Because the record evidence showed that plaintiff's use of the fabricated document was not innocent, and had harmed the defendant in causing it to end its business relationship with the foreign automotive company, this Court found that dismissal of the complaint with prejudice was an appropriate sanction. 253 F.Supp.3d at 877-79.

In the present case, ICE's conduct does not even remotely approach the standard for fraud on the court that would warrant the relief that Petitioners request, or any relief at all. As discussed in detail above and as supported by record evidence, the statements challenged in this motion were not false or materially misleading, but were instead offered in good faith to address specific points before this Court as it was considering Petitioners' preliminary injunction in late 2017. At that time, to address the *Zadvydas* claim, Respondents were required to explain their position for why there was *SLRRFF* for the entire class of detained Iraqi nationals, despite the fact that approximately four months earlier the TRO and preliminary injunction effectively prevented removals for but a handful of individuals who had opted-out of the preliminary injunction. This was not an "unconscionable scheme calculated to interfere with the judicial system's ability to adjudicate a matter," but rather an attempt to explain how removals would work under the nascent agreement with Iraq after the process had been brought to a near complete stop. Moreover, it did not hamper Petitioners' claims. Petitioners prevailed on the preliminary injunction, and with exception of small number of people detained under 8 U.S.C. 1225, all detained

class members had the opportunity for a bond hearing. The fact that Petitioners had to conduct discovery and file a renewed preliminary injunction was a consequence of weakness of their *Zadvydas* claim. Moreover, the record does not establish that Respondents "lie[d] to the court and [their] adversar[ies] intentionally, repeatedly, and about issues that are central to the truth-finding process," that would warrant a finding of fraud on the court. *See Almeciga,* 185 F.Supp.3d at 427. Accordingly, this Court should not grant the motion for sanctions.[2]

**D.    Conclusion**

For the reasons stated herein, the Court should deny Petitioners' motion for sanctions.

Dated:  September 29, 2018                      Respectfully submitted,

JOSEPH H. HUNT                                */s/ William C. Silvis*
Assistant Attorney General,                   WILLIAM C. SILVIS
Civil Division                                Assistant Director
                                              United States Department of Justice
WILLIAM C. PEACHEY                            Office of Immigration Litigation
Director                                      District Court Section
                                              PO Box 868 Ben Franklin Station
CARA E. ALSTERBERG                            Washington, DC 20044
MICHAEL A. CELONE                             Tel: (202) 307-4693
JOSEPH A. DARROW                              Fax: (202) 305-7000
Trial Attorneys                               william.silvis@usdoj.gov

---

[2] Petitioners also cite Michigan Rules of Professional Conduct 4.1 and 3.3, but do not provide any factual basis or argument for any claim that undersigned counsel violated their ethical duties to this Court. There is no record of counsel making knowingly false statements, or offering anything into evidence knowing it to be false.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this date, I caused a true and correct copy of the foregoing Respondents/Defendants' Opposition to Petitioners/Plaintiffs' Motion for Sanctions (ECF 381) to be served via CM/ECF upon all counsel of record.

Dated:  September 29, 2018                     Respectfully submitted,

*/s/ William C. Silvis*
WILLIAM C. SILVIS

*Counsel for Respondents*

2

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

USAMA JAMIL HAMAMA, et al.,

     Petitioners and Plaintiffs,

v.

REBECCA ADDUCCI, et al.,

     Respondents and Defendants.

Case No. 2:17-cv-11910
Hon. Mark A. Goldsmith
Mag. David R. Grand
Class Action

## <u>DECLARATION OF JOHN A. SCHULTZ JR.</u>

I, John A. Schultz Jr., hereby make the following declaration with respect to the above-captioned matter:

1. I am the Deputy Assistant Director for the Removal Management Division East which encompasses the Asia and Europe Removal and International Operations ("RIO") unit as well as the Middle East/East Africa unit within the U.S. Department of Homeland Security ("DHS"), U.S. Immigration and Customs ("ICE"), Enforcement and Removal Operation's ("ERO") Removal Management Division ("RMD"). The RMD is located at ICE Headquarters in Washington, D.C. RMD provides guidance and assistance to officers attempting to obtain travel documents ("TDs") for foreign nationals who are ordered removed. RMD collaborates with embassies and consulates, as well as with interagency and international networks to facilitate the efficient

1

removal of aliens from the United States. RMD provides nationwide Post-Order Custody Review ("POCR") guidance, implements policy and procedures, and is responsible for providing case management support for aliens subject to a final order of removal.

2. I have been employed with ICE since April 2003, and I have worked with ERO since then. From July 2016 to present, I have been employed as the RMD East Deputy Assistant Director in both an acting and permanent capacity.

3. This declaration is based upon my personal knowledge, information obtained from other individuals employed by ICE, and information obtained from DHS records. I am aware of the facts and circumstances of *Hamama, et al., v. Adducci*, et al., 2:17-cv-11910, in the U.S. District Court for the Eastern District of Michigan, Southern Division. I also have knowledge of ICE's efforts to arrange for the removal of Iraqi nationals that have been ordered removed from the United States. As RMD East Deputy Assistant Director, I have worked on matters related to repatriation of Iraqi nationals.

4. I have read the Petitioners/Plaintiffs' Motion for Sanctions ("Sanctions Motion") (ECF 381). I can attest to the following and if called as a witness I would testify that:

(1) In 2017, the Government of Iraq ("GOI") expressed their willingness to accept the return of all Iraqi nationals with final orders of removal without limitation;

(2) ICE will be able to secure TDs for all Iraqi nationals with final orders of removal. While ICE pursued 280 TDs in May/June 2017 prior to this court's Temporary Restraining Order (ECF 32), ICE did not pursue the TDs after July 24, 2017 when the permanent injunction was issued (ECF 87). Furthermore, the 24 denials in the June 7, 2017 letter were not related to the 280 TDs presented in May/June 2017, which is why I stand by my statements in my November 30, 2017 declaration, ECF 158-2 ¶¶ 7-8;

(3) Because the Embassy of Iraq historically did not issue TDs, ICE pursued removals through a charter flight using manifests and, in early 2017, the Iraqi Government agreed to accept the April 2017 charter flight using manifests. After Iraq's March 2017 statement of cooperation regarding the repatriation of 1,400 Iraqi nationals subject to final orders of removal, discussions I had with the Iraqi Ambassador and given the fact that Iraq did issue TDs for the April 2017 charter flight, it was my understanding that Iraq would continue to issue TDs going forward; and

(4) This court's first injunction that was issued on June 22, 2017 only affected Detroit, Michigan. On Friday, June 23, 2017, ICE was prepared to remove approximately 60 Iraqi nationals, excluding the individuals from Detroit, Michigan. However, due to the failure of Iraqi officials to conduct TD interviews on June 25, 2017, and given the Iraqi government's inability to accept the flight as scheduled but willingness to receive it at a later time, which may have been a result of the Eid Al-Fitr ("EID") holiday which is celebrated at the end of Ramadan, as well as extensive media attention and Congressional letters surrounding the *Hamama* litigation, on June 26, 2017, I postposed the flight for additional time to work with the Iraqi Government on identifying an appropriate date to reschedule the June charter flight. Later that day, I was informed that the court in *Hamama* issued a nationwide TRO (ECF 43), which is why the flight remained postponed. Had the TRO been lifted, I am confident that we would have been able to complete the removal of the approximately 60 individuals. On July 12, 2017, I had to cancel the June flight altogether to avoid incurring certain charges, as discussed in more detail below, but my plan was to reschedule the flight if the TRO was lifted. On July 24, 2017, however, I was informed that the court issued a preliminary injunction.

4

5. I have previously submitted two declarations dated July 20, 2017 (ECF 81-4) and November 30, 2017 (ECF 158-2), detailing the U.S. Government's efforts to remove Iraqi citizens with final orders of removal. I stand by my statements made in these declarations and offer this declaration to address some specific questions raised by the Sanctions Motion.

### The Iraqi Statement of Cooperation

6. In paragraph 5 and 6 of my July 18, 2017 declaration, and in paragraph 4 of my November 30, 2017 declaration, I reference "renewed discussions" and negotiations between the United States and Iraq. What I am referring to is Iraq's statement of cooperation that is memorialized in the March 12, 2017 U.S. Department of State Cable that was produced at ICE – 0271129-32, attached as Exhibit 1 to this declaration. That statement indicated that Iraq would accept 1,400 Iraqi nationals with final orders of removal, and did not place any limitations on that agreement, which is why I understand that Iraq will take back all Iraqi nationals with final orders of removal regardless of whether they are volunteers, asylum seekers or otherwise.  Exh. 1.

7. On April 19, 2017, ICE conducted its first charter flight since 2010 consisting of eight (8) Iraqi nationals.  ICE had expected the Iraqi Government to accept the flight and the Iraqi nationals utilizing a manifest and without issuing

individual TDs. However, Iraqi officials issued individual Laissez Passer documents for the eight individuals on April 18, 2017.

8. After the successful charter flight in April, ICE started planning large scale charter flights to address the backlog of Iraqi nationals who had final orders. Between May 4 and June 6, 2017, Supervisory Detention and Deportation Officer Christopher George and Detention and Deportation Officer Julius Clinton sent via e-mail approximately 280 TD packages to U.S. Department of State ("DOS") officials in Baghdad. The DOS officials submitted the documents to Iraqi officials with a diplomatic note. Exh. 2, ICE-0269224.

9. The "blanket denial letter of June 7, 2017" denying the TDs for 24 individuals was a response to TD packets requested years earlier and was not related to the 280 TD packets submitted in the May/June 2017 time frame. From the best that ICE can determine, most of those TD packages were submitted years earlier. For example, ICE records show that many of those TD applications were submitted in person to the Iraqi Embassy in D.C. at a meeting on April 14, 2014. Additionally, from ICE records it also appears that some were not submitted to the Iraqi Embassy in D.C., but rather submitted directly to the Iraqi Consulate in Detroit, Michigan. These TD packets were submitted before the March 2017 agreement.  The letter from June 7, 2017, (Exh. 3, ICE - 0298492-93), was not

based upon the May and June submissions which were submitted directly to DOS officials in Baghdad with a diplomatic note.

10. To explain further what ICE was working on prior to this Court's first June TRO, I have prepared a timeline below (a.-l. produced at Exh. 4, ICE – 0269224):

   a. **May 15, 2017:** The first non-detained Iraqi national with a final removal order is arrested as the start of the operation to begin removing non-detained Iraqi final order cases.

   b. **May 16, 2017:** 64 non-detained final order cases were submitted to the DOS for TD presentation.

   c. **May 17, 2017:** 26 detained final order cases were sent to DOS for presentation to the Iraqi Ministry of Foreign Affairs [MFA]. These cases were from TD requests made to RIO by the field offices. No TD request for this subject was submitted to RIO.

   d. **May 22, 2017:** 149 additional non-detained final order cases were submitted to the DOS for TD presentation. The lists of 239 cases ready to be presented to the Iraqi MFA for the upcoming charter was sent to Air Ops, Field Ops, and RIO. The lists contained 26 detained final order cases with pending TD requests; the remainder were non-detained final order

cases that had excellent identification documents which RIO anticipated would result in easily obtaining TDs.

e. **May 24, 2017:** RIO received a TD request for a detained Iraqi national which was forwarded to DOS. The list was now at 240 cases total. DOS requested RIO not submit anymore more cases for presentation at this time.

f. **May 25, 2017:** DOS submitted all 240 TD presentations to the Iraqi MFA along with a diplomatic note for the upcoming June charter flight. The subject in question was not on the list as he was not part of the non-detained cases review and no TD presentation for the subject was made to RIO as a detained case.

g. **May 30, 2017:** ICE established June 28, 2017, as the removal date for the charter flight.  As the field continued to make arrests of Iraqi nationals with final orders, RIO noticed there were individuals arrested who were not included on the original list of 240 cases submitted to the Iraqi MFA for approval. RIO asked DOS if it could submit cases not included on the list of 240, in order to fill the charter flight. DOS agreed to allow RIO to submit more cases but requested them ASAP.

h. **May 31, 2017:** RIO conducted a detained docket review and noticed the subject in question was already scheduled for a commercial flight.

8

    i. **June 1, 2017:** DOS informed RIO that June 6, 2017, was the deadline to submit the new cases for individuals who were arrested as part of the operation.

    j. **June 6, 2017:** 40 add-on cases were submitted to DOS for the June charter.

    k. **June 8, 2017:** RIO received confirmation that the second leg of the Iraqi charter, from Cairo to Baghdad, was a go.

    l. **June 9, 2017:** At this point ICE had more aliens in custody than seats on the plane; only room for 75, but total cases ready was at 90; 17 cases were identified for the future July charter due to field arrests.

    m. **June 12, 2017:** Charter passenger list was submitted to ICE Air Ops. *See* Exh. 5, ICE – 269677.

11. To address the assertion that the U.S. Government had not entered into an agreement with Iraq about the return of Iraqi nationals, ICE has turned over hundreds of e-mails demonstrating that an agreement existed. The following are two e-mails that explicitly summarize efforts by the DOS pertaining to the March 2017 agreement and the June charter, which postdate the vague assertion made in the e-mail at Exh. 6, ICE - 0269475:

    a. E-mail dated June 16, 2017 from Andrew Miller to ICE Officers Christopher George and Julius Clinton produced at Exh. 7, ICE – 296919:

        "I just talked to Ambassador Silliman, who relayed a conversation he had with Iraqi Ambassador to the U.S. Farid Yaseen.  Ambassador Yaseen has

9

offered to provide the travel documents for the deportees from Washington, without waiting for go ahead from Baghdad. He needs the information on who is to be deported, so they can research and confirm citizenship.

I would recommend that a combined State/ICE group meet with or provide the Ambassador that information as soon as possible. The first attachment is Chris's full manifest for the June charter. The second is a version I cut down to send to the Ministry of Foreign Affairs in Baghdad. That has only bio information on the passengers. The third is one example of the packets we have received from ICE to send to the Ministry. They are very nicely detailed, and the information on citizenship varies from person to person. In this case, citizenship was confirmed by a twelve year old fax from the Iraqi Embassy itself!"

b. Email on June 16, 2017 from Peter Shea to ICE Officers Christopher

George and Julius Clinton produced at Exh. 8, ICE – 269619-20:

"When DAS Pennington and Bryan met Amb Yaseen earlier this week, **there was no hint that the GOI might be backing away from its commitment to proceed.**" (emphasis added).

### The Impact of the Court's Orders on the Repatriation Process

12. Therefore, in June 2017, ICE was actively planning for a larger Charter flight to depart the United States on June 28, 2017. As part of that plan, ICE had taken into custody Iraqi nationals with final orders and had transported them to an ICE staging facility in Arizona, so that Iraqi officials could interview the aliens and issue a flight manifest.

13. These efforts are demonstrated in an email on June 24, 2017 from myself to Bryan Koontz, stating "We are still moving forward as if the flight will leave

10

as scheduled on the 28th." (Exh. 9, ICE - 269326). However, that same day, Petitioners filed a motion to make the TRO nationwide. ECF 77.

14. On or around Sunday, June 25, 2017, Iraqi government officials were scheduled to interview the detainees at the FDC in Arizona. However, they postponed their visit at the last minute. When ICE scheduled the June charter for June 28, ICE was unaware that it was the holiday, EID.

15. On June 26, 2017, ICE decided to postpone the June 28, 2017 charter flight because the Iraqi officials did not interview the detainees as scheduled and approval for the flight to land had not yet been granted. ICE was trying to work through the U.S. Embassy in Baghdad to identify a new date.

   a. This is explained in my email dated Monday, June 26, 2017 at 7:18 PM to Johnny Williams produced at Exh. 10, ICE – 269253 stating:

   "The charter for this week has been postponed. We are continuing to work through the US Embassy in Baghdad and the Iraq Embassy in DC to identify a new date."

16. During this time, I also received information that on June 22, 2017, U.S. Representative Jim Cooper wrote a letter requesting that the Iraqi Consulate halt issuance of all TDs for Iraqi nationals. *See* Exh. 11.

17. On June 26, 2017, this Court entered a nationwide injunction prohibiting ICE from removing Iraqi nationals. (ECF 87) That night, I was advised that the

injunction applied nationwide and that no Iraqi national could be removed for at least 14 days.

18. On June 27, 2017, I remained hopeful that ICE could continue to make headway in the repatriation process.  At 4:33 p.m. I sent an e-mail stating that while "we are standing by as [the TRO] unfolds, but we hope that post can make some headway in country regarding the agreement of a date for the charter." Exh. 12, ICE - 0268971.

19. Then, on July 5, 2017, I received an e-mail from Scott Riedmann advising me that he had spoken with Dr. Rikabi from the Iraqi MFA and that the Prime Minister's Office approved proceeding with the repatriation. *See* Exh. 13, ICE - 0268969. This e-mail states:

    a. "I wanted to let you know I spoke with Dr. Rikabi from the MFA today and he told me the **PMs office gave them the go-ahead on deportations**. He said I should provide him a date for the next flight as soon as we know. I explained the current court situation and he understood, but I told him we would let him know a date as soon as we were able to determine it, given the current status.

    As far as numbers, he did not mention a specific amount, but we know from previous discussions that their preferred amount is 60 per flight, at least for now and until we can establish a reasonable return schedule. Amb Silliman will be in DC in a few days and I think is planning to meet with you all to discuss.

    The Iraqi Embassy in Washington is the next piece of the puzzle. They will need to be geared up to meet with detainees/issue travel docs, or whatever they feel they need/want to do. I'm sure Amb Silliman will meet with Amb Yaseen as well to discuss."

20. I replied to Scott Riedmann's e-mail on July 5, 2017, to inform him that, "We will do 60 on this flight but need to have 75 on subsequent flights as we have over 200 final order cases in custody." Exh. 14, ICE - 0268968.

21. On the evening of July 5, 2017, I received ICE counsel regarding scheduling of the flight, and I decided not to schedule the exact flight date due to the uncertainty of the long-term impact of the TRO. I was not familiar with stays of removals in my past efforts to repatriate large numbers of individuals and was not sure what would happen.

22. I began to coordinate with Jorge Tenarodriguez who informed me that the timing of the flight depended on where ICE chose to make a "tech spot" which is a detainee transfer point.  Third country transit arrangements require minimum scheduling time and notice before a flight can be scheduled. Therefore, a July 13th date landing in Baghdad would only give ICE one week to coordinate.  I knew that we could not wait several weeks for landing clearance in Cairo because this was supposed to be a "normalized process in which we will have a flight each month." Exh. 15, ICE – 0269064.

23. On July 5, 2017, given the TRO, I was ready to elevate the flight schedule because I understood we were working under tight time constraints. Exh. 16, ICE – 0269173-75.

24. On July 6, 2017, I received good news from Peter Shea in the email below produced at Exh. 17, ICE - 0268966:

   a. "This afternoon with Amb Yaseen I previewed the aim for a July 13 flight if the court injunction is removed (I've still not seen anything yet). I told him this could be 60 pax, but in future months we want to see that number increase. **Fareed reiterated his willingness to cooperate. He is awaiting new instructions from Baghdad, including to clarify if the embassy may issue travel docs to all removal cases, or only those who had been convicted of felonies and have served their sentences. I reiterated that U.S. law does not differentiate, that Iraq has an obligation to accept all, and that we believe PM Abadi understands this. Fareed understood.**

   As for the 13th date, the Ambassador noted that it will be hard logistically for the Embassy to make work unless it's decided today or perhaps tomorrow at the latest. Fareed would have to get his team to the holding facility Friday or Monday, after he gets instructions. I expect Amb Yaseen will reach out to you John as well." (emphasis added).

25. By July 7, 2017, I was informed that the TRO had been extended until July 24, 2017, and that "MP has asked that we start making arrangements for the flight to go the week of July 24." MP refers to Marlen Pineiro, the Assistant Director for Removal. Exh. 18, ICE - 0269063.

26. Because of the TRO's extension I was prepared to move quickly, advising that: "There are about 90 or so detained in Mesa and most of them are criminals. Again it would be helpful for the PM's office to dispatch the Embassy to Mesa to conduct the interviews so that once the TRO is lifted we can move quickly." Exh. 19, ICE - 0297660. By July 11, 2017, I was informing my team that I had met with Ambassador Silliman that day. The plan was to proceed with the

14

removal of 60 Iraqi nationals on July 25.  But, this was contingent on two things: (1) that the TRO was lifted, and (2) that Iraq would proceed with the interviews in Arizona.  Exh. 20, ICE - 0268963.

27. On July 12, 2017, the June flight was cancelled.  This is summarized in the e-mail I received from Johnny Williams:

    a. "The Iraqi mission has been cancelled as requested. TR has been notified to cancel the non-U.S. flag portion from Cairo to Baghdad too. Since he signed the contract yesterday we will likely incur a penalty for the cancellation too. Also as discussed, we have reassigned the RON for the Djibouti mission to Dakar as the carrier is unable to acquire the requisite visas in the short time window we have available before he mission date.

    To summarize where we are on the cancelation penalties, we will be paying 70%, or about $450k, for the Iraqi mission not the full 100%. The next time we reschedule the Iraqi mission it will be invoiced as a new contract." Exh. 21.

ICE was making all possible efforts to keep the Iraq charter flight.  However, with the delay from the original June 24th TRO, which was extended on July 5 and then to July 24, ICE was put in the impossible position of guessing when it would be legally permitted to remove these Iraqi nationals.

Rescheduled flights usually must occur within 30 days and require a certain amount of advanced notice and third country clearance.  Due to the preliminary injunction, and the uncertainty of when it would be lifted, ICE could not provide

a viable date with certainty after July 24ᵗʰ to reschedule the two parts of the flight: U.S. to Cairo and then Cairo to Baghdad.

28. The Iraqi interview process continued.  By July 19, 2017, the Consulate had finished all the Iraqi interviews.  That morning, Christopher George e-mailed me stating that:

    a. "The Consulate kept stating the agreement was to interview 62, Im not sure where that number came from, but I pressed back and got them to interview everyone on our list, 60 primary cases and the 20 alternates. Several aliens refused to speak to the Consulate or acknowledge their legitimacy, but were given access to their Consulate and choose to be that way. They did somehow manage to interview each alien one on one, took notes, and seemed very much pleased with how the process went." Exh. 22, ICE - 0271031.

29. On July 24, 2017, the court issued a preliminary injunction prohibiting ICE from removing all Iraqi nationals covered under the class without providing a time frame for future removal. As of this date, ICE no longer continued to seek issuance of the recently requested TDs, including the TD packages submitted in May and June which facilitated the interviews that were conducted in July.

████████████████████████████████

      ██████████████████

████████████████████████████████

  ████████████████████████████████

  ████████    ████████████████████

███████ ████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████ *See* Schultz Dep. at 189-194; Exh. 23, ICE-0271028; Exh. 24, ICE-0296029-34.

31. While Petitioners cite to an e-mail from Joshua Coster (ECF 376-2, ¶ 24.d), Joshua Coster was not engaged in the removal of Iraqi nationals. The portion of that e-mail that Petitioners refer to was an opinion formed by him after he attended a meeting discussing the litigation. Part of the e-mail is redacted because the main portion of it was dealing with the litigation at hand and not any TD issues. Joshua Coster did not have any knowledge of the TD process. After I received this e-mail from Joshua Coster, I did not think that there were any problems with the TD process, other than ICE's inability to remove Iraqi nationals due to the subject injunction. Exh. 25, ICE - 0296142.

32. The U.S. Government requests that foreign governments take appropriate steps to confirm the citizenship of aliens suspected to be their nationals, including by conducting interviews where necessary; the timely issuance of TDs, where appropriate; and accepting the physical return of their nationals by scheduled commercial flights or, where necessary, special charter flights. Any lack of

cooperation from the nation of origin delays, and in many cases, inhibits the removal process. Such uncooperative countries are referred to as recalcitrant.

33. Twice a year ICE conducts an analysis of countries' cooperation levels in terms of ICE's removal mission. Factors that could lead to a country being classified as recalcitrant include: hindering ICE's removal efforts by refusing to allow charter removal flights into the country, and denials or delays in issuing TDs, such as passports.

34. Since January 2017, DHS has removed eight countries from a list of recalcitrant countries maintained by ICE — including Iraq and Somalia. Other countries may be considered uncooperative or at risk of non-compliance and this is constantly being evaluated.

35. Pursuant to her authority under Section 243(d) of the Immigration and Nationality Act (INA), Secretary of Homeland Security Kirstjen Nielsen may notify the Secretary of State that a foreign government has denied or unreasonably delayed accepting their nationals ordered removed from the United States, and as such granting of visas for individuals from these countries should be discontinued. As a result, the Secretary of State will order consular officers in these countries to discontinue granting visas. These sanctions will remain in place on each of these respective countries until the Secretary of

Homeland Security notifies the Secretary of State that cooperation on removals has improved to an acceptable level.

36. Visa sanctions have been implemented upon eight countries in the past: Guyana in 2001; the Gambia in 2016; Cambodia, Eritrea, Guinea, and Sierra Leone in 2017; and Burma and Laos in 2018.

## **Manifests and Travel Documents**

37. The concept of utilizing a manifest to remove individuals via a charter flight rather than having TDs issued was the result of limited cooperation with the Iraqi Embassy in Washington, D.C. After the Iraqi Government reported the statement of cooperation in March 2017, Respondent ICE understood that Iraq would be issuing TDs in the removal process.

38. I recognize that in Michael Bernacke's declaration (ECF 184-2, ¶6) he believed that these flights would be going forward without TDs, using manifests instead. It was my understanding, however, that the process going forward would be to have TDs.  I may not have clearly communicated that based upon my discussions with Iraqi officials following the March 2017 cable indicating that Iraq would be issuing TDs for the flights going forward.  It is likely that this miscommunication is why Michael Bernacke stated in his declaration that ICE would be using manifests for the larger charter flights.  In my professional experience, there is no functional difference between using manifests versus

using TDs. For example, I originally thought that the April 2017 flight would be going forward with a manifest. However, the night before it was scheduled to leave, Iraq produced TDs. This process did not cause a delay in the flight's scheduled departure. Charter flights can go forward with either TDs or manifests. Charter flights just need the country to agree to accept the individual which is why ICE can use manifests. Using a commercial flight, on the other hand, requires TDs.

39. Because Respondent ICE and the Iraqi Government have successfully held four rounds of consular interviews since May 2018, and Iraq has issued TDs for all of those individuals that it has determined are Iraqi nationals, Respondent ICE has not inquired further about using manifests for charter flights instead of TDs. Furthermore, the candidate pool of actionable cases was limited due to the injunction, so there has been no apparent need for a large charter mission.

40. After the statement of cooperation in March 2017, the Iraqi Embassy indicated that it would issue TDs for individuals being removed. Therefore, there was no need to pursue utilizing a manifest in place of TDs. Respondent ICE has not had enough cases where individuals can be removed via a large charter flight to justify exploring this avenue, and so has not continued to inquire about using a manifest in lieu of TDs.

41. The statements I made in my July 20, 2017 declaration (ECF 81-4 ¶ 4) remain accurate. Iraq has and continues to agree to use charter flights for the repatriation of Iraqi nationals.  There was a charter flight in May 2018, and one is scheduled for later in 2018.

42. ICE has received numerous TDs throughout fiscal year 2018, at this time amounting to approximately 72.  I still agree with my November 30, 2017 statement (ECF 158-2 ¶ 8) because Iraq continues to issue TDs for Iraqi nationals.

### ICE Removes Individuals Who Do Not Volunteer to Return to Iraq

43. It is my understanding, as laid out in Respondent ICE's responses to Petitioners' Interrogatory No. 1, as well as based on my own personal knowledge, that the process is exactly the same for Iraqi nationals who declined to sign an Iraqi Government form stating that they were willing to return to Iraqis it is for Iraqi nationals who agree to sign the GOI form and for Iraqi nationals who were not presented with the form at all. In May 2018, the Iraqi Government asked Iraqi nationals at consular interviews to sign the voluntary form. For the six individuals that declined to sign the form, Respondent ICE sought additional approval directly through its DOSS counterpart in Baghdad. In June and July 2018, the Iraqi Government continued to request Iraqi nationals to sign the voluntary form at consular interviews, despite Respondent ICE's requests that

they stop using the form. In June and July 2018, Respondent ICE began sending a letter with limited biographical information to the Iraq Embassy for all Iraqi nationals participating in consular interviews. In September 2018, the Iraqi Government did not ask Iraqi Nationals to sign the voluntary form at consular interviews, and Respondent ICE sent the biographical information letter for all participants in the interviews.

44. The letter Respondent ICE sends to the Iraqi Government (which is for all Iraqi Nationals, contains limited biographical information associated with the alien(s), such as alien registration number, date of birth, criminal history in the United States; confirmation of the issuance of a final order of removal; and a statement that the final order is administratively final. Respondent ICE has also continued to meet with representatives of the Iraqi Government to request that TDs are issued in a timely fashion. ICE is not asking Iraq nationals to sign the voluntary form.

45. It was communicated to me on July 2, 2018 by the Iraqi Ambassador, the Deputy Chief of Mission, and the First Secretary that the Iraqi Government expects to issue TDs for all individuals it determines to be Iraqi nationals, regardless of whether they state they wish to return to Iraq voluntarily.

46. The Iraqi Government issued 15 TDs for Iraqi nationals who refused to sign the GOI voluntary return form at their consular interviews. These TDs were

provided to Respondent ICE by the Iraqi Government on July 13, 2018 and on September 5, 2018.

47. At present, it is my understanding that the process of obtaining TDs or authorization for repatriation from the Iraqi Government is not affected by an Iraqi national's expressed desire (written or verbal) to return or expressed desire (written or verbal) to not return to Iraq. As indicated above, it is also my understanding that the Iraqi Government is issuing TDs for Iraqi nationals regardless of voluntariness. This has been demonstrated through Iraq issuing TDs for 12 individuals who declined to sign the voluntary form.

48. It is my understanding that the Iraqi Government no longer requests Iraqi nationals to sign the voluntary form.

49. Over the last year, the process for obtaining Iraqi TDs has changed and continues to be an evolving process. While ICE has made efforts to stop the inclusion of a voluntary form as part of Iraq's interview process, as of September 2018, the GOI has confirmed to me that it is no longer using the voluntary form.

50. Between July 24, 2017 and November 30, 2017, ICE only sought TDs to be issued for individuals going through the voluntary removal process because it was the only way to lift this Court's preliminary injunction. Based on the Court's ruling, ICE could not remove any other individuals, and it seemed to be

unwise to seek a TD for an individual given the fact that TDs for Iraq expire after 6 months.

51. ICE now attempts to identify and seek TDs for individuals who ICE believes will no longer be subject to this Court's preliminary injunction before the TD expires.

52. I still agree with my statement that ICE expects to receive TDs for all individuals that ICE has requested to be removed to Iraq (ECF 158-2 ¶ 7).  The only exception that I have seen to date for the denial of TDs is that once ICE presents an individual Iraq determines that the individual is not an Iraqi National.

Pursuant to 28 U.S.C. § 1746, I declare, under penalty of perjury, that the foregoing is true and correct based upon reasonable inquiry, knowledge, information, and belief.

Executed this 28th day of September 2018.

John A. Schultz Jr.
Deputy Assistant Director
Removal Management Division
Washington, D.C.

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

USAMA JAMIL HAMAMA, et al.,

       Petitioners and Plaintiffs,

v.

REBECCA ADDUCCI, et al.,

       Respondents and Defendants.

Case No. 2:17-cv-11910
Hon. Mark A. Goldsmith
Mag. David R. Grand
Class Action

## DECLARATION OF MICHAEL V. BERNACKE

I, Michael V. Bernacke, make the following declaration with respect to the above-captioned matter:

1. I am the Unit Chief for the Removal Management Division-East Unit Chief for the Middle East/Eastern Africa unit within the U.S. Department of Homeland Security ("DHS"), U.S. Immigration and Customs Enforcement ("ICE"), Enforcement and Removal Operation's ("ERO") Removal Management Division ("RMD"). The RMD is located at ICE Headquarters in Washington, D.C. RMD provides guidance and assistance to officers attempting to obtain travel documents ("TDs") for foreign nationals who are ordered removed. RMD collaborates with embassies and consulates, as well as with interagency and international networks to facilitate the efficient

1

removal of aliens from the United States. RMD provides nationwide Post-Order Custody Review ("POCR") guidance, implements policy and procedures, and is responsible for providing case management support for aliens subject to a final order of removal.

2. I have been employed with DHS as an immigration officer since March 2006, and I have worked with ERO since February 2009. From October 2017 to present, I have been employed as the Removal Management Division-East Unit Chief for the Middle East/Eastern Africa unit in a permanent capacity.

3. This declaration is based upon my personal knowledge, information obtained from other individuals employed by ICE, and information obtained from DHS records. I am aware of the facts and circumstances of this case and the efforts to arrange for the removal of Iraqi nationals that have been ordered removed from the United States.

4. I have read the Petitioners/Plaintiffs' Motion for Sanctions ("Sanctions Motion") (ECF 381). I can attest to the following and if called as a witness I would testify that:

> (1) The U.S. reached an agreement with Iraq in 2017 where Iraq expressed their willingness to accept the return of all Iraqi nationals with final orders of removal without limitation;

(2) ICE will be able to secure travel documents for all Iraqi nationals with final orders of removal; and

(3) Because the Embassy of Iraq historically did not issue TDs, ICE pursued removals through a charter flight using manifests and in early 2017 Iraq had agreed to accept the April 2017 charter flight using manifests. I understood that ICE would be using manifests, however, it is now my understanding that Iraq will continue to issue TDs going forward. There is no functional difference between manifests and TDs, as either will end with an individual being repatriated to Iraq; and

(4) As explained to me by John Schultz, Julius Clinton, and ICE counsel, the flight originally scheduled for June 2017, postponed until July 2017, and cancelled on July 12, 2017, was a result of this Court's injunction. I have previously submitted a declaration dated December 22, 2017 (ECF 184-2) ("December declaration") detailing the U.S. government's efforts to remove Iraqi citizens with final orders of removal. I stand by my statements made in this declaration and offer this declaration to address some specific questions raised by the Sanctions Motion.

3

5.  As stated in my December declaration, I entered my role of Removal Management Division-East Unit Chief for the Middle East/Eastern in October 2017.  My knowledge of the repatriation of Iraq nationals and the *Hamama* litigation prior to this point was based upon my conversations with John Schultz, Julius Clinton, and ICE counsel. I also reviewed the briefing documents provided to me by Julius Clinton. Exh. 26, ICE – 0270495 – 0270500.

6.  Specifically, in paragraph 6 of my December declaration, I discuss the planning of the charter flights that were set to depart in June 2017.  At the time that I offered this declaration, my understanding was that ICE would be using the manifest-only approach, similar to the approach that ICE uses for Mexico. I recently learned that there was a difference of opinion within my division whether those charter flights would be manifest-only or whether Iraq would promptly issue TDs for these flights.

7.  In my experience, whether a flight is a charter flight based on manifests or whether every alien on board the flight has a TD, there is no functional difference because the receiving country has accepted its' national for removal.  Both processes result in the national being removed.

4

8. Ultimately, the flight scheduled for June 2017 and the other flights scheduled for the rest of the summer of 2017 never came to fruition because of this Court's injunction along with other logistical complications, as I have now learned from John Schultz. There are no current visa sanctions against Iraq. I would not recommend sanctions against Iraq at this time given their cooperation in the repatriation process. The preparation of a visa sanctions packet can be done as an exercise to deal with potentially recalcitrant countries.

9. Iraq has been and continues to be willing to accept flights containing Iraqi nationals. While individual and commercial flights may experience challenges in terms of logistical planning and execution, in the case of Iraq, those have largely resulted from capacity issues from the Department of State ("DOS") and certain transit issues through third countries. None of the logistical issues arise from Iraq's willingness to accept Iraqi nationals for repatriation.

10. In fact, recently the Iraqi Embassy has indicated a preference that ICE increase the volume of Iraqi Nationals being removed at one time, such as in a small charter rather than individual commercial removals, so that a delegation of Iraqi officials can meet these nationals at the airport for the purposes of reintegration.

11. I stand by my statements in paragraph 10 of my December declaration as being true at the time that they were made.  At that time, ICE was seeking TDs for people who were no longer subject to this Court's preliminary injunction or who were in the process of voluntarily seeking to be removed from the Court's injunction.

12. More recently, ICE has expanded the group of individuals for whom ICE is seeking TDs. ICE is now seeking TDs for individuals who ICE believes will no longer be subject to this Court's preliminary injunction before the TD expires.

13. To my knowledge, the only individuals who have been denied TDs are those that the Iraqi Government has found to not be Iraqi nationals.

14. At present, ERO will introduce TD requests to both the Iraqi Consulate/Embassy in Washington D.C., and concurrently send those TD requests to a Department of State contact in Baghdad who submits these requests to the Iraqi Ministry of Foreign Affairs.

15. As noted in Respondent ICE's responses to Petitioners' Interrogatory No. 1, and based on my own personal knowledge, for each Iraqi National who declined to sign a GOI form stating that they were willing to return to Iraq, the process is now the exact same for Iraqi Nationals who did agree to sign the GOI form and for Iraqi Nationals who were

not presented with the form at all. In May 2018, the GOI asked Iraqi Nationals at consular interviews to sign the voluntary form. For the six individuals that declined to sign the form, Respondent ICE sought additional approval directly through its Department of State counterpart in Baghdad and received those travel documents. In June and July 2018, the GOI continued to request Iraqi Nationals to sign the voluntary form at consular interviews, despite Respondent ICE's requests that they stop using the form. In June and July 2018, Respondent ICE began sending a letter with limited biographical information to the Iraq Embassy for all Iraqi Nationals participating in consular interviews. This resulted in the issuance of travel documents for all individuals, regardless of whether they signed the form. In September 2018, the GOI did not ask Iraqi Nationals to sign the voluntary form at consular interviews, and Respondent ICE sent the biographical information letter for all participants in the interviews.

16. Since June 2018, Respondent ICE sends a letter to the GOI (not just for Iraqi Nationals who declined to sign the GOI form, but for all Iraqi Nationals) that contains: limited biographical information associated with the alien(s), including alien registration number, date of birth, criminal history in the United States; confirmation of the issuance of a

7

final order of removal; and a statement that the final order is administratively final. Respondent ICE has also continued to meet with representatives of the GOI to request that travel documents are issued in a timely fashion.

17. On July 2, 2018, it was communicated to me in person at a meeting with the Iraqi Ambassador, the Deputy Chief of Mission, and the First Secretary that the GOI expects to issue travel documents for all individuals determined to be Iraqi Nationals by the GOI, regardless of whether they state they wish to return to Iraq voluntarily.

18. To my knowledge there are the four individuals who ICE believes to be Iraqi Nationals that have not yet received travel documents.  One of those individuals, is Mr. Safaa Hashim Raoof Al Shakarchi, ███ ██, an Iraqi National, but not a *Hamama* class member, who was released on a POCR on February 20, 2018.  On September 18, 2018, I was informed by the San Antonio Field Office that he had violated the conditions of his order of supervision and have reason to believe he absconded to Canada. Mr. George Arthur, █████, was denied a TD for not having sufficient proof of Iraqi citizenship. Mr. Aalan Kamal, █████, and Mr. Maytham Al Bidairi, █████, no

longer have final orders so Respondent ICE is not actively pursuing TDs for them.

Pursuant to 28 U.S.C. § 1746, I declare, under penalty of perjury, that the foregoing is true and correct based upon reasonable inquiry, knowledge, information, and belief.

Executed this 28th day of September, 2018.

Michael W. Bernacke
Unit Chief
Middle East/Eastern Africa Unit
Removal Management Division
Washington, D.C.

# EXHIBIT 1

Message

| | |
|---|---|
| **From:** | Schultz, John A [/O=IRMMAIL/OU=MBX SERVERS - NYC/CN=RECIPIENTS/CN=JASCHULT] |
| **Sent:** | 3/14/2017 5:35:15 PM |
| **To:** | Pineiro, Marlen [/O=IRMMAIL/OU=MBX Servers - MIA/cn=Recipients/cn=mpineiro] |
| **CC:** | Day, Dana [/O=IRMMAIL/OU=MBX Servers - BAL/cn=Recipients/cn=dday] |
| **Subject:** | FW: Iraq Inter-ministerial Committee on Deportations Outlines Deportations Facilitation |

Possible huge breakthrough in Iraq

Sent with Good (www.good.com)

---

**From:** Weiller, Brigid R (Baghdad)
**Sent:** Tuesday, March 14, 2017 1:13:03 PM
**To:** Hankinson, Simon R
**Cc:** Clinton, Julius A; Schultz, John A; Fenzel, Andrew D; Lewis, Poonam
**Subject:** RE: Iraq Inter-ministerial Committee on Deportations Outlines Deportations Facilitation

Hi Simon,

The Consular access request was not tied to travel document issuance; they wanted to individually visit each of the 1400 per consular access, which would be problematic vis-à-vis time, distance, and logistics. They agreed to consider the Consular access request met by having an Iraqi official present at the departure.

With regard to travel documents, the GoI agreed to have previously-reviewed plane manifests replace the need for travel documents for Iraqis for whom the USG can provide some evidence of Iraqi citizenship, i.e., valid or expired passports or national identification cards, or other Iraqi citizenship documentation. This was the "Haiti model" we previously discussed with DHS.

In addition, the GoI is willing to accept information derived from U.S. systems that note Iraqi citizenship as permitted by the United States (DHS and DoS records) in lieu of Iraqi citizenship documentation, i.e., for Iraqis who threw away passports or ID cards. The info would be vetted as part of the manifest package provision to the MFA.

Thanks,

Brigid

SBU
This email is UNCLASSIFIED.

---

**From:** Hankinson, Simon R
**Sent:** Monday, March 13, 2017 9:38 PM
**To:** Weiller, Brigid R (Baghdad)
**Cc:** Clinton, Julius A                    ; John A. Schultz                    ; Fenzel, Andrew D; Lewis, Poonam
**Subject:** FW: Iraq Inter-ministerial Committee on Deportations Outlines Deportations Facilitation

Brigid

I didn't see the action request (last para) until I read it carefully today. "Action request for CA/VO and NEA/I: Please raise with DHS the request for DHS approval for Iraqi officials to meet with Iraqi deportees at the points of embarkation in order to meet the GoI's consular access request."

I don't know what this means. ICE is normally happy to arrange meetings between consular officials and detainees so they can establish nationality and issue TDs. What does it mean by the points of embarkation? They would need to have TDs in hand before anyone from ICE took them to an airport.

Simon


**Official**
UNCLASSIFIED

---

**From:** SMART Core
**Sent:** Sunday, March 12, 2017 12:22 PM
**Cc:** King, Karin M; Siddiqi, Raja L; Norton, Bradley; McCarthy, Evan K; Ashby, Stephen M; Borkowicz, Brandon L; Hankinson, Simon R; Madre Rull, Nuria; Cuan, Andrew S; Schofield, Trina L; Mauck, Taylor R; Lewis, Poonam
**Subject:** Iraq Inter-ministerial Committee on Deportations Outlines Deportations Facilitation

UNCLASSIFIED
SBU

| | |
|---|---|
| **Info Office:** | P, Special_Assistant |

---

| | |
|---|---|
| **MRN:** | 17 BAGHDAD 278 |
| **Date/DTG:** | Mar 12, 2017 / 121621Z MAR 17 |
| **From:** | AMEMBASSY BAGHDAD |
| **Action:** | WASHDC, SECSTATE ROUTINE |
| **E.O.:** | 13526 |
| **TAGS:** | PGOV, PREL, CVIS, IQ, DHS, FBI |
| **Captions:** | SENSITIVE |
| **Reference:** | 17 BAGHDAD 66 |
| **Pass Line:** | PASS TO: CA/VO ANDREW FENZEL, NEA/I BRYAN KOONTZ, DHS/RIO JULIUS CLINTON |

---

| | |
|---|---|
| **Subject:** | Iraq Inter-ministerial Committee on Deportations Outlines Deportations Facilitation |


1. (SBU) Summary: Dr. Kadhim Al-Rikabi, Ministry of Foreign Affairs, met with the Deputy Consul General (DCG) and Assistant Legal Attaché March 7 to discuss the initial steps outlined by the Iraq Inter-ministerial Committee on Deportations to commence the return of over 1400 Iraqi nationals ordered deported from the United States. Al-Rikabi said the Committee had identified four necessary steps for Iraq to facilitate the deportations: consular access, Iraqi citizenship verification, deportation court order review, and travel document issuance. Al-

Rikabi said the deportations are a high priority for the Prime Minister and Foreign Minister, and the Committee was prepared to finalize within 30 days the removal of the first group of deportees.  Al-Rikabi also said the GoI would share with the United States any derogatory information that surfaced in the inter-ministerial deportation documentation review.  End Summary.

2.  (SBU) Al-Rikabi said the newly-formed Iraq Inter-ministerial Committee on Deportations is comprised of representatives from the Prime Minister's Office, the Ministry of Foreign Affairs (MFA), the Ministry of Justice (MoJ), and the Ministry of the Interior (MoI).  He said the structure of the Committee is designed to ensure the appropriate GoI ministries review the deportation notices thoroughly and quickly under the auspices of Deputy Foreign Minister Khairallah (reftel).

3.  (SBU) Consular Access: Al-Rikabi said the Committee was prepared to direct officials from the Embassy of Iraq in Washington, DC and the consulates in Los Angeles, CA and Detroit, MI to meet individually with each of the approximately 1400 Iraqi nationals ordered deported from the United States, prior to facilitating their deportation.  After a discussion of the workload implications for the Embassy and consulate officials, the time needed to coordinate and carry out the visits across the United States, and the additional logistical burden this would place on the Department of Homeland Security, Al-Rikabi agreed, provided DHS is amenable (see below action request), to consider the consular access request met by having an Iraqi official meet briefly with groups of deportees at the point of embarkation from the United States.

4.  (SBU) Citizenship Verification: Al-Rikabi said once a deportation notification and accompanying documents were received by the MFA, the Ministry of Interior would review and verify the evidence of citizenship provided by the United States.  Al-Rikabi noted that for cases where a deportee's travel documents could not be provided by the United States, the GoI was concerned that among the 1400 might be nationals of neighboring countries who were in possession of false Iraqi citizenship documents.  In response to the DCG's offer for the United States to provide where permissible evidence of Iraqi citizenship derived from U.S. information systems, Al-Rikabi said the GoI would accept such evidence in lieu of passports and national identification cards.

5.  (SBU) Deportation Order Review: Al-Rikabi said the Ministry of Justice (MoJ) would review each deportation court order in tandem with the citizenship verification review process.  He stated the MoJ and MoI would also ascertain whether the deportees were subject to any pending criminal charges or convictions in Iraq.

6.  (SBU) Travel Document Issuance: Al-Rikabi said the Committee was prepared to direct the Iraqi Embassy and Consulates to provide travel documents for each of the 1400 deportees.  The DCG noted DHS had previously provided copies of passports and identification cards to the Embassy and consulates for the purpose of obtaining travel documents, but to no avail.  Al-Rikabi agreed the process would be streamlined if the need for travel documents was minimized by excluding deportees who had some evidence of citizenship documents or secondary

information confirming their citizenship.

7.  (SBU) Information Sharing: Al-Rikabi said the GoI would welcome detailed histories of the deportees' criminal behavior in the United States.  He said the GoI would use the citizenship verification process to determine whether the deportees had pending criminal charges or convictions in Iraq.  In response to the DCG's noting that information sharing, in addition to the deportations, met two of the three areas of enhanced Iraq-U.S. areas of cooperation per the March 6 Executive Order Protecting the Nation From Foreign Terrorist Entry Into the United States, Al-Rikabi agreed to have the GoI share with the United States any derogatory information that surfaced during the GoI reviews.

8.  (SBU) Action request for CA/VO and NEA/I: Please raise with DHS the request for DHS approval for Iraqi officials to meet with Iraqi deportees at the points of embarkation in order to meet the GoI's consular access request.

| | |
|---|---|
| **Signature:** | Silliman |

| | |
|---|---|
| **Drafted By:** | BAGHDAD:Weiller, Brigid R (Baghdad) |
| **Cleared By:** | DOJ:Brennan, Sean (Baghdad) |
| | POL:Curran, Sylvia R (Baghdad) |
| **Approved By:** | Executive Office:Williams, Stephanie T (Baghdad) |
| **Released By:** | BAGHDAD:Weiller, Brigid R (Baghdad) |
| **Info:** | BASRAH, AMCONSUL *ROUTINE*; ERBIL, AMCONSUL *ROUTINE* |

| | |
|---|---|
| **Action Post:** | NONE |
| **Dissemination Rule:** | DIS_P, DIS_SPECIAL_ASSISTANT |

UNCLASSIFIED
SBU

# EXHIBIT 2

| Message | |
| --- | --- |
| **From**: | George, Christopher [/O=IRMMAIL/OU=MBX SERVERS - BAL/CN=RECIPIENTS/CN=CGEORGE2] |
| **Sent**: | 6/30/2017 4:53:44 PM |
| **To**: | Farmer, Floyd S [/O=IRMMAIL/OU=MBX Servers - DAL/cn=Recipients/cn=FSFarmer]; Carey, John J [/O=IRMMAIL/OU=MBX Servers - NYC/cn=Recipients/cn=jjcarey]; Clinton, Julius A [/O=IRMMAIL/OU=MBX Servers - NYC/cn=Recipients/cn=JAClinto] |
| **Subject**: | RE: For Your Awareness |

Below is what I could come up with for a timeline, please feel free to add or take away as you deem necessary.


May 15, 2017: First non-detained Iraqi national arrested as the start of the operation to begin removing non-detained Iraqi final order cases.

May 16, 2017: 64 non-detained cases submitted to the DOS for TD presentation.

May 17, 2017: List of 26 detained final order cases sent to DOS for presentation to the Iraqi MFA.  These cases presented were from TD requests made to RIO by the field offices.  No TD request for this subject was submitted to RIO.

May 22, 2017: 149 additional non-detained cases submitted to the DOS for TD presentation.  The lists of 239 cases ready to be presented to the Iraqi MFA for the upcoming charter sent to Air Ops, Field Ops, and RIO.  The lists contained mainly non-detained cases that had excellent ID docs which we anticipated would result in an easy TD, along with the fact that most of them were reporting on OSUP; along with the 26 detained cases with outstanding TD requests.

May 24, 2017: RIO received a TD request for a detained Iraqi national, which was forwarded to DOS for presentation.  The list was now at 240 cases total.  DOS requested RIO not submit anymore more cases for presentation at this time.

May 25, 2017: DOS submitted all 240 presentations to the Iraqi MFA along with a Dip note for the upcoming June charter. The subject of question was not on the list as he was not part of the non-detained review, and no TD presentation was made to RIO as a detained case.

May 30, 2017: ICE established June 28, 2017, as the removal date for the charter. As the field continued to make arrests of non-detained Iraqi nationals, RIO noticed a trend in which there were cases arrested that were not included on the original list of 240 cases submitted to the MFA for approval. RIO asks DOS if we still can submit more cases, otherwise the plane would only have about 40 passengers if we could only use cases that were submitted in the 240 list.  DOS agrees to allow RIO to submit more cases but needs them ASAP.

May 31, 2017: RIO conducts a detained docket scrub and notices the subject of question was already scheduled for a commercial flight.

June 1, 2017: DOS informs RIO that June 6, 2017, was our drop dead date to submit the new cases that were arrested as part of the operation.

June 6, 2017: 40 add-on cases submitted to DOS for the June charter.

June 8, 2017: Received confirmation that the second leg of the Iraqi charter, from Cairo to Baghdad was a go.

June 9, 2017: At this point we have more aliens in custody than we have seats on the plane, only 75 can go, 15 alternates identified, total cases ready is at 90.  17 cases identified for the future July charter due to field arrests.

June 12, 2017: Charter list is submitted to Air ops.

As for the other questions below.  We will add him to the manifest; however, I have not seen or heard of a new charter date, so commercial removal might be faster if this charter flight is still uncertain. I am not aware of any interactions between RIO and field regarding this subjects removal, I believe he entered our radar on May 31, 2017, only due to the self-initiated docket scrub. I don't believe the field submitted a TD request for the subject or informed RIO of his upcoming departure, but that's only what I know of.

I am not aware of the process by which who decides which aliens go commercially vs charter; however, I agree that closer collaboration with Air Ops and RIO could be established to determine when aliens should be cut from commercial removal in favor of a planned charter mission.  Once a charter mission is outlined, RIO could reach out to Air Ops and obtain a list of all scheduled commercial removals for the charter country, then RIO could decide if the best viable option would be charter or commercial, include Air Ops in the decision making process, and execute the removal in whichever manner is the best option with all things being considered.

# EXHIBIT 3





EMBASSY OF THE REPUBLIC OF IRAQ

وشــنـطــن
WASHINGTON

**June, 7th, 2017**

**U.S. Department of Homeland Security**
**Immigration and Customs Enforcement**
**Mr. Julius A. Clinton**

███████████████████████

*Compliments,*

With reference to your request for travel documents for the aliens whose names are listed in the attachment, kindly be advised the Embassy of the Republic of Iraq in Washington D.C. is unable to issue such Travel documents for lack of the required official Iraqi documents. The Iraqi passports of these individual are invalid and cannot be extended. Expired passports are not alternative to the required Iraqi document in the process of travel document issuance. The applicant must submit with his request an original and valid Iraqi Personal Identification Card and Iraqi Citizenship Certificate and should express orally and in writing his willingness to return to Iraq voluntarily in order to be issued a travel document.

*Please accept our consideration with regards.*







سفـارة جـمـهوريـة الـعـراق
بـاليوزخــــــــــانەی کۆمـــــــاری عێـــــراق
EMBASSY OF THE REPUBLIC OF IRAQ

واشــنطـن
WASHINGTON



| No | Name | A. Number |
|---|---|---|
| 1 | Bassam Youkhana | |
| 2 | Kahlid Najeeb | |
| 3 | Hussien Ali Hussien | |
| 4 | Thanaa Yousif | |
| 5 | Sami Al issawi | |
| 6 | Ghada N Rizk | |
| 7 | Faek Muqbill | |
| 8 | Jalal Kassam Al Maliki | |
| 9 | Usamah Hamama | |
| 10 | Moushtaq Jalal Korkees | |
| 11 | Hussain Al Jabari | |
| 12 | John Rayes | |
| 13 | Fared Bolis | |
| 14 | Jihan Asker | |
| 15 | Johny Aodisho | |
| 16 | Muzhar Al HasanWy | |
| 17 | Stewart Shaffou | |
| 18 | Alaa Toma | |
| 19 | Jado Duay | |
| 20 | Samir Tarafa | |
| 21 | Alan Sheba | |
| 22 | Bassim Sawdi | |
| 23 | Khalid Altemim | |
| 24 | Ali Alradh Ahussein | |

2



# EXHIBIT 4

| Message | |
| --- | --- |
| **From**: | George, Christopher [/O=IRMMAIL/OU=MBX SERVERS - BAL/CN=RECIPIENTS/CN=CGEORGE2] |
| **Sent**: | 6/30/2017 4:53:44 PM |
| **To**: | Farmer, Floyd S [/O=IRMMAIL/OU=MBX Servers - DAL/cn=Recipients/cn=FSFarmer]; Carey, John J [/O=IRMMAIL/OU=MBX Servers - NYC/cn=Recipients/cn=jjcarey]; Clinton, Julius A [/O=IRMMAIL/OU=MBX Servers - NYC/cn=Recipients/cn=JAClinto] |
| **Subject**: | RE: For Your Awareness |

Below is what I could come up with for a timeline, please feel free to add or take away as you deem necessary.


May 15, 2017: First non-detained Iraqi national arrested as the start of the operation to begin removing non-detained Iraqi final order cases.

May 16, 2017: 64 non-detained cases submitted to the DOS for TD presentation.

May 17, 2017: List of 26 detained final order cases sent to DOS for presentation to the Iraqi MFA. These cases presented were from TD requests made to RIO by the field offices. No TD request for this subject was submitted to RIO.

May 22, 2017: 149 additional non-detained cases submitted to the DOS for TD presentation. The lists of 239 cases ready to be presented to the Iraqi MFA for the upcoming charter sent to Air Ops, Field Ops, and RIO. The lists contained mainly non-detained cases that had excellent ID docs which we anticipated would result in an easy TD, along with the fact that most of them were reporting on OSUP; along with the 26 detained cases with outstanding TD requests.

May 24, 2017: RIO received a TD request for a detained Iraqi national, which was forwarded to DOS for presentation. The list was now at 240 cases total. DOS requested RIO not submit anymore more cases for presentation at this time.

May 25, 2017: DOS submitted all 240 presentations to the Iraqi MFA along with a Dip note for the upcoming June charter. The subject of question was not on the list as he was not part of the non-detained review, and no TD presentation was made to RIO as a detained case.

May 30, 2017: ICE established June 28, 2017, as the removal date for the charter. As the field continued to make arrests of non-detained Iraqi nationals, RIO noticed a trend in which there were cases arrested that were not included on the original list of 240 cases submitted to the MFA for approval. RIO asks DOS if we still can submit more cases, otherwise the plane would only have about 40 passengers if we could only use cases that were submitted in the 240 list. DOS agrees to allow RIO to submit more cases but needs them ASAP.

May 31, 2017: RIO conducts a detained docket scrub and notices the subject of question was already scheduled for a commercial flight.

June 1, 2017: DOS informs RIO that June 6, 2017, was our drop dead date to submit the new cases that were arrested as part of the operation.

June 6, 2017: 40 add-on cases submitted to DOS for the June charter.

June 8, 2017: Received confirmation that the second leg of the Iraqi charter, from Cairo to Baghdad was a go.

June 9, 2017: At this point we have more aliens in custody than we have seats on the plane, only 75 can go, 15 alternates identified, total cases ready is at 90. 17 cases identified for the future July charter due to field arrests.

June 12, 2017: Charter list is submitted to Air ops.

As for the other questions below. We will add him to the manifest; however, I have not seen or heard of a new charter date, so commercial removal might be faster if this charter flight is still uncertain. I am not aware of any interactions between RIO and field regarding this subjects removal, I believe he entered our radar on May 31, 2017, only due to the self-initiated docket scrub. I don't believe the field submitted a TD request for the subject or informed RIO of his upcoming departure, but that's only what I know of.

I am not aware of the process by which who decides which aliens go commercially vs charter; however, I agree that closer collaboration with Air Ops and RIO could be established to determine when aliens should be cut from commercial removal in favor of a planned charter mission. Once a charter mission is outlined, RIO could reach out to Air Ops and obtain a list of all scheduled commercial removals for the charter country, then RIO could decide if the best viable option would be charter or commercial, include Air Ops in the decision making process, and execute the removal in whichever manner is the best option with all things being considered.

EXHIBIT 5

Message

| | |
|---|---|
| **From**: | George, Christopher [/O=IRMMAIL/OU=MBX SERVERS - BAL/CN=RECIPIENTS/CN=CGEORGE2] |
| **Sent**: | 6/15/2017 7:26:55 PM |
| **To**: | Chessman, Mitchell A [/O=IRMMAIL/OU=MBX Servers - ATL/cn=Recipients/cn=machessm]; Hernandez, Alejandro E [/O=IRMMAIL/OU=MBX Servers - MIA/cn=Recipients/cn=aehernan]; Bretz, John C [/O=IRMMAIL/OU=First Administrative Group/cn=Recipients/cn=jcbretz] |
| **CC**: | Clinton, Julius A [/O=IRMMAIL/OU=MBX Servers - NYC/cn=Recipients/cn=JAClinto]; Farmer, Floyd S [/O=IRMMAIL/OU=MBX Servers - DAL/cn=Recipients/cn=FSFarmer] |
| **Subject**: | FW: SPECIAL HIGH RISK CHARTER; 06/28/2017;IRAQ |
| **Attachments**: | SHRC Removal Worksheet- FLO.DOC; Iraq Charter (June 2017).xlsx |

Good afternoon,

I wanted to make you aware that HQ RIO intends to have the below listed subject travel on the June Charter flight.  I believe he has been medically cleared for travel and it is RIO's intent for him to be staged and removed.

| 5 | ATL | | Bakri | Jamiel Nadhim | IRAQ | 7/15/1970 | Ma |
|---|-----|--|-------|---------------|------|-----------|----|

Best Regards,
Chris

**Christopher George**
Supervisory Detention & Deportation Officer
Removal and International Operations (RIO)



**From:** Guardiola, Matthew IOn Behalf OfIAO-SHRC
**Sent:** Monday, June 12, 2017 4:08:10 PM (UTC-05:00) Eastern Time (US & Canada)
**To:** ACO-ERONewOrleans; ACO/EROHouston; ACO/ERO DALLAS,; ACO/ERO PHILADELPHIA,; ACO-ERONEWARK,; ACO/EROBOSTON,; ACO-EROBUFFALO,; ACO/EROBALTIMORE,; ACO-EROWashington,; SNARCU; ACO/ERO San Antonio; ACO/ERO MIAMI,; KromeDMARC; ACO/EROATLANTA; ACO/ERO SEATTLE,; ACO/EROLOSANGELES,; ACO/ERO SAN DIEGO,; ACO/ERO SAN FRANCISCO; ACO/ERO CHICAGO; ACO/EROSTPAUL,; ACO/ERO DETROIT; ICE-DET-FlightOps; ICE-DET-Transport; ICE-ERO-OMDC; ICE-DET-Detained; ACO/EROPHOENIX; ACO/EROSALTLAKECITY,; ACO/ERO El Paso,; RGV-OPS-Flightline; Garcia, Christopher S; Lewis, Ragan; ACO/ERO Denver,; PHOEloyRemovals; Maldonado, Ramiro L; Reyes, C Yvette
**Cc:** IAO-DOMESTIC MISSIONS; Caraballo, Franchesca; Cordero, Robert; Cruz, Alejandro J; Fuchs, Gary P Jr.; Gripentrog, David D; LaBier, Christopher L; Rivera, Coby C; Stevens, Terry A
**Subject:** SPECIAL HIGH RISK CHARTER; 06/28/2017;IRAQ

Good afternoon,

If you are receiving this notification, your AOR has a detainee(s) that will need to be transferred to Florence, AZ (Florence Staging Facility; utilizing IWA airport code) for staging.  I also have receiving offices added to the email string as well.

All detainees need to be transferred to Florence, AZ before the SHRC on Wednesday, June 28th (Detainees and AOR's listed in Excel sheet attached).

# EXHIBIT 6

**From:** Schultz, John A [                                    ]
**Sent:** Wednesday, July 05, 2017 11:47 AM
**To:** Riedmann, Scott R (Baghdad); Fenzel, Andrew D; Katz, Evan C; Shea, Peter T; Knoch, Johanna L; Pennington, Joseph S
**Cc:** Howell, Loye E; Abdelraouf, Hadeil; Coble, Elizabeth A; Khoury-Kincannon, Sahar; Koontz, Bryan K; Stafford, John W; Yu, William Q (Baghdad); Weiller, Brigid R (Baghdad); Tenarodriguez, Jorge; Rapp, Marc A; Farmer, Floyd S; Williams, Johnny N; Kane, Katrina S
**Subject:** RE: Anything new?

Sorry landing in Baghdad on July 13th.

Sent with BlackBerry Work
(www.blackberry.com)

**From:** Riedmann, Scott R (Baghdad) <                      >
**Date:** Wednesday, Jul 05, 2017, 3:44 PM
**To:** Schultz, John A <                          , Fenzel, Andrew D <                    >, Katz, Evan C
<                          Shea, Peter T <                      >, Knoch, Johanna L <                          >, Pennington, Joseph S <            >
**Cc:** Howell, Loye E <                        >, Abdelraouf, Hadeil <                        >, Coble, Elizabeth A
<                    >, Khoury-Kincannon, Sahar <                          >, Koontz, Bryan K <                          >, Stafford, John W <                          >, Yu, William Q (Baghdad) <                    >, Weiller, Brigid R (Baghdad)
<                          >, Tenarodriguez, Jorge <                          >, Rapp, Marc A
<                          >, Farmer, Floyd S <                      >, Williams, Johnny N
<                          >, Kane, Katrina S <                      >
**Subject:** RE: Anything new?

Which date exactly?

SBU
This email is UNCLASSIFIED.

**From:** Schultz, John A [                                ]
**Sent:** Wednesday, July 05, 2017 8:55 AM
**To:** Riedmann, Scott R (Baghdad); Fenzel, Andrew D; Katz, Evan C; Shea, Peter T; Knoch, Johanna L; Pennington, Joseph S
**Cc:** Howell, Loye E; Abdelraouf, Hadeil; Coble, Elizabeth A; Khoury-Kincannon, Sahar; Koontz, Bryan K; Stafford, John W; Yu, William Q (Baghdad); Weiller, Brigid R (Baghdad); Tenarodriguez, Jorge; Rapp, Marc A; Farmer, Floyd S; Williams, Johnny N; Kane, Katrina S
**Subject:** RE: Anything new?

Scott

I am going to see if we can get the plane for next week. Can you socialize the date today? We will do 60 on this flight but need to have 75 on subsequent flights as we have over 200 final order cases in custody.

Thanks

John

# EXHIBIT 7

Message
_____

**From:**       Miller, Andrew T [█████████████]
**Sent:**       6/16/2017 12:00:10 PM
**To:**         George, Christopher [/O=IRMMAIL/OU=MBX Servers - BAL/cn=Recipients/cn=cgeorge2]; Clinton, Julius A
                [/O=IRMMAIL/OU=MBX Servers - NYC/cn=Recipients/cn=JAClinto]; Weiller, Brigid R (Baghdad)
                [█████████████]
**CC:**         Farmer, Floyd S [/O=IRMMAIL/OU=MBX Servers - DAL/cn=Recipients/cn=FSFarmer]; Koontz, Bryan K
                [████████████]; Fenzel, Andrew D [████████████]; Hankinson, Simon R [█████████████;
                Shea, Peter T [████████████]; Riedmann, Scott R (Baghdad) [█████████████]
**Subject:**    Baghdad update 6/16
**Attachments:** Iraq Charter (June 2017).xlsx; June 29 manifest.xlsx; 1- Matrut, Karim █████████pdf


Hello,
Adding new Baghdad  CG Scott Riedmann and Iraq desk director Peter Shea.   I just talked to Ambassador
Silliman, who relayed a conversation he had with Iraqi Ambassador to the U.S. Farid Yaseen.    Ambassador
Yaseen has offered to provide the travel documents for the deportees from Washington, without waiting for
go ahead from Baghdad.  He needs the information on who is to be deported, so they can research and
confirm citizenship.

I would recommend that a combined State/ICE group meet with or provide the Ambassador that information as
soon as possible.   The first attachment is Chris's  full manifest for the June charter.   The second is a
version I cut down to send to the Ministry of Foreign Affairs in Baghdad.  That has only bio information
on the passengers.  The third is one example of the packets we have received from ICE to send to the
Ministry.  They are very nicely detailed, and the information on citizenship varies from person to
person.  In this case, citizenship was  confirmed by a twelve year old fax from the Iraqi Embassy itself!

This is different from what the Iraqis had told us in April, I know, that they could only move if so
directed by the MFA in Baghdad.  But it seems the Iraqi Ambassador is trying to be helpful, and if we can
have the players in Washington sharing the information on this group of deportees, that can at least take
the logistical concerns off the table.  Ambassador Silliman is back and will be looking for senior people
to remind the Iraqis of their commitment to make this happen.
Thanks, Andy

-----Original Message-----
From: George, Christopher [█████████████████████████████]
Sent: Tuesday, June 13, 2017 5:12 PM
To: Miller, Andrew T; Clinton, Julius A; Weiller, Brigid R (Baghdad)
Cc: Farmer, Floyd S; Koontz, Bryan K; Fenzel, Andrew D; Hankinson, Simon R
Subject: RE: Baghdad update

Good day Andy,

Attached is the list of the names for the flight in June.  Our max number we can send back for this
specific flight is 75, but as issues arise and some cases get cut from the list, we will pull from the
list of alternates to ensure we can go with a max full flight.  All of the cases on the attached list
have been sent over and we included any citizenship documents, or biographical information in the absence
of citizenship documents.

Best Regards,
Chris

-----Original Message-----
From: Miller, Andrew T [████████████████████]
Sent: Tuesday, June 13, 2017 9:48 AM
To: Clinton, Julius A; Weiller, Brigid R (Baghdad)
Cc: George, Christopher; Farmer, Floyd S; Koontz, Bryan K; Fenzel, Andrew D; Hankinson, Simon R
Subject: Baghdad update

Hello Julius,
I wanted to give you an update from here.  We talked to Brigid's primary POC in the Ministry of Foreign
Affairs, reminding him of our dipnote of May which noted the June flight, and letting him know another
note with more names was on its way.  We reminded him that the Prime Minister had promised our Ambassador
that deportations would resume.  His response was that with such a large number this time there were
important identity and logistical issues to arrange, and the best he could offer was a meeting at MFA
next week with all the Iraqi players. He was very concerned that anyone deported is truly an Iraqi.   He
offered several times that delaying this flight would give them more room. I didn't take the bait. The
roundups in Detroit over the weekend got some big play in the media here, and that may play into their

# EXHIBIT 8

---

Message

| | |
|---|---|
| **From:** | Riedmann, Scott R (Baghdad) ████████████████ |
| **Sent:** | 6/18/2017 2:43:29 PM |
| **To:** | George, Christopher [/O=IRMMAIL/OU=MBX Servers - BAL/cn=Recipients/cn=cgeorge2]; Clinton, Julius A [/O=IRMMAIL/OU=MBX Servers - NYC/cn=Recipients/cn=JAClinto]; Weiller, Brigid R (Baghdad) ████████████ |
| **CC:** | Farmer, Floyd S [/O=IRMMAIL/OU=MBX Servers - DAL/cn=Recipients/cn=FSFarmer]; Koontz, Bryan K ███████████████ Fenzel, Andrew D ████████████ Hankinson, Simon R ██████████████; Shea, Peter T ████████████ Miller, Andrew T ████████ |
| **Subject:** | RE: Baghdad update 6/16 |

Hello All,

I arrived a few days ago and am succeeding Andy, who will depart in a day or so.  I am trying to convince him to stay, but no luck so far.

Anyway, we huddled today and Ambassador Silliman, as well as the rest of us, are drilling down on this and seeking clarity on some details.  Specifically, the Ambo was asked the following questions by Amb. Yaseen:

--What happens to someone who may have committed a crime, fulfilled the sentence, been released and has since perhaps married and has Amcit children and/or spouse?  Is there any allowance for this?

-- Some of the deportation orders may be old.  Is there a statute of limitations on these orders?  We thought not but would like to confirm.

-- The Iraqis are concerned by the large number of deportees this time around as opposed to last time (8 vice 75).  They are wondering if it would be possible to regularize the process, by which we would deport in tranches of say 40 or 50, which they would deem a more manageable number?  As well, would it be possible to handle the simple, straight forward cases first?  That is, those cases where it is clear the individual is Iraqi, committed a crime recently or had a recent deportation order.

-- As well, was there some method for determining who would be deported first?  Why where these specific 75 chosen for initial deportation?

-- Is denying these deportees Iraqi citizenship documents a violation of some international agreements?  For example, I think we have been suggesting that issuance of citizenship docs (ppts) is required under ICAO.  If so, this would be a useful point for us to make.

I am sure other questions will arise, but any information related to these questions/issues would be useful for us.

Many thanks,

Scott


**Official - SBU**
**UNCLASSIFIED**

---

**From:** Shea, Peter T
**Sent:** Friday, June 16, 2017 5:19 PM
**To:** Miller, Andrew T; 'George, Christopher'; Clinton, Julius A; Weiller, Brigid R (Baghdad)
**Cc:** Farmer, Floyd S; Koontz, Bryan K; Fenzel, Andrew D; Hankinson, Simon R; Riedmann, Scott R (Baghdad)
**Subject:** RE: Baghdad update 6/16

Andrew –

When DAS Pennington and Bryan met Amb Yaseen earlier this week, there was no hint that the GOI might be backing away from its commitment to proceed.  Of course he was concerned about all the press coverage, and we gave him talking points that seemed to suffice.  He had not received any new/different instructions from Baghdad. Correct Bryan?

Andrew, do you know when Amb Silliman spoke to Amb Yaseen?  When we last discussed the specific element of lists (a week or two back – before the media kerfuffle), Amb. Yaseen said he needed to *receive that information from MFA/MOI*.  At first he asked us if we had a list, then immediately he corrected himself and said "no no, wait, its better if this come from Baghdad."  We said we'd pass that way.  So I am not so confident Yaseen will issue travel docs without Baghdad's guidance.  He'd be going out on a limb.  Please let us know when Amb Silliman had that conversation.

Thanks
Peter


SBU
This email is UNCLASSIFIED.

---

**From:** Miller, Andrew T
**Sent:** Friday, June 16, 2017 7:54 AM
**To:** 'George, Christopher'; Clinton, Julius A; Weiller, Brigid R (Baghdad)
**Cc:** Farmer, Floyd S; Koontz, Bryan K; Fenzel, Andrew D; Hankinson, Simon R; Shea, Peter T; Riedmann, Scott R (Baghdad)
**Subject:** Baghdad update 6/16

Hello,
Adding new Baghdad  CG Scott Riedmann and Iraq desk director Peter Shea.   I just talked to Ambassador Silliman, who relayed a conversation he had with Iraqi Ambassador to the U.S. Farid Yaseen.   Ambassador Yaseen has offered to provide the travel documents for the deportees from Washington, without waiting for go ahead from Baghdad.  He needs the information on who is to be deported, so they can research and confirm citizenship.

I would recommend that a combined State/ICE group meet with or provide the Ambassador that information as soon as possible.   The first attachment is Chris's full manifest for the June charter.  The second is a version I cut down to send to the Ministry of Foreign Affairs in Baghdad.  That has only bio information on the passengers.  The third is one example of the packets we have received from ICE to send to the Ministry.  They are very nicely detailed, and the information on citizenship varies from person to person.  In this case, citizenship was  confirmed by a twelve year old fax from the Iraqi Embassy itself!

This is different from what the Iraqis had told us in April, I know, that they could only move if so directed by the MFA in Baghdad.  But it seems the Iraqi Ambassador is trying to be helpful, and if we can have the players in Washington sharing the information on this group of deportees, that can at least take the logistical concerns off the table.  Ambassador Silliman is back and will be looking for senior people to remind the Iraqis of their commitment to make this happen.
Thanks, Andy

-----Original Message-----
From: George, Christopher [███████████████████████]
Sent: Tuesday, June 13, 2017 5:12 PM
To: Miller, Andrew T; Clinton, Julius A; Weiller, Brigid R (Baghdad)
Cc: Farmer, Floyd S; Koontz, Bryan K; Fenzel, Andrew D; Hankinson, Simon R
Subject: RE: Baghdad update

Good day Andy,

Attached is the list of the names for the flight in June.  Our max number we can send back for this specific flight is 75, but as issues

# EXHIBIT 9

Message

| | |
|---|---|
| **From:** | Schultz, John A [/O=IRMMAIL/OU=MBX SERVERS - NYC/CN=RECIPIENTS/CN=JASCHULT] |
| **Sent:** | 6/24/2017 8:12:43 PM |
| **To:** | Koontz, Bryan K [███████████]; Clinton, Julius A [/O=IRMMAIL/OU=MBX Servers - NYC/cn=Recipients/cn=JAClinto] |
| **CC:** | Pennington, Joseph S [███████████]; Riedmann, Scott R (Baghdad) [███████ |
| **Subject:** | Ambassador meeting ? |

Hi Scott

Did the Ambassador get a chance to meet with the Prime Minister today?

We are still moving forward as if the flight will leave as scheduled on the 28th. Have you heard anything from your points of contact in Baghdad?

Thanks,
John

Sent with BlackBerry Work
(www.blackberry.com)

---

**From:** Koontz, Bryan K <███████████>
**Date:** Friday, Jun 23, 2017, 6:13 PM
**To:** Schultz, John A <███████████>, Clinton, Julius A <███████████>
**Cc:** Pennington, Joseph S <███████████>
**Subject:** RE: Readout of Meeting?

Were any conclusions reached?

**Official**
UNCLASSIFIED

---

**From:** Schultz, John A [mailto:███████████]
**Sent:** Friday, June 23, 2017 6:12 PM
**To:** Koontz, Bryan K; Clinton, Julius A
**Cc:** Pennington, Joseph S
**Subject:** RE: Readout of Meeting?

They just got off the phone with Amb Yasseen it wasn't very productive

John A Schultz Jr.
Deputy Assistant Director
Removal Management Division- East
Enforcement and Removal Operations
Immigration and Customs Enforcement

███████████

---

**From:** Koontz, Bryan K [███████████]
**Sent:** Friday, June 23, 2017 4:54 PM
**To:** Schultz, John A; Clinton, Julius A

**Cc:** Pennington, Joseph S
**Subject:** Readout of Meeting?

John and Julius,

Good afternoon!  I hope things are going well for you all, and that you're looking forward to the weekend!

I understand the meeting took place today as scheduled.  I was wondering if you'd received any kind of readout on what transpired?  I'd like to be able to help out in whatever way we can, and knowing what was decided would be useful.

Thanks!

Bryan Koontz
Political Pillar Chief
NEA- Iraq Desk

**Official**
UNCLASSIFIED

# EXHIBIT 10

Message

| | |
|---|---|
| **From:** | Tenarodriguez, Jorge [/O=IRMMAIL/OU=MBX SERVERS - PHO/CN=RECIPIENTS/CN=JTENAROD] |
| **Sent:** | 6/26/2017 5:21:56 PM |
| **To:** | Schultz, John A [/O=IRMMAIL/OU=Mbx servers - nyc/cn=recipients/cn=jaschult]; Williams, Johnny N [/O=IRMMAIL/OU=MBX Servers - LOS/cn=Recipients/cn=jnwillia]; Martinez, John P [/O=IRMMAIL/OU=MBX Servers - SFR/cn=Recipients/cn=JPMarti]; Rapp, Marc A [/O=IRMMAIL/OU=MBX Servers - LOS/cn=Recipients/cn=marapp]; Farmer, Floyd S [/O=IRMMAIL/OU=MBX Servers - DAL/cn=Recipients/cn=FSFarmer] |
| **CC:** | Clinton, Julius A [/O=IRMMAIL/OU=MBX Servers - NYC/cn=Recipients/cn=JAClinto]; George, Christopher [/O=IRMMAIL/OU=MBX Servers - BAL/cn=Recipients/cn=cgeorge2]; Carey, John J [/O=IRMMAIL/OU=MBX Servers - NYC/cn=Recipients/cn=jjcarey]; Kane, Katrina S [/O=IRMMAIL/OU=First Administrative Group/cn=Recipients/cn=kskane]; Lenox, Mark R [/O=IRMMAIL/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Lenox, Mark R]; Katz, Evan C [/O=IRMMAIL/OU=MBX Servers - ATL/cn=Recipients/cn=eckatz]; Lynn, Stephanie D [/O=IRMMAIL/OU=First Administrative Group/cn=Recipients/cn=sdromero] |
| **Subject:** | RE: Iraq charter |

Copy that....Cairo is cancelling all ongoing/pending transactions for this mission!

Sent with BlackBerry Work
(www.blackberry.com)

---

**From:** Schultz, John A <▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮>
**Date:** Monday, Jun 26, 2017, 7:18 PM
**To:** Williams, Johnny N <▮▮▮▮▮▮▮▮▮▮▮▮▮>, Martinez, John P <▮▮▮▮▮▮▮▮▮▮▮▮▮>, Rapp, Marc A <▮▮▮▮▮▮▮▮▮▮▮▮>, Tenarodriguez, Jorge <▮▮▮▮▮▮▮▮▮▮▮▮▮▮>, Farmer, Floyd S <▮▮▮▮▮▮▮▮▮▮▮▮>
**Cc:** Clinton, Julius A <▮▮▮▮▮▮▮▮▮▮▮>, George, Christopher <▮▮▮▮▮▮▮▮▮▮▮▮▮>, Carey, John J <▮▮▮▮▮▮▮▮▮▮▮▮▮>, Kane, Katrina S <▮▮▮▮▮▮▮▮▮▮▮▮▮>, Lenox, Mark R <▮▮▮▮▮▮▮▮▮▮▮▮>, Katz, Evan C <▮▮▮▮▮▮▮▮▮▮▮▮>, Lynn, Stephanie D <▮▮▮▮▮▮▮▮▮▮▮▮>
**Subject:** Iraq charter

All-

The charter for this week has been postponed. We are continuing to work through the US Embassy in Baghdad and the Iraq Embassy in Dc to identify a new date.

Johnny- can you please cancel any officer movements that haven't yet occurred and notify those that have staged to make arrangements to return to their field office. Also please immediately notify CSI of the postponement.

Marlen is going to let Henry know within the next 20 mins or so and I am going to follow up with an email to Albert.

Thanks all

John

Sent with BlackBerry Work
(www.blackberry.com)

# EXHIBIT 11

Message

| | |
|---|---|
| **From:** | Tremont, Robert L [/O=IRMMAIL/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=RLTREMON] |
| **Sent:** | 7/12/2017 5:12:11 PM |
| **To:** | Werderitch, Eric J [/O=IRMMAIL/OU=MBX Servers - CHI/cn=Recipients/cn=EJWerder]; Clinton, Julius A [/O=IRMMAIL/OU=MBX Servers - NYC/cn=Recipients/cn=JAClinto] |
| **Subject:** | FW: large charters |

Robert Tremont
Detention and Deportation Officer
RIO/Embassy Liaison Middle East & Eastern Africa

**From:** Williams, Johnny N
**Sent:** Wednesday, July 12, 2017 12:34 PM
**To:** Schultz, John A; Martinez, John P
**Cc:** Kane, Katrina S; Lambert, Sue L; Zelenka, Martin E; Cordero, Robert; Cruz, Alejandro J; LaBier, Christopher L; Rapp, Marc A; Tremont, Robert L; Tenarodriguez, Jorge; Kirk, Karl V; Waddington, William E; Farmer, Floyd S
**Subject:** RE: large charters

John,

The Iraqi mission has been cancelled as requested. TR has been notified to cancel the non-U.S. flag portion from Cairo to Baghdad too. Since he signed the contract yesterday we will likely incur a penalty for the cancellation too.  Also as discussed, we have reassigned the RON for the Djibouti mission to Dakar as the carrier is unable to acquire the requisite visas in the short time window we have available before he mission date.

To summarize where we are on the cancelation penalties, we will be paying 70%, or about $450k, for the Iraqi mission not the full 100%. The next time we reschedule the Iraqi mission it will be invoiced as a new contract.

Thanks!

Johnny N. Williams
Unit Chief
ICE Air Operations



**From:** Schultz, John A
**Sent:** Tuesday, July 11, 2017 2:51 PM
**To:** Williams, Johnny N; Martinez, John P
**Cc:** Kane, Katrina S; Lambert, Sue L; Zelenka, Martin E; Cordero, Robert; Cruz, Alejandro J; LaBier, Christopher L
**Subject:** RE: large charters

Ok we will be engaging the Embassies immediately  when will we get the passports?

John A Schultz Jr.
Deputy Assistant Director
Removal Management Division- East
Enforcement and Removal Operations
Immigration and Customs Enforcement



**From:** Williams, Johnny N
**Sent:** Tuesday, July 11, 2017 5:48 PM
**To:** Schultz, John A; Martinez, John P
**Cc:** Kane, Katrina S; Lambert, Sue L; Zelenka, Martin E; Cordero, Robert; Cruz, Alejandro J; LaBier, Christopher L
**Subject:** RE: large charters

Will do.

RON's will be in Cairo for Iraq and Djibouti for the Somalian mission.

Thanks!

Johnny N. Williams
Unit Chief
ICE Air Operations



**From:** Schultz, John A
**Sent:** Tuesday, July 11, 2017 2:42 PM
**To:** Williams, Johnny N; Martinez, John P
**Cc:** Kane, Katrina S; Lambert, Sue L
**Subject:** large charters

Johnny-

Please lock in the flights for Iraq and Somalia.

Thanks

john

John A Schultz Jr.
Deputy Assistant Director
Removal Management Division- East
Enforcement and Removal Operations
Immigration and Customs Enforcement



# EXHIBIT 12

Brigid

Official - SBU
UNCLASSIFIED

From: Schultz, John A ███████████████████████
Sent: Tuesday, June 27, 2017 4:33 PM
To: Fenzel, Andrew D; Katz, Evan C
Cc: Howell, Loye E; NEA-I-POL-DL; Yu, William Q (Baghdad); Weiller, Brigid R (Baghdad)
Subject: RE: Iraq URGENT Assistant Req

Right now we are standing by as it unfolds but we hope that post can make some headway in country regarding the agreement of a date for the charter


Sent with BlackBerry Work
(www.blackberry.com<http://www.blackberry.com<http://www.blackberry.com<http://www.blackberry.com>>)
From: Fenzel, Andrew D < ██████████████████████
Date: Tuesday, Jun 27, 2017, 8:55 AM
To: Schultz, John A < ████████████████████████>, Katz, Evan C
< █████████████████████>
Cc: Howell, Loye E < ████████████>>, NEA-I-POL-DL < █████████
███████████████████>, Yu, William Q (Baghdad) < ████████████████████>,
Weiller, Brigid R (Baghdad) < ███████████████████>
Subject: RE: Iraq URGENT Assistant Req

John/Corey,

Is there anything you need from State at this time?  Please let us know asap.


Thanks,
Andrew

Andrew Fenzel
Post Operations Division, Office of Visa Services
Bureau of Consular Affairs
U.S. Department of State
███████████████████████

Official - SBU
UNCLASSIFIED

From: Howell, Loye E
Sent: Tuesday, June 27, 2017 8:23 AM
To: NEA-I-POL-DL; Yu, William Q (Baghdad); Weiller, Brigid R (Baghdad)
Cc: Fenzel, Andrew D
Subject: FW: Iraq URGENT Assistant Req

Colleagues,

Please see email below from DHS and let us know if you have any questions.
Regards,
Loye



SBU
This email is UNCLASSIFIED.


From: Pineiro, Marlen [ ████████████████████████

# EXHIBIT 13

Hey Scott

The fourth was spent on a plane traveling to Hanoi - I did see a picture of fireworks ;)

Thanks for the update I will get with our team in DC and start planning. I am guessing it will be towards the end of July but once I have something concrete I will circle back with you.

Thanks again

John


Sent with BlackBerry Work
(www.blackberry.com<http://www.blackberry.com<http://www.blackberry.com<http://www.blackberry.com>>)
From: Riedmann, Scott R (Baghdad) <█████████████████████████████████>
Date: Wednesday, Jul 05, 2017, 12:09 PM
To: Schultz, John A <█████████████████████████>, Fenzel, Andrew D
<█████████████████████>, Katz, Evan C
<█████████████████████>, Shea, Peter T <█████████████████████████████>,
Knoch, Johanna L <█████████████████████████>, Pennington, Joseph S
<█████████████████████████████████>
Cc: Howell, Loye E <█████████████████████████>, Abdelraouf, Hadeil
<█████████████████████████>, Coble, Elizabeth A
<█████████████████████>, Khoury-Kincannon, Sahar
<█████████████████████>, Koontz, Bryan K
<█████████████████████>, Stafford, John W <█████████████████████████>,
Yu, William Q (Baghdad) <█████████████████████>, Weiller, Brigid R (Baghdad)
<█████>
Subject: RE: Anything new?

Hi John,

Hope you a great 4th.  I have some good news for you.

I wanted to let you know I spoke with Dr. Rikabi from the MFA today and he told me the PMs office gave them the go-ahead on deportations.  He said I should provide him a date for the next flight as soon as we know.  I explained the current court situation and he understood, but I told him we would let him know a date as soon as we were able to determine it, given the current status.

As far as numbers, he did not mention a specific amount, but we know from previous discussions that their preferred amount is 60 per flight, at least for now and until we can establish a reasonable return schedule.  Amb Silliman will be in DC in a few days and I think is planning to meet with you all to discuss.

The Iraqi Embassy in Washington is the next piece of the puzzle.  They will need to be geared up to meet with detainees/issue travel docs, or whatever they feel they need/want to do.  I'm sure Amb Silliman will meet with Amb Yaseen as well to discuss.

Hopefully we can implement a durable solution.  We are cautiously optimistic.

Best,

Scott


SBU
This email is UNCLASSIFIED.


From: Schultz, John A [█████████████████████████]
Sent: Monday, July 03, 2017 3:59 PM
To: Riedmann, Scott R (Baghdad); Weiller, Brigid R (Baghdad); Fenzel, Andrew D; Katz, Evan C
Cc: Howell, Loye E; Abdelraouf, Hadeil; Coble, Elizabeth A; Khoury-Kincannon, Sahar; Koontz, Bryan K; Stafford, John W; Yu, William Q (Baghdad)

# EXHIBIT 14

Subject: RE: Anything new?

Which date exactly?


SBU
This email is UNCLASSIFIED.

From: Schultz, John A ███████████████████████
Sent: Wednesday, July 05, 2017 8:55 AM
To: Riedmann, Scott R (Baghdad); Fenzel, Andrew D; Katz, Evan C; Shea, Peter T; Knoch, Johanna L; Pennington, Joseph S
Cc: Howell, Loye E; Abdelraouf, Hadeil; Coble, Elizabeth A; Khoury-Kincannon, Sahar; Koontz, Bryan K; Stafford, John W; Yu, William Q (Baghdad); Weiller, Brigid R (Baghdad); Tenarodriguez, Jorge; Rapp, Marc A; Farmer, Floyd S; Williams, Johnny N; Kane, Katrina S
Subject: RE: Anything new?

Scott

I am going to see if we can get the plane for next week. Can you socialize the date today? We will do 60 on this flight but need to have 75 on subsequent flights as we have over 200 final order cases in custody.


Thanks

John

Sent with BlackBerry Work
(www.blackberry.com<http://www.blackberry.com<http://www.blackberry.com<http://www.blackberry.com>>)
From: Riedmann, Scott R (Baghdad) <█████████████████████████████>
Date: Wednesday, Jul 05, 2017, 12:38 PM
To: Schultz, John A <█████████████████████████████>, Fenzel, Andrew D <█████████████████████████████>, Katz, Evan C <█████████████████████████████>>, Shea, Peter T <█████████████████████████████>, Knoch, Johanna L <█████████████████████████████>, Pennington, Joseph S <█████████████████████████████>
Cc: Howell, Loye E <█████████████████████████████>, Abdelraouf, Hadeil <█████████████████████████████>, Coble, Elizabeth A <█████████████████████████████>, Khoury-Kincannon, Sahar <█████████████████████████████>, Koontz, Bryan K <█████████████████████████████>, Stafford, John W <█████████████████████████████>>, Yu, William Q (Baghdad) <█████████████████████████████>, Weiller, Brigid R (Baghdad) <█████████████████████████████>
Subject: RE: Anything new?

Hopefully you had some chow in Hanoi.  Safe travels.

Talk to you soon,

Scott


SBU
This email is UNCLASSIFIED.

From: Schultz, John A ███████████████████████
Sent: Wednesday, July 05, 2017 8:36 AM
To: Riedmann, Scott R (Baghdad); Fenzel, Andrew D; Katz, Evan C; Shea, Peter T; Knoch, Johanna L; Pennington, Joseph S
Cc: Howell, Loye E; Abdelraouf, Hadeil; Coble, Elizabeth A; Khoury-Kincannon, Sahar; Koontz, Bryan K; Stafford, John W; Yu, William Q (Baghdad); Weiller, Brigid R (Baghdad)
Subject: RE: Anything new?

# EXHIBIT 15

**From:** Schultz, John A █████████████████████████████
**Date:** Wednesday, Jul 05, 2017, 7:13 PM
**To:** Tenarodriguez, Jorge <████████████████████████, Rapp, Marc A <████████████████████, Williams, Johnny N <████████████████>, Martinez, John P █████████████████████
**Cc:** Kane, Katrina S <████████████████, Farmer, Floyd S ██████████████████████ Lenox, Mark R <████████████ Lambert, Sue L <██████████████████>
**Subject:** RE: Anything new?

TR

I was just looking this over and it may not have been clear. We can't wait 4 weeks for landing clearance in Cairo this is supposed to be a normalized process in which we will have a flight each month.

Let me know if you can't get the permit for the arrival on the 13th or if I need to elevate this.

Thanks


Sent with BlackBerry Work
(www.blackberry.com)

---

**From:** Schultz, John A <█████████████████████████
**Date:** Wednesday, Jul 05, 2017, 9:45 PM
**To:** Tenarodriguez, Jorge <████████████████████, Rapp, Marc A ██████████████████████, Williams, Johnny N <███████████████>, Martinez, John P <█████████████
**Cc:** Kane, Katrina S <██████████████ Farmer, Floyd S ██████████████████████, Lenox, Mark R ████████████████████████, Lambert, Sue L <██████████████████>
**Subject:** RE: Anything new?

TR

Dropping DOS

When we hear back from OPLA regarding today's hearing you may need to go back to MFA and make a modified request. We will also push from our end in DC.

Once the TRO is over we need to get the planes going.


Sent with BlackBerry Work
(www.blackberry.com)

---

**From:** Tenarodriguez, Jorge <████████████████████
**Date:** Wednesday, Jul 05, 2017, 8:50 PM
**To:** Schultz, John A <████████████, Riedmann, Scott R (Baghdad) ████████████████ Fenzel, Andrew D ████████████████, Katz, Evan C <l███████████████████, Shea, Peter T <████████████████, Knoch, Johanna L <██████████████ Pennington, Joseph S <████████████████
**Cc:** Howell, Loye E <█████████████, Abdelraouf, Hadeil <████████████, Coble, Elizabeth A <████████████████████> Khoury-Kincannon, Saha ████████████████, Koontz, Bryan K <███████████████████ Stafford, John W <████████████ Yu, William Q (Baghdad) <████████████████, Weiller, Brigid R (Baghdad) ████████████████████ Rapp, Marc A <████████████████████, Farmer, Floyd S ████████ Williams, Johnny N ██████████████████████>, Kane, Katrina S ████████████████████>
**Subject:** RE: Anything new?

# EXHIBIT 16

< ███████████ > Farmer, Floyd S < ███████████ >, Williams, Johnny N
< ███████████ >, Kane, Katrina S < ███████████ >
**Subject:** RE: Anything new?

Scott, John,

I will reach out to Ambassador Yaseen today to address - as well we have some unrelated business.  I will ask if he's received MFA instructions and note that he'll likely need to get consular officers  to Mesa (?) very early next week for documentation.

To clarify, I understood the court injunction on Iraq removals was until July 14 (is it the 13th?).  Also what does ICE think the chances are that the court will extend the stay?  ICE will plan everything and then cancel if the court extends?

Thanks
Peter


**Peter T. Shea**
Director, Office of Iraq Affairs (NEA/I)
Bureau of Near Eastern Affairs
U.S. Department of State

███████████


SBU
This email is UNCLASSIFIED.

---

**From:** Riedmann, Scott R (Baghdad)
**Sent:** Wednesday, July 05, 2017 6:54 AM
**To:** 'Schultz, John A'; Fenzel, Andrew D; Katz, Evan C; Shea, Peter T; Knoch, Johanna L; Pennington, Joseph S
**Cc:** Howell, Loye E; Abdelraouf, Hadeil; Coble, Elizabeth A; Khoury-Kincannon, Sahar; Koontz, Bryan K; Stafford, John W; Yu, William Q (Baghdad); Weiller, Brigid R (Baghdad); Tenarodriguez, Jorge; Rapp, Marc A; Farmer, Floyd S; Williams, Johnny N; Kane, Katrina S
**Subject:** RE: Anything new?

I'll pass the date to the MFA here.  I'll let you know how they respond.

What needs to happen right away is that the Iraqi Embassy will need to be prompted to dispatch officers to document the deportees nlt Saturday/Sunday.

Best,

Scott


SBU
This email is UNCLASSIFIED.

---

**From:** Schultz, John A ███████████
**Sent:** Wednesday, July 05, 2017 1:25 PM

**To:** Riedmann, Scott R (Baghdad); Fenzel, Andrew D; Katz, Evan C; Shea, Peter T; Knoch, Johanna L; Pennington, Joseph S
**Cc:** Howell, Loye E; Abdelraouf, Hadeil; Coble, Elizabeth A; Khoury-Kincannon, Sahar; Koontz, Bryan K; Stafford, John W; Yu, William Q (Baghdad); Weiller, Brigid R (Baghdad); Tenarodriguez, Jorge; Rapp, Marc A; Farmer, Floyd S; Williams, Johnny N; Kane, Katrina S
**Subject:** RE: Anything new?

I know it's a quick turn but they have had the list of cases since May 25 and had previously indicated that all they would need was 15 days to get them processed.

Sent with BlackBerry Work
([www.blackberry.com](www.blackberry.com))



**From:** Riedmann, Scott R (Baghdad) <█████████████████>
**Date:** Wednesday, Jul 05, 2017, 4:01 PM
**To:** Schultz, John A <██████████████>, Fenzel, Andrew D <████████████, Katz, Evan C <█████████████ Shea, Peter T <███████████, Knoch, Johanna L █████████████, Pennington, Joseph S <███████████>
**Cc:** Howell, Loye E <█████████████>, Abdelraouf, Hadeil <████████████████>, Coble, Elizabeth A <███████████, Khoury-Kincannon, Sahar <███████████ Koontz, Bryan K Stafford, John W <███████████>, Yu, William Q (Baghdad) <██████████████>, Weiller, Brigid R (Baghdad) <█████████, Tenarodriguez, Jorge <██████████████████>, Rapp, Marc A <███████████>, Farmer, Floyd S <██████████ Williams, Johnny N <███████████████ Kane, Katrina S ██████████████████
**Subject:** RE: Anything new?

Keep in mind as well, that doesn't leave much time for the Iraqi Embassy to do the consular visits and issue travel docs. As much as we would like to think they could to it in this time frame, I have my doubts. I'm not even sure at this point that the MFA here has informed the Iraqi Embassy of the PM's decision. I don't want to set ourselves up for another last-minute delay.

SBU
This email is UNCLASSIFIED.

**From:** Riedmann, Scott R (Baghdad)
**Sent:** Wednesday, July 05, 2017 11:51 AM
**To:** 'Schultz, John A'; Fenzel, Andrew D; Katz, Evan C; Shea, Peter T; Knoch, Johanna L; Pennington, Joseph S
**Cc:** Howell, Loye E; Abdelraouf, Hadeil; Coble, Elizabeth A; Khoury-Kincannon, Sahar; Koontz, Bryan K; Stafford, John W; Yu, William Q (Baghdad); Weiller, Brigid R (Baghdad); Tenarodriguez, Jorge; Rapp, Marc A; Farmer, Floyd S; Williams, Johnny N; Kane, Katrina S
**Subject:** RE: Anything new?

In eight days? This date is certain, given the on-going litigation? I just don't want to muddy the waters by telling them this date and then having to push it back. That kind of change is hard to manage here sometimes.

SBU
This email is UNCLASSIFIED.

**From:** Schultz, John A █████████████████████
**Sent:** Wednesday, July 05, 2017 11:47 AM
**To:** Riedmann, Scott R (Baghdad); Fenzel, Andrew D; Katz, Evan C; Shea, Peter T; Knoch, Johanna L; Pennington, Joseph S
**Cc:** Howell, Loye E; Abdelraouf, Hadeil; Coble, Elizabeth A; Khoury-Kincannon, Sahar; Koontz, Bryan K; Stafford, John W; Yu, William Q (Baghdad); Weiller, Brigid R (Baghdad); Tenarodriguez, Jorge; Rapp, Marc A; Farmer, Floyd S; Williams, Johnny N; Kane, Katrina S
**Subject:** RE: Anything new?

Sorry landing in Baghdad on July 13th.


Sent with BlackBerry Work
([www.blackberry.com](www.blackberry.com))

---

**From:** Riedmann, Scott R (Baghdad) < ████████████████████ >
**Date:** Wednesday, Jul 05, 2017, 3:44 PM
**To:** Schultz, John A < ██████████████████ >, Fenzel, Andrew D ████████████ >, Katz, Evan C < ████████████ >, Shea, Peter T ████████████, Knoch, Johanna L < ███████████ Pennington, Joseph S
**Cc:** Howell, Loye E < ██████████████ Abdelraouf, Hadeil < ███████████ >, Coble, Elizabeth A < ██████████ >, Khoury-Kincannon, Sahar < ██████████ Koontz, Bryan K < ██████ Stafford, John W < ████████ Yu, William Q (Baghdad) ██████████ Weiller, Brigid R (Baghdad) < ███████ >, Tenarodriguez, Jorge < ████████ Rapp, Marc A ██████████████ Farmer, Floyd S < ████████ Williams, Johnny N ██████████ >, Kane, Katrina ███████████████
**Subject:** RE: Anything new?

Which date exactly?


SBU
This email is UNCLASSIFIED.

---

**From:** Schultz, John A [ ████████████████████ ]
**Sent:** Wednesday, July 05, 2017 8:55 AM
**To:** Riedmann, Scott R (Baghdad); Fenzel, Andrew D; Katz, Evan C; Shea, Peter T; Knoch, Johanna L; Pennington, Joseph S
**Cc:** Howell, Loye E; Abdelraouf, Hadeil; Coble, Elizabeth A; Khoury-Kincannon, Sahar; Koontz, Bryan K; Stafford, John W; Yu, William Q (Baghdad); Weiller, Brigid R (Baghdad); Tenarodriguez, Jorge; Rapp, Marc A; Farmer, Floyd S; Williams, Johnny N; Kane, Katrina S
**Subject:** RE: Anything new?

Scott

I am going to see if we can get the plane for next week. Can you socialize the date today? We will do 60 on this flight but need to have 75 on subsequent flights as we have over 200 final order cases in custody.


Thanks


John

# EXHIBIT 17

Do you think there would be any willingness on the Ambassadors part to proactively conduct the interviews while awaiting word from Baghdad?

Sent with BlackBerry Work
([www.blackberry.com](www.blackberry.com))



From: Shea, Peter T <███████████████████████>
Date: Thursday, Jul 06, 2017, 6:38 AM
To: Tenarodriguez, Jorge <███████████████████████████████>, Schultz, John A
<███████████████████████>, Riedmann, Scott R (Baghdad)
<█████████████████████████ Fenzel, Andrew D
<█████████████████████████████>, Katz, Evan C
<███████████████████████████████████>, Knoch, Johanna L
<███████████████████████████████>, Pennington, Joseph S
<██████████████████████████████████>
Cc: Howell, Loye E <██████████████████████████████>, Abdelraouf, Hadeil
<█████████████████████████████>, Coble, Elizabeth A
<█████████████████████████, Khoury-Kincannon, Sahar
<████████████████████████>, Koontz, Bryan K
<████████████████████████████>, Stafford, John W <█████████████████████████████>,
Yu, William Q (Baghdad) <███████████████████>, Weiller, Brigid R (Baghdad)
<██████████████████████████████>, Rapp, Marc A
<██████████████████████████████████>, Farmer, Floyd S
<████████████████████████████████████>, Williams, Johnny N
<████████████████████████████████>, Kane, Katrina S
<████████████████████████████████>
Subject: Re: Anything new?

This afternoon with Amb Yaseen I previewed the aim for a July 13 flight if the court injunction is removed (I've still not seen anything yet). I told him this could be 60 pax, but in future months we want to see that number increase. Fareed reiterated his willingness to cooperate. He is awaiting new instructions from Baghdad, including to clarify if the embassy may issue travel docs to all removal cases, or only those who had been convicted of felonies and have served their sentences. I reiterated that U.S. law does not differentiate, that Iraq has an obligation to accept all, and that we believe PM Abadi understands this. Fareed understood.

As for the 13th date, the Ambassador noted that it will be hard logistically for the Embassy to make work unless it's decided today or perhaps tomorrow at the latest. Fareed would have to get his team to the holding facility Friday or Monday, after he gets instructions.

I expect Amb Yaseen will reach out to you John as well.

Peter

Sent from my BlackBerry 10 smartphone.
From: Shea, Peter T
Sent: Wednesday, July 5, 2017 11:43 AM
To: Tenarodriguez, Jorge; Schultz, John A; Riedmann, Scott R (Baghdad); Fenzel, Andrew D; Katz, Evan C; Knoch, Johanna L; Pennington, Joseph S
Cc: Howell, Loye E; Abdelraouf, Hadeil; Coble, Elizabeth A; Khoury-Kincannon, Sahar; Koontz, Bryan K; Stafford, John W; Yu, William Q (Baghdad); Weiller, Brigid R (Baghdad); Rapp, Marc A; Farmer, Floyd S; Williams, Johnny N; Kane, Katrina S
Subject: RE: Anything new?

FYI – I will see Ambassador Yaseen at 4:00pm. Any updates on the court or other matters before that hour will be greatly appreciated.

This email is UNCLASSIFIED.

# EXHIBIT 18

**Subject:** RE: Anything new?

Ok, got it.

Can you we have our call first thing next week Monday?


Sent with BlackBerry Work
(www.blackberry.com)

**From:** Schultz, John A <██████████████████████>
**Date:** Friday, Jul 07, 2017, 2:40 PM
**To:** Williams, Johnny N <██████████████████>, Tenarodriguez, Jorge <██████████████████████>, Rapp, Marc A <██████████████>, Martinez, John P <██████████████████>
**Cc:** Kane, Katrina S <████████████>, Farmer, Floyd S <████████████████>, Lenox, Mark R <████████████████>, Lambert, Sue L <██████████████>, Cordero, Robert <████████████████████████>, Cruz, Alejandro J <██████████>, LaBier, Christopher L <████████████████████>, Clinton, Julius A <████████████████████>
**Subject:** RE: Anything new?

Johnny/TR/Julius

MP has asked that we start making arrangements for the flight to go the week of July 24.



Sent with BlackBerry Work
(www.blackberry.com)

**From:** Williams, Johnny N <██████████████████>
**Date:** Thursday, Jul 06, 2017, 8:04 AM
**To:** Schultz, John A <██████████████████>, Tenarodriguez, Jorge <██████████████████>, Rapp, Marc A <██████████████>, Martinez, John P <██████████>
**Cc:** Kane, Katrina S <██████████████>, Farmer, Floyd S <████████████████>, Lenox, Mark R <████████████>, Lambert, Sue L <██████████████████>, Cordero, Robert <████████████████████>, Cruz, Alejandro J <██████████████>, LaBier, Christopher L <██████████████>
**Subject:** RE: Anything new?

We'll need to have a call on this if the TRO is lifted. Lots of things need to be ironed out before we can set a date. I'm available anytime.

Thanks!


Johnny N. Williams
Chief
ICE Air Operations

████████████████

# EXHIBIT 19

This email is UNCLASSIFIED.

---

**From:** Schultz, John A █████████████████████████
**Sent:** Friday, July 07, 2017 8:03 AM
**To:** Shea, Peter T; Tenarodriguez, Jorge; Riedmann, Scott R (Baghdad); Fenzel, Andrew D; Katz, Evan C; Knoch, Johanna L; Pennington, Joseph S
**Cc:** Howell, Loye E; Abdelraouf, Hadeil; Coble, Elizabeth A; Khoury-Kincannon, Sahar; Koontz, Bryan K; Stafford, John W; Yu, William Q (Baghdad); Weiller, Brigid R (Baghdad); Rapp, Marc A; Farmer, Floyd S; Williams, Johnny N; Kane, Katrina S
**Subject:** RE: Anything new?

Peter/Scott

I was jut informed that the TRO has been extended until July 24.

There are about 90 or so detained in Mesa and most of them are criminals. Again it would be helpful for the PM's office to dispatch the Embassy to Mesa to conduct the interviews so that once the TRO is lifted we can move quickly.

Thanks

John


Sent with BlackBerry Work
([www.blackberry.com](www.blackberry.com))

---

**From:** Shea, Peter T < ████████████████ >
**Date:** Thursday, Jul 06, 2017, 8:40 AM
**To:** Schultz, John A < ███████████ Tenarodriguez, Jorge < ███████████████████ Riedmann, Scott R (Baghdad) < █████████████████ >, Fenzel, Andrew D < ███████████████ , Katz, Evan C < █████████████████ , Knoch, Johanna L ██████████████████ , Pennington, Joseph S < ███████████████ >
**Cc:** Howell, Loye E < █████████████ >, Abdelraouf, Hadeil < █████████████ >, Coble, Elizabeth A < █████████████ >, Khoury-Kincannon, Sahar < ██████████████ >, Koontz, Bryan K < ██████████████ >, Stafford, John W < ████████████████ >, Yu, William Q (Baghdad) < ██████████████ >, Weiller, Brigid R (Baghdad) < ████████████████ >, Rapp, Marc A < ████████████████ , Farmer, Floyd S ████████████████ , Williams, Johnny N < ███████████████ Kane, Katrina S < ██████████████████ >
**Subject:** Re: Anything new?

Thanks John. I expect Amb Yaseen would prefer to wait for revised instructions. I know Amb Silliman is pressing for those from the Baghdad end. Perhaps Amb Yaseen could be convinced to pre-screen those previously convicted of felonies. Are all the individuals in Mesa, AZ?

Sent from my BlackBerry 10 smartphone.
From: Schultz, John A
Sent: Wednesday, July 5, 2017 8:09 PM
To: Shea, Peter T; Tenarodriguez, Jorge; Riedmann, Scott R (Baghdad); Fenzel, Andrew D; Katz, Evan C; Knoch, Johanna L; Pennington, Joseph S
Cc: Howell, Loye E; Abdelraouf, Hadeil; Coble, Elizabeth A; Khoury-Kincannon, Sahar; Koontz, Bryan K; Stafford, John W; Yu, William Q (Baghdad); Weiller, Brigid R (Baghdad); Rapp, Marc A; Farmer, Floyd S; Williams, Johnny N; Kane, Katrina S
Subject: RE: Anything new?


Peter

Thanks for the read out. We haven't received word regarding the hearing today and I hope that we will get a decision tomorrow.

# EXHIBIT 20

---

Message

| | |
|---|---|
| **From:** | Schultz, John A [/O=IRMMAIL/OU=MBX SERVERS - NYC/CN=RECIPIENTS/CN=JASCHULT] |
| **Sent:** | 7/11/2017 9:16:20 PM |
| **To:** | Shea, Peter T ███████████; Tenarodriguez, Jorge [/O=IRMMAIL/OU=MBX Servers - PHO/cn=Recipients/cn=jtenarod]; Riedmann, Scott R (Baghdad) ██████████████; Fenzel, Andrew D ██████████████; Katz, Evan C [/O=IRMMAIL/OU=MBX Servers - ATL/cn=Recipients/cn=eckatz]; Knoch, Johanna L ███████████ Pennington, Joseph S |
| **CC:** | Howell, Loye E ██████ Abdelraouf, Hadeil ████████ Coble, Elizabeth A ████████ Khoury-Kincannon, Sahar ██████████ Koontz, Bryan K ██████████ Stafford, John W ████████ Yu, William Q (Baghdad) ████████ Weiller, Brigid R (Baghdad) ████████ Rapp, Marc A [/O=IRMMAIL/OU=MBX Servers - LOS/cn=Recipients/cn=marapp]; Farmer, Floyd S [/O=IRMMAIL/OU=MBX Servers - DAL/cn=Recipients/cn=FSFarmer]; Williams, Johnny N [/O=IRMMAIL/OU=MBX Servers - LOS/cn=Recipients/cn=jnwillia]; Kane, Katrina S [/O=IRMMAIL/OU=First Administrative Group/cn=Recipients/cn=kskane]; Lenox, Mark R [/O=IRMMAIL/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Lenox, Mark R]; Farmer, Floyd S [/O=IRMMAIL/OU=MBX Servers - DAL/cn=Recipients/cn=FSFarmer]; Clinton, Julius A [/O=IRMMAIL/OU=MBX Servers - NYC/cn=Recipients/cn=JAClinto] |
| **Subject:** | RE: Anything new? |

Scott/Peter-

I wanted to let you know that we met with Ambassador Silliman today and informed if that the plan is to proceed with the removal of 60 Iraqi nationals on July 25.  This would result in the arrival in Baghdad on July 26.  Given this is contingent on two things 1. That the TRO is lifted and 2. That Iraq allows us to proceed.

John A Schultz Jr.
Deputy Assistant Director
Removal Management Division- East
Enforcement and Removal Operations
Immigration and Customs Enforcement

████████████████████
████████████████████
████████████████████
████████████████████

---

**From:** Shea, Peter T ████████████████
**Sent:** Friday, July 7, 2017 8:40 AM
**To:** Schultz, John A; Tenarodriguez, Jorge; Riedmann, Scott R (Baghdad); Fenzel, Andrew D; Katz, Evan C; Knoch, Johanna L; Pennington, Joseph S
**Cc:** Howell, Loye E; Abdelraouf, Hadeil; Coble, Elizabeth A; Khoury-Kincannon, Sahar; Koontz, Bryan K; Stafford, John W; Yu, William Q (Baghdad); Weiller, Brigid R (Baghdad); Rapp, Marc A; Farmer, Floyd S; Williams, Johnny N; Kane, Katrina S; Lenox, Mark R
**Subject:** RE: Anything new?

Thanks John. I will relay that. I should also mention, in addition to my meeting with Yaseen today, Ambassador Silliman (who will be here for the D-ISIS meetings) will see Yaseen early Monday morning. The Deputy Foreign Minister may/may also be in DC next week, and he is critical to actually issuing the instructions to Amb Yaseen. We'll engage him as well – here in DC if he travels, in Baghdad if not.

So we will have ample opportunities.

Best,
Peter

# EXHIBIT 21

**To:** Clinton, Julius
**From:** Brooks, Richard A 1910-MAG-DRG    ECF No. 466-23    filed 10/26/18    PageID.12645    Page 2 of 3
**Sent:** Mon 6/26/2017 9:12:34 AM (UTC-04:00)
**Subject:** FW: Congressman Asks Iraq Not to Issue TDs - Is this Legal?

Mr. Clinton,
I was asked by my DFOD to forward this article regarding a request by a U.S. Rep in Nashville to the Iraqi Consulate basically asking to halt issuance of t/d's for Iraqi nationals.  (a)DFOD Acuna is wondering if this should be brought to someone's attention.  Thanks for your assistance.

Richard A. Brooks
Assistant Field Office Director
ICE – Enforcement and Removal Operations



---

**From:** Acuna, Brian S
**Sent:** Monday, June 26, 2017 7:58 AM
**To:** Brooks, Richard A
**Cc:** Byrd, Thomas N; Cox, Bryan D; Smith, Gerald B; Johnson, Ronald E
**Subject:** Congressman Asks Iraq Not to Issue TDs - Is this Legal?

http://www.tennessean.com/story/news/2017/06/23/jim-cooper-asks-iraq-safety-assurances-nashville-kurds-facing-deportation/421358001/

## Jim Cooper asks Iraq for safety assurances for Nashville Kurds facing deportation

Katherine Scheu , USA TODAY NETWORK - Tennessee 9:13 p.m. CT June 22, 2017

U.S. Rep. Jim Cooper wants the ambassador of Iraq to provide him information regarding the safety of Kurdish residents if the United States deports them to northern Iraq from Nashville.

In a letter to the ambassador, Cooper, D-Nashville, wrote that if the situation at their destination in Iraq is determined to be dangerous, they may be excused from deportation, at least temporarily.

"It is vitally important to determine if the dangers they could face abroad entitle them to at least temporary protection from removal," Cooper said.

Cooper's letter to Ambassador Fareed Yasseen comes as U.S. Immigration and Customs Enforcement agents have detained at least a dozen Kurdish residents in Middle Tennessee for possible deportation.

After negotiations between Iraq and the U.S., Iraq has agreed to accept a number of Iraqi nationals who have deportation orders, according to immigration officials.

ICE officials have said all of those subject to deportation orders have had criminal convictions.

According to Cooper, ICE has detained several Kurdish residents who have lived in Nashville for an extended amount of time and is holding them in Jena, La.
Cooper said for some of these Kurds, the deportation orders are more than a decade old.
Cooper concluded his letter with three questions:
    1.  Cooper asked if the Iraq Embassy could halt or slow its issuance of travel documents so that the detainees could seek legal counsel in the meantime.
    2.  Cooper asked that if the situation in northwest Iraq is determined safe, the detained Nashville Kurds could fly directly to a city there and be near their families and other contacts.
    3.  Cooper asked if there will be guaranteed, immediate and safe passage to northwest Iraq from Baghdad if residents are not able to fly directly to northwest Iraq.

Nashville has the largest Kurdish community in the U.S., and Cooper said the residents lead upright lives, have earned their places in American society and some have been under court supervision.

Nashville Mayor Megan Barry also wrote a letter concerning immigration officials, criticizing ICE agents for tactics that she said posed a greater danger to public safety.

Barry said ICE's usage of the word "police" on agents' uniforms undermined efforts made by Metro police to build relationships with the immigrant community in and around Nashville.  As the Trump administration works to advance its travel bans, Nashville has seen an increase in the number of arrests ICE makes.

Brian S. Acuna

New Orleans Field Office
ICE - Enforcement and Removal Operations



EXHIBIT 22

Removal Management Division- East
Enforcement and Removal Operations
Immigration and Customs Enforcement

**From:** George, Christopher
**Sent:** Wednesday, July 19, 2017 10:36 AM
**To:** Schultz, John A; Farmer, Floyd S
**Cc:** Clinton, Julius A; Carey, John J
**Subject:** Iraq interviews

Good morning,

Just a quick update, we finished all the Iraqi interviews late last night, well early this morning, 2am EST. The Consulate kept stating the agreement was to interview 62, Im not sure where that number came from, but I pressed back and got them to interview everyone on our list, 60 primary cases and the 20 alternates. Several aliens refused to speak to the Consulate or acknowledge their legitimacy, but were given access to their Consulate and choose to be that way.

They did somehow manage to interview each alien one on one, took notes, and seemed very much pleased with how the process went. We are all flying back today, I changed my flight to mirror the Consulates, so I will be back in the office tomorrow.

Regards,
Chris


Sent with BlackBerry Work
(www.blackberry.com)

# EXHIBIT 23

**Message**

| | |
|---|---|
| **From:** | Farmer, Floyd S [/O=IRMMAIL/OU=MBX SERVERS - DAL/CN=RECIPIENTS/CN=FSFARMER] |
| **Sent:** | 7/20/2017 2:41:25 PM |
| **To:** | Schultz, John A [/O=IRMMAIL/OU=Mbx servers - nyc/cn=recipients/cn=jaschult] |
| **Subject:** | FW: Sanctions Iraq |
| **Attachments:** | Formal Letter S1 to S1 Invoke Visa Sanctions Iraq.docx; Memo EAD to D1 Invoke Visa Sanctions Iraq.doc; Memo D1 to S1 Invoke Visa Sanctions (7.19.17) Iraq.doc; White Paper Invoke Visa Sanctions Iraq.docx |

Attached Iraq 243d packet for your review.

Floyd S. Farmer
Unit Chief
HQ Immigration and Customs Enforcement,
ERO/Removal and International Operations
Middle East / East Africa



---

**From:** Clinton, Julius A
**Sent:** Thursday, July 20, 2017 9:47 AM
**To:** Farmer, Floyd S
**Subject:** Sanctions Iraq

Sir,

Sorry you should have received this yesterday afternoon with my log off email. Please review and advise if you need me to make additional edits.

Respectfully,

*Julius A. Clinton*
Desk Officer
Removal and International Operations (RIO)
Removal Management Division
U.S. Department of Homeland Security
U.S. Immigration & Customs Enforcement
Enforcement and Removal Operations Headquarters
Potomac Center North



Warning: This document is UNCLASSIFIED//FOR OFFICIAL USE ONLY (U//FOUO). It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not to be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of an authorized DHS official. No portion of this report should be furnished to the media, either in written or verbal form.

# EXHIBIT 24



*Enforcement and Removal Operations*

<u>U.S. Department of Homeland Security</u>



U.S. Immigration
and Customs
Enforcement

MEMORANDUM FOR:     Thomas D. Homan
                    Acting Director

THROUGH:            Peter T. Edge
                    Acting Deputy Director

FROM:               Matthew T. Albence
                    Executive Associate Director
                    Enforcement and Removal Operations

SUBJECT:            Recommendation to Initiate the Process to Invoke Visa Sanctions
                    under Section 243(d) of the Immigration and Nationality Act
                    against Iraq

<u>Purpose</u>:



# DP

Approve _____    Disapprove _____

Modify_____    Needs Discussion _____

Attachments

ICE - 0296030

PRE-DECISIONAL/DELIBERATIVE

*Office of the Director*



U.S. Immigration
and Customs
Enforcement

**ACTION**

MEMORANDUM FOR THE SECRETARY

FROM:            Thomas D. Homan
                 Acting Director

SUBJECT:         **Recommendation to initiate the process to invoke visa sanctions under
                 section 243(d) of the Immigration and Nationality Act against Iraq**

# DP

# DP

Approve/date _____    Disapprove/date _____


Modify/date _____    Needs Discussion/date _____

Attachment



Iraq:  Numerous verbal démarches have been delivered to the Government of Iraq.
In response, in February 2017, Iraq approved the removal of Iraqi nationals via charter flight; the flight was completed on April 19, 2017.  ICE was subsequently informed that the Government of Iraq has identified a process to facilitate the removal of Iraqi nationals.  Due to a July 24, 2017 decision by the United States District Court, Eastern District of Michigan, Southern Division ICE is prevented from removing any Iraqi nationals who had a final order of removal on June 24, 2017 until October 24, 2017.

**NR**



**NR**

# EXHIBIT 25

Message

| | |
|---|---|
| **From**: | Schultz, John A [/O=IRMMAIL/OU=MBX SERVERS - NYC/CN=RECIPIENTS/CN=JASCHULT] |
| **Sent**: | 7/26/2017 7:01:50 PM |
| **To**: | Pineiro, Marlen [/O=IRMMAIL/OU=MBX Servers - MIA/cn=Recipients/cn=mpineiro] |
| **Subject**: | FW: Iraq |

Odd adam said there wasn't a discussion but here is the read out from Josh

John A Schultz Jr.
Deputy Assistant Director
Removal Management Division- East
Enforcement and Removal Operations
Immigration and Customs Enforcement

███████████████

**From:** Coster, Joshua
**Sent:** Wednesday, July 26, 2017 2:57 PM
**To:** Schultz, John A
**Subject:** RE: Iraq

Sir,
There was no defined way forward as to Iraq and the current TD issuance problems we're facing. The discussion yesterday was during an OPLA update and specific to the *Hamama v. Adducci* case and the TRO filed in District Court.

**AWP**

**AWP** He mentioned the meeting with Ambassador Silliman and the fact that State countered the argument that Iraqi Chaldeans would necessarily face persecution upon return to Iraq.

That said, I wanted to get a copy of the report for the Acting DD and AD1's staff for better awareness on the topic.

Thanks again for your assistance!

Josh

Joshua Coster
Deputy Chief of Staff
ICE-Deputy Director
U.S. Immigration and Customs Enforcement

███████████████

**From:** Schultz, John A
**Sent:** Wednesday, July 26, 2017 1:53 PM
**To:** Coster, Joshua
**Subject:** Iraq

Waiting on state to send me their report did anything come from the meeting or conversation regarding a way forward?

John A Schultz Jr.

# EXHIBIT 26

FOR OFFICIAL USE ONLY

## Meeting with Iraqi Embassy Regarding Litigation Volunteers

**Overview:**

- You will meet Mohamed Jawad Al Quraishy,  the Deputy Chief of Misson (DCM) of Iraq.
- This meeting is scheduled for Tuesday, January 09, 2018 at 11:00am local time at DHS Headquarter, ███████████████████████████
- ICE attendees: John Schultz, Deputy Assistant Director, Michael Bernacke, Unit Chief, Julius Clinton, Detention & Deportation Officer.
- In attendance from the Department of State Derek Hoffmann, Desk Officer for Iraq.
- Iraqi removals remain temporarily stayed by order of the United States District Court for the Eastern District of Michigan in *Hamama, et al. v. Adducci*, et al., Case No. 2:17-cv-11910,
- **Vienna Convention –**Iraq is not a mandatory notification country.
- **International Civil Aviation Organization.** – Iraq is a party to Annex 9 to the Convention on International Civil Aviation.
- **Working Groups –**ICE ERO is not part of a working group involving Iraq.
- **Gift Exchange** – No gift exchange.

**Discussion Points:**

- Thank the DCM for meeting with you and thank them for their cooperation with interviewing subject scheduled to go on charters and issuance of  travel documents to these subjects.
- We thank GoI for issuance of the travel documents they have provided for our previous charter mission.  However, we request that travel document issuance occur in a timely manner to best facilitate orderly scheduling of future charter missions.   We also request that, for aliens who indicate an unwillingness to return to Iraq, that travel documents still be issued to such aliens despite them expressing their retiscence.
- You may wish to mention that ICE's goal is for the GoI to issue travel documents for Iraqi nationals within thirty days of request—as called for by Annex 9 to the International Civil Aviation Organization (ICAO), to which Iraqis a party (specific talking points follow):

  o  Under international law every state is obliged to accept the return of all its respective nationals who are not eligible to remain in the United States, or any other country.
  o  Just as we are, Iraq is a party to the ICAO. Annex 9 of the Convention provides for the issuance of travel documents for a state's nationals within 30 days of a request.

**Background:**

FOR OFFICIAL USE ONLY

ICE - 0270495

FOR OFFICIAL USE ONLY

ERO has upgraded Iraq from uncooperative at risk of being uncooperative country regarding their compliance with ICE/ERO's attempts to procure travel documents (TDs) for Iraqi nationals who have been ordered removed from the U.S.

Due to the lack of cooperation from the Iraq Embassy, Washington, D.C. on this issue, ERO and the Department of State developed a strategy to request approval for final order cases directly from Baghdad. In February 2017, ERO received confirmation from the U.S. Embassy in Baghdad that Iraqi officials have approved the acceptance of a Special High Risk Charter flight containing eight Iraqi detainees. These cases were approved and were removed. On April 19, 2017, ICE successfully completed the charter flight to Iraq since 2010.

On March 12, 2017, the Department of State issued a cable which summarized the outcomes of a meeting between the U.S. Embassy, Baghdad and the Iraq Ministry of Foreign Affairs (MFA). MFA informed the embassy representatives that an Iraq Inter-ministerial Committee of Deportation was formed and is comprised of representatives from the Prime Minister's Office, the Ministry of Foreign Affairs (MFA), the Ministry of Justice (MoJ), and the Ministry of the Interior (MoI). The Committee had identified four necessary steps for Iraq to facilitate deportation:

- Consular access - MFA indicated that they would like to meet with those being removed at the point of embarkation from the U.S.
- Citizenship verification- MFA indicated that the MOI would review and verify the evidence of citizenship provided by the U.S. ICE could use evidence of citizenship obtained from U.S. information systems in lieu of passports or national identity cards
- Deportation order review- MFA indicated that the MOJ would review each deportation order in tandem with the citizenship verification process.
- Travel document issuance- the Committee is prepared to inform the Iraqi Embassy and Consulates to provide travel documents for the 1,400 non-detained Iraqi nationals.

On May 25, 2017, in preparation for a removal flight, ICE transmitted 280 travel document requests to the U.S. Embassy in Baghdad for submission to the inter-ministerial committee of deportation. The removal flight is scheduled to arrive in Bagdad on June 29, 2017 with no more than 75 Iraqi nationals with final orders of removal on board.
Since May 15, 2017, 213 Iraqi nationals subject to a final order of removal have entered ICE custody all but four have criminal convictions.

A list of 280 travel document requests were submitted by ICE to the U.S. Embassy in Baghdad during a period covering May 17, 2017 through June 6, 2017.  After a DOS review and follow up questions regarding several cases, DOS submitted all 280 cases with a Dip note to the Iraqi MFA on June 6, 2017.

ERO was notified on, June 21, 2017, that Iraq would not accept the charter scheduled to arrive on June 29, 2017.

On June 22, 2017, the U.S. District Court for the Eastern District of Michigan temporarily stayed the removal of 114 Iraqi nationals.

2

FOR OFFICIAL USE ONLY

FOR OFFICIAL USE ONLY

On June 26, 2017, the U.S. District Court filed a ruling expanding the June 22 order to apply to 1,400 similarly situated Iraqis with final orders nationwide.

On July 5, 2017, the district court heard oral argument on two motions filed by plaintiffs – (1) to expedite briefing for a preliminary injunction motion and extend the temporary restraining order, and (2) to permit expedited class discovery.

There are currently 280 Iraqi nationals in ERO custody, under a final order of removal. ICE is waiting for approval of diplomatic note for a charter when the nationwide moratorium is lifted. There are a total of fifteen Iraqi subjects that have asked to be removed from the class action lawsuit:

**Aliens removed from injunction and ICE is able to remove:**
- Al Shimary, Naser Abbas Habib - **Subject scheduled for removal January 30**
- Ibrahim, Wisam - **Pending removal scheduling.**
- Mirza Jwany - **Removal scheduled for January 25**
- Alzarkani, Bassam Arif - **Pending travel document**
- Dhahir Al Salman – **Pending travel document**
- Omar Al Talaqani – **Pending travel document**
- Rezgar Gundky – **Pending travel document**

**Aliens pending exclusion from injunction who have volunteered to be removed:**
- George Phillip Arthur –**Pending travel document**
- Al Bidairi - **Pending travel document**
- Al Kinani - **Pending travel document**
- Jafar Al Kurdi - **Pending travel document**
- Jimmy Al Daoud - **Pending travel document**
- Suhel Aesa - **Pending travel document**
- Yahya, Karwan - **Pending travel document**
- Ali Jaffar Saled – **New case, will submit travel document request**

The Iraqi Embassy in D.C. has jurisdictional responsibilities to issue travel documents for those Iraqi nationals under a final order in Alabama, Connecticut, Delaware, Florida, Georgia, Louisiana, Maine, Maryland, Massachusetts, Mississippi, New Hampshire, New Jersey, New York, North Carolina, Pennsylvania, Rhode Island, South Carolina, Tennessee, Vermont, Virginia and West Virginia.

Iraq is not a mandatory notification country.

Press:
This meeting is closed to the press.

Removal data as of December 23, 2018

3

FOR OFFICIAL USE ONLY

FOR OFFICIAL USE ONLY

**RCI data for Iraq** – Iraq is listed as "ARON" for FY2017 under the Removal Cooperation Initiative Tool.

- o  As of  FY2017 metrics note Iraq as considered "At Risk of being Uncooperative" with a Cooperation Score of 68.75 per below:
    - ▪ Grants Interview:  Yes –
    - ▪ Accepts Charters:  Yes – Charter Mission Meets Needs
    - ▪ Releases to Removals Ratio:  0.15
    - ▪ Average Time from Executable Final Order to Removal: 277.66 days

4

FOR OFFICIAL USE ONLY

FOR OFFICIAL USE ONLY

**FY12 to FY17YTD Removal Statistics for Iraq**

| Country | Total | | | | | |
|---|---|---|---|---|---|---|
| | FY2012 | FY2013 | FY2014 | FY2015 | FY2016 | FY2017 |
| Iraq | 33 | 62 | 57 | 36 | 48 | 58 |

**FY15-FY17 Average Length of Stay**

| Country | FY2015 | FY2016 | FY2017 |
|---|---|---|---|
| Iraq | 93 | 132.7 | 124 |

**Currently Detained and Non-Detained Final Order Cases**

| Country | Currently Detained and Non-Detained with Final Order | | | | | |
|---|---|---|---|---|---|---|
| | Detained Criminal | Detained Non-Criminal Immigration Violator | Total | Non-Detained Criminal | Non-Detained Non-Criminal Immigration Violator | Total |
| Iraq | 240 | 40 | 280 | 1000 | 120 | 1400 |

**FY12 –FY17 Zadvydas Releases**

| Country | FY2012 | FY2013 | FY2014 | FY2015 | FY2016 |
|---|---|---|---|---|---|
| Iraq | 7 | 14 | 38 | 18 | 4 |

**Attachments:** Profile on Deputy Chief of Mission, Eight Voluntary Deportee Histories
**Staff Responsible for Briefing Memo:** *Julius Clinton, DDO, RIO,* ████████████████

**Iraqi Embassy**
· Mohamed Alquraishi, DCM
· Yarub Al-Anpaqi, First Secretary
· Wathiq Alhammam, First Secretary
· Ahmed Utaifa, Second Secretary

**DHS HQ**
· Ken Holt, Director for Middle East Affairs
· Alex Kisselburg, Deputy Director for Middle East Affairs
**ICE**
· John Schultz, Deputy Assistant Director
· Michael Bernacke, Unit Chief
· Julius Clinton, Detention and Deportation Officer

5

FOR OFFICIAL USE ONLY

FOR OFFICIAL USE ONLY

**Department of State**
- Derek Hoffman, Political Unit Chief
- Kris Clark, Political Officer
- David Nobles, Deputy Director

6

ICE - 0270500