# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

| | |
|---|---|
| **USAMA J. HAMAMA**, et al.,<br>Petitioners and Plaintiffs, | Case No. 17-cv-11910 |
| v. | Hon. Mark A. Goldsmith<br>Mag. David R. Grand |
| **REBECCA ADDUCCI**, et al.,<br>Respondents and Defendants. | Class Action |

# PETITIONERS' REPLY BRIEF ON RENEWED MOTION FOR PRELIMINARY INJUNCTION UNDER *ZADVYDAS*

## I.    Introduction

We have been down this road before. When the *Zadvydas* motion was first filed, Respondents claimed that "but for the stay", ECF 158, PgID 4103-04, ICE would remove Petitioners. Yet almost a year later, Iraq has issued travel documents for only a handful of involuntary returnees.[1] Undeterred, Respondents again claim that "ICE expects to receive TDs for all individuals that ICE has requested to be removed." Schultz Decl. ¶ 52, ECF 410-4, Ex. A. Tellingly, there is no timeframe.

The past year has shown three things. First, the government is a poor predictor. Second, while no one knows for sure what Iraq will do, so far Iraq has slow-walked, only occasionally doling out a few documents in response to intense pressure. Third, incarceration based on guesses about Iraqi policy imposes tremendous human costs. *See* Ex. 3, Brané Decl. It remains just as uncertain if or when most detainees can be repatriated as when they first sought *Zadvydas* relief. The only difference is that they have spent almost another year behind bars.

The government does not dispute that the length of time Petitioners have been incarcerated means that what counts as the "reasonably foreseeable future" is

---

[1] Respondents' predictions failed not just for the class, but also for individuals. For example, class member Jomaa Al Essa was denied relief on his habeas petition after the government filed a declaration from James Maddox stating that although ICE had not yet gotten travel documents, ICE "believe[s] that Iraq will issue a travel document for Mr. Al Essa." Ex. 4, Maddox Decl.; *Al-Essa v. Sessions*, Case No. 17-cv-12490 (D. Mass. June 22, 2018). Mr. Al Essa was released approximately 90 days after this Court lifted the stay of removal, presumably because Iraq refused his return. Ex. 1, Chron. ¶ 55.g.

now very short. *Zadvydas v. Davis*, 533 U.S. 678, 701 (2001). Nor does the government argue that there is a significant likelihood of removal for those fighting their immigration cases, nearly two-thirds of the *Zadvydas* subclass[2]; instead the government—recognizing that for them removal could be years away—argues that *Zadvydas* should not apply. Only for those who have agreed to removal or have exhausted appeals do Respondents even argue the reasonable foreseeability of removal. Both Respondents' factual argument (that Iraq is now likely to speedily accept forced repatriations of those who are removable) and Respondents' legal argument (that those pursuing immigration relief can be indefinitely detained) fail.

## II.    Respondents Have Failed to Rebut Petitioners' Showing That Removal is Not Significantly Likely in the Reasonably Foreseeable Future.

Iraq's 18-month on-again-off-again approach is comprehensively described in Petitioners' opening brief, with dozens of exhibits and a detailed chronology, now updated by Exhibit 1. The facts themselves are largely undisputed: Iraq has a long-standing policy against forced repatriations; there is no written repatriation agreement[3]; Iraq's position on repatriations is continually shifting; accomplishing

---

[2] There are at least 54 subclass members with active merits cases, and 9 with pending or not-yet-filed motions to reopen. Ex. 2, Schlanger Decl. ¶18, tbl. B.

[3] ICE characterizes the March 2017 cable summarizing a meeting with Iraq as an "agreement," but Iraq's subsequent actions made clear that it would not repatriate all its nationals with final U.S. removal orders. In June 2017, Iraq issued a blanket denial of dozens of requests for travel documents, on the basis that the individuals were not agreeing to their own repatriation. ECF 376, ¶20(h). And in June 2017, it declined to permit a charter flight to effectuate such removals. *Id.*

repatriations is an arduous, time-consuming, and uncertain process; Iraq has declined to grant the hundreds of travel documents requested through the summer of 2017; has denied documents for involuntary repatriations through the winter and spring of 2018; and in the time since—after intense diplomatic pressure—has issued documents for only 15 involuntary repatriates[4]. Moreover, even detainees with travel documents have sat in detention for months without being removed.[5]

The facts continue to evolve, but Iraq's stance towards repatriations remains as murky as ever. ICE has produced no persuasive evidence that Iraq will agree to any future involuntary repatriations, much less large-scale involuntary repatriations.[6] Moreover, as of September, Iraq is not granting *any* travel documents until

---

¶20(u). Over subsequent months, Iraq continued to decline to allow the repatriation of non-volunteers. *Id.* ¶¶22-23, 27-35.

[4] ECF 376-2, ¶¶ 19-24, 25-37, 43; Ex. 1, Chron. ¶ 56.

[5] Ex. 1, Chron. ¶ 60.

[6] Deputy Assistant Director Schultz states, "It was communicated to me on July 2, 2018 by the Iraqi Ambassador, the Deputy Chief of Mission, and the First Secretary that the Iraqi Government expects to issue TDs for all individuals it determines to be Iraqi nationals, regardless of whether they state they wish to return to Iraq voluntarily." Schultz Dec. ¶45, ECF 410-4, Ex, A. Unit Chief Bernacke uses nearly identical language. Bernacke Dec. ¶17, ECF 410-4, Ex. B. But this hearsay statement omits *who* so "communicated" and what that person said. There is no timeframe for the cited "expect[ation]," and no reason to believe it will prove truer than ICE's similar "expectations" a year ago, when—the record makes crystal clear—Iraq was unwilling to allow involuntary repatriations. ECF 376-2, ¶¶ 27-37. And Schultz and Bernacke's declarations are contradicted by their prior, far more specific, testimony to the contrary. *Id.*, at ¶50-51. Affidavits contradicting earlier deposition testimony can themselves merit sanctions. *Cf. Trustees of Plumbers & Steamfitters Local Union No. 43 Health & Welfare Fund v. Crawford*, 573 F.Supp.2d 1023, 1039 (E.D. Tenn. 2008); *Rogers v. AC Humko*

presented with a travel itinerary—which offers no guarantee of actual removal.[7] This change appears to reflect the significant obstacles to removal even *after* travel documents issue. Ex. 1, Chron. ¶¶ 59-63. Since mid-August, more detainees have seen scheduled repatriations cancelled than completed. *Id.* at ¶61. In sum, Petitioners have been held long past the presumptive six months. No one knows long it will be till they are removed, assuming they can be removed at all.

The central disagreement between the parties is not about what Iraq has done to date, but rather about what Iraq will do in the future, and whether prolonged detention is lawful in the face of great uncertainty. Petitioners believe Iraq will continue slow-walking its response to U.S. demands for speedier and more certain repatriations. Respondents hope that despite enormous obstacles to removal and Iraq's on-again-off-again approach, they will eventually be able to thread the removal needle. Respondents cannot dispute that *Zadvydas*'s presumptive six-month limitation will soon have passed thrice over, and they offer no prediction— much less a concrete timeframe—for when repatriation might occur. Their predictions also lack any specificity about whom Iraq will accept. Under *Rosales-Garcia v. Holland*, 322 F.3d 386 (6th Cir. 2003), the government must present actual evidence that repatriation will occur soon for specific individuals, not just

*Corp.*, 56 F.Supp.2d 972, 978-81 (W.D. Tenn. 1999).

[7] Under the new process, Iraq "pre-approves" detainees for removal, but does not issue a travel document until after ICE manages to schedule a detainee's flight. Ex. 1, Chron. ¶57; Ex. 7, ICE's Suppl. Interrog. Resp. ¶11.

speculation about the outcome of ongoing negotiations.[8] In the absence of a firm repatriation agreement, vague claims that Iraq will someday accept all Iraqi nationals are insufficient to justify further incarceration.

### III. Petitioners Have Structured the Relief to Allow For Detention if Respondents' Predictions About the Future Should Come True.

No one—not Petitioners, not Respondents, and not this Court—can know whether Iraq will eventually accept all of the detainees who ultimately lose their immigration cases. The government asks the Court to ignore that uncertainty, depriving over a hundred people of their liberty based on the government's hope that Iraq will succumb to U.S. demands. Petitioners' proposed relief, by contrast, is designed to account for the existing uncertainty and for the fact that Iraq is unlikely simply to jettison its long-held and principled opposition to involuntary repatriations but may—under pressure from the most powerful government on earth— occasionally dole out a travel document here or there to avoid sanctions.

The proposed relief thus allows detention if travel documents issue, and release under supervision where they do not. If Respondents' predictions come true, they get what they want: detention. But if Respondents' crystal ball is once again wrong, Petitioners will get what the law demands: release. The Court need

---

[8] Respondents seek to distinguish *Rosales-Garcia* because there the government did not contend petitioners' removal was reasonably foreseeable. But what matters is not the government's concession, but rather the Sixth Circuit's *finding*—that removal was not reasonably foreseeable because, despite continuing negotiations, petitioners were not "currently on a list of persons to be returned." *Id.* at 415.

not decide which scenario is more likely. Detention or release depends on what Iraq actually does, rather than what anyone predicts Iraq will do.

One modification to the prior request is, however, necessary. Respondents are now seeking travel documents for detainees who are still pursuing their immigration cases. ECF 410-4, Ex. A, Schultz Decl., ¶¶50-51; Ex. 2, Schlanger Decl., tbl. B.  Pre-order detainees should not languish in detention just because a travel document has issued, especially since that document expires after six months but the immigration cases take much longer.[9] ECF 138, PgID 36-38. To address this issue, Petitioners propose slightly edited relief (new language in italics):

> Order that members of the *Zadvydas* subclass who have been detained longer than six months be released under orders of supervision within 14 days unless Respondents by that date provide the Court individualized evidence that:
> a. ICE has *both a final order and* valid travel documents for the detainee; or
> b. There is another strong special justification for the individual's detention other than effectuating removal.

In addition, because recent evidence makes clear that Respondents are having difficulty repatriating detainees even *after* travel documents issue, any such detainee for whom the stay has lifted should be released if not removed within 30 days.

## IV.   Respondents' Arguments for Unlimited, Indefinite Detention Fail.

The government appears to concede that for the majority of the detainees

---

[9] Five detainees for whom ICE obtained travel documents have reopened their cases and no longer have final orders. Ex. 2, Schlanger Decl. tbl. B, row 9. They cannot be removed until their immigration proceedings conclude.

who are still fighting their cases, removal is not likely anytime soon; for them, the government's sole argument is a legal one—that *Zadvydas* should not apply at all. Respondents make two arguments: 1) there are *no* limits on detention for class members who have reopened their cases; and 2) there are *no* limits on detention for class members who remain covered by the stay of removal. Both arguments fail.

**A.  There Are Statutory and Constitutional Limits on Pre-Order Detention.**

Detainees who succeed in reopening their cases are less likely to be removed than those with final orders: they have proven that changed country conditions warrant reconsideration of their deportation orders, and cannot be removed unless they lose their reopened cases. Respondents, however, argue that although these detainees were covered by *Zadavydas* **before** they won reopening, their very success in immigration court means they can now be held indefinitely.

This Court has already found that *Zadvydas* applies to pre-order detainees:

> The Government's argument that there is not commonality because the *Zadvydas* framework only applies to §1231 detainees ignores that courts have extended *Zadvydas* to §1225(b), §1226(a), and §1226(c) detainees.

ECF 191, PgID 5351-52 (citations omitted). Moreover, as explained in Petitioners' opening brief, there are statutory limits to pre-order detention under §1226(a), which this Court has found to be the applicable detention authority for the vast majority of pre-order detainees. ECF 191, PgID 5341. Because §1226(a) contains the same permissive language that *Zadvydas* found ambiguous in §1231, Section

1226(a) must likewise be interpreted to require release if removal is not significantly likely in the reasonably foreseeable future. ECF 376, PgID 8546-47.

Respondents, in arguing that *Jennings v. Rodriguez*, 138 S.Ct. 830 (2018), forecloses such an interpretation, make claims about §1226 as a whole, without acknowledging the linguistic difference between §1226**(a)** and §1226**(c)** and without disclosing that their *Jennings* quotations relate almost entirely to §1226**(c).**[10] True, *Jennings* read §1226**(c)** to mandate detention. But Petitioners are held under §1226**(a)**, not §1226**(c)**. Respondents' one *Jennings* reference to §1226(a)—which states that §1226(a) does not hint that detention length is relevant to the frequency of bond hearings—relates to the lower court's decision to impose repeated bond hearings. 138 S.Ct. at 848. *Jennings* simply did not discuss whether §1226(a) can be read to incorporate an implicit limit based on foreseeability of removal. What *Jennings* did do, however, is reemphasize that "the key statutory provision in *Zadvydas* said that the aliens in question 'may,' not 'shall,' be detained." *Id.* at 850. Because §1226(a) uses the word "may," it must likewise be interpreted as authorizing detention only so long as removal is significantly likely.

---

[10] For example, Respondents—omitting key parts of the quotation—misleadingly suggest that *Jennings* reads *all* of §1226 as requiring mandatory detention, when of course detention under §1226(a) is discretionary. The actual sentence reads: "And together with §1226(a), §1226(c) makes clear that detention of aliens within its scope *must* continue 'pending a decision on whether the alien is to be removed from the United States.' §1226(a)." Jennings, 138 S.Ct. at 846. The Supreme Court was describing §1226**(c)**, not §1226**(a)**, as mandatory.

Even if, however, one interprets §1226(a)'s permissive language as mandating detention regardless of the likelihood of removal, that still leaves the constitutional problem, a problem that Respondents studiously avoid. As the Third Circuit recently held, "[w]e see no substantial distinction between the liberty interests of aliens detained under §1226(a) and §1231(a)(6)." *Guerrero-Sanchez v. Warden York County Prison*, -- F.3d --, 2018 WL 4608970 at *11 (3d Cir. 2018) (Ex. 6). *See also Diouf v. Napolitano*, 634 F.3d 1081, 1087 (9th Cir. 2011) ("Regardless of the stage of the proceedings, the same important interest is at stake—freedom from prolonged detention."). Or, as this Court said: "the length of the detention—not the stage of the proceeding—drives the constitutional concern." ECF 191, PgID 5341 (citation omitted). Immigration detention, whether pre- or post-order, is only reasonably related to its purpose—removal—if removal is in fact likely fairly soon.

## B. Statutory and Constitutional Limits on Detention Do Not Disappear Simply Because Petitioners Are Fighting Their Removal.

Respondents argue that the *Zadvydas* clock does not start if there is a legal impediment to removal: Petitioners can be incarcerated for however many more months or years it takes until ICE can freely remove them. Respondents' argument is much broader than this Court's stay of removal. Some class members with final orders have sought stays from the BIA and Courts of Appeals, and many more would likely do so should the Sixth Circuit lift this Court's stay. Class members who reopen their cases no longer have an executable final order. According to

Respondents, when immigrants succeed in staying removal to fight their cases, the price of that success is incarceration for however long it takes until they exhaust all their options for immigration relief.

The Sixth Circuit rejected that idea in *Ly v. Hansen*, 351 F.3d 263 (6th Cir. 2003). The Court focused on the reasonableness of detention in relation to the purpose of civil immigration detention, namely facilitating removal, and held that detention is permissible only "for a time reasonably required to complete removal proceedings in a timely manner." *Id.* at 268. Moreover, a person

> cannot be [indefinitely] detained merely because he seeks to explore avenues of relief that the law makes available to him. Further, although an alien may be responsible for seeking relief, he is not responsible for the amount of time that such determinations may take. The mere fact that an alien has sought relief from deportation does not authorize the INS to drag its heels indefinitely in making a decision. The entire process, not merely the original deportation hearing, is subject to the constitutional requirement of reasonableness.

*Id.* at 272. As this Court found here, securing the stay of removal was a "bona fide effort[] to utilize the tools the law affords." ECF 191, PgID 5334 n.7.

*D'Alessandro v. Mukasey*, 628 F.Supp.2d 368, 386, 404 (W.D.N.Y. 2009), relying on *Ly*, rejects exactly this argument:

> Respondents cite no convincing authority that an application for a stay "acts as a temporary waiver of constitutional due process protections so as to permit the Government to forego the statutory and regulatory procedures for justifying continued detention" . . . . [or] that an alien seeking to avail himself of legal remedies, which he is entitled to pursue, has locked the keys to his own cell.

Similarly, *Oyedeji v. Ashcroft*, 332 F.Supp.2d 747, 753-54 (M.D. Pa. 2004), held

10

that the existence of a stay "does not undermine the bedrock principle that there must be a 'special justification' outweighing the alien's constitutionally-protected interest in liberty" to justify prolonged detention. *See Guerrero-Sanchez*, 2018 WL 4608970 at *9 (detaining immigrant who "pursu[ed] his bona fide withholding-only claim 'would effectively punish him for pursuing applicable legal remedies'"); *Abudulle v. Gonzales*, 422 F.Supp.2d 774, 779 (W.D. Tex. 2006).

Oddly, the government relies on *Diouf v. Mukasey*, 542 F.3d 1222 (9th Cir. 2008), which held that pursuing legal relief and obtaining a stay of removal do *not* toll the removal period.[11] Section 1231(a)(1)(C)'s language suspending the removal period for "acts to prevent the alien's removal" applies "only to intentionally obstructionist, bad faith tactics that are designed to frustrate the government's attempts to effectuate a removal order, not to an alien's good faith attempt to make use of legally available judicial review and remedies." *Id.* at 1232. *See Prieto-Romero v. Clark*, 534 F.3d 1053, 1061 n.7 (9th Cir. 2011) (because §1231(a)(1)(C) language is mirrored in a penalty provision, adopting government's interpretation

---

[11] The other cases cited by Respondents likewise support Petitioners or are unpersuasive, particularly compared to the reasoning in *D'Alessandro* and *Oyedeji*, both of which apply *Ly* to find that stays of removal do not stop the *Zadvydas* clock. *Hechavarria v. Sessions*, 891 F.3d 49, 56 n.6 (2d Cir. 2018), expresses great skepticism, based on *Ly*, that a stay would preclude *Zadvydas* relief. The language in *Akinwale v. Ashcroft*, 287 F.3d 1050, 1052 n.4 (11th Cir. 2002) is dicta, and the situation there—where a habeas was filed *before* six months elapsed—is unlike that here where ICE had years during which no stay was in effect but it was unable to effectuate removal. And *Abimbola v. Ridge*, 181 F. App'x 97 (2d Cir. 2006)—an unpublished opinion on a pro se appeal—is unpersuasive.

would condition judicial review on payment of a $500/day penalty); *Martinez v. Gonzales*, 504 F.Supp.2d 887, 898 (C.D. Cal. 2007) (nothing in §1231(a)(1)(C) "suggests that an alien's exercise of his right to seek judicial review of an order of removal qualifies as 'conspiring or acting to prevent' his removal").

Respondents also argue—based on this Court's prior decision that removal can be reasonably foreseeable "where the only impediment to removal is the litigation process, which has a definite endpoint," ECF 191, PgID 5334—that the Court has condoned unlimited detention. That ruling was made six months into Petitioners' detention. Now, 16 months in, the calculus has changed: "for detention to remain reasonable, as the period of prior postremoval confinement grows, what counts as the 'reasonably foreseeable future' [has] to shrink." *Zadvydas*, 533 U.S. at 701. The longer detention goes on, the more divorced it becomes from its ostensible civil purpose: facilitating removal. While Petitioners' immigration cases do have a definite endpoint, *Ly* makes clear that when litigation takes too long, continued detention during the pendency of that litigation becomes unreasonable. *Ly*, 351 F.3d at 269 ("[T]he time of incarceration is limited by constitutional considerations, and must bear a reasonable relation to removal.").[12]

---

[12] This Court previously looked to *Soberanes v. Comfort*, 388 F.3d 1305 (10th Cir. 2004), and *Casas-Castrillon v. Dep't of Homeland Sec.*, 535 F.3d 942 (9th Cir. 2008), both of which concerned detention while a petition for review of a final order was pending in the Court of Appeals, a circumstance with an "evidently *impending* termination point." *Soberanes*, 388 F.3d. at 1311 (emphasis added). As

## V.   Petitioners Have Standing to Challenge Their Detention.

Respondents' argument—that Petitioners lack standing to challenge their de-
tention because most (but not all) had bond hearings and therefore any injury is
traceable to immigration judges not to Respondents—is meritless.[13] Respondents
are the jailers here, and have the keys. Immigration judges can order ICE to release
the detainees—provided this Court's bond order is not reversed. But ICE can act
on its own, too. Respondents' refusal to release detainees, though their removal is
not reasonably foreseeable, is the cause of the injury. As this Court said: "A bond
hearing provides an *opportunity* for release." In contrast, "*Zadvydas*, after a finding
that there is no significant likelihood of removal in the reasonably foreseeable

---

the Tenth Circuit recognized, even at that late stage of a case, the time until compl-
etion of proceedings affects the legality of detention. *Id.* ("[W]e can only presume
that the Ninth Circuit's decision on the petition for review will be forthcoming in
due course; at this point we have no occasion to express any opinion on whether
subsequent delay in that court might warrant remedial action under *Zadvydas*.").
Most detainees here are at much earlier stages of very protracted proceedings,
which require first a motion to reopen, with potential appeals to the BIA and
Courts of Appeals, and then adjudication of the merits, again with potential
appeals. The end point is not "impending," but rather may be years away. The
Sixth Circuit has made clear that detainees are not responsible for the slow pace of
immigration proceedings; if those proceedings are not concluded in a reasonable
time, release is required. *Ly*, 351 F.3d at 2670-72.

[13] Respondents argue that bond hearings eliminate the need for *Zadvydas* relief,
but that is not true, as is evident from the fact that class members remain detained.
Even for those class members who were released on bond, their situation remains
precarious as Respondents are simultaneously seeking reversal of this Court's bond
order. They too are covered by Petitioners' motion; under *Rosales-Garcia*, 322
F.3d at 396, a released detainee facing redetention can bring a *Zadvydas* claim
because he is "threatened with an actual injury traceable to [ICE]."

future, *requires* that release be granted in order to prevent further unlawful confinement." ECF 345, PgID 7885 (emphasis added). Thus, bond hearings do not affect the *Zadvydas* analysis. If prolonged detention is not reasonably related to its purpose—ensuring availability for removal in the reasonably foreseeable future—then it is simply not authorized.

Finally, Respondents argue that "to the extent that Petitioners take issue with the IJ's determination in their bond hearings, they should be required to exhaust such a claim" through administrative appeals. ECF 410-1, PgID 9656. Petitioners are not asking this Court to review bond decisions, but rather to decide whether Respondents must release them under *Zadvydas*, a question that the immigration judges did not even consider, that Petitioners accordingly cannot appeal administratively,[14] and that, to the extent it involves constitutional considerations, the BIA may have no jurisdiction to decide.[15] *Sterkaj v. Gonzales*, 439 F.3d 273, 279 (6th Cir. 2006). The idea that Petitioners should have exhausted on issue A (bond) before they sought habeas relief on issue B (*Zadvydas*), even though the legal issues are different and there is no review available for issue B, is nonsense.

---

[14] There is no mechanism for Petitioners to seek review of ICE's decision that they are not eligible for release under *Zadvydas*. While post-order detainees are entitled to post order custody reviews—which only some received and which "were not undertaken in good faith," ECF 191, PgID 5345, n.12—there is no mechanism to appeal POCR decisions. Pre-order detainees do not receive POCRs.

[15] *See McCarthy*, 503 U.S. at 147-48; *Soberanes*, 388 F.3d at 1310; *Baidas v. Jennings*, 123 F.Supp.2d 1052, 1057 (E.D. Mich. 1999); *Kelly v. Farquharson*, 256 F.Supp.2d 93, 99-100 (D. Mass. 2003).

Even if administrative remedies existed that Petitioners could exhaust, because there is not statutory exhaustion requirement, exhaustion is merely prudential. Courts must therefore "balance the interest of the individual in retaining prompt access to a federal judicial forum against countervailing institutional interests favoring exhaustion." *McCarthy v. Madigan*, 503 U.S. 140, 146 (1992). Whether to require exhaustion "is a matter of sound judicial discretion." *Bangura v. Hansen*, 434 F.3d 487, 494 (6th Cir. 2006). *Phan v. Reno* is directly on point:

> It is true that the general policies underlying the exhaustion doctrine—to avoid premature interruption of the administrative process and to allow executive agencies to exercise their discretionary authority—would counsel in favor of an exhaustion requirement were the Court being asked to review discretionary determinations by the INS or other administrative findings of fact. But this is not what petitioners ask us to do. Rather, they ask us to decide whether their continued detention is lawful under applicable statutes and the Fifth Amendment. No administrative proceeding exists to consider these issues. Under the circumstances, no exhaustion requirement should be imposed.

56 F.Supp.2d 1149, 1153 (W.D. Wash. 1999) (en banc) (citations omitted).

## CONCLUSION

Because Petitioners have provided good reason to believe their removal is not significantly likely in the reasonably foreseeable future, and Respondents have failed to rebut that showing, Petitioners ask that the Court grant the requested relief, as modified above.

Respectfully submitted,

Michael J. Steinberg (P43085)
Bonsitu A. Kitaba (P78822)
Miriam J. Aukerman (P63165)
ACLU FUND OF MICHIGAN
2966 Woodward Avenue
Detroit, Michigan 48201
(313) 578-6814
msteinberg@aclumich.org

/s/Kimberly L. Scott
Kimberly L. Scott (P69706)
Wendolyn W. Richards (P67776)
Cooperating Attorneys, ACLU Fund
  of Michigan
MILLER, CANFIELD, PADDOCK
  & STONE, PLC
101 N. Main St., 7th Floor
Ann Arbor, MI 48104
(734) 668-7696
scott@millercanfield.com

Nora Youkhana (P80067)
Nadine Yousif (P80421)
Cooperating Attorneys, ACLU Fund
  of Michigan
CODE LEGAL AID INC.
 27321 Hampden St.
Madison Heights, MI 48071
(248) 894-6197
norayoukhana@gmail.com

María Martínez Sánchez (NM
Bar126375)
ACLU OF NEW MEXICO
1410 Coal Ave. SW
Albuquerque, NM 87102
msanchez@aclu-nm.org

Judy Rabinovitz (NY Bar JR-1214)
Lee Gelernt (NY Bar NY-8511)
ACLU FOUNDATION
  IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2618
jrabinovitz@aclu.org

Margo Schlanger (P82345)
Cooperating Attorney, ACLU Fund
  of Michigan
625 South State Street
Ann Arbor, Michigan 48109
734-615-2618
margo.schlanger@gmail.com

Susan E. Reed (P66950)
MICHIGAN IMMIGRANT RIGHTS
  CENTER
3030 S. 9th St. Suite 1B
Kalamazoo, MI 49009
(269) 492-7196, Ext. 535
Susanree@michiganimmigrant.org

Lara Finkbeiner (NY Bar 5197165)
Mark Doss (NY Bar 5277462)
INTERNATIONAL REFUGEE
  ASSISTANCE PROJECT
Urban Justice Center
40 Rector St., 9th Floor
New York, NY 10006
(646) 602-5600
lfinkbeiner@refugeerights.org

David B. Johnson (Ill. 6186478)
Cooperating Attonry, ACLU Fund of MI
573 Hawksnest Drive
South Haven, MI 49090
(616) 302-5226
Notworking2012@gmail.com


*Attorneys for All Petitioners and Plaintiffs*

William W. Swor (P21215)
WILLIAM W. SWOR
 & ASSOCIATES
1120 Ford Building
615 Griswold Street
Detroit, MI 48226
wwswor@sworlaw.com

*Attorney for Petitioner/Plaintiff Usama Hamama*

Dated: October 26, 2018

## **CERTIFICATE OF SERVICE**

I hereby certify that on October 26, 2018, I electronically filed the foregoing papers with the Clerk of the Court using the ECF system which will send notification of such filing to all ECF filers of record.

By: */s/Kimberly L. Scott*
Kimberly L. Scott (P69706)
Cooperating Attorneys, ACLU Fund of Michigan
MILLER, CANFIELD, PADDOCK
 & STONE, PLC
101 N. Main St., 7th Floor
Ann Arbor, MI 48104
(734) 668-7696
scott@millercanfield.com

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**USAMA J. HAMAMA**, et al.,
Petitioners and Plaintiffs,

Case No. 17-cv-11910

v.

Hon. Mark A. Goldsmith
Mag. David R. Grand

**REBECCA ADDUCCI**, et al.,
Respondents and Defendants.

Class Action

INDEX OF EXHIBITS
TO PETITIONER/PLAINTIFF' REPLY BRIEF ON
RENEWED MOTION FOR PRELIMINARY
INJUNCTION UNDER *ZADVYDAS*

| Exhibit 1 | Updated Chronology |
| --- | --- |
| Exhibit 2 | Declaration of Margo Schlanger, dated October 12, 2018 |
| Exhibit 3 | Declaration of Michelle Brané, dated November 2, 2017 |
| Exhibit 4 | Declaration of James Maddox, dated June 22, 2018<br>*Al Essa v. Sessions*, 1:17-cv-12490 (D. Mass) (ECF 36-2) |
| Exhibit 5 | Email from C. Alsterberg, dated September 19, 2018<br>*PII Redacted Pursuant to Fed. R. Civ. P. 5.2 and ECF 338* |
| Exhibit 6 | *Guerrero-Sanchez v. Warden York County Prison*, -- F.3d --,<br>2018 WL 4608970 at *11 (3d Cir. 2018) |
| Exhibit 7 | Respondent ICE's Supplemental Responses to Interrogatory,<br>dated October 5, 2018 |
| Exhibit 8 | Respondent ICE's Supplemental Responses to Interrogatory<br>No. 6, dated October 5, 2018<br>*PII Redacted Pursuant to Fed. R. Civ. P. 5.2 and ECF 338* |

Exhibit 9          Intentionally left blank

Exhibit 10         Respondent DHS's Supplemental Responses to Interrogatory,
                   dated October 5, 2018

# EXHIBIT 1

# CHRONOLOGY SUPPLEMENT

This document supplements/updates the Chronology attached to Petitioners' Renewed Motion for a Preliminary Injunction under *Zadvydas*, ECF 376-2, in light of new and newly-revealed facts. In order to preserve consistency in citation, it begins with ¶ 54, where the original chronology left off.

## JOMAA AL ESSA

54. On May 23, 2018, the government of Iraq conducted numerous consular interviews of detainees at the Stewart Detention Center, in Lumpkin, Georgia. See Chron. ¶¶ 38-40, ECF 376-2, PgID 8598-99. As previously described, Iraq fairly quickly issued travel documents for those detainees who signed a form acquiescing to their own removal, and then over a month later, issued travel documents for six individuals who declined to so acquiesce. See Chron. ¶¶ 41-43, ECF 376-2, PgID 8599-600. There were several additional individuals for whom Iraq declined to issue travel documents based on Iraq's doubts about their nationality. Among these was Jomaa Al Essa.

55. For Mr. Al Essa, the events unfolded as follows:

    a. May 23, 2018: After Iraqi officials interviewed Mr. Al Essa, they "request[] additional identity and or family documents" in support of ICE's claim that he is an Iraqi national. Detention and Deportation Officer (DDO) James Maddox emails responsive information "[s]hortly thereafter." Ex. 4, Maddox Decl. ¶ 6.

    b. June 8, 2018: The Iraqi government declines to issue travel documents for several class members, continuing to review those travel document requests. Among this group is Mr. Al Essa. *Id.* at ¶ 7.

    c. June 14, 2018: This Court lifts the stay of removal as to Mr. Al Essa, by stipulation. ECF 309.

    d. June 15 and June 22, 2018:

            Iraq Embassy continues to have concerns about Mr. Al Essa's nationality, telling ICE that "he was Bidoon." ICE

1

provides Iraq with additional information about Mr. Al Essa, from his father's A-file, and also provides contact information for his father. Ex. 8, Respondent ICE's Supplemental Responses to Interrogatory No. 6, dated October 5, 2018; Ex. 4, Maddox Decl. ¶ 9.

e. June 26, 2018: ICE opposes Mr. Al Essa's habeas petition in the U.S. District Court for the District of Massachusetts with a sworn declaration by Mr. Maddox that, "[b]ased upon this officer's experience and expertise, information obtained from other individuals employed by ICE, and information obtained from DHS records, I believe that Iraq will issue a travel document for Mr. Al Essa." Ex. 4, Maddox Decl. ¶ 10.

f. July 13, 2018: As previously described (ECF 376-2, PgID 8600, Chron. ¶ 43) Iraq issues travel documents for several individuals who had declined to sign the Iraqi "volunteer" form. Iraq does *not*, however, issue a travel document for Mr. Al Essa. Ex. 2, Schlanger Decl. ¶ 13.

That same day, ICE wins an order dismissing Mr. Al Essa's individual habeas case. Although that order apparently was not final (the docket shows a second dismissal order dated September 7, 2018), the habeas docket contains no filing by the government informing the court that Iraq had approved other travel documents but not the ones at issue.

g. Sept. 19, 2018: In its biweekly disclosure, ICE notes that Mr. Al Essa has been released from detention. *See* Ex. 5, Email dated September 19, 2018 (noting that Mr. Al Essa is no longer in detention and not listed as removed). The release occurred approximately 90 days after this Court lifted the stay of removal for Mr. Al Essa. Evidently, travel documents were not forthcoming and on that basis he was released from ICE custody. Ex. 2, Schlanger Decl. ¶¶ 14-16; Ex. 7, Respondent ICE's Supplemental Responses to Interrogatory No. 10, dated October 5, 2018.

2

## FACTUAL DEVELOPMENTS IN SEPTEMBER 2018

56. In early September, 2018, Iraq issued travel documents for each of the 16 class members whose consular interviews had been conducted on June 28 and July 19. *Id.* at ¶ 8. This included 7 who, when asked by Iraqi officials, apparently acquiesced in their own removal and 9 who did not. See *Id.* at ¶ 9. Adding these to the travel documents issued previously, this means that as of today, October 12, 2018, Iraq has issued 63 travel documents for class members since the beginning of the case. (*See* ECF 376-2, PgID 5600, ¶ 44 for the earlier tally.) Of these, 13 class members—15 Iraqis altogether—for whom travel documents have issued are known to have declined to acquiesce to their own removal. Ex. 2, Schlanger Decl. ¶ 9.

57. ICE has disclosed that in September ICE and Iraq shifted the travel document process. As ICE has explained it, "Beginning with the September 2018 interviews, the GOI will either pre-approve a travel document or refuse to issue a travel document. If the GOI determines an individual is approved for a travel document, it emails ICE to inform them of its preapproval. ICE will then secure a travel itinerary for the individual and provide it to the GOI before the GOI will issue a travel document." Ex. 7, Respondent ICE's Supplemental Responses to Interrogatory at No. 1(a)(6), dated October 5, 2018.

58. On September 6, 2018, Iraqi consular officials conducted 23 additional interviews of Iraqi nationals at the York County Prison—20 of them class members. Per the new protocol, Iraq has not issued travel documents for any of those interviewees. ICE has, however, listed all but two of them as "approved" by Iraq on October 2, 2018.   Ex. 8, Respondent ICE's Supplemental Responses to Interrogatory No. 6, dated October 5, 2018. Because no other relevant documents have been produced in discovery to date, precisely what this means is unclear.

## THE PRESENT: ICE's DIFFICULTY REPATRIATING EVEN INDIVIDUALS WITH TRAVEL DOCUMENTS SEEMS TO BE GROWING

59. At the end of August 2018, it was already clear that even for individuals who have agreed to removal and for whom Iraq has issued travel documents, ICE's removal capabilities were limited. *See* ECF 376-2, PgID 5600, ¶ 44. Now, mid-October, this issue has grown much more severe, as detailed in this section.

60. To update ¶ 44 of the original chronology, there have now been 39 repatriatable class members (class members for whom the Court has lifted the stay of removal). As of today (October 12, 2018), there have been only 19 class member removals, one of these in violation of the Court's stay of removal. (See *id.* for details about this tally.) There are 16 class members for whom there is *both* no legal impediment to removal *and* who either have travel documents (14) or "pre-approval" for such documents (2). Ex. 2, Schlanger Dec., Table A. The amount of time they have been waiting in detention for removal varies—but for some, it has been over nine months since the stay of removal was lifted *and* over four months since travel documents were issued. *See id.*

61. Since the Court in June ordered Respondents to share information on scheduled removal dates, ECF 316 and 389, it has become apparent that ICE faces significant hurdles to repatriation even after it obtains travel documents. Between mid-August (the date of the data underling the first Chronology) and early October (the date of the data underlying this update), ICE has repatriated just *two* class members. By contrast, there are currently *four* class members in detention whose flights were cancelled. Each member of this latter group has travel documents and no stay of removal. Nonetheless, they evidently could not be repatriated, and continue to be detained awaiting ICE's next attempt. *See* Ex. 2, Schlanger Dec., Table A.

62. ICE has itself recently emphasized how difficult scheduling is, explaining for example, that Iraqi deportees and escorting officers must transit through third countries to reach Iraq, and therefore need transit visas, which "are generally limited in time and duration, often only permitting a single entry during a very specific period of time." Ex. 7, Respondent ICE's Supplemental Responses to Interrogatory, dated October 5, 2018. 1.h.

63. It seems that ICE has not successfully set a travel itinerary for any of the September interviewees: the travel documents are denoted "approved" rather than "issued" in the information disclosed October 2, 2018. Ex. 8, Respondent ICE's Supplemental Responses to Interrogatory No. 6, dated October 5, 2018. In addition, under ECF 316 and 389, ICE is obligated to disclose to Petitioners both receipt of travel documents and travel itineraries. No such disclosures have been made with respect to any detainee who was interviewed later than June. Ex. 2, Schlanger Decl. ¶ 12.

# EXHIBIT 2

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

**USAMA JAMIL HAMAMA, et al.,**
　　　Petitioners/Plaintiffs,

**v.**

**REBECCA ADDUCCI, et al.,**
　　　Respondents/Defendants.

Case No. 2:17-cv-11910
Hon. Mark A. Goldsmith
Mag. David R. Grand

Class Action

## SIXTH DECLARATION OF MARGO SCHLANGER

I, Margo Schlanger, hereby make this declaration based upon my own personal knowledge; if called to testify, I could and would do so competently as follows:

### Qualifications and Sources of Information

1. My qualifications and background are fully set out in my first declaration in this case, dated November 6, 2017, ECF 138-2, PgID 3402 ¶¶ 2-4. As it says, I am the Wade H. and Dores M. McCree Collegiate Professor of Law at the University of Michigan Law School, and counsel for all Petitioners/Plaintiffs. I have been designated class counsel, as well. ECF 191, PgID 5360 ¶ 1(d); ECF 404, PgID 9567.

2. This declaration is based primarily on: the Respondents' court-ordered disclosures; the Respondents' answers to Petitioners' discovery requests (both interrogatories and requests for production); the Department of Justice Executive Office for Immigration Review (EOIR) 1-800 immigration case hotline; and the U.S. Immigration and Customs Enforcement (ICE) online detainee lookup system. All sources are referenced where used.

3. Under this Court's orders, Respondents disclose information on class member detention location and immigration case progress every two weeks. The most recent disclosure was made October 3, 2018 and was current as of September 27, 2018 (for the EOIR data) and September 29, 2018 (for the ICE data).

4. Except when otherwise noted, this declaration is based on information about the primary class, which includes all Iraqi nationals in the United States who had final orders of removal at any point between March 1, 2017 and June 24, 2017 and who have been, or will be, detained for removal by U.S. Immigration and Customs Enforcement. ECF 191, PgID 5347-48; ECF 404, PgID 9569. When I refer more specifically to the *Zadvydas* subclass, I am using the definition certified by this Court: "All Primary Class Members, who are currently or will be detained in ICE custody, and who do not have an open individual habeas petition seeking release from detention." ECF 191, PgID 5348. Based on monitoring of PACER entries using the names of class members, I am aware of ten detained members of the primary class who are not members of the subclass because they have open individual habeas petitions.

5. This declaration deals with three topics: travel documents and repatriation efforts; the situation of a particular class member, Jomaa Al Essa; and the status of the class members as far as travel documents, this Court's stay of removal, and the procedural progress of their immigration cases.

**Travel documents and Repatriations**

6. There have been 39 repatriatable primary class members (class members for whom the Court has lifted the stay of removal). As of October 12, 2018, ICE has disclosed only 19 class member removals, one in violation of the Court's stay of removal.  (In addition, this Court approved one individual's waiver of the stay of removal, ECF 85, even before entering the July 24 preliminary injunction.)

7. There are currently 16 primary class members for whom there is *both* no legal impediment to removal *and* who either have travel documents (14) or whom ICE has disclosed Iraq has "approved" for travel documents, without actually issuing a laissez-passer (2). The amount of time they have been waiting in detention for removal varies—but for some, it is over nine months since the stay of removal was lifted *and* over four months since travel documents were issued.  This is detailed in Table A, below.

8. The Court—first on June 20 for class members and then on September 7 for others—has ordered Respondents to provide ongoing disclosure when Iraq issues travel documents for any Iraqi national, within one business day. ECF 316, 389. In addition, ICE's responses to two sets of interrogatories have revealed additional information about travel document requests and

Iraqi responses to them. Together, these disclosures show that in early September 2018, Iraq issued travel documents for each of the 16 class members whose consular interviews had been conducted on June 28 and July 19. ICE had previously provided the information that 7 of these, when asked by Iraqi officials, apparently acquiesced in their own removal and 9 did not.

9. Adding these to the travel documents issued previously, this means that as of today, October 12, 2018, Iraq has issued 63 travel documents for class members since the beginning of the case. Of these, 13 class members—15 Iraqis altogether—for whom travel documents have issued are known to have declined to acquiesce to their own removal.

10. ICE notified Petitioners of 23 additional consular interviews conducted September 6, 2018, at the York County Prison, in Pennsylvania. No travel documents have been issued (so far as has been disclosed) for any of these individuals. Instead, ICE has provided the information that, for two of them (one of them a class member), Iraq has denied travel documents, and for the other 21 (19 of them class members), has "pre-approved" travel documents. According to ICE disclosures, that "pre-approval" is a new approach to these attempted repatriations; the next step is for ICE to secure a travel itinerary, at which point it can return to Iraqi officials and seek a travel document.

11. The Court in June ordered Respondents to disclose estimated removal dates for Iraqi nationals. ECF 316; ECF 389. As a result, we are now able to better track individuals' progress towards repatriation. In recent weeks—since mid-August, when Petitioners filed their opening *Zadvydas* brief—just two class members have been removed; Table A shows that *four* remain in detention after scheduled travel has been cancelled.

12. ICE has apparently not successfully set a travel itinerary for anyone whose consular interview took place later than June 2018; there are no individuals who were interviewed in either July or September 2018 for whom travel itineraries have been disclosed.

**Table A: Primary Class members detained who have no stay of removal.**

| Name | Stay Lifted Date | ECF | Travel document obtained date | Days since Stay lifted | Days since Travel document obtained | Scheduled for removal notes (dates are "week of") |
|------|------------------|-----|-------------------------------|------------------------|-------------------------------------|---------------------------------------------------|
| Dhahir Al Salman | 12/18/2017 | 181 | 6/8/2018 | 298 | 126 | |
| Aqil Al Muntafiji | 3/7/2018 | 253 | 6/8/2018 | 219 | 126 | |
| Sabeeh Alsaad | 3/7/2018 | 252 | 7/10/2018 | 219 | 94 | 9/10/2018. Still in detention without new date. |
| Saed Al Zamely | 4/13/2018 | 270 | 6/8/2018 | 182 | 126 | 10/14/2018 |
| Abdulrazaq Al Shimari | 5/10/2018 | 283 | 9/4/2018 | 155 | 38 | |
| Aziz Al Darraji | 5/24/2018 | 291 | 9/4/2018 | 141 | 38 | |
| Ahmad Mirza | 5/31/2018 | 294 | 6/8/2018 | 134 | 126 | 8/13/2018. Still in detention without new date. |
| Wamidh Al Idani | 6/6/2018 | 300 | 9/4/2018 | 128 | 38 | |
| Hani Al Bazoni | 6/8/2018 | 303 | 9/4/2018 | 126 | 38 | |
| Jomaa Al Essa | 6/14/2018 | 309 | Declined | 120 | NA | Released from detention because ICE could not obtain travel documents. |
| Sarkoun Ablahid | 6/19/2018 | 314 | 9/4/2018 | 115 | 38 | 11/4/2018 |
| Salar Omar Karim | 7/10/2018 | 332 | 6/8/2018 | 94 | 126 | 8/20/2018; rescheduled 11/4/2018 |
| Mohammed Al Khafaji | 7/19/2018 | 346 | "approved" but not issued, 10/2/2018 | 85 | | |
| Nouzat Hanna | 7/30/2018 | 352 | 6/8/2018 | 74 | 126 | 7/31/2018; rescheduled 10/28/2018 |
| Khalid Al-Asakir | 8/7/2018 | 361 | 6/8/2018 | 66 | 126 | 10/14/2018 |
| Sarmad Israil | 8/22/2018 | 369 | "approved" but not issued, 10/2/2018 | 51 | | |
| Madhi Al Mosawi | 9/27/2018 | 372 | 6/8/2018 | 15 | 126 | |
| George Arthur | 9/5/2018 | 384 | Declined | 37 | | |

**Jomaa Al Essa**

13. Looking at ICE's court ordered disclosures in this case, which require that Respondents inform Petitioners within 1 business day of any travel documents issued, ECF 389, Iraq has not issued a travel document for Jomaa Al Essa, notwithstanding ICE's concerted efforts with respect to him.

14. In its biweekly disclosure dated September 19, ICE noted that Mr. Al Essa has been released from detention. *See* Ex. 5, Email dated September 19, 2018 (noting that Mr. Al Essa is no longer in detention and not listed as removed). The release must have been between the prior biweekly disclosure, dated September 5, 2018, and September 19.

15. ICE's disclosures indicate that Iraqi officials had concerns about Mr. Al Essa's nationality, telling ICE that "he was Bidoon." (I understand the word "Bidoon" to connote statelessness.)

16. To ascertain why Mr. Al Essa was no longer in ICE's custody, I spoke to his habeas counsel, Susan Church, on October 3, 2018.  Ms. Church informed me that her client had been released several weeks before. She had spoken only briefly to her client about it, but he told her that he was released because Iraq declined to issue travel documents for him. (This Court lifted the stay of removal for Mr. Al Essa on June 14, 2018, so if ICE considers that the start of the "removal period" under 8 U.S.C. §1231(a)(1)(A), that 90-day removal period came to a close in mid-September, right when Mr. Al Essa was released.)

**Procedural posture of *Zadvydas* Subclass Members**

17. A second table, Table B, more generally categorizes the 105 current *Zadvydas* subclass members. (That is, unlike Table A, Table B omits primary class members with open habeas cases.) As it shows:

    a. There are currently 54 subclass members whose immigration cases are pending on the merits (that is, who have no final removal order). These individuals cannot be removed until and unless they lose their immigration cases. Note that because of data limitations, this category does *not* include individuals with pending Petitions for Review in the Court of Appeals. *See* Table B, rows 7-9.

    b. There are 9 subclass members who are technically "post-order," but who have pending motions to reopen (MTRs) or can still file them timely under this Court's orders. See rows 1-6.

    c. There are 42 individuals whose cases in immigration court are done. See rows 10-16.

18. Table B does not include no-longer operative travel document requests and denials (such as those that occurred June 7, 2017), but focuses only ICE's more recent efforts to obtain travel documents, the first step of which is for Iraq to agree to conduct a consular interview. As shown in rows 7-9, most pre-order detainees have not had recent consular interviews. This likely reflects the fact that Iraq requires a final order in order to even consider repatriation. Ex. 10, Respondent DHS's Supplemental Responses to Interrogatory No. 1.a (*see* entry relating to June 26, 2017), dated October 5, 2018. Travel documents have issued or been "approved" for 5 subclass members who have merits cases pending (row 9) and 3 whose motions to reopen are pending or still timely (rows 2, 5, 6) (who, if they prevail on those motions, will also not be removable until the conclusion of their immigration cases).

**Table B: Procedural Progress for Class Members**

| Row | Procedural Progress | Stay | Travel Doc Status | # |
|---|---|---|---|---|
| (1) | MTR still timely | In place | Not recently requested | 3 |
| (2) | | | "Approved" (not issued) | 1 |
| (3) | | Stip in progress | Not recently requested | 1 |
| (4) | MTR pending | In place | Not recently requested | 2 |
| (5) | | | "Approved" (not issued) | 1 |
| (6) | | | Issued | 1 |
| (7) | Merits pending | In place | Not recently requested | 47 |
| (8) | | | Interview pending | 2 |
| (9) | | | Issued | 5 |
| (10) | Done | In place | Not recently requested | 13 |
| (11) | | | Denied | 1 |
| (12) | | | "Approved" (not issued) | 10 |
| (13) | | | Issued | 6 |
| (14) | | Lifted | Not recently requested | 1 |
| (15) | | | "Approved" (not issued) | 3 |
| (16) | | | Issued | 8 |
| TOTAL | | | | 105 |

Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury under the laws of the United States that the above statements are true and correct to the best of my knowledge, information, and belief.

Sworn in Washtenaw County, Michigan.

Date: October 12, 2018

*Margo Schlanger*

Margo Schlanger

# EXHIBIT 3

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**USAMA JAMIL HAMAMA**, et al.,

       Petitioners/Plaintiffs,

*v.*

**REBECCA ADDUCCI**, et al.,

       Respondents/Defendants.

Case No. 2:17-cv-11910
Hon. Mark A. Goldsmith
Mag. David R. Grand

Class Action

## <u>DECLARATION OF MICHELLE BRANÉ</u>

I, Michelle Brané, declare the following:

### *Expert Qualifications*

     1.    I am the Director of the Migrant Rights and Justice (MRJ) Program of the Women's Refugee Commission (WRC), where I have been employed since June 2006.  From 2002 until 2006 I served as the Director of Access to Justice and Coordinator of the Program for Detained Torture Survivors at Lutheran Immigration and Refugee Service (LIRS).  Prior to that I served as a Human Rights Officer for the Organization for Security and Cooperation in Europe (OSCE), seconded by the U.S. Department of State from 1998–2001, and as an Attorney Advisor at the U.S. Department of Justice, Board of Immigration Appeals from 1995–1998.

     2.    As part of my research experience on immigration detention and alternatives to detention in the United States, I have toured and interviewed detained men, women, and families at over 20 Immigration and Customs Enforcement (ICE) facilities; toured various U.S. Customs and Border Protection facilities; done extensive research and made recommendation in the design and implementation of various alternatives programs; and visited alternatives to detention programs in both the United States and internationally. My work has involved engagement with U.S. immigration detention and asylum authorities at both a local and national level. I have been on the Governance Board of the International Detention Coalition since 2006, served on the Board of the Detention

Watch Network from 2006–2013, was a member of the Department of Homeland Security Advisory Committee on Family Residential Centers, and on the Community Reference Committee for the ICE Family Case Management Program for the length that the program was in operation. I have testified before Congress, at United Nations High Commission for Human Rights, and the United Nations High Commission for Refugees as well as various other governmental and international bodies.

3.      I am the principal author, co-author and/or supervisor and editor of numerous reports on detention, asylum, and alternatives to detention, including: *Locking Up Family Values: The Detention of Immigrant Families* (WRC with LIRS, 2007), *Halfway Home: Unaccompanied Children in Immigration Custody* (WRC, 2009), *Migrant Women and Children at Risk: In Custody in Arizona* (WRC, 2010); *Politicized Neglect: A Report from Etowah County Detention Center* (WRC, 2012); *How to Protect Refugees and Prevent Abuse at the Border: Blueprint for U.S. Government Policy* (HRF, 2014); *Locking Up Family Values, Again: A Report on the Renewed Practice of Family Immigration Detention* (WRC, with LIRS, 2014); *Betraying Family Values: How Immigration Policy at the United States Border is Separating Families* (WRC, with LIRS and Kids in Need of Defense, 2017); and *Prison for Survivors: the Detention of Women Seeking Asylum in the U.S.* (WRC, 2017).

4.      I submit this declaration to document that various options for alternatives to immigration detention are possible, exist in the U.S. immigration enforcement system, and are effective and cost efficient options for ensuring immigrant compliance with immigration procedures.

### The Women's Refugee Commission and the Migrant Rights and Justice Program

5.      The WRC is a non-profit organization that advocates for the rights of women, children, and youth fleeing violence and persecution. The WRC is based in New York, New York; the MRJ Program is based in Washington, D.C.

6.      The WRC was founded in 1989, originally as a program within the International Rescue Committee, after having identified a dearth of programming to protect women and girls displaced by humanitarian crises around the world. It subsequently evolved into an independent entity. WRC's mission is to improve the lives and protect the rights of women, children and youth displaced by conflict and crisis.

2

7.     The WRC is a leading expert on the needs of refugee women and children, and the policies and programs that can protect and empower them.  The WRC regularly consults displaced women, children, and youth, and works with the community-based organizations that are usually the first responders in any humanitarian crisis.   It then raises those needs with policy makers and implementers, including local and national governments, the United Nations, and other international non-governmental organizations that drive humanitarian policy and practice.

8.     The MRJ program focuses on the right to seek asylum in the United States.   It strives to ensure that refugees, including women and children, are provided with humane reception in transit and in the United States, given access to legal protection, and protected from exposure to gender discrimination or gender-based violence.  The MRJ program regularly consults with diverse stakeholders, including affected migrants and refugees; community-based, national, and international organizations; policymakers, including Members of Congress and their staff; and federal government officials from several departments and agencies that work on immigration-related issues and conduct oversight.

9.     Since 1996, the WRC has made numerous visits to the southwest border region, including along Mexico's northern border, as well as to immigration detention centers throughout the United States as well as in the United Kingdom and Europe, to shelters and detention facilities housing unaccompanied children throughout the United States as well as in Mexico and to Alternatives to Detention Programs in the United States and abroad. Based on the information that we collect on these visits and our legal and policy analysis of the issues, we advocate for improvements through various methods, including meetings with government officials and service providers, policy proposals, and by documenting our findings through fact sheets, reports, backgrounders, and other materials.   We make recommendations to address identified or observed gaps or ways in which we believe the corresponding department or agency could improve its compliance with the relevant standards.  We use these materials in our advocacy work to inform the perspectives and decisions of policymakers.   Although the WRC has not traditionally litigated cases directly, the MRJ program has filed amicus briefs and declarations in pending litigation on issues such as the conditions and standards for the custody of immigrant children.

10.     Immigration detention is growing at an unprecedented rate.  In May 2017, U.S. Immigration and Customs Enforcement (ICE) was funded to maintain

detention levels of over 39,000 detention spaces each day.[1]  Immigration detention has been proven to traumatize vulnerable populations, jeopardize the basic health and safety of those detained, and undermine meaningful access to counsel in isolated, remote facilities. Alternative forms of detention and alternatives to detention have long been a proven working model for ensuring that those in immigration proceedings appear for hearings and deportation. Study after study has shown that alternatives work, are more humane and are in line with our national values.[2]

11.   A broad spectrum of alternatives is already in place and have been used by ICE (and previously INS) for over 20 years, to ensure appearance of non-detained immigrants in removal proceedings.  These include releasing people to a responsible sponsor or family member, with instructions on when and where they are expected to report or appear in court (like many pre-trial programs do in our criminal justice system); requiring periodic check-ins with a detention officer or case worker; or more restrictive options, like house arrest or GPS programs for those who may present a higher risk of flight. Some of these programs are already in place but are underused. Some have been piloted and others, such as community support programs, and the family case management program, have recently been discontinued notwithstanding their prior successful implementation.[3]

12.   WRC has a long history of documenting immigration detention conditions and policies and how these impact access to protection, physical and mental health, and family unity.  Immigration detention is a restriction of liberty that has extensive and very negative repercussions. Both detention itself, and the particular conditions of immigration detention currently, cause numerous obstacles to pursuing asylum or other immigration relief.  Detainees are significantly less likely to have legal representation that those pursuing their immigration case from the community.  Attorneys are often not available or have to travel long distances to remote facilities.  Detention centers often lack confidential meetings space and

---

[1] House Appropriations Committee, FY2017 Omnibus Summary- Department of Homeland Security Appropriations at page 2: https://appropriations.house.gov/uploadedfiles/05.01.17_fy_2017_omnibus_-_homeland_security_-_summary.pdf.

[2] In 2009, a bipartisan Independent Task Force on U.S. Immigration Policy sponsored by the Council on Foreign Relations called for an expansion of the use of alternatives to immigration detention as one of its recommendations to ensure that all immigrants have the "right to fair consideration under the law and humane treatment." Council on Foreign Relations, Independent Task Force Report No. 63: U.S. Immigration Policy (2009), https://www.cfr.org/sites/default/files/pdf/2009/08/Immigration_TFR63.pdf.

[3] American Immigration Lawyers Association, Lutheran Immigration and Refugee Service, National Immigrant Justice Center, Women's Refugee Commission, *The Real Alternatives to Family Detention*, available at https://www.womensrefugeecommission.org/images/zdocs/Real-Alternatives-to-Family-Detention.pdf

participation in court may occur through video or telephonic conferencing that impedes communication. Immigrants in detention suffer from high levels of depression and trauma. Many immigration detainees have suffered trauma prior to their arrival – either as part of the source of their claim, their journey to the U.S., or their apprehension experience and this trauma can be exacerbated by the isolation and criminalization of detention.[4] In addition to the harm to the detainee, immigration detention is expensive and difficult to manage in comparison with alternatives to detention.[5]

13. ATDs cost far less than detention, even if one is enrolled in ATD longer than in detention. The average cost of alternatives in the United States varies from 17¢ to $44 a day depending on the level of restriction or services provided. The Department of Homeland Security (DHS) estimated in its Congressional Budget Justification for fiscal year (FY) 2018 that it costs the taxpayers $133.99 per day to hold an adult immigrant in detention and $319.37 for an individual in family detention.[6] In FY 2018, DHS estimated that the average cost per ATD participant would be $4.50 per day.[7] A 2014 Government Accountability Office (GAO) report found that the daily rate of ATD was less than 7% of that of detention.[8] Although participants may be enrolled on ATD for a longer period of time due to court delays when they are not detained, GAO found that an individual would have had to be on ATD for 1,229 days before time on ATD and time in detention cost the same amount.[9]

14. ATDs are extremely effective at ensuring compliance. ICE's current ATD program and several community supported pilot programs have shown high rates of compliance with immigration check-ins, hearings and - if ordered - removal. Over 95% of those on "full-service" ATDs (which include case

[4] Allen S Keller, Barry Rosenfeld, Chau Trinh-Shevrin, Chris Meserve, Emily Sachs, Jonathan A Leviss, Elizabeth Singer, Hawthorn Smith, John Wilkenson, Glen Kim, Kathleen Allden, Douglas Ford; Mental Health of Detained Asylum Seekers, Lancet 2003, 1721-23, https://www.scribd.com/document/358865292/Mental-Health-of-Detained-Asylum-Seekers.
[5] Dora Schriro, Immigration Detention Overview and Recommendations, October 6, 2009, https://www.ice.gov/doclib/about/offices/odpp/pdf/ice-detention-rpt.pdf.
[6] DHS Immigration and Customs Enforcement Congressional Justification for FY 2018 (ICE Budget Justification) at page 128, https://www.dhs.gov/sites/default/files/publications/CFO/17_0524_U.S._Immigration_and_Customs_Enforcement.pdf.
[7] ICE Budget Justification at 180.
[8] United States Government Accountability Office. Alternatives to Detention, (Nov. 2014), http://www.gao.gov/assets/670/666911.pdf.
[9] American Immigration Lawyers Association, Lutheran Immigration and Refugee Service, National Immigrant Justice Center, Women's Refugee Commission, *The Real Alternatives to Detention*, available at: http://lirs.org/wp-content/uploads/2017/06/The-Real-Alternatives-to-Detention-FINAL-06.27.17.pdf

management) are found to appear for their final hearings.[10] Data from Contract Year 2013 from Geo-Group.BI, Inc., the private contractor who operates some of the government's ATD programming, showed a 99.6% appearance rate at immigration court hearings for those enrolled in its "Full Service" program and a 79.4% compliance rates with removal orders for the same population.[11] ICE's Family Case Management Program (FCMP), in which families received caseworker support without having to wear an ankle monitor, indicated compliance rates of 99% with court appearances, ICE appointments, and reported high compliance with removal orders.[12] DHS's own Congressional Budget Justification released in May 2017 notes that, "[h]istorically, ICE has seen strong alien cooperation with ATD requirements during the adjudication of immigration proceedings."[13]

### Existing Alternatives Used by ICE

15. <u>Release on recognizance, or parole</u> (for arriving asylum seekers per the Immigration and Nationality Act). Asylum seekers and those with credible legal claims and family and community in the United States have strong incentives to appear in immigration court and comply with requirements. Consequently, for many, release on recognizance or a minimal bond is appropriate because they pose little flight risk or risk to the community.

16. <u>Release on bond and orders of supervision.</u> Bond, and orders of supervision, can serve to mitigate concerns of a flight risk if such a risk has been identified. Other conditions of release can and often include telephonic check-ins, or in-person reporting.

17. <u>Electronic monitoring.</u> Electronic monitoring provides an additional level of supervision in cases where bond or check-ins are not enough. These can range from more frequent telephonic controls, to GPS monitors and ankle bracelets. They can allow for free movement, or a restricted geographic range such as a city, neighbourhood, or even house arrest. Ankle monitors and GPS are the most restrictive and among the most costly alternatives. Ankle bracelets require confinement in a specific space for many hours per day to charge the device. That kind of restriction on liberty is rarely necessary for an individual seeking

---

[10] United States Government Accountability Office. Alternatives to Detention, (Nov. 2014), http://www.gao.gov/assets/670/666911.pdf.
[11] American Civil Liberties Union. Alternatives to Immigration Detention: Less Costly and More Humane than Federal Lock Up at FN 9, https://www.aclu.org/other/aclu-fact-sheet-alternatives-immigration-detention-atd.
[12] Frank Bajak. ABC News. ICE shutters detention alternative for asylum-seekers, June 9, 2017, available at http://abcnews.go.com/Politics/wireStory/ice-shuttersdetention-alternate-asylum-seekers-47931693.
[13] ICE Budget Justification at 179.

protection from removal, who has every incentive to attend his or her hearing. GPS devices should only be used when no other conditions could reasonably ensure public safety and compliance with the immigration process.

18.   <u>ISAP-II.</u> In addition to combinations of the above, ICE implements the Intensive Supervised Appearance Program, ISAP-II which is run by the private for-profit prison company Geo-Group. The ISAP program has a full-service component and also an electronic monitoring only program. ISAP uses electronic ankle monitors, installation of biometric voice recognition software, unannounced home visits, employer verification, and in-person reporting to supervise participants. The case management component is very limited. Over 95% of those on "full-service" ATDs (which include case management) are found to appear for their final hearings.[14] BI, Inc., the private contractor who operates some of the government's ATD programming, attests that for Contract Year 2013, the "Full Service" program resulted in a 99.6% appearance rate at immigration court hearings and a 79.4% compliance rates with removal orders.[15]

19.   In addition to the above mentioned currently operating programs, ICE has used several additional community based models that were either pilots or discontinued, despite their effectiveness:

20.   In 1999 the legacy Immigration and Naturalization Service (INS) partnered with Lutheran Immigration and Refugee Service to assist 25 Chinese asylum seekers released from detention. The asylum seekers were released into open shelters around the country, where they received housing, food, medical care, and case management. Participants had a 96% appearance rate to their immigration hearings.[16]

21.   The Family Case Management Program (FCMP) was operated by Geo-Care, and provided a case management release program for families as an alternative to family detention.  It reported a 99% appearance rate, including through the removal of some families.  It was discontinued in 2017.[17]

---

[14] United States Government Accountability Office. Alternatives to Detention, (Nov. 2014), http://www.gao.gov/assets/670/666911.pdf.
[15] American Civil Liberties Union. Alternatives to Immigration Detention: Less Costly and More Humane than Federal Lock Up at FN 9, https://www.aclu.org/other/aclu-fact-sheet-alternatives-immigration-detention-atd.
[16] Unlocking Liberty: A Way Forward for U.S. Immigration Detention Policy, Lutheran Immigration and Refugee Service, October 27, 2011, www.lirs.org/dignity.
[17] ICE Fact Sheet: Stakeholder Referrals to the ICE/ERO Family Case Management Program, http://www.aila.org/infonet/ice-fact-sheet-family-casemanagement-program?utm_source=aila.org&utm_medium=InfoNet%20Search. See also Bajak, ICE shutters detention alternative.

22.     From 1999–2002, INS worked with Catholic Charities of New Orleans to release 39 asylum seekers and 64 "indefinite detainees" who could not be removed from the United States.  The court appearance rate for participants was 97%.[18]

23.     The Vera Institute of Justice Appearance Assistance Project funded by the INS from 1997–2000 studied over 500 participants in three groups: asylum seekers, people convicted of crimes and facing removal, and undocumented workers from detention facilities. They used a risk assessment instrument and case management which they found instrumental in the program's 91% appearance rate at required hearings, including a 93% appearance rate for asylum seekers.[19]

24.     Between 2012 and 2015 ICE entered into a memorandum of understanding with LIRS and USCCB to screen vulnerable immigrants into a community support initiative with a 97% appearance rate.[20]

25.     Community-support ATD models are by far the most effective. Holistic programs that offer case management services and facilitate access to legal counsel as well as safe and affordable housing have been shown to substantially increase program compliance without the extensive use of electronic monitoring.

26.     DHS does not currently have guidance on whether and when to enroll individuals in a specific type of program or when to de-escalate them onto a less onerous ATD program after demonstrated compliance. Despite repeated evidence of their effectiveness and efficiency, alternatives are underused and inefficiently implemented.

27.     DHS does not have the detention capacity to physically detain everyone currently in immigration proceedings.  Alternatives to detention are an effective and efficient method for managing and ensuring appearance and compliance and ICE has the capacity to manage and use them if it so chooses. While ICE's detention budget has more than doubled from 1 billion to 1.3 billion

---

[18] A More Human System: Community-Based Alternatives to Immigration Detention (Part 2), Sue Weishar, Just South Quarterly.
[19] The Appearance Assistance Program, Attaining Compliance with Immigration Laws Through Community Supervision, Vera Institute of Justice, 1998, www.vera.org/download?file+211/aap.pdf.
[20] Lutheran Immigration and Refugee Service, Family Placement Alternatives: Promoting Compliance with Compassion and Stability through Case Management Services (April 2016), http://lirs.org/wp-content/uploads/2016/04/LIRS_FamilyPlacementAlternativesFinalReport.pdf.

in 2016.  The budget for alternatives to detention has also grown at an even faster pace, to $114 million in 2016 from $28 million in 2006.[21]

28.    In sum, for individuals in detention for long periods of time as they fight their immigration cases, ICE has sufficient capacity and managerial experience with alternatives to detention that it could, if it chose, channel thousands of detainees into alternatives to detention that would be cheaper and would promote fair adjudication of immigration cases.  If implemented effectively and with case management that matches flight risk to mitigating factors, as shown through countless current alternatives to detention programs and past pilots, alternatives to detention are an effective, affordable and much more humane method of managing immigration enforcement while ensuring court appearance and compliance with final immigration court orders.

Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury under the laws of the United States that the above statements are true and correct to the best of my knowledge, information, and belief.

| 11-2-2017 | *Michelle Brané* |
|-----------|------------------|
| Date | Michelle Brané |

---

[21] See DHS "Publications Library" available at https://www.dhs.gov/publications; Congressional Research Service, "Homeland Security Department: FY 2007 Appropriations" (2006), See also Center for American Progress, Alternatives to Detention and the For Profit Immigration Detention system, https://www.americanprogress.org/issues/immigration/news/2017/06/09/433975/alternatives-detention-profit-immigration-system/

# EXHIBIT 4

## DECLARATION OF JAMES MADDOX

I, James Maddox, hereby make the following declaration with respect to the above-captioned matter:

1. I am a Detention and Deportation Officer (DDO) in Removal and International Operations (RIO) assigned to the Headquarters Office of Enforcement and Removal Operations (HQ ERO), United States Immigration and Customs Enforcement (ICE), within the Department of Homeland Security (DHS) in Washington D.C. RIO is responsible for assisting field offices in obtaining travel documents necessary to execute administratively final orders of removal. I have been employed with ICE and the former Immigration and Nationality Service (INS) since April 1997. I have worked in the HQ ERO within ICE from March 2018 to present. I was employed most recently as a Deportation Officer (DO) and a Supervisory Detention and Deportation Officer (SDDO) in the Washington Field Office from January 2001 until March 2018.

2. In my capacity as a DDO for RIO, I am in charge of the Iraqi Docket, which includes assisting the ERO field offices in obtaining travel documents and coordinating removal of aliens with final orders of removal. RIO is also responsible for post-order custody reviews (POCRs) of aliens detained pursuant to Immigration and Nationality Act section 241 who are in ICE custody for more than 180 days from commencement of the removal period. I am the DDO over all Iraqi cases.

3. This declaration is based on my personal knowledge, and information conveyed to me in the course of my official duties and responsibilities, including information obtained from other individuals employed by ICE and information obtained from DHS records. I am aware of the facts and circumstances of *Hamama, et al., v. Adducci*, et al., 2:17-cv-11910,

in the U.S. District Court for the Eastern District of Michigan, Southern Division. I also
have knowledge of ICE's efforts to arrange for the removal of Iraqi nationals that have
been ordered removed from the United States.

5. I have reviewed the alien file for Jomaa Al Essa A# xxx-xxx-483.  In order to facilitate
travel document processing, ICE made arrangements for the GOI to conduct in-person
interviews of 42 individuals on May 23, 2018 at the Stewart Detention Facility in
Georgia, to include Mr. Al Essa.  Prior to the interviews, ICE provided the GOI officials
with copies of citizenship related documents. To establish citizenship, the GOI has
decided to accept a wide range of photocopied evidence from U.S. government
information systems, including various citizenship documentation or secondary
information (including relatives' identification documents) confirming citizenship located
in the Alien files.  The travel document packages are prepared by the field offices and
sent to headquarters for submission to the GOI in Washington D.C.

6. Mr. Al Essa was interviewed by GOI officials on May 23, 2018.  At the conclusion of the
interviews, I spoke directly with the GOI interviewing officials about the results of their
interviews.  In Mr. Al Essa case, the GOI requested additional identity and or family .
documents to demonstrate his citizenship prior to approval of a travel documents.
Shortly thereafter, I e-mailed the GOI officials with information about Mr. Al Essa's
father per their request.

7. On June 8, 2018, I received 33 travel documents from the GOI in Washington D.C., that
match up with the 33 individuals who were interviewed on May 23, 2018.  The GOI
denied citizenship for two individuals and indicated that further approval was necessary

for six other individuals. The GOI has repeatedly informed me that the 7 travel documents requests for the detainees, including Mr. Al Essa, are pending.

8. On June 14, 2018, the U.S. District Court for the Eastern District of Michigan, Southern Division issued an order lifting the preliminary injunction for Mr. Al Essa. Therefore, a stay of removal from that District Court against Mr. Al Essa is no longer is in place.

9. On June 15, 2018, the GOI was provided with further information from Mr. Al Essa's father's alien file to assist in corroborating nationality. The GOI officials asked for Mr. Al Essa's father's contact information. ICE obtained this information on June 22, 2018 and ICE has provided this contact information to the GOI officials for consideration.

10. Based upon this officer's experience and expertise, information obtained from other individuals employed by ICE, and information obtained from DHS records, I believe that Iraq will issue a travel document for Mr. Al Essa.

Pursuant to 28 U.S.C. § 1746, I declare, under penalty of perjury, that the foregoing is true and correct based upon reasonable inquiry, knowledge, information, and belief.

Executed this 22th day of June, 2018.

06/22/2018

Date

James Maddox
DDO
Department of Homeland Security
U.S. ICE
Washington, D.C.

# EXHIBIT 5

*PII Redacted Pursuant to*
*Fed. R. Civ. P. 5.2 and ECF 338*

**Scott, Kimberly L.**

| | |
|---|---|
| **From:** | Alsterberg, Cara E. (CIV) <Cara.E.Alsterberg@usdoj.gov> |
| **Sent:** | Wednesday, September 19, 2018 4:57 PM |
| **To:** | Scott, Kimberly L.; Miriam Aukerman; Angyan, James M.; Margo Schlanger (margo.schlanger@gmail.com) (margo.schlanger@gmail.com) |
| **Cc:** | Silvis, William (CIV); Murley, Nicole (CIV) |
| **Subject:** | Hamama - Biweekly Report - 9.19.2018 |
| **Attachments:** | Biweekly Detained Iraqi Nationals Report_09.19.18.pdf; Hamama BiWeekly Report 9_19_18 - confidential subject to protective order.xlsx |

**CAUTION EXTERNAL EMAIL:** DO NOT open attachments or click links from unknown or unexpected emails.

Counsel,

Please find attached the September 19, 2018, Hamama Biweekly Report for Petitioners and Plaintiffs. Pursuant to the Order Regarding Further Proceedings on September 25, 2017, the attached biweekly report only contains detained Iraqi nationals. Moreover, pursuant to the Order Regarding Further Proceedings on March 13, 2018, ICE will now be including aliens with motions to reopen (MTR) grants in the biweekly report.

The following aliens were removed from the last report since they are no longer in ICE custody:



A R , M – removed
A -A , A R
AL ESSA, JOMAA
A -A , H

The following aliens are additions to the attached report:



A H , F
S , L

The following information is disclosed pursuant to Order Regarding Production of Alien Files and Records of Proceedings on January 4, 2018:



A H , F – detained 9/11/2018; file has not been produced; as of now, recipient will be the alien; as of now, did not designate class counsel to receive a copy of A-file and/or ROP
S , L – detained 9/6/2018; file has not been produced; as of now, recipient will be the alien; as of now, did not designate class counsel to receive a copy of A-file and/or ROP

A , L – detained 6/6/2018; file was served to Plaintiff's counsel on 9/17/2018

Pursuant to the Order Regarding Further Proceedings on January 19, 2018, the following aliens have reached 180 days or more in detention, but do not appear eligible for a bond hearing:



A , G – detained pursuant to 8 U.S.C. § 1225
A , W – detained pursuant to 8 U.S.C. § 1225
A -I , W – detained pursuant to 8 U.S.C. § 1225
N , F K – detained pursuant to 8 U.S.C. § 1225

Further, pursuant to the Amended Order Regarding Production of A-Files and Records of Proceedings and Other Matters on November 21, 2017, the following aliens were removed from the United States after the Court lifted the protection of the July 24, 2017, stay of removal:



Thank you,
Cara

**Cara E. Alsterberg**
Trial Attorney
U.S. Department of Justice, Civil Division
Office of Immigration Litigation-District Court Section
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Tel. 202.532.4667 | Fax. 202.305.7000
Cara.E.Alsterberg@usdoj.gov



*This communication, along with any attachments, is covered by federal and state law governing electronic communications and may contain confidential and legally privileged information. If the reader of this message is not the intended recipient, the reader is hereby notified that any dissemination, distribution, use or copying of this message is strictly prohibited. If you have received this in error, please reply immediately to the sender and delete this message.*

# EXHIBIT 6

2018 WL 4608970
Only the Westlaw citation is currently available.
United States Court of Appeals, Third Circuit.

Rafael Ignacio GUERRERO-SANCHEZ
v.
WARDEN YORK COUNTY PRISON; District
Director Philadelphia Field Office; Jacqueline
Osterlind; Thomas S. Winkowaski; Secretary
United States Department of Homeland Security,
Appellants

Nos. 16-4134 & 17-1390
|
Argued April 18, 2018
|
(Opinion Filed: September 26, 2018)

**Synopsis**
**Background:** Native and citizen of Mexico filed petition
for writ of habeas corpus challenging his continued
confinement while he litigated his application for
withholding of removal under Convention Against
Torture (CAT). The United States District Court for the
Middle District of Pennsylvania, No. 1:15-cv-02423,
William W. Caldwell, J., granted petition, and
government appealed.

**Holdings:** The Court of Appeals, Greenaway, Jr., Circuit
Judge, held that:

[1] regulation governing execution of reinstated orders of
removal was not entitled to Chevron deference;

[2] alien's detention was governed by Immigration and
Nationality Act (INA) post-removal detention provision;
and

[3] alien was entitled to bond hearing after his prolonged
detention.

Affirmed.

Rendell, Circuit Judge, concurred and filed opinion

West Headnotes (10)

[1] **Administrative Law and Procedure**
   Aliens, immigration, and citizenship
**Aliens, Immigration, and Citizenship**
   Judicial Review or Intervention

Department of Homeland Security regulation
governing execution of reinstated orders of
removal was not entitled to Chevron deference
in determining whether alien detainee who was
subject to reinstated removal orders, but who
expressed fear of removal, was entitled to bond
hearing. Immigration and Nationality Act § 241,
8 U.S.C.A. § 1231(a)(6); 8 C.F.R. § 241.8(f).

Cases that cite this headnote

[2] **Aliens, Immigration, and Citizenship**
   Detention After Order of Removal

Reinstated order of removal against alien who
was pursuing bona fide withholding-only relief
was administratively final, and thus alien's
detention was governed by Immigration and
Nationality Act (INA) post-removal detention
provision; no proceeding was pending before
immigration judge as to whether alien was to be
removed from United States, and withholding-
only proceedings did not disturb underlying
order of removal, but only potentially impeded
order's execution with respect to specific
country. Immigration and Nationality Act § 241,
8 U.S.C.A. § 1231(a); 8 C.F.R. § 241.1.

Cases that cite this headnote

[3] **Aliens, Immigration, and Citizenship**
   Bond or bail

Native and citizen of Mexico who had reinstated
order of removal but was also pursuing bona
fide withholding-only relief was entitled to bond
hearing after his prolonged detention, even
though it had not been determined that there was
no significant likelihood of removal in

2018 WL 4608970

reasonably foreseeable future, where alien had been held for more than six months. Immigration and Nationality Act § 241, 8 U.S.C.A. § 1231(a)(6).

Cases that cite this headnote

[4]   **Constitutional Law**
🔑 Resolution of non-constitutional questions before constitutional questions

Court must avoid deciding constitutional question if case may be disposed of on some other basis.

Cases that cite this headnote

[5]   **Constitutional Law**
🔑 Avoidance of doubt

It is cardinal principle of statutory interpretation that when Act of Congress raises serious doubt as to its constitutionality, courts will first ascertain whether construction of statute is fairly possible by which question may be avoided.

Cases that cite this headnote

[6]   **Statutes**
🔑 Consistency, uniformity, and fairness

Language given limiting construction in one context must be interpreted consistently in other contexts, even though other of statute's applications, standing alone, would not support same limitation.

Cases that cite this headnote

[7]   **Aliens, Immigration, and Citizenship**

🔑 Bond or bail

Government must show by clear and convincing evidence that alien detainee subject to order of removal is flight risk or danger to community to justify denial of bond at hearing while alien seeks withholding-only relief. Immigration and Nationality Act § 241, 8 U.S.C.A. § 1231(a)(6).

Cases that cite this headnote

[8]   **Aliens, Immigration, and Citizenship**
🔑 Bond or bail

Alien facing prolonged detention of more than six months under Immigration and Nationality Act (INA) provision authorizing continued detention "beyond the removal period" is entitled to bond hearing before immigration judge and to be released from detention unless government establishes that alien poses risk of flight or danger to community, or alien's release or removal is imminent. Immigration and Nationality Act § 241, 8 U.S.C.A. § 1231(a)(6).

Cases that cite this headnote

[9]   **Administrative Law and Procedure**
🔑 Administrative Construction of Statutes

When statute is ambiguous, court will normally apply *Chevron* deference to agency's interpretation of statute, so long as that construction was reasonable, but will not defer to agency's interpretation of statute that raise serious constitutional doubts.

Cases that cite this headnote

[10]   **Courts**
🔑 Decisions in other circuits

Court of Appeals should be reluctant to create circuit split, especially where rules at issue are

best applied uniformly, and should only do so where compelling basis exists.

Cases that cite this headnote

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF PENNSYLVANIA (D.C. Civ. Action No. 1:15-cv-02423), District Judge: Honorable William W. Caldwell

**Attorneys and Law Firms**

Chad A. Readler, William C. Peachey, Sarah Fabian, Joseph A. Darrow [Argued], United States Department of Justice, Office of Immigration Litigation, District Court Section, P.O. Box 868, Ben Franklin Station, Washington, D.C. 20044 Counsel for Appellants

Daniel B. Conklin [Argued], The Shagin Law Group, 120 South Street, Harrisburg, PA 17101, Counsel for Appellee

Witold J. Walczak, 247 Ft. Pitt Blvd., 2nd Floor, Pittsburgh, PA 1522, Counsel for Amici Appellee, American Civil Liberties Union of Pennsylvania

Golnaz Fakhimi, P.O. Box 60173, Philadelphia, PA 19102, Counsel for Amici Appellee, American Civil Liberties Union of Pennsylvania

Michael Tan, Judy Rabinovitz, 125 Broad Street, 18th Floor, New York, NY 10004, Counsel for Amici Appellee, American Civil Liberties Union Foundation Immigrants' Rights Project

Farrin R. Anello, Edward Barocas, Jeanne LoCicero, 89 Market Street', 7th floor, P.O. Box 32159, Newark, NJ 07102, Counsel for Amici Appellee, American Civil Liberties Union of New Jersey Foundation

Trina Realmuto, 100 Summer Street, 23rd Floor, Boston, MA 02110, Counsel for Amici Appellee, American Immigration Counsel

Mark R. Barr, Lichter Immigration, 1601 Vine Street, Denver, CO 80206, Counsel for Amici Appellee, American Immigration Lawyers Association

Before: GREENAWAY, JR., RENDELL, and FUENTES, Circuit Judges.

OPINION

GREENAWAY, JR., Circuit Judge.

**\*1** Rafael Guerrero-Sanchez, a native and citizen of Mexico whose original removal order was reinstated pursuant to 8 U.S.C. § 1231(a)(5), was detained by Immigration and Customs Enforcement ("ICE") from May 2015 to February 2017 while he awaited the Immigration Court's decision on whether he would be afforded country-specific protection from removal. The District Court determined that his detention was governed by the pre-removal detention provision of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1226(a), which affords aliens a right to a bond hearing before an immigration judge to determine if the alien's detention is necessary while he or she awaits immigration proceedings. At the hearing, the District Court determined that Guerrero-Sanchez posed neither a flight risk nor a danger to society, and therefore released him on bail after 637 days in civil confinement.

The Government appeals solely the District Court's determination of the source of Guerrero-Sanchez's detention, which it contends is 8 U.S.C. § 1231(a), the post-removal detention authority provision of the INA. In stark contrast to § 1226(a), the text of § 1231(a) does not explicitly authorize a bond hearing. Guerrero-Sanchez, however, contends that his detention raises constitutional concerns even under § 1231(a), and therefore that Congress implicitly intended for that provision to compel a bond hearing after prolonged detention. Thus, in Guerrero-Sanchez's estimation, he was owed a bond hearing regardless of the statutory source of his detention.

Accordingly, this case requires us to decide a novel question of immigration law in this Circuit: is the detention of an alien, such as Guerrero-Sanchez, who has a reinstated order of removal but is also pursuing withholding-only relief governed by § 1226(a) or § 1231(a)? If the former, then such aliens are statutorily permitted to a bond hearing. But if we find that § 1231(a) controls, then we must answer a second question: does § 1231(a)(6) compel an implicit bond hearing requirement after prolonged detention?

For the reasons discussed below, we hold that § 1231(a) governs Guerrero-Sanchez's detention and that § 1231(a)(6) affords a bond hearing after prolonged

detention to any alien who falls within the ambit of that provision. We will therefore affirm on alternative grounds the District Court's decision to afford Guerrero-Sanchez a bond hearing.

# I. FACTS

Guerrero-Sanchez attempted to unlawfully enter the United States from Mexico on January 24, 1998 by presenting a fraudulent birth certificate. U.S. Customs and Border Protection determined that he was inadmissible for having sought admission by fraud or misrepresentation, in violation of 8 U.S.C. § 1182(a)(6)(C)(ii). An expedited order of removal was entered against him, *see* 8 U.S.C. § 1225(b)(1)(A)(i), and he was immediately removed back to Mexico.

At an unknown date thereafter, Guerrero-Sanchez reentered the United States without inspection. In April 2012, he was arrested for his role in an Idaho-based drug trafficking organization. Guerrero-Sanchez pled guilty to one count of conspiracy to distribute more than fifty grams of methamphetamine, in violation of 21 U.S.C. §§ 846 and 841(a)(1), and he was sentenced to forty-two months of imprisonment. While Guerrero-Sanchez was serving that sentence, ICE reinstated his original order of removal from 1998, pursuant to 8 U.S.C. § 1231(a)(5). On April 9, 2015, Guerrero-Sanchez filed before this Court a petition for review and motion for stay of the reinstated removal order, which were denied.

**\*2** On May 19, 2015, the date that Guerrero-Sanchez completed his sentence, he was transferred to ICE custody pending his removal. An asylum officer subsequently conducted a reasonable-fear interview at Guerrero-Sanchez's request, *see* 8 C.F.R. § 241.8(e), where Guerrero-Sanchez contended that he would be tortured by a drug cartel if removed to Mexico. The officer concluded that Guerrero-Sanchez's fear of persecution was reasonable and referred the matter to an immigration judge. *See* 8 C.F.R. § 1208.31(e).

Guerrero-Sanchez subsequently initiated withholding-only proceedings before the Immigration Court, seeking an order either withholding his removal to Mexico pursuant to 8 U.S.C. § 1231(b)(3) or, in the alternative, deferring his removal under the Convention Against Torture ("CAT"). The Immigration Judge denied both claims, finding that he was ineligible for relief under § 1231(b)(3) because he committed a "particularly serious

crime," *see* § 1231(b)(3)(B)(ii), and that he did not qualify for CAT relief because he did "not [meet] his burden of establishing by a preponderance of the evidence that the Mexican Government would consent to or be willfully blind to [his] hypothetical torture...." App. 120. Guerrero-Sanchez appealed the denial of his CAT claim to the Board of Immigration Appeals ("BIA"), which affirmed the Immigration Judge. He then petitioned this Court for review of the BIA's order, and we stayed his removal pending the disposition of his appeal.

We granted the petition of review, finding that "the BIA erred by failing to consider whether the record evidence of the violence caused by the [drug] cartel and corruption of law enforcement officials demonstrated that it is more likely than not that Guerrero will be tortured 'by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.' " *Guerrero v. Attorney Gen.*, 672 F. App'x 188, 191 (3d Cir.2016) (quoting 8 C.F.R. § 1208.18(a)(1) ). We therefore vacated the BIA's order and remanded for further consideration.

On December 17, 2015, while his case remained pending before the BIA, Guerrero-Sanchez filed a petition for a writ of habeas corpus before the District Court, challenging his detention by ICE while he waits for a determination on whether he will be afforded country-specific protection from removal. To date, his withholding-only proceeding is not scheduled until September 5, 2019, which is fifty-three months from the date that he was originally detained by ICE. On September 19, 2016, the District Court granted the petition, finding that Guerrero-Sanchez was statutorily permitted to a bond hearing because his detention was governed by the pre-removal order detention statute, 8 U.S.C. § 1226(a), rather than the post-removal statute, 8 U.S.C. § 1231(a). The District Court therefore ordered that the Immigration Judge afford Guerrero-Sanchez a hearing within twenty-one days.

At the hearing, the Immigration Judge denied Guerrero-Sanchez release on bond, finding that he represented a flight risk and/or danger to the community. Following the bond hearing before the Immigration Judge, Guerrero-Sanchez filed a motion to reconsider and "to enforce" the District Court's order, claiming that the bond hearing had been legally deficient and requesting that the District Court conduct the hearing itself. The District Court granted the motion in part on December 23, 2016, finding that the bond hearing was legally insufficient because it was not individualized, did not account for the evidence of rehabilitation that Guerrero-Sanchez provided, and that it was "doubtful" that the Government carried its burden

of proof that he is a flight risk or a danger to the community. App. 40.

**\*3** The District Court then, in February 2017, held a bond hearing itself. It found that Guerrero-Sanchez did not pose a danger to the community because of "the absence of any criminal history beyond his drug conspiracy conviction, acceptance of responsibility for his criminal conduct, extensive evidence of rehabilitation and good conduct while incarcerated and detained, multiple offers of support from family and employers if he were to be released, and numerous sworn statements attesting to [his] good character." App. 19. The District Court also determined that Guerrero-Sanchez was not a flight risk because he has a wife and daughter living in Las Vegas, Nevada, that he was pursuing a bona fide withholding of removal claim before the Immigration Court, and that the conditions of release would assure that he appeared at future immigration proceedings. It therefore ordered his immediate release subject to conditions of supervision. In total, Guerrero-Sanchez had remained in ICE detention for 637 days without a bond hearing.[1]

## II. THE AUTHORITY GOVERNING GUERRERO-SANCHEZ'S DETENTION

The Government originally appealed the District Court's order holding that 8 U.S.C. § 1226(a) governs Guerrero-Sanchez's detention, as well as the orders mandating a de novo hearing in federal court and releasing him on bond. It then withdrew its appeals of the latter two determinations. Thus, the Government now contests only the statutory basis of Guerrero-Sanchez's detention. In the Government's view, it is not the pre-removal detention provision, 8 U.S.C. § 1226(a), that controls in Guerrero-Sanchez's case, but rather, the post-removal detention provision, 8 U.S.C. § 1231(a). Because § 1231(a) contains no explicit bond hearing requirement, the Government argues that such a hearing should have never been held, and that the Government should have the authority to detain Guerrero-Sanchez again.[2] For his part, Guerrero-Sanchez contends that the District Court was correct in concluding that § 1226(a) applies, but that even if § 1231(a) governs, he was still entitled to a bond hearing because § 1231(a)(6) implicitly requires a bond hearing after prolonged detention. Thus, according to Guerrero-Sanchez, he was entitled to a bond hearing irrespective of the statutory authority for his detention, and he should remain released subject to the conditions of supervision already in place.

With all of this in mind, we must first decide whether Guerrero-Sanchez's detention is governed by § 1226(a) or § 1231(a). Because this question is an issue of statutory interpretation, it is subject to de novo review. *Fair Hous. Rights Ctr. in Se. Pa. v. Post Goldtex GP, LLC*, 823 F.3d 209, 213 (3d Cir.2016). For the reasons discussed below, we hold that § 1231(a), the post-removal provision, controls. We will then proceed to address Guerrero-Sanchez's alternative argument, that is, whether § 1231(a)(6) implicitly requires that he be afforded a bond hearing after prolonged detention.

### A. Legal Framework

**\*4** We begin by examining the text of both provisions. *See, e.g., United States v. Thornhill*, 759 F.3d 299, 307 (3d Cir.2014) ("Statutory interpretation requires that we begin with a careful reading of the text." (quoting *Zimmerman v. Norfolk S. Corp.*, 706 F.3d 170, 177 (3d Cir.2013) ) ). Section 1226 is the pre-removal provision of the INA and "generally governs the process of arresting and detaining ... aliens pending their removal." *Jennings v. Rodriguez*, ---- U.S. ----, 138 S.Ct. 830, 837, 200 L.Ed.2d 122 (2018). It provides that "an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States." 8 U.S.C. § 1226(a). Critical for the purposes of this case, an alien detained under § 1226(a) must be afforded a bond hearing before an immigration judge to determine if the alien's detention is necessary while he or she awaits immigration proceedings. *See Jennings*, 138 S.Ct. at 837 ("[T]he Attorney General 'may release' an alien detained under § 1226(a) 'on bond ... or conditional parole.' " (quoting 8 U.S.C. § 1226(a) ) ); 8 C.F.R. § 236.1(d)(1) ("[T]he immigration judge is authorized to exercise the authority ... to detain the alien in custody, release the alien, and determine the amount of bond.").

Section 1231(a) is the post-removal detention provision of the INA and applies to aliens who are subject to a final order of removal. It provides that "when an alien is ordered removed, the Attorney General shall remove the alien from the United States within a period of 90 days." 8 U.S.C. § 1231(a)(1)(A). The provision requires that the alien be detained during this 90-day timeframe, *see* 8 U.S.C. § 1231(a)(2), which is "referred to as the 'removal period.' " 8 U.S.C. § 1231(a)(1)(A). "If the alien does not leave or is not removed within the removal period," then he is normally subject to supervised release. 8 U.S.C. § 1231(a)(3). Section 1231(a)(6), however, authorizes the continued detention of certain classes of aliens "beyond

the removal period," 8 U.S.C. § 1231(a)(6), for a timeframe "reasonably necessary to bring about that alien's removal from the United States," *Zadvydas v. Davis*, 533 U.S. 678, 689, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001) (*see also id.* at 701, 121 S.Ct. 2491 ("[A]n alien may be held in confinement until it has been determined that there is no significant likelihood of removal in the reasonably foreseeable future."). The categories of aliens covered by § 1231(a)(6) include those who, like Guerrero-Sanchez, are inadmissible under 8 U.S.C. § 1182.[3]

Critically, unlike § 1226(a), the text of § 1231(a)(6) does not explicitly authorize a bond hearing. Therefore, at least according to the Government, whether Guerrero-Sanchez is entitled to a bond hearing turns on whether § 1226(a) or § 1231(a) authorizes his detention. We note at the outset that this is a question that has divided our sister circuits. *Compare Padilla-Ramirez v. Bible*, 882 F.3d 826, 832 (9th Cir.2017) (holding that § 1231(a) governs), *with Guerra v. Shanahan*, 831 F.3d 59, 64 (2d Cir.2016) (holding that § 1226(a) governs).

B. *Chevron* Deference

[1]As a threshold matter, the Government contends that a regulation issued by the Department of Homeland Security, 8 C.F.R. § 241.8(f), is owed *Chevron* deference because it allegedly provides that § 1231(a) applies to aliens with reinstated orders of removal.[4] We disagree. That regulation states that "[e]xecution of the reinstated order of removal and detention of the alien shall be administered in accordance with" Part 241 of the Code of Federal Regulations, which contains the regulations implementing 8 U.S.C. § 1231. 8 C.F.R. § 241.8(f). The relevant provisions of Part 241, however, apply to aliens who are subject to reinstated removal orders but, unlike Guerrero-Sanchez, have either not expressed a fear of removal, or have already been granted withholding but are still subject to detention. *See id.* §§ 241.3, 241.4(b)(3), 241.8(f). Conspicuously absent from these regulations is any mention of aliens, who like Guerrero-Sanchez, have reinstated removal orders but are still pursuing bona fide withholding-only relief. *Chevron* deference is inapplicable, then, because § 241.8(f) does not resolve the question of whether § 1226(a) or § 1231(a) governs Guerrero-Sanchez's detention. *See Padilla-Ramirez v. Bible*, 882 F.3d at 831 (declining to defer to 8 C.F.R. § 241.8(f) "because the regulation does not answer the question presented"); *Guerra*, 831 F.3d at 63 ("*Chevron* deference is inapplicable because [Part 241] do[es] not answer the question of which provision governs Guerra's

detention."). We must therefore conduct our own scrutiny of the statutory provisions.

C. Authorization of Detention

*5 To determine whether Guerrero-Sanchez was entitled to a bond hearing, we must ascertain the source of authority for his detention. The authorization for an alien's detention shifts from § 1226(a) to § 1231(a)—that is, from the pre-removal phase to the post-removal phase—at the point that the alien's order of removal becomes administratively final and removal is therefore certain. *See* 8 U.S.C. § 1231(a)(1)(B). Thus, which provision governs here depends on whether the removal order entered against Guerrero-Sanchez is administratively final: if it is final, then § 1231(a) applies; otherwise, § 1226(a) controls.

Crucial to this determination is the fact that Guerrero-Sanchez's removal order was reinstated "from its original date and is not subject to being reopened or reviewed." 8 U.S.C. § 1231(a)(5).[5] Although aliens with reinstated orders of removal are "not eligible and may not apply for any relief" under Chapter 12 of the INA, *id.*, they may seek withholding-only remedies, *see Cazun v. Attorney Gen. United States*, 856 F.3d 249, 255-56 (3d Cir.2017) ("[P]recedent and the Attorney General's own interpretation clarify that withholding from removal and CAT protection—both forms of relief—are actually still available to individuals in reinstatement proceedings." (citing *Fernandez-Vargas v. Gonzales*, 548 U.S. 30, 35 n.4, 126 S.Ct. 2422, 165 L.Ed.2d 323 (2006); 8 C.F.R. §§ 1208.31(e), 1208.16(c)(4) ) ). Accordingly, in order to resolve this case, we must decide whether a reinstated order of removal against an alien who, like Guerrero-Sanchez, is pursuing bona fide withholding-only relief is administratively final.

[2]With this framing of the issue in mind, we find that § 1231(a), the post-removal provision, is the more logical source of authority for Guerrero-Sanchez's detention. A removal order is unquestionably final when it is first entered. *See* 8 C.F.R. § 241.1. When such an order is subsequently reinstated, as happened here in Guerrero-Sanchez's case, "it stands to reason that it retains the same administrative finality because section 1231(a)(5) proscribes any challenge that might affect the status of the underlying removal order." *Padilla-Ramirez*, 882 F.3d at 831. Indeed, when a reinstated order of removal is in place, withholding-only proceedings do not disturb the underlying order of removal; rather, they only potentially impede the order's execution with respect to a specific

Guerrero-Sanchez v. Warden York County Prison, --- F.3d ---- (2018)

2018 WL 4608970

country. *See* § 1208.2(c)(3)(i). If Guerrero-Sanchez were to ultimately prevail on either his withholding or CAT claim, the resulting remedy would prohibit only his removal to the country of risk: Mexico. It would not prohibit his removal from the United States to an alternative, non-risk country. *See, e.g., Lanza v. Ashcroft,* 389 F.3d 917, 933 (9th Cir.2004) (stating that a grant of withholding "only prohibits removal of the petitioner to the country of risk, but does not prohibit removal to a non-risk country" (quoting *Castellano-Chacon v. INS,* 341 F.3d 533, 545 (6th Cir.2003), holding modified by *Almuhtaseb v. Gonzales,* 453 F.3d 743, 748 (6th Cir.2006) ) ). Thus, "[t]he removal order itself ... is not at issue in the withholding-only proceedings, meaning that those proceedings cannot diminish or otherwise affect its finality." *Padilla-Ramirez,* 882 F.3d at 832.

**\*6** Furthermore, the placement of § 1231(a)(5), which governs reinstated orders of removal, within the post-removal provision itself evidences Congress's intent that § 1231(a) governs the detention of aliens with reinstated orders of removal, even when they pursue withholding-only proceedings. *See id.; see also, e.g., Cipollone v. Liggett Grp., Inc.,* 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992) ("Congress' intent may be 'explicitly stated in the statute's language or implicitly contained in its structure' " (quoting *Jones v. Rath Packing Co.,* 430 U.S. 519, 525, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977) ) ). The Ninth Circuit, which held that such detentions were authorized by § 1231(a), did so in part on this basis. *Padilla-Ramirez,* 882 F.3d at 832 ("The fact that the reinstatement provision appears among section 1231(a)'s detention and supervision provisions further bolsters this inference.").

Conversely, we are compelled to find that the plain text of the pre-removal provision, § 1226(a), forecloses its application to reinstated removal orders. Critically, for that provision to apply there must be a decision "pending" before an immigration judge as to "whether the alien is to be removed *from the United States.*" 8 U.S.C. § 1226(a) (emphasis added). No such decision is pending here. As discussed above, the decision that was before the Immigration Judge was not whether Guerrero-Sanchez should be removed "from the United States"—as is required to trigger § 1226(a)—but rather, whether he may be removed to Mexico, i.e., *to where* he should be removed. "This narrow question of *to where* an alien may be removed is distinct from the broader question of *whether* the alien may be removed; indeed, the former inquiry requires that the latter already have been resolved in the affirmative." *Padilla-Ramirez,* 882 F.3d at 830. Because Guerrero-Sanchez's CAT claim casts no doubt on his removal from the United States, it does not

implicate § 1226(a). *See id.* ("The fact that [an alien] may seek further withholding relief if he prevails on his present application does not change this conclusion since the pending decision in such hypothetical proceedings always will be whether he can be removed to a particular country, which does not implicate section 1226(a).").

Accordingly, we hold that a reinstated order of removal against an alien who has initiated withholding-only proceedings is administratively final.[6] Therefore, just as we elect to follow *Padilla-Ramirez,* we concurrently decline to follow *Guerra.* In *Guerra,* the Second Circuit found that § 1226(a) governs because, although an alien subject to a reinstated removal order is clearly removable, the "purpose of withholding-only proceedings is to determine precisely whether 'the alien is to be removed from the United States.' " 831 F.3d at 62 (quoting 8 U.S.C. § 1226(a) ). However, as discussed *supra,* we respectfully disagree with the Second Circuit's interpretation—the purpose of withholding-only proceedings is to determine the narrow question of where an alien will be removed to, but has no bearing on whether the alien will ultimately "be removed *from the United States.*" 8 U.S.C. § 1226(a) (emphasis added). We agree with the Ninth Circuit that "[i]n concluding that the 'purpose of withholding-only proceedings is to determine precisely whether the alien is to be removed from the United States,' [the Second Circuit] did not paint with a fine enough brush." *Padilla-Ramirez,* 882 F.3d at 835 (citations and internal quotation marks omitted) (quoting *Guerra,* 831 F.3d at 62).

**\*7** *Guerra* also reasoned that the reinstated removal order was not final because an alien could appeal a denial of a withholding application to a federal court of appeals. 831 F.3d at 63. On the basis that the conception of finality pertaining to judicial review must be the same as that which pertains to the administrative finality of his removal order for detention purposes, the Second Circuit reasoned that a "bifurcated definition of finality" would "run[ ] counter to principles of administrative law which counsel that to be final, an agency action must 'mark the consummation of the agency's decisionmaking process.' " *Id.* (quoting *U.S. Army Corps of Eng'rs v. Hawkes Co.,* ––– U.S. ––––, 136 S.Ct. 1807, 1813, 195 L.Ed.2d 77 (2016) ). However, we disagree—as the Ninth Circuit aptly explained, the application of § 1231(a) here does not vitiate the administrative legal principles that the Second Circuit relies on:

The Second Circuit is correct that only an agency action marking "the consummation of the agency's decisionmaking process" qualifies as final agency action. But its conclusion that no such consummation exists while withholding-only proceedings are ongoing

again misunderstands the decision at stake in those proceedings. The agency already decided that Padilla–Ramirez "is to be removed from the United States," 8 U.S.C. § 1226(a), and a different, more limited decision is now pending in his withholding-only proceedings—namely, whether he may be removed to El Salvador. The agency has consummated its decision-making regarding the first issue, but not the second. It therefore is consonant with settled administrative legal principles to hold that Padilla–Ramirez's reinstated removal order (i.e., the agency's decision that he "is to be removed from the United States," *id.*) is final for detention purposes even though it lacks finality for purposes of judicial review of his withholding-only claim.

*Padilla-Ramirez*, 882 F.3d at 836 (citations omitted); *see also Ponta-Garcia v. Att'y Gen.*, 557 F.3d 158, 162 (3d Cir.2009) ("[A]liens subject to reinstatement have already been ordered removed, and thus have already been provided with the requisite procedures and review.").

In a similar vein, amici the American Immigration Council and the American Immigration Lawyers Association (collectively "AIC") contend that "[e]very circuit to have addressed the question [of finality] has agreed that a reinstatement order where the individual has articulated a fear of return is *not* final until reasonable fear or the withholding-only proceedings have been concluded." AIC Br. at 17-18 (citing *Ponce-Osorio v. Johnson*, 824 F.3d 502 (5th Cir.2016); *Jimenez-Morales v. Att'y Gen.*, 821 F.3d 1307 (11th Cir.2016), *cert. denied sub nom. Jimenez-Morales v. Lynch*, ––– U.S. ––––, 137 S.Ct. 685, 196 L.Ed.2d 528 (2017); *Luna-Garcia v. Holder*, 777 F.3d 1182, 1183 (10th Cir.2015); *Ortiz-Alfaro v. Holder*, 694 F.3d 955 (9th Cir.2012) ). However, none of these cases address the finality of reinstated deportation orders for the purposes of removal. Rather, they address whether such orders are final "for the purposes of timely petitioning for judicial review" of orders denying relief in a reasonable fear or withholding-only proceeding. *See, e.g., Ortiz-Alfaro*, 694 F.3d at 958 (noting that validity of "the underlying prior removal order" was not before the court).[7] These cases are therefore inapposite. AIC relies on the incorrect assumption that "the finality of a reinstatement order is identical for purposes of judicial review and detention." AIC Br. at 20. Indeed, it is telling that neither *Padilla-Ramirez* nor *Guerra*—both of which were decided after *Ponce-Osorio*, *Jimenez-Morales*, *Luna-Garcia*, and *Ortiz-Alfaro*—rely on any of these cases for support; to the contrary, they distinguish them.[8]

**\*8** To summarize, Guerrero-Sanchez's detention is governed by § 1231(a). A reinstated removal order is administratively final for the purposes of removal because it provides that an alien "shall be removed" from the United States, and that determination is "not subject to being reopened or reviewed." 8 U.S.C. § 1231(a)(5). An alien with a reinstated order of removal therefore cannot have a decision "pending" before an immigration judge on "whether the alien is to be removed *from the United States.*" 8 U.S.C. § 1226(a) (emphasis added). As a result, such aliens cannot fulfill the necessary predicate to implicate § 1226(a), and they cannot rely on that provision to obtain a bond hearing.

### III. THE IMPLICIT BOND HEARING REQUIREMENT OF § 1231(a)(6)

[3]Because § 1231(a) governs Guerrero-Sanchez's detention, we must next reach his alternative argument that he is still entitled to a bond hearing because that provision implicitly requires a bond hearing after prolonged detention. For the reasons below, we agree and will affirm the District Court's order on this basis.

#### A. *Zadvydas v. Davis*
As discussed *supra*, when an alien has been found to be unlawfully present in the United States and a final order of removal has been entered, the Government ordinarily secures the alien's removal during a subsequent 90-day statutory "removal period," during which time the alien normally is held in custody. 8 U.S.C. § 1231(a)(1)(A). However, since Guerrero-Sanchez's detention lasted longer than 90 days, it was governed by § 1231(a)(6), which authorizes detention beyond the 90 days under certain circumstances. It provides:

> An alien ordered removed [1] who is inadmissible ... [2] [or] removable [as a result of violations of status requirements or entry conditions, violations of criminal law, or reasons of security or foreign policy] or [3] who has been determined by the Attorney General to be a risk to the community or unlikely to comply with the order of removal, may be detained beyond the removal period and, if released, shall be subject to [certain] terms of supervision....

8 U.S.C. § 1231(a)(6). Noticeably, unlike § 1226(a), the text of § 1231(a)(6) does not explicitly authorize a bond hearing for aliens that are encompassed within its ambit.

Nor does § 1231(a)(6) contain any express limit on the duration of an alien's detention under the provision.

In *Zadvydas v. Davis*, 533 U.S. 678, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001), however, the Supreme Court interpreted § 1231(a)(6) to authorize the detention of aliens "only as long as 'reasonably necessary' to remove them from the country." *Clark v. Martinez*, 543 U.S. 371, 377, 125 S.Ct. 716, 160 L.Ed.2d 734 (2005) (quoting *Zadvydas*, 533 U.S. at 689, 699, 121 S.Ct. 2491). Such an interpretation was required to avoid the " 'serious constitutional threat' ... posed by the indefinite detention of aliens who had been admitted to the country." *Id.* (quoting *Zadvydas*, 533 U.S. at 699, 121 S.Ct. 2491). According to the Court, the provision's use of the word "may" was ambiguous because it " 'suggests discretion,' but 'not necessarily ... unlimited discretion.' " *Id.* (quoting *Zadvydas*, 533 U.S. at 699, 121 S.Ct. 2491). Here, the Government argues that *Zadvydas* resolves the only ambiguity in the text of § 1231(a)(6) and makes clear that Guerrero-Sanchez "may be held in confinement until it has been determined that there is no significant likelihood of removal in the reasonably foreseeable future." Appellant Br. at 15 (quoting *Zadvydas*, 533 U.S. at 701, 121 S.Ct. 2491).

We disagree. *Zadvydas* had no occasion to address the due process concerns posed by prolonged detention of someone in Guerrero-Sanchez's situation who is still seeking withholding-only relief. Rather, *Zadvydas* addressed only the detention of noncitizens who—unlike Guerrero-Sanchez—have exhausted all administrative and judicial challenges to removal, including applications for relief from removal, and are only waiting for their removal to be effectuated. *See Demore v. Kim*, 538 U.S. 510, 527, 123 S.Ct. 1708, 155 L.Ed.2d 724 (2003) (distinguishing *Zadvydas* on the basis that "in *Zadvydas*, the aliens challenging their detention following final orders of deportation were ones for whom removal was 'no longer practically attainable' " (quoting *Zadvydas*, 533 U.S. at 690, 121 S.Ct. 2491) ).

**\*9** This distinction is material because detaining Guerrero-Sanchez without a bond hearing while he pursues his bona fide withholding-only claim "would effectively punish [him] for pursuing applicable legal remedies."⁹ *Leslie v. Attorney Gen. of U.S.*, 678 F.3d 265, 271 (3d Cir.2012) (internal quotation marks omitted), *abrogated in part and on other grounds by Jennings*, 138 S.Ct. at 847. Thus, *Zadvydas*' focus on the foreseeability of removal—and its limiting construction of § 1231(a)(6) as authorizing detention only when removal is reasonably foreseeable—does not address or settle the due process concerns raised by the prolonged detention of an alien

like Guerrero-Sanchez, who is still pursuing a bona fide withholding-only claim that could take years to resolve.

More importantly, *Zadvydas* narrowed the *scope* of the detention that § 1231(a)(6) authorizes. *See Hernandez-Carrera v. Carlson*, 547 F.3d 1237, 1248 (10th Cir.2008) ("The Supreme Court [in *Zadvydas*], confronted with a very broad statute, narrowed its scope to avoid unconstitutionality" (quoting *Thai v. Ashcroft*, 389 F.3d 967, 971 (9th Cir.2004) (Kozinski, J., dissenting from denial of *en banc* ) ) ). It did not, however, provide that the Court's limiting construction of § 1231(a)(6) is the sole constraint on detention that the Due Process Clause requires.¹⁰ *See id.* at 1249 ("In *Zadvydas*, the Supreme Court did not purport to 'resolve' the statutory ambiguity in § 1231(a)(6) once and for all. ... In no way, ... did the Court signal that its interpretation was the only reasonable construction of § 1231(a)(6)."); *id.* at 1248 ("[T]he Court's method of narrowing [§ 1231(a)(6) in *Zadvydas*] is not the only permissible one." (quoting *Thai*, 389 F.3d at 971 (Kozinski, J., dissenting from denial of *en banc* ) ) ). Indeed, a detention could still raise constitutional concerns even if it is ostensibly authorized by statute. *See Diouf v. Napolitano*, 634 F.3d 1081, 1084 (9th Cir.2011) (invoking canon of constitutional avoidance to interpret § 1231(a)(6) after determining "that [the alien's] detention was authorized by statute"); *Prieto-Romero v. Clark*, 534 F.3d 1053, 1065 (9th Cir.2008) ("Even if [an alien's] continued detention is permitted by statute, however, due process requires 'adequate procedural protections' to ensure that the government's asserted justification for physical confinement 'outweighs the individual's constitutionally protected interest in avoiding physical restraint.' " (quoting *Zadvydas*, 533 U.S. at 690-91, 121 S.Ct. 2491) ). While *Zadvydas* limited the *substantive scope* of § 1231(a)(6), it did not explicitly preclude courts from construing § 1231(a)(6) to include additional *procedural* protections during the statutorily authorized detention period, should those protections be necessary to avoid detention that could raise different constitutional concerns. *See Diouf*, 634 F.3d at 1084 (holding that "individuals detained under § 1231(a)(6) are entitled to the same procedural safeguards against prolonged detention as individuals detained under § 1226(a)").

B. The Due Process Concerns Associated with Guerrero-Sanchez's Detention

**\*10** Guerrero-Sanchez's detention without bond—which had spanned 637 days before his hearing—pending the resolution of his withholding-only proceedings raises serious due process concerns. *See Diouf*, 634 F.3d at 1086

("[P]rolonged detention under § 1231(a)(6), without adequate procedural protections, would raise 'serious constitutional concerns.' " (quoting *Casas-Castrillon v. Dep't of Homeland Sec.*, 535 F.3d 942, 950 (9th Cir.2008) ) ); *Chavez-Alvarez v. Warden York Cty. Prison*, 783 F.3d 469, 471 (3d Cir.2015) ("The total number of days that Chavez–Alvarez has been held in civil detention since his arrest, if tallied, gives us reason for pause."), *abrogated in part and on other grounds by Jennings*, 138 S.Ct. at 847.

We have already recognized in the pre-removal context that "when detention becomes unreasonable, the Due Process Clause demands a hearing, at which the Government bears the burden of proving that continued detention is necessary to fulfill the purposes of the detention statute." *Diop v. ICE/Homeland Sec.*, 656 F.3d 221, 233 (3d Cir.2011), *abrogated in part and on other grounds by Jennings*, 138 S.Ct. at 847.[11] In those cases, "due process requires us to recognize that, at a certain point—which may differ case by case—the burden to an alien's liberty outweighs a mere presumption that the alien will flee and/or is dangerous." *Chavez-Alvarez*, 783 F.3d at 474–75 (footnote omitted); *see also Diop*, 656 F.3d at 232 ("At a certain point, continued detention becomes ... unconstitutional unless the Government has justified its actions at a hearing inquiring into whether continued detention is consistent with the law's purposes of preventing flight and dangers to the community.").

**\*11** We see no substantial distinction between the liberty interests of aliens detained under § 1226(a) and § 1231(a)(6) because "[r]egardless of the stage of the proceedings, the same important interest is at stake—freedom from prolonged detention"—accordingly, "[t]he liberty interests of persons detained under § 1231(a)(6) are comparable to those of persons detained under § 1226(a)." *Diouf*, 634 F.3d at 1087. The Government contends that individuals like Guerrero-Sanchez have a lesser liberty interest because they each have a prior removal order already in place. However, Guerrero-Sanchez's status is not appreciably different from that of the alien in *Diop*, who had a final removal order at the time we decided his case and was subjected to prolonged detention while pursuing—precisely like Guerrero-Sanchez—CAT relief, as well as withholding of removal. *See* 656 F.3d at 226 (explaining that the alien in *Diop* argued before the Immigration Court "that the vacatur of his conviction meant that he was eligible for withholding of removal" and that he made a "claim of a right to relief under the Convention Against Torture").

As to the Government's interest in detaining aliens in the post-removal context, we agree with the Ninth Circuit that "[t]he distinctions between § 1226(a) and § 1231(a)(6) ...

are not substantial enough to justify denying a bond hearing to all aliens subject to extended detention under § 1231(a)(6)." *Diouf*, 634 F.3d at 1087. As the Ninth Circuit aptly explained:

> First, the government has an interest in ensuring that aliens are available for removal if their legal challenges do not succeed whether they are detained under § 1226(a) or § 1231(a)(6). Second, in either circumstance, the government's interest in the prompt removal of aliens who have exhausted their legal challenges is served by the bond hearing process itself. If the alien poses a flight risk, [continued] detention is permitted.

> Third, the same concerns about prolonged detention arise irrespective of whether an alien has petitioned for review of an order of removal (direct review) or an order denying a motion to reopen (collateral review). In both situations, it may take years for the petitions for review to be resolved.

*Id.* at 1087-88. We therefore find that it *may* be the case that the Due Process Clause prohibits prolonged detention under § 1231(a)(6) without a bond hearing.

A. Underline: Canon of Constitutional Avoidance and Our Construction of § 1231(a)(6)

**[4]** **[5]** Despite the constitutional concerns raised by Guerrero-Sanchez's detention under § 1231(a)(6), we decline to decide whether his continued confinement violated the Due Process Clause. "As a first inquiry, we must avoid deciding a constitutional question if the case may be disposed of on some other basis." *Doe v. Pa. Bd. of Prob. & Parole*, 513 F.3d 95, 102 (3d Cir.2008). We assume that Congress does not intend to pass unconstitutional laws—accordingly, "it is a cardinal principle of statutory interpretation ... that when an Act of Congress raises a serious doubt as to its constitutionality, ... [courts] will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided." *Diop*, 656 F.3d at 231 (quoting *Zadvydas*, 533 U.S. at 689, 121 S.Ct. 2491). We therefore invoke the canon of constitutional avoidance so long as "the statute is found to be susceptible of more than one construction." *Jennings*, 138 S.Ct. at 842 (quoting *Clark*, 543 U.S. at 385, 125 S.Ct. 716).

The Supreme Court has already determined that the text of § 1231(a)(6) is ambiguous as to the due process protections that it provides. *See Zadvydas*, 533 U.S. at 697, 121 S.Ct. 2491 (holding that § 1231(a)(6) is

Guerrero-Sanchez v. Warden York County Prison, --- F.3d ---- (2018)

2018 WL 4608970

ambiguous). This is the case because § 1231(a)(6), unlike other provisions in the INA, does not provide for detention for a specified period of time, uses the word "may" to describe the detention authority rather than "shall," and lacks an express exception to detention provided for in the provision. *See Jennings*, 138 S.Ct. at 844. The plain text of § 1231(a)(6) therefore invites us to apply the canon of constitutional avoidance in order to avoid the question of whether Guerrero-Sanchez's continued detention under that provision violates the Due Process Clause. *See Demore*, 538 U.S. at 523, 123 S.Ct. 1708 ("It is well established that the Fifth Amendment entitles aliens to due process of law in deportation proceedings." (quoting *Reno v. Flores*, 507 U.S. 292, 306, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993) ) ).

**\*12** [6] [7] [8]In order to avoid determining whether Guerrero-Sanchez's detention violates the Due Process Clause, we adopt the Ninth Circuit's limiting construction of § 1231(a)(6) that "an alien facing prolonged detention under [that provision] is entitled to a bond hearing before an immigration judge and is entitled to be released from detention unless the government establishes that the alien poses a risk of flight or a danger to the community."[12] *Diouf*, 634 F.3d at 1092. Critically, our holding today necessarily applies to *all* aliens detained under § 1231(a)(6), not just those, like Guerrero-Sanchez, who have reinstated removal orders under § 1231(a)(5) and are pursuing withholding-only relief. This is because "statutory language given a limiting construction in one context must be interpreted consistently in other contexts, 'even though other of the statute's applications, standing alone, would not support the same limitation.' " *Spector v. Norwegian Cruise Line Ltd.*, 545 U.S. 119, 140, 125 S.Ct. 2169, 162 L.Ed.2d 97 (2005) (quoting *Clark*, 543 U.S. at 380, 125 S.Ct. 716).

Here, there is no basis in § 1231(a)(6) to fashion a class of aliens that is not explicitly enumerated in the provision— if we were to hold that only aliens like Guerrero-Sanchez were entitled to bond hearings, then we would be acknowledging and distinguishing a specific class of aliens that is not ostensibly recognized anywhere in the text or legislative history of the INA. *See Clark*, 543 U.S. at 378, 125 S.Ct. 716 ("To give [the words 'may be detained beyond the removal period,' in § 1231(a)(6) ] a different meaning for each category [of aliens] would be to invent a statute rather than interpret one."). Such a reading of § 1231(a)(6) would be implausible, and would therefore constitute an inappropriate application of the canon of constitutional avoidance. *See Jennings*, 138 S.Ct. at 843 ("Spotting a constitutional issue does not give a court the authority to rewrite a statute as it pleases. Instead, the canon permits a court to 'choos[e] between

competing *plausible* interpretations of a statutory text.' " (quoting *Clark*, 543 U.S. at 381, 125 S.Ct. 716) ). Accordingly, our interpretation applies to *all* classes of aliens that are enumerated in § 1231(a)(6)—*i.e.*, aliens who are inadmissible under 8 U.S.C. § 1182, removable under 8 U.S.C. § 1227(a)(1)(C), (a)(2), or (a)(4), or who have "been determined by the Attorney General to be a risk to the community or unlikely to comply with the order of removal," 8 U.S.C. § 1231(a)(6)—because "[t]he operative language of § 1231(a)(6), 'may be detained beyond the removal period,' applies without differentiation to all three categories of aliens that are its subject." *Clark*, 543 U.S. at 378, 125 S.Ct. 716 (quoting 8 U.S.C. § 1231(a)(6) ).

We emphasize, however, that aliens detained under § 1231(a)(6) are only entitled to a bond hearing after *prolonged* detention.[13] We therefore must determine *when* a detention becomes prolonged. In order to identify "the specific dictates of due process" in this context, we apply the three-part test that the Supreme Court enunciated in *Mathews v. Eldridge*, 424 U.S. 319, 355, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). That test provides that we weigh three factors:

> **\*13** First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* Under § 1231(a)(6), "[w]hen detention crosses the six-month threshold and release or removal is not imminent, the private interests at stake are profound" and "the risk of an erroneous deprivation of liberty in the absence of a hearing before a neutral decisionmaker is substantial." *Diouf*, 634 F.3d at 1091-92; *id.* at 1092 n.13 ("As a general matter, detention is prolonged [under § 1231(a)(6) ] when it has lasted six months and is expected to continue more than minimally beyond six months."). This is because "the constitutional case for continued detention without inquiry into its necessity becomes more and more suspect as detention continues...." *Diop*, 656 F.3d at 234; *see also Zadvydas*, 533 U.S. at 701, 121 S.Ct. 2491 (providing that due process analysis is altered as "the

period of ... confinement grows").

Correspondingly, the fiscal and administrative burden on the Government of requiring a bond hearing before an immigration judge is diminished in light of our estimation that the incidence of these hearings will be manageable since the vast majority of removal orders are executed well before six months.[14] As such, "[t]he burden imposed on the [G]overnment by requiring hearings before an immigration judge at the [post-removal] stage of the proceedings is ... a reasonable one." *Diouf, 634 F.3d at 1092*. Indeed, in *Zadvydas*, the Supreme Court, while interpreting § 1231(a)(6) in a related context, adopted a presumption that aliens could be reasonably detained without a hearing for six months because there is "reason to believe ... that Congress previously doubted the constitutionality of detention for more than six months." 533 U.S. 678, 701, 121 S.Ct. 2491 (citing Juris. Statement in *United States v. Witkovich*, O.T. 1956, No. 295, pp. 8-9). We therefore adopt a six-month rule here—that is, an alien detained under § 1231(a)(6) is generally entitled to a bond hearing after six months (*i.e.*, 180 days) of custody.[15]

**B.** *Chevron* Deference

*\*14 [9]*In interpreting § 1231(a)(6) to avoid the serious due process concerns identified above, we recognize that we are declining to defer to relevant DHS regulations. When a statute is ambiguous, we "normally apply *Chevron* deference to the agency's interpretation of the statute, so long as that construction was reasonable." *Romanishyn v. Attorney Gen. of U.S.*, 455 F.3d 175, 183 (3d Cir.2006). However, although we consider the canon of constitutional avoidance to "defin[e] the scope of a congressional delegation in light of an agency's actual interpretation," *Am. Farm Bureau Fed'n v. U.S. E.P.A.*, 792 F.3d 281, 301 (3d Cir.2015), we do not defer to an agency's interpretation of a statute that raise serious constitutional doubts. *See Miller v. Johnson*, 515 U.S. 900, 923, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995) ("[W]e think it inappropriate for a court engaged in constitutional scrutiny to accord deference to [an agency's] interpretation of [a statute]."); *Rust v. Sullivan*, 500 U.S. 173, 207, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991) ("It is thus implausible that, after *Chevron*, agency interpretations of ambiguous statutes will prevail even if the consequence of those interpretations is to ... raise serious constitutional doubts" (quoting Cass R. Sunstein, *Law and Administration After Chevron*, 90 COLUM L. REV. 2071, 2113 (1990) ) ); *Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 173-74, 121 S.Ct. 675, 148 L.Ed.2d 576 (2001) (refusing

to apply *Chevron* deference where "significant constitutional questions [are] raised"); *Hernandez-Carrera*, 547 F.3d at 1249 ("It is well established that the canon of constitutional avoidance does constrain an agency's discretion to interpret statutory ambiguities, even when *Chevron* deference would otherwise be due."); *Nat'l Mining Ass'n v. Kempthorne*, 512 F.3d 702, 711 (D.C. Cir.2008) ("This canon of constitutional avoidance trumps *Chevron* deference, and we will not submit to an agency's interpretation of a statute if it 'presents serious constitutional difficulties.' " (quoting *Chamber of Commerce v. FEC*, 69 F.3d 600, 605 (D.C. Cir.1995) ) (citation omitted) ); *Kim Ho Ma v. Ashcroft*, 257 F.3d 1095, 1105 n.15 (9th Cir.2001) ("*Chevron* principles are not applicable where a substantial constitutional question is raised by an agency's interpretation of a statute it is authorized to construe." (citation omitted) ).

Such is the case here. The DHS regulations that implement the Government's detention authority under § 1231(a)(6) themselves "raise serious constitutional concerns." *Diouf, 634 F.3d at 1091*. These regulations—8 C.F.R. §§ 241.4 and 241.13—provide administrative custody reviews after 90 days, 180 days, and 18 months, *see* 8 C.F.R. § 241.4(k)(2)(ii)-(iii), by DHS employees who are not ostensibly neutral decision makers such as immigration judges. Importantly, the regulations also place the burden on *the alien*, rather than the Government, to prove that he or she is *not* a flight risk or a danger to the society, *see* 8 C.F.R. § 241.4(d)(1), and "there is no appeal from [DHS's] ... decision." 8 C.F.R. § 241.4(d); *see also* 8 C.F.R. § 241.13(g)(2).[16]

This procedure fails to account for the Supreme Court's admonition that "the Constitution may well preclude granting 'an administrative body the unreviewable authority to make determinations implicating fundamental rights.' " *Zadvydas*, 533 U.S. at 692, 121 S.Ct. 2491 (quoting *Superintendent, Mass. Corr. Inst. at Walpole v. Hill*, 472 U.S. 445, 450, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985) ). We therefore decline to apply *Chevron* deference to the Government's interpretation of § 1231(a)(6). *See Diouf, 634 F.3d at 1091* (declining to defer to DHS regulations that implement post-removal detention).

## IV. CONCLUSION

[10]As we have discussed throughout our decision, our holding today is in line with that of the Ninth Circuit, the

Guerrero-Sanchez v. Warden York County Prison, --- F.3d ---- (2018)

2018 WL 4608970

sole court of appeals to have also addressed this issue. *See Diouf*, 634 F.3d at 1082. *Diouf* is not controlling on us, yet it is instructive. We are also "reluctant to create [a] circuit split[ ]," and only do so "where a 'compelling basis exists.' " *Parker v. Montgomery Cty. Corr. Facility/Bus. Office Manager*, 870 F.3d 144, 152 (3d Cir.2017) (quoting *Karlo v. Pittsburgh Glass Works, LLC*, 849 F.3d 61, 75 n.7 (3d Cir.2017) ). This reluctance is especially acute "where the rules at issue 'are best applied uniformly.' " *Padilla-Ramirez*, 882 F.3d at 836 (quoting *Kelton Arms Condo. Owners Ass'n, Inc. v. Homestead Ins. Co.*, 346 F.3d 1190, 1192 (9th Cir.2003) ). Here, the INA "certainly falls into this category" because it is "a comprehensive federal scheme that requires a nationally unified administration program." *Id.*; *see also Arizona v. United States*, 567 U.S. 387, 401, 132 S.Ct. 2492, 183 L.Ed.2d 351 (2012) (describing federal immigration law as "a comprehensive and unified system"). Our decision today aligns this Court's law with that of our sister circuit, and therefore effectuates Congress's directive that "the immigration laws of the United States should be enforced vigorously and *uniformly*." Immigration Reform and Control Act of 1986, Pub.L. 99-603, § 115, 100 Stat. 3384 (emphasis added).

**\*15** Here, Guerrero-Sanchez was detained by ICE from May 2015 to February 2017, and he was provided a bond hearing only after 637 days in civil detention. Pursuant to our limiting construction of § 1231(a)(6), he was owed a hearing because he was detained well beyond six months. According to the Government, Guerrero-Sanchez should not have received a bond hearing at any point before his withholding-only proceeding takes place, which is not scheduled until September 5, 2019. The Government contends that it may detain Guerrero-Sanchez under § 1231(a)(6) for, at a minimum, fifty-three months without inquiry into the necessity of his detention. For all of the reasons discussed *supra*, we find to the contrary and hold that Guerrero-Sanchez's detention was unquestionably prolonged. We will therefore affirm on alternative grounds the District Court's decision to afford Guerrero-Sanchez a bond hearing.[17]

RENDELL, Circuit Judge, concurring:

I concur in the majority's reasoning and result but believe that neither 8 U.S.C. § 1226(a) nor § 1231(a) clearly addresses the detention of one whose removal order has been reinstated but who has filed for withholding of removal. The majority chooses to apply § 1231(a)(6) because, given the finality of a reinstated removal order, a decision as to whether Guerrero-Sanchez is to be removed

from the United States is not "pending." While § 1226(a) may be intended to apply before a removal order is entered, the provision for bond hearings under § 1226(a) may be better suited to the instant situation, since withholding proceedings are protracted, and can remain pending for years. Two other Courts of Appeals have considered this issue, each reasoning thoughtfully to a different conclusion.[1] Thus, I submit that legislative clarification is needed in order to addresses the specific detention issue before us.[2]

Section 1231(a) anticipates that removal is certain, yet Guerrero-Sanchez's reinstated removal order is not administratively final, as his withholding proceedings are ongoing. *C.f.* Majority Opinion at ——. Indeed, nearly every Court of Appeals to have considered the issue of finality of a reinstated removal order has held that there is no administrative finality until the agency has adjudicated the request for withholding of removal. *See Guerra v. Shanahan*, 831 F.3d 59, 63–64 (2d Cir.2016); *Jimenez-Morales v. Att'y Gen.*, 821 F.3d 1307, 1308 (11th Cir.2016), *cert. denied sub nom. Jimenez-Morales v. Lynch*, —— U.S. ——, 137 S.Ct. 685, 196 L.Ed.2d 528 (2017); *Ponce-Osorio v. Johnson*, 824 F.3d 502, 506–07 (5th Cir.2016); *Luna-Garcia v. Holder*, 777 F.3d 1182, 1185–86 (10th Cir.2015); *Ortiz-Alfaro v. Holder*, 694 F.3d 955, 958 (9th Cir.2012); *but see Padilla-Ramirez v. Bible*, 882 F.3d 826, 832 (9th Cir.2017). *See also Shehu v. Att'y Gen.*, 482 F.3d 652, 656 (3d Cir.2007) (holding that an order is final when the alien is entitled to "no further process" before they are removed). Granted, Guerrero-Sanchez's removal order has been reinstated, and thus not subject to appeal. Nonetheless, it is not final in the true sense of the word.[3]

**\*16** As the Majority notes, Guerrero-Sanchez was detained under § 1231(a)(6) for 637 days (approximately 21 months) while his withholding proceedings remained, and continue to remain, pending. Guerrero-Sanchez was detained by ICE in May of 2015 and his withholding-only proceedings are scheduled for September 5, 2019, after which it may take months for a final decision to be issued, subject to further appeals. Thus, Guerrero-Sanchez would potentially have been detained for over four years absent a bond hearing and grant of release. Alternatively, an initial bond hearing under § 1226(a) would release those aliens who should not be detained—those who neither pose a risk of flight nor danger to their communities—without detaining them for over 6 months before they can raise a due process challenge to the prolonged nature of their detention.[4] *See* Majority Opinion at —— – ——.

Thus, I urge that legislative action is needed to clarify whether someone in Guerrero-Sanchez's position is

2018 WL 4608970

statutorily entitled to a bond hearing.

--- F.3d ----, 2018 WL 4608970

**All Citations**

Footnotes

1   The District Court had jurisdiction over this case pursuant to 28 U.S.C. § 2241, and we have jurisdiction under 28 U.S.C. §§ 1291 and 2253.

2   In the alternative, the Government argues that, should § 1226 govern, then a different subsection of the provision—§ 1226(c)—applies. That subsection "carves out a statutory category of aliens who may *not* be released under § 1226(a)." *Jennings v. Rodriguez,* ―― U.S. ――――, 138 S.Ct. 830, 837, 200 L.Ed.2d 122 (2018). It provides that the "Attorney General shall take into custody any alien," who commits one of various enumerated categories of criminal and terrorist offenses, 8 U.S.C. § 1226(c), including a violation of "any law or regulation of a State, the United States, or a foreign country relating to a controlled substance," *id.* § 1227(a)(2)(B)(i). If an alien falls within the ambit of § 1226(c), then no bond hearing is provided and the alien's "detention may end prior to the conclusion of removal proceedings 'only if' the alien is released for witness-protection purposes." *Jennings,* 138 S.Ct. at 847 (quoting 8 U.S.C. § 1226(c) ).

3   The other classes of aliens covered by § 1231(a)(6) are those removable under § 8 U.S.C. 1227(a)(1)(C), 1227(a)(2), or 1227(a)(4), and those who have "been determined by the Attorney General to be a risk to the community or unlikely to comply with the order of removal," 8 U.S.C. § 1231(a)(6).

4   "Under the familiar two-step *Chevron* inquiry, first, if the statute is clear we must give effect to Congress' unambiguous intent, and, second, if the statute is silent or ambiguous with respect to a specific issue, we defer to an implementing agency's reasonable interpretation of that statute." *De Leon-Ochoa v. Att'y Gen.,* 622 F.3d 341, 348 (3d Cir.2010) (citing *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) ).

5   Section 1231(a)(5) provides in its entirety:
    If the Attorney General finds that an alien has reentered the United States illegally after having been removed or having departed voluntarily, under an order of removal, the prior order of removal is reinstated from its original date and is not subject to being reopened or reviewed, the alien is not eligible and may not apply for any relief under this chapter, and the alien shall be removed under the prior order at any time after the reentry.
    8 U.S.C. § 1231(a)(5).

6   It is worth noting that if § 1226 applied, there would be merit to the Government's argument that § 1226(c) would nonetheless—as a statutory matter—prohibit a bond hearing in Guerrero-Sanchez's case. As discussed *supra* note 2, § 1226(c) applies to the detention of aliens that have been convicted of certain qualifying offenses and does not afford a bond hearing unless the alien is released for witness protection purposes. *See Jennings,* 138 S.Ct. at 847. Here, Guerrero-Sanchez pled guilty and was convicted under 21 U.S.C. §§ 846 and 841(a)(1) for conspiracy to distribute more than fifty grams of methamphetamine and was sentenced in April 2013 to forty-two months' imprisonment. That offense is a qualifying criminal conviction under § 1226(c), which provides that "[t]he Attorney General shall take into custody any alien who ... is deportable by reason of having committed any offense covered in section 1227(a)(2)(A)(ii), (A)(iii), (B) ... of this title." 8 U.S.C. § 1226(c)(1)(B). Relevant for Guerrero-Sanchez's case is § 1227(a)(2)(B)(i), which provides:
    Any alien who at any time after admission has been convicted of a violation of (or a conspiracy or attempt to violate) any law or regulation of a State, the United States, or a foreign country relating to a controlled substance (as defined in section 802 of Title 21), other than a single offense involving possession for one's own use of 30 grams or less of marijuana, is deportable.
    8 U.S.C. § 1227(a)(2)(B)(i). Because Guerrero-Sanchez's conviction related to more than fifty grams of methamphetamine, his detention would fall within the confines of § 1226(c). Since he offers no evidence that his release is pursuant to a witness protection purpose, he would be *statutorily* foreclosed from being afforded a bond hearing altogether if § 1226 applied. Whether Guerrero-Sanchez would be *constitutionally* entitled to a bond hearing under the Due Process Clause is an entirely different question—a question that we need not resolve today because we hold that his detention is governed by § 1231(a). *See Jennings,* 138 S.Ct. at 847 (declining to decide whether the Due Process Clause requires a pre-removal bond hearing because the Supreme Court is "a court of review, not of first view" (quoting *Cutter v. Wilkinson,* 544 U.S. 709, 718 n.7, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005) ) ).

Guerrero-Sanchez v. Warden York County Prison, --- F.3d ---- (2018)

2018 WL 4608970

7  *See also Ponce-Osorio, 824 F.3d at 507* ("The reinstatement order is thus non-final, and we lack jurisdiction over Ponce-Osorio's petition for review."); *Luna-Garcia, 777 F.3d at 1185* (describing the issue as determining "the point at which a reinstated removal order becomes final for purposes of calculating the time to petition for review"); *Jimenez-Morales, 821 F.3d at 1308* ("DHS' reinstatement of the 2011 order of removal was not final because the reasonable fear proceeding was ongoing. That presents a jurisdictional problem because the Immigration and Nationality Act vests circuit courts with jurisdiction to review only 'final' orders of removal.").

8  In *Guerra*, when discussing that the court was deciding an issue of first impression, it stated "[t]he Ninth and Tenth Circuits have held that they lack jurisdiction over petitions for review filed while withholding-only proceedings are ongoing" but that "[n]either court, however, answered the question of which section authorized detention for aliens in Guerra's position." 831 F.3d at 62 n.1 (citing *Ortiz-Alfaro, 694 F.3d at 958*; *Luna-Garcia, 777 F.3d at 1184*).
In *Padilla-Ramirez*, the Ninth Circuit held that *Ortiz-Alfaro* "is readily distinguishable because its holding rested on the canon of constitutional avoidance." *882 F.3d at 833.* Conversely, "[h]olding that Padilla-Ramirez's reinstated order is administratively final for detention purposes poses no such constitutional difficulty, so the avoidance canon need not dictate the outcome here." *Id.* Thus, "*Ortiz-Alfaro* ... does not control the outcome of this case." *Id. at 834.* Notably, Guerrero-Sanchez relies on *Ortiz-Alfaro* for the proposition that a holding that the reinstated removal order is final would make it impossible for him to timely petition for review of an immigration judge's decision denying him relief. However, this portion of his case does not invoke the canon of constitutional avoidance because "the text and structure of the [INA] indicate that Congress intended for section 1231(a) to govern detention of aliens subject to reinstated removal orders." *Padilla-Ramirez, 882 F.3d at 834. Ortiz-Alfaro* is therefore inapposite.

9  The Government contends that Guerrero-Sanchez's confinement is not " 'punishment' for pursuing withholding or deferral of removal to Mexico" because such detention is "nonpunitive in purpose and effect." Government Reply Br. at 18 (quoting *Zadvydas, 533 U.S. at 690, 121 S.Ct. 2491*). However, "the reality [is] that merely calling a confinement 'civil detention' does not, of itself, meaningfully differentiate it from penal measures." *Chavez-Alvarez v. Warden York Cty. Prison, 783 F.3d 469, 478 (3d Cir.2015)* (citing *Kansas v. Hendricks, 521 U.S. 346, 361, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997)*; *Application of Gault, 387 U.S. 1, 27, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967)* ).

10  To the contrary, *Zadvydas* provides that, even where detention is not indefinite, it still must bear a "reasonable relation" to the Government's interests in preventing flight and danger to the community and be accompanied by adequate procedures to determine if detention is necessary. *533 U.S. at 690, 121 S.Ct. 2491* (quoting *Jackson v. Indiana, 406 U.S. 715, 738, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972)* ); *see also id. at 700, 121 S.Ct. 2491* ("[I]f removal is reasonably foreseeable, the habeas court should consider the risk of the alien's committing further crimes as a factor potentially justifying confinement within that reasonable removal period.").

11  In *Diop*, applying the canon of constitutional avoidance, we construed § 1226(c) to contain an implicit "reasonable" time limit on the period for which detention without a bond hearing was statutorily authorized. *656 F.3d at 231.* This statutory holding has been abrogated by *Jennings*, where the Court held that the text of § 1226(c) is clear and that "detention [under § 1226(c) ] may end prior to the conclusion of removal proceedings 'only if' the alien is released for witness-protection purposes." *Jennings, 138 S.Ct. at 847* (quoting 8 U.S.C. § 1226(c) ).
*Diop*, however, also reached a constitutional holding and found that "when detention becomes unreasonable, the *Due Process Clause* demands a hearing, at which the Government bears the burden of proving that continued detention is necessary to fulfill the purposes of the detention statute." 656 F.3d at 233 (emphasis added); *see also id. at 223* ("[T]he Due Process Clause of the Fifth Amendment to the Constitution requires that the Government establish that continued detention is necessary to further the purposes of [§ 1226(c) ].");*id. at 235* (holding that Diop's detention constituted "a violation of the Due Process Clause"). We reasoned, *inter alia*, that "[t]he constitutionality of [mandatory detention] is a function of the length of the detention" and that "[a]t a certain point, continued detention ... *becomes unconstitutional* unless the Government has justified its actions at a hearing inquiring into whether continued detention is consistent with the law's purpose of preventing flight and dangers to the community." *Id. at 232* (emphasis added). Since we hold that Guerrero-Sanchez's detention is governed by § 1231(a)(6) and not § 1226(c), we have no occasion to determine here whether *Diop*'s constitutional holding survives *Jennings*.
However, the constitutional *concerns* that *Diop* identified with mandatory detention in the pre-removal context are similar to those in the post-removal context. *See Diouf, 634 F.3d at 1087* ("Regardless of the stage of the proceedings, the same important interest is at stake—freedom from prolonged detention."). And we need not determine that those concerns rise to the level of an outright constitutional violation in order to employ the canon of constitutional avoidance. Indeed, the entire purpose of the canon is to avoid reaching the merits of the constitutional issue. *See, e.g., Santana Prod., Inc. v. Bobrick Washroom Equip., Inc., 401 F.3d 123, 130–31 (3d Cir.2005)* ("[I]t is well established that courts have a duty to avoid passing upon a constitutional question if the case may be disposed of on some other ground." (quoting *Spicer v. Hilton, 618 F.2d 232, 239 (3d Cir.1980)* ) ). Accordingly, because we conclude that—unlike § 1226(c)—§ 1231(a)(6) is ambiguous, we will interpret the provision in a manner that does not raise the constitutional

2018 WL 4608970

concerns that *Diop* identified.

[12] The Government must meet its burden in such bond hearings by clear and convincing evidence. *See Singh v. Holder*, 638 F.3d 1196, 1203-04 (9th Cir.2011) ("Because it is improper to ask the [alien] to 'share equally with society the risk of error when the possible injury to the individual'—deprivation of liberty—is so significant, a clear and convincing evidence standard of proof provides the appropriate level of procedural protection." (quoting *Addington v. Texas*, 441 U.S. 418, 427, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979) ) ); *Lora v. Shanahan*, 804 F.3d 601, 616 (2d Cir.2015) ("[W]e also hold that the detainee must be admitted to bail unless the government establishes by clear and convincing evidence that the immigrant poses a risk of flight or a risk of danger to the community."), *cert. granted, judgement vacated on other grounds*, ––– U.S. ––––, 138 S.Ct. 1260, 200 L.Ed.2d 415 (2018).

[13] Put differently, our decision today does not hold that Congress intended for § 1231(a)(6) to contain an immediate bond hearing at the instant that an alien's removal order becomes final. *See Diouf*, 634 F.3d at 1091 ("Our focus here ... is on *prolonged* detention."). Furthermore, we emphasize that aliens are not necessarily entitled to *release* after prolonged detention. Rather, they are owed only a bond hearing before an immigration judge to determine if they pose either a flight risk or a danger to the community. An alien will be released only if the immigration judge answers both inquiries in the negative.

[14] *See, e.g.*, *United States v. Castro-Verdugo*, 750 F.3d 1065, 1074 (9th Cir.2014) ("[T]he median time spent by defendants in immigration custody prior to a removal in Fall of 2012 (including people who did not concede removability) was 10 days, with 40 percent of aliens spending three days or less in immigration detention prior to their removal." (citing *Legal Noncitizens Receive Longest ICE Detention*, Transactional Records Access Clearinghouse (June 3, 2013), Table 3: Statistics on Detention Time by Detailed "Book-out" Reason, http://trac.syr.edu/immigration/reports/321/ (finding that, in November and December 2012, ninety-eight percent of detainees were removed within six-months after removal order was entered, and that post-removal median detention length was ten days and average detention length was twenty-seven days) ) ).

[15] However, we agree with the Ninth Circuit that "[i]f the 180-day threshold has been crossed, but the alien's release or removal is imminent ... [then] the government [is not] required to afford the alien a [bond] hearing before an immigration judge." *Diouf*, 634 F.3d at 1092 n.13. We do so to ensure the uniform and national administration of bond hearings pursuant to § 1231(a)(6). *See, e.g.*, *Kahn v. INS*, 36 F.3d 1412, 1414 (9th Cir.1994) ("The INA 'was designed to implement a uniform federal policy,' and the meaning of concepts important to its application ... 'require[ ] a uniform federal definition.' " (quoting *Rosario v. INS*, 962 F.3d 1412, 1414 (9th Cir.1994) ) ). We emphasize that this exception is narrow, and that it applies only in instances where detention "is expected to continue more than minimally beyond six months." *Diouf*, 634 F.3d at 1092 n.13.

[16] In the narrow circumstances that an alien is determined to have "no significant likelihood of removal in the reasonably foreseeable future," 8 C.F.R. § 241.14(a)(1), and if ICE determines that he or she is "specially dangerous," then it refers that ruling to an immigration judge for review, who must conduct a "reasonable cause hearing" before making a merits determination, *id.* § 241.14(g). The immigration judge's determination on the merits may be appealed by either party to the BIA. *Id.* § 241.14(i)(4).

[17] Because we conclude that a bond hearing was statutorily required, and the Government withdrew its appeal of the District Court's determination at the bond hearing to release Guerrero-Sanchez subject to certain conditions, the District Court's order pertaining to Guerrero-Sanchez's release will be left undisturbed.

[1] In *Padilla-Ramirez v. Bible*, 882 F.3d 826 (9th Cir.2017), the court found a reinstated removal order to be administratively final for the purpose of detention, despite the detainee's ongoing withholding proceedings, and thus found detention to be appropriate under § 1231(a). In *Guerra v. Shanahan*, 831 F.3d 59 (2d Cir.2016), the court reasoned that proceedings were not administratively final until the detainee's withholding proceedings had been adjudicated, and thus found § 1226(a) to apply.

[2] Although we have construed § 1231(a)(6) to require a bond hearing after prolonged detention, § 1226(a) requires such a hearing at the outset to determine whether an alien can be detained, so the application of one section versus the other has significant ramifications.

[3] First, an alien subject to a reinstated removal order may not be removed from the United States until withholding proceedings have concluded and administrative proceedings are truly final. Second, practically speaking, if an alien is granted withholding of removal to the designated country, he may never be removed at all, and thus removal contemplated by § 1231(a) is even less certain. Here, if Guerrero-Sanchez is granted withholding of removal to Mexico based on his reasonable fear of future persecution or his CAT claim, he may never be removed from the United States.

2018 WL 4608970

Although prevailing on a withholding or CAT claim "would not prohibit [Guerrero-Sanchez's] removal from the United States to an alternative, non-risk country," Majority Opinion at ——, actual removal to a third, alternate country is rare. To do so, the U.S. Government must show a tie between the alien and the third country to satisfy the requirements of 8 U.S.C. §§ 1231(b)(2)(D) and (E), and that country must also be willing to accept the alien. *See, e.g., Himri v. Ashcroft,* 378 F.3d 932, 936–38 (9th Cir.2004) (the government did not carry its burden of showing that petitioners, Palestinians who lived in Kuwait but had Jordanian passports, who were entitled to withholding of removal to Kuwait, were removable to Jordan, nor did the government show that Jordan would be willing to accept petitioners). Often, no such alternate country exists, and the alien who is granted withholding of removal remains in the United States indefinitely.

4   Although I recognize that the application of § 1226 to Guerrero-Sanchez would not automatically afford him a bond hearing due to his criminal conviction, *see* Majority Opinion at —— n.6, mandatory detention under either section for many months, even years, could raise serious due process concerns.

---

**End of Document**                                              © 2018 Thomson Reuters. No claim to original U.S. Government Works.

---

# EXHIBIT 7

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**USAMA JAMIL HAMAMA,** et al.,

      Petitioners and Plaintiffs,

v.

**REBECCA ADDUCCI**, et al.,

      Respondents and Defendants.

Case No. 2:17-cv-11910
Hon. Mark A. Goldsmith
Mag. David R. Grand
Class Action

## RESPONDENT/DEFENDANT U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT'S SUPPLEMENTAL RESPONSES TO PETITIONER/PLAINTIFF ANWAR HAMAD'S FIRST SET OF INTERROGATORIES TO RESPONDENT

Pursuant to Federal Rule of Civil Procedure 33, Respondent U.S. Immigration and Customs Enforcement ("ICE") hereby supplements its responses to Petitioner/Plaintiff Anwar Hamad's First Set of Interrogatories to Respondent Ronald Vitiello as follows:

1. Explain your understanding of the process by which Respondents seek and the GOI determines whether to allow the repatriation of an Iraqi National, including:

    a. Describing each step of the process of obtaining travel documents or authorization for repatriation, from start to finish, both by Respondents and, to Respondents' knowledge, by the GOI;

    e. Describing each and every step taken by Respondents and by "Baghdad," as that term is used in Interrogatory-First Set No. 1, DHS's Second Supplemental Responses, to process travel document requests for Iraqi Nationals who do not qualify as "voluntary removals," including the names and job titles of all persons involved both from the U.S. government and the GOI;

    h. Describing the remaining steps in the removal process after the travel document or repatriation processes have reached an outcome, both if the document/authorization is granted and if denied.

1

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

## SUPPLEMENTAL RESPONSE:

a. At present, the process of obtaining travel documents or authorization for repatriation from the GOI is as follows, including the addition to step 6:

1. ICE sends the Iraqi Embassy and a Department of State employee in Iraq who interfaces with the GOI a request for a travel document. This includes providing a letter containing: limited biographical information associated with the alien(s), such as alien registration number, date of birth, criminal history in the United States; confirmation of the issuance of a final order of removal; and a statement that the final order is administratively final.

2. ICE separately provides a copy of any documents showing indicia of Iraqi nationality, and the final order of removal to GOI officials in D.C.

3. If additional information is needed, the GOI will make a request for additional information to ICE and ICE will respond.

4. ICE proposes a date and location for the interviews. The GOI agrees to the proposed date or requests an alternative date for interviews with the Iraqi Nationals.

5. The GOI interviews the individuals and makes a determination regarding whether the information is sufficient to establish that the individual is Iraqi. If the GOI has requested additional information, no final decision is made until the GOI receives a response to that request.

6. Beginning with the September 2018 interviews, the GOI will either pre-approve a travel document or refuse to issue a travel document. If the GOI determines an individual is approved for a travel document, it emails ICE to inform them of its pre-approval. ICE will then secure a travel itinerary for the individual and provide it to the GOI before the GOI will issue a travel document.

e. James Jimenez, Department of State Consul General in Baghdad, Iraq sends Respondent ICE's travel document requests directly to the GOI in Baghdad. Yarub Al Anpaqi, First Secretary with the Iraqi Embassy and Consulate in Washington, D.C. handles consular matters such as travel document issuance for ICE detainees.

h. After the travel document or repatriation process has reached an outcome, the remaining steps in the removal process are described below.

1. If the travel document or authorization to repatriate an individual is granted, that individual may be removed individually on a commercial flight or in a group on a charter flight.

   a. Commercial – individual removals: Field officers generally have travel coordinators. This individual is responsible for submitting an electronic request to the government travel contractor – Omega World Travel. The travel coordinator indicates the date, time, and location that is being

2

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

requested for a flight and provides the local ERO office with a tentative flight itinerary, which is then approved by local ERO.

Once the itinerary is approved, the local ERO office conducts a threat assessment to determine whether the alien can travel alone or must be escorted.  ERO Commercial Air Operations issues a cable to the receiving country, copying transit countries, to provide notice of the upcoming travel.  ERO Commercial Air Operations must seek electronic country clearance from transit countries and the destination country for any officers who will be required to fly with the alien.

If the alien or officers are transiting through a third country, a transit visa may be required for the alien and any escorting officers. If a transit visa is required, then the local ERO office is responsible for getting that transit visa, unless that country's removal processes are handled solely by ICE headquarters, in which case ICE headquarters would secure the necessary visa. Both entry and transit visas are generally limited in time and duration, often only permitting a single entry during a very specific period of time.

b. <u>Charter – group removals</u>: All Iraqi charter requests are made at the headquarters level.  ERO's Removal Management Division (RMD) submits a request to ICE Air Charter Operations (ICE Air), generally through one or more informal phones call between the offices to determine the availability and special needs for an upcoming charter request.  ICE Air maintains active flight contracts and will seek to provide RMD with a tentative timeframe and schedule for a proposed flight.

After ICE Air provides tentative availability for scheduling the charter, RMD drafts a charter request memo for approval.  At or around the same time, ICE Air notifies the flight contractor and starts making specific time and date arrangements for the flight. During the planning stages of the charter flight, ICE notifies Iraqi government officials in Washington, D.C. of the planned charter date.  Once all the relevant details of the flight are available, ICE provides that information to GOI officials.

Additional steps for ICE Air include:  contracting for the connecting flight from a third country to Iraq (because ICE Air charter flights do not fly directly into Iraq), securing country clearances for landing in each country impacted by the charter, and securing electronic country clearance for all

3

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

ICE staff and aliens who will be present on the plane.

For certain countries, including Iraq, the Department of State (DOS) requires preapproval for submission of transit and entry visas.  As such, ICE is also required to submit a "Hand Carry Letter" prior to submitting a visa request. For certain countries, the DOS also requires preapproval of government employee travel for submission of transit and entry visas.  For Iraq, ICE is required to submit a letter with the officers' names and travel information prior to submitting a visa request from the country. The DOS will then provide an approval letter back to ICE indicating that ICE can seek the necessary visas.

ERO Removal and International Operations (RIO) is responsible for obtaining the escorting officers transit or entry visas, if required.  This process may require that the officer's passport, passport pictures, completed application, and application fee be submitted to each required country Embassy or Consulate for processing. These types of transit and entry visas are generally limited in time and duration, often only permitting a single entry during a very specific period of time.

2.  If the travel document or authorization to repatriate an individual is denied, ICE determines whether repatriation to a third country is a viable option. It then conducts a SLRRFF analysis to determine whether continued detention or release is appropriate.

5. In several responses to prior discovery requests, Respondents have referred to GOI "form[s]" related to travel documents.
   d.  Identify each other GOI form you are aware is sometimes or always used in the travel document or repatriation process.

**<u>SUPPLEMENTAL RESPONSE:</u>**

d.  Respondent ICE is aware of one other GOI form that may be used in the travel document process, known as the travel document application. The form is in Arabic and Respondent ICE has not had it translated. Respondent ICE is aware that there are older versions of this form. The majority of the form is not in English and therefore, comparison with forms is difficult.  A version of this form is attached with these responses.

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

6. For each Iraqi National for whom Respondents have sought travel documents from the GOI since May 1, 2018[1], provide the following:

    a. the name and A-number of the Iraqi National;

    b. the name of the attorney representing the Iraqi National, if any;

    c. the date the removal order became final;

    d. the dates the individual has been detained by ICE since January 1, 2016;

    e. the type of travel and identity documents the Iraqi National that were presented as part of their TD packet[2], and whether those documents have expired;

    f. the date(s) the request for travel documents was made to the GOI;

    g. whether the GOI has conducted a consular interview(s) and if so the date(s) of any such consular interview(s) and the name, title, and office of each person from the Government of Iraq that conducted each interview;

    h. whether, how, and when the Iraqi National has expressed his or her willingness or unwillingness to return to Iraq;

    i. whether the Iraqi National's repatriation was considered "voluntary" or "involuntary" by the GOI, and how you know;

    j. the response of the GOI embassy or consulate to the request, and the date(s) of that response;

    k. if the travel document request was not approved under the initial process for requesting travel documents, whether ICE has requested further consideration from "Baghdad" through the "different internal GOI" process, as those terms are used in the Declaration of James Maddox, ¶ 11.b, ECF 311-3, and if so when that request was made, the response of the GOI to the request, and the date(s) of that response(s);

    l. whether the GOI has agreed to issue travel documents, and if so, any conditions placed on their use;

    m. whether the GOI has agreed to accept the Iraqi National for repatriation without travel documents, and if so, which part of the GOI so agreed, how, and any conditions placed on repatriation;

    n. if the request for travel documents or for repatriation was approved, the type of travel documents or permission obtained, including the office of the Iraqi government approving the travel documents or repatriation, and the issue and expiration date for the documents or permission;

    o. if the request for travel documents or for repatriation was denied, the GOI office issuing the denial, the date of the denial, the reason(s) given for the denial, and any steps Respondents have taken or plan to take after the denial;

    p. whether the Iraqi National has been repatriated, and if so, the date of repatriation,

---

[1] Date changed to May 1, 2018 as a result of an agreement by the parties and recognized by the Court in ECF No. 412.

[2] Language changed to documents presented in the TD packet, and not when they entered ICE custody, as a result of an agreement by the parties.

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

travel method (commercial air, charter air, etc.), and location to which repatriated;

q.  with respect to the existence of a significant likelihood of removal in the reasonably foreseeable future (SLRRFF) for the Iraqi National:

    i.  when Respondents most recently evaluated SLRRFF;

    ii.  the outcome of that evaluation;

    iii.  who conducted that SLRRFF evaluation;

    iv.  whether a federal judge has evaluated the existence of SLRRFF, the outcome of that evaluation, and the relevant court and docket number;

    v.  if either Respondents or a federal judge has determined that removal to Iraq is not significantly likely in the reasonably foreseeable future, the basis of that decision;

r.  whether Respondents are seeking to remove the individual to another country, and if so what country/countries; and

s.  whether the individual has been released from detention and the date of release.

## SUPPLEMENTAL RESPONSE:

a.  Refer to attached chart.

b.  Refer to attached chart.[3]

c.  Refer to attached chart.[4]

d.  Refer to attached chart.

e.  Refer to travel document requests already produced pursuant to ECF 316 and 389.

f.  Refer to attached chart.

g.  Refer to attached chart.

h.  Refer to attached chart.

i.  Refer to attached chart.

j.  Refer to attached chart.[5]

k.  No responsive information.

l.  Refer to travel documents already produced pursuant to ECF 316 and 389.

m.  No responsive information.

n.  Refer to travel documents already produced pursuant to ECF 316 and 389.

o.  Refer to attached chart.

---

[3] This information is derived from EOIR's bi-weekly report produced to petitioners and from documents in ICE records.

[4] This information is derived from ERO databases manually entered by ERO personnel. The official record of the date a removal order became final can be found in the copies of the immigration judge removal orders that are included with the travel document request packets, which have already been produced pursuant to ECF 316 and 389.

[5] "Approved' as used in response to interrogatory 6(j) means that the GOI in Baghdad has approved issuance of travel documents.

p. Refer to attached chart.
q. With regard to SLRRFF:

    i. Refer to attached chart and declaration.

    ii. Refer to attached chart and declaration.

    iii. Refer to attached chart and declaration.

    iv. Respondent ICE is not presently aware of any cases that are responsive to this request, but is checking with field offices to confirm this answer. Refer to attached declaration.

    v. Respondent ICE is not presently aware of any cases that are responsive to this request, but is checking with field offices to confirm this answer. Refer to attached declaration.

r. Refer to attached chart.
s. Refer to attached chart.

7. If not already covered in Interrogatory 6, the same information requested in Interrogatory 6 for every Iraqi National released from detention because there was no significant likelihood of removal in the reasonably foreseeable future.

**SUPPLEMENTAL RESPONSE:**

No responsive information.

8. For each Iraqi National who Respondents have successfully repatriated to Iraq, provide the name, A-number, location in Iraq to which repatriated, and the last known contact information for the Iraqi National or family members.

**SUPPLEMENTAL RESPONSE:**

For Iraqi Nationals who Respondents have successfully repatriated to Iraq since January 1, 2017, please refer to the attached table for name, A-number, and location in Iraq to which repatriated.

ICE does not collect information about how an alien can be contacted once removed. ICE maintains detention records for individuals who are in ICE custody, to include those detained immediately prior to removal. In these instances, the alien's contact information is the location of their place of detention. Therefore, the alien's last

7

known contact information prior to removal would be in ICE detention.

ICE does not maintain pre-detention addresses in a statistically reportable manner. Respondent ICE will have to conduct a manual search to locate this information. ICE files do not have the requested information compiled at this time but plans to supplement these responses by October 10, 2018. If Respondent ICE is not able to do so, it will provide a status update to Petitioners on October 10, 2018. Refer to attached declaration.

9. Identify each document, communication, statement, and instance in which the GOI has declined since January 1, 2017—either permanently or provisionally—to issue travel documents or otherwise allow repatriation of an Iraqi National.

**SUPPLEMENTAL RESPONSE:**

The GOI generally communicates decisions to deny travel documents or repatriation orally. Respondent ICE does not maintain a record of oral communications with the GOI and only maintains records on those aliens for which it was informed in writing. On June 14, 2018, the GOI orally communicated to Respondent ICE that it was declining to issue a travel document for Jomaa Al Essa, 078771483 because they do not consider him an Iraqi national. Refer to ICE – 0298492-93 and refer to attached chart for additional information regarding denials.

11. Describe each and every step in Respondents' process for determining whether an Iraqi National has a significant likelihood of removal in the reasonably foreseeable future (the "SLRRFF process"), including when each step occurs; the office and titles of the individuals who conduct each step; and the documents used and generated during the SLRRFF process.

**SUPPLEMENTAL RESPONSE:**

Iraq is a "headquarters-only" country, meaning that in the repatriation process all coordination with the receiving country is handled at the headquarters level. All decisions related to whether a significant likelihood of removal in the reasonably foreseeable future (SLRRFF) exists for an Iraqi national are made by RMD officials. James Maddox, Detention and Deportation Officer and Michael Bernacke, Unit Chief, Middle East/Eastern Africa make all determinations as to whether an Iraqi national in need of a travel document has SLRRFF. ICE may also issue SLRRFF determinations for all Iraqi nationals who have valid travel documents and are pending removal from the United States.

8

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

There is no rigid step-by-step process for determining SLRRFF in each and every scenario. The decision as to whether an Iraqi national has SLRRFF is case-specific. Only aliens with final orders of removal receive a SLRRFF analysis. Therefore, the first step is for an alien to have a final order.

ICE then generates and submits the travel document letter and request packet. ICE sends the Iraqi Embassy and a Department of State employee in Iraq who interfaces with the GOI a request for a travel document. This includes providing a letter containing: limited biographical information associated with the alien(s), such as alien registration number, date of birth, criminal history in the United States; confirmation of the issuance of a final order of removal; and a statement that the final order is administratively final. ICE separately provides a copy of any documents showing indicia of Iraqi nationality, and the final order of removal to GOI officials in D.C.

The next step is the GOI's acceptance of Respondent ICE's travel document request and the GOI's review of that request. Next, the GOI may take subsequent actions, to include requesting additional biographical or criminal history information, scheduling the interview, and obtaining results from the interview. If additional information is needed, the GOI will make a request for additional information to ICE and ICE will respond.

ICE proposes a date and location for the interviews.  The GOI agrees to the proposed date or requests an alternative date for interviews with the Iraqi Nationals. The GOI interviews the individuals and makes a determination regarding whether the information is sufficient to establish that the individual is Iraqi. If the GOI has requested additional information, no final decision is made until the GOI receives a response to that request.

Beginning with the September 2018 interviews, the GOI will either pre-approve a travel document or refuse to issue a travel document. If the GOI determines an individual is approved for a travel document, it emails ICE to inform them of its pre-approval. ICE will then secure a travel itinerary for the individual and provide it to the GOI before the GOI will issue a travel document.

After issuance of a travel document, SLRRFF will be considered at the next periodic custody review. When GOI officials determine that an individual is not an Iraq national, they will deny the TD request.

If the GOI refused to issue a travel document because it believes an individual is not an Iraqi national, it will generally provide ICE with information about which country the person may be a citizen of. Officer Maddox will refer that individual's case over

9

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

to the appropriate HQ Desk Officer, in consultation with local ERO, for further investigation and travel document requests from the county recommended by the GOI officials. Depending on the country, the primary responsibility for obtaining the travel document and making a SLRRFF determination could be with HQ or the field.

In the event that an alien fails to cooperate with ICE in providing identity or citizenship information necessary to obtain a travel document, local ERO is responsible for filing a Failure to Comply letter.

12. Identify each document and witness Respondents will use at an evidentiary hearing, filing, or otherwise in this action to prove that, for Iraqi Nationals, there is a significant likelihood of removal in the reasonably foreseeable future.

### **SUPPLEMENTAL RESPONSE**:

Respondent ICE may rely on the testimony of John Schultz, Michael Bernacke, and James Maddox. Respondents may reply on: all documents in all exhibits in Respondents' Opposition to Petitioners' Renewed Motion for a Preliminary Injunction under *Zadvydas* and Respondents' Opposition to Petitioners' Motion for Sanctions; the deposition testimony of all witnesses; all travel document requests, cover letters, and travel documents, provided to Petitioners pursuant to ECF 316 and 389; one federal judge decision that found the government did have SLRRFF (*Al Essa v. Sessions*, No. 17-12490, (D. of Mass.)); and all biweekly reports showing that Iraqi nationals have been removed. Respondent ICE reserves the right to identify additional witnesses and evidence and will supplement this interrogatory response no later than three days before any evidentiary hearing scheduled by the Court, pursuant to ECF No. 412.

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

## VERIFICATION

I, Michael Bernacke declare under penalty of perjury:

I am employed by U.S. Immigration and Customs Enforcement as the Unit
Chief for the Middle East/Eastern Africa unit within the Removal Management
Division (East).

I have read and know the contents of this response.  This response was
prepared after obtaining information available to ICE through its officers and
employees and through its documents and records.  This response, subject to
inadvertent and undiscovered errors, is based upon, and necessarily limited by, the
records and information still in existence, able to be located, presently recollected,
and thus far discovered in the course of preparing this response.  The response
regarding ICE are true and correct to the best of my knowledge, information, and
belief.

Executed on ___10/5/14___

_____
Michael V. Bernacke
Unit Chief
Middle East/Eastern Africa Unit
Removal Management Division
Washington, D.C.

# EXHIBIT 8

*PII Redacted Pursuant to*
*Fed. R. Civ. P. 5.2 and ECF 338*

Highly Confidential - Subject to Protective Order
ICE's Supplemental Responses to Petitioners Anwar Hamad's First Set of Interrogatories
Interrogatory 6

| 6a. A NUMBER | 6a. LAST NAME | 6a. FIRST NAME(S) | 6b. ATTORNEY | 6c. DATE REMOVAL ORDER BECAME FINAL | 6d. DATE OF DETENTION | 6f. PRESENTATION DATE | 6g. INTERVIEW DATE | 6g. INTERVIEWERS | 6h. & i. Voluntariness | 6j. RESPONSE FROM IRAQ | 6o. & r. DENIALS | 6p. REPATRIATED | 6qi. DATE MOST RECENT SLRRFF | 6qii. SLRRFF OUTCOME | 6qiii. SLRRFF EVALUATOR | 6qiv. FED. JUDGE EVALUATED SLRRFF | 6qv. SLRRFF RELEASE BY ICE OR FED. JUDGE | 6s. RELEASED FROM DETENTION |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ▐ | ▐ | ▐ | Sinder, Esq., Marlon L.; 3435 Wilshire Blvd. Ste. 2380, Los Angeles, CA 90010 | 01/25/2006 | 7/5/2018 | 6/8/2018 | 6/28/2018 | Yarub Al Anpaqi, First Secretary, Iraq Consulate in DC; Wathiq Al Hammam, First Secretary, Iraq Consulate in DC | Voluntary Opt Out on October 5, 2018 (See ECF 291-2) & Signed GOI Vol Form on June 28, 2018 | TD Issued 9/4/2018 | N/A | No | | | | | | No |
| ▐ | ▐ | ▐ | Bedford, Sean; 1201 West Peachtree St., Atlanta, GA, 30309 | 03/02/2007 | 6/6/2017 | 6/8/2018 | 6/28/2018 | Yarub Al Anpaqi, First Secretary, Iraq Consulate in DC; Wathiq Al Hammam, First Secretary, Iraq Consulate in DC | Voluntary Opt Out on April 5, 2018 (See ECF 283) & Signed GOI Vol Form on June 28, 2018 | TD Issued 9/4/2018 | N/A | No | 8/16/2018 | SLRRFF | Michael Bernacke, Unit Chief, RIO-ERO, ICE | | No | No |
| ▐ | ▐ | ▐ | Anderson, Skyler K.; 5675 S. Redwood Road, #10, Taylorsville, UT 84123 | 10/29/2012 | 6/2/2017 | 6/8/2018 | 6/28/2018 | Yarub Al Anpaqi, First Secretary, Iraq Consulate in DC; Wathiq Al Hammam, First Secretary, Iraq Consulate in DC | Voluntary Opt Out on April 9, 2018 (See ECF 303) & Signed GOI Vol Form on June 28, 2018 | TD Issued 9/4/2018 | N/A | No | | | | | No | No |
| ▐ | ▐ | ▐ | Maze, Bradley; 29566 Northwestern Hwy, Ste 200, Southfield, MI 48034 | 02/23/2018 | 7/10/2018 | 6/8/2018 | 6/28/2018 | Yarub Al Anpaqi, First Secretary, Iraq Consulate in DC; Wathiq Al Hammam, First Secretary, Iraq Consulate in DC | Voluntary Opt Out on May 29, 2018 (See ECF 314) & Signed GOI Vol Form on June 28, 2018 | TD Issued 9/4/2018 | N/A | No | 8/9/2017 | SLRRFF | Floyd S. Farmer, RIO-ERO, ICE | | No | No |
| ▐ | ▐ | ▐ | N/A | 03/24/2005 | 7/10/2018 | 6/8/2018 | 6/28/2018 | Yarub Al Anpaqi, First Secretary, Iraq Consulate in DC; Wathiq Al Hammam, First Secretary, Iraq Consulate in DC | N/A | TD Issued 9/4/2018 | N/A | No | 7/19/2018 | SLRRFF | San Diego Field Office | | No | No |
| ▐ | ▐ | ▐ | Chammas, Nour George; 6 Parklane Blvd, Dearborn, MI 48126 | 10/30/2014 | 7/10/2018 | 6/8/2018 | 6/28/2018 | Yarub Al Anpaqi, First Secretary, Iraq Consulate in DC; Wathiq Al Hammam, First Secretary, Iraq Consulate in DC | N/A | TD Issued 9/4/2018 | N/A | No | | | | | No | No |
| ▐ | ▐ | ▐ | Schaedig, Christopher R; 4000 Town Center, 9th Floor, Southfield, MI 48075 | N/A | 7/24/2018 | 6/8/2018 | 6/28/2018 | Yarub Al Anpaqi, First Secretary, Iraq Consulate in DC; Wathiq Al Hammam, First Secretary, Iraq Consulate in DC | N/A | TD Issued 9/4/2018 | N/A | No | | | | | No | No |
| ▐ | ▐ | ▐ | Chammas, Nour George; 6 Parklane Blvd, Dearborn, MI 48126 | 01/17/2012 | 8/13/2018 | 6/8/2018 | 6/28/2018 | Yarub Al Anpaqi, First Secretary, Iraq Consulate in DC; Wathiq Al Hammam, First Secretary, Iraq Consulate in DC | N/A | TD Issued 9/4/2018 | N/A | No | | | | | No | No |
| ▐ | ▐ | ▐ | Piecuch, Kevin Jon; c/o Kevin Piecuch, 174 Ridge Rd., Grosse Pointe Farms, MI 48236 | N/A | 3/5/2018 | 6/8/2018 | 6/28/2018 | Yarub Al Anpaqi, First Secretary, Iraq Consulate in DC; Wathiq Al Hammam, First Secretary, Iraq Consulate in DC | N/A | TD Issued 9/4/2018 | N/A | No | | | | | No | No |

Highly Confidential – Subject to Protective Order
ICE's Supplemental Responses to Petitioners Anwar Hamad's First Set of Interrogatories
Interrogatory 6

| 6a. A NUMBER | 6a. LAST NAME | 6a. FIRST NAME(S) | 6b. ATTORNEY | 6c. DATE REMOVAL ORDER BECAME FINAL | 6d. DATE OF DETENTION | 6f. PRESENTATION DATE | 6g. INTERVIEW DATE | 6g. INTERVIEWERS | 6h. & i. Voluntariness | 6j. RESPONSE FROM IRAQ | 6o. & r. DENIALS | 6p. REPATRIATED | 6qi. DATE MOST RECENT SLRRFF | 6qii. SLRRFF OUTCOME | 6qiii. SLRRFF EVALUATOR | 6qiv. FED. JUDGE EVALUATED SLRRFF | 6qv. SLRRFF RELEASE BY ICE OR FED. JUDGE | 6s. RELEASED FROM DETENTION |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ▇ | ▇ | ▇ | Free, Robert Andrew; P.O. Box 90568, Nashville, TN 37209 | 08/15/2007 | 6/8/2017 | 6/8/2018 | 6/28/2018 | Yarub Al Anpaqi, First Secretary, Iraq Consulate in DC; Wathiq Al Hammam, First Secretary, Iraq Consulate in DC | Signed GOI Vol Form on June 28, 2018 | TD Issued 9/4/2018 | N/A | No | 7/25/2018 | SLRRFF | Michael Bernacke, Unit Chief, RIO-ERO, ICE | | No | No |
| ▇ | ▇ | ▇ | Driver, Shanta; 19526-B, Detroit, MI 48221 | 4/26/2018 | 5/30/2017 | 7/17/2018 | 7/19/2018 | Yarub Al Anpaqi, First Secretary, Iraq Consulate in DC; Wathiq Al Hammam, First Secretary, Iraq Consulate in DC | Voluntary Opt Out on May 1, 2018 (See ECF 300) & Signed GOI Vol Form on June 28, 2018 | TD Issued 9/4/2018 | N/A | No | 8/28/2018 | SLRRFF | Detroit Field Office | | No | No |
| ▇ | ▇ | ▇ | Bajoka, Edward A; 8424 E 12 Mile Rd, Warren, MI 48093 | 05/24/2018 | 6/11/2017 | 7/17/2018 | 7/19/2018 | Yarub Al Anpaqi, First Secretary, Iraq Consulate in DC; Wathiq Al Hammam, First Secretary, Iraq Consulate in DC | N/A | TD Issued 9/4/2018 | N/A | No | 8/22/2018 | SLRRFF | Detroit Field Office | | No | No |
| ▇ | ▇ | ▇ | Flanagan, Judy C; 77 E. Columbus Ave. Ste. 201, Phoenix, AZ 85012-2352 | 01/31/2012 | 6/20/2017 | 7/17/2018 | 7/19/2018 | Yarub Al Anpaqi, First Secretary, Iraq Consulate in DC; Wathiq Al Hammam, First Secretary, Iraq Consulate in DC | N/A | TD Issued 9/4/2018 | N/A | No | 9/18/2018 | SLRRFF | Michael Bernacke, Unit Chief, RIO-ERO, ICE | | No | No |
| ▇ | ▇ | ▇ | Schlussel, Barry Norman; 26339 Woodward, Huntington Woods, MI 48070 | N/A | 10/4/2017 | 7/17/2018 | 7/19/2018 | Yarub Al Anpaqi, First Secretary, Iraq Consulate in DC; Wathiq Al Hammam, First Secretary, Iraq Consulate in DC | N/A | TD Issued 9/4/2018 | N/A | No | | | | | No | No |
| ▇ | ▇ | ▇ | Atiya, Shahad J; 2040 Monroe St, Dearborn, MI 48124 | 08/10/2005 | 7/25/2018 | 7/17/2018 | 7/19/2018 | Yarub Al Anpaqi, First Secretary, Iraq Consulate in DC; Wathiq Al Hammam, First Secretary, Iraq Consulate in DC | N/A | TD Issued 9/4/2018 | N/A | No | | | | | No | No |
| ▇ | ▇ | ▇ | N/A | 08/23/2018 | 8/20/2018 | 7/17/2018 | 7/19/2018 | Yarub Al Anpaqi, First Secretary, Iraq Consulate in DC; Wathiq Al Hammam, First Secretary, Iraq Consulate in DC | Signed GOI Vol Form on June 28, 2018 | TD Issued 9/4/2018 | N/A | No | 7/3/2018 | SLRRFF | Detroit Field Office | | No | No |
| ▇ | ▇ | ▇ | Ketcham-Colwill, Peter; 1300 19th St NW, Washington, DC 20036 | 07/13/2018 | 9/10/2018 | 8/20/2018 | 9/6/2018 | Yarub Al Anpaqi, First Secretary, Iraq Consulate in DC; Wathiq Al Hammam, First Secretary, Iraq Consulate in DC | Voluntary Opt Out on July 9, 2018 (See ECF 346) | Approved 10/2/2018 | N/A | No | 2/14/2018 | SLRRFF | Michael Bernacke, Unit Chief, RIO-ERO, ICE | | No | No |
| ▇ | ▇ | ▇ | Abrutyn, Russell; 3765 12 Mile Road, Berkley, MI 48072 | 07/25/2018 | 6/12/2017 | 8/20/2018 | 9/6/2018 | Yarub Al Anpaqi, First Secretary, Iraq Consulate in DC; Wathiq Al Hammam, First Secretary, Iraq Consulate in DC | N/A | Approved 10/2/2018 | N/A | No | 10/3/2018 | SLRRFF | Detroit Field Office | | No | No |

Highly Confidential - Subject to Protective Order

ICE's Supplemental Responses to Petitioners Anwar Hamad's First Set of Interrogatories
Interrogatory 6

| 6a. A NUMBER | 6a. LAST NAME | 6a. FIRST NAME(S) | 6b. ATTORNEY | 6c. DATE REMOVAL ORDER BECAME FINAL | 6d. DATE OF DETENTION | 6f. PRESENTATION DATE | 6g. INTERVIEW DATE | 6g. INTERVIEWERS | 6h. & i. Voluntariness | 6j. RESPONSE FROM IRAQ | 6o. & r. DENIALS | 6p. REPATRIATED | 6qi. DATE MOST RECENT SLRRFF | 6qii. SLRRFF OUTCOME | 6qiii. SLRRFF EVALUATOR | 6qiv. FED. JUDGE EVALUATED SLRRFF | 6qv. SLRRFF RELEASE BY ICE OR FED. JUDGE | 6s. RELEASED FROM DETENTION |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ▮ | ▮ | ▮ | N/A | 07/19/2018 | 9/12/2018 | 8/20/2018 | 9/6/2018 | Yarub Al Anpaqi, First Secretary, Iraq Consulate in DC; Wathiq Al Hammam, First Secretary, Iraq Consulate in DC | N/A | Approved 10/2/2018 | N/A | No | | | | | No | No |
| ▮ | ▮ | ▮ | Sofia, Fairuze; 3313 W Commercial Blvd #190, Fort Lauderdale, FL 33309 | 07/02/2018 | 9/10/2018 | 8/20/2018 | 9/6/2018 | Yarub Al Anpaqi, First Secretary, Iraq Consulate in DC; Wathiq Al Hammam, First Secretary, Iraq Consulate in DC | N/A | Approved 10/2/2018 | N/A | No | 12/13/2017 | SLRRFF | Michael Bernacke, Unit Chief, RIO-ERO, ICE | | No | No |
| ▮ | ▮ | ▮ | Bajoka, Edward A; 8424 E 12 Mile Rd, Warren, MI 48093 | 06/27/2018 | 9/11/2018 | 8/20/2018 | 9/6/2018 | Yarub Al Anpaqi, First Secretary, Iraq Consulate in DC; Wathiq Al Hammam, First Secretary, Iraq Consulate in DC | N/A | Approved 10/2/2018 | N/A | No | 9/24/2018 | SLRRFF | Detroit Field Office | | No | No |
| ▮ | ▮ | ▮ | N/A | 05/14/2018 | 6/8/2017 | 8/20/2018 | 9/6/2018 | Yarub Al Anpaqi, First Secretary, Iraq Consulate in DC; Wathiq Al Hammam, First Secretary, Iraq Consulate in DC | Voluntary Opt Out on November 29, 2017 | Approved 10/2/2018 | N/A | No | 8/9/2018 | SLRRFF | Detroit Field Office | | No | No |
| ▮ | ▮ | ▮ | Shuker, Faten Tina; 31000 Northwestern Hwy, Farmington Hills, MI 48334 | 06/21/2018 | 6/12/2017 | 8/20/2018 | 9/6/2018 | Yarub Al Anpaqi, First Secretary, Iraq Consulate in DC; Wathiq Al Hammam, First Secretary, Iraq Consulate in DC | N/A | Approved 10/2/2018 | N/A | No | 9/16/2018 | SLRRFF | Detroit Field Office | | No | No |
| ▮ | ▮ | ▮ | Samona, Randy R; 4196 15 Mile Road, Sterling Heights, MI 48310 | 03/17/2018 | 6/12/2017 | 8/20/2018 | 9/6/2018 | Yarub Al Anpaqi, First Secretary, Iraq Consulate in DC; Wathiq Al Hammam, First Secretary, Iraq Consulate in DC | N/A | Approved 10/2/2018 | N/A | No | | | | | No | No |
| ▮ | ▮ | ▮ | Piecuch, Kevin Jon; c/o Kevin Piecuch, 174 Ridge Rd., Grosse Pointe Farms, MI 48236 | 03/29/2018 | 6/11/2017 | 8/20/2018 | 9/6/2018 | Yarub Al Anpaqi, First Secretary, Iraq Consulate in DC; Wathiq Al Hammam, First Secretary, Iraq Consulate in DC | N/A | Approved 10/2/2018 | N/A | No | | | | | No | No |

Highly Confidential - Subject to Protective Order
ICE's Supplemental Responses to Petitioners Anwar Hamad's First Set of Interrogatories
Interrogatory 6

| 6a. A NUMBER | 6a. LAST NAME | 6a. FIRST NAME(S) | 6b. ATTORNEY | 6c. DATE REMOVAL ORDER BECAME FINAL | 6d. DATE OF DETENTION | 6f. PRESENTATION DATE | 6g. INTERVIEW DATE | 6g. INTERVIEWERS | 6h. & i. Voluntariness | 6j. RESPONSE FROM IRAQ | 6o. & r. DENIALS | 6p. REPATRIATED | 6qi. DATE MOST RECENT SLRRFF | 6qii. SLRRFF OUTCOME | 6qiii. SLRRFF EVALUATOR | 6qiv. FED. JUDGE EVALUATED SLRRFF | 6qv. SLRRFF RELEASE BY ICE OR FED. JUDGE | 6s. RELEASED FROM DETENTION |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Piecuch, Kevin Jon; c/o Kevin Piecuch, 174 Ridge Rd., Grosse Pointe Farms, MI 48236 | N/A | 6/12/2017 | 8/20/2018 | 9/6/2018 | Yarub Al Anpaqi, First Secretary, Iraq Consulate in DC; Wathiq Al Hammam, First Secretary, Iraq Consulate in DC | N/A | Denied TD | Iraq Consulate in DC, after the 9/6/2018 interview, gave ICE an oral representation that this individual was not Iraqi and was instead Kuwaiti. The fact that the Iraqi government did not approve a TD for the individual on 10/2/2018 confirms that they will not be issuing a TD for him. On 09/19/18, ICE sent a Travel Document Request to Kuwait. Kuwait denied the TD, but ICE is seeking reconsideration and has sent evidence of Kuwaiti citizenship. | No | 9/13/2018 | No SLRRFF to Iraq | Michael Bernacke, Unit Chief, RIO-ERO, ICE | | No | No |
| | | | Smith, Monica Renee; 19526-B Cranbrook Drive, Detroit, MI 48221 | 05/04/2018 | 6/12/2017 | 8/20/2018 | 9/6/2018 | Yarub Al Anpaqi, First Secretary, Iraq Consulate in DC; Wathiq Al Hammam, First Secretary, Iraq Consulate in DC | N/A | Approved 10/2/2018 | N/A | No | | SLRRFF | | | No | No |
| | | | Hewitt, Kelly M; 10985 Cody Street Ste 130, Overland Park, KS 66210 | 07/16/2015 | 6/6/2017 | 8/20/2018 | 9/6/2018 | Yarub Al Anpaqi, First Secretary, Iraq Consulate in DC; Wathiq Al Hammam, First Secretary, Iraq Consulate in DC | N/A | Approved 10/2/2018 | N/A | No | 12/14/2017 | SLRRFF | Michael Bernacke, Unit Chief, RIO-ERO, ICE | | No | No |
| | | | Stevens, Mark; 4103 Chain Bridge Road, Fairfax, VA 22030 | N/A | 6/2/2017 | 8/20/2018 | Pending Interview | N/A | N/A | N/A | N/A | No | 12/14/2017 | SLRRFF | Michael Bernacke, Unit Chief, RIO-ERO, ICE | | No | No |
| | | | Christina A. Fiflis; 1942 Broadway, Suite 314, Boulder, CO 803120000 | 06/08/2005 | 9/21/2018 | 8/20/2018 | 9/6/2018 | Yarub Al Anpaqi, First Secretary, Iraq Consulate in DC; Wathiq Al Hammam, First Secretary, Iraq Consulate in DC | N/A | Approved 10/2/2018 | N/A | No | 9/18/2018 | SLRRFF | Michael Bernacke, Unit Chief, RIO-ERO, ICE | | No | No |
| | | | Gilbert, Thomas John; 2510 Saint Clair Avenue, Cleveland, OH 44114 | 08/03/2001 | 6/11/2017 | 8/20/2018 | 9/6/2018 | Yarub Al Anpaqi, First Secretary, Iraq Consulate in DC; Wathiq Al Hammam, First Secretary, Iraq Consulate in DC | N/A | Approved 10/2/2018 | N/A | No | 9/26/2018 | SLRRFF | Michael Bernacke, Unit Chief, RIO-ERO, ICE | | No | No |
| | | | Cryne, Julia A; 11605 Miracle Hills Dr, Omaha, NE 68154 | 04/22/2013 | 5/31/2017 | 8/20/2018 | 9/6/2018 | Yarub Al Anpaqi, First Secretary, Iraq Consulate in DC; Wathiq Al Hammam, First Secretary, Iraq Consulate in DC | N/A | Approved 10/2/2018 | N/A | No | | | | | No | No |

Highly Confidential – Subject to Protective Order
ICE's Supplemental Responses to Petitioners Anwar Hamad's First Set of Interrogatories
Interrogatory 6

| 6a. A NUMBER | 6a. LAST NAME | 6a. FIRST NAME(S) | 6b. ATTORNEY | 6c. DATE REMOVAL ORDER BECAME FINAL | 6d. DATE OF DETENTION | 6f. PRESENTATION DATE | 6g. INTERVIEW DATE | 6g. INTERVIEWERS | 6h. & i. Voluntariness | 6j. RESPONSE FROM IRAQ | 6o. & r. DENIALS | 6p. REPATRIATED | 6qi. DATE MOST RECENT SLRRFF | 6qii. SLRRFF OUTCOME | 6qiii. SLRRFF EVALUATOR | 6qiv. FED. JUDGE EVALUATED SLRRFF | 6qv. SLRRFF RELEASE BY ICE OR FED. JUDGE | 6s. RELEASED FROM DETENTION |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ▇ | ▇ | ▇ | Maze, Bradley; 29566 Northwestern Hwy, Ste 200, Southfield, MI 48034 | N/A | 6/12/2017 | 8/20/2018 | No longer will be interviewed because no longer final order. MTR granted 8/15/2018 | | N/A | | N/A | No | | | | | No | No |
| ▇ | ▇ | ▇ | N/A | N/A | 9/13/2017 | 8/20/2018 | 9/6/2018 | Yarub Al Anpaqi, First Secretary, Iraq Consulate in DC; Wathiq Al Hammam, First Secretary, Iraq Consulate in DC | Voluntary Opt Out July 21, 2018 | Approved 10/2/2018 | N/A | No | | | | | No | No |
| ▇ | ▇ | ▇ | Maze, Bradley; 29566 Northwestern Hwy, Ste 200, Southfield, MI 48034 | 02/09/2001 | 9/11/2018 | 8/20/2018 | 9/6/2018 | Yarub Al Anpaqi, First Secretary, Iraq Consulate in DC; Wathiq Al Hammam, First Secretary, Iraq Consulate in DC | N/A | Approved 10/2/2018 | N/A | No | 9/19/2018 | SLRRFF | Detroit Field Office | | No | No |
| ▇ | ▇ | ▇ | Law Offices of Richard L. Kent, Esq.; 22815 Kelly Road, Eastpointe, MI 48021-2073 | 06/16/2018 | 9/11/2018 | 8/20/2018 | 9/6/2018 | Yarub Al Anpaqi, First Secretary, Iraq Consulate in DC; Wathiq Al Hammam, First Secretary, Iraq Consulate in DC | N/A | Approved 10/2/2018 | N/A | No | 9/19/2018 | SLRRFF | Detroit Field Office | | No | No |
| ▇ | ▇ | ▇ | Saleh, Carine; 6162 W. Vernor Hwy., Detroit, MI 48209 | 03/24/2015 | 9/11/2018 | 8/20/2018 | 9/6/2018 | Yarub Al Anpaqi, First Secretary, Iraq Consulate in DC; Wathiq Al Hammam, First Secretary, Iraq Consulate in DC | N/A | Approved 10/2/2018 | N/A | No | 9/11/2018 | SLRRFF | Detroit Field Office | | No | No |
| ▇ | ▇ | ▇ | Odetalla, Odetalla Mohammed; 150 N. Main, Plymouth, MI 48170 | 06/01/2018 | 6/12/2017 | 8/20/2018 | 9/6/2018 | Yarub Al Anpaqi, First Secretary, Iraq Consulate in DC; Wathiq Al Hammam, First Secretary, Iraq Consulate in DC | N/A | Approved 10/2/2018 | N/A | No | 8/22/2018 | SLRRFF | Detroit Field Office | | No | No |
| ▇ | ▇ | ▇ | Samona, Randy R; 4196 15 Mile Road, Sterling Heights, MI 48310 | N/A | 6/11/2017 | 8/20/2018 | 9/6/2018 | Yarub Al Anpaqi, First Secretary, Iraq Consulate in DC; Wathiq Al Hammam, First Secretary, Iraq Consulate in DC | N/A | Approved 10/2/2018 | N/A | No | 8/24/2018 | SLURFF | Detroit Field Office | | No | No |
| ▇ | ▇ | ▇ | Moore, Christie Ann-Irene; 101 S. Fifth Street, Louisville, KY 40202 | N/A | 8/7/2017 | 8/20/2018 | Pending Interview | N/A | N/A | N/A | N/A | No | | | | | No | No |

Highly Confidential - Subject to Protective Order

ICE's Supplemental Responses to Petitioners Anwar Hamad's First Set of Interrogatories

Interrogatory 6

| 6a. A NUMBER | 6a. LAST NAME | 6a. FIRST NAME(S) | 6b. ATTORNEY | 6c. DATE REMOVAL ORDER BECAME FINAL | 6d. DATE OF DETENTION | 6f. PRESENTATION DATE | 6g. INTERVIEW DATE | 6g. INTERVIEWEERS | 6h. & i. Voluntariness | 6j. RESPONSE FROM IRAQ | 6o. & r. DENIALS | 6p. REPATRIATED | 6qi. DATE MOST RECENT SLRRFF | 6qii. SLRRFF OUTCOME | 6qiii. SLRRFF EVALUATOR | 6qiv. FED. JUDGE EVALUATED SLRRFF | 6qv. SLRRFF RELEASE BY ICE OR FED. JUDGE | 6s. RELEASED FROM DETENTION |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ▬ | ▬ | ▬ | Ragon, Regina R.; Ragon Law Firm, P.O. Box 502, Flintstone, GA 30725 | 3/30/2018 | 4/26/2017 | 8/20/2018 | 9/6/2018 | Yarub Al Anpaqi, First Secretary, Iraq Consulate in DC; Wathiq Al Hammam, First Secretary, Iraq Consulate in DC | N/A | Denied TD | Iraq Consulate in DC, after the 9/6/2018 interview, gave ICE an oral representation that this individual was not Iraqi and was instead Palestinian. The fact that the Iraqi government did not approve a TD for the individual on 10/2/2018 confirms that they will not be issuing a TD for him. On 09/21/18, ICE sent a Travel Document Request to Palestine. | No | 9/13/2018 (HQ); 9/21/2018 (Local) - Seeking TD palistine | 9/13/2018 - No SLRRFF to Iraq; 9/21/2018 - SLRRFF to Palestine | Michael Bernacke, Unit Chief, RIO-ERO, ICE - New Orleans | | No | No |
| ▬ | ▬ | ▬ | Frankel, Richard; Drexel University, Philadelphia, PA 19104 | 06/05/2018 | 7/11/2017 | 8/20/2018 | 9/6/2018 | Yarub Al Anpaqi, First Secretary, Iraq Consulate in DC; Wathiq Al Hammam, First Secretary, Iraq Consulate in DC | N/A | Approved 10/2/2018 | N/A | No | 8/31/2018 | SLRRFF | York Field Office | | No | No |
| ▬ | ▬ | ▬ | N/A | 10/18/2017 | 7/28/2017 | 5/21/2018 | 6/20/2018 | Olla Alaraji, Iraqi Consulate Representative at Iraq Consulate in Detroit | It is Respondent ICE's understanding that the ACLU facilitated arranging the individual's TD interview. | TD Issued 6/29/2018 | N/A | No | 7/25/2018 | SLRRFF | Michael Bernacke, Unit Chief, RIO-ERO, ICE | | No | No |

# EXHIBIT 9
## Intentionally Left Blank

# EXHIBIT 10

HIGHLY CONFIDENTIAL – FOR ATTORNEYS' EYES ONLY

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**USAMA JAMIL HAMAMA,** et al.,

      Petitioners and Plaintiffs,

v.

**REBECCA ADDUCCI**, et al.,

      Respondents and Respondents.

Case No. 2:17-cv-11910
Hon. Mark A. Goldsmith
Mag. David R. Grand
Class Action

---

### RESPONDENT/DEFENDANT U.S. DEPARTMENT OF HOMELAND SECURITY'S SECOND SUPPLEMENTAL RESPONSES TO PETITIONER/PLAINTIFF ANWAR HAMAD'S INTERROGATORIES TO RESPONDENT KIRSTJEN NIELSEN

### I.     PRELIMINARY STATEMENT

All information contained herein is based solely upon such information and evidence as is available and known to Respondent U.S. Department of Homeland Security ("DHS") upon information and belief at this time. Consistent with Fed. R. Civ. P. 26(e), Respondent DHS will amend any and all responses herein if additional facts are ascertained. The responses herein are made in a good faith effort to supply as much information as is known to Respondent DHS at this time, consistent with the positions set forth in the Joint Statement of Issues, ECF No. 235. Pursuant to this Court's Order, ECF No. 412, DHS will supplement these responses with any new information 3 days before any evidentiary hearing scheduled by the Court.

### II.     GENERAL OBJECTIONS

1.     DHS objects to the requests that impose or seek to impose any requirement or discovery obligation greater than or different from those under the Federal Rules of Civil Procedure and the applicable Local Rules and Orders of the Court.

1

HIGHLY CONFIDENTIAL – FOR ATTORNEYS' EYES ONLY

2.      DHS objects to the requests to the extent they seek disclosure of information protected under the attorney-client privilege, deliberative process privilege, law enforcement privilege, attorney work-product doctrine, or any other applicable privilege or immunity.  Should any such disclosure by DHS occur, it is inadvertent and shall not constitute a waiver of any privilege or immunity.

3.      DHS reserves all objections as to the competence, relevance, materiality, admissibility, or privileged status of any information provided in response to these requests, unless DHS specifically states otherwise.

4.      DHS preserves all objections set forth in the Supplemental Responses to Petitioners/Plaintiffs Anwar Hamad's Interrogatories to Respondent Kirstjen Nielsen, but responds pursuant to the Court order, ECF No. 412, as follows.

1.      Explain your understanding of the process by which Respondents seek and the GOI determines whether to allow the repatriation of an Iraqi National, including:

    a.      Describing each step of the process of obtaining travel documents or authorization for repatriation, from start to finish, both by Respondents and, to Respondents' knowledge, by the GOI;

    b.      Identifying each document used as part of the process of obtaining travel documents or authorization for repatriation, either by the Respondents or by the GOI;

    c.      Describing how the process of obtaining travel documents or authorization for repatriation, including but not limited to the outcomes of that process, is affected by an Iraqi National's expressed desire (written or verbal) to return or expressed desire (written or verbal) not to return to Iraq;

    d.      Describing your understanding of the process and criteria the GOI employs to determine whether or not an Iraqi National qualifies as a "voluntary removal," as the term is used in Interrogatory–First Set No. 1, DHS's Second Supplemental Responses ("the Embassy can issue travel documents for voluntary removals, but Baghdad will approve travel documents required for other Iraqi Nationals"), for whom the Embassy can issue travel documents;

    e.      Describing each and every step taken by Respondents and by "Baghdad," as that term is used in Interrogatory-First Set No. 1, DHS's Second Supplemental Responses, to process travel document requests for Iraqi Nationals who do not qualify as

2

HIGHLY CONFIDENTIAL – FOR ATTORNEYS' EYES ONLY

"voluntary removals," including the names and job titles of all persons involved both from the U.S. government and the GOI;

f.  Describing the potential outcomes for the process of obtaining travel documents (e.g., issuance of a passport, laissez passer, or other document, or denial on what bases);

g.  Describing the potential outcomes for the process of obtaining authorization for repatriation;

h.  Describing the remaining steps in the removal process after the travel document or repatriation processes have reached an outcome, both if the document/authorization is granted and if denied.

## RESPONSE:

Respondent ICE is the component agency of DHS with responsibility for the repatriation of Iraqi Nationals. Accordingly, DHS incorporates and relies on all ICE responses on this topic. For responses where DHS has additional or different information than what was provided by ICE, DHS is providing that information as set forth below.

1a.  DHS lacks information sufficient to respond to the details of the repatriation process for Iraqi Nationals and defers to ICE regarding such details. Upon information and belief, DHS understands that Iraq has agreed in principle to repatriate Class Members and that requests for repatriation of Class Members could be coordinated by ICE Enforcement and Removal Operations ("ERO") through the Government of Iraq.

As of June 26, 2017, DHS understood that the Government of Iraq: (1) would accept for repatriation those Iraqi Nationals whose citizenship has been confirmed; (2) criminals with completed sentences; (3) Iraqi Nationals with removal orders; and (4) for criminals, Iraqi Nationals whose criminal convictions is other than for illegal entry into the United States.

As of December 6, 2017, DHS understood that the Government of Iraq: (1) would issue visas in small groups after verifying Iraqi citizenship; (2) wanted to prioritize removal of criminal Iraqi Nationals; (3) would require proof of completion of criminal sentences for Iraqi criminal aliens with completed sentences; (4) wished to prioritize non-immigration-related criminal Iraqi Nationals; and (5) may have difficulty in accepting individuals with failed asylum claims.

As of January 9, 2018, DHS understood that the Government of Iraq: (1) would cooperate with DHS regarding removals and wanted to expedite removals; (2) needed criminal history for removal of criminal aliens; (3) needed proof of Iraqi citizenship; (4)

3

HIGHLY CONFIDENTIAL – FOR ATTORNEYS' EYES ONLY

would not require Iraqi Nationals to sign a form; and (5) that the Embassy can issue travel documents for voluntary removals, but Baghdad will approve travel documents required for other Iraqi Nationals.

Since January 2018, DHS has not directly engaged in discussions with the Government of Iraq regarding repatriation of Iraqi Nationals and defers to ICE for current information.

1b.    DHS lacks information sufficient to respond regarding "each document used as part of the process of obtaining travel documents or authorization for repatriation, either by the Respondents or by the GOI." ICE is the component agency of DHS with responsibility for repatriation of Iraqi Nationals. DHS incorporates by reference its response to Interrogatory No. 1a, specifically, that the Government of Iraq would require proof of Iraqi citizenship and criminal history information.

1c.    DHS lacks information sufficient to respond regarding "how the process of obtaining travel documents or authorization for repatriation, including but not limited to the outcomes of that process, is affected by an Iraqi National's expressed desire (written or verbal) to return or expressed desire (written or verbal) not to return to Iraq." ICE is the component agency of DHS with responsibility for repatriation of Iraqi Nationals. DHS incorporates by reference its response to Interrogatory No. 1a, specifically, that the Embassy can issue travel documents for voluntary removals.

1d.    DHS lacks information sufficient to respond regarding "the process and criteria the GOI employs to determine whether or not an Iraqi National qualifies as a 'voluntary removal,' as the term is used in Interrogatory–First Set No. 1, DHS's Second Supplemental Responses ("the Embassy can issue travel documents for voluntary removals, but Baghdad will approve travel documents required for other Iraqi Nationals"), for whom the Embassy can issue travel documents." ICE is the component agency of DHS with responsibility for repatriation of Iraqi Nationals. Other than the information provided in the quoted language, and again in response to Interrogatory No. 1a, above, DHS has no additional responsive information.

1e.    DHS lacks information sufficient to respond regarding "each and every step taken by Respondents and by "Baghdad," as that term is used in Interrogatory-First Set No. 1, DHS's Second Supplemental Responses, to process travel document requests for Iraqi Nationals who do not qualify as "voluntary removals," including the names and job titles of all persons involved both from the U.S. government and the GOI." ICE is the component agency of DHS with responsibility for repatriation of Iraqi Nationals. Other than the information provided in the quoted language, and again

HIGHLY CONFIDENTIAL – FOR ATTORNEYS' EYES ONLY

in response to Interrogatory No. 1a, above, DHS has no additional responsive information.

      1f.    DHS lacks information sufficient to respond regarding "the potential outcomes for the process of obtaining travel documents (e.g., issuance of a passport, laissez passer, or other document, or denial on what bases)." ICE is the component agency of DHS with responsibility for repatriation of Iraqi Nationals.

      1g.    DHS lacks information sufficient to respond regarding "the potential outcomes for the process of obtaining authorization for repatriation." ICE is the component agency of DHS with responsibility for repatriation of Iraqi Nationals.

      1h.    DHS lacks information sufficient to respond regarding "the remaining steps in the removal process after the travel document or repatriation processes have reached an outcome, both if the document/authorization is granted and if denied." ICE is the component agency of DHS with responsibility for repatriation of Iraqi Nationals.

      2.    Describe all criteria known to you to be used by the GOI to determine what kind of travel document to issue for an Iraqi National: laissez passer (one-way travel document), Iraqi passport, or other specified document.

**RESPONSE:**

      DHS lacks information sufficient to respond regarding "all criteria known to you to be used by the GOI to determine what kind of travel document to issue for an Iraqi National: laissez passer (one-way travel document), Iraqi passport, or other specified document." ICE is the component agency of DHS with responsibility for repatriation of Iraqi Nationals.

      3.    DHSHAMAMA000089 (in the version with redactions modified by the Court) states: "Note: DHS is working with Iraq and STATE to finalize a draft MOU on repatriations and the return of Iraqi nationals under final orders of removal."

             a.    Provide the date of the document provided as DHSHAMAMA000089;

             b.    Identify each draft of the MOU;

             c.    Identify the finalized MOU; and

             d.    If the MOU was never finalized, describe the reasons why and the

HIGHLY CONFIDENTIAL – FOR ATTORNEYS' EYES ONLY

current status, if any, of discussions regarding the MOU.

**RESPONSE:**

3a. Respondent DHS avers that document DHSHAMAMA000089 is dated on or about November 27, 2017.

3b. Respondent DHS does not have any draft or final versions of a MOU and is unaware of the existence of any draft or final MOU with Iraq related to repatriations and the return of Iraqi nationals under final orders of removal.

3c-3d. DHS has no knowledge as to whether the referenced MOU was drafted or finalized, or the reasons why, or the current status, if any, of discussions regarding the referenced MOU and is unaware of the existence of any draft or final MOU with Iraq related to repatriation and the return of Iraqi nationals under final orders of removal.

4.    Michael Bernacke, in his December 22, 2017 declaration, ECF 184-3, ¶¶ 6, 9, stated that the GOI had agreed to allow repatriations of Iraqi Nationals without travel documents, on the basis of an approved flight manifest for a charter flight, and John Schultz, in his declaration of July 20, 2017, ECF 81-4, ¶ 7, stated that 8 Iraqi Nationals were repatriated on such a charter flight in April 2017:

    a.    Describe your understanding of the current status of the GOI willingness to allow the repatriation of Iraqi Nationals without travel documents;

    b.    Identify the basis of that understanding;

    c.    If there was a change from April 2017 to the present in the GOI willingness to allow repatriations of Iraqi Nationals without travel documents, describe the change and your understanding of its cause.

**RESPONSE:**

In response to Petitioner/Plaintiff's Interrogatory Nos. 4a-4c, Respondent DHS has no responsive information. Since January 2018, DHS has not directly engaged in discussions with the Government of Iraq regarding repatriation of Iraqi Nationals and defers to ICE for current information.

HIGHLY CONFIDENTIAL – FOR ATTORNEYS' EYES ONLY

5.     In several responses to prior discovery requests, Respondents have referred to GOI "form[s]" related to travel documents.

       a.    Are the forms referred to in the three statements cited in the footnote to this Interrogatory the same?

       b.    Are the referenced forms the document attached as Exhibit B?

       c.    If the referenced forms are not the document attached as Exhibit B, identify each referenced form.

       d.    Identify each other GOI form you are aware is sometimes or always used in the travel document or repatriation process.

**RESPONSE:**

In response to Petitioner/Plaintiff's Interrogatory Nos. 5a-5d, Respondent DHS has no responsive information. Respondent DHS notes that the reference to the DHS's Second Supplemental Responses reflects an understanding that no signature would be required on a form. Respondent DHS defers to Respondent ICE regarding the references to Respondent ICE's statements included in the referenced footnote.

6.     Not applicable to DHS.

7.     Not applicable to DHS.

8.     Not applicable to DHS.

9.     Not applicable to DHS.

10.    In several documents, Respondents have stated that GOI travel document decisions for Iraqi Nationals who declined to sign a GOI form stating that they were willing to return to Iraq are "pending." Describe the following:

       a.    Your understanding of the steps in "different internal GOI process," including the roles of each office, department, organization, committee, etc., involved.

       b.    For each Iraqi National who declined to sign a GOI form stating that they were willing to return to Iraq, state:

           i.    each step that Respondents have taken in furtherance of their request for travel documents or repatriation;

           ii.    any updates or responses the GOI has provided to that request, including who provided those responses, in what form, to whom, and when; and

           iii.   the outcome (with date) or current status of the process.

HIGHLY CONFIDENTIAL – FOR ATTORNEYS' EYES ONLY

**RESPONSE:**

In response to Petitioner/Plaintiff's Interrogatory Nos. 10a-10b(i) – (iii), Respondent DHS DHS has no responsive information and notes that ICE is the component agency of DHS with responsibility for repatriation of Iraqi Nationals.

11.    Not applicable to DHS.

12.    Identify each document and witness Respondents will use at an evidentiary hearing, filing, or otherwise in this action to prove that, for Iraqi Nationals, there is a significant likelihood of removal in the reasonably foreseeable future.

**RESPONSE:**

DHS incorporates by reference the response of Respondent/Defendant ICE to this interrogatory. Specifically, DHS may rely on the testimony of John Schultz, Michael Bernacke, and James Maddox, as well as the exhibits attached to Petitioners' and Respondents' briefs on Petitioners' Renewed Motion for a Preliminary Injunction under *Zadvydas* and Petitioners' Motion for Sanctions; all travel document requests, cover letters, and travel documents, provided to Petitioners pursuant to ECF 316 and 389; and all biweekly reports showing that Iraqi nationals have been removed. In addition, DHS may also rely on the following documents produced in discovery: DHSHAMAMA000001 – DHSHAMAMA000123. DHS reserves the right to identify additional witnesses and evidence and will supplement this interrogatory response no later than three days before any evidentiary hearing scheduled by the Court, pursuant to ECF No. 412.

HIGHLY CONFIDENTIAL – FOR ATTORNEYS' EYES ONLY

VERIFICATION

I, Matthew H. King declare under penalty of perjury:

I am employed by the U.S. Department of Homeland Security, Office of International Affairs, as the Deputy Assistant Secretary, Office of International Engagement.

I have read and know the contents of these responses.  These responses were prepared after obtaining information available to DHS through its officers and employees and through its documents and records. These responses, subject to inadvertent and undiscovered errors, are based upon, and necessarily limited by, the records and information still in existence, able to be located, presently recollected, an thus far discovered in the course of preparing these responses.  The responses regarding DHS are true and correct to the best of my knowledge, information, and belief.

Executed on _____ 5 OCT 2018 _____

_____

Matthew H. King
Deputy Assistant Secretary
Office of International Engagement
U.S. Department of Homeland Security