# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| **USAMA J. HAMAMA**, et al.,<br>Petitioners and Plaintiffs, | Case No. 17-cv-11910 |
| v. | Hon. Mark A. Goldsmith<br>Mag. David R. Grand |
| **REBECCA ADDUCCI**, et al.,<br>Respondents and Defendants. | Class Action |

## PETITIONERS/PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR SANCTIONS

## I.    Respondents Cannot Explain Away Their Misstatements And Omissions.

Respondents' brief is right about one thing: context matters. That is why Petitioners provided a detailed chronology (and are supplementing it to include new developments) so that the Court has the full history in one place. That chronology proves that Respondents provided false statements on July 20, Nov. 30, and Dec. 22, 2017, knowing then they were untrue, and that their factual presentation throughout has been a "mosaic of half-truths, inconsistencies, mischaracterizations, exaggerations, omissions, evasions, and failures to correct known misimpressions created by their own conduct that, in their totality, evince lack of candor to the court and disrespect for the judicial process." *Six v. Generations Fed. Credit Union*, 891 F.3d 508, 511 (4th Cir. 2018).

The U.S.-Iraq "Agreement": Respondents claim they were truthful when telling this Court that there was an agreement between Iraq and the U.S. for repatriation of all Iraqis with final removal orders. Respondents point to a March 2017 cable as proof of an "agreement." Yet they admit the cable only lays out "the initial steps … to commence the return of over 1,400 Iraqi nationals." Schultz Decl.[1], Ex. 1 at ICE-0271130. Indeed, Respondents acknowledge that when this action commenced, the "agreement…was at an embryonic stage." ECF 410-4, PgID 9700.

---

[1] Unless otherwise noted, references to the Schultz and Bernacke declarations are to Exhibits A and B (and exhibits referenced therein), respectively, to Respondents' Opposition to the Motion for Sanctions (ECF 410-4 and 417).

"Agreement" connotes a definite understanding with definite terms; to refer to an "agreement" as "embryonic" indicates the looseness with which Respondents used the first term. In fact, the cable is not an "agreement," but rather a summary of the state of play in March 2017. ICE was optimistic back then, which is after all why ICE planned for planeloads of deportees. But by the time the government submitted declarations, flights had been cancelled, travel documents denied, and visa sanctions proposed—all of which show there was no "agreement" to begin with.

Iraq's Willingness to Repatriate "All" Iraqis: Petitioners have pointed to voluminous evidence that there was not a firm agreement in 2017 to accept all Iraqis. The government's page-and-a-half of "facts" on this issue show that Iraq continued *even during 2018* to insist that returnees sign a form attesting that they were returning voluntarily—leading to repeated disputes with ICE.[2]  ECF 410-4, PgID 9719-20. For purposes of assessing Respondents' truthfulness, what matters is that these extensive discussions and negotiations occurred, in 2018, precisely because Iraq never agreed in 2017—when the declarations were submitted—to accept forced repatriations. Moreover, Respondents do not even attempt to rebut the evidence that Iraq repeatedly emphasized its unwillingness to take certain

---

[2] According to Respondents' current declarations, this issue was not resolved until "it was communicated…on July 2, 2018…that Iraq would issue travel documents to all individuals it determines are Iraqi nationals, regardless of whether they are returning voluntarily." Schultz Decl. ¶45; Bernacke Decl. ¶17. But those declarations contradict Schultz and Bernacke's less scripted deposition testimony that Iraq on that date had made no such commitment. Chron. ¶¶ 50-51, ECF 376-2.

returnees—including non-criminal immigration violators and asylum seekers—and Respondents continued to claim Iraq would take *all* repatriates. Indeed, when Respondents finally answered the most recent set of interrogatories, they confirmed that in June 2017 they understood that Iraq would not accept immigration violators, and in December 2017 that Iraq would have difficulty accepting individuals with failed asylum claims. Ex. A at ¶ 1a, Interrogatory Responses. Where were these caveats *before* Petitioners found out the true facts via discovery?

<u>Visa Sanctions</u>: Confronted with the fact that Mr. Schultz swore on July 20, 2017 that Iraq had agreed to timely returns, ECF 81-4, ¶5, but that an internal ICE memo a day earlier recommended visa sanctions, the government's response is disingenuous. Respondents paint the documents "as part of an exercise to be prepared to deal with 'recalcitrant' countries," and say Iraq "happened to be one of the 27 countries that fell into [the recalcitrant] category *at that time*." ECF 410-4, PgID 9717 (original emphasis).[3] Respondents' revisionist story strains credulity. Nor do the government's misstatements about Iraq become true because the government ultimately decided not to sanction Iraq (but instead chose to sanction Cambodia, Eritrea, Guinea, and Sierra Leone, presumably also part of the "exercise," Schultz Decl. ¶36). The sanction recommendation, which was prepared

---

[3] Although it is Respondents who emphasize "at that time," the phrase is hardly helpful to their cause. "That time" was the day before Mr. Schultz swore to this Court that "Iraq has agreed, using charter flights, to the timely return of nationals that are subject to final orders of removal." ECF 81-4, PgID 2006, ¶5.

by ICE staff performing their official duties and provided to Mr. Schultz the same day he signed his declaration, ECF 376-37, ICE 0271028, contains factual statements regarding U.S.-Iraqi relations *at that time*, including:

- "ICE considers Iraq to be among the most recalcitrant countries."
- "ICE believes it has exhausted all means at its disposal to secure cooperation."

ECF 376-2, ¶24.a; ECF 376-26, ICE 0297770-72. These statements directly contradict those made to this Court.

Denial of Travel Documents: Even though on June 7, 2017, Iraq issued a blanket denial for 24 repatriation requests, noting that "the applicant…should express orally and in writing his willingness to be returned to Iraq voluntarily in order to be issued a travel document," ECF 376-2, ¶20.h, Respondents still claim that their statements that Iraq would take back all its nationals were true. The denials, the government says, are irrelevant because they are unrelated to the hundreds of requests made after the March "agreement." ECF 410-4, PgID 9711. That is false. The May 2017 request to Baghdad included every one of the 24 individuals for whom travel documents were denied in June.[4] Schlanger Decl. ¶21, ECF 376-62, PgID 8716.

The June and July Flight Cancellations: Mr. Bernacke swore that "[a]s a

---

[4] Those May requests covered only 17% of those with final orders (240/1400); if the blanket denials were truly unrelated to those requests, some of those denied individuals—presumably even a majority—would not have been on the summer 2017 presentation list.

result of the injunction...ICE cancelled the June 2017 charter flight." Bernacke Decl. ¶8, ECF 184-2, PgID 5072. The documents show the opposite—the June flight was cancelled because Iraq refused to accept it. ECF 410, Ex. 26 at ICE-0270496. The July flight was cancelled on July 12 because neither of two conditions—Iraq's agreement to proceed and lifting of the TRO—had been met. See *id.*, Ex. 20 at ICE-0268963. Respondents argue that "context"—documents showing they tried without success to convince Iraq to issue the necessary travel documents and accept these flights—somehow absolves them of responsibility for the misstatements. ECF 410-4, PgID 9714. This context does not render the misstatements any less false. But it does again undercut the claim of an agreement: Iraq's refusal to accept flights or issue travel documents in June and July 2017 shows that there was no agreement.

Manifest-Only Flights: Respondents concede the falsity of Mr. Bernacke's claim that Iraq would accept flights based on manifests, without travel documents.[5] ECF 410-4, PgID 9701. But, they say, this caused no harm because it hardly matt-

---

[5] Respondents argue that Mr. Bernacke's misstatements were innocent, based on Mr. Schultz's speculation about why Mr. Bernacke made the errors. ECF 410-4, PgID 9701; Schultz Decl. ¶38. But Mr. Schultz saw the declaration immediately after it was filed. Ex. B, ICE-0296035. He did nothing to correct the record. The Bernacke's declaration says he "reviewed briefing documents" to inform himself of the facts. Bernacke Decl. ¶5. The cited document (Ex. 26 at ICE-0270496) says that the June flight was cancelled *before* the issuance of the TRO, directly contrary to what Mr. Bernacke swore. ECF 184-2, PgID 5072, ¶8. Finally, the March cable that the government claims evidences the repatriation agreement calls for travel documents, not manifests. (Schultz Decl., Ex. 1 at ICE-0271131.)

ers whether someone flew under travel documents or a manifest. Bernacke Decl. ¶7. This misrepresentation was material because the government made it so. When Petitioners argued that travel documents were necessary under *Rosales-Garcia v. Holland*, 322 F.3d 386 (6th Cir. 2003), the government highlighted Iraq's alleged willingness the accept manifests, thereby freeing ICE from the "labor-intensive, expensive, and time-consuming [travel document] process..." ECF 184-2, PgID 5072, ¶9. The Court found it significant that although "very few travel documents have actually been provided," "large-scale removals can be arranged via charter flight, without the need for travel documents." ECF 191, PgID 5331-32.

In sum, the government presented sworn testimony that it had an unconditional agreement with Iraq for the return of all Iraqis with final orders that would have been implemented but for this court's orders, which supposedly stopped planes set to go. None of this was true, as the government's own documents prove.

## II. Respondents' Other Legal Arguments Provide No Valid Reasons To Deny The Motion.

Respondents identify three reasons to deny sanctions besides their assertions that they did not misrepresent facts. None are persuasive.

First, Respondents assert Petitioners would not have prevailed on their *Zadvydas* claim even if the challenged evidence was not submitted. ECF 410-4, PgID 9702. Petitioners disagree—but in any event, this is not the standard. Only the Court knows what it would have done had it known the truth. More relevant is

whether the misstatements and omissions were material. They were. *Zadvydas* establishes a burden-shifting regime. Because Petitioners had been in custody for six months and because they established that the government had at best provided "vague representations" about a repatriation agreement, ECF 191, PgID 5331, the burden was on the government to establish a significant likelihood of removal. As the government concedes, the only evidence it provided were the assertions of Messrs. Schultz and Bernacke, ECF410-4, PgID 9706—assertions "about issues that are central to the truth-finding process" in this case. *Almeciga v. Ctr. for Investigative Reporting, Inc.*, 185 F.Supp.3d 401, 427 (S.D.N.Y. 2016).

Second, Respondents argue that the detainees were not harmed by their failure to win the *Zadvydas* claim because they received bond hearings. ECF 410-4, PgID 9703. But release under *Zadvydas* is independent of release on bond under this Court's order. A failure to secure one does not affect the other. To the contrary, precisely because they could not secure bond, the remaining detainees have been the persons to suffer most from the government's misconduct.

Finally, Respondents suggest that some other procedure, allowing them a chance to remedy misstatements, should have been followed. *Id*. They identify no particular rule, and provide no authority for the argument. Withdrawal of the offending pleadings would not, in any event, have remedied the harm. Petitioners would still languish in captivity.

Respectfully submitted,

Michael J. Steinberg (P43085)
Bonsitu A. Kitaba (P78822)
Miriam J. Aukerman (P63165)
ACLU FUND OF MICHIGAN
2966 Woodward Avenue
Detroit, Michigan 48201
(313) 578-6814
msteinberg@aclumich.org

*/s/Kimberly L. Scott*
Kimberly L. Scott (P69706)
Wendolyn W. Richards (P67776)
Cooperating Attorneys, ACLU Fund
 of Michigan
MILLER, CANFIELD, PADDOCK
 & STONE, PLC
101 N. Main St., 7th Floor
Ann Arbor, MI 48104
(734) 668-7696
scott@millercanfield.com

Nora Youkhana (P80067)
Nadine Yousif (P80421)
Cooperating Attorneys, ACLU Fund
 of Michigan
CODE LEGAL AID INC.
 27321 Hampden St.
Madison Heights, MI 48071
(248) 894-6197
norayoukhana@gmail.com

María Martínez Sánchez (NM Bar126375)
ACLU OF NEW MEXICO
1410 Coal Ave. SW
Albuquerque, NM 87102
msanchez@aclu-nm.org

Judy Rabinovitz (NY Bar JR-1214)
Lee Gelernt (NY Bar LG-8511)
ACLU FOUNDATION IMIGRANTS'
RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2618
jrabinovitz@aclu.org

Margo Schlanger (P82345)
Cooperating Attorney, ACLU Fund
 of Michigan
625 South State Street
Ann Arbor, Michigan 48109
734-615-2618
margo.schlanger@gmail.com

Susan E. Reed (P66950)
MICHIGAN IMMIGRANT RIGHTS
 CENTER
3030 S. 9th St. Suite 1B
Kalamazoo, MI 49009
(269) 492-7196, Ext. 535
Susanree@michiganimmigrant.org

Lara Finkbeiner (NY Bar 5197165)
Mark Doss (NY Bar 5277462)
INTERNATIONAL REFUGEE
 ASSISTANCE PROJECT
Urban Justice Center
40 Rector St., 9th Floor
New York, NY 10006
(646) 602-5600
lfinkbeiner@refugeerights.org

*Attorneys for All Petitioners and Plaintiffs*

William W. Swor (P21215)
WILLIAM W. SWOR
 & ASSOCIATES
1120 Ford Building
615 Griswold Street
Detroit, MI 48226
wwswor@sworlaw.com

*Attorney for Petitioner/Plaintiff Usama Hamama*

Dated: October 26, 2018

## CERTIFICATE OF SERVICE

I hereby certify that on October 26, 2018, I electronically filed the foregoing papers with the Clerk of the Court using the ECF system which will send notification of such filing to all ECF filers of record.

By: */s/Kimberly L. Scott*
Kimberly L. Scott (P69706)
Cooperating Attorneys, ACLU Fund of Michigan
MILLER, CANFIELD, PADDOCK
  & STONE, PLC
101 N. Main St., 7th Floor
Ann Arbor, MI 48104
(734) 668-7696
scott@millercanfield.com

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

| | |
|---|---|
| **USAMA J. HAMAMA**, et al.,<br>Petitioners and Plaintiffs, | Case No. 17-cv-11910 |
| v. | Hon. Mark A. Goldsmith<br>Mag. David R. Grand |
| **REBECCA ADDUCCI**, et al.,<br>Respondents and Defendants. | Class Action |

## INDEX OF EXHIBITS
### TO PETITIONER/PLAINTIFF' REPLY IN SUPPORT
### OF MOTION FOR SANCTIONS

Exhibit A    Respondent Department of Homeland Security's Supplemental Second Responses to Petitioners/Plaintiff Anwar Hamad's Interrogatories

Exhibit B    Email from J. Schultz dated December 27, 2017 re "Bernacke Draft decl. response 12222017 FINAL"

# EXHIBIT A

Message
**From**:     Schultz, John A [/o=irmmail/ou=mbx servers - nyc/cn=recipients/cn=jaschult]
on behalf of   Schultz, John A
**Sent**:     12/27/2017 4:18:46 PM
**To**:       Lieberman, Joan S [/o=IRMMAIL/ou=MBX Servers - COW/cn=Recipients/cn=jslieber]
**Subject**:  RE: Bernacke Draft decl. response 12222017 Final

I think you are fine Joan---

# DP, ACC

BACKGROUND:

# DP, ACC

John A Schultz Jr.
Deputy Assistant Director
Removal Management Division- East
Enforcement and Removal Operations
Immigration and Customs Enforcement
500 12th Street SW
Washington, DC 20536
(202) 732-5893 (office)
(202) 497-1344 (mobile)
John.a.schultz@ice.dhs.gov

**From:** Lieberman, Joan S
**Sent:** Wednesday, December 27, 2017 9:21 AM
**To:** Schultz, John A
**Subject:** FW: Bernacke Draft decl. response 12222017 Final

Here is what was filed with the court.

**From:** Meymarian, Maryellen
**Sent:** Friday, December 22, 2017 4:39 PM
**To:** Lieberman, Joan S
**Subject:** FW: Bernacke Draft decl. response 12222017 Final

Already signed.

Maryellen Meymarian
Associate Legal Advisor
Enforcement and Removal Operations Law Division
Office of the Principal Legal Advisor
DHS U.S. Immigration and Customs Enforcement
(202) 732-5319 (office)
(202) 760-1064 (cell)
Maryellen.Meymarian@ice.dhs.gov

*** Warning *** Attorney/Client Privilege *** Attorney Work Product *** This document contains confidential and/or sensitive attorney/client privileged information or attorney work product and is not for release, review, retransmission, dissemination or use by anyone other than the intended recipient. Please notify the sender if this E-mail has been misdirected and immediately destroy all originals and copies. Any disclosure of this document must be approved by the Office of the Principal Legal Advisor, U.S. Immigration & Customs Enforcement. This document is for INTERNAL GOVERNMENT USE ONLY. FOIA exempt under 5 U.S.C. § 552(b)(5).

Sent with BlackBerry Work
(www.blackberry.com)

**From:** Bernacke, Michael V <Michael.V.Bernacke@ice.dhs.gov>
**Date:** Friday, Dec 22, 2017, 4:05 PM
**To:** Thacker, Kathleen <Kathleen.Thacker@ice.dhs.gov>, Meymarian, Maryellen <Maryellen.Meymarian@ice.dhs.gov>
**Subject:** RE: Bernacke Draft decl. response 12222017 Final

Noticed something and made an edit:

# DP, ACC

**From:** Thacker, Kathleen
**Sent:** Friday, December 22, 2017 3:43 PM
**To:** Bernacke, Michael V; Meymarian, Maryellen
**Subject:** RE: Bernacke Draft decl. response 12222017 Final

Thank you so much Michael! Have a great holiday.

Kind regards,

**Kathleen Thacker | Associate Legal Advisor**
**District Court Litigation Division**
Office of the Principal Legal Advisor
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security
Direct: (202) 732-3386
Cell: (202) 841-1192
Fax: (202) 732-5346



Attorney/Client Privilege ***Attorney Work Product
This document contains confidential and/or sensitive attorney/client privileged information or attorney work product and is not for release, review, retransmission, dissemination or use by anyone other than the intended recipient.  Please notify the sender if this email has been misdirected and immediately destroy all originals and copies. Any disclosure of this document must be approved by the Office of the Principal Legal Advisor, U.S. Immigration & Customs Enforcement.  This document is for INTERNAL GOVERNMENT USE ONLY.  FOIA exempt under 5 U.S.C. § 552(b)(5).

---

**From:** Bernacke, Michael V
**Sent:** Friday, December 22, 2017 3:43 PM
**To:** Meymarian, Maryellen
**Cc:** Thacker, Kathleen
**Subject:** RE: Bernacke Draft decl. response 12222017 Final

Attached, thanks.

---

**From:** Meymarian, Maryellen
**Sent:** Friday, December 22, 2017 3:39 PM
**To:** Bernacke, Michael V
**Cc:** Thacker, Kathleen
**Subject:** FW: Bernacke Draft decl. response 12222017 Final

Michael

Please just copy Kathleen Thacker on your signed version.  I am trying to get out of here myself.

Thanks

Maryellen Meymarian
Associate Legal Advisor
Enforcement and Removal Operations Law Division
Office of the Principal Legal Advisor
DHS U.S. Immigration and Customs Enforcement
(202) 732-5319 (office)
(202) 760-1064 (cell)
Maryellen.Meymarian@ice.dhs.gov

*** Warning *** Attorney/Client Privilege *** Attorney Work Product *** This document contains confidential and/or sensitive*
*attorney/client privileged information or attorney work product and is not for release, review, retransmission, dissemination or use by*
*anyone other than the intended recipient. Please notify the sender if this E-mail has been misdirected and immediately destroy all*
*originals and copies. Any disclosure of this document must be approved by the Office of the Principal Legal Advisor, U.S.*

*Immigration & Customs Enforcement. This document is for INTERNAL GOVERNMENT USE ONLY. FOIA exempt under 5 U.S.C. § 552(b)(5).*

**From:** Meymarian, Maryellen
**Sent:** Friday, December 22, 2017 3:16 PM
**To:** Bernacke, Michael V
**Subject:** Bernacke Draft decl. response 12222017 Final

Please sign and send back PDF.

Have a great holiday.

# EXHIBIT B

HIGHLY CONFIDENTIAL – FOR ATTORNEYS' EYES ONLY

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

**USAMA JAMIL HAMAMA,** et al.,

     Petitioners and Plaintiffs,

v.

**REBECCA ADDUCCI**, et al.,

     Respondents and Respondents.

Case No. 2:17-cv-11910
Hon. Mark A. Goldsmith
Mag. David R. Grand
Class Action

## RESPONDENT/DEFENDANT U.S. DEPARTMENT OF HOMELAND SECURITY'S SECOND SUPPLEMENTAL RESPONSES TO PETITIONER/PLAINTIFF ANWAR HAMAD'S INTERROGATORIES TO RESPONDENT KIRSTJEN NIELSEN

### I. PRELIMINARY STATEMENT

All information contained herein is based solely upon such information and evidence as is available and known to Respondent U.S. Department of Homeland Security ("DHS") upon information and belief at this time. Consistent with Fed. R. Civ. P. 26(e), Respondent DHS will amend any and all responses herein if additional facts are ascertained. The responses herein are made in a good faith effort to supply as much information as is known to Respondent DHS at this time, consistent with the positions set forth in the Joint Statement of Issues, ECF No. 235. Pursuant to this Court's Order, ECF No. 412, DHS will supplement these responses with any new information 3 days before any evidentiary hearing scheduled by the Court.

### II. GENERAL OBJECTIONS

1. DHS objects to the requests that impose or seek to impose any requirement or discovery obligation greater than or different from those under the Federal Rules of Civil Procedure and the applicable Local Rules and Orders of the Court.

HIGHLY CONFIDENTIAL – FOR ATTORNEYS' EYES ONLY

2.      DHS objects to the requests to the extent they seek disclosure of information protected under the attorney-client privilege, deliberative process privilege, law enforcement privilege, attorney work-product doctrine, or any other applicable privilege or immunity.  Should any such disclosure by DHS occur, it is inadvertent and shall not constitute a waiver of any privilege or immunity.

3.      DHS reserves all objections as to the competence, relevance, materiality, admissibility, or privileged status of any information provided in response to these requests, unless DHS specifically states otherwise.

4.      DHS preserves all objections set forth in the Supplemental Responses to Petitioners/Plaintiffs Anwar Hamad's Interrogatories to Respondent Kirstjen Nielsen, but responds pursuant to the Court order, ECF No. 412, as follows.

1.      Explain your understanding of the process by which Respondents seek and the GOI determines whether to allow the repatriation of an Iraqi National, including:
   a.   Describing each step of the process of obtaining travel documents or authorization for repatriation, from start to finish, both by Respondents and, to Respondents' knowledge, by the GOI;
   b.   Identifying each document used as part of the process of obtaining travel documents or authorization for repatriation, either by the Respondents or by the GOI;
   c.   Describing how the process of obtaining travel documents or authorization for repatriation, including but not limited to the outcomes of that process, is affected by an Iraqi National's expressed desire (written or verbal) to return or expressed desire (written or verbal) not to return to Iraq;
   d.   Describing your understanding of the process and criteria the GOI employs to determine whether or not an Iraqi National qualifies as a "voluntary removal," as the term is used in Interrogatory–First Set No. 1, DHS's Second Supplemental Responses ("the Embassy can issue travel documents for voluntary removals, but Baghdad will approve travel documents required for other Iraqi Nationals"), for whom the Embassy can issue travel documents;
   e.   Describing each and every step taken by Respondents and by "Baghdad," as that term is used in Interrogatory-First Set No. 1, DHS's Second Supplemental Responses, to process travel document requests for Iraqi Nationals who do not qualify as

HIGHLY CONFIDENTIAL – FOR ATTORNEYS' EYES ONLY

     "voluntary removals," including the names and job titles of all persons involved both from the U.S. government and the GOI;

 f. Describing the potential outcomes for the process of obtaining travel documents (e.g., issuance of a passport, laissez passer, or other document, or denial on what bases);

 g. Describing the potential outcomes for the process of obtaining authorization for repatriation;

 h. Describing the remaining steps in the removal process after the travel document or repatriation processes have reached an outcome, both if the document/authorization is granted and if denied.

## RESPONSE:

Respondent ICE is the component agency of DHS with responsibility for the repatriation of Iraqi Nationals. Accordingly, DHS incorporates and relies on all ICE responses on this topic. For responses where DHS has additional or different information than what was provided by ICE, DHS is providing that information as set forth below.

1a. DHS lacks information sufficient to respond to the details of the repatriation process for Iraqi Nationals and defers to ICE regarding such details. Upon information and belief, DHS understands that Iraq has agreed in principle to repatriate Class Members and that requests for repatriation of Class Members could be coordinated by ICE Enforcement and Removal Operations ("ERO") through the Government of Iraq.

As of June 26, 2017, DHS understood that the Government of Iraq: (1) would accept for repatriation those Iraqi Nationals whose citizenship has been confirmed; (2) criminals with completed sentences; (3) Iraqi Nationals with removal orders; and (4) for criminals, Iraqi Nationals whose criminal convictions is other than for illegal entry into the United States.

As of December 6, 2017, DHS understood that the Government of Iraq: (1) would issue visas in small groups after verifying Iraqi citizenship; (2) wanted to prioritize removal of criminal Iraqi Nationals; (3) would require proof of completion of criminal sentences for Iraqi criminal aliens with completed sentences; (4) wished to prioritize non-immigration-related criminal Iraqi Nationals; and (5) may have difficulty in accepting individuals with failed asylum claims.

As of January 9, 2018, DHS understood that the Government of Iraq: (1) would cooperate with DHS regarding removals and wanted to expedite removals; (2) needed criminal history for removal of criminal aliens; (3) needed proof of Iraqi citizenship; (4)

HIGHLY CONFIDENTIAL – FOR ATTORNEYS' EYES ONLY

would not require Iraqi Nationals to sign a form; and (5) that the Embassy can issue travel documents for voluntary removals, but Baghdad will approve travel documents required for other Iraqi Nationals.

Since January 2018, DHS has not directly engaged in discussions with the Government of Iraq regarding repatriation of Iraqi Nationals and defers to ICE for current information.

1b.    DHS lacks information sufficient to respond regarding "each document used as part of the process of obtaining travel documents or authorization for repatriation, either by the Respondents or by the GOI." ICE is the component agency of DHS with responsibility for repatriation of Iraqi Nationals. DHS incorporates by reference its response to Interrogatory No. 1a, specifically, that the Government of Iraq would require proof of Iraqi citizenship and criminal history information.

1c.    DHS lacks information sufficient to respond regarding "how the process of obtaining travel documents or authorization for repatriation, including but not limited to the outcomes of that process, is affected by an Iraqi National's expressed desire (written or verbal) to return or expressed desire (written or verbal) not to return to Iraq." ICE is the component agency of DHS with responsibility for repatriation of Iraqi Nationals. DHS incorporates by reference its response to Interrogatory No. 1a, specifically, that the Embassy can issue travel documents for voluntary removals.

1d.    DHS lacks information sufficient to respond regarding "the process and criteria the GOI employs to determine whether or not an Iraqi National qualifies as a 'voluntary removal,' as the term is used in Interrogatory–First Set No. 1, DHS's Second Supplemental Responses ("the Embassy can issue travel documents for voluntary removals, but Baghdad will approve travel documents required for other Iraqi Nationals"), for whom the Embassy can issue travel documents." ICE is the component agency of DHS with responsibility for repatriation of Iraqi Nationals. Other than the information provided in the quoted language, and again in response to Interrogatory No. 1a, above, DHS has no additional responsive information.

1e.    DHS lacks information sufficient to respond regarding "each and every step taken by Respondents and by "Baghdad," as that term is used in Interrogatory-First Set No. 1, DHS's Second Supplemental Responses, to process travel document requests for Iraqi Nationals who do not qualify as "voluntary removals," including the names and job titles of all persons involved both from the U.S. government and the GOI." ICE is the component agency of DHS with responsibility for repatriation of Iraqi Nationals. Other than the information provided in the quoted language, and again

HIGHLY CONFIDENTIAL – FOR ATTORNEYS' EYES ONLY

in response to Interrogatory No. 1a, above, DHS has no additional responsive information.

      1f.    DHS lacks information sufficient to respond regarding "the potential outcomes for the process of obtaining travel documents (e.g., issuance of a passport, laissez passer, or other document, or denial on what bases)." ICE is the component agency of DHS with responsibility for repatriation of Iraqi Nationals.

      1g.    DHS lacks information sufficient to respond regarding "the potential outcomes for the process of obtaining authorization for repatriation." ICE is the component agency of DHS with responsibility for repatriation of Iraqi Nationals.

      1h.    DHS lacks information sufficient to respond regarding "the remaining steps in the removal process after the travel document or repatriation processes have reached an outcome, both if the document/authorization is granted and if denied." ICE is the component agency of DHS with responsibility for repatriation of Iraqi Nationals.

      2.    Describe all criteria known to you to be used by the GOI to determine what kind of travel document to issue for an Iraqi National: laissez passer (one-way travel document), Iraqi passport, or other specified document.

**RESPONSE:**

      DHS lacks information sufficient to respond regarding "all criteria known to you to be used by the GOI to determine what kind of travel document to issue for an Iraqi National: laissez passer (one-way travel document), Iraqi passport, or other specified document." ICE is the component agency of DHS with responsibility for repatriation of Iraqi Nationals.

      3.    DHSHAMAMA000089 (in the version with redactions modified by the Court) states: "Note: DHS is working with Iraq and STATE to finalize a draft MOU on repatriations and the return of Iraqi nationals under final orders of removal."

          a.    Provide the date of the document provided as DHSHAMAMA000089;
          b.    Identify each draft of the MOU;
          c.    Identify the finalized MOU; and
          d.    If the MOU was never finalized, describe the reasons why and the

HIGHLY CONFIDENTIAL – FOR ATTORNEYS' EYES ONLY

current status, if any, of discussions regarding the MOU.

**RESPONSE:**

3a. Respondent DHS avers that document DHSHAMAMA000089 is dated on or about November 27, 2017.

3b. Respondent DHS does not have any draft or final versions of a MOU and is unaware of the existence of any draft or final MOU with Iraq related to repatriations and the return of Iraqi nationals under final orders of removal.

3c-3d. DHS has no knowledge as to whether the referenced MOU was drafted or finalized, or the reasons why, or the current status, if any, of discussions regarding the referenced MOU and is unaware of the existence of any draft or final MOU with Iraq related to repatriation and the return of Iraqi nationals under final orders of removal.

4.   Michael Bernacke, in his December 22, 2017 declaration, ECF 184-3, ¶¶ 6, 9, stated that the GOI had agreed to allow repatriations of Iraqi Nationals without travel documents, on the basis of an approved flight manifest for a charter flight, and John Schultz, in his declaration of July 20, 2017, ECF 81-4, ¶ 7, stated that 8 Iraqi Nationals were repatriated on such a charter flight in April 2017:
   a.   Describe your understanding of the current status of the GOI willingness to allow the repatriation of Iraqi Nationals without travel documents;
   b.   Identify the basis of that understanding;
   c.   If there was a change from April 2017 to the present in the GOI willingness to allow repatriations of Iraqi Nationals without travel documents, describe the change and your understanding of its cause.

**RESPONSE:**

In response to Petitioner/Plaintiff's Interrogatory Nos. 4a-4c, Respondent DHS has no responsive information.  Since January 2018, DHS has not directly engaged in discussions with the Government of Iraq regarding repatriation of Iraqi Nationals and defers to ICE for current information.

HIGHLY CONFIDENTIAL – FOR ATTORNEYS' EYES ONLY

5.     In several responses to prior discovery requests, Respondents have referred to GOI "form[s]" related to travel documents.

      a.     Are the forms referred to in the three statements cited in the footnote to this Interrogatory the same?

      b.     Are the referenced forms the document attached as Exhibit B?

      c.     If the referenced forms are not the document attached as Exhibit B, identify each referenced form.

      d.     Identify each other GOI form you are aware is sometimes or always used in the travel document or repatriation process.

**RESPONSE:**

In response to Petitioner/Plaintiff's Interrogatory Nos. 5a-5d, Respondent DHS has no responsive information.  Respondent DHS notes that the reference to the DHS's Second Supplemental Responses reflects an understanding that no signature would be required on a form.  Respondent DHS defers to Respondent ICE regarding the references to Respondent ICE's statements included in the referenced footnote.

6.     Not applicable to DHS.

7.     Not applicable to DHS.

8.     Not applicable to DHS.

9.     Not applicable to DHS.

10.    In several documents, Respondents have stated that GOI travel document decisions for Iraqi Nationals who declined to sign a GOI form stating that they were willing to return to Iraq are "pending."  Describe the following:

      a.     Your understanding of the steps in "different internal GOI process," including the roles of each office, department, organization, committee, etc., involved.

      b.     For each Iraqi National who declined to sign a GOI form stating that they were willing to return to Iraq, state:

         i.     each step that Respondents have taken in furtherance of their request for travel documents or repatriation;

        ii.     any updates or responses the GOI has provided to that request, including who provided those responses, in what form, to whom, and when; and

       iii.     the outcome (with date) or current status of the process.

HIGHLY CONFIDENTIAL – FOR ATTORNEYS' EYES ONLY

**RESPONSE:**

In response to Petitioner/Plaintiff's Interrogatory Nos. 10a-10b(i) – (iii), Respondent DHS DHS has no responsive information and notes that ICE is the component agency of DHS with responsibility for repatriation of Iraqi Nationals.

11. Not applicable to DHS.

12. Identify each document and witness Respondents will use at an evidentiary hearing, filing, or otherwise in this action to prove that, for Iraqi Nationals, there is a significant likelihood of removal in the reasonably foreseeable future.

**RESPONSE:**

DHS incorporates by reference the response of Respondent/Defendant ICE to this interrogatory. Specifically, DHS may rely on the testimony of John Schultz, Michael Bernacke, and James Maddox, as well as the exhibits attached to Petitioners' and Respondents' briefs on Petitioners' Renewed Motion for a Preliminary Injunction under *Zadvydas* and Petitioners' Motion for Sanctions; all travel document requests, cover letters, and travel documents, provided to Petitioners pursuant to ECF 316 and 389; and all biweekly reports showing that Iraqi nationals have been removed. In addition, DHS may also rely on the following documents produced in discovery: DHSHAMAMA000001 – DHSHAMAMA000123. DHS reserves the right to identify additional witnesses and evidence and will supplement this interrogatory response no later than three days before any evidentiary hearing scheduled by the Court, pursuant to ECF No. 412.

HIGHLY CONFIDENTIAL – FOR ATTORNEYS' EYES ONLY

<u>VERIFICATION</u>

I, Matthew H. King declare under penalty of perjury:

I am employed by the U.S. Department of Homeland Security, Office of
International Affairs, as the Deputy Assistant Secretary, Office of International
Engagement.

I have read and know the contents of these responses.  These responses were
prepared after obtaining information available to DHS through its officers and
employees and through its documents and records. These responses, subject to
inadvertent and undiscovered errors, are based upon, and necessarily limited by, the
records and information still in existence, able to be located, presently recollected, an
thus far discovered in the course of preparing these responses.  The responses regarding
DHS are true and correct to the best of my knowledge, information, and belief.

Executed on _____5 OCT 2018_____

_____Matth H. K_____

Matthew H. King
Deputy Assistant Secretary
Office of International Engagement
U.S. Department of Homeland Security