UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

USAMA J. HAMAMA, et al.,

              Petitioners,                           Case No. 17-cv-11910

vs.                                            HON. MARK A. GOLDSMITH

REBECCA ADDUCCI, et al.,

              Respondents.

_____/

**OPINION & ORDER**
**GRANTING PETITIONERS' RENEWED MOTION**
**FOR PRELIMINARY INJUNCTION (Dkt. 473)**

The law is clear that the Federal Government cannot indefinitely detain foreign nationals while it seeks to repatriate them, when there is no significant likelihood of repatriation in the reasonably foreseeable future. This principle emanates from our Constitution's core value of rejecting arbitrary restraints on individual liberty.

The issue the Court now resolves is whether there is such a likelihood of repatriation for scores of Iraqi nationals whom the Government has detained for an extended period—many for well over a year—while it engages in a diplomatic dialogue with Iraq that has yet to produce any clear agreement on repatriation. In fact, the weight of the evidence actually uncovered during discovery shows that Iraq will not take back individuals who will not voluntarily agree to return. This means that the Iraqi detainees could remain locked up indefinitely—many in local jails— whether their challenges to their orders of removal are exhausted or on-going. More evidence confirming Iraq's refusal to repatriate might well exist, but the Government has acted ignobly in this case, by failing to comply with court orders, submitting demonstrably false declarations of

1

Government officials, and otherwise violating its litigation obligations—all of which impels this Court to impose sanctions.

As explained fully below, the Court will grant a preliminary injunction, as requested by Petitioners in this case, ordering that those detained more than six months be released under orders of supervision.

## I.   BACKGROUND

### A.  Procedural Background

As recited in the Court's prior opinions, this case arises out of the arrest and detention of Iraqi nationals who are or were subject to long-standing final orders of removal.  See, e.g., Hamama v. Adducci, 261 F. Supp. 3d 820 (E.D. Mich. 2017).   In June 2017, agents from Immigration and Customs Enforcement ("ICE"), an agency of the Department of Homeland Security ("DHS"), began arresting hundreds of these Iraqi nationals, the majority of whom are Chaldean Christians who would face persecution, torture, and possibly death if returned to Iraq. The initial round-up took place in Michigan, snaring approximately 114 individuals.  Am. Pet. ¶ 5 (Dkt. 118).

Many of these individuals were ordered removed to Iraq years ago (some decades ago), because of criminal offenses they committed while in the United States.  All detainees served their sentences and were released under orders of supervision, because Iraq refused to accept repatriation.  According to Petitioners, they lived peaceably in their respective communities under the orders of supervision—a point the Government does not contest.

### 1.  Preliminary Injunction Staying Removal

On July 24, 2017, this Court issued a preliminary injunction enjoining the removal of Petitioners and the putative class, defined at the time as "any and all Iraqi nationals in the United

States who had final orders of removal on June 24, 2017, and who have been, or will be, detained for removal by ICE." Hamama v. Adducci, 261 F. Supp. 3d 820, 841 (E.D. Mich. 2017).  The Court ruled that Petitioners' habeas and due process rights entitled them to access to the immigration courts, prior to removal, so that motions to reopen their immigration proceedings could be filed.  The Government filed a notice of appeal of this ruling on September 21, 2017 (Dkt. 108), which appeal remains pending.

Petitioners filed an Amended Petition on October 12, 2017 (Dkt. 118), both reasserting and revising their claims, and requesting three forms of relief: (i) a stay of removal proceedings to allow class members to seek relief from removal before the appropriate body in the immigration court system; (ii) bond hearings for those held in prolonged detention; and (iii) release under orders of supervision, pursuant to Zadvydas v. Davis, 533 U.S. 678 (2001), unless and until repatriation to Iraq becomes significantly likely in the reasonably foreseeable future.  Zadvydas prohibits civil detention where there is no significant likelihood of removal in the reasonably foreseeable future.

### 2.   Preliminary Injunction Regarding Bond Hearings

As class members' claims wound their way through the immigration courts, the Government elected to continue their administrative detention.  On November 7, 2017, Petitioners moved for a second preliminary injunction, asserting that they were entitled to immediate release from detention under Zadvydas, because there was no significant likelihood of their removal in the reasonably foreseeable future (Dkt. 138).  In the alternative, Petitioners argued that their prolonged detention entitled them to bond hearings before an impartial adjudicator to determine whether their release would present a flight or safety risk.

Petitioners also filed a motion to certify the "Primary Class" (Dkt. 139), which ultimately was defined as "All Iraqi nationals in the United States who had final orders of removal at any

point between March 1, 2017 and June 24, 2017 and who have been, or will be, detained for removal by U.S. Immigration and Customs Enforcement."  9/26/2018 Op. at 18 (Dkt. 404).  The motion also sought certification of three subclasses of detainees: (i) detainees who are subject to final orders of removal; (ii) detainees subject to prolonged detention whom the Government purported to hold under a statutory provision providing for mandatory detention; and (iii) a so-called Zadvydas subclass defined as "All Primary Class Members, who are currently or will be detained in ICE custody, and who do not have an open individual habeas petition seeking release from detention."  Hamama v. Adducci, 285 F. Supp. 3d 997, 1020 (E.D. Mich. 2018).

On January 2, 2018, the Court issued an order granting, in part, Petitioners' second motion for preliminary injunction, holding that those subject to prolonged detention are entitled to a bond hearing before an impartial adjudicator, unless the Government proffered individualized evidence that a detainee should not receive a hearing.  Id. at 1027.  The Court also certified the three detention subclasses and deferred a ruling on primary class certification pending the Sixth Circuit's ruling or other developments.  See id.  The Court later certified the Primary Class.  See 9/26/2018 Op. (Dkt. 404).

The Court also deferred ruling on Petitioners' Zadvydas claim, ordering that the parties conduct discovery to determine whether Iraq is willing to accept class-wide repatriation.  Hamama, 285 F. Supp. 3d at 1028.

### 3.  Discovery Problems

In response to that allowance for discovery, on January 14, 2018, Petitioners served the Government with more narrowly tailored versions of their earlier interrogatory and production

requests.[1]  Pet'rs Mem. re Disc. Sanc. at 5 (Dkt. 454).  However, the Government did not respond to the January 14, 2018 discovery requests, which necessitated a court order requiring, in part, that the Government serve written responses to the interrogatories no later than March 23, 2018, and that it begin document production no later than March 30, 2018.  3/13/2018 Order ¶¶ 20 & 22 (Dkt. 254).  By March 30, 2018, the Government produced a total of four pages of documents, two of which were pages prepared by attorneys in support of the Government's defense in this action. Pet'rs Mem. re Disc. Sanc. at 5 & n.2.  The Government also provided incomplete interrogatory responses, omitting key information such as Iraq's requirement that Petitioners sign forms indicating their willingness to be returned to Iraq.  Id. at 5.

The Government filed a status report on April 6, 2018, in which it indicated that it had located 20,000 potentially responsive documents and would be able to complete production by July 2018 (Dkt. 267).  According to Petitioners, on April 16, 2018, they received forty-six pages of nonresponsive documents from the Government.  The Court was provided with a status report on April 20, 2018, in which the Government stated that it had resolved its technological issues and estimated that it would take eleven weeks (until the first week of July), to complete its document production (Dkt. 272).  The Court thereafter conducted a status conference on May 25, 2018, during which the Government stated that it would begin producing a significant number of

---

[1] The Court initially permitted discovery in a September 2017 order, see 9/29/2017 Order (Dkt. 115), and Petitioners served discovery requests on the Government in October 2017, Pet'rs Mem. re Disc. Violations at 5.  The Court eventually stayed those discovery requests, in part, based on the Government's representation that it would supply pertinent information in its response to Petitioners' November 7, 2017 motion for preliminary injunction (Dkt. 138), which carried the possibility of obviating the need for extensive discovery.  11/22/2017 Order at 2 (Dkt. 153).  As detailed below, that hope was illusory.

documents following entry of the second amended protective order, which was entered on June 19, 2018 (Dkt. 313).

Nonetheless, the Government's discovery responses continued to be deficient and the Government filed a motion to stay discovery (Dkt. 284), which the Court eventually denied (Dkt. 345). On June 12, 2018, the Court entered an order admonishing the Government that it may not withhold production of records pending its completion of all document review. 6/12/2018 Order (Dkt. 304). The Court ordered ICE to produce documents weekly on the following rolling basis: "1,000 pages of documents on each of the following dates: (i) June 19, 2018; (ii) June 26, 2018; (iii) July 3, 2018; and (iv) July 10, 2018. The balance of documents shall be produced July 17, 2018." Id. at 6-7. Notwithstanding the foregoing dates, DHS was required to complete its document production by June 25, 2018. Id. at 7.

The Court made clear that "[f]ailure to produce documents on this schedule will be construed, presumptively, as bad faith, unless Respondents can establish by clear and convincing evidence that there is exceptional good cause for not meeting the schedule." Id. The Court further ordered the Government to provide written responses and objections to Petitioners' January 14, 2018 requests for production by June 12, 2018. Id. With respect to the January 14, 2018 interrogatories, the Court ordered Petitioners to identify the ways in which the Government's responses were deficient and allowed the Government to supplement its responses by June 19, 2018. Id. at 8. The Court further warned the Government that "[i]f Respondents fail to conduct a reasonable inquiry, respond with information within their control or otherwise obtainable by them, provide an appropriate verification, or fully and completely respond to the interrogatories, Respondents may be sanctioned, including the exclusion of that information in motions, in hearings, at any evidentiary hearing, and at trial." Id. at 9.

Despite the Court's warnings, the Government provided only 150 documents by June 19, 2018.  Pet'rs Mem. re Disc. Sanc. at 6-7.  The Government subsequently sought to modify the production schedule (Dkt. 315), claiming great difficulties with production software and the various litigation tasks.  The Court found that the Government had not demonstrated exceptional good cause for failing to produce documents that were months overdue.  6/22/2018 Order at 2 (Dkt. 320).  The Court ordered document production to be completed by July 17, 2018.  Id. at 4. The Court warned the Government that "[f]ailure to comply with the Court's order may be cause for the Court to direct that the facts necessary to support Petitioners' Zadvydas claim are established, or prevent the Government from opposing the Zadvydas claim, or issue other appropriate relief."  Id. (citing Fed. R. Civ. P. 37(b)(2)(A)).  Seven months after service of the first document requests, the Government completed production on the first set of document requests. Pet'rs Mem. re Disc. Sanc. at 8.  ICE produced 1,508 records and DHS produced 123 pages.  Id.

As is often the case, the discovery responses led to new areas of inquiry.  Petitioners served a second set of interrogatories and production requests on July 6, 2018.  Id. at 9.  On the day the new discovery responses were due, the Government sought an extension.  Id.  Petitioners resisted the extension, because they intended to file their renewed preliminary injunction motion in August 2018.  The Court granted an extension until August 20, 2018, but made clear that no further extensions would be granted.  8/13/2018 Order (Dkt. 366).  On August 20, 2018, the Government served written responses to the production requests, but no documents, and refused to answer most of the interrogatories on the ground that they exceeded the 25-interrogatory limit per party.  Pet'rs Mem. re Disc. Sanc. at 9.  The Government's request for an additional twenty-one days to respond to interrogatories, and its subsequent objection to most of them on the ground that they exceeded

the 25-interrogatory limit, evidenced bad faith.  The Court subsequently overruled the objections (Dkt. 385).

### 4.  The Current Motion for Preliminary Injunction and Further Discovery Problems

Petitioners filed their renewed preliminary injunction motion on August 29, 2018 without the benefit of responses to the July 6, 2018 discovery requests (Dkt. 376).  After several status conferences and a motion to compel, the Government provided interrogatory answers on October 5, 2018, less than eighteen days before the hearing was scheduled on the preliminary injunction motion.  Id. at 10.  In the responses, the Government represented that the repatriation process had changed in September 2018.  Id.  However, the Government still had not produced any documents in response to the document requests.  Id.  In light of the October 23, 2018 hearing, and despite ordering document production by August 20, 2018, the Court ordered the Government to produce the outstanding documents by October 16, 2018.  10/12/2018 Order (Dkt. 431).  The Court further granted Petitioners leave to take depositions and Rule 30(b)(6) depositions in light of the information regarding new removal procedures in September and the Government's insistence on an evidentiary hearing.  Id.

Based on the Government's representations, Petitioners expected to review tens of thousands of pages of documents beginning on October 16, 2018 in preparation for depositions on October 18 and 19 and the evidentiary hearing on October 23.  Pet'rs Mem. re Disc. Sanc. at 11.  However, no documents were produced on October 16.  Id.

At an emergency status conference on October 17, 2018, the Court ordered production of the documents in electronic format on the same day, and the depositions were rescheduled for October 22, 2018.  10/19/2018 Order (Dkt. 449).  The Government produced 680 documents out of the 22,275 documents processed using a computer-based Technology Assisted Review ("TAR")

8

program.  Pet's Mem. re Disc. Sanc. at 11.  When the TAR parameters were later disclosed, the parameters were shown to be inadequate.  Id.  The document production was clearly incomplete, as evidenced by the number of documents produced and by the fact that only a handful of documents were dated after mid-July, and none was dated after August 31, 2018.  Id. at 12.  This was particularly problematic because the Government submitted later-dated documents to the Court as proposed exhibits in support of its position at the upcoming evidentiary hearing.  Id.  It was later revealed that approximately half of the documents that the TAR process identified as responsive were withheld.  Id.

After two more emergency status conferences on October 18 and 19, the Court ordered interim relief to Petitioners, including ordering production of all 22,275 documents, subject to the assertions of attorney-client or work product privileges.  10/19/2018 Order (Dkt. 449).  The Court further ordered that documents from the period from August 31, 2018 to September 30, 2018 be produced by 5:00 p.m. on Saturday, October 20, 2018.  Id.

 The Government again failed to meet the Court-ordered deadlines.  Pet's Mem. re Disc. Sanc. at 13.  The Government filed a notice of non-compliance on October 19, 2018 (Dkt. 449) with an accompanying declaration explaining fiscal and staffing constraints for the failure to meet discovery deadlines.  The declaration stated that the Government had produced 7,000 records— which turned out to be erroneous, prompting the Government subsequently to file a motion to strike the notice (Dkt. 450).  The declaration also stated that an additional 20,000 records had been omitted from the TAR review.  Pet's Mem. re Disc. Sanc. at 13.

The Court conducted another emergency status conference on Sunday, October 21, 2018, after which it cancelled the evidentiary hearing and requested briefing on appropriate sanctions for the Government's conduct (in addition to the briefing already filed in connection with Petitioners'

motion for sanctions).  The Court reasoned that an evidentiary hearing—at which the Government would present witnesses and documents of its choosing without full production of the documents ordered by the Court—would be unfair to Petitioners.  10/22/2018 Order (Dkt. 452).  The Court held oral argument on Petitioners' preliminary injunction motion and their motion for sanctions on October 24, 2018.[2]

### B.  Factual Background

#### 1.  Pre-April 2017

The United States has had difficulty repatriating Iraqi nationals for many years.  Removals to Iraq were previously suspended because of combat operations.  Ex. 1-2 to Pet'rs Renewed Prelim. Mot. at 2.[3]  In April 2006, ICE approached the Iraqi Ministry of the Interior ("MoI") to reestablish a removal process.  Id.  On May 19, 2006, DHS approved a bilateral agreement with the Government of Iraq ("GoI") using unexpired passports issued in 2007 or later and established requirements for the issuance of travel documents ("TDs").  Id.  Four years later, the Iraqi consulate in Detroit conducted a charter flight to Iraq returning twenty-three Iraqi nationals to Baghdad.  Id.  However, since that flight, the repatriation numbers decreased, in part, because the consulates' ability to issue travel documents was suspended.  Id.  In November 2011, Iraq's Ministry of Foreign Affairs ("MFA") directed consular officials to not issue passports or TDs to Iraqi nationals who did not wish to return to Iraq.  Id. at 3.  In other words, the GoI would not allow forced repatriation of its nationals.  The GoI's policy against forced repatriation has thwarted the United States' repatriation efforts to this day.

---

[2] Although much of the relief requested in the motion for sanctions is provided for in this Opinion and Order, the Court will formally address that motion in a separate order.

[3] Unless otherwise noted, all Exhibit cites are to Petitioners' Renewed Preliminary Injunction Motion (Dkt. 473).

From February 2014 to December 2016, the Department of State and ICE met with GoI officials seven times to follow-up on the issue of repatriation. Ex. 1-3 at PageID.12939-12940. During the January 29, 2016 meeting, the Iraqi Ambassador in Washington, D.C. assured U.S. government officials that Iraqi consulates would interview Iraqi detainees with criminal records to begin the process of issuing travel documents. Id. The Iraqi consulate in Detroit and the embassy in Washington, D.C. began interviews. However, the consulate in Los Angeles refused to allow a single interview due to lack of identity documents, which are generally needed to issue TDs. Id.

The Enforcement and Removal Operations ("ERO"), a division of ICE, requested that the Department of State's Bureau of Consular Affairs assist "in exploring more aggressive actions to address the removal issue with [GoI]." Ex. 1-2 at 1. In January 2016, ERO held a meeting at the Iraqi Embassy where a document acknowledging an agreement to accept criminal deportees' return to Iraq and copies of identity documents was presented to the GoI. Id. According to ICE briefing materials, the GoI appeared to be willing to accept copies of identity documents, but the GoI officials also mentioned that forced repatriation and fear claims hindered the issuance of TDs. Id.

During an October 2016 evaluation, ERO classified Iraq as an uncooperative country regarding their compliance with ICE/ERO's attempt to procure TDs for Iraqi nationals who had been ordered removed from the United States. Ex. 1-12 at 1; Ex. 1-15 at 1. Due to the lack of cooperation from the Iraqi Embassy in Washington, D.C., and after numerous demarches on the issue of repatriation,[4] ERO and the State Department developed a strategy to request approval for aliens with final orders of removal directly from the MFA in Baghdad. Ex. 1-9 at PageID.12985; see also Ex. 1-12 at 1; Ex. 1-15 at PageID.13007; Ex. 1-16 (June 1, 2017 email thread of ERO and

---

[4] A demarche is a formal diplomatic presentation of a government's official views.

11

State Department officials: "Basically, to make a long story shorter, all those other requirements in order to obtain a TD are out the window as of now, subject to change at any time, and pending further review. . . .  Having original docs no longer applies, not having any docs is also no longer an excuse for them. We are essentially going over the Consulates and Embassy's heads and going right to the Ministry of Foreign Affairs in Baghdad and presenting our TD requests there, and they are forcing the Embassy/Consulate to accept them.").  With the new procedures in place, in early January 2017, ICE prepared to fly eight Iraqi nationals to Baghdad using a charter flight.  Ex. 1-10 at 2.

On January 27, 2017, President Trump issued Executive Order 13769 barring admission into the United States of nationals from seven countries, including Iraq.  82 Fed. Reg. 8977.  In late January 2017, ICE provided the names and criminal records of the eight Iraqi nationals to the MFA, noting that "accepting this flight would be an encouraging sign of progress on an issue that could help remove Iraq from sanctions in future Executive Orders."  Ex. 1-10 at 2.  In February 2017, ERO received confirmation from the U.S. Embassy in Baghdad that Iraqi officials approved the acceptance of a Special High Risk Charter ("SHRC") flight containing the eight Iraqi detainees. Id.; see also Ex. 1-12.  The detainees were intended to be removed without the need of TDs.  Ex. 1-12.

On March 6, 2017, President Trump signed the second version of his Executive Order. Executive Order 13780, 82 Fed. Reg. 13209.  On a press call to announce the new Order, a "senior DHS official" stated that "Iraq is no longer one of those countries [covered by the order] because we have received firm commitments from the government of Iraq over the last several weeks since the first executive order was issued about increased cooperation in terms of information sharing

and other related activity. . . .  Iraq has agreed to the timely return in [sic] repatriation of its nationals who are subject to final orders of removal."  Ex. 1-11 at PageID.12993-12994.

On March 12, 2017, the Deputy General Counsel at the United States Embassy in Baghdad sent a cable to, among others, John Schultz, Deputy Assistant Director for the Removal Management Division East, a division of ICE. Ex. 1-13 at PageID.13002.  The cable later became known as the "Statement of Cooperation" with Iraq.  Ex. 4, Schultz Dep. at 117:3-19.  According to the Statement of Cooperation, an Iraqi Inter-ministerial Committee on Deportations ("Committee") had been formed composed of representatives from the Iraqi Prime Minister's Office, the MFA, the Ministry of Justice ("MoJ"), and the MoI.  Ex. 1-13 at PageID.13001.  On March 7, 2017, high ranking Iraqi officials met to discuss the initial steps outlined by the Committee to commence the return of over 1,400 Iraqi nationals ordered deported from the United States.   Id. at PageID.13000-13001.  The Committee identified four necessary steps for Iraq to facilitate the deportations: (i) consular access; (ii) Iraqi citizenship verification; (iii) deportation court order review; and (iv) travel document issuance.  Id. at PageID.13000.  Schultz considered this to be a "[p]ossible huge breakthrough in Iraq."  Id. at PageID.12999.  However, there is no written acknowledgement from the GoI that codifies the Statement of Cooperation.  Ex. 4, Schultz Dep. 117:20-118:1.  The Statement of Cooperation memorializes the Unites States' understanding of how repatriation efforts will proceed with Iraq.  It was not necessarily, however, the GoI's understanding.

The Statement of Cooperation said that the deportations were a high priority for the Prime Minister and Foreign Minister and that the Committee was prepared to finalize within thirty days the removal of the first group of deportees.  Id. at PageID.13001.  Shortly before the SHRC flight, the Iraqi Deputy Chief of Mission ("DCM"), with the assistance of ICE, traveled to the federal

holding facility in Louisiana.  Ex. 1-10 at PageID.12990.  The DCM confirmed citizenship and issued laissez passer documents (one-time-use passports) for the eight deportees.  Id.  The flight left on April 17, 2017, landed in Dubai, and the Iraqi deportees were separated from other nationalities to fly into Baghdad the next day.  Id.  On April 19, 2017, ICE successfully completed the first charter flight to Iraq since 2010.  Ex. 1-9 at PageID.12985.  However, according to an internal ICE memorandum, this process to repatriate Iraqi nationals with final orders of removal was not repeatable.  Ex. 1-12 at PageID.12997.

### 2. The Cancelled June 29, 2017 Flight

Encouraged by the successful April 2017 flight, ICE prepared for another removal flight of Iraqi nationals.  In May and June 2017, ICE transmitted approximately 280 travel document requests to the U.S. Embassy in Baghdad for submission to the Committee.  Ex. 1-9 at PageID.12986; see also Schlanger Decl., Ex. 7, ¶ 16.  As of June 19, 2017, there were 1,428 Iraqi nationals in the United States with outstanding final orders of removal.  Ex. 1-9 at PageID.12985. The first removal flight was scheduled to arrive in Baghdad on June 29, 2017 with no more than seventy-five Iraqi nationals with final orders of removal on board.  Id. at PageID.12986.  However, on June 7, 2017, Iraq made a "blanket denial" to issue travel documents for twenty-four Iraqi nationals, because they did not have official Iraqi documents and they did not express orally and in writing a willingness to return to Iraq voluntarily.  Ex. 1-18 at PageID.13025-13027.  It is not clear whether these denials were related to the 280 TD requests or whether they related to requests made years earlier.  See Ex. A to Resp. to Mot. for Sanctions, Schultz Sept. 28, 2018 Decl., ¶ 9. Nonetheless, the GoI once again expressed its clear policy against forced repatriation.

As early as June 12, 2017, ICE started receiving indications that the GoI may back out of the charter flight and that there was no agreement between the GoI and the United States regarding

repatriation.  See Exs. 1-19-21.  The State Department spoke with a person in the MFA, reminding him that the Prime Minister had promised the U.S. Ambassador that deportations would resume. Id.  His response was that, with such a large number of deportees this time (seventy-five versus eight), there were important identity and logistical issues to arrange, and the best he could offer was a meeting at the MFA the following week.  Id.  The Iraqi Ambassador made a point to ask the U.S. Ambassador, "[W]hat happens to someone who may have committed a crime, fulfilled the sentence, been released and has since perhaps married and has [American citizen] children and/or spouse?  Is there any allowance for this?"  Id.

Ultimately, the June 29, 2017 flight was cancelled.  The reason for the cancellation is in dispute. According to Schultz, the flight was "rescheduled for July 2017 in view of the court's [June 22, 2017] order; however, ICE was not able to effectuate that flight due to the court's July 24th order."  Schultz Nov. 2017 Decl., Ex. B to Pet'rs Mot. for Sanctions, ¶ 6 (Dkt. 476-3). Michael Bernacke, Acting Deputy Assistant Director for the Removal Management Division – East, further stated that "[a]s a result of the injunction [in this case], ICE cancelled the June 2017 charter flight."  Bernacke Decl., Ex. A to Resp't Supp. Br. to Resp. to Prelim. Mot., ¶ 8 (Dkt. 184-2). Schultz and Bernacke's respective statements are demonstrably false.

Marlen Pineiro, Assistant Director of ICE, was notified on June 20, 2017 that the Iraqi Prime Minister was not going to approve the charter flight, Ex. 1-23 at PageID.13059; ERO was notified on June 21, 2017, Ex. 1-9.  On June 22, 2017, this Court temporarily stayed the removal of 114 Iraqi nationals limited to the jurisdiction of the Detroit ICE Field Office.  Id. Ex. 1-23; 6/22/2017 Order (Dkt. 32).  On June 23, 2017, Matthew King, Deputy Assistant Secretary at ICE, spoke with an Iraqi Ambassador and expressed the importance of ensuring that the June 29 flight departed and arrived as scheduled.  Ex. 1-23 at PageID.13056.  The Iraqi Ambassador was

sympathetic, but was facing bureaucratic hurdles on his side. <u>Id.</u> The Ambassador noted that the flight was scheduled to land during an important Islamic holiday, which posed problems from the Iraqi side. <u>Id.</u> He said the logistics were daunting primarily because the Iraqi government was basically closed through June 29, 2017—after which it would be closed Friday and Saturday and then would be in "bedlam" for a week after. <u>Id.</u> The Ambassador stated that the flight was "problematic (almost impossible) as scheduled." <u>Id.</u>

On June 26, 2017, Iraqi Ambassador Yasseen sent an email to Thomas Homan, Matthew King, and John Schultz, among others, stating the following:

Dear friends,

I forwarded the information to Baghdad and I heard from them this morning. I think that the fact that the deputy foreign minister would respond on this issue in spite of the holiday underlines the importance we attach to this issue.

The lists and documentation that you provided is being circulated among related Iraqi agencies, in particular the Justice Ministry. Because of the large number of returnees and the logistics required, the Deputy FM requested clearance from the PM's office, and we are awaiting the response. The US embassy had informed the Foreign Ministry that the batch of returnees would arrive on June 29. That date was determined by the US embassy and other US agencies without consultation with the Iraqi agencies involved. As things stand, we will not be able to receive the returnees on the date mentioned (time too short to guarantee receipt of PM's clearance or to arrange for the logistics required for such a large number of returnees). On this issue, our working group met in Baghdad with the US Consul and his deputy or assistant and explained these issues, the Consul in turn promised to delay the trip until after receipt of the PM's clearances on a later date to be agreed to by both sides.

With regard to the names on the list, Iraq can only admit:

1. Those whose Iraqi citizenship is confirmed through the agreed to procedures for this issue [sic] utilized previously by both Iraqi and US sides;
2. That they have completed their sentences;
3. That the removal procedure is court-ordered;
4. That their crime be different from illegal entry into the USA as these fall into the category of asylum seekers and their removal could be considered an enforced repatriation. As you can see, the response of the ministry is

16

> quite consistent with what I anticipated during our phone conversation. In
> all cases, I will keep you apprised of all/any developments.

Ex. 1-26 at 6.  On the same day, this Court issued a ruling expanding the June 22, 2017 order to

apply to 1,144 similarly situated Iraqis with final orders nationwide.  Ex. 1-9; 6/26/2017 Order

(Dkt. 43).  Contrary to the Schulz and Bernacke declarations, the June 2017 charter flight was

cancelled for reasons other than the Court's injunctions.

### 3.  Plans for a July 2017 Flight

On June 28, 2017, Marlen Pineiro sent an email saying that "we have exhausted all our

efforts at our level.  We haven't even been able to get a new tentative date for the flight."  Ex. 1-

27.  Scott Riedmann from the U.S. Embassy in Baghdad relayed that "[t]he GOI basically told us

they would not accept the flight until the [Prime Minister] signed off on it. . . . The Amb met with

the [Prime Minister] yesterday and this was the first issue the Amb raised. The [Prime Minister]

said he wasn't sure why he even had to decide this issue again. To him, the issue had already been

decided and the relevant ministries should work out."  Id.  Shortly thereafter, Riedmann sent an

email to Schultz informing him that the MFA had decided to once again proceed with deportations.

Ex. 1-29 at PageID.13094.  Cautiously optimistic, ICE set a tentative new charter flight date of

July 25, 2017, which was set contingent on two things: (i) that the Court's TRO was lifted, and (ii)

that Iraq allowed the repatriation.  Id.; Ex. 1-30.

On July 13, 2017 Riedmann sent an email to Schultz informing him of a meeting with the

MFA, where the issue of deportations based on criminal convictions, as opposed to immigration

violations, arose. Ex. 1-32 at PageID.13117.  Reidmann noted that ICE "clearly see[s] no

difference between the two; but the Iraqis do."  Id.  The GoI was concerned that individuals who

sought asylum were among the deportees and that they could be at risk if returned to the Iraq.  Id.

At that time, roughly 800 of the more than 1400 Iraqis with final orders of removal had criminal

convictions forming the basis for their ordered deportation.  Id.  According to Reidmann, it would be helpful politically if the initial flights did not contain "failed asylum seekers."  Id.  Riedmann noted that this "is a bit of a sticking point with the GOI."  Apparently, ICE efforts to arrange the flight were unsuccessful, because by the end of July, John Coster, Deputy Chief of Staff ICE-Deputy Director, told Schultz "[t[here was no defined way forward as to Iraq and the current TD issuance problems we're facing."  Ex. 1-28 at PageID.13085.

### 4.  The Government Considers Sanctions

In a July 19, 2017 summary, ICE stated that it "considers Iraq to be among the most recalcitrant countries."  Ex. 1-24 at PageID.13067.  "Despite expending significant resources and exhausting other available means to obtain cooperation, ICE has been unsuccessful in securing cooperation from the Government of Iraq in the acceptance of its nationals subject to final orders of removal and has determined that implementing visa sanctions pursuant to section 243(d) of the Immigration and Nationality Act (INA) is the only remaining avenue available to secure cooperation."  Id.  "ICE and the U.S. Department of State (State) have collaborated to engage Iraq and have pursued graduated measures outlined in the April 2011 Memorandum of Understanding between ICE and State Bureau of Consular Affairs concerning repatriation."  Id.  "These and other diplomatic efforts . . . have failed to yield substantive progress regarding the removal of Iraqi nationals."  Id.

A tool unavailable to ICE, but vested in the Attorney General, is visa sanctions under section 243(d) of the Immigration and Nationality Act, which provides that:

> On being notified by the Attorney General that the government of a foreign country denies or unreasonably delays accepting an alien who is a citizen, subject, national, or resident of that country after the Attorney General asks whether the government will accept the alien under this section, the Secretary of State shall order consular officers in that foreign country to discontinue granting immigrant visas or nonimmigrant visas, or both, to citizens, subjects, nationals, and residents of that

country until the Attorney General notifies the Secretary that the country has accepted the alien.

8 U.S.C. § 1253(d).

On July 20, 2017, Floyd S. Farmer, ERO Unit Chief, sent Schultz an email attaching documents seeking sanctions against Iraq. Ex. 1-35; Ex. 1-36 ("Subject: Recommendation to Initiate the Process to Invoke Visa Sanctions under Section 243(d) of the Immigration and Nationality Act against Iraq"). Surprisingly, on that same day, Schultz signed a declaration used in response to Petitioners' original preliminary injunction motion (Dkt. 81-4) stating that "due to renewed discussions between the United States and Iraq in recent months, Iraq has agreed, using charter flights, to the timely return of its nationals that are subject to final orders of removal." Ex. A to Pet'r's Mot. for Sanctions ¶ 5 (Dkt. 476-2).

In a July 29, 2017 Rudaw World News Article, Almanhal Alsafi, Iraq's Consul General in Detroit, Michigan, rejected the notion that the GoI is behind America's renewed interest in deporting Iraqi nationals. He said that "[t]he detainees had committed some sort of crime and are not only Christians, they are Muslims, Kurds, Arabs, you name it." Ex. 1-37. "Those people are citizens of Iraq. If they are willing to go back, we will accept them," however, "[w]e will not accept any detainee going back involuntarily." Id. On August 4, 2017, Schultz directed his staff to draft a sanctions package for, among others, Iraq. Ex. 1-38 at PageID.13145.

### 5. The Cycle Repeats

This endless cycle of potential removals, but with dubious results, continued. In September 2017, a State Department official informed Pineiro that Ambassador Yasseem said that GoI remained focused on facilitating the process of removals for Iraqis with final orders of removal. Ex. 1-39. ICE's ERO submitted approximately 300 travel document requests; however, travel

documents were not issued, because the consulate was once again awaiting authorization from the Prime Minister's office to issue the requested travel documents.  Ex. 1-39.

At the meeting on December 5, 2017, "a variety of issues, including the repatriation of Iraqi Nationals, was discussed."  Ex. 1-40 (DHS's Supp. Resp. to Interrog. 12).   In a December 6, 2017 email from DHS to Schultz, the following was reported:

> Ambassador Nealon met with the Iraqi Deputy Foreign Minister (DFM) yesterday. The topic of repatriations came up. Here's a read-out:
>
> - The DFM said that 1,400 Iraqis are subject to removal in the United States.
> - He said that the Iraqi Embassy is prepared to issue visas, but needs to issue in small groups.
> - Said that the Embassy needs to verify that they're actually Iraqi.
> - For criminals that have finished their sentences, needs to see some sort of proof.
> - He said that the Iraqi Government wants to prioritize repatriations of non-immigration related criminals.
> - He said that it would be difficult for the Iraqi Government to accept individuals whose asylum claims have failed, again wants to prioritize criminals.

Ex. 1-42.  In response, Schultz said "[t]hose bullet points are troubling."  Id.

In January 2018, in response to an inquiry on Iraqi nationals who volunteered to be removed, the State Department reported that the GoI was ready to accept voluntary deportees.  Ex. 1-43.  To that end, on January 24, 2018, First Secretary Director of Political Section in the Iraqi Embassy in Washington D.C. wrote to Julius Clinton, a Detention and Deportation Officer for ICE, to provide an updated travel document to be signed by detainees and submitted with their TD requests.  Ex. 1-48.  ICE translated the documents, and it turned out that the document was a voluntary removal declaration to be served on detainees as part of their updated TD application packet. Ex. 1-45.  ICE has consistently resisted the GoI's insistence on removals being voluntary;

Bernacke verified that the form would not be provided to the detainees; and Julius Clinton advised the embassy accordingly.  Id.

On June 15, 2018, Bernacke wrote to Ambassador Yasseem making "an urgent request from ICE for the immediate issuance of the outstanding travel documents."  Ex. 1-47 at PageID.13195.  Bernacke noted that for a small group of individuals Iraqi citizenship was not in dispute, but that the individuals refused to sign a declaration stating their desire to return to Iraq. Id.  Therefore, it was ICE's understanding that additional approval from Baghdad was necessary to complete the issuance of TDs.  Id.  Bernacke further said that "ICE is again requesting that the Consulate Section of the Embassy of Iraq no longer require Iraqi Nationals to sign the declaration form wherein they state their desire to return to Iraq."  Id. at 13196 (emphasis added).

### 6.  Iraq's Position

There are few documents in the record stating GoI's position on repatriation, but the ones before the Court are quite telling.  The head of Iraq's Consular Department sent a letter, dated March 25, 2018, to all Iraq's political and consular missions abroad states the following:

> We attach for you, the letter by the Ministry of Migration and Displaced/Department of Immigration Affairs/Foreign Migration Department . . . including the rejection of the principle of forced return of Iraqis abroad or any other nationals, because it conflicts with human rights international laws and resolutions, principles of the International Community and policy of the Iraqi government.  In addition, Iraq strives to use all its capabilities to encourage and urge the host countries of refugees, asylum - seekers/applicants or those whose asylum applications were refused to allow voluntarily return to those who want to return to Iraq as an alternative solution for those countries, after coordination and cooperation with the Ministry of Migration and Displaced, our overseas missions and international organizations.

Ex. 1-46, Official GoI document in Arabic, translated by Edgar Lopez, Ex. 7 (emphasis added).

The attached letter by Dr. Jassim Mohamed Mohamed Ali, Minister of Migration and Displaced states the following:

Based on the principle of protecting and caring for Iraqis abroad and in accordance with the human rights international laws and resolutions of, principle of the International Community and policy of our ministry, since it was established, <u>we refuse the principle of forced return of Iraqis</u> abroad or any other nationals, because it conflicts with humanitarian laws and principles.  In addition, Iraq strives to use all its potential to <u>encourage and urge the host countries of refugees, asylum-seekers/applicants or those whose asylum applications are refused to allow the voluntarily return to those who wish to do so as an alternative solution</u>, after coordination and cooperation with our Ministry, the Iraqi diplomatic missions and the international organizations.

Kindly inform all our missions to coordinate with those countries to reduce this serious phenomenon that affects Iraqis abroad.

<u>Id.</u> (emphasis added).

On July 26, 2018, Dr. Jassim Mohamed Mohamed Ali wrote the following letter to the

Ministry of Foreign Affairs - Minister's Office:

Dear Minister,

We have received information indicating that some countries which host Iraqi nationals intend to forcibly return them, particularly, the EU countries and the USA.

Since this issue contravenes the policy of the State and international law and norms, <u>please ensure that all our embassies and consulates in the countries that host Iraqi nationals are ensuring they are not subject to deportation or forced return</u>.

Ex. 1-52 (translation in Ex. 1-53 and Ex. 8, Ex. D) (emphasis added).

On August 12, 2018, the Iraqi Ministry of Foreign Affairs website released the following

statement regarding discussions with Sweden:

The Ambassador of the Republic of Iraq in Stockholm, Dr. Ahmed Al-Kamali, met the Coordinator of Migration and Refugees Affairs at the Swedish Ministry of Foreign Affairs, Ambassador Nicolas Kleese at the Swedish Ministry of Foreign Affairs to discuss the return of refugees.

He explained that <u>the Iraqi government refuses to return forcibly to Iraqi refugees</u>, explaining that the conditions experienced by the country after the victories achieved against terrorist gangs, <u>can affect positively facilitate the voluntary **gradual** return of citizens abroad</u>.

Ex. 1-50 (emphases added).

An October 7, 2018 article in a Finnish news source (YLE) quoted Iraqi Ambassador Matheel al-Sabti as saying the following:

> "We will accept those returning of their own free will and those guilty of crimes," says Iraqi ambassador [to Finland] Matheel al-Sabti.

> Iraq will no longer accept rejected asylum seekers who do not willingly want to return to Iraq, says Iraqi ambassador Matheel al-Sabti.

> "<u>The Iraqi government has opposed forced repatriations for a long time and is now preventing them in practice too</u>."

> Last month, Yle reported that deportees returned from Finland to Iraq have been turned around and sent back to Helsinki, with local officials saying that the returnees did not have the required travel documents.

> This is not a new position, al-Sabti says, adding that Iraq is finally enforcing the policy it announced eons ago, instead of allowing EU countries to act against the will of the government.

> "We will accept those returning of their own free will and those guilty of crimes, but we oppose forced repatriations."

> Last year, Finnish police began to issue temporary travel documents to ensure that rejected asylum seekers without passports could be returned.

> However, al-Sabti believes that regardless of the documents they may carry, <u>Iraq will not allow entry to anyone who opposes their deportation.</u>

> "If they do not want to get off the airplane, or the police will not receive them, they cannot be returned."

Ex. 1-49 (emphasis added).

More recently, in relation to this case, Iraqi officials told CNN on November 2, 2018 that the GoI is unwilling to accept Iraqis who are being forcibly removed.  Ex. A to Pet'rs Supp. Statement in Supp. of PI Mot. (Dkt. 483-1) (Sonia Moghe, <u>Iraq May Not Welcome US Deportees, Contrary to Court Arguments</u>, CNN Politics (Nov. 2, 2018, 7:13 p.m.)).  "Ahmed Mahjoub, a spokesman for the Iraqi Foreign Ministry, told CNN the government encourages Iraqi nationals'

return '. . . if they are willing to come to their homeland and are ready to facilitate it through our diplomatic missions, but, again, we won't cooperate with any government trying to forcibly return them.'" Id.[5]

ICE has recognized that currently, there is "no international agreement in force, nor any written arrangement in effect, between the governments of Iraq and the United States regarding repatriation." Ex. 1-54, March 23, 2018 Schultz Interrogatory Responses; see also Ex 1-56, Matthew King Interrogatory Responses. However, according to Schultz, "through discussions [through March 2018], the governments of Iraq and the United States have reached an understanding of the process for repatriating Iraqi nationals." Id.

### 7.  The Declaration of Daniel Smith

Petitioners provided the declaration of Daniel Smith, a researcher specializing in Iraq and resident of Iraq since 2007. Ex. 8, ¶ 1, "Smith Decl." From 2009 to 2013, he was a research consultant for the International Crisis Group, contributing to several major reports on Iraq by conducting dozens of interviews with all levels of politicians, security officials, party officials, tribal leaders, and religious figures, as well as collecting and organizing ongoing current events, legislation, and Supreme Court decisions. Id. ¶ 2. For more than a decade, Smith has contributed to, or been interviewed by, multiple news publications on Iraq-related issues. Id. ¶ 5. He has given several public presentations on Iraq, including as the featured panel member at a roundtable discussion at the Council on Foreign Relations. Id. He has also been a participant on multiple discussion panels in Iraq, on topics including general human rights in Iraq, human trafficking, women's rights, freedom of speech, personal status laws, and proposed draft legislation. Id. Since

---

[5]   Although the article is hearsay, the rules of evidence are relaxed in this habeas setting. Abdur'Rahman v. Bell, 999 F. Supp. 1073, 1097 n.30 (M.D. Tenn. 1998), aff'd in part & vac'd in part, 226 F.3d 696 (6th Cir. 2000).

2013, Smith has submitted reports on Iraq country conditions in over twenty immigration court proceedings in the United States and Canada.  Id. ¶ 10.  He has appeared as a fact witness, and at other times he has been qualified and provided testimony as an area expert.  Id.

According to Smith, continued political turmoil in Iraq has caused large numbers of Iraqis to flee the country for decades, but this number has spiked since the 2003 regime change.  Id. ¶ 13.  Large communities of displaced Iraqi nationals now reside in the United States, Europe, and throughout the Middle East, among other regions.  Id.  When countries seek to forcibly repatriate these communities back to Iraq, they are met with resistance.  Smith says the Iraqi government has long opposed forced repatriation of its nationals for principled, practical, and political reasons.  Id. ¶ 14.

First, Smith explains that Iraq opposes forced repatriation on humanitarian grounds.  Id. ¶ 15.  Among other reasons, over the last fifteen years, forced repatriation has become a prominent issue in Iraq.  Id.  Iraq has made efforts to pressure or coerce repatriated Iraqis and internally displaced persons ("IDPs") to their areas of origin even though the areas are no longer safe, and the perception is that the action is state-sanctioned displacement or ethnic cleaning.  Id.  Smith says that to avoid negative reactions from the press or the populace, Iraqi officials and agencies routinely stress in public statements that any returns, internal or external, must be voluntary.  Id.

Second, as a practical matter, forced repatriation is extremely challenging.  Id. ¶ 16.  The Iraqi government has been unable to return and reintegrate nearly two million remaining IDPs and replace their missing identity or other civil documentation.  Id. ¶ 17.   And this is for a population that has never left Iraq.  Id.  Smith explains that these issues are even more difficult for those returning to Iraq who speak little to no Arabic, no longer know or never have known the Iraqi culture, and have few, if any, family connections left in Iraq.  Id. ¶ 18.

Finally, as to political reasons, Smith explains that many countries in addition to the United States would like to repatriate Iraqi nationals.  Id. ¶ 19.  He says that the Iraqi government is necessarily concerned with setting a precedent for reparations from one country that would lead to large numbers of repatriations from other countries as well.  Id.

Smith notes that when the British government attempted to forcibly return multiple Iraqi nationals, the Iraqi Parliament passed a resolution to "'demand that the government and the Ministry of Foreign Affairs take measures to block the forcible return of Iraqi refugees who do not volunteer to do so.'"  Id. ¶ 31 (quoting May 3, 2017 resolution).  Smith nonetheless concedes that, with direct pressure by the United States, the MFA may issue a small number of travel documents, but even then, other ministries may oppose the removals; id. ¶¶ 35, 41; and the greater the number of removals, the greater resistance would be exerted.  Id. ¶ 41.

When Smith inquired recently of Iraqi government officials, he was repeatedly told that forced repatriation was a sensitive issue, and that there was substantial pressure from the United States to accept forced repatriation.  Id. ¶ 36.  Smith says that for this reason, Iraqi officials are hesitant to state publicly that they will not cooperate with the United States, out of fear of negative diplomatic consequences, and instead continue to state that forced returns are against Iraqi policy. Id.  Smith claims that he was told by more than one Iraqi official that the Iraqi government's position had not and would not change.  Id.

On August 27, 2018, Smith spoke with Dr. Hoshyar Zebari, who spent over a decade as Iraq's Minister of Foreign Affairs (2003-2014), served as Deputy Prime Minister in 2014, and then Finance Minister until 2016.  Dr. Zebari explained that "'[w]e want our people back to build up our country and contribute to Iraq, but the violence and terrorism and bad governance make it not

a conducive atmosphere for many people to return safely, so our policy was always against allowing them to be forced to come back. This never changed.'" <u>Id.</u> ¶ 39 (quoting Dr. Zebari).

Additionally, Smith does not believe that Iraq's next administration would reconsider its policy against forced repatriation. <u>Id.</u> ¶ 44. The Iraqi government is currently reorganizing in the post-election negotiation process. <u>Id.</u> ¶¶ 44-46. According to Smith, the recent elections resulted in strengthening anti-American coalitions within Parliament. <u>Id.</u> ¶ 44. Smith says that even if the current Prime Minister, who is generally seen as pro-American, retains his position, there will be added pressure to not appear subjugated by the United States. <u>Id.</u> According to Dr. Zebari, no Prime Minister would make an important decision, such as changing Iraq's policy on repatriation, while the government is being formed in the post-election process. <u>Id.</u> ¶ 46. Dr. Zebari also explains that the current Minister of Foreign Affairs, Ibrahim al-Jaafari, is not coming back as the next minister. <u>Id.</u> ¶ 47. Dr. Zebari says this is important because whoever the next minister may be, that individual will not begin in the new position by changing Iraq's long-standing policy against forced repatriation, which would be an unpopular decision in Iraq. <u>Id.</u>

In Smith's opinion, it is highly unlikely that Iraq would change its position on forced repatriation in the foreseeable future such that the United States could repatriate large groups of Iraqi nationals. <u>Id.</u>

## II. STANDARD OF DECISION

To determine whether to grant a preliminary injunction, a district court must consider: (i) the plaintiff's likelihood of success on the merits; (ii) whether the plaintiff may suffer irreparable harm absent the injunction; (iii) whether granting the injunction will cause substantial harm to others; and (iv) the impact of its decision on the public interest. <u>Yolton v. El Paso Tennessee Pipeline Co.</u>, 435 F.3d 571, 578 (6th Cir. 2006). These four factors "are factors to be balanced,

27

not prerequisites that must be met." <u>Hamad v. Woodcrest Condo. Ass'n</u>, 328 F.3d 224, 230 (6th Cir. 2003).

## III. ANALYSIS

Petitioners' central contention is that <u>Zadvydas</u> subclass members must be granted relief because their continued detention violates the statutory provisions under which they are detained and/or the Fifth Amendment's Due Process Clause. As explained fully below, they are likely to succeed on this claim. Many of the subclass members are detained under the specific statutory provision analyzed in <u>Zadvydas</u>, 8 U.S.C. § 1231(a) (applicable to persons subject to final orders of removal), which the Supreme Court interpreted as not allowing detention beyond six months, if there were no significant likelihood of removal in the reasonably foreseeable future, absent exceptional circumstances. Others are held under 8 U.S.C. §1226(a) (pre-order-detention statute), which is linguistically indistinguishable from the provision addressed in <u>Zadvydas</u> and must be interpreted in the same way. Other detention statutes—8 U.S.C. § 1225(b) (applicable to arriving aliens) and 8 U.S.C. § 1226(c) (applicable to persons convicted of certain crimes)—contain different language providing for mandatory detention—meaning they cannot be interpreted to avoid the unconstitutional consequence of indefinite detention. Regardless of which provision applies to any particular subclass member, continued detention beyond six months is not permissible, because the record unquestionably demonstrates that there is no significant likelihood of repatriation in the reasonably foreseeable future. The Government's arguments to the contrary on all these points are without merit, as are its arguments on standing and the propriety of class-wide relief. The Court addresses all these points and the other injunction factors, in turn.

### A.  Likelihood of Success on the Merits

Civil detention is constitutionally fraught when the detention may be for an indefinite length.  As explained in <u>Foucha v. Louisiana</u>, 504 U.S. 71 (1992), "[f]reedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause."  <u>Id.</u> at 80.  This bedrock value is recognized in the deportation context, as well: "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that Clause protects."  <u>Zadvydas</u>, 533 U.S. at 690.

However, the Supreme Court has also recognized some level of "detention during deportation proceedings as a constitutionally valid aspect of the deportation process."  <u>Demore v. Kim</u>, 538 U.S. 510, 523 and 527 (2003).  Otherwise, "deportation proceedings 'would be vain if those accused could not be held in custody pending the inquiry into their true character.'"  <u>Id.</u> (quoting <u>Wong Wing v. United States</u>, 163 U.S. 228, 235 (1896)).  Nonetheless, even where temporary detention is "justified by concerns about public safety or flight risks," civil detention must "always be constrained by the requirements of due process."  <u>Hernandez v. Sessions</u>, 872 F.3d 976, 981 (9th Cir. 2017).

To understand how courts have struck the balance of competing values and concerns in the immigration context, it is necessary to parse various provisions of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 <u>et seq.</u>, which authorize the Attorney General to detain aliens under various circumstances.

- Aliens who are subject to final orders of removal may be detained under 8 U.S.C. § 1231(a)(6).

- Aliens who are awaiting a decision on whether removal will be ordered may be detained under 8 U.S.C. § 1226(a).

- Aliens who are inadmissible or deportable from the United States because they have been convicted of one of a specified set of criminal offenses must be taken into custody, under certain circumstances, under 8 U.S.C. § 1226(c).

- Aliens arriving in the United States may be detained under 8 U.S.C. § 1225(b); subject to exceptions, this includes persons who are stopped at the border or discovered within the country without authorization to enter.

Because each of these provisions has or may have some bearing on our case, an examination of the judicial approaches to each provision follows.

These provisions apply variously to subclass members based on their progress in the immigration court system.  Currently, there are 105 <u>Zadvydas</u> subclass members.  "Schlanger Decl. VI," Ex. 2 to Reply in Supp. of Pet'rs Mot. for Prelim. Inj., ¶ 17 (Dkt. 479-3).  There are fifty-four subclass members whose immigration cases are pending, and therefore are no longer subject to final orders of removal, <u>id.</u> ¶ 17(a); there are nine subclass members who are subject to final orders of removal, but have motions to reopen their immigration proceedings pending or still have time to file motions to reopen, <u>id.</u> ¶ 17(b); and there are forty-two subclass members whose immigration cases have run their course and who are subject to final orders of removal, <u>id.</u> ¶ 17(c).  Of the forty-two subclass members subject to final orders of removal, the Court's stay has been lifted as to eighteen of them.  <u>Id.</u> ¶ 12, Table A, ¶ 18, Table B rows 14-16.

### 1.  Discretionary Detention under 8 U.S.C. § 1231(a)

The Supreme Court considered the perils of indefinite detention under 8 U.S.C. § 1231(a)(6) in <u>Zadvydas</u>, which involved two petitioners, Kestutis Zadvydas and Kim Ho Ma. Zadvydas was taken into custody after the conclusion of his criminal sentence and ordered removed.  Efforts by the Government to deport Zadvydas to Germany, Lithuania, and the Dominican Republic were all unsuccessful, and the district court ordered Zadvydas released after concluding that he would be permanently confined.  The Fifth Circuit reversed, holding that Zadvydas's detention was constitutional because his removal was still possible in light of ongoing diplomatic negotiations.  Ma was also taken into custody following completion of a criminal

sentence. Both the district court and Ninth Circuit ruled that Ma was entitled to release because there was no likelihood of removal in light of the lack of a repatriation agreement between the United States and Cambodia, Ma's native country.

The Supreme Court considered whether 8 U.S.C. § 1231(a)(6) "authorizes the Attorney General to detain a removable alien indefinitely beyond the removal period or only for a period reasonably necessary to secure the alien's removal." Id. at 682. The statute has both mandatory and discretionary provisions. The statute establishes that where an alien has been ordered removed, the Attorney General shall remove the alien within ninety days (known as the "removal period"). 8 U.S.C. § 1231(a)(1)(A). During the removal period, "the Attorney General shall detain the alien." 8 U.S.C. § 1231(a)(2) (emphasis added). However, the statute permits the Attorney General to continue detention beyond the removal period. It states, in pertinent part:

> An alien ordered removed [1] who is inadmissible . . . [2] [or] removable [as a result of violations of status requirements or entry conditions, violations of criminal law, or reasons of security or foreign policy] or [3] who has been determined by the Attorney General to be a risk to the community or unlikely to comply with the order of removal, may be detained beyond the removal period and, if released, shall be subject to [certain] terms of supervision.

Zadvydas, 533 U.S. at 678 (quoting 8 U.S.C. § 1231(a)(6)) (emphasis added). Id.

In Zadvydas, the Government argued that section 1231(a)(6) allowed for indefinite detention, because the statute set no time limit as to how long the Attorney General could detain an alien. Id. at 689. The Court explained that reading the statute to permit "indefinite detention of an alien would raise a serious constitutional problem," especially with respect to the Fifth Amendment's Due Process Clause. Id. at 690. Civil detention is justified only "in certain special and narrow nonpunitive circumstances where a special justification, such as harm-threatening mental illness, outweighs the individual's constitutionally protected interest in avoiding physical

restraint." Id. at 690, 692 (citation and internal marks omitted; quoting Foucha, 504 U.S. at 80, and Kansas v. Hendricks, 521 U.S. 346, 356 (1997)).

Noting the civil nature of the case and its nonpunitive purpose, the Court rejected the Government's argument based on ensuring the alien's appearance at legal proceedings and preventing danger to the community. As to the first justification, the Court found that preventing flight "is weak or nonexistent where removal seems a remote possibility at best." Id. at 690. As to the second justification, the Court explained that it has "upheld preventive detention based on dangerousness only when limited to specially dangerous individuals and subject to strong procedural protections." Id. at 691. The Court further found that "the sole procedural protections available to the alien are administrative proceedings . . . without significant later judicial review." Id. at 692. The Court observed that "the serious constitutional problem arising out of a statute that, in these circumstances, permits an indefinite, perhaps permanent, deprivation of human liberty without any such protection is obvious." Id.

To avoid the obvious constitutional problem, the Court turned to the canon of constitutional avoidance. See id. at 696-697. The Court found that the word "may" in section 1231(a)(6) was ambiguous, because "while 'may' suggests discretion, it does not necessarily suggest unlimited discretion." Zadvydas, 533 U.S. at 697. The Court held that it could not find "any clear indication of congressional intent to grant the Attorney General the power to hold indefinitely in confinement an alien ordered removed." Id. at 697. Thus, the Court chose an alternative reading and held that "the statute, read in light of the Constitution's demands, limits an alien's post-removal-period detention to a period reasonably necessary to bring about that alien's removal from the United States. It does not permit indefinite detention." Id. at 678.

The Court ultimately held that detention for six months is presumptively reasonable and then stated:

> After this 6–month period, once the alien provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the Government must respond with evidence sufficient to rebut that showing. And for detention to remain reasonable, as the period of prior postremoval confinement grows, what counts as the 'reasonably foreseeable future' conversely would have to shrink.

Id. at 701.  The Court remanded both cases in light of its new standard.  It noted in Zadvydas's case that the Fifth Circuit had concluded that continued detention was lawful because Zadvydas had not demonstrated that his removal was "impossible"—meaning that an alien had to show "the absence of any prospect of removal"—which the Supreme Court found to be an excessive standard. Id. at 702 (emphasis in original).  Remand was ordered in Ma's case, because the Ninth Circuit may have based its conclusion of no likelihood of removal based solely on the absence of a repatriation agreement, without giving due weight to future negotiations over repatriation.

To satisfy due process under section 1231(a)(6), the Court said that the detention must "bear a reasonable relation" to the statutory purpose.  Id. at 690.  Zadvydas instructs district courts to "ask whether the detention in question exceeds a period reasonably necessary to secure removal."  Id. at 699.  Courts "should measure reasonableness primarily in terms of the statute's basic purpose, namely, assuring the alien's presence at the moment of removal."  Id.  "If removal is not reasonably foreseeable, the court should hold continued detention unreasonable and no longer authorized by statute."  Id. at 699-700.  "In that case, of course, the alien's release may and should be conditioned on any of the various forms of supervised release that are appropriate in the circumstances, and the alien may no doubt be returned to custody upon a violation of those conditions."  Id. at 700.

The Government does not dispute that <u>Zadvydas</u> applies to class members with final orders of removal detained under section 1231(a).  The parties' dispute as to this group is whether there is a significant likelihood of repatriation in the reasonably foreseeable future—an issue that is later addressed.

### 2.  Section 1226(a) (pre-order-detention)

Section 1226(a) provides that "[o]n a warrant issued by the Attorney General, an alien <u>may</u> be arrested and detained pending a decision on whether the alien is to be removed from the United States."  8 U.S.C. § 1226(a) (emphasis added).  The use of "may" introduces the same ambiguity that the Supreme Court detected in <u>Zadvydas</u> when considering detention under section 1231(a)(6). Given the similarity of language and the canon of constitutional avoidance, section 1226(a) must be read as not authorizing indefinite detention.

The Government invokes <u>Jennings v. Rodriguez</u>, 138 S. Ct. 830 (2018), a case that did not address our question.  There, the question was whether sections 1225(b), 1226(a) and (c) could be read to require periodic bond hearings.  <u>Id.</u> at 836-837.  The Ninth Circuit, applying the canon of constitutional avoidance, held "that detained aliens have a statutory right to periodic bond hearings under the provisions at issue."  <u>Id.</u> at 836.  The Supreme Court found otherwise and distinguished <u>Zadvydas</u> as having concerned a statute that was ambiguous, thus triggering the application of the canon.  <u>Id.</u> at 843-846.  It held that, subject only to express exceptions, sections "1225(b) and 1226(c) authorize detention until the end of applicable proceedings. . . [a]nd . . . that there is no justification for any of the procedural requirements that the Court of Appeals layered onto § 1226(a) without any arguable statutory foundation."  <u>Id.</u> at 842.  <u>Jennings</u> notably did not include section 1226(a) as a provision authorizing detention until the end of applicable proceedings.  The question of whether section 1226(a) suffers from the same statutory ambiguity found by the

Zadvydas Court in section 1231(a)(6) was not addressed in Jennings, nor did Jennings consider whether Zadvydas relief was available in relation to the statutory provisions the Court did address.

By contrast, other courts have addressed questions closer to our context, concluding that sections 1226(a) and 1231(a)(6) require similar treatment. Indeed, after Jennings was decided, the Third Circuit held that there is "no substantial distinction between the liberty interests of aliens detained under § 1226(a) and § 1231(a)(6) because '[r]egardless of the stage of the proceedings, the same important interest is at stake—freedom from prolonged detention'—accordingly, '[t]he liberty interests of persons detained under § 1231(a)(6) are comparable to those of persons detained under § 1226(a).'" Guerrero-Sanchez v. Warden York Cty. Prison, 905 F.3d 208, 222 (3d Cir. 2018) (quoting Diouf v. Napolitano, 634 F.3d 1081, 1087 (9th Cir. 2011)). The Sixth and Ninth Circuits have found the same.

The Sixth Circuit, well before Jennings was decided, took up the issue in Ly v. Hansen, 351 F.3d 263 (6th Cir. 2003). The issue in Ly was whether section 1226(c) permitted indefinite detention. Id. at 265. However, the panel did not limit its holding to section 1226(c). Id. at 267. The panel noted that "Zadvydas prohibits only one thing: permanent civil detention without a showing of a 'strong special justification' that consists of more than the government's generalized interest in protecting the community from danger." Id. (quoting Zadvydas, 533 U.S. at 690). "Zadvydas establishes a specific rule: '[A] habeas court must ask whether the detention in question exceeds a period reasonably necessary to secure removal." Id. (quoting Zadvydas, 533 U.S. at 699. Although Ly was decided in the context of 1226(c), the panel's holding was not necessarily limited to that provision. The Sixth Circuit found that because indefinite detention under section 1226 "would be unconstitutional," it construed "the statute to avoid that result, as did the Court in Zadvydas." Id. Jennings, of course, effectively overruled Ly to the extent Ly applied the canon

of constitutional avoidance to section 1226(c).  <u>Jennings</u> did not, however, overrule <u>Ly</u>'s holding with respect to section 1226(a).

Similarly, the Ninth Circuit, in <u>Prieto-Romero v. Clark</u>, held "that an alien is being held under § 1226(a), and not § 1231(a)(6), does not render <u>Zadvydas</u> inapplicable."  534 F.3d 1053, 1062 (9th Cir. 2008).  The Ninth Circuit found "that § 1226(a), like § 1231(a)(6), also does not authorize indefinite detention."  <u>Id.</u> at 1063 ("Consistent with <u>Zadvydas</u>, we construe the Attorney General's detention authority under § 1226(a) as limited to the "period reasonably necessary to bring about [an] alien's removal from the United States.").

Accordingly, the Government's authority to detain Petitioners, under section 1226(a), as with section 1231(a)(6), is limited "to a period reasonably necessary to [remove Petitioners] from the United States."  <u>Zadvydas</u>, 533 U.S. at 689; <u>see also</u> <u>Prieto–Romero</u>, 534 F.3d at 1063; <u>Ly</u>, 351 F.3d at 267.  Therefore, continued detention can be justified only if the Government can meet its burden of showing that there is a significant likelihood that those detained under either of those sections will be repatriated in the reasonably foreseeable future.

### 3.  Sections 1225(b) and 1226(c)

<u>Jennings</u> is clear that sections 1225(b) and 1226(c) authorize prolonged detention as a matter of statutory interpretation.  138 S. Ct. at 842.[6]  However, <u>Jennings</u> did not address the constitutionality of sections 1225(b) and 1226(c) with respect to indefinite detention, instead

---

[6] Section 1226(c) says that, with respect to an alien who has committed certain offenses and served the imposed sentence, the "Attorney General shall take into custody any [such] alien…when released" from the criminal sentence.  Under section 1225, "[a]n alien present in the United States who has not been admitted or who arrives in the United States," is treated as "an applicant for admission" or an "arriving alien." 8 U.S.C. § 1225(a)(1); 8 C.F.R. § 1001.1 ("Arriving alien means an applicant for admission coming or attempting to come into the United States at a port-of-entry, or an alien seeking transit through the United States at a port-of-entry[.]").  Section 1225(b), like section 1226(c), contains no limitation on the length of detention.

remanding to the Ninth Circuit to decide that question in the first instance.  Id. at 851.  This Court, therefore, must determine whether indefinite detention under sections 1225(b) and 1226(c) offends the Fifth Amendment's Due Process Clause.  There is no question that it does.[7]

The Supreme Court previously addressed section 1226(c) detention in Demore v. Kim, 538 U.S. 510 (2003).  In Demore, Hyung Joon Kim was found to be deportable under the INA because of two prior convictions for crimes involving moral turpitude.  Id. at 513; see also 8 U.S.C. § 1227(a)(2)(A)(ii).  The Immigration and Naturalization Service ("INS") detained Kim under 8 U.S.C. § 1226(c).  Id.  Kim subsequently filed a habeas corpus action challenging his detention under section 1226(c) arguing that it "violated due process because the INS had made no determination that he posed either a danger to society or a flight risk," such as through a bond hearing.  Id. at 514.  Kim had been incarcerated for six months when the district court granted habeas relief.  Id. at 530.  The Ninth Circuit affirmed the district court and the Government appealed to the Supreme Court.  Id. at 515.  Kim's argument to the Supreme Court relied, in part, on the Court's prior holding in Zadvydas.  The Demore Court was not persuaded and held that individuals can be "detained for the brief period necessary for their removal proceedings."  Id. at 513 (emphasis added).

---

[7] Based on the Court's prior ruling, there do not appear to be any detainees held under section 1226(c).  However, the Government claims that those who finished serving sentences years ago and have lived in their communities, in some cases for decades, are being held under section 1226(c), even though the statute mandates detention only if the alien is taken into custody "when the alien is released [after completing his criminal sentence]."  (emphasis added).  The Court previously rejected the Government's view that long-delayed detention is authorized under section 1226(c), holding that all detainees purportedly held under section 1226(c) are deemed held under 1226(a), as to which detention is not mandatory. See 1/2/2018 Op. at 24 (Dkt. 191).  The Supreme Court is currently considering the meaning of the phrase "when released" in Nielsen v. Preap, 138 S. Ct. 1279 (argued Oct. 10, 2018), as is the Sixth Circuit in the appeal in this case.  But even if Petitioners are held under section 1226(c), it does not disturb the holding in this case, as indefinite detention under any of the relevant provisions is unconstitutional.

The Court distinguished <u>Zadvydas</u> in two ways.  First, it found that unlike <u>Zadvydas</u>, where the purpose of detention under section 1231(a) was no longer served (because removal was no longer practically obtainable), the purpose of detention under section 1226(c) was served where an alien is detained "<u>pending their removal proceedings</u>."  <u>Id.</u> at 527-528 (emphasis in original). The Court explained that because removal was imminent, the detention served the purpose of preventing the deportable alien from fleeing.  <u>Id.</u>  Second, the Court reasoned that unlike <u>Zadvydas</u>, where detention is potentially indefinite, detention under section 1226(c) "is of a much shorter duration."  <u>Id.</u> at 528.  It observed that detention has a "definite termination point, in the majority of cases it lasts for less than the 90 days [the Court] considered presumptively valid in <u>Zadvydas</u>." <u>Demore</u>, 538 U.S. at 529 (noting section 1226(c) detention "lasts roughly a month and a half in the vast majority of cases in which it is invoked, and about five months in the minority of cases in which the alien chooses to appeal").

The Court, therefore, held that "Congress, justifiably concerned that deportable criminal aliens who are not detained continue to engage in crime and fail to appear for their removal hearings in large numbers, may require that persons such as [Kim] be detained for the <u>brief</u> period necessary for their removal proceedings."  <u>Id.</u> at 513 (emphasis added).  However, although the Court upheld the constitutionality of section 1226(c) in the context of that case, Justice Kennedy made the following statement in his concurrence:

> [S]ince the Due Process Clause prohibits arbitrary deprivations of liberty, a lawful permanent resident alien such as [Kim] could be entitled to an individualized determination as to his risk of flight and dangerousness if the continued detention became unreasonable or unjustified. . . . Were there to be an unreasonable delay by the INS in pursuing and completing deportation proceedings, it could become necessary then to inquire whether the detention is not to facilitate deportation, or to protect against risk of flight or dangerousness, but to incarcerate for other reasons.

Id. at 532–533 (Kennedy, J., concurring); see also Ly, 351 F.3d at 270 (Demore is distinguishable "to the extent that Kim was a deportable alien for whom deportation, to South Korea, was a real possibility, and he could avail himself of such liberty at any time. That is not the case with Ly.").

Sections 1226(c) and 1225(b), as applied to Zadvydas subclass members, are unconstitutional. Courts have made clear that indefinite detention under any of the statutory provisions at issue in this case is an "obvious" constitutional problem. Zadvydas, 533 U.S. at 692. What distinguishes the present case from Demore and others, as discussed more fully below, is that there is no significant likelihood of removal in the reasonably foreseeable future. It is immaterial where Petitioners are in the removal process if their eventual removal cannot be secured. "Zadvydas prohibits only one thing: permanent civil detention without a showing of a 'strong special justification' that consists of more than the government's generalized interest in protecting the community from danger." Ly, 351 F.3d at 267 (quoting Zadvydas, 533 U.S. at 690).

Accordingly, regardless of the specific detention provision under which Petitioners are being held, they are all entitled to relief under Zadvydas because their detention is indefinite and potentially permanent.

### 4. Significant Likelihood of Removal in the Reasonably Foreseeable Future

The Zadvydas subclass has been detained well beyond the presumptively reasonable period of six months. Therefore, to be considered for Zadvydas relief, Petitioners must show "good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future," which the Government must then rebut. Zadvydas, 533 U.S. at 701. The Government can rebut the showing with evidence that removal is significantly likely, otherwise detention justified by preventing flight "is weak or nonexistent where removal seems a remote possibility at best,"

id. at 691, and that removal will occur in the "reasonably foreseeable future," a time period that shrinks the longer detention persists, id. at 701.

Petitioners have provided ample evidence showing that their removal is unlikely in the reasonably foreseeable future. Even under significant pressure from the United States, in the form of executive orders, the GoI only agreed to repatriate eight Iraqi nationals on the SHRC flight. Thereafter, the GoI cancelled the next charter flight and has delayed scheduling any more charter flights. Furthermore, the GoI has issued official statements that it will not accept forced repatriation of its nationals. And almost all subclass members who are currently detained have steadfastly refused to agree to voluntary removal to Iraq despite the coercive pressure of incarceration. Petitioners have more than met their burden of showing good reason to believe that their removal is unlikely in the reasonably foreseeable future.

The Government, in response, argues that Petitioners' removal is significantly likely in the reasonably foreseeable future, and their detention—which now extends well over a year—is reasonable. The Government essentially makes two arguments in an effort to rebut Petitioners' showing. First, the Government argues that removal is significantly likely because Petitioners who have opted out of the Court's stay of removal have been, and continue to be, removed to Iraq regardless of voluntariness. Second, the Government argues that the removal period has not begun for Petitioners, because the Court's stay of removal, and not Iraq, is the only impediment to removal. Both arguments are deficient.

With respect to its first argument, the Government's best purported evidence in support of its position that Iraq will accept forced repatriation is its representation that "Iraq issued fifteen travel documents to ICE on July 13, 2018 and on September 5, 2018 for Iraqis who refused to sign a voluntary return form at their consular interviews." Ex. A to Resp. to Mot. for Sanctions, ¶ 46

(Dkt. 478-1) ("Schultz Sept. 28, 2018 Decl.").  However, the Government's representation that fifteen individuals were removed who refused to sign voluntary return forms at their consular interviews is cagey at best.  The Government does not explain who these individuals are. Presumably, they are among the thirty-nine class members for whom the Court has lifted the stay of removal, Schlanger Decl. VI, ¶ 6,[8] and who executed forms agreeing to be returned, as explained below.  These are hardly "involuntary" returnees.

As of October 12, 2018, it appears that eighteen class members have been removed.[9]  Id. The fifteen so-called "involuntarily" removed class members must have come from this group. However, it is impossible to determine whether Iraq was furnished with some document in which the returnees expressed a willingness to be repatriated.  While the group of fifteen may not have signed a voluntary return form at their consular interviews, at least twenty-two individuals have signed the following forms—the "Detainee Stipulation To Prompt Removal To Iraq"—which states: "I wish to be removed to Iraq as promptly as possible," see, e.g., Dkts. 346-2, 332-2, 300-2, 294-2, 278-2, 270-2, or the "Detainee Request For Prompt Removal to Iraq"—which states: "I do not have a lawyer, and I currently wish to be removed promptly to Iraq," see Dkt. 161-2.  Iraq might well have accepted such forms as expressing voluntary agreement to be repatriated. Therefore, because the Government has failed to identify this group of fifteen, the Court has

---

[8] The Court's initial preliminary injunction order granting a stay allowed it to be terminated as to particular class members in certain circumstances: (i) if the class member did not file a motion to reopen immigration proceedings within ninety days; (ii) if a timely appeal of an adverse ruling was not taken; (iii) if a United States Court of Appeals denied a motion to stay; or (iv) if a class member consented to a lifting of the stay.  7/24/2017 Prelim. Inj. at 33-34 (Dkt. 87).  If the parties do not stipulate to the lifting of the stay, the Government is allowed to file a motion to have a class member removed from the injunction.  Id. at 34.

[9] One additional class member, Muneer Subaihani, was removed in violation of the Court's injunction (Dkts. 379 & 393).

nothing but the Government's conclusory statements that their removals were "involuntary." And the Government's representations in this case are often suspect.

The Government asks the Court to accept John Schultz's present "understanding that the Iraqi Government is issuing TDs for Iraqi nationals regardless of voluntariness." 9/28/2018 Schultz Decl., ¶ 47. However, Schultz's understanding is not a credible indicator of Iraq's willingness to accept forced repatriation of its nationals, as it is contrary to every statement made publicly by Iraqi officials on the subject. And it is contrary to the exceptionally credible declaration of Daniel Smith, whose explanation of Iraqi policies comports with the record before the Court.

In addition to Schultz's demonstrably false statements to the Court that it was the stay of removal, and not the GoI, that stopped the June 2017 charter flight, Schultz says that based on the 2017 Statement of Cooperation, he believed and continues to believe "that Iraq will take back all Iraqi nationals with final orders of removal regardless of whether they are volunteers, asylum seekers or otherwise." Id. ¶ 6; see also Resp. Mot. for Prelim. Inj. at 31 (citing Schultz Dep. 39:4-24). Schultz insists that Petitioners can be removed to Iraq "without limitation." Id. ¶ 4(1).

Bernacke also stated in December 2017 that "Iraq agreed to the timely return of its nationals subject to a final order of removal." December 2017 Bernacke Decl., Ex. A to Resp't Supp. Br. to Resp. to Prelim. Mot., ¶ 4 (Dkt. 184-2). Like Schultz, Bernacke doubles down on his previous statements and submitted a new declaration stating unequivocally that "[t]he U.S. reached an agreement with Iraq in 2017 where Iraq expressed their willingness to accept the return of all Iraqi nationals with final orders of removal without limitation." September 2018 Bernacke Decl., Ex. B to Resp't Mem. Resp. re Disc. Sanc. (463-2). He says that the GoI "has been and continues to be willing to accept flights containing Iraqi nationals." Id. ¶ 9. He even says that the GoI "has

42

indicated a preference that ICE increase the volume of Iraqi Nationals being removed at one time."
Id. ¶ 10.  Based on prior experience, the Court finds Schultz's and Bernacke's representations not
worthy of belief—especially without supporting documentation, which has not materialized.

In contrast to his "without limitation" assertion, Schultz concedes that ICE and the GoI
continued the back and forth with respect to whether subclass members would be required to sign
voluntary removal forms though June and July 2018.  9/28/2018 Schultz Decl., ¶ 43.  Schultz now
says that "[o]ver the last year, the process for obtaining Iraqi TDs has changed and continues to be
an evolving process."  Id. ¶ 49.  Bernacke made a similar statement in December 2017 that, at that
time, the agreement "between the United States and the Iraqi Ministry of Foreign Affairs (MFA)
is not memorialized in any written document or treaty.  It is a product of ongoing diplomatic
negotiations."  December 2017 Bernacke Decl., ¶ 4 (emphasis added).  An evolving process or
ongoing diplomatic negotiations are quite different from what the Government asserted at oral
argument—that there is a "reliable process for the removal of Iraqi nationals" in place.  10/24/2018
Hr'g Tr. 46:20-21 (Dkt. 461).

Schultz's declaration further indicates that there have been developments as recently as
September 2018 on Iraq's willingness to accept repatriation of its nationals.  9/28/2018 Schultz
Decl., ¶ 49.  And Bernacke says that "[o]n July 2, 2018, it was communicated to [him] in person
at a meeting with the Iraqi Ambassador, the Deputy Chief of Mission, and the First Secretary that
the GOI expects to issue travel documents for all individuals determined to be Iraqi Nationals by
the GOI, regardless of whether they state they wish to return to Iraq voluntarily."  December 2017
Bernacke Decl., ¶ 17.  Unfortunately, the Government's document production largely concludes
in July 2018.  See Pet'rs Mem. re Disc. Sanc. (Dkt. 454).  Despite representations to the Court that
as many as 60,000 potentially responsive documents exist, albeit identified under a flawed

methodology, Petitioners have received only 123 pages from DHS and approximately 9,135 pages from ICE, some of which are duplicates, and most of which predate July 2018.  Pet'rs Reply in Supp. of Mem. re Disc. Sanc. at 4 (Dkt. 469).  Despite Court orders, the Government has not made an appropriate document production on Petitioners' July 6, 2018 document requests.  The Government's failures in this regard undermine the Schultz and Bernacke declarations and also warrant sanctions, as discussed later.

The Government has not met its burden of rebutting that Petitioners' removal is not significantly likely in the foreseeable future, as Sixth Circuit precedent demonstrates.  In Rosales-Garcia v. Holland, 322 F.3d 386, 391 (6th Cir. 2003), the Attorney General initiated removal proceedings against a group of Mariel Cubans whom the United States ordered removed because they had past criminal convictions, like many subclass members in this case.  The district court denied the petitioners' writs of habeas corpus.  Id. at 390.  On appeal, the Government did not contend that repatriation of the petitioners was reasonably foreseeable.  Id. at 391-392.  It "attested that negotiation between the United States and Cuba regarding the excluded Mariel Cubans is ongoing, there is no evidence that Cuba has any particular intention to repatriate [the petitioners]." Id. at 391 n.3.  The Sixth Circuit held that evidence of "continuing negotiations with Cuba over the return of Cuban nationals excluded from the United States" was not sufficient to justify the continued detention of the petitioners.  Id. at 415.

The Government attempts to distinguish this case by arguing that, unlike in Rosales-Gonzales, it does not concede that there is no likelihood of removal, because a repatriation agreement exists, and Petitioners continue to be removed.  Resp. at 32.  The Government's argument is unavailing.

There is no question that American officials purported to believe that some form of an agreement existed in March 2017, as detailed in the Statement of Cooperation, which resulted in the repatriation of eight Iraqi nationals.  But the process used at that time was not repeatable.  Ex. 1-12 at PageID.12997.  Subsequent to the SHRC flight, and the failed June 2017 charter flight, the records reflect ongoing negotiations with Iraq with respect to issuing TDs, whether to use voluntary repatriation forms, and whether Iraq will accept forced repatriation at all.  This case is a great deal like Rosales-Gonzales in that respect.  Whatever the "agreement" was between the United State and Iraq on March 12, 2017, the agreement has not evolved; it has devolved, back to the negotiation stage, and there does not appear to be a clear way forward to repatriate Iraqi nationals at this time.

Equally deficient is the Government's second argument—that the removal period has not begun because, supposedly, the Court's stay of removal, and not Iraq, is the only impediment to removal.  Fatal to the Government's argument is that several individuals are no longer under the stay and yet they remain in this country.  At least eighteen class members have had the Court's stay lifted, some almost a year ago, and have yet to be removed.  For example:

- The Court lifted the stay of removal as to Khahir Al Salaman on December 18, 2017 (Dkt. 181); he obtained TDs in June 2018; and yet he remains in detention. Schlanger Decl. VI, Table A.

- The Court lifted the stay as to Aqil Al Muntafigi on March 7, 2018 (Dkt. 253); he obtained TDs in June 2018; and yet he remains in detention.  Id.

- The Court lifted the stay as to Sabeeh Alsaad on March 7, 2018; he obtained TDs on July 10, 2018; and he was scheduled to be removed on September 10, 2018; and yet he remains in detention.  Id.

The case of Al Shakarchi also undermines the Government's argument.  Although an Iraqi national, he was not a member of the class and was never subject to the stay.  10/24/2018 Hr'g Tr. 11:2.  He had been detained subject to a final order of removal for quite some time.  Id. at 11:6.

45

There were no impediments to Al Shakarchi's removal, other than that he would not volunteer to be removed.  Id. at 11:8-9.  When Iraq refused to issue TDs for Al Shakarchi, the ICE field office released him, citing Zadvydas.  Id. at 11:10-12.

What the Court can reasonably infer from Al Shakarchi's case and others is that the Court's stay is not the barrier to Petitioners' removals.  Although some Petitioners have been removed, the Government has not explained under what circumstances the removals took place and has steadfastly refused to meet its discovery obligations, which would allow for a more robust picture of any repatriation dialogue with Iraq.

The Government relies on cases that do not support its position.  For example, in Beckford v. Lynch, 168 F. Supp. 3d 533 (W.D.N.Y. 2016), the Jamaican petitioner's only argument in support of Zadvydas relief was his pursuit of judicial review of his final order of removal.  Id. at 538-539.  The petitioner did not offer any good reason to believe that Jamaica would not accept his repatriation.  Id. at 539.  Similarly, in Joseph v. United States, 127 F. App'x 79 (3d Cir. 2005), the petitioner, originally from Antigua-Barbuda, "submitted no evidence that removal would not occur in the foreseeable future."  Id. at 80-81.  On the other hand, "DHS submitted evidence that a representative from the Consulate General of Antigua had advised in April 2004 that [the petitioner's] travel documents would be forthcoming."  Id. at 81.

Unlike the petitioners in Beckford and Joseph, the Zadvydas subclass members have offered a plethora of credible evidence in support of their position that there is no reasonable likelihood of removal in the reasonably foreseeable future.  The subclass members' position is more in line with other decisions upholding Zadvydas claims.  See, e.g., Khader v. Holder, 843 F. Supp. 2d 1202, 1209 (N.D. Ala. 2011) (magistrate judge recommending Jordanian national be released after eleven months' detention, and petition ultimately dismissed as moot after ICE

46

released the petitioner on an order of supervision); Andreasyan v. Gonzales, 446 F. Supp. 2d 1186, 1192 (W.D. Wash. 2006) (ordering the release of Uzbekistan national after eight months' detention where his travel document request remained pending before consular officials); Moallin v. Cangemi, 427 F. Supp. 2d 908, 928 (D. Minn. 2006) (ordering release of Somali national after sixteen-month detention and finding no likelihood of removal where there was no functioning Somali government); Seretse-Khama v. Ashcroft, 215 F. Supp. 2d 37, 54 (D.D.C. 2002) (granting Liberian national's preliminary injunction under Zadvydas after forty-six-month detention).

Based on the record before the Court, the Court finds that Petitioners' removal is not significantly likely in the reasonably foreseeable future. Civil detention is justified only "in certain special and 'narrow' nonpunitive 'circumstances,'" which are not present here such that the detention "outweighs the 'individual's constitutionally protected interest in avoiding physical restraint.'" Zadvydas, 533 U.S. at 690, 692 (citation omitted; quoting Foucha, 504 U.S. at 80, and Hendricks, 521 U.S. at 356 (1997)). Accordingly, the Court finds that Petitioners are likely succeed on the merits of their Zadvydas claim.[10]

### B. Discovery Sanctions

Independent of what the record shows, Petitioners are entitled to Zadvydas relief because of the Government's discovery abuses. Petitioners have sought discovery, since January 14, 2018, on the issue of whether there is a significant likelihood of Petitioners' removal in the reasonably foreseeable future.[11] The Government concedes that it did not meet its document production

---

[10] The Government's argument that the removal period has not begun to run for subclass members who are still contesting their orders of removal is without merit. Indefinite detention cannot be justified just because the individual chooses to use legal avenues to challenge his removal. See, e.g., Ly, 351 F.3d at 272; see also D'Alessandro v. Mukasey, 628 F. Supp. 2d 368, 386, 404 (W.D.N.Y. 2009).

[11] Petitioners made even earlier discovery requests on the matter, but the present discovery was authorized by the Court's January 2, 2018 Opinion (Dkt. 191).

deadlines.  Resp. Mem. re Disc. Sanc. at 3 (Dkt. 463).  The Government explains its noncompliance by noting that it had technical difficulties and that it was understaffed.  Id. at 6-7. It nonetheless asserts that it has produced "305,538 pages of discovery and court-ordered production."  Id. at 17 (emphasis added).  The Government's number is highly misleading.

The Government, despite identifying tens of thousands of potentially responsive documents, has produced only 123 pages from DHS and 9,135 pages from ICE, many of which are duplicate pages.  Id. at 17; Pet'rs Mem. re Disc. Sanc. at 4.  The remaining 296,280 of the 305,538 pages relate to Court-ordered disclosures, including Petitioners' A-Files and Records of Proceedings, which go directly to Petitioners and not class counsel, for use in their immigration proceedings.  Id. at 4; Pet'rs Mem. re Disc. Sanc. at 4.  The Court-ordered productions are not in lieu of traditional discovery, and the Court-ordered productions, such as A-Files and Records of Proceedings, do not address the issue of whether there is a significant likelihood of removal in the reasonably foreseeable future.

As to the Government's document production, the Government's document review has moved at a glacial pace.  According to the Government, it collected 28,000 potentially responsive documents in April 2018, to respond to January 2018 document requests—yet it did not produce the documents until July 2018.  See id. at 8 (citing Scott A. Whitted Decl. ("Whitted Decl."), Ex. D to Resp't Resp. to Mem. re Disc Sanc., ¶ 7 (Dkt. 463-4).  After threading the emails,[12] the number of potentially responsive documents was approximately 15,000.  The Government estimated that it would take eleven weeks to review the 15,000 documents.  Id. at 8.  The

---

[12] A threaded email is one that includes the original email, plus all replies and forwards.  Whitted Decl. ¶ 7.

Government's estimate was based on ten attorneys reviewing twenty-five documents an hour, or 200 documents a day, Whitted Decl., ¶ 9, which is by no means fast.

Based on ten-attorney reviewers, 2,000 documents should have been reviewed each day, and the initial review should have been completed in a week and a half.  Even accepting the Government's time estimates with respect to a training week and a second-level review, the entire production should have been completed in a little over a month.  However, the Government only assigned the ten attorneys to review documents one day a week, which, when training and a second-level review is considered, forms the basis for its eleven-week estimate.  Whitted Decl. ¶ 10.  ICE's production was finally made on July 17, 2018.  Pet'rs Mem. re Disc. Sanc. at 8.  The Government complains that it did not have the resources to complete its production in a timely fashion, but even taking into consideration its difficulties, it should not have taken seven months to make its first document production.

As to the second set of document requests, Petitioners served the requests on July 6, 2018. Therefore, under Rule 34, documents should have been requested, reviewed, and produced on or before August 5, 2018.  Fed. R. Civ. P. 34(b)(2)(A).  However, the Government did not make the internal request to search for electronically stored records, such as emails, until September 4, 2018—two months after the request for production was served.  Manuel Ramirez Decl., Ex. A to Resp't Resp. Mem. re Disc. Sanc., ¶ 7 (Dkt. 463-1).  The Government made no effort to comply with Rule 34's requirement to produce documents by August 5, 2018, or the Court's order to produce records by August 20, 2018.  8/15/2018 Order (Dkt. 366) ("Respondents shall serve their responses to Petitioners' second set of discovery requests, including production of documents, on or before August 20, 2018.  No further extension shall be granted.").

The Government represented to the Court that there were 22,275 potentially responsive documents to Petitioners' second document request, which the Court repeatedly ordered to be produced to Petitioners.  See 10/12/2018 Order (Dkt 431); 10/19/2018 Order (Dkt. 449).  To date, only 680 documents have been produced to Petitioners, and the 680 documents almost entirely omit documents from August 2018 and contain no documents from September 2018, which— based on the Government's most recent representations—is the most vital period.

Shortly after the Court ordered the 22,275 documents be turned over to Petitioners, an additional 20,000 potentially responsive documents surfaced, Pet'rs Mem. re Disc. Sanc. at 13, and that number has since swelled to upwards of 60,000 documents, Ramirez Decl., ¶¶ 8-9.  If the past is any indication, the Government will need more than ten months to complete the review of these documents.   Petitioners should not be made to languish in detention while the Government puts this case on the back burners.

The Government has needlessly prolonged the Zadvydas discovery for almost a year, and there is no end in sight.  The Government's cry of lack of resources simply demonstrates improper prioritization of its litigation responsibilities, for which it must live with the consequences.  Under Federal Rule of Civil Procedure 37, a district court, as a sanction for failure to comply with discovery orders, may order the matters at issue or other designated facts to be "established" for purposes of the action.  Fed. R. Civ. P. 37(b)(2)(A)(i); see, e.g., Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee (Compagnie des Bauxites), 456 U.S. 694, 695 (1982) (holding that a district court did not abuse its discretion in finding personal jurisdiction as a sanction, where the plaintiff repeatedly attempted to use discovery to establish jurisdictional facts, only to be obstructed by defendant's refusal to produce the requested information).  Furthermore, the Court has inherent authority to sanction a party, which "derives from its power to impose respect in its

presence, control the litigants before it, and guarantee the integrity of the courts." Bradley J. Delp Revocable Tr. v. MSJMR 2008 Irrevocable Tr., 665 F. App'x 514, 520 (6th Cir. 2016) (citing Chambers v. NASCO, Inc., 501 U.S. 32, 43-44 (1991)).

Whether under Rule 37(b) or the Court's inherent authority, the factors a district court considers when imposing a particularly severe sanction are the same.  Coleman v. Am. Red Cross, 23 F.3d 1091, 1094 n.1 (6th Cir. 1994).  The Court must consider (i) whether a party's failure to cooperate with discovery is the result of willfulness, bad faith, or fault; (ii) whether the other side was prejudiced by the conduct; (iii) whether the disobedient party was warned of the potential sanctions; and (iv) whether less drastic sanctions were considered or imposed.  Universal Health Grp. v. Allstate Ins. Co., 703 F.3d 953, 956 (6th Cir. 2013) (quoting United States v. Reyes, 307 F.3d 451, 458 (6th Cir. 2002)) (internal quotation marks and citation omitted). Although no one factor is dispositive, where the conduct amounts to bad faith, the importance of the other three factors fades.  Knoll v. Am. Tel. & Tel. Co., 176 F.3d 359, 366 (6th Cir. 1999).

The Government has used discovery to slow this case to its benefit.  From the earliest stages of this case, the Government made demonstrably false statements to the Court designed to delay the proceedings.  It represented that the GoI was ready and willing to accept repatriation of its nationals without limitation, and that but for the Court's stay of removal, it would have done so. The Government has maintained this position even while it was considering sanctions against Iraq, noting it is one of the most recalcitrant countries with respect to repatriation. The Government asked for extensions of time to make procedural objections to interrogatories that could have been easily made without an extension.  The Government appears befuddled by the entire discovery process and cannot proceed without the Court's constant intervention instructing the Government on the steps necessary to meet its obligations under the Federal Rules.  The Government's attorneys

are quite capable, which leads the Court to the conclusion that the Government's conduct is of its own making and demonstrates clear bad faith.

The prejudice to the <u>Zadvydas</u> subclass members is obvious.  They have been subjected to civil detention well beyond the presumptively reasonable six-month period.  Even if the subclass members are eventually allowed to remain in the United States, they have been deprived of more than a year of their lives with their families and their communities.  Additionally, it is doubtful any of them have their old jobs or businesses waiting for them after this long period of time.   Even after their release, the subclass members will have to start over to regain some measure of economic stability.

Sanctions cannot come as a surprise.  The Court has repeatedly warned the Government that failing to comply with the Court's discovery orders may result in sanctions.  <u>See</u> 3/13/2018 Order ¶¶ 20 & 22 (Dkt. 254); 6/12/2018 Order (Dkt. 304) ("Failure to produce documents on this schedule will be construed, presumptively, as bad faith, unless Respondents can establish by clear and convincing evidence that there is exceptional good cause for not meeting the schedule."); 6/22/2018 Order ("Failure to comply with the Court's order may be cause for the Court to direct that the facts necessary to support Petitioners' <u>Zadvydas</u> claim are established, or prevent the Government from opposing the <u>Zadvydas</u> claim, or issue other appropriate relief.") (citing Fed. R. Civ. P. 37(b)(2)(A)); 8/13/2018 Order (Dkt. 366); 10/12/2018 Order (Dkt 431); 10/19/2018 Order (Dkt. 449).

Lesser sanctions will not suffice in this case.  The <u>Zadvydas</u> issue, and the reason for the present discovery, is to determine whether to release Petitioners under orders of supervision.  The Government has delayed a determination on the merits of that issue for over a year, which has benefitted the Government in that Petitioners remain in custody.   The hard-fought limited

discovery in this case paints a picture that there is no likelihood of Petitioners' removal in the reasonably foreseeable future.  The Court is not persuaded by the Government's representations that the discovery delays are solely because it is overworked and understaffed.  The Court draws the reasonable inference that the Government is withholding documents adverse to its position in the hope that its situation will improve in the future.  Petitioners should not be subject to indefinite detention because of the Government's indefinite discovery delays.  The Court finds that the Government has failed to comply with the Court's discovery orders and has done so willfully.  Therefore, sanctions are warranted.

Accordingly, for the purposes of Petitioners' motion for a preliminary injunction, the Court orders it established that there is no significant likelihood of Petitioners' removal in the reasonably foreseeable future.[13]

### C.  Standing

The Government argues that the Zadvydas subclass members lack standing to pursue their claims, because their detention arises from their own inaction or inability to obtain a bond.  Resp. at 3, 18-19.  Additionally, the Government argues that to the extent Petitioners are seeking review of their bond determinations, they must exhaust their administrative remedies.  Id. at 20.  Petitioners argue that bond hearings and relief under Zadvydas are distinct forms of relief.  Reply in Supp. of Mot. for Prelim. Injunc. at 13-14.  And Petitioners argue that exhaustion is neither required nor available in the context of this case.  Id. at 15.  The Court agrees with Petitioners.

Standing is "the threshold question in every federal case."  Warth v. Seldin, 422 U.S. 490, 498 (1975).  Article III of the Constitution requires an "actual controversy" to be pending before the court.  The standing doctrine is "one of several principles used to ensure compliance with the

---

[13]  The Court will consider the issue of attorney fees at a later stage of the proceedings.

case or controversy requirement," <u>Poe v. Snyder</u>, 834 F. Supp. 2d 721, 728 (E.D. Mich. 2011) (citing <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560 (1992)), and "requires that a litigant have suffered an injury-in-fact that is fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief," <u>Peoples Rights Organization, Inc. v. City of Columbus</u>, 152 F.3d 522, 527 (6th Cir. 1998).

The traditional prerequisites for standing are established. Petitioners are injured by their continued incarceration. That incarceration is attributable to the Government, because it was the Government that detained them and continues to do so.  An order by this Court would redress the harm.  Accordingly, Petitioners have indubitably established standing to pursue relief under <u>Zadvydas</u>.

The Government seems to be arguing that the availability of bond hearings, previously ordered by the Court, undermines Petitioners' standing to pursue <u>Zadvydas</u> relief. The theory appears to be that the detention is a failure to secure a bond, and thus not traceable to Government action.  However, as noted above, the initial, primary and continuing cause of their detention is that they were arrested and detained by the Government—not their failure to secure a bond.

Further, the relief now requested is different in kind than relief under a bond.  As this Court has already said, "[a] bond hearing provides an <u>opportunity</u> for release; relief under <u>Zadvydas</u>, after a finding that there is no significant likelihood of removal in the reasonably foreseeable future, <u>requires</u> that release be granted in order to prevent further unlawful confinement." 7/18/2018 Op. at 6 (citing <u>Zadvydas</u>, 533 U.S. at 699–700) (emphasis added) (Dkt. 345). Obviously, for those who were denied bond or could not make bond, that opportunity did not and would not provide the relief sought now.  Therefore, the availability of a bond remedy has no bearing on Petitioners' standing to pursue <u>Zadvydas</u> relief.

As for its argument on exhaustion, the Government cites no authority—and the Court is aware of none—holding that exhaustion is required for <u>Zadvydas</u> relief.

**D.  Class Issues with Respect to Rule 23(b)(2)**

In a footnote, the Government argues that a class action seeking general injunctive relief is an inappropriate vehicle to bring this case.  Resp. at 33 n.10 (citing Fed. R. Civ. P. 23(b)(2)).  It argues that "[t]he key to the (b)(2) class is 'the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." <u>Id.</u> (quoting <u>Wal-Mart Stores, Inc. v. Dukes</u>, 564 U.S. 338, 360 (2011)).  The Government argues that "the fact that some class members have already been removed to Iraq on its own shows that the class's detention cannot be 'declared unlawful . . . as to all of the class members' under <u>Zadvydas</u>, and therefore the Court must deny this motion." <u>Id.</u>  It maintains that "[t]o the extent Petitioners think they could prevail individually, they may not do so within the confines of this action." <u>Id.</u>  Petitioners do not respond to this argument, perhaps because class certification is not before the Court currently.

Petitioners are all seeking the same remedy—immediate release under <u>Zadvydas</u>. Petitioners' detention may be authorized under different statutory provisions; however, as the Court has already explained, either the statutory provisions or the Constitution requires their release from indefinite detention.  Denying Petitioners' preliminary injunction motion because Petitioners are situated somewhat differently would discard the substantial benefits of consolidated treatment.  "[W]hat matters to class certification . . . [is] the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." <u>Wal-Mart Stores, Inc.</u>, 564 U.S. at 350.  The Court has generated common answers regarding statutory and constitutional

concerns, which in turn drive this litigation to a common resolution—namely release under Zadvydas. Rule 23(b)(2) is the most appropriate way to proceed in this matter.

### E.  Irreparable Harm; Balance of the Equities; Public Interest

Petitioners have unquestionably met their burden regarding irreparable harm.  Detention has inflicted grave harm on numerous detainees for which there is no remedy at law.  Families have been shattered.  Petitioner Hassan Al-Atawna has been detained since January 2017 and taken away from his family, including his infant—now toddler—son.  Gandhi Decl., Ex. 14, ¶¶ 6-8. Maytham Al Bidairi has been in ICE detention since May 2016 separated from his wife and three daughters for over two years.  After Al Bidairi's arrest, his family was evicted because they could no longer afford rent.  Moore Decl., Ex. 13, ¶¶ 4-6.  Firas Nissan was arrested in June 2017 and can no longer provide for his two children, elderly parents, and five siblings.  He is now locked in solitary confinement twenty-one hours a day.  Piecuch Decl., Ex. 12, ¶¶ 3-14.  The harm to Petitioners, who are ostensibly not being punished for criminal activity, is intolerable and ongoing.

The balance of equities tips decidedly in favor of preliminary relief.  Without some relief from detention, detainees will undoubtedly continue to experience these or similar harms.  The Government argues that there is no irreparable harm, because Petitioners' detention is lawful for a reasonable period.  The Court cannot find detention reasonable for Al Bidairi, who did not receive a custodial sentence for making false statements, and yet has spent almost two-and-half years in detention based on his removal status.  For Al Bidairi, and any Petitioner who has been incarcerated beyond six months, whatever may have once been considered reasonable under the law, has long since passed.

Finally, the public interest requires preliminary relief.  Our Nation has a long history of resisting unreasonable governmental restraints.  As the Supreme Court has made clear, "[i]n our

society liberty is the norm." <u>United States v. Salerno</u>, 481 U.S. 739, 755 (1987).  Petitioners' only crime is being caught between the United States and Iraq's diplomatic tug-o-war over repatriation. Nonetheless, more than half of the detainees are being held in penal institutions under the same conditions as those convicted of crimes.  The public interest overwhelmingly favors freedom over mass detention in these circumstances.

In balancing all of the factors, the Court concludes that Petitioners are entitled to preliminary relief.

## IV. CONCLUSION

For the reasons set forth above, the Court grants Petitioners' renewed motion for preliminary injunction (Dkt. 473) as follows:

1.      The Government must release on orders of supervision all members of the <u>Zadvydas</u> subclass who have been detained for more than six months within thirty days of this Opinion and Order, except as provided in paragraphs 3 and 4 below.

2.      Any <u>Zadvydas</u> subclass member who has not yet been detained for six months, but whose period of detention reaches six months hereafter, shall be released on an order of supervision no later than thirty days after that member's six-month period of detention is reached.

3.      If the Government contends that there is a strong special justification, within the meaning of <u>Zadvydas</u>, to detain a specific individual, the Government need not release such individual, provided the Government files a motion alleging and substantiating that contention prior to the time for release.  The Court will thereafter address whether release is, nonetheless, required.

4.      The Government need not release an individual on supervised release if the Government actually removes that individual prior to the time required for release and does so in conformity with prior orders of the Court.

5.      This preliminary injunction currently will not apply to those on bond, because the Petitioners have not spoken consistently about whether the relief they seek should be applied to such persons. <u>Compare</u> Schlanger Decl. V,  Table B (Dkt. 473-62) (reflecting 110 total subclass members, but none on bond) <u>with</u> Pet'rs Reply at 13, n.13 (Dkt. 479) (stating that relief is being sought as to those on bond also).  Nor has the Government addressed this issue.  Accordingly, if Petitioners intend to seek extension of this preliminary injunction to such individuals, they must file a supplemental brief in that regard; the Government may file a response within seven days after service of the supplemental brief; Petitioners may file a reply within three days after service of the Government's response.

6.      This injunction is to remain in place until there is a final determination on the merits of all of Petitioners' claims.

7.      To the extent any party wishes to modify, supplement, or clarify the relief granted here, that party shall confer with opposing parties to attempt a resolution of any such issue.  If there is agreement as to any issue, the parties shall submit a proposed stipulated order to that effect.  If any dispute remains, counsel shall contact the Court's case manager to arrange a telephonic status conference to address the matter.

          SO ORDERED.

Dated:  November 20, 2018                          s/Mark A. Goldsmith_____
          Detroit, Michigan                        MARK A. GOLDSMITH
                                                   United States District Judge

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on November 20, 2018.

s/Deborah Tofil
Case Manager
