UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

USAMA JAMIL HAMAMA, et al.,

            Petitioners,

v.

REBECCA ADDUCCI, et al.,

            Respondents.
_____/

Case No. 17-cv-11910
Hon. Mark A. Goldsmith
Mag. Judge David R. Grand

**ORDER OF THE SPECIAL MASTER**

███████████, a *Hamama* Class Member who has been detained by ICE since October 2025, has filed a pro se motion before the Special Master seeking release from immigration detention under the terms of the Settlement Agreement (Dkt. 717-2).[1] ICE opposes the motion. For the reasons that follow, the motion is granted.

**BACKGROUND**

Mr. ███ is a native and citizen of Iraq who entered the United States in 1993, at the age of three years old. Written Statement of Movant at 1 (Nov. 10, 2025) ("Nov. 2025 Movant Statement") (attached to Mot. for Release (Nov. 19, 2025), PDF at 18–19); Declaration of Detention and Deportation Officer Samuel Medina (Feb. 9, 2026) ("Medina Decl."), at ¶ 9. He states that his father, mother, five brothers, and sister are all U.S. citizens, that he has three children who were all born in the United States, and that for the past thirty-three years, all of them have lived in ████████████████. Nov. 2025 Movant Statement at 1.

In July 2002, ICE issued a notice to appear charging Mr. ███ as removable. Medina Decl. ¶ 10. In October 2002, an immigration judge issued Mr. ███ an Order Granting Protection from Removal to Iraq, in the form of withholding of removal and relief under the Convention Against Torture (CAT). Mot. for Release at 4; Nov. 2025 Movant Statement at 1; Medina Decl. ¶ 10. The removal ground appears to have been INA § 237(a)(2)(A)(iii), and the record suggests that a removal order become final in August 2004. Warning for Failure to Depart (unsigned and

---

[1] This Order incorporates and uses terms and definitions set forth in the Settlement Agreement.

undated) (attached to Mot. for Release (Nov. 19, 2205), PDF at 17). However, neither ICE nor Mr. ███ has submitted either an actual removal order or Order Granting Protection from Removal as part of the record. The parties agree that Mr. ███ is a member of the *Hamama* class. Mot. for Release at 1; Renewed Mot. for Release at 1; Opp'n to Release at 1; *see* Agreement § I.A; Order Approving Settlement Agreement and Dismissing Case ¶ 2 (Dkt. 730).

Between 2009 and 2022, Mr. ███ was convicted of certain state criminal law offenses. Medina Decl. ¶ 11; Nov. 2025 Movant Statement at 1; Notice of Revocation of Release at 1 (Oct. 10, 2025) ("Oct. 2025 Revocation Notice") (attached to Mot. for Release (Nov. 19, 2025), PDF at 14). ICE states that on August 14, 2019, Mr. ███ was held for one day in the San Diego District Staging Detention Facility and released that same day under an order of supervision.[2] Medina Decl. ¶ 8; *see* Oct. 2025 Revocation Notice at 1.

On October 10, 2025, following Mr. ███'s subsequent release from state criminal custody, ICE issued a notice revoking his order of supervision and took him into immigration custody.[3] Oct. 2025 Revocation Notice at 1; *see* Medina Decl. ¶¶ 12–13; Nov. 2025 Movant Statement at 1; Mot. for Release at 1, 3; Renewed Mot. for Release at 2, 3; Supp. to Renewed Mot. for Release at 2, 3. After being detained for one day at the SFR Hold Room in San Francisco, California, he was transferred on October 11, 2025 to the California City Detention Facility in Kern County, California, where he currently remains in detention. Medina Decl. ¶ 7; Mot. for Release at 1, 2–3; Renewed Mot. for Release at 1, 2; Supp. to Renewed Mot. for Release at 1, 2.

---

[2] Neither ICE nor Mr. ███ has submitted the actual order of supervision as part of the record.

[3] In the revocation notice, an ICE official stated that Mr. ███ failed to report as required on two separate occasions, May 5, 2020 and January 19, 2021. Oct. 2025 Revocation Notice at 1. Although Mr. ███ represents that the reason he did not report to ICE on those occasions is because he was in state custody at the time, those circumstances are not entirely clear from the record. Mot. for Release at 5; Nov. 2025 Movant Statement at 3. For purposes of deciding Mr. ███'s motion for release, it is unnecessary to resolve any questions concerning those circumstances. No factual findings are being made about whether Mr. ███ was or was not in custody on those dates.

Upon taking Mr. ███ into custody, ICE evidently provided him with at least two documents in addition to the revocation notice. First, an unsigned, undated I-229(a) "Warning for Failure to Depart" recites the criminal penalties to which individuals may be subject under INA § 243(a) for willful failure to depart the United States within the 90-day statutory "removal period," willful failure to make timely application for travel documents, conspiracy to "prevent or hamper" the noncitizen's departure pursuant to a final removal order, or willful failure to present oneself for removal in response to a formal agency notice to report for removal. I-229(a), Warning for Failure to Depart (undated) (attached to Mot. for Release (Nov. 19, 2025), PDF at 17). Second, an unsigned, undated "instruction sheet" sets forth a list of ten "things [he is] required to complete within 30 days" to comply with his "obligation to assist in obtaining a travel document." Instruction Sheet to Detainee Regarding Requirement to Assist in Removal (undated) ("Instructions to Assist in Removal") (attached to Mot. for Release (Nov. 19, 2025), PDF at 16).

Mr. ▮ initially filed a motion for release with the Special Master on November 19, 2025, arguing that because an immigration judge had issued him an Order Granting Protection from Removal to Iraq, in the form of withholding of removal and CAT relief, his removal from the United States was not significantly likely in the reasonably foreseeable future. Mot. for Release at 2; Nov. 2025 Movant Statement at 1. He further stated that the deportation officer responsible for his case informed him on two occasions during October 2025 that "Iraq is off the table as a country of removal."[4] Mot. for Release at 4; Nov. 2025 Movant Statement at 1. On December 8, 2025, the motion was dismissed without prejudice for lack of jurisdiction under the Settlement Agreement. Letter of the Special Master (Dec. 8, 2025) (Dkts. 745, 746).

Subsequently, on January 21, 2026, Mr. ▮ submitted a renewed motion for release, which is dated January 2, 2026 and was received by the Special Master via the U.S. Postal Service on January 21, 2026. Renewed Mot. for Release (Jan. 21, 2026); Supp. to Renewed Mot. for Release (Jan. 21, 2026).[5] In his renewed motion, Mr. ▮ states that he "ha[s] not been provide[d] any documentation regarding [his] travels," and he reiterates that an ICE official twice informed him in October 2025 that removal to Iraq was "off the table" because he had been granted an Order Granting Protection from Removal to Iraq. Renewed Mot. for Release at 3–4; Supp. to Renewed Mot. for Release at 3–4.

In its opposition to Mr. ▮'s release, ICE represents that on November 21, 2025, it "inquired regarding third country removal" and "contacted the Department of State requesting assistance with removal to third country." Medina Decl. ¶¶ 14–15. ICE does not identify any particular third country (or countries) to which it might be seeking to remove Mr. ▮ or provide any specifics about its "inquir[y]." While ICE states that the State Department responded on November 24, 2025 by "indicating that it has forwarded the request to the appropriate Department of State decision makers," Medina Decl. ¶ 17, it does not provide any information on the nature, timing, or other details about the State Department's decision-making process for such matters. It notes, however, that in its response to ICE's inquiry, the State Department also "requested that ICE refrain from taking further action until guidance is received from the Department of State." Medina Decl. ¶ 16. Without explaining or specifying further, ICE

---

[4] The motion also drew attention to certain health problems that Mr. ▮ is experiencing, which he states that the California City Detention Facility "refuse[d]" to treat. Mot. for Release at 5.

[5] Two different versions of Mr. ▮'s renewed motion for release, both dated January 2, 2026, were received by the Special Master on January 21, 2026. These pro se submissions are deemed to be part of a single renewed motion, with the second submission, Supp. to Renewed Mot. for Release (Jan. 21, 2026), construed as a supplemental filing in support of the renewed motion for release, Renewed Mot. for Release (Jan. 21, 2026).

3

represents that once that guidance is received, it "anticipates executing the removal within a reasonable time period." Medina Decl. ¶ 19.

In his reply, Mr. ▮ states that on January 14, 2026, an ICE officer informed him that the government had "tried to see if they could remove [him] to Australia or Mexico," but that "both countries said no." Reply at 1 (Feb. 19, 2026). The reply further states that Mr. ▮ has "not seen a travel document or flight itinerary to any country the entire time" that he has been detained. Reply at 1. As of January 21, 2026, the date on which his renewed motion for release was filed, Mr. ▮ had been detained by ICE for 103 days, and as of the date of this order he has been detained for 135 days.

## DISCUSSION

Consistent with broader legal and constitutional principles, a basic "governing principle[]" under the Settlement Agreement is that ICE shall not detain any Class Member with a Final Order of Removal except (1) if the Class Member violates an Order of Supervision, or (2) to effectuate removal. Agreement § III.A; *see United States v. Salerno*, 481 U.S. 739, 755 (1987) ("In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception."). In particular for purposes of this motion, the Special Master is authorized to review good faith challenges to determine whether ICE has satisfied the Settlement Agreement's requirements under Section IV.B.4.d.ii for continued detention of Category 1 Individuals with final orders of removal who were not detained as of the Settlement Date of May 13, 2024.[6] Agreement § VIII.D.2.b.iii (cross-referencing § IV.B.4.d.ii).

**I. Process and Standard for Review Under Section IV.B.4.d**

For a Class Member with a final order of removal who has been detained by ICE directly upon release from a term of state criminal imprisonment, and who ICE has determined to be a Category 1 Individual, ICE is allowed an initial detention period of up to 90 days for Travel Document processing and removal efforts. Agreement §§ IV.B.1.a, IV.B.4.c. If ICE has not removed the Class Member within that initial 90-day period, it must conduct a custody review, upon which it must either release the Class Member or, if continued detention remains

---

[6] While no documentation appears in the record of any formal determination by ICE that Mr. ▮ is a Category 1 Individual, his motion does not challenge the correctness of any such classification, while reserving the right to do so. Renewed Mot. for Release at 3 & n.2; Supp. to Renewed Mot. for Release at 3 & n.2. The question of whether Mr. ▮ has been properly categorized is therefore not before the Special Master.

4

permissible, provide notice that the result of the custody review is to continue detention.[7] *Id.* § IV.B.4.d.

If the Class Member remains in detention after that initial 90-day period, the individual may file a motion for release with the Special Master. *Id.* § IV.B.4.d.ii.3. ICE bears the burden of providing the Special Master with "evidentiary support" showing (1) that "Iraq has indicated that it will issue a Travel Document," and separately (2) that the "Class Member's removal is significantly likely to occur in the reasonably foreseeable future." *Id.* § IV.B.4.d.ii.4. If ICE does not demonstrate a "significant likelihood of removal within the reasonably foreseeable future," then the Special Master "shall order the Class Member's Release."[8] *Id.* § IV.B.4.d.ii.6.

The "significant likelihood of removal within the reasonably foreseeable future" standard under the Settlement Agreement derives from the Supreme Court's decision in *Zadvydas v. Davis*, 533 U.S. 678 (2001). In *Zadvydas*, the Court interpreted 8 U.S.C. § 1231(a)(6), which governs detention of noncitizens with final orders of removal beyond the 90-day statutory "removal period," in light of the Fifth Amendment's Due Process Clause. To avoid "serious constitutional concerns" that would arise from an interpretation of that provision authorizing indefinite detention, the Court construed § 1231(a)(6) only to authorize a noncitizen's detention for a period of time "reasonably necessary" to effectuate that individual's removal. *Zadvydas*, 533 U.S. at 689; *see also Hamama v. Adducci*, 349 F.Supp.3d 665, 686–89, 692 (E.D. Mich. 2018) (Dkt. 490); *Hamama v. Adducci*, 285 F.Supp.3d 997, 1009–1010 (E.D. Mich. 2018) (Dkt. 191), *vac'd and remanded on other grounds*, 912 F.3d 869 (6th Cir. 2018). "[O]nce removal is no longer reasonably foreseeable," the Court held, "continued detention is no longer authorized by statute." *Zadvydas*, 533 U.S. at 699.

Because "[r]easonableness" must be assessed "primarily in terms of the statute's basic purpose, namely assuring the alien's presence at the moment of removal," *Zadvydas* held that "if

---

[7] The record indicates that a custody review was scheduled to take place on or about January 7, 2026, but does not include any documentation indicating that formal notice was provided to Mr. ▮▮▮▮ of the outcome of that review. Notice to Alien of File Custody Review (undated) (attached to Mot. for Release (Nov. 19, 2025), PDF at 15).

[8] The Settlement Agreement also provides that if ICE has not removed the Class Member within 180 days, continued detention only is permitted "if ICE clearly demonstrates a very high likelihood of imminent removal, by demonstrating that Iraq has already provided a Travel Document and ICE has already arranged a removal itinerary for the very near future." *Id.* § IV.B.4.e; Order of the Special Master at 9–10 (Feb. 9, 2026) (Dkts. 750, 751); Order of the Special Master at 9–10 (Sep. 26, 2024) (Dkts. 735, 736). Under those circumstances, the Class Member has the option of seeking an order for release directly from the Court. Agreement § IV.B.4.e.

removal is not reasonably foreseeable," a reviewing court "should hold continued detention unreasonable and no longer authorized by statute." *Id.* To ensure uniformity and minimize the need for courts to make "difficult judgments," the Court recognized a six-month period of post-final order detention under § 1231(a)(6) as "presumptively reasonable." *Id.* at 701. Beyond that six-month period, a noncitizen "may be held in confinement until it has been determined that there is no significant likelihood of removal in the reasonably foreseeable future." *Id.*

When ICE itself reviews the custody of individuals detained beyond that "presumptively reasonable" period, it is directed by a post-*Zadvydas* regulation to consider a nonexclusive list of factors to determine whether there is a "significant likelihood" of the individual's removal "within the reasonably foreseeable future."[9] 8 C.F.R. § 241.13(f). *Zadvydas* also emphasized that for detention "to remain reasonable as the period of prior postremoval confinement grows, what counts as the 'reasonably foreseeable future' conversely would have to shrink." *Zadvydas*, 533 U.S. at 701; *see also Hamama*, 349 F.Supp.3d at 692. Consistent with these context-sensitive criteria, the Settlement Agreement defines the "reasonably foreseeable future" for purposes of the Special Master's review under Section IV.B.4.d to be "no longer than the next ninety (90) days," but also provides that it "could, depending on the circumstances, be shorter." Agreement § IV.B.4.d.ii.6.

Under *Zadvydas*'s interpretation of § 1231(a)(6), the noncitizen bears the initial burden of providing "good reason to believe that there is no significantly likelihood of removal in the reasonably foreseeable future," after which "the Government must respond with evidence sufficient to rebut that showing." *Zadvydas*, 533 U.S. at 701. However, under the Settlement Agreement the Class Member's initial burden is only to show that the triggering conditions for the Special Master's review have been satisfied—at which point ICE must affirmatively "demonstrate[] a significant likelihood of removal within the reasonably foreseeable future" for

---

[9] The regulation directs agency officials to consider "all the facts of the case" when conducting these reviews, including, "but not limited to":

> the history of the alien's efforts to comply with the order of removal, the history of the [agency's] efforts to remove aliens to the country in question or to third countries, including the ongoing nature of the Service's efforts to remove this alien and the alien's assistance with those efforts, the reasonably foreseeable results of those efforts, and the views of the Department of State regarding the prospects for removal of aliens to the country or countries in question.

8 C.F.R. § 241.13(f).

detention to continue.[10] Agreement §§ IV.B.4.d.ii.4, IV.B.4.d.ii.6; *see* Order of the Special Master at 5–8 (Feb. 9, 2026) (Dkts. 750, 751); Order of the Special Master at 8–11 (Mar. 4, 2025) (Dkts. 738, 739); Order of the Special Master at 5–9 (Sep. 26, 2024) (Dkts. 735, 736); *cf. Roble v. Bondi*, 803 F.Supp.3d 766, 772–73 (D. Minn. 2025) (when seeking to revoke release and detain an individual under 8 C.F.R. § 241.13(i)(2), ICE bears the initial evidentiary burden to establish that the claimed change in circumstances makes removal significantly likely in the reasonably foreseeable future); *Nguyen v. Hyde*, 788 F.Supp.3d 144, 150 n.2 (D. Mass. 2025) (same).

The Settlement Agreement contains multiple provisions that are expressly premised on the assumption that the country to which ICE seeks to remove the Class Member is Iraq—including, notably, the requirement under Section IV.B.4.d.ii.4 that ICE provide "evidentiary support showing that *Iraq* has indicated that it will issue a Travel Document."[11] Agreement § IV.B.4.d.ii.4 (emphasis added). At the same time, the Settlement Agreement also states that its provisions applying to Class Members who have Final Orders of Removal "shall apply equally to Class Members who have an Order Granting Protection from Removal to Iraq"—defined to mean "a grant of withholding of removal, pursuant to 8 U.S.C. § 1231(b)(3), and withholding or deferral of removal under the regulations implementing Article 3 of the United Nations Convention Against Torture, 8 C.F.R. § 1208.16-18"—and to "Class Members whom ICE seeks to remove to a third country." *Id.* §§ I.B.16, IV.C.

**II. Application to the Renewed Motion for Release**

Because Mr. ▬▬▬ has been granted an Order Granting Protection from Removal, which prevents his removal to Iraq, his motion raises questions and considerations that are distinct from

---

[10] If ICE has not removed the Class Member within 180 days, that same standard obliges ICE to "clearly demonstrate[] a very high likelihood of imminent removal, by demonstrating that Iraq has already provided a Travel Document and ICE has already arranged a removal itinerary for the very near future." *Id.* § IV.B.4.e; Order of the Special Master at 9–10 (Feb. 9, 2026) (Dkts. 750, 751); Order of the Special Master at 9–10 (Sep. 26, 2024) (Dkts. 735, 736).

[11] *See also* Agreement § I.B.22 (defining "Travel Document" to mean "documents that are used or required for travel by an Iraqi from the United States *to Iraq* and that are sufficient for the Class Member to be removed *to Iraq*" (emphasis added)); *id.* § IV.A.3 (defining and qualifying certain Class Members' obligation to "make good faith efforts to obtain Travel Documents" in Iraq-specific terms); *id.* § IV.B.1 (providing that if ICE seeks to remove a Class Member with a Final Order of Removal, it must provide 90 days' written notice before it begins to "finaliz[e] Travel Documents and a travel itinerary for the Class Member's return *to Iraq*" (emphasis added)); *id.* § IV.B.4.e (providing that if a Class Member has not been removed within 180 days and seeks an order for release, ICE must "clearly demonstrates a very high likelihood of imminent removal, by demonstrating that *Iraq* has already provided a *Travel Document* [as defined in § I.B.22, in Iraq-specific terms] and ICE has already arranged a removal itinerary for the very near future" (emphasis added)).

those presented when ICE seeks to remove a Class Member to Iraq. *See, e.g.*, *Banoub v. Crawford*, No. 25-cv-917, 2025 WL 3723458, at *9–10 (E.D. Va. Dec. 23, 2025) (holding that an individual's grant of withholding of removal "presents strong evidence that his removal is unlikely to occur in the reasonably foreseeable future"); *Zavvar v. Scott*, No. 25-cv-2104, 2025 WL 2592543, at *7 (D. Md. Sep. 8, 2025) ("A grant of withholding of removal 'substantially increases the difficulty of removing' an individual."); *Munoz-Saucedo v. Pittman*, 789 F.Supp.3d 387, 398 (D.N.J. 2025) ("[D]ata . . . supports the general inference that removal . . . of detainees [who have been granted withholding of removal] is substantially more difficult.").

Despite its inability to remove Mr. ▓▓▓ to Iraq, ICE opposes his motion based on its assertion that removal nevertheless is significantly likely in the reasonably foreseeable future to an alternative third country because (1) it "has presented evidence that a Travel Document *has been requested*" for Mr. ▓▓▓ and (2) "the Department of State is *actively assisting* with his removal to a third country." Opp'n to Release at 3 (emphasis added). In fact, ICE goes further to argue that it even satisfies the more demanding standard of showing "a very high likelihood of imminent removal"—not by demonstrating that Mr. ▓▓▓ "has already [been] provided a Travel Document and ICE has already arranged a removal itinerary for the very near future," as Section IV.B.4.e provides, but based instead on its assertions that, "with the State Department," it is "obtaining ▓▓▓'s travel document and securing an alternative country for removal" and that it "has the means to remove Iraqi nationals to third countries."[12] Opp'n to Release at 3.

The generalized, largely conclusory statements submitted by ICE fall considerably short of what is required under the Settlement Agreement to demonstrate a significant likelihood of removal in the reasonably foreseeable future—to speak nothing of "a very high likelihood of imminent removal"—since they lack the requisite specificity, detail, or documentary support to satisfy ICE's evidentiary burden. First, when construed to apply to "Class Members whom ICE seeks to remove to a third country," as directed by Section IV.C, Section IV.B.4.d.ii.4 requires ICE to provide evidentiary support "showing" that *the third country in question* "has indicated that it will issue a Travel Document." Agreement §§ IV.B.4.d.ii.4, IV.C; *cf.* 8 U.S.C. § 1231(b)(2)(E)(vii) (permitting, under specified circumstances, removal to a third country "whose government *will accept* the alien into that country" (emphasis added)). By its terms, this provision demands evidence about what *the prospective country of removal* has indicated about its willingness

---

[12] It is not clear why ICE invokes this more stringent standard, which applies only if ICE has not removed a Class Member within 180 days after being detained. Agreement § IV.B.4.e.

and ability to issue a travel document—not evidence about U.S. officials' own efforts, as ICE seeks to rely upon here.[13]

Nor does the evidence submitted by ICE demonstrate that U.S. officials have even identified a specific third country to which the United States might realistically remove Mr. ▇▇▇, much less whether ICE has contacted officials of any such country or received an affirmative response concerning its willingness to accept him.[14] *See* 8 U.S.C. § 1231(b)(2)(E)(vii); *Lorenzo v. Raycraft*, No. 26-cv-77, 2026 WL 369349, at *5 (W.D. Mich. Feb. 10, 2026) (evidentiary burden under 8 C.F.R. § 241.13(i)(2) not satisfied when ICE asserts merely that it is "exploring removal" to a third country and "do[es] not identify any such 'third country'"); *Davut v. Noem*, No. 25-cv-3740, 2026 WL 194858, at *1, *3 (S.D. Cal. Jan. 26, 2026) (burden under 8 C.F.R. § 241.13(i)(2) not satisfied by merely stating that internal U.S. government request for assistance "identifying a third country for removal" has been made, especially when "no third country has been identified"); *Momennia v. Bondi*, No. 25-cv-1067, 2025 WL 3006045, at *1 (W.D. Okla. Oct. 27, 2025) (under *Zadvydas*, assertions that "the State Department, DHS, and ICE are working together on a third-country removal," but without identifying "any countries with which any level of progress has been made toward obtaining the country's acceptance," are insufficient to rebut showing that removal is not significantly likely in the reasonably foreseeable future); *Yee S. v. Bondi*, 806 F.Supp.3d 894, 901 (D. Minn. 2025) (burden under 8 C.F.R. § 241.13(i)(2) not satisfied where ICE does not "identify *any* specific country that has agreed to accept Petitioner" and fails to "describe what steps have been taken"); *see also Abrego Garcia v. Noem*, __ F.Supp.3d __, No.

---

[13] Even if evidence of ICE's own efforts could satisfy the express terms of Section IV.B.4.D.ii.4, ICE's vague and cursory statements about those efforts would nevertheless be insufficient. *See, e.g.*, *Vu v. Noem*, 2025 WL 3114341, at *6 (E.D. Cal. Nov. 6, 2025) (burden under 8 C.F.R. § 241.13(i)(2) not satisfied by "general assertion that ICE is 'making efforts' to obtain travel documents"); *Sun v. Noem*, No. 25-cv-2433, 2025 WL 2800037, at *2–3 (S.D. Cal. Sep. 30, 2025) (burden under 8 C.F.R. § 241.13(i)(2) not satisfied by "vague assertions" and "threadbare evidence" that they are "*preparing* to apply for the necessary documents to remove Petitioner"); *Roble v. Bondi*, 803 F.Supp.3d 766, 773 (D. Minn. 2025) (burden under 8 C.F.R. § 241.13(i)(2) not satisfied by "bare fact that ICE officials in St. Paul have requested third-country removal assistance from ICE headquarters"); *Hoac v. Becerra*, No. 25-cv-1740, 2025 WL 1993771, at *4 (E.D. Cal. July 16, 2025) (burden under 8 C.F.R. § 241.13(i)(2) not satisfied by ICE's assertion of "inten[t] to complete a travel document request"); *Nguyen v. Hyde*, 788 F.Supp.3d 144, 152 (D. Mass. 2025) (burden under 8 C.F.R. § 241.13(i)(2) not satisfied when ICE "ha[s] not identified what concrete steps [it] has taken" to process travel document; *Singh v. Gonzales*, 448 F.Supp.2d 1214, 1219–20 (W.D. Wash. 2006) (assertions that "ICE has done all it can to obtain travel documents from India" and "has been successful in repatriating Indian citizens" are insufficient to establish significant likelihood of removal in the reasonably foreseeable future).

[14] The only country-specific evidence in the record—coming not from ICE but from Mr. ▇▇▇—suggests that at least two countries have declined to accept his removal. Reply at 1.

9

25-cv-2780, 2025 WL 3545447, at *4–7 (D. Md. Dec. 11, 2025). As such, the evidence cannot show—because it does not attempt to show—that any particular, identified third country "has indicated" its willingness and ability to issue a travel document, either at all or within a timeframe and under circumstances that would enable removal to be significantly likely within the reasonably foreseeable future. *See* Order of the Special Master at 5–6 (Feb. 9, 2026) (Dkts. 750, 751); Order of the Special Master at 6 (Mar. 4, 2025) (Dkts. 738, 739).

Second, ICE's evidentiary support is also insufficient to demonstrate that Mr. ▓▓▓▓'s removal to any particular, identified third country is significantly likely in the reasonably foreseeable future. Because a variety of distinct, country-specific uncertainties and complications can arise when the government seeks to remove noncitizens to third countries, the lack of evidence showing that any particular third country has been contacted or even specifically identified in Mr. ▓▓▓▓'s case could be understood as dispositive. *See, e.g.*, *Lorenzo*, 2026 WL 369349, at *5; *Davut*, 2026 WL 194858, at *1, *3; *Momennia*, 2025 WL 3006045, *1; *Yee S.*, 806 F.Supp.3d at 901–02; *Roble*, 803 F.Supp.3d at 772–73; *see also Hmung v. Bondi*, No. 25-cv-1303, 2025 WL 3657221 (W.D. Okla. Dec. 9, 2025) (magistrate judge's report and recommendation) ("[B]eyond a single assertion that [ICE] is 'working [on]' Petitioner's removal, Respondents have presented no evidence that *any* country would be actually willing to take Mr. Hmung, and the mere possibility of repatriation to third countries, without concrete progress, is insufficient to justify continued detention."), *adopted*, 2025 WL 3670499 (W.D. Okla. Dec. 17, 2025); *Zhuzhiashvili v. Carter*, 802 F.Supp.3d 1337, 1339–40 (D. Kan. 2025) (evidence insufficient to show significant likelihood of removal in the reasonably foreseeable future under *Zadvydas* where "an immigration official states only that inquiries have been made within the Government to identify a possible third country" for removal and that "ICE will continue its efforts to identify alternative countries"). Assuming that a separate order of removal (and not only an Order Granting Protection from Removal) was in fact formally and properly issued for Mr. ▓▓▓▓,[15] formal acceptance by an alternative third country would be required before removal could take place. *See* 8 U.S.C. § 1231(b)(2)(E)(vii) (providing that only if removal to a country designated under preceding clauses of § 1231(b)(2)(E) would be "impracticable, inadvisable, or impossible" may the Attorney General remove the noncitizen to "another country *whose government will accept the alien into that country*" (emphasis added));

---

[15] *But see Abrego Garcia*, 2025 WL 3545447, at *10–11 (addressing case in which order granting withholding of removal or CAT relief was issued, but corresponding order of removal improperly was not). The present record contains no indication that any alternative third countries were formally designated under 8 U.S.C. § 1231(b)(2) during the 2002 removal proceedings.

*Ndandu v. Noem*, No. 25-cv-2939, 2026 WL 25848, at *5 (S.D. Cal. Jan. 5, 2026) (emphasizing that "[e]ven when authorized, third country removal still requires the affirmative assent of the receiving country"); AM. IMMIGR. COUNCIL, THIRD-COUNTRY REMOVALS IN UNITED STATES IMMIGRATION POLICY 2, 4 (Dec. 2025) (hereinafter AM. IMMIGR. COUNCIL, THIRD-COUNTRY REMOVALS, https://www.americanimmigrationcouncil.org/wp-content/uploads/2025/12/Third-Country-Removals-Factsheet_1225.pdf [https://perma.cc/N53N-VFYS] (noting that "[m]ost countries to which the United States seeks to deport people have to issue travel documents for them—which requires them to consent to accept that person from the United States," and that countries may be "willing to accept only a certain number of deportees, or deportees of a certain type—or may simply refuse to issue travel documents for a particular individual"); *see also Jama v. ICE*, 543 U.S. 341, 342 (2005) (noting that "[n]onacceptance may surely be" a factor making "removal to a given country . . . impracticable or inadvisable").

    Since the United States would need to obtain that formal acceptance if it seeks to remove Mr. ▇▇▇ to a third country, the lengths of time required to identify a particular third country, contact its officials, secure its willingness to accept the individual, and ultimately effectuate the individual's physical removal are all highly relevant when determining whether there might be a significant likelihood of removal in the reasonably foreseeable future. However, ICE's submission provides neither pertinent details nor documentary support concerning the process of seeking assistance from the State Department, identifying prospective third countries for removal, obtaining the necessary consent to acceptance, and effectuating physical removal—either in general or with respect to any particular, identified third countries to which the United States might seek to remove Mr. ▇▇▇ specifically. For example, its submission provides no relevant details about the "assistance" that it has requested from the State Department in Mr. ▇▇▇'s case. *See, e.g.*, *Roble*, 803 F.Supp.3d at 773 (holding, as "not a close call," that "paltry evidence" that ICE "'requested third country removal assistance from' . . . ICE headquarters" is insufficient to establish a significant likelihood of removal in the reasonably foreseeable future); *Escalante v. Noem*, No. 25-cv-182, 2025 WL 2206113, at *4 (E.D. Tex. Aug. 2, 2025) (under 8 C.F.R. § 241.13(i), "conclusory statements that [DHS respondents] are taking steps to remove" a citizen of El Salvador who was granted CAT relief either "to Mexico or perhaps Canada" are insufficient to satisfy ICE's burden); *Nguyen*, 788 F.Supp.3d at 152. Nor does ICE's submission provide concrete information about how long it ordinarily takes for the State Department to review and respond to ICE's requests for assistance with third country removals; about the rates of success in ultimately

effectuating physical removal when such requests are made, both in general and for specific countries; about how and why that process might proceed more slowly or more quickly under different factual circumstances; about any specific factors that are present in Mr. ▮▮▮'s own case might affect the timeline for removal; or about any other specific information that might bear upon the timeline for identifying, contacting, and receiving an affirmative response from a plausible third country for removal in the reasonably foreseeable future.

Moreover, as suggested by the District Court's own findings specifically about Iraq in the *Hamama* litigation itself, the time required to successfully remove individuals can vary greatly depending on the particular country to which ICE seeks to remove the individual—even in situations involving repatriation of the country's own nationals. *Hamama*, 349 F.Supp.3d at 674–85, 692–96; *Hamama*, 285 F.Supp.3d at 1010–13; Order of the Special Master at 6–7 (Sep. 26, 2024); *see also* Dep't of Homeland Sec., Off. of Inspector Gen., *ICE Faces Barriers in Timely Repatriation of Detained Aliens* 6–11 (Mar. 11, 2019) (Rep. No. OIG-19-28) (hereinafter DHS OIG, *ICE Faces Barriers in Timely Repatriation of Detained Aliens*), https://www.oig.dhs.gov/reports/2019/ice-faces-barriers-timely-repatriation-detained-aliens/oig-19-28-mar19 [https://perma.cc/3GC9-RLDF] (discussing country-specific variation and "inconsistent cooperation" of foreign governments with repatriation of their own nationals). Those country-specific uncertainties and risks of delay may be heightened when ICE seeks removal to a third country, where removal depends on the willingness of another sovereign to accept a non-national. Because ICE has not identified any particular third country to which it seeks to remove Mr. ▮▮▮, the evidence it has submitted is necessarily insufficient to support the country-specific assessments that would be required before concluding that there is a significant likelihood of removal in the reasonably foreseeable future. *See also* 8 C.F.R. § 241.13(f) (directing agency officials to consider, when assessing whether there is a "significant likelihood of removal in the reasonably foreseeable future" for a particular individual, factors including "the history of the [agency's] efforts to remove aliens *to the country in question or to third countries*" and "the views of the Department of State regarding the prospects for removal of aliens *to the country or countries in question*" (emphasis added)).

Finally, the distinct prospect of legal claims against third country removal creates additional complications and a significant potential source of further delay in effectuating removal. As a matter of both domestic and international law, the United States is obligated not to remove a noncitizen if the individual's "life or freedom would be threatened in that country" because of race, religion, nationality, membership in a particular social group, or political opinion, or if the

12

individual faces a likelihood of torture in that country. 8 U.S.C. § 1231(b)(3)(A) (implementing United States' non-refoulement obligations under Article 33(1) of the 1951 Convention Relating to the Status of Refugees, as incorporated by the 1967 Protocol Relating to the Status of Refugees); Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. 105-277, Div. G, § 2242(a), 112 Stat. 2681, 2681-822 (1998) (codified as statutory note to 8 U.S.C. § 1231) (implementing United States' non-refoulement obligations under Article 3 of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment); *see* AM. IMMIGR. COUNCIL, THIRD-COUNTRY REMOVALS, *supra*, at 5–6. If ICE seeks to remove a noncitizen to a third country that was not specifically designated in a formal removal order, the individual is likely entitled to notice and a hearing conforming to the requirements of due process on their fear-based claims against removal to that proposed third country.[16] 8 U.S.C. § 1231(b)(3)(C); *see, e.g.*, *D.V.D. v. U.S. Dep't of Homeland Sec.*, 778 F.Supp.3d 355, 387–91 (D. Mass. 2025) (due process requires notice and a meaningful opportunity to present fear-based claims before removal to third country), *stay pending appeal granted*, 145 S.Ct. 2153 (2025) (non-merits docket); *Barka v. Mattos*, No. 25-cv-1781, 2025 WL 3723998, at *7–8 (D. Nev. Dec. 23, 2025) ("In the context of country of removal designations, last minute orders of removal to a country may violate due process if an immigrant was not provided an opportunity to address his fear of persecution in that country" (quoting *Najjar v. Lynch*, 630 F.App'x 724, 724 (9th Cir. 2016)); *Escobar v. Chestnut*, No. 25-cv-1801, 2025 WL 3687639, at *4 (E.D. Cal. Dec. 19, 2025) ("Petitioner has a clear protected liberty interest in ensuring his removal is not to a country where Petitioner faces a credible fear of persecution, torture, and death" (citing *A.A.M. v. Andrews*, __ F.Supp.3d __, No. 25-cv-1514, 2025 WL 3485219, at *8 (E.D. Cal. Dec. 4, 2025)); *Cruz Medina v. Noem*, 806 F.Supp.3d 536, 545–46 (D. Md. 2025) (due process requires review of fear-based claims "not only by an asylum officer but also by an immigration judge"), *specific performance ordered*, 2025 WL 3157608, *3 (D. Md. Nov. 12, 2025); *Vu*, 2025 WL 3114341, at *8–9 ("[F]ailing to notify individuals who are subject to deportation that they have the right to apply for asylum in the United States and for withholding of deportation to the country to which they will be deported violates the constitutional right to due process."); *Nguyen v. Scott*, 796 F.Supp.3d 703, 727–28 (W.D. Wash. 2025) ("[A] noncitizen must

---

[16] *See also A.A.R.P. v. Trump*, 145 S.Ct. 1364, 1367–68 (2025) (per curiam) (citing *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950)); *Trump v. J.G.G.*, 604 U.S. 670, 673 (2025) (per curiam); *Yamataya v. Fisher*, 189 U.S. 86, 101 (1903); Sarah Sherman-Stokes, *Third Country Deportation*, 53 IND. L. REV. 333, 357–68 (2021); Matthew Boaz, *Due Process in Third Country Removals*, LAWFARE (Dec. 1, 2025), https://www.lawfaremedia.org/article/due-process-in-third-country-removals.

be given sufficient notice of a country of deportation that, given his capacities and circumstances, he would have a reasonable opportunity to raise and pursue his claim for withholding of deportation" (quoting *Aden v. Nielsen*, 409 F.Supp.3d 998, 1009–10, 1019–22 (W.D. Wash. 2019)). Those fear-based claims might also involve claims to protection against harms inflicted by non-state actors or against the risk of "chain refoulement," resulting from the third country's subsequent transfer of the individual to another country for which withholding or CAT relief either was previously granted or would be warranted. *D.V.D.*, 778 F.Supp.3d at 390; *see* AM. IMMIGR. COUNCIL, THIRD-COUNTRY REMOVALS, at 5 (discussing "chain refoulement").

Accordingly, even if an alternative country of removal had been specifically identified by ICE, the time required for fear-based claims against removal to that country to be fully presented and adjudicated might still render removal significantly unlikely to occur in the reasonably foreseeable future. *See, e.g.*, *Segundo Sangronis v. Unknown Party*, No. 26-cv-88, 2026 WL 362790, at *4 (W.D. Mich. Feb. 10, 2026) (ordering release under *Zadvydas* where fear-based claims against removal "only recently" were referred to and accepted by USCIS and no evidence indicated that they would "be resolved in the reasonably foreseeable future"); *Munoz-Saucedo v. Pittman*, 789 F.Supp.3d 387, 399–400 (D.N.J. 2025) (concluding that "even if ICE identified a third country" for removal, the prospect of "additional, lengthy proceedings" to seek protection against removal to that country contributes to rendering removal unlikely in the reasonably foreseeable future). Of course, since ICE has not, in fact, identified any specific prospective third country of removal or provided evidence of concrete steps toward effectuating removal in this case, it is impossible to know whether Mr. ▮▮▮▮ would assert such claims if ICE eventually identifies and obtains the formal acceptance of some plausible third country of removal, and if so how long such proceedings might take. Those uncertainties reinforce the conclusion that the evidence submitted by ICE is insufficient to carry its burden.

## CONCLUSION

For the foregoing reasons, the motion for release from detention is granted. Consistent with Section IV.B.4.d.8 of the Settlement Agreement, this order of release does not preclude detention for removal for up to thirty (30) days "once an itinerary is finalized and the Class Member has returned to ICE custody."

Date: February 22, 2026                      /s/Anil Kalhan
                                             ANIL KALHAN
                                             Special Master

## CERTIFICATE OF SERVICE

  The undersigned certifies that the foregoing document was served and filed, as required under the terms of the Settlement Agreement (Dkt. 717-2) and Second Amended Stipulated Order Appointing Special Master (Dkt. 737) in *Hamama v. Adducci*, No. 17-cv-11910 (E.D. Mich.), on February 22, 2026.


                /s/ Anil Kalhan
                Special Master