UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

USAMA JAMIL HAMAMA, et al.,

                Petitioners,

v.

REBECCA ADDUCCI, et al.,

                Respondents.

_____/

Case No. 17-cv-11910
Hon. Mark A. Goldsmith
Mag. Judge David R. Grand

## ORDER OF THE SPECIAL MASTER

████████████, who has been detained by ICE since September 2025, has filed a pro se motion before the Special Master seeking release from immigration detention under the terms of the Settlement Agreement (Dkt. 717-2).[1] ICE opposes the motion, arguing that (1) Mr. ████ ██████ is not a *Hamama* Class Member covered by the Settlement Agreement and (2) even if he is covered by the Agreement, he should not be released because there is a significant likelihood of removal in the reasonably foreseeable future. For the reasons that follow, the motion is granted.

## BACKGROUND

Mr. █████████ is a native and citizen of Iraq who entered the United States as a refugee in 1992. Declaration of Deportation Officer James M. Bradley ¶ 8 (Mar. 17, 2026) ("Bradley Decl."); Notice to Appear (Sep. 9, 2025) (attached to Mot. for Release (Feb. 25, 2026), PDF at 13). In 1993, he adjusted his status and became a lawful permanent resident. Bradley Decl. ¶ 9. In 1998, Mr. █████████ applied for naturalization to become a U.S. citizen, but the INS denied his application in 2000. *Id.* ¶ 10. In September 2002, the INS initiated removal proceedings, charging Mr. █████████ as removable on certain crime-based grounds. *Id.* ¶ 12; Notice to Appear (Sep. 10, 2002) (attached as Ex. B to Opp'n to Release (Mar. 17, 2026)). The immigration court (David J. Cordova, Immigration Judge) ordered Mr. █████████'s removal to Iraq in 2003. Order of Removal (May 19, 2003) (attached as Ex. C to Opp'n to Release); Bradley Decl. ¶ 13; Mot. for Release at 5. ICE was unable to execute the removal order, and it released him on an order of

---

[1] This Order incorporates and uses terms and definitions set forth in the Settlement Agreement.

1

supervision in 2004. Order of Supervision (July 19, 2004) (attached as Ex. D to Opp'n to Release); Bradley Decl. ¶ 14.

On May 18, 2017, Mr. ███████ was taken into ICE custody following a criminal conviction. Bradley Decl. ¶ 15. On July 13, 2017, he filed a motion to reopen and requested a stay of removal based on claims of (1) changed country conditions, (2) a change in the law pertaining to his criminal conviction, and (3) eligibility for adjustment of status. Emergency Motion to Reopen Based on Changed Country Conditions and Stay of Removal (July 13, 2017) (attached as Ex. E to Opp'n to Release); Bradley Decl. ¶ 16. The motion to reopen was granted by an immigration judge on September 1, 2017, and on December 8, 2017, Mr. ███████ was granted bond. Bradley Decl. ¶ 16; Memorandum of Bond Decision and Order of Immigration Judge (Dec. 8, 2017) (attached as Ex. F to Opp'n to Release). Mr. ███████ filed a motion to terminate proceedings on February 28, 2018, and on April 17, 2018, the immigration court (Steven Caley, Immigration Judge) granted that motion and terminated proceedings, concluding that ICE had failed to satisfy its burden to establish that Mr. ███████ was removable under the INA. Decision of the Immigration Judge at 6 (Apr. 18, 2018) (attached as Ex. G to Opp'n to Release); Bradley Decl. ¶ 16. Accordingly, Mr. ███████ was restored to the status of a lawful permanent resident. Bradley Decl. ¶ 16.

In September 2025, Mr. ███████ was taken into ICE custody following his completion of a state criminal sentence and was charged as removable. *Id.* ¶¶ 18–19; Notice to Appear (Sep. 11, 2025) (attached as Ex. I to Opp'n to Release); Record of Deportable/Inadmissible Alien (Sep. 9, 2025) (Form I-213) (attached as Ex. H to Opp'n to Release). In an oral decision on December 22, 2025, the immigration court (Glen Baker, Immigration Judge) concluded that Mr. ███████ was removable and denied his application for deferral of removal under the Convention Against Torture. Order of the Immigration Judge (Dec. 22, 2025) (checkbox summary of oral decision) (attached as Ex. J to Opp'n to Release) ("Dec. 22, 2025 IJ Decision"); Bradley Decl. ¶ 20. On that basis, the immigration judge ordered that Mr. ███████ be removed to Iraq or, in the alternative, to the United Kingdom or Mexico. Dec. 22, 2025 IJ Decision at 4. Mr. ███████ did not appeal that removal order, which has become final.

The present pro se motion for release from Mr. ███████ is dated February 12, 2026 and was received by the Special Master via the U.S. Postal Service on February 25, 2026. Mot. for Release. In the motion, Mr. ███████ states that "ha[s] not yet seen any travel document or any intentions to remove [him]" and reiterates his fear of torture and persecution if removed to Iraq. *Id.* at 4. Because of unclear and conflicting indications in the motion as to whether any removal order during the Settlement Agreement's coverage period makes him a *Hamama* Class Member

covered by the Agreement and whether any fear-based claims might still be the subject of ongoing proceedings in the immigration court, the Special Master requested counsel for ICE and Class Counsel to meet and confer to address any issues that might bear upon the Special Master's jurisdiction over Mr. ████████'s motion. Email from Special Master (Feb. 26, 2026). Since the parties were unable to reach agreement regarding the question of Mr. ████████'s class membership, briefing was scheduled to allow ICE to submit its position on both jurisdiction and the merits of Mr. ████████'s motion and to afford Class Counsel and Mr. ████████ an opportunity to reply.[2] Scheduling Order (Mar. 11, 2026).

In addition to contesting whether Mr. ████████ is a Class Member covered by the Settlement Agreement in its opposition to release, ICE argues on the merits that Mr. ████████ should not be released because there is a significant likelihood of removal in the reasonably foreseeable future. Opp'n to Release at 7. It states that Mr. ████████ has "refused to assist ICE with obtaining a travel document," but that it nevertheless believes it is likely "that a travel document and itinerary can be obtained so removal . . . can occur." Bradley Decl. ¶¶ 21–22, 24. In reply, Class Counsel states that Mr. ████████ recounted that "he did not understand what he was being asked to sign and was asking for the documents to be explained to him." Class Counsel Reply at 7 n.1.

Following the commencement of military action against Iran by the United States and Israel on February 28, 2026, travel across the region has been significantly disrupted, and since then official U.S. government statements regularly have reported that Iraqi airspace has been closed. *See, e.g.*, U.S. Embassy Baghdad, Iraq, *Security Alert—U.S. Embassy Baghdad, Iraq—April 2, 2026* (Apr. 2, 2026), https://iq.usembassy.gov/security-alert-u-s-embassy-baghdad-iraq-april-2-2026/ [https://perma.cc/XND2-B53P] (reporting that "[a]irspace is closed and commercial flights are not operating out of Iraq"); Order of the Special Master at 2–3 (Mar. 15, 2026) (Dkts. 766, 767). While ICE acknowledges without elaboration that there are "current issues with removal of aliens to the Middle East," it maintains that "airspace at or near Iraq can reopen at any time in the very near future" and that it "has the means to remove Iraqi nationals." Bradley Decl. ¶¶ 23–24, 26. ICE also notes that Mr. ████████'s removal order designated both the United Kingdom and Mexico as alternative countries of removal in addition to Iraq. Opp'n to Release at 7; *see* Dec. 22, 2025 IJ Decision at 4. Without providing specific information about any steps it has taken, ICE

---

[2] Class Counsel does not represent Mr. ████████ but requested an opportunity to reply because of their interest in how the Settlement Agreement's coverage provision is interpreted and applied, both in Mr. ████████'s own case and in future cases. Class Counsel Reply at 1.

represents in general terms that it is "working on securing alternative plans for removal" and, on that basis, that it "believes" there to be a significant likelihood of removal in the reasonably foreseeable future. Bradley Decl. ¶ 23, 25; Opp'n to Release at 7.

As of February 25, 2026, the date on which the motion for release was filed, Mr. ▉ ▉ had been detained by ICE for 170 days, and as of the date of this order he has been detained for more than 205 days.

## DISCUSSION

Consistent with broader legal and constitutional principles, a basic "governing principle[]" under the Settlement Agreement is that ICE shall not detain any *Hamama* Class Member with a Final Order of Removal except (1) if the Class Member violates an Order of Supervision, or (2) to effectuate removal. Agreement § III.A; *see United States v. Salerno*, 481 U.S. 739, 755 (1987) ("In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception."). In particular for purposes of this motion, the Special Master is authorized to review good faith challenges to determine whether ICE has satisfied the Settlement Agreement's requirements under Section IV.B.4.d.ii for continued detention of Category 1 Individuals with final orders of removal who were not detained as of the Settlement Date of May 13, 2024.[3] Agreement § VIII.D.2.b.iii (cross-referencing § IV.B.4.d.ii).

### I. Jurisdiction

The merits of Mr. ▉ 's motion for release only may be considered by the Special Master if Mr. ▉ is, in fact, a *Hamama* Class Member who is covered by the Settlement Agreement. Section I.B.6 of the Settlement Agreement defines the Class to include "all Iraqi nationals in the United States who had Final Orders of Removal at any point between March 1, 2017 and June 24, 2017," and Section I.A provides that the Agreement "applies to all Iraqi nationals in the United States who had Final Orders of Removal at any point between March 1, 2017 and June 24, 2017, and whose Final Orders of Removal from that period have not already been executed." Agreement §§ I.A, I.B.6. As discussed above, a Final Order of Removal was issued for Mr. ▉ in 2003 and was never executed. While Mr. ▉ 's motion to reopen was granted on September 1, 2017, and he was restored to lawful permanent resident status

---

[3] While no documentation appears in the record of any formal determination by ICE that Mr. ▉ ▉ is a Category 1 Individual, his motion does not challenge the correctness of any such classification, while reserving the right to do so. Mot. for Release at 3 & n.2. The question of whether Mr. ▉ has been properly categorized is therefore not before the Special Master.

when his reopened proceedings were terminated on April 18, 2018, both of these events took place after the end of the Settlement Agreement's coverage period on June 24, 2017. On that basis, Class Counsel argues that Mr. ▇▇▇▇▇▇ satisfies the Settlement Agreement's criteria for both class membership and coverage, maintaining "that the period from March 1, 2017, to June 24, 2017, is the only relevant time frame for determining class membership under the Settlement." Class Counsel Reply at 2–3.

ICE disputes this position. While it implicitly acknowledges that Mr. ▇▇▇▇▇▇ had a Final Order of Removal throughout the period from March 1, 2017 through June 24, 2017, and that this removal order was never executed, it nevertheless maintains that Mr. ▇▇▇▇▇▇ "falls outside the coverage" of the Settlement Agreement. Opp'n to Release at 4. First, ICE maintains that Mr. ▇▇▇▇▇▇ "ceased to have a 'final' removal order" as early as September 1, 2017, when the immigration judge granted his motion to reopen. *Id.* (citing *Nken v. Holder*, 556 U.S. 418, 429 n.1 (2009)). Second, ICE argues that when the immigration judge terminated the reopened proceedings on April 18, 2018, Mr. ▇▇▇▇▇▇ "no longer had a qualifying final order" at all. *Id.* at 5. Measured against either date, ICE argues, Mr. ▇▇▇▇▇▇ no longer was included within the Settlement Agreement's coverage by the time that the class "was certified and granted benefits" in 2024.[4] *Id.* at 4. ICE attributes "instructive" significance to the fact that Section I.A requires not only that a Class Member have been subject to a Final Order of Removal during the requisite time period, but also that the removal order not have been "executed"—a criterion that ICE characterizes as "reflect[ing] a requirement that the proceeding be alive and not have reached a legal conclusion." *Id.* at 5. Urging that "executed" and "terminated" be treated "synonymously" under Section I.A, ICE argues that Mr. ▇▇▇▇▇▇ "no longer had a qualifying final order at the time the class was certified" and that any claim he might have to class membership and coverage under the Agreement should therefore be deemed "moot." *Id.*

In further support of this position, ICE argues that the "structure and language" of the Settlement Agreement indicate that the parties did not intend for the Agreement to cover "individuals whose proceedings had already concluded—whether by execution or by

---

[4] The parties in the *Hamama* litigation entered into the proposed Settlement Agreement on May 13, 2024 (Dkt. 717-2), and the District Court preliminarily approved the Agreement on June 4, 2024. Order Preliminarily Approving Class Settlement, Directing Notice to Class Members, and Setting a Fairness Hearing (June 4, 2024) (Dkt. 718). The Court approved the form of notice to Class Members—which used language stipulated upon by the parties—on June 14, 2024. Text-Only Order (Jun. 14, 2024); Statement of Corrected Proposed Class Notice (Jun. 12, 2024) (Dkt. 720). A fairness hearing was held on July 31, 2024, and the Court entered an order giving final approval to the Settlement Agreement on August 2, 2024. Order Approving Settlement Agreement and Dismissing Case (Aug. 2, 2024) (Dkt. 728).

nullification—and who are placed into separate, unrelated removal proceedings." *Id.* The "point" of the *Hamama* litigation and Settlement Agreement, ICE maintains, was only "to allow Iraqi nationals to reopen existing proceedings based on changed country conditions." *Id.* Once Mr. ███ ███████'s reopened proceedings were terminated by the immigration judge on April 17, 2018, ICE argues, that objective was "fully resolved" in his case, and the removal order was thereby "nullified" in a manner "placing him outside of the scope" of the Settlement Agreement's coverage.[5] *Id.* at 5–6.

The text of the Settlement Agreement clearly resolves the questions of class membership and the Agreement's applicability in Mr. ████████'s favor. Sections I.A and I.B.6 of the Agreement define both class membership and the Agreement's coverage in bright-line, temporally-specific terms: the "Class" includes "all Iraqi nationals in the United States who *had* Final Orders of Removal *at any point* between March 1, 2017 and June 24, 2017" (emphasis added) and the Agreement applies to Class Members "whose Final Orders of Removal *from that period* have not *already been executed*" (emphasis added). Agreement §§ I.A, I.B.6. Contrary to ICE's position, neither the reopening of Mr. ████████'s removal order in 2017 nor the termination of his proceedings in 2018 can be treated as equivalent to or "synonymous[]" with Section I.A's exclusion from the Agreement's coverage of individuals whose removal orders have "already been executed." Opp'n to Release at 5.

First, while ICE cites *Nken v. Holder*, 556 U.S. 418, 429 n.1 (2009) for the proposition that granting a motion to reopen "has the effect of 'extinguishing' a final removal order" rather than merely "suspend[ing]" it, Opp'n to Release at 4,  Section I.A defines the Agreement's coverage only with reference to the historical question of whether an individual "had" a Final Order of Removal "at any point" during the specified coverage period, without regard to the order's status at any other point in time. Had the parties intended Section I.A's coverage to turn on whether an individual had a final order of removal at some point other than the specified period, they could

---

[5] Albeit obliquely, ICE seems to go further to suggest not only that Mr. ████████ does not fall within the Settlement Agreement's coverage, but also that he was never a member of the class certified by the District Court during the pendency of the litigation. Opp'n to Release at 6. At most, ICE argues, Mr. ████████ may have received "benefits," such as a stay of removal and the opportunity to file a motion to reopen, "as a result of, or merely during the same period as the litigation," not because of his membership in either the primary class or subclasses certified by the Court. *Id.* While Class Counsel contests ICE's position, Class Counsel Reply at 5–6, for purposes of establishing the Special Master's jurisdiction the only question is whether Mr. ████████ is a member of the Class defined by the Settlement Agreement, as approved by the District Court, and included within the Agreement's provision governing its coverage. *See* Agreement §§ I.A, I.B.6; *see also* Order Approving Settlement Agreement and Dismissing Case at 1 ¶ 4 & at 3 ¶ 2 (Dkt. 728).

have phrased that provision accordingly. For example, the coverage provision could have expressly excluded individuals who did not have Final Orders of Removal as of January 2, 2018, the date on which the District Court certified the detention-related subclasses, *Hamama v. Adducci*, 285 F.Supp.3d 997, 1020 (E.D. Mich. 2018) (Dkt. 191), *vac'd and remanded on other grounds*, 912 F.3d 869 (6th Cir. 2018); as of September 24, 2018, the date on which the Court certified the primary class, *Hamama v. Adducci*, 342 F.Supp.3d 751, 765 (E.D. Mich. 2018) (Dkt. 402); or as of May 13, 2024, the date on which the parties entered into the Settlement Agreement (Dkt. 717-2). Since the only time period specified in Section I.A and I.B.6 is the period between March 1, 2017 and June 24, 2017, the only temporal question concerning class membership and the Agreement's coverage is whether an individual had a Final Order of Removal "at any point" during that specified period, which Mr. ███████ indisputably did.

Second, the only expressly stated basis in Section I.A for excluding individuals who had Final Orders of Removal during that specified time period—for individuals whose removal orders "have . . . already been executed"—does not apply to Mr. ███████. To "execute" an order is "[t]o perform or complete" it. *Execute*, BLACK'S LAW DICTIONARY (12th ed. 2024). In the immigration law context, a final removal order is executed when an individual subject to that order is physically removed from the United States or departs on their own. *Luna Gutierrez v. Noem*, 811 F.Supp.3d 133, 162 (D.D.C. 2025) ("[R]emoval occurs when an individual subject to a removal order leaves the United States, regardless of whether that departure is by their own design or carried out by the Government."); *see Nicusor-Remus v. Sessions*, 902 F.3d 895, 899 (9th Cir. 2018) ("A removal order is executed once an alien 'has left the United States.'" (quoting 8 U.S.C. § 1101(g)); *Mansour v. Gonzales*, 470 F.3d 1194, 1198 (6th Cir. 2006) (describing as "well-settled" that when a noncitizen "departs the United States while under a final order of deportation, he or she executes that order pursuant to the law.").[6]

Nothing in the Settlement Agreement (including, for example, the definitions set forth in Section I.B) suggests that the parties intended the reference to "execut[ion]" of a removal order in Section I.A to mean something other than what the word ordinarily and conventionally means in immigration law. Indeed, ICE's reading of Section I.A's qualification on the scope of its coverage to more broadly "reflect[] a requirement that the proceeding be alive and not have reached a legal conclusion," Opp'n to Release at 5, would be particularly dubious in light of what

---

[6] *See also Johnson v. Guzman Chavez*, 594 U.S. 523, 534–35, 537–38 (2021) (using "execution" of a removal order to refer to the act of effectuating physical removal from the United States).

it means for a removal order to be "executed." After all, both an order granting a motion to reopen and an order terminating proceedings have the opposite effect of *preventing* a removal order from being "executed," which renders any characterization of either one as equivalent to or "synonymous[]" with "execution" entirely untenable. Given the ordinary and conventional meaning of "executed," Section I.A's exclusion from the Agreement's coverage of Class Members whose removal orders "have . . . already been executed" cannot be interpreted as a broader exclusion of Class Members whose removal proceedings have reached some other sort of "legal conclusion" not involving physical removal, as ICE maintains. *Cf. Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 482 (1999) (interpreting "decision or action" to "execute removal orders" under 8 U.S.C. § 1252(g) to refer to a "narrow[]," "discrete" action that does not more broadly encompass "other decisions or actions that may be part of the deportation process").

The parties' own stipulated language in the court-approved notice to Class Members, which was prepared and sent pursuant to Section XI.C of the Settlement Agreement in 2024, confirms this interpretation. The class notice provided that an individual is a *Hamama* Class Member "if you are an Iraqi national in the United States who had a final order of removal at any point between March 1, 2017 and June 24, 2017, *and you were not already removed from the United States based on that final order*." Class Action Notice (Jun. 12, 2024) (Dkt. 720-1) (emphasis added); Text-Only Order (Jun. 14, 2024) (approving class notice). Again, had the parties intended the exclusion from coverage in Section I.A to sweep more broadly—whether to exclude individuals whose removal orders' finality had been "extinguish[ed]" by a motion to reopen, *Nken*, 556 U.S. at 429 n.1, or for any other reason—they could have phrased that provision in any number of other ways. For example, Section I.A could have excluded individuals whose removal proceedings had been "resolved," "concluded," "disposed of," "terminated," or "reopened," rather than more narrowly excluding only those individuals whose removal orders "have . . . already been executed."

ICE's interpretation also cannot be reconciled with the structure of the Settlement Agreement, whose other provisions expressly extend its protections to individuals who seek to reopen their proceedings. As one of the Agreement's "governing principles," Section III.F expressly provides that "if a class member's case is reopened," the Class Member is not thereby removed from the Agreement's coverage—as the logic of ICE's position would suggest—but rather that their "detention must be consistent with" the requirements set forth in Section V. Agreement § III.F. Moreover, ICE's further argument that the Agreement's coverage depends on whether the individual's removal proceedings are deemed to be "alive," "separate," or

8

"unrelated" to the Final Orders of Removal that qualify the individual for class membership under Section I.B.6, Opp'n to Release at 5, would create an unworkable standard, since the Agreement itself provides no substantive criteria for determining when any subsequent proceedings would be sufficiently "alive" or "related" for an individual to remain covered by the Agreement. That kind of approach to coverage not only would require importing substantive criteria for coverage— derived from contestable, extratextual characterizations of the "point" of the *Hamama* litigation and Settlement Agreement, *id.*—from outside the four corners of the Agreement. *See* Agreement § XII.B (integration clause providing that Agreement, Recitals, and attached exhibits "constitute complete, final, and exclusive embodiment of [the parties'] agreement"). More fundamentally, as discussed above, it also would conflict with the clear and express text of Section I.A itself.

Accordingly, Mr. ███████ is a Class Member covered by Sections I.A and I.B.6 of the Settlement Agreement, and the Special Master has jurisdiction over his motion for release.

## II. Process and Standard for Review Under Section IV.B.4.d

For a Class Member with a final order of removal who has been detained by ICE directly upon release from a term of state criminal imprisonment, and who ICE has determined to be a Category 1 Individual, ICE is allowed an initial detention period of up to 90 days for Travel Document processing and removal efforts. Agreement §§ IV.B.1.a, IV.B.4.c. If ICE has not removed the Class Member within that initial 90-day period, it must conduct a custody review, upon which it must either release the Class Member or, if continued detention remains permissible, provide notice that the result of the custody review is to continue detention.[7] *Id.* § IV.B.4.d.

If the Class Member remains in detention after that initial 90-day period, the individual may file a motion for release with the Special Master. *Id.* § IV.B.4.d.ii.3. ICE bears the burden of providing the Special Master with "evidentiary support" showing (1) that "Iraq has indicated that it will issue a Travel Document," and separately (2) that the "Class Member's removal is significantly likely to occur in the reasonably foreseeable future." *Id.* § IV.B.4.d.ii.4. If ICE does not demonstrate a "significant likelihood of removal within the reasonably foreseeable future," then the Special Master "shall order the Class Member's Release." *Id.* § IV.B.4.d.ii.6. The Settlement Agreement also provides that if ICE has not removed the Class Member within 180 days, continued detention only is permitted "if ICE clearly demonstrates a very high likelihood of imminent removal, by demonstrating that Iraq has already provided a Travel Document and ICE

---

[7] No documentation appears in the record of either any formal custody review or notice of its outcome.

has already arranged a removal itinerary for the very near future." *Id.* § IV.B.4.e; Order of the Special Master at 9–10 (Mar. 15, 2026) (Dkts. 766, 767); Order of the Special Master at 9–10 (Feb. 9, 2026) (Dkts. 750, 751); Order of the Special Master at 9–10 (Sep. 26, 2024) (Dkts. 735, 736). Under those circumstances, the Class Member has the option of seeking an order for release directly from the Court. Agreement § IV.B.4.e.

The "significant likelihood of removal within the reasonably foreseeable future" standard under the Settlement Agreement derives from the Supreme Court's decision in *Zadvydas v. Davis*, 533 U.S. 678 (2001). In *Zadvydas*, the Court interpreted 8 U.S.C. § 1231(a)(6), which governs detention of noncitizens with final orders of removal beyond the 90-day statutory "removal period," in light of the Fifth Amendment's Due Process Clause. To avoid "serious constitutional concerns" that would arise from an interpretation of that provision authorizing indefinite detention, the Court construed § 1231(a)(6) only to authorize a noncitizen's detention for a period of time "reasonably necessary" to effectuate that individual's removal. *Zadvydas*, 533 U.S. at 689; *see also Hamama v. Adducci*, 349 F.Supp.3d 665, 686–89, 692 (E.D. Mich. 2018) (Dkt. 490); *Hamama v. Adducci*, 285 F.Supp.3d 997, 1009–1010 (E.D. Mich. 2018) (Dkt. 191), *vac'd and remanded on other grounds*, 912 F.3d 869 (6th Cir. 2018). "[O]nce removal is no longer reasonably foreseeable," the Court held, "continued detention is no longer authorized by statute." *Zadvydas*, 533 U.S. at 699.

Because "[r]easonableness" must be assessed "primarily in terms of the statute's basic purpose, namely assuring the alien's presence at the moment of removal," *Zadvydas* held that "if removal is not reasonably foreseeable," a reviewing court "should hold continued detention unreasonable and no longer authorized by statute." *Id.* To ensure uniformity and minimize the need for courts to make "difficult judgments," the Court recognized a six-month period of post-final order detention under § 1231(a)(6) as "presumptively reasonable." *Id.* at 701. Beyond that six-month period, a noncitizen "may be held in confinement until it has been determined that there is no significant likelihood of removal in the reasonably foreseeable future." *Id.*

When ICE itself reviews the custody of individuals detained beyond that "presumptively reasonable" period, it is directed by a post-*Zadvydas* regulation to consider a nonexclusive list of factors to determine whether there is a "significant likelihood" of the individual's removal "within

the reasonably foreseeable future."[8] 8 C.F.R. § 241.13(f). *Zadvydas* also emphasized that for detention "to remain reasonable as the period of prior postremoval confinement grows, what counts as the 'reasonably foreseeable future' conversely would have to shrink." *Zadvydas*, 533 U.S. at 701; *see also Hamama*, 349 F.Supp.3d at 692. Consistent with these context-sensitive criteria, the Settlement Agreement defines the "reasonably foreseeable future" for purposes of the Special Master's review under Section IV.B.4.d to be "no longer than the next ninety (90) days," but also provides that it "could, depending on the circumstances, be shorter." Agreement § IV.B.4.d.ii.6.

Under *Zadvydas*'s interpretation of § 1231(a)(6), the noncitizen bears the initial burden of providing "good reason to believe that there is no significantly likelihood of removal in the reasonably foreseeable future," after which "the Government must respond with evidence sufficient to rebut that showing." *Zadvydas*, 533 U.S. at 701. However, under the Settlement Agreement the Class Member's initial burden is only to show that the triggering conditions for the Special Master's review have been satisfied—at which point ICE must affirmatively "demonstrate[] a significant likelihood of removal within the reasonably foreseeable future" for detention to continue. Agreement §§ IV.B.4.d.ii.4, IV.B.4.d.ii.6; *see* Order of the Special Master at 5–8 (Feb. 9, 2026) (Dkts. 750, 751); Order of the Special Master at 8–11 (Mar. 4, 2025) (Dkts. 738, 739); Order of the Special Master at 5–9 (Sep. 26, 2024) (Dkts. 735, 736); *cf. Roble v. Bondi*, 803 F.Supp.3d 766, 772–73 (D. Minn. 2025) (when seeking to revoke release and detain an individual under 8 C.F.R. § 241.13(i)(2), ICE bears the evidentiary burden to establish that the claimed change in circumstances makes removal significantly likely in the reasonably foreseeable future); *Nguyen v. Hyde*, 788 F.Supp.3d 144, 150 n.2 (D. Mass. 2025) (same). If ICE has not removed the Class Member within 180 days, that standard obliges ICE to "clearly demonstrate[] a very high of imminent removal, by demonstrating that Iraq has already provided a Travel Document and ICE has already arranged a removal itinerary for the very near future." Agreement § IV.B.4.e; Order of the Special Master at 9–10 (Mar. 15, 2026) (Dkts. 766, 767); Order of the

---

[8] The regulation directs agency officials to consider "all the facts of the case" when conducting these reviews, including, "but not limited to":

> the history of the alien's efforts to comply with the order of removal, the history of the [agency's] efforts to remove aliens to the country in question or to third countries, including the ongoing nature of the Service's efforts to remove this alien and the alien's assistance with those efforts, the reasonably foreseeable results of those efforts, and the views of the Department of State regarding the prospects for removal of aliens to the country or countries in question.

8 C.F.R. § 241.13(f).

Special Master at 9–10 (Feb. 9, 2026) (Dkts. 750, 751); Order of the Special Master at 9–10 (Sep. 26, 2024) (Dkts. 735, 736).

### III. Application to the Motion for Release

In its opposition, ICE argues that Mr. █████████ 's motion should be denied because (1) "ICE has presented evidence that a Travel Document has been requested" for Mr. █████████ and (2) removal is significantly likely to occur within the reasonably foreseeable future because "ICE is in the process of securing alternative plans for removal" of Mr. █████████, possibly involving removal to the United Kingdom or Mexico in lieu of Iraq since those countries were expressly designated in his removal order. Opp'n to Release at 7. However, the generalized, conclusory statements that ICE has submitted fall very far short of what is required under the Settlement Agreement to demonstrate a significant likelihood of removal in the reasonably foreseeable future—to speak nothing of "a very high likelihood of imminent removal"—since they lack the requisite specificity, detail, or documentary support to satisfy ICE's evidentiary burden.

*First*, while ICE states it has presented evidence "that a Travel Document *has been requested*" from some unspecified country for Mr. █████████, an examination of the declaration submitted in support of its opposition does not, in fact, indicate that a Travel Document has been requested from any country.[9] *Id.*; *see* Bradley Decl. ¶¶ 21–22. Moreover, even if it were more clear from the submitted evidence that a Travel Document had been requested, ICE's generalized statements would remain insufficient to satisfy its burden. Section IV.B.4.d.ii.4 requires ICE to provide evidentiary support "showing" that Iraq "has indicated that it will issue a Travel Document." Agreement § IV.B.4.d.ii.4. When construed to apply to apply to "Class Members whom ICE seeks to remove to a third country," as directed by Section IV.C, that same provision requires ICE to provide evidentiary support "showing that the third country in question "has indicated that it will issue a Travel Document." *Id.* §§ IV.B.4.d.ii.4, IV.C; *see* Order of the Special Master at 8–9 (Feb. 22, 2026) (Dkts. 759, 760); *cf.* 8 U.S.C. § 1231(b)(2)(E)(vii) (permitting, under specified circumstances, removal to a third country "whose government *will accept* the alien into that country" (emphasis added)). By its terms, this provision demands evidence about what *the prospective country of removal* has indicated about its willingness and ability to issue a travel

---

[9] While ICE states that Mr. █████████ has not cooperated with ICE's efforts to obtain a Travel Document, Bradley Decl. ¶¶ 21–22, Class Counsel recounts that Mr. █████████ disputes this characterization by stating "that he did not understand what he was being asked to sign and was asking for the documents to be explained to him." Class Counsel Reply at 7 n.1. Given the limited evidence submitted, and the conflicting nature of these accounts, the record is inconclusive and no finding about Mr. █████████ 's cooperation is being made.

document—not evidence about U.S. officials' own hopes, desires, or efforts.[10] And here, the evidence does not show that either Iraq, the United Kingdom, or Mexico "has indicated" its willingness and ability to issue a travel document, either at all or within a timeframe and under circumstances that would enable removal to be significantly likely within the reasonably foreseeable future. *See* Order of the Special Master at 8–10 (Feb. 22, 2026) (Dkts. 759, 760); Order of the Special Master at 5–7 (Feb. 9, 2026) (Dkts. 750, 751); Order of the Special Master at 6–8 (Mar. 4, 2025) (Dkts. 738, 739).

*Second*, ICE's evidentiary support is also insufficient to demonstrate that Mr. ███ ██████ 's removal is significantly likely in the reasonably foreseeable future—whether to Iraq, the United Kingdom, Mexico, or somewhere else. To the extent that ICE intends to remove Mr. ████████ to Iraq, the District Court's findings about the longstanding obstacles to effectuating removals to Iraq—including in cases in which individuals were not subject to stays of removal, and in which Travel Documents had been issued, *Hamama*, 349 F.Supp.3d at 695–96—establish a factual baseline that is highly relevant when assessing the evidentiary showing required for ICE to demonstrate a "significant likelihood of removal within the reasonably foreseeable future." In seeking to satisfy its burden, the only affirmative evidentiary support that ICE provides comes from an ICE official's statements representing that "ICE has the means to remove Iraqi nationals and has done so successfully over the past few years." This evidentiary support is even less substantial than the thin evidentiary support that was determined to be inadequate in previous ICE oppositions to motions for release before the Special Master concerning the likelihood of removal to Iraq. *See* Order of the Special Master at 7–8 (Feb. 9, 2026) (Dkts. 750, 751); Order of the Special Master at 8–11 (Mar. 4, 2025) (Dkts. 738, 739); Order of the Special Master at 5–9 (Sep. 26, 2024) (Dkts.

---

[10] Even if evidence of ICE's own efforts could satisfy the express terms of Section IV.B.4.D.ii.4, ICE's vague and cursory statements about those efforts would nevertheless be insufficient. *See, e.g.*, *Vu v. Noem*, No. 25-cv-1366, 2025 WL 3114341, at *6 (E.D. Cal. Nov. 6, 2025) (burden under 8 C.F.R. § 241.13(i)(2) not satisfied by "general assertion that ICE is 'making efforts' to obtain travel documents"); *Sun v. Noem*, No. 25-cv-2433, 2025 WL 2800037, at *2–3 (S.D. Cal. Sep. 30, 2025) (burden under 8 C.F.R. § 241.13(i)(2) not satisfied by "vague assertions" and "threadbare evidence" that they are "*preparing* to apply for the necessary documents to remove Petitioner"); *Roble v. Bondi*, 803 F.Supp.3d 766, 773 (D. Minn. 2025) (burden under 8 C.F.R. § 241.13(i)(2) not satisfied by "bare fact that ICE officials in St. Paul have requested third-country removal assistance from ICE headquarters"); *Hoac v. Becerra*, No. 25-cv-1740, 2025 WL 1993771, at *4 (E.D. Cal. July 16, 2025) (burden under 8 C.F.R. § 241.13(i)(2) not satisfied by ICE's assertion of "inten[t] to complete a travel document request"); *Nguyen v. Hyde*, 788 F.Supp.3d 144, 152 (D. Mass. 2025) (burden under 8 C.F.R. § 241.13(i)(2) not satisfied when ICE "ha[s] not identified what concrete steps [it] has taken" to process travel document; *Singh v. Gonzales*, 448 F.Supp.2d 1214, 1219–20 (W.D. Wash. 2006) (assertions that "ICE has done all it can to obtain travel documents from India" and "has been successful in repatriating Indian citizens" are insufficient to establish significant likelihood of removal in the reasonably foreseeable future).

735, 736). As with those previous cases, the extensive record developed over the course of the *Hamama* litigation casts doubt on whether such brief, generalized statements are sufficient to establish a "significant likelihood of removal within the reasonably foreseeable future." *See, e.g.*, Order of the Special Master at 7–8 (Feb. 9, 2026) (Dkts. 750, 751).

Moreover, as ICE acknowledges, Bradley Decl. ¶ 24, the ongoing military conflict and closure of airspace in the Persian Gulf region has created significant uncertainties concerning the likelihood of any removals to Iraq taking place in the reasonably foreseeable future. *See* Order of the Special Master at 2–3, 8 (Mar. 15, 2026) (Dkts. 766, 767). While ICE surmises that "airspace at or near Iraq can reopen at any time in the very near future, and it is likely that a travel document and itinerary can be obtained so that removal . . . can occur," Bradley Decl. ¶ 24, such vague and speculative assertions are categorically inadequate to satisfy ICE's affirmative burden of demonstrating a significant likelihood of removal to Iraq within the reasonably foreseeable future— especially given the substantial doubt cast on those assertions by the surrounding circumstances. *See* Order of the Special Master at 8 (Mar. 15, 2026) (Dkts. 766, 767).

To the extent that ICE intends to remove Mr. ████████ to either the United Kingdom or Mexico instead of Iraq, its evidentiary support is also insufficient. ICE has not submitted any evidence indicating that it has contacted officials from the United Kingdom or Mexico about Mr. ████████'s case or taken any other concrete steps to pursue his removal to either of those third countries. Especially given the distinct, country-specific uncertainties and complications can arise when the government seeks to remove noncitizens to third countries—where removal necessarily depends on the willingness of another sovereign to accept a non-national—the lack of evidence showing that officials from either country have been contacted could be understood as dispositive. *See* Order of the Special Master at 10–11 (Feb. 22, 2026) (Dkts. 759, 760). Ordinarily, a third country's formal acceptance is required before removal of a non-national to that country can take place. AM. IMMIGR. COUNCIL, THIRD-COUNTRY REMOVALS IN UNITED STATES IMMIGRATION POLICY 2, 4  (Dec. 2025) (hereinafter AM. IMMIGR. COUNCIL, THIRD-COUNTRY REMOVALS, https://www.americanimmigrationcouncil.org/wp-content/uploads/2025/12/Third-Country-Removals-Factsheet_1225.pdf [https://perma.cc/N53N-VFYS] (noting that "[m]ost countries to which the United States seeks to deport people have to issue travel documents for them—which requires them to consent to accept that person from the United States," and that countries may be "willing to accept only a certain number of deportees, or deportees of a certain type—or may simply refuse to issue travel documents for a particular individual"). Since the United States would need to obtain that formal acceptance from either the United Kingdom or Mexico, the lengths of

time required to decide to pursue removal to that country, contact its officials, secure its willingness to accept the individual, and ultimately effectuate the individual's physical removal are all highly relevant when determining whether there might be a significant likelihood of removal in the reasonably foreseeable future. However, ICE's submission provides neither pertinent details nor documentary support concerning any of those matters—either in general or with respect to removal of third country nationals to the United Kingdom or Mexico specifically. *See* Order of the Special Master at 11–12 (Feb. 22, 2026) (Dkts. 759, 760). The possibility of legal claims against removal to either third country creates additional uncertainties and potential sources of further delay in effectuating removal. *See id.* at 12–14 (Feb. 22, 2026) (Dkts. 759, 760).

The foregoing considerations are sufficient to conclude that ICE has not established a "significant likelihood of removal within the reasonably foreseeable future," and on that basis to resolve the motion in Mr. ██████'s favor. However, it is also worth noting that the prolonged period of Mr. █████'s detention to date—at least 205 days as of the date of this order, a period well exceeding the six-month period that *Zadvydas* found "presumptively reasonable"—is relevant to any assessment of "reasonableness" under Section IV.B.4.d of the Settlement Agreement. As *Zadvydas* makes clear, "what counts as the 'reasonably foreseeable future' . . . shrink[s]" as the "period of prior postremoval confinement grows." *Zadvydas*, 533 U.S. at 701; *see also Hamama*, 349 F.Supp.3d at 692. Indeed, the Settlement Agreement itself embraces and operationalizes this same *Zadvydas*-derived principle. If a Class Member is detained for more than 180 days, the individual has the option of seeking an order for release directly from the Court, rather than from the Special Master—upon which the individual must be released unless ICE "clearly demonstrates a very high likelihood of imminent removal, by demonstrating that Iraq has already provided a Travel Document and ICE has already arranged a removal itinerary for the very near future." Agreement § IV.B.4.e.

While Section IV.B.4.e does not purport by its terms to apply its high standard directly to cases under Section IV.B.4.d, it would be anomalous for ICE to be held arbitrarily to different substantive standards, based on the same facts, in cases that concurrently fall within the purview of both the Special Master and the Court—especially since reasonableness under Section IV.B.4.d itself requires a more stringent standard "as the period of prior postremoval confinement grows." *Zadvydas*, 533 U.S. at 701; *see Hamama*, 349 F.Supp.3d at 692. As such, for Class Members who may be eligible to seek an order of release from the Court under Section IV.B.4.e, the reasonableness analysis under Section IV.B.4.d must be closely guided by the same factors and considerations that underlie Section IV.B.4.e, if not the identical standard. *See* Order of the Special

Master at 9–10 (Mar. 15, 2026) (Dkts. 766, 767); Order of the Special Master at 9–10 (Feb. 9, 2026) (Dkts. 750, 751); Order of the Special Master at 9–10 (Sep. 26, 2024) (Dkts. 735, 736).

In any event, as discussed above, ICE has not provided sufficient evidence to demonstrate a "significant likelihood of removal in the reasonably foreseeable future" without regard to either the criteria and factors specifically embodied in Section IV.B.4.e or, as instructed by *Zadvydas*, 533 U.S. at 701, the length of Mr. ███████'s detention generally. Accordingly, it necessarily follows that the evidentiary support provided by ICE is insufficient when taking the prolonged length of detention for more than 180 days into account, whether under Section IV.B.4.e directly or under the reasonableness analysis required by Section IV.B.4.d.ii.6.

## CONCLUSION

For the foregoing reasons, the Special Master grants the motion for release. Consistent with Section IV.B.4.d.8 of the Settlement Agreement, the order of release does not preclude detention for removal for up to thirty (30) days "once an itinerary is finalized and the Class Member has returned to ICE custody." Given the considerations discussed above regarding the uncertainties arising from the military conflict in the Persian Gulf region, any itinerary for removal to Iraq should not be considered "finalized" for this purpose unless, in light of the totality of the surrounding circumstances, it reflects a removal plan that clearly supports a finding that removal is significantly likely to occur within the reasonably foreseeable future. *See Zadvydas*, 533 U.S. at 699, 701; Agreement §§ IV.B.4.d.ii.6, IV.B.4.e.

Date: April 3, 2026

/s/ Anil Kalhan
ANIL KALHAN
Special Master

16

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served and filed, as required under the terms of the Settlement Agreement (Dkt. 717-2) and Second Amended Stipulated Order Appointing Special Master (Dkt. 737) in *Hamama v. Adducci*, No. 17-cv-11910 (E.D. Mich.), on April 3, 2026.

/s/Anil Kalhan
Special Master